using historically for counting and reporting subscriber numbers.[9]  Karen Chrosniak testified as a

prosecution witness that Adelphia had consistently used the "prevailing rate" method in counting

"Equivalent Bulk Units" (EBUs) and that the numbers that Adelphia reported in 2000 and 2001

were in substantial excess of what should have been reported under that methodology.

[Comerford Decl. Ex. B: Trial Tr. 5501, 5508-13.] Similarly, James Brown testified that the

prevailing rate methodology was used and inappropriate additions were made to it to

fraudulently manipulate subscriber numbers. [Trial Tr. 6264.]  By contrast, the defense sought to

establish that Adelphia had used a different method and that the reported numbers did not inflate

the number of subscribers under the legitimate method Adelphia had long utilized.

The August 9, 2002 letter from Adelphia's counsel to the government powerfully rebuts

Ms. Chrosniak's and Mr. Brown's testimony. Specifically, counsel for Adelphia made it clear

that Adelphia had *not* traditionally been using the prevailing rate method, but that it was *now*

going to include that method in its reporting.  The letter states:

> Historically, Adelphia calculated its number of subscribers by counting the
> number of households (or in the case of households with multiple billing
> accounts, the number of accounts) that receive signals from its cable system (the
> "Subscriber Accounts").  For example, in the Company's Form 8-K filed with the
> SEC on June 10, 2002, the Company reported that management's best estimate of
> the number of subscribers as of December 31, 2001 was 5,763,000; that number
> was the number of Subscriber Accounts and excluded the Subscriber Accounts of
> the Rigas Family Managed Entities and the Brazilian and Venezuelan joint
> ventures (the "Excluded Accounts").  The Company's new management intends
> to improve the quality of the Company's public disclosure.  In connection with
> that effort, the Company intends to report two different subscriber numbers – the
> Subscriber Accounts and the "Equivalent Subscribers."  Equivalent Subscribers is
> a notional number that in general is obtained by dividing the total revenue for
> basic cable services in each market by the prevailing rate in the market.  The

---

[9] The dispute in this regard turned on what method of counting "bulk units" Adelphia had, in fact been using
historically.  These "bulk units" are apartment buildings or complexes that have multiple individual subscribers –
even though the building or complex managers pay only one collective bill.  Within the industry there are different
accepted methods for counting the number of individual subscribers within these units.  [Comerford Decl. Ex. B:
Trial Tr. 5497.]  The "prevailing rate" method is just one of the accepted methodologies.

difference between Subscriber Accounts and Equivalent Subscribers results principally from bulk billing for multiple dwelling units.

[Comerford Decl. Ex. J: Letter P. Korologos to Timothy J. Coleman, U.S. Att'y Office at 30 n.1 (Aug. 9, 2002).]

This description is directly contrary to Chrosniak's and Brown's testimony that Adelphia used a prevailing rate method and their claim that Adelphia (through the Rigases) then added in inappropriate categories of subscribers to fraudulently increase subscriber numbers.[10]

The defense sought to show that Adelphia's 2000 and 2001 reports were consistent with its historic method of counting by introducing a 10-K issued by the new Adelphia Board on June 10, 2002, showing a subscriber figure substantially similar to the one that the Rigas-controlled Board had announced. [Comerford Decl. Ex. L: Adelphia Comm'c Corp., June 2002 8K at ¶ 5 (June 10, 2002).] But the government successfully fought against admission of that 10-K, arguing that it was using a counting method different than that historically used by Adelphia: "You can make an examination and if you use different criteria, you may come up with a different number. . . . Ms. Chrosniak just explained to the Court and the jury about EBUs, and that's how she understood Adelphia had calculated them in the past." [Comerford Decl. Ex. B: Trial Tr. 5531:12-14; 5540:1-4.]  The letter the government had in its possession, but did not disclose, exposes the disingenuousness of that argument. This is yet another example of the government presenting a theory to the jury and the Court that it knew was contradicted by other material evidence in its possession that had been withheld from the defense.

---

[10]  Indeed, in November 2002, when Adelphia's new board first started reporting both figures – one under its historical method and one under the new "prevailing rate" method – the historical method yielded an estimate of about 400,000 (or 8%) higher than the prevailing rate method's estimate. [Comerford Decl. Ex. K: Adelphia Comm'c Corp., November 2002 8K at 2 (Oct. 25, 2002).] This is what one would expect because the "prevailing rate" method underestimates the number of actual subscribers.  It does that because bulk units receive discounted rates (wholesale rates, so to speak), meaning that each individual unit does not pay the "prevailing rate" of individual subscribers (retail rate, so to speak).

***

The suppressed exculpatory evidence described above would have enabled the defendants to present a far more compelling defense on a great many of the most central components of the case. There is strong reason to believe that had the jury heard this evidence it would have discredited several of the government's witnesses and bolstered the defendants' claim that they reasonably relied on the advice of counsel and were not criminally responsible for many of the acts and omissions at issue. Similarly, the evidence would have informed the sentencing inquiry in essential ways. The Rigases have now served over four years in prison and John Rigas will soon turn 87 years old. He must not be condemned to die in prison, and Timothy Rigas must not be condemned to spend the next decade in prison, based on a trial infected by such grievous *Brady* errors. They are entitled to a new trial (or, at the very least a new sentencing).

## III. THE GOVERNMENT VIOLATED THE RIGASES' CONSTITUTIONAL RIGHTS BY CAUSING ADELPHIA TO WITHDRAW ADVANCEMENT OF LEGAL FEES AND BY CAUSING ADELPHIA TO CLOSE OFF ACCESS TO CRITICAL WITNESSES AND EVIDENCE.

In July 2002 the President's Corporate Fraud Task Force was created to wage a "war on corporate crime." *See* Lisa Griffin, *Compelled Cooperation and the New Corporate Criminal Procedure*, 82 N.Y.U. L. Rev. 311, 314 (2007) [Comerford Decl. Ex. M.] During the several years that followed, the government engaged in several, now-discredited, extraordinarily aggressive approaches to enlist corporate collaboration in the prosecution of a company's former officers, directors and employees. Using threats of indictment with corporations that refused to "cooperate," prosecutors were able to pressure corporations to take an array of actions to advance the prosecution's interests – often through crippling individual defendant's rights to mount a meaningful defense. The central operational plan for these tactics was set forth in directives from the Department of Justice – first the Holder Memorandum and later the

Thompson Memorandum. [Comerford Decl. Ex. N & O.] The nature of the techniques and the intensity with which they were employed were unprecedented.

The tide on these practices began to turn in 2006, when the court in *Unites States v. Stein*, 435 F. Supp. 2d 330 (S.D.N.Y. 2006), *aff'd*, 541 F.3d 130 (2d Cir. 2008), applied clearly established law to hold that the government had violated the defendants' constitutional rights by pressuring the accounting giant KPMG to withhold indemnification from various individuals the government was prosecuting.  Later that year, the Department of Justice issued a new set of policies (through the McNulty Memorandum) that scaled back on some of the particularly egregious approaches it had adopted. *See, e.g.,* Andrew Weissmann & Ana R. Bugan, *The McNulty Memorandum*, NAT'L L.J. (Feb. 5, 2007) [Comerford Decl. Ex. P.]

The prosecution of the Rigases, the first case brought by the Task Force, took place during that short era in which the prosecution's role in co-opting corporations to secure their cooperation was at its peak. Although the government's role did not come to light until well after the Rigases were convicted, it is now evident that the government – through the Holder Memorandum and through extensive direct interactions with Adelphia – enlisted Adelphia as its soldier in manners that violated the Rigases' rights under the Fifth and Sixth Amendments.

The Rigases raised some of these issues in a 2008 pre-trial motion to dismiss the pending tax charges in the Middle District of Pennsylvania.  In his opinion addressing the claim, Judge John E. Jones wrote that "the arguments raised in the Rigases' Motion to Dismiss give us significant pause." *United States v. Rigas*, No. 05-cr-402, 2011 WL 2371554, at *1 (M.D. Pa. June 14, 2011). Judge Jones concluded, though, that the arguments were ones to be raised before this Court in a motion under Section 2255 or otherwise.  Hence, he denied the motion to dismiss

in deference to the propriety of this Court having the opportunity to address the issues first.[11] Indeed, the government also argued there that the "issues raised in the motion are more appropriately the subject of collateral attack in the Southern District of New York." [Comerford Decl. Ex. Q: Gov't Br. in Supp. of Objections & Mot. for Protective Order at 12; *see also id.* at 17 (asking court to halt discovery because the "issue best lay in the Southern District of New York").] These Motions are that collateral attack. The Rigases are entitled to discovery on these issues and an evidentiary hearing which will confirm their right to relief.

## A.   The Actions Taken by Adelphia

In early 2002, in response to SEC changes in accounting policies after the corporate scandals involving Enron and Worldcom, Adelphia's auditors (Deloitte) recommended that Adelphia make additional disclosures specifying the precise amounts of the co-borrowing allocated to Adelphia and the amounts allocated to the Rigas family entities. That disclosure was made on March 27, 2002. [Comerford Decl. Ex. R: Press Release, Adelphia Comm'c Corp., Table 3, n.6 at A0757973 (Mar. 27, 2002).] The price of Adelphia's stock dropped and the government launched the investigation into Adelphia and the Rigases that culminated in this

---

[11]   Judge Jones mistakenly believed that the Rigases had already filed motions under Section 2255 but had failed to raise the issue. That is, of course, not the case. The Rigases have filed no Section 2255 motions prior to this one. After the Rigases moved for reconsideration, the Court clarified its mistake. *United States v. Rigas*, No. 05-cr-402, slip op. at 2 & n.1 (M.D. Pa. Aug. 12, 2011).

prosecution.[12]  During the ensuing months, Adelphia took a series of actions that had dramatic

impact on the Rigases and the outcome of the trial.

To begin with, in mid-May 2002, several outside Board members asked John Rigas (who

served as Chairman and CEO) and Timothy Rigas (who served as CFO) to resign both their

management and Board positions with Adelphia. [T. Rigas Decl. ¶¶ 14-16, 20.] In negotiating

the terms of the resignation in mid-May, the Board repeatedly reduced the severance package it

was offering, on the ground that the government was not happy with the amount the Board was

willing to pay.  Throughout all these discussions, though, one thing was always clear: Adelphia

agreed it would honor its obligations to advance legal fees and to indemnify the Rigases.[13] [*Id.* ¶¶

21-23.] This guarantee was made an explicit part of John Rigas's severance agreement, executed

on May 23, 2002. [T. Rigas Decl. Ex. 1: Agreement between Adelphia Comm'c Corp. & the

Rigas Family § 11 (May 23, 2002).]

---

[12] One of the prosecutors in this case later explained how he determines whom to investigate:

> More often than not, it starts with a newspaper article. Every morning, Mr. Owens says, he scrutinised the financial pages looking for people to subpoena. It was a banal report in *The Wall Street Journal* about a sale of stock in ImClone Systems, a pharmaceutical company, just days before the U.S. Food and Drug Administration declined to approve a drug that led to Martha Stewart, the television personality, serving a five-month jail term for obstruction of justice. Mr. Owens says: "I circled the article with a red pen, walked down the hall with The Wall Street Journal under my arm, found a prosecutor and said: 'This stinks, cut some subpoenas.' Next thing we knew, Martha Stewart was in our office, lying."

[Comerford Decl. Ex. S: Carl Mortished, *Beware the Long Arm of American Law*, THE TIMES (London) Online (April 28, 2007).]

[13] Adelphia's Bylaws required the Company to advance legal fees whenever a person is made a party to any proceeding, civil or criminal, "by reason of the fact that the person ... is or was a director or officer of the Corporation." [Comerford Decl. Ex. T: Bylaws, §§ 6.1, 6.2 (Sept. 30, 1999)]. The only exception is when the "Board of Directors or independent legal counsel reasonably determines that such person deliberately breached his duty to the Corporation or its shareholders." John Rigas, who was Adelphia's founder, chairman and CEO until May 2002 has submitted a declaration affirming he is not aware of any situation in which Adelphia declined a request to advance legal fees to an officer or director prior to its 2002 decision regarding the Rigas family.  [J. Rigas Dec. at ¶ 2.]

On June 1, 2002, just more than a week after the May 23 Agreement, Adelphia had an abrupt change of heart with reference to its commitment to advance legal fees to the Rigases and decided it would renege on its agreement. [T. Rigas Decl. ¶ 27.] Adelphia also forced the withdrawal of Fried Frank despite its earlier agreement that the Firm would be able to represent the Rigases if a conflict ever developed between them and Adelphia. [*Id.* ¶¶ 4-8.] And Adelphia abruptly withdrew from the Joint Defense Agreement that it had entered into with the Rigases.

Several months later, after the Rigases had been indicted and had begun the process of preparing their defense (as best they could without access to advancement of fees from Adelphia), Adelphia issued a series of directives barring all Adelphia employees from having any contact with the Rigases or their representatives. An October 14, 2002 memorandum from General Counsel Randy Fisher directed all Adelphia employees that if approached by the Rigases or any of their defense team, the employees should tell them "it would be inappropriate to answer any questions or provide any information." [Comerford Decl. Ex. U: Mem. from Randall D. Fisher, Vice Pres. & Gen. Counsel to All Adelphia Employees at 2 (Oct. 14, 2002).]

Throughout the pre-trial and trial periods, Adelphia also worked aggressively to restrict the Rigases' access to their *own personal resources* to fund their defense. As part of the Adelphia bankruptcy proceedings, Adelphia secured a restraining order against the Rigases' selling property in order to pay their criminal defense attorneys. Thus, the Rigases were forced to go to the Bankruptcy Court and litigate extensively over how much money they could use to defend themselves – a process that delayed payments extensively, impaired the defense preparation and investigation in irreparable ways, and itself cost millions of dollars in litigation costs.

As will be explained below, these measures had a devastating impact on the Rigases' ability to mount their defense.   Nonetheless, there was nothing the Rigases could do at that time to challenge Adelphia's action as unconstitutional. Given Adelphia's apparent status as a private actor, there was no constitutional impediment to Adelphia's taking these actions. Hence, the Rigases had no choice but to proceed to trial without any possibility of attacking the various obstacles Adelphia had placed in their way.

**B.      Revelations About the Role of the Government**

In the years since they were convicted, the Rigases have obtained evidence that dramatically alters the constitutional implications of the injuries they suffered. It is now clear that Adelphia was not acting as a purely private actor but was instead acting in concert with, and at the behest of, the government in significant ways. The evidence already shows this, and Movants are confident that the additional evidence that will emerge during discovery and an evidentiary hearing will bolster this showing even further.

Over the course of the years since trial the Rigases have obtained evidence on these topics from a variety of sources, including discovery in Adelphia's civil action against them, various administrative proceedings and, most recently, discovery ordered by Judge Jones in the tax prosecution pending against the Rigases in the Middle District of Pennsylvania. The information now available, taken together with various pieces of evidence available earlier, paints a picture of an extraordinarily close working relationship between Adelphia and the government.  Adelphia worked hand-in-hand with the government and allowed the government to call the shots in directing and approving Adelphia's decisions vis-à-vis the Rigases and other key players in this prosecution. The evidence also reveals that the Adelphia Board placed the goal of appeasing the government to avoid corporate indictment as its highest imperative and understood that the best way to accomplish this goal was to meld its behavior to each of the

factors set forth in the Holder Memorandum.  As Judge Jones stated, the government does not dispute that it put pressure "upon the company to cooperate against the Rigases or face potential corporate indictment." *United States v. Rigas*, No. 05-cr-402, 2011 WL 2371554, at *2.

### 1.    May to June 2002

The first example of the government's role in directing Adelphia's actions was in the government's extreme pressure on Adelphia to oust the Rigases.  On or around May 15, 2002, Audrey Strauss (an attorney with Fried Frank who was representing Adelphia) told Adelphia's Board that the government was disappointed with the level of cooperation it was getting from Adelphia and that a continued failure to cooperate (as the government viewed it) would be met with serious consequences, including potential indictment of Adelphia.  [T. Rigas Decl. ¶ 17; J. Rigas Decl. ¶ 6.] On May 17, 2002, lawyers from the United States Attorney's Office and the SEC met with lawyers representing Adelphia and several directors. The government lawyers conveyed the message that the only way for Adelphia to avoid indictment would be for it to oust the Rigases from control of the Board. (John and Timothy Rigas had, by that time, already been forced to resign their management positions). [T. Rigas Decl. ¶¶ 18-19.]  Erland Kailbourne, one of Adelphia's outside Board members who was particularly involved in the discussions and who knew about the cooperation the Rigases were providing, indicated that he was shocked that anyone could be alleging that the Rigases were being less than fully cooperative with the government at that stage.

In keeping with the government's directions, the Adelphia Board met the following day and discussed the need to secure the resignations of all Rigas family members from the Adelphia Board. [T. Rigas Decl. ¶ 18-19; Comerford Decl. Ex. V: Adelphia Comm'c Corp., Mins. of a Meeting of the Board of Directors (May 18, 2002).] Mr. Kailbourne told the Board that the government was demanding the resignations and this would be the only way to save the

Company (despite Mr. Kailbourne's expressing his view that the Rigases had not engaged in any wrongdoing). [T. Rigas Decl. ¶ 19; J. Rigas Decl. ¶ 5.] To accomplish this, the Board discussed various severance packages that might be offered, all of which included a reaffirmation of the Company's obligation to advance legal fees and to provide indemnification. [T. Rigas Decl. ¶¶ 20-22; Comerford Decl. Ex. V.] With regard to a severance package being discussed, Len Chazen (one of the attorneys from Covington, who was representing the Special Committee) cautioned that "the government might not permit that type of arrangement if the members of the Rigas family did not cooperate with the investigation of the Special Committee."[14] [Id. at 2.] Notes taken by attorney Bruce Booken (of Buchanan Ingersoll) also indicate that the government's "focus" at the meeting was to "stop the flow $ or control flow $ to Rigas family." [Comerford Decl. Ex. W: B. Booken & C. Rothenberger, Notes of Board Meeting at 2 (May 18, 2002).] Similarly, notes taken by attorney Carl Rothenberger describe the focus as the "need to stop flow of funds to family." [Id. at 4.]

On May 23, 2002, Adelphia and the Rigases executed an agreement that set forth the terms they had negotiated. [T. Rigas Decl. ¶ 24, Ex. 1.] These included an explicit reaffirmation that the company would advance legal fees and indemnify the Rigas family members, as required by the company's bylaws and by Delaware law and as Adelphia had consistently done with each and every employee in the past. [Id.] See supra note 13. This obligation was undertaken, even though the company was aware of the allegations (as revealed in a Form 8-K filed with the SEC on the next day) that the Rigases may have acted improperly. [Id. ¶ 26.]

During a Special Committee meeting two days later – on Saturday May 25, 2002 – the committee was given a report on the status of discussions with the government. Notes taken by

---

[14] It has now become clear that the cooperating with the Special Committee's investigation was a euphemism for cooperating with the government, given Adelphia's own boasts that it was turning over to the government each and every piece of information it learned.

Pete Metros indicate that there had been a conversation on "Thur. PM" with the "Chief Secur/Fraud" and that the government was "appalled at the deal." [Comerford Decl. Ex. X: P. Metros, Notes of Special Committee Meeting at 4 (May 25, 2002).]  The notes refer to the need to "put together a story."

During the week following that meeting at which it learned that the government was "appalled," Adelphia changed its direction dramatically and decided that it would not offer the Rigases any indemnification after all – despite the 5/23 Agreement, the Bylaws, and Delaware law. In a June 1 Board meeting, the Special Committee announced that it had determined that indemnification was inappropriate because the Rigases has "deliberately breached their duties to the Company and its shareholders by failing to cooperate with the Special Committee in its investigation by declining to provide full and complete answers to the Special Committee and by participating in related party transactions for their benefit to the detriment of the Company without appropriate disclosure and approval of the Board of Directors." [Comerford Decl. Ex. Y: Adelphia Comm'c Corp., Mins. of a Meeting of the Board of Directors at 3 (June 1, 2002).] There was no account of how any investigation had led to that conclusion during that one week – a week in which the Rigases had continued to cooperate in the investigation and in which the Committee had interviewed only three minor witnesses, who provided no evidence inculpating the Rigases in any way.  Instead, it appears that this was the way in which the Special Committee "put together a story" to renege on its obligations to the Rigases and appease the government.

Mr. Metros took notes at this meeting, which indicate that the government was now pleased with changes that had been made in the agreement with the Rigases.  The notes also contain a passage stating. "Special Committee  Section 6.2–Atty Fees; Bd of Directors will be

breached/No attys fees." [Comerford Decl. Ex. Z: P. Metros, Notes of Board Meeting at 3 (June 1, 2002) (emphasis added).]

The report to the Board from Special Committee Member Les Gelber also connects the government to the decisions that were being made. He explained that that "he had described to officials at the Securities and Exchange Commission and the Justice Department the progress of the investigation of the Special Committee" and "that the officials with whom Mr. Gelber had met appeared satisfied at the progress of the Special Committee." [Comerford Decl. Ex. Y: Mins. of Meeting of Board of Directors at 3.]

### 2.    June to October 2002

The now-available evidence reveals that the government's micromanagement of Adelphia's decisions and pressure on Adelphia continued in the months following the June decision to revoke the fee-advancement and indemnification agreement. For example, in July 2002 Adelphia was about to place seven employees on paid administrative leave pursuant to an agreement with each employee. The terms of the agreements conditioned these individuals' continued salary on their willingness to cooperate with the government and to be interviewed by Unites States Attorney's Office and the SEC. On July 30, before entering the agreements, Covington lawyer Bruce Baird forwarded a draft of the agreements to Assistant United States Attorney Christopher Clark asking, "Chris, does this do the trick?" [Comerford Decl. Ex. AA: Email, C. Clark, Asst. U.S. Att'y, to B. Baird (July 31, 2002).] Assistant U.S. Attorney Clark answered the following day, with an e-mail stating, "new agreement is okay, provided that our agreement relating to your interviews of our co-operators in [sic] still in effect." [*Id.*] (The reference to the earlier agreement apparently refers to Adelphia's earlier agreement not to interview any witnesses identified by the government as off-limits.)

The very next day, Covington sent a letter to the government seeking to make the case for why Adelphia should not be indicted. [Comerford Decl. Ex. BB: Letter, B. Baird to Timothy J. Coleman, U.S. Att'y Office (Aug. 1, 2002).] The letter explains that Adelphia has complied "to the letter" with the Holder Memorandum, which was attached as Exhibit A. [*Id.* at 11.] In a section addressing the section of the Holder Memorandum that assesses a company's cooperation with the prosecution (including the denial of indemnification), the letter declared that Adelphia "has done everything the government could wish for." [*Id.* at 2.]  According to the letter,

> The Company has shielded no one, forcing the resignation of the Rigases and working with the government to coordinate the appropriate replacement of employees found to have knowingly participated in improper activities.  Simply stated, the Company, through the Special Committee, has taken as its mandate the duty to provide complete and unqualified assistance to the government in its efforts to bring charges against the Company's former executives.

[*Id.* at 11.]  Strikingly, the letter indicated that Adelphia's response to the investigation was driven by the "government's approval of this response, indeed, its insistence that no less is acceptable." [*Id.* at 2.]

A few weeks later, on August 22, 2002, one of the lawyers from Boies Schiller who was representing Adelphia wrote an e-mail to Assistant U.S. Attorney Timothy Coleman forwarding a draft Application to the Bankruptcy Court for Adelphia to have funds authorized for Adelphia (which was by then in bankruptcy) to pay various cooperating witnesses' lawyers. [Comerford Decl. Ex. CC: Email, P. Korologos to Timothy Coleman, Asst. U.S. Att'y (Aug. 22, 2002).] The Application expressly stated that Adelphia wished to pay the cooperators' attorneys fees because there was a chance that these employees might cease cooperating with the government if they were unable to pay for counsel. [*Id.* at 6.] Ultimately, employees who were later deemed uncooperative (such as Carla Brown-Horn, Ed Hartman and Colin Higgin) had their indemnification and advancement of fees cut off while other employees who were cooperating

with the government (such as Karen Chrosniak, Luke Healy, Doug Malone, Timothy Werth, Dean Marshall and James Helms) continued to have their fees paid – even though many of them were accused of, and in some cases charged with, wrongdoing.  And, of course, Adelphia has continued to pay all legal fees of members of the Adelphia Board, even though they approved so many of the transactions which the government alleges were fraudulent.

Another example of Adelphia having taken steps to comply with the Holder Memorandum and to satisfy the government's ongoing interests was embodied in the October 14, 2002 Memorandum from Randy Fisher barring all Adelphia employees from communicating with the Rigases or their representatives. [Comerford Decl. Ex. U.] The Memorandum indicated that Adelphia was taking this step because it was committed to cooperating with the government in order to "help the company avoid prosecution." [*Id.* at 1.] This Memorandum explains the various ways in which Adelphia was working with the prosecutors and then stated that "[a]s part of this process, *I have been asked* to direct everyone" to follow specific procedures if contacted by any of the Rigases or their representatives. [*Id.* (emphasis added).] The Memorandum explains that "Adelphia continues to cooperate . . . by reviewing with the government . . . [its] communications with members of the Rigas Family, Rigas Family private entities employees, former Adelphia executives under indictment or any of their actual or purported counsel or representatives." [*Id.*] The context of the letter leaves little doubt that when Mr. Fisher stated "*I have been asked* to direct everyone," it was the government that did the "asking." (To the extent that there is any doubt about this, that question can be definitively resolved through discovery and an evidentiary hearing.)

### 3.    Adelphia's November 2004 Presentation to the Government

The intensity of the coordination between the government and Adelphia is most explicitly acknowledged in the presentation Adelphia made to the United States Attorney's Office on

November 5, 2004. [Comerford Decl. Ex. DD: *In re Adelphia Comm'c Corp.*, No. 02-ap-41729 (Bankr. S.D.N.Y.) Vinegrad Decl. & *Thompson Mem. Factors*, Presentation to U.S. Att'y Office (Nov. 5, 2004).] This remarkable presentation, entitled "Thompson Memorandum Factors," was part of Adelphia's continued effort to persuade the prosecution not to indict the company. [*Id.* ¶¶ 20-22.] A dominant theme in the presentation is that Adelphia took extraordinary measures to work with the government in the prosecution of the Rigases. The presentation divides this cooperation into five categories.

The first category, labeled "Providing Access to Privileged Materials," details how Adelphia provided the government with extensive information developed by the Special Committee and its outside counsel. [*Id.* at ACC-DOJ 00562.] This included the "450-page privileged investigation prepared by Special Committee's outside counsel," as well as "privileged summaries of more than 10 witness interviews conducted by counsel to the Special Committee, including summaries of seven witnesses who testified for the government at the *United States v. Rigas* trial."

The second area of cooperation set forth in the presentation is titled "Production of Documents and Other Information." [*Id.* at ACC-DOJ 00563.] In this regard, Adelphia told the government that it had produced for the government's benefit over 10 million pages of documents, 25 imaged local computer drives, 228 compact disks and access to the computer database. The presentation also referenced a July 17, 2002 agreement under which Adelphia undertook to "produce materials to the government as quickly as possible, even before conducting a privilege review."

The third category of cooperation Adelphia heralded was its "Assistance Before and During the *United States v. Rigas* Trial." [*Id.* at ACC-DOJ 00564.] This particular slide merits

full quotation as it reveals the extraordinary degree to which Adelphia and the government were

working hand-in-hand throughout the prosecution of the Rigases.

"Assistance Before and During the *United States v. Rigas* Trial."

- Adelphia has provided extraordinary assistance for over two years in connection
  with prosecution of the Rigases and others:

  o Detailed comments on the draft criminal complaint

  o Adelphia's forensic accountants made available to the Government on
    short notice

  o Assistance in the preparation of key witnesses

  o Real-time data analysis and other assistance during the trial

  o Review of 70,000 pages produced by the Rigases on the eve of trial

    ▪ Completed in one week (400 hours of work)

  o Analysis of all transactions between Adelphia and the Rigas entities over a
    3 ½ year period to rebut Rigases' defense that they could have repaid their
    debts to the company

    ▪ Completed before the end of the Government's case-in-chief
      (3,000 hours of work)

  o Adelphia spent several million dollars assisting the Government in
    connection with the trial

The presentation's fourth set of "cooperation" factors described Adelphia's assistance to

the government in the tax investigation of the Rigases. [*Id.* at ACC-DOJ 00565.] This included

collection and review of documents, availability of Adelphia employees and forensic auditors to

the government.

The final category of "cooperation" Adelphia put forth was entitled, "Adelphia Did Not

Obstruct the Government's Investigation." [*Id.* at ACC-DOJ 00566.] This discussion, in

particular, reveals the extent to which the steps that Adelphia took vis-à-vis the Rigases during

the early stages of the investigation were taken in concert with the government. The presentation

proclaims "Adelphia has provided extraordinary cooperation since the Rigases were removed from their positions at the Company." [*Id.*] In particular, it explains that the "Special Committee moved immediately to oust Rigases once it learned of Government's concerns" and that the "Special Committee's decisive action enabled Government to promptly identify culpable individuals and conduct extensive investigation." [*Id.*]

Adelphia's plan of appeasing the government worked. After hearing Adelphia's presentation, which emphasized all the ways in which it cooperated to facilitate the Rigases' convictions, the government chose not to indict the company (or any of the outside Board members who had been involved in many of the transactions that were the subject of the charges against the Rigases).

**4.     Other evidence of the relations between the Government and Adelphia**

The relationship between the government and Adelphia was further illuminated during the May 18, 2006 deposition testimony of Dennis Coyle, a former Adelphia director and General Counsel of Florida Power & Light, who was a member of the Special Committee.  Mr. Coyle testified that the Committee had virtually no role in its own investigation, because its attorneys had been "co-opted by the government." [Comerford Decl. Ex. EE: *Adelphia Comm'c Corp. v. Deloitte & Touche LLP et al.*, No. 000598 (C.P. Phila.) Coyle Dep. Tr. 640-41 (May 18, 2006).]

Finally, for now, it is important to touch on the interactions between the government and Adelphia in late 2004.  At that time, the Rigas Managed Entities (RMEs) were providing some indemnification and advancement of attorney fees for the Rigases' defense. The government approached Adelphia's counsel and expressed its extreme displeasure with this practice and explicitly threatened to indict the RMEs if they continued to offer any indemnification and fee-advancement to the Rigases. [McMichael Decl. ¶ 52.] Although this particular incident occurred

well after the trial it shows that during the years in question the government had a *modus operandi* of strong-arming companies with regard to indemnification and fee-advancement, as it did in 2002 with Adelphia, as it did in 2004 with the RMEs, and as it did with KPMG in the *Stein* case.

*   *   *

These descriptions of the relationship between Adelphia and the government demonstrate that the Adelphia Board and the Special Committee had become the government's handmaidens in relation to the investigation and the prosecution of the Rigases.  It has now become obvious that the various actions Adelphia took that crippled the Rigases' defense (beginning with their ouster from the company through the interference with access to evidence and funding) were actions taken either at the behest of the government or in response to clear signals that the government would be looking kindly at this type of "cooperation" in deciding whether to indict the company. These new revelations have enormous legal significance, as we will now explain.

### C.   Adelphia's Interference with the Rigases' Defense Constituted State Action Given Adelphia's Close Relationship and Coordination with the Government.

Supreme Court precedents demonstrate that Adelphia's interference with the Rigases' defense constituted state action given Adelphia's close relationship and coordination with the government.  Not only were the actions at issue brought about by virtue of pressure exerted through the Holder Memorandum, but, in addition, the government explicitly drove home that Adelphia would need to cooperate in every imaginable way if it had any hope of avoiding the death sentence of corporate indictment. Indeed, Adelphia was routinely securing the government's blessing on its actions to make sure they fit with the government's battle plan and would be seen as sufficient evidence of corporate cooperation.  This evidence more than satisfies the established standards for treating Adelphia's actions as "state action," and charging the

government with the constitutional implications of the interference with the Rigases' various rights under the Fifth and Sixth Amendments.

In *United States v. Stein*, 541 F.3d 130 (2d Cir. 2008), the Second Circuit thoroughly reviewed the Supreme Court's state action decisions in reaching the conclusion that the terms of the Thompson Memorandum (functionally identical to the Holder Memorandum) and the government's encouragement of KPMG's decisions there constituted state action. These precedents compel the identical conclusion here. The Holder Memorandum explicitly called on prosecutors when deciding whether to indict (and thereby destroy) a company to consider the various ways that companies were "cooperating" with the prosecution's requests – including whether they were advancing fees and indemnifying those whom the prosecution believed were culpable.

The Supreme Court's decisions establish that a private actor's actions constitute state action (and are thus chargeable to the government) when "there is a sufficiently close nexus between the State and the challenged action of the [private] entity so that the action of the latter may be fairly treated as that of the State itself." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974). This close nexus is present, of course, where the government affirmatively directs the private behavior, but is also present when the government has "provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982).

For example, in *Skinner v. Railway Labor Executives Ass'n*, 489 U.S. 602 (1989), the Federal Railroad Administration had promulgated regulations that *allowed – but did not compel* – railroads to conduct drug and alcohol testing of railroad employees in the absence of a warrant or even reasonable suspicion that alcohol or drug use was involved in the incident under

investigation. The Court held that whether the decision of a private railroad to institute such testing constituted state action "necessarily turns on the degree of the Government's participation in the private party's activities." *Id.* at 614. Because the government in that case "did more than adopt a passive position toward the underlying private conduct," the Court held that the circumstances showed that the "Government's encouragement, endorsement, and participation" sufficed to implicate the Constitution despite the fact the actual decision to implement the testing was made by a private actor. *Id.* at 615-16.

There can be no serious doubt that the Holder Memorandum and the government's direct interactions with Adelphia here show that the government did much more than adopt a "passive position." Rather, there was clear "encouragement, endorsement and participation" of the various decisions Adelphia made vis-à-vis the Rigases and the prosecution of the case.

To begin with, the Holder Memorandum made clear that a company seeking to avoid indictment would be evaluated, in part, by whether it was "cooperating" with government. The Holder Memorandum specified that federal prosecutors should consider whether a company is "cooperating" by denying indemnification and advancement of attorneys' fees to employees and agents whom the government believes to be culpable. [Comerford Decl. Ex. N: Holder Mem. at 7.] In addition, the Memorandum specifies that a corporation "cooperates" by refusing to retain employees the government considers culpable and by refusing to provide information to such employees pursuant to a joint defense agreement. [*Id.*] The Memorandum further specifies that "cooperation" includes a company's waiving privilege and providing the government access to any and all interviews conducted though an internal investigation. [*Id.*] These are just examples of cooperation. As a former United States Attorney has written, the climate created by these memoranda led the government to invoke the memoranda's "criteria at the outset at every

investigation and immediately start 'grading' a company on its performance in the government's investigation." Mary Jo White, *Corporate Criminal Liability: What Has Gone Wrong? in* 2 37TH ANNUAL INSTITUTE ON SECURITIES REGULATION 815, 820 (PLI No. B-1517 2005); *see also id.* at 818 (memoranda were used "by some prosecutors, not so much as factors in making their charging decisions, but as means to force companies to behave and reform themselves as the prosecutors" wished).

As Adelphia declared in beseeching the government to spare it indictment, Adelphia complied with the Holder Memorandum "to the letter" and did "everything the government could ask for." Thus, even were this a case in which the government's encouragement of Adelphia's actions had been accomplished only through adoption of the Holder Memorandum, that would be more than enough to satisfy the standards of encouragement and to treat Adelphia's actions as those in which the government was implicated.[15]

The government's role here, however, went well beyond the issuance of the Holder Memorandum. As we have detailed above, the government actively expressed approval – and sometimes disapproval that triggered reversal – of many decisions that Adelphia made regarding the Rigases and other former Adelphia personnel. These decisions included: pressuring Adelphia to oust the Rigases from their positions as officers and directors and thereby wresting control of Adelphia away from them (see *supra* at 37-41); demanding changes in the severance agreements which had included guarantees of advancement of legal fees and indemnification (see *supra* at 41-42); and placing conditions on the administrative leaves of other employees to insist that they would stop being paid if they refused to be interviewed and otherwise cooperate (see *supra* at 42-

---

[15] Significantly, the government has taken the position in a number of cases (including the Computer Associates prosecution) that an individual's false statements to a company's internal investigators constitute the federal crime of obstructing justice because these investigators work hand in hand with the government and pass on whatever they are told to the federal prosecutors. *See* Griffin, 82 N.Y.U. L. REV. at 372-73. This is strong evidence of the ways in which the government and the company have become intertwined in prosecutions of this type.

43). It is difficult to imagine more robust and active governmental involvement in directing, approving and encouraging a company's cooperation with the government's battle against the Rigases.

Comparing the circumstances here with those the Second Circuit considered in *Stein* drives home this point forcefully. In *Stein*, the company's actions (as here) were affected by both the governmental policy directive (in that case, the Thompson Memorandum) and by comments from the specific prosecutors working on the KPMG investigation. Given the terms of the Thompson Memorandum, the court observed, "the only safe course was [for KPMG] to allow the government to become (in effect) paymaster." 541 F.3d 130, 148.  As occurred here, the Board had committed itself to providing advancement of fees but then made an abrupt change contemporaneous with pressure from the government to enhance its level of cooperation.  *Id.* Just as in *Stein*, the prosecutors here "intervened in [the] decisionmaking" and were not shy about expressing "their 'strong preference' as to what the firm should do, and their 'desire to share the fruits of such intrusions.'"  *Id.* at 148 (quoting *Skinner*, 489 U.S. at 615).  And as occurred here, the prosecution demanded that KPMG threaten and penalize employees who the government concluded were not cooperating.  *Id.* at 150. Ultimately, the court concluded, "the government brought home to KPMG that its survival depended on its role in a joint project with the government to advance government prosecutions."  *Id.* at 147.

That describes to a tee what occurred in the Adelphia prosecution as well. This is by no means surprising. The same office prosecuted both the Adelphia and the KPMG cases and utilized very similar tactics. The Holder and Thompson Memoranda mandated many of these

tactics. Others came about through the United States Attorney's Office for the Southern District of New York's particularly aggressive stance in its application of the policies.[16]

Had it not been for the government's pressure and encouragement of Adelphia (through the Holder Memorandum, repeated demands for "cooperation," and direct coordination), Adelphia would have stood by its obligations under the bylaws, Delaware law, and the May 23 Agreement and would have advanced the required fees to the Rigases. Much as in *Stein*, where the court noted that KPMG had never before withheld fees-advancement and indemnification, Adelphia had consistently provided these funds to anyone and everyone who incurred legal fees growing out of any issues related to their work with Adelphia. And Adelphia had been adamant that it would abide by this policy with respect to the Rigases. [Comerford Decl. Ex. GG: P. Metros, Notes of Board Meeting (May 22, 2002).] But then the government made it clear that in assessing Adelphia's cooperation – and deciding whether to indict Adelphia – it would be looking closely at the terms of the severance Adelphia made with the Rigases and that it would not allow the company to enter an agreement unless its terms were acceptable to the government. [Comerford Decl. Ex. V.] Indeed the government conveyed that it was "appalled" at the May 23 Agreement that included, among other things, a reaffirmation of the fee-advancement and indemnification obligation. [Comerford Decl. Ex. W at 4.] These circumstances demonstrate a direct causal relationship between the government's policies and statements and Adelphia's course of action. They certainly create more than enough cause to allow discovery and evidentiary hearing on these matters.

---

[16] Indeed, Judge Kaplan has noted in a speech that, like the KPMG case, the government's prosecution of Adelphia executives (*i.e.,* the Rigases) raised questions about its practice of using the threat of criminal prosecution of companies in order to gain leverage in investigations of alleged wrongdoing by company employees. [Comerford Decl. Ex. FF: Evan Perez, *KPMG Judge Questions Law, Tactics Used In Corporate Cases*, WALL ST. J. (Sept 28, 2007).]

**D.     The Government's Policies and Actions With Regard to the Indemnification and Advancement of Fees Violated the Rigases' Sixth Amendment Rights.**

As the Second Circuit explained in *Stein*, Supreme Court precedent demonstrates that governmental interference with a defendant's right to secure advancement of legal fees and indemnification from a company violates the Sixth Amendment.  The Supreme Court's decision in *Maine v. Moulton*, 474 U.S. 159 (1985), summed up the governing principle when it explained that the Sixth Amendment's right to counsel

> means more than simply that the State cannot prevent the accused from obtaining the assistance of counsel. The Sixth Amendment also imposes on the State an affirmative obligation to respect and preserve the accused's choice to seek this assistance.... [A]t the very least, the prosecutor and police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel.

*Id.* at 170-71.

That right to counsel includes the right to be represented by counsel of choice, so long as the defendant can afford that counsel. *See Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624-25 (1989) ("the Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds"). As the court put it in *Stein*, "[i]n a nutshell, the Sixth Amendment protects against unjustified governmental interference with the right to defend oneself using whatever assets one has or might reasonably and lawfully obtain." *Stein*, 541 F.3d at 156.

Here, Adelphia (and thus the government) interfered with the Rigases' choice of counsel by causing two firms (Fried Frank and Reed Smith) that were prepared to represent the Rigases to withdraw (even though there had been assurances that if a conflict ensued they would continue to represent the Rigases and withdraw from representing Adelphia). [T. Rigas Decl. ¶¶ 4-8.] This

interference with choice of counsel is *per se* reversible error.  *United States v. Gonzalez-Lopez,* 548 U.S. 140, 148-52 (2006); *Stein,* 541 F.3d at 157.

In any event, beyond any interference with choice of counsel, there was real prejudice here which makes it impossible to dismiss any error as harmless.  The shortage of funds caused by the denial of fee-advancement had severe implications on the ability of counsel to prepare for trial in the manner they would have prepared had the Rigases received the fee-advancement from Adelphia as originally planned. [Maloney Decl. ¶¶ 4-5; T. Rigas Decl. ¶ 37.] For example, even though the government and Adelphia produced literally millions of documents, the Rigases were unable to afford having their attorneys conduct the usual document review. [*See generally* Maloney Decl.; T. Rigas Decl. ¶ 37.][17] Instead, they compiled a small team of family members and a few former Adelphia employees to review documents. [T. Rigas Decl. ¶ 38.] The documents were produced to the Rigases mostly in .TIFF format, which meant that each page needed to be reviewed rather than a document by document review. [Maloney Decl. ¶ 6.] Given the number of completely irrelevant documents provided, including phone books, this page by page review was tedious and time consuming. [*Id.* ¶ 7.]  Indeed, many of the disks that were eventually turned over to the defense were corrupt and could not be opened, but there was simply insufficient manpower to follow up on all these problems.

The magnitude of this problem cannot be exaggerated.  As a very experienced criminal defense lawyer (and former chief of the United States Attorney's Securities Fraud Unit) explained, this prosecution was "historic in terms of its overall complexity and scope." [Grand Decl. ¶ 4.]  The stark reality is the massive undertaking of reviewing *millions* of documents required massive resources – which the government had precluded the Rigases from securing.

---

[17] The Rigases used Navigant, a document review firm, for a portion of the material – primarily documents turned over by Deloitte.  But they could not afford to pay Navigant (much less pay the law firms representing them) to review the lion's share of the documents that needed to be examined and analyzed. [Maloney Decl. ¶¶ 4-5, 10.]

Without the investment in trial preparation, the trial ran the risk of being an empty ritual.  *See generally Powell v. Alabama*, 287 U.S. 45, 57 (1932) ("the most critical period of the proceeding against these defendants [was] from the time of their arraignment until the beginning of their trial, when consultation, thoroughgoing investigation and preparation were vitally important").

Additionally, at the time of the review, the Rigases had no idea of the breadth of the government case, which vastly expanded just before trial. [T. Rigas Decl. ¶ 39.] The documents were not searchable, so any documents not identified as relevant during review in 2002 and 2003 could not later be located. [*Id.* ¶ 41.]  At trial, the government ended up focusing on a large number of uncharged acts dating back to the early 1990s – prior to the period covered in the indictment.  Because the Rigases could not even afford to review all the documents relevant to the charged conduct, they were most certainly incapable of countering the government's evidence about the earlier uncharged conduct which would have required an extensive expansion of the scope of documents that needed to be analyzed. Moreover, Adelphia produced the Buchanan documents to the Rigases on a rolling basis beginning just a few months before trial. [T. Rigas Decl. ¶ 40.]  Indeed, many documents were not produced until so close to trial that an effective review could not be accomplished. [*Id.* ¶ 41.]

In contrast, Adelphia provided the same documents to the government in a searchable database containing documents that were coded. Thus, the government did not have the problem of having to invest innumerable hours mindlessly paging through useless material to find something relevant. This was just another way in which Adelphia "cooperated" with the prosecution to the great detriment of the Rigases.  First, Adelphia deprived the Rigases of the funds they needed.  Then, despite the fact that Adelphia was providing a searchable database to the government, Adelphia refused to provide the same documents to the Rigases in a useful form

unless the Rigases could come up with money which they did not have precisely because of

Adelphia's non-advancement of fees.

This is by no means after-the-fact reasoning.  In their July 2003 motion to the Bankruptcy

Court for the release of funds, the Rigases explained that their

> inability to adequately defend themselves against the criminal and civil charges
> against them has now reached a critical stage. The criminal trial starts in a little
> over five months. There are millions of documents to review, index and assimilate
> into the defense. This is a labor intensive process, and consequently very
> expensive. Without defense cost funding, the Rigases ability to defend themselves
> fully and fairly will be impaired. By way of example only, the tasks required of
> the Rigases and their counsel include analysis of millions of pages of documents,
> retention of experts to help understand and articulate the complicated accounting
> and business issues and, in light of these analyses, develop trial strategy and
> testimony.

[Comerford Decl. Ex. HH: *In re Adelphia Comm'c Corp.*, No. 02-ap-41729, Mot. to Modify

TRO ¶ 12 (July 18, 2003) (D.I. 133).]  This, among other things, led John Rigas's chief attorney,

Peter Fleming, to announce just days before the trial was to begin that the defense was

"underprepared." [Comerford Decl. Ex. II: *In re Adelphia Comm'c Corp.*, No. 02-ap-41729

(Bankr. S.D.N.Y.) Tr. Oral Arg. 115-16 (Feb. 18, 2004).]

The ineffective review of just these two document populations (the Adelphia CD

production and the Buchanan documents) led to severe prejudice to the defense. For example,

one of the documents turned over to the defense before trial was a 1999 memorandum from

James Brown to the Adelphia Board regarding co-borrowing. [Grand Decl. ¶ 7 & Ex. A: Mem.

from James Brown to Adelphia Comm'c Corp. Board of Directors (1999); T. Rigas Decl. ¶ 42.]

Contrary to the government's arguments and contrary to Brown's trial testimony, the

memorandum explicitly disclosed to the Board that the Rigases were using co-borrowed funds

for their purchases of Adelphia stock. [T. Rigas Decl. ¶ 42.] The memorandum was attached to

letters from a dozen banks indicating that they knew and approved of the use of the funds for

stock purchases. [*Id.*] This document, of course, went to the core of the government's case – it belied any arguments that the Rigases were hiding the source of their funding for the purchases. Yet, the defense had not located the document at the time of trial. The reason was simple: the absence of fee-advancements from Adelphia made it impossible to undertake the kind of methodical review of tendered documents that is *de rigueur* in a sophisticated case alleging financial fraud of this sort.

This was by no means the only missed document of great significance.  Another crucial document that was turned over to the defense but never uncovered during the subpar document review was a 1998 communication between Carl Rothenberger and Bruce Booken (two of Adelphia's lawyers at Buchanan Ingersoll) that was part of the Buchanan production. [Grand Decl. ¶ 7 & Ex. B: Mem. from C. Rothenberger & P. Zawadski to Bruce Booken (Jan. 9, 1998); T. Rigas Decl. ¶ 43.] This document reflects a conversation with Dean Marshall about how the Rigases could use Adelphia credit availability to fund purchases of stock.[18] Again, this evidence belies the government's core claim that the Rigases had no right to rely on their counsel because they were hiding things from their own lawyers. Yet, here again, finding this pivotal piece of evidence amidst an avalanche of documents required funds which the Rigases simply did not have as a result of the absence of fee-advancement.

The severe shortage of funds prior to trial also led to a series of difficult decisions that had severe adverse impacts on the trial. [T. Rigas Decl. ¶ 36.] For example, because the available funds were being exhausted by motion practice and whatever document reviews the Rigases

---

[18]  On September 12, 2007, counsel for the Rigases met with the current and former Rigas prosecutors to discuss the overwhelming exculpatory evidence subsequently discovered in civil depositions. [McMichael Decl. ¶¶ 43-48.] During that meeting, counsel for the Rigases presented copies of both of these documents to the prosecutors. Former prosecutor Christopher Clark commented that the government was aware of this information and would have indicted Buchanan if the government had had one more shred of evidence against Buchanan. [*Id.*]

could afford, the Rigases' counsel were without funds to mount their own robust investigation. Shortages of funds during the critical pre-trial stage required the defendants to make painful triage decisions and to abandon the pursuit of many potentially significant witnesses and pieces of evidence.

Indeed, these financial limitations affected the core decision on whether John and Timothy Rigas would be able to testify. Throughout the pre-trial period and during the trial itself, they both assumed they would take the stand – as part of a vigorous defense case. Yet, the defense lawyers, who were limited in their staffing of the case because of the lack of fee-advancement and indemnification, were never able to find the massive time necessary to prepare the defendants to testify. (Recall that the government spent over 400 hours preparing James Brown alone.) [T. Rigas Decl. ¶ 48.] Thus, when it came time for the defendants to tell the Court about their decision on whether to testify, that decision was a *fait accomplis*. [*Id.*] It would have been unthinkable for them to take the stand without having been extensively prepared. The reason they had no meaningful choice traces directly back to the absence of fee-advancement. Had the resources for funding a defense in a case of this magnitude been available in a timely basis, there were no shortage of lawyers who could have prepared them so that they could have made a meaningful choice on whether to exercise their constitutional right to testify. *See generally Jones v. Barnes*, 463 U.S. 745, 751 (1983) (recognizing defendant's right personally to decide whether to testify).

The Second Circuit's description of what occurred in *Stein* bears close resemblance to what occurred here:

> These defendants can easily demonstrate interference in their relationships with counsel and impairment of their ability to mount a defense based on Judge Kaplan's non-erroneous findings that the post-indictment termination of fees "caused them to restrict the activities of their counsel," and thus to limit the scope

of their pre-trial investigation and preparation…. Defendants were indicted based on a fairly novel theory of criminal liability; they faced substantial penalties; the relevant facts are scattered throughout over 22 million documents regarding the doings of scores of people, … the subject matter is "extremely complex," … technical expertise is needed to figure out and explain what happened; and trial was expected to last [many] months, As Judge Kaplan found, these defendants "have been forced to limit their defenses … for economic reasons and … they would not have been so constrained if KPMG paid their expenses." We therefore hold that these defendants were also deprived of their right to counsel under the Sixth Amendment.

*Stein*, 541 F.3d at 157.[19]

These examples of some of the obstacles the Rigases faced provide a sense of how the interference with the advancement of fees and the indemnification impacted the defense. We seek to develop these subjects more fully during the course of discovery and the evidentiary hearing we are requesting.

### E. The Funds the Rigases Eventually Received for the Defense Did Not Cure the Injury They Had Suffered.

Based on the government's response in the Pennsylvania case, we expect the government will argue here that the Rigases suffered no prejudice because they eventually were able to secure their own funds from their private companies to help fund their defense. This argument ignores the very real impact that the delays in obtaining those funds and the limitations on the funds had on the Rigases' efforts to defend themselves.

When Adelphia rescinded its agreement to advance defense costs to the Rigases, the Rigases attempted to sell property in order to fund counsel. [McMichael Decl. ¶ 5.] Upon

---

[19] *See also Stein*, 435 F. Supp. 2d at 371, explaining:

> The government has spent years investigating the case, presumably reviewing millions of pages of documents and interviewing scores of witnesses if not more. The KPMG Defendants, however, have limited resources. Although each defendant is represented by retained counsel, the government's interference almost inevitably has affected at least some lawyer selections and, equally important, limited what the KPMG Defendants can pay their lawyers to do. At least most of them likely will be unable to afford to pay their attorneys to review all or even most of the documents the government has produced or, perhaps, to interview even a fraction of the witnesses the government has interviewed.

learning of this, in August, 2002, Adelphia obtained a restraining order from the Bankruptcy Court enjoining the Rigases from selling real property. [*Id.* ¶ 6.]  That restraining order was expanded in November to cover all Rigas assets. [*Id.* ¶ 7.]  After months of negotiations, Adelphia finally agreed to permit the Rigases to sell a limited number of properties to fund defense costs. [*Id.* ¶ 8.]  Despite the Rigases' best efforts during the next few months, however, only one such property was sold, for a sum of approximately $500,000.  [*Id.*]

Because of a complete lack of funding, as of June 30, 2003, the Rigases' criminal and civil counsel and experts were owed a total of approximately $2.5 million. [*Id.* ¶ 11.]  Most notably, Navigant Consulting, which had been retained in January, 2003 to assist in document review with the promise of being funded out of property sales, was owed approximately $800,000. [*Id.*]  With the prejudice mounting, the Rigases sought fee-advancement and indemnification from their privately-owned cable companies. [*Id.* ¶ 12.]  When Adelphia, who managed the systems, refused to permit funds to be paid to the Rigases, the Rigases filed a motion for an order directing Adelphia to cause the Rigases private cable companies to advance fees to the Rigases in an amount up to $15 million. [*Id.* ¶¶ 12-15.]  The $15 million figure was an estimated sum the Rigases believed would fully fund criminal costs (for each of the four defendants) and civil defense costs, and was based upon an assumption that the criminal trial would last a total of approximately 8 weeks, commencing January 5, 2004 and concluding in early March 2004.  [*Id.* ¶ 21.]  The motion noted that funding for the criminal defense was at a critical stage and further explained how the criminal defense had been hampered thus far due to a lack of funds. [*Id.* ¶¶ 15-16.]

On August 1, 2003, the Bankruptcy Court granted the Rigases' motion. [*Id.* ¶ 17.]  The assumptions on which the $15 million request was premised ultimately proved incorrect after

several events dramatically increased the estimated cost of the criminal defense and imposed additional burdens on civil counsel. [*Id.* ¶ 22.] Among other things, the government's estimate of the length of the prosecution case doubled in length, trial was postponed for approximately two months and the case was expanded substantially by the government's filing of a Bill of Particulars on the eve of trial. [*Id.*] For all these reasons, the original funding was nearly exhausted by the end of January, 2004 – a month before the trial was to commence. [*Id.*]

Accordingly, the Rigases filed another motion seeking an additional $12.8 million for the criminal defense. [*Id.* ¶¶ 23-24.] The $12.8 million estimate for consulting and testifying experts and for counsel for the defense of the criminal case through June, 2004, was based upon the revised trial schedule and the information provided by the government and described above concerning the prosecution case. [*Id.*] The Bankruptcy Court held a hearing on February 18, 2004. [*Id.* ¶ 25.] Although the criminal trial was to start just a few days later, lead counsel from each of the Rigas defendants attended this very important hearing. Each made very compelling arguments regarding why additional funds were needed. [McMichael Decl. Ex. F: *In re Adelphia Comm'c Corp.*, No. 02-ap-41728 (Bankr. S.D.N.Y.) Tr. Oral Arg. 57-71; 108-15 (Levander); 71-75 (Grand); 75, 115-17 (Fleming) (Feb. 18, 2004); *see also id.* at 94-97 (McMichael).]

Based largely on those arguments, the Bankruptcy Court granted an additional $12.8 million from the private cable companies. In doing so, the Bankruptcy Court stated:

> I noted last time that the amount requested by the Rigases, while plainly very large in absolute terms, was a drop in the bucket in the context of the fee requests in these cases, and I believe that even with the incremental amount sought here, that remains true. … [T]he Rigases, nevertheless, were fair in pointing out that in the context of the total fees the estate is bearing, and understandably so, the amount they are asking *for is still a drop in the bucket. And it is hardly excessive in amount when compared to the fees charged by other professionals, Boies*

> *Schiller, Covington & Burling, and PWC, who have been focusing on Rigas-related matters.*

[*Id.* at. 129-31 (emphasis added).]  Indeed, through October 31, 2003, counsel for John and Tim Rigas (and Navigant) billed just over *$4.2 million* versus almost *$60 million* billed by Boies, Covington and PWC (who had been focusing on Rigas-related matters). [*Id.* ¶ 33.]

We recognize that, at first glance, it may seem strange to argue that defendants who ultimately had access to this much money were impaired in their ability to prepare and present their case.  But once one considers the timing of the money becoming available just a few months prior to trial, the magnitude of the case expanding exponentially shortly before trial and the amounts that were being spent by the prosecution and by Adelphia in aiding the prosecution, it becomes evident that the defense was at a significant disadvantage and the money available to them was inadequate.  For example, Adelphia's presentation to the government in November 2004 boasted that "Adelphia spent several million dollars assisting the Government in connection with the trial." [Comerford Decl. Ex. II at ACC-DOJ 00564.]  This was in addition to the enormous monetary value of all the interviews and documents Adelphia produced.  Of course, the government had virtually unlimited resources available in addition to the time invested by the cooperating private lawyers and Adelphia.

Ultimately, of the $27.8 million in defense funding permitted by the Bankruptcy Court, the Rigases' defense counsel and litigation support received under $14 million – less than a quarter of what Boies, Covington and PWC charged in just the first 15 months. [*Id.* ¶ 34.]  Since the prosecution case took longer than the government had predicted, the funds authorized by the Bankruptcy Court were exhausted before the end of the prosecution case.  [*Id.* ¶ 35.]  In fact, these criminal defense firms were collectively owed approximately over $1.1 million for work completed through the date of the jury's verdict, after exhausting all retainers. [*Id.*]  To be sure,

these are all staggering amounts, but given the scope of the prosecution and amounts being spent against the Rigases here, the money made available to them was inadequate in view of the timing of its release.

**F.     The Government's Policies and Actions With Regard to Closing Off Access to Witnesses and Evidence Violated the Rigases' Fifth Amendment Rights to Due Process.**

Another element of Adelphia's "cooperation" with the government was to bar any Adelphia employees from speaking with the Rigases, their counsel, or their representatives. The October 14, 2002 Memorandum imposing this rule explicitly attributed this policy to Adelphia's ongoing efforts to cooperate with the government. [Comerford Decl. Ex. U.] It appears also, based on reasons we will explain (*infra* at note 20), that Adelphia may have led other entities and individuals, including Buchanan Ingersoll – to refuse to interact with the Rigases or their defense team. This directive – taken in coordination with the government and in response to the government's pressure for cooperation – violated the Rigases' constitutional rights by interfering with their access to critical witnesses and evidence.

It is axiomatic that the government may not interfere with a defendant's right of access to actual or potential witnesses.  *See generally United States v. Valenzuela-Bernal*, 458 U.S. 858, 865-66 (1982). For example, the government may not (absent compelling security concerns) hide a witness to keep him from the defense or conceal the whereabouts of a witness. *See id*. at 866 (recognizing this general principal as applying in cases not involving the government's right to deport aliens despite the possibility they might have value as witnesses).  For this reason, courts have uniformly held that the Constitution prohibits the government from directing or advising an individual to avoid interacting with the defense.  *See, e.g.*, *International Business Machine Corp. v. Edelstein*, 526 F.2d 37, 44 (2d Cir. 1975) (due process right to a fair trial bars the government from seeking to impede parties' access to witnesses by instructing witnesses not to cooperate);

*Gregory v. United States*, 369 F.2d 185 (D.C. Cir. 1966) (government violated "elemental fairness and due process" when it advised witnesses not to speak with the defense unless the government lawyers were also present).

This was not an instance of a company simply closing ranks and instructing its employees and agents not to speak with *anyone*. Rather, Adelphia was affirmatively pressuring those under its control to be interviewed and otherwise cooperate with the government. [T. Rigas Decl. ¶ 50.] Indeed, employees who refused were terminated and had their advancement of fees and indemnification guarantees withdrawn. [*Id.*] Similarly, through control of the attorney-client privilege, Adelphia was able to call the shots on whether lawyers at Buchanan Ingersoll would share information and be interviewed. (Of course, this all was possible because the government had forced Adelphia to oust the Rigases from Adelphia.) With regard to both Adelphia and Buchanan Ingersoll personnel, the outcome was the same. No one was allowed to speak with or provide documents to the defense and everyone was ordered to speak with and provide documents to the government.

This interference with access to witnesses and evidence was particularly egregious with regard to Buchanan Ingersoll. That firm had not only represented Adelphia; it had also served as longtime counsel to John Rigas and the Rigas family businesses dating back to years before Adelphia was created. Yet, the Rigases were unable to retrieve any information relating to the work of their very own lawyers. [Preziosi Decl. Ex. 1: Fleming Aff.; Comerford Decl. Ex. II: *In re Adelphia Comm'c Corp.*, Tr. of Oral Arg. 116-17 (Fleming was "shocked" that Buchanan Ingersoll would not speak to defense counsel).]

Far from an across-the-board directive, Adelphia was working with the government to ensure that the government would have maximum access to all witnesses and evidence and to

ensure that the Rigases would have no access at all. This interference with the Rigases' right to a fair trial was breathtaking.[20]

As a result of the directive to Adelphia employees and agents that they refuse to speak with the defense, the Rigases' defense team hit a series of brick walls in their efforts to interview witnesses. Adelphia employees who were approached consistently indicated they were prohibited from cooperating with or even speaking with anyone associated with the Rigases. In addition, witnesses from Buchanan Ingersoll and Deloitte – witnesses who were vital to the Rigases' reasonable-reliance-on-counsel defense – also refused to speak with the defense.

In *United States v. Valenzuela-Bernal*, the Supreme Court held that a defendant asserting unconstitutional interference with access to witnesses must "make some plausible showing of how their testimony would have been both material and favorable to his defense." 458 U.S. at 867. This standard, the Court explained, takes into account that a defendant who has been denied the opportunity to interview a witness cannot fairly be required to prove exactly what that witness would have said at trial. *See id.* at 871. Rather, a court's assessment of "the events to which a witness might testify, and the relevance of those events to the crime charged, may well demonstrate either the presence or absence of the required materiality." *Id.* This standard is readily satisfied here – as would be any reasonable standard of materiality.

Anyone considering the defenses that the Rigases were advancing at trial had to have been left with some glaring questions: Where were the defense witnesses? Where were all the Adelphia employees to corroborate the defense's arguments about the actual nature of the transactions at issue and about the role of John and Timothy Rigas? Where were the witnesses

---

[20]   Given the ways in which the government was also threatening Buchanan Ingersoll, Deloitte and individual Adelphia employees with possible indictments, there is reason to believe the government may have directly (*i.e.,* not only through Adelphia's directive) influenced these firms and individuals not to provide evidence or interviews to the defense. This subject is included in the discovery movants are seeking.

from Buchanan Ingersoll or Deloitte to support the Rigases' defense that they reasonably relied on the advice and direction of qualified professionals?

The prosecution drove home this point in its closing argument, telling the jury: "If in fact these men really believed that any of the lawyers or auditors approved or supported what went on and was charged to be illegal, don't you think they would have called one of them as a witness in this trial." [Comerford Decl. Ex. B: Trial Tr. 10605-06.] A reasonable observer (including a reasonable juror) was left with just one conclusion: no such witnesses were called by the defense because no such witnesses existed. No matter what the defense counsel suggested in their cross-examinations or closing arguments, the absence of witnesses to support the defense's assertions was overpowering.

That observer (or juror) would have been profoundly wrong in making that fatal assumption. There were scores of witnesses from within Adelphia, Buchanan Ingersoll and Deloitte who were in a position to substantiate the defense. The reason they were not called is that Adelphia (acting in coordination with the government) had forbidden anyone within its control from speaking with defense investigators or lawyers prior to trial. No lawyer worth his salt would ever blindly call a witness at trial when that witness has refused to be interviewed. *See Leka*, 257 F.3d at 103 (a "responsible lawyer" cannot put a witness "on the stand without essential groundwork"). The prejudice the defense suffered as a result of the witnesses' refusal to be interviewed was devastating.

This is by no means speculative. We now know through depositions in various other proceedings that many witnesses who were directed not to speak with the defense prior to trial had evidence extremely helpful to the defense. For example, had witnesses not been improperly

dissuaded from talking with defense counsel, the Rigases would have learned the following, powerful information that has been brought out in various post-trial proceedings:

- After the criminal trial was over, Buchanan Ingersoll produced the handwritten notes of Mr. Rothenberger relating to estate planning advice. [McMichael Decl. ¶ 39.] This was not previously provided to the Rigases during Buchanan' Ingersoll's document production. These notes make it abundantly clear that the $50 million in payments provided by Highland Holdings to John Rigas were intended to be loans and that such loans were part of a legitimate larger estate plan.

- Paula Zawadzki, another Buchanan Ingersoll partner who represented Adelphia with respect to the co-borrowing agreements, recalled that it was her understanding that the co-borrowers would have rights of contribution against each other if one co-borrower repaid the bank for funds used by another co-borrower. [Comerford Decl. Ex. JJ: *Adelphia Comm'c Corp. v. Deloitte & Touche LLP et al.*, No. 000598 (C.P. Phila.) Zawadzki Dep. Tr. 27, 179-83 (Aug. 14, 2006).] This evidence would have established that, despite the joint and several nature of the co-borrowing obligations, if the Rigas Entities did not pay back their portion of the co-borrowed debt, Adelphia would have a claim against the Rigas Entities.

- During post-trial civil proceedings, Mike Brady and Ann Montgomery testified that they had no knowledge about Adelphia having ever manipulated its EBITDA. For instance, Brady testified that he "certainly didn't know that [anyone was] manipulating EBITDA" and that he never even questioned whether the senior financial executives of the company were doing things that were meant to overstate or manipulate EBITDA. [Comerford Decl. Ex. KK: *Adelphia Comm'c Corp. v. Deloitte & Touche LLP et al.*, No. 000598 (C.P. Phila.) Brady Dep. Tr. 41, 52-56, 226-27 (Mar. 10, 2005); Ex. LL: *Adelphia Comm'c Corp. v. Deloitte & Touche LLP et al.*, No. 000598 (C.P. Phila.) Montgomery Dep. Tr. 170-71 (May 19, 2005).] This was directly contrary to James Brown's trial testimony that he had discussed EBITDA manipulations with both Mr. Brady and Ms. Montgomery. Had Mr. Brady and Ms. Montgomery not been forced to refuse to talk to the defense, the Rigases would have learned that and known to call both of them as witnesses.[21]

It is outrageous that with full knowledge that Adelphia and others had shut off access to all witnesses (with the government's blessings and encouragement), the government would then

---

[21] Mr. Brady did speak to defense counsel on two or three occasions, but subsequently, when approached by a defense team investigator after the Fisher Memorandum had issued, refused to be interviewed. At his deposition, Brady confirmed that, while defense counsel attempted to speak with him on several occasions, he "wasn't willing to talk to them." [Comerford Decl. Ex. KK: Brady Dep. Tr. 176-77.]

stand up at closing argument and urge the jury to convict because the defense had not called those very witnesses to the stand.

### G.   The Rigases Were Severely Injured By the Ways in Which Non-Advancement of Fees to James Brown Pressured Him to Become a Government Witness and Tell the Government What It Wished to Hear.

Adelphia (and through it, the government) also used the weapon of withholding attorneys' fees to shape the testimony of James Brown, the prosecution's key witness.  Mr. Brown, who had been charged in the indictment along with Rigases and others, approached Timothy Rigas in a panic when Adelphia advised that it would no longer pay his legal costs.  Mr. Brown told Timothy that he could not afford to retain counsel but did not believe he was eligible for a public defender.  Mr. Brown asked the Rigas family for a loan to pay his legal costs. [T. Rigas. Decl. ¶ 50.]   Mr. Brown indicated at the time that he did not think anybody at the Company had done anything wrong, and he believed the charges against him were defensible, but he was worried about how he would defend against charges arising out of such complex transactions without a source of funding for his defense attorneys. [*Id.*] He explained that his wife would not stay with him were he to be sentenced to prison and that he could not bear that risk without assistance of qualified counsel.  He further suggested that the absence of funding for his defense might force him into a plea if he could get a good deal.  Ultimately, confronted with these pressures, Mr. Brown did enter a guilty plea and became the government's chief cooperating witness.  [*Id.*]

IV.     **CONCLUSION**

The Supreme Court has recognized that the adversarial system breeds a certain level of gamesmanship and that "prosecutors and policemen simply cannot be asked to maintain the requisite neutrality with regard to their own investigations – the 'competitive enterprise' that must rightly engage their single-minded attention." *Coolidge v. New Hampshire*, 403 U.S. 443, 450 (1971). This particular prosecution was marked by intense passion and pressure on the prosecution to convict – starting with the Presidential press conference announcing the arrests as the first salvo in the war on corporate crime. The Constitution – which embodies our deepest commitment to fairness and human rights – stands to safeguard liberty precisely at moments in which passions and political pressure generate incentives to sacrifice those timeless values to short-term goals. But the Constitution is not self-executing; it requires courts – which possess the requisite perspective and neutrality – to enforce those rights and to ensure fidelity to these core commitments.

For the reasons stated herein, Movants request that the Court:

(a)     Grant their motion for discovery;

(b)     Hold an evidentiary hearing on the claims they have brought; and

(c)     Grant appropriate relief under 28 U.S.C. § 2255, including

        i.     Dismissal of the Indictment;

        ii     a new trial; or

        iii.    a new sentencing hearing.

Respectfully submitted:

LAWRENCE G. MCMICHAEL, ESQ.
*ADMITTED PRO HAC VICE*
CHRISTIE CALLAHAN COMERFORD, ESQ.
DILWORTH PAXSON LLP
1500 MARKET STREET, SUITE 3500E
PHILADELPHIA, PA 19102-2101
(215) 575-7000

LAWRENCE C. MARSHALL, ESQ.
*ADMITTED PRO HAC VICE*
STANFORD LAW SCHOOL
559 NATHAN ABBOT WAY
STANFORD, CA 94305
(650) 723-7572

PATRICK M. NORTHEN, ESQ.
DILWORTH PAXSON LLP
1500 MARKET STREET, SUITE 3500E
PHILADELPHIA, PA 19102-2101
(215) 575-7000

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| | : | |
| v. | : | 02 CR. 1236 (LBS) |
| | : | |
| JOHN J. RIGAS, TIMOTHY J. RIGAS, | : | |
| MICHAEL J. RIGAS, AND MICHAEL C. | : | |
| MULCAHEY | : | |
| | : | |
| Defendants. | : | |
| | : | |

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of October, 2011, true and correct copies of the Motions to Vacate, Set Aside, or Correct a Sentence, and supporting memorandum of law, declarations and exhibits, of the Defendants, John J. Rigas and Timothy J. Rigas, was served via hand delivery on the following counsel of record:

David B. Massey
Assistant United States Attorney
Office of the United States Attorney
One St. Andrew's Plaza
New York, New York 10007

Kristen L. Repyneck