# UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

JOHN J. RIGAS, TIMOTHY J. RIGAS,
MICHAEL J. RIGAS, and MICHAEL C. MULCAHEY

: 02 Cr. 1236 (LBS)

## DECLARATION OF TIMOTHY J. RIGAS

1.      I am the former Chief Financial Officer of Adelphia Communication Corp., and was also a member of Adelphia's Board of Directors.

2.      The events that led to Adelphia's downfall were triggered on March 27, 2002, when Adelphia made a number of disclosures, one of which related to borrowings by Rigas Family Entities under a co-borrowing arrangement with Adelphia. These disclosures were approved by, and not controversial to, Adelphia's Board of Directors, internal accounting personnel, outside auditors or outside counsel.   In the days immediately following those disclosures, and with an already sluggish stock market, the price of Adelphia's stock dropped and government investigations began.

3.      Buchanan Ingersoll, which had been the sole outside counsel for the Rigas family and Adelphia for nearly two decades, suggested that it would be best for the Rigas family to obtain separate representation with respect to these issues, while Buchanan continued to represent Adelphia.

4.      Based upon Buchanan's advice, and having little knowledge of other law firms, I contacted our financial advisors (Salomon Smith Barney).  Salomon expressed the view that the initial market reaction to the disclosure would be short-term, that much information about Adelphia's co-borrowing arrangement was already in the market and that confidence in the

Company would be restored.  I asked Salomon to recommend counsel who could represent us.  Salomon suggested Stephen Fraidin at the Fried Frank law firm.

5.      On Easter Sunday, 2002, members of my family and I met with Mr. Fraidin and Mark Stein with Fried Frank to discuss the possibility of Fried Frank representing the Rigas family in lieu of Buchanan Ingersoll.

6.      Fried Frank agreed to undertake the representation.  It was to be paid by Adelphia for this legal work.  Mr. Fraidin stated that, based upon his review of the situation, he did not believe that there was a conflict of interest between the Rigases and Adelphia.  He thought that Fried Frank could be more effective if it also represented Adelphia.  He stated that, if a conflict arose, Fried Frank would continue to represent the Rigases and resign from representing Adelphia.

7.      Thus, our understanding was that Fried Frank was representing both the Rigas family individually and Adelphia.  Fried Frank never notified us that it believed a conflict existed or formally resigned from representing us.

8.      Around April of 2002, an associate of mine suggested that we might want to bring in an attorney we knew, and who had a better understanding of Adelphia, to complement Fried Frank.  Accordingly, my family and I hired Michael Snyder, a partner at Reed Smith who had formerly been with Buchanan Ingersoll, to represent us.  Reed Smith agreed to take on the representation and stated that any conflicts of interest that might have existed with respect to the Adelphia situation had been waived.  Mr. Snyder attended certain meetings on our behalf.  However, approximately six weeks after undertaking the representation, Reed Smith advised us that it had determined that it *did* have a disqualifying conflict of interest, and would need to withdraw from representing us.  Reed Smith did not elaborate as to what caused it to change its

mind as to the existence of an alleged conflict, but this withdrawal took place after the time that Adelphia started holding meetings with the government. Additionally, it became clear at some point that Fried Frank was representing Adelphia exclusively and ignoring the interests of the Rigas family.

9.     Between March 27, 2002 and May 23, 2002, Adelphia's Board of Directors had multiple discussions, some of which occurred during formal board meetings, regarding whether it would be appropriate to indemnify and advance defense costs to Adelphia's officers and directors in regard to events arising out of a possible government investigation. These discussions included attorneys from Adelphia's long-time counsel Buchanan Ingersoll, along with lawyers from Fried Frank.

10.    All persons present during these discussions agreed that indemnification was appropriate. In particular, directors Leslie Gelber and Dennis Coyle were very outspoken that Adelphia should post significant retainers with various law firms and place millions of dollars in escrow in order to ensure that, regardless of what ultimately happened, all of Adelphia's officers and directors, including the Rigases, had sufficient funds from the Company to pay defense costs..

11.    Mr. Gelber and Mr. Coyle contacted David Boies of the Boies Schiller law firm about teaming up with Fried Frank to represent the Company, as well as representing Gelber and Coyle individually. We met with Mr. Boies, who indicated that he had reviewed the situation and spoken with Messrs. Gelber and Coyle. Mr. Boies expressed his opinion that Adelphia's situation was not like that of Enron or some other companies then being investigated by the SEC, rather one that merely needed to be explained to the SEC. He further stated that, based upon his conversations with Mr. Gelber and Mr. Coyle, Adelphia's outside directors had been aware of

and approved all of the transactions and agreed they were proper. Based upon this, Mr. Boies stated that there was no conflict in his firm representing Adelphia, the Rigases and the outside directors. Subsequently, he advised that, although there was still no conflict, the Rigas family should retain Glenn Mitchell, an attorney with whom Mr. Boies had worked and was comfortable, so that we would have our own separate counsel for any possible court proceedings. Mr. Mitchell would support Mr. Boies' firm so that a coordinated strategy could be followed. Mr. Mitchell subsequently resigned as counsel after our relationship with Mr. Boies' clients became adversarial.

12.     Additionally, Adelphia hired counsel for several members of its accounting department, as well as separate counsel for Adelphia Vice President of Finance, James Brown. My family retained Paul Grand at the Morvillo law firm, who was recommended by Boies, to represent us with respect to government investigations. It was agreed that Adelphia would pay all of these legal costs.

13.     Carla Brown-Horn, an in-house attorney with Adelphia, was charged with coordinating among the law firms retained, obtaining retention letters and reviewing legal invoices. To the best of my recollection, prior to June 2002, I was never asked to pay for legal services rendered to me. I understand that those charges were to be paid by Adelphia.

14.     In mid-May, 2002, we received word that some of Adelphia's directors had an urgent need to meet with us. A late night meeting with Adelphia directors Erland Kailbourne and Peter Metros was held at the Rigas family home in Coudersport, Pennsylvania.

15.     During that meeting, Mr. Kailbourne asked my father, John Rigas, to resign as Chairman and CEO of Adelphia. Mr. Kailbourne and Mr. Metros stressed that my father would always be an important part of the Company and would maintain an office at Adelphia, have

access to Adelphia employees and serve as the Company's Chairman Emeritus. However, Mr. Kailbourne stated that Adelphia was facing significant pressure from the government and market forces, such that the Company's future required a new public face. He indicated that, once the issues confronting the Company had been resolved, my father would return to a more formal role with the Company. For the good of the Company, my father agreed to resign. At that time, it was discussed that other Rigas family members would continue in pivotal roles with the Company.

16.    Later, David Boies suggested that I resign my position as Adelphia's Chief Financial Officer, but remain on Adelphia's Board of Directors and continue to serve Adelphia as a consultant. I was to receive a severance package. For the good of the Company, I also agreed to resign as CFO. I believed that once the issues confronting the Company had been resolved, I would return to a more formal role with Adelphia. Furthermore, I knew that Mr. Kailbourne and the other individuals who would assume leadership positions had no experience running a cable company and assumed that they would require the continued involvement of the Rigas family.

17.    On or about May 14 or 15, 2002, a meeting/conference call occurred with various Adelphia directors and outside counsel. Some participants (including myself) attended the meeting in Adelphia's Executive Conference Room while others participated by telephone. During that meeting, Audrey Strauss, an attorney with Fried Frank, reported on discussions she had with the government. Ms. Strauss advised that the government was taking the position that Adelphia was not cooperating with the government's investigation. Ms. Strauss further conveyed the government's comment that a continued failure to cooperate (as the government viewed it) would be met with serious consequences, which might include an indictment of

Adelphia. I was stunned by this report, and asked Ms. Strauss what more we could have done. She could not articulate any lack of cooperation by anyone associated with Adelphia. During that meeting, nobody pointed to anything that could or should have been done differently. Prior to this report, Fried Frank had never indicated that it believed we had done anything wrong.

18.     On May 18, 2002, a meeting of the Board of Directors was held. During that meeting, Mr. Kailbourne and various attorneys reported on meetings with the SEC and the U.S. Attorney's office. As indicated in the minutes of that meeting, Mr. Kailbourne discussed written agreements with my father and me. One of Adelphia's attorneys suggested that the government was monitoring the negotiations over an agreement with the Rigas family and might not permit certain arrangements.

19.     During the May 18 Board meeting, it was suggested by some of Adelphia's directors that my brothers Michael Rigas and James Rigas resign their positions of employment with Adelphia, and that all members of the Rigas family resign from the Board. Mr. Kailbourne reported that the government was demanding the Rigases' resignation and said it would be the only way to save the Company. However, he expressed his personal support for the Rigas family and indicated his continued belief that we had not engaged in any wrongdoing.

20.     In order to facilitate the survival of the Company that my father had formed approximately fifty years ago, and to which my brothers and I had devoted our entire adult lives, we agreed to resign as directors and began negotiating an appropriate agreement.

21.     During these negotiations, there was a significant amount of back-and-forth with Adelphia's attorneys on various issues. Among other things, the Rigas family reaffirmed that certain assets (including stock in Adelphia and the Rigas family's private cable company holdings) were available to repay their debts and to reassure the marketplace. In these

negotiations, two issues were of particular concern to my family and me. First, and most importantly, we required that Adelphia acknowledge its continuing obligation to pay our future legal costs in connection with all matters related to Adelphia. Second, we wanted the ability to appoint two non-family members to Adelphia's Board, in order to ensure that our family had continued access to information regarding matters being addressed by the Board and that nothing of significance regarding the Company or the investigation would be permitted to happen without our knowledge.

22. The Board's lead attorney during these negotiations was David Boies. During these negotiations, various representatives of Adelphia (including Mr. Kailbourne) repeated that Adelphia was in frequent contact with the government regarding these negotiations. On some occasions, Adelphia representatives stated that certain provisions under consideration might be difficult for the government to accept. However, Mr. Kailbourne and Mr. Boies consistently assured us that Adelphia would not cut off funding for our defense costs.

23. I specifically recall that during one call, Mr. Fraidin, a lawyer with Fried Frank, identified certain requests that he said came from the government. I later conveyed these thoughts to Mr. Boies. Mr. Boies essentially waived off these concerns, stating that he believed the terms being discussed were appropriate, and that he (Mr. Boies) would take care of working through any concerns that the government might have after the agreement was entered.

24. On May 23, 2002, we executed an Agreement memorializing the terms of our discussions with Adelphia, including our continued right to advancement/indemnification from Adelphia. I understood the 5/23 Agreement to be a valid and binding contract as to all parties, which was based upon the terms that were needed to save Adelphia, as well as our need to ensure a source of payment for our legal costs.

25. A true and correct copy of the 5/23 Agreement is attached hereto as Exhibit 1.

26. The day after entering into the 5/23 Agreement, Adelphia filed a form 8-K with the SEC, which advised that a Special Committee of Adelphia's Board was investigating certain transactions involving the Rigas family, and that it should not be assumed that the transactions discussed were approved by the Board of Directors or were the subject of arms-length negotiations. My family and I viewed the 8-K as false, misleading and a surprise attack on us, in that it was inconsistent with the message that Adelphia had sent prior to that time, *i.e.* that the Company did not believe that we had engaged in any wrongdoing but that our resignations were necessary to satisfy outside sources (such as the government and the capital markets) and move the Company forward. We simply could not see how this misleading 8-K was appropriate or beneficial to the Company.

27. Between May 23 and June 1 (the date on which Adelphia apparently determined that it would not pay defense costs for the Rigas family), I was not asked to cooperate with the Special Committee in any regard. Similarly, I was not asked to respond to any allegation that I had breached my duties to the Company. Moreover, from the time that we hired Fried Frank we authorized Fried Frank to hire an accountant (PriceWaterhouse) to assist its investigation. At all times when we remained in charge of Adelphia, we gave Fried Frank access to any Company documents or personnel it requested.

28. During the time period from Adelphia's decision to cease advancing defense costs through the conclusion of the criminal trial, the substantial majority of my personal assets consisted of Adelphia securities or ownership in the Rigas Family Entities (private companies owned by the Rigas family). Thus, almost all of my assets (which were always available for repayment of Rigas debt) were placed in trust as part of the 5/23 Agreement. Accordingly, I

needed to rely upon our right of advancement from Adelphia in order to ensure payment of my legal costs. As a result of an April 2005 settlement agreement with the government, all of my ownership interests in any material assets were either forfeited to the government or have been transferred to, or for the benefit of, other members of the Rigas family as consideration for their consent to the forfeiture of their assets to the government. The legal fund established in our settlement agreement with Adelphia has already been exhausted.

29.     Following Adelphia's refusal to pay our defense costs, and having already been denied the ability to use Fried Frank or Reed Smith as our counsel, we made extensive efforts to retain another law firm having sufficient resources and expertise to handle a case of this complexity, which would supplement the work of our criminal defense attorneys. For instance, due to the sophisticated nature of the transactions under investigation, my family engaged the Dewey Ballentine law firm to supplement criminal counsel in analyzing the sophisticated business transactions at issue and developing a cohesive strategy for defending against the multi-faceted attack against us. Retaining such co-counsel was essential to my family and me, but we were required to terminate Dewey Ballentine due to a lack of funds to pay it.

30.     Thus, Adelphia's refusal to pay our defense costs interfered with my ability to retain counsel of my choosing. As another example, we interviewed Kirkpatrick & Lockhart ("Kirkpatrick"), a Pittsburgh-based law firm that had been highly recommended to us. However, Kirkpatrick estimated a litigation budget of approximately $15-20 million and required a substantial retainer. Due to our inability to pay that retainer or ensure the payment of such substantial fees, we were unable to hire the Kirkpatrick firm. We interviewed various New York law firms that we were unable to retain due to their fee requirements.

31.     Additionally, we were forced to terminate lawyers who had provided us with valuable counsel on certain strategic and supplemental matters, including Michael Mitchell.

32.     Furthermore, we wished to utilize our civil counsel, Dilworth Paxson, to perform certain projects related to the criminal case, but were limited in our ability to do so, due to the lack of funds and the requirement that Dilworth devote most of its efforts towards trying to obtain funds to pay our lawyers.

33.     I had many conversations with defense counsel about trying to find money for defense costs. Because of the expected length of trial (which ended up taking four-and-a-half months) and my inability to secure a consistent source of funds for defense costs, defense counsel advised me that they would limit each firm's participation at trial to a single attorney per defendant, if we could not find more funds.

34.     From Adelphia's decision to deny advancement, and throughout the entire calendar year of 2003, much of our legal efforts were directed at developing and pursuing strategies to obtain funds to pay our lawyers. Most of the litigation surrounding this issue unfolded in the bankruptcy court, where we were represented by our civil counsel, Dilworth Paxson. Our efforts to obtain funding for our defense costs were vigorously resisted by Adelphia.

35.     Ultimately, the defendants in the Southern District of New York case (including my father and me) were able to obtain approximately $27.8 million from the Rigas Family Entities to put towards defense costs. However, those funds were authorized by the bankruptcy court separately and at different times. The first authorization totaled $15 million and was not provided until approximately October 2003 (about two-and-a-half months prior to the original trial date and four months prior to the actual trial). Additionally, these funds were to cover all

four defendants in the criminal case. Because of the large backlog of unpaid legal bills – much of which were expended on efforts to obtain defense funds rather than substantive criminal defense work – such funds were quickly exhausted. Thus, a second authorization was requested but not granted until the trial was already in progress.

36.     As a result of Adelphia's failure to advance defense costs, our attorneys were unable to defend the case in the same way they would have if Adelphia had been advancing defense costs.

37.     For instance, the case involved millions of pages of documents produced on cds. This information was not produced in searchable format. Because we were unable to pay our attorneys to review the millions of documents that had been produced in the case, we had to do much of our own document review from home, utilizing unsophisticated coding systems. The review was made even more difficult because the documents were produced in a format requiring that each page be individually reviewed versus being able to skip all pages in a single document. Because the cds were riddled with irrelevant documents, such as telephone books, not being able to advance to the next document without reviewing every individual page made the review tedious and time consuming.

38.     The Rigas family also reviewed thousands of hard copy documents in hundreds of boxes.

39.     At the time the family reviewed the cds and boxes, we had no idea regarding the scope of the government charges, which greatly expanded just before trial.

40.     We also retained Navigant, a less expensive, non-attorney consultant to help organize our document review and focus on certain document issues. Thus, our attorneys were unable to conduct a detailed review of many of the documents in this case. Moreover, many of

the documents produced by Buchanan, which were not received until two to three months prior to trial, were never reviewed by anyone. Some of the CDs that we received from the government were corrupted and could not be reviewed, but we lacked the time or resources to follow-up.

41.     The result of the ineffective document review was that documents that would have been crucial to the defense were missed and, therefore, unavailable at the time of trial.

42.     For example, at trial, we did not locate before trial a 1999 memorandum from James Brown to the Adelphia Board regarding co-borrowing. Contrary to the government's arguments and contrary to Brown's trial testimony, the memorandum explicitly disclosed to the Board that the Rigases were using co-borrowed funds for their purchases of Adelphia stock. The memorandum was attached to letters from a dozen banks indicating that they knew and approved of the use of the funds for stock purchases.

43.     Another crucial document that was turned over to the defense but never uncovered during the subpar document review was a 1998 correspondence between Carl Rothenberger and Bruce Booken (two of Adelphia's lawyers at Buchanan Ingersoll) that was part of the Buchanan production. This document reflects a conversation with Dean Marshall about how the Rigases could use Adelphia credit availability to fund purchases of stock.

44.     Buchanan Ingersoll represented the Rigas family even before Adelphia became a public company and, was therefore, an important source of information regarding, among other things, Adelphia's historical practices relating to the transactions at issue in the criminal case.

45.     Buchanan had hundreds of boxes of hard copy documents from the commencement of its representation of the Rigases through the mid-1990s in a warehouse in Western Pennsylvania. Because of funding issues, such documents were only briefly scanned over a day or two by a small team consisting of me, a former Adelphia employee and a junior

associate from our civil counsel. With such a limited review, we were unable to locate documents that I know would have assisted our defense.

46. Similarly, I do not believe that any meaningful review of Adelphia's public filings from 1986 through the mid-1990s occurred prior to trial. This information was critical to place the subsequent transactions at issue in the criminal trial into the proper context.

47. Additionally, it is my understanding that lack of resources – together with the prohibition against current Adelphia employees communicating with the Rigases or their representatives – limited my lawyers' ability to interview many potentially important third party witnesses.

48. Financial constraints also impaired their ability to prepare witnesses or retain appropriate experts. For instance, while I understand that James Brown (the prosecution's chief witness in the case at trial) spent approximately 400-500 hours preparing with the government, our limited financial resources did not allow a similar amount of time to be spent preparing for my potential testimony, which ultimately played a critical role in my decision not to testify.

49. Although each of the defendants was represented by separate counsel, Adelphia's failure to advance defense costs made it cost-prohibitive for each defendant to pay his respective attorneys to thoroughly understand all of the complex transactions and issues involved in the case. Accordingly, it was necessary for counsel to divide the various issues and transactions among them. Thus, although I was personally involved in many of the transactions and issues that were central to the government's case, I had to rely upon other counsel for the other defendants to rebut the government's argument on those issues.

50. Adelphia's decision to cut off defense costs also impacted other targets of the government's investigation. For instance, James Brown approached me in a panic when

Adelphia advised that it would no longer pay his legal costs. He asked the Rigas family for a loan to pay his legal costs and to contact our "wealthy friends" to attempt to get additional resources to pay defense costs. We agreed to lend him $400,000 to partially cover a $800,000-900,000 retainer request from his attorney. Mr. Brown indicated at the time that he did not think that anybody at the Company had done anything wrong. He believed the charges against him were defensible, but he was worried about how he would defend against charges arising out of such complex transactions without a source of funding for his defense attorneys. Confronted with these pressures, he eventually entered a guilty plea and became the government's chief cooperating witness.

51.     At the criminal trial, Adelphia's counsel was in the courtroom and consulted with the government's lawyers throughout the proceedings.

52.     In early July, 2002, my criminal counsel was in talks with the government regarding the possibility that the government would bring criminal charges against me. I was told by my counsel that the government had advised that no charges would be brought until after Labor Day because the investigation was still progressing.

53.     Within a week after the first meeting of the new Corporate Fraud Task Force on July 12, 2002, the media began reporting that we would soon be indicted.

54.     My counsel, along with my father's counsel, repeatedly requested over the course of the ensuing week that we be permitted to voluntarily surrender (something routinely permitted) but those requests were rejected.

55.     Instead, the government arrested us on July 24, 2002 in a public "perp walk" in handcuffs in front of the media, which had clearly been tipped off to the arrests. Indeed, when we were first taken into custody the press and photographers had not yet arrived, so we were kept

in a room in a government building for approximately two hours and then escorted outside once the press had gathered so the press could see us and take our pictures in handcuffs."

56.     Buchanan Ingersoll ("Buchanan") was first retained to represent the Rigas family in the early 1980's. When the decision was made to consolidated the majority of the cable companies owned by the Rigas family into a new public company under the name Adelphia Communications Corp., Buchanan represented the family and Adelphia in the initial public offering.

57.     From that point until the Summer of 2002, Buchanan continued to represent both the Rigas family and Adelphia, essentially acted as outside general counsel.

58.     Buchanan partner, Carl Rothenberger, a securities and corporate governance attorney, led the team of Buchanan of attorneys representing the Rigas family and Adelphia. Mr. Rothenberger was involved in virtually all of the transactions and disclosures regarding the Rigas family and Adelphia during this period.

59.     Following the Rigases' resignations from Adelphia, and notwithstanding the long attorney-client relationship between the Rigas family and Buchanan, neither Mr. Rothenberger nor any other Buchanan attorney would speak with our counsel regarding Buchanan's involvement in the over 15 years of transactions and disclosures regarding Adelphia and the Rigas family. The refusal of Buchanan to speak to our counsel had a devastating effect on our defense.

60.     Doug Malone was Adelphia's Director of External Reporting. In that capacity, he had full and direct access to all of Adelphia's books and records, including those maintained on computer systems such as Adelphia's general ledger.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief under 28 U.S.C. § 1746.

Executed on: _October 2, 2011_

_Timothy J. Rigas_
Timothy J. Rigas

**1**

Exhibit 99.01

AGREEMENT

This agreement, dated May 23, 2002, sets forth the essential terms of an agreement between Adelphia Communications Corporation ("Adelphia" or the "Company") and the Rigas Family, as defined herein.

1. The Rigas Family members (John Rigas, Tim Rigas, James Rigas and Michael Rigas, collectively with the entities directly or indirectly owned or controlled thereby, the "Rigas Family") will resign immediately from the Board of Directors of Adelphia. The Rigas Family members may designate two non-family members to be appointed to the Board until the earlier of December 31, 2006, the sale of the Family Cable Operations, or the repayment of the Rigas Family's obligations.

2. All Rigas Family members resign as officers of Adelphia effective immediately.

3. All stock owned by the Rigas Family will be placed in a voting trust until all obligations of the Rigas Family to the Company for loans, advances, or borrowings under the co-borrowing agreements or otherwise are satisfied. The voting trust will vote such shares as directed by the Special Committee through the Company's 2004 annual meeting and thereafter in proportion to the votes cast by all other shares.

4. The Rigas Family's Managed Entities (the "Family Cable Operations") will use all of their free cash flow to pay down the co-borrowing debt that is the primary liability of the Family. The Rigas Family will pledge their equity in all the Family Cable Operations to the Company until all obligations of the Rigas Family to the Company for loans, advances or borrowings under the co-borrowing agreements or otherwise are satisfied.

5. The Rigas Family agrees to transfer, and to do everything in their power to facilitate the transfer, of the stock or assets of the Family Cable Operations to the Company or a person or entity designated by the Company as requested by the Company in exchange for (a) an amount equal to the taxes incurred by the Rigas Family as a direct and necessary result of the transfer and (b) a reduction in the amount of the Family's primary obligation under the co-borrowing agreements equal to the difference between the appraised value of the stock and assets transferred and the amount of such taxes incurred. In requesting the transfer of stock or assets, the Company will make a reasonable effort to maximize the economic benefit to the Company. Interest shall accrue on the remaining balance under the co-borrowing agreements at a rate of 6% per annum, with such interest to be paid on December 31, 2006 or at such earlier time that the Rigas Family elects to repay the balance, which it is explicitly permitted to do.

The value of the assets transferred pursuant to this paragraph shall be established by independent appraisers selected by the Company and by the Rigas Family. (For this purpose, the Rigas Family may retain and/or may utilize the recent appraisal prepared for the Company by Dugan Financial, Inc., and the Company hereby consents to such use.) The respective appraisers will consult with each other and seek to reach agreement on such appraised values. If the difference between the appraisals is less than 15% of the higher appraisal, then the value of the systems will be deemed to be the average of the two appraisals; if the difference between the appraisals is more than 15% of the higher appraisal, then the two appraisers shall retain a third appraiser who shall appraise

such systems in consultation with the first two appraisers, and such third appraisal shall be binding.

6. The Company agrees that the Family Cable Operations that the Company reasonably concludes are not strategic (e.g., Coudersport, Dubois, Blairville, Hilton Head) or otherwise needed in connection with planned dispositions of assets shall, at the request of the Rigas Family, be appraised pursuant to the provisions in paragraph 5 above. If the Rigas Family or a third party pays the appraised amount to the Company to reduce the outstanding co-borrowing obligations, such assets will be released from the restrictions in paragraph 4 above.

7. All Company debt held directly or indirectly by the Rigas Family (approximately $567 million) will be transferred to the Company in exchange for satisfaction of the $202 million due under existing stock purchase agreements and a reduction of $365 million in the amount of the Rigas Family's primary co-borrowing obligations.

8. All Adelphia shares owned directly or indirectly by the Rigas Family will be pledged to secure: (a) the repayment of co-borrowing facilities, and (b) to secure the undertaking to repay Adelphia for indemnification payments discussed in paragraph 11 below. To the extent permitted by Delaware law, the Company agrees not to seek any transfer or collection of such shares in connection with any effort to collect such balance prior to December 31, 2006; provided, however, that if prior to December 31, 2006, the lenders commence judicial or arbitration proceedings to collect the co-borrowing balance owed by the Rigas Family, the Company will be entitled to access pledged shares to satisfy that obligation.

9. The land in the Timber Deal will be transferred to the Company in exchange for a $464,930 reduction in the amount of the Rigas Family's primary co-borrowing obligations.

10. The Company will honor its commitment to make the following severance arrangements for John Rigas: (a) cash compensation of $1.4 million per year for three years, (b) healthcare coverage for him and his wife for the remainder of their lives, (c) the use of an office, computer and telephone equipment and secretary, (d) vested stock options exercisable for their term, and (e) the use of the Company planes for emergency reasons as available and as authorized by the Company (the "Severance Arrangements"). The Severance Arrangements will terminate if John Rigas is convicted of a felony.

11. The Company will provide indemnification to family members (according to the Bylaws and Delaware law) as long as Rigas Family members undertake to repay Adelphia per the Bylaws. This undertaking will be collateralized as per paragraph 8 above.

12. Adelphia reserves all of its rights to take action against the Rigas Family in the future. The Rigas Family reserves all of its rights to take action against the Company in the future. All statute of limitations are tolled.

13. The parties agree, intending to be legally bound, to the foregoing. The parties acknowledge that the implementation of this agreement will require the preparation and execution of definitive documentation and the approval, consent or other action of third parties. The parties will act in good faith and use their commercially reasonable efforts, separately and in cooperation with each other, to implement this agreement. To the extent the parties are not able to agree on definitive

documentation of this agreement, the parties agree to submit to binding arbitration pursuant to the rules of the American Arbitration Association to resolve the terms of the definitive documentation of this agreement.

14. In order to permit the Rigas Family to prepare financial statements for themselves and their affiliates and associates, including their tax returns, the Company will permit the Rigas Family and their representatives to have reasonable access to the books and records of the Company, its subsidiaries and the entities which are contributed.

15. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflict of laws principles.

ADELPHIA COMMUNICATIONS CORPORATION

BY /s/ Erland E. Kailbourne
-----------------------------------------------
Chairman and Interim Chief Executive Officer
(with the authority of the Special Committee)

NAME:
TITLE:
DATE:

/s/ John J. Rigas
-----------------------------------------------
John J. Rigas

/s/ Michael J. Rigas
-----------------------------------------------
Michael J. Rigas

/s/ Timothy J. Rigas
-----------------------------------------------
Timothy J. Rigas

/s/ James J. Rigas
-----------------------------------------------
James J. Rigas

## DECLARATION OF JOHN J. RIGAS

1.     I am the former Chief Executive Officer and Chairman of Adelphia Communication Corp. (the "Company"), a company that I founded in 1952 upon purchasing the rights to wire Coudersport, Pennsylvania for cable television.

2.     Adelphia's Bylaws provided that the Company would advance legal fees whenever a person is made a party to any proceeding, civil or criminal, "by reason of the fact that the person ... is or was a director or officer of the Corporation." During my tenure with Adelphia, I am not aware of the Company refusing a request by any officer or director of the Company for advancement of legal expenses, until its announcement that it would not advance legal fees for me or my sons, Tim and Michael Rigas. Moreover, I am not aware of any occasions in which Adelphia undertook to make a determination as to whether an officer or director had breached duties to the Company before advancing legal costs.

3.     Between March 27, 2002 and May 23, 2002, Adelphia's Board of Directors had multiple discussions, some of which occurred during formal board meetings, regarding whether it would be appropriate to indemnify and advance defense costs to Adelphia's officers and directors in regard to events arising out of a possible government investigation. These discussions included attorneys from Adelphia's long-time counsel Buchanan Ingersoll, along with lawyers from Fried Frank. All directors and attorneys present during these discussions consistently agreed that indemnification and advancement were appropriate. Indeed, I recall that the discussion of indemnification was raised by Adelphia's non-Rigas directors immediately after the disclosure. Those non-Rigas directors insisted that everybody's legal fees must be paid by the Company. It was an issue that was of deep concern to me as Chairman, as it was to Adelphia's other directors.

4.    To the best of my recollection, prior to June 2002, I was never asked to pay for legal services rendered to me nor, to my knowledge, was anybody who worked for Adelphia. I understood that those charges were to be paid by Adelphia.

5.    In mid-May, 2002, we received word that some of Adelphia's directors had an urgent need to meet with us. A late night meeting with Adelphia directors Erland Kailbourne and Pete Metros was held at the Rigas family home in Coudersport, Pennsylvania. At that meeting, Mr. Kailbourne stated his belief that a change in the public face of the Company was necessary for Adelphia's future. He also stated that the government was asking for our resignations. However, Mr. Kailbourne and Mr. Metros told us that they felt the Rigas family had not done anything fraudulent or improper. Mr. Kailbourne told me that once the issues confronting the Company had been resolved, I would return to a more formal role with the Company and that, in the meantime, I would continue to be involved and interact with Adelphia leadership and personnel in an informal way. After hard consideration, and for the good of the Company, I agreed to resign on or about May 13, 2002.

6.    On or about May 14, 2002, a Board of Directors meeting occurred with various Adelphia directors and outside counsel. During that meeting, Audrey Strauss, a senior attorney with Fried Frank, gave a report via telephone regarding her recent meeting with the government. I vividly recall Ms. Strauss stating that the government was angry and believed that Adelphia was not cooperating. Ms. Strauss advised that a continued failure to cooperate, as the government viewed it, would be met with serious consequences for Adelphia, possibly including indictment.

7.    Ms. Strauss's comments came as a complete shock to me, since I thought that both the Rigas family and Adelphia were providing all the information asked of us. I consistently pressed her for examples of anything Adelphia or the Rigas family had failed to

do that had been asked of us. She said that she did not know of any lack of cooperation and could not tell us what the government meant. In fact, we previously authorized Fried Frank to hire an accountant (PriceWaterhouse) to assist its investigation and, at all times when we remained in charge of Adelphia, gave Fried Frank access to any Company documents it required. I approached Mr. Kailbourne to inquire what the supposed lack of cooperation was, and Mr. Kailbourne, who was aware of all the ways my family and I were cooperating with the government, expressed his shock that anyone could suggest we were being less than fully cooperative.

8.     Prior to executing the Agreement with Adelphia on May 23, 2002, Adelphia's outside directors consistently expressed support for me and my family and indicated that they did not believe we had engaged in any wrongdoing. For instance, Mr. Kailbourne and Mr. Metros stressed that I would always be an important part of the Company, maintain an office at Adelphia, have access to Adelphia employees and retain a role as Chairman Emeritus.

9.     In addition to reaffirming that Adelphia would advance our defense costs, the May 23, 2002 Agreement provided that the Rigas family would be able to select two non-family members to serve on Adelphia's Board. We identified two qualified individuals, Dan Milliard and Leo Farrero, who preliminarily indicated that they were willing and able to serve and asked to speak with the Company's Chairman. However, Mr. Milliard and Mr. Ferraro reported to me that Company representatives had told them that they could serve as directors, but the Company would not provide them with indemnity protection. Neither Mr. Milliard nor Mr. Ferraro was willing to serve as an Adelphia director under those conditions.

10.     Adelphia's refusal to indemnify the directors we selected essentially rendered its promise to the Rigas family meaningless, since under the environment that existed at the time, no competent business person would have agreed to serve as an Adelphia director

without corporate indemnification. Indeed, Adelphia provided indemnification to the newly-appointed outside directors that were not selected by the Rigas family.

11.     Between May 23 and June 1 (the date on which Adelphia determined that it would not pay defense costs for the Rigas family), I was not requested to provide the Special Committee with any information or to cooperate with it in any regard. Similarly, I was not asked to respond to any allegation that I had breached my duties to the Company.

12.     Initially, Paul Grand was hired to represent the entire Rigas family with respect to the government's investigation. Subsequently, on Mr. Grand's recommendation that all family members retain separate counsel, I hired Peter Fleming of the Curtis Mallet-Provost law firm to represent me with respect to a potential criminal investigation. However, due to the sophisticated nature of the transactions under investigation, I also desired to obtain another law firm having sufficient resources and expertise to handle a case of this complexity, which would supplement the work of our criminal defense attorneys. For instance, due to the sophisticated nature of the transactions under investigation, my family engaged the Dewey Ballentine law firm to, among other things, assist criminal counsel in analyzing the sophisticated business transactions at issue and developing a cohesive strategy for defending against the multi-faceted attack against us. Retaining such co-counsel was essential to my family and me, but we were required to terminate Dewey Ballentine due to a lack of funds to pay it.

13.     Due to the massive complexity of the matters at issue, all firms I spoke with estimated legal costs in the millions and required substantial retainers. Without Adelphia paying the legal fees, and without advancement by the Rigas family entities, I lacked the reliable payment source necessary to secure such counsel. As a result, during a critical time period, I was left without the comprehensive legal representation the situation required.

14.     Furthermore, I was not able to pay my lead criminal defense counsel to prepare to defend the criminal case in the manner in which it would have been defended if Adelphia were paying the bills. We were thus unable to pay our attorneys to review the millions of documents that had been produced in the case by the government and third parties (including documents produced by Buchanan, which were not received until two months prior to trial). Instead, the Rigas family had to do much of their own document review from home, utilizing unsophisticated coding systems.

15.     During the time period from Adelphia's decision to cease advancing defense costs through the conclusion of the criminal trial, the substantial majority of my personal assets consisted of Adelphia securities or ownership in the Rigas Family Entities (private companies owned by the Rigas family). Despite my efforts to liquidate assets to secure funds to pay for the criminal defense, these assets could not be readily liquidated for a variety of reasons, including the encumbrances created by the 5/23 Agreement and injunctions issued by the bankruptcy court restricting the sale of assets owned by us or the Rigas Family Entities. Today, as a result of an April 2005 settlement agreement with the government, all of my ownership interests in any material assets were either forfeited to the government or have been transferred to, or for the benefit of, other members of the Rigas family, as consideration for their consent to the forfeiture of their assets to the government. The legal fund established in our settlement agreement with Adelphia has already been exhausted.

16.     During the year prior to trial, I was consistently and regularly advised by my criminal counsel that the lack of funding was imperiling counsel's ability to defend the case. I spent much of my own time and effort during this period trying to get funds to pay for an adequate defense of the case. My counsel told me that if he had proper funding for trial preparation, he would win the case.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief under 28 U.S.C. § 1746.

Executed on:_____

_____
John J. Rigas

Grand Decl.

## DECLARATION OF PAUL R. GRAND

1.    I am a principal of Morvillo, Abramowitz, Grand, Iason, Anello & Bohrer, P.C. ("Morvillo Abramowitz").

2.    I served as primary criminal trial counsel to Timothy Rigas in this case and make this declaration in connection with the Motions to Vacate, Set Aside, or Correct the Sentence filed by John Rigas and Timothy Rigas (the "Rigases").

3.    In the spring of 2002, my firm was retained to represent Tim Rigas in what was then an investigation by the Department of Justice and the United State Securities & Exchange Commission. Shortly after my firm was retained, Curtis, Mallet-Prevost, Colt & Mosle, LLP ("Curtis") was retained to represent John Rigas and Swidler Berlin Shereff Friedman, LLP ("Swidler") was retained to represent Michael Rigas.

4.    It quickly became apparent to me that the Rigases' prosecution would be historic in terms of its overall complexity and scope. I also soon learned that the Rigases had very few available liquid assets with which to pay experts, consultants, and counsel (once initial retainers were exhausted).

5.    In late September 2002, defense counsel began receiving a vast number of documents from the government pursuant to Rule 16 of the Federal Rules of Criminal Procedure. These documents came from numerous sources including Adelphia and Adelphia's auditors (Deloitte & Touche). From late 2002 through early 2003, the Rigases received approximately 8 million pages of material, all of which needed to be reviewed and analyzed to defend against the criminal charges pending against the Rigases.

6.    Although my recommendation and preference was to have this review conducted by lawyers and an outside consultant with document management and accounting expertise, due to a lack of money to pay these professionals, Tim Rigas, his brothers Michael and James, co-

defendant Michael Mulcahey, and several former Adelphia employees who were working for the Rigases, undertook the initial task of reviewing these documents. I had a number of concerns with this approach, including that the document review would not be as complete or useful as it could be if it had been conducted and supervised by counsel and consultants. Because of the Rigases' lack of funds, an outside consultant (Navigant Consulting Inc.) was not retained to assist with the document review until January of 2003. While Navigant and defense counsel devoted substantial time to reviewing documents, even after this date, the Rigases continued to take the lead in reviewing documents produced by the United States Attorney's Office.

7.    It now appears that significant exculpatory documents were missed in the Rigases' document review. By way of example, at least two exculpatory documents were not uncovered by the Rigases. The first document is a 1999 memorandum from James Brown, a prosecution witness, to Adelphia's Board of Directors. [A true and correct copy of this memorandum is attached hereto as Exhibit "A"]. This memorandum dealt with the concept of co-borrowing and explicitly disclosed to the Board that the Rigases were using co-borrowed funds for their purchases of Adelphia stock. The second document is a January 9, 1998 memorandum from Bruce Booken to Carl Rothenberger, Jr. (two of Adelphia's lawyers at Buchanan Ingersoll) and Paula Zawadzki. [A true and correct copy of this memorandum is attached hereto as Exhibit "B"]. This document memorializes a conversation regarding how the Rigases could use Adelphia credit availability to fund purchases of stock.

8.    In early 2003, I learned that Adelphia and its Special Litigation Committee had created catalogues indexing Adelphia's documents on an issue by issue basis (the "Index"). The Rigases moved to compel the production of the Index, which Adelphia had shared with the government, but that motion was denied. I am informed that filings in Adelphia's bankruptcy

proceedings reflect that Adelphia paid professionals for approximately 15,000 to 16,000 hours of work devoted to preparing the Index. Due to the Rigases' precarious financial condition, they were unable to dedicate the tremendous resources needed to recreate this index.

9.      In the fall of 2003, the Honorable Robert E. Gerber of the United States Bankruptcy Court for the Southern District of New York granted the Rigases' application to have their private cable companies, which were then under the control of Adelphia, pay additional defense costs. Had this money been available earlier in the case, defense counsel could have done far more to prepare for the upcoming trial, which at that point was scheduled to begin in less than three months.

10.     I declare under penalty of perjury that the foregoing is true and correct under 28 U.S.C. § 1746.


EXECUTED ON: October___3___, 2011                    _Paul R. Grand_

                                                     Paul R. Grand

# Exhibit A



EXHIBIT
R 242

To: Adelphia Communications Corporation Board of Directors
From: Jim Brown – VP Finance
Re: Status of Bank Financing

On February 17, 1999, Adelphia Communications Corporation and the John Rigas family requested proposals for the placement of $700 Million of senior debt by several cable television companies (collectively the "Borrowers") owned by Adelphia subsidiaries or by the Rigas family. All of the companies included in the proposed credit facilities are currently included in the UCA Corp. and Affiliates ("UCA") credit agreement or the Hilton Head Communications ("HHC") credit agreement. We are anticipating placing $400 MM of the debt through commercial banks (original commitments to these properties under the current credit agreements totaled $550 MM which has been reduced to the present level of $440 MM) with the remainder to be placed with other institutions as a pari passu "B" Tranche. The current lenders to UCA and HHC are primarily Banks with long term and strong relationships with Adelphia and the Rigas family. Consequently, we expect a high degree of participation from these lenders in this new facility.

The initial use of proceeds from the new credit facility will be to repay existing indebtedness of UCA and HHC and to make a distribution to the Rigas family. The Rigas family intends to use the proceeds of this distribution to purchase equity securities from Adelphia.

Response to the request for proposal has been exceptionally strong. To date, we have received proposals from 14 of the 16 institutions that we solicited for proposals. Each of the proposals included an offer to lead the transaction and expressed a willingness to take underwriting risk. And none of the proposals gave any indication of a possible difficulty in consummating the transaction. Additionally, consensus terms and pricing from the proposals indicate this transaction can be completed on terms and pricing substantially improved over the existing UCA and HHC credit facilities and the recently completed Parnassos facility. Three of the proposals, those received from Credit Suisse First Boston, Chase Securities and TD Securities, included offers to underwrite the entire facility.

On a normal course basis, the expected closing date is March 31, 1999. However, TD Securities indicated a willingness to take all syndication risk, which would allow the loan to be closed by March 15, 1999.

# Exhibit B

# MEMORANDUM

To:     Carl Rothenberger, Jr.
        Paula Zawadzki

From:   Bruce I. Booken

Date:   January 9, 1998

Re:     Proposed Adelphia/Highland Holdings Financing

---

Colin Higgin and Dean Marshall discussed with me yesterday the proposed financing transaction which is primarily intended to provide liquidity to the Rigas family so that they can participate in future Adelphia stock offerings. The Chelsea credit facility provides for the issuance of letters of credit and there is currently adequate borrowing capacity to allow for the issuance of a $50,000,000 letter of credit. A letter of credit presumably would be issued in favor of a newly formed subsidiary of Adelphia ("Newco") which would be directly owned by Adelphia and would not be part of any borrowing group. Newco would presumably agree to pay to Chelsea the fees associated with the issuance and maintenance of the letter of credit. I am not certain whether other amounts would be payable to Chelsea.

Highland Holdings, a general partnership owned by the Rigas family, would borrow $50,000,000 from a third party lender (presumably a bank) and the $50,000,000 borrowing would be guaranteed by Newco. The Newco guaranty would be secured by the letter of credit. Newco would presumably receive a fee from Highland Holdings for the secured guaranty being provided for the benefit of Highland Holdings.

This proposed financing transaction appears to be a way in which Adelphia can assist and arrange for financing for the benefit of Highland Holdings rather than directly lend money to Highland Holdings. I would like to get together with you to generally discuss this proposed financing structure. In particular, I would like to discuss the various affiliate transactions which are occurring and determine what actions should be taken with respect to those transactions.

/kjb

PGH1: 367712-1



DEPOSITION
EXHIBIT
Rigas 122
AKF-9-21-05

BIPC 2677606

Maloney Decl.

## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

       v.

JOHN J. RIGAS, TIMOTHY J. RIGAS,
MICHAEL J. RIGAS, and MICHAEL C. MULCAHEY

:
:   02 Cr. 1236 (LBS)
:
:
:
:

RECEIVED 2001 OCT -4 P 6:57 U S DISTRICT COURT SDNY

### DECLARATION OF MICHAEL F. MALONEY

1. I am a Managing Director in the Disputes and Investigations practice of Navigant Consulting, Inc.

2. In January, 2003, Navigant was retained by three law firms (the "Law Firms") representing members of the "Rigas Family" (John J. Rigas, Timothy J. Rigas, Michael J. Rigas, and James P. Rigas) to provide professional consulting services (the "Engagement Letter"). I was the Engagement Manager on the project.

3. The services provided pursuant to the Engagement Letter included, without limitation, assisting the Law Firms and the Rigas Family by reviewing documents in the criminal case brought by the U.S. Department of Justice against John Rigas, Timothy Rigas, Michael Rigas and Michael Mulcahey, in their capacity as former employees and management of Adelphia Communications Corp. ("Adelphia").

4. Specifically, Navigant was asked to review a small subset of what I recall to be over 400 CDs containing documents relevant to the case produced by the government (the "Government CD Production").

5. We were not instructed by the Law Firms or the Rigas Family to review all of the Government CD Production. At the commencement of our work, the significant majority of the Government CD Production review was being conducted by members of the Rigas Family (the "Rigas Team"), as opposed to counsel or Navigant. My impression was that the Law Firms and the Rigas Family decided to have the Rigas Team perform this portion of the review in order to save money.

6. I recall that many of the documents in the Government CD Production were in "tiff" format which meant that they could only be reviewed electronically on a page by page basis instead of by document. I also recall that the documents in the Government CD Production were not searchable.

7. Due to the size and condition of the Government CD Production, and the decision by the Law Firms and the Rigas Family that the Rigas Team (which was of modest size) would assume responsibility for reviewing the significant majority of the Government CD Production, the process of reviewing this information was extremely cumbersome and, ultimately, in my view, ineffective. The end result, in my view, is that the Government CD Production was likely not adequately reviewed in preparation for the criminal trial (which began in early 2004).

8. In my view, if the Government CD Production had been in searchable format and contained some amount of searchable "coding" (e.g., dates, document titles, custodians), the review may have been more effective in preparation for the criminal trial.

9. Throughout the period before the criminal trial, I recall various large document productions being made by Buchanan Ingersoll ("Buchanan"), Adelphia's former outside law firm. I recall more than one large production occurring very close in time to the start of the criminal trial. Because of the late timing and the volume of documents, the entire Buchanan population, of which Navigant was asked by the Law Firms and the Rigas Family to review portions of, in my view was not adequately reviewed in preparation for the criminal trial.

10. When Navigant was first retained, a small team (approximately three full time Navigant professionals) was assigned to the engagement. My recollection is that Navigant was asked by the Law Firms and the Rigas Family to begin with a small team because there were not sufficient funds available for a larger Navigant budget that would have permitted additional staffing at that point.

11. In my view, if Navigant had been given a larger budget at the commencement of our Engagement, we were in a position to add, and would have added, additional skilled professional resources to our team. Had that occurred, I believe the review of documents in the case from the commencement of our Engagement until August 2003 likely may have been much more productive and effective.

12. Sometime after the Bankruptcy Court ordered additional defense funding on August 1, 2003, Navigant was given the authority by the Law Firms and the Rigas Family, to expand the Navigant team significantly, resulting in a team of between 10 and 20 professionals.

13. In summary, I believe that there was not sufficient funding or resources available to review the Government CD Production and the Buchanan document populations in a manner that

may have necessarily identify all of the critical documents in preparing the defense for the criminal trial.

14. The facts stated in this Declaration are true and correct to the best of my knowledge, information and belief. I make this Declaration pursuant to the penalties applicable for unsworn falsification to authority.

_____

Michael Maloney

DATED: September 30, 2011

**Preziosi Decl.**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,                    :

                            Plaintiff,        :

              -against-          :          02 Cr. 1236 (LBS)

                                  :

JOHN J. RIGAS, TIMOTHY J. RIGAS,        :
MICHAEL J. RIGAS and MICHAEL C. MULCAHEY,        :

                        Defendants.        :

---

## DECLARATION OF BENARD V. PREZIOSI, JR.

1.      I am a member of the Bar of this Court and of Curtis, Mallet-Prevost, Colt & Mosle LLP. I was a member of the Curtis trial team, led by Peter Fleming Jr. (who died in 2009), which defended John Rigas at the trial which resulted in his conviction on July 8, 2004.

2.      Annexed hereto as Exhibit 1 is a true and correct copy of a July 3, 2007 affidavit of Mr. Fleming, together with its Exhibit A, that was submitted in connection with a motion of John and Timothy Rigas for a new trial. I reviewed this affidavit and its Exhibit with Mr. Fleming and other defense counsel prior to the time that it was submitted and it accords with my recollection of the events in which I was involved.

3.      The firm Buchanan Ingersoll, as we understood it, had been lead outside counsel for Adelphia Communications Corporation and its subsidiaries (collectively, "Adelphia") during the period relevant to the events at issue in the criminal case, and Carl Rothenberger had been the lead partner at the Buchanan firm with regard to the Adelphia account. Based upon information that was made available to us during the criminal case, we

understood that Mr. Rothenberger and his firm had been involved in virtually every transaction of significance in which Adelphia engaged, and that Mr. Rothenberger (and/or other attorneys at the Buchanan firm) had attended all of the meetings of the Adelphia Board of Directors. The Curtis trial team, as well as counsel for the other defendants, considered Mr. Rothenberger to be a key witness and in that regard, we sought through his attorney (who was also counsel for the Buchanan firm) to interview him. Counsel informed us on a number of occasions that he would not permit his clients, including Mr. Rothenberger, to speak with defense counsel. Defense counsel were very wary about calling Mr. Rothenberger as a defense witness because he would not speak with us in advance.

4. During jury selection, the prosecution sent a letter to defense counsel dated February 24, 2004 advising that Mr. Rothenberger "may be able to provide information that is favorable to the defense concerning the timber rights transaction discussed in the Government's Bill of Particulars." The timber rights transaction was one of many transactions that were alleged in the Indictment and in the Bill of Particulars. A true and correct copy of the February 24, 2004 letter is annexed hereto as Exhibit 2. It is my recollection that when we received this letter, we understood that Mr. Rothenberger had spoken with the Government and we were of the view that, while he may have had helpful information regarding one of the multitude of transactions alleged in the Indictment and in the Bill of Particulars, other information he provided to the Government would likely have been inculpatory of the Rigases on other issues. As a result, and because of his refusal to speak with us, the defense determined not to call Mr. Rothenberger as a witness in the case.

EXECUTED ON: October 3, 2011

BENARD V. PREZIOSI, JR.

-2-

# EXHIBIT 1

Patrick M. Northen (PN-3771)
Lawrence G. McMichael (Admission Pro Hac Vice Pending)
DILWORTH PAXSON LLP
3200 Mellon Bank Center
1735 Market Street
Philadelphia, PA 19103-7595
(215) 575-7000
Attorneys for Defendants John J. Rigas and Timothy J. Rigas

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------- X

UNITED STATES OF AMERICA,                    :

                      Plaintiff,          :

         -against-                     :

JOHN J. RIGAS, TIMOTHY J. RIGAS,             :
MICHAEL J. RIGAS and MICHAEL C. MULCAHEY,

                   Defendants.          :
--------------------------------------------------------------- X

02 Cr. 1236 (LBS)

AFFIDAVIT OF
PETER FLEMING JR.

STATE OF NEW YORK  )
                   ) ss.:
COUNTY OF NEW YORK  )

      PETER FLEMING JR., being duly sworn says:

      1.    I am a member of the Bar of this Court and of the firm of Curtis, Mallet-Prevost, Colt & Mosle LLP.

      2.    I served as lead counsel in the defense of John Rigas at the trial which resulted in his conviction on July 8, 2004. I make this affidavit in connection with the motion of John and Timothy Rigas for a new trial based upon testimony provided in the post-conviction litigation.

3754294v1

3.     There is attached to this affidavit as Exhibit A a description of events

having to do with the potential testimonial composition of the defense case in the criminal trial.

It accords with my recollection of all the events in which I was involved, and, to the extent it

involves my co-counsel, is based upon their recent communications with me. Co-counsel do

agree with the contents of Exhibit A.

_____
Peter Fleming Jr.


Sworn to before me this
3rd day of July, 2007.

_____
Notary Public

LINDA L. FROCCARO
Notary Public, State of New York
No. 31-6241000
Qualified in New York County
Commission Expires May 31, 2010

3754294v1

**EXHIBIT A**

The case against the Rigases was unique in terms of the breadth of the alleged criminal conduct. The indictment charged fraud in connection with the recording of, and disclosure relating to, the co-borrowed debt, and the reclassification of co-borrowed debt from the books of Adelphia to the books of a Rigas co-borrower in connection with the October 2001 securities purchase by a separate Rigas entity. It also charged EBITDA manipulations based upon the marketing support arrangements between Adelphia and Scientific Atlanta and Motorola. In addition, the indictment charged understatement of capital expenditures in connection with an alleged fraudulent converter box sale from Adelphia to a Rigas entity, misrepresentations to rating agencies concerning de-leveraging and liquidity, fraud in connection with the payments of funds to members of the Rigas family, the payment by Adelphia of Rigas margin loan calls, the undisclosed use of corporate aircraft and the undisclosed development of a golf course on land owned by the Rigases, and bank fraud based upon claimed improper post-closing adjustments designed to impact the leverage ratio reported to lenders.

The large number of charges in the indictment, which themselves raised a myriad of accounting and disclosure issues, were expanded by the Government's Bill of Particulars (which was filed in June 2003) and then by its Preclusive Bill of Particulars (which was filed in January 2004). There, the Government charged:

- Alleged fraud in connection with a variety of securities transactions other the October 2001 securities purchases (BOP ¶ 81. a. 2.)

- The alleged improper allocation of interest associated with the co-borrowing debt and the affiliate receivables (BOP ¶ 81 a. 3.)

- Improper activities in connection with a multitude of real estate transactions (BOP ¶ 81. a. 4.- 10.)

-3-

- The improper allocation of the cost associated with the acquisition of the Prestige cable systems (BOP ¶ 81 a. 11.)

- Alleged undisclosed payments to Wending Creek Farm and Eleni's Interiors (BOP ¶ 81 a. 12-13.)

- Alleged improper advances of funds to finance the production of Songcatcher (BOP ¶ 81. a. 14).

- Alleged improper charges to Adelphia for golf club memberships, other personal expenses of the Rigases (e.g., Ellen Rigas's wedding), and charitable donations (BOP ¶ 81. a. 15-16.)

- The alleged improper taking by John Rigas of $30,000,000 in the early 1990s (BOP ¶ 81. a. 17.)

- The alleged misappropriation of treasury stock for use in connection with the acquisition of the Sabres hockey franchise (BOP ¶ 81 a. 18.)

- Alleged EBITDA manipulations resulting from the improper failure to consolidate foreign cable systems (BOP ¶ 82 a. 1.)

- Alleged EBITDA manipulations resulting from the improper recording of placement fees (BOP ¶ 82 a. 3.)

- Alleged misrepresentations concerning the use of margin loans in connection with securities transactions (BOP ¶ 82 a. 4-5.)

- Alleged misrepresentations in the statements of cash flow relating to advances to and from related parties (BOP ¶ 83 a. 6.)

- Alleged EBITDA manipulations resulting from the improper charge to capital expenditures of labor costs (BOP ¶ 89 a.)

- Alleged EBITDA manipulations resulting from the use of misleading subscriber numbers in calculating revenue under programming contracts with HBO/Cinemax and Viacom (BOP ¶ 89 b.)

- The alleged improper recognition of revenue resulting the @Home warrants (BOP ¶ 89 c.)

-4-

- Alleged EBITDA manipulations resulting from the over-capitalization of labor costs, subcontractor fees, insurance premiums and system power costs (BOP ¶ 96 a.)[1]

Deloitte & Touche audited Adelphia during all of the years in question and, in each year, issued a clean audit opinion. Buchanan & Ingersol, and its partner, Carl Rotherberger, were Adelphia's main outside counsel during the entire period in question, were involved in virtually every major transaction, including all of the direct placements of securities to the Rigases and all of the co-borrowing credit facilities, and attended all of the Board meetings. The Government did not call any witness from Deloitte or Buchanan. Nor did the Government call any witness from Scientific Atlanta or Motorola, the contra-parties in the marketing support transactions. Further, in addition to those current and former Adelphia employees called by the Government during its case (including Brown), other witnesses with potentially relevant knowledge who remained employed by Adelphia were not called by the Government.

Shortly before trial, the Government produced 3500 material relating to more than 150 Government witnesses. That material, as it related to Deloitte personnel, included transcripts of testimony, including testimony in SEC investigative proceedings relating to Adelphia. To the extent these materials related to certain issues in the criminal case – including the recording of the co-borrowing debt and the netting of affiliate receivables – it was of significant benefit to the defense position.

Attempts were made by the defense to interview relevant personnel from Deloitte, Scientific Atlanta and Motorola, and Buchanan. Deloitte refused interviews. Counsel did have limited contact with individual counsel for Gregory Dearlove, the Deloitte engagement

---

[1] During trial, the Government was permitted to prove additional transactions, beyond those identified in even an expansive reading of the Bill of Particulars, that were claimed to have been fraudulent and that gave rise to accounting issues. For example, the Government was permitted to show that John Rigas acquired certain local cable systems with funds, paid over time, from the Adelphia concentration account.

partner for the year end 2000 audit, and through counsel received limited information regarding what Mr. Dearlove might say. However, it is uncertain whether a full interview would have been permitted, and Mr. Dearlove received an SEC Wells Notice on October 1, 2003, making any cooperation with the defense in a criminal case extremely remote.[2] While defense counsel believe that Scientific Atlanta and Motorola refused interviews, they cannot support that belief with certainty.

The position of these entities was somewhat unusual, but understandable in light of the fact that the Government, in its Preclusive Bill of Particulars, identified Scientific Atlanta and Motorola as "co-conspirators" and stated:

> The Government hereby gives notice that it reserves the right to add Ivan Hoffmann, William Caswell, and Deloitte & Touche, LLP, to the list of unindicted co-conspirators pending the outcome of ongoing investigative efforts.

The effect of being identified by the Government as a co-conspirator in any case – much less a case of this magnitude – is obvious.

Counsel for Buchanan likewise informed defense counsel that he would not permit his clients to talk with the defense. It was further suggested to defense counsel that individual Buchanan attorneys might assert their Fifth Amendment privileges if called to testify.

Finally, in an October 14, 2002 memorandum, issued shortly after the indictment had been returned and when Adelphia was openly cooperating with the government and under the threat of indictment, Adelphia's Vice President and General Counsel directed all Adelphia employees in no uncertain terms that they should not speak with the Rigases or their counsel and

---

[2] Mr. Dearlove was subsequently the subject of an SEC administrative proceeding pursuant to Section 21C of the Securities Exchange Act of 1934 and Rule 102(e) of the Commission's Rules of Practice. In that case, the Administrative Law Judge found that the SEC's own expert had acknowledged that no FAS standard specified how joint and several liability arising under a credit agreement should be treated, and had conceded that "the joint-and-several liability provisions of the credit agreement were not sufficient, on their own and without resort to FAS 5, to support his conclusion that most of the co-borrowing debt should have been booked as Adelphia's liability."

should report to him any efforts that were made by the Rigases or their representatives to contact the employees. In the memorandum, the employees were advised that Adelphia's Legal Department would review any such contact "and may refer the matter to appropriate government agencies." Quite clearly, this memorandum had a chilling effect on personnel who could potentially assist the defense. Aside from the risk of job loss in a community with few employment opportunities, no employee would want the prosecution to be told that he or she was cooperating with the defense. The chilling effect of Adelphia's memorandum was underscored when the Government itself identified a host of Adelphia employees, including Dean Marshall, Joseph Sabol and Jason Woolcock, as co-conspirators and co-schemers in its Bill of Particulars. Michael Brady, an Adelphia employee who was not identified as a co-conspirator, did speak to defense counsel on two or three occasions, but subsequently, when approached by a defense team investigator, refused to say anything without a subpoena. Ann Montgomery refused to return calls from that investigator.

Counsel's diligence is also demonstrated by letters that were sent to a large number of individuals (or, where known, their counsel) identified by the Government as witnesses in the 3500 material, including, among others, Joseph Sabol and Jason Woolcock, as well as many of the senior Deloitte personnel. In the letter, defense counsel asked for an opportunity to meet or speak telephonically with the witness at a time and in a fashion convenient for the witness. The defense received few responses to those letters, and in those few responses, the witnesses declined to be interviewed.

In sum, any Adelphia employee in a significant accounting role was targeted as a criminal, and all Adelphia employees were gagged under threat of reference to the Government; Motorola and Scientific Atlanta were labeled as corrupt; and Deloitte & Touche and its personnel

3754294v1

were, at a minimum, under suspicion. Indeed, in a pre-indictment meeting in the Summer of 2002, counsel for John Rigas expressed the view that any charge based upon the impropriety of the accounting for and disclosures relating to the co-borrowing debt would be wrong and unfair because Deloitte, as the Government knew, had known about and passed upon these issues based upon a FAS 5 analysis. AUSAs Clark and Coleman responded by stating in words or substance that Deloitte was indictable. Later, during trial, counsel for John Rigas reiterated the view, this time to AUSA Owens, that the co-borrowing fraud charge was wrong in the face of the clear evidence that Deloitte knew the relevant facts and approved the accounting and disclosure. AUSA Owens responded in words or substance that if he had one more piece of evidence establishing criminal intent on the part of Deloitte, he would indict the firm. It is a certainty that the Government's position had been expressed to Deloitte and its counsel. That Deloitte was at serious risk in the event it supported the Rigas defense cannot be questioned.

For whatever reasons, including the foregoing, key witnesses – identified by the Government as potential Government witnesses – were not available for interview by the defense. Had the Government called these witnesses, the defense would have cross-examined. When the Government did not call any of these witnesses, the defense was put to a Hobson's choice – (a) subpoena the witness and take him "cold" not knowing what he might say concerning issues about which the 3500 material was silent or ambiguous, with the obvious risk that the Government, having undoubtedly advised the witness (or the company with which he or she was associated) that the witness or the employer was in peril, could potentially obtain very damaging testimony, true or false, on those issues from a defense witness, or (b) pass on calling the witness. The choice was discussed among counsel and with at least Tim and John Rigas. In the end, counsel, with the concurrence of the Rigas defendants, determined that the appropriate

-8-

course in all the circumstances was not to call witnesses who would not speak with the defense given the substantial risk that they might testify adversely for whatever reason as to matters not adequately covered in the 3500 materials, and thereby permit the Government to strengthen its case through defense witnesses. This risk was heightened in the case of witnesses – Deloitte, Scientific Atlanta, Motorola and the Adelphia employees – labeled by the Government as actual or potential co-conspirators – who, quite naturally, would not want to testify in a manner that was contrary to the Government's version of the facts.

In a real sense, many of the key witnesses, including those identified above, were unavailable to the defense before and during the criminal trial. As set forth above, the defense made efforts to overcome this hurdle. But the lawyers for the witnesses would not agree to interviews, the Adelphia witnesses were shackled with a gag order and the threat of prosecution, Motorola and Scientific Atlanta were tarred as co-conspirators, and Deloitte was under investigation and refused to be interviewed. Although the Government listed many charges in the bill of particulars, it ultimately chose not to attempt to prove many of those allegations. Indeed, the Government even chose not to attempt to prove certain of the allegations in the indictment (i.e., the converter box fraud). It seems apparent that the Government, which chose not to call an accounting expert and itself avoided calling Deloitte or the attorneys, knew full well that its multiplicity of charges put the defense in the impossible position described.

We believe that counsel's professional judgment was one with which virtually any competent, experienced criminal defense counsel would agree. This Court should find that the witnesses identified herein, and the testimony they gave at subsequent post-conviction depositions and hearings, were unavailable to the defense during the criminal trial.

3754294v1

# EXHIBIT 2

□

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

February 24, 2004

To All Counsel
(Distribution List Attached)

       Re:  <u>United States v. John J. Rigas, et al.,</u>
           S1 02 Cr. 1236 (LBS)

Dear Counsel:

      The Government writes to inform you that Carl
Rothenberger, Esq. may be able to provide information that is
favorable to the defense concerning the timber rights transaction
discussed in the Government's Bill of Particulars.

                    Very truly yours,

                    DAVID N. KELLEY
                    United States Attorney
                    Southern District of New York

By: _____
               Christopher J. Clark
               Richard D. Owens
               Judd C. Lawler
               Assistant United States Attorneys
               (212) 637-2205/2415/2701

BI Bradylol