# UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

      v.

JOHN J. RIGAS, TIMOTHY J. RIGAS,
MICHAEL J. RIGAS, and MICHAEL C. MULCAHEY

11 Cv. 6964 (LBS) ECF CASE

02 Cr. 1236 (LBS)

## DECLARATION OF CHRISTIE CALLAHAN COMERFORD, ESQUIRE

I, Christie Callahan Comerford, hereby certify that I am attaching true and correct copies

of referenced portions of the following documents:

### Exhibits:

A.      *United States v. Rigas*, No. 08-3485-cr *et al.* (2d Cir.) Tr. Oral Arg. on Appeal (May 5, 2009)

B.      *United States v. Rigas*, No. 02-cr-1236 (S.D.N.Y.) Trial. Tr.

C.      *United States v. Rigas*, No. 02-cr-1236 (S.D.N.Y.) Rigas Mem. in Support of Mot. to Compel

D.      *United States v. Rigas*, No. 02-cr-1236 (S.D.N.Y.) Gov't Mem. in Opp'n

E.      *United States v. Rigas*, No. 02-cr-1236 (S.D.N.Y.) Pretrial Arg. Tr. (April 10, 2003)

F.      *United States v. Rigas*, No. 08-3485-cr *et al.* (2d Cir.) Rigas Appeal Br.

G.      *United States v. Rigas*, No. 08-3485-cr *et al.* (2d Cir.) Gov't Appeal Br.

H.      Interview by Christopher Clark, Asst. U.S. Att'y, with Carl Rothenberger (Feb. 20, 2004)

I.      *Adelphia Comm'c Corp. v. Deloitte & Touche LLP et al.*, No. 000598 (C.P. Phila.), Rothenberger Dep. Tr. 487, 490-91 (Oct. 26, 2005).

J.      Letter, P. Korologos to Timothy J. Coleman, U.S. Attorney's Office (Aug. 9, 2002)

K.      Adelphia Comm'c Corp., November 2002 8K (Oct. 25, 2002)

L.   Adelphia Comm'c Corp., June 2002 8K (June 10, 2002)

M.   Lisa Griffith, *Compelled Cooperation and the New Corporate Criminal Procedure*, 82 N.Y.U. L. REV. 311 (2007)

N.   Holder Mem. (June 16, 1999)

O.   Thompson Mem. (Jan. 20, 2003)

P.   Andrew Weissman & Ana R. Bugan, *The McNulty Memorandum*, NAT'L L. J. (Feb. 5, 2007)

Q.   *United States v. Rigas*, No. 05-cr-402 (M.D. Pa.) Gov't Br. in Supp. of Objections & Mot. for Protective Order

R.   Press Release, Adelphia Comm'c Corp., *Adelphia Comm'c Announces Fourth Quarter & Full Year 2001 Results* (Mar. 27, 2002)

S.   Carl Mortished, *Beware the Long Arm of American Law*, THE TIMES (London) Online (April 28, 2007)

T.   Bylaws, §§ 6.1, 6.2 (Sept. 30, 1999)

U.   Mem. from Randall D. Fisher, Vice Pres. & Gen. Counsel to All Adelphia Employees (Oct. 14, 2002).

V.   Adelphia Comm'c Corp., Mins. of a Meeting of the Board of Directors (May 18, 2002)

W.   B. Booken & C. Rothenberger, Notes of Board Meeting (May 18, 2002).

X.   P. Metros, Notes of Special Committee Meeting (May 25, 2002).

Y.   Adelphia Comm'c Corp., Mins. of a Meeting of the Board of Directors (June 1, 2002)

Z.   P. Metros, Notes of Board Meeting (June 1, 2002)

AA.   Email, C. Clark, Asst. U.S. Att'y, to B. Baird (July 31, 2002)

BB.   Letter, B. Baird to Timothy J. Coleman, U.S. Att'y Office (Aug. 1, 2002)

CC.   Email, P. Korologos to Timothy Coleman, Asst. U.S. Att'y (Aug. 22, 2002)

DD.   *In re Adelphia Comm'c Corp.*, No. 02-41729 (Bankr. S.D.N.Y.) Vinegrad Decl. & *Thompson Mem. Factors*, Presentation to U.S. Att'y Office (Nov. 5, 2004)

EE.   *Adelphia Comm'c Corp. v. Deloitte & Touche LLP et al.*, No. 000598 (C.P. Phila.) Coyle Dep. Tr. (May 18, 2006)

FF.    Evan Perez, *KPMG Judge Questions Law, Tactics Used In Corporate Cases*, WALL ST. J. (Sept 28, 2007)

GG.    P. Metros, Notes of Board Meeting (May 22, 2002)

HH.    *In re Adelphia Comm'c Corp.*, No. 02-ap-41729 (Bankr. S.D.N.Y.) Mot. to Modify TRO (July 18, 2003) (D.I. 133)

II.    *In re Adelphia Comm'c Corp.*, No. 02-ap-41729 (Bankr. S.D.N.Y.) Tr. Oral Arg. (Feb. 18, 2004)

JJ.    *Adelphia Comm'c Corp. v. Deloitte & Touche LLP et al.*, No. 000598 (C.P. Phila.) Zawadzki Dep. Tr. (Aug. 14, 2006).

KK.    *Adelphia Comm'c Corp. v. Deloitte & Touche LLP et al.*, No. 000598 (C.P. Phila.) Brady Dep. Tr. (Mar. 10, 2005)

LL.    *Adelphia Comm'c Corp. v. Deloitte & Touche LLP et al.*, No. 000598 (C.P. Phila.) Montgomery Dep. Tr. (May 19, 2005)

I declare under penalty of perjury that the above is true and correct to the best of my knowledge, information and belief under 28 U.S.C. § 1746.


DATED: October 4, 2011                          Christie Callahan Comerford

# Exhibit A

```
        9555RIGA
1       UNITED STATES COURT OF APPEALS
1       FOR THE SECOND CIRCUIT
2       ----------------------------x
2
3       UNITED STATES OF AMERICA,
3
4                   Appellee,
5           v.                              08-3485-cr
5                                           08-3500-cr
6                                           08-3592-cr
6                                           08-3597-cr
7
7
8       JOHN J. RIGAS and TIMOTHY J. RIGAS,
9                   Appellants,
9
10
10      ----------------------------x
11                                      New York, N.Y.
11                                      May 5, 2009
12      Before:
12
13                      HON. JOSE A. CABRANES,
13                      HON. WILFRED FEINBERG,
14                      HON. RALPH K. WINTER,
14
15                                      Circuit Judges
15
16                      APPEARANCES
17
18      LEV L. DASSIN
18          United States Attorney for the
19          Southern District of New York
19      BY:  WILLIAM JOHNSON
20          Assistant United States Attorney
20
21      STEPHEN R. MCALLISTER
21          Attorney for Appellants
22
22
23
24
25
```

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

2

```
        9555RIGA
1               (Case called)
2               APPELLANT:  May it please the Court.  My name is Steve
3       McAllister and I represent the Rigases in this appeal.  I have
4       reserved two minutes for rebuttal.
5               Given my short time this morning, I will address only
6       two issues and rely solely on our briefs for discussion of the
7       other issues, all of which the defendant continue to press.
8               The two issues I want to touch on this morning are,
9       first, the government's continuing refusal to produce even for
10      an in camera inspection by this Court the government's notes of
11      a two-day pretrial interview of a critical potential witness,
12      the lead securities lawyer for both Adelphia and the Rigases.
13      Importantly, this issue is relevant to sentencing
14      considerations as well as guilt considerations as the Supreme
```

6   bring -- that is the factor that drives these sentences.
7       Furthermore, with respect to John Rigas, if the key
8   question is the March 27th disclosure of the co-borrowing,
9   there is really no evidence in the record that John directly
10  participated in that or knew about that.  The evidence
11  regarding John Rigas, there is a reference about accounting
12  magic, that reporting some performance measures, that was not
13  about co-borrowing and that's the level of culpability under
14  3553(a)(1) that the District Court needs to focus on.
15      JUDGE CABRANES:  And you think and none of this was
16  before the District Court the first time around?
17      APPELLANT:  Well, a lot of the level of culpability
18  evidence was not there in terms of Rothenberger and the
19  scientific Atlantic and Motorola and other people.  That
20  testimony all comes out in civil depositions years after the
21  trial and is now available.  Certainly we argue that the Court
22  had to focus on the loss causation originally, but he didn't
23  any more than he did this time.  And in fact it is ironic that
24  the government says, oh, you argued Dura the first time around.
25  Of course we did.  But the government argued, no, Dura doesn't

    9555RIGA
1   apply in a criminal securities fraud case.  And this Court
2   rejected the government's position expressly in Rutkoske and
3   said that's wrong.  If anything, the considerations here are
4   even more compelling.  We need to be even more careful when we
5   may, in essence, sentence someone where in reality to a life
6   sentence; the loss causation calculation needs to be made with
7   care, precision, some attention normally to economic testimony,
8   not just back of the envelope armchair economics it must be a
9   big number, we have no idea what it is.  That's simply not
10  appropriate for a situation of this significance.
11      JUDGE CABRANES:  Thank you.
12      APPELLANT:  Thank you.
13      APPELLEE:  May it please the Court, my name is William
14  Johnson.  I'm an Assistant United States Attorney in the
15  Southern District of New York and I represented the government
16  in the District Court below following this Court's remand in
17  2007.  Let me first address the Brady issue.
18      Judge Sand did not abuse his considerable discretion
19  in denying the motion to compel.  And, let mé make one thing
20  very clear right up front.  I have reviewed these notes
21  personally, the Rothenberger notes.  I have discussed them with
22  the postal inspector who took them and the Assistant United
23  States Attorney who was present at the time of the interview
24  and there is nothing exculpatory in those notes beyond the
25  limited disclosure that was made concerning the timber rights

    9555RIGA
1   transaction.  Full stop.
2       Second, and I regret that this is not in our brief,
3   but this morning I was looking at the transcript of the trial
4   and determined some contemporaneous corroboration for that
5   fact:  Judge Sand, at one point, asked whether the government
6   would stipulate that appellants' use of co-borrowed facilities
7   to purchase securities was disclosed to, among others, the
8   Buchanan lawyers.  The AUSA responded at that time:  We have
9   been told by Mr. Rothenberger he was not aware of that fact.
10      Rothenberger has never testified at any point that he

11  said anything to the government that is found in his civil
12  deposition testimony that the appellants now claim to be
13  exculpatory. Essentially they're asking you to speculate and
14  draw an inference from some of the testimony that he gave which
15  was not connected to the government interview. They did not
16  produce an affidavit for Mr. Rothenberger below to connect that
17  assumption and we would invite you to look at his testimony.
18  It is not exculpatory and in many instances he has a failure of
19  recollection on important issues that appellants would urge
20  before this Court. Let me just direct you to one specifically.
21         In their brief, their opening brief, appellants claim
22  at page 104 that Rothenberger did not believe that the
23  disclosures were legally inadequate or deficient. And if you
24  look at the cites for those, he is talking about the
25  information that he had. Well, it is clear from the record

9555RIGA
1   that he did not know certain critical facts about what was
2   going on behind the scenes. They also stated, and I'm quoting
3   now, Rothenberger did not believe that the amount of Rigas
4   co-borrowed debt needed to be disclosed. And I think in their
5   reply brief they say he was legally comfortable that it didn't
6   need to be disclosed.
7          Well, if you look at the pages of the transcript where
8   he is asked about that in civil deposition, he describes a
9   conversation he had with the head of accounting, a guy named
10  Tim Worth who was a government cooperator but who did not
11  testify at trial. What he says is I discussed the amount with
12  Worth and he told me the amount was not material. Rothenberger
13  doesn't say he even knew what the amount was and he states that
14  Worth was adamant that the amount was not material, and I quote
15  Rothenberger says, I took it at face.
16         That makes very clear he did not know the amounts
17  here, was not told these things, did not pass legal judgment on
18  it and that, in and of itself, is not exculpatory.
19         Again, going back, the relevant inquiry is whether the
20  government was in possession of material at the time of trial
21  that was exculpatory and the appellants simply have not proven
22  that the government knew that.
23         JUDGE CABRANES: This material to which you referred
24  at the outset that you have reviewed personally, has it been
25  reviewed by Judge Sand?

9555RIGA
1          APPELLEE: It has not, your Honor.
2          JUDGE CABRANES: Is that appropriate or would that be
3   helpful in adjudicating the question?
4          APPELLEE: We have always taken the position that the
5   government understands its obligations and has carried those
6   obligations out and in the normal course that's the practice in
7   this district. It is not required for a judge to review and
8   look behind that absent something that suggests strongly that
9   that process has been subverted and we don't think that that
10  was necessary.
11         JUDGE CABRANES: I understand it may be in practice
12  here but why is it a sound practice in the particular
13  circumstances which were entered here? Wouldn't it solve a lot
14  of problems? Would it have made things a little easier to
15  comprehend?

# Exhibit B

1

2

3  UNITED STATES OF AMERICA,

4
       v.           02 CR 1236 (LBS)

5
JOHN J. RIGAS,
6  TIMOTHY J. RIGAS,
  MICHAEL J. RIGAS and
7  MICHAEL C. MULCAHEY,

8       Defendants.

9  -----------------------------x

10           New York, N.Y.
             February 23, 2004
11           9:15 a.m.

12  Before:

13        HON. LEONARD B. SAND,

14
             District Judge
15

16

17

18

19

20

21

22

23

24

25

1 Overruled.

2 BY MR. CLARK:

3 Q. You can answer the question, Mr. Zacherl.

4 A. Please repeat.

5 Q. Did you ever discuss with Tim Rigas the proper way for

6 Adelphia to disclose loans to its officers?

7 A. Yes, I did.

8 Q. Tell us what you told Tim Rigas.

9 A. I had provided a memo to Tim along with an attachment. And

10 that attachment was basically depicting what the disclosure

11 would look like that would go into a public filing. It started

12 off at the beginning, accounts receivable, and of course on the

13 left-hand side it would be from each of the individual family

14 members. There is a column for pluses, which would be

15 increases to those balances. There was another column for the

16 decreases, which would be payments in some form or fashion, and

17 then the ending balance. The schedule was the prescribed

18 format by the SEC.

19 Q. At the time you spoke to Tim Rigas?

20 A. Yes, and this was an example of what it would look like for

21 a period of time.

22 Q. And in your discussion, did you discuss whether those loans

23 to officers needed to be broken out by individual officers?

24     MR. TEMKIN: Could we get a time frame, your Honor?

25     THE COURT: Yes.

1 BY MR. CLARK:

2 Q. What time frame do you recall discussing this with Tim

3 Rigas?

4 A. This was in the summer of 1994.

5 Q. What, if anything, do you recall about the discussion of

6 the need to break out --

7     MR. CLARK: I'm sorry. I'm going to withdraw that,

8 Judge, someone was coughing.

9 Q. What, if anything, do you recall discussing with Tim Rigas

10 about the need to break out individual officers in disclosing

11 loans to officers?

12     MR. TEMKIN: Objection. Leading.

13     THE COURT: Overruled.

14 A. We discussed the content of the schedule and what it would

15 look like, and Tim had come back into my office and indicated

16 that it would be, you know, it would be taken under

17 consideration, it would be considered, you know, in the next,

18 in the future.

19 Q. Was the format you discussed with Tim Rigas something you

20 understood was voluntary?

21 A. No.

22 Q. Who did you understand required that format?

23 A. The Securities and Exchange Commission.

24     MR. FLEMING: I object to that and ask to strike it,

25 your Honor.

1    THE COURT: Overruled. The witness' understanding.

2    MR. CLARK: That's what I asked for, Judge.

3    THE COURT: Yes.

4 BY MR. CLARK:

5 Q. What, if anything, did you understand Tim Rigas to say

6 about the adoption of that required format?

7 A. That it would be taken under consideration, considered in

8 the future, and it then led into, as any type of discussion

9 regarding the intercompany balances as to perhaps what the next

10 meeting would be, how we were going to address the current

11 situation that existed. The current situation with the

12 accounts receivable balance at the company.

13 Q. Did there come a time when you or Kathy Mitchell or someone

14 working at your direction was able to formulate a total for the

15 balance owed by the Rigas entities to Adelphia?

16 A. I believe we had a pretty good tracking mechanism. We

17 spent a considerable amount of time from the day I started.

18 Until shortly thereafter.

19    MR. FLEMING: Not a responsive answer.

20    THE COURT: The question was: Did there come a time

21 when you had obtained that information? That's a yes or no.

22 BY MR. CLARK:

23 Q. Did there come a time when you obtained that information?

24 A. Yes.

25 Q. Can you give us an approximate time frame?

1 A. The way the books and records are kept, you know monthly

2 what's going on. So it was shortly after I started in which we

3 came up with the initial set of balances that had, that were

4 somewhat validated. Then they were being monitored on a month

5 by month by month basis thereafter, both at the request of the

6 family and, of course, we're putting the balances together so

7 the last range that I recall, I can't pinpoint it, but the last

8 range was somewhere in 12, 14 million range. It could have

9 been, could have been greater. It could have been smaller by a

10 few percentage points, but I can't -- I do not recall the exact

11 amount, but it was substantial.

12 Q. And was that money that was owed to Adelphia by the managed

13 cable entities owned by the Rigas family?

14 A. No.

15 Q. Who owed that money to Adelphia?

16 A. The members of the family, and there may be one other or

17 two other private companies in there that would be inclusive of

18 that amount.

19 Q. Did you also understand that, separate and apart from that

20 total, the managed cable entities owned by the Rigas family

21 owed Adelphia money?

22     MR. FLEMING: Objection to form.

23     THE COURT: Overruled. You may answer.

24 A. Yes.

25 Q. And was it your effort in creating this receivable balance

1  to include the managed entity debt in the same balance that

2  we're talking about?

3  A. No.

4  Q. So this is -- who, if anyone's, debts does the balance

5  we're talking about represent?

6      MR. LEVANDER: Asked and answered, your Honor.

7      THE COURT: Overruled.

8  A. The family members, and there may be one or two other

9  private entities included.

10 Q. What, if anything, did you do to try to determine or put a

11 number on the amount of money that the managed cable entities

12 separately owed to Adelphia?

13 A. I had not gotten into that. The balances were netted, and

14 I had not gone down that path. I was -- I hadn't gotten into

15 it.

16 Q. What did you focus on?

17 A. As I indicated earlier today, there was a fair amount of my

18 time that was spent on establishing a foundation, providing

19 some of these tolls that we talked about on the basic internal

20 control structure to begin to curtail, stop the other types of

21 expenditures that were going through the company's books and

22 records.

23 Q. I think you told us -- withdrawn.

24      How, if at all, did you understand the Rigas family

25 debts that we're talking about were going to be repaid to

1 Adelphia?

2 A. We had talked about going the cash route, is there any way

3 that you can pay them down, and that did not happen. So then

4 we started looking for alternatives as to what else can we do

5 or something in the way of their assets, maybe the company is

6 using that we could bring back in to retire those accounts

7 receivable balances. There were a number of meetings held in

8 that regard which I think I alluded to earlier.

9     MR. LEVANDER: Could we specify with whom, your Honor?

10 Could we specify with whom he's having these conversations?

11     THE COURT: Yes. Who participated in these meetings?

12     THE WITNESS: Tim was present at a number of the

13 meetings. There was Rhona Alter. She was in the tax

14 department. Chuck Gill was in the tax department. Mike

15 Mulcahey. I believe from time to time Jake Kane may have been

16 there. Jim Brown, Ed Hartman. Did I say Colin Higgin, Colin

17 Higgin.

18     MR. CLARK: Ms. Lee, can we show the witness

19 Government's Exhibit 9210, please.

20 Q. Mr. Zacherl, can you tell what this document is?

21 A. A memo that I wrote to the files, dated November 30, 1994.

22 Q. What's the subject?

23 A. Minutes of the November 22, 1994, intercompany meeting.

24 Q. Do the minutes reflect that John Rigas was present at the

25 meeting?

1 A. Yes.

2 Q. Do the minutes reflect that Tim Rigas was present at the

3 meeting?

4 A. Yes.

5 Q. Do the minutes reflect that Michael Mulcahey was present at

6 the meeting?

7 A. Yes.

8 Q. Do the minutes reflect that you were present at the

9 meeting?

10 A. Yes.

11     MR. CLARK: The government offers 9210, your Honor.

12     THE COURT: Received.

13     (Government's Exhibit 9210 received in evidence)

14     MR. CLARK: Can you blow up, thank you, Ms. Lee.

15 Q. Does that first section indicate who was present at the

16 meeting, Mr. Zacherl?

17 A. Yes.

18 Q. In addition to the individuals that you've identified, who

19 was Chris Thurner?

20 A. John's accountant, John Rigas' accountant.

21 Q. Who was Rhona Alter?

22 A. A member of the tax department.

23 Q. Who was Luke Heely?

24 A. At this point in time, at this point in time, Luke may have

25 been the controller.

1 Q. Of Adelphia?

2 A. Yes.

3 Q. How about Tom Elliott?

4 A. I believe he was an accountant.

5 Q. And Jerry Fillhart?

6 A. Jerry worked for Chris Thurner as John's accountant.

7    MR. CLARK: Ms. Lee, can you blow up section 1,

8 please.

9 Q. Mr. Zacherl, did you learn about a transaction between

10 Dorellenic and Island Partners on the one hand and Adelphia on

11 the other hand where certain real estate was going to be given

12 to Adelphia?

13 A. Yes.

14 Q. What did you understand the purpose of that transaction

15 was?

16 A. To decrease intercompany balances.

17 Q. Do you know whether that transaction ever took place?

18 A. Took place on March 31, 1994.

19    MR. CLARK: Could we go to page -- I'm sorry.

20 Q. Can you tell from this document what the amount of

21 credit -- withdrawn.

22    Who did you understand owned Dorellenic?

23 A. Members of the Rigas family.

24 Q. Who did you understand owned Island Partners?

25 A. Members of the Rigas family.

1  Q. Do you know what the value for the real estate was given in

2  that transaction?

3  A. $14,312,000.

4  Q. What was the purpose of that transaction?

5  A. To reduce intercompany balances.

6  Q. At the time that transaction took place, do you know

7  whether there was any appraisal made of the real estate that

8  was transferred from the Rigas family entities to Adelphia?

9  A. No, there was not.

10  Q. How do you know that?

11  A. It was a subsequent initiative that we put forth to value

12  those properties and to what we call true up the transaction,

13  should there be a need. And the appraisals, there were many

14  properties and there were many appraisals that had to be

15  obtained in different cities, different states. And the final

16  difference between the value and the appraised values was de

17  minimus.

18      MR. CLARK: Can we look at page 2, and highlight

19  paragraph 2, Ms. Lee.

20  Q. What's being discussed in the last two lines of this

21  paragraph?

22  A. I'd have to read the sentence.

23      "Chris Thurner is still attempting to contact a New York

24  City realtor to obtain current values needed to finalize the

25  gross amount used in the second group of properties brought

1 into Adelphia for the purpose of absorbing the initial

2 shortfall of $2.7 million in value."

3 Q. What, if anything, do you know about the shortfall of $2.7

4 million in value?

5 A. I don't recall. The schedule that was being put together

6 was evolving over time.

7     MR. LEVANDER: Objection, your Honor. He doesn't

8 recall.

9     THE COURT: I don't recall is the answer.

10     MR. CLARK: Okay.

11     Ms. Lee, can we show the witness what's marked as

12 Government's Exhibit 1239, please.

13 Q. Do you recognize this document, Mr. Zacherl?

14 A. Yes, a memo from Chris Thurner to Tom Elliott, dated

15 February 13, 1995.

16 Q. Are you carbon copied on this document?

17 A. Yes, I am.

18     MR. CLARK: Ms. Lee, can you go to the first page of

19 this document. I'm sorry, the second page.

20 Q. Do you recognize the schedule attached as the second page

21 in this document, Mr. Zacherl?

22 A. Yes. This was a listing of the properties and the tracking

23 mechanism that when the appraisals came in they were entered in

24 the column called appraised value, which is the second column

25 from the right.

1 Q. Were you present at meetings where this document, where

2 these schedules were shown to and discussed with John Rigas?

3 A. Yes.

4 Q. Were you present at meetings where this document was shown

5 to and discussed with Tim Rigas?

6 A. Yes.

7 Q. Were you present at meetings when this document was shown

8 to and discussed with Michael Mulcahey?

9 A. Yes.

10     MR. CLARK: Your Honor, the government offers

11 Government's Exhibit 1239.

12     THE COURT: Received.

13     (Government's Exhibit 1239 received in evidence)

14     MR. FLEMING: No objection.

15     MR. CLARK: Could you show the first page, please,

16 Ms. Lee.

17 Q. What does the first sentence say?

18 A. "Please find attached a copy of the final real estate

19 schedules for the March 31, 1994, transfer to Adelphia."

20     MR. CLARK: Can you give us the second page, please,

21 Ms. Lee.

22 Q. What's reflected here on the second page, Mr. Zacherl?

23 A. This is the spread sheet that was used as the tracking

24 mechanism, listing all the properties, and I believe there was

25 another page as well as the net book -- I'm sorry, as well as

1  the appraised values. Purpose of it was to compare the value

2  of the appraised properties to the amount that was used in the

3  books and records.

4      MR. CLARK: Can we go to page 2 briefly -- page 3.

5  Q. Are those more properties?

6  A. Yes.

7      MR. CLARK: And page 4.

8  Q. Are those yet more properties?

9  A. Yes.

10  Q. What's the last property listed there?

11  A. Job Rigas, Saratoga unit No. 23A.

12  Q. Was it your understanding that that was supposed to be

13  conveyed to Adelphia as part of this transaction?

14  A. Yes.

15  Q. Mr. Zacherl, do you know what a buyer of property gets when

16  he or she takes ownership of that property?

17  A. You get a lot of paperwork, you get rights to use the

18  property and the legal title was conveyed to the property,

19  during the closing process.

20  Q. What good is a sale of property if legal title is not

21  conveyed?

22      MR. FLEMING: Objection.

23      THE COURT: Can you answer that question?

24      THE WITNESS: From an accounting standpoint?

25      THE COURT: Yes, from an accounting extant point.

1 BY MR. CLARK:

2 Q. From an accounting standpoint.

3 A. You don't get much of anything. The property may have been

4 transferred on the books, but from a legal standpoint, I don't

5 believe you have the right to use it.

6     MR. MAHONEY: I object to the legal standpoint, your

7 Honor. He's supposed to be answering as an accountant.

8     MR. CLARK: Is that an objection or a comment, your

9 Honor?

10     THE COURT: Excuse me?

11     MR. CLARK: Is that an objection?

12     THE COURT: I think that's an objection. I'll sustain

13 the objection to the last incomplete phrase.

14     MR. LEVANDER: Your Honor, this is a technical

15 confusion, but on the list of Government's Exhibits, there's an

16 Exhibit 1236, which looks very much like 1239, which we are

17 putting in evidence, but that was not listed among the

18 exhibits, so I'm a little confused which we're bringing into

19 evidence and which we're not bringing into evidence.

20     MR. CLARK: If there's a typo on the list, they're

21 functional equivalents. We can revisit it later. I put in

22 1239.

23     THE COURT: 1239 is the document we were looking at on

24 the screen.

25     MR. LEVANDER: What was given to us as 1236, I'm

1 trying to straighten --

2     THE COURT: Why don't you do that with Mr. Clark.

3 BY MR. CLARK:

4 Q. What was the purpose of transferring these properties to

5 Adelphia?

6 A. Retirement of an accounts receivable balance.

7 Q. What value would Adelphia have gotten out of this transfer

8 if it didn't receive the titles for these properties?

9     MR. FLEMING: Objection.

10     THE COURT: Overruled.

11 A. I don't believe they would have received value.

12 Q. While you worked at Adelphia, did you become aware of --

13 withdrawn.

14     I believe you told us earlier about certain temporary

15 repayments of account balances by the Rigas family.

16     MR. LEVANDER: Objection.

17     THE COURT: I think you're directing his attention to

18 his testimony this morning.

19     MR. CLARK: That's right, your Honor.

20     THE COURT: Ask the question.

21 BY MR. CLARK:

22 Q. Do you recall this morning talking about cash payments on a

23 temporary basis made by members of the Rigas family to accounts

24 payable?

25 A. Yes. These were the --

1    THE COURT: Yes. Yes?

2    THE WITNESS: Yes.

3    THE COURT: You remember. Next question.

4  BY MR. CLARK:

5  Q. How was the money -- how did you understand the money for

6  those payments was obtained?

7    MR. FLEMING: Objection.

8    THE COURT: Did you have an understanding of the

9  source of those monies used for repayment?

10    THE WITNESS: Yes.

11    THE COURT: What was your understanding based on?

12    THE WITNESS: There were, the first time I came across

13  it there was a series of papers that were attached to a

14  document, and those papers showed the transactions that would

15  be recorded in the books to show the reduction of the accounts

16  receivable balance, and then there was another set of papers

17  also known as journal entries that would show the money going

18  back out --

19    MR. TEMKIN: Objection, your Honor.

20    THE COURT: Overruled.

21    THE WITNESS: -- a few days later.

22    THE COURT: Okay.

23    MR. CLARK: Could I have one moment, your Honor.

24    MR. FLEMING: I don't think it was a responsive

25  answer, your Honor.

1     THE COURT: The question was: What was your

2  understanding based on? The question was brought and he

3  replied indicating what his understanding was based on.

4     MR. FLEMING: It had to do with where the funds, the

5  money came from.

6     THE COURT: He had not answered that question yet.

7     MR. FLEMING: I agree. That was my objection.

8  BY MR. CLARK:

9  Q. Was it your understanding --

10     THE COURT: No, no.

11     MR. CLARK: Sorry, your Honor.

12     THE COURT: It's obviously going to be a leading

13  question.

14  BY MR. CLARK:

15  Q. What did you understand these transactions accomplished?

16  A. The transactions retired the accounts receivable balances

17  at a point in time, a couple of days or the day prior to the

18  end of the reporting period.

19  Q. What, if any, effect did they have on Adelphia's reported

20  financial statements?

21     MR. LEVANDER: Asked and answered, your Honor.

22     MR. FLEMING: We had that this morning, your Honor. I

23  object.

24     THE COURT: Overruled.

25  A. The total effect would be an increase to cash and the

1 A. John Rigas and his four children.

2 Q. Do you recall their respective ownership percentages?

3 A. John Rigas had a small amount, approximately 2 to 3

4 percent. Ellen had approximately 5 percent, and the other

5 remaining 92, 93 percent were owned equally by Michael, Tim and

6 James Rigas.

7 Q. You also mentioned a company called did Eleni Interiors.

8 What business was that in?

9 A. Eleni Interiors was in the sale of -- business of interior

10 decorating services.

11 Q. Who owned Eleni Interiors?

12 A. John Rigas.

13 Q. Did Eleni Interiors have a particular customer that

14 accounted for the majority of its revenue?

15 A. In later years, it did a significant amount of business

16 with Adelphia.

17 Q. Now, when you first assumed responsibilities as controller,

18 did you have a staff that reported to you?

19 A. Yes, I did.

20 Q. How many people?

21 A. Initially for a brief period of time it was just one, and

22 then I hired a second person. Ultimately the staff increased

23 to approximately seven or eight.

24 Q. By March of 2002, when John Rigas resigned from Adelphia,

25 how large was the staff for --

1 A. Approximately seven, eight people reporting to me.

2 Q. And you mentioned you had some duties with respect to John

3 Rigas's personal finances when you began. Can you tell us what

4 those were?

5 A. Yes. We maintained accounting records for Mr. Rigas'

6 personal expenditures, his personal expenditures, his personal

7 revenues, purchases of assets, indebtedness. We also gave

8 information on his personal financial affairs to the CPA who

9 prepared his tax return. I managed Mr. Rigas' investments and

10 also advised him on his holdings of life insurance.

11 Q. What, if any, control did you have over bank accounts in

12 John Rigas' name?

13 A. Initially I had very little, if any, control over those.

14 Starting, stay, in 1993 and 1994, people in my area began to

15 have signature authority over various bank accounts of

16 Mr. Rigas and the business entity that I was responsible for.

17 Q. And what, if any, authority or control did you have over

18 bank accounts for the various private companies that you have

19 described for us?

20 A. Various people had -- we did all the accounting for it in

21 terms of reporting transactions, reconciling the bank accounts

22 on a periodic basis, reporting on a daily basis to Mr. Rigas

23 what the bank balances were in each respective account, and

24 also ultimately, as I said, in '93 and '94, we started limited

25 individuals had signature authority on the bank accounts.

1  Q. Now, how did you and your staff keep track of revenue and

2  expenses for these various entities?

3  A. We utilized a computerized general ledger software package

4  by the name of MAS 90, had a general ledger which essentially

5  tracks revenues and expenses, assets, liabilities and so forth

6  in Mr. Rigas' -- within the accounts payable module when

7  expensed invoices and bills as they are incurred, how those

8  bills are paid and when they are paid. Also billings for

9  things such as he had a couple of small rental properties, when

10  the cash is collected on that, also any transfers between

11  various bank accounts.

12  Q. Could your computer -- the computerized ledger system you

13  mentioned, the MAS 90 system, could it communicate data

14  electronically with Adelphia's computerized ledger system?

15  A. No.

16  Q. What types of reports did you and your staff prepare from

17  the ledger information which --

18  A. There were various reports. We had -- on a periodic basis,

19  we would provide balance sheets, income statements, statements

20  of cash flows for Mr. Rigas and the various entities that he

21  controlled. There were also transactional reports that it

22  would show, for example, checks written on a particular day or

23  on -- over a period of time. Also invoices that were input or

24  had been expensed over a period of time, cash that had been

25  received over set periods of time, any transfers between

1 various bank accounts and so forth.

2 Q. Which, if any, of these reports did you provide to

3 Mr. Rigas while you worked for him?

4 A. Mostly the reports in terms of balance sheets, income

5 statements, statement of cash flows for the various entities.

6 We had other reports that provided a breakout by various

7 business or product lines of sales and expenses. We also had

8 reports that allowed him to review and monitor the performance

9 of his investments. We had other reports on checks written

10 daily, daily banking balances, comparing the bank balance to

11 the general ledger balance.

12 Q. Were there any particular types or particular formats of

13 reports that were specifically requested by Mr. Rigas?

14 A. There were -- was one that involved looking at his -- all

15 of his expenditures on a -- what was called a pure cash basis,

16 or cash basis of accounting, where revenues are recognized when

17 the cash is received for those, such as when he would receive a

18 salary and be paid for that, we would record that. And when

19 certain bills were paid and so forth, the expenses or the

20 acquisition of a particular asset or paydown of an existing

21 debt would be recorded.

22       Now, typically you see most accounting reports are

23 prepared on accrual basis, which is done by income. For

24 example, your salary is recognized when you actually earn it

25 for that particular period of time, not necessarily whether it

1 Ms. Ottenberg.

2 Q. What's the date on this deed?

3 A. December 29, 1998.

4 Q. Who is the seller?

5 A. Wending Creek Farms.

6 Q. Who is the buyer?

7 A. Andrew C. White and Blake E. Kritzberg.

8 Q. Which piece of property did this deed relate to?

9 A. The Stamborecky property.

10 Q. Is this the same Stamborecky property as had been sold or

11 subject to the agreement of sale to Adelphia?

12 A. Yes.

13      MR. OWENS: Ms. Ottenberg, could you take us to the

14 third page of this document and blow up the bottom half of the

15 page, please.

16 Q. Whose signatures appear there?

17 A. John Rigas'.

18 Q. Now, Mr. Thurner, are you familiar with something called an

19 SEC form 13D?

20 A. Yes.

21 Q. What is an SEC form 13D?

22 A. It's a form by which anyone who owns more than 5 percent of

23 a publicly traded stock files with the SEC disclosing their

24 holdings.

25 Q. Do you know if any members of the Rigas family filed form

1  13Ds with the SEC in connection with their ownership of

2  Adelphia stock?

3  A.  Yes.

4  Q.  What, if any, role did you have in preparing the form 13Ds

5  filed on behalf of members of the Rigas family?

6  A.  I would review drafts provided to me by Carl Rothenberger.

7  Q.  Who was Carl Rothenberger?

8  A.  He was an attorney at Buchanan Ingersoll.

9  Q.  When you say drafts, drafts of what?

10  A.  Drafts of the 13D.

11  Q.  What did you do when you reviewed drafts of the 13Ds?

12  A.  I would compare the information provided by Carl to records

13  I had that tracked the number of shares and class of shares

14  that the Rigas family owned in Adelphia's publicly traded -- or

15  in Adelphia stock.

16  Q.  When did you first begin reviewing these 13Ds?

17  A.  As I can best recall, it was sometime in the late 1990s.

18  Q.  Can you be any more specific than that?  Do you recall

19  approximately what year?

20  A.  No, I don't recall the exact year.

21  Q.  Now, apart from reviewing the drafts with respect to the

22  numbers of shares owed, what, if any, other information did you

23  provide Mr. Rothenberger with respect to the 13Ds?

24  A.  If John Rigas personally had purchased shares --

25       MR. FLEMING:  I object to this.  It's unresponsive.

1    THE COURT: Overruled.

2    MR. FLEMING: May I have the question again, your

3 Honor.

4    THE COURT: Excuse me?

5    MR. FLEMING: Could I hear the question again?

6    THE COURT: Yes.

7    (Record read)

8    THE COURT: You may answer.

9 BY MR. OWENS:

10 Q. You can answer.

11 A. When Mr. Rigas would purchase in the open market through

12 his brokerage accounts shares in Adelphia or Adelphia Business

13 Solutions, I would provide that information to Carl, trade

14 confirmation, showing the date of purchase, number of shares

15 purchased, price at which they were purchased and so forth.

16 Q. Did you ever read the instructions provided by the SEC for

17 filling out a form 13D?

18 A. No.

19 Q. How did you know how to count the shares to be included on

20 the form?

21 A. I did it based upon conversations I had with

22 Mr. Rothenberger.

23 Q. Let me show you now what's in evidence as Government's

24 Exhibit 4710-A.

25     MR. OWENS: Could you show that to us, please,

1 Ms. Ottenberg, the first page. And if you could take us to the

2 next page.

3        One moment, please, your Honor.

4        Why don't you put up on the screen Government's

5 Exhibit 4710-H.

6        I apologize, your Honor.

7        And show us the next page, please.

8 Q. Mr. Thurner, this is a different version of the document

9 that I showed you. Can you tell us from the screen what this

10 is?

11 A. This is a schedule 13D filed as of January 21, 2000.

12        MR. OWENS: If we could scroll down the page, please,

13 and into the next page, please, Ms. Ottenberg.

14 Q. Can you tell us who this form 13D was filed on behalf of?

15 A. John Rigas, Michael, Timothy, James, and Ellen Rigas.

16        MR. OWENS: Now, just for ease, I want to ask you to

17 go back to the manual signed copy of this, 4710-A, to page 15.

18        One moment, please, your Honor. We can't seem to find

19 this in the computer, Judge. I'm just going to ask the witness

20 to read.

21 Q. See on page 15, there's a heading "source and amount of

22 funds or other consideration"?

23 A. Yes.

24 Q. Can you read paragraph 3C to us, please?

25        THE COURT: This is a document in evidence?

1 the third page, and if you could blow up the top half of the

2 page for us, please.

3 Q. Do you see the line that has the number of shares in column

4 No. 9 of 97,949?

5 A. Yes.

6 Q. Let me ask you something differently. Does this form 4

7 relate to the Brush purchase?

8 A. This was, as I recall, Timothy Rigas' form 4 that was

9 given.

10 Q. And does it relate to the Brush purchase?

11 A. Yes. That helps me answer the question, if I know it was

12 Tim's. Yes, it does.

13 Q. Now, the forms that were filed in March of 2000, the form

14 4s for Tim Rigas and Michael Rigas, were they the same?

15 A. I'm sorry. Would you repeat the question, please.

16 Q. Were the transactions disclosed or the forms that were

17 filled out for Tim Rigas and Michael Rigas the same?

18 A. I believe they were.

19      MR. OWENS: Could we go to the bottom of the third

20 page now. Can you blow up for us the text in the lower right

21 hand -- sorry, the lower left-hand corner.

22 Q. Can you read that text for us?

23 A. "Intentional misstatements or omissions of facts constitute

24 federal criminal violations. See 18 U.S.C. 1001 and 15 U.S.C.

25 78ff(a). Note: File three copies of this form, one of which

1 must be manually signed. If space provided is insufficient,

2 see instruction 6 for procedure."

3 Q. So, is it your recollection, remember we've looked at a

4 number of letters between you -- that you received from

5 Mr. Rothenberger, and the letters from Mr. Rothenberger to the

6 SEC, filing these forms? Do you recall we looked at those

7 earlier?

8 A. Yes.

9 Q. Is it your recollection that Mr. Rothenberger filed forms

10 that were not manually signed?

11 A. I believe so, but I -- he filed electronically, so I don't

12 know how that requirement flies on electronic document.

13 Q. What is the note requirements, the text here?

14 A. It says one of which must be manually signed.

15     MR. OWENS: Could we go back to the full page, and

16 blow up the text in the lower right-hand corner.

17 Q. What's the date on this form?

18 A. January 7, 2000.

19 Q. And when did you send this to Michael Rigas?

20 A. March the eighth.

21 Q. Did he sign it after you sent it to him?

22 A. I recall that he did, yes.

23 Q. Did he complain to you that you sent it to him two months

24 after the date it was dated?

25 A. No, I don't recall that he did.

1 Q. When he sent it back to you, did he correct the date on the

2 form?

3 A. No, I don't recall that he did.

4 Q. You were asked, you were shown a number of drafts of form

5 13Ds, various memos, had some handwriting on them. I want to

6 ask you some questions about those specifically. But first,

7 what was your role in assisting in the preparation of the draft

8 13Ds?

9 A. I primarily served as a second set of eyeballs, so to

10 speak, for Mr. Rothenberger to review the information.

11 Primarily focusing on the number of shares that -- and number

12 of shares in each class of stock that were owned by the Rigas

13 family and that were being disclosed and that the -- I had

14 maintained some schedules that outlined those shares, and

15 again, for him as a check to his work.

16 Q. What, if any, information did you provide Mr. Rothenberger

17 about the source of funds for purchases of securities by

18 members of the Rigas family from the period 1998 through 2002?

19 A. I believe the only information I would have provided

20 regarding source of funds to him would be on any open market

21 transactions by John Rigas in purchasing Adelphia securities

22 through his brokerage accounts in the open market.

23 Q. Was the Jim Brush purchase an open market transaction?

24 A. No.

25 Q. Did you provide Mr. Rothenberger with any information about

1 the source of funds for that purchase?

2 A. No, I did not.

3    MR. OWENS: One moment, please, your Honor.

4    Steve, if you could put up for us, please, Defense

5 Exhibit 9818, and if you could take us to, blow up the bottom

6 half of the second page. And if you could highlight for us

7 paragraph 2E.

8 Q. This is your memo to Mr. Rothenberger about the Jim Brush

9 13D, right?

10 A. Yes.

11 Q. What, if any, information did you provide in this memo to

12 Mr. Rothenberger about the source of funds for the Jim Brush

13 transaction?

14 A. Just, just the comment that it would need to be included in

15 the source of funds.

16 Q. The drafts that you saw before you sent this to

17 Mr. Rothenberger, did they include any information about the

18 source of funds?

19 A. No. I would not have raised the point. Consideration of

20 disclosing that would have been needed in my memo, if they had

21 been.

22 Q. I'm sorry?

23 A. If it had been disclosed in previous drafts, I would not

24 have raised, you know, the question that, whether or not it

25 should be included in the source of funds, directing him to

1 that.

2 Q. After you sent this memo to Mr. Rothenberger, did he ask

3 you any questions about the source of funds for the Brush

4 purchase?

5 A. As I best recall, I only recall that we talked in regards

6 to the price shown on the form 4.

7      MR. OWENS: Pardon me a moment, your Honor.

8      THE COURT: Mm-hmm.

9      MR. OWENS: Pardon me, your Honor. I'm trying to find

10 the next document I want to show the witness.

11      Steve, can you put up for us now Defense Exhibit 9819.

12 Q. Mr. Thurner, what is this document?

13 A. This is my memo to Carl Rothenberger of February 1, 2000.

14 Q. If you scroll down the page a little bit, all the way to

15 the bottom, see the double underlined text at the bottom?

16 A. Yes. "Chris, all the above-suggested changes have been

17 made."

18 Q. What is that?

19 A. That's Carl Rothenberger's response to my comments shown

20 above that line.

21 Q. So that we understand, Defense Exhibit 9819 includes Mr.

22 Rothenberger's replies to your comments?

23 A. Yes.

24      MR. OWENS: Now, if we can go to the second page,

25 please, Steve, and if you could blow up for us paragraph 2E.

1 special in certain ways, correct?

2 A. I do not know.

3 Q. He also made certain calculations, which we will get to in

4 a moment, for bulk units, is that correct?

5 A. I don't know if Brett Klein made those adjustments.

6 Q. And he also helped you with make the adjustments for Brazil

7 and Venezuela and data that you described --

8 A. Those adjustments I do have direct knowledge of and those

9 adjustments I will say that I instructed Brett to make.

10 Q. OK. But you are aware, aren't you, that those aren't the

11 only adjustments accounting made to the subscriber numbers,

12 correct?

13 A. I am aware of other adjustments made to essbase for

14 subscribers, correct.

15 Q. Many other adjustments, in fact, correct?

16 A. I mean, I am aware of some.

17 Q. Let's talk about bulk units for just a second. Are you

18 familiar with the term EBU, ma'am?

19 A. Yes, I am.

20 Q. EBU means -- now I forgot, estimated bulk units -- is that

21 correct?

22 A. I don't believe so.

23 Q. Equivalent bulk units, is that correct?

24 A. That is correct.

25 Q. And here is the problem here with bulk units, correct,

1 certain apartment buildings or hotels, condominium

2 associations, cooperatives, bill as a collective unit, correct?

3 A. Right. I don't know that I would describe it as a problem

4 but those are equivalent bulk units.

5 Q. Right. And if an apartment building, let's say, receives a

6 single cable bill which it has negotiated on behalf of all of

7 the residents of the apartments in that building, it is only

8 one bill, correct?

9 A. That's my understanding.

10 Q. And the problem, or maybe not problem, but the issue for

11 Adelphia was how do you calculate how many individual

12 subscribers there are represented by that bulk bill, correct?

13 A. Correct.

14 Q. And there were various ways that Adelphia used to make that

15 calculation, correct?

16 A. I am aware of two ways.

17 Q. All right. One method, is it not correct, was to calculate

18 EBU's equivalent bulk units, at 11.95, correct?

19 A. That's one way I am aware.

20 Q. And another way to do it was to calculate EBU's at the

21 prevailing rate in that area or some area, correct?

22 A. Correct.

23 Q. You would agree with me that if the prevailing rate is,

24 say, $20 a subscriber, it makes a big difference in your

25 resulting numbers depending on whether you divide the bulk bill

1 by 11.95 or $20, correct?

2 A. Yes, if the prevailing rate is different, there could be a

3 difference in the calculation, sure.

4 Q. Using my hypothetical, if you use the 11.95 method, you are

5 going to get a number that's almost double the number you will

6 get if you use the prevailing rate of $20, correct?

7 A. Hypothetically speak, yes.

8 Q. And that's because 11.95 is just a little more than half of

9 20, correct?

10 A. Yes.

11 Q. Now, there was a special issue with respect to Florida bulk

12 subscribers, correct?

13 A. I don't have much knowledge of this.

14 Q. Were you aware, ma'am, that it was possible to count the

15 individual bulk units within an apartment building or

16 condominium association in Florida but not in other states,

17 correct?

18 A. I am aware that there was an issue in Florida with counting

19 subscribers, but I am not aware of the specifics or what was

20 done.

21 Q. Have you ever heard the expression "counting kitchens"?

22 A. I have.

23 Q. And didn't that refer to the ability to actually count

24 individual apartment dwellers or co-op owners or condo owners

25 in Florida as opposed to other places?

1  A. Again, I am familiar with the term "kitchen," "counting

2  kitchens," meaning individual units, in other words.  Exactly

3  what was done with Florida, I don't have knowledge of.

4  Q. But, in any event, Florida was a special case, as you

5  understood it, correct?

6  A. Again, I don't know how Florida units were counted.

7  Q. All right.  Now, you have described for us two methods of

8  calculating EBU's correct, the 11.95 method, let's call it, and

9  the prevailing rate method, correct?

10  A. Correct.

11  Q. What method did Ms. Coolidge use, if any, in her weekly

12  reports that you received?

13  A. Well, in the weekly reports that you are referring to from

14  Darla Davis, I don't recollect those reports, looking at them

15  at all.

16  Q. Take a look again, ma'am, at Government Exhibit 2552 --

17      THE COURT:  It talks about two different methods, the

18  prevailing rate or 11.95.  Spell that out.  What would you do

19  for 11.95?

20      THE WITNESS:  Well, the way I understand it is if you

21  had an apartment building and let's say Adelphia contracted

22  with the apartment building to have cable, they would charge

23  the apartment building a certain rate for all of those people.

24  That rate would be divided by 11.95.

25      THE COURT:  You take the bill to the apartment, divide

1  it by 11.95, and that would give you the number of units that

2  you came up with for --

3      THE WITNESS: That's my understanding.

4  Q. Or you could do the same with the prevailing rate method,

5  correct?

6  A. Yes, the same kind of calculation applies.

7  Q. By the way, when apartment dwellers, just to use that

8  example, were billed in this fashion, they would receive a

9  discount from Adelphia, correct?

10  A. I have no idea.

11  Q. They didn't receive the same bill that a homeowner in a

12  freestanding house or a barbershop would receive for the same

13  cable services, correct?

14  A. I mean, I don't have any direct knowledge of what Adelphia

15  contracted with various apartment buildings. I am sorry.

16  Q. OK. Before we go back to this document, I just want to ask

17  you a few other general questions which I was about to omit.

18      The EBU calculations -- strike that.

19      When you got the subscriber numbers in essbase, and

20  were preparing your press releases, reporting basic subscribers

21  and other categories of subscribers, did you use a method of

22  reporting bulk units?

23  A. Can you repeat that, please?

24  Q. Certainly, ma'am. Let me start with a more basic question.

25      The numbers for subscribers that you reported in your

1 press releases, did those include EBU's?

2 A. Yes, I believe so.

3 Q. And what method did you use, or people under your employ,

4 to calculate those EBU's?

5 A. It's my understanding that the method that was used was the

6 prevailing rate method.

7 Q. Is that your complete understanding of that process?

8 A. Well, I am aware of some --

9 Q. Let me ask you another question if you don't mind. Isn't

10 it the case that the accounting department used a hybrid method

11 for determining EBU's? And by that I mean Legacy systems which

12 were old systems that Adelphia had owned and managed for a long

13 time were treated one way and new acquisitions, like Frontier

14 Vision and Harron, which were acquired in 1999, was treated

15 another way?

16 A. My understanding is that, generally speaking, the

17 calculation was based on using a prevailing rate method.

18 However, I was made aware of some bogus adjustments that were

19 made to essbase at some prior period in order to equate

20 Adelphia Legacy systems or in order to make the Adelphia Legacy

21 subscribers be on the prevailing rate.

22 Q. Now, the EBU adjustments made in the accounting group were

23 made by Mr. Klein, correct?

24 A. I don't know that.

25 Q. If you could just take a look at Government Exhibit 3512A.

1  BY MR. O'BRIEN:

2  Q.  Is it your understanding, however fragmentary, that under

3  these adjustments we've been talking about now --

4      MR. OWENS:  Objection.

5      THE COURT:  Yes.

6      MR. O'BRIEN:  I apologize, your Honor.  I'll rephrase

7  it.

8  Q.  Is it your understanding, Ms. Chrosniak, that under these

9  adjustments for EBUs you're describing now, Legacy Systems were

10  treated differently from recent acquisitions?

11  A.  It's my understanding that Legacy Systems and the newer

12  systems, I guess what period -- I mean, what period of time are

13  you referring to?

14  Q.  During the time you were at Adelphia, at any point within

15  those two years, did the adjustments you're talking about now

16  involve treating Legacy Systems differently from the newer

17  systems, as you say?

18  A.  I guess my understanding is the only difference would be

19  that the Legacy Systems have these adjustments on them.

20  Q.  All right, ma'am.  Now, if you could turn to Government's

21  Exhibit 2552, which I put in front of you some time ago, you

22  are on this e-mail as a recipient, correct?

23  A.  Yes, I believe we -- yep, there I am.

24  Q.  And you do have some familiarity with weekly reports you

25  received from Ms. Coolidge and/or Ms. Davis, correct?

1 A. Again, I'm looking at this report, in all of the detail,

2 and I do not recall opening up this e-mail. I'm not saying I

3 didn't receive it. I'm just saying, you know, there's a lot of

4 e-mails I get. Not all of them, if they weren't relevant to

5 me, did I open. So, when I look at this report, it does not

6 look familiar to me.

7 Q. All right. Let's turn to, well, let's turn to the third

8 page. See that?

9 A. Yes, I do.

10     MR. O'BRIEN: Can we just scroll down to the bottom

11 half.

12 Q. By the way, Ms. Chrosniak, would you be surprised to know

13 that about 50 weekly reports from Ms. Davis and Ms. Coolidge

14 are on your computer hard drive from Adelphia?

15 A. I would not be surprised.

16     MR. O'BRIEN: Now, if we could just, Steve, I'm going

17 to have to ask you to go back to the top, because I forgot to

18 read what I was supposed to read.

19 Q. This says manual systems, correct?

20 A. Yes.

21 Q. And the explanation is these cost centers are held constant

22 using the most recent month end data available, correct?

23 A. That's correct.

24 Q. These cost centers are held constant because there's no

25 data for the week covered by the report, correct?

1 A. I have no idea.

2 Q. Isn't that the way you were using the most recent month end

3 data available for this report, as the page says?

4 A. I do not know.

5 Q. Now, if you go down to the bottom of this report, it has a

6 total, and that total is 1,186,166, correct?

7 A. Yes.

8 Q. And that is the number of subscribers for the cost centers

9 which are being held constant, correct?

10 A. Again, I'm reading this off this chart for the first time,

11 so, it says there's a total there of that number, I don't

12 really know exactly what it means.

13 Q. All right, ma'am. If you could turn to -- would you like a

14 hard copy?

15 A. I have one. Thank you.

16 Q. If you could just go five pages in from this point. I

17 don't have the number of the page to give you, but Steve has

18 it.

19 A. I'll make sure I'm on the right page.

20 Q. Now, this shows Adelphia Communications basic subscriber

21 counts, correct?

22 A. Yes.

23 Q. And there are different categories of subscribers listed on

24 Ms. Coolidge's and Ms. Davis' page here, correct?

25 A. Yes.

1 Q. For example, the first column says total basic with EBUs at

2 PR, correct?

3 A. Yes.

4 Q. And that's prevailing rate, right?

5 A. I believe so.

6 Q. And if you just skip the next column, the third column says

7 basic, correct?

8 A. Yes.

9 Q. And then the next column over says EBU at prevailing rate,

10 correct?

11 A. Correct.

12 Q. Is it fair to say, ma'am, that adding the number you see

13 there for basic plus the number for EBU at prevailing rate

14 gives you the number for the first column we looked at, which

15 is total basic with EBUs at prevailing rate?  If you'd like a

16 calculator, I have one.

17 A. You know, I've got one right here.

18 Q. Okay, great.

19 A. Just bear with me.

20      MR. O'BRIEN:  Could we highlight those numbers, Steve?

21 Is it possible to get all three?  There you go.

22 A. I added those two totals there.  5,146,158, and 269, and I

23 did get the total basic at 5,415,998.

24 Q. So basic plus EBUs gives you total basic with EBUs,

25 correct?

1  A.  Yes.

2  Q.  It would be fair to say that the category basic on this

3  chart does not include EBUs, correct, because we had to add

4  them to get the total basic?

5  A.  Right.  But I don't know what's in that 5,146,158 number.

6  Q.  I'm just asking you about the numbers, ma'am.  As a matter

7  of simple addition, the EBUs are not included in basic,

8  correct?

9  A.  Well, I think we established that the EBU total of 269 plus

10  the basic total of 5,146 equals total basic with EBUs at PR.

11  Q.  So, that second category, basic MSO, does not include EBUs,

12  correct?

13  A.  I don't know that.  I mean, I'm not trying to be difficult.

14  I just don't know all of what's in that 5.1 million subscriber

15  number.  It doesn't include whatever these EBUs are here to the

16  right.

17  Q.  I understand your point.  If it were included in basic, you

18  would be double counting the EBUs, correct, and reaching total

19  basic with EBUs at prevailing rate?

20  A.  If they were not the same EBUs, so, I'm willing to say that

21  this 5.1 million number plus these 269,000 subscribers in this

22  other column agree to this total column.

23  Q.  Now, when you published your press releases, as Mr. Owens

24  pointed out, there is a category for basic subscribers,

25  correct?

1  A. Yes, there is.

2  Q. That number certainly does include EBUs, correct?

3  A. It's my understanding that that does include EBUs.

4  Q. Now, based on the information on this chart, there's

5  another way of calculating EBUs, correct?

6      MR. O'BRIEN: If we could just move to the right,

7  Steve. And just highlight the next column.

8  Q. There's also a calculation for EBUs at $11.95, correct?

9  A. Yes, there's a column there for that.

10  Q. And that's the second method you described for us earlier,

11  correct?

12  A. Yes.

13  Q. Now, if you could perform this calculation with your

14  calculator --

15  A. Okay.

16  Q. Add the number EBU at $11.95, 729,419, correct?

17  A. Yes. I got it.

18  Q. And add that to the basic number, which is 5,146,158.

19  A. Yes, okay.

20  Q. And what number do you get?

21  A. 5,875,577.

22  Q. And that's compared to 5,415,998 for total basic with EBUs

23  at prevailing rate, correct?

24  A. Yes. That's the total there.

25  Q. And that's a swing of over 450,000 subscribers, correct?

1    A. Yes.

2        MR. O'BRIEN: Your Honor, may I approach and just put

3    a couple of these numbers on the chart for our jury.

4        THE COURT: Yes.

5    BY MR. O'BRIEN:

6    Q. Ms. Chrosniak, those are the two numbers we just

7    calculated, correct? If you can see it. Prevailing rate, you

8    get 5,415,998, correct?

9    A. Yes.

10    Q. And at $11.95, you get 5,875,577, correct?

11    A. Correct.

12        MR. O'BRIEN: Does anyone have a problem seeing that

13    number? Thanks.

14    Q. Now, this is for the period March 20 through March 26,

15    2001, correct? If you look at the cover sheet, or if you just

16    look at the fine print.

17    A. Yes. No, I see that. That's correct.

18    Q. And that's almost quarter end, end of first quarter '01,

19    correct?

20    A. Yes. That ends on March 31.

21    Q. Could you remind us, ma'am, what was the total reported for

22    basic subscribers for the first quarter 2001 in your press

23    release? It's found in GX3065.

24        MR. O'BRIEN: We don't have to put this up on the

25    screen, Steve, unless it's necessary for Ms. Chrosniak.

1       THE WITNESS: No. I can look at a hard copy.

2 BY MR. O'BRIEN:

3 Q. Okay.

4 A. 3065?

5 Q. Yes, ma'am. I believe that's right.

6 A. Okay. Actual and pro forma are the same, so in this case,

7 I'll just read the basic subscriber number.

8 Q. Okay.

9 A. This is as of March 31, 2001, the basic subscriber reported

10 was 5,723,315.

11 Q. Let me just write that on our chart, for completeness.

12     Can we call this the external number, Ms. Chrosniak?

13 A. Sure.

14 Q. 5,7 --

15 A. -- 723,315.

16 Q. Now, you would agree with me, wouldn't you, ma'am, these

17 are all different numbers, correct?

18 A. I would agree with you there.

19 Q. Thank you. And would you also agree with me that the

20 number reported in the press release, the external number, is

21 higher than the number for total subs with prevailing rate,

22 correct?

23 A. Yes.

24 Q. But it is lower than what's reported for total subs at

25 $11.95, correct?

1  A.  That's correct.

2  Q.  So, it falls in between, correct?

3  A.  Yes.

4  Q.  Let's turn to another page of the report.  Talk about voice

5  and data subscribers for a minute.  If you can just go two

6  pages in to the document, you'll see a page, Adelphia

7  Communications voice data.  Do you see that, ma'am?

8  A.  Not really.  I'm sorry.  How many pages in?

9  Q.  Two from the page we were on.

10  A.  Oh, two more pages.  Okay.

11  Q.  Yes.

12  A.  Voice and data.  Okay.

13  Q.  And this lists voice and data subscribers by category,

14  correct?

15  A.  Yes, that's what it says.

16  Q.  And if you look at the second column, it says PowerLink two

17  way, see that?

18  A.  Yes.

19  Q.  Is that PowerLink high speed, do you know?

20  A.  I don't know.

21  Q.  Now, if you look down at the month to date variance, which

22  is under the heading PowerLink two way, it's the third column?

23  A.  Yes, I see that.

24  Q.  Month to date variance, that means the growth from month to

25  month.  Do you see that?

1     I was talking to the Court, Mr. Clark.

2     MR. CLARK: Sorry.

3     MR. FLEMING: It seems to me, I don't know if it's

4   right or wrong, if it's a number in between what was reported

5   and what the government claims.

6     MR. CLARK: I don't think that's right, Judge, because

7   there are several subscriber numbers given, and one of them is

8   far below what was reported and one of them is slightly below

9   what was reported. So I don't think that's accurate, let alone

10  something that we would stipulate to. I mean, if they want

11  that the number is different, your Honor has summarized the

12  appropriate argument that could be made. You can make an

13  examination and if you use different criteria, you may come up

14  with a different number.

15     That's clearly what happened here, and we're happy to

16  stipulate to that fact. If the defense wants to put the actual

17  number that was derived in, they're seeking to admit that for

18  the truth of that number, and to say this is what Adelphia came

19  up with, look, it's not that much different than what was

20  reported, and in that case, they're offering it for the truth

21  of what Adelphia's reporting.

22     MR. LEVANDER: We're not, your Honor.

23     THE COURT: Is there any way you can characterize a

24  number -- what's the difference between the numbers?

25     MR. LEVANDER: 5,810,253, which was in the March press

1 Adelphia disclosed in the past, EBU at prevailing rate. Ms.

2 Chrosniak just explained to the Court and the jury about EBUs,

3 and that's how she understood Adelphia had calculated them in

4 the past. That EBU at prevailing rate number that's given is

5 substantially lower than even the government's allegation of

6 what the real numbers were.

7     MR. LEVANDER: Your Honor, I have no problem with this

8 chart because what Mr. Clark said is not accurate. It says

9 basic subscriber customers, as if that's not cable people. But

10 if you look at the definition, it says, shall mean both

11 subscribers will receive cable television directly and those

12 subscribers under bulk billing arrangement. Then a new

13 category, and additional services, and if you want to put in

14 all those number, 5,810,253 and 5,763,000, as it stands in the

15 8-K, they're different numbers and we're prepared to live with

16 all those numbers and they can argue what they want and we can

17 argue what we want.

18     THE COURT: Thereafter, in a November 15, 2002,

19 filing, new management redefined the term basic subscriber and

20 the formula for its determination. So let me read it again in

21 its totality.

22     The parties have stipulated that in an SEC filing,

23 dated June 10, 2002, after John, Timothy, and Michael Rigas

24 were no longer working at Adelphia, it recalculated -- Adelphia

25 recalculated the number of basic subscribers and estimated that

1 A. I do.

2 Q. Did you review it when you worked at Adelphia?

3 A. I did.

4 Q. What is it?

5 A. This is an agreement between Highland Holdings and Adelphia

6 Communications Corporation for Highland Holdings to pay $4

7 million in cash on December 31 and $4 million in cash on March

8 31, 2000, to Adelphia, in connection with services provided,

9 purported to be provided by Adelphia to Highland Holdings

10 related to the acquisition of the Prestige system, by the Rigas

11 family.

12        MR. CLARK:  Judge, we offer the second page of

13 Government's Exhibit 9030A.

14        THE COURT:  Received.

15        (Government's Exhibit 9030A, page 2 received in

16 evidence)

17 BY MR. CLARK:

18 Q. Mr. Brown, what date appears on this document?

19 A. December 31, 1999.

20 Q. What's the first date you ever discussed placement fees for

21 the Prestige acquisition with Tim Rigas?

22 A. I'm not certain, but definitely after that date.

23 Q. Well, do you know whether this contract existed on December

24 31, 1999, as it's dated?

25 A. It did not.

1  Q.  How do you know that?

2  A.  As the person who thought up the idea for this transaction,

3  it was thought up after I already knew the results, the real

4  results for the December 31, 1999, quarter.  So it couldn't

5  have been in place then.

6  Q.  Do you know why this document was backdated?

7  A.  To support, to fool the auditors, that we could book these

8  fees into the periods that we wanted to book them into.

9  Q.  Whose letterhead is this document written on?

10  A.  Adelphia Communications Corporation.

11  Q.  Who is it written to?

12  A.  Highland Holdings.

13  Q.  In the last sentence of the first paragraph --

14       MR. CLARK:  If you could highlight that, Ms. Lee.

15  Q.  -- what does it say Highland has agreed to do?

16  A.  "The fees to be paid hereunder by Highland shall consist of

17  4 million in cash."

18  Q.  Can you slow down when you read, Mr. Brown?

19  A.  It says that Highland will pay $4 million in cash on

20  December 31, '99, and 4 million in cash on March 31, 2000.

21  Q.  Did Highland ever make those cash payments to Adelphia?

22  A.  It did not.

23  Q.  What does this document say the purpose of these supposed

24  payments was?

25  A.  To reimburse Adelphia for services provided in conjunction

1  with the brokering and acquisition of the purchase by the Rigas

2  family of the Georgia Prestige systems.

3  Q.  Was that true?

4  A.  No.

5  Q.  What was the purpose of this contract?

6  A.  To have a document to fool the auditors with into allowing

7  us to book EBITDA for that quarter.

8  Q.  Who, if anyone, did you discuss that true purpose with?

9  A.  Tim Rigas, Luke Healy and Tim Werth.

10  Q.  What, if anything, does this letter say about a reduction

11  in the purchase price paid by the Rigas family for the Georgia

12  Prestige systems?

13  A.  It doesn't mention it at all.

14  Q.  Why not?

15  A.  Because then the auditors wouldn't have allowed us to book

16  the revenue that we recorded from this to deflate our EBITDA.

17  Q.  Mr. Brown, do you know when this contract, dated December

18  31, 1999, was actually first drafted?

19  A.  Yes, I do.

20  Q.  When?

21  A.  In March of 2001.

22  Q.  Is that true date reflected anywhere on this document?

23  A.  It is not.

24      MR. CLARK:  Can we please look at Government's Exhibit

25  2467.  And can you blow up the top half, please.

1 Q. Why not?

2 A. I think that would have raised a red -- what I call a red

3 flag with the auditors if we told them a document had been

4 backdated that far.

5 Q. Why?

6 A. Because it would be some evidence to the auditors that

7 there was no such agreement in place as of June 30, 2000, which

8 would just -- would make them not allow us to book the fees in

9 that quarter.

10 Q. What does this contract say in the last sentence Highland

11 Prestige Georgia will do?

12 A. The last sentence of the first paragraph says, "The fees to

13 be paid to Adelphia by Highland hereunder shall consist of $4

14 million," and then in parentheses $7,279,875, "to be paid on

15 June 30, 2000."

16 Q. What was your understanding of the amount of fees that were

17 going to be booked on Adelphia's books and records?

18 A. The number in the parenthetical, the approximately $7.3

19 million.

20 Q. Is the $4 million a typo?

21 A. I believe it is.

22 Q. Did Adelphia receive either $4 million or $7.2 million in

23 cash from Highland Prestige Georgia on June 30, 2000?

24 A. It did not.

25 Q. What does the agreement say the purpose of those purported

1 fees was?

2 A. To pay Adelphia for services rendered to Highland by

3 Adelphia for the negotiation, placement, and closing of one of

4 the co-borrowing agreements.

5 Q. Was that the real reason for these fees?

6 A. No.

7 Q. What was the real reason?

8 A. To inflate Adelphia's reported EBITDA.

9 Q. Who if anyone did you discuss that real reason with?

10 A. Tim Rigas, Karen Chrosniak, Dean Marshall, Tim Werth.

11 Q. What if any effect did this purported fee have on

12 Adelphia's true EBITDA?

13 A. It had no impact on its true EBITDA.

14 Q. What if any effect did this purported fee have on

15 Adelphia's publicly disclosed EBITDA?

16 A. It inflated it by approximately $7.3 million.

17 Q. As a result of this transaction, was Adelphia's publicly

18 reported EBITDA disclosed for the quarter ending June 30, 2000

19 true and accurate?

20 A. It was not.

21 Q. Do you know whether the price paid by the Rigas family for

22 the Prestige Georgia systems was ever actually reduced

23 consistent with your discussion with Tim Rigas?

24 A. It was reduced, yes, later on.

25 Q. Who if anyone did you discuss that later reduction with?

1 Q. When?

2 A. On a number of occasions, when we talked about the other

3 companies' results and their other reported results, that would

4 be in several quarters, and then also, there was a schedule we

5 had prepared that compared our results to other people's

6 results, and I talked about that schedule with John on a couple

7 of occasions.

8 Q. What, if anything, would John Rigas say about Adelphia's

9 true basic subscriber growth rate?

10 A. He said he had looked at what he called the Tracy Coolidge

11 reports, and he didn't understand how we were reporting growth

12 rates that were better than what were in the Tracy Coolidge

13 reports.

14 Q. What, if anything, did you say to John Rigas about that?

15 A. I told him on one occasion that we were counting

16 subscribers from Venezuela in the current period, and that's

17 the only one I remember specifically where I discussed the

18 difference in growth rates between the two.

19 Q. Did you ever discuss Adelphia's true basic subscriber

20 growth rate with Michael Rigas?

21 A. I remember one such occasion.

22 Q. Do you remember when that was?

23 A. I believe it was in early 2001.

24 Q. Can you tell us what you said to Michael Rigas and what he

25 said to you?

1 A. I asked Michael what he thought, why he thought that

2 Charter Communications, which is another cable company's basic

3 subscriber numbers were doing better than Adelphia's in terms

4 of the results that they had just reported, compared to the

5 results that we had reviewed internally, to see why he thought

6 they were growing and we weren't growing.

7 Q. What, if anything, did Michael Rigas say about Charter's

8 results?

9 A. Michael said he didn't believe -- he said he understood

10 what kind of systems they had acquired and what kind of systems

11 they owned, and he didn't think that the numbers were real,

12 that Charter was reporting.

13 Q. What basic subscriber growth rate number were you

14 discussing with Michael Rigas, Adelphia's publicly reported or

15 its internal number?

16 A. Its internal number.

17 Q. When Adelphia reported its results in its press release,

18 did it report that number?

19 A. Not in the last nine or ten quarters that I worked there,

20 no.

21 Q. What number did it disclose?

22 A. It disclosed a manipulated number.

23 Q. Who approved those press releases?

24 A. John Rigas, Tim Rigas, Mike Rigas, and me.

25 Q. Based on your conversations with those people, do you know

1 whether they were aware of Adelphia's true basic subscriber

2 growth rate?

3     MR. LEVANDER: Objection, your Honor.

4     MR. FLEMING: I object.

5     THE COURT: What was the substance of your discussion

6 with those people?

7 BY MR. CLARK:

8 Q. What was the substance of your discussions with those

9 people about Adelphia's true basic subscriber growth rate?

10     MR. LEVANDER: I object, your Honor. I think there

11 should be a separate --

12     THE COURT: We'll lead.

13 BY MR. CLARK:

14 Q. So tell us your conversation with Michael Rigas.

15 A. For the conversation -- could you restate the question.

16 Q. In the conversation you had with Michael Rigas, was he

17 aware of Adelphia's true basic subscriber growth rate?

18     MR. LEVANDER: Objection, your Honor.

19     THE COURT: You can restate the question.

20 BY MR. CLARK:

21 Q. What, if anything, in that conversation did you discuss

22 with Michael Rigas about Adelphia's true basic subscriber

23 growth rate?

24 A. I was specifically comparing Adelphia's true basic

25 subscriber growth rate from internal reports with the number

1  Honor.

2      THE COURT: Received.

3      (Government's Exhibit 1910D received in evidence)

4      MR. CLARK: Ms. Lee, can we go to the first page and

5  blow up the top half.

6  Q. Is this another form 10-K, Mr. Brown?

7  A. Yes.

8  Q. What is it dated?

9  A. March 27, 2001.

10  Q. When did Adelphia generally file its form 10-K?

11  A. It needed to be filed by April 1 of 2001.

12      MR. CLARK: Can we please go to page 65 of this

13  document. And can you blow up the "certain subsidiaries"

14  paragraph, and can you highlight it.

15  Q. Mr. Brown, can you read us what appears in this draft in

16  that coborrowing paragraph?

17  A. "Certain subsidiaries of Adelphia are coborrowers with

18  managed entities under credit facilities for borrowings of up

19  to $3,751,250,000. Each of the borrowers is liable for all

20  borrowings under the credit agreements, although the lenders

21  have no recourse against Adelphia other than against Adelphia's

22  interest in such subsidiaries. The managed entities have

23  outstanding borrowing of $1,599,733,000 as of December 31,

24  2000, under such facilities."

25  Q. That last sentence, who first suggested that last sentence

1 be disclosed to Adelphia's investors, if you know?

2 A. I'm not certain of the individual.

3 Q. Well, who did you first discuss it with, to your

4 recollection?

5 A. I think it was Luke Healy.

6 Q. And what, if anything, did Mr. Healy say to you, and what,

7 if anything, did you say to him?

8 A. He indicated to me that Deloitte really wants to have this

9 in here, and I said: That's not going to be good. Let me talk

10 to Tim.

11 Q. Did you discuss this disclosure that Deloitte & Touche had

12 proposed with Tim Rigas?

13 A. Yes, I did.

14 Q. What, if anything, did you say to Mr. Rigas, and what, if

15 anything, did he say to you?

16 A. I showed him what Deloitte was proposing, and we discussed

17 that the bond market in particular wasn't going to be happy

18 about finding out about this information, and could we try to

19 talk them into letting us do it the way we had done it in the

20 past, which is to just speak to what's in the first sentence,

21 the maximum that could be borrowed.

22 Q. When, do you recall when you had that discussion with Tim

23 Rigas?

24 A. Probably the day I received this draft, which would have

25 been March 27. It might have been the next day.

1 Q. What, if anything, did you do after you had that discussion

2 with Tim Rigas? What, if anything, else did you say to Tim

3 Rigas at that meeting?

4 A. I told him I'd try to get Deloitte to take it out.

5 Q. Did you propose any explanations or things to say to

6 Deloitte?

7 A. Yeah. I mean, I said maybe we can convince them that it's

8 actually a more conservative disclosure by saying that each of

9 the entities could borrow up to the maximum amount, that by

10 putting in the specific dollar amount, you know, it might

11 mislead the investor into thinking that it was somehow lower

12 than it really was because they could go above that amount, try

13 to describe that to Deloitte as the more conservative

14 disclosure.

15 Q. Did you believe that was a more conservative disclosure?

16     MR. FLEMING: Objection.

17     THE COURT: Overruled.

18 A. No, not at all.

19 Q. Did you ever give that explanation to Deloitte & Touche?

20 A. I did.

21 Q. Who, if anyone, was present when you gave that explanation

22 to Deloitte & Touche?

23 A. Bill Caswell. I think Luke Healy, Tim Werth, and Dean

24 Marshall were there as well.

25 Q. What, if anything, did you say to Deloitte & Touche about

1 this coborrowing disclosure?

2 A. Pretty much exactly what I just said. I tried to sell them

3 the story that it was a more conservative disclosure and that

4 we really wanted to do it that way. And I asked them, you

5 know, I think I asked, went as far as asking the question, Are

6 you not going to sign the opinion over this issue? Will you

7 let us do it the way we want?

8 Q. What, if anything, did they say to you?

9 A. They said they would sign the opinion, but they wanted to

10 make it clear that these were Adelphia's management's financial

11 statements, not theirs.

12 Q. Did Adelphia in the end disclose to investors the amount of

13 Rigas coborrowing debt in 2000 as this draft includes?

14 A. We did not.

15 Q. Why didn't you?

16    MR. FLEMING: Objection.

17    MR. LEVANDER: Objection, your Honor.

18    THE COURT: Yes. I'll allow it, again, understanding

19 it's this witness' opinion, this witness' statement of his

20 reasons, personal opinions.

21 A. My reasons were that I thought for sure my supervisor

22 didn't want it to be disclosed, and I didn't want to disclose

23 it to the public.

24 Q. Who was your supervisor?

25 A. Tim Rigas.

1 Q. In discussing this issue with Deloitte & Touche, did you

2 tell them all the information you considered important about

3 this disclosure?

4 A. No, I didn't discuss any meaningful financial information

5 with them about it other than the dollar amounts that were

6 there.

7 Q. What, if anything, did you tell them about the Rigas

8 entities' inability to pay the interest expense based on their

9 earnings?

10 A. Nothing.

11 Q. What, if anything, did you tell them about the fact that,

12 according to Adelphia's books and records, the Rigas entities

13 were under water in 2000?

14 A. Nothing.

15 Q. Do you know whether Tim Rigas communicated that information

16 to Deloitte?

17 A. I'm not aware that he did.

18      MR. CLARK: Can we look at Government's Exhibit 4029,

19 please.

20      Can I have one minute, your Honor.

21      THE COURT: Yes.

22      MR. CLARK: Actually, can I have, Ms. Lee -- I'm

23 sorry. Could I have Government's Exhibit 2107, please.

24 Q. What's this, Mr. Brown?

25 A. This is an instant messaging log between Tim Werth and me.

1 draft of the 10-K for the year ending December 31, 2000?

2 A. Yes, I do.

3     MR. FLEMING: I offer it.

4     THE COURT: What is the exhibit number, please?

5     MR. FLEMING: Defendant's Exhibit 505.

6     THE COURT: 505 is received.

7     (Defendant's Exhibit 505 received in evidence)

8 Q. And I'm right, aren't I, Mr. Brown, that you were involved

9 in the preparation of the 10-K's on a yearly basis?

10 A. That's correct.

11 Q. And would you turn to -- this is -- who is M. Nichols, at

12 Adelphia?

13 A. That's Mary Nichols. She worked as an assistant in the

14 accounting and treasury departments.

15 Q. She worked under your supervision?

16 A. No.

17 Q. And this is a -- do you recognize this as an e-mail from

18 Mary Nichols on Tuesday, March 27, to Mr. Rothenberger and

19 perhaps others?

20 A. Yes. That's what it appears to be.

21 Q. Would you turn to page 69 of the attachment.

22     MR. FLEMING: Could we highlight the second paragraph

23 contained on that page.

24 Q. And would you read the last sentence of that line, of that

25 paragraph.

1 A. The last line?

2 Q. Yes.

3 A. OK. "The managed entities have outstanding borrowing of $1

4 billion 599 million 733 as of December 31, 2000 under such

5 facilities."

6 Q. Does that refresh your recollection that Mr. Rothenberger

7 did know, in connection with the preparation of the 10-K for

8 the year 2000, the amount of the Rigas debt under the

9 co-borrowing agreement?

10 A. No. I still don't know what Mr. Rothenberger knew.

11 Q. Do you agree that this draft was sent to him and contained

12 a disclosure of the amount?

13 A. Yes. It was sent to him and, yes, this draft contains an

14 amount. This is what the e-mail indicates that it was sent to.

15 Q. Is the amount $1 billion 599, 733, what --

16 A. Yes, that is the amount.

17 Q. And on Thursday, March 29, Mr. Rothenberger sent you the

18 telefax that's Exhibit 1912-A, in which Mr. Rothenberger

19 suggests an addition, or in addition to the co-borrowing a

20 footnote, but does not recommend a disclosure of the dollar

21 amount. Is that right?

22 A. Could you say the question part of that again?

23 Q. The draft which Ms. Nichols sends over to Mr. Rothenberger

24 is sent on Tuesday, March 27, 2001, correct?

25 A. That's what it says, yes.

1 Q. And on Thursday, March 29, 2001, Mr. Rothenberger sends you

2 an e-mail, which is Government's Exhibit 1912-A.

3 A. Yes.

4 Q. And it makes a recommendation for an insert to the

5 paragraph having to do with the co-borrowing debt.

6 A. It does.

7 Q. It does not propose disclosure of the dollar amount of the

8 Rigas borrowings.

9 A. It does not.

10 Q. And Mr. Rothenberger was, is it fair to say, the senior

11 outside legal advisor to the corporation?

12 A. I considered him as such.

13 Q. Now, when did you first go to work at Adelphia?

14 A. In 1984.

15 Q. And tell me, what was your position in March of 2002?

16 A. In March of 2002. I was either vice president of finance

17 or senior vice president of finance. There was a promotion

18 offered somewhere that I don't know if it ever became effective

19 or not.

20 Q. Just go back to the year 1999. What was your position in

21 the year beginning January 1, 1999?

22 A. My title was vice president of finance.

23 Q. And in the spring of 1999, Mr. John Rigas was chief

24 executive officer and director --

25 A. Yes.

1 Q. -- in 1999. In the spring of 1999, did he have certain

2 medical problems, to your knowledge?

3 A. I remember John having some medical problems. I don't

4 really remember what time they were at.

5 Q. Do you remember him undergoing a triple bypass heart

6 operation?

7 A. I do.

8 Q. And then having some additional medical problems?

9 A. I'm aware of those, yes.

10 Q. OK. Now, were you aware that Tim Rigas and Michael Rigas

11 were appointed by the board as co-chief executive officers

12 after John's illness?

13 A. I'm not sure when I became aware of that, whether, I think,

14 it was even when I worked at the company or afterwards.

15 Q. I see. But you became aware that it happened.

16 A. Yes.

17 Q. Now, how old are you, Mr. Brown?

18 A. 41.

19 Q. And how old is Tim Rigas, if you know?

20 A. Tim is about six years older than me. He's 47 or 48.

21 Q. And Michael?

22 A. I think Michael is about 50.

23 Q. And of course John is substantially older than you. Right?

24 A. I think John is 79.

25 Q. Let me ask you a question. While you were at Adelphia

1 entries, don't they?

2 A. Yes, they do.

3 Q. So all of these transactions generated journal entries.

4 A. That's correct.

5 Q. Now, I think you said that in performing your analysis, you

6 downloaded 100,000 or so transactions?

7 A. That's an estimated number, yes.

8 Q. I understand. A very large amount of transactions.

9 A. Yes.

10 Q. And you said you reviewed the underlying journal entries

11 from many of these transactions?

12 A. That's correct.

13 Q. Had you also reviewed other supporting documentation in

14 order to assist you in your categorization?

15 A. In the teams' categorization, yes.

16 Q. The team's categorization. You didn't do this all

17 yourself.

18 A. I did not.

19 Q. You had 25 or so people out there helping you.

20 A. That's correct.

21 Q. These were Adelphia employees?

22 A. Substantially all, yes.

23 Q. Nobody else from Tatum Partners?

24 A. There was some assistance from other Tatum partners.

25 Q. But those were not full-time Adelphia people, were they?

1  A.  Yes, they are.

2  Q.  I see.  So Tatum Partners has you full-time and there are

3  other people from Tatum Partners who are full-time at Adelphia

4  now?

5  A.  That's correct.

6  Q.  How many?

7  A.  There are three full-time.  One I'm not sure if he is still

8  there now or not.  It's been a little while since I have spoken

9  with him.  There could be a possible fourth.

10  Q.  Are they all partners?

11  A.  Yes, they are.  They are not all working on this project,

12  however.

13  Q.  I understand, but they are all working full-time at

14  Adelphia?

15  A.  Yes.

16  Q.  They all get $15,000 a week?

17  A.  No.

18  Q.  Now, just to be clear, you downloaded the journal entries

19  into a database?

20  A.  That's correct.

21  Q.  You looked at treasury department documents, like daily

22  banking packages?

23  A.  Looked at portions of the daily banking packages, yes.

24  Q.  When you looked for the daily banking packages, you found

25  them for the most part?

1 A. Yes.

2 Q. They have wire transfer documents attached to them?

3 A. Yes.

4 Q. You looked at some of them with Mr. Owens?

5 A. Yes, yes.

6 Q. You also looked at other materials, am I right?

7 A. Yes.

8 Q. And the information that you needed to do your analysis was

9 there at Adelphia and had not been destroyed, am I right?

10 A. Substantially all.

11 Q. And it was the availability of that data that allowed you

12 to do this analysis for the government.

13 A. It -- yes.

14 Q. Just one more thing about journal entries. There is

15 nothing sinister about journal entries, is there?

16 A. If there is, then I have been in the wrong profession.

17 Q. Right. Major corporations use them all the time.

18 A. That's correct.

19 Q. I want to go back to this cash versus noncash for a second.

20 And yesterday you looked at -- I think this case is going to

21 finally make me get glasses, Judge.

22      THE COURT: It's very stressful on the eyes.

23 Q. You looked at I think two lines, and if you would go to

24 page 2 of 22.

25      THE COURT: Two of 101?

1 send Adelphia's cash out for the benefit of the Rigas family,

2 Tim Rigas and Mike Mulcahey sent this money out to Highland

3 Holdings to benefit the Rigas family.

4       And if we look at -- I'm not going to go through all

5 of the bank records, but you might recall that Mr. Helms walked

6 you through every one of these wire transfer records, every one

7 of the stock statements, and they showed that Tim Rigas and

8 Mike Mulcahey approved these payments. If you look on the

9 chart below each of the payments, you see a Government's

10 Exhibit number. I'm going to highlight one now, 11106. And

11 although we're not going to go through all those exhibits, I

12 want you to know that any piece of evidence that you want

13 during your deliberations, you can have. And so if you feel

14 like you need any of these bank records, although we haven't

15 gone over them, you can ask the judge, and they'll be sent in

16 to the jury room.

17      I will show you Government's Exhibit 11101, page 2, and

18 this is, we see in the upper right-hand corner, Highland

19 Holdings securities account at Salomon Smith Barney. And we

20 see that during October of 1999, Highland Holdings bought

21 500,000 shares of Adelphia stock. And the total right below

22 the highlighted box was 24.9 million. And, ladies and

23 gentlemen, that 24.9 million came from Adelphia. There was no

24 benefit to Adelphia to give the Rigas family money to buy stock

25 for itself. If Adelphia wanted to buy stock, it should have

1 gotten the stock, not Highland Holdings.

2      And knowing that this transaction was not fair to

3 Adelphia, that it was wrong, and that it couldn't be justified,

4 these men lied about where the money came from, and they hid

5 the truth about this transaction from Adelphia shareholders,

6 and we can see that if we look at Government's Exhibit 4710A.

7 This is one of those form 13Ds we talked about at this trial.

8 And you learned that a form 13D has to be filed whenever an

9 entity or a group or a person who owns more than 5 percent of

10 the stock in a company buys more stock. And you also learned

11 that a form 13D requires disclosure of the source of the money

12 those people used to buy the stock. And if we look at page 22

13 of this form 13D, we see listed here on schedule B the same

14 Adelphia stock purchases that we saw on Highland Holdings'

15 account statement. Same 500,000 shares, in October of '99.

16 And on page 15 of this form 13D, we see section 3, which is the

17 required disclosure I just told you about, "source and amount

18 of funds or other consideration."

19      Now, we know what the source of the funds was because

20 all of us here heard Mr. Helms testify. We saw the bank

21 records and we saw the money came from Adelphia, and you just

22 saw that on the chart again. That's not what these men told

23 the public. If we look at paragraph D, it says, "Schedule B

24 annexed hereto," and that's what we just looked at, "sets forth

25 any other acquisitions of class A common stock by the filing

10475

1  parties." And this 13D was filed by the Rigas family, "within

2  60 days prior to the filing of this amendment No. 10, unless

3  otherwise noted on such schedule B, any such acquisitions were

4  made on an individual basis for investment purposes and

5  over-the-counter open market transactions, and the source of

6  the purchase price paid for each of these acquisitions was the

7  respective personal funds of each of such persons."

8       No, it wasn't. It was Adelphia's money, ladies and

9  gentlemen. That's a lie. It's a lie in an SEC filing, which

10  made this filing false, and it's a lie to Adelphia's investors.

11  And that's securities fraud, ladies and gentlemen.

12       And we saw during this trial, on page 18, that this

13  form 13D was signed by Michael Rigas, and he signed it not only

14  on behalf of himself, he signed it on behalf of numerous Rigas

15  entities and persons, knowing that this document is just a lie.

16  It's not true. And knowing that there's no explanation for the

17  lie, you heard Michael Rigas' defense counsel, Mr. Levander,

18  try to imply through questioning that Michael Rigas just didn't

19  read this form before he signed it. He spent a lot of time

20  asking Mr. Thurner about whether he gave this to Michael Rigas

21  to read, did he discuss it with Michael Rigas, does he know

22  whether Michael Rigas read it. And, in fact, Mr. Levander made

23  a big point that this document was given to Michael Rigas with

24  the signature page on top.

25       And so let's look at what the signature page says on

1 top: "After reasonable inquiry and to the best of my knowledge

2 and belief, I certify that the information set forth in this

3 statement is true, complete and correct." And there's a reason

4 that that statement appears in this document, ladies and

5 gentlemen. It's so executives can't come into a courtroom like

6 this, after investors have relied on their lies, and say to

7 you, Oh, I didn't know I was supposed to read the SEC documents

8 I've signed. I had no idea that I was certifying that this

9 document was accurate, complete, and correct.

10        You know that Michael Rigas knew that he was supposed

11 to read these documents, and you know that he understood he was

12 vouching for its truth and its completeness and correctness.

13 Because even if this is the only page of the document he read,

14 and he had to at least look at this page to know where to sign,

15 he read this statement, and he told them that

16        And if in fact this is the only page of this document

17 Michael Rigas read, was that a reasonable inquiry? It says

18 here he made a reasonable inquiry into the truth, completeness,

19 and correctness of this document. Is it a reasonable inquiry

20 to just blindly tell investors that what's in an SEC filing is

21 true? No, it's not reasonable.

22        And even aside from this representation in this SEC

23 filing, even assuming that Michael Rigas didn't manage to read

24 these two lines on this document, what did Michael Rigas think

25 it meant to sign this form, that he hadn't read it? Ladies and

1  gentlemen, you don't need to go to Harvard Law School to know

2  that when you sign a document, you're telling the reader that

3  you've read and approved its contents. That's what it means to

4  sign a document.

5      And remember way back in January when all of you came

6  in through the snow and you filled out those jury

7  questionnaires? You signed those jury questionnaires, and you

8  signed them because you were telling Judge Sand, "I read this

9  questionnaire, the answers on it are mine, and I stand by the

10  answers." And Judge Sand didn't do a big cross-examination of

11  each of you when you came in for questioning, is this, did you

12  read this whole thing, because that's what you told Judge Sand

13  when you signed document. I read it, these are my answers, I

14  stand behind them. You don't need to go to Harvard Law School

15  to know that.

16      This form 13D was false, it was untrue, and it was not

17  correct. But Michael Rigas signed it anyway, just as you'll

18  see he signed dozens of other misleading documents in this

19  case, and he did that because he didn't want Adelphia's

20  shareholders and other investors to know how his family was

21  taking advantage of Adelphia

22      How hard would it have been to simply say in this

23  document, We got the cash from Adelphia? It would have been

24  one sentence. It wouldn't have made it any longer or more

25  complicated. The reason it's not in here is because these men

1 knew it was wrong. They knew it was wrong because it's wrong

2 to take other people's money, and they knew it was wrong

3 because they were told it was wrong.

4     THE COURT: Mr. Clark, whenever --

5     MR. CLARK: This would be a good time to break, your

6 Honor.

7     THE COURT: This would be?

8     MR. CLARK: Yes. Thank you.

9     THE COURT: All right.

10     (Jury excused)

11     THE COURT: Note from the jurors. "There is confusion

12 among the jurors. Are we sitting from nine to 12 on Friday?

13 What time do we reconvene? In addition, are the other jurors

14 excused? Sorry for the additional notes."

15     The answer is everyone will be excused from 12 on

16 Friday until 2:30. We'll take five minutes.

17     MR. MAHONEY: Your Honor, your Honor, I object to my

18 client being given a nickname by Mr. Clark. Michael

19 Okay-to-Pay Mulcahey. I think that's derogatory. I think it

20 should stop now.

21     THE COURT: The objection is noted.

22     Mr. Fleming.

23     MR. FLEMING: Your Honor, I would like to note for the

24 record the time that Mr. Clark spent, I think, 59 minutes --

25     THE COURT: Yes.

1   MR. FLEMING: -- on what has been characterized as

2 background evidence having to do with alleged misconduct --

3   THE COURT: Yes.

4   MR. FLEMING: -- back in 1994.

5   THE COURT: Yes.

6   MR. FLEMING: I just want that as a matter of record.

7 I'd also request a mistrial on that basis.

8   THE COURT: Noted. Denied. Take five minutes.

9   (Recess)

10   THE COURT: All right. The prosecutor has used an

11 hour and 20 minutes.

12   (In open court; jury present)

13   THE COURT: You may be seated.

14   (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1  deal between Jim Brush and John Rigas were paid, not by John

2  Rigas, but by Adelphia. You saw and Chris Thurner explained to

3  you, Government Exhibit 9650-D, which shows that Adelphia paid

4  the regular interest payments to Jim Brush for this stock that

5  John Rigas was going to get when the deal was closed. And each

6  month Adelphia paid around $12,800 in that interest.

7        And then, if we look at Government Exhibit 9650-A, we

8  see that Mike Mulcahey went ahead and approved a $1.752 million

9  check to Jim Brush for John Rigas to buy those shares. And if

10  we look at the top in the "approved by" slip, that's Mike

11  Mulcahey's signature. And if we look at 9650-B, we see that

12  Mike Mulcahey's approval got a check issued from Adelphia to

13  Jim Brush for $1.752 million. And this is the way that the

14  Rigas family bought up the remaining class B shares of Adelphia

15  that it didn't already own. Adelphia cut a check.

16        Now let's go back to Government Exhibit 4710-A, at

17  page 15. Can we blow up paragraph C again, please, or you can

18  highlight it.

19        Now, what did the Rigases tell the public about this

20  deal, where Adelphia bought this class B stock for them? On

21  December 1, 1999, John Rigas, Michael Rigas, Tim Rigas, James

22  Rigas, and Ellen Rigas purchased 34,132 and 15,950, repeated

23  four times, shares of class B common stock, respectively, at

24  $57.25 per share in a private transaction. The source of such

25  funds was the personal funds of each of such persons.



1        So what does this say?  It says that the Rigases

2  bought this class B stock in a private transaction -- that's

3  the Jim Brush deal -- at $57 a share.  Well, we saw the

4  agreement, and it said it was $22 a share, ladies and

5  gentlemen.  So that's lie number one in this document.

6        "The source of such funds was the personal funds of

7  each of such persons."  So they're telling the public that John

8  Rigas, Michael Rigas, Tim Rigas, James Rigas, and Ellen Rigas

9  each, with their personal funds, bought the amount of shares

10  that it says here.  That's just a lie, ladies and gentlemen.

11  And if we look back at the signature page of this document,

12  which is page 18, we see that, again, Michael Rigas certified

13  these statements were true, complete, and correct.  They

14  weren't, ladies and gentlemen.  They were lies to hide the fact

15  that Adelphia paid for this stock that the Rigas family took.

16        You learned that these crooked open market deals where

17  Adelphia paid the cash for stock bought by the Rigases didn't

18  end in 1999.  We saw Government Exhibit 11211-B where exactly

19  the same thing happened in April of 2000.  Again, Mr. Helms

20  walked you through all the documents that make up this chart.

21  I'm not going to do that now.  But I'll just remind you that

22  every one of the exhibits that supports this chart is listed on

23  here, and if you need to see any of them, just request them.

24  And again, we see the money goes from Adelphia to Highland

25  Holdings.  Highland Holdings buys the stock on the open market.

1  We see that Adelphia doesn't get any cash back from Highland,

2  and it doesn't get the stock.

3      And you remember from Mr. Helms' testimony, again, all

4  these wire transfers -- and they're all, the bank records

5  relating to them are listed on this chart -- were approved by

6  Jim Rigas and Mike Mulcahey. And if we look at Government

7  Exhibit 4029, that's the Adelphia 10-K for the year 2000, the

8  year this transaction happened in. And if we look at page 104

9  of Government Exhibit 4029, we see again the related party

10  transactions disclosure, and we see that there is no mention of

11  this $30 million in cash that was transferred from Adelphia to

12  the Rigas family so the Rigas family could buy more stock.

13  It's not disclosed to Adelphia's investors.

14      And if we look at Government Exhibit 4711-H, this is a

15  13-D filed on behalf of the Rigas family relating to this

16  purchase, the one made in April of 2000. If we go to page 31

17  of Government Exhibit 4711-H, we see another one of these

18  schedule Bs, and we see it lists the open market purchases we

19  just talked about by Highland Holdings.

20      And now, if we go to page 19 of Government Exhibit

21  4711-B, this is the source of funds section again. Paragraph H

22  talks about the purchases on schedule B. And I won't read this

23  whole paragraph to you again. It's very similar to the one

24  that we saw in the previous form 13-D. But it says "the source

25  of the purchase price paid for each of these acquisitions was

1 the respective personal or partnership funds or affiliate

2 borrowings of each of such persons."

3     Well, I guess it's true that this was an affiliate

4 borrowing, because they took the money from Adelphia. But

5 don't you think Adelphia's shareholders would have liked to

6 have known that the affiliate being talked about here was

7 actually Adelphia? Because you've learned during this trial

8 that there are hundreds of Rigas affiliates, and not

9 necessarily all of them are Adelphia companies. So this

10 disclosure didn't tell Adelphia's shareholders the one thing

11 they needed to know about this transaction, that the Rigases

12 took the cash from Adelphia to buy this stock.

13     Ladies and gentlemen, this is a good example of a

14 half-truth. It's technically true. I guess it was an

15 affiliate borrowing. But it leaves out the most important

16 information that the person reading this needs to know, that

17 that affiliate was Adelphia. And it shows you how a half-truth

18 can be just as misleading as an outright lie, because this

19 gives you no more information about the Rigas family taking

20 this money from Adelphia than did the outright lie about using

21 personal funds in the previous form 13-D. Half-truths are

22 misstatements under the securities laws, just like outright

23 lies are, when they're meant to fool people. And this

24 statement, which is a clever way of trying to skirt the issue

25 and say affiliate borrowings, is one of those half-truths.

1    Now, finally you learned about a third of these open

2 market securities purchases that happened in February of 2001,

3 and that's Government Exhibit 11305-B, a similar chart, same

4 transaction essentially. The money goes from Adelphia to

5 Highland Holdings, and Highland Holdings buys stock. And this

6 transaction only involves a $4.5 million wire transfer. And

7 compared to a lot of the numbers that we've already discussed

8 today and that we're going to discuss in a little bit, $4.5

9 million sounds kind of small. But think about that. This is

10 $4.5 million in cash. It's more money than most people see in

11 their lives. Most people, if they got a wire transfer of $4.5

12 million, could quit their jobs. It's a huge amount of money.

13 And think about the amount of money sent from Adelphia to

14 Highland Holdings, with no documentation and no disclosure in

15 this transaction, in this way: John Rigas's disclosed salary

16 at Adelphia was around $1.5 million a year. That's what it

17 said in the proxy statements. And each of Tim and Michael

18 Rigas were paid around $250,000 a year. That's what it said in

19 the proxy statements. That's a total of around $2 million a

20 year for those three men in their rightful salary from

21 Adelphia. This one wire transfer to Highland Holdings, all by

22 itself, is more than the total amount of money that these men

23 earned for their work at Adelphia in one year. So this isn't a

24 small amount of money, ladies and gentlemen.

25    During Mr. Helms' testimony, you learned again, and

1 the government exhibits are on here, that Mike Mulcahey and Tim

2 Rigas approved the wire transfers that went out to Highland

3 Holdings for this purchase. And as is reflected on the bottom

4 of this schedule, there's absolutely no disclosure of this

5 transaction. In fact, as you see in the square, the Rigas

6 family filed a form 13-D in August of 2001. And this didn't

7 even get disclosed in it. So not only was this transaction not

8 disclosed as far as where the money came from to Adelphia's

9 shareholders; nobody knew that this even happened.

10        So that's the open market purchases of securities by

11 the Rigas family with Adelphia's money.

12        The second kind of crooked securities deal that these

13 defendants carried out involved the Rigases paying actual cash

14 in to Adelphia for stock or bonds and then just pulling that

15 cash right back out of Adelphia again, leaving Adelphia with

16 nothing but another useless receivable on its books.

17        If we look at Government Exhibit 11058-B, we see one

18 of these deals. This is the 1999 ABIZ bond transaction.

19 Again, Mr. Helms walked you through this. You saw all the bank

20 records and the wire transfer records relating to this. What

21 happened very briefly was, Hilton Head Communications, in the

22 left-hand bottom corner, borrowed $100 million from a Rigas

23 credit facility, a credit facility that Adelphia had no

24 obligation to pay back. It transferred that money to Highland

25 Holdings, who paid cash to ABIZ of $98.4 million for bonds, and

10544

1  also has an Adelphia Bates number on it. And so this was a

2  business record that Adelphia kept, and that it was false. So

3  this also is a false business record.

4          And if we look at the second page of this -- Ms.

5  Ottenberg, if we can see the second page -- this is the one

6  that Michael Rigas signed. So both Tim Rigas, Michael Rigas,

7  and James Rigas, with the assistance of Michael Mulcahey,

8  created false documents to make it look like the Rigases paid

9  cash in this deal for stock. And they did it because Michael

10 Rigas had already falsely promised that that's what the Rigases

11 would do.

12         Now, if we look at Government's Exhibit 1164CR, we can

13 see what these defendants told the public about this deal. And

14 if we blow up the left-hand side, we see that in Adelphia's

15 form 10-K for the year 2000, Government's Exhibit 4029, the

16 defendants talk about this deal, and they said, "Adelphia used

17 a portion of the proceeds of approximately $375 million to

18 repay borrowings under revolving credit facilities of its

19 subsidiaries, which may be reborrowed and used for general

20 corporate purposes."

21         The bank records show, ladies and gentlemen, just like

22 the chart above this disclosure shows, Adelphia did not get

23 proceeds of $375 million. At best, it got $136 million, and it

24 was liable for that to the banks. So this is a lie. This is a

25 false statement about what Adelphia got from the Rigas family

1  in this deal. And if we look at the disclosure on the

2  right-hand side of this chart, this is from the Rigas family

3  form 13D that was filed for this transaction, and as you saw

4  during the trial, it was signed by Michael Rigas, and with the

5  same certification we looked at yesterday, that after

6  reasonable inquiry, it was Michael Rigas' position that the

7  form 13D was true, complete, and correct. And this also says

8  that the Rigases paid $375 million to Adelphia. And it says,

9  "The source of such funds were affiliate borrowings."

10       Well, Adelphia borrowed the money, and Adelphia paid

11  itself the money, but even if you assumed that the Rigas family

12  borrowed the money under the coborrowings, there's nothing in

13  this disclosure that tells you that, and that was an important

14  fact to investors, that the coborrowings were involved here.

15  And there is no way for an investor to know that fact from

16  reading this disclosure. This is another half-truth, ladies

17  and gentlemen. It's technically true, but it hides all the

18  important facts from the people that need to know them. And

19  half-truths, just like lies, and just like omissions of

20  important facts, are securities fraud.

21       And you learned as time went on these securities deals

22  got even more crooked and even less justifiable. If we look at

23  Government's Exhibit 11353, we see yet another securities

24  purchase agreement between Highland 2000 and Adelphia, and this

25  one is dated January 17, 2001. And if we look at page 3 of

1  this document, in the section marked (ii), we see that yet

2  again, Highland Holdings promised to deliver to the company for

3  the purchase price of the shares in immediately available funds

4  in cash.

5       And if we look at page 5, once again, this promise was

6  made by Michael Rigas. And what's interesting about this

7  document is that Michael Rigas made this promise on behalf of

8  Highland, and he also accepted the promise on behalf of

9  Adelphia. And as a director of Adelphia, who made this deal,

10  you know that Michael Rigas had a duty to make sure that

11  Highland paid the cash it promised, not only because he

12  promised Adelphia that on behalf of Highland Holdings, but

13  because he approved this deal on behalf of Adelphia. And you

14  remember the testimony about this, and we'll look at it in a

15  minute, and you're going to see that this was a false promise

16  by Michael Rigas. He never made Highland pay this cash to

17  Adelphia. He never followed through on his duty to make his

18  family cut a fair deal with Adelphia.

19       If we look at Government's Exhibit 4029, very quickly,

20  at page 149, and if we look at Exhibit 10106, we see just like

21  the other purchase agreement signed by Michael Rigas, this

22  document was filed with the SEC as an exhibit to Adelphia's

23  form 10-K, and it was disclosed to the public. So Michael

24  Rigas not only made this promise to Adelphia, he made this

25  promise to the public too.

1 Did the defendants honestly and in good faith seek to involve

2 lawyers and accountants in what they were doing to make sure

3 that their conduct was lawful?

4　　And second, think about: Did the defendants disclose

5 or make sure that someone disclosed all the relevant facts to

6 lawyers and accountants?

7　　And third: Did the defendants, after they told

8 everything to the accountants and lawyers, did they receive and

9 honestly rely on advice from the lawyers and accountants that

10 they told everything to?

11　　The answers to each one of these questions is no.

12 First of all, you heard from George Cretekos, a long time ago,

13 about this issue, and he was Adelphia's director of flight

14 operations. And he told you about a time in 1999, when he just

15 started working at Adelphia, when John Rigas told him his views

16 about Adelphia's corporate lawyers. And if we look at page

17 1952, at line 23, here's what John Rigas said: "And he then

18 turned to the fellow who was sitting next to him, and said,

19 What do you do for a living, after I introduced the two, and

20 the gentleman said, Well, I'm in the title insurance business.

21 And he said, and he said, well, You must deal with a lot of

22 lawyers, and that got a laugh out of us. And the gentleman

23 sitting there said, Yeah, I sure do, every day. And then

24 Mr. Rigas said, well, you know, I pay millions of dollars to

25 lawyers and consultants every year, and they're always trying

1  to tell me how to run my cable business, and I don't listen to

2  them. I do what I want to do."

3      And that tells you what you need to know about John

4  Rigas' reliance on his lawyers.

5      And you also know that the lawyers from Buchanan

6  Ingersoll were deceived by the false cross-receipts that were

7  sent to them, and they told those lawyers that the Rigas family

8  paid cash for the stock. That wasn't true. Any advice that

9  Buchanan Ingersoll gave the Rigases about those securities

10  purchases couldn't be based on full disclosure because Buchanan

11  didn't have all the facts. Similarly, we saw Government's

12  Exhibit 2515 a little bit earlier, and this is a document that

13  Mr. Brown told you was created to deceive Deloitte & Touche.

14  This relates to the marketing support transactions, and

15  Mr. Brown explained to you that these were specifically made to

16  fool the auditors. And if we look at transcript page 6140,

17  line 5, Mr. Brown said on direct examination:

18      "Do you know whether any documents were created

19  relating to these marketing support deal?

20      "They were.

21      "Do you know why those documents were created?

22      "To fool auditors." These are just a few examples of

23  the way these men flat out lied, told half-truths to, and

24  failed to disclose things to their lawyers and auditors.

25      Let me say this: If in fact these men really believed

1  that any of the lawyers or auditors approved or supported what

2  went on and was charged to be illegal, don't you think they

3  would have called one of them as a witness in this trial?  They

4  don't have a burden, but, ladies and gentlemen, you better

5  believe that if there was a lawyer or an accountant out there

6  that had approved these transactions and said they were okay,

7  we'd have seen them in this courtroom.  You didn't see anything

8  like that.  So you have to think about if lawyers and

9  accountants really approved or endorsed any of these

10 transaction, why didn't you hear from any of them?

11      Now, the defendants may say that since the government

12 has the burden of proof, it should have called the accountants

13 and lawyers to say that they didn't approve the transactions,

14 and there's two responses to that question:  First, the lawyers

15 and accountants didn't know about a lot of these transactions.

16 We've shown you from the people who were involved in them, who

17 ran them, that they were frauds.  You know that they were

18 misleading.  You know that they were false, and that's the

19 evidence of the defendants' intent to defraud.

20      And, second, while the government has the burden of

21 proof, we don't have the burden of wasting everybody's time by

22 calling six and seven witnesses to testify to the same thing.

23 The defendants aren't charged with defrauding Deloitte &

24 Touche, and they're not charged with defrauding their lawyers.

25 They're accused of defrauding Adelphia's investors, and the

1  witnesses we've called have shown that.

2      Now, finally, the third chapter that I want to talk

3  about in this case is the way that the Rigases used the assets

4  of Adelphia to benefit themselves.

5      You have heard a lot of evidence in this trial about

6  how these men spent Adelphia's money as if it was their own,

7  how they used Adelphia's cash for the Rigas family's private

8  benefit and purposes to pay Rigas bills, to pay for Rigas

9  private investments, to pay for Rigas private vacation homes,

10  and pay off the Rigases' private debt. You've heard lots of

11  evidence about how nearly every month, Mike Mulcahey, with the

12  knowledge and approval of Tim Rigas, would transfer over a

13  million dollars in cash from Adelphia to Highland Holdings for

14  John Rigas' personal use

15      I want to take a few minutes to go over in a little

16  detail how these men took cash out of Adelphia, cash they

17  weren't entitled to and cash that wasn't disclosed in

18  Adelphia's SEC filings. And first, I want to make clear what's

19  illegal about these looting transactions. As I said earlier,

20  the securities laws are concerned with disclosure, with

21  investors getting accurate information. And they, therefore,

22  prohibit misstatements and misleading omissions to the public

23  about securities. That's the crime alleged here, the failure

24  to tell the public about this looting.

25      In his opening statement, Mr. Fleming said there was

1       (Jury present)

2       THE COURT: You may be seated.

3       You have now heard all of the closing argument on

4 behalf of the defendants, and we are now at the point where the

5 government, because it has the burden of proof, has the

6 opportunity to make rebuttal argument.

7       Let me just tell you just where we are. The

8 government's rebuttal argument will take approximately two

9 hours -- an hour today, an hour tomorrow -- then mid morning

10 tomorrow I will start my -- 10:00 tomorrow -- I will start my

11 closing instructions to you, which will take all day and

12 probably go over until Friday. Following that, our work is

13 done and your work begins. That's where we are.

14      Mr. Owens.

15      MR. OWENS: Thank you, your Honor.

16      Good afternoon, ladies and gentlemen.

17      JURORS: Good afternoon.

18      MR. OWENS: It's been a while since I got to stand up

19 here and speak with you. And I am happy to have the

20 opportunity to do that again.

21      I would like to start out by acknowledging what we all

22 know: that this has been a long, long trial, and trials can

23 take a toll on the participants, especially the lawyers. They

24 can be long, exhaustive and emotional.

25      But the issues before you, the jury, are not issues of

1  emotion or sympathy. They are issues simply of the facts. And

2  that's what I would like to take us back to now, the facts and

3  the evidence in this case. And though it's been a long and in

4  some respects a hard-fought trial, there are a couple of points

5  I want to make at the outset about what are surprisingly a

6  large number of things that are apparently not in dispute by

7  the defendants. Let me tick off a partial list of those

8  matters for you:

9      First, there is no real dispute about what happened at

10  Adelphia, no real dispute about where cash went, what it was

11  used for and things like that.

12      There is no claim by the Rigas defendants that they

13  paid cash for the securities purchases. We have proven to you

14  through the bank records they didn't pay for them with cash.

15      There is no real dispute that the 10-Ks and the 10-Qs

16  and some of the press releases all say that Adelphia got

17  proceeds for those securities that they sold to the Rigas

18  family.

19      And there is no real dispute that the press releases

20  and 10-Qs and 10-Ks that say those proceeds were used to pay

21  off subsidiary bank debt weren't true, because there is no real

22  dispute that that didn't happen.

23      There is also no real dispute that over $50 million

24  came out of Adelphia's cash management system, went through

25  Highland Holdings, John Rigas and other Rigas family

1 enterprises, like Songcatcher, Rigas Entertainment and others

2 that Mr. Clark spoke with you about at greater length.

3 　　　And there is no dispute that over $100 million came

4 out of Adelphia's cash management system to pay off Rigas

5 family margin debts, margin loans taken out by Rigas family

6 partnerships for which Adelphia had no liability and no

7 obligation to repay.

8 　　　And there is no dispute that for the entire time of

9 the indictment period, which is from in or about 1999 up until

10 May of 2002, Adelphia had to file, under the terms of its bond

11 indenture, every six months compliance certificates that

12 required, as you saw -- and we will talk about a little bit

13 more later -- calculations to be prepared and reviewed, and

14 there is no dispute that, with one exception, those

15 calculations were never prepared or reviewed in the period that

16 those filings were made. And there is no real dispute that

17 Michael Rigas, Tim Rigas and Michael Mulcahey signed those

18 certificates.

19 　　　Nor is there any real dispute that Adelphia's proxy

20 statements and its 10-KAs did not disclose all these

21 related-party transactions in an itemized way, which is what

22 the law requires. Nor -- and by the way, an itemized matter

23 that the testimony of LeMoyne Zacherl shows he explained to Tim

24 Rigas.

25 　　　And there is no dispute that prior to March 27, 2002,

1 the Rigases did not disclose to Adelphia shareholders that they

2 were using the coborrowing credit facilities to fund purchases

3 of Adelphia stock.

4      And there is no dispute that prior to March 27, 2002,

5 the Rigases did not -- and by "the Rigases," I mean the Rigas

6 defendants sitting in this courtroom who were officers and

7 directors of Adelphia -- didn't disclose to Adelphia

8 shareholders that the securities purchases that the public was

9 told about did not increase Adelphia's liquidity by one dime.

10      And there is no dispute that on March 27, 2002,

11 Adelphia's stockholders, bondholders then learned for the very

12 first time about the things that we have just been talking

13 about; that the Rigases had used the coborrowing facilities to

14 buy stock or had transferred debt as a means of paying for

15 stock and that Adelphia was contingently liable for over $2

16 billion in additional borrowings under those coborrowing

17 agreements that had never been disclosed to the shareholders.

18      And there is also no dispute about what happened to

19 Adelphia as a result of that disclosure.  There is no dispute

20 about how the marketplace, the marketplace here, free market,

21 which values companies, sets their price and determines the

22 price of the stocks on the markets, on the free market, no

23 dispute how the free market viewed that news.  In a matter of

24 weeks, Adelphia's stock price had gone from the low twenties to

25 pennies on the dollar.  That sends a powerful signal about the

1 materiality of the information that these men did not disclose.

2     And Mr. Mulcahey, sorry, Mr. Mahoney a few moments ago

3 tried to suggest that this trial was about scapegoating. You

4 know that's not right. Think about who is trying to scapegoat

5 when Mr. Mahoney stands up here and says: The reason Adelphia

6 failed was not because of these disclosures, but because of the

7 government investigations of the conduct that followed. The

8 reason Adelphia failed is the truth came out and investors in

9 the marketplace valued it based upon full and complete

10 information. And as a result, Adelphia went into bankruptcy.

11     So instead, we have heard from the defense lawyers in

12 this case rather than disputes about those basic facts, we have

13 heard about 20 hours of excuses to explain all these facts

14 away, 20 hours of excuses to explain why these clear,

15 undisputed facts don't show these men engaged in crimes.

16     We have heard, for example, that Tim Rigas was a busy

17 man. We call that the busy-man defense; that he was so busy,

18 he didn't know what was in the 10-Ks he signed. He didn't know

19 what was in the 10-Qs he signed. He had no idea that

20 Adelphia's EBIDTA was being manipulated because he was so busy

21 doing other things.

22     We have heard that John Rigas, the chairman of the

23 board, president of the company, founder, was so out of the

24 loop that he, too, had no idea what was in the 10-Ks, what was

25 in the 10-Qs, what was being told to Adelphia shareholders.