1 this document, in the section marked (ii), we see that yet

2 again, Highland Holdings promised to deliver to the company for

3 the purchase price of the shares in immediately available funds

4 in cash.

5      And if we look at page 5, once again, this promise was

6 made by Michael Rigas. And what's interesting about this

7 document is that Michael Rigas made this promise on behalf of

8 Highland, and he also accepted the promise on behalf of

9 Adelphia. And as a director of Adelphia, who made this deal,

10 you know that Michael Rigas had a duty to make sure that

11 Highland paid the cash it promised, not only because he

12 promised Adelphia that on behalf of Highland Holdings, but

13 because he approved this deal on behalf of Adelphia. And you

14 remember the testimony about this, and we'll look at it in a

15 minute, and you're going to see that this was a false promise

16 by Michael Rigas. He never made Highland pay this cash to

17 Adelphia. He never followed through on his duty to make his

18 family cut a fair deal with Adelphia.

19      If we look at Government's Exhibit 4029, very quickly,

20 at page 149, and if we look at Exhibit 10106, we see just like

21 the other purchase agreement signed by Michael Rigas, this

22 document was filed with the SEC as an exhibit to Adelphia's

23 form 10-K, and it was disclosed to the public. So Michael

24 Rigas not only made this promise to Adelphia, he made this

25 promise to the public too.

1 Did the defendants honestly and in good faith seek to involve

2 lawyers and accountants in what they were doing to make sure

3 that their conduct was lawful?

4     And second, think about: Did the defendants disclose

5 or make sure that someone disclosed all the relevant facts to

6 lawyers and accountants?

7     And third: Did the defendants, after they told

8 everything to the accountants and lawyers, did they receive and

9 honestly rely on advice from the lawyers and accountants that

10 they told everything to?

11     The answers to each one of these questions is no.

12 First of all, you heard from George Cretekos, a long time ago,

13 about this issue, and he was Adelphia's director of flight

14 operations. And he told you about a time in 1999, when he just

15 started working at Adelphia, when John Rigas told him his views

16 about Adelphia's corporate lawyers. And if we look at page

17 1952, at line 23, here's what John Rigas said: "And he then

18 turned to the fellow who was sitting next to him, and said,

19 What do you do for a living, after I introduced the two, and

20 the gentleman said, Well, I'm in the title insurance business.

21 And he said, and he said, well, You must deal with a lot of

22 lawyers, and that got a laugh out of us. And the gentleman

23 sitting there said, Yeah, I sure do, every day. And then

24 Mr. Rigas said, well, you know, I pay millions of dollars to

25 lawyers and consultants every year, and they're always trying

1  to tell me how to run my cable business, and I don't listen to

2  them. I do what I want to do."

3      And that tells you what you need to know about John

4  Rigas' reliance on his lawyers.

5      And you also know that the lawyers from Buchanan

6  Ingersoll were deceived by the false cross-receipts that were

7  sent to them, and they told those lawyers that the Rigas family

8  paid cash for the stock. That wasn't true. Any advice that

9  Buchanan Ingersoll gave the Rigases about those securities

10  purchases couldn't be based on full disclosure because Buchanan

11  didn't have all the facts. Similarly, we saw Government's

12  Exhibit 2515 a little bit earlier, and this is a document that

13  Mr. Brown told you was created to deceive Deloitte & Touche.

14  This relates to the marketing support transactions, and

15  Mr. Brown explained to you that these were specifically made to

16  fool the auditors. And if we look at transcript page 6140,

17  line 5, Mr. Brown said on direct examination:

18      "Do you know whether any documents were created

19  relating to these marketing support deal?

20      "They were.

21      "Do you know why those documents were created?

22      "To fool auditors." These are just a few examples of

23  the way these men flat out lied, told half-truths to, and

24  failed to disclose things to their lawyers and auditors.

25      Let me say this: If in fact these men really believed

1  that any of the lawyers or auditors approved or supported what

2  went on and was charged to be illegal, don't you think they

3  would have called one of them as a witness in this trial?  They

4  don't have a burden, but, ladies and gentlemen, you better

5  believe that if there was a lawyer or an accountant out there

6  that had approved these transactions and said they were okay,

7  we'd have seen them in this courtroom.  You didn't see anything

8  like that.  So you have to think about if lawyers and

9  accountants really approved or endorsed any of these

10  transaction, why didn't you hear from any of them?

11         Now, the defendants may say that since the government

12  has the burden of proof, it should have called the accountants

13  and lawyers to say that they didn't approve the transactions,

14  and there's two responses to that question:  First, the lawyers

15  and accountants didn't know about a lot of these transactions.

16  We've shown you from the people who were involved in them, who

17  ran them, that they were frauds.  You know that they were

18  misleading.  You know that they were false, and that's the

19  evidence of the defendants' intent to defraud.

20         And, second, while the government has the burden of

21  proof, we don't have the burden of wasting everybody's time by

22  calling six and seven witnesses to testify to the same thing.

23  The defendants aren't charged with defrauding Deloitte &

24  Touche, and they're not charged with defrauding their lawyers.

25  They're accused of defrauding Adelphia's investors, and the

1 witnesses we've called have shown that.

2      Now, finally, the third chapter that I want to talk

3 about in this case is the way that the Rigases used the assets

4 of Adelphia to benefit themselves.

5      You have heard a lot of evidence in this trial about

6 how these men spent Adelphia's money as if it was their own,

7 how they used Adelphia's cash for the Rigas family's private

8 benefit and purposes to pay Rigas bills, to pay for Rigas

9 private investments, to pay for Rigas private vacation homes,

10 and pay off the Rigases' private debt.  You've heard lots of

11 evidence about how nearly every month, Mike Mulcahey, with the

12 knowledge and approval of Tim Rigas, would transfer over a

13 million dollars in cash from Adelphia to Highland Holdings for

14 John Rigas' personal use

15      I want to take a few minutes to go over in a little

16 detail how these men took cash out of Adelphia, cash they

17 weren't entitled to and cash that wasn't disclosed in

18 Adelphia's SEC filings.  And first, I want to make clear what's

19 illegal about these looting transactions.  As I said earlier,

20 the securities laws are concerned with disclosure, with

21 investors getting accurate information.  And they, therefore,

22 prohibit misstatements and misleading omissions to the public

23 about securities.  That's the crime alleged here, the failure

24 to tell the public about this looting.

25      In his opening statement, Mr. Fleming said there was

1    (Jury present)

2    THE COURT: You may be seated.

3    You have now heard all of the closing argument on

4 behalf of the defendants, and we are now at the point where the

5 government, because it has the burden of proof, has the

6 opportunity to make rebuttal argument.

7    Let me just tell you just where we are.  The

8 government's rebuttal argument will take approximately two

9 hours -- an hour today, an hour tomorrow -- then mid morning

10 tomorrow I will start my -- 10:00 tomorrow -- I will start my

11 closing instructions to you, which will take all day and

12 probably go over until Friday.  Following that, our work is

13 done and your work begins.  That's where we are.

14    Mr. Owens.

15    MR. OWENS:  Thank you, your Honor.

16    Good afternoon, ladies and gentlemen.

17    JURORS:  Good afternoon.

18    MR. OWENS:  It's been a while since I got to stand up

19 here and speak with you.  And I am happy to have the

20 opportunity to do that again.

21    I would like to start out by acknowledging what we all

22 know: that this has been a long, long trial, and trials can

23 take a toll on the participants, especially the lawyers.  They

24 can be long, exhaustive and emotional.

25    But the issues before you, the jury, are not issues of

1 emotion or sympathy. They are issues simply of the facts. And

2 that's what I would like to take us back to now, the facts and

3 the evidence in this case. And though it's been a long and in

4 some respects a hard-fought trial, there are a couple of points

5 I want to make at the outset about what are surprisingly a

6 large number of things that are apparently not in dispute by

7 the defendants. Let me tick off a partial list of those

8 matters for you:

9      First, there is no real dispute about what happened at

10 Adelphia, no real dispute about where cash went, what it was

11 used for and things like that.

12      There is no claim by the Rigas defendants that they

13 paid cash for the securities purchases. We have proven to you

14 through the bank records they didn't pay for them with cash.

15      There is no real dispute that the 10-Ks and the 10-Qs

16 and some of the press releases all say that Adelphia got

17 proceeds for those securities that they sold to the Rigas

18 family.

19      And there is no real dispute that the press releases

20 and 10-Qs and 10-Ks that say those proceeds were used to pay

21 off subsidiary bank debt weren't true, because there is no real

22 dispute that that didn't happen.

23      There is also no real dispute that over $50 million

24 came out of Adelphia's cash management system, went through

25 Highland Holdings, John Rigas and other Rigas family

1 enterprises, like Songcatcher, Rigas Entertainment and others

2 that Mr. Clark spoke with you about at greater length.

3     And there is no dispute that over $100 million came

4 out of Adelphia's cash management system to pay off Rigas

5 family margin debts, margin loans taken out by Rigas family

6 partnerships for which Adelphia had no liability and no

7 obligation to repay.

8     And there is no dispute that for the entire time of

9 the indictment period, which is from in or about 1999 up until

10 May of 2002, Adelphia had to file, under the terms of its bond

11 indenture, every six months compliance certificates that

12 required, as you saw -- and we will talk about a little bit

13 more later -- calculations to be prepared and reviewed, and

14 there is no dispute that, with one exception, those

15 calculations were never prepared or reviewed in the period that

16 those filings were made. And there is no real dispute that

17 Michael Rigas, Tim Rigas and Michael Mulcahey signed those

18 certificates.

19     Nor is there any real dispute that Adelphia's proxy

20 statements and its 10-KAs did not disclose all these

21 related-party transactions in an itemized way, which is what

22 the law requires. Nor -- and by the way, an itemized matter

23 that the testimony of LeMoyne Zacherl shows he explained to Tim

24 Rigas.

25     And there is no dispute that prior to March 27, 2002,

1 the Rigases did not disclose to Adelphia shareholders that they

2 were using the coborrowing credit facilities to fund purchases

3 of Adelphia stock.

4     And there is no dispute that prior to March 27, 2002,

5 the Rigases did not -- and by "the Rigases," I mean the Rigas

6 defendants sitting in this courtroom who were officers and

7 directors of Adelphia -- didn't disclose to Adelphia

8 shareholders that the securities purchases that the public was

9 told about did not increase Adelphia's liquidity by one dime.

10     And there is no dispute that on March 27, 2002,

11 Adelphia's stockholders, bondholders then learned for the very

12 first time about the things that we have just been talking

13 about; that the Rigases had used the coborrowing facilities to

14 buy stock or had transferred debt as a means of paying for

15 stock and that Adelphia was contingently liable for over $2

16 billion in additional borrowings under those coborrowing

17 agreements that had never been disclosed to the shareholders.

18     And there is also no dispute about what happened to

19 Adelphia as a result of that disclosure. There is no dispute

20 about how the marketplace, the marketplace here, free market,

21 which values companies, sets their price and determines the

22 price of the stocks on the markets, on the free market, no

23 dispute how the free market viewed that news. In a matter of

24 weeks, Adelphia's stock price had gone from the low twenties to

25 pennies on the dollar. That sends a powerful signal about the

1 materiality of the information that these men did not disclose.

2     And Mr. Mulcahey, sorry, Mr. Mahoney a few moments ago

3 tried to suggest that this trial was about scapegoating. You

4 know that's not right. Think about who is trying to scapegoat

5 when Mr. Mahoney stands up here and says: The reason Adelphia

6 failed was not because of these disclosures, but because of the

7 government investigations of the conduct that followed. The

8 reason Adelphia failed is the truth came out and investors in

9 the marketplace valued it based upon full and complete

10 information. And as a result, Adelphia went into bankruptcy.

11     So instead, we have heard from the defense lawyers in

12 this case rather than disputes about those basic facts, we have

13 heard about 20 hours of excuses to explain all these facts

14 away, 20 hours of excuses to explain why these clear,

15 undisputed facts don't show these men engaged in crimes.

16     We have heard, for example, that Tim Rigas was a busy

17 man. We call that the busy-man defense; that he was so busy,

18 he didn't know what was in the 10-Ks he signed. He didn't know

19 what was in the 10-Qs he signed. He had no idea that

20 Adelphia's EBIDTA was being manipulated because he was so busy

21 doing other things.

22     We have heard that John Rigas, the chairman of the

23 board, president of the company, founder, was so out of the

24 loop that he, too, had no idea what was in the 10-Ks, what was

25 in the 10-Qs, what was being told to Adelphia shareholders.

1    THE COURT: Yes.

2    MR. FLEMING: I had one comment, one request.

3    THE COURT: OK.

4    MR. FLEMING: I understood Mr. Owens to say, with

5 regard to --

6    MR. GRAND: Can't hear you, Peter.

7    MR. FLEMING: I understood Mr. Owens to say, with

8 regard to related-party transactions, that they did not itemize

9 them the way which is what the law requires.

10    THE COURT: Right, um-hmm.

11    MR. FLEMING: And I have to check the record, your

12 Honor, but I wanted to draw your Honor's attention, because I

13 don't think that's what the law requires and it's a strong

14 statement which, if I am correct, should be remedied.

15    THE COURT: Mr. Owens.

16    MR. OWENS: I'm happy to submit something about that

17 from the SEC rules and regulations that say that. My basis for

18 saying that was the testimony from LeMoyne Zacherl about a

19 schedule he discussed with Timothy Rigas explaining how

20 related-party transactions and, in particular, loans had --

21    THE COURT: Was it related also to the SEC comment

22 letter in 1994 about how what you had --

23    MR. OWENS: No, that's a slightly different issue.

24 That's about whether or not you can net related-party

25 receivables on the statement of cash flows. I was referring to

1  related-party transactions as disclosed in the 10-KAs.

2      MR. FLEMING:  Whatever Mr. Zacherl said he was

3  instrumental in preparing the 1994 10-K which netted the

4  receivables and the SEC comment letter.

5      THE COURT:  That's a jury argument, and your time to

6  argue to the jury has passed.

7      MR. FLEMING:  I understand that, your Honor.  I was

8  objecting to "the law requires."

9      MR. GRAND:  The statement was the government's

10  contention, the statement was --

11      THE COURT:  I know what it was.  As a matter of fact,

12  I think I even wrote it down.

13      Just tell us all, Mr. Owens, in what way did it not

14  itemize in the way the law requires?

15      MR. OWENS:  Well, the law requires that each loan to a

16  distinct entity be separately itemized, each borrower, each

17  related-party borrower and the amount of the borrowing has to

18  be itemized.  That's fairly straightforward under Reg SK.

19      THE COURT:  And that would require a --

20      MR. OWENS:  Separate itemization of the debts from

21  Songcatcher, Rigas Entertainment, Highland Holdings, the Rigas

22  individuals individually, rather than lumping them all in and

23  calling them Dorellenic.

24      THE COURT:  Objection noted.  And I don't know that

25  you are asking for any action on the part of the court.  Are

1 you?

2      MR. FLEMING: I am, your Honor.

3      THE COURT: What are you asking for?

4      MR. FLEMING: I am asking, as the court did this

5 morning with regard to the assumption of debt, I think that

6 some instruction, which I will draft and get to the court, is

7 required with regard to this allegation that itemized

8 presentation of related-party transactions is required by the

9 law.

10      THE COURT: I will look at whatever you give me. As

11 of this moment I don't see that there is any occasion for the

12 court to take any action, but I will certainly carefully look

13 at anything you submit.

14      We are adjourned until -- Mr. Grand?

15      MR. GRAND: One other item at page 123 and 124 of the

16 daily transcript.

17      THE COURT: Of today's daily transcript?

18      MR. GRAND: Mr. Owens was talking about Mr. Mulcahey

19 and he represented that there was no pressure from the

20 government. That's not true. He stated. So we now have

21 Mr. Owens as a witness in this case vouching for evidence, and

22 we object to it. Something should be said about that.

23      THE COURT: Well, how does one respond to an argument

24 that witnesses lied because they were pressured by the

25 government, i.e., the prosecutors.

# Exhibit C

Lawrence G. McMichael, Esquire (Admitted Pro Hac Vice)
DILWORTH PAXSON LLP
3200 Mellon Bank Center
1735 Market Street
Philadelphia, PA 19103
(215) 575-7000

*Attorney for John J. Rigas and Timothy J. Rigas*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| -against- | : | 02 Cr. 1236 (LBS) |
| | : | |
| JOHN J. RIGAS, TIMOTHY J. RIGAS, | : | |
| MICHAEL J. RIGAS and MICHAEL C. MULCAHEY, | : | |
| | : | |
| Defendants. | : | |

### MEMORANDUM OF LAW IN SUPPORT OF JOHN RIGAS AND TIMOTHY RIGAS' MOTION TO COMPEL PRODUCTION OF NOTES TAKEN DURING GOVERNMENT INTERVIEWS

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................... ii

PRELIMINARY STATEMENT ............................................................................... 1

BACKGROUND ..................................................................................................... 2

ARGUMENT ........................................................................................................... 7

A.     The Legal Standard .................................................................................. 7

B.     This Court Should Order the Government to Produce the Rothenberger
       Interview Materials ................................................................................. 10

         1.    Rothenberger Disclosed Exculpatory Information to the
             Government ............................................................................. 10

               a.    Rothenberger was responsible for drafting and reviewing
                   Adelphia's and the Rigases' securities filings and did not
                   identify any improprieties in the filings .................................. 11

               b.    Rothenberger believed the source of funds disclosures in
                   the 13-Ds were accurate concerning the Rigases' stock
                   purchases .................................................................................. 12

               c.    Rothenberger viewed the liability among co-borrowers as a
                   guarantee .................................................................................. 15

               d.    Rothenberger understood that the golf course was designed
                   to provide a benefit to Adelphia and the Coudersport
                   community ................................................................................ 15

               e.    Rothenberger did not identify anything legally
                   inappropriate about separating the documentation for
                   marketing support payments and the converter box
                   purchase .................................................................................. 16

         2.    There Is No Countervailing Interest Militating Against Production ..... 18

C.     The Government Should Produce Any Interview Materials from
       Rothenberger as Part of the SEC's investigation .......................................... 20

D.     The Government Should Identify Any Materials Reflecting Other
       Interviews Conducted by the Department of Justice or SEC as Part of the
       Investigations Involving Adelphia ................................................................ 22

CONCLUSION ........................................................................................................ 24

John Rigas and Timothy Rigas ("the Rigases"), by and through their undersigned counsel, hereby submit this Memorandum of Law in Support of their Motion to Compel Production of Notes Taken During Government Interviews.

## PRELIMINARY STATEMENT

Prior to the commencement of the criminal trial in this case, the government served the Rigases with interview notes and memoranda for dozens of witnesses including many irrelevant witnesses such as secretaries and other low level Adelphia employees. In contrast, the government did not even disclose that it had interviewed Carl Rothenberger, Adelphia's lead securities lawyer who prepared virtually all of the securities filings that were the subject matter of the criminal trial, let alone produce its interview notes or memoranda relating to that interview. The government has refused the Rigases' explicit request that these materials be produced, claiming that after two days of interviewing Rothenberger and determining not to call him as a government witness, the only exculpatory evidence he provided related to one transaction involving a timber purchase. It strains reason to believe that Rothenberger provided absolutely no exculpatory information regarding his involvement in the myriad of securities and related-party transactions on which he worked on behalf of Adelphia and the Rigases. Rothenberger's subsequent testimony in a civil case demonstrates that the government did, in fact, question him regarding many of these transactions. In the same civil proceeding, Rothenberger provided much exculpatory information regarding the same transactions that the government asked him about. This Court should order that the government immediately produce all relevant notes and memoranda regarding Rothenberger's interview by the United States Attorneys' Office for the Southern District of New York or any other arm of the government including, but not limited to, the SEC.

The Court should further order that the government provide the Rigases with a list of all other interviews of Buchanan Ingersoll attorneys conducted by the government, as well as bankers and representatives from Scientific Atlanta and Motorola, all of whom, gave exculpatory testimony in a subsequent civil depositions.

Finally, the government has refused to produce, or even confirm the existence of, notes or memorandum relating to the SEC's preparation of James Brown's testimony in the Dearlove and Mulcahey civil proceedings. As set forth in detail in the Rigases' Rule 33 Motion, Mr. Brown's testimony in those proceedings was contradictory to his testimony in the criminal trial and exculpatory for the Rigases. It defies logic to believe that his pre-testimony interviews by the SEC would not also have contained exculpatory information. Accordingly, those materials should also be produced.

## BACKGROUND

Carl Rothenberger was Adelphia's lead, outside securities and corporate governance lawyer. During the criminal trial, the government focused on numerous securities filings that Rothenberger drafted. He also played a key role with respect to Adelphia's Board meetings and corporate governance issues. He set the agenda for such meetings and advised the company on the approval and disclosure of related party transactions, including the co-borrowing agreements and the Rigas securities purchases. Rothenberger attended and often guided the discussions at company's Board meetings and drafted the minutes for those meetings. His disclosure advice included whether an event or transaction required disclosure and, if so, how the event or transaction should be disclosed. [Carl Rothenberger Deposition Transcript ("Roth. Tr.") (Declaration, Ex. 1) 10-13.] From 1996 through 2001, he spent between 60% and 90% of his time working on Adelphia matters. [Roth. Tr. 55.] He attended all Adelphia Board meetings

2

during this period. [Roth. Tr. 61.] In light of this role, he is one of the most important witnesses in any Adelphia matter, including this criminal case. Despite his key role at Adelphia and, in particular, his role with respect to the government's main allegations against the Rigases, the government did not call Rothenberger as a witness at the criminal trial.

As part of its prosecution of the Rigases, the government conducted a broad investigation of Adelphia. On January 27, 2004, the government sent the Rigases an updated list of witness statements that included over 150 people, including memoranda of interviews of Rothenberger conducted by counsel to Adelphia's Special Committee. [Declaration, Ex. 2.][1] The government provided the Rigases with notes from interviews that it conducted with over 70 people included on this list. Many of the people included on this list had a very limited involvement with and knowledge of Adelphia and were consequently of minor importance to the case. For example, the government produced its notes from interviews with Dick Garbarino, who was a self-employed caretaker. The government nevertheless produced the notes of its interviews with these people, including many people whose names were never even mentioned at the trial. It did not produce notes or memoranda from any government interview of Rothenberger. [Declaration, Ex. 2.]

The government also produced transcripts of sworn testimony from the SEC investigation of several of Deloitte's auditors, SEC notes from an interview with Niraj Gupta, a Salomon Smith Barney analyst who covered Adelphia, and two SEC correspondence files concerning

---

[1]     Although the written memoranda of interviews conducted by counsel to Adelphia's Special Committee were produced, the handwritten notes and drafts of such interviews were never produced. Dennis Coyle, Chair of the Special Committee, testified that the government co-opted Adelphia's internal investigation: "Covington [counsel to the Special Committee] was co-opted . . . by the government, they weren't reporting to me anymore." [Dennis Coyle Deposition Transcript (Declaration, Ex. 3) 641.] Given the government's control over the Special Committee Investigation, the notes and drafts of interviews should have also been produced to the Rigases.

3

Adelphia's SEC filings in 1994 and 1995. No SEC materials relating to Rothenberger were produced. [Declaration, Ex. 2.]

Prior to the criminal trial, Rothenberger consistently refused to speak with the Rigases' defense counsel. Through his counsel, he advised the Rigas defense team that, if he was subpoenaed to testify at trial, he would invoke his Fifth Amendment rights. Rigas defense counsel was also advised that Rothenberger took a similar view with respect to the government: he would not talk to government investigators or lawyers and would assert a Fifth Amendment privilege if subpoenaed.

Notwithstanding the position that Rothenberger enunciated to the Rigas defense team, he in fact agreed to be interviewed by the U.S. Attorney's Office. The interview took place over two days shortly before the commencement of the criminal trial. He was interviewed on February 20 and 21, 2004 by Christopher Clark, one of the prosecution's trial lawyers and by Thomas Feeney, a U.S. Postal inspector. Thomas Feeney took notes of the interview. Although the interview was not recorded, in a subsequent civil deposition, Rothenberger testified that he recalled questions about schedule 13-D filings that were made on behalf of the Rigases. He also remembered discussing either or both the press release and SEC filing disclosures for the Rigases' stock purchases. [Roth. Tr. 31-32.] The interview also included questions about Form 4s filed by the Rigases.

On February 24, 2004, Clark sent a one sentence letter to criminal counsel informing them that Rothenberger may be able to provide favorable information regarding the timber transaction:

> The Government writes to inform you that Carl Rothenberger, Esq. may be able to provide information that is favorable to the defense concerning the timber rights transaction discussed in the Government's Bill of Particulars.

4

[Letter from Clark dated February 24, 2004 (Declaration, Ex. 4).] The letter did not disclose that Rothenberger had been interviewed nor did it advise defense counsel what exculpatory information was in the government's possession.[2]

Following the interview, the prosecutors decided not to call Rothenberger as a witness at trial. After the criminal trial, Rothenberger was deposed in a civil proceeding for 13 days -- far longer than any other witness. He offered a vast amount of exculpatory evidence on the very issues that the government had questioned him about and stated consistently that he did not believe that any type of fraud had occurred. His mere acknowledgement that he drafted the relevant disclosures and that they complied with the law is highly exculpatory. His statements during the government interview were surely consistent with his subsequent sworn testimony and must have contained similar exculpatory evidence.

After the Rigases' trial, Rothenberger was also interviewed by the SEC in December 2004 concerning the SEC's investigation of Adelphia matters. There was a court reporter present who transcribed the interview. During a subsequent civil deposition, Rothenberger generally recalled discussing with the SEC transactions in which his firm represented Adelphia as well as transactions in which his firm represented the Rigases but could not remember specific questions that he was asked by the SEC. He also recalled discussing with the SEC conflict issues and general background information. [Roth. Tr. 17-20.] The government has never produced the transcript of this interview.

Many other witnesses have subsequently provided exculpatory testimony in other civil proceedings. In order to identify whether the Department of Justice or the SEC interviewed any

---

[2]    In a subsequent deposition in a civil matter, Rothenberger admitted having discussions with Adelphia management and concluding that no Board approval of the timber transaction was required at the time. [Roth. Tr. 1576-81.] Since the government failed to provide the Rigases with this exculpatory information and because Rothenberger refused to speak with the Rigases' counsel prior to the commencement of the criminal trial, the Rigases' ability to defend themselves with respect to this transaction was severely prejudiced.

5

of these exculpating witnesses, the Rigases have made several narrow requests that the government acknowledge whether certain witnesses were interviewed. The government has refused to respond to this request.

On September 12, 2007, the Rigases' counsel met with Bill Johnson, the Assistant U.S. Attorney currently in charge of the Rigases' case, to discuss the government's case against the Rigases and the Rigases' motion for a new trial. The substance of the discussions between Mr. Johnson and the Rigases' counsel is privileged under Federal Rule of Evidence 408 and will not be discussed.

Clark and Richard Owens, who prosecuted the case and are now in private practice, also attended this meeting. During the meeting, counsel for the Rigases summarized testimony that Rothenberger had given in the subsequent civil depositions and highlighted portions of documents used in those depositions that were exculpatory to the Rigases. Clark indicated that the information that was presented was not new and stated that he had interviewed Rothenberger prior to the criminal trial. The Rigases' counsel sought confirmation that there were notes from the meeting and asked the government to produce the notes. On September 21, 2007, Assistant U.S. Attorney Johnson called the Rigases' counsel and informed them that Clark and Postal Inspector Feeney had interviewed Rothenberger on February 20 and 21, 2004. He confirmed that Feeney took notes, which were not produced to the Rigases. The government refuses to produce those notes to the Rigases.

In a letter dated October 15, 2007, the Rigases made a very specific request asking the government to disclose whether the Department of Justice or the SEC possessed materials reflecting interviews (1) with Rothenberger other than the February 20 and 21, 2004 interview identified here; (2) with any other Buchanan Ingersoll attorneys; (3) with Motorola or Scientific

6

Atlanta representatives; and (4) with any lenders or investment bankers involved in Adelphia's transactions. The Rigases also requested in this letter that the government indicate whether there existed any materials reflecting the preparation of James Brown to testify as a government witness in the Dearlove and Mulcahey proceedings. Given Brown's testimony in those proceedings, the Rigases believe that if any of these materials existed, they would contain exculpatory evidence. In response to the letter, the government declined to indicate whether any of the materials existed nor did they deny that the materials exist. [Declaration, Ex. 5]

## ARGUMENT

**A.    The Legal Standard**

The government should produce to the Rigases the notes from Rothenberger's interviews with the Department of Justice and SEC and answer the Rigases inquiries in the October 15th letter. Under *Brady v. Maryland*, 373 U.S. 83 (1963), the government has an affirmative duty to produce any evidence favorable to the defendant that is material to either guilt or punishment. *United States v. Bagley*, 473 U.S. 667, 674-75 (1985). Both exculpatory information and evidence that can be used to impeach the prosecution's witnesses are considered "favorable" under *Brady* and must be disclosed by the government. *Id.* at 676-77. In cases where it is not clear whether a particular bit of evidence or information is materially exculpatory, the prosecutor should err on the side of providing the evidence. *United States v. Urciuoli*, 470 F. Supp. 2d 109, 113 (D.R.I. 2007) (citing *Kyles v. Whitley*, 514 U.S. 419, 439 (1995)).

In *United States v. Dennis*, 384 U.S. 855 (1966), the Court found that defendants were entitled to review grand jury testimony that the government had refused to turn over. The Court stated that "[i]n our adversary system for determining guilt or innocence, it is rarely justifiable for the prosecution to have exclusive access to a storehouse of relevant fact," and added that

7

"[t]here is no justification for relying upon 'assumption.'" *Id.* at 873-74. The Court also dismissed the idea that a trial judge could always properly weigh the value of information:

> Nor is it realistic to assume that the trial court's judgment as to the utility of material for impeachment or other legitimate purposes, however conscientiously made, would exhaust the possibilities. . . . The determination of what may be useful to the defense can properly and effectively be made only by an advocate.

*Id.* at 874-75. In *Dennis*, the government conceded that the importance of preserving the secrecy of the grand jury minutes sought by the defendant was minimal. Based on a finding that the defendants had demonstrated a "particularized need" for the materials, the Court concluded that the grand jury minutes should be produced to the defendants to review. *Id.* at 874-75.

In a later opinion, the Supreme Court held that *Dennis* did not entitle defendants to the unsupervised authority to search through government files. *Pennsylvania v. Ritchie*, 480 U.S. 39, 59-60 (1986). "In the typical case where a defendant makes only a general request for exculpatory material under [*Brady*], it is the State that decides which information must be disclosed." In *Ritchie*, the defendant was accused by his minor daughter of various sexual offenses. He sought access to her files held by the Pennsylvania Children and Youth Services. *Id.* at 991. The Court balanced the defendant's interests against the Commonwealth's and concluded that full disclosure to the defendant could sacrifice unnecessarily the Commonwealth's compelling interest in protecting its child-abuse interest. *Id.* at 60.

Thus, the *Ritchie* Court did not hold that defendants should always be precluded from gaining access to government files. A prosecutor's decision is final "unless defense counsel becomes aware that other exculpatory evidence was withheld and brings it to the court's attention." *Id.* at 60. "If a defendant is aware of specific information contained in the file (*e.g.*, the medical report), he is free to request it directly from the court, and argue in favor of materiality." *Id.* at 61.

8

Other courts besides the Supreme Court have ordered government production of documents to defendants who successfully argued that the documents likely contained *Brady* information. In *United States v. Bergonzi*, 216 F.R.D. 487 (N.D. Cal. 2003), the court ordered the government to produce documents to the defendants. In doing so, the court interpreted *Brady* to require disclosure of exculpatory information that is either admissible or reasonably likely to lead to admissible evidence. *Id.* at 499.

The *Bergonzi* defendants were former executives charged with engaging in fraudulent practices that resulted in the intentional misstatement of their company's publicly reported results. The company independently investigated their past actions. As part of its internal review, the company drafted memoranda based on interviews that it conducted. The company used the memoranda to produce a report, which, along with the interview memoranda, was shared with the government. *Id.* at 490-91.

As part of its prosecution, the government used the report and interview memoranda to organize its initial investigation. *Id.* at 499. One of the defendants argued that the report likely outlined the roles that various officers and employees played at the company and thereby probably contained information concerning the process for having made the relevant financial and accounting decisions. This would have affected his defenses of lack of criminal knowledge and intent. *Id.* at 498-99.

The court found that the company's claim that it was a victim and had a "common interest" with the government to be significant. It concluded that the claim "point[ed] persuasively toward a finding" that both the report and underlying interview materials would provide the defendants with exculpatory information that would either be admissible or likely to lead to admissible evidence. The government's concession that it was obligated to produce

9

certain interview memoranda supported the court's conclusion, as did the government's statement that the report provided a useful roadmap. The court consequently compelled the production of the report and interview memoranda to the defendants. *Id.* at 499.

The Second Circuit has also ordered the government to produce documents to defendants making *Brady* claims. In *United States v. Schwarz*, 259 F.3d 59, 62-63 (2d Cir. 2001), two district courts had denied motions to compel the production of FBI and New York City Police Department investigation materials. In its opinion about a *Brady* violation, the court noted that "[t]o consider the *Brady/Giglio* claim on appeal, we ordered the Government to provide appellants and this Court . . . all statements made at the GO-15 hearings (including any summaries of these statements) and all reports of FBI interviews of persons who testified in the GO-15 hearings." *Id.*

**B.**   **This Court Should Order the Government to Produce the Rothenberger Interview Materials**

This Court should order that the government produce the notes to the Rigases since the notes are likely to contain favorable information that could lead to admissible evidence and the production of the notes would create little burden, if any, upon the government. On the other hand, the information contained in the notes is likely to be of great value to the Rigases.

**1.**   **Rothenberger Disclosed Exculpatory Information to the Government**

Adelphia filed suit against Deloitte on November 6, 2002. *Adelphia Communications Corp. v. Deloitte & Touche LLP*, No. 02-000598 (Pa. Ct. Com. Pl. Phila. Co., Nov. 6, 2002). In that case, Rothenberger was deposed for a total of 13 days, and he provided a large amount of favorable testimony for the Rigases. During that deposition, Rothenberger recalled that during his interview by the government he was asked questions about schedule 13-D filings that were made on behalf of the Rigases. He also remembered discussing either or both the press release

10

and SEC filing disclosures for the Rigases' stock purchases. [Roth. Tr. 31-32.] The interview also included questions about Form 4s filed by the Rigases. During the depositions, Rothenberger expanded upon these topics, providing compelling exculpatory evidence regarding the Rigases.

### a. Rothenberger was responsible for drafting and reviewing Adelphia's and the Rigases' securities filings and did not identify any improprieties in the filings

From 1996 to 2001, Rothenberger understood that Adelphia's directors relied on him and his firm to provide legal advice as to the adequacy of the 10-K and co-borrowing disclosures. Rothenberger was the lead attorney at Buchanan engaged in the review of 10-Ks. Part of the review process was looking at the adequacy of the disclosures. He and his colleagues would have pointed out any inadequacies to Adelphia:

> Q. And if you had seen any deficiencies in the disclosures of the co-borrowings in the 10-Ks or other filings that Adelphia made up through the year 2000, you would have pointed that out to the company; is that correct?
>
> A. We would have raised it for discussion I believe, yes.

[Roth. Tr. 1436-37.] But Buchanan never raised any potential problems with disclosures because its attorneys did not find anything legally inadequate or deficient in the disclosures:

> Q. From 1996 up through May 1st, 2002, did you find any legal inadequacies or deficiencies in the disclosures that were made by Adelphia and their public filings with respect to the co-borrowing facilities?
>
> A. At the time of each such filing, my general recollection is that I did not reach that conclusion.

[Roth. Tr. 1439.]

When Adelphia filed its 2000 10-K, Rothenberger was comfortable that the amount of Rigas co-borrowing debt did not need to be disclosed. [Roth. Tr. 1276-77] Even though he had

11

received a draft 10-K for 2000 that contained the amount of RFE debt, Rothenberger did not advise the Rigases to amend the disclosure related to their co-borrowing. [Roth. Tr. 1281, 1757-60.]

Rothenberger also did not think that there was a legal problem with the joint and several liability of the co-borrowers when the co-borrowing facilities were presented to the Board for approval. He would have called it to the Board's attention if he thought that there was a problem. [Roth. Tr. 340-41.]

This testimony goes to the heart of the Rigases' defense that they relied on the advice of counsel signing the 10-Ks. The fact that experienced SEC counsel saw nothing wrong with these disclosures defies against the notion that the Rigases, who were not expert in the SEC rules, knew the disclosures were misleading.

**b.   Rothenberger believed the source of funds disclosures in the 13-Ds were accurate concerning the Rigases' stock purchases**

In addition to his work on Adelphia's 10-Ks, Rothenberger spearheaded the process for producing 13-Ds. From the mid-1990s onward, he was the lead attorney responsible for preparing the 13-Ds. He or a colleague would typically produce the initial draft of a 13-D. In addition to using information they already knew, Buchanan attorneys received information for preparing 13-Ds from Adelphia, Form 4s, and Chris Thurner. Thurner worked as a controller for Wending Creek Farms, which was owned by John Rigas, and was Rothenberger's contact for information regarding 13-Ds and Form 4s. Rothenberger found Thurner to be conscientious, thorough, and responsive to requests. He encountered no resistance to his obtaining necessary information for filing the 13-Ds. [Roth. Tr. 268-76, 1796.]

Besides drafting the documents, Rothenberger believed he had an obligation to conduct, and did conduct, a reasonable inquiry as to the facts stated in the 13-Ds:

12

> Q. When you prepared 13(d)s, did you believe that you had an obligation to conduct a reasonable inquiry as to the facts stated in the 13(d)?
>
> A. My recollection is that generally speaking, that was the way I approached the 13(d).

[Roth. Tr. 324.] As part of verifying the accuracy of the facts provided in 13-Ds, he went through information with respect to transactions that were being reported and attempt to correct numbers, descriptions, and other information. [Roth. Tr. 325.]

Rothenberger also testified that 13-D filings did not need to disclose if money to purchase stock was received from affiliate lenders, such as Highland Video. Instead, the ultimate purchasers of stock needed to disclose their source of funds. For example, the 13-D filed on January 21, 2000 indicated that Highland 2000 purchased 5.9 million shares of class B common stock from Adelphia for $375 million. Highland 2000 received the $375 million from "affiliate borrowings." Rothenberger understood "affiliate borrowings" to mean borrowings from affiliates, in this case affiliates of Highland 2000. Rather, only the ultimate purchaser needed to disclose where it was getting the money. When this 13-D was filed, Rothenberger understood that there was no obligation to disclose where affiliates received the money to lend to Highland 2000 to come up with $375 million used to purchase stock in January 2000. If Rothenberger had thought otherwise, he would have made that disclosure. [Roth. Tr. 1794-96.]

When Rothenberger worked on the 13-D for the July 3, 2000 Rigas stock purchase, he had the same understanding of the meaning of "affiliate borrowings." The source from where the affiliates were getting the money to lend to Highland 2000 did not need to be disclosed:

> Q. And was your understanding also that the source of where the affiliates were getting the money to lend to Highland 2000 did not need to be disclosed?
>
> A. Again, I don't recall a specific understanding at the time sitting here today. My recollection is that was the general understanding.

13

[Roth. Tr. 1802.] When Rothenberger was preparing this and other 13-Ds, he tried to do a good job in disclosing what he thought needed to be disclosed. He was not trying to hide anything from anyone, nor was he trying to deceive anyone:

> Q. In general, when you were preparing this and the other 13Ds . . . were you trying to do a good job in disclosing what you thought needed to be disclosed?
>
> A. I believe, generally, yes.
>
> Q. You weren't trying to hide anything from anyone, were you?
>
> A. I don't recall doing that.
>
> Q. Do you recall trying to deceive anyone about where the Rigases were getting the money to buy hundreds of millions of dollars in securities?
>
> A. I don't recall that.
>
> Q. And if you were trying to deceive somebody, do you think you might recall that?
>
> A. I think I might.
>
> Q. In fact, you weren't trying to deceive anybody, were you?
>
> A. I don't recall that I was, no.
>
> Q. I'm trying to give you a real easy question, Mr. Rothenberger. You know -- sitting here today, you know for a fact -- and I'm not talking about recollection. You know for an absolute certainty that you were not trying to deceive anybody, don't you?
>
> A. Yes.

[Roth. Tr. 1802-03.]

Rothenberger was also the lead attorney for reviewing proxy statements. Other attorneys assisted him with the review process. Rothenberger also prepared part of the proxy statements, including the shareholders table and portions of sections describing specific transactions. Buchanan helped prepare Form 4s, using a process similar to that for 13-Ds. Rothenberger took

14

the lead for preparing these forms. Buchanan received information from non-Rigas directors, and the Rigases, in addition to information they knew. [Roth. Tr. 266.]

As with the 10-Ks, Rothenberger's testimony that he, as drafter of the 13-Ds, did not believe them to be fraudulent underscores that the Rigases also had no reason to believe there was anything improper about these filings.

### c. Rothenberger viewed the liability among co-borrowers as a guarantee

Rothenberger was one of the authors of a memorandum dated April 5, 2000 that concluded that liability under the co-borrowing agreements was in the form of a guarantee. The memorandum analyzed the Arahova indentures that were part of the financing for the Century Holdings co-borrowing facility. The memorandum stated that "[u]nder the credit agreement for the facility, the Arahova borrowers and subsidiaries would be guaranteeing the borrowings made by the Olympus subsidiary, as well as Highland Prestige and any unrestricted borrowers." The Arahova borrowers were Adelphia entities, while Highland Prestige was a Rigas entity. The memorandum concluded that "[w]ith respect to the credit agreement and its cross-guarantee, it would appear that since the non-Arahova borrowers, other than the unrestricted borrowers, will be cross-guaranteeing the Arahova borrowings, that such would appear to be as fair as any third-party transaction would be to Arahova." Rothenberger did not disagree with the memorandum's conclusion, and he would not have put his name on a memo if he did not agree with the conclusion. [Roth. Tr. 141-46.]

### d. Rothenberger understood that the golf course was designed to provide a benefit to Adelphia and the Coudersport community

Rothenberger recalled that the "board was well aware" of the golf course project. Various Board members took tours of the property on different occasions. [Roth. Tr. 1582] He knew, prior to March 2002, that the golf course was being built on land owned by John Rigas

15

and land owned by Adelphia. He also knew that having a charitable foundation own the golf course was part of the structure considered for tax and charitable matters. One of the purposes of the investment was to provide amenities to attract and retain Adelphia employees, and the golf course was part of a larger land-use development project in the Coudersport area. The directors were aware of the effort to make the area more attractive to prospective and current Adelphia employees. [Roth. Tr. 1701-08.]

Tim Rigas sought Buchanan's advice about the best ownership structure for the course given its anticipated uses. Buchanan's work that related to the golf course was billed to Adelphia, and Rothenberger did not think that there was a problem with doing so. Final approval was never sought from the Board since the ownership structure had never been resolved. [Roth. Tr. 1710-19.]

Had the Rigases had access to this testimony prior to the criminal trial, they could have severely undermined the government's claims regarding the golf course at trial.

e. **Rothenberger did not identify anything legally inappropriate about separating the documentation for marketing support payments and the converter box purchase**

Rothenberger received an email from Tim Werth on October 2, 2000 asking him to create a second document in connection with the agreement with Scientific Atlanta for marketing support payments and the purchase of converter boxes. [Roth. Tr. 1878.] Rothenberger knew at the time he was discussing the documentation for this transaction that there already existed an agreement whereby Adelphia was going to purchase a certain number of digital converter boxes from Scientific Atlanta. [Roth. Tr. 2036.] He also knew that Adelphia was going to add $50 to the price of each converter box by amending the original purchase agreement and that Scientific Atlanta was going to give Adelphia $50 per converter box for marketing support. [Roth. Tr. 2040.]

16

Rothenberger recalled that it was the company's objective to obtain a better and more appropriate accounting treatment for the purchase and marketing efforts regarding the Scientific Atlanta transaction. This was an accounting approach that several of Adelphia's competitors had taken, and Adelphia wanted to use a similar approach to reflect the services provided with respect to the converter boxes. [Roth. Tr. 1878-79, 2036-38.]

There were two distinct functions that Adelphia was trying to address. The first was the purchase of boxes, and the second was the extensive services, as Rothenberger was told, that the company was providing with respect to the marketing of the digital converter boxes. The marketing of these boxes required significant effort and expense on the company's marketing side. [Roth. Tr. 1879.]

After Rothenberger received this email, he had discussions with Tim Werth, who was Adelphia's director of accounting. He could not recall any concerns regarding this email. Rothenberger did not see any legal problem with the transaction and he did not advise any member of the Rigas family that there was such a problem with the transaction. [Roth. Tr. 1881.]

As set forth above, during the government's interview of Rothenberger, it inquired about 13-D and Form 4 filings, and disclosures contained in Adelphia's press releases and SEC filings. These issues were at the heart of the government's case against the Rigases, and evidence that he provided in civil depositions exculpated the Rigases. Thus, information about the timber transaction cannot be the only information in Rothenberger's interview notes that is

17

exculpatory.[3] The interview covered the central areas of the government's case against the Rigases, and Rothenberger's subsequent civil testimony indicates that he provided exculpatory information during the interview. Clark interviewed him for two days before the trial, but the government decided not to call Rothenberger as witness. This further demonstrates that Rothenberger provided exculpating evidence about the Rigases.

As was the case in *Bergonzi*, Rothenberger's notes could have provided exculpatory information regarding the Rigases' knowledge and intent. Rothenberger acknowledged that he drafted the relevant disclosures and that they complied with the law. This alone is highly exculpatory. Moreover, the government's disclosure regarding the timber transaction indicates the significance of the interview notes. In *Bergonzi*, the government's production of certain interview memoranda persuaded the court that the other interview memoranda and the report should have been provided to the defendants. For the Rigases, the government's timber transaction letter similarly suggests the potential importance of and need to disclose Rothenberger's interview notes.

## 2. There Is No Countervailing Interest Militating Against Production

No government interest militates against production of the notes. In *Ritchie*, the court believed that allowing full disclosure to the defense would unnecessarily sacrifice Pennsylvania's interest in protecting its child abuse information. Fully disclosing the records

---

[3]  The government's one line sentence suggests that Rothenberger may be able to provide favorable information concerning the timber transaction. It in no way suggests that the government has such favorable information and that the government can provide it. Instead, the government unilaterally decided not to turn over its notes of the Rothenberger interview or even acknowledge that such an interview took place. Rather, at the criminal trial, the government solicited evidence that the timber transaction was harmful to Adelphia and a related-party transaction that was not approved by Adelphia's independent directors, all the while fully knowing that Rothenberger had provided specific advice that the transaction was not a related-party transaction. The government should not be permitted to avoid its legal obligations simply because it does not like what a witness had to say. The jury was entitled to know all of the facts surrounding this transaction not merely those facts that favored the government's position. The reference that Rothenberger, who was not speaking with defense counsel, might have exculpatory information was plainly inadequate to discharge the government's obligation to provide the actual exculpatory information that it knew about as a result of the Rothenberger interview.

18

sought by the defendant would have had a "seriously adverse effect on Pennsylvania's efforts to uncover and treat abuse." *Ritchie,* 480 U.S. at 60.

In this case, disclosing the notes would not have an adverse effect upon any government interest. Unlike *Ritchie,* there is no public interest that would be harmed by the production of Rothenberger's notes. Indeed, the government has already turned over interview materials for over 70 interviewees, a number of whom could not provide any significant evidence and consequently were never likely to play any role in the criminal trial. Furthermore, there is no ongoing investigation of Adelphia matters and no concerns about protecting potential witnesses. The Rigases, however, are not seeking general discovery or making a broad request for *Brady* materials. They are instead making a very narrow request based on substantial and detailed evidence.

Finally, the Rigases should be allowed to view the notes since they are best suited to evaluate the information contained in them. The Rigases have examined Rothenberger's testimony from his civil depositions and will consequently be most able to evaluate the utility of all the information contained in the notes. Allowing them to at least review the notes will provide the best protection of the Rigases' due process rights.

The interview notes provide valuable, exculpatory evidence for the Rigases. The government would suffer no harm from producing the notes, while the Rigases would benefit greatly. The government has turned over notes from the interviews from some of the most minor witnesses but still refuses to produce the notes regarding Rothenberger, who was at the center of events. Producing Rothenberger's notes would not place any greater burden on the government than producing the notes of the other interviewees. Consequently, the government should

19

disclose the notes to the Rigases or permit the Rigases to review the notes at the U.S. Attorneys' office.

### C. The Government Should Produce Any Interview Materials from Rothenberger as Part of the SEC's investigation

The government is also obligated to produce any materials from the SEC's interview with Carl Rothenberger. As discussed above, to the extent that the prosecutor knows of material evidence favorable to the defendant in a criminal prosecution, the government has a due process obligation to disclose that evidence to the defendant. *See, e.g. Kyles v. Whitley*, 514 U.S. 419, 437 (1995); and *Brady*, 373 U.S. 87. The Second Circuit has imposed constructive knowledge on a prosecutor of any information held by those whose actions can be fairly imputed to him— those variously referred to as an "arm of the prosecutor" or part of the "prosecution team." *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998), *see, e.g., United States v. Morell*, 524 F.2d 550, 555 (2d Cir. 1975); and *United States v. Gil*, 297 F.3d 93, 106 (2d Cir. 2002). It is clear that when there is actual knowledge that several arms of the government are involved in the investigation of a particular case, then the knowledge of those arms is imputed to the prosecutions. *Smith v. Sec. of New Mexico Dept. of Corrections*, 50 F.3d 801, 825 n. 36 (10th Cir. 1995).

Where the agency is statutorily or otherwise charged with administration of a statute or program and has consulted with the prosecution, that agency is to be "considered part of the prosecution in determining what information must be available to the defendant charged with violation of the statute." *United States v. Wood*, 57 F.3d 733, 737 (9th Cir. 1995). In *Wood*, the government charged the defendants with conspiracy to defraud the Food and Drug Administration. The prosecution, however, failed to turn over documents in the FDA's possession related to new drug applications. The court determined that the prosecutor and the

20

FDA, as the agency charged with administration of the statute, "were one" for *Brady* purposes. *Id.* at 727, *see also United States v. Perdomo*, 929 F.2d 967 (3d Cir. 1991) (holding a federal prosecutor responsible for criminal record information residing in the files of the Virgin Islands government); *United States v. Auten*, 632 F.2d 478 (5th Cir. 1980) (finding that the prosecution is obligated to produce certain evidence actually or constructively in its possession or accessible to it.). *See also United States v. Joseph*, 996 F.2d 36, 39 (3d Cir. 1993) (holding that the government must produce information and material in its actual and constructive possession and that constructive possession means anything the prosecutor should have known about).

Thus, the scope of the government's discovery obligation rests upon a finding that the subject information and documents are accessible to the prosecution or that the agency whose files are at issue is closely aligned and working with the prosecution. While it is recognized that knowledge on the part of persons employed by a different office of the government does not in all instances warrant the imputation of knowledge to the prosecutor, *e.g. Avellino*, 136 F.3d at 255, the prosecution is responsible for information and material known to it or of which it should reasonably know.

In this case, prosecutors had actual knowledge of the SEC's investigation. Indeed, prosecutors produced to the Rigases copies of sworn testimony from Deloitte auditors taken by the SEC, SEC interview notes, and other internal SEC files. In addition, the SEC acknowledged in a 2002 press release the U.S. Attorney's Office and the U.S. Postal Inspection Service's assistance in its Adelphia investigation. [Declaration, Ex. 6.] Thus, the files and information of the SEC are within the scope of the government's obligations to disclose.

**D.** **The Government Should Identify Any Materials Reflecting Other Interviews Conducted by the Department of Justice or SEC as Part of the Investigations Involving Adelphia**

The government should answer the narrow inquiries made in the Rigases' October 15, 2007 letter. Each of the letter's requests refers to specific, readily identifiable sources of information. Moreover, each request is based on third party information indicating that there is a strong likelihood that if any of the information sought does exist, it would be highly exculpatory.

As discussed above, Rothenberger was the lead attorney for Buchanan and provided much exculpatory information during his depositions. As is the case with the February 2003 interview notes from his interview, any additional material reflecting interviews with Rothenberger would likely yield exculpating information for the Rigases. Furthermore, any interviews of other Buchanan attorneys conducted as part of the investigation of Adelphia could also yield highly exculpatory evidence. It is unlikely that Rothenberger's colleagues who worked on Adelphia matters would have had remarkably different perceptions than Rothenberger did of events at Adelphia. As a result, any materials produced from interviews with other Buchanan attorneys would contain exculpatory information.

Rothenberger was far from being the only witness to provide exculpating testimony in subsequent civil proceedings. Many other witnesses provided testimony in the *Adelphia v. Deloitte* depositions that was exculpatory.

Several bankers have testified in civil proceedings that they were aware that the Rigases were using co-borrowed funds to purchase Adelphia stock. If the Department of Justice or SEC interviewed any bankers, materials based on those interviews could contain pertinent, exculpatory information.

For example, bankers involved with Adelphia's lending agreements knew that a portion of funds from the co-borrowing facilities were used by the Rigas family to purchase Adelphia

22

securities. Thomas Carter, from Bank of America, testified that it was always understood by Bank of America that a portion of the funds in the UCA/HHC facility were intended for use by the Rigas family to purchase Adelphia securities. [Thomas Carter Deposition Transcript (Declaration, Ex. 7) 92-93.] Another Bank of America employee, Pamela Kurtzman, was also aware that the Rigases used co-borrowed funds to buy securities and did not believe that the drawdown from the UCA/HHC facility and distribution for purchases of Adelphia securities was improper. [Pamela Kurtzman Deposition Transcript (Declaration, Ex. 8) 212-14.]

Mark Misenheimer was Wachovia/First Union's primary account officer for Adelphia. He did not think that that use of co-borrowed funds for the Rigases' purchase of Adelphia stock violated the UCA or CCH co-borrowing agreements. [Mark Misenheimer Deposition Transcript ("Misenheimer Tr.") (Declaration, Ex. 9) 275.] He was also aware that funds from one or more of the co-borrowing facilities were being used to the fund some of the Rigases' purchases of Adelphia stock. [Misenheimer Tr. 88-90.]

Any interviews with personnel from Scientific Atlanta or Motorola would have also likely produced at least some exculpatory information since both Wharton and Tracy testified that their companies had approved the marketing support agreements after having it examined by executives, legal counsel, and auditors. Representatives from both of the cable-box vendors with whom Adelphia entered into the marketing support agreements provided significant exculpating evidence. They used a model that had been used by other cable companies, and Wharton thought that such arrangements were "not unusual" in the cable industry. [John Wharton Deposition Transcript ("Wharton Tr.") (Declaration, Ex. 10) 35, 126-27.] Scientific Atlanta received the go-ahead to do a marketing support agreement with Adelphia in an internal email dated August 11, 2000. [Wharton Tr. 117-20.] Scientific Atlanta had approved the marketing support documents

through a "normal approval process," which would have included review by executives, legal counsel, and auditors. [Wharton Tr. 45-48, 52-53, 127-31.]

John Tracy similarly testified that Motorola's executives, counsel, and auditors had approved the marketing support transaction. [John Tracy Deposition Transcript ("Tracy Tr.") (Declaration, Ex. 11) 23-25, 121-24, 144-57.]

Both John Wharton and John Tracy were deposed by both the Department of Justice and SEC about their companies' contracts with Adelphia. [Wharton Tr. 9-10; Tracy Tr. 6.] The Rigases were not informed of and did not receive any materials reflecting these depositions.

Finally, materials reflecting Jim Brown's preparation to testify in the Dearlove or Mulcahey proceedings would be highly exculpatory. Considering that the testimony he gave during these proceedings contradicted his criminal trial testimony, any materials reflecting his preparation for those proceedings would produce exculpatory material for the Rigases.

The Rigases are not fishing for information. Instead, they have specifically identified potential sources that would likely contain favorable, material information based on the sworn testimony of third party witnesses. Allowing the government to continue to stonewall the Rigases would seriously impair the Rigases' due process rights. Consequently, the government should tell the Rigases whether any of the materials referenced in the October 15th letter exist.

## CONCLUSION

For all the reasons stated herein, the government should disclose all of Rothenberger's interview notes. In sum, Rothenberger is one of the central figures in this matter. Few people were as involved as Rothenberger was with Adelphia and Rigas matters from 1999 through 2001. He was a skilled attorney with much experience handling corporate securities matters, and Adelphia depended on him to provide legal advice for its SEC filings and disclosures. He produced the initial draft of a number of the public documents produced at trial. He also

24

attended Adelphia's Board meetings and drafted the minutes for those meetings. He even toured the golf course construction site with Tim Rigas and some of the Board members. In sum, Rothenberger had an extensive and thorough knowledge of Adelphia and its transactions.

Rothenberger testified in a subsequent civil proceeding that he had discussed the very transactions and issues at the heart of the government's case against the Rigases in his interview with the government. He further provided exculpatory information regarding those transactions and issues in his subsequent civil deposition including that he did not believe there was anything improper about the securities filings that he worked on. Given this testimony, the Rigases have specifically identified material, exculpating evidence to which the Rigases are entitled under *Brady*. Producing the notes will not burden any government interest, and there is no valid reason why the government should not produce them. The government should produce the notes directly to the Rigases since they can best evaluate the significance of the notes. The government should also answer the Rigases' inquires made in the October 15th letter to ensure that the Rigases' due process rights are fully protected.

Respectfully submitted,

Lawrence G. McMichael, Esquire
DILWORTH PAXSON LLP
3200 Mellon Bank Center
1735 Market Street
Philadelphia, PA 19103
(215) 575-7000

Dated: December 4, 2007

*Attorneys for John J. Rigas and Timothy J. Rigas*

707346_10

# Exhibit D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------X
                                  :

UNITED STATES OF AMERICA       :

     - v -                   :          S1 02 Cr. 1236 (LBS)

JOHN J. RIGAS,                :
TIMOTHY J. RIGAS,        :

            Defendants.      :

--------------------------------------------------------------X

### GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANTS' MOTION TO COMPEL PRODUCTION OF NOTES TAKEN DURING GOVERNMENT INTERVIEWS

#### Preliminary Statement

The Government respectfully submits this Memorandum of Law in opposition to the

motion by defendants John J. Rigas and Timothy J. Rigas to compel production of notes taken

during Government interviews in this matter (the "Motion"). For the reasons set forth below,

defendants' request is without merit, and accordingly should be denied.

### ARGUMENT

#### Defendants' Motion To Compel Production Should Be Denied

Defendants have failed to demonstrate that they are entitled to any notes of Government

interviews not already produced during the discovery and trial phases of this case. First, the

limited *Brady* material with respect to Carl Rothenberger was properly and timely disclosed to

the defense. There is no other such material with respect to Rothenberger. The defendants'

claims concerning the allegedly exculpatory nature of Rothenberger's post-trial deposition

testimony in civil litigation have been addressed and rejected by this Court in its order denying

the defendants' motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure (the "Rule 33 Motion"). The Government is not required to provide the defense with notes taken during any interviews of witnesses, like Rothenberger, who were not called at trial. This principle applies equally to the other witnesses from Buchanan Ingersoll, Scientific-Atlanta, Motorola, investment banks, and lenders referenced in the Motion. The testimony of these witnesses was also addressed in the Court's Rule 33 Opinion. Finally, defendants have failed to establish that they are entitled to materials in the sole possession of the United States Securities and Exchange Commission ("SEC"), namely the SEC's notes of any interviews of Rothenberger, other Buchanan attorneys, and personnel from Scientific-Atlanta, Motorola, investment banks, and lenders, as well as notes taken in preparation for the testimony of James Brown in the *Dearlove* and *Mulcahey* SEC proceedings. Accordingly, the Motion should be denied.

## I.    Applicable Legal Principles

Under *Brady v. Maryland*, 373 US. 83 (1963), and its progeny, the Government is compelled to produce to the defendant, in a timely fashion, any exculpatory information concerning the defendant in its possession or of which it is constructively aware. In a frequently-cited case, *United States v. Ruggiero*, 472 F.2d 599 (2d Cir. 1973), the Second Circuit held that:

> The purpose of the *Brady* rule is not to provide the defendant with complete disclosure of all evidence in the government's file which might conceivably assist him in the preparation of his defense, but to assure that he will not be denied access to exculpatory information known to the government but unknown to him. Here the appellant was on notice of the essential facts required to enable him to take advantage of such exculpatory testimony as [two witnesses] might furnish. He was also well aware of the process by which they could be compelled to testify at trial. . . . If appellant wanted their testimony, the obvious and logical course was to subpoena them and put them on the witness stand.

*Id.* At 604-05. It has long been the law and practice in the Second Circuit that the Government may fulfill its *Brady* obligations with respect to a particular witness by identifying the witness to the defendant and indicating that the witness may have favorable information on a particular subject. *See United States* v. *Frank*, 11 F. Supp. 2d 322, 327 (S.D.N.Y. 1998) (Cote, J.) ( "the Government may fulfill its *Brady* obligation by directing the defendant's attention to witnesses who may have exculpatory evidence"); *United States* v. *Oshatz*, 700 F. Supp. 696, 698 (S.D.N.Y. 1988) (Sweet, J.) ("By providing [the defendants] the names of the [witnesses] and informing them that these individuals may possess information helpful to the defense, the government has met its *Brady* obligation. It is now up to [the defendants] to subpoena these witnesses to take advantage of any exculpatory information they might furnish.").

Moreover, "[e]vidence, even if exculpatory and material, is not required to be disclosed, however, if the defendant knows or should have known of 'the essential facts permitting him to take advantage of any exculpatory evidence.'" *United States* v. *Frank*, 11 F. Supp. 2d at 327. It is well-settled that, under *Brady*, "the government ha[s] a duty to disclose only 'information which had been known to the prosecution but unknown to the defense.'" *United States* v. *Grossman*, 843 F.2d 78, 85 (2d Cir. 1988). The Government has no duty to disclose such information when the defendant is aware of the identity of the witness. *See id.*; *United States* v. *LeRoy*, 687 F.2d 610, 618-19 (2d Cir. 1982); *United States* v. *Brown*, 582 F.2d 197, 200 (2d Cir. 1978); *United States* v. *Upton*, 856 F. Supp. 727, 751-52 & n. 18 (E.D.N.Y. 1994) (Glasser, J.).

## II. Discussion

### A. Carl Rothenberger

Defendants first claim that the Government is compelled under *Brady* to produce to the

defendants notes of any interviews it conducted of Adelphia's former lead outside counsel, Carl Rothenberger. (Motion pp. 2-20). This contention is meritless.

First, based on well-established Second Circuit law, the Government had no obligation to disclose any information in the possession of Carl Rothenberger. As defendants boldly declare, they have been well aware that Rothenberger "is one of the most important witnesses in any Adelphia matter, including this criminal case," noting further his "key role at Adelphia and, in particular, his role with respect to the government's main allegations against the Rigases." (Motion p. 3). Accordingly, defendants' Motion can be rejected on this ground alone.

Notwithstanding the foregoing, however, in a letter to defense counsel dated February 24, 2004, the Government did identify Rothenberger to the defendants as a witness who could provide favorable information with respect to the timber rights transactions discussed in the Government's Bill of Particulars. Under the well-settled precedent set forth above, this was sufficient notice to fulfill the Government's *Brady* obligations with respect to Rothenberger.[1] Moreover, when the Government has complied with its obligations in this fashion, "the government is not required to produce copies of . . . memoranda or notes of interviews." *United States* v. *Trupin*, 1999 WL 322656, at *3 (S.D.N.Y. 1999) (McKenna, J.).[2]

Buttressing the Government's point, defendants devote nearly 9 pages of their brief to the

---

[1]   Without any citation to authority, defendants criticize the Government's notice procedures, suggesting that the Government intentionally suppressed evidence. (Motion p. 18, n.3). As the law makes clear, however, such procedures were fully in accord with Second Circuit requirements, and the defendants cannot claim otherwise. Defendants have failed even to cite, let alone distinguish, this dispositive precedent.

[2]   Because the Government did not call Rothenberger as a trial witness, it was not obligated to provide any notes of interviews to the defendants pursuant to Title 18, United States Code, Section 3500.

-4-

claim that Rothenberger may possess exculpatory information. (Motion pp. 10-18). Yet, despite knowing Rothenberger's apparently significant role "in any Adelphia matter," defendants did not even attempt to subpoena him to testify at trial or move to compel the Government to immunize him.[3] *See United States* v. *Turkish*, 623 F.2d 769, 777 (2d Cir. 1980); *United States* v. *Ebbers*, 458 F.3d 110, 117-22 (2d Cir. 2006). The Court noted this failure in rejecting the defendants' Rule 33 Motion based on post-trial civil deposition testimony of Rothenberger, among other witnesses. (See Opinion Nov. 20, 2007, pp. 9-10) ("Defendants' choice not to pursue this testimony was a strategic decision, and cannot now form the basis for a new trial."). Defendants' failure even to attempt to compel the testimony of a witness they claim to be "one of the most important witnesses in any Adelphia matter, including this criminal case," was most assuredly a knowing, strategic decision. Accordingly, because the Government provided defendants with notice of *Brady* material in Rothenberger's possession, and because defendants, by their own admission, were well aware of the significance of Carl Rothenberger and took no action to procure his testimony, their *Brady* claim with respect to Rothenberger should be rejected and the Government should not be compelled to produce notes of interviews.

**B.     Other Witnesses From Buchanan, Scientific-Atlanta, Motorola, Investment Banks, And Lenders**

Defendants also seek all notes of any Government interviews of other witnesses from the Buchanan Ingersoll law firm, as well as witnesses from Scientific-Atlanta, Motorola, investment

---

[3]     Defendants' contentions about Rothenberger have evolved since their Rule 33 Motion. In that motion, defendants stated that it was "*suggested* to defense counsel that individual Buchanan attorneys *might* assert their Fifth Amendment privileges if called to testify." (Rule 33 Motion at 46) (emphasis added). Now, defendants assert that Rothenberger's counsel "advised the Rigas defense team that, if he was subpoenaed to testify at trial, he *would invoke his* Fifth Amendment rights." (Motion p. 4) (emphasis added).

banks, and lenders. (Motion pp. 22-24). This request should also be denied.

There was no *Brady* disclosure triggered by any such witnesses whom the Government interviewed. Moreover, as set forth above, even had such witnesses provided exculpatory information, defendants would not be entitled to production of the notes of interviews. Had such witnesses provided exculpatory information, the Government would have been permitted to fulfill its *Brady* obligations by identifying the witness for the defendants, assuming the defendants were not already on notice. With respect to other witnesses from Buchanan, defendants claimed in their Rule 33 Motion that counsel for Buchanan would not permit his clients to speak to the defense, and that it "was further suggested . . . that individual Buchanan attorneys might assert their Fifth Amendment privileges if called to testify." (Rule 33 Motion p. 46). Defendants were also well aware of the existence of the Scientific-Atlanta and Motorola witnesses, but failed to call any such witnesses at trial, and apparently did not even interview them before trial, contending weakly that they "believe" without "certainty" that those witnesses refused interviews. (Rule 33 Motion p. 45). Defendants do not claim to have been unaware of the identity of witnesses at investment banks and lenders, but also did not call such witnesses at trial. Nor did defendants even attempt to compel the Government to immunize any witnesses whom they thought might be useful. Accordingly, because defendants were aware of the existence of the witnesses listed in their Motion, and because defendants failed to take steps to procure the testimony of any such witnesses, their *Brady* motion seeking notes of any Government interviews of such witnesses should be rejected.[4]

---

[4]     As with Rothenberger, because the Government did not call these witnesses at trial, it was not obligated to provide any notes of interviews to the defendants pursuant to Title 18, United States Code, Section 3500.

## C.   Notes In The Sole Possession Of The SEC

Defendants also seek to compel the Government to obtain and produce to the defendants all notes of interviews, conducted by the SEC during its parallel civil investigation, of Rothenberger, other witnesses from Buchanan Ingersoll, Scientific-Atlanta, Motorola, investment banks, and lenders, as well as notes taken in preparation for the testimony of James Brown in the *Dearlove* and *Mulcahey* SEC proceedings.[5] (Motion pp. 20-24). This demand is equally meritless and should also be rejected.

The Government generally agrees that its *Brady* obligations extend to information of which it is, or could reasonably be, aware, but that is in the possession of another government agency such as the SEC. As it had done before trial, the Government, since the Motion was filed, has inquired of the SEC whether it possesses exculpatory information concerning the witnesses described above. The Government is satisfied that the SEC does not possess such material.

As discussed above, the Government's *Brady* obligations do not require it to produce any notes or other specific documents to the defendants. Moreover, the particular notes requested are not in the possession, custody, and control of the United States Attorney's Office. With respect to documents and tangible objects, the Government has no disclosure obligation as to items that are not in its "possession, custody, or control." Fed. R. Crim. P. 16(a)(1)(E). When the items sought are in the possession of a governmental agency other than the prosecutor's office that has

---

[5]    With respect to the James Brown materials, defendants claim they are entitled to such materials because Brown testified in an inconsistent manner in the *Dearlove* and *Mulcahey* proceedings, and thus the SEC's materials "would be highly exculpatory." (Motion p. 24). Because the Court has already rejected this contention in denying the defendants' Rule 33 Motion, it is an insufficient basis for the instant request.

brought the charges, the Government need not physically produce the items pursuant to Rule 16 absent a joint investigation between the governmental agency in question and the prosecutor. *Compare United States* v. *Upton*, 856 F. Supp. 727, 749-50 (E.D.N.Y. 1994) (denying motion for discovery of materials in files of FAA, even though FAA investigators "assist[ed] in the investigation, because "the United States Attorney's Office did not conduct a joint investigation with the other agencies [including the FAA] whose records defendants seek") *and United States* v. *Guerrerio*, 670 F. Supp. 1215, 1219 (S.D.N.Y. 1987) (denying motion for discovery of materials in files of Bronx District Attorney because there was no joint investigation between state and federal prosecutors) *with United States* v. *Shakur*, 543 F. Supp. 1059, 1060 (S.D.N.Y. 1982) (ordering disclosure of *Brady* information in possession of Rockland County District Attorney because "there has been and still is cooperative activity between [the United States Attorney] and the District Attorney of Rockland County with respect to the alleged crime charged in this indictment" and noting that the District Attorney "surely . . . is equally mindful of his responsibility under *Brady*"). [6] *See also SEC* v. *Stanard*, 2007 WL 1834709, at *3 (S.D.N.Y. 2007 ) (Lynch, J.) (noting that the SEC is an independent agency from the U.S. Attorney's Office, and that the respective investigations, "while they may have overlapped, were not conducted jointly, and that the SEC has neither possession, custody, nor control of the FBI's notes"). Although the SEC conducted a parallel civil enforcement investigation with respect to

---

[6] Defendants cite a Ninth Circuit case, *United States* v. *Wood*, 57 F.3d 733, 737 (9th Cir. 1995), for the proposition that if the Government merely consults with the civil agency charged with administration of the statue at issue in the criminal case, the civil agency is considered part of the prosecution for discovery purposes. As set forth above, this standard is not the law in the Second Circuit. Moreover, the Government has inquired of the SEC and determined that it does not possess exculpatory information.

Adelphia, the civil investigation was not jointly conducted with the criminal investigation.

Accordingly, the defendants are not entitled to documents in the possession, custody and control of the SEC.

The Government takes its discovery obligations extremely seriously, and does not take the position that it does not have possession of these materials in order to engage in an exercise in formalism. There can be no legitimate dispute that the Government has already produced massive discovery to defendants. Under the law, however, defendants are not entitled to production of the SEC's interview notes, or notes taken in preparation of James Brown to testify in the *Dearlove* and *Mulcahey* proceedings.

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that the defendants' Motion to compel discovery of notes of Government interviews should be denied.

Dated: New York, New York
      December 26, 2007

                                 Respectfully submitted,

                                 MICHAEL J. GARCIA
                                 United States Attorney

By:

                                 WILLIAM F. JOHNSON
                                 Assistant United States Attorney
                                 (212) 637-2403

# Exhibit E

DOC # 77

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

   v.       02 Cr. 1236 (LBS)

JOHN J. RIGAS
TIMOTHY J. RIGAS
MICHAEL J. RIGAS
MICHAEL C. MULCAHEY,

    Defendants.
------------------------------x

        New York, N.Y.
        April 10, 2003
        2:20 p.m.

Before:

     HON. LEONARD B. SAND,

         District Judge

     APPEARANCES

JAMES B. COMEY
  United States Attorney for the
  Southern District of New York
TIMOTHY J. COLEMAN
CHRISTOPHER J. CLARK
  Assistant United States Attorneys

CURTIS, MALLET-PREVOST, COLT & MOSIE
  Attorney for Defendant John J. Rigas
BY: PETER FLEMING, JR.

MORVILLO, ABRAMOWITZ, GRAND, IASON & SILBERBERG
  Attorneys for Defendant Timothy J. Rigas
BY: JEREMY H. TEMKIN

SWIDLER BERLIN SHEREFF FRIEDMAN
  Attorneys for Defendant Michael J. Rigas
BY: ANDREW J. LEVANDER
  KEVIN O'BRIEN
  ADAM WASSERMAN

MARK J. MAHONEY
  Attorney for Defendant Michael C. Mulcahey

1          THE COURT:  Mr. Coleman.

2          MR. COLEMAN:  Judge, unless the Court has questions.

3          THE COURT:  I do have some questions.

4      Tell me affirmatively what's contained in the report

5  have or will be furnished to the defendants and what will not

6  be furnished to them, at least pursuant to this application?

7          MR. COLEMAN:  I'll do them in reverse order, which may

8  be simpler.

9      The only thing that we will not turn over to the

10 defense, not agree to turn over to the defense, are the legal

11 conclusions and the analytical conclusions of the

12 professionals.  All of the underlying documents which are

13 referenced or cited or in any way at issue in any of these

14 materials, to the best of my knowledge, have already been

15 turned over.

16         THE COURT:  Witness statements?

17         MR. COLEMAN:  There are witness statements that are

18 referenced in the materials.  And to the extent we are required

19 to turn over witness statements, it won't just be grand jury

20 testimony.  But we will turn over witness statements that we

21 have obtained from third parties.

22         THE COURT:  The question was raised as to what test

23 you're using for what's exculpatory.

24         MR. COLEMAN:  We don't cut it very thinly, Judge,

25 anything that might conceivably be exculpatory either in the

1    sense that it is probative of the defendant's innocence or even

2    impeachment material for another witness.

3         THE COURT:  Tell me about these indices.  First of

4    all, do I understand the indices are a listing made by somebody

5    as to which documents are relevant to which issue?

6         MR. COLEMAN:  Yes, that's exactly what they are.  They

7    are lists of Bates numbers categorized by issue, which are

8    simply the conclusions of counsel as to what issues particular

9    documents relate to.  And I should say that they are not a

10   comprehensive listing of all of the documents that have been

11   turned over to defense.  There are some subset of documents

12   that were reviewed by counsel.  Counsel turned over that work

13   product to us.  So all of the documents listed on the list have

14   been turned over, but we have not produced the list themselves

15   reflecting counsel's conclusions about what subjects the

16   documents related to.

17        THE COURT:  All right.  Yes.

18        MR. FLEMING:  I think I'm wrong.  I'm going to

19   paraphrase what I thought I heard Mr. Coleman say.  I thought

20   he said he was prepared to turn over -- he would not turn over

21   the expert's analyses or conclusions, but he would turn over

22   everything else.

23        THE COURT:  He would turn over everything else in that

24   he would turn over the witnesses' statements, he would turn

25   over the documents that are referred to.  What else is there