# Exhibit F

# 08-3485-cr(L)

## 08-3500-cr(CON), 08-3592-cr(CON), 08-3597-cr(CON)

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

UNITED STATES OF AMERICA,

*Appellee,*

—against—

TIMOTHY J. RIGAS, JOHN J. RIGAS,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT BRIEF FOR DEFENDANTS-APPELLANTS

NEAL K. KATYAL
THE LAW CENTER
600 New Jersey Avenue
Washington, DC 20001
(202) 662-9000

LAWRENCE G. MCMICHAEL
DILWORTH PAXSON LLP
1500 Market Street, Suite 3500E
Philadelphia, Pennsylvania 19102-2101
(215) 575-7000

*Attorneys for Defendants-Appellants*

# TABLE OF CONTENTS

Page

I.    STATEMENT REGARDING ORAL ARGUMENT .................................... 1

II.   STATEMENT OF JURISDICTION ............................................. 1

III.  STATEMENT OF THE ISSUES .............................................. 1

IV.   STATEMENT OF FACTS .................................................. 2

V.    STATEMENT OF THE CASE ............................................... 5

      A.    The Trial And Appeal ........................................... 5

      B.    The Rule 33 Motion ............................................. 6

      C.    The Motion To Compel ........................................... 8

      D.    Resentencing ................................................... 8

VI.   SUMMARY OF ARGUMENT ................................................ 9

      A.    Resentencing Was Procedurally And Substantively Flawed. ........... 10

      B.    The District Court Abused Its Discretion In Denying The
            Rigases' Motion For A New Trial ................................. 14

      C.    The District Court Erred In Denying The Motion to Compel ........... 15

VII.  ARGUMENT ......................................................... 16

      A.    The District Court Committed Reversible Error In Failing To
            Conduct Resentencing Properly. ................................ 16

            1.    This Court's bank-fraud reversal required *de novo*
                  resentencing ............................................ 16

            2.    The district court committed procedural error by simply
                  modifying its original sentence, rather than making a new
                  Guidelines calculation. ................................. 21

            3.    The district court's treatment of the guidelines was
                  procedurally unreasonable and wrong. .................... 24

                  a)    The district court's decision was
                        procedurally unreasonable because it failed to
                        make the loss causation findings required by
                        *Rutkoske* to justify its 26-point enhancement. ........ 29

i

(1)     Loss-causation principles and the district court's sentencing.................................... 31

(2)     The district court's approach to loss causation decimates appellate review and this Court's precedents. ........................ 37

      (i)     This case does not fit the single, narrow exception to *Rutkoske*. ................. 38

      (ii)     The district court cited no proof of pre-disclosure price inflation, and ignored expert testimony that no price inflation occurred. ...................................... 41

(3)     The district court never quantified and separated out the effect of other causes of the drop in share price. ......................... 45

      (i)     Loss from the undisputed general market decline and in the cable sector must be excluded..................................... 46

      (ii)     Loss from ABIZ bankruptcy's effect on Adelphia must be excluded. ................. 47

      (iii)     Loss from the failure of the anticipated cable system sale must be excluded. ................................................... 48

      (iv)     Loss from Deloitte's decision to suspend its audit, rather than agree to the SEC's position, must be excluded....... 48

      (v)     Losses suffered by investors who bought prior to the fraud and held their stock must be excluded. .................... 50

      (vi)     The final loss amount, if any, must be reduced by the collateral the Rigases pledged. ................................................... 52

(4)     This Court should bar the government from revisiting its intentional strategic decisions and errors to ignore loss-causation principles. .......................................................... 55

b) The district court wrongly imposed three other offense-level adjustments............................................ 56

    (1) The district court failed to exclude from its calculation an enhancement that the government expressly abandoned.   57

    (2) The district court failed to find facts suggesting the Rigases were "organizers or leaders" and the factual record was to the contrary............................................................. 58

    (3) As the government concedes, the "more than 50 victims" adjustment rises and falls with the loss calculation – which was invalid. ........... 63

4. The district court failed to conduct the individualized assessment required by §3553(a). ........................... 64

5. The district court's sentences are substantively unreasonable................................................................. 72

B. The District Court Abused Its Discretion By Denying A New Trial Where The Government's Principal Cooperating Witness Gave False and Misleading Testimony. ........................... 75

1. Standard of review ................................................. 77

2. The government's key witness gave materially false and misleading testimony at trial.................................... 78

    a) Debt reclassification ..................................... 82

    b) Ability to repay co-borrowed debt................. 84

    c) Knowledge of Rigases' use of co-borrowed funds to purchase securities ......................... 86

3. Brown's testimony against the Rigases was critical to their convictions. ................................................... 87

4. A new trial is "virtually automatic" where the government knows or should have known about the witness's materially false testimony. ...................... 91

5. Independently, post-trial testimony by Brown and others confirms that the Rigases are entitled to a new trial. .............. 93

<table>
<tr><td></td><td>a)</td><td>Knowledge of the Rigases' use of co-borrowed funds to purchase securities ........................... 94</td></tr>
</table>

        a)     Knowledge of the Rigases' use of co-borrowed funds to purchase securities ........................... 94

        b)     Allegations regarding EBITDA manipulations and "two sets of books" ......................................... 95

        c)     Marketing support ...................................................... 95

        d)     Capitalization of labor .................................................... 96

        e)     Netting of affiliate receivables ....................................... 97

    6.     The post-trial testimony of other witnesses constitutes "newly discovered" evidence that could not have been discovered through due diligence. .......................... 98

C.     The District Court's Denial Of The Motion To Compel *Brady* Materials Should Be Reversed. ...................................... 101

    1.     The government's intentional failure to produce notes of a pre-trial interview with the Rigases' attorney, a key witness. .................................................................. 101

    2.     The district court should have ordered production of the notes. ................................................................... 106

        a)     The materials were potentially exculpatory ............... 106

        b)     The materials were intentionally suppressed ............... 108

            (1)     The government intentionally misled the Rigases regarding the existence of potentially exculpatory information provided by Rothenberger. ............................... 108

            (2)     The "essential facts" exception does not apply. .............................................................. 109

            (3)     This Court should not countenance the government's repeated abuse of the "essential facts" exception ................................ 110

        c)     Prejudice has ensued. .................................................. 112

        d)     This Court should order the government to produce the exculpatory materials in advance of oral argument. ............................................................ 115

3.   The SEC materials should be produced, along with the other exculpatory materials, or examined at a hearing on remand. ................................................................... 117

VIII.  CONCLUSION .......................................................................... 119

In sum, any Adelphia employee in a significant accounting role was targeted as a criminal; all Adelphia employees were gagged under threat of the government; and Deloitte was under suspicion. Further, Adelphia had cut off indemnification to the Rigases, crippling their defense.

These facts are therefore nothing like those in *Owen*, 500 F.3d at 91, where the defendant had specific knowledge of the evidence but was unable to secure it at trial. This case is thus far closer to *United States v. Ouimette*, 798 F.2d 47, 51 (2d Cir. 1986), where police intimidation rendered a potential witness functionally unavailable to defense counsel. The case for reversal here is even stronger than in *Ouimette*, where defense counsel *knew* what testimony the witness might have offered at trial. While the government pressure in this case may be less extreme, it was no less deliberate and just as effective. Witnesses were prevented from speaking with defense counsel, and this precluded a fair trial. *See Stein, supra.*

Under these circumstances, a new trial is justified.

### C. The District Court's Denial Of The Motion To Compel *Brady* Materials Should Be Reversed.

#### 1. The government's intentional failure to produce notes of a pre-trial interview with the Rigases' attorney, a key witness.

On February 20 and 21, 2004, just days before jury selection commenced, AUSA Christopher Clark and Postal Inspector Thomas Feeney interviewed Carl Rothenberger. Rothenberger was Adelphia's lead outside securities and corporate

governance lawyer, and separately, the attorney for the Rigases personally and in their capacity as officers of Adelphia and in their roles vis-à-vis the RFEs.

Feeney took notes. Yet to this day, Feeney's notes have been neither produced to the Rigases nor examined *in camera* by the district court – despite the overwhelming likelihood that they contain significant exculpatory evidence. While making numerous other arguments about these notes, the government has *never* denied that they are exculpatory.

Rothenberger was a central figure. The core of the criminal case was the claim that in Adelphia's SEC filings, the Rigases failed accurately to disclose debt incurred under the CBAs. Rothenberger and his firm, Buchanan, had – like Deloitte – deemed these disclosures to be entirely proper. [A-1249-52, 1283, 1285-88.] Rothenberger drafted all the SEC filings at issue in the criminal trial, and advised the Rigases and the Adelphia board on the approval and disclosure of the related-party transactions at issue, including the CBAs and the Rigases' purchases of Adelphia securities. [A-1267-80, 1321-22.]

On February 24, 2004, after jury selection commenced, AUSA Clark gave a one-sentence letter to the Rigases' criminal counsel that stated, in its entirety, "The Government writes to inform you that Carl Rothenberger, Esq. may be able to provide information that is favorable to the defense concerning the timber rights

transaction discussed in the Government's Bill of Particulars." [A-1352.] That transaction was a very minor aspect of the criminal case.

Clark's letter was misleading. It did not state that Rothenberger had been interviewed by the government; it did not enclose any interview notes; and the information it conveyed – that Rothenberger might possess exculpatory information about timber – could have come from many different witnesses. Previously, moreover, prosecutors had given the impression of providing full disclosure: They had produced notes from 70 Adelphia witnesses (all the way down to a secretary and a self-employed caretaker), and a list of 150 witnesses who had provided statements. [A-1331-47.] Under these circumstances, and given the pressure exerted by the government, it was reasonable for defense counsel to continue to believe that – as Rothenberger's criminal attorney had consistently indicated – Rothenberger would not talk to the defense; had not spoken, and would not speak, to government investigators or prosecutors; and if called to testify, would take the Fifth. More important, the timber letter misled the Rigases into thinking Rothenberger did not possess significant exculpatory information and that they should not call him at trial.

Following the interview, the government decided not to call Rothenberger at trial – an indication, in retrospect, that his testimony may have undermined the

government's case. The government did, however, call Brown to the stand. As detailed above, Brown provided highly inculpatory testimony.

Over the period encompassing 2005 and 2006, Rothenberger was deposed in *Adelphia v. Deloitte* and other proceedings for approximately 13 days. Rothenberger offered a vast amount of exculpatory evidence on various issues, including the Rigases' securities purchases and co-borrowing disclosures, and stated consistently that he did not believe that such disclosures were legally inadequate or deficient (let alone improper or fraudulent). [A-1286-88, 1318-1320.] More specifically, Rothenberger did not believe that the amount of Rigas co-borrowed debt needed to be disclosed. [A-1283.] He also testified that he was not trying to deceive anyone when he drafted the disclosures regarding the source of funds for the Rigas purchases of Adelphia securities. [A-1321-22.] These are the very topics that were discussed in the government interview of Rothenberger. [A-1257-58.]

As detailed above, many other witnesses (most glaringly, Brown) have similarly provided exculpatory post-trial testimony in other proceedings. To this day, the Rigases still do not know whether Brown was ever interviewed by the SEC[17] and if so, whether he provided exculpatory evidence, nor have they received

_____

[17] It is highly likely that Brown was interviewed by the SEC since he was a witness in both the Dearlove and Mulcahey SEC proceedings.

from the government any notes of any such interviews, despite requests for their production.

On September 12, 2007, years after the criminal trial had concluded, the Rigases' counsel met with prosecutors, including AUSA Clark, who had conducted the two-day pre-criminal-trial Rothenberger interview. At the meeting, the Rigases' counsel presented to prosecutors the exculpatory testimony Rothenberger had given in the post-trial proceedings. Clark indicated that the information was not new, disclosing *for the first time* that he and Postal Inspector Feeney had interviewed Rothenberger prior to trial and that Clark had learned of this material during that interview. [A-1225.]

On September 21, 2007, the government confirmed that Feeney had taken notes at the Rothenberger meeting. Yet no notes were produced, and subsequent defense requests for the notes were ignored.

On October 15, 2007, the defense asked the government to disclose whether it possessed materials reflecting interviews with: (1) Rothenberger; (2) any other attorneys at Buchanan; (3) bankers; (4) representatives of Motorola or Scientific-Atlanta; and (5) Brown.[18] The defense specifically sought government interviews

---

[18] Representatives of Motorola and Scientific-Atlanta testified in civil proceedings that they were interviewed by the government. Both witnesses provided exculpatory evidence during their civil depositions. [A-735-38, 45-47, 56-88.]

with Brown in connection with his work on the Dearlove and Mulcahey SEC proceedings. [A-1345-55.] The government refused to produce such materials or even indicate whether they existed.

On December 4, 2007, the Rigases filed a Motion to Compel seeking this material – both for resentencing and to determine whether the failure to produce the notes violated *Brady*. Judge Sand denied the motion, without a hearing or *in camera* review. [A-1484-87.]

> ## 2. The district court should have ordered production of the notes.

*Brady v. Maryland*, 373 U.S. 83 (1963), requires that the government turn over to the defense any evidence that is exculpatory, or that may be used to impeach government witnesses. *United States v. Bagley*, 473 U.S. 667, 676-77 (1985). Such evidence also "must have been suppressed by the [prosecution], either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Both untranscribed oral statements and notes fall under *Brady*. *United States v. Rodriguez*, 496 F.3d 221, 222 (2d Cir. 2007).

Each *Brady* requirement is satisfied here.

> ### a) The materials were potentially exculpatory.

The prosecution has studiously avoided claiming that the Rothenberger notes were not exculpatory, and Rothenberger's powerful subsequent civil testimony

# Exhibit G

# 08-3485-cr(L)

**08-3500-cr(CON), 08-3592-cr(CON),** *To Be Argued By:*
**08-3597-cr(CON)** William F. Johnson

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

**Docket Nos. 08-3485-cr(L), 08-3500-cr(CON),
08-3592-cr(CON), 08-3597-cr(CON)**

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

JOHN J. RIGAS, TIMOTHY J. RIGAS,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Southern District of New York

## BRIEF FOR THE UNITED STATES OF AMERICA

Michael J. Garcia,
*United States Attorney for the
Southern District of New York,
Attorney for the United States
of America.*

William F. Johnson,
Katherine Polk Failla,
*Assistant United States Attorneys,
Of Counsel.*

# TABLE OF CONTENTS

PAGE

Preliminary Statement. . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement Of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A. The Trial And Initial Sentencing. . . . . . . . . . . 4

       1. The Offense Conduct. . . . . . . . . . . . . . . . . 4

          a. Overview. . . . . . . . . . . . . . . . . . . . . . . 4

          b. The Rigas Family's Fraudulent Stock
             Purchases. . . . . . . . . . . . . . . . . . . . . . . 7

          c. The Sham Transfers Of Co-
             Borrowing Debt. . . . . . . . . . . . . . . . . . 12

          d. The Fraudulent Manipulation Of
             Adelphia's EBITDA. . . . . . . . . . . . . . . 16

       2. The Government's Evidence At Trial. . . . . . 18

       3. The Defense Case. . . . . . . . . . . . . . . . . . . 20

       4. The Initial Sentencing. . . . . . . . . . . . . . . . 21

    B. The Initial Appeal And Remand. . . . . . . . . . . . 24

       1. The Initial Appeal. . . . . . . . . . . . . . . . . . . 24

       2. The New Trial Motion. . . . . . . . . . . . . . . . 24

       3. The Motion To Compel Discovery. . . . . . . 25

       4. The Resentencing. . . . . . . . . . . . . . . . . . . 26

PAGE

ARGUMENT:

POINT I—The District Court's Resentencing Of The Appellants Was Both Procedurally And Substantively Reasonable.................... 28

A. The Standard Of Review................. 29

   1. Sentencing Standards Generally.......... 29

   2. The Scope Of Resentencing............. 31

B. *De Novo* Resentencing Was Not Required..... 33

C. Judge Sand Considered The Information Submitted To Him In Connection With The Resentencing............................ 36

   1. Judge Sand Considered The Section 3553(a) Factors....................... 37

   2. Judge Sand Considered Appellants' Sentencing Submissions, Even To The Extent They Exceeded The Scope Of The Remand............................ 38

   3. Judge Sand Considered The Guidelines.... 38

D. Even Under A *De Novo* Standard, Judge Sand's Sentences Were Reasonable.......... 41

   1. Judge Sand Properly Declined To Import Private Securities Litigation Concepts When Determining The Fraud Loss Figure. ......................... 41

2. Judge Sand Properly Rejected
   Appellants' Loss Arguments............. 47

   a. The Government Presented
      Overwhelming Evidence Of
      Economic Loss. ................... 47

   b. Appellants' Conduct Caused The
      Economic Loss ................... 56

   c. External Causal Factors Were
      Excluded, Or Did Not Materially
      Alter The Loss Calculation........... 60

      i. Unrelated Business Disclosures
         Did Not Materially Impact
         Adelphia's Stock Price............ 61

      ii. Judge Sand Was Not Required To
          Obtain, Or Rely Upon, Expert
          Testimony On Loss .............. 64

      iii. The Loss Figure Was Not
           Materially Impacted By General
           Market Conditions............... 65

      iv. The Loss Figure Was Not
          Attributable To Adelphia's Mere
          Failure To File Its Form 10-K...... 66

3. Judge Sand Properly Rejected
   Appellants' Offset Argument............ 67

4. Judge Sand Properly Calculated The Number Of Victims........................... 69

5. Both Appellants Warranted Role Enhancements............................ 69

6. The Sentences Were Substantively Reasonable.............................. 73

POINT II—The District Court Properly Denied Appellants' Motion For A New Trial............ 77

A. Relevant Facts............................ 78

B. Applicable Law............................ 80

1. New Trial Motions Based On "Newly Discovered" Evidence.................... 80

2. New Trial Motions Based On Claims Of Trial Perjury........................... 82

C. Discussion............................... 84

1. The Evidence Was Not "Newly Discovered"............................ 84

2. James Brown Testified Truthfully........ 92

a. Appellants' Misconceptions About The Government's Theory At Trial And Proof........................... 92

b. Appellants' Specific Claims Concerning Brown's Testimony....... 93

i.  Brown Never Claimed At Trial
    To Have Lied To Deloitte On
    All Matters. . . . . . . . . . . . . . . . . . . .  93

ii.  Brown's Testimony Concerning
     Debt Re-Classification. . . . . . . . . . .  95

iii. Brown's Testimony Concerning
     "Netting". . . . . . . . . . . . . . . . . . . . .  97

iv.  Brown's Testimony Concerning
     The February 2002 Audit
     Committee Meeting. . . . . . . . . . . . .  99

v.  Brown's Testimony Concerning
    The Solvency Of The Rigas
    Family Partnerships. . . . . . . . . . . .  102

c.  Appellants' Failure To Consider The
    Government's Other Evidence At
    Trial. . . . . . . . . . . . . . . . . . . . . . . . .  105

d.  Appellants' Specific Claims
    Concerning The Testimony Of Other
    Witnesses. . . . . . . . . . . . . . . . . . . . .  109

3.  The Verdict Would Not Have Been
    Different. . . . . . . . . . . . . . . . . . . . . . .  112

POINT III—The District Court Properly Rejected
Appellants' Motion To Compel Discovery. . . . . .  113

A.  Relevant Facts. . . . . . . . . . . . . . . . . . . . . . .  113

B.  Applicable Law. . . . . . . . . . . . . . . . . . . . . .  118

PAGE

    1. The Standard Of Review.............. 118

    2. Standards Governing The Production Of
       Exculpatory Material.................. 118

  C. Discussion........................... 120

    1. Carl Rothenberger.................... 122

    2. Other Witnesses ..................... 130

    3. Notes In The Sole Possession Of The
       SEC.............................. 131

CONCLUSION............................... 135

## TABLE OF AUTHORITIES

*Cases:*

*Adelphia Communications Corp.* v. *Deloitte*
  *& Touche, LLP,*
  No. 02-000598 (Phila. Ct. Com. Pl.,
  Nov. 6, 2002)............................ 78

*Brady* v. *Maryland,*
  373 U.S. 83 (1963).................... 25, 118

*Central Bank of Denver, N.A.* v. *First Interstate*
  *Bank of Denver, N.A.,*
  511 U.S. 164 (1994)...................... 42

*Dura Pharmaceuticals* v. *Broudo,*
  544 U.S. 336 (2005)..................... 36

> considered the allegedly conflicting testimony.

(SPA 11). Appellants have not established, and cannot establish, that Judge Sand clearly erred in making these findings, or otherwise abused his discretion in denying Appellants' motion.

## POINT III

### The District Court Properly Rejected Appellants' Motion To Compel Discovery

Finally, Appellants argue that the District Court erred by failing to compel the Government, prior to resentencing, to produce notes of interviews with certain witnesses not called at trial and notes taken by SEC staff during its civil investigation in response to claims that such notes purportedly contained *Brady* material. (Br. 101-18). With respect to the interview notes in the Government's possession, the Government fully discharged its disclosure obligations under *Brady*, and the Appellants' rank speculation about what one or more witnesses "must have said"—in light of a subsequent civil proceeding occurring years after the trial—is insufficient to demonstrate otherwise. With respect to the SEC notes, the Government was never in possession of such notes, but has discharged its *Brady* obligations as to these materials as well.

### A. Relevant Facts

Carl Rothenberger of Buchanan Ingersoll was Adelphia's principal outside counsel during the time period charged in the Indictment. Rothenberger was involved in,

among other things, the preparation of Adelphia's public disclosures concerning its financial condition and its transactions with other Rigas Family entities. As Appellants acknowledged, Rothenberger also "played a key role with respect to Adelphia's Board meetings and corporate governance issues." (A. 1221). Appellants each dealt with Rothenberger during the relevant time frame and were plainly aware of his involvement in the underlying events and, at least generally, the scope of his knowledge.

On February 20, 2004, shortly before the criminal trial began, the Government interviewed Rothenberger. Several days later, on February 24, 2004, the Government sent a letter to Appellants' respective trial counsel in which it specifically identified Rothenberger as a witness who could provide potentially favorable information to Appellants on the limited issue of certain timber rights transactions discussed in the Government's Bill of Particulars.* The Government did not call Rothenberger as a Government witness at trial. Appellants did not subpoena Rothenberger to appear as a defense witness at trial, nor did they seek to have the Government immunize Rothenberger.

Beginning in September 2005, and concluding in October 2006, Rothenberger was deposed for a total of 13 days in connection with the *Adelphia* state court proceeding. Appellants' present counsel was present for virtually

---

\* The Government made a similar *Brady* disclosure, in this instance related to Deloitte, well before trial in a letter dated October 28, 2003. Appellants have not challenged this disclosure.

all of the deposition proceedings. On September 26, 2005, the first day of Rothenberger's deposition, counsel for Deloitte asked Rothenberger some general questions about the topics covered during the Government's interview of him. In response, Rothenberger identified certain topics that had come up during his interview with the Government, some of which are relevant to the issues on appeal. (*See* A. 1257-58). Counsel for Deloitte then asked Rothenberger a few follow-up questions concerning the specific information communicated to the Government on those topics; Rothenberger responded that he did not recall the specifics of what was discussed as to those particular topics during his Government interview.

The next day, and for portions of a total of six of the 13 deposition days, counsel for Appellants deposed Rothenberger. During that time, Appellants' counsel asked no questions of Rothenberger concerning the Government's interview. Moreover, none of the other counsel who deposed Rothenberger during the remaining 12 days of the deposition questioned him about the Government's interview. The Government was not a party to the depositions, and was not made aware contemporaneously of the substance of Rothenberger's deposition testimony. Indeed, the testimony transcripts were sealed under a protective order in the state court litigation.

In December 2007—more than two years after the start of Rothenberger's civil deposition and some six months after this Court's affirmance of their convictions—Appellants filed a motion seeking to compel the disclosure of (1) notes taken by the Government during the Rothen-

berger interview; (2) materials concerning Rothenberger obtained by the SEC during its investigation; and (3) materials "reflecting other interviews conducted by the Department of Justice or SEC as part of the investigations involving Adelphia." (A. 1241). Notably, Appellants were unable to identify a single item of exculpatory information that the Government had failed to disclose. Indeed, Appellants acknowledged that the Government had made a disclosure about the timber rights transaction. (A. 1223-24). Nonetheless, Appellants argued that it "strain[ed] reason to believe that Rothenberger provided no exculpatory information regarding his involvement in the myriad of securities and related-party transactions on which he worked on behalf of Adelphia and the Rigases." (A. 1220).

After receiving the motion, the Government reviewed the notes of the Rothenberger interview with the former Postal Inspector who took the notes, in part to confirm that the Government had not neglected to disclose any exculpatory information pre-trial.* The Government also contacted

---

* Appellants find it "odd" that a Postal Inspector took the interview notes, rather than an Assistant United States Attorney. (Br. 111 n.19). To Appellants, this practice suggests that the Government does not believe that the notes are within its possession, custody, or control for discovery purposes because they are taken by a representative of a "fellow branch of government." (*Id.*). This argument is both disingenuous and wrong. As Appellants well know, there is a difference between the Postal Inspection Service, an agency working as an agent of the

the SEC, as it had done pre-trial, to determine whether any of the investigative materials in the SEC's possession warranted additional *Brady* disclosures. (A. 1426). Finally, the Government participated in a meeting with Appellants' counsel and the two former prosecutors who had tried the matter. At the conclusion of its review of the matter, the Government was satisfied that its original *Brady* disclosures concerning Rothenberger had been sufficient, and that no further disclosures (concerning Rothenberger or any other facet of the Government's or SEC's investigation) were warranted. (A. 1421).

In denying Appellants' motion, Judge Sand found that the Government was under no Jencks Act obligation to produce the notes of interviews with Rothenberger, since Rothenberger was not a Government witness at trial. (SPA 12-13). He further found that because (1) Appellants "knew of Rothenberger's existence, his role at Adelphia, and the facts on which he could [provide] testimony," and (2) the Government had identified Rothenberger as a witness with potentially exculpatory material on a specified subject matter, the Government's *Brady* obligations had been satisfied. (SPA 13-14). Relatedly, Judge Sand denied Appellants' request for SEC investigative materi-

---

criminal prosecutors, and a civil agency like the SEC, which is not a part of the criminal process. In any event, much of the 3500 material produced in this case comprised notes taken by Postal Inspectors, so the Government obviously was not attempting to shield such notes from discovery.

als, finding that such materials were not within the Government's possession, custody, or control. (SPA 14-15 (citing Fed. R. Crim. P. 16(a)(1)(E))).

## B. Applicable Law

### 1. The Standard Of Review

A district judge's decision on a motion to compel discovery is reviewed for abuse of discretion. *First City, Texas-Houston, N.A.* v. *Rafidain Bank*, 150 F.3d 172, 175 (2d Cir. 1998).

### 2. Standards Governing The Production Of Exculpatory Material

The Government did not call Rothenberger as a trial witness, and was therefore not obligated to provide any notes of interviews with Rothenberger to Appellants pursuant to the Jencks Act, 18 U.S.C. § 3500. The Government's disclosure obligations *vis-à-vis* Rothenberger instead stem from *Brady* v. *Maryland*, 373 US. 83 (1963), and its progeny.

Under *Brady*, the Government has a constitutional obligation to disclose, in a timely fashion, evidence favorable to an accused that is in its possession or of which it is constructively aware, when such evidence is material to guilt or punishment. In a frequently-cited case, *United States* v. *Ruggiero*, 472 F.2d 599 (2d Cir. 1973), this Court observed that:

> The purpose of the *Brady* rule is not to provide the defendant with complete disclosure of all evidence in the government's file

which might conceivably assist him in the preparation of his defense, but to assure that he will not be denied access to exculpatory information known to the government but unknown to him. Here the appellant was on notice of the essential facts required to enable him to take advantage of such exculpatory testimony as [two witnesses] might furnish. He was also well aware of the process by which they could be compelled to testify at trial. . . . If appellant wanted their testimony, the obvious and logical course was to subpoena them and put them on the witness stand.

*Id.* at 604-05.

As *Ruggiero* makes clear, "[e]vidence is not 'suppressed' if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence." *Leka* v. *Portuondo*, 257 F.3d 89, 100 (2d Cir. 2001) (internal citation and quotation omitted). Under *Brady*, "the government ha[s] a duty to disclose only 'information which had been known to the prosecution but unknown to the defense.'" *United States* v. *Grossman*, 843 F.2d 78, 85 (2d Cir. 1988). The Government has no duty to disclose such information when the defendant is aware of the identity of the witness. *See id.*; *United States* v. *LeRoy*, 687 F.2d 610, 618-19 (2d Cir. 1982); *United States* v. *Brown*, 582 F.2d 197, 200 (2d Cir. 1978); *United States* v. *Upton*, 856 F. Supp. 727, 751-52 & n.18 (E.D.N.Y. 1994).

This Court recently found in *United States* v. *Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007), in a situation in which the defendant was unaware of certain potentially exculpatory information, that Government disclosure on the issue "must be sufficiently specific and complete to be useful." The harm sought to be avoided by the Court, both in *Rodriguez* and in *Leka*, was the situation in which the "defendant was left to gamble on what the witness would say." *United States* v. *Rodriguez*, 496 F.3d at 226; *Leka* v. *Portuondo*, 257 F.3d at 103.

It has long been the law and practice in this Court and in the Southern District of New York that the Government may fulfill its *Brady* obligations with respect to a particular witness by identifying the witness to the defendant and indicating that the witness may have favorable information on a particular subject. *See, e.g., United States* v. *Frank*, 11 F. Supp. 2d 322, 327 (S.D.N.Y. 1998) ("the Government may fulfill its *Brady* obligation by directing the defendant's attention to witnesses who may have exculpatory evidence"); *United States* v. *Oshatz*, 700 F. Supp. 696, 698 (S.D.N.Y. 1988) ("By providing [the defendants] the names of the [witnesses] and informing them that these individuals may possess information helpful to the defense, the government has met its *Brady* obligation. It is now up to [the defendants] to subpoena these witnesses to take advantage of any exculpatory information they might furnish.").

## C. Discussion

Appellants' *Brady* arguments are imperiled by several flaws in logic. First, Appellants are crafty, but inaccurate,

in framing the disclosure issue: Unable to identify a single piece of exculpatory information that Rothenberger provided to the Government that was not communicated to them, Appellants instead urge this Court (as they urged Judge Sand below) to overlook this glaring deficiency in proof, to look instead at Rothenberger's civil deposition testimony—which occurred two years after his interview with the Government and one year after the criminal trial had concluded, in a proceeding in which the Government was not a party, with no specific testimony concerning what was said during the interview—and to divine from that testimony that some exculpatory information "must have been" communicated to the Government. This temporal sleight-of-hand should not be tolerated. The relevant inquiry is whether, at the time of the trial, the Government possessed information that necessitated disclosure under *Brady*. The record makes plain that the Government discharged its obligations by disclosing the one item in its possession at the time of trial that arguably fell within the rubric of *Brady*; even on appeal, Appellants have presented no evidence to the contrary.

More fundamentally, Appellants are seeking, without justification, to subvert the process by which *Brady* disclosures are made. The Government is charged with the responsibility, in the first instance, of reviewing the information it obtains during the course of its investigation in order to comply with its obligations under *Brady* and cases like *United States* v. *Giglio*, 405 U.S. 150 (1972). It takes this responsibility seriously, and it fully recognizes the potentially drastic remedies that exist for failure to abide by these constitutional obligations (*e.g.*, reversal of

a conviction). That compliance with these obligations is crucial to guaranteeing defendants fair trials, however, does *not* mean—as Appellants' arguments suggest—that the responsibility should be taken away from the Government and thrust upon the trial or appellate courts, particularly on the meager showing offered by Appellants here.

### 1. Carl Rothenberger

Appellants principally claim that the Government suppressed exculpatory information that it learned during its February 2004 interview of Rothenberger. That simply did not happen. Indeed, given the significant role that Rothenberger played in the underlying events, and Appellants' firsthand knowledge of that role, such a suppression could not have happened. Rather, a careful review of the record indicates that Appellants' decision not to subpoena or seek immunity for Rothenberger to testify at trial was knowing and strategic, and that the instant *Brady* claims are little more than "Monday-morning quarterbacking" concerning that decision.

Both at the time of trial and after the motion was made, the Government considered its disclosure obligations with respect to the information obtained during the Rothenberger interview. The Government's review of the notes of this interview on both occasions revealed nothing exculpatory beyond the limited disclosure referred to above concerning the timber rights transactions. Appellants' speculation that there is an "overwhelming likelihood that [the Government's notes of Rothenberger's statements] contain significant exculpatory evidence," and their assertion that the "government has *never* denied that they

are exculpatory" (Br. 102, *see also* Br. 106-07), are thus belied by the Government's clear representation in the District Court that, apart from the information concerning the timber rights transactions, "[t]here is no other [*Brady*] material with respect to Rothenberger." (A. 1421).[*]

Appellants place heavy reliance on certain portions of Rothenberger's civil deposition testimony several years after the trial. A review of that testimony, however, discloses that this reliance is unjustified. As noted above, during the depositions, counsel asked Rothenberger general questions concerning the *topics* covered during the Government's interview of him, and Rothenberger confirmed that he spoke to the Government about those general topics. (*See* A. 1257-58). However, Appellants have cited no instance, and the Government's independent review of the deposition has found none, in which Rothenberger stated that he provided information to the Government during his interview which would be considered exculpatory but which the Government failed to disclose.

---

[*] On this point, Appellants assert that "it would defy logic to suggest that Rothenberger did not tell the government exactly what he said at his later civil depositions." (Br. 107). Yet, in making a point concerning their new trial motion, Appellants earlier noted that witness Joseph Sabol's civil deposition testimony "contradicts the interview memo provided to defense counsel as part of the 3500 production." (Br. 92 n.14). Appellants cannot have it both ways.

Appellants cite specific portions of Rothenberger's testimony (Br. 104), given later in his deposition and separate from the questions about his interview with the Government, which they contend are exculpatory. As with their Rule 33 motion concerning James Brown, however, Appellants resort to quoting statements out of context and other semantic games. A review of the cited portions of Rothenberger's testimony indicates that the testimony concerned *Rothenberger's* state of mind, not Appellants'. And while Appellants choose their words carefully in stating that the Government's interview of Rothenberger covered the "very same topics," they cite to no instance in which Rothenberger testified to providing this allegedly exculpatory information to the Government during his interview.* Accordingly, Appellants have failed to provide

---

\* Appellants also assert (Br. 105) that one of the former prosecutors who tried the case—indeed, the same prosecutor who interviewed Rothenberger and authored the February 2004 disclosure letter—informed the defense during a meeting in 2007 with the Government and defense counsel that the Rothenberger testimony that Appellants now claim is exculpatory was "not new" to him, and that Rothenberger had disclosed such information to the Government during its interview of Rothenberger. The "not new" statement is taken out of context and should not concern the Court. It confounds logic to suggest, as Appellants do, that the same prosecutor who wrote two *Brady* disclosure letters prior to trial (one relating to Rothenberger) would intentionally suppress additional *Brady* material for three years, and then blithely

evidence contradicting the Government's steadfast position that it was not in possession of any exculpatory material from Rothenberger beyond the limited *Brady* disclosure that was made.

At times, Appellants appear to suggest that the Government somehow prevented them from understanding that Rothenberger may have possessed material exculpatory information concerning the subjects of the instant prosecution. Such a suggestion ignores the reality of the situation: As Adelphia's lead outside counsel, Rothenberger was deeply involved, with Appellants' knowledge, in the events underlying the Indictment. Indeed, as Appellants boldly declared in their briefs below, they have been well aware that Rothenberger "is one of the most important witnesses in any Adelphia matter, including this criminal case," noting further his "key role at Adelphia and, in particular, his role with respect to the government's main allegations against the Rigases." (A. 1222).

Nonetheless, Appellants criticize the Government's notice procedures, suggesting that it was not clear to trial counsel for the Appellants that Rothenberger, as opposed to some other unnamed witness, was actually the source of the information referred to in the *Brady* letter that specifically named Rothenberger. (Br. 103). To state that conten-

---

confess to the suppression in 2007 as if it meant nothing. In reality, as set forth above, the Rothenberger notes are not exculpatory (beyond the timber rights disclosure that was made), and the Government has never believed otherwise.

tion is to demonstrate its absurdity. Appellants were represented at trial by Peter Fleming, Jr., Esq. (John Rigas), and Paul Grand, Esq. (Timothy Rigas), two of the most seasoned defense counsel in this District and both former federal prosecutors in this District. Plainly, these attorneys would have recognized that a letter stating that counsel should speak with Rothenberger about a particular subject referred to information in Rothenberger's possession, and not some other unnamed individual. Thus, the Government's notice procedures were not only fully in accord with this Court's requirements and the *Brady* disclosure practices of this Office, but also "sufficiently specific and complete" to ensure that Appellants were not "left to gamble on what the witness would say." *See generally United States* v. *Rittweger*, 524 F.3d 171, 180 (2d Cir. 2008) (citing *Leka*).*

Further, if Rothenberger possessed additional exculpatory information that was not disclosed to the Government, Appellants had the opportunity to obtain any such information prior to trial. Appellants' contention that they believed Rothenberger was unavailable to them at trial cannot withstand scrutiny. Indeed, Appellants' contentions about

---

    \* This notice argument is also negated by Appellants' argument, a mere six pages later, that "[p]ointing to Rothenberger as a *source* of exculpatory evidence for the timber transaction alone, as the government did in its one-sentence letter, heavily implied that, to the government's knowledge, *he possessed no further exculpatory evidence.*" (Br. 109 (emphasis added)).

Rothenberger have evolved since their Rule 33 motion. In the earlier motion, Appellants stated that it was "*suggested* to defense counsel that individual Buchanan attorneys *might* assert their Fifth Amendment privileges if called to testify." (A. 431 (emphasis added)). That information was derived from the affidavit of Peter Fleming, Jr., Esq., filed in the District Court. (*See* A. 429, 1460). By the time of their motion to compel, however, Appellants asserted that Rothenberger's counsel "advised the Rigas defense team that, if he was subpoenaed to testify at trial, he *would invoke* his Fifth Amendment rights." (A. 1223 (emphasis added)).

In any event, once the Government issued the February 2004 disclosure letter concerning Rothenberger, it was, or should have been, clear to Appellants' experienced trial counsel that Rothenberger had been interviewed by the Government. From this, it was, or should have been, clear to counsel either that Rothenberger had made statements to the Government without invoking his Fifth Amendment right against self-incrimination, or that Rothenberger had been given some form of protection in connection with his statements (*e.g.*, a proffer agreement, non-prosecution agreement, or statutory immunity). In either instance, it was clear that any prior assumptions about Rothenberger's "unavailability" to the defense were no longer valid.*

---

\* For example, if Rothenberger was not invoking his Fifth Amendment rights, he would be available to testify at trial. If Rothenberger had received a non-prosecution letter or formal statutory immunity, he likely could be

Appellants' failure even to attempt to compel the testimony of a witness they claim to be "one of the most important witnesses in any Adelphia matter, including this criminal case," was most assuredly a knowing, strategic decision. Buttressing this point is the fact that Appellants devoted nearly nine pages of their brief in the District Court to the claim that Rothenberger may have possessed exculpatory information. (A. 1229-37). They have not contended, and cannot now contend, that they were unaware of Rothenberger's role in Adelphia matters until *after* Rothenberger's civil deposition testimony in 2005 and 2006. Put another way, it did not take 13 days of civil deposition testimony for Appellants suddenly to become aware of Rothenberger's role in Adelphia's business. Yet, despite knowing Rothenberger's apparently significant role "in any Adelphia matter," Appellants did not even attempt to subpoena him to testify at trial or move to compel the Government to immunize him. *See United States* v. *Turkish*, 623 F.2d 769, 777 (2d Cir. 1980); *Ebbers*, 458 F.3d at 117-22. Judge Sand properly considered this failure in rejecting Appellants' Rule 33 Motion based on the post-trial civil deposition testimony of

---

compelled to testify for the defense at trial. Indeed, Timothy Werth, who pleaded guilty pursuant to a cooperation agreement with the Government, was made available to testify for Appellants, as counsel for Timothy Rigas acknowledged during summation. (*See* Tr. 10763). In either scenario, Appellants had avenues available to procure Rothenberger's testimony and simply elected not to do so.

Rothenberger, among other witnesses. (*See* SPA 10 ("Defendants' choice not to pursue this testimony was a strategic decision, and cannot now form the basis for a new trial.")).

The fact remains, however, that because there is nothing exculpatory in the Rothenberger interview notes beyond the limited information concerning the timber rights transactions, Appellants would not have learned anything by disclosure of the notes. Accordingly, there is nothing that Appellants could have gleaned from the notes that would have led them to understand that Rothenberger would give the testimony in his subsequent civil deposition that Appellants now allege to be exculpatory. Therefore, Appellants are quite mistaken when they contend that "it is reasonable to assume that the trial would have gone differently had the notes been produced." (Br. 113).

Finally, in connection with this argument, Appellants seek an order from this Court compelling the Government to produce the Rothenberger notes to the Court in advance of oral argument. (Br. 115-17). This extraordinary relief is not supported by the facts in this case, nor the cases cited by Appellants. The Government is charged with the responsibility to comply with its *Brady* and *Giglio* obligations, and it understands the seriousness of that responsibility. Appellants have failed to cite evidence demonstrating that the Government possessed any exculpatory evidence from Rothenberger beyond the limited disclosure that was made. Were defendants permitted to lodge similar accusations in any case as a means of invoking the courts as a review board for the Government's compliance with

all such disclosure obligations, the Government would receive such demands in every case, and the courts would be flooded with litigation on such allegations. Indeed, this Court would likely be called upon on a regular basis to do exactly what Appellants request here: to decide, based on a showing of conjecture, whether *in camera* inspection by this Court of alleged *Brady* material is warranted on appeal. Such a drastic result is not indicated by the law or the facts of this case.

## 2. Other Witnesses

Appellants also sought to compel the Government to produce all notes of any Government interviews of other witnesses from the Buchanan Ingersoll law firm, as well as witnesses from Scientific-Atlanta, Motorola, investment banks, and lenders. (A. 1241-43). None of these witnesses was called by the Government to testify at trial. Although they only devote one sentence to this issue on appeal (Br. 114), Judge Sand properly denied this request as well.

There was no *Brady* disclosure obligation triggered by any such witnesses whom the Government interviewed. Accordingly, no such disclosures were made. Moreover, as set forth above, even had such witnesses provided exculpatory information, Appellants would not necessarily be entitled to production of the notes of interviews. Rather, in such circumstances, the Government would have been permitted to fulfill its *Brady* obligations by identifying the witness and the specific subject matter of the exculpatory material, as it did with respect to Carl Rothenberger.

# Exhibit H

M E. Rothenberg Jr. → Edward
J. Patrick M. M'Laughlin, M'Laughlin & M'Coffery
J. Alan Johnson, Johnson & Billy

SC exp.
- assume voluntarily, right to counsel, 5th Amend right - can invoke any time
- truth or 1801x obl - Martha example
- do not delay or obstruct - time you need to review documents, consult y lawyers

Prior to AHA2 spin-off - what B/S to do got waiver of conflict between RFE & ACC?
   1) 1995 - proposed RFP transaction of interest investors & ACC & RF
        B/S got waiver letter cleared by ACC bd - inc. Ind. directors

      Ind counsel for transactions between ACC & RFP - co-b negotiations
        - negotiating terms? No
        - putting in place? No
        - waiver? No

   Securities purchases from ACC by RF    → B/S rep ACC,        → mostly mail or fax
     - separate counsel ACC & RF?            closed transactions → product is owed for ACC at closings? C Origin
                                                           - where owned? only B/S
   Early docs - does not say immediately available   5 or 6 closed by B/S? Did not buyer at time
     funds for sec purchases GX 41000 1/11/99        - assumed promised avail funds (i.e. cash) transferred
   Later docs do                                      - stock purchase agreement language called for it
   Why?
   4/99 represented D in way RF bought    → HHII & ACC
     shares in connection y public filing    — purchase Class A stock
   - used to close when public closed - more attractive if RF bought alongside public   Discussion of how RF obtained obligations?
   - Δ when ACC signed off    GX 11/50   4/4/99  HH & ACC                               - may have been, do not recall
     major rgs - if $ needed for    — immediately available funds - cash
     those
   - believed ACC going to go to market to get $ for agr         Recall cash liss or cant cash liss
   - wanted to get RF commitment if offering of certain stock    produce by RF of ACC stock?
                                                                  - First heard about it 4/02 or 5/02
                                                                  - Never consulted firm cash liss = from avail funds
   Cross Receipt? Ever seen - yes - generally familiar y it
     - style similar to underwriter's receipt
     - memorializes that each party has met its obligations

                                                                    2/4/04
                                                                    11:10 - 3:45 pm
                                                                    1/2
                                                                    JE
                                                                    26 Feb 04
                                                                    CJG, RLSF

Conversations w/ RCC personnel re: cross receipt do be issued if cash less? No, use one did — 2.
— call it? No — not now available his

— underwriters issued fairness opinion on price of interest rate

B/I @ closings                                        RCC transfer agent re: Class B
— reviewed closing docs — cross receipts, 1st do transfer agent — standard documents — transmitted to RCC
— CER understood RF get shares, RCC gets $ (immediately available funds)
— closings took place in Coit.
— if not present, B/I would receive signed copies — ?/b at firm — no a general matter

Disclosure of closing of securities sale                B/I reviewed 10-Q, 10-K disclosures
  1) announce that [  ] transaction closed           — rely on lits do describe
  2) Use of proceeds discussion? In general, sometimes — after 6X? Yes       transactions? Yes
  3) Amount of proceeds? Yes                                    — Cross Receipts? Yes
                                                      When learn cash less? 4/02 or 5/02
  RF purchases — control party? Yes                  If knew no $, would have advised RCC to
  SEC disclosure issues      Yes                     make strict (in Q or K) of use of $ anyway? No
  Individuals certifying solvency? Yes
    Form 13-D? Yes & Form 4s
      i. disclosure source of funds        Work on any 13.Ds? Yes

Sharing document ordered by Judge — ruled waived Atty/Client priv.   BSTC 1769044
①Form Schedule 13.D
  1/21/00              Item 3: Source & amt of funds    1769059
                        — need to describe source — if from borrowing need to ID parties lending $
              Rule    "affiliate borrowings" — Identify? No, not by name — general description
— re-read 13D closely  [ — any definition, distinguish, or disclosure to describe "affiliate" in doc
                        — "names of parties financed" — no names in disclosure

BSTC 1768241 → disclosure     If borrower gets $ from waiver — raise? if equity transaction? Yes
            G is line 4/13.D? Yes
                  Rule       Early draft sent to CT of [  ] in it for disclosure — sent that way if
Why △ disclosure?                CER did not know that
                              — send e-mail
CER know what affiliate        — CT confirmed that "affiliate borrowing" accurate
borrowings were? No           — CT longer? No
CER ask for definition? No

If "affiliate borrowings" from ACC or guaranteed by ACC - would be significant issue? Yes

Early drafts, got source of funds into form? Do not recall exactly, perhaps prospectus for offering or CT or another family-side employee

Any discussion re: treatment of $ Htd drawdown to buy stock? Cannot recall any

RF bought on open mkt? Yes       Form 13-D for "Yr - "corporate personal funds"
disclosures on Form 5? Yes           - would not have concluded would have been Htd
                                     - then wires ACC → HH → NASDAQ? No

If transfer of $ from ACC → HH & HH buys stock - raises issues - if $ paid for debt (receivable on ACC books)

CER never told ACC source of funds for securities purchases
   - relied on ACC employees for info to draft 13-Ds

RF assets aside from ADLAC shares - owned Real Estate, fair amount
                                    investments in other public cos
                                    cable companies

Source of affiliate borrowings ? $375M ?             up to $300M
   - mostly borrowings from rest of RF holdings → by Yes any RF credit lines beside co-b agreements ?
                                          - had margin loans, but not aware of anything as big as $400M
What besides co-b drawdowns could $375M borrowings have been? Maybe liquidity, other credit lines
   - never did ~ ~ ~ , would have heard of it often

                                            2/02 began to get into on co-b by RF
                                            - first time learned

Break 12:25 pm
Resume 12:35 pm    JR estate planning - issue? Transfer holdings of JR and/or DR
                                       - never came to fruition
BSRE, BRLM 00180, 00090, 00001

                    Committed re: drawdowns from ACC, paid into HH for JR estate planning needs
                                    No.

JR drawdowns - sale of cable properties upon his death ? Not aware of

4/?

HH loan to JR - estate planning or any purpose?

Recall discussions about JR borrowings from HH as part of estate plan

How HH get $ to lend JR borrowings? No idea, no recollection of discussions
Would HH lend HH? do not recall

If ACC → $ → HH → JR, could JR as CEO, approve? No - i) affiliate transaction, ii) self dealing

Mgt deals w/ ACC - Ever brought to CER attention? If at all
 - i) approval          - on b/s 'Advances to Related Parties' → Net, not line item
 - ii) disclosure          - has been components? Not sure knew

Financial Stmts - Footnotes, related party transactions not structure disclosed
Effort to determine if other related party transactions? Yes
 - reviewed 10-K/A w/ O/Md - familiar w/ SEC reporting - Ask him what else under SK 404

Any disclosure of ACC policy JR draw up to $1M/month from ACC? Never told about,   Should be
                                                                                    Disclose? Yes

Debt recless under co-b? None prior to 3/02   No knowledge or understanding
 Never → Q end determine what amount R.F. borrowings, what amount ACC

Understand, that amounts owed by R.F. forgiven by ACC in exchange for RFE take on like amount of debt? No
 If public co agreed w/ mgt to forgive debts in return for assuming their debts - disclose, appraisal needed w/ off'd trans

Intermingling in CMS of ACC$ & RF$? Learned late 01, early 02 in PECO situation - ? AMBEZ
 Understand ACC mgt RF systems - understood mgt involved Cash Mgt - collect $, pay bills
 - did not understand $, intermingled
 - realize any RFE draw down any amount on ACC acct? No  Bd apprised of that? No

Bd told about mgt agreement, running disclosure in 10-K/As, proxy stmts

Understand non-operating RFEs part of CMS? No - any reason for them to be? No

Break 1:15pm      Each year bd appraised affiliate transactions on catch-all basis - from public disclosures
Resume 2:25pm     - some mentioned CMS, not 'inter-mingling'

CER understood intermingling took place w/ mgt entities as part of cash ops
 - Other, non-op RFEs? No understanding - could want it disclosed

5/7

7/2/01 Fee payments
- when drafted? later that year - not signed on that date
- why put date on document, not date drafted or signed? CER told transactions did place, cash paid at time - B/F asked to memorialize event
Date on doc means? - DMId told him
- "as if" formulation is preferable
- "as if" no idea/due to reader idea did not take place on date

Georgia Prestige chronology from DMId to CER (2037-A 6x)
#3 - letter agreement reached? Oral agreement reached more accurate
- understood chronology for

- Why ACE want agreement for 12/31/99 in 3/00? To document it occurred - to whom? Co knew it began another? They did not say that but logical

Bd approval for Georgia Prestige        → purchase amounts did not reflect fair mkt value due to seller = of
- need for fairness opinion? yes         properties & sale in 1 transaction ∴ RF needed to pay DCE fair
                                          share
Bd see fairness opinion? do not know, think mentioned subsequently, but not shown

Transaction close before fairness opinion drafted? do not know

Δ of purchase price subsequently? No discussions about it

Timber rights - 00 - call from TR or Carl Brunton - propose transaction where RF buys
          land & ACE buys timber on same land
- is it an affiliate transaction - or can it be 2 separate transactions → big tax implications
- CER could be 2 if: ACE i) business purpose & 2) pays fair price          - handled by their
                                                                            B/F lawyer
                                                                            & Cport lawyer
Business purpose - TR or CBH → part of ACE/RF initiative to improve Cport profile
      1) Difficulty to recruit trained professionals to GAP
- CER not sure how timber helped that

See documents? yes, some reversion rights & TR or CBH explained: if ACE sold, RF wanted timber also
- consideration - RF to pay for right in sale price of ACE - if ACE sells for $100, RF gets $99 + $1 timber w
- not spelled out in contract
- how to go to ind. Bd members? do not recall conclusion    Shown to Bd? Not that CER recalls

Ever tell anyone timber rights transaction not an affiliate transaction? Q not recall §.
- possible

Ever discuss RF - - - - golden parachute or severance package? No

Fairness opinion on timber rights - 14. BL learned 2nd opinion - one for 25M, but earlier one for 20 M unknown
- who determines fairness? Bd → Ind. members

CER knew unwan provision but never cancelled had to go to Bd (Ind) for approval

GC - CER contacted by TR - late 00/early 01 - formulating ownership/operation of GC
   - wanted BL understanding on affiliate (or not) transaction
   - use by vendors, suppliers, general corp use - some employee usage, some unaffiliated (Inds) use
   - no good gift cause around Cpvt
   - TR - who should own?            CER → said just legal formality that ACL owned course, because
   - 2/3 of acreage RF: 1/3 ACL         majority of use for corporate purposes

CBH wanted simple mgt agreement for entity managing GC - BL associate drafted one

Tax implications - explored many ideas - donation to town / lease-back

Understood GC already under construction? Yes    On land 1/3 RF? Yes    Tell Bd? No
Ever tell anyone to not tell Bd? No

CER once structured would require Bd approval if RF family contributed to own land - TR or CBH discussion

If ACL paid to build, then bd said No?
If transaction needed bd approval, why just expenditure of $ need transaction? Would have to be
Any mgt contract about value of improvements on RF land? No

Ever hear in bd mtgs that ACL $ used to build course? No
Reasonable belief that bd members would be told if paying for it? Yes    Bd never asked to allocate $ to course

Transactions outside of normal course of business - Timber? Yes    GC? Actually
                                                                   Corporate/possibly

Co-op agreements
   - J/S liab? Yes
   - either party borrow max? Yes within covenants - Debt/leverage

Borrower have to be solvent before borrowing? Yes, familiar                    7/2

Not separate restriction beyond covenants                    3/01
 - i.e. no restriction on borrowing more than security contributed → discuss w/ TW, ~DMsl, ~JB
                                                                 - add language on co-b strength in Pu stmt footnote
 - Discuss terms w/ ACC bd? Don't recall                        - risk disclosure
                                                                 - borrow up to full amount

Any discussion re: use of other parties' borrowing ability if
 borrow more than put up? No

Ever explained to bd? No          Difference between 2 ways to pay for stock purchase

Why co. sell stock? Capital raising, financing - get $
  If CF used co-b to buy stock - would it increase ACC liquidity? No


End 3:53pm

# Exhibit I

# In The Matter Of:

*In re: ADELPHIA COMMUNICATIONS CORPORATION, et al. v.*
*DELOITTE & TOUCHE, LLP,*

---

## *CARL ROTHENBERGER*
*October 26, 2005*

## *CONFIDENTIAL*
## *LEGALINK MANHATTAN*

### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
*PH: 212-557-7400 / FAX: 212-692-9171*

ROTHENBERGER, CARL - Vol. 3


LEGALINK

Page 486

1  Q.  Did you -- did you, in your discussions with
2      whoever it was at Adelphia that this was
3      unnecessary, did you ask whether Deloitte &
4      Touche had been consulted with respect to your
5      suggestion?
6          MR. RIDGE:  "This" being the language
7      in the e-mail, Stuart?
8          MR. GOLD:  Yes.
9  A.  I don't remember.
10 Q.  I believe you said you thought you had
11     additional suggestions with respect to the Form
12     10-K that was going to be filed relating to the
13     year ended December 31, 2000?
14 A.  Oh, I thought I mentioned this earlier.  If I
15     didn't, I apologize.  I believe we suggested
16     language be added that the -- the additional
17     language which I believe ended up in the
18     footnote that -- to the effect that all parties
19     to the credit -- to the co-borrowing agreements
20     can borrow the full amounts available under
21     them.
22 Q.  Okay.  And that you believe was a Buchanan &
23     Ingersoll suggestion?
24 A.  Yes.
25          MR. GOLD:  Let me mark as Exhibit 504

Page 487

1      a one-page e-mail from Carl Rothenberger to
2      Doug Malone with a copy to T. Engels dated
3      Saturday, March 31, 2001, subject ACC 10-K.
4          - - - -
5      (Exhibit No. 504 marked for identification.)
6          - - - -
7          MR. GOLD:  You can tell I'm not an
8      official reporter because I stick these
9      everywhere but the bottom.  I apologize.  I'll
10     start putting them on the bottom.
11         - - - -
12     (The witness reviewed the Exhibit.)
13         - - - -
14 A.  Okay.
15 Q.  Mr. Rothenberger, did you send the e-mail
16     that's been marked as Exhibit 504 to Doug
17     Malone on or about March 31, 2001?
18 A.  That's my recollection, yes.
19 Q.  Do you recall -- withdrawn.
20     Item No. 7 reads, The latest draft I
21     received of the ADLAC did not have any
22     additional language in the note 4 discussion of
23     co-borrower/affiliate facilities, either the
24     sentence we sent to Jim B. that clarifies that
25     ADLAC amounts do not include affiliate

Page 488

1      borrowings or the sentence you mentioned
2      yesterday on the phone clarifying that the
3      entire amount of capacity is available to
4      affiliates.  Please advise.
5          Do you recall when you received what
6      you refer to as the latest draft of the 10-K?
7  A.  I don't.
8  Q.  Am I correct that the draft that you are
9      referring to in Exhibit 504 is a draft that you
10     would have reviewed note 4 to the financial
11     statements, at least insofar as it relates to
12     co-borrowings?
13         THE WITNESS:  Could you read that
14     back, please.
15         - - - -
16     (The record was read back by the Reporter.)
17         - - - -
18 A.  I believe I would have thought I was
19     referencing a draft that did not contain this
20     language.
21 Q.  Well, my question is really just whatever draft
22     that was, you did review the section of
23     footnote 4 to the financial statements that
24     related to the co-borrowing?
25 A.  Again, I don't recall specifically, but

Page 489

1      apparently I did, yes.
2  Q.  Okay.
3  A.  And either mistakenly didn't see it there or
4      didn't see it there, so I was noting its
5      absence, yes.
6  Q.  And am I correct that it's your testimony that
7      that draft in note 4 would not have had the
8      language that we were looking at in Exhibit
9      502, the line, The managed entities have
10     outstanding borrowing of 1,599,733,000 as of
11     December 31, 2000, under such facilities?
12 A.  That's my recollection.
13 Q.  Now, when you refer in Exhibit 504, your March
14     31 e-mail, to the sentence we sent to Jim B.,
15     is that referring to the sentence that you had
16     on your e-mail that we marked as Exhibit 503?
17 A.  Yes.
18 Q.  And then you refer to a sentence that
19     Mr. Malone mentioned on March 30th on the phone
20     clarifying that the entire amount of capacity
21     is available to affiliates.  Was that
22     something -- withdrawn.
23     I believe you testified that you made
24     the suggestion to add something that related to
25     the entire amount of each co-borrowing facility

35 (Pages 486 to 489)

Page 490

```
1    could be borrowed by each co-borrower.  Does
2    this refresh your recollection that maybe
3    Mr. Malone suggested that sentence?
4  A. My memory is that, one, we were in agreement
5    with adding that; secondly, that we had
6    suggested it.  That's my recollection.
7  Q. Who is T. Engels who was copied on this?
8  A. That is Terry Engels who was an employee of
9    Adelphia Business Solutions who was -- who
10   worked in their SEC reporting area.  As I
11   mentioned earlier, their draft 10-K was
12   typically circulating at the same time as
13   Adelphia's, as well as other companies.  Terry
14   worked on, from the ABIZ point of view, was the
15   in-house person who was our primary contact on
16   the ABIZ 10-K.
17 Q. Did he also work on the Adelphia Communications
18   Corporation's 10-K?
19 A. Well, I think the comment here relates to
20   whatever the comment is, but also to the fact
21   that since ABIZ was a consolidated subsidiary
22   of Adelphia, the information as to ABIZ
23   generally would be included in public filings
24   of ABIZ, but also often the same information
25   was relevant and included in the Adelphia 10-K
```

Page 491

```
1    since ABIZ was one of its businesses, telephone
2    business.
3        So one of the -- one of the things
4    that we tried to keep an eye on was that the
5    disclosures were consistent with each other as
6    between the ABIZ disclosures and the Adelphia
7    disclosures about ABIZ.
8  Q. Let me show you what's been marked as
9    Exhibit -- I'm going to show you what's been
10   previously marked as Deloitte Exhibit 213,
11   which is a copy of the Form 10-K for Adelphia
12   Communications Corporation for the year ended
13   December 31, 2000, and the page that -- the
14   page that I'm trying to focus on, well, pages,
15   are pages 69 and 70.
16       69 starts footnote 4, and under Notes
17   to Banks and Institutions, if you look at page
18   70, there's that statement which is the first
19   full paragraph on page 70 regarding
20   co-borrowings.  States, Certain subsidiaries of
21   Adelphia are co-borrowers with managed entities
22   under credit facilities for borrowings of up to
23   3,751,250,000.  Each of the co-borrowers is
24   liable for all borrowings under the credit
25   agreements and may borrow up to the entire
```

Page 492

```
1    amount of the available credit under the
2    facility.  The lenders have no recourse against
3    Adelphia other than against Adelphia's interest
4    in such subsidiaries.
5        Do you recall reviewing the final
6    language for that disclosure in footnote 4 to
7    the financial statements before the Form 10-K
8    for the year ended December 31, 2000, was
9    submitted or filed with the SEC?
10 A. I don't recall, sitting here today I don't
11   recall specifically reviewing the final
12   language.  My general recollection is that I
13   did.
14 Q. Now, in the final version of the 10-K, the
15   clause appears, And may borrow up to the entire
16   amount of the available credit under the
17   facility, and you believe that that's language
18   that in substance you suggested be added to the
19   disclosure; is that correct?
20       MR. DOLUISIO:  Objection, asked and
21   answered.
22 A. That's my recollection.
23 Q. And so the company took your suggestion?
24 A. In light of the discussion of this, the company
25   included the language, yes.
```

Page 493

```
1  Q. And in prior years, the disclosure with respect
2    to co-borrowing did not have that language;
3    correct?
4  A. I don't believe so.
5  Q. And at the time you suggested the language that
6    was added, the clause starting, May borrow up
7    to the entire amount, did you believe that the
8    disclosures in prior years that did not have
9    that language were misleading?
10 A. I don't recall that was my belief.
11 Q. And why did you want the company to add the
12   language, May borrow up to the entire amount of
13   the available credit under the facility?
14 A. I recall that the request from the company was
15   to us to come up with additional disclosures
16   with respect to this footnote to clarify or add
17   information, and we were in agreement that
18   that's what this language did.
19 Q. Now, the final version of the disclosure did
20   not include the language that you suggested in
21   your March 29, 2001 e-mail to Mr. Brown.  Did
22   you inquire of anyone at Adelphia as to why
23   that language was not included?
24 A. I recall at some point in this process hearing
25   that it was not deemed necessary by the
```

36 (Pages 490 to 493)

# Exhibit J

August 9, 2002

**VIA HAND DELIVERY**
Timothy J. Coleman, Esq.
Assistant United States Attorney
United States Attorney's Office for the
  Southern District of New York
1 St. Andrews Plaza
New York, New York 10007

        Re:    Adelphia Communications Corporation

Dear Mr. Coleman:

      You have provided Adelphia Communications Corporation ("Adelphia" or the "Company") with the further opportunity to address whether the Company should be indicted in connection with the criminal charges for which three members of the Rigas family and two other senior executives recently were arrested. When we met to discuss these matters on August 2, 2002, you raised several follow-up issues which you requested that we address. We write now to provide this information which, together with our submission of August 1, 2002, we believe further shows that the factors relevant to the indictment decision strongly militate against indictment of the Company.

I.      Potential Bankruptcy Scenarios

      You have asked the Company to provide information regarding different possible bankruptcy scenarios and the likely effects of each, including the probable effects on Adelphia's various stakeholders. We have annexed as Exhibit A hereto a presentation by Lazard (the "Lazard Presentation"), the Company's restructuring advisors, which provides a quantitative analysis of several different bankruptcy scenarios. In addition, we provide a summary analysis below. As we discussed, we continue to believe a meeting with Lazard, as well as representatives of both the Creditors and Equity Committees, will assist you and your colleagues in better understanding the Lazard Presentation and the issues discussed below.

A.    The Company Can Be Successfully Restructured and Reorganized

Due to its valuable assets and strong core business, Adelphia has been and remains a viable and valuable business enterprise that generates substantial cash flow from operations. As of June 1, 2002, the broadband networks for the Debtors' cable systems passed in front of approximately 9.0 million homes and served approximately 5,453,000 million basic subscribers.[1] Adelphia's revenues are derived principally from monthly subscriber fees, premium and ancillary services, local and national advertising sales, pay-per-view programming, high-speed data services and competitive local exchange telecommunications services. (For the year ended December 31, 2001, Adelphia collected approximately $3.2 billion in unaudited, preliminarily revised revenue.[2]) Significantly, recent events have not adversely affected the Company's strong financial prospects. Indeed, the Company has continued to generate monthly revenue of approximately $260 million since the beginning of 2002.

---

[1] Historically, Adelphia calculated its number of subscribers by counting the number of households (or in the case of households with multiple billing accounts, the number of accounts) that receive signals from its cable system (the "Subscriber Accounts"). For example, in the Company's Form 8-K filed with the SEC on June 10, 2002, the Company reported that management's best estimate of the number of subscribers as of December 31, 2001 was 5,763,000; that number was the number of Subscriber Accounts and excluded the Subscriber Accounts of the Rigas Family Managed Entities and the Brazilian and Venezuelan joint ventures (the "Excluded Accounts"). The Company's new management intends to improve the quality of the Company's public disclosure. In connection with that effort, the Company intends to report two different subscriber numbers -- the Subscriber Accounts and "Equivalent Subscribers." Equivalent Subscribers is a notional number that in general is obtained by dividing total revenue for basic cable services in each market by the prevailing rate in the market. The difference between Subscriber Accounts and Equivalent Subscribers results principally from bulk billing for multiple dwelling units. The estimate of 5,453,000 subscribers contained herein calculates Equivalent Subscribers rather than Subscriber Accounts, and excludes the Excluded Accounts.

[2] Audit work with respect to Adelphia's financial statements for the year ended December 31, 2001 has not been completed and, consequently, financial numbers presented herein represent unaudited numbers. In addition, as Adelphia previously has disclosed, certain material financial information, including revenue estimates, for the years ended December 31, 2000 and 2001 was overstated and needs to be revised. Moreover, Adelphia's former independent accountants, Deloitte & Touche LLP, has advised Adelphia that it is withdrawing certifications of Adelphia financial statements since March 2001.

In order to sustain its business, ensure the future development and growth of its cable systems, infrastructure and broadband network, and maintain local franchises, Adelphia must continuously expend capital on construction, modernization, expansion and maintenance. The strategic vision of Adelphia is to continue these capital projects and improvements to offer a broad range of telecommunications services and provide superior customer service while maximizing operating efficiencies. It is only through the successful administration of its chapter 11 cases that Adelphia will be able to achieve these goals.

Toward that end, Adelphia successfully procured at the outset of its bankruptcy filing a $1.5 billion debtor in possession financing facility (the "DIP Facility") from a syndicate of banks and other financial institutions arranged by J.P. Morgan Securities Inc. and Salomon Smith Barney Inc. On June 28, 2002, the Bankruptcy Court overseeing Adelphia's chapter 11 case approved the DIP Facility on an interim basis and authorized borrowings of up to $500 million under the DIP Facility. A hearing to consider final approval of the DIP Facility and authorization of the remaining $1 billion in borrowing availability presently is scheduled to take place on August 22, 2002.

Through a combination of its cash on hand (the Company's opening cash balance as of August 2, 2002 was approximately $151.4 million), cash expected to be generated from operations (the Company's DIP Facility forecast through June 2004 projects cumulative positive EBITDA and EBIT[3] of approximately $2.8 billion and $1.1 billion, respectively) and the significant additional availability being provided under the DIP Facility (up to $1.5 billion), the Company will have more than ample liquidity to fund its operating, working capital and capital expenditure needs during the course of the Company's chapter 11 case.

Indeed, the DIP Facility not only provides the Company with necessary access to financing to fund operations, thereby preserving and maintaining the value of Adelphia, but instills in the Company's programmers, vendors, suppliers, customers and employees confidence in the Company's ability to meet their postpetition obligations going forward and to reorganize. This is borne out by several strong indicators, including that Adelphia (a) has received postpetition trade credit from virtually all of its current vendors, (b) enjoys generally good relations with its approximately 3,500 franchises, (c) has attracted highly-regarded independent directors to serve on its board, and (d) is about to announce the appointment of a new chief executive officer with extensive cable-industry experience (who in turn is expected to reinvigorate the Company's now decimated senior management ranks).

---

[3] "EBITDA" and "EBIT" are acronyms for "Earnings Before Interest Taxes Depreciation and Amortization" and "Earnings Before Interest and Taxes," respectively.

As a result of the Company's strong cash and liquidity position, Adelphia, with its new management team, its newly expanded board of directors, and its recently engaged team of highly experienced and sophisticated legal and financial turnaround specialists, is well-positioned to emerge successfully from chapter 11 and maximize its going-concern value for all of its stakeholders.

### B.    The Company's Going Concern Value

As indicated in the Lazard Presentation, the Company has significant enterprise value as a going concern whether valued based upon current or historical valuation levels. Lazard's preliminary analysis utilizing customarily employed valuation methodologies indicates a wide range of potential enterprise values of $8 billion to $33 billion, exclusive of any claims that the Company may have against third parties (including the substantial Company claims that exist against the Rigases and Deloitte & Touche, among others). Accepting simply the midpoint of this range (*i.e.*, $20.5 billion in enterprise value) for illustrative purposes would result in estimated creditor recoveries of 100% on their claims (which while subject to compromise in the bankruptcy process could total over $15 billion) and estimated equity recoveries totaling approximately $4.1 billion, prior to any enhancement resulting from valuable litigation claims. In fact, Lazard tentatively has concluded that the current value is depressed by both the problems currently confronting the telecommunications and cable industries and the general economic turmoil that exists in the marketplace.

### C.    Impact of a Criminal Indictment

At this stage of its restructuring proceedings, Adelphia believes that a criminal indictment could be the only thing beyond the Company's or management's control that could materially and adversely affect both the Company's reorganization efforts and going concern value. For all of the reasons set forth in the August 1, 2002 letter from Bruce A. Baird to Timothy J. Coleman, and those more fully set forth below and in the accompanying submissions, the Company believes a criminal indictment would in all likelihood spell the Company's doom. Among other devastating consequences, an indictment would result in (a) the strong likelihood that the Company's new lenders would declare that no further borrowings would be available under the $1.5 billion DIP Facility on the basis that a material adverse change and/or certain events of default have occurred as a result of the indictment, (b) a consequent loss of the Company's ability to fund its business and continue its operations, and a corresponding ripple effect through the Company's programmers, vendors, suppliers, customers and employees, (c) the Company's inability to renew franchises and the real likelihood of litigation relating to

attempted franchise revocations,[4] (d) the loss of cable television and other service to millions of citizens, and (e) ultimately, the forced "fire sale" of the Company's assets in a depressed cable and economic market under severe time constraints and at great expense.

D.     Recoveries Available in a Liquidation

Given the Company's strong prospects as explained above, the Company believes the possibility of a forced liquidation are virtually non-existent in the absence of a criminal indictment. However, with no ability to fund its operations in the face of a criminal indictment, the Company would in all likelihood be forced, even if limited financing or use of cash collateral were to be provided to attempt an orderly liquidation, to engage in a "fire sale" of the Company's assets. Indeed, the Company believes that an indictment casts significant doubt even on the Company's ability to implement an orderly liquidation of its assets, particularly given the fact that an indictment will place in severe jeopardy the Company's ability to transfer its most valuable and truly essential assets – that is, its franchises and licenses.

In a "fire sale", the Company's liquidation value also would be depressed by significant subscriber defection and customer migration to satellite service, programming disputes, service level reductions and other tremendous disruptions that would result from a winding down of the business. Moreover, as indicated in the Lazard Presentation, the loss of value from a forced sale would be magnified by the current macro economic environment, the general downturn in the cable industry and the high leverage levels that currently exist to constrain potential strategic buyers of the Company's assets.

As a result of these factors, Lazard has advised the Company that it believes that it is appropriate to discount its preliminary $8 billion to $33 billion going concern valuation range by at least 20% to 50% in a liquidation. The Company believes that the appropriate discount factor to apply most likely would fall at the high end of the range given the delicate (if not ephemeral) nature of the Company's assets, customer base and contractual relationships, the highly-regulated and political environment in which the Company operates, the uncertainty surrounding the Company's ability to transfer its franchises and licenses and sell its other assets, and the severe disruption to the Company that would result from a shut down of its business. Nevertheless, even applying the most optimistic discount factor within the range of factors set forth in the Lazard Presentation would result in completely wiping out all equity value in the Company (or a loss of

---

[4] As you have requested, we have asked the Company's communications counsel, Fleischman & Walsh, to provide a memorandum regarding the potential adverse impact of a criminal indictment on local cable franchises and FCC licenses held by Adelphia, a copy of which is annexed as Exhibit B hereto.

approximately $4.1 billion in estimated equity value if one were to accept the midpoint of Lazard's preliminary views on value). In addition, Lazard's review of the liquidation analyses contained in disclosure statements filed with U.S. Bankruptcy Courts in selected telecommunications liquidations shows an average theoretical gross recovery as a percent to tangible book value of total assets of 24.3%, resulting in a net recovery to secured claims of 67.1% and 0% to other stakeholders. When applied to Adelphia, the theoretical gross liquidation value is estimated to be $1.9 billion, which would result in a recovery to secured creditors of 28% with no value going to other stakeholders in liquidation. Thus, a criminal indictment, at best, would substantially reduce value available to the Company's stakeholders by several billion dollars.

## II.    The Effect of a Successful Reorganization on the Rigas Family's Stock Holdings

You have asked us to analyze whether the Rigases might profit from their ownership of Adelphia stock in a successful chapter 11 reorganization. As discussed above, if the Company is not indicted and successfully emerges from a chapter 11 reorganization, there is a meaningful possibility that stakeholders, including equity holders, will receive a significant recovery. However, even in such a circumstance, we do not believe that there is a meaningful risk that the Rigases will profit from such a recovery for equity holders, given the many tools available to the Company to prevent such a result and given the Company's clear willingness to do everything in its power – including continuing to provide assistance to this office and the Securities and Exchange Commission ("SEC") in connection with forfeiture, disgorgement and other claims – to ensure that the Rigases do not benefit from their wrongdoing.

First, pursuant to the terms of the May 23, 2002 agreement between the Rigas Family and Adelphia the ("May 23 Agreement"), there are only very limited circumstances in which the Rigases could even theoretically receive any benefit from the Adelphia shares they beneficially own. In particular, paragraph 8 of the Agreement provides that all Adelphia shares owned directly or indirectly by the Rigas Family shall be pledged to secure the repayment of the Rigas Family's obligations to Adelphia in connection with the co-borrowing facilities, provided that the Company agrees not to seek any transfer or collection of such shares in connection with any effort to collect such balance prior to December 31, 2006. Given the billions of dollars the Rigas Family owes to Adelphia and the effect that Adelphia's bankruptcy has had on the value of the pledged shares, there appears to be very little likelihood that the Rigas Family will be able to repay their co-borrowing obligations to Adelphia – aggregating not less than $3.1 billion in all – and regain control of the pledged shares. Accordingly, even if Adelphia equity holders recover in connection with a successful reorganization, the Rigas Family would not be expected to receive any value in connection with their pledged shares.

Second, the criminal charges brought by the United States Attorney's Office, the civil complaint filed by the Securities and Exchange Commission (the "SEC"), and the RICO complaint filed by Adelphia all represent further significant claims on the Rigas Family's assets which further ensure that the Rigas Family will not benefit from their wrongdoing. For example, Adelphia's own claims against the Rigas Family seek billions of dollars of damages from the Rigas Family (which, based on Adelphia's RICO claims, could be trebled) that would eliminate entirely, or at least substantially off-set, any claimed recoveries to which the Rigases might otherwise be entitled. In addition, under existing case law, as well as the newly-enacted Sarbanes-Oxley Act, the SEC may obtain an order directing the Rigas Family to disgorge any profits they have obtained through their dealings with Adelphia and place such profits, together with any civil penalties obtained, in a "disgorgement fund" for the benefit of the victims of the Rigas Family's wrongdoing. See S.E.C. v. Drexel Burnham Lambert, Inc., 956 F. Supp. 503, 507 (S.D.N.Y. 1997) ("In cases of securities law violations, the District Court has broad equitable power to fashion appropriate remedies, including ordering that culpable defendants disgorge their profits.")(citation omitted); Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, sec. 308(A), 116 Stat. 745, 784 (2002) (if the SEC "obtains an order requiring disgorgement against any person for a violation of [the securities laws] . . . and the Commission also obtains pursuant to such laws a civil penalty against such person, the amount of such civil penalty shall . . . be added to and become part of the disgorgement fund for the benefit of the victims of such violation."). And, of course, the United States Attorney's Office has the power to seek substantial criminal penalties from those Rigas Family members it indicts, as well as the power to seek forfeiture of Rigas Family assets.[5]

Finally, the Bankruptcy Code provides means to ensure that insiders who abuse their fiduciary positions do not benefit from their wrongdoing. These remedies include subordination and disallowance of the insiders' claims, the avoidance and rescission of transactions by which they wrongly profited, and the recovery of money and other assets wrongfully transferred to them.

Equitable Subordination and Disallowance. Section 510(c) of the Bankruptcy Code provides that a bankruptcy court may, "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim . . . " 11 U.S.C. § 510(c)(1). Bankruptcy courts are also empowered to completely disallow claims in appropriate circumstances where the same

---

[5] Recent reports of an Internal Revenue Service investigation into the Rigas Family suggests that claims for tax fraud may be another significant claim that would further ensure that the Rigases will not benefit in the event of a successful chapter 11 reorganization.

factors allowing equitable subordination are present. See, e.g., HBE Leasing Corp. v. Frank, 48 F.3d 623, 634 (2d Cir. 1995); Koch Ref. v. Farmers Union Exch., Inc., 831 F.2d 1339, 1350-51 (7th Cir. 1987). See also Stebbins v. Crocker Citizens Nat'l Bank (In re Ahlswede), 516 F.2d 784, 787 (9th Cir.) (equitable disallowance appropriate where "some basis . . . exist[s] of the sort traditionally cognizable by equity as justifying its intervention, such as fraud, breach of fiduciary duties, mismanagement, overreaching . . . any breach of the multitude of rules of fair play and good conscience traditionally enforced by a court")(citation omitted). The Rigases epitomize the profile of those subject to these remedies. Indeed, the claims of insiders (which the Rigases unquestionably are) are subordinated even where the insiders have engaged in misconduct that only procures an unfair advantage based on their position -- in short, where the misconduct is far less egregious than the breaches of fiduciary duty and frauds committed here.

Disallowance. Pursuant to section 502(b) of the Bankruptcy Code, bankruptcy courts may disallow a claim where it is "unenforceable against the debtor and property of the debtor, under any agreement or applicable law . . ." or where the claim is for "services of an insider . . . of the debtor [and] such claim exceeds the reasonable value of such services." 11 U.S.C. §§ 502(b)(1), 502(b)(4). Thus, pursuant to section 502(b), any claims based on the service contracts between the Debtors and entities controlled by the Rigas Family may be disallowed on the basis that the fees charged thereunder were in excess of those that would be paid if the services were negotiated in an arms-length transaction. (See Complaint, dated July 24, 2002, in Adelphia Communications Corp. v. John J. Rigas, et al., Adv. No. __ (Bankr. S.D.N.Y)(REG) ("Cplt.") ¶¶ 100-103.)

Avoidance. The Bankruptcy Code empowers Debtors to "avoid" any transfer of an interest of the debtor in property where such transfer amounts to a "preference" or a "fraudulent transfer." Moreover, under section 502(d) of the Bankruptcy Code, the bankruptcy court must disallow any claim of any entity that is a transferee of a transfer avoidable as a preference or fraudulent conveyance unless such transferee has paid the amount, or turned over such property, for which the transferee is liable. See 11 U.S.C. § 502(d). A preference payment occurs where there is a transfer, within a specified period of time before the debtor's bankruptcy petition, of an interest of the debtor in property to a creditor in satisfaction of an antecedent debt, and the creditor receives more than it would have received inside bankruptcy. See 11 U.S.C. § 547(b). A fraudulent transfer occurs where, for example, there is a transfer of an interest of the debtor in property that was made or incurred within one year before the date of the filing of the debtor's bankruptcy petition (or such longer periods provided under applicable state law), if the debtor voluntarily or involuntarily: (i) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any of its creditors; or (ii) received less than reasonably equivalent value in exchange for such transfer and was insolvent at the time the transaction was made. See 11 U.S.C. § 548(a)(1).

Timothy J. Coleman, Esq.
August 9, 2002
Page 9 of 11

Under either a fraudulent conveyance or preference analysis, the Debtors may be able to avoid a number of transactions benefiting the Rigases. For example, pursuant to a December 13, 2001 transaction known as the "Leverage Recapitalization Agreement", Highland Holdings (an entity controlled by the Rigases) agreed to arrange debt financing of $275 million for a cable television joint venture, 50 percent of which was owned by an Adelphia subsidiary. In return for merely "arranging" such financing, which burdened the joint venture with $275 million in debt, Highland was to receive a 60-percent equity interest in the joint venture. (See Cplt. ¶¶ 120-23.)

Recharacterization. Bankruptcy courts are empowered to exercise their equitable power to "recharacterize" debts owed to insiders, so that such debts are treated as capital contributions. See In re AtlanticRancher, Inc., 279 B.R. 411, 433 (Bankr. D. Mass. 2002) (bankruptcy court may recharacterize debt as capital contribution where advances were made by an insider and where "a creditor has contributed capital to a debtor in the form of a loan, but the loan has the substance and character of an equity contribution.") (quoting In re Kids Creek Partners, 212 B.R. 898, 931 (Bankr. N.D. Ill. 1997).

Creation of a Trust Under the Reorganization Plan. To the extent the Rigas Family, notwithstanding the above protections, is entitled to any distribution from the bankruptcy estate, any such funds would then be available to creditors of the Rigases. Moreover, it may be possible to structure the Reorganization Plan to create a trust or similar device into which all the Rigas Family's bankruptcy recoveries -- in whatever currency -- are placed but not released until all direct and third-party claims against the Rigas Family are finally adjudicated, after which it is unlikely that there would be any remaining funds for the Rigases.

In sum, the current Adelphia remains committed, whether through its claims, through assistance to the government in its actions, or through the bankruptcy process, to ensure that the Rigases do not profit at all from their wrongdoing and that they compensate the many victims of their conduct to the greatest extent possible. We also believe that the Company's ability to best pursue this course is to avoid liquidation by avoiding an indictment of the Company.

III.     The Company's Regulatory History (FCC and Antitrust)

You have asked the Company to research whether Adelphia has any history of regulatory issues with the Federal Communications Commission ("FCC") or in the area of antitrust.  We are attempting to investigate with prior counsel whether there are any antitrust issues to report and will report promptly when we have this information.  With respect to the FCC, we have determined that Adelphia – the sixth largest cable operator – has only been subject to four "sanctions," two of which were minor technical infractions, one of which involved the calculation of fees (which are often disputed), and one of which was an EEO violation.   In particular, we have identified the following sanctions:

- On July 19, 2002, the FCC sent Century Huntington Company's Huntington, WV system a Notice of Apparent Liability in the amount of $2,000.00 for an alleged violation of Section 11.61(a) of the FCC's rules regarding tests of EAS equipment and procedures.  On August 1, 2002, the Company requested relief from the forfeiture levied as a result of its June 25, 2002 Chapter 11 bankruptcy filing.

- On December 18, 2001, the FCC's Detroit, MI District Office sent Parnassos, L.P.'s system serving Conneaut, OH a Notice of Apparent Liability in the amount of $3,000.00 for failure to comply with the FCC's rules regarding antenna structure registration.  The Company responded to the FCC's notice and opposed the fine on February 1, 2002.  However, pending consideration of the Company's opposition, the Company paid the amount of the penalty.

- On May 1, 1997, the FCC adopted an order approving a settlement agreement between Adelphia and the FCC that resolved disputes regarding the reasonableness of Adelphia's rates in 40 communities.  Under the terms of the agreement, Adelphia was required to make refunds totaling more than $2.45 million to approximately 320,000 subscribers and to make prospective reductions in its basic service tier and optional "cable programming service tier" rates in certain communities.  By its express terms, the settlement agreement did not constitute an admission by Adelphia of any violation of, or failure to conform to, the 1992 Cable Act, FCC rules, or any other applicable law, rule, or policy.

- On February 1, 1994, the FCC released an order issuing a Notice of Apparent Liability in the amount of $121,500.00 for alleged equal employment opportunity violations surrounding the Company's Palm Beach County, FL employment unit.  The Company fully paid the forfeiture amount.

Timothy J. Coleman, Esq.
August 9, 2002
Page 11 of 11

IV.   Additional Requests for Information

Finally, in addition to the issues addressed above, we also provide the following information that you have requested:

- Annexed hereto as Exhibit C is a copy of the proposed Adelphia Communications Corporation Code of Business Conduct and Ethics, which will be presented to the Adelphia Board of Directors for approval.

- Annexed hereto as Exhibit D is a chart listing all Rigas entities that, pursuant to the May 23 Agreement, have agreed to pledge the Adelphia stock that they own to the Company and identifying the amount of stock to be pledged by each entity.

- A scanned copy of the complaint in Adelphia Communications Corp. v. John J. Rigas, et al., Adv. No. __ (Bankr. S.D.N.Y)(REG) was e-mailed to you by Eric Brenner on August 2, 2002.

* * *

We hope this information is helpful and we look forward to discussing these issues with you further.  Please do not hesitate to contact me or Bruce Baird if there is any further information that we can provide.

Sincerely,

Philip C. Korologos

cc:   Bruce A. Baird, Esq.

A

DISCUSSION MATERIALS

# Adelphia Communications

PRELIMINARY DRAFT – PREPARED AT THE REQUEST OF COUNSEL

LAZARD

# Disclaimer

This report was prepared pursuant to an engagement of Lazard Frères & Co. LLC (herein referred to as "Lazard") by Adelphia Communications Corporation (herein referred to as "Adelphia", the "Debtor" or the "Company"). Lazard was retained by the Company in June 2002 to assist in the negotiation of a restructuring of the Debtor's outstanding debt obligations.

In preparing its analysis, Lazard has relied upon and assumed the accuracy, completeness and fairness of financial and other information furnished by the Company. Lazard did not assume any responsibility to independently audit or verify such information, nor did it make an independent appraisal of the assets or liabilities of the Company. Lazard did not conduct an independent investigation into any of the legal, financial, accounting or other matters affecting the Company, and therefore makes no representation as to their impact on the Company from a financial point of view.

This analysis is preliminary and could significantly change as a result of further information and analysis. To the extent Lazard had more time in which to conduct its analysis, the valuation ranges presented herein could potentially be refined and narrowed.

In addition, Lazard has relied on the Company's representation and warranty that any projections provided by it to Lazard will have been reasonably prepared in good faith reflecting the best currently available estimates and judgments of management and that they are based on fully disclosed assumptions which, in light of the circumstances under which they were made, are reasonable. Lazard assumes no responsibility for and expresses no view as to such projections or assumptions on which they are based.

This report contemplates facts and conditions known and existing as of the date of the report. Events and conditions subsequent to this date, including but not limited to the form of liquidity arrangements the Company may procure, could have a profound effect upon the Company's value.

Use of this report outside of its intended use is prohibited without the prior written authorization of Lazard.

LAZARD

# Executive Summary

- **Notwithstanding recent events, Adelphia's underlying business fundamentals remain strong with sufficient projected cash flow and projected financing resources to remain a viable cable operator**

- **Preliminary analysis indicates that Adelphia has significant value as a "going concern" with the potential for increased value over that based on today's challenging macroeconomic and cable market environment**

  - Current valuation multiples of comparable cable companies applied to Adelphia would imply an indicative valuation range of between $8.0 billion and $19.0 billion

  - A recovery in the cable market and a return to valuation levels of one year ago may result in an indicative value of up to $33.0 billion

- **Any "fire sale" or liquidation that followed an indictment of the Company would likely result in significant impairment to the Company's value**

  - Loss of franchises

  - Severe creditor impairment

  - Recovery to stakeholders below secured creditors would be based solely on the successful assertions of claims against third parties

- **Given the assumed consequences of an indictment, a recovery of any magnitude to equity holders is contingent upon the Company not being indicted**

1 | LAZARD

# I. Situation Overview

LAZARD

# Adelphia Communications' Business and Prospects Appear to Remain Strong

- Significant cash flow generation over the forecast period combined with $1.5 billion DIP financing should provide the Company with adequate financial resources to operate in the ordinary course of business and remain a viable cable service provider

- The Company has added two new directors to the Board and is nearing completion of a search process for a new CEO with cable experience

- The Company has secured $1.5 billion in Debtor in Possession financing from a group of lenders led by JP Morgan Chase and Citibank to meet its short-term liquidity needs

- The Company's opening cash balance on August 2, 2002 was $151.4 million

- The Company has received post-petition trade credit from virtually all of its current vendors

- The Company continues to generate over $260 million in revenue per month while serving approximately 5.3 million subscribers

- Monthly subscriber churn remains stable at approximately 2%-3%

2 | LAZARD

# DIP Financing Forecast—Assumptions

- **The Company's initial DIP financing forecast (the "Initial Forecast") for the period through June 2004 is based upon the Company's Consolidated Operating Budget (the "Budget") for the remainder of 2002 and estimates of revenue and expense growth thereafter. The current forecast through June 2004 (which follows) has been updated to reflect final DIP terms**

- The Initial Forecast reflects the Budget adjusted to account for the following:

  — Accounting policy changes disclosed in the form 8K dated June 10, 2002

  — A contingency reflecting the deferral of certain rebuild and upgrade projects anticipated to increase the Company's revenue run rate during the fourth quarter of 2002

- **Interest and fees are assumed to be paid on pre-petition bank debt at the contract rate**

  - The final DIP agreement provides for payment of interest at ABR plus the applicable margin and all fees required under the respective agreements

- **Where appropriate, balance sheet accounts are projected based upon historical relationships with revenues and expenses**

  - Trade terms are assumed to increase from COD during the immediate post-petition period to 30 days by September 2002

- **Capital expenses are projected at $125 million per month throughout the plan period**

  - Such expenditures are projected to provide the Company with approximately $400 million per year for system rebuilds and upgrades. At June 2004, certain systems will require further rebuilds or upgrades

3 | L A Z A R D



# Forecast – Income Statement

| ($ in millions) | Q3-02 | Q4-02 | 2H-02 | Q1-03 | Q2-03 | Q3-03 | Q4-03 | 2003 | Q1-04 | Q2-04 |
|---|---|---|---|---|---|---|---|---|---|---|
| Total Revenue | $863.3 | $905.2 | $1,768.4 | $918.7 | $922.5 | $926.2 | $930.0 | $3,697.4 | $940.6 | $954.7 |
| Operating Expenses | | | | | | | | | | |
| Programming | 268.1 | 274.3 | 542.5 | 277.8 | 279.9 | 282.0 | 284.1 | 1,123.8 | 286.3 | 288.4 |
| Total Labor | 187.4 | 192.3 | 379.7 | 193.4 | 194.8 | 196.3 | 197.8 | 782.3 | 199.3 | 200.8 |
| Other | 153.6 | 155.1 | 308.7 | 155.8 | 156.9 | 158.1 | 159.3 | 630.2 | 160.5 | 161.7 |
| Total Operating Expenses | $609.2 | $621.7 | $1,230.9 | $627.0 | $631.7 | $636.4 | $641.2 | $2,536.3 | $646.0 | $650.9 |
| Less Capitalized Labor | (82.1) | (84.3) | (166.4) | (84.5) | (84.5) | (84.5) | (84.5) | (337.9) | (84.5) | (84.5) |
| Net Operating Expenses | 527.0 | 537.5 | 1,064.5 | 542.5 | 547.2 | 552.0 | 556.7 | 2,198.4 | 561.6 | 566.4 |
| EBITDA - Budgeted Plans | $336.2 | $367.7 | $704.0 | $376.2 | $375.3 | $374.2 | $373.2 | $1,499.0 | $379.0 | $388.3 |
| EBITDA - Due From Unaffiliated Subsidiaries | 13.8 | 13.8 | 27.5 | 13.8 | 13.8 | 13.8 | 13.8 | 55.0 | 13.8 | 13.8 |
| EBITDA - Contingency | (5.0) | (35.0) | (40.0) | (15.0) | 0.0 | 0.0 | 0.0 | (15.0) | (15.0) | (30.0) |
| EBITDA | | | | | | | | | | |
| Adjustments related to past accounting practices | (25.5) | (25.5) | (51.0) | (25.5) | (25.5) | (25.5) | (25.5) | (102.0) | (25.5) | (25.5) |
| Estimated EBITDA | $319.5 | $321.0 | $640.5 | $349.5 | $363.5 | $362.5 | $361.5 | $1,437.0 | $352.2 | $346.6 |
| % Margin | 37.0% | 35.5% | 36.2% | 38.0% | 39.4% | 39.1% | 38.9% | 38.9% | 37.5% | 36.3% |
| Less: D&A | (192.8) | (197.0) | (389.8) | (201.6) | (206.0) | (210.3) | (214.6) | (832.5) | (218.7) | (222.7) |
| % of Sales | (22.3%) | (21.8%) | (22.0%) | (21.9%) | (22.3%) | (22.7%) | (23.1%) | (22.5%) | (23.2%) | (23.3%) |
| EBIT | $126.7 | $124.0 | $250.7 | $147.9 | $157.5 | $152.2 | $146.9 | $604.5 | $133.6 | $123.9 |
| Total Restructuring Costs | ($73.0) | ($18.0) | ($91.0) | ($18.0) | ($18.0) | ($18.0) | ($18.0) | ($72.0) | ($18.0) | ($18.0) |
| Less: Interest Expense | | | | | | | | | | |
| Interest on DIP Financing | (5.4) | (6.4) | (11.9) | (7.0) | (8.5) | (10.7) | (12.9) | (39.1) | (14.8) | (17.5) |
| Interest on Bank Debt | (98.8) | (98.8) | (197.6) | (98.9) | (98.9) | (98.9) | (98.8) | (395.4) | (98.9) | (98.9) |
| Interest on Subsidiary Capital lease | (5.2) | (5.1) | (10.2) | (5.0) | (4.9) | (4.9) | (4.8) | (19.6) | (4.8) | (4.8) |
| Total Interest Expense | (109.3) | (110.4) | (219.7) | (110.9) | (112.3) | (114.4) | (116.5) | (454.1) | (118.4) | (121.1) |
| Pre-Tax Income | ($55.7) | ($4.4) | ($60.0) | $19.0 | $27.2 | $19.7 | $12.4 | $78.4 | ($2.9) | ($15.2) |
| Less: State Taxes | (3.0) | (3.0) | (6.0) | (3.0) | (3.0) | (3.0) | (3.0) | (12.0) | (3.0) | (3.0) |
| Federal Taxes | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Net Income | ($58.7) | ($7.4) | ($66.0) | $16.0 | $24.2 | $16.7 | $9.4 | $66.4 | ($5.9) | ($18.2) |

Source: Adelphia

4 | LAZARD

PRELIMINARY DRAFT – PREPARED AT THE
REQUEST OF COUNSEL

# Forecast – Balance Sheet

| ($ in millions) | Q2-02 | Q3-02 | Q4-02 | Q1-03 | Q2-03 | Q3-03 | Q4-03 | Q1-04 | Q2-04 |
|---|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | | |
| Cash & Equivalents | 137.8 | 295.5 | 79.7 | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 | 50.0 |
| Subscriber Receivables | 128.6 | 136.6 | 141.3 | 141.9 | 142.5 | 143.6 | 143.6 | 145.8 | 148.6 |
| ABIZ DIP Loan | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 | 15.0 |
| Prepaid Expenses & Other Assets | 342.1 | 342.1 | 342.1 | 342.1 | 342.1 | 342.1 | 342.1 | 342.1 | 342.1 |
| Investment in Unaffiliated Assets | 81.5 | 85.4 | 89.3 | 93.2 | 97.1 | 101.0 | 104.9 | 108.8 | 112.7 |
| Deposits | 40.0 | 40.0 | 40.0 | 40.0 | 40.0 | 40.0 | 40.0 | 40.0 | 40.0 |
| PP&E, Net | 7,355.9 | 7,458.1 | 7,616.1 | 7,789.5 | 7,958.5 | 8,123.2 | 8,283.6 | 8,439.9 | 8,592.2 |
| Intangibles | 15,503.9 | 15,503.9 | 15,503.9 | 15,503.9 | 15,503.9 | 15,503.9 | 15,503.9 | 15,503.9 | 15,503.9 |
| **TOTAL** | 23,564.8 | 23,856.6 | 23,827.4 | 23,975.6 | 24,149.1 | 24,318.2 | 24,483.1 | 24,645.5 | 24,803.9 |
| **LIABILITIES** | | | | | | | | | |
| Accounts Payable | 0.0 | 266.2 | 260.1 | 261.2 | 271.0 | 272.1 | 264.4 | 265.4 | 275.4 |
| Subscriber Payments/Deposits | 0.0 | 30.0 | 30.0 | 30.0 | 30.0 | 30.0 | 30.0 | 30.0 | 30.0 |
| Accrued Liabilities | 300.0 | 280.0 | 276.0 | 264.0 | 252.0 | 240.0 | 228.0 | 216.0 | 204.0 |
| Deferred Income Tax | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Subsidiary Bond Debt and Other Obligations | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Subsidiary Bank Debt | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Subsidiary Cap Leases | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Parent Bond Debt | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Total Debt | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| DIP Revolver | 0.0 | 0.0 | 0.0 | 146.9 | 302.1 | 469.2 | 648.1 | 831.0 | 1,013.4 |
| DIP Term Loan | 0.0 | 200.0 | 200.0 | 200.0 | 200.0 | 200.0 | 200.0 | 200.0 | 200.0 |
| Total DIP Borrowing | 0.0 | 200.0 | 200.0 | 346.9 | 502.1 | 669.2 | 848.1 | 1,031.0 | 1,213.4 |
| **LIABILITIES SUBJECT TO COMPROMISE** | | | | | | | | | |
| Accounts Payable | 925.0 | 835.0 | 835.0 | 835.0 | 835.0 | 835.0 | 835.0 | 825.0 | 825.0 |
| Subscriber Payments/Deposits | 30.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Accrued Interest & Other Liabilities | 108.0 | 108.0 | 108.0 | 108.0 | 108.0 | 108.0 | 108.0 | 108.0 | 108.0 |
| Deferred Income Tax | 204.4 | 204.4 | 204.4 | 204.4 | 204.4 | 204.4 | 204.4 | 200.4 | 200.4 |
| Subsidiary Bond Debt and Other Obligations | 2,411.6 | 2,411.6 | 2,411.6 | 2,411.6 | 2,411.6 | 2,411.6 | 2,411.6 | 2,411.6 | 2,411.6 |
| Subsidiary Bank Debt | 6,816.7 | 6,816.7 | 6,816.7 | 6,816.7 | 6,816.7 | 6,816.7 | 6,816.7 | 6,816.7 | 6,816.7 |
| Subsidiary Cap Leases | 259.6 | 235.9 | 252.1 | 248.4 | 244.6 | 240.9 | 237.1 | 233.4 | 229.6 |
| Parent Bond Debt | 6,917.1 | 6,917.1 | 6,917.1 | 6,917.1 | 6,917.1 | 6,917.1 | 6,917.1 | 6,917.1 | 6,917.1 |
| **TOTAL LIABILITIES** | 17,968.4 | 18,318.8 | 18,297.0 | 18,429.2 | 18,578.5 | 18,730.9 | 18,886.4 | 19,094.6 | 19,231.2 |
| MINORITY INTEREST | 607.2 | 607.2 | 607.2 | 607.2 | 607.2 | 607.2 | 607.2 | 607.2 | 607.2 |
| PREFERRED STOCK | 1,645.0 | 1,645.0 | 1,645.0 | 1,645.0 | 1,645.0 | 1,645.0 | 1,645.0 | 1,645.0 | 1,645.0 |
| COMMON EQUITY | 3,344.2 | 3,285.5 | 3,278.2 | 3,294.2 | 3,318.4 | 3,335.1 | 3,344.6 | 3,338.7 | 3,320.5 |
| **LIABILITIES + EQUITY** | 23,564.8 | 23,856.6 | 23,827.4 | 23,975.6 | 24,149.1 | 24,318.2 | 24,483.1 | 24,645.5 | 24,803.9 |
| New Financing/Revolver Borrowings | 0.0 | 200.0 | 200.0 | 346.9 | 502.1 | 669.2 | 848.1 | 1,031.0 | 1,213.4 |
| Add'l L/C's Required | 0.0 | 75.0 | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 | 125.0 |
| Total Facility Usage | $0.0 | $275.0 | $325.0 | $471.9 | $627.1 | $794.2 | $973.1 | $1,156.0 | $1,338.4 |

| Maximum Facility Need | 1,338.4 |
|---|---|

Source: Adelphia



PRELIMINARY DRAFT – PREPARED AT THE
REQUEST OF COUNSEL

# Forecast – Cash Flows

| ($ in millions) | Q3-02 | Q4-02 | 2H-02 | Q1-03 | Q2-03 | Q3-03 | Q4-03 | 2003 | Q1-04 | Q2-04 |
|---|---|---|---|---|---|---|---|---|---|---|
| Net Income | ($58.7) | ($57.4) | ($66.0) | $16.0 | $24.2 | $16.7 | $9.4 | $66.4 | ($55.9) | ($18.2) |
| Depreciation & Amortization | 192.8 | 197.0 | 389.8 | 201.6 | 206.0 | 210.3 | 214.6 | 832.5 | 218.7 | 222.7 |
| Changes in Working Capital: | | | | | | | | | | |
| Subscriber Receivables | (7.9) | (4.7) | (12.7) | (0.6) | (0.6) | (0.6) | (0.6) | (2.3) | (2.2) | (2.2) |
| ABIZ DIP Loan | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Prepaid Expenses & Other Assets | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Deposits | (40.0) | 0.0 | (40.0) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Intangibles | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Accounts Payable | 266.2 | (6.0) | 260.1 | 1.0 | 9.8 | 1.1 | (7.7) | 4.2 | 1.1 | 10.0 |
| Subscriber Payments/Deposits | 30.0 | 0.0 | 30.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Accrued Interest & Other Liabilities | (12.0) | (12.0) | (24.0) | (12.0) | (12.0) | (12.0) | (12.0) | (48.0) | (12.0) | (12.0) |
| Deferred Income Tax | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Court approved payments of Pre-Petition Obligations | (100.0) | 0.0 | (100.0) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Liabilities Subject to Compromise | (30.0) | 0.0 | (30.0) | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| CASH FROM OPERATIONS | $240.4 | $166.9 | $407.2 | $206.1 | $227.4 | $215.6 | $203.7 | $852.8 | $199.7 | $200.3 |
| Cap Lease Payments | ($3.8) | ($3.8) | ($7.5) | ($3.8) | ($3.8) | ($3.8) | ($3.8) | ($15.0) | ($3.8) | ($3.8) |
| Capital Expenditures | (275.0) | (375.0) | (650.0) | (375.0) | (375.0) | (375.0) | (375.0) | (1,500.0) | (375.0) | (375.0) |
| CASH FROM INVESTING | ($278.8) | ($378.8) | ($657.5) | ($378.8) | ($378.8) | ($378.8) | ($378.8) | ($1,515.0) | ($378.8) | ($378.8) |
| Repayment of Bank Debt | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| Investment in Unaffiliated Assets | (3.9) | (3.9) | (7.8) | (3.9) | (3.9) | (3.9) | (3.9) | (15.6) | (3.9) | (3.9) |
| DIP Term Loan | 200.0 | 0.0 | 200.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| CASH FROM FINANCING | 196.1 | (3.9) | 192.2 | (3.9) | (3.9) | (3.9) | (3.9) | (15.6) | (3.9) | (3.9) |
| TOTAL CASH FLOW B/F NEW FINANCING | $157.7 | ($215.8) | ($58.1) | ($176.6) | ($155.2) | ($167.0) | ($178.9) | ($677.8) | ($182.9) | ($182.4) |
| New Financing Borrowings/(Repayments) | 0.0 | 0.0 | 0.0 | 146.9 | 155.2 | 167.0 | 178.9 | 648.1 | 182.9 | 182.4 |
| Increase/(Decrease) in Cash | $157.7 | ($215.8) | ($58.1) | ($29.7) | $0.0 | $0.0 | $0.0 | ($29.7) | $0.0 | $0.0 |
| Beginning Cash | 137.8 | 295.5 | 137.8 | 79.7 | 50.0 | 50.0 | 50.0 | 79.7 | 50.0 | 50.0 |
| Ending Cash | $295.5 | $79.7 | $79.7 | $50.0 | $50.0 | $50.0 | $50.0 | $50.0 | $50.0 | $50.0 |

Source: Adelphia

6 | LAZARD

PRELIMINARY DRAFT – PREPARED AT THE REQUEST OF COUNSEL

II.   Illustrative Going Concern Values

LAZARD

# Introduction

- **Turmoil in the overall market, and cable market specifically, has depressed valuations and the possible return to historical valuation levels potentially renders current valuation a poor proxy for the future value of the Company as a going concern**

  - Based on past cable market valuation indicators, Adelphia's going concern value has the potential to increase in the future

- **Under all scenarios, based on a preliminary analysis Adelphia has significant going concern value**

  - Current valuation multiples of comparable cable companies applied to Adelphia would imply an indicative valuation range of between $8.0 billion and $19.0 billion

  - A recovery in the cable market and a return to valuation levels of one year ago may result in an indicative value of up to $33.0 billion



7 | LAZARD

PRELIMINARY DRAFT – PREPARED AT THE REQUEST OF COUNSEL

# Overview of Methodology

■ **Two approaches were used in calculating the preliminary value of the Company as a "going concern":**

   ▨ Approach 1: Applying multiples derived from current comparable company trading multiples to current Adelphia statistics (page 10) to provide an indicative going concern value reflecting the prevailing state of the market

   ▨ Approach 2: Applying multiples derived from historical (one year prior) comparable company trading multiples to current Company statistics (page 11) as a proxy for potential future going concern values assuming a cable market recovery, a successful restructuring of Adelphia and resolution of all other legal and accounting issues facing the Company

■ **Approach 1: Illustrative Going Concern Value Range – Current**

   ▨ **Public Market:** EBITDA multiple and per subscriber value ranges derived from publicly traded comparable companies were applied to Adelphia's actual and projected subscriber and EBITDA results to compute preliminary public market value ranges

   ▨ **Private Market (20% premium):** Given the lack of recent comparable precedent transactions in the depressed macroeconomic and cable market environment, as a proxy for precedent transactions, a 20% premium[1] was applied to the public market value ranges to arrive at an illustrative private market range

■ **Approach 2: Illustrative Going Concern Value Range – One Year Prior**

   ▨ **Public Market:** Historical (one year prior) EBITDA multiples and per subscriber value ranges were computed based on comparable company trading statistics (using an average of multiples reported in several Wall Street analyst research reports during July/Aug 2001. Lazard did not have sufficient time to calculate these statistics)

    — Historical EBITDA multiple and per subscriber value ranges derived from this analysis were applied to Adelphia's current actual and projected subscriber and EBITDA results to compute preliminary public market value ranges

   ▨ **Private Market (Precedent Transactions):** EBITDA multiple and per subscriber value ranges derived from precedent transactions (1998-2001) were applied to Adelphia's actual and projected subscriber and EBITDA results to arrive at preliminary private market value ranges

   ▨ **Private Market (20% premium):** For purposes of comparison to Approach 1, we also present an illustrative private market range based on a 20% premium[1] applied to the public market ranges

Note: Current comparable company trading analysis as of 08/05/02
(1) A theoretical 20% premium is an estimate for the change of control premium a buyer would have to pay to to obtain shareholder approval

**8 | L·A·Z·A·R·D**

# Illustrative Recovery to Stakeholders at Various Going Concern Values

*($ in billions, except per subscriber data)*

- **Preliminary analysis shown on pages 10 & 11, shows potential enterprise values that could range from $8 - $33 billion**

  - Range encompasses going concern values reflecting both Approach 1 and Approach 2

| Enterprise Value ($bn) | | $8.0 | $10.5 | $13.0 | $15.5 | $18.0 | $20.5 | $23.0 | $25.5 | $28.0 | $30.5 | $33.0 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Enterprise Value /** | | | | | | | | | | | | |
| **Basic Subscribers** | | | | | | | | | | | | |
| 05/31/2002 | 5.305 | $1,508 | $1,979 | $2,451 | $2,922 | $3,393 | $3,865 | $4,336 | $4,807 | $5,278 | $5,750 | $6,221 |
| **EBITDA** | | | | | | | | | | | | |
| 2001A | $1,199 | 6.7x | 8.8x | 10.8x | 12.9x | 15.0x | 17.1x | 19.2x | 21.3x | 23.4x | 25.4x | 27.5x |
| 2002E | 1,218 | 6.6 | 8.6 | 10.7 | 12.7 | 14.8 | 16.8 | 18.9 | 20.9 | 23.0 | 25.0 | 27.1 |
| **Recovery by Stakeholders**[a] | | | | | | | | | | | | |
| **Debt**[b] | | | | | | | | | | | | |
| $ billions | | $8.0 | $10.5 | $13.0 | $15.5 | $16.4 | $16.4 | $16.4 | $16.4 | $16.4 | $16.4 | $16.4 |
| % Recovery to Secured | | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| % Recovery to Unsecured | | 12.3% | 38.4% | 64.5% | 90.5% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| % Recovery of Total Debt | | 48.8% | 64.0% | 79.2% | 94.5% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| **Equity** | | | | | | | | | | | | |
| Preferred ($bn) | | $0.0 | $0.0 | $0.0 | $0.0 | $1.6 | $1.6 | $1.6 | $1.6 | $1.6 | $1.6 | $1.6 |
| Common ($bn) | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 2.5 | 5.0 | 7.5 | 10.0 | 12.5 | 15.0 |
| | | $0.0 | $0.0 | $0.0 | $0.0 | $1.6 | $4.1 | $6.6 | $9.1 | $11.6 | $14.1 | $16.6 |

(a) Based on total book value of pre-petition debt outstanding of $16.4 billion and preferred stock at book value of $1.6 billion as of June 30, 2002; Excludes impact of debtor-
in-possession financing, trade vendor payables and other potential claims which would further decrease stakeholder recoveries to the extent borrowed
(b) Secured debt of $6.8 billion, unsecured debt of $9.6 billion and total debt of $16.4 billion as of 06/30/02; Source: Management

PRELIMINARY DRAFT – PREPARED AT THE
REQUEST OF COUNSEL



CONFIDENTIAL

# Approach 1: Illustrative Going Concern Value Range – Current

*($ in billions, except per subscriber data)*

- **Public Market:** Current trading multiples of comparable companies imply a public market enterprise value range of $8 - $15 billion, implying a recovery to debt holders of 48%-92%
- **Private Market (20% premium):** A 20% premium applied to the public market value range implies a private market range of $10 - $19 billion, implying a recovery to debt holders of 58%-100% and up to $2.0 billion to equity holders

| | | Valuation Multiples | | Enterprise Value Range ($bn) | | |
|---|---|---|---|---|---|---|
| | | Low | High | Low | | High |
| **Public Market** | | | | | | |
| 5/31/02 Subscribers(a) | 5,305 | $1,900 - | $2,900 | $10.1 | - | $15.4 |
| *Implied 2002E EBITDA Multiple* | | *8.3x -* | *12.6x* | | | |
| 2001A EBITDA(b) | $1,199 | 7.5x - | 11.5x | $9.0 | - | $13.8 |
| 2002E EBITDA(c) | 1,218 | 6.5x - | 10.0x | 7.9 | - | 12.2 |
| **Private Market (20% premium)(d)** | | | | | | |
| 5/31/02 Subscribers | 5,305 | $2,280 - | $3,480 | $12.1 | - | $18.5 |
| *Implied 2002E EBITDA Multiple* | | *9.9x -* | *15.2x* | | | |
| 2001A EBITDA(b) | $1,199 | 9.0x - | 13.8x | $10.8 | - | $16.5 |
| 2002E EBITDA(c) | 1,218 | 7.8x - | 12.0x | 9.5 | - | 14.6 |

Note: Excludes Rigas family managed entities, non-managed entities and Century ML (Puerto Rico) joint venture.
(a) Source: Management
(b) Based on 8-K dated June 10, 2002
(c) Jan-June 2002 based on management estimates and July-Dec 2002E based on DIP model
(d) Multiples based on a theoretical 20% premium to public market valuation multiples. Precedent transaction analysis not used as discussed on page 8

10 | **LAZARD**

PRELIMINARY DRAFT – PREPARED AT THE
REQUEST OF COUNSEL

000054

CONFIDENTIAL

# Approach 2: Illustrative Going Concern Value Range – One Year Prior

*($ in billions, except per subscriber data)*

- **Public Market:** Historical trading multiples of comparable companies applied to current Adelphia results would imply a public market enterprise value of $15 - $25 billion, implying a recovery to debt holders of 92%-100% and up to $8 billion to equity holders

- **Private Market (Precedent Transactions):** Precedent transactions imply a private market value range of $16 – $33 billion, implying a recovery to debt holders of 97%-100% and up to $16 billion to equity holders

- **Private Market (20% premium):** A 20% premium applied to the public market value range implies a private market range of $18 - $30 billion, implying a recovery to debt holders of 100% and up to $13 billion to equity holders

| | | Valuation Multiples | | Enterprise Value Range ($bn) | |
| --- | --- | --- | --- | --- | --- |
| | | Low | High | Low | High |
| **Public Market(a)** | | | | | |
| 5/31/02 Subscribers(b) | 5.305 | $2,800 - | $4,700 | $14.9 - | $24.9 |
| *Implied 2002E EBITDA Multiple* | | *12.2x* - | *20.5x* | | |
| 2001A EBITDA(c) | $1,199 | 14.0x - | 19.0x | $16.8 - | $22.8 |
| 2002E EBITDA(d) | 1,218 | 13.0x - | 17.0x | 15.8 - | 20.7 |
| **Private Market (Precedent Transactions)** | | | | | |
| 5/31/02 Subscribers(b) | 5.305 | $3,300 - | $5,500 | $17.5 - | $29.2 |
| *Implied LTM EBITDA Multiple* | | *14.9x* - | *24.8x* | | |
| LTM EBITDA(f) | $1,178 | 15.0x - | 28.0x | $17.7 - | $33.0 |
| 2002E EBITDA(d) | 1,218 | 13.0x - | 22.0x | 15.8 - | 26.8 |
| **Private Market (20% premium)(e)** | | | | | |
| 5/31/02 Subscribers(b) | 5.305 | $3,360 - | $5,640 | $17.8 - | $29.9 |
| *Implied 2002E EBITDA Multiple* | | *14.6x* - | *24.6x* | | |
| 2001A EBITDA(c) | $1,199 | 16.8x - | 22.8x | $20.1 - | $27.3 |
| 2002E EBITDA(d) | 1,218 | 15.6x - | 20.4x | 19.0 - | 24.9 |

Note: Excludes Rigas family managed entities, non-managed entities and Century ML (Puerto Rico) joint venture
(a) Public market valuation multiples based on average multiples from various Wall Street research reports. Lazard did not have sufficient time to calculate these statistics
(b) Source: Management
(c) Based on 8-K dated June 10, 2002
(d) Jan-June 2002 based on management estimates and July-Dec 2002E based on DIP model
(e) Multiples based on a theoretical 20% premium to public market valuation multiples
(f) Based on ½ of 2001A EBITDA plus Jan-June 2002 EBITDA based on management estimates

11 | L·A·Z·A·R·D

PRELIMINARY DRAFT – PREPARED AT THE REQUEST OF COUNSEL

## III.  Issues Relating to a Potential Indictment

LAZARD

## Potential Impact of Company Indictment

- **Indictment of the Company is likely to result in the following:**

  - The August 9, 2002 letter to Timothy J. Coleman, Esq. from Boies, Schiller & Flexner LLP discusses that the loss of DIP financing would lead to an inability to fund business as a going concern and continue operations

    — Inability to pay for programming

    — Inability to provide competitive programming and other services to subscribers

    — Loss of subscribers to satellite providers and consequent reduction in Company's earnings

    — Denial of franchise renewals

    — Revocation of existing franchises

  - Loss of DIP financing is likely to result in forced "fire sale" of Company assets into a depressed cable market

    — Exacerbated by aforementioned factors

    — Most likely, potential strategic buyers' ability to entertain a transaction is limited by their own high leverage levels, limited cash resources, a significant decline in equity values and other issues ranging from previous acquisition integration constraints to SEC and Justice Department inquiries as summarized on page 14

    — Financial buyers historically have not been competitive bidders due to return requirements and financing limitations

- **Value impairment resulting from an indictment may result in $0 recovery to stakeholders not holding a secured claim**



# Illustrative Liquidation Analysis

*($ in millions, except per subscriber data)*

- Based on and assuming the aforementioned issues a forced "fire sale" would result in a significant discount to the current going concern value (as illustrated on page 10)

- Accordingly, as shown below, a discount to the current going concern value could significantly further impair stakeholders and could result in $0 to equity holders

  - The analysis does not include additional claims that may be asserted as part of a liquidation (e.g., termination payments on executory contracts, employee benefit costs including severance, trustee fees, customer claims etc.)

**Enterprise Value ($bn)[3]**

| Discount | $8.0 | $9.0 | $10.0 | $11.0 | $12.0 | $13.0 | $14.0 | $15.0 | $16.0 | $17.0 | $18.0 | $19.0 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 20% | $6.4 | $7.2 | $8.0 | $8.8 | $9.6 | $10.4 | $11.2 | $12.0 | $12.8 | $13.6 | $14.4 | $15.2 |
| 30% | 5.6 | 6.3 | 7.0 | 7.7 | 8.4 | 9.1 | 9.8 | 10.5 | 11.2 | 11.9 | 12.6 | 13.3 |
| 40% | 4.8 | 5.4 | 6.0 | 6.6 | 7.2 | 7.8 | 8.4 | 9.0 | 9.6 | 10.2 | 10.8 | 11.4 |
| 50% | 4.0 | 4.5 | 5.0 | 5.5 | 6.0 | 6.5 | 7.0 | 7.5 | 8.0 | 8.5 | 9.0 | 9.5 |

**Recovery to Unsecured Debt Holders[4]**

| Discount | $8.0 | $9.0 | $10.0 | $11.0 | $12.0 | $13.0 | $14.0 | $15.0 | $16.0 | $17.0 | $18.0 | $19.0 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 20% | 0% | 4% | 12% | 21% | 29% | 37% | 46% | 54% | 62% | 71% | 79% | 87% |
| 30% | 0% | 0% | 2% | 9% | 17% | 24% | 31% | 38% | 46% | 53% | 60% | 68% |
| 40% | 0% | 0% | 0% | 0% | 4% | 10% | 17% | 23% | 29% | 35% | 42% | 48% |
| 50% | 0% | 0% | 0% | 0% | 0% | 0% | 7% | 7% | 12% | 18% | 23% | 28% |

- In addition, Lazard has analyzed selected telecommunications liquidations (as a proxy for the cable industry as there are no comparable cable liquidations) based upon "Best Interest Tests" (summarized in pages 17-19) which show on average a theoretical gross recovery as a percent of tangible book value of total assets of 24.3%, resulting in a net recovery to secured claims of 67.1% and 0% to any other stakeholder

  - Applying these statistics to Adelphia total tangible assets as of May 31, 2002[1] implies a theoretical gross liquidation value of $1.9 billion which would result in a recovery to secured creditors of 28% and 0%[2] to other stakeholders

(1) Book value of total tangible assets is $8.0 billion. Based on estimated balance sheet dated May 31, 2002
(2) Excludes impact of fees associated with restructuring (trustee and professional fees), employee severance and other costs associated with winding down
(3) Reflects only the value range potentially available in today's environment with no consideration given to potential future values
(4) Secured debt of $6.8 billion, unsecured of $9.6 billion and total debt of $16.4 billion as of 06/30/02; Excludes impact of debtor-in-possession financing, trade vendor payables and other potential claims which would further decrease stakeholder recoveries to the extent borrowed

13 | LAZARD

PRELIMINARY DRAFT – PREPARED AT THE REQUEST OF COUNSEL

# Overview of Potential Strategic Buyers

*($ in millions)*

■ Dramatic recent declines in equity value and burdensome leverage could constrain strategic buyers' ability to acquire assets in the near term

| POTENTIAL BUYER | STOCK PRICE % DROP FROM HIGH | TOTAL DEBT / EBITDA | TOTAL DEBT / CAP | CASH $M |
|---|---|---|---|---|
| Advance - Newhouse | Private | NA | NA | NA |
| AOL Time Warner | (78.9%) | 3.1x | 36.9% | $1,709 |
| AT&T – Comcast | (58.2%) | 4.9x | 43.5% | 604 |
| Cablevision | (86.3%) | 7.8x | 79.0% | 202 |
| Charter | (88.0%) | 8.3x | 91.0% | 7 |
| Cox | (52.0%) | 4.1x | 44.5% | 194 |
| Insight | (69.2%) | 7.2x | 69.7% | 88 |
| Mediacom | (75.7%) | 7.4x | 85.1% | 25 |
| Microsoft | (37.7%) | 0.0x | 0.0% | 38,652 |

14 | LAZARD

PRELIMINARY DRAFT – PREPARED AT THE REQUEST OF COUNSEL

Appendix

LAZARD

# Analysis of Publicly Traded Comparable Companies

*($ in millions, except per subscriber data)*

**Debt at Face Value**

| COMPANY | STOCK PRICE 8/5/02 | CHANGE FROM HIGH | CHANGE FROM LOW | BROADBAND ASSET VALUE (BAV) | BAV AS A MULTIPLE OF EBITDA 2001A | 2002E | BAV AS A MULTIPLE OF SUBSCRIBERS 2001A | 2002E | DEBT/ 2002E EBITDA | 2002E EBITDA MARGIN | DEBT RATING |
|---|---|---|---|---|---|---|---|---|---|---|---|
| AT&T-Comcast | $16.80 | (58.2%) | 0.0% | $44,578 | 11.5x | 9.2x | $2,053 | $2,082 | 4.9x | 29.8% | Baa3/BBB |
| Cablevision | 7.54 | (86.3%) | 29.6% | 9,249 | 11.1 | 9.7 | 3,075 | 3,040 | 7.8 | 38.2% | BB+ |
| Charter | 2.64 | (88.0%) | 2.3% | 19,512 | 10.4 | 9.2 | 2,798 | 2,868 | 8.3 | 45.1% | B3/BB |
| Cox | 20.19 | (52.0%) | 0.0% | 16,787 | 10.7 | 9.3 | 2,691 | 2,657 | 4.1 | 35.8% | Baa2/BBB |
| Insight | 7.85 | (69.2%) | 0.0% | 4,077 | 12.2 | 10.7 | 3,176 | 3,135 | 7.2 | 46.6% | Caa/B- |
| Mediacom | 4.43 | (75.7%) | 2.5% | 3,366 | 10.3 | 8.7 | 2,110 | 2,096 | 7.4 | 41.6% | Caa1/BB |
| Median | | | | | 10.9x | 9.3x | $2,744 | $2,763 | 7.5x | 39.9% | |
| Mean | | | | | 11.0x | 9.5x | $2,651 | $2,650 | 6.6x | 39.5% | |

**Debt at Market Value**

| COMPANY | STOCK PRICE 8/5/02 | CHANGE FROM HIGH | CHANGE FROM LOW | BROADBAND ASSET VALUE (BAV) | BAV AS A MULTIPLE OF EBITDA 2001A | 2002E | BAV AS A MULTIPLE OF SUBSCRIBERS 2001A | 2002E | DEBT/ 2002E EBITDA |
|---|---|---|---|---|---|---|---|---|---|
| AT&T-Comcast | $16.80 | (58.2%) | 0.0% | $42,088 | 10.8x | 8.7x | $1,939 | $1,966 | 4.4x |
| Cablevision | 7.54 | (86.3%) | 29.6% | 8,170 | 9.8 | 8.6 | 2,716 | 2,685 | 6.7 |
| Charter | 2.64 | (88.0%) | 2.3% | 13,661 | 7.3 | 6.4 | 1,959 | 2,008 | 5.5 |
| Cox | 20.19 | (52.0%) | 0.0% | 14,098 | 9.0 | 7.8 | 2,260 | 2,231 | 2.7 |
| Insight | 7.85 | (69.2%) | 0.0% | 3,807 | 11.4 | 10.0 | 2,966 | 2,927 | 6.4 |
| Mediacom | 4.43 | (75.7%) | 2.5% | 2,970 | 9.1 | 7.7 | 1,862 | 1,850 | 6.4 |
| Median | | | | | 9.5x | 8.2x | $2,100 | $2,109 | 5.9x |
| Mean | | | | | 9.6x | 8.2x | $2,284 | $2,278 | 5.4x |



Note:

Enterprise Value = Market Capitalization + Net Debt + Preferred Stock + Minority Interest − Liquid Investments

Broadband Asset Value = Enterprise Value − Non-Cable Assets + Telephony

Source: Various publicly available company filings and analyst research

15 | LAZARD

PRELIMINARY DRAFT − PREPARED AT THE REQUEST OF COUNSEL

000061

# Analysis of Comparable Precedent Transactions

*($ in millions, except per subscriber data)*

| Acquiror | Target | Location | Ann. Date | Aggregate Value | Basic Subs. | Aggregate Value/ Basic Subs. | LTM EBITDA | FY+1 EBITDA(a) |
|---|---|---|---|---|---|---|---|---|
| **Metro** | | | | | | | | |
| Comcast | AT&T | US | 12/19/01 | $61,970 | 13.800 | $4,491 | 34.4x | 31.0x |
| Charter | AT&T | St. Louis MO, Alabama, Nevada | 02/27/01 | 1,790 | 0.574 | 3,118 | 19.3 | 16.3 |
| Insight Midwest | AT&T/Insight | Various Illinois, Indiana, Ohio, Georgia | 01/05/01 | 2,164 | 0.530 | 4,083 | NA | 15.7 |
| Adelphia | GS Communications | Frederick MD, Culpeper VA | 06/14/00 | 1,162 | 0.218 | 5,329 | NA | 14.8 |
| AT&T | Cablevision | Boston MA, Eastern MA, Worchester NY | 04/18/00 | 1,162 | 0.232 | 5,000 | NA | 22.9 |
| Comcast | Jones Intercable | Various Virginia, Maryland, California, Arizona | 12/22/99 | 3,663 | 1.100 | 3,330 | 17.9 | 17.9 |
| Adelphia | Prestige | Various Virginia, North Carolina, Maryland | 12/15/99 | 700 | 0.120 | 5,833 | NA | 22.1 |
| Adelphia | Cablevision | Cleveland OH | 12/07/99 | 1,530 | 0.306 | 5,000 | NA | 20.6 |
| Comcast | Lenfest | Pennsylvania | 11/16/99 | 6,858 | 1.250 | 5,486 | 30.7 | 19.2 |
| Cox | Multimedia Cablevision | Kansas, Oklahoma | 07/27/99 | 2,350 (c) | 0.522 | 4,502 | 21.8 | 15.6 |
| Charter | Bresnan | Michigan | 06/30/99 | 3,100 | 0.686 | 4,519 | 28.4 | 21.0 |
| AT&T | Lenfest | Pennsylvania | 05/04/99 | 5,691 | 1.288 | 4,418 | 28.7 | NA |
| Comcast | AT&T | Baltimore MD, Michigan, Naples FL, N. Mexico, Phil, PA, Wash, DC | 05/04/99 | 2,585 | 0.595 | 4,344 | NA | NA |
| AT&T | MediaOne | US | 04/22/99 | 45,492 (c) | 7.853 | 5,793 | 43.9 | 19.5 |
| Cox | Media General - Cable Systems | Fairfax VA | 04/22/99 | 1,125 (c) | 0.260 | 4,327 | 23.6 | 17.7 |
| Adelphia | Harron | Pennsylvania, Michigan, New England | 04/12/99 | 1,156 | 0.296 | 3,904 | 26.5 | 14.4 |
| Adelphia | Century | California, Colorado, Puerto Rico | 03/05/99 | 5,321 | 1.610 | 3,305 | 19.3 | 13.9 |
| Charter | Greater Media | Worcester MA, Chicopee MA | 02/19/99 | 500 | 0.173 | 2,890 | 16.8 | 13.9 |
| AT&T | Tele-Communications | US | 06/24/98 | 50,220 (c) | 11.349 | 4,425 | 24.5 | 13.8 |
| **Rural** | | | | | | | | |
| Bresnan | AT&T | MT, WY, CO | 04/05/02 | 735 | 0.320 | 2,297 | NA | NA |
| Mediacom | AT&T | Various Georgia, Illinois, Iowa, Missouri | 02/27/01 | 2,215 | 0.840 | 2,637 | 12.6 | 11.4x |
| Cox | AT&T | Various Oklahoma, Louisiana, Arkansas, Nevada, Utah | 07/07/99 | 1,906 | 0.495 | 3,851 | NA | 18.1 |
| Charter | Fanch | Colorado | 05/27/99 | 2,400 | 0.537 | 4,469 | 11.9 (e) | 16.1 |
| Charter | Falcon | California | 05/26/99 | 3,462 | 1.005 | 3,445 | 21.5 (e) | 16.3 |
| Charter | Avalon Cable | Connecticut, Michigan, Massachusetts, New York | 05/17/99 | 832 | 0.252 | 3,302 | 50.9 (e) | 15.0 |
| Cox | TCA Cable TV | Texas | 05/12/99 | 3,785 | 0.883 | 4,287 | 20.6 | 16.1 |
| Mediacom | Triax | Arizona, Illinois, Indiana, Iowa, Michigan, Minnesota, Wisconsin | 05/03/99 | 740 | 0.342 | 2,164 | 13.1 | 11.6 |
| Insight | Intermedia (50%) | Kentucky | 04/20/99 | 725 | 0.215 | 3,372 | 15.2 | 13.4 |
| Charter | Helicon | Vermont, Penn., W. Virginia, N.Carolina, S.Carolina, Tenn., Georgia, Louis. | 02/23/99 | 550 | 0.171 | 3,216 | 15.5 | 12.8 |
| Adelphia | FrontierVision Oper Partners | New England, Virginia, Ohio, Kentucky | 02/23/99 | 2,322 | 0.702 | 3,307 | 18.5 | 14.3 |
| Charter | Rifkin Acquisition Partners | Georgia, Tennessee, Illinois | 02/23/99 | 608 | 0.190 | 3,200 | 19.3 | 13.7 |
| TCI | Intermedia | Tennessee, Kentucky, Utah, Montana | 01/21/99 | 1,100 | 0.300 | 3,667 | NA | 14.4 |
| Charter | Intermedia | South Carolina, Georgia, North Carolina, Tennessee | 01/27/99 | 1,300 | 0.395 | 3,291 | 11.8 | 12.9 |

(a) Aggregate value has been adjusted for tax benefits.
(c) Estimated.
(d) Core cable only.
(e) Source: Kagan.

16 | LAZARD

PRELIMINARY DRAFT – PREPARED AT THE
REQUEST OF COUNSEL

# Selected Precedent Bankruptcies in the Telecom Sector

■ The following table presents summary statistics from selected precedent liquidation analyses, each of which was prepared as part of the Best Interests Test and included in the publicly filed disclosure statement

($ in millions)

| Date of Disclosure | Company | Book Value of Assets | | | Cash as a % of Total Assets | Hypothetical Liq. Proceeds | | Proceeds as a % of Book Value | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Cash | Other Assets | Total Assets | | Gross Liquidation Proceeds | Net Proceeds Available for Distribution | Gross Proceeds / Other Assets | Gross Proceeds / Total Assets | Net Proceeds / Total Assets |
| 07/18/02 | 360 Networks | $189 | $1,112 | $1,301 | 14.5% | $274 | $201 | 24.6% | 21.1% | |
| 06/17/02 | XO Communications | 434 | 4,952 | 5,386 | 8.1% | 847 | 409 | 17.1% | 15.7% | |
| 06/03/02 | Metrocall | 18 | 171 | 189 | 9.5% | 56 | 49 | 32.4% | 29.3% | |
| 05/20/02 | Williams Communications | 365 | 4,541 | 4,906 | 7.4% | 960 | 900 | 21.1% | 19.6% | |
| 05/09/02 | PSINet | 491 | 2,086 | 2,577 | 19.1% | 462 | 452 | 22.2% | 17.9% | |
| 03/13/02 | Arch Wireless | 70 | 529 | 599 | 11.7% | 208 | 180 | 39.3% | 34.7% | |
| 02/28/02 | Viatel | 28 | 827 | 856 | 3.3% | 63 | 53 | 7.6% | 7.3% | |
| 02/26/02 | McLeod USA | 152 | 3,955 | 4,107 | 3.7% | 1,572 | 1,161 | 39.8% | 38.3% | |
| 12/19/02 | ICG Communications | 135 | 650 | 785 | 17.2% | 251 | 94 | 38.7% | 32.0% | |
| 08/27/01 | Covad Communications | 524 | 573 | 1,098 | 47.8% | 294 | 284 | 51.3% | 26.8% | |
| | Min | | | | 3.3% | | | 7.6% | 7.3% | |
| | Max | | | | 47.8% | | | 51.3% | 38.3% | |
| | Mean | | | | 14.2% | | | 29.4% | 24.3% | |
| | Median | | | | 10.6% | | | 28.5% | 23.9% | |
| | Adjusted Average | | | | 11.4% | | | 29.4% | 24.6% | |

Source: Disclosure statements and company filings. See page 19 for notes to each of the above.

17 | L A Z A R D

# Selected Precedent Bankruptcies in the Telecom Sector (cont'd)

■ The following table presents summary statistics from selected precedent liquidation analyses, each of which was prepared as part of the Best Interests Test and included in the publicly filed disclosure statement

($ in millions)

| Date of Disclosure | Company | Book Value of Assets | | Hypothetical Liq. Proceeds | | Claims | | Recovery on Claims | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Cash | Total Assets | Gross Liquidation Proceeds | Net Proceeds Available for Distribution | Secured Claims | Unsecured Claims | Net Proceeds / Secured Claims | Net Proceeds / Total Claims |
| 07/18/02 | 360 Networks | $189 | $1,301 | $274 | $201 | $1,191 | $1,412 | 16.9% | |
| 06/17/02 | XO Communications | 434 | 5,386 | 847 | 409 | 1,053 | 4,064 | 38.8% | |
| 06/03/02 | Metrocall | 18 | 189 | 56 | 49 | 138 | 813 | 35.1% | |
| 05/20/02 | Williams Communications | 365 | 4,906 | 960 | 900 | 824 | 5,676 | 100.0% | |
| 05/09/02 | PSINet | 491 | 2,577 | 462 | 452 | 31 | 4,026 | 100.0% | |
| 03/13/02 | Arch Wireless | 70 | 599 | 208 | 180 | 1,389 | 419 | 13.0% | |
| 02/28/02 | Viatel | 28 | 856 | 63 | 53 | 21 | 2,700 | 100.0% | |
| 02/26/02 | McLeod USA | 152 | 4,107 | 1,572 | 1,161 | 1,045 | 3,284 | 100.0% | |
| 12/19/01 | ICG Communications | 135 | 785 | 251 | 94 | 85 | 2,643 | 100.0% | |
| 08/27/01 | Covad Communications | 524 | 1,098 | 294 | 284 | 0 | 1,427 | NA | |

| | |
| --- | --- |
| Min | 13.0% |
| Max | 100.0% |
| Mean | 67.1% |
| Median | 100.0% |
| Adjusted Average | 70.1% |

Source: Disclosure statements and company filings. See page 19 for notes to each of the above.

 LAZARD

PRELIMINARY DRAFT – PREPARED AT THE REQUEST OF COUNSEL

000064

# Selected Precedent Bankruptcies in the Telecom Sector (cont'd)

| Date of Disclosure | Company | Notes |
|---|---|---|
| | General Notes | Unless otherwise noted, book value of assets per the balance sheet publicly available immediately prior to the the disclosure date. Value of secured and unsecured claims per the liquidation analysis. Gross liquidation proceeds include all available proceeds for distribution prior to administrative claims associated with Ch. 7 liquidation process (e.g. trustee fees, professional fees, wind-down costs, etc.). Unsecured claims include costs associated with rejection of executory contracts. |
| 07/18/02 | 360 Networks | Balance sheet dated September 30, 2002 and included in the disclosure statement as part of the liquidation analysis. |
| 06/17/02 | XO Communications | Asset values and claims per balance sheet as of September 30, 2002.  Recovery value averages high and low ranges. |
| 06/03/02 | Metrocall | Balance sheet as of March 31, 2002.  Total assets of $189.3m, total liabilities of $937.0m, and shareholders' deficit of $821.3m. |
| 05/20/02 | Williams Communications | Balance sheet information dated October 15, 2002 and included in the disclosure statement as part of the liquidation analysis. |
| 05/09/02 | PSINet | Balance sheet as of December 31, 2001.  Recovery value averages high and low ranges. |
| 03/13/02 | Arch Wireless | Balance sheet as of December 31, 2001.  Total assets of $599.1m, total liabilities of $1,855.5m, and shareholders' deficit of $1,396.9m. |
| 02/28/02 | Viatel | Balance sheet dated May 31, 2002 and included in the disclosure statement.  Estimated claims also as of May 31, 2002. |
| 02/26/02 | McLeod USA | Balance sheet information as of December 31, 2001 and included in the disclosure statement as part of the liquidation analysis.  Recovery value averages high and low ranges. |
| 12/19/01 | ICG Communications | Balance sheet dated December 31, 2001 and included in the disclosure statement.  Total assets of $785.0m, total liabilities of $2,877.2m, and shareholders' deficit of $3,458.8m.  Recovery value averages high and low ranges. |
| 08/27/01 | Covad Communications | Balance sheet as of June 30, 2001.  Liquidation analysis as of August 15, 2001. |

19 |  LAZARD

PRELIMINARY DRAFT – PREPARED AT THE
REQUEST OF COUNSEL

# Exhibit K

# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

# FORM 8-K

### Current Report

Pursuant to Section 13 or 15(d) of
The Securities Exchange Act of 1934

Date of Report (date of earliest event reported) October 25, 2002

# ADELPHIA COMMUNICATIONS CORPORATION

**(Exact name of registrant as specified in its charter)**

| **Delaware** | **0-16014** | **23-2417713** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| **One North Main Street—Coudersport, PA** | **16915-1141** |
|---|---|
| (Address of principal executive offices) | (Zip code) |

(814) 274-9830

(Registrant's telephone number, including area code)

The following is a summary of customer information and includes all Subscribers and customers in subsidiaries that are consolidated for financial reporting purposes. The summary does not include any Subscribers and/or customers in the Company's Brazilian and Venezuelan joint ventures.

| | December 31, 2001 | March 31, 2002 | June 30, 2002 | September 30, 2002 |
|---|---|---|---|---|
| **Customer Data** | | | | |
| Basic Subscriber Customers[1] | 5,782,899 | 5,859,929 | 5,845,850 | 5,775,356 |
| EBU at Prevailing Rates[2] | 5,397,155 | 5,454,116 | 5,451,731 | 5,377,026 |
| Revenue Generating Units | | | | |
| Basic Subscriber Customers | 5,782,899 | 5,859,929 | 5,845,850 | 5,775,356 |
| Additional Services[3] | 1,636,600 | 1,898,673 | 2,121,201 | 2,244,351 |
| Total Revenue Generating Units[4] | 7,419,499 | 7,758,602 | 7,967,051 | 8,019,707 |
| Customer Relationships | | | | |
| Basic Subscriber Customers | | | | 5,775,356 |
| Non-Video Customers[5] | | | | 52,428 |
| Total Customer Relationships[6] | | | | 5,827,784 |
| **Digital Cable** | | | | |
| Digital Cable Customers | 1,332,517 | 1,503,608 | 1,633,230 | 1,694,003 |
| Additional Digital Converter Boxes[7] | 550,385 | 653,761 | 710,941 | 731,567 |
| Total | 1,882,904 | 2,157,369 | 2,344,171 | 2,425,570 |
| **High Speed Internet Access** | | | | |
| High Speed Internet Access Customers | 304,083 | 395,065 | 487,971 | 550,348 |
| Additional Cable Modems[8] | 2,529 | 3,717 | 4,480 | 5,167 |
| Total | 306,612 | 398,782 | 492,451 | 555,515 |
| **Bundled Service Customers[9]** | | | | |
| Customers subscribing to the Company's *Advantage* Package | | | | 244,509 |

[1] "Basic Subscriber Customers" shall mean both (i) Subscribers who receive cable television directly and (ii) those Subscribers under a bulk billing arrangement, who generally pay discounted rates. For Subscribers under bulk billing arrangements, Adelphia Communications Corporation (the "Company") does not have a means of directly measuring bulk billing customers, except in the state of Florida, which represents a majority of the Company's bulk billing revenue. Assuming that bulk billing Subscribers outside of Florida have the same average billing rate as the bulk billing Subscribers in Florida, the total number of bulk billing Subscriber Customers at December 31, 2001, March 31, 2002, June 30, 2002 and September 30, 2002 would be 662,104, 677,648, 666,995 and 680,199, respectively. Basic Subscriber Customers is a measurement standard used by current management for business operations.

[2] "EBU at Prevailing Rates" shall mean the number of equivalent billing units ("EBU") at prevailing rates and the number of Subscribers who receive cable television directly. EBU is calculated by reducing the Basic Subscriber Customers billed under a bulk billing arrangement to the equivalent number of Subscribers who receive cable television at the prevailing rate in each franchise area. The number of EBU is then added to the number of Subscribers who receive cable television directly to arrive at the EBU at Prevailing Rates.

3    "Additional Services" shall mean the number of customers having one or more digital converter boxes ("Digital Cable Customers") and the number of customers that receive the Company's *Power Link* high-speed Internet access service having one or more cable modems (the "High Speed Internet Access Customers").

4    "Total Revenue Generating Units" shall mean the sum total of all primary analog video, digital video and high-speed Internet access customers presented in accordance with the National Cable and Telecommunications Association ("*NCTA*") reporting standards. Additional outlets are not counted.

5    "Non-Video Customers" shall mean the estimated number of customers that receive only the Company's *Power Link* high-speed internet access service and do not subscribe to the Company's video services. The Company's current system does not allow for the retrieval of Non-Video Customers prior to September 30, 2002. The Company will be providing this information on a prospective basis.

6    "Total Customer Relationships" shall mean the number of customers who receive at least one level of service from the Company presented in accordance with the NCTA reporting standards.

7    "Additional Digital Converter Boxes" shall mean the number of additional digital converter boxes in households of Digital Cable Customers who have more than one digital converter box. Customers who have more than one digital converter box generally pay a monthly fee of $6.95 per Additional Digital Converter Box.

8    "Additional Cable Modems" shall mean the number of additional cable modems in households of High Speed Internet Access Customers who have more than one cable modem. Customers having more than one cable modem generally pay an average monthly fee of $32.45 per Additional Cable Modem.

9    "Bundled Service Customers" shall mean those customers who have subscribed to the Company's *Advantage* package that includes a combination of basic, digital and high speed Internet access services. The Company's current system does not allow for the retrieval of Bundled Service Customers prior to September 30, 2002. The Company will be providing this information on a prospective basis.

*Limitation on Incorporation by Reference*

In accordance with general instruction B.2 of Form 8-K, the information in this report (including exhibits) is furnished pursuant to Item 9 and shall not be deemed to be "filed" for the purposes of Section 18 of the Exchange Act, as amended or otherwise subject to liabilities of that section. This report will not be deemed an admission as to the materiality of any information in the report that is required to be disclosed solely by Regulation FD.

*Cautionary Statement Regarding Financial and Operating Data*

As a result of actions taken by the former management of the Company: (a) the Company has not yet completed its financial statements as of or for the year ended December 31, 2001, or received its independent public accountants' report thereon or filed with the Securities and Exchange Commission (the "*Commission*") its Annual Report on Form 10-K for the year ended December 31, 2001, (b) the Company's former independent public accountants, Deloitte & Touche LLP, suspended their auditing work on the Company's financial statements as of and for the year ended December 31, 2001 and withdrew their audit report with respect to the year ended December 31, 2000; (c) the Company has not yet completed its financial statements as of and for the three months ended March 31, 2002 or June 30, 2002, or filed with the Commission its Quarterly Report on Form 10-Q for the quarters ended March 31, 2002, June 30, 2002 and does not expect to file its Quarterly Report on Form 10-Q for the quarter ending September 30, 2002; and (d) the Company expects to restate its financial statements for the years ended December 31, 1999 and 2000, and its interim financial statements for 2001 and possibly other periods. Current management took control in May 2002 and has retained new independent auditors and begun the

# Exhibit L

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549


FORM 8-K


Current Report


Pursuant to Section 13 or 15(d) of
The Securities Exchange Act of 1934


Date of Report (date of earliest event reported) June 10, 2002


ADELPHIA COMMUNICATIONS CORPORATION
(Exact name of registrant as specified in its charter)


| Delaware | 0-16014 | 23-2417713 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |


One North Main Street - Coudersport, PA 16915-1141
(Address of principal executive offices) (Zip Code)


Registrant's telephone number, including area code (814) 274-9830

5.  INACCURACIES IN PREVIOUSLY REPORTED DATA

    SUBSCRIBER DATA.

    The Company stated on March 27, 2002 that its cable systems had
5,810,253 "basic cable subscribers" as of December 31, 2001. Current management
has recalculated the number of Subscribers and concluded that its best estimate
of the number of Subscribers at December 31, 2001 is 5,763,000, determined as
follows:

    The Company has both Subscribers who are billed directly and
Subscribers who receive cable television service under a bulk billing
arrangement, which is generally discounted. The number of Subscribers who were
billed directly at December 31, 2001 was 5,118,000. The Company does not have
statistics on the number of bulk billing Subscribers, except in Florida which
had 357,000 bulk Subscribers at that date. Assuming that bulk-billing
Subscribers outside Florida have the same average billing rate as bulk billing
Subscribers in Florida, the total number of bulk billing Subscribers at December
31, 2001 would be 645,000, and the total number of Subscribers overall would be
5,763,000.

    The foregoing figures include Subscribers in joint ventures that are
included in the Company's consolidated financial statements, but does not
include any Subscribers in the Company's Brazilian joint ventures.

    OTHER DATA.

    Current management believes that the public information provided by
prior management on other matters of interest to investors, such as the
Company's rebuild percentage (the percentage of the Company's cable television
systems that the Company believes have been upgraded to current standards), was
unreliable, and the Company intends to correct the information, where material,
as current management develops information it considers reliable.

                                    *****

    CERTAIN STATEMENTS IN THIS FORM 8-K ARE FORWARD-LOOKING STATEMENTS
THAT ARE SUBJECT TO MATERIAL RISKS AND UNCERTAINTIES. INVESTORS ARE CAUTIONED
THAT ANY SUCH FORWARD-LOOKING STATEMENTS ARE NOT GUARANTEES OF FUTURE
PERFORMANCE OR RESULTS AND INVOLVE RISKS AND UNCERTAINTIES, AND THAT ACTUAL
RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THOSE EXPRESSED OR IMPLIED IN
THE FORWARD-LOOKING STATEMENTS AS A RESULT OF VARIOUS FACTORS WHICH ARE
DISCUSSED IN THIS FORM 8-K AND THE COMPANY'S OTHER FILINGS WITH THE SECURITIES
AND EXCHANGE COMMISSION. THESE RISKS AND UNCERTAINTIES INCLUDE, BUT ARE NOT
LIMITED TO, UNCERTAINTIES RELATING TO GENERAL ECONOMIC AND BUSINESS CONDITIONS,
ACQUISITIONS AND DIVESTITURES, THE AVAILABILITY AND COST OF CAPITAL, GOVERNMENT
AND REGULATORY POLICIES, THE PRICING AND AVAILABILITY OF EQUIPMENT, MATERIALS,
INVENTORIES AND PROGRAMMING, PRODUCT ACCEPTANCE AND CUSTOMER SPENDING PATTERNS,
THE COMPANY'S ABILITY TO EXECUTE ON ITS BUSINESS PLANS AND TO CONSTRUCT, EXPAND
AND UPGRADE ITS NETWORKS, RISKS ASSOCIATED WITH RELIANCE ON THE PERFORMANCE AND
FINANCIAL CONDITION OF VENDORS AND CUSTOMERS, TECHNOLOGICAL DEVELOPMENTS,
CHANGES IN THE COMPETITIVE ENVIRONMENT IN WHICH THE COMPANY OPERATES, AND
MATTERS RELATING TO OR IN CONNECTION WITH THE RECENT BANKRUPTCY FILINGS AND
PROCEEDINGS OF ABIZ. THESE RISKS AND UNCERTAINTIES ALSO INCLUDE MATTERS ARISING
OUT OF THE COMPANY'S DELAY IN FILING WITH THE SECURITIES AND EXCHANGE COMMISSION
ITS FORM 10-K FOR THE YEAR ENDED DECEMBER 31, 2001 AND ITS FORM 10-Q FOR THE
QUARTER ENDED MARCH 31, 2002, LIQUIDITY SHORT FALLS ARISING OUT OF DEFAULTS
UNDER LOAN AGREEMENTS AND INDENTURES, THE ANNOUNCED DELISTING OF THE COMPANY'S
COMMON STOCK BY NASDAQ, PENDING DERIVATIVE AND CLASS ACTION LAWSUITS, AND
MATTERS ARISING OUT OF THE PENDING INTERNAL INVESTIGATION BY THE SPECIAL
COMMITTEE. ADDITIONAL INFORMATION REGARDING RISKS, UNCERTAINTIES AND OTHER
FACTORS THAT MAY AFFECT THE BUSINESS AND FINANCIAL RESULTS OF THE COMPANY CAN BE
FOUND IN THE COMPANY'S FILINGS WITH THE SECURITIES AND EXCHANGE COMMISSION,