# Exhibit M

# NEW YORK UNIVERSITY
# LAW REVIEW

| VOLUME 82 | MAY 2007 | NUMBER 2 |

# ARTICLES

## COMPELLED COOPERATION AND THE NEW CORPORATE CRIMINAL PROCEDURE

### LISA KERN GRIFFIN*

*In response to the broad scope of the Enron-era frauds, the federal government has adopted novel strategies to investigate and prosecute corporate crimes. This Article examines the use of stringent cooperation requirements and deferred prosecution agreements, pursuant to which corporate internal investigations have become extensions of government enforcement efforts. At the same time, liability has shifted markedly to the employee level: Over one thousand individuals have been indicted and convicted since the July 2002 creation of the Corporate Fraud Task Force, while few corporations have been charged. The convergence of corporate cooperation doctrine with the focus on individual targets results in significant unfairness for employees who are compelled to incriminate themselves in the context of internal investigations that are directed by the government. Because of the awkward partnering of public governmental investigations with private corporate compliance efforts, that normative burden on employees may not be offset by enforcement benefits. This Article suggests that the government's application of a civil regulatory model to criminal cases creates distortions because individual liberty rather than a financial sanction is at stake, because prosecutors do not engage in negotiated governance, and because judicial oversight at the investigative stage is minimal. This Article also addresses the constitutional implications of outsourcing corporate criminal investigations and argues that employees interviewed by internal investigators pursuant to the terms of a pending deferred prosecution agreement should enjoy immunity analogous to the Garrity shield that protects public employees. Several strands of Fifth Amendment theory are consistent with the argument that economic pressure, such as the threat of job loss, can rise to the level of constitutionally significant coercion. When that pressure is brought to bear pursuant to a*

* Copyright © 2007 by Lisa Kern Griffin. Lecturer in Law, UCLA School of Law. My thanks to Jennifer Arlen, David Dolinko, Jody Freeman, Máximo Langer, David Sklansky, Kathleen Sullivan, Robert Weisberg, Adam Winkler, and Steve Yeazell for advice and comments, and to the staff at the Hugh & Hazel Darling Law Library at the UCLA School of Law for research assistance.

311

Reprinted With The Permission of New York University School of Law

*deferred prosecution agreement, it is delegated coercion, but may be attributed to the government as state action.*

INTRODUCTION .............................................. 312
  I.   THE NEW CORPORATE CRIMINAL PROCEDURE ......... 313
       A. *The Culture of the War on Corporate Crime* ........ 314
       B. *Existing Compliance Obligations: Of Carrots and Sticks* ................................................ 316
       C. *The Thompson Memorandum: Mostly Sticks* ....... 318
       D. *Deferred Prosecution Agreements* ................... 321
       E. *Executive Arrogance in the Enron Era* .............. 326
  II.  THE SHIFT TO INDIVIDUAL CULPABILITY ............... 329
       A. *Focus on Employee Targets* ........................ 329
       B. *Inverted Entity Liability* ............................ 332
       C. *Individual Exposure and Unintended Consequences* ....................................... 333
  III. THE SOLUTION IS ALSO THE PROBLEM ................ 340
       A. *Problematizing the Private Enforcement Analogy* ... 342
       B. *Infringing on the Private Attorney-Client Relationship* ........................................ 347
  IV.  THE CONSTITUTIONAL IMPLICATIONS OF COMMANDEERING INTERNAL INVESTIGATORS .......... 352
       A. *Importing* Garrity *Immunity* ....................... 353
       B. *Delegated Coercion* ............................... 358
       C. *Accountable State Action* .......................... 365
       D. *Strategic State Action* .............................. 371
       E. *The Compliance-Enhancing Function of Excluding Coerced Statements* ............................... 374
CONCLUSION ................................................ 378

## INTRODUCTION

In response to the broad scope of the Enron-era frauds, the federal government has adopted novel strategies to manage the complexity of corporate criminal investigations. Chief among these innovations are the cooperation requirements set forth in the Department of Justice's (DOJ) Thompson Memorandum (along with its successor, the McNulty Memorandum) and the increased use of deferred prosecution agreements (DPAs) between prosecutors and corporations. Under its current practices, the federal government has deferred or declined to bring charges against firms themselves and has shifted liability to the employee level, indicting and convicting over one thousand individuals since the July 2002 creation of the Corporate Fraud Task Force. This Article explores a gap in the constitutional

Reprinted With The Permission of New York University School of Law

protections afforded those individual defendants. Prosecutors' dependence on compelled cooperation is expedient but has unexamined consequences: a bypass around corporate employees' Fifth Amendment privilege against self-incrimination and the potential to degrade self-regulation. These costs arise, in part, from the merger of public governmental investigations and private corporate compliance efforts.

Part I details the policies and practices of the "war on corporate crime," with a particular focus on the factors set forth in the Thompson and McNulty Memoranda and the terms of current DPAs. Part II discusses how the convergence of cooperation doctrine with the shift to individual targets results in significant unfairness for the individual employees compelled to incriminate themselves in the context of internal investigations directed by the government. That normative burden may not be offset by enforcement benefits. Although effective corporate crime prevention often requires the cooperation of insiders, the means used to obtain that cooperation may actually increase the difficulty of detecting fraud by discouraging oversight and minimizing recordkeeping. Part III argues that the government's pursuit of DPAs and application of a civil regulatory model to criminal enforcement creates distortions because individual liberty rather than a financial sanction is at stake, because prosecutors do not engage in negotiated governance, and because judicial oversight at the investigative stage is minimal.

Part IV addresses the constitutional implications of outsourcing corporate criminal investigations. Employees interviewed by internal investigators pursuant to the terms of a pending DPA should enjoy immunity analogous to the *Garrity* shield that protects public employees. Several strands of Fifth Amendment theory are consistent with the argument that economic pressure, such as the threat of job loss, can rise to the level of constitutionally significant coercion. When a DPA is pending, that pressure, even though delegated to corporations to apply, may be attributed to the government as state action. As a practical matter, extending immunity may also enhance compliance investigations by privileging truthful information and the interests of good-faith employees.

# I
## THE NEW CORPORATE CRIMINAL PROCEDURE

This Part outlines the development of the government's[1] current campaign against corporate crime and the structural and strategic

---

[1] References to "the government" throughout this Article generally concern federal prosecutors. My focus here is on Department of Justice (DOJ) policies and practices and

Reprinted With The Permission of New York University School of Law

innovations adopted to prosecute it. The Corporate Fraud Task Force was created by executive order in July 2002,[2] in response to political pressure to take action against corporate scandals—such as Enron's December 2001 bankruptcy and WorldCom's $3.8 billion accounting restatement in June 2002[3]—and to mitigate the effect of such scandals on investor confidence in a market already stressed by the events of September 11, 2001. The Task Force's initial stated mission was to "strengthen the efforts of the Department of Justice and Federal, State, and local agencies to investigate and prosecute significant financial crimes, recover the proceeds of such crimes, and ensure just and effective punishment of those who perpetrate financial crimes."[4] The rhetoric soon escalated, however, to a declaration of "war" on corporate crime,[5] an early sign that the Task Force's adversarial orientation would not harmonize with the cooperative nature of civil regulatory partnerships.

## A.   The Culture of the War on Corporate Crime

Cycles of scandal and reform have been the norm in corporate enforcement. The 1970s and early 1980s featured control strategies that criminalized corporate behavior.[6] The pendulum swung back in

---

recent federal prosecutions. Other executive branch authorities, of course, play a substantial role in corporate fraud prevention. The SEC pursues about five hundred civil actions a year, William R. McLucas et al., *An Overview of SEC Enforcement, Remedial, and Settlement Powers Before and After the Sarbanes-Oxley Act*, *in* 35TH ANNUAL INSTITUTE ON SECURITIES REGULATION 1111, 1113 (PLI Corp. Law & Practice, Course Handbook Series No. B-1396, 2003), and can call in both state and federal prosecutors through its Enforcement Division. Active state attorneys general (in New York, for example), and self-regulatory organizations like the New York Stock Exchange, also play enforcement roles. *See id.* at 1113–14 (discussing federal and state authorities other than DOJ that have focused on corporate fraud).

[2] Exec. Order No. 13,271, 67 Fed. Reg. 46,091 (July 9, 2002).

[3] *See* Dale A. Oesterle, *Early Observations on the Prosecutions of the Business Scandals of 2002–2003: On Sideshow Prosecutions, Spitzer's Clash with Donaldson Over Turf, the Choice of Civil or Criminal Actions, and the Tough Tactic of Coerced Cooperation*, 1 OHIO ST. J. CRIM. L. 443, 443 (2004) (describing magnitude of corporate scandals that were revealed in 2002).

[4] Press Release, White House, Executive Order Establishment of the Corporate Fraud Task Force (July 9, 2002), *available at* http://www.whitehouse.gov/news/releases/2002/07/20 020709-2.html.

[5] *See, e.g.*, Edward Iwata, *Enron Task Force Faces Big Pressure to Deliver: Some Say Squad Is Moving Too Slowly, but Case Is Huge*, USA TODAY, Aug. 21, 2002, at B1 (early reference to "Bush administration's war on corporate crime").

[6] *See* JAMES GOBERT & MAURICE PUNCH, RETHINKING CORPORATE CRIME 309–10 (2003) (discussing increased enforcement role of SEC in response to financial scandals of 1970s and insider trading of 1980s). There are, in fact, interesting parallels between the current climate and the early 1980s, when a "pro-business administration was forced by events, public opinion and political self-interest to respond to major financial scandals." *Id.* at 309.

Reprinted With The Permission of New York University School of Law

Statements received under these circumstances are obtained through state action. By commanding a particular action, even if that action is taken entirely by a private party, the government "put[s] its own weight on the side of the proposed practice"[316] and removes it from the sphere of "private initiative."[317] The line is drawn between government "acquiescence" (or inaction)[318] and government "commandment,"[319] and cooperation requirements under DPAs fall on the latter side of the line.

## D.   Strategic State Action

Pressure on employees, via DPAs, stands alone as a constitutional problem, but it is brought into sharper relief by the government's treatment of employee statements as obstruction. Recognizing state action in internal investigations pursuant to DPAs makes sense not only in light of the case law but also in light of the inconsistencies in the government's position. The government argues that employers are "acting alone" when they obtain true and incriminating statements, but it also claims that government agents are functionally in the room whenever employees make false statements.

Recent prosecutions of minimizing or self-preserving statements made to nongovernmental parties rest on a novel theory of obstruction. In a case involving false reporting of market information by Greg Singleton, a gas trader employed by El Paso Merchant Energy, the government added obstruction charges arising from statements that Singleton made solely to an outside law firm retained by his employer.[320] According to the indictment, Singleton "did not disclose" to outside counsel, "falsely denied," and "otherwise concealed" the fact that employees had provided false information to trade publi-

---

action doctrine to argue that interviews by internal investigators, effectively deputized by the government and entirely within its control, do not require basic Fifth Amendment protections.

[316] Jackson v. Metro. Edison Co., 419 U.S. 345, 357 (1974); *see also* Peterson v. City of Greenville, 373 U.S. 244, 248 (1963) ("When the State has commanded a particular result, it . . . has removed that decision from the sphere of private choice.").

[317] *Skinner*, 489 U.S. at 615.

[318] *See, e.g.*, Flagg Bros. v. Brooks, 436 U.S. 149, 164–66 (1978) (finding that warehouseman's sale of goods to collect unpaid storage fees, pursuant to New York's Uniform Commercial Code, did not constitute state action because statute permitted, but did not require, remedy).

[319] *See* Stone & Perino, *supra* note 286, at 471 (discussing "distinction between [government] acquiescence and commandment").

[320] Superseding Indictment at 16–21, United States v. Singleton, Crim. No. H-06-080, 2006 WL 1984467 (S.D. Tex. July 14, 2006); *see also* Harkness & LaVerne, *supra* note 186 ("Recent developments confirm that the U.S. Department of Justice views the obstruction of justice laws as reaching conduct that many had considered to be without criminal consequence.").

Reprinted With The Permission of New York University School of Law

cations.[321] There was no allegation that Singleton made misstatements directly to the government; it was a case of exclusively "private" lies.[322]

The Computer Associates investigation provides another example of charges based upon alleged misrepresentations to internal investigators. CEO Sanjay Kumar pled guilty in April 2006 to eight counts of securities fraud and obstruction of justice.[323] The latter charges arose from false statements about accounting fraud to the auditors and attorneys Kumar himself had hired.[324] The government brought the charges on the theory that, in lying to the company's outside counsel, Kumar had misled federal prosecutors because the results of the internal investigation were passed on to the government during subsequent cooperation efforts.[325] The government learned of the earlier statements only because the company agreed to a broad waiver of its privilege and turned over all materials relevant to its previous compliance investigation. The indictment effectively alleged that, because the law firm was retained in part to facilitate cooperation with the government, false justifications provided to attorneys were "intended" to be presented to the government.[326] The government also charged obstruction on the basis of Kumar's failure to make disclosures to outside counsel; in other words, incomplete cooperation is itself obstructive.[327] The cases against Kumar and codefendant

---

[321] Superseding Indictment, *supra* note 320, at 20. The indictment alleges that the attorneys who met with Singleton told him that his comments could be disclosed to "third parties, including government agencies," *id.*, and consequently that statements he made to those attorneys were tantamount to intentional obstruction. *Id.* at 21. The indictment does not, however, allege that Singleton "intended" or "knew" that his statements would be supplied to government investigators, only that he "believed" they would be. Harkness & LaVerne, *supra* note 186. The Supreme Court, however, has rejected the related argument that a defendant who lied to a federal agent functionally lied to the grand jury simply because the defendant knew of the pending investigation. United States v. Aguilar, 515 U.S. 593, 601 (1995) ("[W]hat use will be made of false testimony given to an investigating agent who has not been subpoenaed or otherwise directed to appear before the grand jury is . . . speculative [and] . . . cannot be said to have the 'natural and probable effect' of interfering with the due administration of justice.").

[322] Harkness & LaVerne, *supra* note 186. Singleton was convicted of one count of wire fraud, but the jury deadlocked or found him not guilty on the false reporting and obstruction charges. John C. Roper, *Verdict, Deadlock in Gas Trading Case*, Hous. Chron., Aug. 4, 2006, at 3.

[323] Alex Berenson, *Software Chief Admits to Guilt in Fraud Case*, N.Y. Times, Apr. 25, 2006, at A1.

[324] *Id.*

[325] *See id.* (describing Kumar's indictment for lying to lawyers and internal investigators); Alex Berenson, *Case Expands Type of Lies Prosecutors Will Pursue*, N.Y. Times, May 17, 2004, at C1 (describing plea agreements of three Computer Associates executives indicted for lying to internal investigators).

[326] Superseding Indictment, *supra* note 63, at 23, 28.

[327] *See id.* at 22–23, 27.

Reprinted With The Permission of New York University School of Law

Stephen Richards, former head of worldwide sales at Computer Associates, gathered force from the guilty pleas of three other Computer Associates executives.[328] Each of those defendants was convicted of obstruction of justice for statements made to company counsel in the course of the internal investigation, and not one of the indictments included allegations that they directly misled the government or the grand jury.[329] They were convicted of lying to prosecutors without ever talking to them.[330] Computer Associates General Counsel Stephen Woghin was also indicted for "proxy obstruction": statements professing innocence made in a press release and false justifications made to inside auditors.[331]

The earlier prosecution of three former executives of the Rite Aid Corporation likewise illustrates the government's willingness to charge obstruction on the basis of statements made to internal investigators or material information that is withheld from them. Defendants Martin Grass and Eric Sorkin pled guilty to, among other things, obstruction of justice, and defendant Franklin Brown was convicted at trial of conspiracy to obstruct justice, largely as a result of interactions with internal investigators retained by Rite Aid.[332]

These prosecutions of false and incomplete statements to corporate counsel and auditors necessitate the finding of an official, public dimension to the interactions, that is, of some intent to impede a government investigation or proceeding.[333] The government thus stands

---

[328] Kumar and Richards initially challenged the indictment, but the district court denied their motion to dismiss the obstruction counts. Memorandum and Order, United States v. Kumar, CR No. 04-846 (E.D.N.Y. Feb. 21, 2006). In doing so, the court rejected the defendant's argument that statements made to counsel employed by them to represent the company in connection with the government's ongoing DOJ and SEC investigations had an "insufficient nexus" with the judicial proceedings. *Id.* at 8–9.

[329] *See* Information at 8–10, 12–14, United States v. Kaplan, CR No. 04-330 (E.D.N.Y. Apr. 8, 2004), *available at* http://www.usdoj.gov/dag/cftf/chargingdocs/kaplaninfo.pdf; Information at 8–10, 13–14, United States v. Rivard, CR No. 04-329 (E.D.N.Y. Apr. 8, 2004), *available at* http://www.usdoj.gov/dag/cftf/chargingdocs/rivardinfo.pdf; Information at 9–13, 16–17, United States v. Zar, CR No. 04-331 (E.D.N.Y. Apr. 8, 2004) [hereinafter *Zar* Information], *available at* http://www.usdoj.gov/dag/cftf/chargingdocs/zarinfo.pdf. For a brief summary of the indictments, see Berenson, *supra* note 325.

[330] In the case of Computer Associates CFO Ira Zar, the government alleged that he had armed outside counsel with "false justifications the purpose of which was to counter or explain away evidence of the 35-day month practice." *Zar* Information, *supra* note 329, at 10.

[331] Information, *supra* note 121, at 8–9.

[332] *See* Indictment at 76–80, United States v. Grass, No. 1:02-CR-00146 (M.D. Pa. June 21, 2002), *available at* www.usdoj.gov/dag/cftf/chargingdocs/grassetalind.pdf (detailing charges against Grass, Sorkin, and Brown).

[333] *See* 18 U.S.C. § 1512(c)(2) (Supp. IV 2004) (imposing sanction on anyone who "obstructs, influences, or impedes any *official proceeding*, or attempts to do so" (emphasis added)). The false statement provision also requires that the information concern a matter

Reprinted With The Permission of New York University School of Law

in the shoes of internal investigators for strategic state action purposes only: It lays claim to the questions if the answers are obstructive but denies any responsibility if an employee confesses truthfully and under duress. There is, if anything, a more compelling case for perceiving the government's weight on the scales in the coercive environment of corporate cooperation than there is for recognizing obstruction by proxy in cases of organic false statements that may be morally blameless.[334]

The larger questions raised by derivative obstruction offenses merit further exploration; I have touched on them briefly to highlight both the significance of the statements that employees may be compelled to make in internal investigations and the incoherence of declining to apply constitutional protections on state action grounds. Because this is the current charging paradigm, because the government claims to be interchangeable with corporate investigators for purposes of imposing liability for falsehoods, and because prosecutors prosecute the false denials, minimizing responses, and "failures to report" that arise from internal investigations, the government should also accord the subjects of those investigations constitutional protections. Extending immunity, moreover, would lead to fewer false statements, and the obstruction that does take place would be a more considered act of will, and therefore a more justifiable basis for punishment.

### E. The Compliance-Enhancing Function of Excluding Coerced Statements

Applying *Garrity* protections in the context of employee statements compelled by an existing DPA would mean excluding those statements and their fruits in subsequent individual prosecutions. Such immunity would preclude a shortcut that prosecutors currently

---

"within the jurisdiction . . . of the United States." 18 U.S.C. § 1001 (2000); *see also* United States v. Facchini, 874 F.2d 638, 641 (9th Cir. 1989) (defining "jurisdiction" in § 1001 as "a direct relationship [that] obtains between the false statement and an authorized function of a federal agency or department").

[334] *See, e.g.,* John Shepard Wiley Jr., *Not Guilty by Reason of Blamelessness: Culpability in Federal Criminal Interpretation,* 85 VA. L. REV. 1021, 1035–56, 1155–61 (1999) (positing "mandatory culpability" rule of statutory interpretation that would require government to prove "moral culpability" in cases where criminal statute "might reach conduct that is not inevitably nefarious" and applying rule to cases concerning prosecutions of false statements (citation omitted)); Stuntz, *supra* note 260, at 1242–61 (arguing that self-preserving lies used to avoid more serious consequences are excusable and do not merit punishment). *But see* Seidmann & Stein, *supra* note 222, at 453 n.79 ("[W]e do not see a good reason for excusing suspects' and defendants' perjury. . . . [S]uch lies harm not only 'the system,' but also innocent suspects. . . . [because they] enable the guilty to pool with the innocent.").

# Exhibit N



## MEMORANDUM

**TO:**     All Component Heads and United States Attorneys

**FROM:**    THE DEPUTY ATTORNEY GENERAL

**SUBJECT:**  Bringing Criminal Charges Against Corporations

More and more often, federal prosecutors are faced with criminal conduct committed by or on behalf of corporations. The Department is committed to prosecuting both the culpable individuals and, when appropriate, the corporation on whose behalf they acted.

The attached document, *Federal Prosecution of Corporations*, provides guidance as to what factors should generally inform a prosecutor in making the decision whether to charge a corporation in a particular case. I believe these factors provide a useful framework in which prosecutors can analyze their cases and provide a common vocabulary for them to discuss their decision with fellow prosecutors, supervisors, and defense counsel. These factors are, however, not outcome-determinative and are only guidelines. Federal prosecutors are not required to reference these factors in a particular case, nor are they required to document the weight they accorded specific factors in reaching their decision.

The factors and the commentary were developed through the hard work of an *ad hoc* working group coordinated by the Fraud Section of the Criminal Division and made up of representatives of United States Attorneys' Offices, the Executive Office of United States Attorneys, and Divisions of the Department with criminal law enforcement responsibilities. Experience with these guidelines may lead to changes or adjustments in the text and commentary. Therefore, please forward any comments about the guidelines, as well as instances in which the factors proved useful or not useful in specific cases to Shirah Neiman, Deputy United States Attorney, Southern District of New York, and Philip Urofsky, Trial Attorney, Fraud Section, Criminal Division. I look forward to hearing comments from the field as to the application of these factors in practice.

Encl.


# Federal Prosecution of Corporations

## I.    Charging Corporations: General

    A.   *General Principle*: Corporations should not be treated leniently because of their artificial nature nor should they be subject to harsher treatment. Vigorous enforcement of the criminal laws against corporate wrongdoers, where appropriate, results in great benefits for law

enforcement and the public, particularly in the area of white collar crime. Indicting corporations for wrongdoing enables the government to address and be a force for positive change of corporate culture, alter corporate behavior, and prevent, discover, and punish white collar crime.

B. *Comment*: In all cases involving corporate wrongdoing, prosecutors should consider the factors discussed herein. First and foremost, prosecutors should be aware of the important public benefits that may flow from indicting a corporation in appropriate cases. For instance, corporations are likely to take immediate remedial steps when one is indicted for criminal conduct that is pervasive throughout a particular industry, and thus an indictment often provides a unique opportunity for deterrence on a massive scale. In addition, a corporate indictment may result in specific deterrence by changing the culture of the indicted corporation and the behavior of its employees. Finally, certain crimes that carry with them a substantial risk of great public harm,*e.g.*, environmental crimes or financial frauds, are by their nature most likely to be committed by businesses, and there may, therefore, be a substantial federal interest in indicting the corporation.

Charging a corporation, however, does not mean that individual directors, officers, employees, or shareholders should not also be charged. Prosecution of a corporation is not a substitute for the prosecution of criminally culpable individuals within or without the corporation. Further, imposition of individual criminal liability on such individuals provides a strong deterrent against future corporate wrongdoing.

Corporations are "legal persons," capable of suing and being sued, and capable of committing crimes. Under the doctrine of *respondeat superior*, a corporation may be held criminally liable for the illegal acts of its directors, officers, employees, and agents. To be held liable for these actions, the government must establish that the corporate agent's actions (i) were within the scope of his duties and (ii) were intended, at least in part, to benefit the corporation. In all cases involving wrongdoing by corporate agents, prosecutors should consider the corporation, as well as the responsible individuals, as potential criminal targets.

Agents, however, may act for mixed reasons -- both for self-aggrandizement (both direct and indirect) and for the benefit of the corporation, and a corporation may be held liable as long as one motivation of its agent is to benefit the corporation. Thus, in *United States v. Automated Medical Laboratories*, 770 F.2d 399 (4th Cir. 1985), the court affirmed the corporation's conviction for the actions of a subsidiary's employee despite its claim that the employee was acting for his own benefit, namely his "ambitious nature and his desire to ascend the corporate ladder." The court stated, "Partucci was clearly acting in part to benefit AML since his advancement within the corporation depended on AML's well-being and its lack of difficulties with the FDA." Similarly, in *United States v. Cincotta*, 689 F.2d 238, 241-42 (1st Cir. 1982), the court held, "criminal liability may be imposed on the corporation only where the agent is acting within the scope of his employment. That, in turn, requires that the agent be performing acts of the kind which he is authorized to perform, and those acts must be motivated -- at least in part -- by an intent to benefit the corporation." Applying this test, the court upheld the corporation's conviction, notwithstanding the substantial personal benefit reaped by its miscreant agents, because the fraudulent scheme required money to pass through the corporation's treasury and the fraudulently obtained goods were resold to the corporation's customers in the corporation's name. As the court concluded, "Mystic--not the individual defendants--was making money by selling oil that it had not paid

for."

Moreover, the corporation need not even necessarily profit from its agent's actions for it to be held liable. In *Automated Medical Laboratories*, the Fourth Circuit stated:

> [B]enefit is not a "touchstone of criminal corporate liability; benefit at best is an evidential, not an operative, fact." Thus, whether the agent's actions ultimately redounded to the benefit of the corporation is less significant than whether the agent acted with the intent to benefit the corporation. The basic purpose of requiring that an agent have acted with the intent to benefit the corporation, however, is to insulate the corporation from criminal liability for actions of its agents which be inimical to the interests of the corporation or which may have been undertaken *solely* to advance the interests of that agent or of a party other than the corporation.

*Id.* at 407 (emphasis added; quoting *Old Monastery Co. v. United States*, 147 F.2d 905, 908 (4th Cir.), *cert. denied*, 326 U.S. 734 (1945)).


## II.    Charging Corporations -- Factors to Be Considered

A.    *General Principle*: Generally, prosecutors should apply the same factors in determining whether to charge a corporation as they do with respect to individuals. *See* U.S.A.M. § 9-27.220, *et seq*. Thus, the prosecutor should weigh all of the factors normally considered in the sound exercise of prosecutorial judgment: the sufficiency of the evidence, the likelihood of success at trial, the probable deterrent, rehabilitative, and other consequences of conviction, and the adequacy of non-criminal approaches. *See id.* However, due to the nature of the corporate "person," some additional factors are present. In conducting an investigation, determining whether to bring charges, and negotiating plea agreements, prosecutors should consider the following factors in reaching a decision as to the proper treatment of a corporate target:

1.    The nature and seriousness of the offense, including the risk of harm to the public, and applicable policies and priorities, if any, governing the prosecution of corporations for particular categories of crime (*see* section III, *infra*);

2.    The pervasiveness of wrongdoing within the corporation, including the complicity in, or condonation of, the wrongdoing by corporate management (*see* section IV, *infra*);

3.    The corporation's history of similar conduct, including prior criminal, civil, and regulatory enforcement actions against it (*see* section V, *infra*);

4.    The corporation's timely and voluntary disclosure of wrongdoing and its willingness to cooperate in the investigation of its agents, including, if necessary, the waiver of the corporate attorney-client and work product privileges (*see* section VI, *infra*);

5.    The existence and adequacy of the corporation's compliance program (*see* section VII, *infra*);

6.    The corporation's remedial actions, including any efforts to implement an effective corporate compliance program or to improve an existing one, to replace responsible management, to discipline or terminate wrongdoers, to pay restitution, and to cooperate

with the relevant government agencies (*see* section VIII, *infra*);

7. Collateral consequences, including disproportionate harm to shareholders and employees not proven personally culpable (*see* section IX, *infra*); and

8. The adequacy of non-criminal remedies, such as civil or regulatory enforcement actions (*see* section X, *infra*).

B. *Comment*: As with the factors relevant to charging natural persons, the foregoing factors are intended to provide guidance rather than to mandate a particular result. The factors listed in this section are intended to be illustrative of those that should be considered and not a complete or exhaustive list. Some or all of these factors may or may not apply to specific cases, and in some cases one factor may override all others. Further, national law enforcement policies in various enforcement areas may require that more or less weight be given to certain of these factors than to others.

In making a decision to charge a corporation, the prosecutor generally has wide latitude in determining when, whom, how, and even whether to prosecute for violations of Federal criminal law. In exercising that discretion, prosecutors should consider the following general statements of principles that summarize appropriate considerations to be weighed and desirable practices to be followed in discharging their prosecutorial responsibilities. In doing so, prosecutors should ensure that the general purposes of the criminal law -- assurance of warranted punishment, deterrence of further criminal conduct, protection of the public from dangerous and fraudulent conduct, rehabilitation of offenders, and restitution for victims and affected communities -- are adequately met, taking into account the special nature of the corporate "person."

## III. Charging a Corporation: Special Policy Concerns

A. *General Principle*: The nature and seriousness of the crime, including the risk of harm to the public from the criminal conduct, are obviously primary factors in determining whether to charge a corporation. In addition, corporate conduct, particularly that of national and multi-national corporations, necessarily intersects with federal economic, taxation, and criminal law enforcement policies. In applying these principles, prosecutors must consider the practices and policies of the appropriate Division of the Department, and must comply with those policies to the extent required.

B. *Comment*: In determining whether to charge a corporation, prosecutors should take into account federal law enforcement priorities as discussed above. *See* § 9-27.230. In addition, however, prosecutors must be aware of the specific policy goals and incentive programs established by the respective Divisions and regulatory agencies. Thus, whereas natural persons may be given incremental degrees of credit (ranging from immunity to lesser charges to sentencing considerations) for turning themselves in, making statements against their penal interest, and cooperating in the government's investigation of their own and others' wrongdoing, the same approach may not be appropriate in all circumstances with respect to corporations. As an example, it is entirely proper in many investigations for a prosecutor to consider the corporation's pre-indictment conduct, *e.g.*, voluntary disclosure, cooperation, remediation or restitution, in determining whether to seek an indictment.

However, this would not necessarily be appropriate in an antitrust investigation, in which antitrust violations, by definition, go to the heart of the corporation's business and for which the Antitrust Division has therefore established a firm policy, understood in the business community, that credit should not be given at the charging stage for a compliance program and that amnesty is available only to the first corporation to make full disclosure to the government. As another example, the Tax Division has a strong preference for prosecuting responsible individuals, rather than entities, for corporate tax offenses. Thus, in determining whether or not to charge a corporation, prosecutors should consult with the Criminal, Antitrust, Tax, and Environmental and Natural Resources Divisions, if appropriate or required.

## IV.  Charging a Corporation: Pervasiveness of Wrongdoing Within the Corporation

A.  *General Principle*: A corporation can only act through natural persons, and it is therefore held responsible for the acts of such persons fairly attributable to it. Charging a corporation for even minor misconduct may be appropriate where the wrongdoing was pervasive and was undertaken by a large number of employees or by all the employees in a particular role within the corporation, *e.g.*, salesmen or procurement officers, or was condoned by upper management. On the other hand, in certain limited circumstances, it may not be appropriate to impose liability upon a corporation, particularly one with a compliance program in place, under a strict *respondeat superior* theory for the single isolated act of a rogue employee. There is, of course, a wide spectrum between these two extremes, and a prosecutor should exercise sound discretion in evaluating the pervasiveness of wrongdoing within a corporation.

B.  *Comment*: Of these factors, the most important is the role of management. Although acts of even low-level employees may result in criminal liability, a corporation is directed by its management and management is responsible for a corporate culture in which criminal conduct is either discouraged or tacitly encouraged. As stated in commentary to the Sentencing Guidelines:

> Pervasiveness [is] case specific and [will] depend on the number, and degree of responsibility, of individuals [with] substantial authority . . . who participated in, condoned, or were willfully ignorant of the offense. Fewer individuals need to be involved for a finding of pervasiveness if those individuals exercised a relatively high degree of authority. Pervasiveness can occur either within an organization as a whole or within a unit of an organization.

U.S.S.G. § 8C2.5, comment. (n. 4).

## V.  Charging the Corporation: The Corporation's Past History

A.  *General Principle*: Prosecutors may consider a corporation's history of similar conduct, including prior criminal, civil, and regulatory enforcement actions against it, in determining

whether to bring criminal charges.

B.    *Comment*: A corporation, like a natural person, is expected to learn from its mistakes. A history of similar conduct may be probative of a corporate culture that encouraged, or at least condoned, such conduct, regardless of any compliance programs. Criminal prosecution of a corporation may be particularly appropriate where the corporation previously had been subject to non-criminal guidance, warnings, or sanctions, or previous criminal charges, and yet it either had not taken adequate action to prevent future unlawful conduct or had continued to engage in the conduct in spite of the warnings or enforcement actions taken against it. In making this determination, the corporate structure itself, *e.g.*, subsidiaries or operating divisions, should be ignored, and enforcement actions taken against the corporation or any of its divisions, subsidiaries, and affiliates should be considered. *See* U.S.S.G. § 8C2.5(c) & comment. (n. 6).

## VI.    Charging the Corporation: Cooperation and Voluntary Disclosure

A.    *General Principle*: In determining whether to charge a corporation, that corporation's timely and voluntary disclosure of wrongdoing and its willingness to cooperate with the government's investigation may be relevant factors. In gauging the extent of the corporation's cooperation, the prosecutor may consider the corporation's willingness to identify the culprits within the corporation, including senior executives, to make witnesses available, to disclose the complete results of its internal investigation, and to waive the attorney-client and work product privileges.

B.    *Comment*: In investigating wrongdoing by or within a corporation, a prosecutor is likely to encounter several obstacles resulting from the nature of the corporation itself. It will often be difficult to determine which individual took which action on behalf of the corporation. Lines of authority and responsibility may be shared among operating divisions or departments, and records and personnel may be spread throughout the United States or even among several countries. Where the criminal conduct continued over an extended period of time, the culpable or knowledgeable personnel may have been promoted, transferred, or fired, or they may have quit or retired. Accordingly, a corporation's cooperation may be critical in identifying the culprits and locating relevant evidence.

In some circumstances, therefore, granting a corporation immunity or amnesty may be considered in the course of the government's investigation. In such circumstances, prosecutors should refer to the principles governing non-prosecution agreements generally. See USAM § 9-27.600-650. Specifically, these principles permit a non-prosecution agreement in exchange for cooperation when a corporation's "timely cooperation appears to be necessary to the public interest and other means of obtaining the desired cooperation are unavailable or would not be effective." Prosecutors should note that in the case of national or multi-national corporations, multi-district or global agreements may be necessary. See USAM § 9-27.641.

In addition, the Department, in conjunction with regulatory agencies and other executive branch departments, encourages corporations, as part of their compliance programs, to conduct internal investigations and to disclose their findings to the appropriate authorities. Some agencies, such as the SEC and the EPA, as well as the Department's Environmental

and Natural Resources Division, have formal voluntary disclosure programs in which self-reporting, coupled with remediation and additional criteria, may qualify the corporation for amnesty or reduced sanctions.[1]Even in the absence of a formal program, prosecutors may consider a corporation's timely and voluntary disclosure in evaluating the adequacy of the corporation's compliance program and its management's commitment to the compliance program. However, prosecution and economic policies specific to the industry or statute may require prosecution notwithstanding a corporation's willingness to cooperate. For example, the Antitrust Division offers amnesty only to the first corporation to agree to cooperate. This creates a strong incentive for corporations participating in anti-competitive conduct to be the first to cooperate. In addition, amnesty, immunity, or reduced sanctions may not be appropriate where the corporation's business is permeated with fraud or other crimes.

One factor the prosecutor may weigh in assessing the adequacy of a corporation's cooperation is the completeness of its disclosure including, if necessary, a waiver of the attorney-client and work product protections, both with respect to its internal investigation and with respect to communications between specific officers, directors, and employees and counsel. Such waivers permit the government to obtain statements of possible witnesses, subjects, and targets, without having to negotiate individual cooperation or immunity agreements. In addition, they are often critical in enabling the government to evaluate the completeness of a corporation's voluntary disclosure and cooperation. Prosecutors may, therefore, request a waiver in appropriate circumstances.[2]The Department does not, however, consider waiver of a corporation's privileges an absolute requirement, and prosecutors should consider the willingness of a corporation to waive the privileges when necessary to provide timely and complete information as only one factor in evaluating the corporation's cooperation.

Another factor to be weighed by the prosecutor is whether the corporation appears to be protecting its culpable employees and agents. Thus, while cases will differ depending on the circumstances, a corporation's promise of support to culpable employees and agents, either through the advancing of attorneys fees,[3]through retaining the employees without sanction for their misconduct, or through providing information to the employees about the government's investigation pursuant to a joint defense agreement, may be considered by the prosecutor in weighing the extent and value of a corporation's cooperation. By the same token, the prosecutor should be wary of attempts to shield corporate officers and employees from liability by a willingness of the corporation to plead guilty.

Finally, a corporation's offer of cooperation does not automatically entitle it to immunity from prosecution. A corporation should not be able to escape liability merely by offering up its directors, officers, employees, or agents as in lieu of its own prosecution. Thus, a corporation's willingness to cooperate is merely one relevant factor, one that needs to be considered in conjunction with the other factors, particularly those relating to the corporation's past history and the role of management in the wrongdoing.


## VII.  Charging a Corporation: Corporate Compliance Programs

A.  *General Principle*: Compliance programs are established by corporate management to prevent and to detect misconduct and to ensure that corporate activities are conducted in accordance with all applicable criminal and civil laws, regulations, and rules. The Department encourages such corporate self-policing, including voluntary disclosures to the government of any problems that a corporation discovers on its own. However, the existence of a compliance program is not sufficient, in and of itself, to justify not charging a corporation for criminal conduct undertaken by its officers, directors, employees, or agents. Indeed, the commission of such crimes in the face of a compliance program may suggest that the corporate management is not adequately enforcing its program. In addition, the nature of some crimes, *e.g.*, antitrust violations, may be such that national law enforcement policies mandate prosecutions of corporations notwithstanding the existence of a compliance program.

B.  Comment. A corporate compliance program, even one specifically prohibiting the very conduct in question, does not absolve the corporation from criminal liability under the doctrine of respondeat superior. *See United States v. Basic Construction Co.*, 711 F.2d 570 (4th Cir. 1983) ("a corporation may be held criminally responsible for antitrust violations committed by its employees if they were acting within the scope of their authority, or apparent authority, and for the benefit of the corporation, even if . . . such acts were against corporate policy or express instructions."). Thus, in *United States v. Hilton Hotels Corp.*, 467 F.2d 1000 (9th Cir. 1972), *cert. denied*, 409 U.S. 1125 (1973), the Ninth Circuit affirmed antitrust liability based upon a purchasing agent for a single hotel threatening a single supplier with a boycott unless it paid dues to a local marketing association, *even though the agent's actions were contrary to corporate policy and directly against express instructions from his superiors*. The court reasoned that Congress, in enacting the Sherman Antitrust Act, "intended to impose liability upon business entities for the acts of those to whom they choose to delegate the conduct of their affairs, thus stimulating a maximum effort by owners and managers to assure adherence by such agents to the requirements of the Act."[4] It concluded that "general policy statements" and even direct instructions from the agent's superiors were not sufficient; "Appellant could not gain exculpation by issuing general instructions without undertaking to enforce those instructions by means commensurate with the obvious risks." *See also United States v. Beusch*, 596 F.2d 871, 878 (9th Cir. 1979) ("[A] corporation may be liable for the acts of its employees done contrary to express instructions and policies, but . . . the existence of such instructions and policies may be considered in determining whether the employee in fact acted to benefit the corporation."); *United States v. American Radiator & Standard Sanitary Corp.*, 433 F.2d 174 (3rd Cir. 1970) (affirming conviction of corporation based upon its officer's participation in price-fixing scheme, despite corporation's defense that officer's conduct violated its "rigid anti-fraternization policy" against any socialization (and exchange of price information) with its competitors; "When the act of the agent is within the scope of his employment or his apparent authority, the corporation is held legally responsible for it, although what he did may be contrary to his actual instructions and may be unlawful.").

While the Department recognizes that no compliance program can ever prevent all criminal activity by a corporation's employees, the critical factors in evaluating any program are whether the program is adequately designed for maximum effectiveness in preventing and detecting wrongdoing by employees and whether corporate management is enforcing the

program or is tacitly encouraging or pressuring employees to engage in misconduct to achieve business objectives. The Department has no formal guidelines for corporate compliance programs. The fundamental questions any prosecutor should ask are: "Is the corporation's compliance program well designed?" and] "Does the corporation's compliance program work?" In answering these questions, the prosecutor should consider the comprehensiveness of the compliance program, the extent and pervasiveness of the criminal conduct; the number and level of the corporate employees involved; the seriousness, duration, and frequency of the misconduct, and any remedial actions taken by the corporation, including restitution, disciplinary action, and revisions to corporate compliance programs.[5] Prosecutors should also consider the promptness of any disclosure of wrongdoing to the government and the corporation's cooperation in the government's investigation.

Prosecutors should therefore attempt to determine whether a corporation's compliance program is merely a "paper program" or whether it was designed and implemented in an effective manner. In addition, prosecutors should determine whether the corporation has provided for a staff sufficient to audit, document, analyze, and utilize the results of the corporation's compliance efforts. In addition, prosecutors should determine whether the corporation's employees are adequately informed about the compliance program and are convinced of the corporation's commitment to it. This will enable the prosecutor to make an informed decision as to whether the corporation has adopted and implemented a truly effective compliance program that, when consistent with other federal law enforcement policies, may result in a decision to charge only the corporation's employees and agents.

Compliance programs should be designed to detect the particular types of misconduct most likely to occur in a particular corporation's line of business. Many corporations operate in complex regulatory environments outside the normal experience of criminal prosecutors. Accordingly, prosecutors should consult with relevant federal and state agencies with the expertise to evaluate the adequacy of a program's design and implementation. For instance, state and federal banking, insurance, and medical boards, the Department of Defense, the Department of Health and Human Services, the Environmental Protection Agency, and the Securities and Exchange Commission have considerable experience with compliance programs and can be very helpful to a prosecutor in evaluating such programs. In addition, the Fraud Section of the Criminal Division, the Commercial Litigation Branch of the Civil Division, and the Environmental Crimes Section of the Environment and Natural Resources Division can assist U.S. Attorneys' Offices in finding the appropriate agency office and in providing copies of compliance programs that were developed in previous cases.

## VIII. Charging the Corporation: Restitution and Remediation

A.  *General Principle*: Although neither a corporation nor an individual target may avoid prosecution merely by paying a sum of money, a prosecutor may consider the corporation's willingness to make restitution and steps already taken to do so, as well as other remedial actions such as implementing an effective corporate compliance program, improving an existing one, and disciplining wrongdoers, in determining whether to charge the corporation.

B.   *Comment*: In determining whether or not a corporation should be prosecuted, a prosecutor may consider whether meaningful remedial measures have been taken, including employee discipline and full restitution.[6] A corporation's response to misconduct says much about its willingness to ensure that such misconduct does not recur. Thus, corporations that fully recognize the seriousness of their misconduct and accept responsibility for it should be seen to be taking steps to implement the personnel, operational, and organizational changes necessary to establish an awareness among employees that criminal conduct will not be tolerated. Among the factors prosecutors should consider and weigh are whether the corporation appropriately disciplined the wrongdoers and disclosed information concerning their illegal conduct to the government.

Employee discipline is a difficult task for many corporations because of the human element involved and sometimes because of the seniority of the employees concerned. However, while corporations need to be fair to their employees, they must also be unequivocally committed, at all levels of the corporation, to the highest standards of legal and ethical behavior. Effective internal discipline can be a powerful deterrent against improper behavior by a corporation's employees. In evaluating a corporation's response to wrongdoing, prosecutors may evaluate the willingness of the corporation to discipline culpable employees of all ranks and the adequacy of the discipline imposed. The prosecutor should satisfy himself or herself that the corporation's focus is on the integrity and credibility of its remedial and disciplinary measures rather than on the protection of the wrongdoers.

In addition to employee discipline, two other factors in evaluating a corporation's remedial efforts are restitution and reform. As with natural persons, the decision whether or not to prosecute should not depend upon the target's ability to pay restitution. A corporation's efforts to pay restitution even in advance of any court order is, however, evidence of its "acceptance of responsibility" and, consistent with the practices and policies of the appropriate Division of the Department entrusted with enforcing specific criminal laws, may be considered in determining whether to bring criminal charges. Similarly, although the inadequacy of a corporate compliance program is a factor to consider when deciding whether to charge a corporation, that corporation's quick recognition of the flaws in the program and its efforts to improve the program are also factors to consider.


## IX.   Charging the Corporation: Collateral consequences


A.   *General Principle*: Prosecutors may consider the collateral consequences of a corporate criminal conviction in determining whether to charge the corporation with a criminal offense.

B.   *Comment*: One of the factors in determining whether to charge a natural person or a corporation is whether the likely punishment is appropriate given the nature and seriousness of the crime. In the corporate context, prosecutors may take into account the possibly substantial consequences to a corporation's officers, directors, employees, and shareholders, many of whom may, depending on the size and nature (*e.g.*, publicly *vs.* closely held) of the corporation and their role in its operations, have played no role in the criminal conduct, have been completely unaware of it, or have been wholly unable to prevent it. Further, prosecutors should also be aware of non-penal sanctions that may accompany a criminal

charges, such as potential suspension or debarment from eligibility for government contracts or federal funded programs such as health care. Whether or not such non-penal sanctions are appropriate or required in a particular case is the responsibility of the relevant agency, a decision that will be made based on the applicable statutes, regulations, and policies.

Virtually every conviction of a corporation, like virtually every conviction of an individual, will have an impact on innocent third parties, and the mere existence of such an effect is not sufficient to preclude prosecution of the corporation. Therefore, in evaluating the severity of collateral consequences, various factors already discussed, such as the pervasiveness of the criminal conduct and the adequacy of the corporation's compliance programs should also be considered in determining the weight to be given to this factor. For instance, the balance may tip in favor of prosecuting corporations in situations where the scope of the misconduct in a case is widespread and sustained within a corporate division (or spread throughout pockets of the corporate organization). In such cases. the possible unfairness of visiting punishment for the corporation's crimes upon shareholders may be of much less concern where those shareholders have substantially profited, even unknowingly, from widespread or pervasive criminal activity. Similarly. where the top layers of the corporation's management or the shareholders of a closely-held corporation were engaged in or aware of the wrongdoing and the conduct at issue was accepted as a way of doing business for an extended period, debarment may be deemed not collateral but a direct and entirely appropriate consequence of the corporation's wrongdoing.

The appropriateness of considering such collateral consequences and the weight to be given them may depend on the special policy concerns discussed in section III,*supra*.

## X.  Charging a Corporation: Non-Criminal Alternatives

A.  *General Principle*: Although non-criminal alternatives to prosecution often exist, prosecutors may consider whether such sanctions would adequately deter, punish, and rehabilitate a corporation that has engaged in wrongful conduct. In evaluating the adequacy of non-criminal alternatives to prosecution, *e.g.*, civil or regulatory enforcement actions, the prosecutor may consider all relevant factors, including:
   1.  The sanctions available under the alternative means of disposition;
   2.  the likelihood that an effective sanction will be imposed; and
   3.  the effect of non-criminal disposition on Federal law enforcement interests.

B.  *Comment*. The primary goals of criminal law are deterrence, punishment, and rehabilitation. Non-criminal sanctions may not be an appropriate response to an egregious violation, a pattern of wrongdoing, or a history of non-criminal sanctions without proper remediation. In other cases, however, these goals may be satisfied without the necessity of instituting criminal proceedings. In determining whether federal criminal charges are appropriate, the prosecutor should consider the same factors (modified appropriately for the regulatory context) considered when determining whether to leave prosecution of a natural person to another jurisdiction or to seek non-criminal alternatives to prosecution, i.e., the strength of the regulatory authority's interest; the regulatory authority's ability and willingness to take

effective enforcement action, the probable sanction if the regulatory authority's enforcement action is upheld, and the effect of a non-criminal disposition on Federal law enforcement interests. *See* USAM §§ 9-27.240, 9-27.250.

## XI. Charging a Corporation: Selecting Charges

A. *General Principle*: Once a prosecutor has decided to charge a corporation, the prosecutor should charge, or should recommend that the grand jury charge, the most serious offense that is consistent with the nature of the defendant's conduct and that is likely to result in a sustainable conviction.

B. *Comment*: Once the decision to charge is made, the same rules as govern charging natural persons apply. These rules require "a faithful and honest application of the Sentencing Guidelines" and an "individualized assessment of the extent to which particular charges fit the specific circumstances of the case, are consistent with the purposes of the Federal criminal code, and maximize the impact of Federal resources on crime." *See* USAM § 9-27.300. In making this determination, "it is appropriate that the attorney for the government consider, *inter alia*, such factors as the sentencing guideline range yielded by the charge, whether the penalty yielded by such sentencing range . . . is proportional to the seriousness of the defendant's conduct, and whether the charge achieves such purposes of the criminal law as punishment, protection of the public, specific and general deterrence, and rehabilitation." *See* Attorney General's Memorandum, dated October 12, 1993.

## XII. Plea Agreements with Corporations

A. *General Principle*: In negotiating plea agreements with corporations, prosecutors should seek a plea to the most serious, readily provable offense charged. In addition, the terms of the plea agreement should contain appropriate provisions to ensure punishment, deterrence, rehabilitation, and compliance with the plea agreement in the corporate context. Although special circumstances may mandate a different conclusion, prosecutors generally should not agree to accept a corporate guilty plea in exchange for non-prosecution or dismissal of charges against individual officers and employees.

B. *Comment*: Prosecutors may enter into plea agreements with corporations for the same reasons and under the same constraints as apply to plea agreements with natural persons. *See* USAM §§ 9-27.400-500. This means, *inter alia*, that the corporation should be required to plead to the most serious, readily provable offense charged. As is the case with individuals, the attorney making this determination should do so "on the basis of an individualized assessment of the extent to which particular charges fit the specific circumstances of the case, are consistent with the purposes of the federal criminal code, and maximize the impact of federal resources on crime. In making this determination, the attorney for the government consider, *inter alia*, such factors as the sentencing guideline range yielded by the charge, whether the penalty yielded by such sentencing range . . . is proportional to the seriousness of the defendant's conduct, and whether the charge achieves such purposes of the criminal law as punishment, protection of the public, specific and

general deterrence, and rehabilitation." *See* Attorney General's Memorandum, dated October 12, 1993. In addition, any negotiated departures from the Sentencing Guidelines must be justifiable under the Guidelines and must be disclosed to the sentencing court. In addition, corporations should be made to realize that pleading guilty to criminal charges constitutes an admission of *guilt* and not merely a resolution of an inconvenient distraction from its business. Thus, as with natural persons, pleas should be structured so that the corporation may not later "proclaim lack of culpability or even complete innocence." *See* USAM §§ 9-27.420(b)(4), 9-27.440, 9-27.500. Thus, for instance, there should be placed upon the record a sufficient factual basis for the plea to prevent later corporate assertions of innocence.

A corporate plea agreement should also contain certain provisions that recognize the nature of the corporate "person" and ensure that the principles of punishment, deterrence, and rehabilitation are met. In the corporate context, punishment and deterrence are generally accomplished by substantial fines, mandatory restitution, and institution of appropriate compliance measures, including, if necessary, continued judicial oversight or the use of special masters. *See* U.S.S.G. §§ 8B1.1, 8C2.1, *et seq*. In addition, where the corporation is a government contractor, permanent or temporary debarment may be appropriate. Where the corporation was engaged in government contracting fraud, a prosecutor may not negotiate away an agency's right to debar or to list the corporate defendant.

In negotiating a plea agreement, prosecutors should also consider the deterrent value of prosecutions of individuals within the corporation. Therefore, one factor that a prosecutor may consider in determining whether to enter into a plea agreement is whether the corporation is seeking immunity for its employees and officers or whether the corporation is willing to cooperate in the investigation of culpable individuals. Generally, prosecutors should rarely negotiate away individual criminal liability in a corporate plea.

Rehabilitation, of course, requires that the corporation undertake to be law-abiding in the future. It is, therefore, appropriate to require the corporation, as a condition of probation, to implement a compliance program or to reform an existing one. As discussed above, prosecutors may consult with the appropriate state and federal agencies and components of the Justice Department to ensure that a proposed compliance program is adequate and meets industry standards and best practices. *See* section VII, *supra*.

In plea agreements in which the corporation agrees to cooperate, the prosecutor should ensure that the cooperation is complete and truthful. To do so, the prosecutor may request that the corporation waive the attorney-client and work product privileges, make employees and agents available for debriefing, disclose the results of its internal investigation, file appropriate certified financial statements, agree to governmental or third-party audits, and take whatever other steps are necessary to ensure that the full scope of the corporate wrongdoing is disclosed and that the responsible culprits are identified and, if appropriate, prosecuted. *See generally* section VIII, *supra*.

Footnotes

1. In addition, the Sentencing Guidelines reward voluntary disclosure and cooperation with a reduction in the corporation's offense level. *See* U.S.S.G. § 8C2.5(g).
[Return To Text]

2. This waiver should ordinarily be limited to the factual internal investigation and any contemporaneous advice given to the corporation concerning the conduct at issue. Except in unusual circumstances, prosecutors should not seek a waiver with respect to communications and work product related to advice concerning the government's criminal investigation.
[Return To Text]

3. Some states require corporations to pay the legal fees of officers under investigation prior to a formal determination of their guilt. Obviously, a corporation's compliance with governing law should not be considered a failure to cooperate.
[Return To Text]

4. Although this case and *Basic Construction* are both antitrust cases, their reasoning applies to other criminal violations. In the *Hilton* case, for instance, the Ninth Circuit noted that Sherman Act violations are commercial offenses "usually motivated by a desire to enhance profits," thus bringing the case within the normal rule that a "purpose to benefit the corporation is necessary to bring the agent's acts within the scope of his employment." 467 F.2d at 1006 & n.4. In addition, in *United States v. Automated Medical Laboratories*, 770 F.2d 399, 406 n.5 (4th Cir. 1985), the Fourth Circuit stated that *Basic Construction* states a generally applicable rule on corporate criminal liability despite the fact that it addresses violations of the antitrust rules."
[Return To Text]

5. For a detailed review of these and other factors concerning corporate compliance programs,see United States Sentencing Commission, **Guidelines Manual**, § 8A1.2, comment. (n. 3(k)) (Nov. 1997). *See also* U.S.S.G. § 8C2.5(f).
[Return To Text]

6. For example, the Antitrust Division's amnesty policy specifically requires that "[w]here possible, the corporation [make] restitution to injured parties . . . ."
[Return To Text]

# Exhibit O



**U.S. Department of Justice**

Office of the Deputy Attorney General

---

The Deputy Attorney General

*Washington, D.C. 20530*

January 20, 2003

MEMORANDUM

TO:       Heads of Department Components
           United States Attorneys

FROM:   Larry D. Thompson
           Deputy Attorney General

SUBJECT: Principles of Federal Prosecution of Business Organizations

As the Corporate Fraud Task Force has advanced in its mission, we have confronted certain issues in the principles for the federal prosecution of business organizations that require revision in order to enhance our efforts against corporate fraud. While it will be a minority of cases in which a corporation or partnership is itself subjected to criminal charges, prosecutors and investigators in every matter involving business crimes must assess the merits of seeking the conviction of the business entity itself.

Attached to this memorandum are a revised set of principles to guide Department prosecutors as they make the decision whether to seek charges against a business organization. These revisions draw heavily on the combined efforts of the Corporate Fraud Task Force and the Attorney General's Advisory Committee to put the results of more than three years of experience with the principles into practice.

The main focus of the revisions is increased emphasis on and scrutiny of the authenticity of a corporation's cooperation. Too often business organizations, while purporting to cooperate with a Department investigation, in fact take steps to impede the quick and effective exposure of the complete scope of wrongdoing under investigation. The revisions make clear that such conduct should weigh in favor of a corporate prosecution. The revisions also address the efficacy of the corporate governance mechanisms in place within a corporation, to ensure that these measures are truly effective rather than mere paper programs.

Further experience with these principles may lead to additional adjustments. I look forward to hearing comments about their operation in practice. Please forward any comments to Christopher Wray, the Principal Associate Deputy Attorney General, or to Andrew Hruska, my Senior Counsel.

---

**Federal Prosecution of Business Organizations**[1]

**I. Charging a Corporation: General**

A. General Principle: Corporations should not be treated leniently because of their artificial nature nor should they be subject to harsher treatment. Vigorous enforcement of the criminal laws against corporate wrongdoers, where appropriate results in great benefits for law enforcement and the public, particularly in the area of white collar crime. Indicting corporations for wrongdoing enables the government to address and be a force for positive change of corporate culture, alter corporate behavior, and prevent, discover, and punish white collar crime.

B. Comment: In all cases involving corporate wrongdoing, prosecutors should consider the factors discussed

herein. First and foremost, prosecutors should be aware of the important public benefits that may flow from indicting a corporation in appropriate cases. For instance, corporations are likely to take immediate remedial steps when one is indicted for criminal conduct that is pervasive throughout a particular industry, and thus an indictment often provides a unique opportunity for deterrence on a massive scale. In addition, a corporate indictment may result in specific deterrence by changing the culture of the indicted corporation and the behavior of its employees. Finally, certain crimes that carry with them a substantial risk of great public harm, e.g., environmental crimes or financial frauds, are by their nature most likely to be committed by businesses, and there may, therefore, be a substantial federal interest in indicting the corporation.

Charging a corporation, however, does not mean that individual directors, officers, employees, or shareholders should not also be charged. Prosecution of a corporation is not a substitute for the prosecution of criminally culpable individuals within or without the corporation. Because a corporation can act only through individuals, imposition of individual criminal liability may provide the strongest deterrent against future corporate wrongdoing. Only rarely should provable individual culpability not be pursued, even in the face of offers of corporate guilty pleas.

Corporations are "legal persons," capable of suing and being sued, and capable of committing crimes. Under the doctrine of *respondeat superior*, a corporation may be held criminally liable for the illegal acts of its directors, officers, employees, and agents. To hold a corporation liable for these actions, the government must establish that the corporate agent's actions (i) were within the scope of his duties and (ii) were intended, at least in part, to benefit the corporation. In all cases involving wrongdoing by corporate agents, prosecutors should consider the corporation, as well as the responsible individuals, as potential criminal targets.

Agents, however, may act for mixed reasons -- both for self-aggrandizement (both direct and indirect) and for the benefit of the corporation, and a corporation may be held liable as long as one motivation of its agent is to benefit the corporation. In *United States v. Automated Medical Laboratories*, 770 F.2d 399 (4th Cir. 1985), the court affirmed the corporation's conviction for the actions of a subsidiary's employee despite its claim that the employee was acting for his own benefit, namely his "ambitious nature and his desire to ascend the corporate ladder." The court stated, "*Partucci* was clearly acting in part to benefit AML since his advancement within the corporation depended on AML's well-being and its lack of difficulties with the FDA." Similarly, in *United States v. Cincotta*, 689 F.2d 238, 241-42 (1st Cir. 1982), the court held, "criminal liability may be imposed on the corporation only where the agent is acting within the scope of his employment. That, in turn, requires that the agent be performing acts of the kind which he is authorized to perform, and those acts must be motivated -- at least in part -- by an intent to benefit the corporation." Applying this test, the court upheld the corporation's conviction, notwithstanding the substantial personal benefit reaped by its miscreant agents, because the fraudulent scheme required money to pass through the corporation's treasury and the fraudulently obtained goods were resold to the corporation's customers in the corporation's name. As the court concluded, "Mystic--not the individual defendants--was making money by selling oil that it had not paid for."

Moreover, the corporation need not even necessarily profit from its agent's actions for it to be held liable. In *Automated Medical Laboratories*, the Fourth Circuit stated:

[B]enefit is not a "touchstone of criminal corporate liability; benefit at best is an evidential, not an operative, fact." Thus, whether the agent's actions ultimately redounded to the benefit of the corporation is less significant than whether the agent acted with the intent to benefit the corporation. The basic purpose of requiring that an agent have acted with the intent to benefit the corporation, however, is to insulate the corporation from criminal liability for actions of its agents which be inimical to the interests of the corporation or which may have been undertaken solely to advance the interests of that agent or of a party other than the corporation.

770 F.2d at 407 (emphasis added; quoting *Old Monastery Co. v. United States*, 147 F.2d 905, 908 (4th Cir.), cert. denied, 326 U.S. 734 (1945)).

## II. Charging a Corporation: Factors to Be Considered

A. General Principle: Generally, prosecutors should apply the same factors in determining whether to charge a corporation as they do with respect to individuals. *See* USAM § 9-27.220, *et seq.* Thus, the prosecutor should weigh all of the factors normally considered in the sound exercise of prosecutorial judgment: the sufficiency of the evidence; the likelihood of success at trial,; the probable deterrent, rehabilitative, and other consequences of conviction; and the adequacy of noncriminal approaches. *See* id. However, due to the nature of the corporate "person," some additional factors are present. In conducting an investigation, determining whether to bring charges, and negotiating plea agreements, prosecutors should consider the following factors in reaching a decision as to the proper treatment of a corporate target:

1. the nature and seriousness of the offense, including the risk of harm to the public, and applicable policies and priorities, if any, governing the prosecution of corporations for particular categories of crime (*see* section III, *infra*);

2. the pervasiveness of wrongdoing within the corporation, including the complicity in, or condonation of, the wrongdoing by corporate management (*see* section IV, *infra*);

3. the corporation's history of similar conduct, including prior criminal, civil, and regulatory enforcement actions against it (*see* section V, *infra*);

4. the corporation's timely and voluntary disclosure of wrongdoing and its willingness to cooperate in the investigation of its agents, including, if necessary, the waiver of corporate attorney-client and work product protection (*see* section VI, *infra*);

5. the existence and adequacy of the corporation's compliance program (*see* section VII, *infra*);

6. the corporation's remedial actions, including any efforts to implement an effective corporate compliance program or to improve an existing one, to replace responsible management, to discipline or terminate wrongdoers, to pay restitution, and to cooperate with the relevant government agencies (*see* section VIII, *infra*);

7. collateral consequences, including disproportionate harm to shareholders, pension holders and employees not proven personally culpable and impact on the public arising from the prosecution (*see* section IX, *infra*); and

8. the adequacy of the prosecution of individuals responsible for the corporation's malfeasance;

9. the adequacy of remedies such as civil or regulatory enforcement actions (*see* section X, *infra*).

B. Comment: As with the factors relevant to charging natural persons, the foregoing factors are intended to provide guidance rather than to mandate a particular result. The factors listed in this section are intended to be illustrative of those that should be considered and not a complete or exhaustive list. Some or all of these factors may or may not apply to specific cases, and in some cases one factor may override all others. The nature and seriousness of the offense may be such as to warrant prosecution regardless of the other factors. Further, national law enforcement policies in various enforcement areas may require that more or less weight be given to certain of these factors than to others.

In making a decision to charge a corporation, the prosecutor generally has wide latitude in determining when, whom, how, and even whether to prosecute for violations of Federal criminal law. In exercising that discretion, prosecutors should consider the following general statements of principles that summarize appropriate considerations to be weighed and desirable practices to be followed in discharging their prosecutorial responsibilities. In doing so, prosecutors should ensure that the general purposes of the criminal law -- assurance of warranted punishment, deterrence of further criminal conduct, protection of the public from dangerous and fraudulent conduct, rehabilitation of offenders, and restitution for victims and affected communities -- are adequately met, taking into account the special nature of the corporate "person."

### III. Charging a Corporation: Special Policy Concerns

A. General Principle: The nature and seriousness of the crime, including the risk of harm to the public from the criminal conduct, are obviously primary factors in determining whether to charge a corporation. In addition, corporate conduct, particularly that of national and multi-national corporations, necessarily intersects with federal economic, taxation, and criminal law enforcement policies. In applying these principles, prosecutors must consider the practices and policies of the appropriate Division of the Department, and must comply with those policies to the extent required.

B. Comment: In determining whether to charge a corporation, prosecutors should take into account federal law enforcement priorities as discussed above. See USAM § 9-27-230. In addition, however, prosecutors must be aware of the specific policy goals and incentive programs established by the respective Divisions and regulatory agencies. Thus, whereas natural persons may be given incremental degrees of credit (ranging from immunity to lesser charges to sentencing considerations) for turning themselves in, making statements against their penal interest, and cooperating in the government's investigation of their own and others' wrongdoing, the same approach may not be appropriate in all circumstances with respect to corporations. As an example, it is entirely proper in many investigations for a prosecutor to consider the corporation's pre-indictment conduct, e.g.,voluntary disclosure, cooperation, remediation or restitution, in determining whether to seek an indictment. However, this would not necessarily be appropriate in an antitrust investigation, in which antitrust violations, by definition, go to the heart of the corporation's business and for which the Antitrust Division has therefore established a firm policy, understood in the business community, that credit should not be given at the charging stage for a compliance program and that amnesty is available only to the first corporation to make full disclosure to the government. As another example, the Tax Division has a strong preference for prosecuting responsible individuals, rather than entities, for corporate tax offenses. Thus, in determining whether or not to charge a corporation, prosecutors should consult with the Criminal, Antitrust, Tax, and Environmental and Natural Resources Divisions, if appropriate or required.

### IV. Charging a Corporation: Pervasiveness of Wrongdoing Within the Corporation

A. General Principle: A corporation can only act through natural persons, and it is therefore held responsible for the acts of such persons fairly attributable to it. Charging a corporation for even minor misconduct may be appropriate where the wrongdoing was pervasive and was undertaken by a large number of employees or by all the employees in a particular role within the corporation, e.g., salesmen or procurement officers, or was condoned by upper management. On the other hand, in certain limited circumstances, it may not be appropriate to impose liability upon a corporation, particularly one with a compliance program in place, under a strict respondeat superior theory for the single isolated act of a rogue employee. There is, of course, a wide spectrum between these two extremes, and a prosecutor should exercise sound discretion in evaluating the pervasiveness of wrongdoing within a corporation.

B. Comment: Of these factors, the most important is the role of management. Although acts of even low-level employees may result in criminal liability, a corporation is directed by its management and management is responsible for a corporate culture in which criminal conduct is either discouraged or tacitly encouraged. As stated in commentary to the Sentencing Guidelines:

Pervasiveness [is] case specific and [will] depend on the number, and degree of responsibility, of individuals [with] substantial authority ... who participated in, condoned, or were willfully ignorant of the offense. Fewer individuals need to be involved for a finding of pervasiveness if those individuals exercised a relatively high degree of authority. Pervasiveness can occur either within an organization as a whole or within a unit of an organization.

USSG §8C2.5, comment. (n. 4).

### V. Charging a Corporation: The Corporation's Past History

A. General Principle: Prosecutors may consider a corporation's history of similar conduct, including prior

criminal, civil, and regulatory enforcement actions against it, in determining whether to bring criminal charges.

B. Comment: A corporation, like a natural person, is expected to learn from its mistakes. A history of similar conduct may be probative of a corporate culture that encouraged, or at least condoned, such conduct, regardless of any compliance programs. Criminal prosecution of a corporation may be particularly appropriate where the corporation previously had been subject to non-criminal guidance, warnings, or sanctions, or previous criminal charges, and yet it either had not taken adequate action to prevent future unlawful conduct or had continued to engage in the conduct in spite of the warnings or enforcement actions taken against it. In making this determination, the corporate structure itself, *e.g.*, subsidiaries or operating divisions, should be ignored, and enforcement actions taken against the corporation or any of its divisions, subsidiaries, and affiliates should be considered. *See* USSG § 8C2.5(c) & comment. (n. 6).

## VI. Charging a Corporation: Cooperation and Voluntary Disclosure

A. General Principle: In determining whether to charge a corporation, that corporation's timely and voluntary disclosure of wrongdoing and its willingness to cooperate with the government's investigation may be relevant factors. In gauging the extent of the corporation's cooperation, the prosecutor may consider the corporation's willingness to identify the culprits within the corporation, including senior executives; to make witnesses available; to disclose the complete results of its internal investigation; and to waive attorney-client and work product protection.

B. Comment: In investigating wrongdoing by or within a corporation, a prosecutor is likely to encounter several obstacles resulting from the nature of the corporation itself. It will often be difficult to determine which individual took which action on behalf of the corporation. Lines of authority and responsibility may be shared among operating divisions or departments, and records and personnel may be spread throughout the United States or even among several countries. Where the criminal conduct continued over an extended period of time, the culpable or knowledgeable personnel may have been promoted, transferred, or fired, or they may have quit or retired. Accordingly, a corporation's cooperation may be critical in identifying the culprits and locating relevant evidence.

In some circumstances, therefore, granting a corporation immunity or amnesty or pretrial diversion may be considered in the course of the government's investigation. In such circumstances, prosecutors should refer to the principles governing non-prosecution agreements generally. *See* USAM § 9-27.600-650. These principles permit a non prosecution agreement in exchange for cooperation when a corporation's "timely cooperation appears to be necessary to the public interest and other means of obtaining the desired cooperation are unavailable or would not be effective." Prosecutors should note that in the case of national or multi-national corporations, multi-district or global agreements may be necessary. Such agreements may only be entered into with the approval of each affected district or the appropriate Department official. *See* USAM §9-27.641.

In addition, the Department, in conjunction with regulatory agencies and other executive branch departments, encourages corporations, as part of their compliance programs, to conduct internal investigations and to disclose their findings to the appropriate authorities. Some agencies, such as the SEC and the EPA, as well as the Department's Environmental and Natural Resources Division, have formal voluntary disclosure programs in which self-reporting, coupled with remediation and additional criteria, may qualify the corporation for amnesty or reduced sanctions.[2] Even in the absence of a formal program, prosecutors may consider a corporation's timely and voluntary disclosure in evaluating the adequacy of the corporation's compliance program and its management's commitment to the compliance program. However, prosecution and economic policies specific to the industry or statute may require prosecution notwithstanding a corporation's willingness to cooperate. For example, the Antitrust Division offers amnesty only to the first corporation to agree to cooperate. This creates a strong incentive for corporations participating in anti-competitive conduct to be the first to cooperate. In addition, amnesty, immunity, or reduced sanctions may not be appropriate where the corporation's business is permeated with fraud or other crimes.

One factor the prosecutor may weigh in assessing the adequacy of a corporation's cooperation is the completeness of its disclosure including, if necessary, a waiver of the attorney-client and work product

protections, both with respect to its internal investigation and with respect to communications between specific officers, directors and employees and counsel. Such waivers permit the government to obtain statements of possible witnesses, subjects, and targets, without having to negotiate individual cooperation or immunity agreements. In addition, they are often critical in enabling the government to evaluate the completeness of a corporation's voluntary disclosure and cooperation. Prosecutors may, therefore, request a waiver in appropriate circumstances.[3] The Department does not, however, consider waiver of a corporation's attorney-client and work product protection an absolute requirement, and prosecutors should consider the willingness of a corporation to waive such protection when necessary to provide timely and complete information as one factor in evaluating the corporation's cooperation.

Another factor to be weighed by the prosecutor is whether the corporation appears to be protecting its culpable employees and agents. Thus, while cases will differ depending on the circumstances, a corporation's promise of support to culpable employees and agents, either through the advancing of attorneys fees,[4] through retaining the employees without sanction for their misconduct, or through providing information to the employees about the government's investigation pursuant to a joint defense agreement, may be considered by the prosecutor in weighing the extent and value of a corporation's cooperation. By the same token, the prosecutor should be wary of attempts to shield corporate officers and employees from liability by a willingness of the corporation to plead guilty.

Another factor to be weighed by the prosecutor is whether the corporation, while purporting to cooperate, has engaged in conduct that impedes the investigation (whether or not rising to the level of criminal obstruction). Examples of such conduct include: overly broad assertions of corporate representation of employees or former employees; inappropriate directions to employees or their counsel, such as directions not to cooperate openly and fully with the investigation including, for example, the direction to decline to be interviewed; making presentations or submissions that contain misleading assertions or omissions; incomplete or delayed production of records; and failure to promptly disclose illegal conduct known to the corporation.

Finally, a corporation's offer of cooperation does not automatically entitle it to immunity from prosecution. A corporation should not be able to escape liability merely by offering up its directors, officers, employees, or agents as in lieu of its own prosecution. Thus, a corporation's willingness to cooperate is merely one relevant factor, that needs to be considered in conjunction with the other factors, particularly those relating to the corporation's past history and the role of management in the wrongdoing.

## VII. Charging a Corporation: Corporate Compliance Programs

A. General Principle: Compliance programs are established by corporate management to prevent and to detect misconduct and to ensure that corporate activities are conducted in accordance with all applicable criminal and civil laws, regulations, and rules. The Department encourages such corporate self-policing, including voluntary disclosures to the government of any problems that a corporation discovers on its own. However, the existence of a compliance program is not sufficient, in and of itself, to justify not charging a corporation for criminal conduct undertaken by its officers, directors, employees, or agents. Indeed, the commission of such crimes in the face of a compliance program may suggest that the corporate management is not adequately enforcing its program. In addition, the nature of some crimes, e.g., antitrust violations, may be such that national law enforcement policies mandate prosecutions of corporations notwithstanding the existence of a compliance program.

B. Comment: A corporate compliance program, even one specifically prohibiting the very conduct in question, does not absolve the corporation from criminal liability under the doctrine of *respondeat superior*. *See United States v. Basic Construction Co.*, 711 F.2d 570 (4th Cir. 1983) ("a corporation may be held criminally responsible for antitrust violations committed by its employees if they were acting within the scope of their authority, or apparent authority, and for the benefit of the corporation, even if... such acts were against corporate policy or express instructions."). In *United States v. Hilton Hotels Corp.*, 467 F.2d 1000 (9th Cir. 1972), *cert. denied,* 409 U.S. 1125 (1973), the Ninth Circuit affirmed antitrust liability based upon a purchasing agent for a single hotel threatening a single supplier with a boycott unless it paid dues to a local marketing association, even though the agent's actions were contrary to corporate policy and directly against express instructions from his superiors. The

court reasoned that Congress, in enacting the Sherman Antitrust Act, "intended to impose liability upon business entities for the acts of those to whom they choose to delegate the conduct of their affairs, thus stimulating a maximum effort by owners and managers to assure adherence by such agents to the requirements of the Act."[5] It concluded that "general policy statements" and even direct instructions from the agent's superiors were not sufficient; "Appellant could not gain exculpation by issuing general instructions without undertaking to enforce those instructions by means commensurate with the obvious risks." *See also United States v. Beusch,* 596 F.2d 871, 878 (9th Cir. 1979) ("[A] corporation may be liable for the acts of its employees done contrary to express instructions and policies, but ... the existence of such instructions and policies may be considered in determining whether the employee in fact acted to benefit the corporation."); *United States v. American Radiator & Standard Sanitary Corp.,* 433 F.2d 174 (3rd Cir. 1970) (affirming conviction of corporation based upon its officer's participation in price-fixing scheme, despite corporation's defense that officer's conduct violated its "rigid anti-fraternization policy" against any socialization (and exchange of price information) with its competitors; "When the act of the agent is within the scope of his employment or his apparent authority, the corporation is held legally responsible for it, although what he did may be contrary to his actual instructions and may be unlawful.").

While the Department recognizes that no compliance program can ever prevent all criminal activity by a corporation's employees, the critical factors in evaluating any program are whether the program is adequately designed for maximum effectiveness in preventing and detecting wrongdoing by employees and whether corporate management is enforcing the program or is tacitly encouraging or pressuring employees to engage in misconduct to achieve business objectives. The Department has no formal guidelines for corporate compliance programs. The fundamental questions any prosecutor should ask are: "Is the corporation's compliance program well designed?" and "Does the corporation's compliance program work?" In answering these questions, the prosecutor should consider the comprehensiveness of the compliance program; the extent and pervasiveness of the criminal conduct; the number and level of the corporate employees involved; the seriousness, duration, and frequency of the misconduct; and any remedial actions taken by the corporation, including restitution, disciplinary action, and revisions to corporate compliance programs.[6] Prosecutors should also consider the promptness of any disclosure of wrongdoing to the government and the corporation's cooperation in the government's investigation. In evaluating compliance programs, prosecutors may consider whether the corporation has established corporate governance mechanisms that can effectively detect and prevent misconduct. For example, do the corporation's directors exercise independent review over proposed corporate actions rather than unquestioningly ratifying officers' recommendations; are the directors provided with information sufficient to enable the exercise of independent judgment, are internal audit functions conducted at a level sufficient to ensure their independence and accuracy and have the directors established an information and reporting system in the organization reasonable designed to provide management and the board of directors with timely and accurate information sufficient to allow them to reach an informed decision regarding the organization's compliance with the law. *In re: Caremark,* 698 A.2d 959 (Del. Ct. Chan. 1996).

Prosecutors should therefore attempt to determine whether a corporation's compliance program is merely a "paper program" or whether it was designed and implemented in an effective manner. In addition, prosecutors should determine whether the corporation has provided for a staff sufficient to audit, document, analyze, and utilize the results of the corporation's compliance efforts. In addition, prosecutors should determine whether the corporation's employees are adequately informed about the compliance program and are convinced of the corporation's commitment to it. This will enable the prosecutor to make an informed decision as to whether the corporation has adopted and implemented a truly effective compliance program that, when consistent with other federal law enforcement policies, may result in a decision to charge only the corporation's employees and agents.

Compliance programs should be designed to detect the particular types of misconduct most likely to occur in a particular corporation's line of business. Many corporations operate in complex regulatory environments outside the normal experience of criminal prosecutors. Accordingly, prosecutors should consult with relevant federal and state agencies with the expertise to evaluate the adequacy of a program's design and implementation. For instance, state and federal banking, insurance, and medical boards, the Department of Defense, the Department of Health and Human Services, the Environmental Protection Agency, and the Securities and Exchange Commission have considerable experience with compliance programs and can be very helpful to a prosecutor in evaluating such programs. In addition, the Fraud Section of the Criminal Division, the Commercial Litigation Branch of the Civil Division, and the Environmental Crimes Section of the Environment and Natural Resources Division can assist U.S. Attorneys' Offices in finding the appropriate agency office and in providing copies of

compliance programs that were developed in previous cases.

## VIII. Charging a Corporation: Restitution and Remediation

A. General Principle: Although neither a corporation nor an individual target may avoid prosecution merely by paying a sum of money, a prosecutor may consider the corporation's willingness to make restitution and steps already taken to do so. A prosecutor may also consider other remedial actions, such as implementing an effective corporate compliance program, improving an existing compliance program, and disciplining wrongdoers, in determining whether to charge the corporation.

B. Comment: In determining whether or not a corporation should be prosecuted, a prosecutor may consider whether meaningful remedial measures have been taken, including employee discipline and full restitution.[7] A corporation's response to misconduct says much about its willingness to ensure that such misconduct does not recur. Thus, corporations that fully recognize the seriousness of their misconduct and accept responsibility for it should be taking steps to implement the personnel, operational, and organizational changes necessary to establish an awareness among employees that criminal conduct will not be tolerated. Among the factors prosecutors should consider and weigh are whether the corporation appropriately disciplined the wrongdoers and disclosed information concerning their illegal conduct to the government.

Employee discipline is a difficult task for many corporations because of the human element involved and sometimes because of the seniority of the employees concerned. While corporations need to be fair to their employees, they must also be unequivocally committed, at all levels of the corporation, to the highest standards of legal and ethical behavior. Effective internal discipline can be a powerful deterrent against improper behavior by a corporation's employees. In evaluating a corporation's response to wrongdoing, prosecutors may evaluate the willingness of the corporation to discipline culpable employees of all ranks and the adequacy of the discipline imposed. The prosecutor should be satisfied that the corporation's focus is on the integrity and credibility of its remedial and disciplinary measures rather than on the protection of the wrongdoers.

In addition to employee discipline, two other factors used in evaluating a corporation's remedial efforts are restitution and reform. As with natural persons, the decision whether or not to prosecute should not depend upon the target's ability to pay restitution. A corporation's efforts to pay restitution even in advance of any court order is, however, evidence of its "acceptance of responsibility" and, consistent with the practices and policies of the appropriate Division of the Department entrusted with enforcing specific criminal laws, may be considered in determining whether to bring criminal charges. Similarly, although the inadequacy of a corporate compliance program is a factor to consider when deciding whether to charge a corporation, that corporation's quick recognition of the flaws in the program and its efforts to improve the program are also factors to consider.

## IX. Charging a Corporation: Collateral Consequences

A. General Principle: Prosecutors may consider the collateral consequences of a corporate criminal conviction in determining whether to charge the corporation with a criminal offense.

B. Comment: One of the factors in determining whether to charge a natural person or a corporation is whether the likely punishment is appropriate given the nature and seriousness of the crime. In the corporate context, prosecutors may take into account the possibly substantial consequences to a corporation's officers, directors, employees, and shareholders, many of whom may, depending on the size and nature (e.g., publicly vs. closely held) of the corporation and their role in its operations, have played no role in the criminal conduct, have been completely unaware of it, or have been wholly unable to prevent it. Prosecutors should also be aware of non-penal sanctions that may accompany a criminal charge, such as potential suspension or debarment from eligibility for government contracts or federal funded programs such as health care. Whether or not such non-penal sanctions are appropriate or required in a particular case is the responsibility of the relevant agency, a decision that will be made based on the applicable statutes, regulations, and policies.

Virtually every conviction of a corporation, like virtually every conviction of an individual, will have an impact on innocent third parties, and the mere existence of such an effect is not sufficient to preclude prosecution of the

corporation. Therefore, in evaluating the severity of collateral consequences, various factors already discussed, such as the pervasiveness of the criminal conduct and the adequacy of the corporation's compliance programs, should be considered in determining the weight to be given to this factor. For instance, the balance may tip in favor of prosecuting corporations in situations where the scope of the misconduct in a case is widespread and sustained within a corporate division (or spread throughout pockets of the corporate organization). In such cases, the possible unfairness of visiting punishment for the corporation's crimes upon shareholders may be of much less concern where those shareholders have substantially profited, even unknowingly, from widespread or pervasive criminal activity. Similarly, where the top layers of the corporation's management or the shareholders of a closely-held corporation were engaged in or aware of the wrongdoing and the conduct at issue was accepted as a way of doing business for an extended period, debarment may be deemed not collateral, but a direct and entirely appropriate consequence of the corporation's wrongdoing.

The appropriateness of considering such collateral consequences and the weight to be given them may depend on the special policy concerns discussed in section III, *supra*.

## X. Charging a Corporation: Non-Criminal Alternatives

A. General Principle: Although non-criminal alternatives to prosecution often exist, prosecutors may consider whether such sanctions would adequately deter, punish, and rehabilitate a corporation that has engaged in wrongful conduct. In evaluating the adequacy of non-criminal alternatives to prosecution, *e.g.*, civil or regulatory enforcement actions, the prosecutor may consider all relevant factors, including:

    1. the sanctions available under the alternative means of disposition;

    2. the likelihood that an effective sanction will be imposed; and

    3. the effect of non-criminal disposition on Federal law enforcement interests.

B. Comment: The primary goals of criminal law are deterrence, punishment, and rehabilitation. Non-criminal sanctions may not be an appropriate response to an egregious violation, a pattern of wrongdoing, or a history of non-criminal sanctions without proper remediation. In other cases, however, these goals may be satisfied without the necessity of instituting criminal proceedings. In determining whether federal criminal charges are appropriate, the prosecutor should consider the same factors (modified appropriately for the regulatory context) considered when determining whether to leave prosecution of a natural person to another jurisdiction or to seek non-criminal alternatives to prosecution. These factors include: the strength of the regulatory authority's interest; the regulatory authority's ability and willingness to take effective enforcement action; the probable sanction if the regulatory authority's enforcement action is upheld; and the effect of a non-criminal disposition on Federal law enforcement interests. *See* USAM §§ 9-27.240, 9-27.250.

## XI. Charging a Corporation: Selecting Charges

A. General Principle: Once a prosecutor has decided to charge a corporation, the prosecutor should charge, or should recommend that the grand jury charge, the most serious offense that is consistent with the nature of the defendant's conduct and that is likely to result in a sustainable conviction.

B. Comment: Once the decision to charge is made, the same rules as govern charging natural persons apply. These rules require "a faithful and honest application of the Sentencing Guidelines" and an "individualized assessment of the extent to which particular charges fit the specific circumstances of the case, are consistent with the purposes of the Federal criminal code, and maximize the impact of Federal resources on crime." *See* USAM § 9-27.300. In making this determination, "it is appropriate that the attorney for the government consider, *inter alia*, such factors as the sentencing guideline range yielded by the charge, whether the penalty yielded by such sentencing range ... is proportional to the seriousness of the defendant's conduct, and whether the charge achieves such purposes of the criminal law as punishment, protection of the public, specific and general deterrence, and rehabilitation." *See* Attorney General's Memorandum, dated October 12, 1993.

## XII. Plea Agreements with Corporations

A. General Principle: In negotiating plea agreements with corporations, prosecutors should seek a plea to the most serious, readily provable offense charged. In addition, the terms of the plea agreement should contain appropriate provisions to ensure punishment, deterrence, rehabilitation, and compliance with the plea agreement in the corporate context. Although special circumstances may mandate a different conclusion, prosecutors generally should not agree to accept a corporate guilty plea in exchange for non-prosecution or dismissal of charges against individual officers and employees.

B. Comment: Prosecutors may enter into plea agreements with corporations for the same reasons and under the same constraints as apply to plea agreements with natural persons. *See* USAM §§ 9-27.400-500. This means, *inter alia*, that the corporation should be required to plead guilty to the most serious, readily provable offense charged. As is the case with individuals, the attorney making this determination should do so "on the basis of an individualized assessment of the extent to which particular charges fit the specific circumstances of the case, are consistent with the purposes of the federal criminal code, and maximize the impact of federal resources on crime. In making this determination, the attorney for the government considers, inter alia, such factors as the sentencing guideline range yielded by the charge, whether the penalty yielded by such sentencing range ... is proportional to the seriousness of the defendant's conduct, and whether the charge achieves such purposes of the criminal law as punishment, protection of the public, specific and general deterrence, and rehabilitation." *See* Attorney General's Memorandum, dated October 12, 1993. In addition, any negotiated departures from the Sentencing Guidelines must be justifiable under the Guidelines and must be disclosed to the sentencing court. A corporation should be made to realize that pleading guilty to criminal charges constitutes an admission of guilt and not merely a resolution of an inconvenient distraction from its business. As with natural persons, pleas should be structured so that the corporation may not later "proclaim lack of culpability or even complete innocence." *See* USAM §§ 9-27.420(b)(4), 9-27.440, 9-27.500. Thus, for instance, there should be placed upon the record a sufficient factual basis for the plea to prevent later corporate assertions of innocence.

A corporate plea agreement should also contain provisions that recognize the nature of the corporate "person" and ensure that the principles of punishment, deterrence, and rehabilitation are met. In the corporate context, punishment and deterrence are generally accomplished by substantial fines, mandatory restitution, and institution of appropriate compliance measures, including, if necessary, continued judicial oversight or the use of special masters. *See* USSG §§ 8B1.1, 8C2.1, *et seq.* In addition, where the corporation is a government contractor, permanent or temporary debarment may be appropriate. Where the corporation was engaged in government contracting fraud, a prosecutor may not negotiate away an agency's right to debar or to list the corporate defendant.

In negotiating a plea agreement, prosecutors should also consider the deterrent value of prosecutions of individuals within the corporation. Therefore, one factor that a prosecutor may consider in determining whether to enter into a plea agreement is whether the corporation is seeking immunity for its employees and officers or whether the corporation is willing to cooperate in the investigation of culpable individuals. Prosecutors should rarely negotiate away individual criminal liability in a corporate plea.

Rehabilitation, of course, requires that the corporation undertake to be law-abiding in the future. It is, therefore, appropriate to require the corporation, as a condition of probation, to implement a compliance program or to reform an existing one. As discussed above, prosecutors may consult with the appropriate state and federal agencies and components of the Justice Department to ensure that a proposed compliance program is adequate and meets industry standards and best practices. *See* section VII, *supra.*

In plea agreements in which the corporation agrees to cooperate, the prosecutor should ensure that the cooperation is complete and truthful. To do so, the prosecutor may request that the corporation waive attorney-client and work product protection, make employees and agents available for debriefing, disclose the results of its internal investigation, file appropriate certified financial statements, agree to governmental or third-party audits, and take whatever other steps are necessary to ensure that the full scope of the corporate wrongdoing is disclosed and that the responsible culprits are identified and, if appropriate, prosecuted. *See* generally section VIII, *supra.*

**Footnotes:**

1. While these guidelines refer to corporations, they apply to the consideration of the prosecution of all types of business organizations, including partnerships, sole proprietorships, government entities, and unincorporated associations.

2. In addition, the Sentencing Guidelines reward voluntary disclosure and cooperation with a reduction in the corporation's offense level. *See* USSG §8C2.5)g).

3. This waiver should ordinarily be limited to the factual internal investigation and any contemporaneous advice given to the corporation concerning the conduct at issue. Except in unusual circumstances, prosecutors should not seek a waiver with respect to communications and work product related to advice concerning the government's criminal investigation.

4. Some states require corporations to pay the legal fees of officers under investigation prior to a formal determination of their guilt. Obviously, a corporation's compliance with governing law should not be considered a failure to cooperate.

5. Although this case and *Basic Construction* are both antitrust cases, their reasoning applies to other criminal violations. In the Hilton case, for instance, the Ninth Circuit noted that Sherman Act violations are commercial offenses "usually motivated by a desire to enhance profits," thus, bringing the case within the normal rule that a "purpose to benefit the corporation is necessary to bring the agent's acts within the scope of his employment." 467 F.2d at 1006 & n4. In addition, in *United States v. Automated Medical Laboratories*, 770 F.2d 399, 406 n.5 (4th Cir. 1985), the Fourth Circuit stated "that Basic Construction states a generally applicable rule on corporate criminal liability despite the fact that it addresses violations of the antitrust laws."

6. For a detailed review of these and other factors concerning corporate compliance programs, see United States Sentencing Commission, GUIDELINES MANUAL, §8A1.2, comment. (n.3(k)) (Nov. 1997). *See also* USSG §8C2.5(f)

7. For example, the Antitrust Division's amnesty policy requires that "[w]here possible, the corporation [make] restitution to injured parties...."

# Exhibit P

## WHITE-COLLAR CRIME

# The McNulty Memorandum

### By Andrew Weissmann and Ana R. Bugan

 

On the heels of mounting criticism, the U.S. Department of Justice (DOJ) recently instituted significant revisions to its corporate charging guidelines. The "Thompson Memorandum"—as the now superseded guidelines were informally known—had come under fire from several sectors, including the business and legal communities, a federal judge and Congress. Critics complained that the Thompson memo was eroding the attorney-client privilege and infringing on the Fifth and Sixth Amendment rights of employees who refused to cooperate with the government's investigation. Indeed, the din from such criticism led to the question of whether the Thompson memo would survive. It has not. The question now becomes whether the new memorandum, named after the current deputy attorney general, Paul McNulty, will suffer the same fate, offering too little, too late by way of necessary reforms. McNulty Memorandum, www.usdoj.gov/dag/speech/2006/mcnulty_memo.pdf.

## The McNulty Memorandum includes several revisions

The Thompson memo required prosecutors to consider several factors in

---

**Andrew Weissmann** *is a partner in the New York office of Jenner & Block, and* **Ana R. Bugan** *is an associate in its Chicago office. Weissmann is a former director of the Enron Task Force and testified before Congress concerning the Thompson Memorandum in September 2006. Both are members of the firm's white-collar criminal defense and counseling practice group.*

---

determining whether to indict a company. The most controversial one was whether the company had cooperated with the government's investigation by agreeing to waive the attorney-client and work-product protections when asked by the government. In response to the criticism, the McNulty memo institutes procedures a prosecutor must follow before asking a company for a privilege waiver. First, the prosecutor must establish a "legitimate need" for the protected materials.

Part of the legitimate-need calculation is whether the information is available from other, nonprivileged sources and the degree to which the information will benefit the government's investigation. Moreover, if the waiver is sought for attorney-client protected information and nonfactual work product, the deputy attorney general must personally approve such waiver request in advance. And, in a critical new provision, even if the request is approved, a company's refusal to waive the attorney-client privilege in the latter circumstance may not count against it in a charging decision.

The McNulty memo also virtually eliminates from a prosecutor's consideration another controversial Thompson factor: whether a company is paying the

legal fees of employees who are under investigation or have been indicted. Judge Lewis Kaplan, in a ruling in the KPMG tax-shelter fraud case, held that this provision of the Thompson memo infringes upon the Fifth Amendment due process clause and the Sixth Amendment. *U.S. v. Stein*, 435 F. Supp. 2d 330 (S.D.N.Y. 2006).

The McNulty memo's rationale for the elimination, namely that many corporations are contractually obligated to advance legal fees, differs significantly from Kaplan's. Regardless of the stated rationale, however, the McNulty memo takes this controversial factor off the table, with one small exception. The payment of legal fees can be considered against a company if the "totality of the circumstances" indicates that the advancement of fees is part of an effort to impede the government's investigation. Even then, the new guidelines require a prosecutor to obtain approval from the deputy attorney general before he or she can weigh the payment in a charging decision.

The McNulty memo is promising in several important respects. The revisions will likely go far in curbing the "culture of waiver"—the tendency of certain prosecutors to demand blanket waivers at the very outset of an investigation or simply for convenience's sake, even though the information could be obtained by the government through nonprivileged channels. For instance, a prosecutor previously was permitted to seek memoranda of employee interviews, even though the employees were available for the prosecutor to interview herself. The McNulty memo states that "[a] legitimate need for the information is not established by concluding it is merely desirable or

convenient to obtain privileged information." Also, the requirement that prosecutors justify the need for a waiver to their boss (or their boss's boss) is likely to make them reluctant to seek waivers in borderline cases.

The revised policy also increases the prospect of greater uniformity across the 93 U.S. attorneys' offices. A significant problem under the Thompson memo was that it gave prosecutors a green light to seek waivers, but offered no guidance about when it was appropriate to do so or under what circumstances a company's failure to waive should be taken as noncooperation. The considerable variances in interpretation that resulted subjected companies, many of which are national or international in scope, to the vagaries and unreviewed decisions of an individual prosecutor. The new memo, which establishes two senior officials at Main Justice—the deputy attorney general and the assistant attorney general—as gatekeepers, holds out the prospect of a consistent, national policy for waiver requests.

Despite these salutary provisions, the McNulty memo is vulnerable to valid criticism that it does not go far enough. For instance, it is probable that companies will continue to feel pressure to waive the privilege because the McNulty memo still gives "credit" to those companies that waive. While a refusal to disclose legal advice and attorney-client communications may not count against a company, the same does not hold true for information the government deems "purely factual." Such information "may or may not be privileged" and includes "purely factual interview memoranda...factual chronologies, factual summaries, or reports...containing investigative facts documented by counsel." A prosecutor must first show a legitimate need for the materials and obtain permission prior to requesting the waiver. But if the company refuses to waive, the prosecutor may ultimately consider that refusal against it in making a charging decision.

The McNulty memo falls short of the recommendations of Thompson memo critics, such as the American Bar Association, the Heritage Foundation and even former senior DOJ officials, who called for the complete elimination of waiver as a

consideration in corporate charging decisions. Nor does it go as far as would legislation first proposed by Senator Arlen Specter, R-Pa., in December 2006 and reintroduced in January. Unlike the revised guidelines, the Attorney-Client Privilege Protection Act would categorically prohibit prosecutors from conditioning a charging decision on any valid assertion of the attorney-client privilege or work-product protection, regardless of

■ ■

## Memo disappoints Thompson memo critics, who called for total elimination of waiver as a consideration in charging decisions.

■ ■

whether DOJ deems the requested materials "purely factual." Some have suspected that the timing of the McNulty memo, just five days after Specter introduced his bill, is DOJ's attempt to pre-empt this more far-reaching legislation, which would remove regulation of the waiver issue from DOJ's hands.

## McNulty safeguards do not apply to voluntary waivers

Under the McNulty memo, companies are likely to continue to experience pressure to waive privilege for another reason. The safeguards it lays out do not apply when a company voluntarily waives the privilege in the absence of a formal waiver request. The pressure to make a voluntary waiver may arguably be even greater than it was before, as companies seek to obtain favor with the government by eliminating a prosecutor's need to jump through the hoops of securing a formal request. As long as waiver weighs favorably in the balance, coercive pressures will remain, as will the

negative impact on the ability of employees to have full and candid discussions with counsel. Companies may at first blush consider this a positive step. In reality, it serves to encourage waivers with little or no concomitant benefit. A company's voluntary privilege waiver will rarely be determinative of the charging decision. This factor is overwhelmed by myriad others, such as the nature, severity and scope of the criminal conduct, and a history of recidivism. The McNulty memo also fails to address another criticism of the Thompson memo. Specter's bill would bar conditioning a charging decision on a company's failure to fire an employee who refuses to cooperate with the investigation. The McNulty memo leaves the Thompson language unchanged.

Perhaps the McNulty memo's greatest shortcoming is that it does not require DOJ approval of the most critical decision—whether to prosecute a company. That determination remains in the hands of individual prosecutors. In the post-Enron world it is not too much of a stretch to say, as did Kaplan in the KPMG case, that an indictment could be a corporate death sentence. Given these dire potential consequences, the decision to prosecute a company should receive at least the same review as the decision to seek privileged materials—namely, approval by the deputy attorney general.

The greatest potential threat to the McNulty memo's longevity comes from Specter's bill. Calling the DOJ's changes "insufficient" and the new protections for the privilege "inadequate," the senator reintroduced his bill in January. The bill has been referred to the Senate Judiciary Committee, but its members may well wait and see how the revised guidelines play out in practice. If the memo succeeds in dampening congressional resolve, DOJ's limited concessions will have staved off much-needed reforms. ■NLJ

This article is reprinted with permission from the February 5, 2007 edition of THE NATIONAL LAW JOURNAL. © 2007 ALM Properties, Inc. All rights reserved. Further duplication without permission is prohibited. For information, contact ALM, Reprint Department at 800-888-8300 x6111 or visit www.almreprints.com. #005-02-07-0002

# Exhibit Q

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 4:CR-05-0402 |
| | : | |
| v. | : | |
| | : | (JONES, J.) |
| JOHN J. RIGAS and | : | |
| TIMOTHY J. RIGAS | : | **ELECTRONICALLY FILED** |

**REPLY BRIEF OF THE UNITED STATES IN SUPPORT OF
OBJECTIONS AND PROTECTIVE ORDER CONCERNING DISCOVERY
RELATED TO DEFENDANTS' MOTION TO DISMISS THE
INDICTMENT ON FIFTH AND SIXTH AMENDMENT GROUNDS**

The Rigases clearly are using the motion to dismiss and related discovery as a stalking horse for a collateral challenge to their fraud convictions in the Southern District of New York. Despite a 79-page opposition brief and extensive discovery, the Rigases have failed to show any impairment of their Sixth Amendment rights in this criminal tax prosecution resulting from Adelphia's actions in not advancing legal fees. Instead they present information derived principally from the securities fraud prosecution and the bankruptcy case in the Southern District, which, far from impairing their defense in this case, have made them much better prepared because of the readily available testimony, exhibits, and discovery gained from those prior proceedings. They have failed to show that prosecutors in any way interfered with their Sixth Amendment rights in either the New York case or this criminal tax matter. And by not raising them on remand in the Southern District of New York, the Rigases are

estopped from claiming that their defense is impaired in this case, some nine years after Adelphia decided not to advance the Rigases' legal fees.

## 1.  The Rigases Have Failed to Show the Government Interfered With Their Right to Counsel.

In United States v. Stein, the Second Circuit concluded that the defendants had been deprived of attorneys' fees "as a direct consequence of the government's overwhelming influence" which resulted in a violation of the defendants' Sixth Amendment rights. 541 F.3d 130, 136 (2d Cir. 2008).  The Court found that the government "forced KPMG to adopt its constricted Fees Policy" and then "became 'entwined in the ... control' of KPMG in enforcing that policy. Id. at 148.  In contrast, the Rigases have not shown that prosecutors in the Southern District of New York ever interfered or influenced in any way  Adelphia's decision not to advance legal fees to them.  Nothing in the voluminous discovery materials generated to date reveals any grounds to believe that prosecutors ever tried to prevent the Rigases from funding their defense of any criminal or civil action.  In fact, as represented to the bankruptcy court, the prosecutors in the New York criminal case never opposed or took any position against requests to the bankruptcy court for orders allowing the Rigases to sell assets to fund their defense or make whatever arrangements they needed to fund their defense.  (Government Exhibit 2, p. 22-23)

2

Moreover, while their arguments assume such knowledge, the Rigases have not demonstrated that prosecutors knew of the Adelphia Board's decision to withhold advancement of legal fees before the decision was made on June 1, 2002.  Based on discussions with counsel having knowledge and information concerning the June 1, 2002 Board meeting, the United States proffers that the prosecutors were not even advised of Adelphia's decision until after the Board decided not to advance legal fees to the Rigases on June 1, 2002. Likewise, while it is certainly true that Adelphia and its independent directors and management were acutely aware that the company could be indicted, the Rigases have brought forth no evidence, despite extensive pre-trial discovery, that Adelphia declined to cover the Rigases' legal expenses as a means to avoid being indicted, or otherwise took such action at the government's request.  The face of the Board minutes reporting the decision not to advance legal fees plainly establishes two fundamental reasons for not advancing legal fees: The Rigases failure to cooperate with the Special Committee investigating their misconduct and the astounding level of self-dealing by them.  And both these grounds are fully consistent with Adelphia's corporate by-laws.[1]

---

[1]Section 6.2 of the Adelphia By-laws specifically provided that the Rigases were not entitled to advancement of defense expenses if the Board of Directors or independent legal counsel reasonably determines that [they] deliberately breached [their] duty to the Corporation or its shareholders."  (Rigas Exhibit 9)

The most the Rigases have come up with to show governmental interference in the funding of their defense in New York is the Covington & Burling letter dated August 9, 2002, in which lawyers for Adelphia outlined the company's compliance with the Holder Memorandum and reasons why it should not be indicted.   They make much of language stating that the Holder Memorandum had been followed "to the letter," yet not every factor contained in the memorandum is addressed in the Covington letter.   For example, the letter does not discuss such factors as restitution and disciplinary actions against corporate employees (other than the Rigases), considerations specifically identified in the Holder Memorandum.

But most important, despite the Rigases' claim that it constitutes "smoking gun" evidence of government pressure causing Adelphia not to advance defense costs, the Covington letter is strikingly silent on that very point.   While it includes a nine-page discussion of the Holder factors, the letter never mentions the Board's decision not to fund the Rigases' defense, let alone feature it as a reason for not prosecuting Adelphia.   Likewise, almost two years later, in a November 2004 presentation on the Thompson Memorandum factors to prosecutors in the Southern District of New York, Adelphia's counsel again omitted any reference to the company's decision not to advance the Rigases legal fees. Presumably, if Adelphia and its counsel truly sought to curry favor

4

with the government by denying the Rigases the means to fund their legal defense, that issue would have occupied a prominent position in both the letter and presentation requesting that the company not be indicted.   Instead, that issue is never mentioned, even in passing.

Contrary to its portrayal by the Rigases, the Holder Memorandum, like the later Thompson Memorandum, did not require prosecutors to consider whether a corporation has advanced attorneys fees to its employees.   In fact, the Holder Memorandum stated that advancement of legal fees may be considered in weighing the extent and value of a corporation's cooperation.   Yet if Adelphia actually had denied the Rigases attorneys fees to avoid indictment, as the Rigases maintain, one would expect their counsel to emphasize that fact to prosecutors on both occasions when Adelphia sought to avoid indictment.   But instead the Rigases' own exhibits establish that Covington & Burling never even asked the government to consider in weighing whether to indict Adelphia that the company declined to advance funds to the Rigases for their legal defense.   It made no sense for its attorneys to leave that out of its presentations to the government on whether it should be indicted, unless, of course, the company declined to advance legal fees because of the Rigases' misconduct, rather than to garner credit with the government under the Holder factors.

Equally dramatic, but no more persuasive, is the Rigases' claim that in January 2005, following their convictions, Adelphia again succumbed to pressure exerted by the government with respect to the so-called Rigas Managed Entities, or RME's.  The Rigases contend that prosecutors threatened to indict those entities in an effort to prevent Adelphia from providing the Rigases with legal fees.  However, they fail to mention the context in which discussions concerning a possible indictment of the RME's arose: As the Rigases' own exhibits show clearly, indictment of the managed entities and Adelphia represented a means to render those assets forfeitable, or otherwise recoverable, as restitution to the victims in the face of the bankruptcy action contemplated by the creditors' committee.  (Rigas Exhibit 23, p. 3-12)  Counsel who participated in those discussions reported that the creditors' committee in the Adelphia bankruptcy proceedings had threatened to put the RME's into bankruptcy, an action that would have tied up assets held by those entities as a source of restitution to victims and for satisfying the $2.5 billion forfeiture judgment against the Rigases in connection with their pending sentences.  (Rigas Exhibit 23, p. 3)  Indeed, Adelphia devoted an entire a slide show presentation to an analysis of the economic impact and other consequences of criminally forfeiting the RME's.  (Rigas Exhibit 23, Ex. 2 p. 3)  Thus any discussion of indicting Adelphia or the RME's which occurred after the Rigases' conviction and the jury's

forfeiture finding focused on ensuring that the potential bankruptcy of the RME's did not prevent the recovery of restitution, rather than curtailing funding for the Rigases' legal defense.

The Rigases' effort to spin threads of governmental interference from notes and minutes of Board meetings are not any more convincing. For example, the Rigases maintain that the May 18, 2002 minutes show that the Board was concerned that the government would "not permit" payments to the Rigases. However, it is clear that the Board was considering severance payments following their termination as corporate officers, not the payment of legal expenses as the Rigases maintain. (Rigas Exhibit 11) More important, in connection with the issue of severance payments, the Board focused on the level of cooperation by John and Tim Rigas with the Special Committee investigation and the pending request by the committee to interview them. (Rigas Exhibit 11) Rather than demonstrating any government interference, what the minutes really show is the failure of the Rigases to cooperate with the company's investigation of their wrongdoing, a factor that weighed heavily in the Board's decision not to fund the Rigases' legal defense.

The May 18, 2002 minutes make abundantly clear that the level of the Rigases' cooperation with the Special Committee investigation, or lack thereof, was a cause of considerable concern to the Board. In fact, counsel for the Special Committee

7

"reiterated" the committee's "request for interviews of the Rigas Family" and emphasized that the "palatability" of severance payments to the Rigases (not indemnification as the defendants maintain) "would depend on the family's ability to cooperate with the investigation of the special committee." (Rigas Exhibit 11, p. 2)   Referring to the question of severance arrangements, counsel for the committee stated that "the government might not permit that type of arrangement if the members of the Rigas Family did not cooperate with the investigation of the Special Committee." Id. But significantly in offering that prediction, Adelphia's counsel never stated that prosecutors had made any demands with respect to the issues of severance, let alone indemnification for legal fees.

 Similarly, notes about prosecutors being "appalled" clearly refer to the proposed severance package and retention of board seats by the Rigases -- in the face of public disclosure of their wrongdoing --- and not to the advancement of legal expenses.  (Rigas Exhibit 31)  And a reference to the fact that the government "[m]ay indict the Company" expressed what was obvious to Adelphia management in May 2002 – indictment of the company was certainly a possibility in light of the breadth and flagrancy of the Rigases' self-dealing and looting of corporate funds.  (Rigas Exhibit 31)

     The Rigases also attempt to characterize certain notes and e-mail messages as revealing the government's purported displeasure with Adelphia over payments to the Rigases.  However, references to

"the need to stop the flow of funds" to the Rigas family clearly do not concern the payment of the Rigases' legal defense costs by Adelphia. Instead, they center on prosecutors' and SEC regulators' understandable concern about the full disclosure of the Rigases' related party transactions involving millions of dollars in Adelphia funds, including the use of $200 million in co-borrowed funds to cover the Rigases' personal margin loans, the need to ensure repayment of the corporate funds diverted by the Rigases, and the implementation of measures to prevent the Rigases from engaging in additional transfers of funds and other misconduct. (Rigas Exhibit 26)   The notes thus reflect discussions with prosecutors concerning the dissipation of corporate assets by the Rigases and not any effort to curtail their right to counsel. Likewise, an e-mail message between Adelphia's counsel and a prosecutor is portrayed as revealing the company's attempt "to appease" the government, when it simply refers to a release being prepared in August 2002 for employees on administrative leave covering such issues as return of corporate property and records and its impact on records already provided to the government by Adelphia employees – an event occurring well after the Board's decision denying advancement of legal fees to the Rigases – and an agreement concerning interviews of employees cooperating with the on-going criminal investigation.

Unlike the facts in <u>United States v. Stein</u>, the Rigases have
not demonstrated any connection between the conduct of prosecutors
and the decision of Adelphia to decline to advance legal fees for
their defense.   Nothing  in  the  record  indicates  that  the
prosecutors in the Southern District of New York raised the subject
of advancing legal fees in discussions with Adelphia officials, let
alone  that  the  advancement  of  fees  would  be  held  against  the
company in any manner.   In <u>Stein</u>, the district court found that but
for  the  government  interference,  KPMG  in  that  case  would  have
advanced unlimited legal fees to the defendants.  541 F.3d at 146.
District courts applying <u>Stein</u> have emphasized that defendants must
show that prosecutors and regulators "significantly encouraged"
termination  of  legal  fees,  "became  entwined  in  the  control"  of
corporate  decisions  denying  attorney's  fees  to  employees,  or
otherwise wrongfully interfered in a defendant's right to use his
funds  to  retain  the  counsel  of  choice,  or  that  a  decision  to
terminate  legal  fees  was  the  "direct  consequence  of  the  pressure
applied by" the Thompson or Holder memoranda.  <u>See</u> <u>United States v.</u>
<u>Balsinger</u>, 2009 WL 2750673, *3-*4 (E.D. Wis. 2009)(record did not
show government coercion was "sole cause" of company's decision to
limit payment of defendants' legal defense fees; nothing to show
that prosecutors raised the subject of legal fees with company or
indicated that advancement of fees would be used against company);
<u>SEC v. Dunn</u>, 587 F.Supp.2d 486, 512-513 (S.D. N.Y. 2008)(no facts

showing that decision to terminate employee's legal fees was "direct consequence" of Thompson Memorandum or SEC "significantly encouraged" or became "entwined" in decision-making process); United States v. Rosen, 487 F.Supp.2d 721; 726 (E.D. Va. 2007)(allegation that government pointedly asked employer at meeting if it was paying employee defendants' legal fees and indicated employer should cease paying fees enough to show wrongful interference with right to counsel).  Here, the Rigases have not produced any records even suggesting that Adelphia would have advanced attorneys fees to the Rigas in the absence of the Holder memorandum or that prosecutors pressured Adelphia to deny the advancement of attorney's fees to the Rigases or any other employee, or otherwise involved themselves in the control of Adelphia or the decision not to advance attorneys fees.

Accordingly, additional discovery will have no appreciable impact in resolving the Rigases' motion to dismiss on Sixth Amendment grounds.  Even assuming *arguendo* that Adelphia believed it was complying with the Holder memo by not funding defense costs – a prospect belied by the Covington & Burling presentations – the Rigases have failed to show that government conduct pressured Adelphia to withhold advancement of legal fees.  Nor have they shown that but for any government conduct Adelphia would have unconditionally funded their criminal legal defense in view of information available at the time concerning their sweeping

diversion of corporate funds for their personal gain and their failure to cooperate with the Board's investigation of their conduct. In short, the discovery produced to date shows that Adelphia's decision was the direct consequence of the Rigases' criminal conduct, not any actions or influence by the government.

2. **The Bankruptcy Court Proceedings, the Fraud Conviction, the Rigases' Failure to Raise their Stein Claims on Remand to the Southern District, and the Adelphia-Rigas Settlement Estop the Rigases From Seeking Relief in this Criminal Tax Prosecution.**

The bankruptcy court decisions holding that Adelphia was not required to indemnify them for defense costs, their conviction for securities and bank fraud, the post-conviction settlement agreement and their failure to raise their Stein claim on remand in the New York criminal case undermine the Rigases' motion for dismissal of the pending criminal tax charges **in this case.** Despite claiming that their right to counsel was impaired when Adelphia decided not to advance their legal fees, the Rigases have acknowledged in bankruptcy proceedings that they were not entitled to have their defense costs paid out of Adelphia assets. As Judge Lynch stated in deciding appeals by the Rigases and Adelphia from a temporary restraining order issued in the bankruptcy proceeding, all parties to that action "acknowledge that the Rigases are not entitled to

have their defense costs paid out of Adelphia assets ... ."[2] _Adelphia Communications Corp. v. Rigas_, 2004 WL 2186582, *13 (September 27, 2004 S.D.N.Y). Judge Lynch vacated an order of the bankruptcy court directing Adelphia to release $12.8 million from the RME's to the Rigases for criminal defense costs and remanded for further proceedings. _Id._ at *13-*14. Following remand to the bankruptcy court for determination of whether the Rigases had some legal entitlement to the managed entities' cash flow, Judge Gerber further emphasized that the bankruptcy court had previously determined that it would not direct Adelphia to spend any of its own funds for the Rigases' defense, and "neither side has quarreled with this view." _In re Adelphia Communications Corp._, 323 B.R. 345, 394 (S.D.N.Y. 2005). In fact, Judge Gerber specifically found that the managed entities could make the payments of the $12.8 million "without tapping Adelphia itself." _Id._ at 394.

However, Judge Gerber determined that because of their convictions on the New York fraud charges the Rigases were not entitled to indemnification. _Id._ at 379. Judge Gerber further found that in light of the jury verdicts, neither John nor Timothy Rigas acted in good faith and that the jury verdicts "trumped" the Rigases' declarations that they acted in good faith without

---

[2]Indeed, in their motion to modify the temporary restraining order to permit funding of criminal and civil defense costs, the Rigases were "not requesting that Adelphia pay for their criminal and civil defense costs." (Rigas Exhibit 41 p. 8)

reasonable cause to believe they were acting unlawfully. <u>Id</u>. at 389. Indeed, Judge Gerber agreed that "it was 'surreal and imaginary' for the Rigases to conclude that after a jury verdict there was 'no reasonable cause to believe that they had acted illegally.'"

The Rigases have not satisfactorily accounted for how the funds disbursed for their civil and criminal defense through the bankruptcy proceedings – up to $38 million paid from the managed entities – were insufficient for them to prepare a defense, whether in this case, or in the New York prosecution.[3] <u>See id</u>. at 362. Nor have they mustered a sensible explanation of why, despite their own acknowledgment in the bankruptcy proceedings and the jury verdicts in the Southern District of New York, Adelphia's action in declining advancement of legal fees for their defense was unjustified. Surely if their convictions for fraud preclude indemnification for criminal defense costs in the Southern District of New York by the managed entities in which they had a legal interest, the Rigases could not have reasonably expected to have their legal defense costs in this case covered by Adelphia. The

---

[3]Perhaps the answer lies in the discovery requested by the United States from the Rigases, specifically billing records for legal fees incurred by the Rigases and the RME's in connection with the New York criminal prosecution, the bankruptcy proceedings, and this case. That discovery, however, has not been produced yet. The United States reserves the right to supplement its protective order motion following production and review of those materials.

bankruptcy decisions authorizing the disbursement of funds from the managed entities sought to balance the interests of Adelphia and the Rigases' right to use the RME's to fund their defense.  But the Rigases cannot blame prosecutors when they run out of the many millions of dollars allocated through the bankruptcy court and the global settlement agreement negotiated by them to pay for their criminal defense.

Significantly, the Rigases failed to raise their Sixth Amendment claims in the Southern District of New York, where the alleged improper deprivation of legal fees originated.  Following an appeal of the fraud convictions, their case was remanded on May 24, 2007 to Judge Sand in the Southern District of New York for resentencing.  Although <u>United States v. Stein</u>, 435 F.Supp.2d 330 (S.D.N.Y. 2006) had been decided by then, the Rigases failed on remand to raise their Sixth Amendment arguments in conjunction with renewed challenges to their convictions on other legal grounds. The Rigases had the opportunity to bring their claims under the Sixth Amendment via post-trial motions, but chose not to raise them with Judge Sand.  Instead, the Rigases waited until 2008 to file their motion to dismiss in this case, despite the fact that most of the relevant evidence and witnesses reside in the Southern District of New York and the alleged conduct that they complain of occurred there in 2002.

Nor can the Rigases credibly complain about an alleged impairment of their right to counsel in this case, when they agreed to the creation of a legal defense fund in entering into a comprehensive settlement agreement with Adelphia and the United States Attorney for the Southern District of New York which settled all forfeiture claims and related bankruptcy claims, a global agreement approved by the bankruptcy court and the district court and entered into by the Rigases, their family members, and the RME's. Significantly, the Rigases were well aware of this pending criminal tax prosecution in April 2005 when they entered into the settlement with Adelphia and the government which created their $11.5 million legal defense fund. Their counsel met with members of the Tax Division and the United States Attorney's office for this district concerning the instant charges on or about January 24, 2005. They thus entered into that agreement with full knowledge of the need to fund a legal defense in this district. They further agreed to the transfer of assets in which they had an interest knowing that those resources would be forfeited in connection with the New York fraud convictions and no longer available to finance their legal representation in this case. Accordingly, the Rigases are estopped from seeking dismissal of this case because they are running out of money for legal fees, when the circumstances giving rise to their financial position are

16

the product of their own settlement negotiations in the New York prosecution and ultimately their own criminal conduct.

If the discovery permitted to date establishes anything, it is that the Rigases' claims should have been presented in the Southern District of New York.  That is where most of the evidence and witnesses concerning Adelphia's decision not to advance their legal fees reside.  And that is where the bankruptcy case was filed and proceedings conducted which largely determined the amount and the manner in which legal fees were paid to the Rigases from the RME's.  Accordingly, the Court should not give the Rigases further opportunity to take discovery on an issue that best lay in the Southern District of New York.

## 3.   The Rigases Have Failed to Establish How Their Defense in This Criminal Tax Case Has been Impaired.

The many millions of dollars received by the Rigases to fund their civil and criminal defense costs, mark a dramatic difference between the facts in this case and the <u>Stein</u> decision so heavily relied upon by them.  In <u>Stein</u>, the district court found that the defendants were denied the counsel of their choice based on KPMG's decision not to fund their defense.  By contrast, in the New York fraud case the Rigases had the benefit of preeminent white collar criminal practitioners, distinguished counsel chosen by them.  The Rigases entered into a joint defense agreement with each other and co-defendants Mulcahey and Michael Rigas which specifically

17

provided for the sharing of documents, reports, memos, interviews, and work product.  They also had the benefit of appellate counsel of their choosing to represent them in two appeals of the New York convictions.  Unlike the defendants in Stein who were cut off from funds to pay counsel chosen to represent them, the Rigases received millions of dollars authorized through the Adelphia bankruptcy proceedings to pay attorneys selected by them.  Cf. United States v. Rosen, 487 F.Supp.2d at 734-735 (notwithstanding government interference that allegedly led to loss of fee payments, no prejudice to defense where counsel chosen by defendants remained fully engaged in case and provided zealous and very effective defense).

The discovery developed until now has failed to establish that any governmental conduct influenced Adelphia's decision to withhold advancement of legal fees to the Rigases, or that the Rigases were denied the counsel of their choice.  While the Court permitted discovery in connection with the motion to dismiss before briefing on the substantive motion to dismiss was completed[4], it is evident that additional discovery will not alter the fact that Adelphia decided to withhold advancement of legal fees based on the Rigases'

---

[4]The Court had held the briefing schedule in abeyance pending the Rigases' interlocutory appeal.  The Court authorized discovery during a telephone conference call with counsel to address scheduling issues following remand from the Third Circuit.  At that time, briefing was not complete on the motion to dismiss, which had sought both dismissal of the indictment and discovery in connection with that request.

misconduct and not as a result of any government action.  Instead, continued discovery represents an effort to chum the waters in this case to facilitate a fishing expedition for evidence and witnesses to mount a collateral challenge to the New York conviction.  The Rigases already have received numerous documents from the United States and four law firms, including Fried, Frank, Shriver & Jacobson, Boies, Schiller & Flexner, Covington & Burling, and Reed Smith, none of which conclusively show that Adelphia's decision not to advance attorneys' fees resulted from any governmental misconduct.  If those records had contained any information proving that Adelphia's decision was "a direct consequence of the government's overwhelming influence," in the word of the Stein case, surely the Rigases would have produced it instead of the loose tapestry of speculation, layered innuendo, and hyperbole presented in the response to the motion for protective order.  Accordingly, the United States requests the Court to halt any further discovery on the motion to dismiss and enter an order scheduling briefing on the substantive issues raised in the motion.

Respectfully submitted,

PETER J. SMITH
United States Attorney

     s/George J. Rocktashel
GEORGE J. ROCKTASHEL
Assistant United States Attorney
Attorney I.D. #PA44922

Date: April 29, 2011

19

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 4:CR-05-0402 |
| | : | |
| v. | : | |
| | : | (JONES, J.) |
| JOHN J. RIGAS and | : | |
| TIMOTHY J. RIGAS | : | **ELECTRONICALLY FILED** |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion to be competent to serve papers. That on this Friday, April 29, 2011, he served a true and correct copy of the foregoing

**REPLY BRIEF OF THE UNITED STATES IN SUPPORT OF OBJECTIONS AND PROTECTIVE ORDER CONCERNING DISCOVERY RELATED TO DEFENDANTS' MOTION TO DISMISS THE INDICTMENT ON FIFTH AND SIXTH AMENDMENT GROUNDS**

by electronic means by sending a copy to each of the e-mail addresses stated below:

**AND/OR**

by placing said copy in a postpaid envelope addressed to the person(s) hereinafter named, at the places and addresses stated below, which is the last known address, and by depositing said envelope and contents in the United States Mail in Williamsport, Pennsylvania.

Addressee:  Joseph U. Metz, Esquire
112 Market Street, 8th Floor
Harrisburg, PA 17101

Lawrence G. McMichael, Esquire
1735 Market Street, Suite 3200
Philadelphia, PA 19103

Dated:  April 29, 2011          s/George J. Rocktashel
GEORGE J. ROCKTASHEL
Assistant United States Attorney
Attorney I.D. #PA44922

# Exhibit R



EXHIBIT

Deloitte 757

21.106 1Q

# PRESS RELEASE

FOR RELEASE: IMMEDIATE

CONTACTS: Karen Chrosniak, Director of Investor Relations
Dean Marshall, Director of Finance, or
Jim Brown, Vice President, Finance
(877) 496-6704

## ADELPHIA COMMUNICATIONS ANNOUNCES FOURTH QUARTER AND FULL YEAR 2001 RESULTS

### Management Increases 2002 Guidance for Digital and Data Deployments

Coudersport, PA -- March 27, 2002

John J. Rigas, Chairman and CEO of Adelphia Communications Corporation ("Adelphia"), (NASDAQ: ADLAC) reported the results of operations for the fourth quarter and full year ended December 31, 2001. The Company's consolidated results reflect the activity of Adelphia Business Solutions, Inc. ("ABIZ"), a 79% owned subsidiary, as of December 31, 2001. On January 11, 2002, Adelphia completed its spin-off of ABIZ via a common stock distribution to Adelphia's common shareholders.

Consolidated Results

For the year ended December 31, 2001, the Company reported consolidated revenues of $3,580.1 million, a 23% increase from the $2,909.4 million reported in 2000. Consolidated EBITDA increased 29% to $1,409.4 million from the $1,089.4 million reported in 2000. Fourth quarter of 2001 results showed record consolidated revenues of $950.0 million compared with $804.6 million for the quarter ended December 31, 2000 while consolidated EBITDA grew to $395.3 million compared with $275.9 million for the quarter ended December 31, 2000. Consolidated net loss applicable to common stockholders for the year ended December 31, 2001 totaled $1,711.8 million, or $9.73 per share, compared to $602.5 million, or $4.45 per share, for the same period in the prior year. The increase in the net loss for the year ended December 31, 2001 is primarily attributable to a $1,152.7 million impairment write-down related to certain assets of ABIZ as required under generally accepted accounting principles. The impact of this impairment write-down amounted to $6.55 per share for that period.

A   0757965

GOVERNMENT
EXHIBIT
3087
02 Cr. 1236 (LBS) (ID)

## Cable Operations

On a pro forma basis, as if all acquisitions and divestitures which had closed as of December 31, 2001 had occurred on January 1, 2000, basic cable subscribers grew 0.5% to 5,810,253 during the twelve-month period ended December 31, 2001. Adelphia's digital subscriber base grew from 945,796 to 1,879,044 and its high-speed data subscriber base grew from 150,906 to 377,510 on this same basis.

As a result of this growth, Adelphia's cable operations achieved pro forma annual gross revenue and EBITDA growth rates of 9.2% and 11.3%, respectively, compared to the December 31, 2000 year. Excluding the impact of non-recurring revenue and charges, full year operating margins were 44.9% as compared to 44.0% a year ago.

On that same pro forma basis and excluding the impact of non-recurring revenue and charges, Adelphia's cable operations for the fourth quarter of 2001 resulted in gross revenue and EBITDA growth of 9.2% and 19.7%, respectively, as compared to the fourth quarter of 2000. The Company reported operating margins for the fourth quarter of 45.5% as compared to 41.5% a year ago.

Timothy Rigas, CFO of Adelphia commented, "We are pleased with the results we have delivered for 2001. During the year, we made significant progress rebuilding our cable systems and delivering growth in new product deployments while maintaining our focus on strong operating results. We have continued to prioritize our plant rebuild project, building down to less than 150 homes per node, which we believe will provide the platform for new product deployments and interactive ventures as well as expand our reach to new data and digital subscribers."

"During 2001, Adelphia continued its successful deployment of new services including the strong roll-out of Adelphia Digital Cable as well as our high-speed data product, Power Link. We ended the year with almost 1.9 million digital boxes deployed adding over 900,000 subscriptions for the year. During the fourth quarter of 2001, we continued to increase our digital penetration with quarterly additions of approximately 197,000 units or an average of over 15,000 adds per week. We have continued to aggressively market our bundled product, Adelphia Advantage, adding new product choices which has provided our customers with more choice and value. At the end of the first quarter of 2002, we expect to report digital subscriptions of over 2.2 million."

Tim Rigas further commented, "We continue to be extremely excited about the growth prospects for our high-speed data product. We added over 62,000 cable modem subscribers during the quarter averaging about 4,800 adds per week. We finished the year with over 377,000 high-speed data customers, representing a penetration of marketable homes of almost 8%. On a pro forma basis, data revenues have almost tripled from the year 2000 and during the fourth quarter of 2001, represented over 25% of our total cable revenue growth."

"During the fourth quarter we also successfully transitioned about 45,000 data customers from the Excite @Home network to Adelphia's Power Link. The process of migrating these customers went smoothly, with nearly all of our customers using Adelphia as their internet service provider. As a result of our plant rebuild project and new marketing initiatives including expanding our retail presence and continuing to market our bundled offerings, we firmly believe that our high-speed data deployments will continue to accelerate throughout 2002. We expect to report over 475,000 data customers as of the end of the first quarter of 2002 resulting in about 100,000 data adds during the first quarter. This deployment rate represents an increase in new customer adds of over 60% from that of the fourth quarter of 2001. As such, we continue to be very optimistic with respect to the revenue and EBITDA contributions from this product throughout the next year."

A   0757966

Management Guidance for 2002

"We expect pro forma revenue and EBITDA for the full year 2002 to grow between 12.0%-13.0%, respectively, as compared to pro forma 2001 results. Given our continued efforts to rebuild and open up our plant to new customers, we are increasing our 2002 digital and data subscriber guidance to 2.7 million digital subscriptions and 775,000 high-speed data customers. We also expect basic subscriber growth to be consistent with 2001. We believe our strong track record of solid operating results, a solid collection of cable assets and a stronger balance sheet will provide the framework for accelerated growth rates and new opportunities for 2002."

In an unrelated matter, Adelphia's former subsidiary ABIZ (along with several of its subsidiaries) filed in bankruptcy court for reorganization under Chapter 11. Adelphia will be filing a Form 8-K with the Securities and Exchange Commission with respect to this.

Certain statements in this press release are forward-looking statements that are subject to material risks and uncertainties. Investors are cautioned that any such forward-looking statements are not guarantees of future performance or results and involve risks and uncertainties, and that actual results or developments may differ materially from those expressed or implied in the forward-looking statements as a result of various factors which are discussed in the Company's filings with the Securities and Exchange Commission. These risks and uncertainties include, but are not limited to, uncertainties relating to general economic and business conditions, acquisitions and divestitures, the availability and cost of capital, government and regulatory policies, the pricing and availability of equipment, materials, inventories and programming, product acceptance and customer spending patterns, the Company's ability to execute on its business plans and to construct, expand and upgrade its networks, risks associated with reliance on the performance and financial condition of vendors and customers, technological developments, changes in the competitive environment in which the Company operates, and matters relating to or in connection with the recent bankruptcy filings and proceedings of Adelphia Business Solutions, Inc. Additional information regarding risks, uncertainties and other factors that may affect the business and financial results of Adelphia can be found in the Company's filings with the Securities and Exchange Commission, including the Form 8-K filed for the event dated January 16, 2001, the most recently filed Quarterly Report on Form 10-Q, the Form 10-K for the year ended December 31, 2000, the upcoming Form 10-K to be filed for the year ended December 31, 2001, and the most recent prospectus supplement filed under Registration Statement No. 333-64224, under the section entitled "Risk Factors" contained therein. The Company does not undertake to update any forward-looking statements in this press release or with respect to matters described herein.

Adelphia will hold its quarterly conference call with investors on March 27, 2002 at 10:00am Eastern Standard Time. The conference call can be accessed by dialing 1-973-633-1010. A telephone replay of the conference call will be available immediately following the call and through April 3, 2002. To access the replay, please dial 1-973-341-3080 (passcode 3178169). In addition, the call will be broadcast live via the Internet at www.adelphia.com. A recording of the conference call will be available on the Company's website from March 27, 2002 through April 10, 2002.

#####

A    0757967

| | Actual Results (1) Year Ended December 31, | | | Pro Forma Results (2) Year Ended December 31, | | |
|---|---|---|---|---|---|---|
| | 2000 | 2001 | % Change | 2000 | 2001 | % Change |
| **Adelphia excluding ABIZ** | | | | | | |
| Video | $2,196,375 | $2,634,114 | 19.9% | $2,485,514 | $2,694,214 | 8.4% |
| Advertising Sales | 134,170 | 151,574 | 13.0% | 149,519 | 155,657 | 4.1% |
| Off Net Operations | 52,697 | 72,160 | 36.9% | 61,765 | 72,715 | 17.7% |
| Data Services | 30,841 | 82,986 | 169.1% | 33,062 | 85,570 | 158.8% |
| Pay Per View | 30,786 | 35,354 | 14.8% | 38,606 | 38,747 | 0.4% |
| Other | 145,729 | 136,122 | -6.6% | 151,044 | 141,060 | -6.6% |
| Shopping | 17,030 | 20,413 | 19.9% | 19,348 | 21,423 | 10.7% |
| Subtotal | 2,607,627 | 3,132,722 | 20.1% | 2,938,858 | 3,209,386 | 9.2% |
| Non-recurring revenue (4) | 0 | 45,266 | * | 0 | 45,266 | * |
| Gross Revenue | 2,607,627 | 3,177,988 | 21.9% | 2,938,858 | 3,254,651 | 10.7% |
| | | | | | | |
| Programming | 668,811 | 831,758 | 24.4% | 769,048 | 857,535 | 11.5% |
| Direct & Systems Expenses | 243,973 | 311,244 | 27.6% | 287,908 | 324,326 | 12.6% |
| Administrative | 403,351 | 456,941 | 13.3% | 476,996 | 476,562 | -0.1% |
| Marketing | 89,397 | 113,219 | 26.6% | 111,343 | 119,152 | 7.0% |
| Operating Expenses | 1,405,532 | 1,713,162 | 21.9% | 1,645,295 | 1,777,575 | 8.0% |
| | | | | | | |
| Programming | 25.6% | 26.6% | * | 26.2% | 26.7% | * |
| Direct & Systems Expenses | 9.4% | 9.9% | * | 9.8% | 10.1% | * |
| Administrative | 15.5% | 14.6% | * | 16.2% | 14.8% | * |
| Marketing | 3.4% | 3.6% | * | 3.8% | 3.7% | * |
| Operating Expenses, as a % of recurring revenue | 53.9% | 54.7% | * | 56.0% | 55.4% | * |
| | | | | | | |
| EBITDA, excluding non-recurring revenue | $1,202,096 | $1,419,560 | 18.1% | $1,293,562 | $1,431,811 | 10.7% |
| EBITDA Margin | 46.1% | 45.3% | * | 44.0% | 44.6% | * |
| | | | | | | |
| Non-recurring charges (4) (5) | 0 | 7,855 | * | 0 | 7,855 | * |
| | | | | | | |
| EBITDA, excluding non-recurring revenue and non-recurring charges | $1,202,096 | $1,427,415 | 18.7% | $1,293,562 | $1,439,666 | 11.3% |
| EBITDA Margin | 46.1% | 45.6% | * | 44.0% | 44.9% | * |

A   0757968

| | Actual Results (1) Year Ended December 31, | | | Pro Forma Results (2) Year Ended December 31, | | |
|---|---|---|---|---|---|---|
| | 2000 | 2001 | % Change | 2000 | 2001 | % Change |
| EBITDA, Cable - excluding non-recurring revenue and non-recurring charges | $1,202,096 | $1,427,415 | 18.7% | $1,293,562 | $1,439,666 | 11.3% |
| Interest Expense, Net - Cable | (850,705) | (1,017,765) | 19.6% | (1,019,182) | (1,019,182) | 0.0% |
| Other Income (Expense), Net - Cable | (623,348) | (538,426) | -13.6% | (702,527) | (551,415) | -21.5% |
| Net Income (Loss) - Cable | (271,957) | (128,776) | -52.6% | (428,147) | (130,931) | -69.4% |
| EBITDA, ABIZ | (112,702) | (55,392) | -50.9% | (112,702) | (55,392) | -50.9% |
| Interest Expense, Net - ABIZ | (72,160) | (155,034) | 114.8% | (72,160) | (155,034) | 114.8% |
| Other Expense, Net - ABIZ | (145,665) | (1,372,609) | 842.3% | (145,665) | (1,372,609) | 842.3% |
| Net Loss - ABIZ | (330,527) | (1,583,035) | 378.9% | (330,527) | (1,583,035) | 378.9% |
| Net Income (Loss) - Total | ($602,484) | ($1,711,811) | -184.1% | ($758,674) | ($1,713,966) | 125.9% |
| Capital Expenditures - Cable | $1,500,000 | $2,200,000 | * | $1,520,000 | $2,223,000 | * |
| ADLAC Common Shares Outstanding (in thousands) | | | | | | |
| Weighted Average | 135,515 | 175,948 | 29.8% | * | * | * |
| Fully Converted (3) | * | * | * | 332,318 | 332,318 | * |
| Per Share Data | | | | | | |
| Cable Operations | ($2.01) | ($0.73) | -63.5% | ($1.29) | ($0.39) | -69.4% |
| Total | ($4.45) | ($9.73) | 118.8% | ($2.28) | ($5.16) | 125.9% |

(1) During October 2001, Adelphia purchased certain network and telecommunications assets from Adelphia Business Solutions. As the network and telecommunications assets sold to Adelphia constitute businesses contained within legal entities under common control, the sales will be reported as a change in reporting entity. As a result, the ABIZ financial information is recast for the periods presented to reflect these asset sales for all applicable periods that the network and telecommunication assets were under the common control of Adelphia.

(2) - The pro forma financial and other data is presented as if all acquisitions that closed prior to December 31, 2001 had occurred as of January 1, 2000. The pro forma results include the application of net proceeds of approximately $1,558,000 from the January 2002 Class A Common stock and 7.5% Series F Mandatory Convertible Preferred Stock offerings, approximately $400,000 from the purchase of the 3.25% Convertible Subordinated Notes due 2021 by the Rigas Family which closed on January 22, 2002 as well as the application of net proceeds of approximately $150,000 from the pending sale by Adelphia of 7,500,000 shares of Class B common stock and $50,000 of Series E preferred stock to the Rigas Family, as if these transactions had occurred on January 1, 2000. Additionally, the pro forma results exclude certain non-recurring charges related to the transition of data customers from Excite@home Internet service to Power Link (see footnote 4).

The pro forma information is not necessarily indicative of what the results would have been had these transactions occurred on January 1, 2000. Reference is made to the Company's Annual Report on Form 10-K to be filed for the year ended December 31, 2001 for further information on the acquisitions and other pro forma transactions.

(3) - Fully converted shares outstanding include the issuance of approximately 18,560,000 shares resulting from conversion of the 6% Convertible Subordinated Notes due 2006, approximately 22,282,000 shares from conversion of the 3.25% Convertible Subordinated Notes due 2021, 7,500,000 shares of Class B common stock to be purchased by the Rigas Family, approximately 15,570,000 shares from conversion of the 7.5% Series E Mandatory Convertible Preferred Stock due 2004, 40,000,000 shares from the January 2002 Class A common stock issuance and approximately 16,672,000 shares from conversion of the 7.5% Series F Mandatory Convertible Preferred Stock due 2005.

(4) Reflects the recognition of deferred revenue associated with Excite@home payments of approximately $45,266 as well as non-recurring charges of approximately $4,855 related to the transition of approximately 45,000 data customers from Excite@home Internet service to Power Link.

(5) Includes approximately $3,000 of non-recurring legal and other expenses incurred related to the attempted sale of the Puerto Rico systems.

* - Item has no meaning.

A   0757969

| | Actual Results (1) Three Months Ended December 31, | | | Pro Forma Results (2) Three Months Ended December 31, | | |
|---|---|---|---|---|---|---|
| | 2000 | 2001 | % Change | 2000 | 2001 | % Change |
| Adelphia excluding ABIZ | | | | | | |
| Video | $584,781 | $674,738 | 15.4% | $627,590 | $685,639 | 9.2% |
| Advertising Sales | 40,022 | 39,849 | -0.4% | 42,307 | 40,628 | -4.0% |
| Off Net Operations | 14,149 | 19,806 | 40.0% | 15,035 | 19,866 | 32.1% |
| Data Services | 11,029 | 28,831 | 161.4% | 11,633 | 29,395 | 152.7% |
| Pay Per View | 9,511 | 5,229 | -45.0% | 10,781 | 7,450 | -30.9% |
| Other | 42,242 | 35,076 | -17.0% | 42,325 | 35,237 | -16.7% |
| Shopping | 4,762 | 5,464 | 14.7% | 5,178 | 5,808 | 12.2% |
| Subtotal | 706,497 | 808,993 | 14.5% | 754,850 | 824,023 | 9.2% |
| Non-recurring revenue (4) | 0 | 45,266 | * | 0 | 45,266 | * |
| Gross Revenue | 706,497 | 854,259 | 20.9% | 754,850 | 869,288 | 15.2% |
| | | | | | | |
| Programming | 189,405 | 215,602 | 13.8% | 203,779 | 220,225 | 8.1% |
| Direct & Systems Expenses | 59,841 | 82,233 | 37.4% | 69,480 | 84,237 | 21.2% |
| Administrative | 113,583 | 116,534 | 2.6% | 128,265 | 121,136 | -5.6% |
| Marketing | 34,918 | 30,340 | -13.1% | 40,076 | 31,183 | -22.2% |
| Operating Expenses | 397,747 | 444,709 | 11.8% | 441,600 | 456,781 | 3.4% |
| | | | | | | |
| Programming | 26.8% | 26.7% | * | 27.0% | 26.7% | * |
| Direct & Systems Expenses | 8.5% | 10.2% | * | 9.2% | 10.2% | * |
| Administrative | 16.1% | 14.4% | * | 17.0% | 14.7% | * |
| Marketing | 4.9% | 3.8% | * | 5.3% | 3.8% | * |
| Operating Expenses, as a % of recurring revenue | 56.3% | 55.0% | * | 58.5% | 55.4% | * |
| | | | | | | |
| EBITDA, excluding non-recurring revenue | $308,750 | $364,285 | 18.0% | $313,249 | $367,241 | 17.2% |
| EBITDA Margin | 43.7% | 45.0% | * | 41.5% | 44.6% | * |
| | | | | | | |
| Non-recurring charges (4) (5) | 0 | 7,855 | * | 0 | 7,855 | * |
| | | | | | | |
| EBITDA, excluding non-recurring revenue and non-recurring charges | $308,750 | $372,140 | 20.5% | $313,249 | $375,097 | 19.7% |
| EBITDA Margin | 43.7% | 46.0% | * | 41.5% | 45.5% | * |

A   0757970

| | Actual Results (1) Three Months Ended December 31, | | | Pro Forma Results (2) Three Months Ended December 31, | | |
|---|---|---|---|---|---|---|
| | 2000 | 2001 | % Change | 2000 | 2001 | % Change |
| EBITDA, Cable - excluding non-recurring revenue and non-recurring charges | $308,750 | $372,140 | 20.5% | $313,249 | $375,097 | 19.7% |
| Interest Expense, Net - Cable | (251,669) | (261,560) | 3.9% | (262,977) | (262,977) | 0.0% |
| Other Income (Expense), Net - Cable | (188,470) | (158,962) | -15.7% | (201,369) | (161,758) | -19.7% |
| Net Income (Loss) - Cable | (131,389) | (48,382) | -63.2% | (151,096) | (49,638) | -67.1% |
| EBITDA, ABIZ | (32,877) | (14,286) | -56.5% | (32,877) | (14,286) | -56.5% |
| Interest Expense, Net - ABIZ | (37,106) | (46,193) | 24.5% | (37,106) | (46,193) | 24.5% |
| Other Expense, Net - ABIZ | (54,446) | (1,222,076) | 2144.6% | (54,446) | (1,222,076) | 2144.6% |
| Net Loss - ABIZ | (124,429) | (1,282,555) | 930.8% | (124,429) | (1,282,555) | 930.8% |
| Net Income (Loss) - Total | (255,818) | (1,330,937) | -420.3% | (275,525) | (1,332,193) | 383.5% |
| Capital Expenditures - Cable | $641,000 | $623,000 | * | $646,000 | $629,000 | * |
| ADLAC Common Shares Outstanding (in thousands) | | | | | | |
| Weighted Average | 148,167 | 191,566 | 29.3% | * | * | * |
| Fully Converted (3) | * | * | * | 332,318 | 332,318 | * |
| Per Share Data | | | | | | |
| Cable Operations | ($0.89) | ($0.25) | -71.5% | ($0.45) | ($0.15) | -67.1% |
| Total | ($1.73) | ($6.95) | 302.4% | ($0.83) | ($4.01) | 383.5% |

(1) During October 2001, Adelphia purchased certain network and telecommunications assets from Adelphia Business Solutions. As the network and telecommunications assets sold to Adelphia constitute businesses contained within legal entities under common control, the sales will be reported as a change in reporting entity. As a result, the ABIZ financial information is recast for the periods presented to reflect these asset sales for all applicable periods that the network and telecommunication assets were under the common control of Adelphia.

(2) - The pro forma financial and other data is presented as if all acquisitions that closed prior to December 31, 2001 had occurred as of January 1, 2000. The pro forma results include the application of net proceeds of approximately $1,558,000 from the January 2002 Class A Common stock and 7.5% Series F Mandatory Convertible Preferred Stock offerings, approximately $400,000 from the purchase of the 3.25% Convertible Subordinated Notes due 2021 by the Rigas Family which closed on January 22, 2002 as well as the application of net proceeds of approximately $150,000 from the pending sale by Adelphia of 7,500,000 shares of Class B common stock and $50,000 of Series E preferred stock to the Rigas Family, as if these transactions had occurred on January 1, 2000. Additionally, the pro forma results exclude certain non-recurring charges related to the transition of data customers from Excite@home Internet service to Power Link (see footnote 4).

The pro forma information is not necessarily indicative of what the results would have been had these transactions occurred on January 1, 2000. Reference is made to the Company's Annual Report on Form 10-K to be filed for the year ended December 31, 2001 for further information on the acquisitions and other pro forma transactions.

(3) - Fully converted shares outstanding include the issuance of approximately 18,560,000 shares resulting from conversion of the 6% Convertible Subordinated Notes due 2006, approximately 22,282,000 shares from conversion of the 3.25% Convertible Subordinated Notes due 2021, 7,500,000 shares of Class B common stock to be purchased by the Rigas Family, approximately 15,570,000 shares from conversion of the 7.5% Series E Mandatory Convertible Preferred Stock due 2004, 40,000,000 shares from the January 2002 Class A common stock issuance and approximately 16,672,000 shares from conversion of the 7.5% Series F Mandatory Convertible Preferred Stock due 2005.

(4) Reflects the recognition of deferred revenue associated with Excite@home payments of approximately $45,266 as well as non-recurring charges of approximately $4,855 related to the transition of approximately 45,000 data customers from Excite@home Internet service to Power Link.

(5) Includes approximately $3,000 of non-recurring legal and other expenses incurred related to the attempted sale of the Puerto Rico systems.

* - Item has no meaning.

A   0757971

| | Actual Results (1) As of December 31, | | | Pro Forma Results (2) As of December 31, | | |
|---|---|---|---|---|---|---|
| | 2000 | 2001 | % Change | 2000 | 2001 | % Change |
| **Balance Sheet Data - Cable (8)** | | | | | | |
| Total Debt (6) | $11,222,693 | $13,330,953 | * | * | $11,562,654 | * |
| Cash | 121,093 | 156,292 | * | * | 156,292 | * |
| Total Net Debt | 11,101,600 | 13,174,662 | * | * | 11,406,363 | * |
| Total Net Senior Debt (9) | $11,101,600 | $11,567,968 | * | * | $9,399,668 | * |
| Net Senior Debt: EBITDA | 8.99 | 7.77 | * | * | 6.26 | * |
| | | | | | | |
| **Balance Sheet Data - ABIZ** | | | | | | |
| Total Debt (6) | $1,380,720 | $1,400,767 | * | * | $1,400,767 | * |
| Cash | 3,543 | 1,108 | * | * | $1,108 | * |
| Total Net Debt | 1,377,177 | 1,399,658 | * | * | 1,399,658 | * |
| Total Net Senior Debt (9) | $1,377,177 | $1,399,658 | * | * | $1,399,658 | * |
| Net Senior Debt: EBITDA | * | * | * | * | * | * |
| | | | | | | |
| **Balance Sheet Data - Consolidated (7)** | | | | | | |
| Total Debt (6) | $12,603,413 | $14,731,720 | * | * | $12,963,421 | * |
| Cash | 124,636 | 157,400 | * | * | 157,400 | * |
| Total Net Debt | 12,478,777 | 14,574,320 | * | * | 12,806,021 | * |
| Total Net Senior Debt (9) | $12,478,777 | $12,967,626 | * | * | $10,799,326 | * |
| Net Senior Debt: EBITDA | 11.31 | 9.06 | * | * | 7.48 | * |
| | | | | | | |
| **Statistical Data** | | | | | | |
| Homes Passed | 8,757,938 | 9,549,011 | 9.0% | 9,417,171 | 9,549,011 | 1.4% |
| Basic Subscribers | 5,547,690 | 5,810,253 | 4.7% | 5,780,325 | 5,810,253 | 0.5% |
| Digital Subscriptions | 904,263 | 1,879,044 | 107.8% | 945,796 | 1,879,044 | 98.7% |
| High Speed Data Subscribers | 148,504 | 377,510 | 154.2% | 150,906 | 377,510 | 150.2% |

(1) During October 2001, Adelphia purchased certain network and telecommunications assets from Adelphia Business Solutions. As the network and telecommunications assets sold to Adelphia constitute businesses contained within legal entities under common control, the sales will be reported as a change in reporting entity. As a result, the ABIZ financial information is recast for the periods presented to reflect these asset sales for all applicable periods that the network and telecommunication assets were under the common control of Adelphia.

(2) - The pro forma financial and other data is presented as if all acquisitions that closed prior to December 31, 2001 had occurred as of January 1, 2000. The pro forma results include the application of net proceeds of approximately $1,558,000 from the January 2002 Class A common stock and 7.5% Series F Mandatory Convertible Preferred Stock offerings, approximately $400,000 from the purchase of the 3.25% Convertible Subordinated Notes due 2021 by the Rigas Family which closed on January 22, 2002 as well as the application of net proceeds of approximately $150,000 from the pending sale by Adelphia of 7,500,000 shares of Class B common stock and $50,000 of Series E preferred stock to the Rigas Family, as if these transactions had occurred on January 1, 2000. Additionally, the pro forma results exclude certain non-recurring charges related to the transition of data customers from Excite@home Internet service to Power Link (see footnote 4).

The pro forma information is not necessarily indicative of what the results would have been had these transactions occurred on January 1, 2000. Reference is made to the Company's Annual Report on Form 10-K to be filed for the year ended December 31, 2001 for further information on the acquisitions and other pro forma transactions.

Footnotes continued on following page.

A   0757972

(6) Certain subsidiaries of the Company are co-borrowers with certain companies owned by the Rigas Family and managed by the Company ("Managed Entities") for borrowing amounts of up to $5,630,000. Each of the co-borrowers is liable for all borrowings under the credit facilities and may borrow up to the full amount of the facilities. Amounts borrowed under these facilities by the Company's subsidiaries are included as debt on the Company's consolidated balance sheet. Amounts borrowed by Managed Entities under the facilities are not included on the Company's consolidated balance sheet. The Company expects the Managed Entities to repay their borrowings in the ordinary course. The Company does not expect that it will need to repay the amounts borrowed by the Managed Entities. As of December 31, 2001, co-borrowing credit facilities balances, net of amounts otherwise reflected as debt on the Company's consolidated balance sheet, totaled approximately $2,384,000. The related maturities of these amounts are as follows: approximately $0 in 2002, $26,000 in 2003 to 2005, $519,000 in 2006 and $1,739,000 thereafter.

Reference is made to the Company's Annual Report on Form 10-K to be filed for the year ended December 31, 2001 for further information.

(7) Actual results are presented on a consolidated basis. As a result of the spin-off of ABIZ on January 11, 2002, its future results will no longer be presented on a consolidated basis. Therefore, the pro forma results are presented on a combined basis.

(8) Excludes any potential obligations that could arise from ABIZ's bankruptcy proceedings, including any obligations that could arise from the guarantees by certain Adelphia subsidiaries of the $500,000 unsecured bank borrowings by Adelphia Business Solutions Operations, Inc., a wholly owned subsidiary of ABIZ.

(9) Total net senior debt assumes the immediate conversion of the 6% Convertible Subordinated Notes due 2006 issued in January 2001 and the immediate conversion of the 3.25% Convertible Subordinated Notes due 2021 issued in April 2001.

* - Item has no meaning.

A   0757973

# Exhibit S

From Times Online
April 28, 2007

# Beware the long arm of American law

## Two former US attorneys have a stark warning for everybody who works in the City

Carl Mortished, International Business Editor

Richard Owens's eyes follow my scribbled notes as he talks. He is a former assistant US attorney in the Department of Justice (DoJ), most recently head of the securities fraud unit in Manhattan, and his gaze is penetrating. Name a famous American white-collar criminal case and Mr Owens and his team were probably probing and prosecuting. Think Bernie Ebbers, Frank Quattrone and Martha Stewart.

My scribbles become more chaotic and messy and his stare becomes more intense. Are my notes accurate? What if Mr Owens subpoenas the notebook as evidence? Will I have to read my scribbles in court?

He and Sean Berkowitz, also a former assistant US attorney and a lead prosecutor in the Enron trial, have quit game-keeping for the more lucrative world of poaching in Latham & Watkins, a big American corporate law firm.

Are they in London to tell British businessmen to beware the long arm of the DoJ? "It's probably less of a threat, now that we are not there," Mr Owens says.

These guys are quick on their feet, but look slightly uncomfortable in the swish but sterile corporate environment of Latham & Watkins's City offices. You want to see them in a drab government office with venetian blinds, strip lighting and stale coffee in plastic cups.

Mr Owens is dry, Mr Berkowitz the more ebullient. The latter became famous for his theatrical presentation at the summation of the Enron trial last year, when he held up a placard to the jury with the words "Truth" and "Lies" boldly displayed in black and white. "You get to decide what's right," he told the jurors. "You get to decide whether they told the truth or whether they told lies. Black and white."

They decided: lies. Jeffrey Skilling, Enron's president, was convicted on 19 counts of conspiracy, fraud and insider trading. Kenneth Lay, the chairman, was convicted of six conspiracy and fraud counts.

The defence spent $100 million on the case but, according to Mr Berkowitz, the prosecution's strategy was not to get embroiled in the nightmarish complexity of Enron's business in an attempt to criminalise aggressive business practices. "We tried to avoid that," he says. "Virtually all of those complicated transactions were approved by outside lawyers." Instead, the strategy was to get them on "simple lies".

Those little fibs that you told your accountant will hang you in the end. The fraud cases that end up in a media scrum outside a court can start in various ways, Mr Owens says. It can be a

company that runs out of cash, as with Enron, or a whistleblower, as happened with both Enron and WorldCom.

More often than not, it starts with a newspaper article. Every morning, Mr Owens says, he scrutinised the financial pages looking for people to subpoena. It was a banal report in *The Wall Street Journal* about a sale of stock in ImClone Systems, a pharmaceutical company, just days before the US Food and Drug Administration declined to approve a drug that led to Martha Stewart, the television personality, serving a five-month jail term for obstruction of justice. Mr Owens says: "I circled the article with a red pen, walked down the hall with *The Wall Street Journal* under my arm, found a prosecutor and said: 'This stinks, cut some subpoenas.' Next thing we knew, Martha Stewart was in our office, lying."

Telling your lies in Europe won't necessarily help you, according to the two former prosecutors, who point to an increasingly aggressive assertion of jurisdiction by the DoJ. Three British bankers are awaiting trial in Texas on Enron-related allegations, while Ian Norris, the former chairman of Morgan Crucible, is appealing to the House of Lords against extradition to the United States in a price-fixing case. If you work for an American company, or if your company has issued stock in the US or is listed in the US or takes part in a cartel that affects the US, the DoJ reckons that you are in its bailiwick and are fair game.

"The US is looking to enforce the full extent of its jurisdiction," Mr Berkowitz says.

That includes the Foreign Corrupt Practices Act, which was used against Statoil, the Norwegian oil company, which was accused of bribing Iranian officials. In the first half of last year, 50 prosecutions were launched in America under the Act. That compares with nil prosecutions in the UK and one notable retreat – the British Government's decision not to pursue BAE Systems's alleged bribery of Saudi officials.

Mr Owens believes that this could change. "If I were to predict a trend, the increasing aggression of US prosecutors will prompt Europeans to pursue a similar strategy," he says. "If you are a regulator, the last thing you want is for the public to think you are asleep at the wheel. That could result in a competitive race [to prosecute], which would be very bad for businesses."

The US is pursuing white-collar crime with zeal. It is politically popular and makes good television. For Mr Owens, occasionally it meant curbing the enthusiasm of his own staff in high-profile cases. "It was a real challenge to keep the egos of my subordinates in check," he says. He did it by keeping his own media appearances to a minimum and by "reminding them of who they really are".

Many more fraud cases may be on the horizon, the two men reckon, as the economic cycle turns. In the 1990s boom, it was stock market manipulation, often involving traditional crooks and "the Mob". Then it was Enron and WorldCom as the dot-com bubble burst. A new downturn will lead to a new flight of capital, accounting scandals and fraud as desperate people try to keep their finances afloat. Mr Berkowitz reckons that the debacle in the sub-prime mortgage market is already fruitful territory.

White-collar crime is rarely about greed, in the opinion of the former prosecutors. "It is generally hubris," Mr Owens says. "It's a corporate culture that is detached and guarded by advisers who never challenge."

**The partners**

**Sean Berkowitz** a litigation partner in Latham & Watkins, Chicago, graduated from Harvard Law School and was previously director of the Enron task force for the US Department of Justice. He served as lead prosecutor in the case against Kenneth Lay and Jeffrey Skilling

**Richard Owens** a partner in Latham & Watkins, New York, is a graduate of Harvard Law School. He served 12 years as assistant US attorney in New York's Southern District and was chief of the securities and commodities fraud task force between 2002 and 2006. He supervised prosecutions relating to WorldCom, Adelphia Communications, Martha Stewart and Royal Ahold