# Exhibit T

EXHIBIT 3.00

AMENDED AND RESTATED BYLAWS

OF

ADELPHIA COMMUNICATIONS CORPORATION

As amended through September 30, 1999)

ARTICLE I

Stockholders

Section 1.1 Annual Meetings. An annual meeting of the stockholders shall be held for the election of directors and the transaction of any other proper business on the first Thursday of June in each year, if not a legal holiday, and if a legal holiday, then on the next secular day following at 10:00 a.m., or at such date  time and place either within or without Delaware as may be designated by the Board of Directors from time to time.

Section 1.2 Special Meetings. Special meetings of the stockholders may be called at any time by the Chairman of the Board, the President, any Executive Vice President, or the Board of Directors to be held at such date, time and place either within or without Delaware as may be stated in the notice of the meeting.

Section 1.3 Notice of Meetings. Whenever stockholders are required or permitted to take any action at a meeting, a written notice of the meeting shall be given which shall state the place, date and hour of the meeting, and, in the case of a special meeting, the purpose or purposes for which the meeting is called. Unless otherwise provided by law, such written notice shall be given not less than ten (10) nor more than sixty (60) days before the day of the meeting to each stockholder entitled to vote at such meeting. If mailed, such notice shall be deemed to be given when deposited in the United States mail, postage prepaid, directed to the stockholder at such stockholder's address as it appears on the records of the corporation.

Section 1.4 Adjournments. Any meeting of stockholders, annual or special, may adjourn from time to time to reconvene at the same or some other place, and notice need not be given of any such adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting the stockholders may transact any business which might have been transacted at the original meeting. If the adjournment is for more than thirty (30) days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

Section 1.5 Quorum. Except as otherwise provided in the certificate of incorporation or by law, at any meeting of the stockholders, the presence in person or by proxy of the holders of the majority of the votes of all of the outstanding shares, in the aggregate, of all classes of stock entitled to vote at the meeting shall constitute a quorum. The stockholders present at a duly organized meeting may continue to do business until adjournment notwithstanding the withdrawal of enough stockholders to leave less than a quorum. If a meeting



ADEL 0021698

cannot be organized because a quorum has not attended, those present may adjourn the meeting in the manner provided by Section 1.4 of these bylaws until a quorum shall attend.

Section 1.6 Organization. Meetings of stockholders shall be presided over by the Chairman of the Board, or in the absence of the Chairman of the Board, by the President, or in the absence of the President, by any Vice President, or in the absence of the foregoing persons, by a chairman designated by the Board of Directors, or in the absence of such designation by a chairman chosen at the meeting. The Secretary, or in the absence of the Secretary, an Assistant Secretary, shall act as Secretary of the meeting, but in the absence of the Secretary and any Assistant Secretary the chairman of the meeting may appoint any person to act as Secretary of the meeting.

Section 1.7 Voting; Proxies. The stockholders of the Corporation shall have such voting rights and powers as set forth in the certificate of incorporation. All questions shall be decided by the vote of the majority of the votes of all of the voting shares of all classes, in the aggregate, entitled to vote on the matter in question, represented at any meeting, unless otherwise provided in the certificate of incorporation or by law. Each stockholder entitled to vote at a meeting of the stockholders or to express consent or dissent to corporate action in writing without a meeting may authorize another person or persons to act for such stockholder by proxy, but no such proxy shall be voted or acted upon after three (3) years from its date, unless the proxy provides for a longer period. All proxies must be in writing and filed with the Secretary of the corporation. A duly executed proxy shall be irrevocable if it states that it is irrevocable and if it is coupled with an interest sufficient in law to support an irrevocable power. Revocation of a proxy is not effective until notice of the revocation has been given to the Secretary of the corporation.

Section 1.8 Record Date. In order that the corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, or to express written consent to corporate action without a meeting, or entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the Board of Directors may fix, in advance, a record date, which shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting, nor more than sixty (60) days prior to any other action. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting, except that the Board of Directors may fix a new record date for the adjourned meeting. In the event dividends are declared, stock transfer books will not be closed but that a record date will be set by the Company, upon which date the transfer agent will take a record of all shareholders entitled to the dividend without actually closing the transfer books.

Section 1.9 List of Stockholders Entitled to Vote. The officer in charge of the stock ledger of the corporation shall make, at least ten (10) days before each meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting, arranged in alphabetical order, with the address of and the number of shares registered in the name of each, which list shall be kept on file at the registered office of the corporation and, further, shall be subject to inspection by any stockholder, for any purpose germane to the meeting, during usual business hours, for a period of at least ten (10) days before the meeting, either at a place within the city where the meeting is to be held, which place shall be specified in the notice of the meeting or, if not so specified, at the place where the meeting is to be held. This list shall also be produced and kept at the time and place of the meeting, and shall be subject

ADEL 0021699

to inspection by any stockholder during the whole time of the meeting.

Section 1.10 Consent of Stockholders in Lieu of Meeting. Unless otherwise provided in the certificate of incorporation or by law, any action required by law to be taken at any annual or special meeting of stockholders of the corporation, or any action which may be taken at any special meeting of such stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted. Prompt notice of the taking of the corporate action without a meeting by less than unanimous consent shall be given to those stockholders who have not consented in writing.

Section 1.11 Voting by Fiduciaries and Pledgees. Persons holding stock in a fiduciary capacity shall be entitled to vote the shares so held. A person whose stock is pledged shall be entitled to vote, unless in the transfer by the pledgor on the books of the Corporation he has expressly empowered the pledgee to vote thereon, in which case only the pledgee, or his proxy, may represent and vote such stock.

ARTICLE II

Board of Directors

Section 2.1 Powers; Number; Qualifications. The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors. The Board shall consist of not less than five (5) nor more than twenty-five (25) members, the number thereof to be determined from time to time by the Board. Directors need not be stockholders, unless the certificate of incorporation so requires.

Section 2.2 Election; Term of Office; Resignation; Removal; Vacancies. Each director shall hold office until the annual meeting of stockholders next succeeding his election and until his successor is elected and qualified or until his death, resignation or removal. Any director may resign at any time upon written notice to the Board of Directors or to the President, any Vice President, or the Secretary of the corporation. A resignation shall take effect at the time it specifies, and unless otherwise specified in the resignation, no acceptance of the resignation is necessary to make it effective. Any director may be removed, with or without cause, by the holders of a majority of the shares then entitled to vote at an election of directors except that whenever the holders of any class are entitled by the certificate of incorporation to elect one or more directors, the director or directors so elected may be removed with or without cause by a majority of the holders of the outstanding shares of that class. Unless otherwise provided in the certificate of incorporation or these bylaws, vacancies and newly created directorships resulting from any increase in the authorized number of directors may be filled by a majority of the directors then in office, although less than a quorum, or by the sole remaining director.

Section 2.3 Regular Meetings. Regular meetings of the Board of Directors may be held at such places within or without Delaware and at such times as the Board may from time to time determine, and if so determined, notice thereof need not be given.

Section 2.4 Special Meetings. Special meetings of the Board may be called by the Chairman of the Board, the President, or any Executive Vice

ADEL 0021700

President. Except as otherwise provided in the certificate of incorporation, meetings of the Board of Directors may be held at such places within or without Delaware as a majority of the directors may direct. Notice of all special meetings of the Board of Directors specifying the place, day and hour shall be given to each director at least twenty-four (24) hours before the day and time named for the meeting, either (i) personally (including by phone) or (ii) by sending a copy thereof by mail or by telegram, charges prepaid, facsimile, e-mail or other electronic or wireless means, charges prepaid, to his address, facsimile number or e-mail address, as the case may be, appearing on the books of the Corporation or supplied by him to the Corporation for the purpose of notice. Notice may also be given by any other means permitted by law. Any oral notice given personally or by telephone may be communicated either to the director or to the person at the office of the director who the person giving the notice has reason to believe will promptly communicate it to the director. When a meeting of directors is adjourned, notice need not be given of the adjourned meeting or of the business to be transacted at an adjourned meeting, other than by announcement at the meeting at which the adjournment is taken.

Section 2.5 Participation in Meetings by Conference Telephone. Unless otherwise restricted by the certificate of incorporation, members of the Board of Directors, or any committee designated by the Board, may participate in a meeting of the Board or of such committee, as the case may be, by means of conference telephone, similar communications equipment by means of which all persons participating in the meeting can hear each other or by any other means permitted by law.

Section 2.6 Quorum; Vote Required for Action. A majority of the directors in office is necessary to constitute a quorum for the transaction of business, and the acts of a majority of the Directors present at a meeting at which a quorum is present shall be the acts of the Board of Directors. If at any meeting a quorum is not present, the meeting may be adjourned from time to time until a quorum is present.

Section 2.7 Organization. Meetings of the Board of Directors shall be presided over by the Chairman of the Board, or in the absence of the Chairman of the Board, by the President, or in the absence of Chairman of the Board and the President, by any Vice President, or in their absence, by a chairman chosen at the meeting. The Secretary, or in the absence of the Secretary, an Assistant Secretary, shall act as Secretary of the meeting, but in the absence of the Secretary and any Assistant Secretary, the chairman of the meeting may appoint any person to act as Secretary of the meeting.

Section 2.8 Compensation of Directors. The Board of Directors shall have the authority to fix the compensation of Directors.

Section 2.9 Action by Directors Without a Meeting. Unless otherwise restricted by the certificate of incorporation, any action required or permitted to be taken at any meeting of the Board of Directors, or of any committee thereof, may be taken without a meeting if all members of the Board or of such committee, as the case may be, consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the Board or committee.

Section 2.10 Interested Directors; Quorum. No contract or transaction between the Corporation and one or more of its Directors or officers, or between the Corporation and any other corporation, partnership, association or other organization in which one or more of its Directors or officers are Directors or officers, or have a financial interest, shall be void or voidable solely for that reason, or solely because the director or officer is present at or participates in the meeting of the Board or committee which authorizes the contract or transaction, or solely because his or their votes are counted for

ADEL 0021701

such purpose, if: (1) the material facts as to his relationship or interest and
as to the contract or transaction are disclosed or are known to the Board of
Directors or the committee and the Board or the committee in good faith
authorizes the contract or transaction by the affirmative vote of a majority of
the disinterest directors, even though the disinterested directors be less than
a quorum; or (2) the material facts as to his relationship or interest and as to
the contract or transaction are disclosed or are known to the stockholders
entitled to vote thereon, and the contract or transaction is specifically
approved in good faith by vote of the stockholders; or (3) the contract or
transaction is fair as to the Corporation as of the time it is authorized,
approved or ratified by the Board of Directors, a committee thereof or the
stockholders. Common or interested directors may be counted in determining the
presence of a quorum at a meeting of the Board of Directors or of a committee
which authorizes the contract or transaction.

      Section 2.11 Other Powers. In addition to the powers expressly
conferred by these bylaws, the Board of Directors may exercise all such powers
of the Corporation and do all such lawful acts as are not by law, the
certificate of incorporation or these bylaws required to be exercised or done by
the stockholders.

## ARTICLE III

### Committee

      Section 3.1 Committees. The Board of Directors may, by resolution
passed by a majority of the whole Board, designate one or more committees, each
committee to consist of one or more of the Directors of the corporation. The
Board may designate one or more directors as alternate members of any committee,
who may replace any absent or disqualified member at any meeting of the
committee. In the absence or disqualification of a member of a committee, the
member or members thereof present at any meeting and not disqualified from
voting, whether or not such member or members constitute a quorum, may
unanimously appoint another member of the Board to act at the meeting in place
of any such absent or disqualified member. Any such committee, to the extent
provided in the resolution of the Board, shall have and may exercise all the
powers and authority of the Board in the management of the business and affairs
of the Corporation, and may authorize the seal of the Corporation to be affixed
to all papers which may require it; but, except to the extent otherwise provided
by law, no such committee may (i) approve or adopt or recommend to the
stockholders any action or matter that the Delaware General Corporation Law
requires stockholders to approve or (ii) adopt, amend or repeal any bylaw of the
Corporation.

      Section 3.2 Committee Rules. Unless the Board of Directors otherwise
provides, each committee designated by the Board may adopt, amend and repeal
rules for conducting its business. In the absence of a provision by the Board or
a provision in the rules of a committee to the contrary, a majority of the
entire authorized number of members of such committee shall constitute a quorum
for the transaction of business, the vote of a majority of the members present
at a meeting at the time of such vote if a quorum is then present shall be the
act of such committee, and in other respects each committee shall conduct its
business in the same manner as the Board conducts its business pursuant to
Article II of these bylaws.

## ARTICLE IV

### Officers

ADEL 0021702

Section 4.1 Officers; Election. As soon as practicable after every annual meeting of stockholders, the Board of Directors shall elect a President and a Secretary, and it may, if it so determines, elect from among its members a Chairman of the Board and a Vice Chairman of the Board. The Board may also elect one or more Vice Presidents, one or more Assistant Secretaries, a Treasurer and one or more Assistant Treasurers, and such other officers as the Board may deem desirable or appropriate and may give any of them such further designations or alternate titles as it considers desirable. In addition to the officers elected by the Board in accordance with this Section 4.1, the Corporation may have one or more appointed Vice Presidents, Assistant Secretaries or Assistant Treasurers. Such Vice Presidents, Assistant Secretaries or Assistant Treasurers may be appointed by the Chairman of the Board, the President or an Executive Vice President. Vice Presidents, Assistant Secretaries or Assistant Treasurers appointed by the Chairman of the Board, the President or an Executive Vice President may be removed in accordance with Section 4.2 or by the Chairman or the President. Any number of offices may be held by the same person.

Section 4.2 Term of Office; Resignation; Removal; Vacancies. Except as otherwise provided in the resolution of the Board of Directors electing him, each officer shall hold office until the first meeting of the Board after the annual meeting of the stockholders next succeeding his election, and until his successor is elected and qualified, or until his earlier resignation or removal. An officer may resign at any time upon written notice to the Board or to the President or the Secretary of the Corporation. A resignation shall take effect at the time it specifies, and unless otherwise specified in the resignation, no acceptance of the resignation is necessary to make it effective. The Board may remove any officer with or without cause at any time. Any removal shall be without prejudice to the contractual rights of the officer, if any, with the Corporation, but the election of an officer shall not of itself create contractual rights. Any vacancy occurring in any office of the Corporation by death, resignation, removal or otherwise may be filled for the unexpired portion of the term by the Board at any regular or special meeting.

Section 4.3 Powers and Duties. The officers of the Corporation shall have such powers and duties in managing the Corporation as shall be stated in these bylaws or in a resolution of the Board of Directors not inconsistent with these bylaws and, to the extent not so stated, as generally pertain to their respective offices, subject to the control of the Board. The Secretary shall have the duty to record the proceedings of the meetings of the stockholders, the Board of Directors and any committees in a book to be kept for that purpose. The Board may require any officer, agent or employee to give security for the faithful performance of his duties.

Section 4.4 Chairman of the Board. The Chairman of the Board shall preside at all meetings of the Board of Directors and of the stockholders at which he is present and shall have and may exercise such powers as may, from time to time, be assigned to him by the Board and as may be provided by law.

Section 4.5 President. In the absence of the Chairman of the Board, the President shall preside at all meetings of the Board of Directors and of the stockholders at which he is present. The President shall be the chief executive officer and shall have general charge and supervision of the business of the Corporation and, in general, shall perform all duties incident to the office of president of a corporation and such other duties as may, from time to time, be assigned to him by the Board or as may be provided by law.

Section 4.6 Vice Presidents. The Vice President or Vice Presidents, at the request or in the absence of the President or during the President's inability to act, shall perform the duties of the President and when so acting shall have the powers of the President. If there be more than one Vice

ADEL 0021703

President, the Board of Directors may determine which one or more of the Vice Presidents shall perform any of such duties; or if such determination is not made by the Board, the President may make such determination; otherwise any of the Executive Vice Presidents may perform any of such duties. The Vice President or Vice Presidents shall have such other powers and shall perform such other duties as may, from time to time, be assigned to him or them by the Board or the President or as may be provided by law. Vice Presidents shall include Executive Vice Presidents, Senior Vice Presidents, other similarly designated Vice Presidents, and Vice Presidents.

Section 4.7 Secretary. The Secretary shall have the duty to record the proceedings of the meetings of the stockholders, the Board of Directors and any committees in a book to be kept for that purpose, shall see that all notices are duly given in accordance with the provisions of these bylaws or as required by law, shall be custodian of the records of the Corporation, may affix the corporate seal to any document the execution of which, on behalf of the Corporation, is duly authorized, and when so affixed may attest the same, and, in general, shall perform all duties incident to the office of Secretary of a corporation and such other duties as may, from time to time, be assigned to him by the Board or the President or as may be provided by law.

Section 4.8 Treasurer. The Treasurer shall have charge of and be responsible for all funds, securities, receipts and disbursements of the Corporation and shall deposit or cause to be deposited, in the name of the Corporation, all moneys or other valuable effects in such banks, trust companies or other depositories as shall, from time to time, be selected by or under authority of the Board of Directors. If required by the Board, the Treasurer shall give a bond for the faithful discharge of his duties, with such surety or sureties as the Board may determine. The Treasurer shall keep or cause to be kept complete and accurate records of all receipts and disbursements of the Corporation, shall render to the President and to the Board, whenever requested, an account of the financial condition of the Corporation, and, in general, shall perform all the duties incident to the office of treasurer of a corporation and such other duties as may, from time to time, be assigned to him by the Board or the President or as may be provided by law.

Section 4.9 Other Officers. Any other officers of the Corporation shall have such powers and duties in managing the Corporation as shall be stated in a resolution of the Board of Directors, or the as determined by the Chairman of the Board or the President, which is not inconsistent with these bylaws and, to the extent not so stated or determined, as generally pertain to their respective offices, subject to the control of the Board. The Board may require any officer, agent or employee to give security for the faithful performance of his duties.

ARTICLE V

Stock

Section 5.1 Certificates. Every holder of the stock in the Corporation shall be entitled to have a certificate signed by or in the name of the Corporation by the Chairman of the Board of Directors, or the President or any Vice-President, and by the Treasurer or an Assistant Treasurer, or the Secretary or an Assistant Secretary of the Corporation, certifying the number and class of shares owned by him in the Corporation. Any of the signatures on the certificate may be a facsimile. If any officer, transfer agent, or registrar who has signed or whose facsimile signature has been placed upon a certificate ceases to be such officer, transfer agent, or registrar before the certificate is issued, it may be issued by the Corporation with the same effect as if he were such officer, transfer agent, or registrar at the date of issue.

ADEL 0021704

Section 5.2 Lost, Stolen or Destroyed Stock Certificates; Issuance of New Certificates. The Board of Directors may direct a new certificate or certificates to be issued in place of any certificates previously issued by the Corporation alleged to have been lost, stolen or destroyed. When authorizing such issuance, the Board of Directors may require the owner of the lost, stolen or destroyed certificate or certificates, or his legal representative, to give the Corporation a bond sufficient to indemnify the Corporation against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of such new certificate.

ARTICLE VI

Indemnification

Section 6.1 Indemnification. Except to the extent prohibited by law, the corporation shall indemnify (including without limitation indemnification for all expenses (including attorneys fees), judgments, fines, and amounts paid in settlement actually and reasonably incurred by such person in connection with any action, suit or proceeding) any person made, or threatened to be made, a party to a threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative ("an Action") by reason of the fact that the person or such person's representative is or was a director or officer of the Corporation, and may indemnify (including without limitation indemnification for all expenses (including attorneys fees), judgments, fines, and amounts paid in settlement actually and reasonably incurred by such person in connection with any action, suit or proceeding) any person made, or threatened to be made, a party to any Action by reason of the fact that he is or was an employee or agent of the Corporation or serves or served as a director, officer, employee, or agent of any other enterprise at the request of the Corporation. This indemnification shall not be deemed exclusive of any other rights to which any person indemnified may be entitled under any agreement, vote of stockholders or disinterested directors, or otherwise. The Corporation may, but shall have no obligation to, purchase insurance on behalf of any person who is or was a director, officer, employee or agent of the Corporation against any liability asserted against or incurred by him in any such capacity, or arising out of his status as such to the extent permitted by law. Such insurance may be provided by the Corporation at the sole discretion of the Board of Directors.

Section 6.2 Right to Advancement of Defense Expenses. Expenses (including fees and expenses of counsel selected by the person entitled to indemnification described in Section 6.1) incurred in defending any action shall be paid by the Corporation in advance upon the written request of such person if he shall undertake to repay such amounts advanced to the extent that a court of competent jurisdiction ultimately determines that such person is not entitled to indemnification under this Article or otherwise, unless the Board of Directors or independent legal counsel reasonably determines that such person deliberately breached his duty to the Corporation or its shareholders. Such person's expenses incurred in connection with successfully establishing his right to indemnification, in whole or part, in any such proceeding shall also be indemnified by the Corporation.

Section 6.3 Right to Indemnification. The right to indemnification and advances as provided in this Article VI shall be a contractual right. Indemnification under this Article VI shall continue as to a person eligible to be indemnified even though he may have ceased to be a director or officer, and shall inure to the benefit of the heirs and legal representatives of persons entitled to indemnity hereunder, and shall be applicable to any Action commenced after the adoption hereof, whether arising from acts or omissions occurring

ADEL 0021705

before or after adoption hereof. Any repeal or modification of this Article VI shall not affect any rights or obligations then existing.

## ARTICLE VII

### Miscellaneous

Section 7.1 Fiscal Year. The fiscal year of the Corporation shall begin on January 1 and end on December 31 of each calendar year, commencing with the fiscal year ended December 31, 1998.

Section 7.2 Office. The registered office of the Corporation shall be 229 South State Street, City of Dover, County of Kent, State of Delaware, or any other location within Delaware which the Board of Directors may determine.

Section 7.3 Registered Agent. The registered agent of the Corporation shall be The Prentice-Hall Corporation System, Inc., or such other individual or domestic corporation (including the Corporation) as the Board of Directors may designate.

Section 7.4 Seal. The Corporation may have a corporate seal which shall have inscribed thereon the name of the Corporation, and shall be in such form as may be approved from time to time by the Board of Directors. The seal may be used by causing it or a facsimile thereof to be impressed or affixed, or in any other manner reproduced.

Section 7.5 Form of Records. Any records maintained by the Corporation in the regular course of its business, including its stock ledger, books of account and minute books, may be kept on, or be in the form of, punch cards, magnetic tape, photographs, microphotographs or any other information storage device, provided that the records so kept can be converted into clearly legible form within a reasonable time. The Corporation shall so convert any records so kept upon the request of any person entitled to inspect the same.

Section 7.6 Waiver of Notice of Meetings of Stockholders, Directors and Committees. Whenever any written notice is required to be given by law, the Certificate of Incorporation or these bylaws, a waiver thereof in writing, signed by the person entitled to such notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice. Unless otherwise required by the certificate of incorporation, neither the business to be transacted at nor the purpose of the meeting need be specified in the waiver of notice of such meeting. The attendance of a person, either in person or by proxy, at any meeting shall constitute a waiver of notice of the meeting, except where a person attends a meeting for the express purpose of objecting to the transaction of any business because the meeting was not lawfully called or convened.

Section 7.7 Amendment of Bylaws. These bylaws may be amended or repealed, and new bylaws adopted, by the Board of Directors, but the stockholders entitled to vote may adopt additional bylaws and may amend or repeal any bylaw whether or not adopted by them.

## ARTICLE VIII

### Nominating and Proposal Procedures

Section 8.1 Without limiting any other notice requirements imposed by law, the certificate of incorporation or these bylaws, any nomination for

ADEL 0021706

election to the Board or other proposal to be presented by any stockholder at a stockholders' meeting (the "Proponent") will be properly presented only if written notice of the Proponent's intent to make such nomination or proposal has been personally delivered to and otherwise in fact received by the Secretary of the Corporation not later than (i) for the annual meeting, at least 120 days prior to the anniversary date of the mailing of the proxy statement for the immediately preceding year's annual meeting, provided however, that if the date of the annual meeting is more than 45 days before or after the anniversary date of the immediately preceding annual meeting, the notice must have been received on or before the 15th day after the public announcement, by SEC filing, press release or otherwise, by the Corporation of the date of the annual meeting, or (ii) for any special meeting, the close of business on the tenth day after notice of such meeting is first given to stockholders; provided, however, that nothing contained herein shall limit or restrict the right of any stockholder to present at a stockholders' meeting any proposal made by such stockholder in accordance with Rule 14a-8 promulgated pursuant to the Securities Exchange Act of 1934, as amended, as it may hereafter be amended, or any successor rule. Such notice by the Proponent to the Corporation shall set forth in reasonable detail information concerning the nominee (in the case of a nomination for election to the Board of Directors) or the substance of the proposal (in the case of any other stockholder proposal), and shall include: (a) the name and residence address and business address of the stockholder who intends to present the nomination or other proposal or of any person who participates or is expected to participate in making such nomination and of the person or persons, if any, to be nominated and the principal occupation or employment and the name, type of business and address of the business and address of the corporation or other organization in which such employment is carried on of each such stockholder, participant and nominee; (b) a representation that the Proponent is a holder of record of stock of the Corporation entitled to vote at such meeting and intends to appear in person or by proxy at the meeting to present the nomination or other proposal specified in the notice; (c) a description of all arrangements or understandings between the Proponent and any other person or persons (naming such person or persons) pursuant to which the nomination or other proposal is to be made by the Proponent; (d) such other information regarding each proposal and each nominee as would have been required to be included in a proxy statement filed pursuant to the proxy rules of the Securities and Exchange Commission had the nomination or other proposal been made by the Board of Directors; and (e) the consent of each nominee, if any, to serve as a director of the Corporation if elected. Within fifteen (15) days following the receipt by the Secretary of a notice of nomination or proposal pursuant hereto, the Secretary shall advise the Proponent in writing of any deficiencies in the notice and of any additional information the Corporation is requiring to determine the eligibility of the proposed nominee or the substance of the proposal. A Proponent who has been notified of deficiencies in the notice of nomination or proposal and/or of the need for additional information shall cure such deficiencies and/or provide such additional information within fifteen (15) days after receipt of the notice of such deficiencies and/or the need for additional information. The presiding officer of a meeting of stockholders may, in his or her sole discretion, refuse to acknowledge a nomination or other proposal presented by any person that does not comply with the foregoing procedure and, upon his or her instructions, all votes cast for such nominee or with respect to such proposal may be disregarded.

ARTICLE IX

Non-Applicability of Section 203
of the Delaware General Corporation Law

Section 9.1  Section 203 of the General Corporation Law of Delaware shall not apply to the Corporation.

ADEL 0021707

ARTICLE X

Non-Applicability of Section 141(c)(1) of the
Delaware General Corporation Law

Section 10.1 Section 141(c)(1) of the General Corporation Law of
Delaware shall not apply to the Corporation, as the Corporation, by resolution
adopted by the Board, has elected to be governed by Section 141(c)(2) of the
General Corporation Law of Delaware.

(As amended through September 30, 1999)

ADEL 0021708

# Exhibit U



Randall D. Fisher
Vice President and General Counsel
One North Main Street
Coudersport, PA 16915

Phone    814.274.6356
Fax       814.274.7782

**Memorandum**

Date           October 14, 2002

To             All Employees

From           Randall D. Fisher, Vice President and General Counsel

Regarding      **Contact with members of the Rigas Family, employees of
               Rigas Family private companies or former employees
               indicted by the Federal Government**

Cc             Erkie Kailbourne, Ron Stengel, Dan Liberatore, Bob Legge,
               Chris Dunstan

As a reminder, the Company is still under investigation by the United States
Attorneys office in both New York and Pennsylvania as part of ongoing
investigations, which have resulted in indictments of three members of the Rigas
Family as well as two former executives of Adelphia. Employees should be aware
that the Securities and Exchange Commission has sued Adelphia, the Rigas Family
and the former Adelphia executives for alleged violations of securities laws. The
Company is committed to cooperating with these federal agencies, because it is the
right thing to do and because cooperation with the government will help
recover damages done by the Rigases and will help the Company avoid prosecution.
Adelphia continues to cooperate with these government agencies by reviewing with
the government both its transactions and its communications with members of the
Rigas Family, Rigas Family private entities employees, former Adelphia executives
under indictment or any of their actual or purported counsel or representatives.
Additionally, beginning later this week, the Company will be cooperating with agents
of the Internal Revenue Service in investigations of the Rigas Family. Also, Adelphia
continues to pursue its own claims against the Rigas Family.

As part of this process, I have been asked to direct everyone to use the following

1

**Procedures for Contact from Rigas Family,**
**Private Companies, Indicted Former Employees**
**October 14, 2002**

procedures regarding contact with either any member of the Rigas Family, any employee of any of the Rigas Family private companies, any former executive of Adelphia currently under indictment or any of their actual or purported counsel or representatives..

## Direct Contact

It has come to the attention of the Company that members of the Rigas family have been attempting to contact certain Company employees on various issues.  In the case of any contact regarding a business matter between the Rigas Family or Rigas Family private company and Adelphia, whether at work or in a social setting, please refer all contacts to the Legal Department by using the following procedures:

1. If the contact is direct (either in person or by phone) the person making the contact should be told that it would be inappropriate to answer any questions or provide any information.
2. Tell the individual that all contacts should be referred to Leslie Brown, Gene Fitzmaurice or Randy Fisher.
3. The Adelphia employee who has received the contact should both make the referral and report the contact to the Legal Department as well.

**There is no exception to this situation.** Should the situation arise, these same procedures should be followed for any direct contact from any former Adelphia executive currently under indictment, or any of the Rigas Family or these former Adelphia executives' actual or purported counsel or representatives.

## Social Settings

In addition to the telephone procedures described above, employees should use good judgment if they find themselves in situations where members of the Rigas family, the former Adelphia executives currently under indictment or employees of the Rigas Family private companies are also present (e.g., events, conferences, professional or civic related gatherings, etc.). The company requires that if such meetings occur, employees will not disclose or divulge any confidential information concerning the Company, the ongoing investigation or the bankruptcy proceeding.  All employees must report all such contacts with Rigas family members or former Adelphia executives currently under indictment to the Legal Department.

## Indirect Contact

In the case of an indirect contact (such as a voice mail from a member of the Rigas Family) employees should use the following procedures:

1. Report the contact to the Legal Department immediately.
2. Do not attempt to return the phone call.

The Legal Department will review the matter and may refer the matter to appropriate

**Procedures for Contact from Rigas Family,**
**Private Companies, Indicted Former Employees**
October 14, 2002

government agencies and litigation counsel for review. After any required review, the Legal Department will, on a case-by-case basis, refer the matter to the appropriate business people within the Company for the requisite action on each matter.

## Business Conduct

No employee is authorized to agree to any transaction or course of conduct with the Rigas Family, an employee of a Rigas Family private company, any former Adelphia executive currently under indictment or any of the Rigas Family or these former Adelphia executives' actual or purported counsel or representatives on any issue on behalf of Adelphia, **regardless of its size or consequence**. All transactions or course of conduct must now be referred to the legal department where any transaction or occurrence may be reviewed by the company's litigation counsel, the United States Attorney's Office in New York and Pennsylvania, the Securities and Exchange Commission as well as representatives of the United States Internal Revenue Service. Once that review has been completed, if appropriate, the matter will then be referred back to the appropriate business people for any required action.

Following these procedures will be in the best interest of the Company. Please ensure that you and those around you implement these procedures immediately. If you have any questions regarding these procedures, please contact Leslie Brown, Gene Fitzmaurice or Randy Fisher in the Legal Department.

3

# Exhibit V

DRAFT DOCUMENT
NOT IN FINAL FORM

5/31/2002
8:44 PM

## ADELPHIA COMMUNICATIONS CORPORATION
## MINUTES OF A MEETING OF THE
## BOARD OF DIRECTORS

### May 18, 2002

A meeting of the Board of Directors of Adelphia Communications Corporation (the "Company") was held at 10:30 a.m. on May 18, 2002.  Present (either in person or by telephone conference) were: Erkie Kailbourne, chairman, John Rigas, Chairman Emeritus, Tim Rigas, Mike Rigas, James Rigas, Peter Venetis, Les Gelber and Dennis Coyle. Also there was Randy Fisher, Vice President and General Counsel of the Company, Chris Boies and Phil Korologos, of Boies Schiller and Flexner, LLP, ("Boies") representing the Company, Stephen Fraidin, Audrey Strauss, Craig Miller and Tom Christopher, of Fried Frank Harris Shriver and Jacobsen, ("Fried Frank") representing the Company, Carl Rothenberger, Bruce Booken, Lew Davis and Cal Harvey, of Buchanan Ingersol, PC, ("Buchanan") representing the Company, Bruce Baird, Jonathan Blake, Len Chazen and Andrew Muratore, of Covington and Burling, ("Covington") representing the Special Committee of Independent Directors, Mike Snyder and Steve Johnson, of Reed Smith, representing the Rigas family, Paul Grand of Morvillo, Abramowitz, Grand, Iason & Silberberg, representing the Rigas Family, and Al Garner and David Kurtz, of Lazard, Freres & Co. LLC, ("Lazard") financial advisors to the Special Committee of Independent Directors ("Special Committee"). Mr. Kailbourne chaired the meeting and Mr. Fisher acted as secretary for the meeting.

Mr. Kailbourne called the meeting to order, then asked that the financial advisors leave the meeting and return at 1 p.m. Then Mr. Kailbourne reported to the directors on his meeting with NASDAQ and the timetable of public disclosures and reports to NASDAQ that the Company was required to meet to avoid being de-listed and to enable trading of the Company's shares to resume.

Mr. Kailbourne and several of the attorneys who were present then reported to the board on their meeting with the Securities and Exchange Commission ("SEC") and the U.S. Attorney's office. Mr. Kailbourne described the statements he had made at the meeting regarding the actions that the independent directors would take to reform the Company's corporate governance and facilitate the repayment of the Rigas family's share of the co-borrowing debt.

Mr. Kailbourne then asked Mr. Fisher to leave the meeting and the directors and counsel continued their discussion of the issues raised earlier in the meeting, as well as the financial condition of the Company. Following that meeting, the directors recessed until 4 p.m.

At 4 p.m., Mr. Kailbourne called the meeting back to order. No Fried Frank lawyers returned to the meeting at this point. Mr. Kailbourne gave the directors an assessment of the Company's liquidity, describing transactions that might provide an immediate infusion of funds to the Company. He also described the work that the Company and its advisors were doing to determine whether the Company was in compliance with its debt covenants.

ADELPHIA COMMUNICATIONS CORPORATION        DRAFT DOCUMENT
BOARD OF DIRECTORS MINUTES – MAY 18, 2002      NOT IN FINAL FORM

Mr. Kailbourne then reported  on his efforts to retain a chief restructuring officer, and Mr. Fraidin described his latest discussion with Leonard Tow's counsel regarding Mr. Tow's request for three seats on the Company's board of directors. No action was taken on this item.

Mr. Kailbourne then asked Mr. Fisher to leave the room and for counsel other than counsel for the individual directors to disconnect from their telephone connections and the directors and their counsel continued their discussion.

Mr. Kailbourne revewed the positions before the board and the need for the Rigas Family to cooperate in promptly resolving the governance and co-borrowing debt issues facing the company. Mr. Snyder stated that the Rigas Family wanted to cooperate in any way that it could. He stated that it was in everyone's interest for the company to succeed.  He stated that the Rigas Family wanted to find a solution, but that it would be impossible to find one in two to three hours.

Mr. Kailbourne then turned to housekeeping matters. He stated that he wanted in writing arrangements with Tim Rigas and John Rigas as to their resignations as CEO and CFO and a timeline on movement on those issues. Mr. Kailbourne assigned the drafting of the consulting agreement to Chris Boies and to Dennis Coyle of the Special Committee. Mr. Gelber noted that everyone was in full agreement to proceed on termination and the consultancy. Mr. Kailbourne assigned Mr. Boies to interface with Mr. Coyle and Tim Rigas on the issue.

Mr. Kailbourne and Mr. Snyder then discussed the possible terms of a severance arrangement in connection with Mr. Rigas's stepping down as Chairman and resigning from his positions as President and CEO. Mr. Snyder asked for a salary, benefits, use of an office, use of a secretary and some benefits for the next three years. Mr. Kailbourne countered that he was reluctant to include benefits and felt that any severance payment be made over time due to the company's liquidity stress. Mr. Chazen stated that the palatability of the payments would depend on the family's ability to cooperate with the investigation of the special committee. He also stated that the government might not permit that type of arrangement if the members of the Rigas Family did not cooperate with the investigation of the Special Committee.

The directors then conferred over the Rigas Family right to indemnification according to the by-laws of the corporation. The directors and their respective counsel then discussed the need to set all the Rigas Family transactions during the next 48 hours to have all the necessary transitions completed.

The directors next discussed the plans for the Rigas Family to repay the debts owed to the company.  Mr. Chazen stated to the directors that if a plan could not be implemented soon, the Special Committee would need to pursue other options.

The directors next discussed the proposal made to the Rigas Family by the Special Committee regarding the board seats occupied by the Rigas Family.  Mr. Chazen then reiterated the Special Committee's request for interviews of the Rigas Family and Mr. Grand stated that an answer as to availability would be given on Monday.

2

A-RA016837

ADELPHIA COMMUNICATIONS CORPORATION          DRAFT DOCUMENT
BOARD OF DIRECTORS MINUTES – MAY 18, 2002          NOT IN FINAL FORM

The directors then discussed what press release procedure would be used for the transition. Mr. Kailbourne stated that a process proposal would be put forward for comment before it was put in place.

The meeting then adjourned

Respectfully submitted

Randy Fisher, Acting Secretary

3

A-RA016838

# Exhibit W

(BIB)

10:30

5/18/02 - ADLAC  Board Meeting

Paul Graham - counsel to Family

Les Gelber

Ernie K

Fried Frank → Audrey Strauss, Franklin, Cecis Falk, Tom Christoph

C+B - Bruce Baird, John Blohm, Len Chazen, Aaron Marcu, Andrew March

Lazard Freres - Al Garner, David Korte - push 2 other

BI - BIB, CER, L Davis, C Harvey

Ernie - recall at 1:00, 4:00, 7:00

Ernie

Phil K, Chris Brie

Jim

pretty Snyder, S Johnson - Reed Smith

James, Michael

John

Peter Venetu

Randy Fisher

Ernie → dismiss financial advisors —

Ernie →

NASDAQ hearing - delisting

frame issues → ①2.6 Billion debt of Family guaranteed by ADLAC - needs
   to be disclosed by ADLAC - recognize value Family cable system
valued at 1.2 Billion ;  1.4 Billion owing - not fully supported

② NASDAQ - fb obligation - full disclosure related party transactions

   10-K issues ———— related party - by Tues
expectation - early next week - update / report status - findings Special Comm.
   crucial to NASDAQ findings ; full disclosure by Friday

D+T
items

**BIPC 2697884**

2 steps to begin trading
→ full public disclosure related party transaction — public release/filing
→ plan — memo understanding - family - deal w/ these matters

Fried Frank — Co. Counsel - assist by BS
Family + its counsel

SEC / US Attorneys Office

3 hr mtg — Ethics —
→ their focus (GOVT) — issues
① Public Company — action/recourse to collect # from Family — recover
② financial engineering allegations — Special
Comm. to deal w/
③ full disclosure related party
④ concern — family involvement/policy as to ADLAC
⑤ stop flow # or control flow # to Rigas Family
⑥ concern — #200,000,000 margin loan (# - 40,000,000 now
outstanding) — use Co-borrowing to pay off
margin loan —
update to GOVT — next week
GOVT also focused on conduct D+T
at start meeting — ADLAC disclosed Mulcahy docs re: Oct 2001
stock purchase — first time GOVT apparently learned of this

4:30
Tow — review at 7:00 pm
6:10 — Randy Fisher — Bd mtg adjourned

BIPC 2697885

1:00 recall in 4ᵒ⁰   7ᴾᴹ

LAO, CEK,
CH, BB

3/18/02   10:30 am Bd Meeting

D Cox leaves meeting

Carol
R_____, SJ (PSM), FF, B Baird, Lay, C Bul.
                    SF              also    B Baird
LG, FF           And Sr.         David Faciz   Dep Ch.
                  C Holly                    J LaEa
RF                T Clist                    Doron Mercer
                                             Ambru Avastri

Phil K   LG, EK, TR, JR, ___ PV, MR, J&R
Chris B

M Tayler, J Johnson (PSM)

PV did not get Email agenda / notice

NASD pts:                    Phil K, EK
① 2.6 BB debt          Chu M, Amar Lam, Jim Schack,
  – 1.2 systems              Matt Manely

  1.4 not fully supported

To do:   next plan
         related party transaction fully disclosed by Tues
         need all facts known   —   PR update
         review of issues re Rote 10K

         expect to report by Tues / Wed  -- findings of Spec Comm
                        coming

BIPC 2697886

Used ware process described + in place
— receipt of info

Public release of related parties info
— advance notice of NASD from Co.

② 3 hr.      A ⓒᵀᵀ

Non-MGRB Entities        MEC borrowings    1.2 / 1.4

① whether LCC doing to seek recourse on 2.6
— recovery on 1.2
— recovery on 1.4
  L Chi said yes if appropriate process

② Allegis of financial engineering

③ Full Disclosure All Parties retired

④ Signif concerns on family policy mostly attitudes
   and Co going forward

L Ci ⑤ Focus on stopping flow of assets then on to
        family

**BIPC 2697887**

— need to stop flow of funds to family

— Margin loans (200 aum)

2,755,000 total

2,551,000 Co B's

200,000 4 brokerage loans
margin

⟶ 40 mm outstanding
more

Reg U ==pd down by
loans under Co B's

Apr. 2 or 3 paydowns of
margin loans

— News that recycled $ to Co.
— News that caused $ flowing out of Co.

Gov — US Atty Chief Sec Fraud
Chief Enf. SEC

N. Stein = proactive deal- tested over ~~that~~ short time
positive ending
PWC findings

Focused on D/T

**BIPC 2697888**

Cal: 5803015 (c)
9638890 (4)

MM doca expud

adjourned to 1 PM

adjourned to 4 PM

4:30          Reconvene at 7/ same @
                              upon call in

Tow

BIPC 2697889

# Exhibit X



special com. mtg
5/25/02

PM 04052

May 25, 2001

— Covington & Burleigh                    NASD —
— Carl Rothenberger / BRUCE
• Steve Forenen; Mark Stein.
• John Blake
◦ Randy Fisher
◦ 2 CPA working a CPA
• Len Chazen.
• FINANCIAL Advisors

CRITICAL —

• Housekeeping
   — Consulting agreements w/
        Chief Restructuring Officer — Approved
        Org Chart
                              Bd. Of Directors
— Advisory function ◄——————— Special Committee — Exec. Comm.
                                    — CEO
   Does not require           — HR LEGAL
   amendment to the charter   ① Advisor – Restructuring
                               ② CFO    —1  $3000/DAY
   important to the fed.      ③ Controller —1  $2000/DAY
   Regulators                 ④ LAZARD

PM 04053

(2)

(888) 422-7128

May 25   Spec. Committee   Pass Code: 445 685
            May 25 (1000 AM)

Chris Dumstone        CFO
Steve Torsha          Controller
Ron                   Chief Restructuring Officer

Len Chozen   (Dennis Coyle)
              · 8k
        getting back the Co. Assets.
Issue #1 — Co/ Apartment. in NYC
            The Saratoga.
            Pay Back Rent
            Vacate Apt.

        Townhouse #61  Beaver Creek

        Hilton Head owns Co Lots.
              who did we buy it from.

    Nor WAIVED any claim of the Co. on
        the family. (Legal Rights)

    Voting Trust Agreement — Need in Place
                    Immediately —

PM 04054

③

* <u>Board Mtg</u>:
   * Appropriate Signing Authorities.
       after LeuTow's 2 members are on board.

   5/2 coming forward.
       Must be approved by
           Leu Chazen in

   Peter indicated not formally approached "to leave" the Bd.
       He was asked to sign.
       But not if aware of The Resolution

   Follow Through ——> Negotiations on TUESDAY
                       Peters' Lawyer <——> Bruce
                                           (Covington)

   ┌─────────────────────────────────────┐
   │ Conditions:  No Limitations          │
   └─────────────────────────────────────┘

   * Linda Robinson — Wants to be paid.

   — Officers
       Subsidiaries
       Board — Directors ┼ Internal
           — Officers.

   — Committees must be restructured

PM 04055

④

<u>Gov't Status</u>  ~~By~~ Mark Stein

— Daily  FCC (Attn Gevil)
— Negotiations
— SIC
— Tuesc — conf. call w/ FCC.
                  went very good

— THURSDAY


very appreciated
real △ in The company.


Thurs. PM
        — Chief. Secu./Fraud
        — All appalled at the Deal.
                couldn't fathom
                        1) Severance package
                        2) 2 Seats on The Board.
                        3) ~~Have~~ May indict the Company.

                who were
People a Part of The negotians should talk to
the  US Attorneys office.


"Put together a story"

PM 04056

John Blake
    Les, David, Eeric, & Dennis & others:

    Wednesday morning @ 1000.

Real Estate Co who did the work
    Pat Larsen (Local Attorney)

## NASD.

✓ Fillings made yesterday (3 Fillings) ⎯ · 8K
                                          Inv. Report
✓ Genl Consul (NASD)
    ↳ Said "Where is the roadmap"
    ↳ Concerns:
        — Wants by Tuesday 5:Pm to
          walk him Thou the document
        — Wants all document tied together
        — 4 to 5 Page letter

Public Relations — Tighten up; everything through
                    Linda Robinson.

PM 04057

(6)

<u>Joined The Financial Analyst</u>
- Lazore
- Salomon
- BK of America
- Daniels + Charter visiting every site / Property.

Chris Boise
David Boise

Weekly Cash Receipt & Disbursement.
ERKIE/CHRISTINA
<u>Insight</u>
- least Due Diligence
- Weakest Financial Backing
- Least prepared
- Could not work with them was The message

Phase 1A/1B — 50 mio available w/o restrictions
Phase II — 45-60% → give Them The Co. for $1 billion.

- Third out of 3.

Will take a lot of work to get Them There
and we may not ever get The There.

**PM 04058**



## TPG

Funded by the Bass
Working for over 1 wk
Must up the curve on Due Diligence
Do not know the Cable Business

1A  Provide 120 mio @ FRONTIER ⊂ Div. to co.
                                    Div. to co.
1B         25 mio inv. in FRONTIER — cure the defaults

2  Provision  min  150  } @ Adelphia Comm.
   Max  us   600  }
                          | Jr TO BANK DEBT |
                          | Sr TO PUBLIC DEBT |

General Summary – 750 mio of very
expensive money.  Issue: Cost
        1A – Liquidation → higher than their offering
                    feature
Willing to:
✓ Changed some things
✓ Probably a little room to negotiate
but ... 2nd on the list — Not worth it until Phase 2
                in place.

With be viewed by investors as good
        BOARD After Phase
        3-man — }
        2 man — } Negotiable

PM 04059

⑧

$3.7 \rightarrow 4.3$ billion

$\#$ ~~Billion~~ want to buy on

Charter for
Purchase:

CROWN          418,000      LA Subscribers
Source         102,000      W.Va S.OU
               93,000       Atlanta
               26,000       Hilton
Other up to    35,000       StatsV. NC
Sell i.e not   —            —
the best stuff 220K   —   Knoxville
we have.       180K   —   LA

$600/Sub
↓
4200/SUB

Lot of Subscribers
 - Adjacent to their properties
 - Good for them

No TAY INPUT
NOL

Bd. PRESENTATION 5/2 Page 11
NXT Value mid Point  ( 3.8 Billion )
     is within the range

Due Diligen in Conderspent
   Legal           "      → Pittsburgh
Site Visits completed by Tues -
   Could Sign by FRIDAY

**PM 04060**

( Up Front Bridge Facility subject to Nothing )  $
250 mill

(9)

250 after Bond defaults
will close w/ 120 DAYS
~~June~~ ——> Oct 1st Wk.

New impact of the ~~Re~~ new Bd. members.

I think
this is the
"correct inter-
pretation!"   } Should have little effect on selling ω
               down the road.

Prepared to buy the Lt Joint Venture.
    — Concern: Comcast is 25% of that joint vent.
    — We may not be able to get them to
       sign off by the end of the week.

ATT
ATT & BROADBAND
    COMCAST

PROPOSAL — Strategic Value to Charter

Confident — we can get price (Top Dollar) for
         the Balance of the Systems.

**PM 04061**

(10)

Sell the whole company?!

Limited chances.

Mtg w/Leonard Tow next week.
⤷ should be agreeable

Debt holders
⤷ continues to trade.

---

After Charter Sell
- How long will much time to we have

Step
4.0 Billion — Retire
-1.0 Oprat
3.0 — Repayment of 50% of Bk debt.

Pior to Renegotiating        Renegotiate The Bank Debt
"clean it up"                 Which allow us
                              to meet the amortization.

---

Corthed → Sell to

Kery Vox.          — 70% chance to 75%.
Kp Fla.            — Owner Paul Allen wants
Keep Corlsbad.        2 Billion Sals
                   Wonts LA

**PM 04062**

⑪

Paul Allen —— Involved.

Risk II — Get to Thursday
We were going to pay this — —
but we found ____ ___ = —

— loose values in contract. —

Issue:
— Frontier Vision —► considered unrestricted
file w/ Trustee in
1999/2000 but were
the indenture calculations
Passed.

We cannot find those calculations

High Property.

○ OAK HILL
○ KKR → 3 to 4 funds. ⎫  STATUS
○ Sequal ⎬  "
          ⎭  "

Pursue Charter w/TPG as backup.

PM 04063

(12)

Puerto Rico —

Met w/ the Caldwell Group. _Providence Equity_
↳ willing to step in ?!

— Tuesday —

10 other people have wanted to get into it.

Facilitate those people —> to get
together w/ Merill Lynch

| Merill Lynch Payment |

- Need to get agreement from Rigas. (w/o relieving their
  Need to get Bd. approval.                        obligations)

- Amend the bylaws
  Need: > 24HR Notice.

Venezuela:
    Person looking @ The agreement.

Gary Holmes    (    )    Pg 46
        (212) 484 7736 (O)
        203 656 4643 (H)
        917 834 2815 (C)

PM 04064

# Exhibit Y

ADELPHIA COMMUNICATIONS CORPORATION
MINUTES OF A MEETING OF THE
BOARD OF DIRECTORS

June 1, 2002

A meeting of the Board of Directors of Adelphia Communications Corporation (the "Company") was held on June 1, 2002, at 10 a.m. at the office of Boies, Schiller & Flexner, LLP, at 570 Lexington Avenue, New York, NY. Present (either in person or by telephone conference) were: Erland Kailbourne, Chairman, Les Gelber, Dennis Coyle, Peter Venetis, Leonard Tow and Scott Schneider. Also in attendance were Stephen Fraidin, and Craig Miller, of Fried Frank Harris Shriver and Jacobsen, ("Fried Frank") representing the Company, Phil Korologos, David Boies and Christopher Boies, of Boies Schiller & Flexner, ("Boies") representing the company, Martin Auerbach, representing Mr. Venetis, Ron Stengel, of Conway Del Genio Gries & Co., representing the Company, Chris Dunstan, Chief Financial Officer and Randall D. Fisher, Vice President and General Counsel of the Company. Mr. Kailbourne chaired the meeting and Mr. Fisher acted as secretary.

Next, the directors reviewed drafts of minutes of meetings. Because the Secretary had not received review comments from Mr. Gelber, the meeting minutes of May 2, 2002 were tabled for review until the next meeting. After the Chairman received a motion and second for approval of the May 5, 2002, minutes, those minutes were approved.

After the Chairman received a motion and second for approval of the May 6, 2002, minutes, those minutes were approved.

At this point, Pete Metros joined the meeting. After the Chairman received a motion and second for approval of the May 9, 2002, minutes, those minutes were approved.

After the Chairman received a motion and second for approval of the May 14, 2002, minutes, those minutes were approved.

After the Chairman received a motion and second for approval of the May 15, 2002, minutes, those minutes were approved.

After the Chairman received a motion and second for approval of the May 18, 2002, minutes, those minutes were approved.

Review of the minutes of the May 22, 2002 meeting was tabled until the next meeting to allow counsel for Mr. Venetis to submit Mr. Venetis' suggested revision to reflect his understanding of his participation in that meeting.

BOARD OF DIRECTORS MINUTES – JUNE 1, 2002

After the Chairman called the meeting to order, Mr. Kailbourne first welcomed Mr. Tow and Mr. Schneider to the Board of Directors meeting. Then, upon a motion and second, Mr. Tow and Mr. Schneider were then elected to the board of directors.

The Chairman then reviewed a motion dealing with the resignation of John Rigas, Mike Rigas, Tim Rigas and James Rigas from each of their officer positions with Adelphia Communications Corporation and all related subsidiaries. Following that review and after a motion and second, Chris Dunstan was elected as Executive Vice President, Chief Financial Officer and Treasurer of the Company and all its related subsidiaries. In the same motion Steve Teuscher was elected Senior Vice President, Controller and Chief Accounting Officer of the Company and all related subsidiaries. (See Attachment A to minutes and incorporated by reference herein.)

The Chairman then directed the Secretary to ensure that an appropriate Form 8K is released to the public confirming the appointments.

The Chairman then reviewed a resolution declaring the need for new signatures for all bank accounts for the company. After a motion for approval of the resolution and second was received, the resolution was adopted unanimously. (See Attachment B to minutes and incorporated by reference herein.)

The Chairman then reviewed the need to retain the firm of Lazard, Freres & Co. LLC, ("Lazard") as a second financial advisor to the Company to assist it with liquidity issues. Mr. Stengel, at the request of the Chairman, discussed the current relationship with the firm and the advantages of expanding that relationship, considering the Company's current liquidity crisis. Mr. Stengel then discussed the difference between Lazard and the other financial advisors currently employed by the Company. He also discussed the revised terms that would be put in place with Lazard if Lazard's role were expanded per the discussion. The Chairman asked for advice from the directors and indicated that management will review the terms and conditions of the proposed engagement.

The Chairman then discussed additional governance needs of the Company. He sought approval to name Mr. Coyle as chairman of the Audit Committee and Mr. Tow and Mr. Metros as members of that committee. He sought approval to name Mr. Coyle as chairman of the Compensation Committee and Mr. Gelber and Mr. Metros as members of that committee and he sought approval to create a Nominations Committee with Mr. Gelber as chairman of that committee and Mr. Tow and Mr. Coyle as members of that committee. Mr. Tow stated that he would accept the appointments to the committees conditioned upon approval by his counsel. With that reservation, the Chairman received a motion and second and all committee appointments passed unanimously.

Following that motion, the Chairman received a report from Mr. Gelber, the chairman of the Special Committee of Independent Directors ("Special Committee"), outlining its investigation of the related-party transactions which occurred within the Company, discussing both its appropriate reporting of those transactions, and other issues

A-RA015384

COMMUNICATIONS CORPORATION
BOARD OF DIRECTORS MINUTES – JUNE 1, 2002

surrounding its investigation. Mr. Gelber reported that he had described to officials at the Securities and Exchange Commission and the Justice Department the progress of the investigation of the Special Committee, including the agreement between the Rigas Family and the Company regarding the family resignations as Directors of the Company and as officers of the Company. Mr. Gelber indicated that the officials with whom Mr. Gelber had met appeared satisfied at the progress of the Special Committee. Mr. Gelber then read a resolution from the Special Committee that had been approved unanimously stating that John Rigas, Mike Rigas, Tim Rigas, Peter Venetis and Jim Brown had deliberately breached their duties to the Company and its shareholders by failing to cooperate with the Special Committee in its investigation by declining to provide full and complete answers to the Special Committee and by participating in related party transactions for their benefit to the detriment of the Company without appropriate disclosures and approval of the Board of Directors. As a consequence, such officers and directors were no longer entitled to the advancement of defense expenses under the Company's Bylaws. (See Attachment C to minutes and incorporated by reference herein.)

Mr. Venetis objected to the assertion that he had failed to cooperate with the Special Committee, stating that neither he nor his attorneys had appropriate notice of the needs of the Special Committee and that he had every intention of cooperating with the Special Committee and its requests in the immediate future. Mr. Auerbach asked that the Board table action on Mr. Venetis until a future date, giving Mr. Auerbach and Mr. Venetis the opportunity to schedule discussions with the Special Committee at a mutually acceptable time. Mr. David Boies then advised the board of

REDACTED

A-RA015385

ADELPHIA COMMUNICATIONS CORPORATION
BOARD OF DIRECTORS MINUTES – JUNE 1, 2002

At 11 a.m., financial advisors and additional legal advisors to the Company joined the meeting. They included Christina Mohr and Dan Richards from Salomon Smith Barney ("Salomon"), Tony Whayne of Credit Suisse First Boston ("CSFB"), Brian Devey of Daniels and Associates ("Daniels"), Al Garner and David Kurtz of Lazard, Freres & Co. ("Lazard"), Carl Rothenberger and Bruce Booken of Buchanan Ingersoll, P.C. ("Buchanan") counsel to the Company, Myron Trepper and Marc Abrams, Holly Youngblood and Maurice Lefkot, of Wilkie Farr & Gallagher, ("Wilkie Farr") counsel to the Company, joined the meeting.

The Chairman stated that he first wanted to discuss the liquidity status and cash forecast of the Company and asked Mr. Dunstan to lead that discussion. Mr. Dunstan indicated that barring bridge financing, the Company had two to three weeks of remaining cash to fund its operations. Mr. Dunstan then reviewed with the directors the issues surrounding projected negative cash flow for the Company.

Mr. Dunstan reviewed the projected cash needs of the Company for the balance of the year as being approximately $1.2 billion before certain discretionary items. He indicated the Company's suppliers and other creditors could force disruption of services if resolution to the cash issues is not found. Mr. Dunstan then discussed short-term options available to the Company. The directors reviewed the information and discussed other options available to the Company.

The Chairman then asked for an update from Ms. Mohr of Salomon regarding the status of potential bridge financing and/or asset sales to create a liquidity event for the Company. Ms. Mohr led a discussion of the status of efforts of the advisors to create an asset sale with Charter, Insight, and Texas Pacific Group, with associated bridge loans from both groups. Mr. Kurtz reviewed the status of efforts to obtain bridge loan financing from CSFB. Ms. Mohr reviewed a handout that discussed each of these groups and their respective financial capabilities and related due-diligence efforts. (See Attachment D to minutes, and incorporated by reference herein.)

Ms. Mohr stated that other groups had indicated an interest in participating in either financing or acquisition options but were waiting for the Company to resolve through waivers the existing defaults on its outstanding debt before those groups would participate. Mr. Tow questioned whether the proposition was put forward as a partial asset sale or a complete sale of the company. Mr. Kurtz explained that the proposition was a partial sale. Mr. Tow stated that the better approach was to offer to sell the whole Company and that some form of binding control of the sale could be handed to a lead bank to get them to assist the Company.

The directors then discussed various options with the advisors and discussed whether a proposed asset sale to Charter or any of the bridge financing options would be sufficient enough to avoid a liquidity crisis. Mr. Tow then asked the advisors to compare the properties that the Company was offering against the properties offered by AT&T to Comcast in those companies' recent merger. After hearing the comparisons, the directors

4

**COMMUNICATIONS CORPORATION**
**BOARD OF DIRECTORS MINUTES – JUNE 1, 2002**

then discussed the advantages and disadvantages of a complete sale of assets versus a partial sale and subsequent restructuring of the balance sheet.

The Chairman then turned to Mr. Trepper to discuss other options available to the Company.

# REDACTED

At 2 pm, the Chairman reconvened the meeting without financial and certain legal advisors.

Mr. Kailbourne and Mr. Dunstan reported to the directors regarding the potential for some miscellaneous asset sales and the availability for disposal of some public securities, which could raise in excess of $10 million in cash to support the Company's short-term working capital needs. The directors approved selling 374,043 shares and 187,023 of warrants of Motorola and placing for sale 2,818,045 shares of United GlobalCom, Inc..

The Chairman also indicated that the Company's G3 aircraft has been grounded and that the Company would seek to liquidate that asset in the most effective manner for the company. Mr. Dunstan then discussed the ability sell timber assets at between $15 and $20 million. After hearing a motion and second, the board approved the pursuing of a sale of those assets.

The directors then discussed the status of a planned buyout of ML Media out of the Puerto Rico partnership in September, and the related attempt by ML to accelerate the sale immediately based upon their assertion of a change of control of the Company. The directors discussed options available to the Company and strategies to take. Mr. Kailbourne indicated that a letter was due to ML by 5 p.m. Monday after Friday's meeting and that the Company would be seeking a standstill agreement and would bring to the Board the appropriate terms of negotiating with ML on this transaction.

The Chairman then summarized the Company's options in view of its significant liquidity crisis. A general discussion ensued. Mr. Tow stated that the directors need to consider selling all the assets. He stated that the best option would be to find a large bridge facility of at least $1 billion that provides for a disposition of the Company in its entirety. He said the bridge loan effort must be led by an institution that commands respect in the financial community. He told the directors that he believes an institution with marketplace respect would facilitate obtaining waivers and gathering the support of other financial players to participate in the venture. He said if that institution could be found, then the directors could bring the current crisis to a halt. Mr. Tow proposed the board authorize him to contact certain institutions to discuss their interest in such a role.

A-RA015387

ADELPHIA COMMUNICATIONS CORPORATION
BOARD OF DIRECTORS MINUTES – JUNE 1, 2002

The directors then heard from Mr. David Boies regarding

# REDACTED

After further discussion by the directors, the directors agreed to authorize Mr. Tow on behalf of the Company, to seek financial institutions that would discuss a bridge loan of sufficient magnitude to satisfy the Company's working capital needs, with the provision that the bridge loan provider would be given certain covenants to allow it to force the sale of the entirety of the Company in an orderly manner.

Mr. Tow then inquired about the status of the Form 10K and asked for a copy of the latest draft for his review prior to his meetings with appropriate financial institutions.

The directors then discussed the status of the Company's investment in the Buffalo Sabres, the team's interdependency on the Company's cash management system, its relationship with the Company 401K plan, and Company insurance programs. The directors also discussed notification to the team that it would cease funding its payroll as of May 31, 2002. The Chairman said that discussions were ongoing with the Rigas Family about selling the team.

The Chairman also discussed the status of meetings with Deloitte & Touche, LLP, to seek the audit firm's resumption of the audit of the Company. The Chairman told the directors that there would be more discussions in the next week.

The Chairman also discussed the Company's interdependency with Adelphia Business Solutions and Company efforts to reach arm's length transactions with that company. The Chairman also promised the directors a report at a subsequent meeting regarding the status of the 401K trustees. He stated that the two trustees have resigned but that would not be effective until two new trustees have been appointed.

The Chairman, upon advice of counsel, requested that Mr. Fisher meet with the Special Committee to review requests of individuals for indemnification. Mr. Gelber told the directors he would convene a meeting of the Special Committee immediately following the conclusion of the regular meeting to review those requests.

The directors then returned to the issue of indemnification for Peter Venetis. Mr. Gelber told the directors that his failure thus far to cooperate with the Special Committee Investigation (including missing the deadline of yesterday that was set by counsel for the Special Committee to work out any cooperation) and his involvement in related party transactions including the use of the Company's New York City apartment without compensation constitute breaches of duty to the Company, which warranted the determination that Mr. Venetis was not entitled to the advancement of defense expenses under the By-laws. Mr. Gelber then stated that Special Committee encouraged Mr.

6

BOARD OF DIRECTORS MINUTES – JUNE 1, 2002

Venetis to take advantage of the opportunity to come forward to meet with the Special Committee and to have him fully explain his issues to the investigators.

There being no further business of the directors, the meeting adjourned.

Respectfully Submitted,

*Randall D. Fisher*

Randall D. Fisher
Acting Secretary

7

A-RA015389

# Exhibit Z



Adelphia Bd mtg
6-1-02

PM 04065

(i)

June 1, 2002
Adelphia — Bd. Meeting.

888   432   7124
605 764
— Joined in The middle —
Approval of the minutes.
5/15/02 —

May 22, 2002   Minutes
Governance / Resolutions

Two new Officers :
— Deurstod } Chief Acctg. Officers   (CHRIS)
— Touscher }  & FOE   (STEVE)

Approved

Form 8K
Lazard — Retained by The Special Committee
Restructuring
Chapt. 11
More to Bd Of Directors

Would
Disappear } [ Solomon Cannot be involved in ]
in Chap 11)   [ Chapt 11 ]

→ incremental 10 million.
— More if we go Chap. 11.

— Lazard would take The lead w/ The Banks
— Solomon would not do That.      PM 04066

②

Cont. governance
— Interim CEO
— Recess Those committee                    Cogle Chair.
→    On the Audit Committee          → Matros
—    On the Compensation Committee  — Tow
                                     — Cogle Chi
                                     — Gelbo
                                     — Matro

—   Chair of The Nominating Committee  — Gelbo
                Cogle                    the Chair

Chair CEO   Issues of the Co.
     1. Liquidity Issues.

Special Committee
        Wednesday — Len Chazen
                    Done

→ Attn Genl from New York
    Rich. Owens + 1
    Shows progress that mine made
        Δ in Control
        agreement
    ✓ Indicating Their pleasure
    ✓ Open Dialogue willing to now share info.
        (will be kept confidential)        PM 04067

③

Special Committee
Section 6.2 – Attn Fees; Bd of Directors
Will be breached / No Attn fees.

Bd. John, Tim, Michael, James
– Vanitis

Vanitis lawyer
was taking
issue re: to
communication.

No advancement of Attn fees.

His client
Nor in Breach of communication.
Not really the same
as the Family

incl. items in 8K

– Auerbach & Rep. for Covington
– Vanitis wants to fulfill his duties
   to the Board

Recommend
Board
Change

Wants to Table This recommendation
first
Cogle – wants to pursue it but
leave it open for discussion.

PM 04068

David Boie   ④ Alternatives.
I like the 4th Recommdat

Passed –
w/o

Has Vanitis Breached his obligations
The full Board  Must Req: 8K +
   ① Counsel to Special Committee
   ② Committee

✓ Lazard
✓ Solomon } now joined us.

Liquidity

Cash Flow — Chris Dumstane

|                | 2002 | 2003 |
|----------------|------|------|
| 8K             | (700 mio ) } |  |
| Press Releases | ( by YE ) } |  |
| Cash           |      |      |

No access to capital

Reduced CAPITAL Program    Cut: (400) mio.

1.2 B. of Bridge Financing Required.

Shortfall hardening →

Dec.   700 mio
    Jan.
        ✓ Cut back on CAP EX
        ✓ EBITA cut back   340
        ✓ Waiver s. Addil. Fees
        ✓ EBITA  1.4

832 — Shortfall in EBITA     PM 04069
808 — Cap Ex Reductions
Working Payables = Stretched Suppliers } DISRUPTION in Austin

Fees:

✓ Bridgeloan Interest:

Managed System   not included ≅ 90 million
      "            "       (10 2x  →

They are users of Cost Anyway.

Can discretionary payments
      Princ. Bond Repayments ⟩ must reschedule.
      Otherwise 1.9 billion problem
      <u>Will Require</u>
      Bridge Loan
      Asset Sales

1.2 Shortfall
let's call it a 1 Billion shortfall.
      in The ordinary course, how would The finance?
      <u>Answer</u>:
①      1.5 Billion under our back Line
②      + Commercial Market

      ∴ No access to the above 2 markets
      has created a crises

• 10K default
Li Tow.  • Are there any other covenants →  **PM 04070**

Christina Moor

<u>Sale of Assets:</u>
  ✓ So. Co.
  ✓

EBITA Decline    (200 mo)
Reduce Liquidity

Help from: (Short Term)
  — Charter          ←——————— Certain competitors
  — Insight
  — Texas Pacific    ~ Apollo
                     ~ Microsoft interest in LA ←
                     ~ Equal3
                     — O

Bring people into FRONTIER Vision —→ $150 mo ≑ $200
  (Unrestricted Subs)

| 155 EBITA |
| 1.3 B in Debt |
| 700 K Subscribers |

600 ⎫ $
500 ⎭   Ability Finance from
        econuic is being
        Reduced

**PM 04071**

Total Bank Debt

6.9 B. in
7.1 B.
.2
1.4
.3 Other
$15.8   Debt

Total Debt   Sr $.   >10 X
        Total        > 11.3 X
        LQA Basis    even higher than above level
Un encumbered Assets    } Still can't get to it.
    250,000 Subscriber }

Message :
    Margin
    ① Only source is to sell assets.
    ② Frontier

Phase 1 - Allow co. to operate - need 3-4 wks
        2 - Summarizes.

Page 9   Bank Proposals
        6 ∆ Banks Syndicates.

⎡ 5/21 Mtg.
⎣ We made a "pitch"

Otherwise we go bankrupt    | Should give us the money
→ Banks would be better    | to go forward $750 mi.
    to help to not go into Bankruptcy

**PM 04072**

Working w/ Banks w/ "Work out" plan.

✓ Do not want to force us into chapt. 11
✓ Open minded to any program.... but No additional
                                          money from These
                                          Banks.

Asset values are appealing
but . . . . .

Maybe  50-75 mio  ⟶ bandaid Bridge

All Banks want to be our lender
    in Bankruptcy "DIP LENDER"

<u>At the AGENT LEVEL:</u>

1st. Boston would help us bad...., contingent
on certain things. Banks would Subordinate
their debt to 1st Boston. for 1 Billion.

Leonard Tow can bring us to such a bank!!
Must Think bigger.
        ✓ Competition would be greater.
        ✓ Sell of Assets give NOLs

Don't sell The Co.
        ✓ Sell only the assets.
        ✓

**PM 04073**

How long does it take to get The Bk waivers

Brick er ⟶
    Equity Support ⟶

Banks would go for it

You'll ~~need a~~ get a stampede from
The banks once one bank breaks.

1st Boston goes Then
    - all others will follow!
    - co agent roles.

Charter conce to The co.
- or { ① 200 mio   $connect ∴ N/ The toleb Frontier
      ② ___ Secured Deposit on the asset sell
                          on The unsecular Subscriber
    ✓ Charter/ working on The deal
              continues

Insight —   } still want control

Texas Pacific —
    Final Proposal — "Most work of anyone"
        7 days of due Diligence
    "Want Warrants"

*Tom believes he can get The banks to jum un The money.*

PM 04074

Continue: Christinal

Charter  Buy: $45,000  Subs. & SE. and other $\Bigg\{\begin{array}{l}\text{Boston}\\\text{Conn}\end{array}$

Asset Purchase Agreement — Rather aggressive.

✓ Side due diligence

✓ 400-500 mio  BRIDGE LOANS  vs  $\dfrac{\$750\ \text{mio}}{\text{Before}}$

✓

Valuations:

→ Rebuild The Rebuild.

→ EBITA in Los Angeles down year

• over year (2001 vs 2002) → Problem

• S. Boston problems: collections

• New England — Union Issues

• W. Va. less attractive & clearly less valuable

• More attractive than W. Va. but less attract

Valuation

| | | |
|---|---|---|
| Premium | LA :— Most desirable | LA: Above |
| Average | Conn — OK | Parito Ave. Cable Syst. |
| Less. Avg. | Other — Worst | (W.Va.) less than Avg. Cable Syst. |

$\$3600 - \$4200$ = occ. Package (Average)

= New Price Proposal.

→ Negotiating

$\$4600 / \text{Sub.}\ \Big\} \text{Partim}$
AT&T

" Low Price from Charter"  Lack of competition
Paul Allen is a different animal when there is
        Competition.

PM 04075

Adelphia is a unique asset.
   ✓ Owns key properties.
   ✓ In key Markets.

➡ Huge # of Buyers.

Texas Pacific

   ① merg into the Co.

   ② Capital in the comp.

   ③

TPG

→ Banks; Bondholders;

Delisting; How does that affect the Company?

<u>Board Responsibility</u>:

Myron: → ✓ Entities   ✓ Shareholders
           ✓ Vendors
           ✓ Employees
           ✓ Bondholder

Heading toward Bankruptcy

Bridge w/ or asset sell.
         ↳ Chapter ① will be a challeng

➤ Safety NET?

**PM 04076**

Issues:

[ Liquidity ]   #1 PRIORITY

There is a lot of money out There !?

Aged Banks / Lawyer

└→ Interest what will happen when we
   go into Bankruptcy?

---

[ Shut for
4.0000 ]

Asset Sales

— 6 mio Metrovilla  ⟩
—
— G3   Sale   6.0 mio.   — 40 on The
—                              market!
                              8-11.0 mio

Timber    Move quick
          1st 15 mio
          2nd 20 mio — Sell it!!
Puerto Rico — Will we FROZEN ⟩ 15 mio. —→
  └→ -1 or 2 buyers
     [ Merrill-Lynch ] —→ take a reduction. —→

PM 04077

Erkin Kailbourn

• Liquidity Three June 15   maybe 1 more wk
• 1A   250 million   give time to get cosiners

Phase 2   Sell Assets.

◦ Good Control
◦ Charter unwilling on 1A c. "Soft" prices.
◦

<u>Leonard :</u>
Consider  # of option   but --- he recommends

[ Large BRIDGE   1 Billion ]



Disposition of The entire Co.

Bd would agree to that.

2  Market institutions That qualify.
   Then herding.

16 Billion of Debt.
   + TRADE CREDITORS

Take the 1 Billion; Refinance The Debt.

✓ Solomon        } Someone statue
✓ City Group

PM 04078

✓ Revenue Solid
✓ Cash Flow Solid
✓ Subscriber ——↑ } UNFORTUNATELY OVERSTATED

                Some Things were capitalized That
                should have been expensed.

— GOING FORWARD —
" You want good News."


SABRES ——  ✓ 30 million invested
             ✓ CANNOT FIND IT
             ✓ What if any recovery could we take.
             ✓ Looking @ prospective Buyers.
              STOP FUNDING THE SABRES


D - T.      IN REVIEW OF Being RE-INSTATED.

AB12      Inter tangle of support activities

401k      Existing Trustees have resigned.
            (Violation of LAW)


            Requests for Indemnification
            " Requires Board Approval"

**PM 04079**

        Ed Hartman — Relationship w/ The Sabres
                Refused due to his
                lawyer has not been
                paid.  25,000 RETAINER
                (10,000 has been paid)

# Exhibit AA

| | |
|---|---|
| **From:** | Clark, Christopher <Christopher.Clark2@usdoj.gov> |
| **Sent:** | Wednesday, July 31, 2002 4:39 PM |
| **To:** | Baird, Bruce <bbaird@cov.com> |
| **Subject:** | RE: Adelphia - Revised Release |

The new agreement is okay, provided that our agreement relating to your interviews of our co-operators in still in effect. Please confirm that via email.

In addition, the letter I saw yesterday (not attached today) will have to be revised to reflect the changes in the contract. Please confirm via email that it will be so revised.

With those provisos, it's fine.

-----Original Message-----
From: Baird, Bruce [mailto:bbaird@cov.com]
Sent: Tuesday, July 30, 2002 7:51 PM
To: Clark, Christopher
Subject: FW: Adelphia - Revised Release


Chris, does this do the trick?

-----Original Message-----
From: Haller, Peter [mailto:phaller@willkie.com]
Sent: Tuesday, July 30, 2002 6:29 PM
To: Baird, Bruce
Cc: Lefkort, Maurice; Haller, Peter
Subject: Adelphia - Revised Release



 Bruce, attached is a copy of the release for the administrative leave
employees, which has been revised to reflect the comments we discussed
earlier this afternoon.

Please call me on my cell phone 917-597-6561 if you would like to discuss
further or provide additional comments.

Peter Haller
Willkie Farr & Gallagher
787 Seventh Avenue
New York, New York 10019

(212) 728-8524 (phone)
(212) 728-8111 (fax)

COV 0156

phaller@willkie.com
<<NEW_YORK_1077152_3.DOC>> <<Redline.rtf>>

************************************************************
*****

IMPORTANT NOTICE:  This e-mail message is intended to be received
only by persons entitled to receive the confidential information
it may contain.  E-mail messages to clients of Willkie Farr &
Gallagher presumptively contain information that is confidential
and legally privileged; e-mail messages to non-clients are
normally confidential and may also be legally privileged.  Please
do not read, copy, forward or store this message unless you are an
intended recipient of it. If you have received this message in
error, please forward it back to the sender and delete it
completely from your computer system.

************************************************************
*****

COV 0157

# Exhibit BB

COVINGTON & BURLING

| 1201 PENNSYLVANIA AVENUE NW | WASHINGTON | BRUCE A. BAIRD |
| WASHINGTON, DC 20004-2401 | NEW YORK | TEL 202.662.5122 |
| TEL 202.662.6000 | SAN FRANCISCO | FAX 202.662.6291 |
| FAX 202.662.6291 | LONDON | BBAIRD @ COV.COM |
| WWW.COV.COM | BRUSSELS | |

August 1, 2002

**VIA FACSIMILE AND FEDERAL EXPRESS**

Timothy J. Coleman, Esq.
Assistant United States Attorney
United States Attorney's Office for the
 Southern District of New York
1 St. Andrews Plaza
New York, New York  10007

Re:  **Adelphia Communications Corporation**

Dear Mr. Coleman:

You have provided us, as counsel to the Special Committee of the Board
of Directors of Adelphia Communications Corporation ("Adelphia" or "the
Company"), with the opportunity to address whether the Company should be indicted
in connection with the criminal charges for which three members of the Rigas family
and two other senior executives recently were arrested.   We appreciate this
opportunity and submit that consideration of the factors relevant to such a decision
strongly militates against indictment of the Company.

I.      Overview

On June 16, 1999, the Office of the Deputy Attorney General issued a
Memorandum on the subject of "Bringing Criminal Charges Against Corporations"
(the "Memorandum"), which is attached hereto as Exhibit A for ease of reference.
The Memorandum first articulates the "General Principle" that in appropriate
situations, "[i]ndicting corporations for wrongdoing enables the government to
address and be a force for positive change of corporate culture, alter corporate
behavior, and prevent, discover, and punish white collar crime," and then provides

COVINGTON & BURLING

Timothy J. Coleman, Esq.
July 31, 2002
Page 2

guidance as to the particular factors that should "generally inform a prosecutor in
making the decision whether to charge a corporation in a particular case."
Memorandum at 1.  Although we address each of those particular factors in part III
below, we would like, at the outset, to urge three core reasons why an indictment of
the Company would violate the guidelines set forth in the Memorandum.

        First, we submit that this is a case in which the government's goals of
changing corporate culture and behavior and punishing those who commit white-
collar crime are best served by *not* indicting the Company.  The Company, through
the Special Committee of the Board of Directors, has itself vigorously forced positive
change, drastically altered corporate behavior, and significantly aided the government
in developing the evidence that has led to the arrest of the actual perpetrators in a time
frame dramatically shorter than that of similar cases, both past and present.  In short,
the Company here has made a sharp break with the past, including all of its implicated
past management, and has done everything the government could wish for in response
to evidence of corporate wrongdoing.  The government's approval of this response,
indeed, its insistence that no less is acceptable, is surely among the most important
messages that corporate America and the public now need to hear.

        Second, the Memorandum limits corporate liability to those situations in
which "one motivation of its agents is to benefit the corporation."  Memorandum at 1.
Applying that principle here further demonstrates that the government should decline
to prosecute the Company, because this is, at its heart and most significantly, a case of
massive self-dealing by the top individuals in the Company for their own benefit and
without disclosure to the other members of the Board of Directors, to the very great
detriment of the corporation and its stockholders.  In the words of the government:
"[t]he investigation has revealed probable cause to believe that JOHN J. RIGAS, the
defendant, together with members of his family, has looted Adelphia on a massive
scale, using the company as the Rigas Family's personal piggy bank, at the expense of
public investors and creditors . . . ."  Complaint, Feeney Affidavit, ¶ 5.  Certainly, the
Company was incidentally benefited by some of the Rigas family's activities but that
was not the purpose of the family's crimes.

        Third, the Memorandum provides that prosecutors should take into
account "the possible substantial consequences" of an indictment to a company's

COVINGTON & BURLING

Timothy J. Coleman, Esq.
July 31, 2002
Page 3

employees, stockholders and others who have played no role in the misconduct.
Here, Adelphia is already in bankruptcy.  An indictment would eliminate any realistic
hope of salvaging the Company under new management.  It would destroy the
Company's ability to obtain debtor-in-possession financing and further punish
stockholders, employees, cable customers, creditors, bank lenders and the more than
800 communities in which the Company is located or which it serves – all of whom
are innocent of the wrongdoing wrought by members of the Rigas family.  An
indictment would destroy over $10 billion of claims by creditors.  David Friedman, of
Kasowitz, Benson, Torres & Friedman, which represents the Adelphia Creditors
Committee in the pending bankruptcy proceeding, has asked to address the
government on this point if plans to indict the Company go forward.  This is surely
not a case in which stockholders or other stakeholders have benefited, unknowingly or
otherwise, from the wrongdoing.

Criminal prosecution of the Company itself can effect no further
positive change at Adelphia.  It can only punish further those who were themselves
victimized by the Rigases' wrongdoing and serve as a disincentive to a company
committed to do all it can do to put things right.

II.     Adelphia's "Post-Rigas" Conduct

Because we believe that Adelphia's break with its past has been
dramatic and is critical to most of the factors relevant to the government's
prosecutorial decision, we would like to provide an overview of the process by which
control was wrested from the Rigas family and a new beginning was made.

- On March 6, 2002, Adelphia's Board of Directors, controlled by the Rigas
  family, appointed a Special Committee consisting solely of outside
  directors to make recommendations with respect to future decisions about
  the relationship between the Company and Adelphia Business Solutions,
  Inc.  After the revelation in late March of the extent of borrowings by
  certain Rigas entities under co-borrowing agreements, the Special
  Committee's mandate was expanded to include other decisions about
  relationships between the Company and entities controlled by the Rigas

COVINGTON & BURLING

Timothy J. Coleman, Esq.
July 31, 2002
Page 4

family.  At the beginning of April, the Company became aware that the SEC and United States Attorney's offices had begun investigations.

- As the Special Committee uncovered information regarding the improper activities of the Rigas family, it became apparent to the independent members of the Board that an effective rehabilitation of the Company could not be achieved so long as members of the Rigas family controlled the Company.  Under intense pressure from the independent directors, John Rigas agreed to resign as Chairman, President and Chief Executive Officer of the Company on May 15, 2002.  Also on May 15, and also as a result of significant pressure by the independent members of the Board, the Special Committee charter was broadened to include an investigation of any and all self-dealing or other wrongdoing that the Special Committee itself felt worthy of investigation.  The following day, Timothy Rigas resigned as Executive Vice President, Chief Financial Officer and Treasurer of the Company, and on May 19, 2002, James R. Brown resigned his position as Vice President of Finance.

- The Special Committee and its advisors then began a long series of negotiations with the Rigas family, which culminated in an agreement reached in the early morning hours of May 23, 2002.  Under that agreement, John Rigas, Timothy Rigas, Michael Rigas and James Rigas resigned their seats on the Board of Directors, leaving the independent directors with a majority of the seats on the Board.  In addition, Michael Rigas and James Rigas resigned their executive positions with the Company.  The Rigases also surrendered control of the Company by agreeing to have their shares of the Company's stock placed into a voting trust, which would initially be controlled by the Special Committee.  On June 11, 2002, Peter Venetis, the son-in-law of John Rigas and husband of Ellen Rigas Venetis, also resigned from the Board of Directors.

- On May 15, 2002, Erland E. Kailbourne assumed the duties of Chairman and Interim CEO of Company.  Following the resignations of Timothy Rigas and James R. Brown, Adelphia appointed individuals to head its financial management who are independent and experienced and who had

COVINGTON & BURLING

Timothy J. Coleman, Esq.
July 31, 2002
Page 5

no prior connection with the Company or the Rigas family.  Restrictions
were promptly placed on the ability of the Rigas-owned entities to draw
funds and a new, uniform procedure for employee loans was put in place.

- On May 16, 2002, Covington & Burling, counsel to the Special Committee,
  began its investigation of a broad range of possible accounting and
  disclosure issues.  Forensic accountants were retained to analyze the
  transactions that had passed through the cash management system and to
  investigate a wide range of possible misconduct.

- Beginning during the week of May 20, 2002, the Company made a series of
  significant announcements and SEC disclosures regarding the Company's
  financial condition and the related-party transactions in which the Company
  had engaged while under the control of the Rigas family.

- On May 24, 2002, counsel to the Special Committee submitted its First
  Report to the Special Committee of the Board of Directors of Adelphia, and
  thereafter to the NASDAQ, the United States Attorney's Office, and the
  SEC.  That report summarized the tentative findings of the investigation as
  of that date, provided information that identified related parties, and
  explained what had been uncovered regarding co-borrowings, margin loans,
  16 particular transactions between the Company and Rigas entities,
  accounting and disclosure issues and inaccurate corporate records.  Many of
  these same issues are the subject of the government's Complaint and the
  SEC's civil action.

- The Company issued a Form 8-K on June 10, 2002, which contained
  revised operating results for 2000 and 2001 and that identified multiple
  inaccuracies in disclosures and reported figures that had been made by
  Rigas management.  The Company is preparing restated financial
  statements for 1999 and 2000 and financial statements for 2001, which will
  be audited by Adelphia's new independent public accountants,
  PricewaterhouseCoopers LLP.

COVINGTON & BURLING

Timothy J. Coleman, Esq.
July 31, 2002
Page 6

- By the end of this week, approximately 70 witnesses will have been interviewed as a result of the Special Committee's investigation, either directly or, at the request of the United States Attorney's Office, through a presentation by their attorneys, and hundreds of boxes of documents have been turned over to the government and are being reviewed for their pertinence to accounting problems and other wrongdoing. As new issues have arisen, the investigation has been expanded to include them, and interviews are continuing.

- The information that the investigation has yielded has been steadily and promptly provided to the government, often in draft form to avoid any delay, both orally by counsel and in the form of witness interview memoranda and other documents, and counsel to the Special Committee has volunteered suggestions as to witnesses who could provide the government with useful information. The forensic accountants remain hard at work, generating analyses pertinent to the investigation and the effort to issue restated financial systems. Indeed, on two occasions, PricewaterhouseCoopers has made detailed presentations to the government regarding the Rigas family's stock purchases and the so-called quarterly "reclassification" of co-borrowing debt. Much of the information provided by PricewaterhouseCoopers is evident in the complaints filed by United States Attorney's Office and the SEC.

- The process of eliminating employees who knowingly participated in improper activities from any accounting or finance functions is ongoing. By July 29, 2002, ten employees had been terminated, had resigned or had been placed on administrative leave in connection with this matter, and additional employee action is anticipated.

- To date, the equivalent of about 855 boxes of documents, containing literally millions of pages, have been collected by the Special Committee so they could be provided, either as hard copies or in electronic form, to the United States Attorney's Office and/or the SEC. In order to provide this huge volume of material to the government as quickly as possible, counsel to the Special Committee suggested and entered into an agreement, dated

COVINGTON & BURLING

Timothy J. Coleman, Esq.
July 31, 2002
Page 7

July 17, 2002, with the government that materials would be turned over without prior review and without the assertion of privilege in advance of production. In the short time since that agreement, counsel to the Special Committee has provided the United States Attorney's Office with more than 650 of the 855 boxes. The massive effort to produce these documents is ongoing, and the remaining documents, including the hard drives of members of the Rigas family and other executives will be produced to the government in short order.

⊙ Of that voluminous production, more than 10,000 pages were provided in quick response to informal requests from the government. Moreover, counsel to the Special Committee not only provided information upon the government's request, but also freely provided additional information on their own initiative.

⊙ The Special Committee retained an investigative firm for the purpose of recovering assets from the Rigas family and is actively sharing information discovered by that company with the United States Attorney's Office.

⊙ On July 24, 2002, after having met with the government to advise it of the Company's intention and to insure that any concerns were addressed, the Company brought an action against Rigas family members Rigas-controlled entities and certain former Adelphia executives. The lawsuit alleges violation of the RICO statute, breach of fiduciary duties, waste of corporate assets, abuse of control, breach of contract, unjust enrichment, fraudulent conveyance, conversion, constructive trust, and damages. As alleged therein, "[t]hrough their positions of control of Adelphia, the Rigas Family Directors, together with the other defendants are responsible for one of the largest cases of corporate looting and self-dealing in American corporate history." The claims made are derivative claims that are property of the debtor's estate pursuant to § 541 of the Bankruptcy Code.

⊙ Adelphia is in the process of adopting a Code of Business Conduct and Ethics that prohibits employees from misusing corporate funds or corporate information or taking actions that create, or give the appearance of creating,

COV 0166

COVINGTON & BURLING

Timothy J. Coleman, Esq.
July 31, 2002
Page 8

conflicts of interest. Adelphia also has adopted strict guidelines for loans to employees and an anti-nepotism policy.

- The Adelphia Board is in the process of making the following changes to its Committee structure: the creation of a Governance Committee to oversee corporate governance at Adelphia, revisions to the Audit Committee Charter, and the adoption of Charters for the Compensation and Nominating Committees. Adelphia's internal audit group, whose function had fallen into abeyance under old management, has been reconstituted and now reports directly to the Audit Committee.

- On July 26, 2002, two distinguished independent directors were nominated to the Board and agreed to serve pending Bankruptcy Court approval of their indemnification agreements, joining the four independent directors who remained after the Rigases and Peter Venetis resigned. The new directors are Anthony T. Kronman, Dean and Edward J. Phelps Professor of Law at Yale Law School, and Rodney William Cornelius, a certified public accountant and formerly Executive Vice President and Vice Chairman of Cablevision Industries and Vice Chairman of Renaissance Cable. It is anticipated that Mr. Cornelius will join the Audit Committee and that Dean Kronman will chair a new Governance Committee.

    In sum, in only just over four months since the initial discovery of self-dealings, the Company ousted the Rigas family and other wrongdoers from management, wrested control of the Board from the Rigas family, turned over massive amounts of information and documents to the government, publicly disclosed massive self-dealing and other wrongdoing of prior management, brought suit against the Rigas family and several of their accomplices, and began the long and difficult process of rebuilding a company massively looted by prior management.

COV 0167

COVINGTON & BURLING

Timothy J. Coleman, Esq.
July 31, 2002
Page 9

III.     The Guidelines Enumerated by the U.S. Department of Justice for Prosecution
         of Corporations

         The Memorandum specifies the following factors that "prosecutors
should consider in reaching a decision as to the proper treatment of a corporate
target." Memorandum at 2.

         A.     The Nature and Seriousness of the Offense

         The "nature and seriousness of the crime, including the risk of harm to
the public from the criminal conduct, are obviously primary factors in determining
whether to charge a corporation." Memorandum at 2. The wrongdoing here was
unquestionably serious. It has, however, been halted by the Company itself, and as
the Memorandum explains, "it is entirely proper in many investigations for a
prosecutor to consider the corporation's pre-indictment conduct, e.g., voluntary
disclosure, cooperation, remediation or restitution in determining whether to seek an
indictment." Id. As is discussed more fully in part III.D below, we believe that the
Company's "pre-indictment conduct" – beginning with its wresting of control from
the Rigases and continuing with a vigorous investigation to uncover evidence of
wrongdoing and full cooperation with the United States Attorney's Office and the
SEC – has been exemplary. The results of the Company's ongoing investigation have
been fully shared with the government, no information has been withheld on grounds
of privilege, and the Company has been providing information as quickly as possible
both at the initiative of the Special Committee in response to particular requests for
information from the government. Indeed, it is conduct that the government should
seek to foster, not punish.

         B.     The Pervasiveness of Wrongdoing

         The Memorandum provides that a prosecutor should consider the
"pervasiveness of wrongdoing within the corporation, including the complicity in, or
condonation of, the wrongdoing by corporate management." Memorandum at 2. The
present Board and management did not condone and were not complicit in the
wrongdoing of prior management. In fact, the directors who remain on the Board
forcibly removed the Rigases from their corporate offices and the corporate

COV 0168

COVINGTON & BURLING

Timothy J. Coleman, Esq.
July 31, 2002
Page 10

boardroom and have ensured that others implicated in the wrongdoing have been either dismissed or separated from their previous responsibilities.

      C.      <u>The Corporation's Past History</u>

      We have not had sufficient time to reliably research Adelphia's entire history, but we are not aware of any criminal, civil or regulatory enforcement cases involving similar conduct or, indeed, any prior accusations involving criminal or securities laws.

      D.      <u>Cooperation</u>

      The Memorandum further provides:

> In determining whether to charge a corporation, that corporation's timely and voluntary disclosure of wrongdoing and its willingness to cooperate with the government's investigation may be relevant factors. In gauging the extent of the corporation's willingness to identify the culprits within the corporation, including senior executives, to make witnesses available, to disclose the complete results of its internal investigation, and to waive the attorney-client and work product privileges.

Memorandum at 3. We respectfully submit, and it is our understanding that the government agrees, that the Company's level of cooperation since the Rigases were ousted has met the highest standards. We also respectfully submit that the refusal of the Rigases to cooperate when they remained at the helm of the Company should not be held against the Company. The striking "before and after" pictures of compliance demonstrate that it was the Rigases who were refusing to cooperate, not in order to protect the Company but in a futile effort to hide their own wrongdoing. Their failure to cooperate has had its appropriate consequences: three members of the Rigas family have now been arrested and four of them are among the subjects of the SEC's Complaint. The Company, however, should be credited, not punished, for its cooperation once it was able to make decisions free of the Rigases' abundant self-interest.

COV 0169

COVINGTON & BURLING

Timothy J. Coleman, Esq.
July 31, 2002
Page 11

The Company has followed the Memorandum's guidelines to the letter. Through the Special Committee of its Board of Directors, it has identified "the culprits within the corporation, including senior executives." It has "made witnesses available" and identified them promptly, for example, arranging for Mr. Les Gelber, Chairman of the Special Committee, to be interviewed on the same day that the government's request was made. It is, through the Special Committee, undertaking an extensive investigation and it has steadily and completely disclosed its results to the government and, as appropriate, to the public on SEC Forms 8-K. It has produced, and is continuing to produce, hundreds of boxes of documents and electronic materials, both in response to a number of subpoenas and also in response to informal requests from the government. That production is proceeding and counsel has freely offered up its work product to the government, including witness interviews, often in draft form so that the government will have ready access to what has been found or even orally as information has been uncovered. The Company has shielded no one, forcing the resignations of the Rigases and working with the government to coordinate the appropriate replacement of employees found to have knowingly participated in improper activities. Simply stated, the Company, through the Special Committee, has taken as its mandate the duty to provide complete and unqualified assistance to the government in its efforts to bring charges against the Company's former executives.

E.    Corporate Compliance Programs

While under the management and control of the Rigases, Adelphia quite obviously lacked a corporate compliance program equal to the task of preventing and detecting misconduct and illegality. The Company fully recognizes the vital need for such a program and is now in the process of adopting a Code of Business Conduct and Ethics which will cover the following subjects:

- Maintenance and retention of accurate books and records.

- Truthfulness and accuracy in communications with the public and the government.

COVINGTON & BURLING

Timothy J. Coleman, Esq.
July 31, 2002
Page 12

    ⊙ Procedures to assure that business decisions are not affected by conflicts of interest.

    ⊙ Protection of confidential information.

    ⊙ Avoiding theft or misuse of Company assets.

    ⊙ Assuring legal compliance.

    ⊙ Avoiding discrimination and harassment.

    ● Prohibition of bribery and kickbacks.

    ⊙ Following ethical business practices and complying with laws that foster competition in the marketplace.

    ● Prohibition of trading on inside information.

        To encourage compliance with this Code of Business Conduct and Ethics employees will be instructed to report any violations of the Code that come to their attention and will be provided with a confidential means of communication with the Chairman of the Governance Committee to report such violations.

F.    Restitution and Remediation

        The Memorandum provides:

A corporation's response to misconduct says much about its willingness to ensure that such misconduct does not recur. Thus, corporation[s] that fully recognize[] the seriousness of their misconduct and accept responsibility for it should be seen to be taking steps to implement the personnel, operational, and organizational changes necessary to establish an awareness among employees that criminal conduct will not be tolerated. Among the factors prosecutors should consider and weigh are whether the

COV 0171

COVINGTON & BURLING

Timothy J. Coleman, Esq.
July 31, 2002
Page 13

corporation appropriately disciplined the wrongdoers and disclosed
information concerning their illegal conduct to the government.

Memorandum at 5.

Here again, we respectfully submit that the Company has fully met
these criteria. Within the course of just a few weeks, the independent directors ended
the Rigas family's control of Adelphia, despite the Rigases' ownership of a majority
of the Company's voting stock, and put in place appropriate safeguards to prevent
further losses to the Company. Thereafter, the Company moved with speed and
determination to fully disclose evidence of illegal conduct to the government. It has a
new Chief Financial Officer and a new Chief Accounting Officer and has employed
the firm of Conway, Del Genio, Gries & Co., LLC as restructuring advisors to assist
the Company's financial management in preparing plans, budgets and financial
reports. Restated financial statements for 1999 and 2000 and financial statements for
2001 are being prepared for audit by PricewaterhouseCoopers.

Furthermore, since assuming control of Adelphia in May 2002, the
independent directors have taken a number of important steps to bring the Company
into compliance with legal requirements and good corporate practices. As previously
described, two distinguished independent directors have been nominated to the Board.
The Board also is making changes to its Committee structure, including the creation
of a Governance Committee to oversee corporate governance at Adelphia and revising
the Audit Committee Charter. The Company's internal audit group has been
reconstituted and now reports directly to the Audit Committee.

We believe that these actions demonstrate that the Company is fully
committed to taking whatever steps are necessary to ensure that good governance and
compliance with the law replace, in their entirety, the wrongdoing and abuse of trust
that has marked the past.

G.      Collateral Consequences

The Memorandum provides that prosecutors "may consider the
collateral consequences of a corporate criminal conviction in determining whether to
charge the corporation with a criminal offense," commenting that:

COVINGTON & BURLING

Timothy J. Coleman, Esq.
July 31, 2002
Page 14

> In the corporate context, prosecutors may take into account the
> possible substantial consequences to a corporation's officers,
> directors, employees, and stockholders, many of whom may,
> depending on the size and nature (*e.g.*, publicly *vs.* closely held) of
> the corporation and their role in its operations, have played no role in
> the criminal conduct, have been completely unaware of it, or have
> been wholly unable to prevent it.

Memorandum at 6.

We respectfully submit that these considerations weigh heavily against indicting Adelphia. Adelphia is already in bankruptcy under Chapter 11. An indictment would in all likelihood spell its doom, an event that would touch the lives of many, many people who participated not at all in the wrongdoing and reaped no benefit, unknowingly or otherwise, from it.

First, an indictment could result in the loss of local cable franchises, which would destroy the company. Local franchising authorities may seek to terminate existing agreements or refuse to renew franchise agreements upon expiration. Adelphia has franchise renewal applications pending in key markets, including Los Angeles. The mere filing of Adelphia's petition for bankruptcy resulted in delays of its franchise renewals in many markets. Under Section 626 of the Communications Act, 47 U.S.C. § 546, an indictment against the Company could provide additional grounds for denial based on a finding that it is not legally qualified to hold a franchise. Loss of critical franchises would hasten the demise of the Company. In addition, an indictment could lead franchise authorities to initiate revocation proceedings against Adelphia, which would drain its already scarce resources and further jeopardize its future.

Second, an indictment could cripple the Company's ability to borrow and could occasion a default under its Debtor-in-Possession Credit Agreement (the "DIP"). The Company could be prevented from borrowing, due to its inability to satisfy a condition precedent under the DIP, if the indictment and/or a conviction of the Company could have or could reasonably be expected to have a material adverse

COVINGTON & BURLING

Timothy J. Coleman, Esq.
July 31, 2002
Page 15

effect on the business, assets, operations, prospects or condition of the Company, such as due to a loss of a local cable franchise.  Furthermore, an Event of Default would occur and the DIP lenders could terminate the commitment and declare the outstanding loans due and payable if, as a result of the indictment and/or conviction, (1) a judgment or order in excess of $5,000,000 is rendered against the Company and the enforcement thereof is not stayed; (2) any non-monetary judgment or order is rendered against the Company which does or would be reasonably expected to have a material adverse effect on the business, assets, operations, prospects or condition of the Company and enforcement is not stayed for ten (10) consecutive days; or (3) any judgment or order results in a lien on any asset of the Company.

Third, an indictment could seriously damage the Company's ability to emerge from Chapter 11.  An indictment and/or conviction may impede the ability of the Company to have its securities listed on a national securities exchange or on the Nasdaq National Market System and may preclude non-institutional private placements and potentially other offerings under state securities laws.  Also, the Company may be unable to obtain exit financing to pay off DIP loans with new working and other capital facility.  Creditors and businesses with whom the Company must likely would be sent running.  There may be a loss of necessary surety bonding and lack of ability to obtain new bonding to support franchise agreements, utility arrangements, performance and construction undertakings and other necessary corporate activities.  The Company's ability to consummate asset sales free and clear of potential criminal sanctions, as well as its ability to attract experienced and competent managers and directors could be seriously be impeded.

Fourth, financial injury to stockholders, noteholders, and bank lenders would become certain and irreversible.  Employees, many of whom are located in Coudersport, Pennsylvania where few other businesses operate, would lose their jobs, and the community likely would be devastated.  At news of the government's investigation, for example, all development projects in Coudersport were halted and estimates of unemployment in Coudersport, if Adelphia were to fail, begin at 30% and go up from there.

Fifth, indicting Adelphia would harm the Company's financial ability to deliver video programming and Internet access to consumers and could lead to a

COVINGTON & BURLING

Timothy J. Coleman, Esq.
July 31, 2002
Page 16

disruption in service that would harm consumers and hundreds of local governments.
Unlike in the WorldCom context where the FCC has authority under Section 214 of
the Communications Act of 1934, 47 U.S.C. § 214, to mandate the continuation of
telephone service, there is no analogous authority for the FCC to ensure that cable and
broadband services provided by Adelphia are not disrupted.

So too, local governments and their constituents would be impacted if
Adelphia's indictment leads to its inability to run cable systems. Under Section 611
of the Communications Act, 47 U.S.C. § 531, cable operators are required to reserve
channels for public, educational and government use. Typically, local governments
showcase local activities such as school board meetings and county councils on these
channels. In contrast, satellite carriers are not subject to similar requirements nor do
they have the capacity to make such channels available. In addition, local
governments would suffer a significant financial penalty if an indictment of Adelphia
leads to a loss of subscribers or termination of service. In 2002, Adelphia's payments
to local governments for franchise fees were approximately $106 million. Though
Adelphia is currently behind in its payments of some of its franchise fees, new
management has pledged to bring the Company current. An indictment would cripple
Adelphia's ability to pay and also would drive consumers to satellite providers,
reducing the fees collected by local governments.

H.    Non-Criminal Alternatives

Finally, the Memorandum states that prosecutors may consider whether
non-criminal alternatives to prosecution "would adequately deter, punish, and
rehabilitate a corporation that has engaged in wrongful conduct." Memorandum at 6.
We respectfully submit that this is such a case. The individuals who perpetrated the
wrongdoing have been arrested and presumably will face criminal prosecution. They
and others, including the Company itself, are the subject of civil SEC proceedings.
Multiple shareholder actions have been filed against the Company by private litigants.
The Company's stock has been delisted by the NASD, and the Company is in
bankruptcy. The Company thus will be held accountable, and the interests of
deterrence served. It is hard to argue that Adelphia, and all of its stockholders and
employees, have not been punished. Moreover, the Company's many actions set forth

COVINGTON & BURLING

Timothy J. Coleman, Esq.
July 31, 2002
Page 17

above establish that it has been rehabilitated without the necessity of criminal sanctions.

We respectfully submit that the balance of the factors articulated by the Department of Justice lies in favor of non-prosecution of the Company. We look forward to the opportunity to meet with you in person this week to discuss these issues and to respond to any questions you may have. This information was put together in only a few days in response to your request. It can be promptly supplemented if there are additional issues that should be addressed.

Respectfully submitted,

Bruce A. Baird

cc: Philip Korologos, Esq.

# EXHIBIT A

# JUSTICE DEPARTMENT GUIDANCE ON PROSECUTIONS OF CORPORATIONS

**U.S. Department of Justice**

**Office of the Deputy Attorney General**

MEMORANDUM                                              June 16, 1999

TO:          Heads of Department Components
             All United States Attorneys

FROM:        Eric H. Holder, Jr.

SUBJECT:     Bringing Criminal Charges Against Corporations

More and more often, federal prosecutors are faced with criminal conduct committed by or on behalf of corporations. The Department is committed to prosecuting both the culpable individuals and, when appropriate, the corporation on whose behalf they acted.

The attached document, *Federal Prosecution of Corporations*, provides guidance as to what factors should generally inform a prosecutor in making the decision whether to charge a corporation in a particular case. In believe these factors provide a useful framework in which prosecutors can analyze their cases and provide a common vocabulary for them to discuss their decision with fellow prosecutors, supervisors, and defense counsel. These factors are, however, not outcome-determinative and are only guidelines. Federal prosecutors are not required to reference these factors in a particular case, nor are they required to document the weight they accorded specific factors in reaching their decision.

The factors and the commentary were developed through the hard work of an *ad hoc* working group co-ordinated by the Fraud Section of the Criminal Division and made up of representatives of United States Attorneys' Offices, the Executive Office of United States Attorneys, and Divisions of the Department with criminal law enforcement responsibilities. Experience with these guidelines may lead to changes or adjustments in the text and commentary. Therefore, please forward any comments about the guidelines, as well as instances in which the factors proved useful or not useful in specific cases to Shirah Neiman, Deputy United States Attorney, Southern District of New York, and Philip Urofsky, Trial Attorney, Fraud Section, Criminal Division. I look forward to hearing comments from the field as to the application of these factors in practice.

## FEDERAL PROSECUTION OF CORPORATIONS

### I. Charging Corporations: General

A. *General Principle:* Corporations should not be treated leniently because of their artificial nature nor should they be subject to harsher treatment. Vigorous enforcement of the criminal laws against corporate wrongdoers, where appropriate, results in great benefits for law enforcement and the public, particularly in the area of white collar crime. Indicting corporations for wrongdoing enables the government to address and be a force for positive change of corporate culture, alter corporate behavior, and prevent, discover, and punish white collar crime.

B. *Comment:* In all cases involving corporate wrongdoing, prosecutors should consider the factors discussed herein. First and foremost, prosecutors should

be aware of the important public benefits that may flow from indicting a corporation in appropriate cases. For instance, corporations are likely to take immediate remedial steps when one is indicted for criminal conduct that is pervasive throughout a particular industry, and thus an indictment often provides a unique opportunity for deterrence on a massive scale. In addition, a corporate indictment may result in specific deterrence by changing the culture of the indicted corporation and the behavior of its employees. Finally, certain crimes that carry with them a substantial risk of great public harm, e.g., environmental crimes or financial frauds, are by their nature most likely to be committed by businesses, and there may, therefore, be a substantial federal interest in indicting the corporation.

Charging a corporation, however, does not mean that individual directors, officers, employees, or shareholders should not also be charged. Prosecution of a corporation is not a substitute for the prosecution of criminally culpable individuals within or without the corporation. Further, imposition of individual criminal liability on such individuals provides a strong deterrent against future corporate wrongdoing.

Corporations are "legal persons," capable of suing and being sued, and capable of committing crimes. Under the doctrine of *respondeat superior*, a corporation may be held criminally liable for the illegal acts of its directors, officers, employees, and agents. To be held liable for these actions, the government must establish that the corporate agent's actions (i) were within the scope of his duties and (ii) at least in part, to benefit the corporation. In all cases involving wrongdoing by corporate agents, prosecutors should consider the corporation, as well as the responsible individuals, as potential criminal targets.

Agents, however, may act for mixed reasons — both for self-aggrandizement (both direct and indirect) and for the benefit of the corporation, and a corporation may be held liable as long as one motivation of its agent is to benefit the corporation. Thus, in *United States v. Automated Medical Laboratories*, 770 F.2d 399 (4th Cir. 1985), the court affirmed the corporation's conviction for the actions of a subsidiary's employee despite its claim that the employee was acting for his own benefit, namely his "ambitious nature and his desire to ascend the corporate ladder." The court stated, "Partucci was clearly acting in part to benefit AML since his advancement within the corporation depended on AML's well-being and its lack of difficulties with the FDA." Similarly, in *United States v. Cincotta*, 689 F.2d 238, 241-42 (1st Cir. 1982), the court held, "criminal liability may be imposed on the corporation only where the agent is acting within the scope of his employment. That, in turn, requires that the agent be performing acts of the kind which he is authorized to perform, and those acts must be motivated—at least in part—by an intent to benefit the corporation." Applying this test, the court upheld the corporation's conviction, notwithstanding the substantial personal benefit reaped by its miscreant agents, because the fraudulent scheme required money to pass through the corporation's treasury and the fraudulently obtained goods were resold to the corporation's customers in the corporation's name. As the court con-

...uded, "Mystic—not the individual defendants—was ...aking money by selling oil that it had not paid for."

Moreover, the corporation need not even necessarily ...rofit from its agent's actions for it to be held liable. In ...utomated Medical Laboratories, the Fourth Circuit tated:

[B]enefit is not a "touchstone of criminal corporate liability; benefit at best is an evidential, not an operative, fact." Thus, whether the agent's actions ultimately redounded to the benefit of the corporation is less significant than whether the agent acted with the intent to benefit the corporation. The basic purpose of requiring that an agent have acted with the intent to benefit the corporation, however, is to insulate the corporation from criminal liability for actions of its agents which be inimical to the interests of the corporation or which may have been undertaken solely to advance the interests of that agent or of a party other than the corporation.

!d. at 407 (emphasis added; quoting Old Monastery Co. ). United States, 147 F.2d 905, 908 (4th Cir.), cert. de- nied, 326 U.S. 734 (1945)).

## II. Charging Corporations—Factors to Be Considered

A. General Principle: Generally, prosecutors should apply the same factors in determining whether to charge a corporation as they do with respect to individuals. See U.S.A.M. § 9-27.220, et seq. Thus, the prosecutor should weigh all of the factors normally considered in the sound exercise of prosecutorial judgment: the sufficiency of the evidence, the likelihood of success at trial, the probable deterrent, rehabilitative, and other consequences of conviction, and the adequacy, of non- criminal approaches. See id. However, due to the nature of the corporate "person," some additional factors are present. In conducting an investigation, determining whether to bring charges, and negotiating plea agreements, prosecutors should consider the following factors in reaching a decision as to the proper treatment of a corporate target:

1. The nature and seriousness of the offense, including the risk of harm to the public, and applicable policies and priorities, if any, governing the prosecution of corporations for particular categories of crime (see section III, infra);

2. The pervasiveness of wrongdoing within the corporation, including the complicity in, or condonation of, the wrongdoing by corporate management (see section IV, infra);

3. The corporation's history of similar conduct, including prior criminal civil, and regulatory enforcement actions against it (see section V, infra);

4. The corporation's timely and voluntary disclosure of wrongdoing and its willingness to cooperate in the investigation of its agents, including, if necessary, the waiver of the corporate attorney-client and work product privileges (see section VI, infra);

5. The existence and adequacy of the corporation's compliance program (see section VII, infra);

6. The corporation's remedial actions, including any efforts to implement an effective corporate compliance program or to improve an existing one, to replace responsible management, to discipline or terminate wrongdoers, to pay restitution, and to cooperate with the relevant government agencies (see section VIII, infra);

7. Collateral consequences, including disproportionate harm to shareholders and employees not proven personally culpable (see section IX, infra); and

8. The adequacy of non-criminal remedies, such as civil or regulatory enforcement actions (see section X, infra).

B. Comment: As with the factors relevant to charging natural persons, the foregoing factors are intended to provide guidance rather than to mandate a particular result. The factors listed in this section are intended to be illustrative of those that should be considered and not a complete or exhaustive list. Some or all of these factors may or may not apply to specific cases, and in some cases one factor may override all others. Further, national law enforcement policies in various enforcement areas may require that more or less weight be given to certain of these factors than to others.

In making a decision to charge a corporation, the prosecutor generally has wide latitude determining when, whom, how, and even whether to prosecute for violations of Federal criminal law. In exercising that discretion, prosecutors should consider the following general statements of principles that summarize appropriate considerations to be weighed and desirable practices to be followed in discharging their prosecutorial responsibilities. In doing so, prosecutors should ensure that the general purposes of the criminal law — assurance of warranted punishment, deterrence of further criminal conduct, protection of the public from dangerous and fraudulent conduct, rehabilitation of offenders, and restitution for victims and affected communities — are adequately met, taking into account the special nature of the corporate "person."

## III. Charging a Corporation: Special Policy Concerns

A. General Principle: The nature and seriousness of the crime, including the risk of harm to the public from the criminal conduct, are obviously primary factors in determining whether to charge a corporation. In addition, corporate conduct, particularly that of national and multi-national corporations, necessarily intersects with federal economic, taxation, and criminal law enforcement policies. In applying these principles, prosecutors must consider the practices and policies of the appropriate Division of the Department, and must comply with those policies to the extent required.

B. Comment: In determining whether to charge a corporation, prosecutors should take into account federal law enforcement priorities as discussed above. See § 9-27.230. In addition, however, prosecutors must be aware of the specific policy goals and incentive programs established by the respective Divisions and regulatory agencies. Thus, whereas natural persons may be given incremental degrees of credit (ranging from immunity to lesser charges to sentencing considerations) for turning themselves in, making statements against their penal interest, and cooperating in the government's investigation of their own and others' wrongdoing, the same approach may not be appropriate in all circumstances with respect to corporations. As an example, it is entirely proper in many investigations for a prosecutor to consider the corporation's pre-indictment conduct, e.g., voluntary disclosure, cooperation, remediation or restitution, in determining whether to seek an indictment. However, this would not necessarily be appropriate in an antitrust investigation, in which anti-





trust violations, by definition, go to the heart of the corporation's business and for which the Antitrust Division has therefore established a firm policy, understood in the business community, that credit should not be given at the charging stage for a compliance program and that amnesty is available only to the first corporation to make full disclosure to the government. As another example, the Tax Division has a strong preference for prosecuting responsible individuals, rather than entities, for corporate tax offenses. Thus, in determining whether or not to charge a corporation, prosecutors should consult with the Criminal, Antitrust, Tax, and Environmental and Natural Resources Divisions, if appropriate or required.

### IV. Charging a Corporation: Pervasiveness of Wrongdoing Within the Corporation

A. *General Principle:* A corporation can only act through natural persons, and it is therefore held responsible for the acts of such persons fairly attributable to it. Charging a corporation for even minor misconduct may be appropriate where the wrongdoing was pervasive and was undertaken by a large number of employees or by all the employees in a particular role within the corporation, *e.g.,* salesmen or procurement officers, or was condoned by upper management. On the other hand, in certain limited circumstances, it may not be appropriate to impose liability upon a corporation, particularly one with a compliance program in place, under a strict *respondeat superior* theory for the single isolated act of a rogue employee. There is, of course, a wide spectrum between these two extremes, and a prosecutor should exercise sound discretion in evaluating the pervasiveness of wrongdoing within a corporation.

B. *Comment:* Of these factors, the most important is the role of management. Although acts of even low-level employees may result in criminal liability, a corporation is directed by its management and management is responsible for a corporate culture in which criminal conduct is either discouraged or tacitly encouraged. As stated in commentary to the Sentencing Guidelines:

Pervasiveness [is] case specific and [will] depend on the number, and degree of responsibility, of individuals [with] substantial authority . . . who participated in, condoned, or were willfully ignorant of the offense. Fewer individuals need to be involved for a finding of pervasiveness if those individuals exercised a relatively high degree of authority. Pervasiveness can occur either within an organization as a whole or within a unit of an organization.

U.S.S.G. § 8C2.5, comment. (n.4).

### V. Charging the Corporation: The Corporation's Past History

A. *General Principle:* Prosecutors may consider a corporation's history of similar conduct, including prior criminal, civil, and regulatory enforcement actions against it, in determining whether to bring criminal charges.

B. *Comment:* A corporation, like a natural person, is expected to learn from its mistakes. A history of similar conduct may be probative of a corporate culture that encouraged, or at least condoned, such conduct, regardless of any compliance programs. Criminal prosecution of a corporation may be particularly appropriate where the corporation previously had been subject to non-criminal guidance, warnings, or sanctions, or

previous criminal charges, and yet it either had not taken adequate action to prevent future unlawful conduct or had continued to engage in the conduct in spite of the warnings or enforcement actions taken against it. In making this determination, the corporate structure itself, *e.g.,* subsidiaries or operating divisions, should be ignored, and enforcement actions taken against the corporation or any of its divisions, subsidiaries, and affiliates should be considered. *See* U.S.S.G. § 8C2.5(c) & comment. (n. 6).

### VI. Charging the Corporation: Cooperation and Voluntary Disclosure

A. *General Principle:* In determining whether to charge a corporation, that corporation's timely and voluntary disclosure of wrongdoing and its willingness to cooperate with the government's investigation may be relevant factors. In gauging the extent of the corporation's cooperation, the prosecutor may consider the corporation's willingness to identify the culprits within the corporation, including senior executives, to make witnesses available, to disclose the complete results of its internal investigation, and to waive the attorney-client and work product privileges.

B. *Comment:* In investigating wrongdoing by or within a corporation, a prosecutor is likely to encounter several obstacles resulting from the nature of the corporation itself. It will often be difficult to determine which individual took which action on behalf of the corporation. Lines of authority and responsibility may be shared among operating divisions or departments, and records and personnel may be spread throughout the United States or even among several countries. Where the criminal conduct continued over an extended period of time, the culpable or knowledgeable personnel may have been promoted, transferred, or fired, or they may have quit or retired. Accordingly, a corporation's cooperation may be critical in identifying the culprits and locating relevant evidence.

In some circumstances, therefore, granting a corporation immunity or amnesty may be considered in the course of the government's investigation. In such circumstances, prosecutors should refer to the principles governing non-prosecution agreements generally. *See* USAM § 9-27.600-650. Specifically, these principles permit a non-prosecution agreement in exchange for cooperation when a corporation's "timely cooperation appears to be necessary to the public interest and other means of obtaining the desired cooperation are unavailable or would not be effective." Prosecutors should note that in the case of national or multi-national corporations, multi-district or global agreements may be necessary. *See* USAM § 9-27.641.

In addition, the Department, in conjunction with regulatory agencies and other executive branch departments, encourages corporations, as part of their compliance programs, to conduct internal investigations and to disclose their findings to the appropriate authorities. Some agencies, such as the SEC and the EPA, as well as the Department's Environmental and Natural Resources Division, have formal voluntary disclosure programs in which self-reporting, coupled with remediation and additional criteria, may qualify the corporation



for amnesty or reduced sanctions.[1] Even in the absence of a formal program, prosecutors may consider a corporation's timely and voluntary disclosure in evaluating the adequacy of the corporation's compliance program and its management's commitment to the compliance program. However, prosecution and economic policies specific to the industry or statute may require prosecution notwithstanding a corporation's willingness to cooperate. For example, the Antitrust Division offers amnesty only to the first corporation to agree to cooperate. This creates a strong incentive for corporations participating in anti-competitive conduct to be the first to cooperate. In addition, amnesty, immunity, or reduced sanctions may not be appropriate where the corporation's business is permeated with fraud or other crimes.

One factor the prosecutor may weigh in assessing the adequacy of a corporation's cooperation is the completeness of its disclosure including, if necessary, a waiver of the attorney-client and work product protections, both with respect to its internal investigation and with respect to communications between specific officers, directors, and employees and counsel. Such waivers permit the government to obtain statements of possible witnesses, subjects, and targets, without having to negotiate individual cooperation or immunity agreements. In addition, they are often critical in enabling the government to evaluate the completeness of a corporation's voluntary disclosure and cooperation. Prosecutors may, therefore, request a waiver in appropriate circumstances.[2] The Department does not, however, consider waiver of a corporation's privileges an absolute requirement, and prosecutors should consider the willingness of a corporation to waive the privileges when necessary to provide timely and complete information as only one factor in evaluating the corporation's cooperation.

Another factor to be weighed by the prosecutor is whether the corporation appears to be protecting its culpable employees and agents. Thus, while cases will differ depending on the circumstances, a corporation's promise of support to culpable employees and agents, either through the advancing of attorneys fees,[3] through retaining the employees without sanction for their misconduct, or through providing information to the employees about the government's investigation pursuant to a joint defense agreement, may be considered by the prosecutor in weighing the extent and value of a corporation's cooperation. By the same token, the prosecutor should be wary of attempts to shield corporate officers and employees from liability by a willingness of the corporation to plead guilty.

Finally, a corporation's offer of cooperation does not automatically entitle it to immunity from prosecution. A corporation should not be able to escape liability merely by offering up its directors, officers, employees, or

agents as in lieu of its own prosecution. Thus, a corporation's willingness to cooperate is merely one relevant factor, one that needs to be considered in conjunction with the other factors, particularly those relating to the corporation's past history and the role of management in the wrongdoing.

## VII. Charging a Corporation: Corporate Compliance Programs

*A. General principle:* Compliance programs are established by corporate management to prevent and to detect misconduct and to ensure that corporate activities are conducted in accordance with all applicable criminal and civil laws, regulations, and rules. The Department encourages such corporate self-policing, including voluntary disclosures to the government of any problems that a corporation discovers on its own. However, the existence of a compliance program is not sufficient, in and of itself, to justify not charging a corporation for criminal conduct undertaken by its officers, directors, employees, or agents. Indeed, the commission of such crimes in the face of a compliance program may suggest that the corporate management is not adequately enforcing its program. In addition, the nature of some crimes, *e.g.,* antitrust violations, may be such that national law enforcement policies mandate prosecutions of corporations notwithstanding the existence of a compliance program.

*B. Comment.* A corporate compliance program, even one specifically prohibiting the very conduct in question, does not absolve the corporation from criminal liability under the doctrine of *respondeat superior. See United States* v. *Basic Construction Co.,* 711 F.2d 570 (4th Cir. 1983) ("a corporation may be held criminally responsible for antitrust violations committed by its employees if they were acting within the scope of their authority, or apparent authority, and for the benefit of the corporation even if . . . such acts were against corporate policy or express instructions."). Thus, in *United States* v. *Hilton Hotels Corp.,* 467 F.2d 1000 (9th Cir. 1972), *cert. denied,* 409 U.S. 1125 (1973), the Ninth Circuit affirmed antitrust liability based upon a purchasing agent for a single hotel threatening a single supplier with a boycott unless it paid dues to a local marketing association, *even though the agent's actions were contrary to corporate policy and directly against express instructions from his superiors.* The court reasoned that Congress, in enacting the Sherman Antitrust Act, "intended to impose liability upon business entities for the acts of those to whom they choose to delegate the conduct of their affairs, thus stimulating a maximum effort by owners and managers to assure adherence by such agents to the requirements of the Act."[4] It concluded that "general policy statements" and even direct instructions from the agent's superiors were not sufficient;

---

[1] In addition, the Sentencing Guidelines reward voluntary disclosure and cooperation with a reduction in the corporation's offense level. *See* U.S.S.G. § 8C2.5(g).

[2] This waiver should ordinarily be limited to the factual internal investigation and any contemporaneous advice given to the corporation concerning the conduct at issue. Except in unusual circumstances, prosecutors should not seek a waiver with respect to communications and work product related to advice concerning the government's criminal investigation.

[3] Some states require corporations to pay the legal fees of officers under investigation prior to a formal determination of their guilt. Obviously, a corporation's compliance with government law should not be considered a failure to cooperate.

[4] Although this case and *Basic Construction* are both antitrust cases, their reasoning applies to other criminal violations. In the *Hilton* case, for instance, the Ninth Circuit noted that Sherman Act violations are commercial offenses "usually motivated by a desire to enhance profits," thus bringing the case within the normal rule that a "purpose to benefit the corporation is necessary to bring the agent's acts within the scope of his employment." 467 F.2d at 1006 & n.4. In addition, in *United States* v. *Automated Medical Laboratories,* 770 F.2d 399, 406 n.5 (4th Cir. 1985), the Fourth Circuit stated that *Basic Construction* states a generally applicable rule on corporate criminal liability despite the fact that it addresses violations of the antitrust rules."





 COPYRIGHT ' 1999 BY THE BUREAU OF NATIONAL AFFAIRS, INC., WASHINGTON, D.C.   CRL   ISSN 0011-1341

COV 0181

"Appellant could not gain exculpation by issuing general instructions without undertaking to enforce those instructions by means commensurate with the obvious risks." *See also United States v. Beusch*, 596 F.2d 871, 878 (9th Cir. 1979) ("[A] corporation may be liable for the acts of its employees done contrary to express instructions and policies, but . . . the existence of such instructions and policies may be considered in determining whether the employee in fact acted to benefit the corporation."); *United States v. American Radiator & Standard Sanitary Corp.*, 433 F.2d 174 (3rd Cir. 1970) (affirming conviction of corporation based upon its officer's participation in price-fixing scheme, despite corporation's defense that officer's conduct violated its "rigid anti-fraternization policy" against any socialization (and exchange of price information) with its competitors; "When the act of the agent is within the scope of his employment or his apparent authority, the corporation is held legally responsible for it, although what he did may be contrary to his actual instructions and may be unlawful.").

While the Department recognizes that no compliance program can ever prevent all criminal activity by a corporation's employees, the critical factors in evaluating any program are whether the program is adequately designed for maximum effectiveness in preventing and detecting wrongdoing by employees and whether corporate management is enforcing the program or is tacitly encouraging or pressuring employees to engage in misconduct to achieve business objectives. The Department has no formal guidelines for corporate compliance programs. The fundamental questions any prosecutor should ask are: "Is the corporation's compliance program well designed?" and "Does the corporation's compliance program work?" In answering these questions, the prosecutor should consider the comprehensiveness of the compliance program, the extent and pervasiveness of the criminal conduct, the number and level of the corporate employees involved, the seriousness, duration, and frequency of the misconduct, and any remedial actions taken by the corporation, including restitution, disciplinary action, and revisions to corporate compliance programs.[5] Prosecutors should also consider the promptness of any disclosure of wrongdoing to the government and the corporation's cooperation in the government's investigation.

Prosecutors should therefore attempt to determine whether a corporation's compliance program is merely a "paper program" or whether it was designed and implemented in an effective manner. In addition, prosecutors should determine whether the corporation has provided for a staff sufficient to audit, document, analyze, and utilize the results of the corporation's compliance efforts. In addition, prosecutors should determine whether the corporation's employees are adequately informed about the compliance program and are convinced of the corporation's commitment to it. This will enable the prosecutor to make an informed decision as to whether the corporation has adopted and implemented a truly effective compliance program that, when consistent with other federal law enforcement policies,

may result in a decision to charge only the corporation's employees and agents.

Compliance programs should be designed to detect the particular types of misconduct most likely to occur in a particular corporation's line of business. Many corporations operate in complex regulatory environments outside the normal experience of criminal prosecutors. Accordingly, prosecutors should consult with relevant federal and state agencies with the expertise to evaluate the adequacy of a program's design and implementation. For instance, state and federal banking, insurance, and medical board, the Department of Defense, the Department of Health and Human Services, the Environmental Protection Agency, and the Securities and Exchange Commission have considerable experience with compliance programs and can be very helpful to a prosecutor in evaluating such programs. In addition, the Fraud Section of the Criminal Division, the Commercial Litigation Branch of the Civil Division, and the Environmental Crimes Section of the Environment and Natural Resources Division can assist U.S. Attorneys' Offices in finding the appropriate agency office and in providing copies of compliance programs that were developed in previous cases.

### VIII. Charging the Corporation: Restitution and Remediation

A. *General Principle:* Although neither a corporation nor an individual target may avoid prosecution merely by paying a sum of money, a prosecutor may consider the corporation's willingness to make restitution and steps already taken to do so, as well as other remedial actions such as implementation an effective corporate compliance program, improving an existing one, and disciplining wrongdoers, in determining whether to charge the corporation.

B. *Comment:* In determining whether or not a corporation should be prosecuted, a prosecutor may consider whether meaningful remedial measures have been taken, including employee discipline and full restitution.[6] A corporation's response to misconduct says much about its willingness to ensure that such misconduct does not recur. Thus, corporation that fully recognize the seriousness of their misconduct and accept responsibility for it should be seen to be taking steps to implement the personnel, operational, and organizational changes necessary to establish an awareness among employees that criminal conduct will not be tolerated. Among the factors prosecutors should consider and weigh are whether the corporation appropriately disciplined the wrongdoers and disclosed information concerning their illegal conduct to the government.

Employee discipline is a difficult task for many corporations because of the human element involved and sometimes because of the seniority of the employees concerned. However, while corporations need to be fair to their employees, they must also be unequivocally committed, at all levels of the corporation, to the highest standards of legal and ethical behavior. Effective internal discipline can be a powerful deterrent against improper behavior by a corporation's employees. In evaluating a corporation's response to wrongdoing, prosecutors may evaluate the willingness of the corpo-

---

[5] For a detailed review of these and other factors concerning corporate compliance programs, see United States Sentencing Commission, Guidelines Manual, § 8A1.2, comment. (n.3(k)) (Nov. 1997). *See also* U.S.S.G. § 8C2.5(f).

[6] For example, the Antitrust Division's amnesty policy specifically requires that "[w]here possible, the corporation [make] restitution to injured parties. . . . "

COV 0182

ration to discipline culpable employees of all ranks and the adequacy of the discipline imposed. The prosecutor should satisfy himself or herself that the corporation's focus is on the integrity and credibility of its remedial and disciplinary measures rather than on the protection of the wrongdoers.

In addition to employee discipline, two other factors in evaluating a corporation's remedial efforts are restitution and reform. As with natural persons, the decision whether or not to prosecute should not depend upon the target's ability to pay restitution. A corporation's efforts to pay restitution even in advance of any court order is, however, evidence of its "acceptance of responsibility" and, consistent with the practices and policies of the appropriate Division of the Department entrusted with enforcing specific criminal laws, may be considered in determining whether to bring criminal charges. Similarly, although the inadequacy of a corporate compliance program is a factor to consider when deciding whether to charge a corporation, that corporation's quick recognition of the flaws in the program and its efforts to improve the program are also factors to consider.

### IX. Charging the Corporation: Collateral Consequences

A. *General Principle:* Prosecutors may consider the collateral consequences of a corporate criminal conviction in determining whether to charge the corporation with a criminal offense.

B. *Comment:* One of the factors in determining whether to charge a natural person or a corporation is whether the likely punishment is appropriate given the nature and seriousness of the crime. In the corporate context, prosecutors may take into account the possible substantial consequences to a corporation's officers, directors, employees, and shareholders, many of whom may, depending on the size and nature (e.g., publicly vs. closely held) of the corporation and their role in its operations, have played no role in the criminal conduct, have been completely unaware of it, or have been wholly unable to prevent it. Further, prosecutors should also be aware of non-penal sanctions that may accompany a criminal charges, such as potential suspension or debarment from eligibility for government contracts or federal funded programs such as health care. Whether or not such non-penal sanctions are appropriate or required in a particular case is the responsibility of the relevant agency, a decision that will be made based on the applicable statutes, regulations, and policies.

Virtually every conviction of a corporation, like virtually every conviction of an individual, will have an impact on innocent third parties, and the mere existence of such an effect is not sufficient to preclude prosecution of the corporation. Therefore, in evaluating the severity of collateral consequences, various factors already discussed, such as the pervasiveness of the criminal conduct and the adequacy of the corporation's compliance programs should also be considered in determining the weight to be given to this factor. For instance, the balance may tip in favor of prosecuting corporations in situations where the scope of the misconduct in a case is widespread and sustained within a corporate division (or spread throughout pockets of the corporate organization). In such cases, the possible unfairness of visiting punishment for the corporation's crimes upon shareholders may be of much less concern



where those shareholders have substantially profited, even unknowingly, from widespread or pervasive criminal activity. Similarly, where the top layers of the corporation's management or the shareholders of a closely-held corporation were engaged in or aware of the wrongdoing and the conduct at issue was accepted as a way of doing business for an extended period, debarment may be deemed no collateral but a direct and entirely appropriate consequence of the corporation's wrongdoing.

The appropriateness of considering such collateral consequences and the weight to be given them may depend on the special policy concerns discussed in section III, *supra.*

### X. Charging a Corporation: Non-Criminal Alternatives

A. *General Principle:* Although non-criminal alternatives to prosecution often exist, prosecutors may consider whether such sanctions would adequately deter, punish, and rehabilitate a corporation that has engaged in wrongful conduct. In evaluating the adequacy of non-criminal alternatives to prosecution, *e.g.*, civil or regulatory enforcement actions, the prosecutor may consider all relevant factors, including:

1. The sanctions available under the alternative means of disposition;

2. the likelihood that an effective sanction will be imposed; and

3. the effect on non-criminal disposition on Federal law enforcement interests.

B. *Comment.* The primary goals of criminal law are deterrence, punishment, and rehabilitation. Non-criminal sanctions may not be an appropriate response to an egregious violation, a pattern of wrongdoing, or a history of non-criminal sanctions without proper remediation. In other cases, however, these goals may be satisfied without the necessity of instituting criminal proceedings. In determining whether federal criminal charges are appropriate, the prosecutor should consider the same factors (modified appropriately for the regulatory context) considered when determining whether to leave prosecution of a natural person to another jurisdiction or to seek non-criminal alternatives to prosecution, i.e., the strength of the regulatory authority's interest, the regulatory authority's ability and willingness to take effective enforcement action, the probable sanction if the regulatory authority's enforcement action is upheld, and the effect of a non-criminal disposition on Federal law enforcement interests. *See* USAM § § 9-27.240, 9-27.250.

### XI. Charging a Corporation: Selecting Charges

A. *General Principle:* Once a prosecutor has decided to charge a corporation, the prosecutor should charge, or should recommend that the grand jury charge, the most serious offense that is consistent with the nature of the defendant's conduct and that is likely to result in a sustainable conviction.

B. *Comment:* Once the decision to charge is made, the same rules as govern charging natural persons apply. These rules require "a faithful and honest application of the Sentencing Guidelines" and a "individualized assessment of the extent to which particular charges fit the specific circumstances of the case, are consistent with the purposes of the Federal criminal code, and maximize the impact of Federal resources on crime." *See* USAM § 9-27.300. In making this determination, "it





COV 0183



is appropriate that the attorney for the government consider, inter alia, such factors as the sentencing guideline range yielded by the charge, whether the penalty yielded by such sentencing range . . . is proportional to the seriousness of the defendant's conduct, and whether the charge achieves such purposes of the criminal law as punishment, protection of the public, specific and general deterrence, and rehabilitation." See Attorney General's Memorandum, dated October 12, 1993.

## XII. Plea Agreements with Corporations

A. *General Principle:* In negotiating plea agreements with corporations, prosecutors should seek a plea to the most serious, readily provable offense charged. In addition, the terms of the plea agreement should contain appropriate provisions to ensure punishment, deterrence, rehabilitation, and compliance with the plea agreement in the corporate context. Although special circumstances may mandate a different conclusion, prosecutors generally should not agree to accept a corporate guilty plea in exchange for non-prosecution or dismissal of charges against individual officers and employees.

B. *Comment:* Prosecutors may enter into plea agreements with corporations for the same reasons and under the same constraints as apply to plea agreements with natural persons, *inter alia,* that the corporation should be required to plead to the most serious, readily provable offense charged. As is the case with individuals, the attorney making this determination should do so "on the basis of an individualized assessment of the extent to which particular charges fit the specific circumstances of the case, are consistent with the purposes of the federal criminal code, and maximize the impact of federal resources on crime. In making this determination, the attorney for the government consider, *inter alia,* such factors as the sentencing guideline range yielded by the charge, whether the penalty yielded by such sentencing range . . . is proportional to the seriousness of the defendant's conduct, and whether the charge achieves such purposes of the criminal law as punishment, protection of the public, specific and general deterrence, and rehabilitation." *See* Attorney General's Memorandum, dated October 12, 1993. In addition, any negotiated departures from the Sentencing Guidelines must be justifiable under the Guidelines and must be disclosed to the sentencing court. In addition, corporations should be made to realize that pleading guilty to criminal charges constitutes an admission of *guilt* and not merely a resolution of an inconvenient distraction from its business. Thus, as with natural persons, pleas should be structured so that the corporation may not later

"proclaim lack of culpability or even complete innocence." *See* USAM §§ 9-27.420(b)(4), 9-27.440, 9-27.500. Thus, for instance, there should be placed upon the record a sufficient factual basis for the plea to prevent later corporate assertions of innocence.

A corporate plea agreement should also contain certain provisions that recognize the nature of the corporate "person" and ensure that the principles of punishment, deterrence, and rehabilitation are met. In the corporate context, punishment and deterrence are generally accomplished by substantial fines, mandatory restitution, and institution of appropriate compliance measures, including, if necessary, continued judicial oversight or the use of special masters. *See* U.S.S.G. §§ 8B1.1, 8C2.1, *et seq.* In addition, where the corporation is a government contractor, permanent or temporary debarment may be appropriate. Where the corporation was engaged in government contracting fraud, a prosecutor may not negotiate away an agency's right to debar or to list the corporate defendant.

In negotiating a plea agreement, prosecutors should also consider the deterrent value of prosecutions of individual within the corporation. Therefore, one factor that a prosecutor may consider in determining whether to enter into a plea agreement is whether the corporation is seeking immunity for its employees and officers or whether the corporation is willing to cooperate in the investigation of culpable individuals. Generally, prosecutors should rarely negotiate away individual criminal liability in a corporate plea.

Rehabilitation, of course, requires that the corporation undertake to be law-abiding in the future. It is, therefore, appropriate to require the corporation, as a condition of probation, to implement a compliance program or to reform an existing one. As discussed above, prosecutors may consult with the appropriate state and federal agencies and components of the Justice Department to ensure that a proposed compliance program is adequate and meets industry standards and best practices. *See* section VII, *supra.*

In plea agreements in which the corporation agrees to cooperate, the prosecutor should ensure that the cooperation is complete and truthful. To do so, the prosecutor may request that the corporation waive the attorney-client and work product privileges, make employees and agents available for debriefing, disclose the results of its internal investigation, file appropriate certified financial statements, agree to government or third-party audits, and take whatever other steps are necessary to ensure that the full scope of the corporate wrongdoing is disclosed and that the responsible culprits are identified and, if appropriate, prosecuted. *See generally* section VIII, *supra.*



COV 0184

# Exhibit CC

| From: | Philip C. Korologos, Esq. <pkorologos@bsfllp.com> |
|---|---|
| Sent: | Thursday, August 22, 2002 2:54 PM |
| To: | Tim Coleman (E-mail) <Timothy.Coleman@USDOJ.gov> |
| Cc: | tfox@willkie.com; Baird, Bruce <bbaird@cov.com> |
| Subject: | Bankruptcy filing |
| Attach: | Counsel ret.DOC |

In connection with getting counsel for several of the witnesses retained and
paid in the bankruptcy action, attached is an application for retention and
billing procedures for such counsel (e.g., Clifford Chance, etc.). If you
have any comments, please get them to me and to Theresa Fox at Willkie.
Theresa's email address is as copied on this email. Her phone number is
(212) 728-8871. (I will be out of the office the remainder of today and
tomorrow.) We plan to file this application tomorrow.

Thanks

Philip C. Korologos, Esq.
Boies, Schiller & Flexner LLP
80 Business Park Drive
Armonk, NY 10504
(914) 749-8227 (Armonk direct)
(914) 273-9810 (Armonk fax)
(917) 767-3724 (cell)
(212) 446-2390 (NYC direct)
(212) 446-2375 (NYC fax)

PRIVILEGED & CONFIDENTIAL/ATTORNEY-CLIENT COMMUNICATION /ATTORNEY WORK
PRODUCT. The information in this transmittal is privileged and
confidential and is intended only for the recipient(s) listed above. If
you are neither the intended recipient(s) nor a person responsible for the
delivery of this transmittal to the intended recipient(s), you are hereby
notified that any distribution or copying of this transmittal is
prohibited. If you have received this transmittal in error, please notify
Boies, Schiller & Flexner LLP immediately at (914) 273-9800 or by return
e-mail.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

Hearing Date: _____
Time: _____

| | | |
|---|---|---|
| In re | ) | Chapter 11 Cases |
| | ) | |
| Adelphia Communications Corporation, et al., | ) | Case No. 02-41729 (REG) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**APPLICATION FOR AN ORDER (I) AUTHORIZING DEBTORS TO
RETAIN, *NUNC PRO TUNC*, CERTAIN SPECIAL EMPLOYEES'
COUNSEL AND PAY FOR THE LEGAL FEES AND DISBURSEMENTS
OF SUCH COUNSEL AND (II) GRANTING SUCH COUNSEL LIMITED
RELIEF FROM THE COURT'S ORDER ESTABLISHING INTERIM
COMPENSATION PROCEDURES IN THESE CASES**

TO:   THE HONORABLE ROBERT E. GERBER,
      UNITED STATES BANKRUPTCY JUDGE

Adelphia Communications Corporation and the other debtors and debtors in possession (collectively, the "Debtors") in the above-captioned case, by their attorneys, respectfully represent:

**INTRODUCTION**

1.      By this motion (the "Motion"), the Debtors seek the Court's approval pursuant to sections 105(a), 107(a), 327(c), 327(e) and 363(b)(1) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") to (i) retain, *nunc pro tunc* to June 25, 2002, special counsel to represent certain of the Debtors' employees in connection with, and through the completion of, their roles as cooperating witnesses in ongoing governmental investigations of the Debtors (as described below); (ii) compensate such counsel; and (iii) grant such counsel limited relief from the interim compensation order entered in these cases.

COV 0287

1081415.6

## JURISDICTION

2.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157

and 1334 and the "Standing Order of Referral of Cases to Bankruptcy Judges," dated July 10,

1984, issued by District Court Judge Robert T. Ward.  Venue of these cases and the within

Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory

predicates for the relief requested herein are sections 105(a), 107(b), 327(c), 327(e) and

363(b)(1) of the Bankruptcy Code as supplemented by Rules 2014(a), 2016 and 9018 of the

Federal Rules of Bankruptcy Procedure.

## BACKGROUND

3.      On June 10, 2002, Century Communications Corporation ("CCC") filed a

voluntary petition for relief under chapter 11 of title 11 of the United States Code (the

"Bankruptcy Code").  On June 25, 2002, Adelphia Communications Corporation and certain of

its subsidiaries and affiliates (collectively, "ACC" and together with CCC, the "Debtors")

commenced cases under chapter 11 of the Bankruptcy Code (the "Petition Date").  The chapter

11 cases of CCC and ACC have been consolidated for procedural purposes only and are being

jointly administered pursuant to an order of this Court entered on June 26, 2002.

4.      The Debtors are continuing in possession of their respective properties and

the management of their respective businesses as debtors in possession pursuant to sections 1107

and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these cases.

5.      On July 11, 2002, the Office of the United States Trustee (the "U.S.

Trustee") appointed an Official Committee of Unsecured Creditors (the "Creditors' Committee")

in these cases.  On July 31, 2002, the U.S. Trustee appointed an Official Committee of Equity

- 2 -

1081415.6

Security Holders (the "Equity Committee," together with the Creditors' Committee, the "Committees").

## RELIEF REQUESTED

6.      Prior to and since the Petition Date, several government entities and agencies have commenced investigations (the "Investigations") concerning the Debtors.  The scope of such Investigations includes issues involving the massive alleged self-dealing  and alleged fraudulent conduct on the part of members of the Rigas family and others.[1]  The governmental entities and agencies that have commenced such investigations include, among others, the Securities and Exchange Commission, the United States Attorney's Office for the Southern District of New York and the United States Attorneys' Office for the Middle District of Pennsylvania. .  Certain employees of the Debtors have been or will be asked to serve as witnesses in the ongoing governmental investigations relating to the Debtors (collectively, the "Cooperating Employees").  By this Application, the Debtors seek authorization to (i) retain the counsel reflected on Exhibit A hereto, *nunc pro tunc* to June 25, 2002, to represent the Cooperating Employees in connection with pending criminal investigations commenced against the Debtors (the "Defense Counsel"); (ii) compensate such special counsel; and (iii) grant such counsel limited relief from this Court's Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals and Committee Members, entered in these cases on August 9, 2002 (the "Interim Compensation Procedures Order").

7.      In the course of the Investigations, the Cooperating Employees have been advised that they are believed to have information relevant to the Investigations.  In addition,

---

[1]    Certain of the Investigations resulted in the July 24, 2002 arrests of the following former officers of the Debtors:  (i) John J. Rigas, the Debtors' founder and former chairman; (ii) his sons, Timothy Rigas, former chief financial officer, and Michael Rigas, former vice president of operations; (iii) James R. Brown, former vice president of finance; and (iv) Michael Mulcahey, former vice president and treasurer.

- 3 -

1081415.6

several of the Cooperating Employees have been placed on paid administrative leave, including

so that they may be better able to focus on participating in the Investigations without distraction.

Notwithstanding the fact that several of the Cooperating Employees may also be targets of the

Investigations, the Debtors believe that such employees' knowledge and cooperation with

governmental officials is needed to achieve a thorough and expeditious resolution of the

Investigations and a successful reorganization of these Debtors' cases. Moreover, in addition to

the Cooperating Employees, there may be other employees whose cooperation in the

Investigations has not yet been requested but who may have information relevant to one or more

of the Investigations. These additional cooperating employees may become eligible for the relief

sought in this Motion.

        8.     The voluntary and uninhibited cooperation, assistance and participation of

the Cooperating Employees is critical to the expeditious and thorough completion of the

Investigations. To facilitate the Cooperating Employees' continued cooperation and ensure that

their legal rights are protected, the Cooperating Employees require representation by counsel.

Because such Investigations are of critical importance to the administration of the Debtors'

estates, the Debtors, by this Motion, are requesting authority to retain and compensate such

counsel for services rendered on behalf of the Cooperating Employees.

**A.**    **Scope of Services**

        9.     As of the date of this Motion, and, in some instances, since the Petition

Date, the Defense Counsel have been providing legal representation to the Cooperating

Employees. Of the Defense Counsel, two firms represent 10 of the 14 Cooperating Employees.

The three firms remaining are each representing one Cooperating Employee, each in a discrete

aspect of the Investigations. In the event that new Defense Counsel not identified herein is

- 4 -

1081415.6

employed,[2] the Debtors will seek relief similar to that which is sought herein by separate

application.  The Debtors understand that the Defense Counsel will provide the following

services:

> (a)   representing the Cooperating Employees in connection with specific Investigations or similar matters relating to the Debtors involving any branches and/or agencies of the United States government (including, for example, any hearings and/or investigations initiated by the United States Congress, the Department of Justice, the SEC) as well as similar matters initiated by any other local, state or foreign entity;
>
> (b)   representing the Cooperating Employees in any litigation or arbitration matters relating to the foregoing;
>
> (c)   attending meetings on behalf of the Cooperating Employees with third parties respecting the foregoing;
>
> (d)   appearing before the Bankruptcy Court, any district or appellate courts, and the United States Trustee on behalf of the Cooperating Employees;
>
> (e)   facilitating and coordinating communications between the Cooperating Employees and other parties in connection with the Investigations; and
>
> (f)   performing other necessary services that are normally associated with the matters identified above.

10.     The Debtors submit that the Cooperating Employees require the services

of separate and independent counsel.  Although the fees and expenses of the Defense Counsel are

being paid by the Debtors, in each instance, the attorney-client relationship will be between the

Cooperating Employee and his or her particular Defense Counsel.  The ethical obligations of the

Defense Counsel will run directly and solely to its particular Cooperating Employee client(s).

The Debtors will not instruct the Defense Counsel regarding any matters.  [If a Cooperating

Employee resigns from the Debtors' employ (or is terminated), as long as the interests of a

---

[2]     For example, new Defense Counsel may be needed because (i) a Cooperating Employee hires new counsel; (ii) a substitution of counsel occurs; or (iii) one or more new employees, who become eligible Cooperating Employees for purposes of this Motion, hire counsel that is not one of the firms identified herein.

- 5 -

1081415.6

particular Employee remains aligned with the interests of the Debtors, the Debtors may continue to pay the Defense Counsel's fees of that Cooperating Employee.]

11.    Without the requested relief, the Debtors fear that many of the Cooperating Employees will be unwilling or unable to obtain adequate representation (or any representation) in connection with the Investigations. The Debtors believe such a development would hinder the progress of the Investigations and possibly impede the expeditious and thorough completion of the Investigations, which, in turn, could jeopardize the Debtors' reorganization efforts.

**B.    Defense Counsel Have No Conflicts On
the Matters for which they are to be Retained**

12.    Each Defense Counsel has prepared an affidavit, pursuant to section 327 of the Bankruptcy Code, providing disclosure of any conflicts and connections with the Debtors, their creditors and other parties in interest (collectively, the "Affidavits"). The Affidavits are attached hereto and may be found as follows:

|       |                                                              |            |
|-------|--------------------------------------------------------------|------------|
| (i)   | David Meister, Esq.<br>Clifford Chance Rogers & Wells LLP —   | Exhibit B  |
| (ii)  | Jill Fieldstein, Esq.<br>O'Sullivan, LLP[3] —                | Exhibit C  |
| (iii) | Richard L. Scheff, Esq<br>Montgomery, McCracken,<br> Walker & Rhoads, LLP — | Exhibit D  |
| (iv)  | Frederick P. Hafetz, Esq.<br>Goldman & Hafetz —              | Exhibit E  |
| (v)   | Henry P. Putzell, III —                                      | Exhibit F  |

---

[3]    As of September 1, 2002, O'Sullivan LLP will be merged with the law firm O'Melveny & Myers LLP and will from that point forward be known only as O'Melveny & Myers LLP.

COV 0292

1081415.6

<table>
<tr><td>(vi)</td><td>Paul J. Curran, Esq.<br>Kaye Scholer Fierman<br>   Hays & Handler, LLP —</td><td>Exhibit G</td></tr>
</table>

13.    To the best of the Debtors' knowledge and except as set forth in the

Affidavits:

(a)    As required by section 327(e) of the Bankruptcy Code, none of the Defense Counsel nor any attorneys at their respective firms holds or represents an interest adverse to the Debtors or the estates with respect to the matters on which the Defense Counsel are to be retained, except that [add relevant disclosure points from Affidavits].

(b)    Neither the Defense Counsel not any of the attorneys at their respective firms are or were creditors or insiders of the Debtors.

(c)    Neither the Defense Counsel nor any attorney at their respective firms are or were, within three years before the filing of the Debtors' chapter 11 cases, an investment banker for any security of the Debtors, or any attorney for an investment banker in connection with the offer, sale or issuance of any security of the Debtors.

(d)    Neither the Defense Counsel nor any of the attorneys at their respective firms are or were, within two years before the Petition Date, a director, officer, or employee of the Debtors or of an investment banker of the Debtors.

(e)    The Defense Counsel does not have an interest materially adverse to the interests of the estates or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with or interest in the Debtors or an investment banker specified in the foregoing paragraphs, with respect to the matters on which the Defense Counsel are to be retained.

(f)    No attorney at each of the Defense Counsel's firms is related to any United States District Judge or U.S. Bankruptcy Judge for eh Southern District of New York or to the U.S. Trustee for such district or to any known employee of the office thereof.

(g)    As set forth in the Affidavits, [describe specific current and former representations of parties in interest by the Defense Counsel per the Affidavits]

(h)    To the best of the Debtors' knowledge, information, and belief, the Defense Counsel (i) do not hold or represent any interest which is adverse to the Debtors' estates with respect to the matters on which the Defense

- 7 -

1081415.6

Counsel is to be retained, and (ii) are "disinterested persons" as that term is defined in section 101(14) of the Bankruptcy Code for the purpose of the representation described.

(i)     The Debtors believe that each of the Defense Counsel is well qualified to represent the Cooperating Employees in connection with the Investigations and that their retention is in the best interest of these Debtor and their estates.

14.     The Debtors request that the Defense Counsels' retentions be approved *nunc pro tunc* to June 25, 2002. The decision to approve the employment of professionals on a *nunc pro tunc* basis is well within the discretion of this Court. See In re F/S Airlease, II, Inc., 844 F.2d 99, 103 (3d Cir.), cert. denied, 488 U.S. 852 (1988), and retroactive approval of the Defense Counsels' retentions is appropriate under the circumstances. Specifically, the timing of the submission of this application and the request for approval on a *nunc pro tunc* basis is due to, among other things, the complexity of these chapter 11 cases and the Investigations, the very limited scope of the Defense Counsel's retention, the large number of creditors and parties in interest in these cases and the resultant time needed for Defense Counsel to address potential conflict issues. Since the Petition Date, however, the Investigations have been progressing and the Defense Counsel have been providing valuable legal services to the Cooperating Employees despite a significant risk of nonpayment. Accordingly, it is respectfully submitted that good cause exists justifying the *nunc pro tunc* retention requested herein. See In re Arkansas Co., Inc., 798 F.2d 645, 548 (3d Cir. 1986).

COV 0294

1081415.6

### C.   Compensation Procedures and Request for Confidentiality

     i.    Request for Confidentiality

15.    As it is contemplated that each Defense counsel will be employed as a retained professional,[4] each firm's fees and expenses will be subject to Court approval in accordance with sections 330 and 331 of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules, the Administrative Orders Re: Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases (collectively, the "Administrative Order") and the Interim Compensation Order.  Finally, the Debtors will provide, on a quarterly basis, a budget [quarterly] respecting each Defense Counsel to the Court, the U.S. Trustee and counsel to the Committees.

16.    The Debtors hereby request that if the Motion is approved, the submission of time records in support of fee requests (the "Time Records") be subject to the proposed procedures below to protect privileged, confidential or client sensitive information.  Permitting limited access to Time Records is, in the Debtors' view, critical to protect the confidentiality of the information conveyed by the Cooperating Employees in the Investigations, as well as the circumstances and status of such Investigations. These bankruptcy cases have generated an inordinate amount of media and public interest.

17.    Given the number and nature of matters in which the Defense Counsel may be involved, their Time Records (even in redacted form) will often convey a significant

---

[4]    [Prepetition, one or more of the Defense Counsel were employed to represent their Cooperating Employee client(s).  To the extent that an individual Defense Counsel received a retainer, that firm may have applied such funds to unpaid amounts due for services rendered and expenses incurred prior to the Petition Date.  A precise disclosure of the remaining amount, if any, of the prepetition retainer held by each Defense Counsel, if applicable, or any unpaid fees or expenses owing, as of the Petition Date, will be supplied in the Defense Counsel's first interim fee application in these cases.  To the extent that any prepetition amounts remain after application of the retainer, each Defense Counsel has indicated to the Debtors that it will waive any such amounts.]

-9-

1081415.6

amount of information about confidential governmental Investigations. This is not information that the Debtors, the Cooperating Employees, or the Government, would necessarily want to become public. For example, the Time Records contain references to subpoenae and other confidential investigative documents and activities, the existence of which are not publicly known. Public disclosure of this information in a fee application or in Time Records would prejudice the Cooperating Employees and the Debtors and would potentially interfere with or hinder the Government's Investigations. In fact, absent the Debtors' bankruptcy and the requirements of the Administrative Order and Interim Compensation Order, such information would never become publicly known. The Time Records also reveal a substantial number of communications with government officials, and investigators from Congress, the DOJ, the SEC and other governmental agencies which, if filed, may reveal -- or allow a party to deduce -- highly confidential and/or privileged information. The sensitive nature of the services provided by Defense Counsel necessitates the protections and procedures the Debtors propose herein.

18.     In addition, even information that first appears innocuous may, upon examination, allow other parties to discover confidential, sensitive or privileged information. Thus, the medias attention to and fascination with these bankruptcy cases increases the risk that filing the Time Records, even in a redacted format, would not fail to protect sufficiently the Cooperating Employees' privileges and legitimate interests in confidentiality. For instance, An attorney (or employee at a law firm) or newsperson could access the Time Records from the Court's website, piece together publicly available information, and then use the Time Records to obtain information and details about Investigations that have been deemed confidential by the investigating agency. To protect the Cooperating Employees' attorney-client privileges, the Cooperating Employees' and their Defense Counsel's interests in protecting confidential attorney

- 10 -

1081415.6

work product, and the confidentiality of the Investigations, the Debtors submit that it is essential to limit the availability of such information.

19.     This Court and other parties in interest can review each Defense Counsel's contributions to these cases and, the reasonableness of time charges in order to determine the extent of a benefit to the Debtors' estates such representation yielded without jeopardizing the valid and compelling privilege and confidentiality interests.  Accordingly, the Debtors request that the proposed procedures for reviewing and filing fee statements and fee applications in this case be adopted in their entirety.

ii.  Proposed Compensation Procedures

20.     The Debtors propose each Defense Counsel shall file its fee applications, fee statements, time records and related documents and records as follows:

(a)     Except as set forth below, each Defense Counsel shall file its fee applications, fee statements, and related documents and records (including expense records) in accordance with Sections 330 and 331 of the Bankruptcy Code, the administrative orders governing interim compensation in SDNY chapter 11 cases and, except as otherwise requested herein, the Interim Compensation Order.[5]

(b)     Distribution of a Defense Counsel's Time Records shall be limited to Chambers, counsel for the Debtors, counsel for the Committees, the United States Trustee and any other party specifically designated by the Court.  Any party receiving the Time Records shall be required to maintain the confidentiality of such information and shall not publicly file or provide the Time Records, directly or indirectly or by any means or in any manner whatsoever, to anyone other than Chambers, counsel for the Debtors, counsel for the Committees, or the United States Trustee and such other parties who are specifically designated by the Court.  Any recipient of Time Records shall limit access to such materials to an attorney only.

(c)     Each Defense Counsel shall publicly file as part of its fee applications and fee statements a summary schedule containing:  (i) the name of

---

[5]     The Debtors request that the procedures set forth in the Interim Compensation Order apply to the Defense Counsel, subject to the modifications proposed herein.

- 11 -

1081415.6

each professional and paraprofessional that worked on the case during the period covered by the fee statement or fee application, his or her position at such firm; (ii) the year that the professional was licensed to practice; (iii) the hours worked by each professional and paraprofessional; (iv) the hourly rate for each professional and paraprofessional; and (v) the aggregate amount billed for the period covered by the fee statement or fee application (the "Summary Schedule"). The requirements of Paragraph B of the Fee Guidelines shall be deemed satisfied upon the filing of the Summary Schedule and the dissemination of the Time Records to counsel for the Debtors, counsel for the Committees and the United States Trustee.

(d)     Any party other than those set forth in subparagraph (b) above that wishes to obtain any Time Records shall submit a written request to the applicable Defense Counsel explaining with reasonable specificity the basis for the request. The Defense Counsel shall have ten (10) days to respond to any such request and shall use its reasonable efforts to resolve any such request without judicial intervention. In the event the Defense Counsel agrees to supply the requested information, the recipient shall be required to maintain the confidentiality of the Time Records as set forth in subparagraph (b) above. If the Defense Counsel determines not to supply the requested information, such requesting party shall then be entitled to file an appropriate motion with the Court upon proper notice to parties in interest.

(e)     The dissemination and disclosure of the Time Records in accordance with these procedures shall not constitute a waiver of the attorney-client privilege or the attorney work product immunity by the applicable Defense Counsel or any other party.

(f)     Any objection to any fee application or fee statement, pleading, or other filing, that references the content of the Time Records in any manner shall be filed in a form complying with subparagraphs (g) and (h) below, with copies of such pleading to be sent solely to Chambers, the applicable Defense Counsel, counsel for the Debtors, counsel for the Committees, the United States Trustee and any other party designated by the Court.

(g)     All objections, pleadings, or other filings referenced in subparagraph (f) shall be filed with a cover sheet on the document or pleading reciting the following:

The materials herein are filed pursuant to an Order of the Court dated _____, 2002. Pursuant to said Order, the attached materials are confidential and may be viewed only by the Chambers of the Honorable Robert E. Gerber, [the applicable Defense Counsel], counsel for the Debtors, counsel for the Official Committee of Unsecured Creditors, counsel for the Official Committee of

- 12 -

1081415.6

Equityholders, and the United States Trustee.  Copies of the attached materials are available solely from [the applicable Defense Counsel] or otherwise by order of the Court under the procedures set forth in the above described Order.

(h)     The cover sheet of each fee statement shall contain the caption of the case, designate the party filing the materials, and be signed by counsel for said party.  Only the cover sheet shall become part of the public record in these cases.  The pleadings or other materials being filed shall be maintained in a sealed envelope to which a copy of the above-referenced cover sheet shall also be affixed.

(i)     With respect to any hearing concerning fee statements, fee applications, Time Records, or related documents or records, the necessary arrangements to maintain the confidentiality of the Time Records shall be addressed with the Court in advance of such hearing.

## APPLICABLE AUTHORITY

A.     **Retention of Special Employees' Counsel**

21.     Section 327(e) of the Bankruptcy Code provides that,

[t]he [debtor], with the court's approval, may employ, for a specified purpose, other than to represent the [debtor] in conducting the case, an attorney that has represented the debtor, if in the best interest of the estate, and if such attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed.

11 U.S.C. § 327(e).

22.     As set forth above and in the Affidavits, none of the Defense Counsel (1)

holds or represents an interest adverse to these estates and (2) will represent any of the

Cooperating Employees in matters that are unrelated to the Investigations.

23.     The Debtors believe that if they are not authorized to retain the Defense

Counsel to represent the Cooperating Employees and pay the legal fees and expenses incurred by

the Cooperating Employees on account of this representation, many of the Cooperating

Employees will be unwilling or unable to obtain adequate representation (or any representation)

in connection with the Investigations.  The Debtors believe that this would, in all likelihood,

- 13 -

1081415.6

cause substantial delay to the progress of the Investigations and possibly impede the

government's ability to bring the Investigations to conclusion.  If the Investigations are halted,

the Debtors' ability to reorganize successfully will be hampered.  Thus, the Debtors submit that

the proposed retention and payment of Defense Counsel is in the best interest of these estates.

**B.**      **Compensation of Special Employees' Counsel**

24.      Section 363(b) of the Bankruptcy Code provides in pertinent part:  "The

trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of

business property of the estate."  11 U.S.C. § 363(b).  Courts within this Circuit interpreting

section 363(b) have held that transactions should be approved pursuant to this provision when, as

here, they are supported by management's sound business judgment.  See, e.g., Comm. of Equity

Security Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063 (2d Cir. 1983) (outlining

the requirements for the sale of assets under section 363(b)).

25.      Courts recognize the applicability of section 363(b) to the use of estate

property to compensate individuals employed outside the ordinary course of business.  See, e.g.,

In re McDonald Bros. Construction, Inc., 114 B.R. 989, 994 (Bankr. N.D. Ill. 1990;  In re First

Services Corp., 25 B.R. 66, 69 (Bankr. D. Conn. 1982).  Recently, in the Enron Corporation

cases, Judge Gonzalez entered an order providing for similar relief.  In re Enron Corp., Case No.

01-16034 (AJG) (Bankr. S.D.N.Y. Mar. 29, 2002).

**C.**      **Request for Confidentiality**

26.      Section 107(b) of the Bankruptcy Code provides bankruptcy courts with

power to issue orders that will protect entities and people from potential harm:

> On request of a party in interest, the bankruptcy court shall,
> and on the bankruptcy court's own motion, the bankruptcy
> court may –

- 14 -

1081415.6

> (1) protect an entity with respect to a trade secret or confidential research, development, or commercial information; or
>
> (2) protect a person with respect to scandalous or defamatory matter contained in a paper filed in a case under this title.

11 U.S.C. § 107(b).

27.     Bankruptcy Rule 9018 defines the procedure by which a party may move for relief under section 107(b):

> On motion or on its own initiative, with or without notice, the court may make any order which justice requires (1) to protect the estate or any entity in respect of a trade secret or other confidential research, development, or commercial information [or] (2) to protect any entity against scandalous or defamatory matter contained in any paper filed in a case under the Code...

Fed. R. Bankr. P. 9018.

28.     Based upon these provisions, courts have limited access to filed documents where parties have demonstrated good cause. See, e.g., In re Epic Assoc. V., 54 B.R. 445, 450 (Bankr. E.D. Va. 1985);  In re Nunn, 49 B.R. 963, 964-65 (Bankr. E.D. Va. 1985). Courts may deny access to judicial documents when open inspection may be used as a vehicle for an improper purpose.  Video Software Dealers Ass'n v. Orion Pictures Corp. (In re Orion Pictures Corp.), 21 F.3d 24, 27 (2d. Cir. 1994) (citing Nixon v. Warner Comm'n, Inc., 435 U.S 589, 597 (1978)).

29.     The decision to allow court records to be kept confidential is left to the sound discretion of the Court. See United States v. Transport Admin. Servs., 260 F.3d 909, 919 (8th Cir. 2001) (stating that debtors may seek protective orders under sections 107(b) and 105(a) of the Bankruptcy Code); In re Ionosphere Clubs, Inc., 156 B.R. 414, 434 (S.D.N.Y. 1993) ("[T]rial courts have 'broad discretion to ... decide when a protective order is appropriate and

- 15 -

1081415.6

what degree of protection is required.'") (*quoting* Seattle Times Co. v. Rhinehart, 467 U.S. 20, 36 (1984)).  Under the plain language of Bankruptcy Rule 9018 and section 107(b) of the Bankruptcy Code, and in light of the Court's broad equitable powers under section 105(a) of the Bankruptcy Code, the requested relief should be granted.

30.     The Debtors respectfully submit that the limitations on dissemination and distribution of Time Records in accordance with the procedures described above are in the best interests of the Cooperating Employees, the Debtors, their creditors and other parties-in-interest and thus within the sound discretion of the Court.  Similar relief has been granted by other Bankruptcy Courts including a court in this District.  See In re Enron Corp., Case No. 01-16034 (AJG) (Bankr. S.D.N.Y. May 30, 2002) (court approves substantially identical procedures);  In re Reliance Acceptance Group, Inc., Case No. 98-00288 (Bankr. D. Del. August 5, 1998);  In re Harnischfeger Industries, Inc., Case No. 99-9121 (Bankr. D. Del. September 10, 1999).

## NOTICE AND PROCEDURE

31.     The Debtors are providing notice of this Motion to:  (i) the U.S. Trustee; (ii) counsel to the Agents for the Debtors' prepetition and postpetition lenders; (iii) counsel to the Creditors' Committee; (iv) counsel to the Equity Committee; and (v) parties who have filed notices of appearance as of the last day prior to the service hereof.  The Debtors submit that given the circumstances, no other or further notice is required.

32.     As this Motion presents no novel issues of law and the legal authorities upon which the Debtors rely are cited herein, the Debtors request that the Court dispense with the requirement of Local Bankruptcy Rule 9013-1(b) that a memorandum of law be submitted herewith.

COV 0302

1081415.6

33.     No previous motion for the relief sought herein has been made to this or
any other court.

- 17 -

COV 0303

1081415.6

## CONCLUSION

**WHEREFORE,** the Debtors respectfully request that the Court enter an Order, substantially in the form annexed hereto, granting the relief requested hereby and such other and further relief as the Court deems just.

Dated: August __, 2002
      New York, New York

                                      **WILLKIE FARR & GALLAGHER**
                                      Attorneys for Debtors and Debtors in Possession

                                    By: _____

                                            Myron Trepper (MT-2636)
                                            (A Member of the Firm)
                                            Marc Abrams (MA-0735)
                                            (A Member of the Firm)
                                            Shelley C. Chapman (SC-4691)
                                          (A Member of the Firm)

                                    787 Seventh Avenue
                                    New York, New York 10019-6099
                                    (212) 728-8000

- 18 -

1081415.6

## EXHIBIT A

| Name and Address of Defense Counsel |
| --- |
| Clifford Chance Rogers & Wells LLP<br>200 Park Avenue<br>New York, NY 10166<br><ul><li>represents (5) employees</li></ul> |
| O'Sullivan, LLP<br>30 Rockefeller Plaza<br>New York, NY 10112<br><ul><li>represents (5) employees</li></ul> |
| Montgomery, McCracken, Walker & Rhoads, LLP<br>123 South Broad Street<br>Philadelphia, PA 19109<br><ul><li>represents (1) employee</li></ul> |
| Frederick P. Hafetz, Esq.<br>Goldman & Hafetz<br>29th Floor<br>500 Fifth Avenue<br>New York, NY 10110-2900<br><ul><li>represents (1) employee</li></ul> |
| Henry P. Putzell, III<br>565 Fifth Avenue<br>New York, NY 10017<br><ul><li>represents (1) employee</li></ul> |
| Paul J. Curran, Esq.<br>Kaye Scholer Fierman Hays & Handler, LLP<br>425 Park Avenue<br>New York, NY 10022<br><ul><li>represents (1) employee</li></ul> |