# Exhibit DD

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                                       :
In re:                                                 :
                                                       :        Case No. 02-41729 (REG)
ADELPHIA COMMUNICATIONS CORP., et                      :        Jointly Administered
al.,                                                   :
                                                       :
                        Debtors,                       :
------------------------------------------------------------x

## DECLARATION OF ALAN VINEGRAD, ESQ. IN SUPPORT OF DEBTORS' MOTION FOR ORDER APPROVING THREE RELATED AGREEMENTS BETWEEN THE DEBTORS AND THE SECURITIES AND EXCHANGE COMMISSION, THE DEBTORS AND THE DEPARTMENT OF JUSTICE AND THE DEBTORS AND THE RIGAS FAMILY

ALAN VINEGRAD, declares, pursuant to 28 U.S.C. § 1746, under penalty of

perjury that:

1.      I am a partner in the law firm Covington & Burling ("C&B") and, together

with certain of my colleagues at C&B, am the principal outside criminal defense counsel to

Adelphia Communications Corporation ("ACC") and its affiliated debtors (collectively with

ACC, the "Debtors").  I make this declaration on the basis of personal knowledge except to the

extent stated otherwise.

2.      I submit this declaration in support of the Debtors' Motion for Order

Approving Three Related Agreements Between the Debtors and the Securities and Exchange

Commission, the Debtors and the Department of Justice and the Debtors and the Rigas Family

(the "Motion").

3.      Except where otherwise stated, the facts contained in this declaration are

based on my personal knowledge and, if called to testify, I could and would testify competently

to such facts.

4.      All capitalized terms not otherwise defined herein have the meanings ascribed to such terms in the Motion.

<u>BACKGROUND AND EXPERIENCE</u>

5.      I graduated *magna cum laude* from the Wharton School of Business in 1980, where I majored in accounting.  Following my graduation, I worked at Price Waterhouse & Co. as a staff accountant.

6.      In 1981, I left Price Waterhouse & Co. to attend law school at the New York University School of Law.  While at that law school, I served as a senior editor of the Law Review and was a member of the Order of the Coif.  I graduated *cum laude* from the law school in 1984.

7.      Following my graduation from law school, I served as a law clerk for the Honorable Leonard B. Sand in the Southern District of New York.  Thereafter, I worked in private practice for several years with an emphasis on white-collar criminal defense and complex civil litigation.

8.      In 1990, I joined the United States Attorney's Office for the Eastern District of New York as an Assistant United States Attorney.  At various times thereafter, I served as that office's Chief of General Crimes, Chief of Civil Rights Litigation, Deputy Chief of the Criminal Division, Chief of the Criminal Division, and Chief Assistant U.S. Attorney.  From June 2001 to September 2002, I served as the United States Attorney for the Eastern District of New York.

9.      During my tenure in the United States Attorney's Office, in addition to my executive and supervisory responsibilities, I personally investigated and prosecuted numerous cases involving fraud, official corruption, narcotics trafficking, gang violence, perjury, obstruction of justice, and civil rights violations.  I also personally argued over 20 cases before

- 2 -

the United States Court of Appeals for the Second Circuit.  In 2002, I served on the President's

Corporate Fraud Task Force.

10.     In January 2003, I joined C&B as a partner in the firm's White Collar

Defense and Trial Practice Groups.  Consistent with my background, my practice focuses on

representing both individuals and corporations in a wide variety of criminal and regulatory

enforcement matters, as well as in complex civil litigation.

### ACC's EFFORTS TO RESOLVE THE DOJ INVESTIGATION AND THE SEC ENFORCEMENT PROCEEDING

11.     In June 2004, ACC's Board of Directors (the "Board") authorized the

Debtors to enter into substantive negotiations over the terms of a settlement with the Department

of Justice (the "DOJ") and the Securities and Exchange Commission (the "SEC") (collectively,

the "Government").  I was personally involved in those negotiations from their inception in July

2004 until their recent culmination in late April 2005.

12.     ACC conveyed its initial offer to the SEC on or about June 25, 2004,

offering to pay $175 million in common stock of the reorganized Adelphia.  ACC made clear at

that time that its offer was contingent on its ability to acquire full ownership of the Managed

Entities.[1]  A copy of ACC's June 25, 2004 settlement offer is annexed hereto as Exhibit 1.

13.     The Government rejected that offer, demanding instead that ACC pay $1

billion to resolve both DOJ's and the SEC's potential and already-asserted claims against the

Debtors.  DOJ indicated that it had two powerful weapons at its disposal – indictment and

forfeiture – and that it would consider using them if ACC was unwilling to pay $1 billion in

compensation for the victims of the crimes committed by Rigas Management.  In support of its

---

[1]     The Managed Entities consist of the entities identified in Exhibit C to the DOJ-Adelphia Agreement (which are sometimes referred to herein as the "Forfeited Managed Entities"), together with Bucktail Broadcasting Corp. and Coudersport Television Cable Co.

$1 billion demand, DOJ cited, among other things, its view that $1 billion was the approximate value of the Managed Entities that the Government intended to seize in full or partial satisfaction of the approximately $2.5 billion forfeiture obligations of John and Timothy Rigas and in claims against other owners of those entities. The SEC also indicated that its claims against the Debtors could amount to more than $5 billion.

        14.    In an effort to persuade the Government to relent from its $1 billion demand and to defend the reasonableness of ACC's $175 million offer, on September 20, 2004, ACC made a presentation to DOJ regarding settlements that had been reached in other large corporate fraud cases. In that presentation, we compared ACC's $175 million settlement offer with settlements paid in other large cases from three different perspectives: (a) as a percentage of the annual gross revenues of the settling entities; (b) as a percentage of the amount of earnings or revenue misstatement that each settling entity's misconduct caused; and (c) as a percentage of the loss to shareholders attributable to the wrongdoing at issue (i.e., the decline of the trading price of each settling defendant's common stock following the revelation of the misconduct at issue). Based on these comparisons, we argued to DOJ that ACC's $175 million offer was fair and reasonable.

        15.    DOJ, however, continued to insist that ACC pay $1 billion to avoid prosecution and forfeiture. Among DOJ's responses were: (a) ACC, unlike the other settling entities, faced a $1 billion forfeiture risk; and (b) the wrongdoing of Rigas Management was more serious than the wrongdoing at WorldCom, which had paid $750 million to settle the SEC's claims only, and of the other settling entities.

        16.    On October 28, 2004, in a further effort to induce the Government into a more reasonable settlement posture, ACC made a presentation to DOJ specifically addressed to

-4-

the subject of forfeiture. A copy of the October 28, 2004 presentation is annexed hereto as Exhibit 2. In that presentation, we attempted to demonstrate to DOJ that, based on then-current valuations, the Managed Entities were not worth $1 billion as the Government contended, but rather, contributed approximately $800 to $900 million of enterprise value as a part of integrated Adelphia.

17.     We further attempted to demonstrate that, even if it could forfeit the Managed Entities, DOJ would be unable to realize their full value. We argued that the Managed Entities' value would be eroded as a result of, among other things: (a) the costs of extracting the entities from the rest of the cable businesses that ACC managed (due in part from having to outsource the infrastructure and services provided by Adelphia in managing those entities' businesses); (b) the fact that the entities, standing alone, are small, non-strategic cable systems whose marketability would be limited; and (c) the discounted realizable value to DOJ resulting from the "fire sale" that would be required in order for DOJ to monetize their value. We demonstrated that, as a result of the foregoing factors, the likely post-forfeiture value realizable by DOJ would be in the range of $220 to $395 million.

18.     We further noted in the October 28, 2004 presentation that DOJ would face substantial obstacles to forfeiture, including, for example (and without limitation): (a) Adelphia's own ownership interests in the Managed Entities; (b) the fact that the convicted Rigases owned only a minority interest in the three largest Managed Entities; and (c) the ability of the lenders to object to forfeiture based on their security interests in the Managed Entities.

19.     Based on all of the reasons set forth in the October 28, 2004 presentation, we attempted to persuade the Government that ACC's $175 million offer was fair and reasonable. The Government, however, did not move from its demand that Adelphia pay $1

billion.  Nor did the matters set forth in the October 28, 2004 presentation regarding the

impediments DOJ would face in a forfeiture proceeding appear to deter DOJ from its expressed

intention to forfeit the Managed Entities.  In fact, as the negotiations proceeded, DOJ sidestepped

the central thrust of the October 28, 2004 presentation regarding the likely reduction in post-

forfeiture value of the Managed Entities by simply proclaiming that ACC would be responsible

for making up to the Government any such reduction in value in order to avoid indictment and to

resolve the SEC's claims.

      20.     Throughout the course of the foregoing negotiations with the Government

(between June and the end of October 2004), in addition to threatening to forfeit the Managed

Entities, DOJ also on several occasions indicated a willingness to consider indicting ACC

(including its operating subsidiaries) for the wrongdoing that had been perpetrated by the

Rigases.

      21.     In order to dissuade DOJ from pursuing such an indictment, on November

5, 2004, ACC made a presentation to DOJ regarding the "Thompson Memorandum Factors."  A

copy of that presentation is annexed hereto as Exhibit 3.  The "Thompson Memorandum" refers

to a January 20, 2003 memorandum from then-Deputy Attorney General Larry D. Thompson

entitled "Principles of Federal Prosecution of Business Organizations," which instructed federal

prosecutors to consider the following nine factors in deciding whether to seek criminal charges

against a corporation: (a) the nature and seriousness of the offense; (b) the pervasiveness of

wrongdoing within the corporation; (c) the corporation's history of similar conduct; (d) the

corporation's timely and voluntary disclosure of wrongdoing and its willingness to cooperate in

the investigation of its agents; (e) the existence and adequacy of the corporation's compliance

programs; (f) the corporation's remedial actions; (g) the collateral consequences of indictment;

(h) the adequacy of the prosecution of individuals responsible for the corporation's malfeasance; and (i) the adequacy of remedies other than criminal prosecution.

22.     In the November 5, 2004 presentation, we sought to persuade DOJ that the Thompson Memorandum factors, as applied to ACC, did not support a decision to indict.  DOJ, however, expressed the view that the Thompson Memorandum factors, as applied to ACC, were essentially in equipoise.  In DOJ's view, the amount of restitution to be paid to victims (a sub-factor under one of the Thompson Memorandum factors) was the "swing" issue that would decide whether the balance would tip in favor of, or against, indictment.  On that point, DOJ expressed the view that ACC's offer of $175 million in stock was substantially inadequate to tip the balance against indictment.  Further, at one point during our meeting with DOJ on November 5, 2004, the prosecutors made it clear that there was a "real risk" that the Debtors could be indicted.  This direct threat, as contrasted with prior allusions to the possibility of indictment, was the first explicit indication that DOJ was giving serious consideration to indicting the Debtors if the settlement negotiations did not progress more favorably.

23.     On November 10, 2004, the Debtors reported to representatives of the Official Committee of Unsecured Creditors (the "Creditors' Committee") regarding the status of the negotiations with the Government.  During this meeting, the Debtors conveyed to the Creditors' Committee that the Government was taking a very hard-nosed approach, that they had indicated there was a real risk of indictment, and that it was unlikely that any consensual resolution could be reached with the Government unless the Debtors were prepared to offer significantly more than $175 million.

24.     In response, representatives of the Creditors' Committee expressed a view that, in order to preserve the estates and obtain leverage over the Government in the settlement

negotiations and to protect the Managed Entities from forfeiture, the Creditors' Committee would consider means to place the Managed Entities into bankruptcy. We told representatives of the Creditors' Committee that we disagreed with that approach for a number of reasons. First, we were not persuaded the Managed Entities would, in fact, receive protection from forfeiture in bankruptcy. And second, we were concerned that such tactics could negatively impact our settlement negotiations by provoking the Government to take more extreme measures in response, including indictment.

25.     Two days later, on November 12, 2004, both the Creditors' Committee (who was engaging in its own set of discussions with DOJ) and the Debtors met, separately, with DOJ to further discuss a consensual resolution of DOJ's investigation. The Creditors' Committee's meeting with DOJ preceded the Debtors' meeting.

26.     During the Creditors' Committee's meeting, I understand that the Creditors' Committee advised DOJ of the Creditors' Committee's intent to consider means to place the Managed Entities in bankruptcy. I learned this from the prosecutors during our meeting later that day. The prosecutors told me that, as a result of this threat, they were already in the process of drafting an indictment of the Managed Entities. To my knowledge, that was the first time that DOJ had ever expressed an interest in indicting the Managed Entities (as contrasted with the Debtors).

27.     In order to dissuade the prosecutors from making good on their threat to indict the Managed Entities, and to salvage the possibility of further productive settlement discussions, we obtained assurances from representatives of the Creditors' Committee that it would cease to explore means to place the Managed Entities into bankruptcy.

- 8 -

28.     In early December 2004, in light of the Government's rejection of ACC's prior settlement overtures, and in an attempt to move toward a consensual resolution, ACC's Board authorized an increase in ACC's settlement offer to the Government. Accordingly, on December 3, 2004, ACC conveyed to the Government an increased offer of settlement in the amount of $300 million, consisting of (a) $175 million to be payable in the same currency that holders of unsecured debt against ACC would receive and (b) $125 million in the form of interests in a litigation trust that the Debtors intend to establish in connection with their plan of reorganization and which will be funded from recoveries on account of the Debtors' claims against the Rigases, Deloitte & Touche, certain prepetition bank lenders and certain other litigation. As with ACC's prior offer, the $300 million offer was contingent on ACC obtaining title to the Managed Entities. A copy of this offer is annexed hereto as Exhibit 4.

29.     In keeping with the Government's hard-nosed settlement posture, DOJ rejected the increased $300 million offer, characterizing it as being "just this side of insulting." Thereafter, the Government once again reiterated its threats to indict the Debtors and/or the Managed Entities and/or to forfeit the Managed Entities if ACC did not propose a substantially larger settlement sum.

30.     Because the threat of an indictment of the Managed Entities had been injected into the mix of the settlement negotiations, we concluded that it was prudent to address that issue directly with DOJ. Accordingly, on January 18, 2005, we made a written submission to DOJ as to why the Managed Entities should not be indicted. A copy of the January 18, 2005 submission is annexed hereto as Exhibit 5. Nevertheless, throughout the remainder of ACC's settlement negotiations with the Government, the threat of indictment of the Managed Entities (along with the Debtors) always remained very much "on the table."

31.     In late January 2005, I met and spoke with certain of the prosecutors in an attempt to get a candid indication from the prosecutors as to what it might take to resolve DOJ's investigation of ACC and the SEC's enforcement action on a consensual basis. As a result of those discussions, in early February 2005, the ACC board authorized an increase in ACC's settlement offer to the Government to $600 million. That increased offer was conveyed to the Government on February 10, 2005 in a meeting with the United States Attorney for the Southern District of New York, David Kelley. As with the prior offers, the $600 million offer was contingent on the Debtors recovering the Managed Entities.

32.     On February 11, 2005, the Government responded with a formal counter-demand in the amount of $750 million. After learning of this counter-demand, I contacted United States Attorney Kelley in an effort to further negotiate the settlement payment amount. As a result of those efforts, the Government reduced its counter-demand to $725 million, but refused to reduce it any further.

33.     Several days later, on February 15 and 17, 2005, Philip Korologos, Esq. (of Boies, Schiller & Flexner, LLP) and I met with the Government to discuss further the status of the parties' negotiations. During this meeting, the Government discussed its desire to include, as a part of the Government's consensual resolution with ACC, a resolution of the Government's claims against the Rigases and the claims existing between ACC and the Rigases. The Government asserted that a multiparty resolution – including both charged and uncharged members of the Rigas Family – would be necessary to effectuate ACC's demand that it obtain title to the Managed Entities as part of ACC's settlement of the Government's asserted and potential claims and charges. During that meeting, we learned that Rigases were seeking to retain approximately $90 million of property (including 23,000 subscribers from the Managed

Entities).  Thereafter, we indicated to the Government that such terms would not be acceptable to ACC.

34.    On February 28, 2005, ACC's Chief Executive Officer, William Schleyer, its lead Director, Anthony T. Kronman, Brad Sonnenberg, the Company's General Counsel, Mr. Korologos and I met personally with United States Attorney Kelley and other prosecutors in an effort to negotiate a more favorable settlement.

35.    Throughout early March, we continued to attempt to negotiate a more favorable settlement.  On March 10, 2005, DOJ indicated a willingness to accept $695 million, provided it was paid all in cash.  DOJ also made it clear that, if ACC did not accept the initial $725 million demand or the alternative $695 million all-cash demand, DOJ would pursue forfeiture and/or indictment of the Managed Entities and, if necessary, indictment of the Debtors.

36.    On March 17, 2005, the Adelphia Board met to consider, among other things, the merits of the Government's $725 million demand and its alternative $695 million all-cash demand.  After carefully evaluating the merits of the two demands, the Board authorized ACC to accept the Government's $725 million demand and to convey to the Government a term sheet embodying the terms on which ACC was prepared to settle the Government's criminal investigation and other claims.

37.    On March 18, 2005, I conveyed to the Government ACC's acceptance of the $725 million demand, and provided the Government with the term sheet that had been authorized by the Board.  A copy of the March 18, 2005 term sheet and accompanying letter are annexed hereto as Exhibit 6.  The term sheet provided, among other things, that the $725 million settlement payment would consist of (a) $600 million in (i) ACC stock in the event of a stand-alone emergence or (ii) common stock of ACC's successor in the event of a sale; and (b) $125

million of an interest in the litigation trust. As with all of the prior settlement offers, the term sheet contained an express condition that ACC receive title to the Managed Entities.

38.     Throughout the remainder of March, I participated in negotiations with representatives of the Rigas Family and the Government in an attempt to reach a settlement with the Rigases in connection with ACC's settlement with the Government. As a result of those negotiations, we were able to reduce substantially the amount of property that would be retained by the Rigas Family. The Government, however, advised me that the Rigases were insisting, as a condition of settlement, that they be permitted to retain two of the Managed Entities (i.e., Bucktail Broadcasting Corp. and Coudersport Television Cable Co.), which consisted of approximately 5,200 subscribers, as well as other real and personal property, and that they receive funds for their past and future legal defense costs.

39.     As a result of the Rigas Family's insistence on retaining two of the Managed Entities, we advised the Government that ACC should not be required to pay the full $725 million settlement that had previously been offered. Ultimately, on March 30, 2005, the Government agreed to accept $715 million, provided that a portion of the payment was made in cash. This, in turn, led to the parties' agreement to the terms that are now embodied in the agreements that are the subject of this Motion. Specifically, ACC agreed to pay $715 million, consisting of: (a) in the event of a standalone emergence, $600 million of common stock and $115 million of interests in the litigation trust; or (b) in the event of a sale, (i) $400 million of common stock of ACC's successor, (ii) $115 million of an interest in the litigation trust and (iii) $200 million in cash (provided the Debtors are sold on terms that include more than $10 billion in cash). A condition of this payment is that ACC obtain full and clear title to all of the Managed Entities other than Bucktail Broadcasting Corp. and Coudersport Television Cable Co.

40.     Between March 31 and April 24, 2005, the parties drafted and negotiated the documentation necessary to memorialize and effectuate their respective agreements. These negotiations were lengthy and hard-fought. At one point, the Government indicated that if the parties did not reach agreements with each other, the Rigases would be sentenced the following week and Adelphia would be indicted the day after the sentencing. The negotiations resulted in the three agreements that are the subject of the instant Motion, as well as related agreements between the Government and the Rigases.

41.     On April 20, 2005, the ACC Board of Directors, after careful deliberation, authorized ACC to execute the relevant settlement documents.

42.     Throughout the entire settlement negotiation process, the ACC board was kept apprised of the status of the negotiations with the Government. In particular, I personally attended Board meetings on October 7 and December 2, 2004 and on February 10, February 17, March 8, March 17, March 31, April 9 and April 20, 2005. At each of those Board meetings, the Board was informed of the status of the negotiations with the Government (and later, the Rigas Family).

43.

REDACTED

REDACTED

I declare under penalty of perjury that the foregoing is true and correct.

Alan Vinegrad

Executed on May 13, 2005.

- 14 -

**<u>Exhibit 3</u>**

# Adelphia Communications Corp.

## Thompson Memorandum Factors

### Presentation to the
### United States Attorney's Office

November 5, 2004

Confidential

For Settlement Purposes Only

COVINGTON & BURLING    NEW YORK    WASHINGTON    SAN FRANCISCO    LONDON    BRUSSELS

ACC-DOJ 00556

2

# Table of Contents

I.     Nature of the Offense
II.    Pervasiveness of Wrongdoing
III.   History of Similar Conduct
IV.    Disclosure and Cooperation
V.     Compliance Programs
VI.    Remedial Actions
VII.   Collateral Consequences of Indictment
VIII.  Adequacy of Individual Prosecutions
IX.    Adequacy of Non-Criminal Remedies
X.     Other Policy Considerations

*Confidential - For Settlement Purposes Only*

3

# I.   Nature of the Offense

## Adelphia Was a Victim of the Rigases' Offenses

- Rigases' crimes were serious
  - Adelphia was a victim:
    - Indictment alleges massive self-dealing by the Rigas family at Adelphia's expense
    - Rigases used corporate funds to pay for:
      - Loans to Rigas entities ($2.3 billion)
      - Company notes and stock ($1.3 billion)
      - Margin loans ($252 million)
      - Undisclosed cash payments and advances ($64 million)
      - Personal expenses ($13 million +)
  - Rigases' conduct led to Adelphia bankruptcy
    - Adelphia will never recover the billions of dollars stolen by the Rigases and is saddled with billions of dollars of debt

*Confidential - For Settlement Purposes Only*

4

# III. Pervasiveness of Wrongdoing

- Wrongdoing limited to Rigas family members and relatively small number of their subordinates in 15,000-employee company

  — Primarily accounting functions

- Unique mitigating factor: family members had voting control and managed the Company

Confidential - For Settlement Purposes Only

ACC-DOJ 00559

# III. History of Similar Conduct

- Adelphia is not a recidivist

- Since ouster of Rigases: No criminal or securities regulatory proceedings or sanctions (other than SEC v. Adelphia)

- Not like Arthur Andersen:
  - June 2001: SEC censures and fines Andersen for fraud in connection with audits of Waste Management
  - July 2001: SEC files amended complaint against Andersen lead engagement partner alleging fraudulent audits of Sunbeam
  - October-November 2001: Andersen obstructs Enron investigation

5

Confidential - For Settlement Purposes Only

ACC-DOJ 00560

6

# IV. Disclosure and Cooperation

A. Providing Access to Privileged Materials

B. Production of Documents and Other Information

C. Assistance Before and During the *United States v. Rigas* Trial

D. Assistance in the Tax Investigation

E. Adelphia Did Not Obstruct the Government's Investigation

*Confidential – For Settlement Purposes Only*

*Disclosure and Cooperation*

7

## A.  Providing Access to Privileged Materials

- Privileged internal documents and outside counsel documents

- 450-page privileged draft summary of investigation prepared by Special Committee's outside counsel

- Privileged summaries of more than 100 witness interviews conducted by counsel to the Special Committee, including summaries for seven witnesses who testified for the Government at the *United States v. Rigas* trial

*Confidential - For Settlement Purposes Only*

8

*Disclosure and Cooperation*

# B.  Production of Documents and Other Information

○ Production of:

    — 1,315 boxes of documents and other media – over

    — 10 million pages

    — 25 imaged local computer drives

    — 228 compact discs

    — Access to computer database

○ July 17, 2002 agreement to produce materials to the Government as quickly as possible, even before conducting a privilege review

*Confidential - For Settlement Purposes Only*

ACC-DOJ 00563

*Disclosure and Cooperation*

9

## C. Assistance Before and During the *United States v. Rigas* Trial

- Adelphia has provided extraordinary assistance for over two years in connection with prosecution of the Rigases and others:

  – Detailed comments on the draft criminal complaint

  – Adelphia's forensic accountants made available to the Government on short notice

  – Assistance in preparation of key witnesses

  – Real-time data analysis and other assistance during the trial

  – Review of 70,000 pages produced by the Rigases on the eve of trial

    ∘ Completed in one week (400 hours of work)

  – Analysis of all transactions between Adelphia and the Rigas entities over a 3½ year period to rebut Rigases' defense that they could have repaid their debts to the Company

    ∘ Completed before the end of the Government's case-in-chief (3,000 hours of work)

- Adelphia spent several million dollars assisting the Government in connection with the trial

*Confidential - For Settlement Purposes Only*

ACC-DOJ 00564

10

*Disclosure and Cooperation*

# D. Assistance in the Tax Investigation

- Adelphia has spent hundreds of hours assisting in investigation of tax issues arising out of the Rigases' fraud
  - Collection and review of thousands of documents
  - Employees and forensic auditors made available to the Government
  - Detailed presentations by Company's forensic auditors to the IRS
- Review of audit workpapers and desk files to assist in Government investigation of Deloitte & Touche

*Confidential - For Settlement Purposes Only*

ACC-DOJ 00565

11

*Disclosure and Cooperation*

## E.  Adelphia Did Not Obstruct the Government's Investigation

○  Adelphia has provided extraordinary cooperation since the Rigases were removed from their positions at the Company

○  Rigases attempted to cover up their wrongdoing during their last six weeks in power

   –  Rigases were entrenched for many years

   –  Special Committee moved immediately to oust Rigases once it learned of Government's concerns

   –  Special Committee's decisive action enabled Government to promptly identify culpable individuals and conduct extensive investigation

○  No suggestion that Adelphia impeded the Government's investigation since Rigases were forced out

*Confidential – For Settlement Purposes Only*

12

# V.   Compliance Programs

- Rigas family's role in running the Company

- Failures by corporate "gatekeepers" and others

  - Auditors' role
  - Outside counsel's role
  - Other professionals' roles
  - Leading to civil lawsuits and criminal investigation

*Confidential – For Settlement Purposes Only*

13

# VI. Remedial Actions

A. Compliance Programs

B. New Management

C. Discipline of Wrongdoers

D. Restitution

E. Extraordinary Cooperation with Government

*Confidential – For Settlement Purposes Only*

*Remedial Actions*

14

# A. Compliance Programs

## 1. Organizational Changes

- Entirely new Board of Directors

    – Anthony Kronman (Lead Director) – former Dean, Yale Law School

    – Philip R. Lochner, Jr. – former SEC Commissioner and former Senior VP and Chief Administrative Officer, Time Warner Inc.

    – Susan Ness – former FCC Commissioner

    – E. Thayer Bigelow, Jr. – former CEO, Time Warner Cable Programming and former President, Home Box Office, Inc.

    – Rod Cornelius – former Vice Chairman, Renaissance Cable and Cablevision Industries

    – Kenneth L. Wolfe – former Chairman and CEO, Hershey Foods

    – William T. Schleyer – new Adelphia CEO

*Confidential - For Settlement Purposes Only*



*Remedial Actions – Compliance Procedures*

15

- Reformed Board Committees
  - Corporate Governance and Nominating Committee – all outside directors
  - Audit Committee – all outside directors
  - Compensation Committee – all outside directors
- All three committees are governed by written charters that exceed legal requirements and incorporate corporate governance best practices
  - SEC apprised in advance of new policies

*Confidential – For Settlement Purposes Only*

16

*Remedial Actions — Compliance Procedures*

## 2.   New Code of Ethics and Whistleblower Policies

○ Code of Business Conduct and Ethics

— Covers compliance with laws and regulations, use of company assets, competition and fair dealing, record retention, loans to employees, anti-nepotism policies

— Requires employees to report any illegal or unethical behavior

— Reporting may take place in various ways, without fear of retaliation

○ Whistleblower Policies and Procedures

— Addresses receipt, retention and handling of all whistleblower complaints

○ SEC apprised in advance of new policies

*Confidential - For Settlement Purposes Only*

*Remedial Actions – Compliance Procedures*

**3. New Internal Controls and Audit Procedures**

17

○ Replacement of senior finance and accounting employees

○ New Disclosure Committee

– Designs, establishes and monitors control and other procedures regarding financial disclosures

○ New Internal Audit procedures

– New Internal Audit head and staff

– Internal Audit department now reports directly to Audit Committee on a monthly basis

○ Selection of PricewaterhouseCoopers as new outside auditors

*Confidential – For Settlement Purposes Only*

ACC-DOJ 00572



# B. New Management

- Prior management has been removed
  - The Rigases
  - James Brown, Timothy Werth, Michael Mulcahey
  - Other Finance and Accounting managers

- Today, Adelphia is led by a new management team with no connection to the Rigases' misconduct
  - William T. Schleyer – CEO
  - Ron Cooper – President and COO
  - Vanessa Whitman – CFO
  - Brad Sonnenberg – GC and Chief Governance Officer
  - New Financial executives and managers

*Remedial Actions*

18

*Confidential – For Settlement Purposes Only*

ACC-DOJ 00573

*Remedial Actions*

19

## C. Discipline of Wrongdoers

### The Wrongdoers Have Been Removed from Adelphia

- Ouster of the Rigases from their executive positions and seats on the Board of Directors

- Termination of other employees involved in the Rigases' malfeasance or who did not take appropriate steps to detect, report or prevent it

*Confidential - For Settlement Purposes Only*

ACC-DOJ 00574

# D. Restitution

## Adelphia Proposal: $175 million penalty

- Distributions to be made prior to distributions to unsecured creditors

- Distributions will reduce recoveries of other current creditors

- Distributions would not be reduced as a result of any other bankruptcy recoveries

*Confidential - For Settlement Purposes Only*



*Remedial Actions – Restitution*

## In Relative Terms, Adelphia's Restitution Offer Is Significantly Larger than the Largest Corporate Fraud Settlement (WorldCom)

- WorldCom: 6–20 times bigger based on market cap, revenue, employees

- WorldCom: Much bigger scope of wrongdoing – misstatements, shareholder loss

- If the WorldCom $750 million settlement is adjusted to reflect Adelphia's smaller size, an Adelphia settlement would range from $29 million to $132 million:

  – Balance sheet misstatement ($59.8 billion v. $2.3 billion) = **$29 million**

  – Peak market cap ($185 billion v. $ 9 billion) = **$36 million**

  – Current annual revenues ($27.3 billion v. $4.2 billion) = **$115 million**

  – Shareholder loss ($27.7 billion v. $4.3 billion) = **$116 million**

  – Number of employees (85,000 v. 15,000) = **$132 million**

*Confidential - For Settlement Purposes Only*



*Remedial Actions – Restitution*

## Adelphia's Restitution Offer Exceeds the Amounts Paid in Comparable Corporate Fraud Settlements

- Nine recent corporate fraud settlements of $25 million +

- Nine settlement amounts averaged 1.9% of the company's annual revenues, 25.6% of the alleged earnings misstatement and 1.9% of investor loss

- Applied to Adelphia, these percentages result in a settlement of $80 million to $95 million

  - **Percentage of annual revenues:**  Adelphia's offer is higher than 8 of 9
  - **Percentage of earnings misstatement:**  Adelphia offer is higher than 7 of 9
  - **Percentage of shareholder loss:**  Adelphia offer is higher than all 9

*Confidential - For Settlement Purposes Only*

22



*Remedial Action — Restitution*

23

**Qwest**

- Qwest $250 million settlement = Adelphia settlement of $42 million to $145 million

  – Earnings misstatement ($2.2 billion v. $370 million) = **$42 million**
  – Current annual revenues ($14.2 billion v. $4.2 billion) = **$74 million**
  – Shareholder loss ($7.4 billion v. $4.3 billion) = **$145 million**

*Confidential - For Settlement Purposes Only*



*Remedial Actions – Restitution*

24

## Computer Associates

- Computer Associates $225 million settlement = Adelphia settlement of $49 million to $286 million

  – Peak market cap ($40.1 billion v. $9 billion) = **$49 million**

  – Shareholder loss ($8.5 billion v. $4.3 billion) = **$114 million**

  – Current annual revenues ($3.3 billion v. $4.2 billion) = **$286 million**

- Computer Associates engaged in criminal obstruction of justice for over two years, resulting in five convictions to date

*Confidential - For Settlement Purposes Only*

25

*Remedial Actions – Restitution*

# The Daiwa Bank and Republic Cases Are Inapposite

## Daiwa Bank

- Heavily-regulated financial institution
- Beneficiary of its crimes: covered up $1.1 billion in proprietary trading losses over an 11-year period
- Indicted for
  - Destroying and hiding evidence
  - Creating false records
  - Lying to regulators after discovery of the fraud
- Did not cooperate with Government or pay voluntary restitution before indictment
- Did not pay full restitution ($340 million fine = 15% of shareholder loss)

*Confidential - For Settlement Purposes Only*

ACC-DOJ 00580

*Remedial Actions — Restitution*

26

# The Daiwa Bank and Republic Cases Are Inapposite

## Republic New York Securities

- Heavily-regulated financial institution
- Indicted for:
  - Furnishing hundreds of documents that it knew would be used to defraud Ponzi scheme investors and hide trading losses
  - Falsifying books and records
  - Executing fund transfers that it knew were improper payments to Ponzi scheme investors
- Beneficiary of its crimes:  participated in cover-up to maintain profitable relationship with Ponzi scheme's sponsor
- Did not pay full restitution ($606 million paid to investors holding $1 billion in notes)

*Confidential - For Settlement Purposes Only*

27

*Remedial Actions -- Restitution*

# The Daiwa Bank and Republic Cases Are Inapposite

## Adelphia

- Adelphia was a *victim* of the Rigases' frauds

- The Rigases' efforts to cover up their crimes were motivated to protect themselves, not the Company

- Adelphia began to provide exemplary cooperation as soon as the Rigases were removed from power, at an early stage of the investigation

- Adelphia is a cable business, not a regulated financial institution

- Adelphia is in bankruptcy

*Confidential - For Settlement Purposes Only*

ACC-DOJ 00582

28

*Remedial Actions — Restitution*

# Restitution: Other Factors

- Adelphia has offered $175 million in advance of any court order or criminal proceeding (acceptance of responsibility)

- Bankruptcy limits Adelphia's ability to pay full restitution

- Decision whether to prosecute "should not depend upon the target's ability to pay restitution" (Thompson Memorandum Section VIII)

*Confidential - For Settlement Purposes Only*

*Remedial Actions*

29

# E. Extraordinary Cooperation with Government

- See Factor IV, above

*Confidential - For Settlement Purposes Only*

30

# VII. Collateral Consequences of Indictment

A. Loss of Financing

B. Termination of Orderly Sales Process

C. Potential Loss of Cable Franchises and Licenses

D. Impact on Innocent Employees and Consumers

*Confidential – For Settlement Purposes Only*



*Collateral Consequences*

31

## A. Loss of Financing

- $1.0 billion Extended Debtor-in-Possession ("DIP") financing
  - DIP Credit Agreement provides that an indictment of the Company constitutes an Event of Default
  - Lenders could terminate the financing and declare all loans due

- $8.8 billion exit financing
  - Lenders can withdraw funding commitments if they are not satisfied with the status of DOJ or SEC claims or proceedings

- Adelphia unable to obtain additional financing or list its securities

*Confidential - For Settlement Purposes Only*

ACC-DOJ 00586

*Collateral Consequences*

32

## B. Termination of Orderly Sales Process

- Indictment will scare off buyers

- Sales process will become fire sale liquidation

*Confidential – For Settlement Purposes Only*

33

*Collateral Consequences*

## C. Potential Loss of Cable Franchises and Licenses

- Federal law provides that local franchising authorities ("LFAs") can consider an applicant's financial, legal and technical qualifications when considering applications for new franchises, franchise renewals or transfers

- Many local franchise laws require LFAs to consider an applicant's "character" or "legal" qualifications

- Indictment could lead to franchise revocation proceedings

- Conviction could trigger an FCC inquiry resulting in the loss of the Company's spectrum licenses

*Confidential – For Settlement Purposes Only*



*Collateral Consequences*

35

# D.  Impact on Employees, Consumers and Creditors

- **Employees:**  thousands of employees around the country would lose their jobs

- **Subscribers:**  local subscribers may suffer disruption of their cable service

- **Creditors:**  fire sale liquidation would result in loss of billions of dollars of value from bankruptcy estate

*Confidential - For Settlement Purposes Only*

ACC-DOJ 00590



# VIII. Adequacy of Individual Prosecutions

- Government has successfully prosecuted and convicted culpable participants
  - John Rigas
  - Timothy Rigas
  - James Brown
  - Timothy Werth
  - Retrial of Michael Rigas

- Government has sent strong message of deterrence

*Confidential – For Settlement Purposes Only*

36

ACC-DOJ 00591

# IX.   Adequacy of Non-Criminal Remedies

- SEC proceedings against Adelphia and individual defendants

  — SEC penalties can be used to compensate shareholders (fair fund)

- Shareholder suits against auditors, banks, outside counsel and others should provide substantial additional compensation to investors

- Adelphia is a completely reformed company

- Adelphia's efforts to recover from wrongdoers will benefit victims

*Confidential - For Settlement Purposes Only*

37

## X.   Other Policy Considerations

38

- Adelphia should be used as a model for proper response to corporate wrongdoing – not punished

- Indictment will discourage other companies from waiving privilege

- Indictment would discourage qualified executives and directors from joining troubled companies

*Confidential – For Settlement Purposes Only*

ACC-DOJ 00593



# Other Policy Considerations

- Decision was made not to indict in summer 2002; all the more reason not to indict the Company two-and-a-half years later
  - Extraordinary cooperation before and during trial
  - Complete overhaul of Company management, Board of Directors and compliance procedures
  - New management has increased enterprise value
  - Company is aggressively pursuing recoveries from wrongdoers
  - Individuals have been successfully prosecuted
  - $175 million offer – restitution for victims
  - Company at critical juncture in bankruptcy process

39

*Confidential – For Settlement Purposes Only*

# Exhibit EE

DENNIS P. COYLE

Page 469

COURT OF COMMON PLEAS
PHILADELPHIA COUNTY, PENNSYLVANIA

CASE NO. 000598

ADELPHIA COMMUNICATIONS CORP.,        )
                                      )
                    Plaintiff,        )
                                      )
vs.                                   )
                                      )
DELOITTE & TOUCHE, LLP,               )
JOHN RIGAS, TIMOTHY RIGAS,            )
MICHAEL RIGAS, JAMES RIGAS,           )
                                      )
                    Defendants.       ) May 18, 2006
_____ ) 9:37 a.m.

- - - - -

D E N N I S   P.   C O Y L E

- - - - -

VOLUME III

VIDEOTAPED DEPOSITION taken pursuant to Notice at
offices of Squire Sanders, 200 So. Biscayne Blvd.,
Ste. 4000, Miami, Florida, 33131, before Ana Reid/Kelli Ann Willis,
Shorthand Reporters and Notary Publics within the
State of of Florida.

b55fbdf9-693b-4854-a05f-b64a483e2871

DENNIS P. COYLE

Page 638

1  didn't occur. In your mind it didn't occur?
2      A.  In -- the independent directors never,
3  other than in '96, approved the use of co-borrowed
4  funds for the purchase of Adelphia securities.
5      Q.  And you knew that fact as of the filing of
6  this 8-K, and there was no further investigation
7  that you thought needed to be done?
8      A.  No, I didn't say that. I mean, I knew
9  that, but you still have to go through the
10 investigation. There may still be something that
11 you don't know. I mean, it's -- and what we did is
12 rather than Dennis Coyle and Les Gelber go do the
13 investigation, we immediately retained Covington &
14 Burling to conduct the investigation.
15     So I personally never investigated
16 anything. I just said, special -- actually, it's
17 built into the resolutions and the May 15, I think.
18 That part of that resolution is that Covington &
19 Burling shall conduct an investigation on behalf of
20 the special committee.
21     Q.  Did Covington & Burling come to any
22 conclusions that you're aware of that you disagreed
23 with?
24     A.  I'm struggling with the "draw the
25 conclusions." Covington & Burling issued a report

Page 639

1  and discussed certain transactions. And it's sort
2  of, I would say -- well, it's not sort of. It's an
3  objective report of what they found. And -- it's
4  sort of factual, I think, although I think there is
5  only one conclusion you can come to, the reader is
6  left to draw his or her conclusion.
7      Q.  The report that you are talking about, was
8  that a report issued by Covington & Burling or
9  issued by you and Mr. Gelber as the special
10 committee?
11     A.  I think it's Covington's report. But I'm
12 not -- it says "Report of the Special Committee." I
13 think that is the caption.
14     Q.  And the special committee was you and
15 Mr. Gelber?
16     A.  Yes.
17     Q.  Did you make any changes to the report
18 before it was issued or did you adopt it in whole?
19     A.  They were conducting the investigation for
20 us. It was given to us and I have never seen
21 anything but a draft.
22     Q.  You have never seen a final report?
23     A.  No.
24     Q.  Did you ever request a final report?
25     A.  Yes.

Page 640

1      Q.  And what was the response that you got?
2      A.  At this point the US Attorney had gotten
3  involved, and they were restricting the distribution
4  of any further information.
5      Q.  Did the -- did the US Attorney have a copy
6  of the draft report?
7      A.  That I don't know for a fact.
8      Q.  Do you have a best guess?
9      A.  My best guess is yes. That is what lead
10 them to say, you know, at least from that point on,
11 I never saw another report.
12     Q.  Who did the US Attorney's office make this
13 request of?
14     A.  I don't know. It was communicated to me,
15 I think, through Covington. Or maybe Boies
16 Schiller, I don't know. It came through counsel.
17     Q.  And what you understood was the US
18 Attorney had asked that a final report not be
19 issued?
20     A.  No.
21     Q.  That is what I wanted to clarify.
22     A.  I don't know.
23     Q.  Let's be real precise.
24     A.  Well, I can't be more precise because I
25 don't know anything more than that. At some point,

Page 641

1  the way I viewed it, Covington was co-opted, and
2  they were -- well, they were co-opted by the
3  government. They weren't reporting to me anymore.
4      Q.  Did you ever raise an objection to the
5  facts that in your mind, at least, Covington was
6  being co-opted by the government and not reporting
7  to the special committee, who under the charter they
8  were supposed to report to?
9      A.  No.
10     Q.  Because it was the government?
11     A.  That is -- that has a lot to do with it.
12     Q.  You don't mess with the government.
13         MR. HEIM: Especially the US Attorney.
14 BY MS. CALLAHAN:
15     Q.  Were there any other communications of
16 this sort that you became aware of from the US
17 Attorney's Office to Adelphia or the special
18 committee relating to the investigation?
19     A.  The only other thing I can think of that
20 the US Attorney did was they stayed all discovery in
21 all litigation.
22     Q.  When you say "they stayed," they went into
23 court and filed the motion.
24     A.  Yes. I guess that's how they did it. I'm
25 not sure.

44 (Pages 638 to 641)

b55fbdf9-693b-4854-a05f-b64a483e2871

# Exhibit FF

KPMG Judge Questions Laws, Tactics Used in Corporate Cases - WSJ.com



**September 28, 2007**

# KPMG Judge Questions Laws, Tactics Used in Corporate Cases

**By EVAN PEREZ**
*September 28, 2007*

**DOW JONES REPRINTS**

⟪R⟫ This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers, use the Order Reprints tool at the bottom of any article or visit: www.djreprints.com.

· See a sample reprint in PDF format.
· Order a reprint of this article now.

WASHINGTON -- The federal judge in the case involving allegedly fraudulent tax shelters marketed by KPMG LLP said it may be time to re-examine laws governing corporate criminal liability and the tactics used by prosecutors to investigate those cases.

U.S. District Judge Lewis A. Kaplan, speaking at a National Association of Criminal Defense Lawyers seminar, said the KPMG case and others, such as the government's prosecution of Adelphia Communications Corp. executives, raise questions about the government's practice of using the threat of criminal prosecution of companies in order to gain leverage in investigations of alleged wrongdoing by company employees.

He said the laws appear to give expansive power to prosecutors, lessening the oversight of courts and juries, at the expense of the constitutional rights of those accused. "I question whether placing virtually unchecked power in the hands of any branch of government" is the right thing, Judge Kaplan said.

The judge drew national attention last year when he ruled that prosecutors violated the constitutional rights of KPMG partners when the government pressured the firm to cut off legal fees for some of the defendants, comprising 16 partners and two others charged in what the government touted as its largest-ever tax-fraud case. In July, Judge Kaplan dismissed charges against 13 defendants. Justice Department officials next month are expected to file an appeal of the ruling.

The Justice Department denies its tactics were unconstitutional, but the ruling helped prompt an overhaul in the department's guidelines for white-collar cases. The department's McNulty memorandum, named for former Deputy Attorney General Paul J. McNulty, who oversaw the changes, was supposed to provide more oversight of prosecutors and, lawyers hoped, cut down on the practice of pushing companies to waive attorney-client privilege in order to aid investigations.

With the Justice Department on the defensive on various issues related to the tenure of former Attorney General Alberto Gonzales, Congress has started work on possible changes to aspects of the McNulty memo. Judge Kaplan, in response to a question, said he didn't believe the McNulty memo changed "a whole lot," but said proposed legislation to alter Justice guidelines may not be enough.

Judge Kaplan's appearance yesterday at the defense-lawyers event, given that he continues to hear the KPMG case, raised eyebrows among some lawyers in attendance. In 2001, an appeals court reprimanded a judge handling a case involving Microsoft Corp. for making comments to reporters away from the bench.

A spokeswoman for the U.S. attorney of the Southern District of New York, which is overseeing the KPMG case, declined to comment.

Daniel Richman, a Columbia Law School professor, said Judge Kaplan's comments mirrored those already being

raised by "serious legal commentators" and bear more discussion. John Moscow, a former prosecutor in the Manhattan district attorney's office turned defense attorney at Baker Hostetler, who didn't hear the judge's speech but has followed the issue, doubted the government would make any attempt to remove Judge Kaplan from the KPMG case or to use his comments to bolster its appeal of the judge's ruling.

—Paul Davies contributed to this article.

**Write to** Evan Perez at evan.perez@wsj.com[1]

**URL for this article:**
http://online.wsj.com/article/SB119094772763542309.html

**Hyperlinks in this Article:**
(1) mailto:evan.perez@wsj.com

**Copyright 2008 Dow Jones & Company, Inc. All Rights Reserved**

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our **Subscriber Agreement** and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit **www.djreprints.com**.

**RELATED ARTICLES FROM ACROSS THE WEB**

Related Articles from WSJ.com
- New Hearing Held in Coal Case  Mar. 13, 2008
- Judge Rules Ex-Qualcomm Lawyers Can Use Private Communications  Mar. 06, 2008
- Law Blog - WSJ.com : Zach Scruggs's Latest Lawyer, Ex-Miss AG Mike Moore  Mar. 16, 2008
- Breaking News: Appeals Court Orders New Trial for Nacchio  Mar. 16, 2008

**More related content**       *Powered by Sphere*

# Exhibit GG

(1)

MAY 22, 2002
8:30PM
    Pw

Paul
@ Home    (616 - 656 9482 (F)

James ⟶

BK    Ready to filed

Ed Hartman — will he meet w/ the Special Committee.

DAVID BOICE

Phil

   — Debt to pay down debt.
   — Terminating the 202 agreement
          Concerned

      ✓ All will leave the Board.
      ✓ Leaning that way.
      ✓ Designate 2 non member family member

BUFFALO SABRES  } Took this off. @ This time
PARAXIS
          ↳ Special Committee.

• Conf Call  ⟶

 10:⁰⁰ PM —

Pauline — "NOT HAPPY" //

PM 03046

②

System Sales —
• KKR has called.

```
     3
    26  000
    15 000
  13 0 000
    26
  39 0,000
```

```
     3,
    26
    25 000
  13 0000
    52
  65 8,000
```

Bankers Mtg in NYC

45 min. {
① Ask for their support re liquidity.
② Facility P&r DIP
③ Commitments to the NASDAQ s'. SEC
④ Strong Co.
⑤ Credit facility in their Best Interest
   — Strong Questions   | Need * 750 mio. |

✓ One lead Banker will/is the interface.

✓ We are not saying No .... working today.

✓ Wachovia → Good Mtg.  re Bridge facility
   liquidity update

Cash flow analysis

   Through July 1 or July 5.   **PM 03047**

③

CASH

VERY PRECARIOUS Position
✓ $90 mio in the bank
✓ Salries are a big drain
✓ Restructuring Officer
            Conway & Con        } well recived by the
            ↳ Reports to the Spec Comm banks.

Handout —
    Retain Restructuring Officer works for
    Special Committee. (all financial matters)

    PRESS RELEASE:

    Amendment to the charter of the Special
    Committee.

—————————————————————————————

Series of Mtg trying to Raise Capital

    Insight / Solomon Bros

            ↳ Significant interest.
            INVESTMENT / Strategic Afiliation
            (They are cople people)

        "Doing Due Dilegence"

    -Need $250 miol + $750 mio

                                        PM 03048

A . . . . C-pital. Moeeting



④

o   Texas Pacific

       Due Diligence

    Interested but .... will be | very expensive |

       $100 mio + _____ . loan
  want More

o   Charter / Salomon   (they want to move quickly)

    ✓ Look up Los Angeles
    ✓ Specific properties
    ✓ Other — flexible

o   KKR

o

| Should call each of these investors when the
8K will be released |

Mtg w/ Charter On FRIDAY

  - Extremely interested in doing a 5th up to
    $ Billion

**PM 03049**

(5)

<u>Questions</u>:

✓ LA Assets  (can't get cash out)
Proposed to do a deal immediately.
$250 mio

Must be closed in MAY

✓ Quantify the liabilities facing the company?
(Not Asked By the Banks)

✓ MAY ∴ have to Damage

Dick PARSONS — Will give us a call in the morning.

— Debt + Equity will save the company.
1) Must move quickly.
2) Will meet on Saturday – Mid Morning  10 AM

Puerto Rico
Opportunity to move aggressively.
The "Carlisle Group."
↳ Could move quickly.
meet w/ them on FRIDAY(?)

"Not getting the interest or the price"  J. Rigas

PM 03050



## 8 K Status:

Iterating ⟶ Next Draft out lst thing
in the morning.  It will be filed
tomorrow.

Incomplete but . . . . must be filed.

Information incomplete — Con E. Kailbourne
sign.

Clarify

Appropriate Policy

PM 03051

Personal Policy:
    Jim Brown — Resigned      }   5 years of expense
        — Severance Package   }   account —
        — Insurance         }   totalling $42K.

Review our compliance     TPC

⑦

Policies in the HR Area.

Schedule
  $ 1,300,000 loans out to the people.

    $700,000 "Interest free loan"? from The Co.?
       John Ricard nothing about This.

  "There are a couple of Policies." John Ricard.
       2 weeks of Their pay.
       Mike Mulhalay.

  Some of Them left The company.

  "Foreign Corrupt Practices Act"

Employee Indemnification
   Civil
   Criminal      } Will not talk.

Co. By laws will Indemnify.
      Officers & Bd. Directors

1) Tell The staff illegal
2) .
3) INDEMNIFY Them                    PM 03052
4) Plead The 5th — Discharge Them.



## D-T Update

- ~~Reassigned~~ Listen
- Cooperate but ....
        not coming back to work
- Available to Spec. Committee if They
        got a waiver. (their lawyers)
-
"Where are we"? relative to a 10K.
Must get:
  ① TWC
  ② Urbet Kahn    } home & log up
  Approach Them first
  ① They have stature
    →
We will never get a 10K from D-T.
Critically important to get a 10K filed.

## 10 minute Break

Leonard Tow Issue

- Very Direct in recent conversation
- Wants 3 seats on The board.
- Recommend That Tow join The board + Scott Snyder 1 or 2 people
David Recommendation: ———→

**PM 03053**

⑨

We should do it.
- Reduces our exposure
- Give him 2 seats now ; 1 later.

He will be a thorn. But ....

He should also be invited to join the special
Committee.

Press Release:
Indebtness Report increase $2.5B in 2001
Total Co borrowing indebtness = $3.1B. (Avail)



John WANTED TO SHOW IT DIFFERENTLY!

Peter Venetis
• Declined to resign.
• Will not sign the agreement.

• He is getting no support.
• He is using Bad Judgement.

**PM 03054**

# Exhibit HH

*Response Date: July 31, 2003, 12:00 p.m.*
*Hearing Date: August 1, 2003, 9:45 a.m.*

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In Re: | : | Chapter 11 |
| | : | |
| ADELPHIA COMMUNICATIONS CORP., et al., | : | Case No. 02-41729 (REG) |
| | : | |
| Debtors. | : | |
| | : | |

### THE RIGASES' MOTION TO MODIFY
### TEMPORARY RESTRAINING ORDERS TO PERMIT
### FUNDING OF CRIMINAL AND CIVIL DEFENSE COSTS
### FROM CASH GENERATED BY PRIVATE CABLE COMPANIES

TO:   THE HONORABLE ROBERT E. GERBER
        UNITED STATES BANKRUPTCY JUDGE

John Rigas, Michael Rigas, Timothy Rigas and James Rigas ("the Rigases") hereby move for an order modifying the previously issued temporary restraining orders to permit funding of criminal and civil defense costs from cash generated by their private cable companies and in support thereof aver as follows:

### PRELIMINARY STATEMENT

1.  Over the past year, the Rigases have used their best efforts to fund their criminal and civil defense. Yet, at each turn, Adelphia Communications Corporation ("Adelphia") has placed obstacles in their path – from breaching a preliminary agreement to indemnify the Rigases, to seeking to enjoin them from liquidating their real property assets, to requesting that all of their assets be frozen, to opposing the Rigases' efforts to utilize the directors' and officers' liability policy, to most recently objecting to the Rigases' use of cash generated from private cable companies, *which are owned by the Rigases*, to fund their criminal and civil defense. Adelphia's

tactics have put the Rigases' defense in serious jeopardy and have created an emergency situation requiring Court action.

2. The Rigases' inability to adequately defend themselves against the criminal and civil charges against them has now reached a critical stage. The criminal trial starts in a little over five months. There are millions of documents to review, index and assimilate into the defense. This is a labor intensive process, and consequently very expensive. Without defense cost funding, the Rigases ability to defend themselves fully and fairly will be impaired. By way of example only, the tasks required of the Rigases and their counsel include analysis of millions of pages of documents, retention of experts to help understand and articulate the complicated accounting and business issues and, in light of these analyses, develop trial strategy and testimony.

3. Through the instant motion, the Rigases seek an order permitting them to fund their criminal and civil defense from cash currently being generated by private cable companies that the Rigases own.[1] Specifically, the Rigases respectfully request that this Court modify the temporary restraining orders to permit the Rigases to draw from the revenues of the private cable companies (a) $5 million immediately to be used to pay currently due amounts to professionals and vendors as described herein and to pay retainers to defense counsel and experts, (b) $5 million by September 30, 2003 to pay, or to reserve for, defense costs and (c) $5 million by November 30, 2003 to pay, or to reserve for, defense costs.

4. This request is entirely consistent with this Court's repeated statements that it would not allow the injunctions entered against the Rigases' assets to jeopardize their legal defense.

---

[1] As discussed more fully below, Adelphia is merely the manager of the private cable companies (either pursuant to express management agreements or on at-will basis); it has no legal right to withhold cash generated from those companies from the Rigases, their owners.

This request is also result-neutral with respect to any potential impact on Adelphia, as the total value of the Rigases' assets will remain the same regardless of whether their criminal and civil defense is funded by selling real property (as is permitted pursuant to a stipulation entered into between Adelphia and the Rigases and approved by this Court) or through cash generated by the private cable companies.

### THE RIGASES' CONSISTENT AND THOROUGH EFFORTS TO FUND THEIR CRIMINAL AND CIVIL DEFENSE

5.   On May 23, 2002, the Rigases entered into a preliminary agreement with Adelphia (the "May 23 Preliminary Agreement"), under which the Rigases agreed to negotiate terms that would relinquish significant rights, including resigning from the Adelphia Board of Directors, in exchange for certain benefits, including indemnification by Adelphia and a severance package for John Rigas.  [See Exhibit "A" hereto].   In furtherance of this preliminary agreement, the Rigases resigned from Adelphia's Board of Directors.  Adelphia has refused to satisfy any of its obligations under the May 23 Preliminary Agreement, however, and instead has breached numerous provisions and obligations under that Agreement.   Most notable for the instant purposes, Adelphia has refused to indemnify the Rigases.[2]

6.   When Adelphia breached its indemnity obligation under the May 23 Preliminary Agreement, the Rigases were forced to begin liquidating certain real estate assets in order to fund their defense.

7.   On August 26, 2002, with approximately an hour's notice, and while the Rigases' lead counsel was on vacation, Adelphia requested an emergency conference with this Court seeking to temporarily enjoin the Rigases from selling any of their real property.   Notably,

---

[2] It is ironic that counsel for Adelphia continues to refer to the May 23 Preliminary Agreement as somehow providing rights to Adelphia when Adelphia has clearly breached the Agreement and has to date refused to assume it  (although the Rigases do not concede that Adelphia has the right to assume it).

counsel for the Rigases did not even receive Adelphia's written motion and supporting papers until the telephone hearing on the motion was well underway.  At the conclusion of the telephone conference, this Court entered an Order temporarily enjoining the Rigases from disposing of any of their real estate (the "August 26 TRO").

8.   Enjoined from selling their real estate, the Rigases began liquidating other assets not subject to the August 26 TRO, including timber rights, in order to fund their criminal and civil defense.  On November 25, 2002, Adelphia filed an ex parte motion requesting an accounting of all income allegedly generated from properties covered by the August 26 TRO and a complete freeze on all of the Rigases' assets.  [Adelphia Emergency Motion for Enforcement of Automatic Stay and Prior Restraining Order, Further Restraining Order, and Related Relief, at ¶¶ 39-43].

9.   Based solely on the submissions of Adelphia and without providing any notice to counsel of record for the Rigases, this Court entered the requested temporary restraining order freezing all of the Rigases' assets on November 25, 2002, and scheduled a further hearing on the request for the morning of November 26, 2002.   At the conclusion of the November 26, 2002 hearing, this Court entered an oral decision regarding a continued freeze on personal property owned by the Rigases (the "November 26 TRO").

10. The November 26 TRO, however, made clear that the injunctions should not impair the Rigases' criminal and civil defenses:

> In short, I want to emphasize that this control over disposition of assets is going to be exercised with the utmost restraint **so that it does not impair the Rigases in their ability to defend themselves anywhere, but especially in the criminal proceedings**.  And if it ever has that effect folks, you find me, because I am going to do what it takes to ensure that that doesn't happen.

[See November 25, 2002 Transcript, p.70 (emphasis added)].

4

11. In February 2003, counsel for Adelphia and counsel for the Rigases agreed in principle to permit the Rigases to sell certain real estate to fund their civil and criminal defense. A Stipulation and Order Regarding Sale of Certain Properties ("Property Stipulation") was executed by the parties on March 18, 2003. Thereafter, the Official Committee of Unsecured Creditors and the Official Committee of Equity Holders objected to certain aspects of the Property Stipulation and the Property Stipulation was modified to address those objections. The final version of the Property Stipulation was filed by the parties and was signed by the Court on May 12, 2003. [See Exhibit "B" hereto].

12. Paragraph 7 of the Property Stipulation provides:

> If the sales of the assets identified in Exhibit A hereto do not generate sufficient net proceeds to fund Defense Costs through the criminal trial, the parties agree to work on [sic] good faith to find a means for the Rigas Family Defendants to be able to fund their Defense Costs, including without limitation, considering the possibility of selling additional assets. **In the event the parties cannot reach agreement, the Rigas Defendants may petition the Court on short notice for a conference to resolve the issue**."

[See Exhibit "B" hereto (emphasis added)].

13. Since the Property Stipulation was executed, only one property (Bloody Point) has been sold, raising only about $519,000 of net proceeds available for the Rigases' defense costs.

14. Consistent with Paragraph 7 of the Property Stipulation, in May 2003, counsel for the Rigases attempted to contact counsel for Adelphia regarding finding another means to fund the Rigases' defense. After being unable to contact counsel for Adelphia by telephone, counsel for the Rigases sent a letter to counsel for Adelphia on May 23, 2003. [See Exhibit "C" hereto]. In that letter, counsel for the Rigases advised that no properties had yet been sold pursuant to the Property Stipulation and that the inability of the Rigases to fund defense costs was prejudicing their defense, especially considering that the criminal trial was scheduled for January 2004. [Id.]

The letter also suggested that defense costs be funded from the cash flow generated by the private cable companies owned by the Rigases.  [Id.]

15. Over the course of the next few weeks, the parties conducted negotiations regarding funding the Rigases' defense costs from cash generated by the private cable companies.  Despite weeks of discussions, the parties have been unable to agree on a mechanism to permit funding of defense costs by the private cable companies.

16. On July 14, 2002, newly retained civil counsel for the Rigases made a final attempt to resolve the issue of funding defense costs.  Although counsel for Adelphia indicated a willingness to engage in further discussions on this issue, there was no indication that Adelphia was willing to change its position.  Accordingly, the Rigases could not further delay seeking intervention from this Court pursuant to Paragraph 7 of the Property Stipulation, which provides that "[i]n the event the parties cannot reach agreement, the Rigas Defendants may petition the Court **on short notice** for a conference to resolve the issue."

17. Since August 2002, the Rigases have also been seeking to obtain funds for certain defense costs through Adelphia's directors' and officers' liability policies.  On August 20, 2002, counsel for the Rigases demanded payment of defense costs from the carrier.  On August 22, 2002, the carrier responded, *inter alia*, by suggesting that it would require bankruptcy court approval before paying defense costs.   On September 13, 2002, the Rigases filed a Motion for Relief From Stay, to the Extent Applicable, to Allow Payment and/or Advancement of Defense Costs under the Debtors' Directors' and Officers' Liability Insurance Policies.  Although the Rigases had complied with the carriers' request to obtain relief from stay, less than two weeks after the Rigases did so, the carriers instituted a rescission action against the Rigases in the United States District Court for the Eastern District of Pennsylvania.

6

18. On November 15, 2002, this Court issued an Order granting the Rigases' Motion for Relief From Stay "to the extent, but only to the extent, of permitting the Rigas Insureds to request, and permitting the Insurers to pay, if the Insurers are agreeable to doing so, up to $300,000 per insured on account of defense costs, without prejudice to requests for further funding with notice and opportunity to be heard . . . . " [See November 15, 2002 Order, p. 7]. Although the November 15, 2002 Order permits the Rigases to "request" payment of defense costs, this Court itself acknowledged that the carriers most likely would deny the request. [November 15, 2002 Order, p. 8, n. 4].

19. The November 15, 2002 Order also enjoined further prosecution of the rescission action in Pennsylvania. By enjoining the rescission action completely, this Court prevented the Rigases from seeking the solely legal determination of whether the carriers were obligated to advance defense costs pending resolution of the rescission action under controlling Third Circuit law. See Little v. MGIC Indemnity Corporation, 836 F.2d 789, 793 (3d Cir. 1988) ("Under a liability policy . . . the insurer's obligation to pay arises as soon as the insured incurs liability for the loss . . . . Although [the section of the insurance policy at issue] does not explicitly speak to the timing of the insurer's duty to pay, the only reasonable interpretation is that this duty arises at the time the insured becomes legally obligated to pay.").[3]

20. In sum, for at least the last year, the Rigases have been diligently attempting to fund their defense costs through (a) the May 23 Preliminary Agreement; (b) the sale of real estate; (c) use of other assets; and (d) pursuit of rights under the Rigases' insurance policy. Each of these efforts have been obstructed. With the criminal trial scheduled to commence in little more than

---

[3] See also Pacific Insurance Company v. General Development, 1992 U.S. Dist. LEXIS 22057 (S.D. Fla. April 30, 1992) ("Despite [the insurer's] arguments requesting the court to consider the rescission aspects of the case, rather than the contractual issues, [the insurer] cannot avoid the *fact that the policy is effective unless and until a final adjudication of rescission is reached*" (emphasis added)); National Union Fire Insurance Company of Pittsburgh v. Brown, 787 F. Supp. 1424 (S.D. Fla. 1991) aff'd, National Union Fire Insurance Company v. Brown, 963 F.2d 385 (11th Cir. 1992).

7

five months, with ongoing obligations in the numerous civil cases and with millions of documents to be analyzed and experts to be retained, the Rigases will be severely prejudiced if they are not permitted access to their own assets to fund their defense.

**THE RIGASES HAVE ASSETS THAT CAN BE USED
TO FUND THEIR CRIMINAL AND CIVIL DEFENSE**

21. Contrary to Adelphia's suggestion in its July 16, 2003 letter to this Court, the Rigases are not requesting that Adelphia pay for their criminal and civil defense.  Rather, the Rigases merely seek access to the cash flow generated by the private cable companies, which they – not Adelphia – own, to fund their defense costs, as well as the defense costs of the private cable companies.

22. The Rigases, either directly or indirectly, own several private cable companies.  The majority of the private cable companies are being managed by Adelphia pursuant to express management agreements; the private cable companies not parties to management agreements with Adelphia are nonetheless being managed by Adelphia on an at-will basis.

23. Notably, Adelphia does not have the ultimate decision-making authority regarding the operation of the private cable companies under any of the management agreements, or otherwise. For example, the September 28, 2001 Management Agreement between, among others, Highland Video Associates, L.P. and Coudersport Television Cable Co., two private cable companies, and Olympus Communications, L.P., an Adelphia entity, provides that the private cable companies "reserve[] the right to reject any or all of Manager's recommendations and to conduct [their] operations in the manner which [the private cable companies] deem[] to be suited to the profitable operation of the Managed System[s] and the business of the [private cable companies]."  [See Exhibit "D" hereto, at ¶2].  Among other rights, the September 28, 2001 Management Agreement also expressly gives the private cable companies the right to "furnish

accounting and legal services appropriate for ... operation of the System [at its own expense]."
[See Exhibit "D" hereto, at ¶2].

24. Most of the private cable companies have been sued, along with the Rigases, in the adversary proceeding brought by Adelphia.  As a result, these companies have retained civil counsel, Dilworth Paxson LLP, to represent them.  In its capacity as counsel to the private cable companies, as well as counsel for the Rigases, Dilworth Paxson has filed motions in the adversary proceeding, including a detailed motion to dismiss, and is presently analyzing the mountainous factual record to prove their defenses, along with its co-counsel.   There is no legitimate reason why Adelphia should be permitted to prevent these private cable companies from paying for their own defense merely because they are managing them.  In this regard, the private companies' legal bills are no different than any other invoice that Adelphia causes to be paid out of the private cable companies' revenues.

25. In addition to paying for their own defense costs, the private cable companies should be permitted to advance defense costs to the Rigases who have been sued, criminally and civilly, largely based upon their involvement as officers, directors, members and/or partners in the private cable companies.  In fact, the organizational documents of the private cable companies obligate them to indemnify, and in most instances to advance defense costs to, the Rigases.[4]

26. For example, the by-laws for Coudersport Television Cable Co. provide indemnification rights for any person made a party to any criminal or civil action by reason of the fact that such person was an officer or director of the Corporation and further provide that

---

[4] As this Court is aware, in June 2002, attorneys for Adelphia arrived unannounced at offices utilized by various Rigas-controlled entities and demanded that all files on location be produced in original form.  After the Rigases' resignations from Adelphia, they were also denied access to the original records of the private cable companies.   Although Adelphia has recently agreed to return certain original documents that it confiscated, the Rigases have not yet received those documents.  As a result, the Rigases are not in possession of all of the organizational documents for each of the private cable companies notwithstanding that they are the owners.  Significantly, the Management Agreements provide that the private cable companies, not Adelphia, are to maintain the company records. [See, e.g. Exhibit "D" hereto, at ¶ 2].

9

indemnification shall include "the right to be paid by the Corporation the expenses incurred in defending any such proceeding in advance of the final disposition thereof ...." [See Exhibit "E" hereto].   Similarly, the limited partnership agreement for Highland Video Associates, L.P. provides for indemnification for the general partners, including John, Michael and Timothy Rigas, and that the "[c]osts and expenses incurred in defending or responding to any pending or threatened civil or criminal action, proceeding or investigation may be advanced by the Partnership to the person who is the subject thereof in advance of the final disposition of such action." [Exhibit "F" hereto].[5]

27. The Rigases' right to advancement of litigation costs by the private cable companies is no less certain because of the criminal and civil charges of fraud against them.   Under applicable law, it is clear that the Rigases are entitled to advancements unless there is a final adjudication of guilt or responsibility for a statutorily prohibited act. See, e.g., 15 Pa. Cons. Stat. § 1745 (2002). All that is required is the party requesting the advancement execute an undertaking promising to reimburse the indemnifying entity for any costs later determined to not be indemnifiable. See, e.g., 15 Pa. Cons. Stat. § 8510(d) (2002) (advancements may be made "upon receipt of an undertaking ... to repay such amount if it shall ultimately be determined that he is not entitled to be indemnified").   This rule is in accordance with the general presumptions against criminal guilt or civil responsibility before a final adjudication.

---

[5] Although the organizational documents for these private cable companies expressly provide for not only indemnification but also advancement of defense costs, under relevant Pennsylvania law, a company may advance defense costs even if the relevant organizational documents do not expressly provide for advancement. See 15 Pa. Cons. Stat. §§ 1741, 1745 (2002); 15 Pa. Cons. Stat. § 8510 (2002).

28. According to the limited information that Adelphia has provided regarding management of the private cable companies,[6] the private cable companies have sufficient cash flow to fund the Rigases' defense costs. According to the income statement provided by Adelphia for the month of March 2003, the "Rigas Family Properties", *i.e.*, the private cable companies, generated operating revenue of $14,746,954 and operating expenses of $10,123,527. [See Exhibit "H" hereto, at lines 31 and 88]. The income statement also discloses EBITDA of $4,623,427 for the month of March 2003. [See Exhibit "H" hereto, at line 100]. It is from these funds – not from Adelphia – that the Rigases seek to fund their criminal and civil defense.

29. The suggestion has been made that if the Rigases use $15 million of the cash generated by the private cable companies to fund defense costs, then that money will not be available for other creditors. As an initial matter, the private cable companies are not in bankruptcy and, therefore, it would be inappropriate for the Court to concern itself with the effect on creditors of the private cable companies. More importantly, however, this concern ignores the reality of the cable business. Specifically, cable companies such as the private cable companies generate cash flow on a daily basis. If funds are used to pay one vendor, in this case attorneys and experts, that does not mean that another vendor does not get paid. Rather, at most, it means that payments to other vendors may be somewhat delayed.

30. As a practical matter, Adelphia will also not be harmed if the Rigases fund their criminal and civil defense using funds generated by the Rigas private cable companies rather than by the sale of real property. If defense costs are paid by using cash from the private cable

---

[6] The Rigases continue to encounter difficulties in obtaining adequate information regarding the management of the private cable companies. Although counsel for the Rigases is attempting to resolve these issues without court intervention, see, e.g., Exhibit "G" hereto, April 23, 2002 letter from Lawrence G. McMichael, Esquire to Kate Ruggieri, Esquire, so far those attempts have not been successful.

companies, then the real estate assets permitted to be sold under the Property Stipulation will remain available to satisfy future obligations.

### THE RIGASES' REQUEST FOR ACCESS TO $15 MILLION FROM THE PRIVATE CABLE COMPANIES IS REASONABLE UNDER THE CIRCUMSTANCES

31. One need only compare the fees expended by Adelphia (and more specifically, by the Special Committee[7]) in this matter to the funding requested by the Rigases to see that the Rigases' request is more than reasonable.

32. As of June 30, 2003, counsel and experts are owed approximately $2.5 million. Of that approximately $2.5 million, over $1.1 million is owed to Dilworth Paxson LLP and several firms serving as local counsel to Dilworth Paxson in the numerous civil actions. Approximately $840,000 is owed to experts and vendors retained to assist the criminal and civil defense. Another approximately $452,000 is owed to Johnson & Tekosky, a law firm providing legal services related to the management and disposition of Rigases' assets under the TROs in addition to general litigation services, and approximately $150,000 is owed to Harrington & Mahoney, counsel for Michael Mulcahey.

33. Criminal counsel have estimated that it will cost approximately $11 million (including the $150,000 past due to Harrington & Mahoney and the $840,000 currently past due to experts and vendors) for the total criminal defense, including experts who will also be of substantial value to the civil actions.

34. Civil counsel has estimated that legal fees through the projected conclusion of the criminal trial in March 2004 will total approximately $2.5 million. Although discovery is

---

[7] Adelphia has refused to provide the Rigases with the multi-million dollar report prepared by the Special Committee of the Independent Directors even though Adelphia has apparently provided the report to the government and thereby waived any privilege there may have been. If this dispute cannot be resolved between the parties, the Rigases may be forced to seek intervention from this Court.

currently stayed in the civil actions, significant work remains. For example, motions to dismiss have yet to be filed in at least five actions brought against the Rigases. In another two actions, motions to dismiss have been filed by the Rigases but reply briefs have not yet been submitted. Similarly, although the Rigases' have filed their Appellants' Brief in the AIG action, they have not yet filed a reply brief.[8]

35. In addition, although this Court has stayed testimonial discovery, *inter alia*, in light of the criminal trial, other courts may take a different position. Even if other courts follow this Court's lead in staying testimonial discovery, once motions to dismiss are decided and the mandatory stay of discovery under the securities laws is lifted, document discovery is likely to commence in these other actions. It would be irresponsible for civil counsel not to begin analyzing documents until after the criminal trial concludes when plaintiffs' counsel will most certainly be prepared to commence depositions as soon as the criminal trial is over.[9]

## CONCLUSION

36. This Court has unequivocally recognized that the Rigases should not be prevented from using their assets to fund their criminal and civil defense. Whether the assets used to fund defense costs come from selling real property or cash generated by the Rigas private cable companies should not make any difference to Adelphia, and Adelphia has no legal basis for dictating the relationship between the private companies and their officers, directors, partners or

---

[8] After this Court enjoined testimonial discovery in the AIG action, the New York Supreme Court, Appellate Division, granted the Rigases permission to appeal the order requiring that they appear for depositions.

[9] The Rigases' preparation of their defenses has been hampered by Adelphia's refusal to provide the Rigases with access to documents and by the financial constraints associated with the Rigases' inability to fund their defense costs. Specifically, Adelphia refused to provide the Rigases with copies of over 400 compact disks that Adelphia had provided to the government unless the Rigases agreed to reimburse Adelphia for its cost of scanning the Adelphia documents onto the compact disks provided to the government. Because the Rigases did not have sufficient funds, it had to wait several months, until November 2002, to obtain these disks from the government at the cost of duplicating the disks only. Notably, the disks ultimately provided to the Rigases are not word-searchable, thus each and every document must be individually reviewed. Adelphia has once again offered to provide the Rigases with word-searchable disks, but only if the Rigases reimburse its cost. Although word-searchable documents would facilitate the Rigases' review of the millions of documents on the disks, even if Adelphia's reimbursement demand were reasonable, given the present financial situation, the Rigases are not in a position to reimburse Adelphia's costs.

members. If cash is not made immediately available, however, it will result in enormous prejudice to the Rigases who are losing precious time to prepare their criminal defense as each day passes.

**WHEREFORE,** for all of the foregoing reasons, the Rigases respectfully request that this Court modify the temporary restraining orders to permit the Rigases to draw from the revenues of the private cable companies (a) $5 million immediately to be used to pay currently due amounts to professionals and vendors as described herein and to pay retainers to defense counsel and experts, (b) $5 million by September 30, 2003 to pay, or to reserve for, defense costs and (c) $5 million by November 30, 2003 to pay, or to reserve for, defense costs.

Respectfully submitted,

By:/s/  Lawrence G. McMichael
    Lawrence G. McMichael

Of Counsel:
DEWEY BALLANTINE LLP
700 Louisiana
Suite 1900
Houston, TX 77002
(713) 445-1500
(713) 445-1533

DILWORTH PAXSON, LLP
1735 Market Street
3200 Mellon Bank Center
Philadelphia, PA 19103
(215) 575-7000
(215) 575-7200

Dated: July 18, 2003

Attorneys for the John Rigas, Timothy Rigas, Michael Rigas and James Rigas

14

# Exhibit II

1

1

2

3  UNITED STATES BANKRUPTCY COURT

4  SOUTHERN DISTRICT OF NEW YORK

5

6  --------------------------------------X

7       In the Matter

8         of              CASE NO.

9  ADELPHIA COMMUNICATIONS CORP.,       02-41729

10            Debtor.

11 --------------------------------------X

12            February 18, 2004

13            United States Custom House

14            One Bowling Green

15            New York, New York 10004

16

17       Motion by the Attorney for The Rigases

18 to Modify August 7, 2003 to permit Additional

19 Funding of Defense Costs.

20

21 B E F O R E:

22

23       HON. ROBERT E. GERBER,

24              Bankruptcy Judge

25

115

1        ADELPHIA COMMUNICATIONS CORP.

2    this case and be nearly prepared under the time

3    table we've got.  But the Rigases are entitled to

4    a defense.  The Rigases need a defense.  That

5    defense costs.  This Court understood that in

6    August 7.  It understood that we might be back for

7    more.  We have shown changed circumstances, we

8    should shown desperate need, and I request that

9    the Court grant our application.  Thank you, your

10   Honor.

11       THE COURT:  Mr. Carpinello -- oh, I'm

12   going to give you a chance to respond, but I want

13   to give Mr. Fleming a chance, and then I've got a

14   couple of questions for Mr. McMichael, or from

15   Mr. McMichael after talking to his group.

16   Mr. Fleming?

17       MR. FLEMING:  It's really very simple,

18   your Honor.  Our estimates were solid estimates

19   based upon the schedule.  The schedule was

20   controlling.  Putting aside the additional number

21   of documents, if we had followed the schedule

22   which existed in August, we would, I think as

23   Mr. McMichael has said, had to be running a half a

24   million dollars over budget.  What's important to

25   Mr. Preziosi, and my partner reminds me, is that

116

1        ADELPHIA COMMUNICATIONS CORP.

2    when the time for fixing a trial date came before

3    Judge Sand, we all had huddled.  And Mr. Grand,

4    speaking for all counsel, gave Judge Sand our

5    best good faith estimate as to how long we would

6    need to prepare the case without really any

7    knowledge of how many documents might be involved,

8    although we knew that there would be millions.

9    Mr. Grand asked to start trial in April of 2004.

10   So Mr. Carpinello's point about extension -- the

11   reality of the case is when Judge Sand said,

12   "You're going to start on January 7," I believe it

13   was -- "January 4," we basically concluded, "Okay,

14   that's what we are going to do," although we would

15   be underprepared.  And we will still be

16   underprepared, but it is not as Mr. Carpinello

17   indicates.  We should have had our work done on

18   December 31.  Putting everything else aside, put

19   all the new documents aside, just start where we

20   were and, therefore, we could be on vacation now,

21   where I'd rather be.  So we really are on budget

22   of each of the court.  The Court's decision, quite

23   obviously, is what's appropriate here.

24        The only thing I would add is two

25   things.  I was shocked -- it may be

117

1        ADELPHIA COMMUNICATIONS CORP.

2    generational -- that Buchanan Ingersoll would not

3    speak to us, even on something as simple as

4    Mr. Rigas's estate planning, which is relevant in

5    the case.  I was less shocked, but somewhat

6    shocked, that Deloitte would not speak to us,

7    having read the Deloitte's answer to the lawsuit

8    against them and having read testimony which

9    indicates to me that Deloitte agrees with the

10   Rigases and with our view of the case as defense

11   counsel and the appropriate accounting issues in

12   this case in almost all respects.

13        And finally, if I could say it, your

14   Honor, I just don't like to be called "profligate"

15   because we have not been and we do not intend to

16   be.

17        THE COURT:  All right.  Before I give

18   Mr. Carpinello a chance to respond, of the

19   supplemental 15 million bucks, how much is on the

20   criminal side and how much is on the civil side?

21        MR. McMICHAEL:  Your Honor, 12.8 million

22   is on the criminal side, 3.2 on the civil side.

23   That number adds up to 16 million.  And I'll

24   mention again so the Court has it firmly in mind,

25   that that 3.2 million is driven largely by the

# Exhibit JJ

# In The Matter Of:

*ADELPHIA COMMUNICATIONS CORP. v.*
*DELOITTE & TOUCHE, LLP, et al.*

---

## PAULA ZAWADZKI
### *August 14, 2006*

---

# CONFIDENTIAL
# LEGALINK MANHATTAN
### *420 Lexington Avenue - Suite 2108*
### *New York, NY 10170*
PH: 212-557-7400 / FAX: 212-692-9171

## ZAWADZKI, PAULA - Vol. 1



LEGALINK
A MERRILL COMPANY

PAULA ZAWADZKI – CONFIDENTIAL

Page 25

1  A.   What do you mean by formed an opinion?
2  Q.   Well, did anyone at Buchanan ever advise
3       Adelphia that additional documentation was
4       necessary and that it would not be appropriate
5       to rely on common law contribution rights?
6  A.   I recall raising the issue and having
7       discussion.  I don't -- I don't recall that's a
8       decision that we would have made for Adelphia.
9  Q.   Well, what do you recall about those
10      discussions between yourself and the people at
11      Adelphia?
12 A.   Just generally I recall raising legal issue as
13      to whether there would be documentation.
14 Q.   Did you or anyone at Buchanan ever tell anyone
15      at Adelphia that they should have additional
16      documentation?
17 A.   I don't recall that one way or the other.
18 Q.   Did you understand that Adelphia was looking to
19      Buchanan Ingersoll to provide legal advice to
20      it with respect to what documentation was
21      necessary in regard to the co-borrowing
22      agreements?
23 A.   I -- I'm not sure I know what you mean.  Can
24      you --
25 Q.   Well, in the --

Page 26

1  A.   -- describe --
2  Q.   -- in the discussions you had with Adelphia,
3       were any of the people you were having
4       discussions with lawyers?
5  A.   I don't recall specifically if Colin Higgin was
6       part of the 1996 discussions.
7  Q.   Did you understand that with respect to credit
8       facilities, that Adelphia was looking to
9       Buchanan to advise it as to what documents were
10      necessary with respect to those co-borrowing
11      facilities?
12 A.   I'm not -- I'm not sure I understand your
13      question.  I'm sorry.
14 Q.   As a lawyer working on this 1996 agreement, you
15      raise a legal issue with respect to whether
16      addition -- additional documentation would be
17      entered into between the entities with respect
18      to joint and several liability; correct?
19 A.   I raised an issue regarding -- yes, as I have
20      described, right.
21 Q.   Now, did you or anyone else at Buchanan ever
22      come to a legal conclusion as to whether that
23      documentation was necessary?
24 A.   We -- my recollection is that we advised the
25      client to consider the issue, the client being

Page 27

1       Adelphia, to consider the issue, and discussed
2       documentation as an option and discussed rights
3       of contribution of common law.
4  Q.   And what advice did you give with respect to
5       the rights of contribution of common law?
6  A.   I don't recall specifically discussions, but
7       the members of our team that I would have
8       consulted with, we would have -- we talked
9       about the -- in a joint and several borrowing
10      situation, rights that exist under common law
11      in various scenarios between co-borrowers,
12      among co-borrowers.
13 Q.   Anything else?
14 A.   Just generally recall raising that.
15 Q.   At the time was it your understanding that the
16      Adelphia -- an Adelphia entity would have a
17      right of contribution against a Rigas entity if
18      that Rigas entity had used co-borrowed funds
19      and not repaid them forcing Adelphia to repay
20      them?
21 A.   Yes.
22 Q.   And vice versa?
23 A.   Yes.
24 Q.   If a Rigas entity paid or repaid for funds
25      drawn down and used by Adelphia that Adelphia

Page 28

1       didn't repay, then the Rigas entity making the
2       repayment would have a right of contribution
3       against Adelphia?
4  A.   Yes.
5  Q.   And that was something that you advised the
6       people at Adelphia?
7  A.   I recall generally talking about it.  I don't
8       recall the specifics.
9  Q.   And with respect to the option of entering into
10      additional documentation, do you recall
11      identifying any pros and cons of doing that?
12 A.   No, I don't.  I don't have any recollection.
13 Q.   Do you recall anything that the Adelphia people
14      said about additional documentation?
15 A.   No, I don't have any -- any recollection of
16      that.
17 Q.   Do you recall whether a decision was made to
18      not enter it or not draft additional
19      documentation?
20 A.   I don't recall being asked personally to draft
21      additional documentation.
22 Q.   And you don't recall ever telling anyone at
23      Adelphia that Adelphia should have additional
24      documentation of its rights with respect to the
25      Rigas entities on the co-borrowing facilities?

7 (Pages 25 to 28)

PAULA ZAWADZKI - CONFIDENTIAL

Page 177

1  what, I think it's been previously marked.  Let
2  me just double-check that I have the correct
3  copy.
4              - - - -
5  (There was a discussion off the record.)
6              - - - -
7  BY MR. DOLUISIO:
8  Q.   Ms. Zawadzki, I've handed you a lengthy
9  document which has previously been marked as
10  Exhibit 190.  You should feel free to take a
11  look at anything in the agreement that you'd
12  like, but I'm going to be directing you to
13  certain pages.
14  A.   Okay.
15  Q.   Okay.  Looking at the first page, do you
16  recognize this to be the amended and restated
17  credit agreement dated as of March 29, 1996?
18  A.   Yes.
19  Q.   And is this the first co-borrowing credit
20  facility?
21  A.   What do you mean by co-borrowing credit
22  facility?
23  Q.   Well, using the same definition that was used
24  earlier today.
25  A.   Rigas entities and Adelphia entities?

Page 178

1  Q.   Yes.
2  A.   Yes.
3  Q.   If I can ask you to take a look first at
4  section 10.7, which appears -- well, first let
5  me ask you, am I correct that you -- you are
6  familiar with this document?
7  A.   I was at one point.
8  Q.   You were the lead lawyer negotiating this on
9  the Adelphia entities' behalf?
10  A.   I was the -- I led our team representing
11  Adelphia, yes.
12  Q.   Okay.  If I could ask you to take a look at
13  page 109, section 10.7.
14       Section 10.7 provides, The various
15  headings of this agreement and each other loan
16  document are inserted for convenience only and
17  shall not affect the meaning or interpretation
18  of this agreement or such other loan document
19  or any provisions hereof or thereof.
20       What was your understanding of what
21  section 10.7 meant?
22  A.   My understanding is that just because you
23  called something, you gave something a title in
24  the name of the section that it wasn't
25  necessarily -- I mean essentially it was just

Page 179

1  for convenience and doesn't affect the meaning
2  of the interpretation, essentially what the
3  words say.
4  Q.   Okay.  If you can take a look at page 51 of the
5  agreement.  Section 3.4 at the bottom of that
6  page, that provides that each borrower
7  acknowledges and agrees that all obligations,
8  including all obligations outstanding on the
9  amendment effective date of the borrowers shall
10  be joint and several obligations of each
11  individual borrower and in furtherance of such
12  joint and several obligations, each borrower
13  hereby irrevocably guarantees the payment of
14  all obligations as set forth in this section.
15       What was your understanding of the
16  first portion of that sentence which was the
17  portion providing that each borrower
18  acknowledges and agrees that all obligations of
19  the borrower shall be joint and several
20  obligations of each individual borrower?
21  A.   Essentially what it said, that each borrower
22  was jointly and severally liable for the
23  obligations as defined.
24  Q.   And if I could ask you to take a look at
25  paragraph 3.4.1 which appears on page 52,

Page 180

1  specifically the last paragraph of that section
2  provides that this guarantee and the provisions
3  of this section constitutes a guarantee of
4  payment when due and not of collection, and
5  each borrower specifically agrees that it shall
6  not be necessary or required that any lender
7  party exercise any right, assert any claim or
8  demand or enforce any remedy whatsoever against
9  a borrower or any other obligor (or any other
10  person) before or as a condition to the
11  obligations of each other borrower hereunder.
12       What was your understanding of that
13  paragraph?
14       MR. RIDGE:  I'm going to let her
15  answer, but I'm going to interpose an
16  objection.  The document speaks for itself.  Go
17  ahead.
18       MR. GOLD:  Objection.
19  A.   This paragraph is part of section 3.4.1, which
20  was a provision that in addition, I would say a
21  belts and suspenders-type provision that has
22  each borrower, in addition to being jointly and
23  severally liable, also guaranteeing the
24  obligations of each other borrower, and this
25  paragraph, this last paragraph is, again, just

45 (Pages 177 to 180)

PAULA ZAWADZKI - CONFIDENTIAL

**Page 181**

1    belts and suspenders, acknowledging --
2    acknowledging that guarantee and that the
3    lenders can exercise their rights against a
4    borrower or any other obligor. It's -- it does
5    speak for itself.
6  Q.  Was it your understanding that that paragraph
7    meant that the lenders could seek repayment
8    from any co-borrower without having to first
9    seek payment from any other co-borrower?
10        MR. GOLD:  Objection.
11        MR. RIDGE:  Objection.  You can
12    answer.
13  A.  It gave the lenders broad rights, yes.
14  Q.  What was your understanding at the time of the
15    purpose behind that paragraph that I read to
16    you in section 3.4.1?
17  A.  I don't recall an understanding of a purpose.
18  Q.  Have you seen similar provisions contained
19    within other credit facilities that you've
20    worked on over the years?
21  A.  Yes.
22  Q.  Did you understand that this provision was
23    designed to give the banks broad powers to seek
24    repayment from any co-borrower?
25  A.  Yes.

**Page 182**

1  Q.  And it could seek repayment from any
2    co-borrower without having to first seek
3    payment from another co-borrower?
4        MR. GOLD:  Objection.
5  A.  Well, I can't speak to what it -- what it could
6    do because that would be subject to applicable
7    law and the facts and circumstances surrounding
8    that, the enforcement or the exercise of this,
9    but I would say that generally on its face that
10    is the -- the language was intended to give the
11    lenders those broad rights to pursue the
12    obligations against any of the borrowers.
13  Q.  There was some testimony today regarding the
14    rights either under the common law or under a
15    potential written agreement of contribution.
16    Do you recall the testimony generally?
17  A.  Yes.
18  Q.  Would -- strike that.
19        Was it your understanding that those
20    contribution rights, if they existed between
21    the co-borrowers, had any effect upon the
22    lenders' rights under section 3.4.1?
23        MS. CALLAHAN:  Objection.
24  A.  My -- my understanding at the time that the
25    credit agreements were entered into was that

**Page 183**

1    really the contribution rights were between --
2    were among the borrowers.  The loan documents
3    spoke to what rights the lenders had against
4    the borrowers.
5  Q.  And if you take a look at Rigas Exhibit 434,
6    which on its first page is just blank with the
7    Bates number on the side BIPC 2667028.
8        Do you see Rigas 434?
9  A.  Yes, I've got it.
10  Q.  Okay.  And is this a draft contribution
11    agreement?
12  A.  That's -- that's what it's titled, yes.
13  Q.  And am I correct that none of the co-borrowing
14    lenders were contemplated to be parties to this
15    contribution agreement?
16  A.  I don't have any recollection of the lenders
17    being a party to this.
18  Q.  If I could ask you to look back at Exhibit 190,
19    which is the co-borrowing credit facility, and
20    flip the page to page 53.
21  A.  Okay.
22  Q.  And looking at section 3.4.3, the last sentence
23    of that first full paragraph under section
24    3.4.3 provides that the liability of each
25    borrower under section 3.4 shall be absolute,

**Page 184**

1    unconditional and irrevocable irrespective of,
2    and then looking down at little paragraph (b),
3    the failure of any lender party to assert any
4    claim or demand or to enforce any right or
5    remedy against any other borrower, any other
6    obligor, or any other person, including any
7    other guarantor under section 3.4 of this
8    agreement, any other loan document or
9    otherwise.
10        Was it your understanding at the time
11    that that was another belt and suspenders type
12    provision which made clear that the liability
13    of the borrowers was absolute even if the banks
14    did not try to proceed against another
15    co-borrower?
16  A.  Yes.
17  Q.  If I could ask you to flip to page 68, and
18    specifically I'm going to look at section
19    5.4.1.
20        Section 5.4.1 provides both before
21    and after giving effect to any credit
22    extensions, and then there's a long
23    parenthetical, the following statements shall
24    be true and correct:  A, the representations
25    and warranties of each obligor set forth in

46 (Pages 181 to 184)