# Exhibit KK

# In The Matter Of:

## ADELPHIA COMMUNICATIONS CORP. v. DELOITTE & TOUCHE, LLP

---

### JOSEPH MICHAEL BRADY
March 10, 2005

---

## LEGALINK MANHATTAN
420 Lexington Avenue – Suite 2108
New York, NY 10170
PH: 212-557-7400 / FAX: 212-692-9171

BRADY, JOSEPH MICHAEL



Page 41

JOSEPH MICHAEL BRADY
frame and when I learned different things.
You know, I know what the legal exposure was,
but I don't know everything I knew then. I
think I knew that, you know, again, the
inter-creditor agreement, and I don't recall
the point in time when I learned over things.
   Q. Were you aware of any information
that might have supported a claim that the
Rigases were doing things to manipulate the
company's EBITDA?
   A. I -- I had knowledge of things
that were aggressive accounting. I didn't
know -- certainly didn't know that they were
manipulating EBITDA.
   Q. What were the aggressive
accounting points that you just referred to?
   A. I knew that the company was very
aggressive in its capitalization. I knew that
there were signif -- significant marketing
adjustments that were -- marketing credits
relative to set-top boxes that were being made
in the financials. I knew there were, if I
didn't say it, significant programing
adjustments. I think those were the major

Page 42

JOSEPH MICHAEL BRADY
items that, you know, I -- I was aware that
there were adjustments that were going through
the financials that were related to those
items.
   Q. When you refer to marketing
credits relative to set-top boxes that were
being made in the financials, are you
referring to -- to the marketing support
payments from Scientific Atlanta and Motorola?
   A. Yes.
   Q. And what did you know about those?
   A. Well, I knew that there -- there
was such a thing. And I also knew that, as a
result of doing the work on the budgets, there
were -- there were several items that were not
really apart of the operating budgets that
were a part of EBITDA, and those were
separated because the Operations people didn't
control them and we didn't report on them in
the monthly reviews. And that was one of the
major items that -- that showed up.
   Q. Were you aware at the time of the
relationship between the marketing support
payments and purchase price adjustments that

Page 43

JOSEPH MICHAEL BRADY
had been agreed to around the same time?
   MS. CALLAHAN: Objection.
   THE WITNESS: I -- I'm not sure I
understand your question. I was -- I was
aware of the marketing support payments and
I was aware that they were made based upon
the, you know, cost of the set-top box and
how many were purchased.
BY MR. SHULMAN:
   Q. Were you aware at the time that
the marketing support payments equalled
amounts by which the company had agreed to in
-- to -- strike that. Let -- let me try it
again.
      Were you aware at the time that
the -- that the marketing support payments
equalled the price increases that the company
had agreed to at about that same period of
time?
   MS. CALLAHAN: Objection.
   THE WITNESS: I don't think I was
aware that they exactly equalled the price
increases.
BY MR. SHULMAN:

Page 44

JOSEPH MICHAEL BRADY
   Q. Were you aware that they
approximately equalled them?
   A. No.
   Q. You -- you also mentioned
programing adjustments.
   A. Yes.
   Q. What -- what does that refer to?
   A. I'm not familiar with the -- with
the nature of the items or why they were
recorded, but I know that there was some
significant reductions in programing expense,
again, down below the operating line that
occurred, and I -- I knew that -- that they
existed. I didn't know anything about why
they existed or what they were.
   Q. And what about the programing --
the programing adjustments caused you concern?
   MR. BRENNER: Object to form.
   MS. CALLAHAN: Objection.
   THE WITNESS: Well, they -- I -- I
don't believe concern is the right word.
They were very large.
BY MR. SHULMAN:
   Q. Okay.

Page 49

JOSEPH MICHAEL BRADY

Q. And did you raise that issue with anybody at the company?
A. No, other than I believe the same conversation -- I'll correct that. No, I think in the same conversation with Tim Werth we were just having a general conversation regarding those below the line items, and I -- I believe I would have asked him about those as well in terms of what would be booked going forward.
Q. And what did he say?
A. I -- I don't recall his answer other than, again, I was satisfied with his answer. His answer was something like it's aggressive accounting, Deloitte knows about the accounting, and that was pretty much it.
Q. Did you ever ask anybody at Deloitte whether -- what their awareness was of the accounting?
A. No.
Q. Did you ever raise any issue or any aspect of the marketing support payments with anybody from Deloitte?
A. No.

Page 50

JOSEPH MICHAEL BRADY

Q. Was it your understanding that -- that the way the marketing support was accounted for -- actually, strike that.
When you used the phrase "below the line items" in one of your prior answers, tell me what you mean by that.
A. What I mean is that when I initially started doing the budgeting reviews which would be conducted with all of the Regional Vice-Presidents, we had a lot of confusion about accounting adjustments affecting numbers that they had no responsibility for. That would be an example. So all of those items in those reviews was moved down below the line, so that we would only be discussing the numbers that they were responsible for in Operations. So we never really got into any of those other items. And, in fact, like on the '02 budget, those would have been budgeted by the accounting people, we would not have known how to budget them.
Q. Again, you used the phrase "below the line." I'm not sure I understand what

Page 51

JOSEPH MICHAEL BRADY

below the line means.
A. Okay.
Q. So I think you got to define what -- what -- what that means.
A. All right. Let me try it this way: When we would go into a budget meeting, we would be reviewing not the EBITDA number, we would review -- review only those numbers down to a line that the managers were responsible for. That would not include, for instance, the programing credit. So when I say below the line, the line stopped at -- at all of the items that the Operations people were responsible for. And so when I say below the line, it would be all of the accounting, adjustments, and other items that they did not have direct responsibility for.
Q. Does below the line mean below the EBITDA line or does it mean below some other line?
A. No, it means below the line that we looked at --
Q. Okay.
A. -- for operational analysis

Page 52

JOSEPH MICHAEL BRADY

purposes.
Q. You said that you had lots of con -- at that -- when you started doing budgeting you had lots of confusion about accounting adjustments affecting numbers that the Operations people had no responsibility for. Explain what you mean by that.
A. Well, two good examples would be the ones that we've talked about, the marketing credit adjustments and the programing adjustments. When those adjustments would come through, if they effected a person in a particular region, they wouldn't know anything about them.
Q. And did you raise this concern about -- or this confusion about these accounting adjustments with any of the Rigases?
A. Yes.
Q. With whom?
A. I believe both Mike and Tim Rigas.
Q. Can you tell me what you said and what they said?
A. What I said was is we can't

Page 53

JOSEPH MICHAEL BRADY

continue to have confusion in these meetings over items that they don't have responsibility for, and we need to delineate between those items that they understand and control and confine our discussion to those, and show the other items in an area where we're not going to focus on those in those Operational meetings.

Q. And what -- what did they say?

A. They -- they agreed. I don't know whether they initially agreed, but they -- it wasn't very long before that's what we did.

Q. Okay. Was it your understanding that the -- that the marketing support adjustments, if I can use that term, had the effect of increasing EBITDA?

A. Yes.

Q. And the programing adjustments, they have the effect of increasing EBITDA?

A. Yes. Assuming that the adjustments were -- reduce the expense.

Q. And that was your understanding, I take it?

A. Well, I didn't see all of the

Page 54

JOSEPH MICHAEL BRADY

different adjustments, but my overall understanding was the ones I was looking at that -- that hit my radar screen were reducing the programing expense.

Q. Did you ever raise with any of the Deloitte people the -- the fact that you were seeing certain significant adjustments that caused questions in your mind that had the effect of increasing EBITDA?

A. No.

Q. Did you ever raise that with any non-Rigas member of the Board of Adelphia?

A. No.

Q. Did you ever raise it with any of the Rigases?

A. Well, as I mentioned before, I raised them, and I didn't raise -- I didn't use the word questions. I'm not sure that's what I said. I certainly -- they were creating a lot of confusion in the Operational reviews, and I had an awareness of them, and, yes, I did talk to the Rigases about them in order to get the Operational reviews so that we could talk about the numbers that the

Page 55

JOSEPH MICHAEL BRADY

people control.

Q. Did you -- did you raise the issue with the Rigases in the context of these adjustments are being made and they're significant adjustments, and they are having a significant positive impact on EBITDA?

MS. CALLAHAN: Objection. Do you want to be more specific with respect to the Rigases?

MR. SHULMAN: Any of the Rigases. And then if he did, we'll get to them, to which one.

THE WITNESS: I don't believe I addressed them in the context that they were having a positive impact on EBITDA. I addressed them within the context that they were significantly impacting the numbers, and if we included those numbers in the Operational reviews, people wouldn't be able to -- to respond to our questions.

BY MR. SHULMAN:

Q. Okay. I take it that you didn't focus on the EBITDA impact, you focused on people not understanding what the numbers are?

Page 56

JOSEPH MICHAEL BRADY

A. Right. My job was Operations and Operational reviews. I didn't focus on the accounting aspects of those and whether they were right or wrong. It was that they were creating confusion with the process I was responsible for.

Q. One of the other areas of aggressive accounting that you mentioned was capitalization; is that right?

A. Yes.

Q. And what was it about -- that you observed about the capitalization practices that -- that made you conclude that they were aggressive?

A. Could you clarify the time frame we're asking about?

Q. Up to the point that the Rigases left. So any time in -- in there.

A. Yes. Well, I knew that the -- the company had historically been aggressive with respect to capitalizing costs.

Q. And aggressive means what?

A. Aggressive means that the upper -- well, aggressive means at the upper end or

Page 173

JOSEPH MICHAEL BRADY
1
2  A. Yes, I did.
3  Q. The memo indicates in the next
4  part of it, the top of the next page and down
5  to the heading that there were four contacts
6  that you had had with the Rigas and then
7  it descr -- the Rigases and then it describes
8  those contacts.
9      Do you see that?
10  A. Yes.
11  Q. Can you take a -- a brief moment
12  or more if you need it to just look at the
13  four contacts that are described there and
14  tell me whether that is an accurate summary of
15  the contacts that you had had with the Rigases
16  up to that point.
17  A. Okay. Well, in the first bullet,
18  I mean, I agree, although, I don't know, some
19  of these adjectives I can't imagine that I
20  said, like shell-shocked, but regardless that
21  meeting took place.
22      Second one took place. I don't
23  recall the -- the handcuffs.
24      John Rigas... Yeah, I kind of
25  remember that with Ron, I asked his opinion on

Page 174

JOSEPH MICHAEL BRADY
1
2  that. I don't think I ever talked to John
3  though in that context on the third bullet.
4  Q. Okay.
5  A. I think the last comment, the way
6  they've characterized it, it's probably not
7  accurate. Actually, that's why I had the call
8  with them --
9  Q. Okay.
10  A. -- is because on November 6th I --
11  I saw the Rigases having dinner at a place in
12  Coudersport, and I hadn't seen them in a long
13  time, and I stopped and I went into their
14  property and, yeah, we talked a lot about very
15  personal things, just like what I described,
16  which most people outside of Coudersport can't
17  understand.
18      And so that's really, you know, my
19  view. And earlier why I said I was angry,
20  I -- I was -- I was angry that I would have a
21  conversation like that, follow the company
22  policy, and the next day be talking to four
23  attorneys.
24  Q. Was -- was it your impression that
25  the lawyers called you the next day because

Page 175

JOSEPH MICHAEL BRADY
1
2  you had had that conversation with the
3  Rigases?
4  A. Yes.
5  Q. Did you have an understanding as
6  to how the lawyers learned of that
7  conversation with the Rigases?
8  A. Yes, because I told -- told Randy
9  Fisher --
10  Q. Who was the general counsel?
11  A. -- as I was required to do, and
12  I'm sure he informed them and then I received
13  a call.
14  Q. And Randy Fisher was the general
15  counsel of Adelphia at the time?
16  A. Yes.
17  Q. Since the time of this interview,
18  have you had any contacts with any of the
19  Rigases?
20  A. Let me think about that. I have.
21  Let me just try to think of -- yeah, I can
22  recall two, two, two times.
23      One -- actually, three times. One
24  I was in a local restaurant and they all
25  walked in and I said hello. That was a

Page 176

JOSEPH MICHAEL BRADY
1
2  five-minute hello. I don't know the time
3  frame of that.
4  Q. Okay.
5  A. The other one was -- I do remember
6  the time frame 'cause it was right after I had
7  left my job at Adelphia. And I received a
8  call from Mike Rigas, and he asked me to come
9  out and meet with him, which I did.
10  Q. Meet with him about what?
11  A. Well, hadn't seen them in a long
12  time, it was a social visit, but also I think,
13  you know, it was a visit to understand why I
14  left Adelphia and what I was going to be
15  doing, you know, and whether I was going to
16  stay there and keep my kid in school, and that
17  sort of thing.
18  Q. Was there any discussion about
19  the -- the criminal proceedings?
20  A. No.
21  Q. Were you ever asked by either the
22  government or any of the Rigases about being a
23  witness at the criminal trial?
24  A. The only thing one of -- I don't
25  know -- one -- an attorney did contact me on

Page 177

JOSEPH MICHAEL BRADY

2 two or three occasions to speak with them
3 regarding -- regarding what, I don't know.
4   Q.  Do you know --
5   A.  And I -- I refused to do that.
6   Q.  Do you know who that lawyer was or
7 who he represented?
8   A.  I'm not sure. It might have been
9 Christie, but I -- I don't know. I know they
10 represented the Rigases and I know they -- I
11 called them -- I returned their call several
12 times.
13   Q.  But never talked to them?
14   A.  No, I told them I wasn't willing
15 to talk to them.
16   Q.  How many times -- how many times
17 were you asked to talk to Rigas lawyers with
18 regard to the criminal trial?
19   A.  I think it was three times.
20   Q.  Did any lawyers for Adelphia ever
21 ask you if they could talk to you about any of
22 the other proceedings that are going on
23 regarding Adelphia?
24   A.  I don't believe so.
25   Q.  Anybody from the Boies Schiller

Page 178

JOSEPH MICHAEL BRADY

2 firm ever contact you?
3   A.  No.
4   Q.  Anybody from the Dechert firm ever
5 contact you?
6   A.  Again, these firms, if -- if they
7 don't represent the Rigases, they didn't.
8   Q.  Okay.
9   A.  But I don't know who they are.
10   Q.  Okay.
11   A.  I mean, I know who they are, but I
12 don't know who they represent.
13   Q.  The -- the -- the incident --
14 the -- the incident with Michael Rigas and
15 going to his house to talk to him, about how
16 long did you spend?
17   A.  Probably spent an hour, and I
18 spoke with Mike, Tim and to a very limited
19 extent John.
20   Q.  Do you recall anything of
21 substance that was said?
22   A.  The only thing John asked me some
23 questions about, well, you know, how did you
24 get fired and all this stuff, and how did they
25 tell you you were going to leave. And it was

Page 179

JOSEPH MICHAEL BRADY

2 very abbreviated. I didn't want to talk about
3 it. And I just said it really didn't happen
4 that way, John, it was really more than
5 anything my decision.
6   Q.  And did he say anything at that
7 point?
8   A.  No.
9   Q.  And did you have any discussion of
10 substance with Tim Rigas?
11   A.  No, we just talked purely about
12 golf and my children.
13   Q.  During this time at Mike Rigas's
14 house --
15   A.  This was actually at their -- just
16 to clarify, they have a building that's kind
17 of a business. It's not Mike's house.
18   Q.  Okay.
19   A.  It's separate from their house,
20 that's why --
21   Q.  On their property?
22   A.  On their property. And that's
23 where they were.
24   Q.  Was there any discussion of what
25 had happened at Adelphia?

Page 180

JOSEPH MICHAEL BRADY

2   A.  I don't -- I don't think so. It
3 was -- it was a type of meeting where it was
4 purely personal. And as I said, John
5 interjected a couple things that were getting
6 close to business related, I think Tim and
7 Mike understood that that's not what we wanted
8 to talk about, and we talked about personal
9 matters.
10   Q.  I think you indicated that there
11 was a third time that you had contact with the
12 Rigases.
13   A.  Right. The third time was right
14 after the trial. I was actually lost and I
15 was walking down Colesburg Road and I'd
16 already walked about nine miles and Mike Rigas
17 was getting out of his car, and -- just by
18 chance, and I walked across the street and
19 said hello to him.
20   Q.  Anything of substance then?
21   A.  No.
22   Q.  Any mention made of the results of
23 the criminal trial?
24   A.  Yes, he just mentioned that, you
25 know, the -- Tim and John just needed to keep

Page 225

1  JOSEPH MICHAEL BRADY
2  was with the accounting group. He worked
3  for me in the budget group after I had
4  hired Jim Devlin, and I have a lot of
5  respect for Luke's ability and his
6  integrity.
7  BY MR. SHULMAN:
8      Q.  Did you form any view about the
9  ability or integrity of Doug Malone?
10         MS. CALLAHAN:  Objection.
11         THE WITNESS:  I worked with Doug
12  in a limited amount.  I -- I felt -- I felt
13  like he was pretty -- pretty good and I
14  never had any question about his integrity.
15  BY MR. SHULMAN:
16     Q.  During the time that you worked at
17  Adelphia, up to the point where the Rigases
18  disengaged or were terminated, did you ever --
19  was there ever a question in your mind about
20  whether the company was manipulating its
21  publicly reported financial results?
22         MS. CALLAHAN:  Objection.
23         THE WITNESS:  I wouldn't state it
24  in those terms.  Again, I stated earlier
25  that I noticed that there were differences,

Page 226

1  JOSEPH MICHAEL BRADY
2  but I never thought that it was
3  manipulation.  I wouldn't have the
4  information to know that.
5  BY MR. SHULMAN:
6      Q.  Did -- when you saw that there
7  were differences, between the internal numbers
8  and the external numbers, did you attempt to
9  talk to more senior executives like Tim Rigas
10  or Michael Rigas to try to resolve in your own
11  mind the inconsistencies?
12     A.  I think you asked me that before
13  and I had indicated that I did talk to Mike
14  Rigas at one time and no one else.
15     Q.  And after that discussion with
16  Michael Rigas, did he resolve for you the
17  inconsistencies?
18     A.  No.
19     Q.  During the time that you worked at
20  Adelphia, up -- again up to the point where
21  the Rigases were terminated, did you ever have
22  a question raised in your own mind about
23  whether the company was failing to disclose
24  material information in its public financials?
25     A.  No.

Page 227

1  JOSEPH MICHAEL BRADY
2      Q.  During this same time, did you
3  ever have a question in your own mind as to
4  whether the company was maintaining two sets
5  of books, one for internal purposes and one
6  for external purposes?
7      A.  No, I -- I didn't, other than what
8  I mentioned earlier, which is the only thing I
9  can -- based on my knowledge is the only thing
10  I can relate to the testimony that was
11  provided on two sets of books was we did have
12  two different views of looking at things.  One
13  was the operational and one was...
14     Q.  During the time that you were --
15  during the same period of time, okay, did you
16  ever have a question as to whether the senior
17  financial executives of the company were doing
18  things that were -- that were meant to
19  overstate or manipulate EBITDA?
20     A.  No.
21     Q.  Did you ever have a question in
22  your mind as to whether the senior financial
23  executives were doing things to manipulate
24  debt covenant compliance?
25     A.  No.

Page 228

1  JOSEPH MICHAEL BRADY
2      Q.  Did you ever form a view -- strike
3  that.
4         Did you ever have a question in
5  your own mind as to whether the senior
6  executives were or might be doing things to
7  inflate the management fees charged to the
8  Rigas entities that the company managed?
9      A.  No.
10     Q.  Did you ever have a question in
11  your mind as to whether the financial
12  executives of the company might be improperly
13  transferring debt from Adelphia books to Rigas
14  entity books?
15     A.  No.
16     Q.  Did you ever have a question in
17  your mind as to whether senior executives were
18  manipulating statistics that were publicly
19  reported regarding the rebuild efforts of the
20  company?
21     A.  No.
22     Q.  In -- going back to Exhibit 184,
23  the email, and I think maybe we've covered
24  this already, but if you look down in the
25  second paragraph of the email there's -- there

# Exhibit LL

# In The Matter Of:

## ADELPHIA COMMUNICATIONS CORP. v. DELOITTE & TOUCHE LLP

---

### ANN MONTGOMERY
May 19, 2005

---

## LEGALINK MANHATTAN
420 Lexington Avenue - Suite 2108
New York, NY 10170
PH: 212-557-7400 / FAX: 212-692-9171

MONTGOMERY, ANN



Page 169

ANN MONTGOMERY

Q. And the pie charts were in connection with what?
A. Investor presentations.
Q. And are they presentations that you made?
A. I participated in some of the presentations. Mainly the customer service side.
Q. Do you happen to know how Adelphia defined when a mile of plant was rebuilt?
A. No, I don't recall.
Q. Do you recall there being any difficulties with people in the field delaying and reporting miles rebuilt for the plant?
A. I don't recall any delays.
Q. Do you recall receiving a memo from Rob McVie that described problems with late reporting of completed miles?
A. I don't recall that, no.
Q. Did Tim Rigas ever tell you to change the 2002 rebuild numbers for any presentation because he thought they were too aggressive?
A. Tim Rigas, no, he did not. That I recall. I don't recall that.

Page 170

ANN MONTGOMERY

Q. I don't think you told us what your salary was when you were at Adelphia. Could you tell me what your salary was.
A. When I started there it was $325,000 a year, and I received a merit increase while I was there. When I left my rate was $340,000 a year.
Q. Do you know of any Adelphia personnel that were paid higher than you?
A. I don't know what anybody else's pay was, no.
Q. Do you know what any of the Rigases were paid?
A. Oh, just from their -- on the profile on Yahoo, I think it was 209,000 a year, I'm not sure. So no, I don't know their actual compensation.
Q. Prior to March 27th, 2002 were you aware of any improper conduct by any of the Rigases?
A. You'd have to define "improper conduct."
Q. With respect to the issues that have arisen to the paper and in the criminal trial --

Page 171

ANN MONTGOMERY

A. No, I was not aware.
Q. Thank you, I think that's all I have.
MR. BRENNER: I've got nothing.
MR. DAVIS: I just have a couple, I'm sorry.
EXAMINATION CONTINUED BY MR. DAVIS:
Q. In answer to Ms. Vendzules questions, you mentioned a couple of people with whom you have retained friendships, who you talked to after the criminal trial respecting their testimony regarding numbers. Is that --
A. When you say "respecting their testimony regarding numbers," what do you mean?
Q. I mean the fact that during the criminal trial Karen Chrosniak, for example, admitted that she falsified certain numbers. Did you discuss that with her --
A. No. When we talk, we don't talk about the Adelphia case.
Q. How about Chris Turner, is that also true?
A. Chris Thurner. Correct.
Q. There was no discussion thereafter

Page 172

ANN MONTGOMERY

about their conduct at Adelphia and why they may have done the things they testified to?
A. No. It's purely friendship. Nothing about the company.
Q. Did you ever ask either of them, putting aside the specifics of what they may have done or not done, what motivated them to engage in conduct which got them into the situation that they had to testify about in the criminal trial?
A. No. I never asked them what their motivation was.
Q. Thank you.
(Continued on following page.)