UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

JOHN J. RIGAS and TIMOTHY J. RIGAS,            :

                                                               11 Civ. 6964 (LBS)

                            Petitioners,            :            02 Cr. 1236 (LBS)

              - v -            :

UNITED STATES OF AMERICA,            :

                        Respondent.            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

### MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO THE MOTIONS OF JOHN J. RIGAS AND TIMOTHY J. RIGAS UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT THEIR SENTENCES

PREET BHARARA
United States Attorney
Southern District of New York
Attorney for the United States of America

David B. Massey
Justina L. Geraci
Assistant United States Attorneys
- Of Counsel -

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in opposition to the motions by John Rigas and Timothy Rigas ("the Rigases") to vacate, set aside or correct their sentences pursuant to Title 28, United States Code, Section 2255 and for Rule 6 discovery, as well as their Memorandum of Law in support of their motions (the "Motion" or "Mot.").

In the Motion, the Rigases seek a new trial based on two very serious accusations of Government misconduct.  First, they claim that the Government improperly withheld material exculpatory information when it declined to produce the notes of an interview with Carl Rothenberger and a 2002 letter to the Government from Adelphia's then-new counsel.  Second, they contend that the Government caused Adelphia to cut off payment of their legal fees and interfere with their access to witnesses.

Both claims are entirely meritless and borderline frivolous because, among other things, the Rigases essentially ignore prior rulings of this Court and the Second Circuit on the very issues that they seek to litigate again; they misleadingly quote out-of-context passages from the Rothenberger notes and other documents to suit their claims; they blatantly sandbag the Court and the Government by seeking post-trial "constitutional" relief for purported problems that could have been addressed by routine requests for adjournment of trial; and they seek to continue the fishing expedition that they started in the Middle District of Pennsylvania after they executed an end-run around this Court and the Second Circuit.

Most remarkably of all, four years into their sentences, the Rigases show not a trace of remorse for the massive, four billion dollar fraud that they orchestrated.  Instead, they seek to keep litigating, ten years after the fraud came to light.

2

For the reasons set forth below, the Court should deny the motion entirely without discovery or a hearing.

## FACTUAL AND PROCEDURAL BACKGROUND

**A.     The Indictment/Superseding Indictment**

Indictment 02 Cr. 1236 (LBS) was filed on September 23, 2002, and a Superseding Indictment, S1 02 Cr. 1236 (LBS), was filed on July 30, 2003, in 23 counts.  The Superseding Indictment charged numerous offenses relating to the Rigases' (and others') conduct as officers and directors of Adelphia Communications Corporation ("Adelphia").  Count One charged John Rigas, Timothy Rigas, Michael Rigas, and Michael Mulcahey (the "defendants") with conspiracy to commit securities and wire fraud, to submit false filings to the United States Securities and Exchange Commission ("SEC"), to create false business records, and to commit bank fraud, in violation of Title 18, United States Code, Section 371.  Counts Two through Sixteen charged the defendants with securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.  Counts Seventeen through Twenty-One charged the defendants with wire fraud, in violation of Title 18, United States Code, Section 1346.  Counts Twenty-Two and Twenty-Three charged the defendants with bank fraud, in violation of Title 18, United States Code, Section 513(a).

**B.     The Government's Case at Trial**

The trial record is described exhaustively in the Second Circuit's first opinion in this case, United States v. Rigas, 490 F.3d 208, 212-19 (2d Cir. 2007), and will not be repeated here.  Very briefly, the Government called sixteen witnesses at trial, including nine current and former employees of Adelphia and/or the Rigas Family.  James Brown, Adelphia's former Vice President of Finance, testified generally about the process Adelphia followed each quarter to

increase artificially its reported earnings in order to meet the stock market's expectations and to satisfy its loan covenants with its bank lenders.[1] (See, e.g., Tr. 6109-14).  Brown also testified about specific sham transactions approved by the Rigases (see, e.g., Tr. 6117-70), and about various reports and "hybrid" financial statements that Brown prepared for the Rigases that compared Adelphia's actual results of operations with the higher, fraudulent numbers released to the public. (See, e.g., Tr. 6241-57; GX 2403, 6905).

Several other current and former Adelphia employees testified about payments made by Adelphia on behalf of the Rigas Family and described how those transactions were booked in Adelphia's accounting systems.  James Helms, an accountant in Adelphia's treasury department, testified about the Rigas Family's purchases of $1.6 billion in Adelphia securities between 1998 and 2002.  Helms explained that in many instances Adelphia received no payment from the Rigas Family for those purchases and accounted for the sales by recording various offsetting payables and receivables among Adelphia and various Rigas Family companies to hide the fact that the securities were never paid for. (See, e.g., Tr. 4377-87, GX 11366-A to -E).  Dennis Coyle, an attorney who was an independent member of Adelphia's Board of Directors, testified about disclosures (and non-disclosures) to the Board concerning various transactions between Adelphia and the Rigas Family.[2]  The Government also called a summary witness, Robert

---

[1]      Brown pleaded guilty, pursuant to a cooperation agreement with the Government, to one count of conspiracy to commit securities fraud, one substantive count of securities fraud, and one count of bank fraud. (Tr. 6070-71).

[2]      Karen Chrosniak, Adelphia's former Director of Investor Relations, testified about the Rigases' roles in approving false press releases (see, e.g., Tr. 5021-23); false statements contained in presentations made by Timothy Rigas to investors during "road shows" to generate interest in Adelphia's debt and stock offerings (see, e.g., Tr. 5131-32, 5173-86); and her involvement with Timothy Rigas in inflating subscriber numbers reported to the public (Tr. 5059-68).  Chris Thurner, who acted as controller for various companies privately owned by the Rigas Family, testified about transactions for the benefit of the Rigas Family that were paid for by Adelphia but not disclosed in Adelphia's public filings.  Chrosniak, Thurner and Helms each testified pursuant to a non-prosecution agreement with the Government. (Tr. 3221, 4124, 5001).

4

DiBella, who was an accountant retained by Adelphia to help prepare Adelphia's restatement of its financial statements. (Tr. 8439-40). DiBella explained to the jury a summary chart of certain information he retrieved from Adelphia's accounting records. That chart, Government Exhibit 101, showed that as of April 30, 2002, Adelphia was owed more than $3.2 billion by the Rigas Family and various companies owned by the Rigas Family. (Tr. 8445-47).

In addition to testimonial evidence, the Government introduced thousands of pages of Adelphia's business records, including: bank records, wire transfer records, securities purchase records, property records, Adelphia's accounts payable and cash ledgers, general ledger journal entries, summary exhibits, and scores of documents signed by the Rigases relating to fraudulent transactions charged in the Indictment.

## C.    The Defense Case

Timothy Rigas called no witnesses. John Rigas called three witnesses. David Acker, a character witness, opined on John Rigas's good reputation in the community, but acknowledged on cross-examination that John Rigas had charged Adelphia rent for Acker's use of one of John Rigas's Cancun condos when Acker traveled to Mexico on vacation. (Tr. 8861; GX 14104, 14105). Andrew Rufino, a partner in the law firm of Covington & Burling, testified briefly about a prior interview he had conducted of Government witness Charles Raptis, in an effort to prove that Raptis had made a prior statement inconsistent with his trial testimony. (Tr. 8873-89). Andrew Cunningham, also a lawyer at Covington & Burling, testified about a separate interview with Raptis in a further effort to prove that Raptis had made a prior statement inconsistent with his trial testimony. (Tr. 8889-96).

**D.      The Trial and Jury Verdict**

The trial began on February 23, 2004, and ended on July 8, 2004, when the jury

convicted John and Timothy Rigas of the conspiracy charge in Count One, all of the securities

fraud charges, and all of the bank fraud charges.  All of the defendants were acquitted of the wire

frauds charged in Counts Seventeen through Twenty-One.

**E.      The First Sentencing**

Prior to the Rigases' sentencings, the United States Probation Office (the "Probation

Office") prepared a Presentence Investigation Report ("PSR" or "Presentence Report") for each

defendant.  In the Offense Conduct section, the Presentence Report described the conspiracy at

Adelphia and Rigases' roles in it. (John Rigas PSR ¶¶ 12-46; Timothy Rigas PSR ¶¶ 12-46).

The Presentence Report also applied the United States Sentencing Guidelines ("U.S.S.G." or

"Guidelines") to calculate the Rigases' offense level.  After concluding that the base offense

level was six, pursuant to U.S.S.G. § 2B1.1, the Presentence Report for each defendant found

that: (a) the offense level should be increased 26 levels, pursuant to U.S.S.G. § 2B1.1(b)(1)(N),

because the loss resulting from the offense was in excess of $100 million; (b) four levels should

be added, pursuant to U.S.S.G. § 2B1.1(b)(2), because the offense involved more than 50

victims; (c) two levels should be added, pursuant to U.S.S.G. § 2B1.1(b)(8)(C), because the

offense involved sophisticated means; (d) two levels should be added, pursuant to U.S.S.G. §

2B1.1(b)(12)(A), because the defendants derived more than $1,000,000 in gross receipts from

one or more financial institutions as a result of the offense; (e) two levels should be added,

pursuant to U.S.S.G. § 3B1.3, because the defendants abused a position of public trust in a

manner that significantly facilitated the concealment of the offense; and (f) four levels should be

6

added, pursuant to U.S.S.G. § 3B1.1(a), because the defendants were leaders of criminal activity that involved five or more participants and was otherwise extensive.

As a result, the Presentence Report for each of the defendants concluded that his total offense level was 46, his Criminal History Category was I, and his resulting Guidelines range was lifetime imprisonment. (John Rigas PSR ¶¶ 71-84, 85-87, 119; Timothy Rigas PSR ¶¶ 53-64, 65-67, 93). The Probation Office recommended that the District Court sentence John Rigas to ten years' incarceration, to be followed by five years of supervised release. (John Rigas PSR at 30-31). The Probation Office recommended that the Court sentence Timothy Rigas to 20 years' incarceration, to be followed by five years of supervised release. (Timothy Rigas PSR at 31).

On June 20, 2005, after receiving extensive sentencing submissions from the parties, the District Court sentenced the Rigases. The District Court articulated the sentencing procedure it intended to follow, including its intention to consider the now-advisory Guidelines and the factors set forth in 18 U.S.C. § 3553(a). After hearing exhaustive argument on Guidelines issues, the District Court adopted the findings and conclusions of each Presentence Report (and the Government's sentencing submission), noting that it had "considered the applicable guideline computations, and I believe that they are accurately set forth in the presentence report and in the government's submission."

The District Court then heard argument on whether it should impose a Guidelines or non-Guidelines sentence. Ultimately, the District Court granted substantial downward variances from the applicable Guidelines range. The District Court sentenced John Rigas to an aggregate term of 15 years' imprisonment, to be followed by three years' supervised release. He sentenced Timothy Rigas to an aggregate term of 20 years' imprisonment, to be followed by three years' supervised release. In structuring the sentences, the District Court specifically ruled that the

sentences on the bank fraud charges, Counts Twenty-Two and Twenty-Three, would run concurrent to each other and to all of the other counts.

The District Court did not impose a fine, and, in light of a settlement agreement reached among the Government, John and Timothy Rigas, other members of the Rigas Family, and Adelphia, did not order John and Timothy Rigas to pay restitution.  The District Court did impose the mandatory special assessments of $1800 against each defendant.

**F.     The Initial Appeal**

John and Timothy Rigas appealed their convictions, but did not challenge their sentences. On appeal, they argued that: (1) the Government failed to establish a violation of generally accepted accounting principles ("GAAP"), in part by failing to call an accounting expert to testify at trial; (2) the Government improperly introduced accounting expert testimony through accountant Robert DiBella; (3) the evidence on the bank fraud charges was insufficient; and (4) the District Court improperly admitted background evidence of the conspiracy.  On May 24, 2007, the Second Circuit, in United States v. Rigas, 490 F.3d 208 (2d Cir. 2007), rejected all of the Rigases' arguments except the bank fraud sufficiency challenge as to Count Twenty-Three. On that count, the Court found that the evidence of materiality was insufficient, reversed the convictions, and remanded for resentencing.

**G.     The New Trial Motion**

On July 5, 2007, the Rigases filed a motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure, contending that alleged "newly discovered evidence" of trial perjury by Government witness James Brown would have affected the outcome of their trial (hereinafter, "the Rule 33 motion").

On November 20, 2007, the District Court denied the Rule 33 motion.  The District Court ruled that Brown did not commit perjury in the portions of testimony that the Rigases had isolated, and that the post-trial deposition testimony upon which the Rigases relied was not "newly discovered" but rather "newly available" pursuant to United States v. Owen, 500 F.3d 83 (2d Cir. 2007).  See United States v. Rigas, 2007 WL 4145282, at *5 (S.D.N.Y., Nov. 20, 2007). The District Court also found that "the jury's verdict would not have been different had it considered the allegedly conflicting testimony."  Id.  These rulings were affirmed on appeal. United States v. Rigas, 583 F.3d 108, 124-25 (2d Cir. 2009), cert. denied, 131 S.Ct. 140 (2010).

## H.     The Motion To Compel Discovery

Shortly thereafter, on December 4, 2007, the Rigases filed a motion seeking to compel the Government to produce notes of interviews of Carl Rothenberger, Esq., Adelphia's lead outside counsel, and several other witnesses not called by either party during the criminal trial, on the ground that such notes constituted material that should have been disclosed pursuant to Brady v. Maryland, 373 U.S. 83 (1963) (hereinafter, the "Motion to Compel").  The Rigases also sought to compel production of notes taken by SEC staff during its civil investigation of Adelphia.

On January 15, 2008, the District Court denied this motion.  The District Court found that the Government was under no obligation to produce the notes of interviews with Rothenberger, since Rothenberger was not a Government witness at trial.  See United States v. Rigas, 2008 WL 144824, at *1 (S.D.N.Y., Jan. 15, 2008).  The District Court also found that because the Rigases plainly knew or should have known of Rothenberger's existence and his role in the issues relevant to the criminal trial, the Government's *Brady* obligations had been satisfied. Id. at *2. In so ruling, the District Court noted that the Government had identified Rothenberger as a

witness with potentially exculpatory material on a specified subject matter. Id. at *1.  Finally, the District Court refused to compel production of the SEC staff notes because such materials were not in the possession, custody or control of the United States Attorney's Office. Id. at *2-3.  In all respects, this ruling was affirmed on appeal.  United States v. Rigas, 583 F.3d 108, 124-25 (2d Cir. 2009), cert. denied, 131 S.Ct. 140 (2010).

## I.     The Resentencing

Prior to resentencing, the Rigases again submitted extensive briefing on a multitude of sentencing issues, and the Government responded.  On May 22, 2008, the District Court conducted a resentencing hearing, at which the Rigases appeared together by video link from prison after executing a written waiver of physical appearance.  During the hearing, the District Court presided over a lengthy oral argument on a host of sentencing issues.  At the conclusion of the hearing, the parties agreed that the District Court could pronounce sentence by issuing a written opinion.

On June 24, 2008, the District Court issued his opinion resentencing the Rigases.  The District Court first addressed the Rigases' arguments concerning the standard of review on resentencing.  The District Court found that the resentencing ordered by this Court was not *de novo*, and instead focused on the effect on the Rigases' sentences of the reversal of their convictions only on Count Twenty-Three of the Indictment.  The District Court found, in the alternative, that even if *de novo* sentencing applied, it would reach the same result.

The District Court then addressed the Rigases' arguments concerning the appropriate loss calculation and other sentencing enhancements.  As to the loss calculation, the District Court found, as it had in connection with the initial sentencing, that the loss caused by the Rigases' conduct exceeded $100 million, the amount necessary to establish a 26-level enhancement to

10

their offense levels.  In so ruling, the District Court concluded, as it had previously, that the

Government was not required to call an expert to establish the causation of the loss, given the

evidence of the effect on the price of Adelphia stock of the disclosure of the $2.2 billion hole in

the capital structure of Adelphia, which disclosure was made on March 27, 2002.  In making this

finding, the District Court quoted from the Second Circuit opinion affirming the Rigases'

convictions:

> [Adelphia] announced its 2001 Fourth Quarter and Full-Year
> results in a March 27, 2002 press release. In a footnote on the
> final page of that press release, Adelphia, at the recommendation of its
> accounting firm, Deloitte & Touche, first disclosed publicly that it
> had approximately $2.2 billion in liabilities not previously reported
> on its balance sheet. On the day of disclosure, Adelphia's stock
> price plummeted by about twenty-five percent to $20.39; by the
> time the stock was delisted in May 2002, the price per share was
> $1.16. The company filed for bankruptcy in June 2002, wiping out
> all shareholder value.

Rigas, 490 F.3d at 212.  The District Court rejected the Rigases' claims that the loss was caused

by factors other than their criminal conduct.  It also rejected the Rigases' claim for an offset of

the loss amount by the $715 million forfeited to the Government as part of a settlement of

restitution and forfeiture claims.

Before arriving at his reduced sentences on remand, the District Court observed: "[W]e

return to the question before the Court: What sentence alteration, if any, would fairly and

adequately reflect the reversal of the conviction on count 23 the sentence for which was

concurrent with that on count 22 which was affirmed."  The District Court concluded that "a

minimal adjustment" was appropriate because the "reversal on count 23 did not alter the

guidelines ... More importantly it in no meaningful way altered the seriousness of defendants'

crimes, nor the suffering which their conduct inflicted on so many people."  The District Court

then reduced John Rigas's sentence by three years, to 12 years, and reduced Timothy Rigas's

sentence by three years, to 17 years.

**J.      The Second Appeal**

In their second appeal, the Rigases challenged their new, reduced sentences and the

District Court's rulings on the Rule 33 motion and the Motion to Compel.  The Second Circuit

found that the new sentences were procedurally and substantively reasonable, and affirmed the

District Court's rulings on the Rule 33 motion and the Motion to Compel in all respects.  United

States v. Rigas, 583 F.3d 108, 124-25 (2d Cir. 2009).  The Supreme Court later denied certiorari.

United States v. Rigas, 131 S.Ct. 140 (2010).

**K.      The Instant Motion Pursuant to Section 2255**

In a Section 2255 petition filed in October 2011, the Rigases now claim that discovery in

a now-dismissed federal criminal tax fraud matter in the Middle District of Pennsylvania, United

States v. Rigas, 05 Cr. 402, has exposed additional violations of their constitutional rights.  Their

present Motion asserts that the Government shirked its disclosure obligations under Brady v.

Maryland, 373 U.S. 83 (1963), this time with respect to two pieces of "highly exculpatory

evidence" (Mot. 2): *(1)* information relating to, and notes of, the Government's February 2004

interview of Rothenberger, which the Rigases had sought in their Motion to Compel; and *(2)* a

letter to the Government from the new management of Adelphia, dated August 9, 2002.  The

Rigases also assert that the Government "hijacked" Adelphia (Mot. 3), causing the company to

withdraw its advancement of legal fees and guarantees of indemnification, and closing off the

defense's access to critical corporate witnesses and evidence.  The Rigases collaterally attack

their sentences under 28 U.S.C. § 2255, and move for Rule 6 discovery and an evidentiary

12

hearing.  For the reasons stated below, the motion is entirely without merit, and should be denied without discovery and without a hearing.

## POINT I

## THE GOVERNMENT'S *BRADY* DISCLOSURE WAS SUFFICIENT

### A.      Applicable Law

#### 1.      Legal Standard for Habeas Relief

Collateral relief under § 2255 is available "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which results in a complete miscarriage of justice.'" United States v. Bokun, 73 F.3d 8, 12 (2d Cir.1995) (quoting Hill v. United States, 368 U.S. 424, 428 (1962)).  A petitioner may not use a § 2255 motion to "'relitigate questions that were raised and considered on direct appeal.'" Riascos–Prado v. United States, 66 F.3d 30, 33 (2d Cir. 1995) (quoting Cabrera v. United States, 972 F.2d 23, 25 (2d Cir. 1992)).  Moreover, a petitioner who has failed to raise an issue on direct appeal may not do so in a § 2255 petition.  See Campino v. United States, 968 F.2d 187, 190 (2d Cir. 1992) ("failure to raise a claim on direct appeal is itself a default").

#### 2.      Discovery

A habeas corpus petitioner is not entitled to discovery as a matter of course. See Drake v. Portuondo, 321 F.3d 338, 346 (2d Cir. 2003) (citing Bracy v. Gramley, 520 U.S. 899, 904 (1997)); Gonzalez v. Bennett, 2001 WL 1537553, at *4 (S.D.N.Y., Nov. 30, 2001).  However, Rule 6(a) of the Rules Governing Section 2255 Proceedings provides that "[a] judge may, for good cause, authorize a [petitioner] to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law."  28 U.S.C. § 2255, Rule 6(a).

13

A petitioner "bears a heavy burden in establishing a right to discovery." <u>Renis v. Thomas</u>, 2003 WL 22358799, at *2 (S.D.N.Y., Oct. 16, 2003) (citing <u>Bracy</u>, 520 U.S. at 904).  In order to show "good cause," a petitioner must present "'specific allegations'" that give the Court "'reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is ... entitled to relief.'" <u>Bracy</u>, 520 U.S. at 908-9 (citation omitted).  A court may deny a petitioner's request for discovery "where the petitioner provides no specific evidence that the requested discovery would support his habeas corpus petition." <u>Hirschfeld v. Comm'r of the Div. of Parole</u>, 215 F.R.D. 464, 465 (S.D.N.Y.2003); <u>see also</u> <u>Charles v. Artuz</u>, 21 F.Supp.2d 168, 170 (E.D.N.Y. 1998).  Generalized statements regarding the possibility of the existence of discoverable material will not be sufficient to establish the requisite "good cause." <u>See</u> <u>Gonzalez v. Bennett</u>, 2001 WL 1537553, at *4 (S.D.N.Y. Nov. 30, 2001); <u>Green v. Artuz</u>, 990 F.Supp. 267, 271 (S.D.N.Y. 1998); <u>Munoz v. Keane</u>, 777 F.Supp. 282, 287 (S.D.N.Y. 1991), <u>aff'd</u> sub nom., <u>Linares v. Senkowski</u>, 964 F.2d 1295 (2d Cir.1992).  Furthermore, "Rule 6 does not license a petitioner to engage in a 'fishing expedition' by seeking documents 'merely to determine whether the requested items contain any grounds that might support his petition, and not because the documents actually advance his claims of error.'" <u>Ruine v. Walsh</u>, 2005 WL 1668855, at *6 (S.D.N.Y., July 14, 2005) (citation omitted).

### 3.   Evidentiary Hearing

A habeas petitioner seeking an evidentiary hearing must also meet a demanding standard. A petition for habeas corpus requires a hearing to resolve disputed issues of fact unless the record shows that the petitioner is not entitled to relief. 28 U.S.C. § 2255.  Courts in this Circuit have "consistently held that the standard to be used in making this determination is whether, 'if the evidence should be offered at a hearing, it would be admissible proof entitling the petitioner

14

to relief.  Mere generalities or hearsay statements will not normally entitle the applicant to a

hearing, since such hearsay would be inadmissible at the hearing itself. The petitioner must set

forth specific facts which he is in a position to establish by competent evidence.'"  Pizzuti v.

United States, 2011 WL 3652293, at *8 (S.D.N.Y., Aug. 18, 2011) (citation omitted) (collecting

cases).

### 4.      Legal Standard for Attacking a Conviction Due To An Alleged *Brady* Violation

The Government has a well-established constitutional duty to disclose material evidence

favorable to the defendant, whether or not requested.  See United States v. Bagley, 473 U.S. 667,

675 (1985); Brady v. Maryland, 373 U.S. 83, 87 (1963).  This disclosure obligation is not

without scope, however.  The *Brady* doctrine "does not require a prosecutor to 'deliver his entire

file to defense counsel,' but only to produce information that is material to the defendant's guilt

or punishment."  Restrepo v. United States, 533 F.Supp.2d 359, 365 (S.D.N.Y. 2008) (citation

omitted).  See also United States v. Coppa, 267 F.3d 132, 135 (2d Cir. 2001) ("*Brady* does not,

however, require the prosecution to disclose *all* exculpatory and impeachment material; it need

disclose only material 'that, if suppressed, would deprive the defendant of a fair trial.'" (citing

Bagley, 473 U.S. at 675)).

To demonstrate that the non-disclosure of a particular piece of evidence deprived a

defendant of a fair trial, the defendant must show that: "(1) the Government, either willfully or

inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the defendant; and

(3) the failure to disclose this evidence resulted in prejudice."  Coppa, 267 F.3d at 140 (citation

omitted).  However, "[a] defendant cannot satisfy the suppression requirement if the defendant,

directly or through counsel, 'either knew, or should have known, of the essential facts permitting

him to take advantage of [that] evidence.'" <u>Lamberti v. United States</u>, 22 F.Supp.2d 60, 66

(S.D.N.Y. 1998) (citation omitted), <u>aff'd</u>, <u>Badalamenti v. United States</u>, 201 F.3d 430 (2d Cir.

1999).  As the District Court has already held in this case, "The *Brady* rule is designed to 'assure

that the defendant will not be denied access to exculpatory evidence only *known to the*

*Government*.' The government must disclose only 'information which had been known to the

prosecution but unknown to the defense.'" <u>United States v. Rigas</u>, 2008 WL 144824 (S.D.N.Y.,

Jan. 15, 2008) (citations omitted) (emphasis in original).  Furthermore, "[i]n the context of

*Brady*, a defendant is deprived of a fair trial only where there is a reasonable probability that the

government's suppression affected the outcome of the case, or where the suppressed evidence

'could reasonably be taken to put the whole case in such a different light as to undermine

confidence in the verdict.'" <u>Coppa</u>, 267 F.3d at 135 (citations omitted).  Cf. <u>Restrepo</u>, 533

F.Supp.2d at 365 ("The test for 'reasonable probability' is not 'whether the defendant would

more likely than not have received a different verdict with the evidence, but whether in its

absence he received a fair trial, understood as a trial resulting in a verdict worthy of

confidence.'" (citation omitted)).

**B.     Discussion**

In their Motion, the Rigases make the very serious allegation that the Government

withheld two pieces of "highly exculpatory evidence" (Mot. 2), which were produced to them

through discovery in the then-pending criminal tax case in the Middle District of Pennsylvania,

namely: (1) notes of the Government's February 2004 pre-trial interview of Carl Rothenberger,

Adelphia's former lead outside counsel; and (2) an August 2002 letter from Adelphia's counsel

to the Government.  (Mot. 2, 7).

The Motion is entirely without merit and should be denied without discovery or a hearing.  Plainly, the District Court and the Second Circuit have already held that the Government's <u>Brady</u> disclosure relating to Rothenberger was sufficient because the Rigases "knew of Rothenberger's existence, his role at Adelphia, and the facts on which he could [give] testimony."  <u>United States v. Rigas</u>, 2008 WL 144824, at *1 (S.D.N.Y., Jan. 15, 2008), <u>aff'd</u> 583 F.3d 108, 125-26 (2d Cir. 2009), <u>cert. denied</u> 131 S.Ct. 140 (2010).  Nothing in the Rigases' instant motion alters that logic.  Nor can they establish prejudice because the Rothenberger notes are replete with inculpatory, rather than exculpatory, material, as described in further detail below.  Moreover, nothing in the notes changes the fact that Rothenberger declined to be interviewed by the Rigases, and the Rigases have conceded that they would never call a witness whom they have not interviewed.  Mot. 66 ("No lawyer worth his salt would ever blindly call a witness at trial when that witness has refused to be interviewed.").  Because the Rigases have not met the standard for discovery, a hearing, or other relief in connection with their <u>Brady</u> application, it should be denied in its entirety.

       1.       **The Government's *Brady* Disclosure Was Sufficient**

              a.      **This Court Has Already Rejected the Rigases' Claims Relating to Rothenberger**

When this Court and the Second Circuit held that the Government's <u>Brady</u> notice relating to Rothenberger was sufficient and denied discovery of the Rothenberger notes, John and Timothy Rigas were undeterred.  Rather, they executed an end-run around those rulings by asking for the same relief a second time in a forum where the Rigases' massive fraud had not been laid bare as it had in this Court.  Now that they have the Rothenberger notes, they ignore inculpatory the passages and quote snippets of language out of context to suggest, falsely, that

Rothenberger's testimony would have supported their defense.  The Rigases also falsely suggest that the notes reveal information that is new to them on a number of subjects.  This suggestion is false because the Rigases' Motion to Compel, filed in December 2007, sets forth much of the very same allegedly exculpatory information that they now claim the Rothenberger notes suddenly reveal.

Rothenberger was not called as a witness at trial by either side.  Nevertheless, acknowledging its obligations under *Brady*, the Government properly and timely identified Rothenberger to the Rigases as a witness who could provide favorable information with respect to the timber rights transactions discussed in the Government's Bill of Particulars.  See Preziosi Decl. Ex. 2 (Letter from the Government to Defense Counsel, dated Feb. 24, 2004) ("The Government writes to inform you that Carl Rothenberger, Esq. may be able to provide information that is favorable to the defense concerning the timber rights transaction discussed in the Government's Bill of Particulars.").  This satisfied the Government's Brady obligation with respect to Rothenberger, as this Court and the Second Circuit have already held.  United States v. John Rigas, 2008 WL 144824, at *1 (S.D.N.Y., Jan. 15, 2008) (rejecting the Rigases' argument that the Rothenberger *Brady* material produced by the government before trial was insufficient, and stating: "because Rothenberger was not called as a witness at trial, the government had no statutory obligation to turn over his statements or the government's notes." See also United States v. Frank, 11 F.Supp.2d 322, 327 (S.D.N.Y. 1998) ("[T]he Government may fulfill its *Brady* obligation by directing the defendant's attention to witnesses who may have exculpatory evidence. Once the defendant is made aware of the existence of such witnesses, he may attempt to interview them to 'ascertain the substance of their prospective testimony,' or subpoena them if the Government does not intend to call them as witnesses at trial." (citation omitted)); United

18

States v. Oshatz, 700 F. Supp. 696, 698 (S.D.N.Y. 1998) ("By providing [the defendants] the names of the [witnesses] and informing them that these individuals may possess information helpful to the defense, the government has met its Brady obligation. It is now up to [the defendants] to subpoena these witnesses to take advantage of any exculpatory information they might furnish.").  When the Government complies with its obligations in this manner, and because the Government did not call Rothenberger as a trial witness, "the government is not required to produce copies of … memoranda or notes of interviews."  United States v. Trupin, 1999 WL 322656, at *3 (S.D.N.Y., May 20, 1999).

Even without the Rothenberger notes in their possession, in 2007 the Rigases devoted nearly nine pages of their brief in support of their Motion to Compel to the claim that Rothenberger possessed exculpatory information.  See Comerford Decl. Ex. C (Motion to Compel) at 10-18.  They stated: "It strains reason to believe that Rothenberger provided absolutely no exculpatory information regarding his involvement in the myriad of [sic] securities and related-party transactions on which he worked on behalf of Adelphia and the Rigases," Id. at 1.  In support, the Rigases cited portions of his deposition transcript in the matter Adelphia Communications Corp. v. Deloitte & Touche LLP, No. 02-000598 (Pa. Ct. Com. Pl. Phila. Co. 2002), which they characterized as "providing compelling exculpatory evidence regarding the Rigases."  Comerford Decl. Ex. C (Motion to Compel) at 11.  Significantly, the allegedly "exculpatory" components of Rothenberger's testimony, as thoroughly described by the Rigases in their 2007 brief, included the following two topics:

1)  Rothenberger and his firm never raised any potential problems or concerns with the Rigases' 10-K and co-borrowing disclosures because they "did not find anything legally inadequate or deficient in the disclosures."  Comerford Decl. Ex. C (Motion to Compel) at 11 (citing Rothenberger deposition transcript).  Rothenberger "was comfortable that *the amount of Rigas co-borrowing debt did not need to be disclosed*," and he "*did not*

19

*think that there was a legal problem with the joint and several liability of the co-borrowers* when the co-borrowing facilities were presented to the Board for approval." Id. at 11-12 (emphasis added) (citing Rothenberger deposition transcript); and,

2) Rothenberger "testified that *13-D filings did not need to disclose if money to purchase stock was received from affiliate lenders* … Instead, the ultimate purchasers of stock needed to disclose their source of funds." Comerford Decl. Ex. C (Motion to Compel) at 13. Had he thought otherwise, "he would have made that disclosure." Id. (emphasis added) (citing Rothenberger deposition transcript).

The Rigases now disingenuously claim in their instant Motion that this same allegedly exculpatory information was revealed to them for the first time in 2011, when they obtained the notes in discovery in the Middle District of Pennsylvania criminal tax fraud case.  With regard to the 13-D filings (see item 2, *supra*), they assert: "The notes reveal that Mr. Rothenberger, Adelphia's securities law expert, believed that the law required only a general description of the sources of funds for the purchases and *did not require the Rigases to specifically identify the source of the affiliate borrowings*."  Mot. 17 (emphasis added).

However, the specific 13-D filing referenced in the Rothenberger notes and cited in the instant Motion – namely, "Form Schedule 13D" filed "1/21/00" "Item 3: Source & amt of funds," see Mot. 17 (quoting Comerford Decl. Ex. H (Rothenberger Notes)) – is the very same example used by the Rigases in their 2007 Motion to Compel to illustrate exactly the same point:

> For example, *the 13-D filed on January 21, 2000* indicated that [affiliate lender] Highland 2000 purchased 5.9 million shares of class B common stock from Adelphia for $375 million.  Highland 2000 received the $375 million from "affiliate borrowings." Rothenberger understood "affiliate borrowings" to mean borrowings from affiliates, in this case affiliates of Highland 2000. Rather, only the ultimate purchaser needed to disclose where it was getting the money.  When this 13-D was filed, Rothenberger understood that there was no obligation to disclose where affiliates received the money to lend to Highland 2000 to come up with $375 million used to purchase stock in January 2000.

Comerford Decl. Ex. C (Motion to Compel) at 13 (emphasis added).

The instant Motion goes on to claim that "[t]he exculpatory import of the Rothenberger notes was equally significant with respect to Mr. Rothenberger's statement *that he had worked with Chris Thurner in learning about the sources for the borrowing and formulating the proper disclosures in the Schedule 13-D disclosures*." Mot. 18 (emphasis added). Again, however, to the extent there is any "exculpatory import" here, it was already known by the Rigases, and presented to, and rejected by, this Court, in their 2007 Motion to Compel:

> In addition to using information they already knew, Buchanan attorneys [such as Rothenberger] received information for preparing 13-Ds from Adelphia, Form 4s, *and Chris Thurner*. Thurner worked as a controller for Wending Creek Farms, which was owned by John Rigas, and *was Rothenberger's contact for information regarding 13-Ds and Form 4s*. Rothenberger found Thurner to be conscientious, thorough, and responsive to requests. He encountered no resistance to his *obtaining necessary information for filing the 13-Ds*.

Comerford Decl. Ex. C (Motion to Compel) at 12 (emphasis added). Compare Mot. 18-19 ("The [Rothenberger] notes provide: 'Early draft sent to CT [Chris Thurner] w/ blank in it for disclosure – sent that way if CER [Carl E. Rothenberger] did not know fact … CT confirmed that 'affiliate borrowing' accurate … Early drafts got source of funds info from?  Do not recall exactly, perhaps prospectus for offering or CT or another family-side employee." (quoting Comerford Decl. Ex. H (Rothenberger Notes))).

With respect to the co-borrowing disclosures in Adelphia's 10-K filings (see item 1, *supra*), the Rigases assert in the instant Motion that "the Rothenberger notes contained material that strongly supported the defense claim that the Rigases had always followed the advice of counsel and never knowingly violated any law." Mot. 22. This is precisely the argument the Rigases made in 2007, quoting swaths of Rothenberger's deposition transcript:

> From 1996 to 2001, Rothenberger understood that Adelphia's directors relied on him and his firm to provide legal advice as to

> the adequacy of the 10-K and co-borrowing disclosures …. But
> Buchanan never raised any potential problems with disclosures
> because its attorneys did not find anything legally inadequate or
> deficient in the disclosures …. Rothenberger also did not think that
> there was a legal problem with the joint and several liability of the
> co-borrowers when the co-borrowing facilities were presented to
> the Board for approval.

Comerford Decl. Ex. C (Motion to Compel) at 11-12.  Again, the Rothenberger notes contain

nothing new on this point; the Rigases set forth this argument fully in their Motion to Compel by

relying on and quoting heavily from Rothenberger's 2005 deposition transcript.  Compare

Comerford Decl. Ex. H (Rothenberger Notes) ("no restriction on borrowing more than security

contributed → 3/01 discuss w/ TW [Timothy Werth], ~DMal [Doug Malone], ~JB [James

Brown] – add language to co-b description in fin stmt footnot – risk disclosure – borrow up to

full amount. – Discuss terms w/ ACC Bd?  Do not recall.  Any discussion re: use of other

parties' borrowing ability if borrow more than put up?  No.  Ever explained to Bd?  No."); with

Comerford Decl. Ex. C (Motion to Compel) at 11-12 ("When Adelphia filed its 2000 10-K,

Rothenberger was comfortable that the amount of Rigas co-borrowing debt did not need to be

disclosed.  Even though he had received a draft 10-K for 2000 that contained the amount of RFE

debt, Rothenberger did not advise the Rigases to amend the disclosure related to their co-

borrowing … [Rothenberger] would have called it to the Board's attention if he thought that

there was a problem."); with Comerford Decl. Ex. I (Rothenberger Dep. Tr. Oct. 26, 2005)

(Regarding the Form 10-K for 2000, Rothenberger states: "I believe we suggested … the

additional language which I believe ended up in the footnote that – to the effect that all parties to

the credit – to the co-borrowing agreements can borrow the full amounts available under them"

and discusses Rothenberger's March 2001 e-mails to both Doug Malone and James Brown on

this issue).

When these arguments were first made by the Rigases in 2007, this Court and the Second Circuit rejected them. See Rigas, 2008 WL 144824 (denying defendants' motion to compel, finding that the government was not in exclusive possession of any exculpatory information, since defendants knew of Rothenberger's role at Adelphia and the facts about which he could testify); aff'd United States v. Rigas, 583 F.3d 108, 125-26 (2d Cir. 2009).  More than four years later, the arguments fail again.

> **b.    The Rigases Decided Not To Call Rothenberger Or Testify In Their Own Defense For Trail Strategy Reasons**

The Rigases argue that, with respect to Rothenberger, the *Brady* material produced by the Government before trial was misleading in that it somehow *prevented* them from calling Rothenberger to the witness stand in their case-in-chief.  This claim was also advanced by the Rigases on appeal in 2008, where they alleged that the Government's February 2004 letter "misled the Rigases into thinking Rothenberger did not possess significant exculpatory information and that they should not call him at trial."  Comerford Decl. Ex. F (Rigas Appeal Brief) at 103.  As this Court has already held, it is impossible to believe that the Rigases could have been misled on this point because they plainly knew that Rothenberger, their own lawyer, had knowledge about particular facts.  The Rigases' decisions not to subpoena or seek immunity for Rothenberger to testify at trial, or to testify in their own defense, were knowing and strategic, and the instant *Brady* claims are little more than "Monday-morning quarterbacking" concerning those decisions.

Indeed, it defies all logic for the Rigases to continue to blame the Government for their decision not to call Rothenberger.  In their 2007 Motion to Compel, the Rigases boldly declared that they had been well aware that Rothenberger "is one of the most important witnesses in any

Adelphia matter, including this criminal case," and acknowledged "his key role at Adelphia and, in particular, his role with respect to the government's main allegations against the Rigases." See Comerford Decl. Ex. C (Motion to Compel) at 3.  They stated on appeal that "Rothenberger was a central figure … Rothenberger drafted all the SEC filings at issue in the criminal trial, and advised the Rigases and the Adelphia board on the approval and disclosure of the related-party transactions at issue, including the CBAs and the Rigases' purchases of Adelphia securities." Comerford Decl. Ex. F (Rigas Appeal Brief) at 102.  They state in the instant motion that "[g]iven the central role he played in drafting most of the disclosure documents at issue in the case, Carl Rothenberger would have been expected to be the key defense witness. As an attorney specializing in securities law with Buchanan Ingersoll & Rooney P.C., a prominent Pittsburgh law firm, Mr. Rothenberger had been intimately involved in virtually all of the transactions and disclosures since even before Adelphia went public, including those that were at issue in the trial." Mot. 9-10.  See also Timothy Rigas Decl. ¶ 58 ("Buchanan partner, Carl Rothenberger, a securities and corporate governance attorney, led the team of Buchanan [ ] attorneys representing the Rigas family and Adelphia. Mr. Rothenberger was involved in virtually all of the transactions and disclosures regarding the Rigas family and Adelphia during this period.").  The notion that the Government somehow prevented the Rigases from understanding the scope of Rothenberger's knowledge simply ignores the reality of the situation.  As Adelphia's lead outside counsel, Rothenberger was deeply involved, *with the Rigases' knowledge*, in the events underlying the prosecution.

The Rigases' contention, now for the third time, that they believed Rothenberger was unavailable to them at trial cannot withstand scrutiny.  Indeed, the Rigases' contentions about Rothenberger have evolved since their Rule 33 motion in 2007.  In that motion, they claimed that

it was "*suggested* to defense counsel that individual Buchanan attorneys *might* assert their Fifth

Amendment privileges if called to testify," Rigas Rule 33 Motion at 46 (emphasis added).  By

the time of their motion to compel, however, the Rigases asserted that Rothenberger's counsel

"advised the Rigas defense team that, if he was subpoenaed to testify at trial, he *would* invoke his

Fifth Amendment rights."  Comerford Decl. Ex. C (Motion to Compel) at 4 (emphasis added).

Now, the Rigases claim that the reason they did not call Rothenberger to the stand was that he

"refused to be interviewed by the defense prior to trial"  Mot. 10.

      This claim makes little sense, and it was already rejected by this Court and by the Second

Circuit.  Once the Government issued the February 2004 disclosure letter concerning

Rothenberger, it was, or should have been, clear to the Rigases' experienced trial counsel that

Rothenberger had been interviewed by the Government.  From this, it was, or should have been,

clear to counsel either that Rothenberger had made statements to the Government without

invoking his Fifth Amendment right against self-incrimination, or that Rothenberger had been

given some form of protection in connection with his statements (*e.g.*, a proffer agreement, non-

prosecution agreement, or statutory immunity).  In either instance, it was clear that any prior

assumptions about Rothenberger's "unavailability" to the defense were no longer valid.[3]  See

Rigas, 2007 WL 4145282 at *5 ("Defendants argue that, despite their diligence, the witness'

[including Rothenberger's] refusal to cooperate rendered them unavailable before trial.

However, the steps that defense counsel took to obtain these witnesses' testimony were

---

[3]     For example, if Rothenberger was not invoking his Fifth Amendment rights, he would be available to testify at trial.  If Rothenberger had received a non-prosecution letter or formal statutory immunity, he likely could be compelled to testify for the defense at trial.  Indeed, Timothy Werth, who pleaded guilty pursuant to a cooperation agreement with the Government, was made available to testify for the Rigases, as counsel for Timothy Rigas acknowledged during summation.  In either scenario, the Rigases had avenues available to procure Rothenberger's testimony, and simply elected not to do so.

insufficient … [T]he testimony that defendants cite could have been available if defendants had subpoenaed these witnesses at the time of trial."); <u>Rigas</u>, 583 F.3d 108, 125 (2d Cir. 2009) .

The Rigases' failure even to attempt to compel the testimony of a witness they claim to be "one of the most important witnesses in any Adelphia matter, including this criminal case," was most assuredly a knowing, strategic decision.  It did not take the production of  the Rothenberger notes in the Middle District of Pennsylvania for the Rigases suddenly to become aware of his role in Adelphia's business.  Yet, despite knowing Rothenberger's apparently significant role, the Rigases did not even attempt to subpoena him to testify at trial or move to compel the Government to immunize him.  <u>See</u> <u>United States v. Turkish</u>, 623 F.2d 769, 777 (2d Cir. 1980); <u>United States v. Ebbers</u>, 458 F.3d 110, 117-22 (2d Cir. 2006); <u>United States v. Oshatz</u>, 700 F. Supp. 696, 698 (S.D.N.Y. 1988) ("By providing [the defendants] the names of the [witnesses] and informing them that these individuals may possess information helpful to the defense, the government has met its *Brady* obligation. It is now up to [the defendants] to subpoena these witnesses to take advantage of any exculpatory information they might furnish.").  This Court properly considered this failure in rejecting the Rigases' Rule 33 Motion based on the post-trial civil deposition testimony of Rothenberger, among other witnesses: "Defendants' choice not to pursue this testimony was a strategic decision, and cannot now form the basis for a new trial."  <u>Rigas</u>, 2007 WL 4145282 at *5.  For the Rigases again to claim in the present motion that "[i]t is easy to understand why" they did not call Rothenberger to the witness stand because Rothenberger "refused to be interviewed by the defense prior to trial," and to assert as a separate ground for relief "that various witnesses' refusal to speak with the defense was a result of the pressure and influence the government exerted on Adelphia and others," (Mot. 10, 10 n.2) ignores this Court's 2007 ruling on these very issues:

26

Defendants argue that, despite their diligence, the witness' refusal
to cooperate rendered them unavailable before trial. However, the
steps that defense counsel took to obtain these witnesses'
testimony were insufficient. Courts have denied Rule 33 motions
where the defendant 'has produced no evidence of any attempts to
subpoena either co-defendant before or during trial,' or 'to request
that the government grant them immunity.' Although defense
counsel attempted to communicate with these witnesses
voluntarily, neither of these steps was taken. Similarly, defendants
claim that the government's Bill of Particulars and a memorandum
from Adelphia's legal department both had a 'chilling effect' and
precluded defense counsel from obtaining statements from a
number of witnesses. Again, defense counsel does not allege that
these witnesses would have defied a federal subpoena had they
been called to testify at trial …. Defendants contend that counsel
could not have been required to subpoena all possible witnesses, or
to 'call all of those individuals to the stand without any indication
of what they would say or whether they had any relevant
information at all.' However, this argument has been squarely
rejected by prior courts.

Rigas, 2007 WL 4145282, at *5 (citations omitted).  See also, United States v. Matos, 781

F.Supp. 273, 279-280 (S.D.N.Y.1991) ("The precise testimony of any potential witness cannot

be known until it is had ... The decision not to interview [a witness], and not to call [a] witness,

whether wise or not, was a deliberate and strategic one. The defendant is not entitled to a new

trial so that he may employ a different strategy.") (citing United States v. Beasley, 582 F.2d 337,

339 (5th Cir.1978)).

The Rigases acknowledge in their present Motion that a key theme to their defense was

"that they had reasonably relied on the counsel of their highly esteemed lawyers and auditors,

and thus even were the jury to find irregularities, they were never done with any intent to defraud

on the part of the Rigases." Mot. 6.  However, at trial, Timothy Rigas called no witnesses, and

John Rigas called only a character witness and two lawyers who testified that a government

witness had made a prior inconsistent statement.  See United States v. Rigas, 490 F.3d 208, 219

27

(2d Cir. 2007).  The Rigases made no attempt to subpoena Rothenberger to testify at trial or

move to compel the Government to immunize him – a choice they acknowledged in prior

submissions to this Court.  See Rigas, 2007 WL 4145282 at *5 ("Defendants concede that the

decision not to call these witnesses was a conscious and deliberate decision, 'discussed among

counsel and with at least Tim and John Rigas.'").  Nor did the Rigases choose to testify at trial

themselves – testimony that would have been highly relevant to their purported advice of counsel

defense, as they were best positioned to testify to their understanding of the advice they

purportedly received.  See, e.g., United States v. Bilzerian, 926 F.2d 1285, 1292 (2d Cir. 1991)

(defendant's testimony "that he thought his actions were legal would have put his knowledge of

the law and the basis for his understanding of what the law required in issue. His conversations

with counsel regarding the legality of his schemes would have been directly relevant in

determining the extent of his knowledge and, as a result, his intent."); United States v. Exxon

Corp., 94 F.R.D. 246, 248-49 (D.D.C. 1981) ("These defenses [of good faith reliance] do not

solely relate to the 'objective' representations of DOE but directly concern Exxon's subjective

interpretation and understanding of those representations; i.e., Exxon's corporate state of mind");

United States v. Locascio, 357 F.Supp.2d 536, 550 (E.D.N.Y. 2004) ("[C]ourts have repeatedly

concluded that, where a party places matters which would be covered by the attorney-client

privilege at issue, such as by asserting a reliance on counsel defense, the attorney-client privilege

will be waived in order to prevent the privilege from being used for the purpose of prejudicing an

opponent's case by providing only selective disclosure. In other words, the privilege may not

simultaneously be used as a shield and a sword; where a defendant opens the door by waiving

the attorney-client privilege, as would be the case if [the defendant] were to assert a reliance on

counsel defense, the defendant can not open the door only to the information he would like to

28

admit." (citations omitted)).  Indeed, it is utterly disingenuous for the Rigases to complain now that "the jury ended up deliberating on whether the Rigases had reasonably relied on counsel without ever having heard from counsel," Mot. 10-11, knowing full well that (1) they made inadequate efforts to have him testify, as this Court and the Second Circuit have already held, and (2) they chose not to testify in their own defense.  They should not be given a second chance to try the case a different way under the guise of a <u>Brady</u> claim.

In any event, even assuming the Rigases genuinely believe that the Rothenberger notes contain new, materially exculpatory information, they could only make meaningful use of it by calling Rothenberger as a witness at a re-trial.  But, in the 2004 trial, they already decided not to call Rothenberger even in the face of the Government's February 2004 letter alerting them that he might have exculpatory information.  Without having established that Rothenberger is any more likely to submit to an interview if the request were repeated now than he was at the time of the 2004 trial, it is extremely unlikely that they would call him at a re-trial.  As the Rigases have stated, "No lawyer worth his salt would ever blindly call a witness at trial when that witness has refused to be interviewed."  Mot. 66.  With respect to Rothenberger, that statement is as true now as it was in 2004.  Accordingly, the Rigases cannot establish prejudice.  On that basis alone, the <u>Brady</u> application should be denied without a hearing or discovery.

### c.      The Rothenberger Notes Are Not Materially Exculpatory

The fact remains, however, that because there is nothing exculpatory in the Rothenberger interview notes beyond the limited information concerning the timber rights transactions, the Rigases would not have learned anything by disclosure of the notes at the time of the 2004 trial, as is evident now that they have been made fully available.  The Rigases are entirely mistaken when they contend that "[t]he government's fervent assurances to this Court and the Second

Circuit have now been revealed as unfaithful to the contents of the notes.  Mot. 16, 32.  In the

four areas cited by the Rigases, the notes are not exculpatory at all, let alone materially

exculpatory.

i.        **The 10-K Filings**

With regard to the 10-K filings, the Rigases incorrectly suggest that the Rothenberger

notes contain exculpatory material.  First, they claim that the testimony of James Brown,

Adelphia's former Vice President of Finance, regarding a conversation he had with Timothy

Rigas in late March 2001 concerning Adelphia's disclosure of the full amount of funds available

under the co-borrowing credit agreements (rather than the amount actually borrowed), is

undermined because "the undisclosed [Rothenberger] notes showed that Mr. Brown had

conferred with Mr. Rothenberger about the language [of the 2000 10-K] and the language that

*was* used was the very language that Mr. Rothenberger – the experienced securities counsel –

had deemed adequate."  Mot. 21.  In fact, the notes say no such thing.  What they explicitly refer

to is Rothenberger's recollection of a possible discussion with Brown ("~JB") and others –

though not the Rigases – in March 2001 about the co-borrowing language.  See Comerford Decl.

Ex. H (Rothenberger Notes) at 7 ("no restriction on borrowing more than security contributed →

3/01 discuss w/ TW [Timothy Werth], ~DMal [Doug Malone], ~JB [James Brown] – add

language to co-b description in fin stmt footnot – risk disclosure – borrow up to full amount. –

Discuss terms w/ ACC [Adelphia Communications Corp.] Bd?  Do not recall.  Any discussion

re: use of other parties' borrowing ability if borrow more than put up?  No.  Ever explained to

Bd?  No.").  Nothing in these notes materially undermines Brown's extensive testimony about

conspiring with Timothy Rigas about the disclosures, in conversations that, according to Brown,

*did not involve Rothenberger*.  At most, the notes reflect that Rothenberger was involved in some

discussion concerning the co-borrowing disclosure in the 2001 10-K.  See, e.g., Comerford Decl. Ex. I (Rothenberger Dep. Tr. Oct. 26, 2005) 487:15-488:4 (discussing Rothenberger's March 31, 2001 e-mail to Doug Malone regarding a draft 10-K disclosure, stating: "The latest draft I received of the ADLAC did not have any additional language in the note 4 discussion of co-borrower/affiliate facilities, either the sentence we sent to Jim B. [i.e., Brown] that clarifies that ADLAC amounts do not include affiliate borrowings or the sentence you mentioned yesterday on the phone clarifying that the entire amount of capacity is available to affiliates.  Please advise.").  But that fact and these notes – which make no mention of the Rigases – in no way "confirm[] the defense's contention that the goal had always been to try in good faith to comply with the applicable securities laws, not to break them."  Mot. 21.  Significantly, the notes do not mention Deloitte or Brown's conversations with Deloitte about Adelphia's disclosure of the full amount of funds available under the co-borrowing credit agreements.  This is for good reason -- because Rothenberger had no knowledge of those conversations.  In fact, the notes make clear that Rothenberger did not even know that the Rigases had in fact borrowed this money, and that this was the true reason that Brown and the Rigases did not want the amount actually borrowed to be disclosed.  Moreover, the notes do not mention the Rigases or any conversations between them and Rothenberger, and they explicitly state that Rothenberger did not discuss this with the Adelphia Board.  The notes, therefore, do not support an advice of counsel defense on this point.

### ii.      The Related Party Transactions

The Rigases also misrepresent the content of the notes with regard to the related party transactions.  They claim that "[t]he notes not only show that people at Adelphia had been told by their counsel that their method of reporting was proper, but also that it was Doug Malone – not any of the Rigases – who worked with Mr. Rothenberger on the disclosure of affiliate

transactions." Mot. 23. Again, this is simply not what the notes say. The notes state: "Effort to determine if other related party transactions? Yes. – reviewed 10-KA w/ DMal [Doug Malone] – familiar w/ SEC reporting – Ask him what else under SK404." Tellingly, the Rigases omit the next several sentences of the notes: "Any disclosure of ACC policy JR [John Rigas] draw up to $1M/month from ACC? Never told about, Should be Disclosed? Yes. Debt reclass under co-b? No knowledge or understanding, None prior to 3/02." <u>See</u> Comerford Decl. Ex. H (Rothenberger Notes) at 4. Indeed, Doug Malone did have "full access to all of Adelphia's books and records and understood Adelphia's cash management system" and Rothenberger undoubtedly relied on information that Malone provided to him. Mot. 23. But Malone was a Rigas co-conspirator; not surprisingly, Malone did not tell Rothenberger the relevant facts. Without knowledge of the relevant facts, Rothenberger's advice cannot give rise to an advice of counsel defense. Neither discovery nor a hearing can change that fact.

### iii.   The Source Of Funds Used To Buy Adelphia Stock

Misrepresentations of the notes abound in the Rigases' discussion of the source of funds used by the Rigases to purchase Adelphia stock. The Rigases quote from a passage where Rothenberger was shown a "Schedule 13D" during the interview and asked whether "affiliate borrowings" were identified in the document. Mot. 17. Rothenberger answered, "No, not by name [but by] general description." <u>See</u> Comerford Decl. Ex. H (Rothenberger Notes) at 2. This passage is not exculpatory; it merely reflects Rothenberger's reading of the Schedule 13D at the time he was interviewed.

Other passages in the notes, ignored by the Rigases in their Motion, show that Rothenberger did not know the source of the funds used to buy the stock. For example, the notes reflect that, when Rothenberger was asked whether he knew what the "'affiliate borrowings'" in

fact were, as that term was used in the disclosures, Rothenberger answered, "No."  Comerford

Decl. Ex. H at 2.  When asked whether Rothenberger asked for a definition of "affiliate

borrowings," he answered, "No."  Comerford Decl. Ex. H at 2.  In another passage cited by the

Rigases on this issue (Mot. 18-19), they tellingly omit the key line -- the line that makes clear

that, when asked whether it would have been a "significant issue" if he had known that "'affiliate

borrowings' [came] from ACC or [were] guaranteed by ACC," Rothenberger answered, "Yes."

Comerford Decl. Ex. H at 3.  Clearly, at the relevant time, Rothenberger did not know the source

of the funds used to buy the Adelphia stock.  Because he did not know the relevant facts, he

could not have exculpated the Rigases through an advice of counsel defense.  To the contrary, his

testimony  would have inculpated them.

     Several other passages in the notes, ignored by the Rigases, clearly establish that

Rothenberger did not know that the Rigases used Adelphia money to buy Adelphia stock.  For

instance, Rothenberger told the Government:

    (1) That he "assumed immed.[iately] avail.[able] funds (i.e. cash) [were] transferred" to
        buy Adelphia stock because "the stock purchase agreement language called for it."
        Comerford Decl. Ex. H (Rothenberger Notes) at 1.

    (2) That he "[f]irst heard" in April or May 2002 that the "RF [Rigas Family]" purchases
        "of ACC stock" were "cashless or part cashless."  Further, he was never consulted on
        the question of whether "cashless = imm. avail. funds," that is, whether a "cashless"
        transaction could be considered "immediately available funds."  Comerford Decl. Ex.
        H at 1.

    (3) When asked whether he had "Conversations w/ACC personnel" regarding whether a
        cross-receipt could be issued if the transaction was cashless, Rothenberger answered,
        "No."  When asked whether a cross-receipt could be issued for a cashless transaction,
        Rothenberger replied "No," because such a transaction was "not imm. available
        fnds."  Comerford Decl. Ex. H at 2.

    (4) According to Rothenberger, at the time of the closings, "CER [Rothenberger]
        understood RF [Rigas Family] get shares, ACC [Adelphia] gets $ (imm available
        funds).  Comerford Decl. Ex. H at 2.

(5) When Rothenberger was asked whether he had known the stock purchases were "cash-less," "would [he] have advised ACC to make stmt (in Q or K) of use of $ anyway," he answered, "No." Comerford Decl. Ex. H at 2.

(6) That, with respect to the use of the phrase "respective personal funds" in the "Form 13-D for 10/99," Rothenberger "would not have concluded" on his own that "respective personal funds" were purportedly used to purchase stock; rather, Rothenberger "would have been told" that such funds were used. Comerford Decl. Ex. H at 3.

(7) When asked did he "know" that, to purchase the stock, the flow of "wires" went from "ACC" to "HH" (Highland Holdings, an RFE) to purchase the stock on the "NASDAQ," Rothenberger answered, "No." Comerford Decl. Ex. H at 3.

(8) When asked, "What besides co-b[orrowing] drawdowns could [the] $375M borrowings have been?," Rothenberger answered, "Maybe liquidity, [or] other credit lines." Rothenberger further stated that he was "never told" about these co-borrowing draw downs, and that if he had been told this, he "would have looked at it closer" than he did. Comerford Decl. Ex. H at 3.

As these passages make clear, Rothenberger would have inculpated the Rigases on the stock purchases. Accordingly, this issue cannot form the basis for a <u>Brady</u> claim, and no discovery or hearing is needed to reach that conclusion.

### iv.  EBIDTA Manipulation

Finally, the Rigases make much of Adelphia's EBITDA transactions and what they deem "the propriety of backdating," Mot. 24 – areas in which Rothenberger was, in fact, not involved and of which he had no meaningful knowledge.[4] This was not a significant issue in the Government's closing arguments to the jury.

The notes merely show that Rothenberger was asked at his interview only whether, as a general matter, it would be acceptable for SEC schedules to be signed as of a certain date, without explicitly stating that it was an "as of" date: "Why put date on document, not date

---

[4]  Werth and Brown were the main witnesses concerning EBITDA and backdating. <u>See</u>, <u>e.g.</u>, <u>Rigas</u>, 490 F.3d 208, 217-18 (2d Cir. 2007) (discussion of testimony concerning Adelphia's inflated EBITDA).

drafted or signed?  CER [Rothenberger] [was] told transactions took place, cash paid at time …
Date on doc means? – 'as of' formulation is preferable. – w/o 'as of' no idea/clue to reader
[illegible] did not take place on date."  <u>See</u> Comerford Decl. Ex. H at 5.  These statements have
nothing to do with the EBIDTA manipulation at issue in the case – the wholesale after-the-fact
fabrication of transactions and corresponding backup documents.  The notes show that, during
his interview with the Government, Rothenberger was actually discussing *bona fide* transactions
(i.e., instances when he was "told transactions took place" by Malone) and stating that, in *those*
cases, it did not violate his sensibilities to date the transaction "as of" a certain date without
explicitly alerting the reader that it was an "as of" date.  Comerford Decl. Ex. H at 5.  Nothing in
the notes suggests that Rothenberger knew about the EBIDTA manipulation, let alone that he
advised the Rigases on this issue.  Accordingly, the notes cannot form the basis for a <u>Brady</u>
claim, and no discovery or hearing is needed to reach that conclusion.

      **2.**        **The Letter from Management**

      The Rigases also claim that the Government impermissibly withheld an August 9, 2002
letter from Adelphia's then-new counsel, Boies Schiller, to the Government, which allegedly
"contains material exculpatory information on the key issue of whether the Rigases inflated the
number of subscribers in their reports in order to show the company was performing well."  Mot.
29; <u>see</u> Comerford Decl. Ex. J.  Putting aside the fact that this letter would not be admissible at
trial under any theory, the footnote that the Rigases cite simply does not establish that the
company was not using a particular calculation method at the relevant time,[5] and it does not
contradict the essential facts established beyond a reasonable doubt at trial.

---

[5]      While the footnote states that Adelphia's new management "intends to improve the quality of the
Company's public disclosures," this is an inculpatory fact, not an exculpatory one, because it indicates that the
earlier disclosures were inadequate.  Comerford Decl. Ex. J at 2 n. 1.

At trial, Brown and Chrosniak explained that, at the direction of Tim Rigas, and with John Rigas' knowledge and approval, Adelphia disseminated materially misleading subscriber growth figures to the public from 2000 to 2002.  Chrosniak was responsible for coordinating the preparation of Adelphia's quarterly earnings press releases and providing drafts to John Rigas, Tim Rigas and James Brown for their review and approval. (Tr. 5021-22). She was also responsible for calculating the number of subscribers and the subscriber growth rates reported to the public. (Tr. 5047).[6]  Chrosniak described for the jury a number of episodes in which Adelphia's reported subscriber growth was fraudulently manipulated at Tim Rigas' direction or with his approval.

The first episode occurred in connection with the earnings release issued in May 2000 (GX 3042) which fraudulently reported inflated numbers for both basic subscribers and the basic subscriber growth rate. (Tr. 5046-48). Chrosniak explained that when her preliminary calculations showed little real growth, Jim Brown directed her to add approximately 14,500 basic cable subscribers who received service from a Brazilian cable company in which Adelphia owned an interest. (Tr. 5048-52).  Chrosniak further explained that these subscribers had never been counted by Adelphia before (Tr. 5051) and that their inclusion artificially increased Adelphia's reported pro forma basic subscriber growth rate. (*See* GX 2592-A).

In preparation of the third quarter 2000 earnings release (GX 3051), Tim Rigas directed Chrosniak to add 28,000 subscribers who received service from a Venezuelan company in which Adelphia owned an interest. (Tr. 5061-68). The Venezuelan subscribers had never been included

---

[6]     Adelphia generally reported subscriber information in three categories: (1) basic subscribers (homes with televisions that subscribed to basic cable services); (2) digital subscribers (homes with televisions that subscribed to digital cable services at a premium rate); and (3) "Powerlink" subscribers (homes that subscribed to Adelphia's internet service). (Tr. 5039-40). Adelphia's annual reports stated: "A home with one or more television sets connected to a cable system is counted as one basic subscriber." (GX 4029 p. 12).

in Adelphia's prior reports and their inclusion in that period fraudulently and artificially boosted the pro forma growth rate reported to investors. (Tr. 5069-72, GX 2592-A). Similarly, in preparing the earnings release for the third of quarter 2001 (GX 3074), Chrosniak saw that basic subscriber growth numbers were flat. (Tr. 5103-05). When Chrosniak spoke with Tim Rigas about her preliminary calculations, Tim Rigas instructed her to add 60,000 home security subscribers. (Tr. 5106-09). Chrosniak explained that it was improper to include the home security service subscribers because if those customers did not subscribe to basic cable service they should not be counted, or if they did also subscribe to basic cable service, they would already have been included in Adelphia's numbers so adding them in would result in double-counting. (*Id.*)

Trail testimony further established that Tim Rigas also instructed Chrosniak to artificially inflate the year-end 2001 number of Powerlink internet service subscribers. Tim Rigas had given guidance to analysts throughout 2001 that Adelphia was likely to have 375,000 Powerlink subscribers by year-end. (Tr. 5101-02). When he learned that Adelphia was likely to fall approximately 5,000 subscribers short, Tim Rigas instructed Chrosniak to add 7,000 "pending installs" as actual subscribers. (Tr. 5115-19). As both Tim Rigas and Chrosniak knew, "pending installs" were customers who had ordered the Powerlink service but whose service had not yet been installed and who were not yet making payments to Adelphia. (*Id.*).

The evidence at trial established that, taken together, Jim Brown and Tim Rigas' fraudulent adjustments had a material impact on Adelphia's reported subscriber growth rates. For year-end 2000, Adelphia's actual subscriber growth rate was an anemic 0.5%, but with the bogus additions, Adelphia reported 1.3% growth. (Tr. 5131; GX 2592-A). For year-end 2001,

Adelphia's actual growth rate was *negative* 1.2%, yet the manipulative additions permitted

Adelphia to report positive growth of 0.5%. (*Id.*)

   Nothing in the August 2002 memorandum undermines this evidence that tens of

thousands of subscribers were fraudulently counted by the Rigases to inflate subscriber growth

rates.  Accordingly, the memorandum is not materially exculpatory, and need not have been

disclosed.  Indeed, the overall thrust of the letter is indisputably inculpatory.  In it, counsel sets

forth, on nearly every page, the harms suffered by the company on account of the longstanding

and complicated fraud perpetuated by the Rigases.  For example:

> [W]e do not believe that there is a meaningful risk that the Rigases
> will profit from such a recovery for equity holders, given the many
> tools available to the Company to prevent such a result and given
> the Company's clear willingness to do everything in its power –
> including continuing to provide assistance to this office and the
> Securities and Exchange Commission ("SEC") in connection with
> forfeiture, disgorgement and other claims – to ensure that the
> Rigases do not benefit from their wrongdoing.

Comerford Decl. Ex. J at 6.  The memorandum further states:

> Given the billions of dollars the Rigas Family owes to Adelphia
> and the effect that Adelphia's bankruptcy has had on the value of
> the pledged shares, there appears to be very little likelihood that
> the Rigas family will be able to repay their co-borrowing
> obligations to Adelphia – aggregating not less than $3.1 billion in
> all – and regain control of the pledged shares.

Comerford Decl. Ex. J at 6.  <u>See also</u>, <u>id</u>. at 7 (discussing Adelphia's claims against the Rigases);

<u>id</u>. at 8 ("[t]he claims of insiders (which the Rigases unquestionably are) are subordinated even

where the insiders have engaged in misconduct that only procures an unfair advantage based on

their position – in short, where the misconduct is far less egregious than the breaches of fiduciary

duty and frauds committed here."); <u>id</u>. at 9 ("[T]he current Adelphia remains committed, whether

through assistance to the government in is actions, or through the bankruptcy process, to ensure

that the Rigases do not profit at all from their wrongdoing and that they compensate the many

38

victims of their conduct to the greatest extent possible.").  Because the memorandum is not exculpatory, it cannot serve as the basis for a <u>Brady</u> claim, and the motion should be denied without discovery or a hearing.[7]

## POINT II

### THE GOVERNMENT DID NOT CAUSE ADELPHIA TO CUT OFF ATTORNEYS' FEES OR INTERFERE WITH THE RIGASES' ACCESS TO WITNESSES

The Rigases contend that the Government violated their constitutional rights by causing Adelphia to stop advancing legal fees for their defense and to cut off their access to Adelphia employees.  These arguments fail and should be denied without discovery or a hearing.  As an initial matter, this Court has already ruled that the Rigases made insufficient efforts to subpoena witnesses and made trial strategy decisions not to call them.  <u>United States</u> v. <u>Rigas</u>, 2007 WL 4145282, at *5.  Second, unlike the defendants in <u>United States v. Stein</u>, the Rigases had access to tens of millions of dollars for their defense.  And to the extent they did not have sufficient funds to complete document review or prepare witnesses in time for trial, the proper remedy would have been to request an adjournment of the trial date, which they did not do on this basis. Third, the evidence that the Rigases cite for the proposition that the Government encouraged Adelphia to cut off fees and access to witnesses actually proves the opposite point.  This evidence shows, shows, among other things, that Adelphia never cited its decision to cut off fees or its instructions to employees regarding contact with the Rigases as reasons not to indict the Company.

---

[7]        The Rigases attempt to confuse this issue with an evidentiary ruling on the introduction of a 10-K.  Mot. 31.  The Government's reasons for opposing the introduction of a document have no bearing on whether this memorandum should have been produced under <u>Brady</u>.

## A.     Relevant Facts

### 1.     The Board's Decision Not To Advance Attorney's Fees

In May 2002, the Special Committee of the Adelphia Board of Directors conducted an investigation through outside counsel, Covington and Burling, concerning the activities of the Rigases, including related party transactions involving entities controlled by the Rigas Family and Adelphia.  The investigation arose in the wake of Adelphia's disclosure and reporting in March 2002 of approximately $2.3 billion in debt borrowed by Rigas Family entities pursuant to co-borrowing agreements that made Adelphia and its subsidiaries jointly and severally liable with the Rigas entities -- but which had not been disclosed on Adelphia's balance sheet.

As a result of the investigation, on or about June 1, 2002, the Adelphia Board of Directors unanimously approved a resolution stating that John and Timothy Rigas and others were no longer entitled to the advancement of attorney's fees under the company's bylaws "[a]s a consequence" of their deliberate breach of their duties to the Company and its shareholders "by failing to cooperate with the Special Committee in its investigation by declining to provide full and complete answers to the Special Committee and by participating in related party transactions for their benefit to the detriment of the Company without appropriate disclosures and approval of the Board of Directors."  Comerford Decl. Exhibit Y, at 3.  On or about June 4, 2002, Adelphia management notified the Rigases of the Board's determination.  On June 6, 2002, Adelphia filed a Form 8-K  with the Securities and Exchange Commission (SEC) reporting the Board's determination that the Rigases' had breached their fiduciary duty and that under the company's bylaws, they were no longer entitled to have their legal expenses, including fees and expenses of legal counsel, incurred in defending actions against them advanced to them by the company.

Less than three weeks after the Board announced its decision, on June 25, 2002, Adelphia filed a bankruptcy petition.  On July 24, 2002, Adelphia sued the Rigases and others in federal court for damages and other relief in violation of the RICO statute, breach of fiduciary duties, waste of corporate assets, breach of contract, unjust enrichment, and other grounds.  These claims constituted property of the debtor's estate under the bankruptcy laws.  Also on July 24, 2002, the Rigases were arrested following the filing of a complaint and affidavit in the Southern District of New York charging conspiracy, securities fraud, wire fraud, and bank fraud.

**2.     The Rigases Shared in Approximately $47.4 Million for Defense Costs**

After the Board of Directors decided not to advance Adelphia's funds for their legal expenses, the Rigases did not make demands or claims of Adelphia, its Board of Directors, or the Special Committee for the advancement and indemnification of attorneys fees.  They did, however, make claims to, and received funds for, defense costs from the Rigas Managed Entities ("RMEs"), cable businesses held in the name of the Rigas Family but managed by Adelphia, and against Adelphia's D&O insurance policies — funds totaling approximately $47.4 million -- in addition to the $11.5 million Legal Defense Fund set up in the Adelphia-Rigas Settlement Agreement.

**a.     Bankruptcy Court Authorized $27.8 Million for Defense Costs**

In January 2003, the Bankruptcy Court heard argument on the issue of staying discovery in the bankruptcy proceedings pending the criminal case in this District.  At that time, an Assistant United States Attorney who tried this case for the Government made clear that the United States had no objection to the expenditure of Adelphia resources to fund the Rigases' defense:

>       I should note also that there are at least a couple of references in the brief to the Government trying to stop people from talking to Adelphia witnesses, [and] the need for the Rigases to have money to fund their defense.  Again, we have never objected, we have never taken a position on orders of the Court allowing the Rigases to sell assets to fund their defense or make whatever arrangements they may need to fund their defense, nor will we.  We don't have an objection to that.  We don't have an interest in trying to stop them from funding their defense of this or the criminal action.
>
>       We have never directed Adelphia, nor could we, as far as we know, tell them not to have their employees talk to anyone.  It's a corporation.  It can do what it wants.  We don't have any power over them.  If Adelphia directed its employee not to talk to other people, I think they could still talk to other people: but certainly that is not something that we have done, and that is not something that is within our control.

Hearing Transcript, In re Adelphia Communications Corp., et al., 02-41729 (REG) (S.D.N.Y.), at 22-23 (attached hereto as Exhibit A).

On or about August 1, 2003, as set forth in an Order dated August 7, 2003, the Bankruptcy Court entered an order providing for, among other things, payments from the RMEs of up to $15 million in the aggregate to pay for the Rigases' legal fees, including the fees incurred in the defense of the Southern District of New York prosecution.  In re Adelphia Communications Corp., et al., 02-41729 (REG) (S.D.N.Y.), Order dated August 7, 2003 (attached hereto as Exhibit B), at 2.  On March 9, 2004, the Bankruptcy Court increased the RME funds available for the Rigas's defense costs to $27.8 million.  In re Adelphia Communications Corp., et al., 02-41729 (REG) (S.D.N.Y.), Order dated March 9, 2004 (attached hereto as Exhibit C, at 1).

   **b.**  **Disbursement of $19.6 Million by Adelphia's D&O Insurers**

Two actions were filed in the Eastern District of Pennsylvania between the Rigases and Associated Electronic & Gas Insurance Services Limited (AEGIS), the primary D&O insurer.

42

On September 24, 2002, AEGIS and other insurers filed a declaratory coverage action captioned *AEGIS v. Rigas*, No. 02-7444 (E.D. Pa.). The district court closed that case after it entered its order dated March 17, 2004, which granted the Rigases partial summary judgment and held that "the Carriers must advance the defense costs incurred by the Rigases [referring to John, Michael, Timothy and James Rigas] and [Peter] Venetis, up to the $300,000 limit currently set by the bankruptcy court for each party."  382 F. Supp.2d 685, 702 (E.D. Pa. 2004).

On November 19, 2007, the parties to the D&O insurance coverage dispute entered into a settlement agreement, but the settlement funds have not been released from escrow.   The settlement agreement recited that AEGIS had advanced a total amount of $13,272,744.76 for defense costs incurred "by certain of the Individual Insureds" (including the Rigases, Peter Venetis and Michael Mulcahey) up to the time the parties reached a settlement in principle.  See Nov. 19, 2007 Settlement Agreement (attached hereto as Exhibit D), at 4.  The settlement agreement provided that AEGIS will pay an additional $3,665,492.60 ($6,400,000 less Rigas defense costs paid by AEGIS from March 22, 2007 to November 19, 2007), less defense costs AEGIS will have advanced to the Rigases from November 19, 2007 to the date when AEGIS fully pays its settlement amount.  (Exhibit D, at 14-15).  On March 7, 2008, the Bankruptcy Court entered an order granting approval of the November 19, 2007 AEGIS-Rigas Settlement Agreement.

The insurance settlement agreement provided that the total to be paid by the D&O insurers is $19,672,744.76, that is $13,272,744.76 plus the additional $6,400,000.  (Exhibit D, at 4, 14-15).  While most of these funds were for costs incurred in the defense of individual insureds other than John and Tim Rigas, AEGIS acknowledged in a December 21, 2004 letter agreement that Dilworth Paxson was representing James, Michael, John and Timothy Rigas, that

43

some defense costs were attributable to representation of them as a group, and, significantly, that Dilworth Paxson would not have to attempt to segregate costs between its clients. (Letter from Michael R. Goodstein to J. Bradford McIlvain, Dec. 21, 2004 (attached hereto as Exhibit E), at 2).

Both before and after AEGIS and the Rigases entered into their December 21, 2004 agreement, the Bankruptcy Court entered a series of orders authorizing advancements of insurance funds for defense costs for James and Michael Rigas at $300,000 per insured, per application.  Prior to their criminal convictions, the bankruptcy court had entered a series of orders permitting the *AEGIS v. Rigas* declaratory judgment action to go forward, leading to the undertaking and payment of $1.2 million for legal costs incurred by the Rigases and James and Michael Rigas.

### c.      Post-Conviction Settlement Agreements

In April 2005, prior to being sentenced in this case, the Rigases entered into settlement agreements with the United States Attorney for the Southern District of New York and Adelphia. In the "Government-Rigas Settlement Agreement," the Rigases and other Rigas family members agreed to the forfeiture of over $1.5 billion in assets to the government and the use of those assets to provide restitution through a victims fund.  The Rigases were permitted under the agreement to keep certain other assets and the United States Attorney agreed not seek restitution at the time of sentencing.  In the "Adelphia-Rigas Settlement Agreement," Adelphia received cable systems and real estate that the Rigases had agreed to forfeit to the government, and the Rigases were allowed to retain certain other cable systems and other assets.  The Rigas-Adelphia Settlement Agreement also provided for the transfer of $11,500,000 by Adelphia to a legal defense fund "to pay documented third-party civil and criminal defense costs of the Rigas

44

Family." (Rigas-Adelphia Settlement Agreement, at 11-12)  In both agreements, the parties expressed their intention to resolve the criminal forfeiture, the adversary action by Adelphia against the Rigases as debtors in bankruptcy, and the SEC enforcement action.  (Rigas-Adelphia Settlement Agreement, at 1-4)  The agreements were approved by the Bankruptcy Court in the Southern District of New York (and upheld on appeal) and Judge Sand approved the Government-Rigas Settlement Agreement (and was likewise upheld on appeal).

The $11.5 million Legal Defense Fund created by the Adelphia-Rigas Settlement Agreement was to be shared by John and Tim Rigas and other members of the Rigas Family, and was to be used for defense costs in various proceedings, including, but not limited to, the Southern District of New York prosecution.  (Rigas-Adelphia Settlement Agreement, at 11-12).

**B.   Applicable Law**

The defendants bear the burden of proving a Sixth Amendment violation associated with Government conduct, at least with respect to non-evidentiary issues. *See, e.g.*, *United States* v. *Jackman*, 46 F.3d 1240, 1245-46 (2d Cir. 1995) (defendant bears burden to demonstrate unconstitutional composition of jury venire); *see also Duren* v. *Missouri*, 439 U.S. 357, 364 (1979) (same); *United States* v. *Blount*, 291 F.3d 201, 212 (2d Cir. 2002) (defendant must show prejudice from attorney's purported conflict of interest); *United States* v. *Desena*, 287 F.3d 170, 176 (2d Cir. 2002) (defendant claiming violation of Compulsory Process Clause must show that witness would have provided favorable, noncumulative testimony); *United States* v. *Danielson*, 325 F.3d 1054, 1071 (9th Cir. 2003) (defendant required to show communication of defense strategy to undisclosed informant acting affirmatively to intrude into attorney-client relationship).

45

The Supreme Court has long recognized that the Sixth Amendment right to assistance of counsel includes a corollary right to be represented by the counsel of the defendant's choosing. *United States* v. *Gonzalez-Lopez*, 126 S. Ct. at 2561; *Wheat* v. *United States*, 486 U.S. 153, 159 (1988). "[T]he Sixth Amendment guarantees the defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds." *Caplin & Drysdale, Chartered* v. *United States*, 491 U.S. 617, 624-25 (1989). However, "the right to counsel of choice is circumscribed in several important respects." *Gonzalez-Lopez*, 126 S. Ct. at 2561 (quotation omitted). The defendant does not have an absolute right to insist on counsel who is unavailable to try the case as reasonably scheduled, who is not qualified under the court rules of the jurisdiction, or who has a conflict of interest. *Wheat* v. *United States*, 486 U.S. at 159. "Because the right to counsel of one's choice is not absolute, a trial court may require a defendant to proceed to trial with counsel not of defendant's choosing; although it may not compel defendant to proceed with incompetent counsel." *United States* v. *Schmidt*, 105 F.3d 82, 89 (2d Cir. 1997). In this fashion, the right to counsel of choice (and any subsidiary right that may arguably exist, such as the right found by the District Court to freedom from interference with access to funds to pay for a defense) differs from the right to effective assistance of counsel, which is an irreducible minimum under the Sixth Amendment.

Where a defendant claims that the Government has infringed on his Sixth Amendment rights, he must prove that the conduct in question is attributable to the Government, *i.e.*, that it constitutes "state action." *See Thompson* v. *Mississippi*, 914 F.2d 736, 738 (5th Cir. 1990) (victim's pretrial viewing of defendant at jail not attributable to state, so no violation of Sixth Amendment right to counsel). In ineffective assistance of counsel cases, the conduct of the trial

46

itself constitutes state action. *See Cuyler* v. *Sullivan*, 446 U.S. 335, 343 (1980). But because the right to counsel of choice can be overridden by various factors, merely proceeding to trial without preferred counsel cannot itself be a Sixth Amendment violation. There must be some conduct attributable to the Government, making it responsible for the defendant's inability to have the counsel of his choice (or the resources he would like to use for his defense), before a constitutional violation can be found.

## C.    Discussion

Notwithstanding extensive discovery already taken on this issue in the Middle District of Pennsylvania, the Rigases have not -- and cannot -- establish that the Government caused Adelphia to cut off payment of their legal fees or interfere with their access to witnesses. Now the Rigases seek to continue their fishing expedition through a motion supported primarily by their own self-supporting affidavits, which can be given no weight in light of the trial record proving beyond a reasonable doubt their orchestration of a massive fraud.  The motion fails and should be denied without discovery or a hearing because (1) the Government did not interfere with the Rigases access to witnesses; (2) their claims could have been raised long ago in this Court and the Second Circuit; (3) they had access to tens of millions of dollars for their defense; and (4) the Government did not cause Adelphia to cut off the payment of fees in any event.

### 1.    The Government Did Interfere with the Rigases' Access To Witnesses

The Rigases contend, based on a single Adelphia memorandum to employees dated October 14, 2002, that the Government violated their constitutional rights by causing Adelphia to instruct its employees not to cooperate with the Rigases.  Mot. 63-68.  This contention fails and should be denied without discovery or a hearing.

47

First, in its Rule 33 opinion dated November 20, 2007, this Court has already rejected this claim.[2]   The Court found that the October 14, 2002 memorandum did not have a "'chilling effect'" on the Rigases' access to certain witnesses because the Rigases did not attempt to subpoena them.  United States v. Rigas, 2007 WL 4145282, at *5; see Rigases Rule 33 Motion dated July 5, 2007, at 46 (citing October 14, 2002 memo).  As this Court has already found, "defense counsel does not allege that these witnesses would have defied a federal subpoena had they been called to testify at trial. . . . Defendants' choice not to pursue this testimony was a strategic decision[.]"  Id. at *5.  Indeed, the Court found that the Rigases have already "'concede[d] that the decision not to call these witnesses was a conscious and deliberate decision 'discussed among counsel and with at least Tim and John Rigas.'"  Id.  This conclusion is not changed by the Rigases protestations that they could not have been expected to subpoena and call witnesses who would not speak to them before trial. (Mot. 66).  This Court has already rejected that argument as well.  Id.  Because the Court has already rejected the Rigases' complaint regarding its access to witnesses, and because this holding has already been affirmed on appeal, the Sixth Amendment claim should be denied without discovery and without a hearing.

Second, nothing in the October 14, 2002 memorandum remotely suggests that the Government asked Adelphia to instruct employees not to speak to the Rigases.  In its opening paragraph, the memorandum notes several legal developments, including Adelphia's pursuit of its own legal claims against the Rigases, litigation with the SEC, and the Government's criminal

---

[2]      To the extent that the purportedly constitutional basis for the Rigases' contention in the instant motion makes it distinguishable from its Rule 33 arguments arising from the same set of facts (that is, the October 14, 2002 memorandum), the contention fails because it was not raised before now as a constitutional claim before the District Court or on direct appeal.

investigation, but it does not even suggest that the Government asked Adelphia to so instruct its employees.  Comerford Decl. Ex. U, at 1.  Indeed, one AUSA who tried the Rigas case for the Government stated in Bankruptcy Court in January 2003 that the Government had done no such thing:

> We have never directed Adelphia, nor could we, as far as we know, tell them not to have their employees talk to anyone.  It's a corporation.  It can do what it wants.  We don't have any power over them.  If Adelphia directed its employee not to talk to other people, I think they could still talk to other people: but certainly that is not something that we have done, and that is not something that is within our control.

Exhibit A, p. 22-23.  Nor is there any other support for the proposition that the Government encouraged Adelphia or any other entity or individual not to cooperate with the Rigases.[3] Indeed, as described in more detail below, the meetings and other communication between Adelphia and the Government in 2002 establishes the opposite proposition – that the Government did not so request.  Finally, there is nothing in the Holder or Thompson memoranda suggesting that a corporation wishing to avoid indictment should instruct its employees not to speak to the Rigases.  Comerford Decl. Ex. N, Ex. O.  Adelphia decided, for its own reasons, to so instruct its employees.  The Rigases' assertion to the contrary is based on pure speculation.  Accordingly, the application should be denied on this issue without discovery or a hearing.

## 2.   The <u>Stein</u> Claim Should Be Denied Because It Was Not Raised Post-Trial Or On Direct Appeal

On May 24, 2007, when it decided the first direct appeal in this case, the Second Circuit remanded this case to the District Court for resentencing.  <u>United States</u> v. <u>Rigas</u>, 490 F.3d 208 (2007).  By that time, <u>United States v. Stein</u>, 435 F.Supp.2d 330 (S.D.N.Y. June 26, 2006) had

---

[3]   The Rigases' assertion in a footnote (Mot. 65 n.20) that the Government influenced Buchanan Ingersoll, Deloitte, and unnamed individuals not to interact with the Rigases also fails because it is based on pure speculation, which is not a proper basis for discovery.

been decided for almost one year.  And by that time, it had been five years since Adelphia's board decided not to advance legal fees to the Rigases on or about June 1, 2002.  After this case was remanded on May 24, 2007, this Court heard a Rule 33 motion (2007 WL 4145282 (S.D.N.Y. Nov. 20, 2007)) and a motion to compel (2008 WL 144824 (S.D.N.Y. Jan. 15, 2008)), and these issues were litigated again before the Second Circuit.  At no time during any of this post-trial, post-Stein litigation did the Rigases claim that the Government violated their Sixth Amendment rights by interfering with their access to attorney's fees.  In addition, although the Government has not conducted an exhaustive search of the voluminous record in this case, the Government believes that, before trial, the Rigases did not seek adjournments or other remedies on the grounds that they had insufficient funds, inadequate technology, or insufficient time to review documents provided to them by the Government or by Buchanan Ingersol, or insufficient time to prepare themselves or other witnesses for testimony.   These are the very alleged circumstances that underlie their Stein claim.  Accordingly, the Sixth Amendment claim should be denied without a hearing and without discovery.  To do otherwise would encourage the worst form of sandbagging.

### 3.    The Rigases Had Access To Tens of Millions of Dollars For Their Defense

Stein is entirely distinguishable from the Rigases' situation.  The Rigases shared in the disbursement during bankruptcy proceedings of $27.8 million for legal fees, and they have had access to an additional $11.5 million held in a legal defense fund pursuant to global settlement agreements with Adelphia and the Government, and another $19.6 million in funds paid by the D&O carrier.  Using these funds, the Rigases defended themselves vigorously at all stages of investigation and litigation for almost ten years.  By their own account, they were represented by a host of lawyers and law firms at various times.  For example, the Rigases retained Curtis

Mallet-Prevost, Colt & Mosle, LLP and Morvillo, Abramowitz, Grand, Iason, & Silberg, P.C. as their criminal trial counsel and also hired Dewey Ballentine for a time.  They also hired a partner at Reed Smith who had been with Buchanan Ingersoll, Adelphia's long-time counsel. The Rigases met with attorneys from Fried Frank Harris Shriver and Jacobsen to discuss the possibility of that firm representing both them and Adelphia.  Before the relationship became adversarial, they were briefly represented by an attorney at Boies Schiller and Flexner, LLP.  On appeal to the Second Circuit and the Supreme Court, they were represented by Howrey LLP, Curtis Mallet-Prevost, and Stillman & Friedman, P.C.  In the instant petition, Rigases are represented by Dilworth Paxson LLP and Lawrence C. Marshall, a Stanford Law School professor.

These lawyers vigorously defended the Rigases at all stages of investigation and litigation for the past ten years.  Over that time, the Rigases' counsel filed numerous pre-trial motions to dismiss, for discovery, and for a bill of particulars.  They extensively cross-examined prosecution witnesses who were on the stand for days at a time in a trial that lasted over four months, and they presented numerous defense trial exhibits and detailed closing arguments. United States v. Rosen, 487 F.Supp.2d at 734-735 (notwithstanding government interference that allegedly led to loss of fee payments, no prejudice to defense where counsel chosen by defendants remained fully engaged in case and provided zealous and very effective defense). How these lawyers (and the Rigases) have decided to spend tens of millions of dollars in their defense was a matter of litigation and trial strategy.  Accordingly, the Stein application should be denied without discovery or a hearing.  See United States v. Rosen, 487 F. Supp.2d 721, 735 (E.D. Va. 2007) (espionage case that was "substantial and complex, but not of Stein's magnitude;" no persuasive showing of prejudice where defense counsel vigorously defended

51

case despite cessation of funding by defendants' employer); United States v. Thomas, 519 F. Supp.2d 141, 144-45 (D. Maine 2007) (no prejudice resulted from IRS jeopardy notice to trust fund which defendant hoped would pay legal fees and expenses for defense of 6-count income tax evasion indictment).

The Rigases speculate that, had they had sufficient time to review or prepare witnesses, they would have identified two particular documents for use at trial, and would have called certain witnesses in their defense, and that the result at trial might have been different.  These claims should be rejected.  First, the fact that the Rigases can identify only two documents that, with hindsight, they might have introduced at trial, establishes how thoroughly prepared they were for trial.  Indeed, after any complex trial, regardless of the result, both sides are likely to have second thoughts about many aspects of witness preparation and evidence.  Such trial strategy decisions cannot form the basis for a Section 2255 petition.

In addition, given the overwhelming evidence of the Rigases' guilt, it is extremely unlikely that the two documents in question  –  a 1998 communication between Carl Rothenberger and Bruce Booken and a 1999 memorandum from James Brown to the Adelphia board  – would have changed the outcome.  Mot. 56-57.  Without conceding the relevance or import of these documents, neither one bears on the issue of whether and how the Rigases' stock purchases were disclosed in public filings, and the Rigases were properly convicted of that crime.

In any event, the Rigases had many months before trial to find these documents, and they had three years between the end of trial and the Second Circuit's remand in May 2007 to bring them to the Court's attention.  Although the Rigases have conceded that they knew of these documents as early as September 2007 (see McMichael Decl. ¶ 45, 46), one of them bears a

deposition exhibit sticker dated September 27, 2005.  See Grand Decl., Ex. B.  They should have brought these documents to the attention of this Court and the Second Circuit long ago, not as part of their 2255 petition.

The Rigases suggest other things that they would have done with more money to pay lawyers – more review of public filings, more witness interviews, and preparation of experts and other witnesses (T. Rigas Decl. ¶ 46-48).  However, their assertions are entirely conclusory and speculative in nature.  The Rigases do not mention a single public filing that was missed or describe anything that a single expert or fact witness would have said at trial that might have changed the outcome.  Accordingly, their <u>Stein</u> motion should be denied without discovery or a hearing.

**4.      The Government Did Not Cause Adelphia To Cut Off Legal Fees**

Separate and apart from the fact that the Rigases had tens of millions of dollars with which to fund their defense, the Rigases have failed to show that Adelphia's decision to not indemnify the Rigases was influenced – let alone "substantially influenced" -- by the Government.

First, the Bankruptcy Court record in January 2003 establishes that the Government did not oppose the Rigases' access to funds to pay for their defense.  At that time, a prosecutor who tried this case stated in open court to a United States Bankruptcy Judge that "we have never objected, we have never taken a position on orders of the Court allowing the Rigases to sell assets to fund their defense or make whatever arrangements they may need to fund their defense, nor will we.  We don't have an objection to that.  We don't have an interest in trying to stop them from funding their defense of this or the criminal action."  Exhibit A, at 22-23.

Second, while it is certainly true that Adelphia and its independent directors and management were acutely aware that the company could be indicted, the Rigases have brought forth no evidence, despite extensive discovery in the Middle District of Pennsylvania, that Adelphia declined to cover the Rigases' legal expenses as a means to avoid being indicted, or otherwise took such action at the government's request.  The June 1, 2002 Adelphia board minutes reflecting the decision not to advance legal fees plainly establish that the Board had two fundamental reasons for not advancing legal fees: (1) the Rigases' "fail[ure] to cooperate with the Special Committee" investigating their misconduct, and (2) the related party transactions that they entered into for their own benefit at Adelphia's expense.  Comerford Decl. Ex. Y, at 3.  And both these grounds are fully consistent with Adelphia's corporate by-laws.[4]  The minutes further make clear that the Government "appeared satisfied" not by Adelphia's decision to cut off fees or access to witnesses but by the "resignations" by the Rigas family members from the board. Id.  The underlying notes of one participant in this meeting also indicate that the Government indicated its "pleasure" at the "Δ [change] in control" of the company, i.e., the Rigases resignation from the board.  Comerford Decl. Ex. Z at PM 04067.

Indeed, the "evidence" that the Rigases cite for the proposition that the Government influenced Adelphia to cut off fees and access to witnesses actually proves the opposite.  For example, Covington & Burling letter to the Government dated August 1, 2002, in which lawyers for Adelphia outlined the company's compliance with the Holder Memorandum and reasons why it should not be indicted, establishes that Government did not influence Adelphia to cut off fees or access to witnesses.  Comerford Decl. Ex. BB.  While it includes a lengthy discussion of the

---

[4]        Section 6.2 of the Adelphia By-laws specifically provided that the Rigases were not entitled to advancement of defense expenses if the Board of Directors or independent legal counsel reasonably determines that [they] deliberately breached [their] duty to the Corporation or its shareholders."

Holder factors, the letter never mentions the Board's decision not to fund the Rigases' defense or Adelphia's decision to instruct its employees not to speak to the defense, let alone feature these decisions as reason for not prosecuting Adelphia.

Similarly, almost two years later, in a November 5, 2004 presentation on the Thompson Memorandum factors to prosecutors in the Southern District of New York, Adelphia's counsel again omitted any reference to the company's decision not to advance legal fees or permit its employees to speak to the defense. Comerford Decl. Ex. DD (attachment to Vinegrad Affidavit). Plainly, if Adelphia had made those decisions to curry favor with the Government, it would have featured them prominently in both of these presentations. Instead, neither issue is mentioned, not even in passing. This is because both decisions were made for reasons independent of the Government.

The Rigases maintain that the May 18, 2002 Adelphia board minutes show that the Board was concerned that the government would "not permit" a certain "type of arrangement" with the Mot. 39. However, when one reads the entire paragraph in question, it is clear that the discussion of what the Government would or would not permit relates to a proposed "severance arrangement" for the Rigases including "salary, benefits, and use of an office." There is no discussion of attorney's fees. Comerford Decl. Ex. V, at 2. The question whether to permit Adelphia employees to speak to the Rigases is also not mentioned in these May 18, 2002 minutes. Notes of this board meeting also indicate that, the "focus" of the Government at a recent meeting was on a number of issues -- including stopping or controlling the Rigases ability to continue looting Adelphia -- none of which included advancement of attorney's fees or access to witnesses. Comerford Decl. Ex. W at 2, 4-5.

Similarly, the May 25, 2002 notes that say prosecutors were "appalled" at the severance deal explicitly say that the Government were upset by the "severance package" and the retention of "2 seats on the Board," and not to the advancement of fees or access to witnesses. Comerford Aff. Ex. X at PM 04056. And a reference to the fact that the government "[m]ay indict the Company" expressed what was obvious to Adelphia management in May 2002 in light of the breadth and depth of the fraud. Id.

In addition, a July 2002 e-mail exchange between a prosecutor and an attorney for Adelphia relating to a release being prepared for employees who were being placed on administrative has no relation to Adelphia's decisions to cut off fees for the Rigases or their access to Adelphia employees. Comerford Decl. Ex. AA. In any event, this exchange occurred approximately two months after the Adelphia board decided to cut off fees for the Rigases. Another e-mail to a prosecutor that the Rigases cite occurred even later – August 22, 2002 – and it also does not relate to these decisions by Adelphia. Comerford Decl. Ex CC.

On this record, United States v. Stein, 541 F.3d 140 (2d Cir. 2008) is entirely distinguishable. In Stein, the Second Circuit concluded that the defendants had been deprived of attorneys' fees "as a direct consequence of the government's overwhelming influence" which resulted in a violation of the defendants' Sixth Amendment rights. 541 F.3d 130, 136 (2d Cir. 2008). The Court found that the government "forced KPMG to adopt its constricted Fees Policy" and then "became 'entwined in the ... control' of KPMG in enforcing that policy. Id. at 148. This finding was based on, among other things, an affidavit from the defendants' employer, KPMG, which stated that KPMG was "substantially influenced" in its decision not to pay the employees legal fees by the Department of Justice memorandum on corporate prosecution. Id. at 405; United States v. Stein, 541 F.3d 130, 140 (2d Cir. 2008). District courts applying Stein

56

have emphasized that defendants must show that prosecutors and regulators "significantly encouraged" termination of legal fees, "became entwined in the control" of corporate decisions denying attorney's fees to employees, or otherwise wrongfully interfered in a defendant's right to use his funds to retain the counsel of choice, or that a decision to terminate legal fees was the "direct consequence of the pressure applied by" the Thompson or Holder memoranda.  See United States v. Balsinger, 2009 WL 2750673, *3-*4 (E.D. Wis. 2009)(record did not show government coercion was "sole cause" of company's decision to limit payment of defendants' legal defense fees; nothing to show that prosecutors raised the subject of legal fees with company or indicated that advancement of fees would be used against company); SEC v. Dunn, 587 F.Supp.2d 486, 512-513 (S.D. N.Y. 2008) (no facts showing that decision to terminate employee's legal fees was "direct consequence" of Thompson Memorandum or SEC "significantly encouraged" or became "entwined" in decision-making process); United States v. Rosen, 487 F.Supp.2d 721; 726 (E.D. Va. 2007)(allegation that government pointedly asked employer at meeting if it was paying employee defendants' legal fees and indicated employer should cease paying fees enough to show wrongful interference with right to counsel).  Here, the Rigases have not produced any records even suggesting that Adelphia would have advanced attorneys fees to the Rigas in the absence of the Holder memorandum or that prosecutors pressured Adelphia to deny the advancement of attorney's fees to the Rigases or any other employee, or otherwise involved themselves in the control of Adelphia or the decision not to advance attorneys fees (or Adelphia's instruction to employees concerning contact with the Rigases).  Because the Rigases have not established that the Government caused Adelphia to cut off fees or access to witnesses, or otherwise met the standard for discovery on this issue, the application should be denied without a hearing.  See United States v. Balsiger, 2009 WL

57

2750673, *4 (E.D. Wis.) (nothing in record to show U.S. Attorney's office raised subject of legal fees with company, let alone that advancement of such fees would be used against company); S.E.C. v. Dunn, 587 F. Supp.2d 486, 512-513 (S.D.N.Y. 2008)(insufficient showing that company's termination of payment of legal fees resulted from state action); United States v. Graham, No. 03-CR-089-RB, 2003 WL 23198793 (D. Colo. Dec. 2, 2003) (rejecting argument that the Thompson Memorandum alone converts a corporation under investigation into an arm of the Government).

**5.     The Government Did Not Cause Brown To Testify Falsely Against the
Rigases**

Finally, the Rigases claim that Adelphia's decision to cut off James Brown's legal fees,

which they attribute to the Government, forced Brown to enter into a cooperating agreement and

testify falsely against them.  Mot. 68.  This argument fails for several reasons.  First, the

Government did not ask Adelphia to cut off Brown's legal fees.  Second, this claim is based on

nothing more than Timothy Rigas's self-serving affidavit, which can be given no weight in light

of the massive fraud that he perpetrated.  Third, the affidavit itself does not even support the

claim; it does not state that Brown told Timothy Rigas that he would plead guilty, let alone plead

guilty pursuant to a cooperation agreement and testify falsely at trial, because of the cost of his

defense.  <u>See</u> T. Rigas Decl. ¶ 50.  Fourth, these purported statements by Brown to Timothy

Rigas were known to the Rigases at the time of trial.  At most, the purported statements

constitute potential impeachment material.  They cannot form the basis for a constitutional

challenge.  Accordingly, the application should be denied without discovery and without a

hearing.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Rigases' Motions should be denied without discovery and

without an evidentiary hearing.

Dated: New York, New York
       February 22, 2012

                                    Respectfully submitted,

                                    PREET BHARARA
                                    United States Attorney

                          By:     _____
                                    David B. Massey
                                    Justina L. Geraci
                                    Assistant United States Attorneys

1

## <u>CERTIFICATE OF SERVICE</u>

I, David B. Massey, Assistant United States Attorney for the Southern District of New

York, hereby certify that on February 22, 2012, I caused a copy of the foregoing *Memorandum*

*of Law of the United States of America in Opposition to the Motions of [ ] Under 28 U.S.C §*

*2255 to Vacate, Set Aside, or Correct their Sentences*, to be served upon:

      Lawrence G. McMichael, Esq. (lmcmichael@dilworthlaw.com)
      Christie Callahan Comerford, Esq. (ccomerford@dilworthlaw.com)
      Kristin L. Repyneck (krepyneck@dilworthlaw.com)
      Dilworth Paxton LLP
      1500 Market Street, Suite 3500E
      Philadelphia, PA 19102-2101
      Tel: 215-575-7000

Dated: New York, New York
      February 22, 2012

                                  _____
                                  David B. Massey
                                  Assistant United States Attorney
                                  (212) 637-2283