UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

JOHN J. RIGAS and TIMOTHY J. RIGAS,

                              Petitioners,                    11-CV-6964 (KMW)
                                                             **<u>OPINION & ORDER</u>**

              -against-

UNITED STATES OF AMERICA,

                              Respondent.
------------------------------------------------------------------X

KIMBA M. WOOD, District Judge:

Petitioners John and Timothy Rigas allege that the Government hindered them from

speaking to potential witnesses before trial, in violation of the Fifth and Sixth Amendments (the

"Witness Access Claim"), and compelled their former employer to refuse to advance their legal

fees, in violation of the Sixth Amendment (the "Fee Advancement Claim").[1]  On June 19, 2014,

the Court preliminarily approved discovery in connection with those claims.  (*See* Discovery

Order [ECF No. 39]).  At the Government's request, however, the Court stayed discovery

pending a determination of whether Petitioners can establish "cause" for procedurally defaulting

their claims earlier in the proceeding.  (*See* Order Staying Discovery [ECF No. 47]).

After review, the Court preliminarily holds that Petitioners have demonstrated cause for

defaulting both claims.[2]  The Court also holds — in response to a Government argument beyond

the scope of the requested briefing — that the Witness Access Claim is not barred by the law-of-

---

[1] Petitioners separately claim that the Government violated the Sixth Amendment by compelling two law firms to decline to represent them.  (*See* Habeas Mot. at 53–54 [ECF No. 1]).  That claim is not at issue here.
[2] The Court may revisit the issue of cause if, during discovery, additional evidence comes to light that was reasonably available to Petitioners at the time of default.

the-case doctrine.  Accordingly, Petitioners may proceed with discovery on their claims, using the attached lists of authorized document requests.

## I.     Background

Petitioners are former executives of Adelphia Communications Corporation ("Adelphia").  John Rigas founded the company and served as its Chief Executive Officer; Timothy Rigas, his son, served as Chief Financial Officer.  In 2002, Adelphia came under government scrutiny for its accounting of related-party transactions with entities that Petitioners and their family members controlled.  Several of the company's executives, including Petitioners, were subsequently prosecuted for fraud and sued by Adelphia for civil damages.  The following portions of those proceedings are relevant to the present dispute.

### A.  Events Before Trial

Petitioners resigned from Adelphia in May 2002, and were indicted four months later on charges of securities fraud, bank fraud and conspiracy.  The indictment claimed, in part, that Petitioners had used related-party transactions and fraudulent accounting to conceal Adelphia's debts and misappropriate millions of corporate dollars for their personal use.

At the time, Adelphia's bylaws conditionally obligated the company to advance legal fees to certain officers who faced criminal charges related to their employment.  (*See* Sep. 30, 1999 Adelphia Bylaws ("Adelphia Bylaws") Sec. 6.2 [ECF No. 7 Ex. T]).  That obligation did not extend to officers who had "deliberately breached [their] duty to the Corporation or its shareholders."  *Id.*  On June 1, 2002, Adelphia's board determined that Petitioners had deliberately breached their duties to both the company and its shareholders by engaging in, and failing to properly disclose, the related-party transactions.  (*See* Minutes of June 1, 2002

Adelphia Board Meeting ("June 1 Minutes") at 3 [ECF No. 7 Ex. Y]).  In keeping with its

bylaws, the company refused to advance legal fees to Petitioners thereafter.  *Id.*

Crippled by concerns about its accounting practices, Adelphia filed for bankruptcy later

in June 2002.  Soon after, the company commenced an adversary bankruptcy proceeding against

Petitioners, among others, seeking to recover the money that they had allegedly "looted" through

the related-party transactions.  Complaint ¶ 57, *In re Adelphia Comm. Corp.*, No. 02-8051

(S.D.N.Y. 2002) (Gerber, B.J.).  In October 2002, Adelphia's general counsel issued a

memorandum to the company's employees.  The document explained that Adelphia was

cooperating with several government investigations, and "continue[d] to pursue its own claims

against" Petitioners.  (Oct. 14, 2002 Memo at 1 [ECF No. 7 Ex. U]).  The memorandum then

instructed Adelphia's employees not to speak to Petitioners or their counsel directly, and to refer

communications from them to the company's legal department.  *Id.* at 2–3.

Over the next two years, Petitioners simultaneously prepared for their criminal trial and

mounted a defense in the adversary bankruptcy proceeding.  Under the relatively strict provisions

of criminal discovery, Petitioners were not entitled to depose Adelphia employees who refused to

speak to them before trial.  But Petitioners could — and did — request to depose those same

employees under the broader civil discovery provisions that applied in bankruptcy court.  Not

surprisingly, the prosecution immediately moved to intervene in the adversary proceeding and

stay most of the requested depositions.  The Government argued that the stay was necessary to

prevent Petitioners from intimidating potential trial witnesses or otherwise "circumventing the

rules governing criminal discovery to obtain an unfair advantage."  (Gov. Mot. to Intervene &

Stay Discovery at 7–10, 21–23, *In re Adelphia Comm. Corp.* [Doc. No. 76]).

Several defendants in the adversary proceeding independently opposed the Government's motion.  One of them, Michael Mulcahey, argued that the real risk of witness intimidation came from Adelphia and the Government, not the defendants.  (*See* Mulcahey Opp. to Interv. & Stay at 18–21, *In re Adelphia Comm. Corp.* [Doc. No. 82]).  Citing the October 2002 memorandum from Adelphia's general counsel, Mulcahey claimed that the company, "encouraged if not commanded by the government, ha[d] expressly intimidated its employees from even talking to the defendants or defense investigators and attorneys." *Id.* at 18.  Mulcahey described that intimidation as unconstitutional, reasoning that Adelphia, acting in concert with the Government, qualified as a state actor and had violated both the employees' free-speech rights and the defendants' right to collect evidence. *Id.* at 19–21.

The prosecution emphatically denied Mulcahey's allegations.  During oral argument about the proposed stay, Assistant United States Attorney Christopher Clark stated:

> I should note also that there are at least a couple of references in the brief to the Government trying to stop people from talking to Adelphia witnesses . . . .  We have never directed Adelphia, nor could we, as far as we know, tell them not to have their employees talk to anyone.  It's a corporation.  It can do what it wants. We don't have any power over them.  If Adelphia directed its employees not to talk to other people, I think they could still talk to other people; but certainly that is not something that we have done, and that is not something that is within our control.

(Transcript of Feb. 4, 2003 Hearing in *In re Adelphia Comm. Corp.* ("Bankruptcy Tr.") at 22:18–23:16 [ECF No. 46 Ex. A]).  Several days later, the bankruptcy court granted the stay.

### B.  Trial and Petitioners' Rule 33(b)(2) Motions

Petitioners' trial began in February 2004 before Judge Sand.  The prosecution called several former or current Adelphia employees, including former Vice President of Finance James Brown, to testify about Petitioners' conduct.  *See United States v. Rigas*, 490 F.3d 208, 221 (2d Cir. 2007) ("*Rigas I*").  Petitioners cross examined those witnesses, but they did not call any

additional Adelphia employees to discuss what had occurred at the company.  *See id.* at 219.  On

July 8, 2004, Petitioners were convicted on multiple counts.  *See id.* at 211.  They immediately

filed motions for a new trial under Federal Rule of Criminal Procedure 33(b)(2) ("Rule

33(b)(2)"), which were unsuccessful.  The following June, Judge Sand sentenced John Rigas to

15 years' imprisonment and Timothy Rigas to 20 years' imprisonment.

C.   Resentencing and Petitioners' 2007 Rule 30(b)(1) Motion

Petitioners appealed their convictions.  In May 2007, the Second Circuit reversed one

count of conviction and remanded for resentencing.  *Rigas I*, 490 F.3d at 239.  In July 2007,

before that resentencing occurred, Petitioners moved for a new trial under Federal Rule of

Criminal Procedure 33(b)(1) ("Rule 33(b)(1)"), which permits a court to vacate a judgment on

the basis of "newly discovered evidence" that the movant could not previously have found

through diligent inquiry.[3]  Fed. R. Civ. P. 33(b)(1).

The motion argued that Brown, a critical Government witness, had perjured himself at

trial.  (*See* 2007 Rule 33(b)(1) Mot., *United States v. Rigas*, No. 02-CR-1236 [Doc. No. 383]).

To support that charge, Petitioners cited Brown's testimony in various post-trial civil

proceedings, which purportedly contradicted (and exposed) his perjurious statements at trial.  *Id.*

at 13–26.  Petitioners also cited the post-trial testimony of several other Adelphia employees,

which allegedly corroborated Brown's post-trial statements.  *Id.* at 26–42.  Unlike Brown, those

Adelphia employees had not testified during Petitioners' trial; Petitioners had known about them

at the time, but had decided not to subpoena them.

---

[3] Petitioners had previously moved for a new trial under Rule 33(b)(1) in March 2005, on the basis of different "newly discovered evidence."  (*See* 2005 Rule 33(b)(1) Mot., *United States v. Rigas*, No. 02-CR-1236 [Doc. No. 217]).  That motion, which was unsuccessful, is not relevant here.

The Rule 33(b)(1) motion offered a creative argument for why Petitioners could not previously have "discovered" the Adelphia employees' testimony by eliciting it during trial.  In keeping with Adelphia's October 2002 internal memorandum, those employees had refused to speak to the Rigas family before the criminal proceeding.  According to the Rule 33(b)(1) motion, that refusal rendered the employees effectively "unavailable" to Petitioners during trial, because it was prohibitively risky for Petitioners to subpoena them without any indication of how they would testify.  *Id.* at 42–49.  In other words, reasonable strategic considerations had barred Petitioners from eliciting the employees' testimony earlier, which meant it qualified as "newly discovered" in 2007.[4]  *Id.*

Judge Sand denied Petitioners' Rule 33(b)(1) motion.  The court concluded that Brown's post-trial testimony did not constitute evidence of prior perjury.  *United States v. Rigas*, No. 02-CR-1236, 2007 WL 4145282, at *3 (S.D.N.Y. Nov. 20, 2007), *aff'd*, 583 F.3d 108 (2d Cir. 2009).  The court also held that the other Adelphia employees' post-trial testimony did not qualify as "newly discovered evidence" under Rule 33(b)(1), because Petitioners could have elicited the same testimony during trial (whatever the attendant tactical risks).  *Id.* at *5.  The Second Circuit affirmed, and in June 2008, Judge Sand resentenced Petitioners to marginally lower sentences.

D.  Habeas

On October 4, 2010, Petitioners filed a habeas motion under 28 U.S.C. § 2255, which raised the Witness Access Claim and the Fee Advancement Claim for the first time.  (*See* Habeas Mot. at 32–68).  There is no dispute that Petitioners procedurally defaulted both claims by not

---

[4] Although the 2007 Rule 33(b)(1) motion speculated that some Adelphia employees had refused to communicate with Petitioners before trial because they feared indictment, the motion did not accuse the Government of unconstitutionally interfering with Petitioners' access to witnesses.  (*See* 2007 Rule 33(b)(1) Mot. at 47–49).

raising them earlier in the case, although the parties disagree about when the defaults occurred. To prevail, therefore, Petitioners must demonstrate either "cause" for their defaults and "prejudice" from the underlying prosecutorial interference, or "actual innocence." *Gutierrez v. Smith*, 702 F.3d 103, 111 (2d Cir. 2012). At the Government's request, the parties have briefed the issue of "cause" separately, before commencing discovery.[5]

To establish cause, Petitioners argue that they lacked a factual basis for either the Witness Access Claim or the Fee Advancement Claim at the trial stage, and were procedurally foreclosed from raising the claims thereafter. Petitioners acknowledge that they possessed before trial some of the evidence on which they now rely to prove unconstitutional prosecutorial interference. According to Petitioners, however, that evidence alone did not support their present claims. Instead, the claims became factually viable only years later, at which point Petitioners had lost their chance to allege prosecutorial interference before the trial or appellate court.[6] (*See* Pet. Opp. at 14–18).

The Government disagrees. It argues that the evidence available to Petitioners before trial constituted a factual basis for both the Witness Access Claim and the Fee Advancement Claim, and that any additional evidence gathered after trial "simply repeat[ed] what Petitioners already knew." (Gov. Reply at 9–20 [ECF No. 58]).

## II.    Legal Standard

To establish cause for a procedural default, a petitioner must show that "'some objective factor external to the defense'" prevented him from raising his claim. *Sosa v. United States*, No.

---

[5] In their briefing, Petitioners suggest that the Witness Access Claim and the Fee Advancement Claim are "not procedurally defaulted" because they can establish cause. (*See, e.g.*, Pet. Opp. at 7 [ECF No. 56]). Petitioners mean to say that their claims are procedurally defaulted with cause; a showing of cause may excuse, but not erase, a procedural default. *See, e.g.*, *Gutierrez*, 702 F.3d at 111 n.4.

[6] Some of Petitioners' arguments are contained in a proposed Sur-Reply Brief. (*See* Pet. Sur-Reply [ECF No. 61 Ex. 1]). The Court has considered those arguments, and now formally GRANTS Petitioners' motion to file the Sur-Reply. (*See* Mot. for Leave to File Sur-Reply [ECF No. 61]).

02-CV-1850, 2003 WL 1797885, at *5 (S.D.N.Y. Apr. 3, 2003) (Leisure, J.) (quoting *Murray v. Carrier*, 477 U.S. 478, 479 (1986)).  A petitioner may make that showing in several ways, including by demonstrating that "the factual or legal basis" for his claim "was not reasonably available to counsel."  *Murray*, 477 U.S. at 488.

The "factual basis" standard creates two potential points of dispute:  what facts were reasonably available at the time of default, and whether those facts constituted a factual basis for the defaulted claim.  The first point is relatively uncontested in this case; with one small exception, the parties agree on the scope of evidence reasonably available to Petitioners at the trial stage.  But the parties disagree sharply on the second point.  Petitioners argue that the evidence available during trial did not support either the Witness Access Claim or the Fee Advancement Claim, while the Government contends that the same evidence constituted a factual basis for both claims.

Case law does not define the precise evidentiary threshold at which the factual basis for a claim forms.  Few decisions have explored the concept in depth, in part because many disputes hinge on whether particular facts were reasonably available — not whether those facts, if available, constituted a factual basis for a defaulted claim.  With such sparse precedential guidance, the Court must employ a degree of discretion in resolving the present dispute.  That said, two prior decisions inform the Court's analysis.

A. *McCleskey v. Zant*

The first decision is *McCleskey v. Zant*, 499 U.S. 467 (1991), which the Government cites at length to clarify the threshold for a factual basis in the procedural default context.  (*See* Gov. Reply at 3–7).  The petitioner in that case had been convicted of murder in state court, based in part on the trial testimony of an inmate who — posing as a relative of the petitioner's

co-defendant — conversed with the petitioner about the crime during his pre-trial detention, and then reported the petitioner's incriminating statements to the police.  *See McCleskey*, 499 U.S. at 470.  After his direct appeals failed, the petitioner filed three successive habeas petitions:  (1) a state petition that argued, unsuccessfully, that the Government had violated his Sixth Amendment rights as defined in *Massiah v. United States*, 377 U.S. 201 (1964), by using the inmate as an agent to elicit incriminating statements; (2) a federal petition under 28 U.S.C. § 2254 that failed to raise the *Massiah* claim; and (3) a second § 2254 petition that attempted to raise the *Massiah* claim.  *McCleskey*, 499 U.S. at 472–74.

The Court decided that the petitioner had procedurally defaulted his *Massiah* claim by omitting it from his first § 2254 petition, and could proceed only by demonstrating cause and prejudice.  *Id.* at 493–94.  In an effort to establish cause, the petitioner argued that the factual basis for his claim had not previously been available.  He contended that his *Massiah* claim was premised entirely on a signed statement that the testifying inmate had made to the police before trial — a document that had not been disclosed until after the petitioner filed his first § 2254 petition.  *Id.* at 474.

The Supreme Court disagreed, holding that the petitioner had possessed a factual basis for the *Massiah* claim during trial.  At that time, the Court explained, the petitioner already knew three facts:  (1) the inmate had posed as his co-defendant's relative; (2) the petitioner had spoken with the inmate about the charged crime; and (3) the inmate had reported the petitioner's incriminating statements to the police.  *Id.* at 499.  According to the Court, that information constituted a factual basis because it placed the petitioner "on notice to pursue the *Massiah*

9

claim." *Id.*  Thus, by the time the petitioner learned about the testifying inmate's signed statement, he had already defaulted his *Massiah* claim without cause.[7]

As a guiding precedent for the present case, *McCleskey*'s value is somewhat limited.  The decision does not define, in generalizable terms, the evidentiary threshold at which a claim's factual basis forms.  And its facts are distinguishable from the instant dispute in several respects. Most critically, *McCleskey* addressed a very different type of constitutional claim:  that the police had wrongfully collected evidence subsequently offered at trial, not — as Petitioners allege here — that the prosecution had wrongfully hindered the defendant from collecting evidence or accessing legal funds.  Nevertheless, *McCleskey* informs the Court's analysis because it provides an example of evidence that sufficed to meet the factual-basis threshold, albeit in a distinct context.  The nature of that evidence merits additional discussion.

Law enforcement officials violate *Massiah* when, using an inmate as an agent, they elicit statements from a defendant in the absence of the defendant's lawyer.  *See Massiah*, 377 U.S. at 205–06.  The agency relationship between officials and the cooperating inmate is essential to the constitutional violation; without it, an inmate's schemes to elicit and report incriminating statements — however conniving — do not run afoul of *Massiah*.  *See United States v. Birbal*, 113 F.3d 342, 346 (2d Cir. 1997) ("The Sixth Amendment rights of a talkative inmate are not violated when a jailmate acts in an entrepreneurial way to seek information of potential value, without having been deputized by the government to question that defendant.").

---

[7] The Court concluded that the signed statement merely reiterated the same facts known to the petitioner during his trial.  *See McCleskey*, 499 U.S. at 502.  Even if the statement had contained additional evidence of a *Massiah* violation, however, the petitioner still would have defaulted his claim without cause.  *See id.* at 497 ("That [the petitioner] did not possess, or could not reasonably have obtained, certain evidence fails to establish cause if other known or discoverable evidence could have supported the claim in any event.").

At the time of his trial, the petitioner in *McCleskey* had no direct evidence of an agency relationship between law enforcement and the inmate who testified against him. But he possessed significant circumstantial evidence. The inmate had appeared to make a concerted, well-informed effort to elicit incriminating statements from the petitioner, using a strategic false identity to glean information. The inmate had then reported those statements to the police. It was certainly possible that the inmate fabricated his false identity and collected inculpatory evidence entirely on his own initiative. But it was also reasonable for the petitioner to allege that the inmate's tactical approach was the product of coordination with the police. *McCleskey* demonstrates that in such circumstances, defendants have a procedural obligation to raise a *Massiah* claim.

B. *Strickler v. Greene*

The second decision that informs the Court's analysis is *Strickler v. Greene*, which Petitioners cite to clarify the threshold for a factual basis in the procedural default context. (*See* Pet. Opp. at 16; Pet. Sur-Reply at 7–9). In that case, a petitioner convicted of murder in state court sought federal collateral relief on several grounds after his state habeas petition failed. 527 U.S. at 278. The district court authorized wide-ranging discovery in connection with the petitioner's claims, which revealed something unexpected: police notes and correspondence related to a detective's pre-trial interviews of a witness for the prosecution. Those documents contained impeachment material, but they had not been included in the prosecution's purportedly comprehensive "open file" discovery.[8] *See id.* at 273–75, 278. After seeing the documents for

---

[8] The parties disputed whether certain other documents related to the pre-trial witness interviews, including a summary prepared by the detective more than a week after the final interview, had been produced before trial. *See* 527 U.S. at 275.

the first time, the petitioner amended his federal habeas petition to include a corresponding claim

under *Brady v. Maryland*, 373 U.S. 83 (1963). *Strickler*, 527 U.S. at 278.

The Fourth Circuit rejected the petitioner's *Brady* claim as procedurally defaulted

without cause. The court acknowledged that the petitioner had uncovered the claim's factual

basis only during federal habeas proceedings. But it held that the petitioner *should* have

uncovered that factual basis earlier, during state habeas proceedings. At that point, the court

reasoned, the petitioner was procedurally obligated to exercise "reasonable diligence" by

requesting discovery of all police files, in the hope of uncovering evidence of a *Brady* violation.

*Strickler v. Pruett*, 149 F.3d 1170, at *8–9 (4th Cir. 1998) (unpublished opinion). That

discovery, if authorized, would have revealed the interview materials that gave rise to the

petitioner's *Brady* claim. The Fourth Circuit thus concluded that the claim's factual basis was

reasonably available to the petitioner at the state habeas stage. *Id.*

The Supreme Court held otherwise. In criminal proceedings, the Court explained, there

is a "presumption . . . that prosecutors have fully discharged their official duties." *Strickler*, 527

U.S. at 286 (internal quotation marks omitted). The prosecution had reinforced that presumption

by representing that its open file discovery included all *Brady* material. *Id.* at 283–84, 289. In

the Court's analysis, the petitioner possessed minimal evidence to the contrary at the state habeas

stage. He knew merely that the police had interviewed a witness for the prosecution and certain

types of interview materials, including contemporaneous notes, had not been produced — facts

that, without additional indicia of prosecutorial wrongdoing, offered "no evidentiary support" for

a *Brady* claim.[9] *Id.* at 286. Accordingly, the Court concluded that the petitioner had "reasonably

---

[9] The Court so held regardless of whether any other document related to the interviews, including the
summary prepared by the detective more than a week later, had been produced, although the Court noted that the
basis for a *Brady* claim would have been even more tenuous if such documents had been disclosed before trial. *See
Strickler*, 527 U.S. at 285 ("Although it is true that petitioner's lawyers—both at trial and in post-trial proceedings—

relied" on the prosecution's representations of constitutional compliance, and had not possessed a factual basis for his *Brady* claim before federal discovery uncovered the interview materials. *Id.* at 289.

Notably, the Court acknowledged that the petitioner and his counsel may have *speculated* that interview materials had been wrongfully withheld.  But the Court emphasized that "conscientious defense counsel" do not "have a procedural obligation to assert constitutional error on the basis of mere suspicion that some prosecutorial misstep may have occurred."  *Id.* at 286–87.  Indeed, had the petitioner sought discovery of the police files on such a speculative basis, the state habeas court likely would have turned him down for lack of "good cause."  *Id.* at 285–86.

*Strickler* is a valuable guiding precedent for the present case in two respects.  First, it offers an example (albeit, again, in a distinct context) of circumstantial evidence that fell short of the factual-basis threshold, which provides a helpful counterpoint to *McCleskey*.  During state habeas proceedings, the petitioner possessed marginal evidence of a potential *Brady* violation: he knew that the police had interviewed a witness for the prosecution, and that no (or very limited) interview materials had been disclosed.  Together, those facts pointed — if faintly — to the possibility of wrongful withholding.  *Strickler* demonstrates that such weak circumstantial evidence does not constitute a factual basis for a *Brady* claim.

Second, relative to *McCleskey*, the constitutional claim at issue in *Strickler* is more analogous to Petitioners' claims.  The *Strickler* petitioner alleged, in effect, that the prosecution

---

must have known that [the witness] had had multiple interviews with the police, it by no means follows that they would have known that records pertaining to those interviews, or that the notes that [the witness] sent to the detective, existed and had been suppressed.  Indeed, if respondent is correct that [other documents related to the interview, including the detective's summary,] were in the prosecutor's 'open file,' it is especially unlikely that counsel would have suspected that additional impeaching evidence was being withheld." (footnote omitted)).

had wrongfully hindered him from acquiring relevant evidence by failing to make complete pre-trial disclosures.  In the same vein, the Witness Access Claim and the Fee Advancement Claim allege that the prosecution hindered Petitioners from interviewing relevant witnesses and acquiring legal funds before trial.  All of those claims relate to prosecutorial interference with a defendant's trial preparation.  The *Massiah* claim in *McCleskey*, by contrast, alleged that the police had overreached in collecting evidence against the petitioner.

Because *Strickler* addresses a claim of prosecutorial interference with trial preparation, its legal analysis is particularly relevant to the present case.  That analysis illustrates two significant principles.  First, prosecutors are presumed to fulfill their constitutional obligations.  Second, a prosecutor's denial of improper conduct reinforces the presumption of constitutional compliance, and a defendant may rely on that denial absent meaningful evidence to the contrary.  Those principles reflect a longstanding measure of judicial faith in prosecutors.  As *Strickler* demonstrates, they also inform a court's factual-basis analysis concerning claims of prosecutorial error.

## III.   Discussion

With *Strickler* and *McCleskey* in mind, the Court turns to the present dispute.  The Government argues that Petitioners procedurally defaulted the Witness Access Claim and the Fee Advancement Claim at three distinct stages of the case:  trial, direct appeal, and the period immediately following remand for resentencing, when Petitioners filed their 2007 Rule 33(b)(1) motion for a new trial.  Petitioners contend that they had cause for defaulting during the first two stages, and that no separate default occurred during the third.  The Court addresses each stage of the litigation in turn.

A.  Trial

The parties agree that Petitioners procedurally defaulted the Witness Access Claim and the Fee Advancement Claim by not raising them at the trial stage, either before the verdict or in a post-verdict Rule 33(b)(2) motion.  (*See* Pet. Opp. at 14).  The Court concurs.  As a matter of procedure, Petitioners were permitted to raise constitutional challenges to the prosecution's conduct during this time, and defaulted by failing to do so.  At Petitioners' suggestion, the Court uses November 15, 2004 — the date on which Judge Sand denied Petitioners' Rule 33(b)(2) motions — as the end date for their trial-stage procedural default.  (*See* Nov. 15, 2004 Order, *United States v. Rigas*, No. 02-CR-1236 [Doc. No. 202]).

i.  Reasonably Available Evidence During the Trial Stage

With one minor exception, the parties agree on the scope of evidence reasonably available to Petitioners during the trial stage.  First, Petitioners attended a May 15, 2002 meeting of Adelphia's board.  Petitioners were still employees at the time, but they (and the company) were under government investigation.  During the board meeting, a lawyer representing Adelphia "reported on discussions she had with the government."  (Decl. of Timothy Rigas ("T. Rigas Decl.") ¶ 17 [ECF No. 6]).  The lawyer "advised that the government was taking the position that Adelphia was not cooperating with the government's investigation," and that "a continued failure to cooperate (as the government viewed it) would be met with serious consequences, which might include indictment of Adelphia."  *Id.*  At the time, the lawyer "could not articulate any lack of cooperation by anyone associated with Adelphia."  *Id.*

Second, Petitioners attended at least part of a May 18, 2002 meeting of Adelphia's board, at which they discussed resigning from the company.  During that meeting, the chairman of the board and several attorneys for Adelphia "reported on meetings with the SEC and the U.S.

Attorney's office" and "suggested that the government was monitoring the negotiations over an agreement with the Rigas family and might not permit certain arrangements." *Id.* ¶ 18. The chairman also noted that "the government was demanding the Rigases' resignation and said it would be the only way to save the Company." *Id.* at ¶ 19.

Later in the same meeting, Adelphia's board discussed the terms of Petitioners' severance. The parties dispute whether Petitioners were present for that discussion. (*See* Pet. Sur-Reply at 10 n.3). There is no dispute, however, that Petitioners received a copy of the full meeting minutes before trial.[10] (*See* Aug. 27, 2014 Decl. of Christie Comerford ("Comerford Decl.") at 3 [ECF No. 48]). Those minutes indicate that Petitioners' lawyer requested severance for John Rigas that included "a salary, benefits, use of an office, [and] use of a secretary . . . for the next three years." (Minutes of May 18, 2002 Adelphia Board Meeting ("May 18 Minutes") at 2 [ECF No. 7 Ex. V]). The board's chairman "countered that he was reluctant to include benefits and felt that any severance payment [should] be made over time." *Id.* An attorney for the board's Special Committee — which had been formed to investigate the company's related-party transactions — added that "the palatability of the payments would depend on the family's ability to cooperate with the [Special Committee's] investigation," and noted that "the government might not permit that type of arrangement if the members of the Rigas Family did not cooperate with the investigation." *Id.* According to the minutes, the board then proceeded to confer "over the Rigas Family right to indemnification according to the by-laws of the corporation." *Id.*

---

[10] The Government implicitly argues that Petitioners attended the full May 18, 2002 board meeting, and thus heard remarks not captured in the minutes. (*See* Gov. Reply at 17). To establish the content of those additional remarks, the Government cites a set of handwritten notes that was not itself available to Petitioners during the trial stage. (*Id.*; *see also* Comerford Decl. at 3). According to those notes, it was suggested during the meeting that the Government was focused on the "need to stop [the] flow of funds to [Petitioners]." (May 18, 2002 Booken & Rothenberger Notes at 4 [ECF No. 7 Ex. W]). The Court is not convinced that Petitioners heard that ambiguous remark; even if they did, however, the Court's factual-basis analysis would not change.

Third, on May 23, 2002, Petitioners executed an agreement with Adelphia that memorialized the terms of their resignations. (*See* May 23, 2002 Agr., T. Rigas Decl. Ex. 1; *see also* T. Rigas Decl. ¶ 22). Under that agreement, the company promised to "provide indemnification to [Petitioners and their family members] (according to the Bylaws and Delaware law) as long as [they] undertake to repay Adelphia per the Bylaws." (May 23, 2002 Agr. ¶ 11). At the time, the bylaws conditionally obligated Adelphia to provide indemnification, including the advancement of attorney's fees, to current or former officers sued in connection with their employment at the company. But the bylaws permitted the board to deny fee advancement to an officer who had "deliberately breached his duty to the Corporation or its shareholders." (Adelphia Bylaws Sec. 6.2).

Fourth, on June 1, 2002, Adelphia's board decided that the company was not obligated to advance legal fees to Petitioners under the bylaws. Petitioners did not attend the meeting, but they received a copy of the meeting minutes before trial. (*See* Comerford Decl. at 3). According to those minutes,

> [a director] reported that he had described to officials at the Securities and Exchange Commission and the Justice Department the progress of the investigation of the Special Committee, including the agreement between the Rigas Family and the Company regarding the family resignations as Directors of the Company and as officers of the Company. [The director] indicated that the officials with whom [he] had met appeared satisfied at the progress of the Special Committee.

(June 1 Minutes at 3). The same director then announced the Special Committee's determination that Petitioners, among others,

> had deliberately breached their duties to the Company and its shareholders by failing to cooperate with the Special Committee in its investigation by declining to provide full and complete answers to the Special Committee and by participating in related party transactions for their benefit to the detriment of the Company without appropriate disclosures and approval of the Board of Directors. As a consequence, such officers and directors were no longer entitled to the advancement of defense expenses under the Company's Bylaws.

17

*Id.* Adelphia subsequently refused to advance legal fees to Petitioners.

Fifth, on October 14, 2002, Adelphia's general counsel distributed the internal memorandum concerning communications with Petitioners.  The document noted that the SEC had sued Adelphia, and that Adelphia in turn had brought "claims against the Rigas Family." (Oct. 14, 2002 Memo at 1).  The memorandum then explained that Adelphia was "committed to cooperating with [several] federal agencies," including the United States Attorney's Office, in part because such cooperation would help the company "recover damages done by the Rigases" and "avoid prosecution."  *Id.*  The document continued:

> As part of this process, I have been asked to direct everyone to use the following procedures regarding contact with either any member of the Rigas Family, any employee of any of the Rigas Family private companies, any former executive of Adelphia currently under indictment or any of their actual or purported counsel or representatives. . . .  In the case of any contact regarding a business matter between the Rigas Family or Rigas Family private company and Adelphia . . . please refer all contacts to the Legal Department. . . .  [T]he person making the contact should be told that it would be inappropriate to answer any questions or provide any information.

*Id.* at 1–2.

Finally, as described above, Petitioners' co-defendant Michael Mulcahey filed a motion in bankruptcy court in early 2003 that raised the issue of prosecutorial interference with witness access.  Mulcahey claimed that Adelphia had silenced its employees at the Government's behest, which unconstitutionally infringed the employees' free-speech rights and Mulcahey's right to gather evidence.  (*See* Mulcahey Opp. to Interv. & Stay at 18–21).  In response, AUSA Clark stated in open court that the prosecution had "never directed Adelphia, nor could we, as far as we know, tell them not to have their employees talk to anyone. . . .  If Adelphia directed its employee not to talk to other people, I think they could still talk to other people; but certainly

that is not something that we have done, and that is not something that is within our control."

(Bankruptcy Tr. at 23:7–16).

In addition to that evidence, the Court finds that two Department of Justice documents, the Holder Memorandum and the Thompson Memorandum, were reasonably available to Petitioners before trial.  Each of those documents defined a "set of principles to guide Department prosecutors as they ma[d]e the decision whether to seek charges against a business organization."  (Thompson Mem. at 1 [ECF No. 7 Ex. O]; *see also* Holder Mem. at 1 [ECF No. 7 Ex. N]).  The Holder Memorandum was issued in 1999, and the Thompson Memorandum superseded it in 2003.  Both documents suggested that a corporation's refusal to cooperate with prosecutors might weigh in favor of an indictment.  The documents identified several types of conduct as potentially non-cooperative, including "a corporation's promise of support to culpable employees and agents . . . through the advancing of attorneys fees."  (Holder Mem. at 7; Thompson Mem. at 6).

The Holder Memorandum and the Thompson Memorandum were publicly filed and openly discussed before November 15, 2004.  *See, e.g.*, Alan Vinegrad, *Deferred Prosecution of Corporations*, N.Y. Law J., Oct. 9, 2003 (discussing the Holder Memorandum and the Thompson Memorandum); *see also United States v. Brown*, No. 02-CR-146, 2013 WL 6182032, at *12 (M.D. Penn. Nov. 25, 2013) (concluding that the Thompson Memorandum was reasonably available to the petitioner in 2003).  The documents were thus reasonably available to Petitioners before their trial.

ii.  The Factual Basis for the Witness Access Claim Was Not Reasonably Available to Petitioners During the Trial Stage

Having considered the collective significance of the evidence reasonably available to Petitioners before November 15, 2004, the Court concludes that Petitioners lacked a factual basis

for the Witness Access Claim during the trial stage.  In this case, as in any other, there was a

"presumption" that the prosecutors had "fully discharged their official duties." *Strickler*, 527

U.S. at 286.  The prosecutors were thus presumed to have complied with *Brady*; in the same

spirit, they were also presumed *not* to have otherwise impeded Petitioners' access to potentially

helpful evidence, including by coercing Adelphia to silence potential witnesses.  AUSA Clark

reinforced that presumption when he emphatically denied any prosecutorial effort to pressure

Adelphia on the issue of employee communications with Petitioners.

Before and during their trial, Petitioners possessed minimal evidence to the contrary.

Only two facts were even arguably relevant to the issue of prosecutorial interference with

witness access.  First, during the May 15, 2002 board meeting, Petitioners learned that the

prosecution "was taking the position that Adelphia was not cooperating with the government's

investigation," and that "a continued failure to cooperate (as the government viewed it) would be

met with serious consequences, which might include indictment of Adelphia."  (T. Rigas Decl.

¶ 17).  Months later, Petitioners received a copy of the October 14, 2002 memorandum.  The

document stated that "[a]s part of" Adelphia's efforts to "pursue its own claims against"

Petitioners and cooperate with related federal investigations, the company's general counsel had

"been asked to direct everyone" not to communicate directly with Petitioners.  (Oct. 14, 2002

Memo at 1–2).  To a skeptical mind, those facts would perhaps have raised a faint possibility of

improper coercion:  that the Government might have demanded, upon threat of indictment, that

Adelphia "cooperate" with its investigation by silencing its employees.

Any overtone of prosecutorial interference, however, was extremely tenuous and

circumstantial.  Other, more innocuous interpretations of the meeting and the memorandum were

far more compelling at the time, and undercut any reasonable ground for raising the Witness

Access Claim.  First, when the board meeting took place on May 15, 2002, Petitioners were still employed by Adelphia, and the investigations into related-party transactions were relatively young.  At that point, it was perfectly legal — and expected — for the Government to request Adelphia's cooperation with its factfinding, and to mention that a lack of cooperation might contribute to an indictment.  Nothing about the Government's communication suggested that it planned to use the threat of corporate prosecution to hinder Petitioners' access to evidence once they resigned.  Further, by the time Adelphia's general counsel issued the memorandum on October 14, 2002, Adelphia had sued Petitioners for millions of dollars.  At that point, it was perfectly legal — and expected — for the company to funnel all communications from Petitioners through its counsel, without any pressure from the prosecution to do so.  The meeting and the memorandum may, as Petitioners contend, have gained new significance in light of post-trial revelations.  But at the time of the proceeding, they provided minimal evidence that the prosecution had compelled Adelphia to silence its employees.[11]

Regarding the Witness Access Claim, therefore, this case resembles *Strickler* much more closely than *McCleskey*.  The prosecution, already presumed to have acted constitutionally, expressly denied any interference with Petitioners' access to potentially helpful witnesses.  At the trial stage, Petitioners possessed only marginal circumstantial evidence to the contrary — a degree of proof more akin to the weak evidence of a possible *Brady* violation in *Strickler* than

---

[11] The Government emphasizes that Michael Mulcahey voiced concerns about unconstitutional prosecutorial interference with witness access before Petitioners' trial, in his opposition to a stay of discovery in bankruptcy court.  (Gov. Reply at 9–11).  That is true.  But Mulcahey, too, lacked a factual basis:  his allegations of prosecutorial interference stemmed exclusively from the October 2002 memorandum, which — as explained above — offered minimal evidentiary support.  Petitioners were not procedurally obligated to raise an unfounded constitutional claim merely because one of their co-defendants had done so.  Moreover, Mulcahey's claim elicited AUSA Clark's emphatic denial of prosecutorial interference with witness access.  That denial undercut any tenuous ground for the Witness Access Claim before Petitioners' trial began.

the significant evidence of a possible *Massiah* violation in *McCleskey*.[12]  It was thus reasonable

for Petitioners to rely on the presumption that the prosecution had not acted unconstitutionally,

as reinforced by AUSA Clark's statement.[13]  That reliance constitutes cause for defaulting the

Witness Access Claim during the trial stage.[14]

### iii.  The Factual Basis for the Fee Advancement Claim Was Not Reasonably Available to Petitioners During the Trial Stage

Petitioners also lacked a factual basis for the Fee Advancement Claim during the trial

stage.  Before November 15, 2004, Petitioners possessed — at best — negligible circumstantial

evidence that the prosecution had compelled Adelphia to deny fee advancement.  During

Adelphia's board meetings on May 15 and 18, 2002, Petitioners received reports that the

Government (1) had demanded Adelphia's cooperation with its investigation, *see* T. Rigas Decl.

---

[12] The Government has not argued that Petitioners were procedurally obligated to seek pre-trial discovery in an attempt to gather additional evidence of prosecutorial interference with their access to witnesses.  The Court notes, however, that had Petitioners requested such discovery based on the marginal evidence they possessed before trial, they — like the *Strickler* petitioner at the state habeas stage — likely would have been turned down for a lack of good cause.  *See Strickler*, 527 U.S. at 285–86.

[13] In reaching that conclusion, the Court does not suggest that AUSA Clark's words were inaccurate (or that he had any intent to mislead).  That is an issue for the merits stage.  Rather, the Court holds that Petitioners' reliance on AUSA Clark's statement was reasonable at the time of trial.

The Court is surprised that the Government has contested this point.  A contrary holding would be inconsistent with *Strickler*, and would effectively encourage defendants in future cases to challenge prosecutors' integrity based on mere speculation.  Moreover, elsewhere in its briefing, the Government argues (prematurely) that Petitioners cannot establish prejudice in connection with the Fee Advancement Claim because they cannot show "that the Government caused Adelphia to fail to advance legal fees."  (Gov. Brief at 13–14 [ECF No. 51]).  In support of that argument, the Government notes that AUSA Clark "stated on the record in a proceeding before a United States Bankruptcy Judge . . . that the Government did not 'have an interest in trying to stop [Petitioners] from funding their defense.'"  (Gov. Brief at 14).  In other words, the Government discounts AUSA Clark's denials of unconstitutional interference when arguing that Petitioners should have raised the Witness Access Claim earlier, but then *relies* on those same denials when arguing that the Fee Advancement Claim fails on the merits.  To borrow a phrase from the Government, "[t]his is an attempt to have it both ways."  (Gov. Reply at 14).

[14] The Government also argues, in the alternative, that the Witness Access Claim is barred by the law-of-the-case doctrine, because Judge Sand rejected the claim when he denied Petitioners' 2007 Rule 33(b)(1) motion for a new trial.  (*See* Gov. Brief at 4–7).  In these circumstances, the law-of-the-case doctrine "is a discretionary one."  *Golden Pac. Bancorp v. F.D.I.C*, No. 95-CV-9281, 2003 WL 21496842, at *5 n.14 (S.D.N.Y. June 27, 2003) (Buchwald, J.).  Even assuming that the doctrine applies, however, the Government's argument is unpersuasive.  In rejecting the Rule 33(b)(1) motion, Judge Sand held that Adelphia employees who had refused to communicate with Petitioners before trial were technically "available" as trial witnesses, which meant that their subsequent testimony in civil proceedings did not qualify as "newly discovered evidence."  *United States v. Rigas*, 2007 WL 4145282, at *5.  Judge Sand did not decide whether the prosecution had unconstitutionally interfered with Petitioners' trial preparation by coercing Adelphia to silence its employees.

¶ 17; and (2) was "monitoring the negotiations over an agreement with the Rigas family and might not permit certain arrangements," *id.* ¶ 18.  And in 2002, the Holder Memorandum suggested that "a corporation's promise of support to culpable employees and agents . . . through the advancing of attorneys fees" might be considered non-cooperative by prosecutors, and thus might weigh in favor of an indictment.  (Holder Mem. at 7).  Examined in isolation, those facts arguably raised a faint possibility of unconstitutional coercion:  that the prosecution might have threatened to indict Adelphia as non-cooperative if it advanced fees to Petitioners.

That faint possibility of coercion, however, was undercut by several other facts known to Petitioners at the time of default.  First, Adelphia's decision to deny fee advancement was explained convincingly by the company's bylaws and its adversary bankruptcy proceeding against Petitioners.  In June 2002, Adelphia concluded that Petitioners "had deliberately breached their duties to the Company and its shareholders . . . by participating in related party transactions for their benefit to the detriment of the Company without appropriate disclosures and approval of the Board of Directors."  (June 1 Minutes at 3).  Under Adelphia's bylaws, that determination relieved the company of any obligation to advance legal fees.  Adelphia then commenced the adversary proceeding, which sought to recover the funds Petitioners had allegedly misappropriated from the company.  From that point forward, it was virtually unthinkable that Adelphia would voluntarily advance fees, as Petitioners had become the company's legal adversaries.

Moreover, the minutes of Adelphia's June 1, 2002 board meeting — which Petitioners received before trial — suggested that the Government had raised no concerns about indemnification or fee advancement.  According to those minutes, an Adelphia director reported that he had informed government officials about the Special Committee's progress, including the

terms of Petitioners' resignations.  (*See* June 1 Minutes at 3; May 23, 2002 Agr. at 2).  The director then explained that the officials "appeared satisfied at the progress of the Special Committee."  (June 1 Minutes at 3).  The minutes contain no mention of any government objection to the terms of Petitioners' resignations, including Adelphia's conditional promise of indemnification.

Overall, therefore, the information reasonably available to Petitioners during the trial stage provided minimal evidence that the prosecution had coerced Adelphia to deny fee advancement.  The facts instead suggested, overwhelmingly, that Adelphia had declined to advance Petitioners' legal fees for its own reasons.  Petitioners may have suspected otherwise, but they were not procedurally obligated "to assert constitutional error" without more substantial evidence.[15]  *Strickler*, 527 U.S. at 286–87.

## B.  Direct Appeal

When the Government first raised the issue of procedural default in this case, it suggested that Petitioners had defaulted the Fee Advancement Claim on direct appeal as well as during trial.  (*See* Gov. Habeas Opp. at 49–50 [ECF No. 16]).  The Government did not advance that argument in subsequent briefing.  Nevertheless, the argument appears correct, and it applies with

---

[15] The Court notes that *United States v. Brown*, 2013 WL 6182032 (M.D. Penn. Nov. 25, 2013), suggests that the Holder Memorandum and the Thompson Memorandum might constitute a factual basis for the Fee Advancement Claim.  In that case, a corporation under government investigation terminated fee advancement to a former officer who faced criminal charges.  The former officer was convicted, and subsequently filed a § 2255 habeas motion that raised a version of the Fee Advancement Claim.  He argued that the Government had used the Thompson Memorandum to coerce the corporation to terminate his fee advancement, in violation of the Fifth and Sixth Amendments.  *See id.* at *1–2.  The court deemed that claim as procedurally defaulted without cause.  It held that the Thompson Memorandum had been reasonably available to the former officer earlier in the proceeding, and had constituted a factual basis for his claim of prosecutorial interference with legal funds.  *Id.* at *12.

The Court declines to ascribe that much evidentiary significance to the Holder Memorandum or the Thompson Memorandum.  Both documents suggest that prosecutors *might* consider fee advancement to an indicted former employee non-cooperative, which *might* weigh in favor of corporate indictment.  But the documents, by themselves, do not constitute a factual basis for accusing prosecutors of *improperly coercing* a corporation to terminate fee advancement.  *See United States v. Olis*, No. H-07-3295, 2008 WL 5046342, at *8 (S.D. Tex. Nov. 21, 2008) (concluding that the petitioner lacked a factual basis for a version of the Fee Advancement Claim, even though he was aware that his former employer was "attempting to comply with the Thompson [M]emorandum").

equal force to the Witness Access Claim.  *See Campino v. United States*, 968 F.2d 187, 190 (2d

Cir. 1992) (holding that the "failure to raise a claim on direct appeal is itself a default of normal

appellate procedure").

 If Petitioners separately defaulted their claims at the appellate stage, however, they did so

with cause.  As a matter of appellate procedure, federal defendants cannot advance collateral

constitutional claims for the first time on appeal, absent extraordinary circumstances, if no

relevant factual record was created during the trial stage.  Such claims should instead be raised in

a habeas motion.  *See United States v. Workman*, 80 F.3d 688, 700–01 (2d Cir. 1996) (declining

to consider a claim of ineffective assistance of counsel raised for the first time on appeal where

"the record [below was] undeveloped," and suggesting that the claim should be raised in a

§ 2255 habeas motion); *see also, e.g.*, *United States v. Rantanen*, 467 F. App'x 414, 420 (6th Cir.

2012) (declining to consider a *Brady* claim raised for the first time on appeal where the record

below was insufficient, and suggesting that the claim should be raised in a § 2255 motion).  *See*

*generally Singh v. Dist. Council 37*, 211 F. App'x 20, 21 (2d Cir. 2006) ("As a general rule,

federal appeals courts do not consider arguments raised for the first time on appeal." (internal

quotation marks omitted)).

 During the trial stage, Petitioners developed no factual record related to prosecutorial

interference with their access to witnesses or fee advancement.  They were thus foreclosed from

raising the Witness Access Claim or the Fee Advancement Claim on direct appeal, a procedural

barrier that constitutes cause for any appellate default.[16]

---

[16] Moreover, Petitioners may still have lacked a factual basis for the Witness Access Claim and the Fee Advancement Claim at the appellate stage.  Much of the evidence on which they now rely emerged after their appeals concluded.  In light of the procedural barrier described above, however, the Court does not reach that issue.

C. 2007 Rule 33(b)(1) Motion

Finally, the Government contends that Petitioners defaulted the Witness Access Claim and the Fee Advancement Claim without cause by failing to raise them in their 2007 Rule 33(b)(1) motion for a new trial. (*See* Gov. Brief at 12–13). The Court is not convinced that any separate procedural default occurred at this stage, as the Government has cited no authority for that proposition. But even if Petitioners *had* procedurally defaulted their claims by omitting them from the Rule 33(b)(1) motion, they would have done so with cause.

In the Second Circuit, a Rule 33(b)(1) motion can address only "the issues raised by the criminal charges" against a defendant, and "not . . . collateral issues such as the effectiveness of trial counsel." *United States v. Mayo*, 14 F.3d 128, 132 (2nd Cir. 1994); *see also United States v. Cammacho*, 462 Fed. App'x 81, 83 (2d Cir. 2012) (same); *United States* v. *Evans*, 224 F.3d 670, 674 (7th Cir. 2000) (holding that a collateral constitutional claim must be brought in a § 2255 motion rather than a Rule 33(b)(1) motion).[17] The Witness Access Claim and the Fee Advancement Claim raise collateral issues regarding prosecutorial interference with trial preparation. That means Petitioners could not have raised the claims in their 2007 Rule 33(b)(1) motion, another procedural barrier that constitutes cause for default.

IV. **Discovery**

Having preliminarily decided that Petitioners had cause for procedurally defaulting the Witness Access Claim and the Fee Advancement Claim, the Court returns to the issue of discovery. On June 19, 2014, the Court proposed three lists of document requests that

---

[17] The Government contends that *United States v. Brown*, 623 F.3d 104 (2d Cir. 2010), contradicted *Mayo* because it permitted a defendant to raise an ineffective assistance claim in a Rule 33(b)(1) motion. (*See* Gov. Brief at 13 n.4). *Brown*, however, appears to have addressed a Rule 33(b)(2) motion. *See* 623 F.3d at 113 n.5 (stating that the defendant was obligated to bring his Rule 33 motion "within 14 days," a time limit that applies to motions under Rule 33(b)(2) but not Rule 33(b)(1)). And even if *Brown* called *Mayo* into question, it did so three years after Petitioners filed their 2007 Rule 33(b)(1) motion, and so could not have provided a legal basis for raising either the Witness Access Claim or the Fee Advancement Claim.

Petitioners could use to collect discovery related to their claims of unconstitutional prosecutorial interference.  (*See* Discovery Order).  The Court invited a response from the Government before finalizing the lists, and on July 21, 2014, the Government submitted a range of objections.  (*See* Gov. Discovery Objections [ECF No. 45]).

The Government makes three overarching "general objections" to the proposed lists of document requests:  (1) they authorize discovery related to how Adelphia and the Government dealt with employees other than Petitioners, which is irrelevant to Petitioners' current claims; (2) they authorize discovery related to how Adelphia and the Government dealt with Petitioners concerning issues other than witness access and indemnification, which is also irrelevant to Petitioners' current claims; and (3) they authorize discovery from the SEC, which had no involvement in Petitioners' criminal case.  (*Id.* at 7–9).  The Court finds those overarching objections unpersuasive.  Information about how Adelphia and the Government dealt with other employees, and with Petitioners on issues other than indemnification and witness access, could well shed light on the process by which Petitioners were denied access to witnesses and fee advancement.  And the SEC — whose representatives appear to have participated alongside criminal prosecutors in several witness interviews, *see* Pet. Discovery Reply at 12–13 [ECF No. 46] — may possess relevant information.

The Government also makes a host of "specific objections" to individual document requests.  (Gov. Discovery Objections at 9–21).  After considering those objections, the Court has modified several requests.  The final lists of document requests, which Petitioners may use for discovery going forward, are attached as Exhibits A through C.

SO ORDERED.

Dated: New York, New York
May 15, 2015

_____
/s/
Kimba M. Wood
United States District Judge

# EXHIBIT A

## EXHIBIT "A"

Document requests directed to the "Government," as defined in B(5), *infra*.

**A.**   **Document Requests**

I.   All documents identifying or concerning each communication, conversation and meeting between the Government and Adelphia relating to the following subject matter:

a.   Whether Adelphia would or should provide advancement, indemnification or payment of legal costs ~~any member of the Rigas Family~~, including but not limited to how the Government would view such advancement, indemnification or payment of legal costs and the timing and basis of such decision. — *Petitioners* KMW

b.   Whether Adelphia would or should provide advancement, indemnification or payment of legal costs to any other current or former Adelphia officer, director or employee or prospective Adelphia director in relation to any ongoing law enforcement investigation, including the timing and basis of such decision.

c.   Adelphia's practices with respect to advancement, indemnification or payment of legal costs incurred by its present or former officers, directors or employees in defense of civil, criminal or administrative matters in the past.

d.   What actions Adelphia would, should or did take to assist the government in its investigation or prosecution of ~~Rigas Family members~~, and what requests were made of Adelphia by the Government, including but not limited to what actions the government would consider to reflect Adelphia's "cooperation." — *Petitioners* KMW

e.   What actions Adelphia would or could take to help it to avoid criminal indictment.

f.   What role, participation or oversight the government would have with respect to the investigation conducted by Adelphia's Special Committee.

g.   Whether Adelphia should prevent or place restrictions upon its employees talking to ~~members of the Rigas Family~~ or their representatives, including but not limited to whether the government had any input into the October 14, 2002 Memo from Randall D. Fisher to Adelphia employees attached as Exhibit "1" to these requests. — *Petitioners* KMW

h.   The Government's position and/or demands with respect to Adelphia's corporate governance and control, including whether ~~members of the Rigas Family~~ should resign and/or be terminated as officers or directors of Adelphia — *Petitioners* KMW

i.    ~~The selection or evaluation of candidates to replace members of the Rigas Family on Adelphia's Board of Directors.~~   KMW

j.    Whether Adelphia should make or refuse to make payments to John Rigas and/or Timothy Rigas pursuant to the terms of their respective severance agreements with Adelphia.

k.    Whether any law firm retained by Adelphia, ~~the Rigas Family~~ and/or other *Petitioners* Adelphia officers and directors should represent, or continue to represent, ~~members of the Rigas Family.~~   KMW

l.    *Petitioners*
Whether the government and/or Adelphia would or should oppose, or seek to enjoin, efforts by ~~any Rigas Family members~~ to gain access to other *Petitioners* funds which potentially could be used to pay defense costs, including but *KMW* not limited to assets held by the Rigas Family, assets belonging to the Rigas Managed Entities, assets allegedly owned by Adelphia and/or the proceeds from any policy of insurance.

m.    Whether the Government had any input into what form Adelphia turned over documents or other information ~~to the Government and/or~~ to the *Petitioners* ~~Rigas Family~~ and defense counsel, including but not limited to whether *KMW* Adelphia was required to provide (or prohibited from providing) that information in a searchable database.

n.    ~~Whether the Government and Adelphia discussed or reached any understanding as to who would bear the expense of providing documents or information to the Government and/or the Rigas Family and defense counsel.~~   KMW

o.    ~~Whether the Government required or encouraged Adelphia to waive and/or raise its attorney-client privilege, including but not limited to whether the Government's position with respect to Adelphia's invocation of the privilege varied depending upon the time frame of the information at issue.~~   kmw

p.    ~~Whether the Government would indict, or threaten to indict, any outside director, law firm or accounting firm for Adelphia, including but not limited to Deloitte & Touche and Buchanan Ingersoll, or employee of such law firm or accounting firm.~~   KMW

q.    The Holder Memorandum.

r.    The Thompson Memorandum.

s.    Whether the Government could or would consider the following factors discussed in the "cooperation and voluntary disclosure" section of the Holder Memorandum and the Thompson Memorandum in weighing the

extent of Adelphia's cooperation and in determining whether the government would seek an indictment of Adelphia:

(i)   Advancement, indemnification or payment of legal costs to present or former officers, directors or employees of Adelphia.

(ii)  Adelphia's "willingness to identify the culprits within the corporation, including senior executives."

(iii) Adelphia's retention of allegedly culpable employees "without sanction for their misconduct."

(iv)  Adelphia's willingness to make witnesses available.

(v)   Adelphia's willingness to disclose the complete results of its internal investigation.

(vi)  Adelphia's willingness to waive the attorney-client and work product privileges (including whether the Government requested such a waiver).

(vii) Adelphia's decision to provide information about the Government's investigation to allegedly culpable employees pursuant to a joint defense agreement.

*identifying or concerning communications, conversations, and meetings between the Government and Adelphia*

2.   All internal Adelphia documents relating to the subject matters identified in requests 1(a)-(s), *as modified.*   KMW

3.   All documents relating to conversations between Adelphia and any third party concerning the subject matters identified in requests 1(a)-(s), *as modified.*   KMW

4.   All documents concerning whether Adelphia would or should provide indemnification or advancement of defense costs to any other current or former Adelphia officer, director or employee in relation with any ongoing law enforcement investigation or criminal proceeding relating to the events described in the indictment for *United States v. Rigas*, No. 02-Cr-1236 (S.D.N.Y.).

5.   All documents reflecting or relating to whether Adelphia previously indemnified or advanced defense costs incurred by any current or former Adelphia officer, director or employee who was made a party to any criminal or administrative action or investigation by reason of the fact that such person is or was a director, officer or employee of Adelphia.

6.   All documents reflecting or relating to Adelphia's reasons for determining that it would not indemnify or advance defense costs (or that it would cease indemnifying or advancing defense costs) to ~~members of the Rigas Family~~ *Petitioners.*   KMW

7.   ~~To the extent not already provided in response to the previous requests, all documents identifying strategies or steps taken by Adelphia to avoid indictment.~~   KMW

8.    To the extent not already provided in response to the previous requests, all documents reflecting or relating to whether the Government requested or pressured Adelphia to refuse indemnification or advancement of defense costs to ~~members of the Rigas Family.~~ Petitioners     KMW

9.    To the extent not already provided in response to the previous requests, all documents reflecting or relating to whether the Government requested or pressured Adelphia to oppose advancement of defense costs to ~~members of the Rigas Family~~ Petitioners by the Rigas Family Entities.     KMW

10.    To the extent not already provided in response to the previous requests, all documents reflecting or relating to whether Adelphia would have indemnified or advanced defense costs to John Rigas or Timothy Rigas absent government pressure and/or Adelphia's desire to cooperate with the government.

11.    ~~All retention agreements or similar documents that relate to legal representation of Adelphia, the Rigas Family and/or Adelphia's outside directors.~~     KMW

12.    Fully unredacted minutes for meetings of the Adelphia Board of Directors from March 27, 2002 through October 31, 2005.

13.    Any notes taken by attendees at meetings of the Adelphia Board of Directors from March 27, 2002 through October 31, 2005.

14.    Fully unredacted minutes of all meetings of the Special Committee.

15.    Any notes taken by attendees at meetings of the Special Committee.

16.    ~~All documents relating to any determination as to which topics the Special Committee would investigate.~~     KMW

17.    ~~All documents relating to information provided to the press concerning the Rigas Family, their resignations, their impending arrest, Adelphia wrongdoings or corrections and/or Adelphia's intent to indemnify Rigas Family members.~~     KMW

18.    All documents relating to or reflecting communications with the SEC regarding the meeting between Adelphia, Deloitte & Touche and the SEC occurring on or about May 9, 2002.

19.    ~~All documents relating to or reflecting a change in Adelphia's indemnification policies following the resignation of John Rigas and Timothy Rigas as Adelphia officers.~~     KMW

20.    ~~All documents relating or referring to a strategy to utilize a public relations firm to discredit the Rigas Family in order to gain favor with the Government or for other reasons.~~     KMW

21.    ~~All documents reflecting or relating to a strategy by Adelphia to cut off funds to the Rigas Family in order to gain an advantage in litigation.~~     KMW

22.   ~~All documents reflecting or relating to a strategy by Adelphia to make it less likely that individuals designated by the Rigases (including Dan Milliard and Leo Ferraro) would be less likely to accept appointment to Adelphia's Board of Directors, including but not limited to denying the right of indemnification to such individuals.~~   KMW

23.   ~~All documents relating or referring to Adelphia's decision to utilize its own funds to assist the Government in its prosecution of the Rigas Family.~~   KMW

24.   ~~All documents indicating the amount of fees and costs incurred by Adelphia or its Special Committee in connection with the Government's investigation and/or its internal investigation of related party transactions involving the Rigas Family or Rigas Family Entities.~~   KMW

25.   All documents relating to any input that the Government had with respect to the May 23, 2002 Agreement between Adelphia and Rigas Family members.

26.   ~~All documents discussing which clients law firms retained by Adelphia, the Rigas Family and/or other Adelphia officers and directors should represent, including but not limited to any document reflecting Government opinion or influence on such decision.~~   KMW

27.   All documents relating to a joint defense between ~~members of the Rigas Family~~ Petitioners and Adelphia.   KMW

28.   ~~To the extent not already provided, all documents relating to the subjects identified in request A.1.a.(i)-(vii) that refer to Adelphia or the Rigas Family.~~   KMW

29.   ~~All notes of interviews conducted by the Government or the Special Committee at the behest of the Government, that have not previously been produced to the Rigases, including but not limited to notes of interviews with Scientific Atlanta and Motorola representatives or personnel.~~   KMW

B.   **Definitions and Instructions**

1.   The term "Adelphia" means Adelphia Communications Corp. and its present or former officers, directors, employees, agents and attorneys, including outside counsel and the Special Committee.

2.   The term "Special Committee" means the Special Committee of Adelphia's Board of Directors appointed on or about March 6, 2002 to investigate a broad range of accounting matters, disclosure issues and related party transactions between Adelphia entities and Rigas Family members and entities.   The term Special Committee includes its outside counsel, Covington & Burling.

3.   The term "Rigas Family" means John Rigas, Timothy Rigas, Michael Rigas and James Rigas or any one or more of them, separately or together.

4.   The term "Rigas Family Entity" means a privately held and managed company owned by the Rigas Family

5.     The term "Government" means the United States Department of Justice ("DOJ"), including prosecutors in the Office of the United States Attorney for the Southern District of New York, agents, attorneys or inspectors for the Securities and Exchange Commission; postal inspectors; agents, attorneys or inspectors of other federal agencies; and any and all personnel employed or assigned to investigate or prosecute violations by Adelphia or any of its current or former officers, directors or employees for violations of the criminal laws from the period of 2002 through the present.

6.     The term "Holder Memorandum" means the June 1999 memorandum issued by then-Deputy Attorney General Eric Holder entitled *"Federal Prosecution of Business Organizations."*

7.     The term "Thompson Memorandum" means the January 30, 2003 memorandum issued by then-Deputy Attorney General Larry D. Thompson entitled *"Principles of Federal Prosecution of Business Organizations."*

8.     A reference to "current or former Adelphia officers, directors or employees" includes (but is not limited to) John Rigas, Timothy Rigas, Michael Rigas, James Rigas, Michael Mulcahey, James Brown, Timothy Werth, Leslie Gelber, Dennis Coyle, Peter Metros, Karen Chrosniak, Dean Marshall, Doug Malone, Peter Venetos, Erland Kailbourne Ed Hartman, Colin Higgin, Ed Babcock, Mike Brady, Randy Fischer, Luke Healy, Ann Montgomery, Ron Rapp, Keith Horn and Carla Brown.

9.     A reference to "prospective Adelphia directors" means persons under consideration for a seat on Adelphia's Board of Directors following the resignations of John and Timothy Rigas, including but is not limited to Dan Milliard and Leo Ferraro.

10.    The term "document[s]" includes any writing, charts or data compilation (including electronically stored information), and includes, without limitation:  notes, lists, agreements, by-laws, minutes (including Board minutes), agendas, calendars and planners, messages, message logs, memoranda, correspondence, email and attachments.  A draft or non-identical copy is a separate document within the meaning of this term.

11.    The term "communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise), whether written or oral.

12.    The term "to identify" means as follows:

    a.     when referring to a person, "to identify" means to give, to the extent known, the person's full name, business address and business title or affiliation;

    b.     when referring to a document, "to identify" means to give:  a) the type of document; b) the general subject matter; c) the date of the document; d) the author(s), addressee(s), and recipient(s);

    c.     when referring to a meeting or oral communication, "to identify" means: a) to state the date and place of the meeting or communication; b) to state

the mode of communication; and c) to identify each person who was present or participated therein.

13.     The terms "all", "each" and "any" mean "all/each/any".

14.     The connectives "and" and "or" mean "and/or".

15.     The use of the singular form of any word includes the plural and vice versa.

16.     If a claim of privilege is asserted in objecting to any request for information or documents and an answer is not provided on the basis of such assertion, the objecting entity shall identify the nature of the privilege, including a brief description of the facts and circumstances giving rise to the privilege, and shall also provide the following information in log form:  a) the type of document; b) the general subject matter of the document; c) the date of the document; d) such other information as is necessary to identify the basis for privilege, including, where appropriate: the author(s), the addressee(s), the recipient(s), and their relationship to one another.

17.     Where a requested communication was oral, the subpoenaed entity shall provide the following information:  (a) the name of the person making the communication and the names of the persons present while the communication was made, and when not apparent, their relationship to one another; (b) the date and place of the communication; and c) the general subject matter of the communication.

18.     Where a document is redacted (for example, to avoid revealing other prosecutions or investigatory matters unrelated to this case, or to safeguard confidentiality and privacy where appropriate), the document produced should so indicate on its face.

Exhibit "1"

.



Randall D. Fisher
Vice President and General Counsel
One North Main Street
Coudersport, PA 16915
Phone    814.274.6358
Fax      814.274.7782

---

**Memorandum**

| | |
|---|---|
| Date | October 14, 2002 |
| To | All Employees |
| From | Randall D. Fisher, Vice President and General Counsel |
| Regarding | Contact with members of the Rigas Family, employees of Rigas Family private companies or former employees indicted by the Federal Government |
| Cc | Erkie Kailbourne, Ron Stengel, Dan Liberatore, Bob Legge, Chris Dunstan |

As a reminder, the Company is still under investigation by the United States Attorneys office in both New York and Pennsylvania as part of ongoing investigations, which have resulted in indictments of three members of the Rigas Family as well as two former executives of Adelphia. Employees should be aware that the Securities and Exchange Commission has sued Adelphia, the Rigas Family and the former Adelphia executives for alleged violations of securities laws. The Company is committed to cooperating with these federal agencies, because it is the right thing to do and because cooperation with the government will help recover damages done by the Rigases and will help the Company avoid prosecution. Adelphia continues to cooperate with these government agencies by reviewing with the government both its transactions and its communications with members of the Rigas Family, Rigas Family private entities employees, former Adelphia executives under indictment or any of their actual or purported counsel or representatives. Additionally, beginning later this week, the Company will be cooperating with agents of the Internal Revenue Service in investigations of the Rigas Family. Also, Adelphia continues to pursue its own claims against the Rigas Family.

As part of this process, I have been asked to direct everyone to use the following

1

Procedures for Contact from Rigas Family,
Private Companies, Indicted Former Employees
October 14, 2002

procedures regarding contact with either any member of the Rigas Family, any
employee of any of the Rigas Family private companies, any former executive of
Adelphia currently under Indictment or any of their actual or purported counsel or
representatives..

### Direct Contact

It has come to the attention of the Company that members of the Rigas family have
been attempting to contact certain Company employees on various issues. In the case
of any contact regarding a business matter between the Rigas Family or Rigas Family
private company and Adelphia, whether at work or in a social setting, please refer all
contacts to the Legal Department by using the following procedures:

1. If the contact is direct (either in person or by phone) the person making
   the contact should be told that it would be inappropriate to answer any
   questions or provide any information.
2. Tell the individual that all contacts should be referred to Leslie Brown,
   Gene Fitzmaurice or Randy Fisher.
3. The Adelphia employee who has received the contact should both make
   the referral and report the contact to the Legal Department as well.

There is no exception to this situation. Should the situation arise, these same
procedures should be followed for any direct contact from any former Adelphia
executive currently under indictment, or any of the Rigas Family or these former
Adelphia executives' actual or purported counsel or representatives.

### Social Settings

In addition to the telephone procedures described above, employees should use good
judgment if they find themselves in situations where members of the Rigas family,
the former Adelphia executives currently under indictment or employees of the Rigas
Family private companies are also present (e.g., events, conferences, professional or
civic related gatherings, etc.). The company requires that if such meetings occur,
employees will not disclose or divulge any confidential information concerning the
Company, the ongoing investigation or the bankruptcy proceeding. All employees
must report all such contacts with Rigas family members or former Adelphia
executives currently under indictment to the Legal Department.

### Indirect Contact

In the case of an indirect contact (such as a voice mail from a member of the Rigas
Family) employees should use the following procedures:

1. Report the contact to the Legal Department immediately.
2. Do not attempt to return the phone call.

The Legal Department will review the matter and may refer the matter to appropriate

2

*Rigas Family Contact Memo 10-12-02*

Procedures for Contact from Rigas Family,
Private Companies, Indicted Former Employees
October 14, 2002

government agencies and litigation counsel for review. After any required review, the
Legal Department will, on a case-by-case basis, refer the matter to the appropriate
business people within the Company for the requisite action on each matter.

**Business Conduct**
No employee is authorized to agree to any transaction or course of conduct with the
Rigas Family, an employee of a Rigas Family private company, any former Adelphia
executive currently under indictment or any of the Rigas Family or these former
Adelphia executives' actual or purported counsel or representatives on any issue on
behalf of Adelphia, regardless of its size or consequence. All transactions or course
of conduct must now be referred to the legal department where any transaction or
occurrence may be reviewed by the company's litigation counsel, the United States
Attorney's Office in New York and Pennsylvania, the Securities and Exchange
Commission as well as representatives of the United States Internal Revenue Service.
Once that review has been completed, if appropriate, the matter will then be referred
back to the appropriate business people for any required action.

Following these procedures will be in the best interest of the Company. Please ensure
that you and those around you implement these procedures immediately. If you have
any questions regarding these procedures, please contact Leslie Brown, Gene
Fitzmaurice or Randy Fisher in the Legal Department.

3

EXHIBIT B

## EXHIBIT "B"

Document requests directed to Adelphia Communications Corporation ~~and its counsel in the instant criminal action, including: Boies, Schiller & Flexner LLP; Fried Frank Harris Shriver & Jacobson; Covington & Burling LLP; Montgomery McCracken Walker and Rhoads LLP; Orrick-Herrington & Sutcliffe LLP; Willkie Farr & Gallagher LLP; Reed Smith LLP; Paul, Weiss, Rifkind, Wharton & Garrison LLP; Buchanan Ingersoll & Rooney PC; O'Melveny & Meyers LLP; Phillips Lytle LLP; and Pillsbury Winthrop.~~   KMW

**A.**   **Document Requests**

1.   All documents identifying or concerning each communication, conversation and meeting between the Government and Adelphia relating to the following subject matter:

a.   Whether Adelphia would or should provide advancement, indemnification   — Petitioners Kaw
or payment of legal costs to ~~any member of the Rigas Family,~~ including but not limited to how the Government would view such advancement, indemnification or payment of legal costs and the timing and basis of such decision.

b.   Whether Adelphia would or should provide advancement, indemnification or payment of legal costs to any other current or former Adelphia officer, director or employee or prospective Adelphia director in relation to any ongoing law enforcement investigation, including the timing and basis of such decision.

c.   Adelphia's practices with respect to advancement, indemnification or payment of legal costs incurred by its present or former officers, directors or employees in defense of civil, criminal or administrative matters in the past.

d.   What actions Adelphia would, should or did take to assist the government   — Petitioners Kaw
in its investigation or prosecution of ~~Rigas Family members,~~ and what requests were made of Adelphia by the Government, including but not limited to what actions the government would consider to reflect Adelphia's "cooperation."

e.   What actions Adelphia would or could take to help it to avoid criminal indictment.

f.   What role, participation or oversight the government would have with respect to the investigation conducted by Adelphia's Special Committee.

g.  Whether Adelphia should prevent/or place restrictions upon its employees talking to ~~members of the Rigas Family~~ or their representatives, including but not limited to whether the government had any input into the October 14, 2002 Memo from Randall D. Fisher to Adelphia employees attached as Exhibit "1" to these requests.    *Petitioners*    *Kmw*

h.  The Government's position and/or demands with respect to Adelphia's corporate governance and control, including whether ~~members of the Rigas Family~~ should resign and/or be terminated as officers or directors of Adelphia.    *Petitioners KMW*

i.  ~~The selection or evaluation of candidates to replace members of the Rigas Family on Adelphia's Board of Directors.~~    *KMW*

j.  Whether Adelphia should make or refuse to make payments to John Rigas and/or Timothy Rigas pursuant to the terms of their respective severance agreements with Adelphia.

k.  Whether any law firm retained by Adelphia, ~~the Rigas Family~~ *Petitioners* and/or other Adelphia officers and directors should represent, or continue to represent, ~~members of the Rigas Family.~~ *Petitioners*    *kmw*

l.  Whether the government and/or Adelphia would or should oppose, or seek to enjoin, efforts by ~~any Rigas Family members~~ to gain access to other funds which potentially could be used to pay defense costs, including but not limited to assets held by the Rigas Family, assets belonging to the Rigas Managed Entities, assets allegedly owned by Adelphia and/or the proceeds from any policy of insurance.    *Petitioners kmw*

m.  Whether the Government had any input into what form Adelphia turned over documents or other information ~~to the Government and/or to the~~ *Petitioners* ~~Rigas Family~~ and defense counsel, including but not limited to whether Adelphia was required to provide (or prohibited from providing) that information in a searchable database.    *kmw*

n.  ~~Whether the Government and Adelphia discussed or reached any understanding as to who would bear the expense of providing documents or information to the Government and/or the Rigas Family and defense counsel.~~    *KMW*

o.  ~~Whether the Government required or encouraged Adelphia to waive and/or raise its attorney-client privilege, including but not limited to whether the Government's position with respect to Adelphia's invocation of the privilege varied depending upon the time frame of the information at issue.~~    *Kmw*

p.  ~~Whether the Government would indict, or threaten to indict, any outside director, law firm or accounting firm for Adelphia, including but not~~    *Kmw*

~~limited to Deloitte & Touche and Buchanan Ingersoll, or employee of such law firm or accounting firm.~~ *KMW*

q.   The Holder Memorandum.

r.   The Thompson Memorandum.

s.   Whether the Government could or would consider the following factors discussed in the "cooperation and voluntary disclosure" section of the Holder Memorandum and the Thompson Memorandum in weighing the extent of Adelphia's cooperation and in determining whether the government would seek an indictment of Adelphia:

(i)   Advancement, indemnification or payment of legal costs to present or former officers, directors or employees of Adelphia.

(ii)  Adelphia's "willingness to identify the culprits within the corporation, including senior executives."

(iii) Adelphia's retention of allegedly culpable employees "without sanction for their misconduct."

(iv)  Adelphia's willingness to make witnesses available.

(v)   Adelphia's willingness to disclose the complete results of its internal investigation.

*identifying or concerning communications, conversations, and meetings between the Government and Adelphia*

(vi)  Adelphia's willingness to waive the attorney-client and work product privileges (including whether the Government requested such a waiver).

(vii) Adelphia's decision to provide information about the Government's investigation to allegedly culpable employees pursuant to a joint defense agreement.

2.   All internal Adelphia documents relating to the subject matters identified in requests 1(a)-(s), *as modified.*   *KMW*

3.   All documents relating to conversations between Adelphia and any third party concerning the subject matters identified in requests 1(a)-(s), *as modified*   *KMW*

4.   All documents concerning whether Adelphia would or should provide indemnification or advancement of defense costs to any other current or former Adelphia officer, director or employee in relation with any ongoing law enforcement investigation or criminal proceeding relating to the events described in the indictment for *United States v. Rigas*, No. 02-Cr-1236 (S.D.N.Y.).

5. All documents reflecting or relating to whether Adelphia previously indemnified or advanced defense costs incurred by any current or former Adelphia officer, director or employee who was made a party to any criminal or administrative action or investigation by reason of the fact that such person is or was a director, officer or employee of Adelphia.

6. All documents reflecting or relating to Adelphia's reasons for determining that it would not indemnify or advance defense costs (or that it would cease indemnifying or advancing defense costs) to ~~members of the Rigas Family.~~ Petitioners   *KMW*

7. ~~To the extent not already provided in response to the previous requests, all documents identifying strategies or steps taken by Adelphia to avoid indictment.~~   *KMW*

8. To the extent not already provided in response to the previous requests, all documents reflecting or relating to whether the Government requested or pressured Adelphia to refuse indemnification or advancement of defense costs to ~~members of the Rigas Family.~~ Petitioners   *KMW*

9. To the extent not already provided in response to the previous requests, all documents reflecting or relating to whether the Government requested or pressured Adelphia to oppose advancement of defense costs to ~~members of the Rigas Family~~ by the Rigas Family Entities.   Petitioners   *KMW*

10. To the extent not already provided in response to the previous requests, all documents reflecting or relating to whether Adelphia would have indemnified or advanced defense costs to John Rigas or Timothy Rigas absent government pressure and/or Adelphia's desire to cooperate with the government.

11. ~~All retention agreements or similar documents that relate to legal representation of Adelphia, the Rigas Family and/or Adelphia's outside directors.~~   *KMW*

12. ~~Fully unredacted~~ Minutes for meetings of the Adelphia Board of Directors from March 27, 2002 through October 31, 2005.

13. Any notes taken by attendees at meetings of the Adelphia Board of Directors from March 27, 2002 through October 31, 2005.

14. ~~Fully unredacted~~ Minutes of all meetings of the Special Committee.

15. Any notes taken by attendees at meetings of the Special Committee.

16. ~~All documents relating to any determination as to which topics the Special Committee would investigate.~~   *KMW*

17. ~~All documents relating to information provided to the press concerning the Rigas Family, their resignations, their impending arrest, Adelphia wrongdoings or corrections and/or Adelphia's intent to indemnify Rigas Family members.~~   *KMW*

*Any redactions for privilege shall be set forth in the privilege log described infra.*

18.    All documents relating to or reflecting communications with the SEC regarding the meeting between Adelphia, Deloitte & Touche and the SEC occurring on or about May 9, 2002.

19.    ~~All documents relating to or reflecting a change in Adelphia's indemnification policies following the resignation of John Rigas and Timothy Rigas as Adelphia officers.~~    *KMW*

20.    ~~All documents relating or referring to a strategy to utilize a public relations firm to discredit the Rigas Family in order to gain favor with the Government or for other reasons.~~    *KMW*

21.    ~~All documents reflecting or relating to a strategy by Adelphia to cut off funds to the Rigas Family in order to gain an advantage in litigation.~~    *KMW*

22.    ~~All documents reflecting or relating to a strategy by Adelphia to make it less likely that individuals designated by the Rigases (including Dan Milliard and Leo Ferraro) would be less likely to accept appointment to Adelphia's Board of Directors, including but not limited to denying the right of indemnification to such individuals.~~    *KMW*

23.    ~~All documents relating or referring to Adelphia's decision to utilize its own funds to assist the Government in its prosecution of the Rigas Family.~~    *KMW*

24.    ~~All documents indicating the amount of fees and costs incurred by Adelphia or its Special Committee in connection with the Government's investigation and/or its internal investigation of related party transactions involving the Rigas Family or Rigas Family Entities.~~    *KMW*

25.    All documents relating to any input that the Government had with respect to the May 23, 2002 Agreement between Adelphia and Rigas Family members.

26.    ~~All documents discussing which clients law firms retained by Adelphia, the Rigas Family and/or other Adelphia officers and directors should represent, including but not limited to any document reflecting Government opinion or influence on such decision.~~    *KMW*

27.    All documents relating to a joint defense between members of the Rigas Family and Adelphia.

28.    ~~To the extent not already provided, all documents relating to the subjects identified in request A.1.3.(i)-(vii) that refer to Adelphia or the Rigas Family.~~    *KMW*

**B.    Definitions and Instructions**

1.    The term "Adelphia" means Adelphia Communications Corp and its present or former officers, directors, employees, agents and attorneys, including outside counsel and the Special Committee.

2.    The term "Special Committee" means the Special Committee of Adelphia's Board of Directors appointed on or about March 6, 2002 to investigate a broad range of accounting matters, disclosure issues and related party transactions between Adelphia entities and Rigas

Family members and entities.   The term Special Committee includes its outside counsel, Covington & Burling.

3.   The term "Rigas Family" means John Rigas, Timothy Rigas, Michael Rigas and James Rigas or any one or more of them, separately or together.

4   The term "Rigas Family Entity" means a privately held and managed company owned by the Rigas Family

5.   The term "Government" means the United States Department of Justice ("DOJ"), including prosecutors in the Office of the United States Attorney for the Southern District of New York, agents, attorneys or inspectors for the Securities and Exchange Commission; postal inspectors; agents, attorneys or inspectors of other federal agencies; and any and all personnel employed or assigned to investigate or prosecute violations by Adelphia or any of its current or former officers, directors or employees for violations of the criminal laws from the period of 2002 through the present.

6.   The term "Holder Memorandum" means the June 1999 memorandum issued by then-Deputy Attorney General Eric Holder entitled *Federal Prosecution of Business Organizations.*"

7.   The term "Thompson Memorandum" means the January 30, 2003 memorandum issued by then-Deputy Attorney General Larry D. Thompson entitled "*Principles of Federal Prosecution of Business Organizations.*"

8.   A reference to "current or former Adelphia officers, directors or employees" includes (but is not limited to) John Rigas, Timothy Rigas, Michael Rigas, James Rigas, Michael Mulcahey, James Brown, Timothy Werth, Leslie Gelber, Dennis Coyle, Peter Metros, Karen Chrosniak, Dean Marshall, Doug Malone, Peter Venetos, Erland Kailbourne Ed Hartman, Colin Higgin, Ed Babcock, Mike Brady, Randy Fischer, Luke Healy, Ann Montgomery, Ron Rapp, Keith Horn and Carla Brown.

9.   A reference to "prospective Adelphia directors" means persons under consideration for a seat on Adelphia's Board of Directors following the resignations of John and Timothy Rigas, including but is not limited to Dan Milliard and Leo Ferraro.

10.   The term "document[s]" includes any writing, charts or data compilation (including electronically stored information), and includes, without limitation: notes, lists, agreements, by-laws, minutes (including Board minutes), agendas, calendars and planners, messages, message logs, memoranda, correspondence, email and attachments.   A draft or non-identical copy *is* a separate document within the meaning of this term.

11.   The term "communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise), whether written or oral.

12.   The term "to identify" means as follows:

a.     when referring to a person, "to identify" means to give, to the extent known, the person's full name, business address and business title or affiliation;

b.     when referring to a document, "to identify" means to give: a) the type of document; b) the general subject matter; c) the date of the document, d) the author(s), addressee(s), and recipient(s);

c.     when referring to a meeting or oral communication, "to identify" means: a) to state the date and place of the meeting or communication; b) to state the mode of communication; and c) to identify each person who was present or participated therein.

13.     The terms "all", "each" and "any" mean "all/each/any".

14.     The connectives "and" and "or" mean "and/or".

15.     The use of the singular form of any word includes the plural and vice versa

16.     If a claim of privilege is asserted in objecting to any request for information or documents and an answer is not provided on the basis of such assertion, the objecting entity shall identify the nature of the privilege, including a brief description of the facts and circumstances giving rise to the privilege, and shall also provide the following information in log form: a) the type of document; b) the general subject matter of the document; c) the date of the document; d) such other information as is necessary to identify the basis for privilege, including, where appropriate: the author(s), the addressee(s), the recipient(s), and their relationship to one another.

17.     Where a requested communication was oral, the subpoenaed entity shall provide the following information: (a) the name of the person making the communication and the names of the persons present while the communication was made, and when not apparent, their relationship to one another; (b) the date and place of the communication; and c) the general subject matter of the communication.

18.     Where a document is redacted (for example, to avoid revealing other prosecutions or investigatory matters unrelated to this case, or to safeguard confidentiality and privacy where appropriate), the document produced should so indicate on its face.

Exhibit "1"



Randall D. Fisher
Vice President and General Counsel
One North Main Street
Coudersport, PA 16915

Phone   814.274.6356
Fax     814.274.7782

---

**Memorandum**

| | |
|---|---|
| Date | October 14, 2002 |
| To | All Employees |
| From | Randall D. Fisher, Vice President and General Counsel |
| Regarding | Contact with members of the Rigas Family, employees of Rigas Family private companies or former employees indicted by the Federal Government |
| Cc | Erkie Kailbourne, Ron Stengel, Dan Liberatore, Bob Legge, Chris Dunstan |

As a reminder, the Company is still under investigation by the United States Attorneys office in both New York and Pennsylvania as part of ongoing investigations, which have resulted in indictments of three members of the Rigas Family as well as two former executives of Adelphia. Employees should be aware that the Securities and Exchange Commission has sued Adelphia, the Rigas Family and the former Adelphia executives for alleged violations of securities laws. The Company is committed to cooperating with these federal agencies, because it is the right thing to do and because cooperation with the government will help recover damages done by the Rigases and will help the Company avoid prosecution. Adelphia continues to cooperate with these government agencies by reviewing with the government both its transactions and its communications with members of the Rigas Family, Rigas Family private entities employees, former Adelphia executives under indictment or any of their actual or purported counsel or representatives. Additionally, beginning later this week, the Company will be cooperating with agents of the Internal Revenue Service in investigations of the Rigas Family. Also, Adelphia continues to pursue its own claims against the Rigas Family.

As part of this process, I have been asked to direct everyone to use the following

1

Procedures for Contact from Rigas Family,
Private Companies, Indicted Former Employees
October 14, 2002

procedures regarding contact with either any member of the Rigas Family, any
employee of any of the Rigas Family private companies, any former executive of
Adelphia currently under indictment or any of their actual or purported counsel or
representatives..

### Direct Contact
It has come to the attention of the Company that members of the Rigas family have
been attempting to contact certain Company employees on various issues.  In the case
of any contact regarding a business matter between the Rigas Family or Rigas Family
private company and Adelphia, whether at work or in a social setting, please refer all
contacts to the Legal Department by using the following procedures:

1.  If the contact is direct (either in person or by phone) the person making
    the contact should be told that it would be inappropriate to answer any
    questions or provide any information
2.  Tell the individual that all contacts should be referred to Leslie Brown,
    Gene Fitzmaurice or Randy Fisher.
3.  The Adelphia employee who has received the contact should both make
    the referral and report the contact to the Legal Department as well.

There is no exception to this situation. Should the situation arise, these same
procedures should be followed for any direct contact from any former Adelphia
executive currently under indictment, or any of the Rigas Family or these former
Adelphia executives' actual or purported counsel or representatives.

### Social Settings
In addition to the telephone procedures described above, employees should use good
judgment if they find themselves in situations where members of the Rigas family,
the former Adelphia executives currently under indictment or employees of the Rigas
Family private companies are also present (e.g., events, conferences, professional or
civic related gatherings, etc.). The company requires that if such meetings occur,
employees will not disclose or divulge any confidential information concerning the
Company, the ongoing investigation or the bankruptcy proceeding.  All employees
must report all such contacts with Rigas family members or former Adelphia
executives currently under indictment to the Legal Department.

### Indirect Contact
In the case of an indirect contact (such as a voice mail from a member of the Rigas
Family) employees should use the following procedures:

1.  Report the contact to the Legal Department immediately.
2.  Do not attempt to return the phone call.

The Legal Department will review the matter and may refer the matter to appropriate

2

Rigas Family Contact Memo 10-12-02

# EXHIBIT C

## EXHIBIT "C"

Document requests directed to the Adelphia Recovery Trust, as successor in interest to Adelphia Communications Corporation.

**A.   Document Requests**

   1.   Identify all persons or entities employed by or associated with Buchanan Ingersoll & Rooney, P.C., deposed in the action designated *Adelphia Recovery Trust v. Bank of America, N.A., et al.*, No. 05-cv-9050-LMM (S.D.N.Y.).

   2.   Copies of all deposition transcripts, including exhibits, for all persons or entities identified in response to A(1) deposed in the action designated *Adelphia Recovery Trust v. Bank of America, N.A., et al.*, No. 05-cv-9050-LMM (S.D.N.Y.)

**B.   Definitions and Instructions**

   1.   The term "document(s)" includes any writing, charts or data compilation (including electronically stored information), and includes, without limitation: notes, lists, agreements, by-laws, minutes (including Board minutes), agendas, calendars and planners, messages, message logs, memoranda, correspondence, email and attachments. A draft or non-identical copy is a separate document within the meaning of this term.

   2.   The term "to identify", when referring to a person or entity, means to give, to the extent known, the person's full name, business address and business title or affiliation.

   3.   The terms "all", "each" and "any" mean "all/each/any".

   4.   The connectives "and" and "or" mean "and/or".

   5.   The use of the singular form of any word includes the plural and vice versa.

   6.   If a claim of privilege is asserted in objecting to any request for information or documents and an answer is not provided on the basis of such assertion, the objecting entity shall identify the nature of the privilege, including a brief description of the facts and circumstances giving rise to the privilege, and shall also provide the following information in log form: a) the type of document; b) the general subject matter of the document; c) the date of the document; d) such other information as is necessary to identify the basis for privilege, including, where appropriate: the author(s), the addressee(s), the recipient(s), and their relationship to one another.

   7.   Where a document is redacted (for example, to avoid revealing other prosecutions or investigatory matters unrelated to this case, or to safeguard confidentiality and privacy where appropriate), the document produced should so indicate on its face.