## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| JOHN J. RIGAS and TIMOTHY J. RIGAS, | : | |
| | : | |
| Petitioners, | : | 11-CV-6964 (KMW) |
| | : | 02-CR-1236 (KMW) |
| *v.* | : | |
| | : | ECF Case |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Respondent. | : | |
| | : | |

**PETITIONERS' STATEMENT PURSUANT TO LOCAL RULE 56.1
IN SUPPORT OF MOTION FOR JUDGMENT ON
VARIOUS CLAIMS ALLEGING VIOLATIONS OF
*BRADY v. MARYLAND*, 373 U.S. 83 (1963)**

LAWRENCE C. MARSHALL, ESQ.
ADMITTED *PRO HAC VICE*
559 NATHAN ABBOTT WAY
STANFORD, CA 94305
(650) 723-7572
lmarshall@stanford.edu

*Attorney for Petitioners,
John J. Rigas and Timothy J. Rigas*

Petitioners submit this Statement Pursuant to Local Rule 56.1 in Support of Motion for Judgment on Various Claims Alleging Violations of *Brady v. Maryland*, 373 U.S. 83 (1963). This Statement sets forth the material facts as to which there is no genuine issue or dispute.

## I.  FACTS PERTAINING TO THE CLAIMS FOR RELIEF BASED ON THE ROTHENBERGER NOTES

1.      On September 23, 2002, Petitioners were indicted on charges of conspiracy, securities fraud, wire fraud and bank fraud in connection with their actions and omissions involving Adelphia Communications Corporation ("Adelphia").   *See* App. 1, Indictment.

2.      In preparing for trial, Petitioners sought to interview Carl E. Rothenberger, a partner in the Pittsburgh law firm, Buchanan, Ingersoll & Rooney. Mr. Rothenberger had served as the long-time outside securities counsel for Adelphia and for the Rigas Family, and had been involved in many of the disclosures and transactions that would be at issue in the trial. Mr. Rothenberger refused to be interviewed by anyone associated with Petitioners' defense. *See* App. 2, Decl. of Larry McMichael at ¶ 42; App. 3, Decl. of Bernard Preziosi ¶ 3; App. 4, Decl. of Timothy Rigas at ¶ 59; App. 3, Preziosi Decl. Ex. 1 at 8-9 (Aff. of Peter Fleming Jr. at 6-7).

3.      On Feb. 24, 2004, the Government sent Petitioners a letter stating, "The Government writes to inform you that Carl Rothenberger, Esq. may be able to provide information that is favorable to the defense concerning the timber rights transaction discussed in the Government Bill of Particulars." App. 3, Preziosi Decl. ¶ 4, Ex. 2 (Letter from U.S. Att'y to Defense Counsel (Feb. 24, 2004)). That reference to timber rights involved an allegation that Petitioners had not properly reported a particular related party transaction.

4.      The Government knew that when the Rigases had sought permission to attend the prosecution's interview with any Buchanan Ingersoll personnel, that request was denied by the

court. *See* App. 5, Pretrial Tr. of Dec. 10, 2003 at 19-23; App. 6, Pretrial Tr. of Feb. 3, 2004, at 49-50.

5.      Because Mr. Rothenberger had refused to speak with the defense, and because the only exculpatory information the prosecution disclosed dealt with the minor timber rights transaction, the defense understood he had nothing exculpatory to say and completely ruled out calling Mr. Rothenberger as a witness at trial. *See* App. 3, Preziosi Decl. ¶ 4; *Id.* at ¶ 4, Ex. 1 at 8-9 (Aff. of Peter Fleming Jr.).

6.      The conclusion that Mr. Rothenberger and Buchanan Ingersoll were watching out for themselves and refusing to provide truthful accounts (*i.e.*, accounts exculpatory of the Rigases), also came across from the May 2002 Form 8-K that Adelphia issued immediately following the Rigases' ouster from Adelphia. That filing, which is one that Mr. Rothenberger and Buchanan Ingersoll had traditionally played a major role in preparing, placed all of the blame on the Rigases. *See* App. 7, Adelphia Communications Corp., Form 8-K (filed with the Securities and Exchange Commission on May 24, 2002).

7.      At trial, the prosecution seized on the fact that the defense had called no lawyers or auditors to support the defense claim that they had acted on the advice and instruction of counsel. The prosecutor told the jury, "[Y]ou better believe that if there was a lawyer or accountant out there that had approved these transactions and said they were okay, we'd have seen them in this courtroom. You didn't see anything like that." Trial Tr., App. 8, at 10,606.

8.      On July 15, 2004, Petitioners were convicted of all charges, with the exception of the wire fraud charges. *See* App. 9, Verdict. The Second Circuit Court of Appeals affirmed those convictions, with the exception of one bank fraud count. *See* App. 10, *United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007).

9.     Petitioners were then resentenced based on the reversal of the one bank fraud count. Petitioner John Rigas was sentenced to 12 years in prison and Petitioner Tim Rigas was sentenced to 17 years in prison. *See* App. 11, *United States v. Rigas*, 583 F.3d 108, 113 (2d Cir. 2009).

10. During civil depositions following the criminal trial the defense began to learn that Mr. Rothenberger had told many things to the prosecution prior to trial that were exculpatory of the Rigases. *See* App. 2, McMichael Decl. at ¶ 44; App. 12, Mem. in Support of Rigas' Mot. to Compel at 1, *United States v. Rigas*, No. 02-Cr-1236 (S.D.N.Y. Jan. 15, 2008).

11.    Upon learning this, the defense approached the prosecutors, who acknowledged that many of these topics had been discussed during a pre-trial interview the Government conducted with Mr. Rothenberger, and that notes existed from that interview. When the defense asked the prosecution to disclose all notes and information relating to that interview, the prosecution refused, assuring the defense Mr. Rothenberger had said nothing exculpatory—other than the disclosed timber rights information. *See* App. 2, McMichael Decl. at ¶ 48; App. 12, Mem. in Support of Rigas' Mot. to Compel at 1, *United States v. Rigas*, No. 02-Cr-1236 (S.D.N.Y. Jan. 15, 2008).

12.    The defense then moved to compel the prosecution to turn over its notes of the Rothenberger interview. The defense conceded it had no direct evidence at that time that Mr. Rothenberger had disclosed exculpatory evidence in that interview. But the defense argued that given the exculpatory information contained in Mr. Rothenberger's 2005 deposition testimony and given the prosecution's acknowledgment that these same subjects were discussed during the 2004 pre-trial interview, "[i]t strains reason to believe that Mr. Rothenberger provided absolutely

no exculpatory information" in the course of that interview.  *See* App. 12, Mem. in Support of Rigas' Mot. to Compel at 1, *United States v. Rigas*, No. 02-Cr-1236 (S.D.N.Y. Jan. 15, 2008).

13.     The Government fought against a disclosure order. One of the Government's central contentions was that *Brady* procedure does not include an order to compel, and that it had followed the "law and practice in the Second Circuit that the Government may fulfill its *Brady* obligations with respect to a particular witness by identifying the witness to the defendant and indicating that the witness may have favorable information *on a particular subject*."  *See* App. 13, Gov't Mem. in Opposition to Mot. to Compel at 3, *United States v. Rigas*, No. 02-Cr-1236 (SDNY Jan. 15, 2008) (emphasis added) (citations omitted).

14.     After hearing these representations, without seeing the notes in question, the District Court denied the Motion to Compel, invoking the "essential facts" doctrine for the proposition that the Government had no obligation beyond what it had disclosed. App. 14, *United States v. Rigas*, 2008 WL 144824, at *1 (S.D.N.Y. Jan. 15, 2008).

15.     In its appeal from that ruling, the defense again conceded it was necessarily only assuming (based on his 2005 civil deposition) that Mr. Rothenberger had provided exculpatory information to the prosecution in 2004. App. 15, Br. of Defendants-Appellants at 104-05, *Rigas*, 583 F.3d 108 (No. 08-3485).

16.     The Government responded by attacking the defense for unfounded "rank speculation." App. 16, Br. of Government-Appellee at 113, *Rigas*, 583 F.3d 108 (No. 08-3485).

>       According to the Government,
>
>       Appellants [] urge this Court (as they urged Judge Sand below) to overlook this *glaring deficiency in proof*, to look instead at Rothenberger's civil deposition testimony—which occurred two years after his interview with the Government and one year after the criminal trial had concluded, in a proceeding in which the Government was not a party, with *no specific testimony concerning what was said during the interview*—and to divine from that testimony that some exculpatory

information 'must have been' communicated to the Government. *This temporal sleight of hand should not be tolerated. . . .*

. . . The Government is charged with the responsibility, in the first instance, of reviewing the information it obtains during the course of its investigation in order to comply with its obligations under *Brady* and cases like [*Giglio v. United States*], 405 U.S. 150 (1972). It takes this responsibility seriously, and it *fully recognizes the potentially drastic remedies that exist for failure to abide by these constitutional obligations (e.g., reversal of a conviction)*. That compliance with these obligations is crucial to guaranteeing defendants fair trials, however, does *not* mean—as Appellants' arguments suggest—that the responsibility should be taken away from the Government and thrust upon the trial or appellate courts, *particularly on the meager showing offered by Appellants here*.

*Id*. at 121-22 (some emphases added).

17.     The Government went well beyond simply telling the Court that the defense was without evidence of what Mr. Rothenberger said during the pre-trial interview, or that a motion to compel was not an appropriate procedural vehicle. The Government declared that the defense's speculation was "belied by the Government's clear representation in the District Court that, apart from the information concerning the timber rights transactions, '[t]here is no other [*Brady*] material with respect to Mr. Rothenberger.'" *See id.* at 122-123 (alterations in original). The Government made a dozen or so similar statements throughout its Second Circuit brief. *See*, *e.g.*, *id.* at 116, 124-25 n.*, 129.

18.     At oral argument, an Assistant United States Attorney began his arguments with this unequivocal declaration to the Court:

[L]et me make one thing very clear right up front. I have reviewed these notes personally, the Rothenberger notes. I have discussed them with the postal inspector who took them and the Assistant United States Attorney who was present at the time of the interview and there is nothing exculpatory in those notes beyond the limited disclosure that was made concerning the timber rights transaction. Full stop.

App. 17, Tr. of Oral Arg. at 12-13, *Rigas*, 583 F.3d 108 (No. 08-3485).

19.     The Second Circuit affirmed the denial of the Motion to Compel. *See* App. 11, *Rigas*, 583 F.3d at 125-26.

20.     In addition to the charges in this case, the Rigases faced related tax fraud charges in the Middle District of Pennsylvania. During April 2011 pre-trial proceedings in that case, the court recognized that Mr. Rothenberger had long been unwilling to be interviewed by the defense. App. 18, *United States v. Rigas*, 779 F. Supp. 2d 408, 414 (M.D. Pa. 2011). The court therefore refused to "accept the Government's assertion that the Defendants have equal access to Rothenberger, which then eliminates any potential *Brady* obligation." *Ibid.*

21.     The District Court concluded that "in view of [Mr.] Rothenberger's significant role in Adelphia and in the questioned transactions . . . the notes of his interviews could very well contain exculpatory information that may be of use to the Rigases at trial." *Ibid.* Accordingly, the court ordered "the Government to release any and all notes of interviews it conducted with [Mr.] Rothenberger." *Ibid.*

22.     Shortly after the notes were produced, the Government dropped its charges against the Rigases in the Pennsylvania case (after having pursued those charges for close to ten years). *See* App. 19, Order, *United States v. Rigas*, No. 4:05-CR-402 (M.D. Pa., Jan. 26, 2012).

23.     In 2015 and 2016, this Court ordered disclosure of four additional sets of materials memorializing what was said at the Government's February 20, 2004 interview of Mr. Rothenberger.  They are:

    a)  A Memorandum by J. Alan Johnson, who attended the meeting as counsel for Buchanan Ingersoll ("Johnson Memorandum") (App. 20) (mailed to counsel in conjunction with ECF No. 87);

    b)  A summary of the meeting produced by P. Jerome Richey, a Buchanan Ingersoll partner ("Richey Notes") (App. 21) (mailed to counsel in conjunction with ECF No. 87);

c)  Notes taken by Patrick M. McLaughlin, who attended the meeting as counsel for Carl Rothenberger ("McLaughlin Notes") (App. 22) (mailed to counsel in conjunction with ECF No. 114); and

d)  A Memorandum by Patrick McLaughlin with modifications to the Johnson Memorandum ("McLaughlin Memorandum") (App. 23) (mailed to counsel in conjunction with ECF No. 87).

24.    The Rigases privately owned a group of Managed Entities, which paid Adelphia for certain management services, including having their funds held by Adelphia and accounted for through Adelphia's Cash Management System ("CMS"). The CMS accounted for funds belonging to Adelphia as well as funds belonging to the Managed Entities. *See* App. 10, *Rigas*, 490 F.3d at 213, 218. *See also* Trial. Tr., App. 24, at 4129-32 (James Helms). A constant flow of Managed Entity money (such as that generated by their cable operations) was deposited in Adelphia managed accounts and accounted for by the CMS as Managed Entity funds. *See* App. 25, Gov't Trial Ex. 101, *United States v. Rigas*, No. 02-Cr.-1236 (S.D.N.Y.) at 3 (describing sources of funds coming in from the Managed Entities).

25.    Starting in 1996, with full knowledge of the Adelphia Board, Adelphia and the Managed Entities arranged for "co-borrowing facilities." *See* App. 26, at 1-2 (Minutes of March 13, 1996 Meeting of the Adelphia Board of Directors). These co-borrowing facilities allowed either Adelphia or the Managed Entities to tap into shared lines of credits. *See* Trial Test., App. 27, at 1278-84 (testimony of Dennis Coyle).

26.    The co-borrowing arrangements were beneficial to Adelphia for a number of reasons. To begin with, there were times they made the Rigases' borrowing power available to Adelphia. Trial Tr., App. 28, at 7031; Trial Tr., App. 29, at 7172-73 (testimony of James Brown).  In addition, they at times provided the Managed Entities sufficient liquidity to purchase Adelphia shares in offerings alongside the public. The underwriters of the securities issuances wanted the

Rigases to make such purchases to demonstrate to the public their confidence in Adelphia. In addition, as a condition of several loans to Adelphia, some banks insisted the Rigases maintain controlling ownership of Adelphia, which required they purchase some new shares as new shares were issued. *See generally* App. 10, *Rigas*, 490 F.3d at 213-14.

27.     The case against the Rigases did not involve any allegation that the intermingling of Adelphia and Managed Entity funds or the CMS or the co-borrowing facility were, themselves, in any way illegal or fraudulent.  As Judge Sand charged the jury: "In considering any allegations related to these agreements, you should know that, like the commingling of funds, such coborrowing agreements are not alleged in this case to be in and of themselves illegal. * * * However, the government contends that the defendants fraudulently failed to disclose the amount of coborrowing debt on the books of Rigas family owned entities and fraudulently failed to disclose how the coborrowing facilities were used in connection with Rigas family purchases of Adelphia securities." Trial Tr., App. 30, at 11,399.

28.     Within Adelphia, careful records were kept of how much of the joint credit facility Adelphia was using and how much the Managed Entities were using. See Trial Tr., App. 31, at 8494-96 (Robert DiBella).  The draw down amounts—whether being borrowed for the sake of Adelphia or one of the Managed Entities—were generally deposited in Adelphia accounts and accounted for under the CMS. The amounts borrowed by Adelphia were put in the books and treated as Adelphia debts owed to the banks. By contrast, the amounts borrowed by the Managed Entities were put in the books and treated as debts the Managed Entities owed to the banks. Trial Tr., App. 29, at 7067 (James Brown).

29.     Adelphia's auditors concluded that under the then-governing FAS 5 accounting protocols, this contingent debt did not need to be treated as Adelphia debt. Trial Tr., App. 29, at

7070-73 (James Brown). This was all happening prior to December 29, 2003, when the SEC issued new rules on the reporting of contingent debt. *See* App. 32, *Disclosure in Management's Discussion and Analysis About Off-Balance Sheet Arrangements and Aggregate Contractual Obligations*, 68 Fed. Reg. 5982 (Feb. 5, 2003).

30.     A good deal of the case against Petitioners involved the claim that they committed fraud in connection with the co-borrowing activities—particularly in relation to Managed Entities' use of co-borrowed funds to purchase Adelphia shares. A Managed Entity's purchase of $375 million in Adelphia shares in 2000 (purchased in 1999; closed in 2000) was treated as a prototype of these transactions. Trial Tr., App. 33, at 10,485-86 (AUSA Clark's Summation).

            *The 13-D Allegations*

31.     In accordance with SEC regulations, the Rigases filed a Schedule 13-D ("Beneficial Ownership Report") shortly after acquiring shares in the 2000 transaction.  That form indicated that "the source of the purchase price paid for each of these acquisitions was the respective personal or partnership funds or affiliate borrowings of each of such persons."  App. 34, at 15 (Gov't Trial Ex. 4710-A).

32.     The Government argued at trial that this description was fraudulent because it failed to disclose that the "affiliate borrowings" came from Adelphia (*i.e.*, from the co-borrowing facility the Managed Entities shared with Adelphia—which the Government argued should be treated as Adelphia funds). *See generally* Trial Tr., App. 35, at 6765-73 (James Brown). The Government contended that because Adelphia was co-responsible for the loans if the Managed Entities did not repay the banks, and because the co-borrowed funds had been held in Adelphia accounts (accounted for through the CMS), the Managed Entities were necessarily borrowing

Adelphia money when they borrowed from the banks under the co-borrowing facility. Trial Tr., App. 33, at 10,474-78, 10,485-86; Trial Tr., App. 8, at 10,545 (AUSA Clark's Summation).

33.     The Government presented the testimony of Chris Thurner, who had worked for John Rigas (and was testifying pursuant to a non-prosecution agreement). Mr. Thurner acknowledged that he worked on providing some information to Mr. Rothenberger regarding the 13-Ds. Trial Tr., App. 36, at 3654; Trial Tr., App. 37, at 3284-85. But he claimed at trial that his role was limited to providing information about the amounts of Rigas family stock holdings—not about the source of funds for their stock purchases.  Trial Tr., App. 36, at 3654-55, 3589-91; Trial Tr., App. 37, at 3283-84. Mr. Thurner's testimony thus served to implicate the Rigases as having themselves worked on the 13-Ds with Mr. Rothenberger, thereby supporting the prosecution's claim that the Rigases themselves deceived their lawyers about the source of the funds.

34.     The Government focused heavily on the Section 13-D allegation throughout its case. For example, in its closing argument the Government told the jury:

> [I]t says "the source of the purchase price paid for each of these acquisitions was the respective personal or partnership funds or affiliate borrowings of each of such persons."

> Well, I guess it's true that this was an affiliate borrowing, because they took the money from Adelphia. But don't you think Adelphia's shareholders would have liked to have known that the affiliate being talked about here was actually Adelphia? Because you've learned during this trial that there are hundreds of Rigas affiliates, and not necessarily all of them are Adelphia companies. So this disclosure didn't tell Adelphia's shareholders the one thing they needed to know about this transaction, that the Rigases took the cash from Adelphia to buy this stock.

> Ladies and gentlemen, this is a good example of a half-truth. It's technically true. I guess it was an affiliate borrowing. But it leaves out the most important information that the person reading this needs to know, that that affiliate was Adelphia. . . . Half-truths are misstatements under the securities laws, just like outright lies are, when they're meant to fool people. And this statement, which is a clever way of trying to skirt the issue and say affiliate borrowings, is one of those half-truths.

Trial Tr., App. 33, at 10,485-86 (emphasis added); *see also* Trial Tr., App. 8, at 10,545 (AUSA Clark's summation).

35.     The Government's closing argument emphasized the accusation that the Rigases knowingly lied about the source of funds.

> And knowing that this transaction was not fair to Adelphia, that it was wrong, and that it couldn't be justified, these men lied about where the money came from, and they hid the truth about this transaction from Adelphia shareholders, and we can see that if we look at Government's Exhibit 4710A. . . .  This form 13D was false, it was untrue, and it was not correct. . . . How hard would it have been to simply say in this document, we got the cash from Adelphia? It would have been one sentence. It wouldn't have made it any longer or more complicated. The reason it's not in here is because these men knew it was wrong. They knew it was wrong because it's wrong to take other people's money, and they knew it was wrong because they were told it was wrong.

 Trial Tr., App. 33, at 10,474-78 (emphasis added).

36.     Since the time of trial, it has emerged that Mr. Rothenberger discussed the 13-Ds with the prosecutors prior to trial, telling them he believed the law required only a general description of the sources of funds and did not require specific identification of the source of the affiliate borrowings.  The Feeney Notes state:

> -need to describe source-if from borrowing need to ID parties lending $

> "affiliate borrowings"- Identify? No, not by name - general description.

App. 38, Feeney Notes at 2.

37.     Mr. Rothenberg told the prosecutors that the disclosures were "in line w[ith] 13-D Rule[.]" *Ibid*. When asked "why think sufficient," Mr. Rothenberger replied, it was an "accurate statement." App. 22, McLaughlin Notes at 7.

38.     During the pre-trial interview, Mr. Rothenberger acknowledged to the Government that he was the one who chose the "affiliate borrowing" formulation. Mr. Rothenberger

explained, "Early draft sent to CT [Chris Thurner] w/blank in it for disclosure – sent that way if CER [Carl E. Rothenberger] did not know fact. . . . CT confirmed that 'affiliate borrowing' accurate." App. 38, Feeney Notes at 2; *see also* App. 22, McLaughlin Notes at 7. Mr. Rothenberger explained that after sending the document to Mr. Thurner, Mr. Rothenberger "was very busy at the time and he did not ask a lot of detail re: this." App. 21, Richey Notes ¶ 12.

39.     Mr. Rothenberger stated that in using the "affiliate borrowing" formulation, he had not felt it necessary to ask Mr. Thurner "if the borrowings were from Adelphia." App. 20, Johnson Mem. ¶ 10.   And, although Mr. Rothenberger had access to countless Adelphia employees, he did not indicate that he ever sought further information from them either. *See* App. 22, McLaughlin Notes at 7-8.

40.     Mr. Rothenberger never suggested at any point in the interview that anyone (including the Rigases) ever lied to him, or misled him, in any way. *See generally* App. 38, Feeney Notes; App. 21, Richey Notes; App. 20, Johnson Memo; App. 22, McLaughlin Notes; App. 23, McLaughlin Memo.

41.     Despite what it heard from Mr. Rothenberger on February 20, 2004, the Government did not include any of this information about the origins of the "affiliate borrowing" language in the letter it sent to the defense on February 24, 2004 reporting that Mr. Rothenberger might have some exculpatory evidence about the timber rights issue.  *See* App. 3, Preziosi Decl. ¶ 4, Ex. 2 (Letter from U.S. Att'y to Defense Counsel (Feb. 24, 2004)).

42.     Mr. Rothenberger attended Adelphia Board meetings and, as lead counsel, reviewed matters coming before the Board. *See, e.g.*, App. 39, Board of Directors Meeting Minutes of April 8, 1999 and August 23, 1999.  In 1999, James Brown (Adelphia's Vice President of Finance) wrote a memorandum to the Board describing the co-borrowing facility and explaining

that "the Rigas family intends to use the proceeds of this distribution to purchase equity securities from Adelphia." App. 40, Decl. of Paul Grand at Ex. A.

43.     On January 9, 1998, Bruce Booken (a partner at Buchanan Ingersoll) sent a one-page memorandum to Carl Rothenberger and Paula Zawadzki (another partner at Buchanan Ingersoll). *Id.* at Ex. B. The memo described a proposed co-borrowing transaction "which is primarily intended to provide liquidity to the Rigas family so that they can participate in future Adelphia stock offerings." *Ibid*.

44.     A March 31, 1999 list of issues Mr. Rothenberger prepared asked, "In terms of closing time, are there any other liquidity considerations other than the closing and funding of the co-borrowing agreement?"  App. 41, E-mails from Carl Rothenberger at 1-2. This same question is asked in three separate e-mails sent on April 1, 1999. *Id.* at 3-10.

45.     This planned use of funds was also explicit in the funding proposals Adelphia and the Managed Entities had submitted to the banks in seeking to establish co-borrowing facilities. *See* App. 42, Executive Summary of Proposal to Banks (Gov't Trial Ex. 1552-A).

46.     When  Mr. Rothenberger drafted the "affiliate borrowing" language he was aware that co-borrowing might well be used for the Managed Entities' purchase of Adelphia stock. *See supra* ¶¶ 42-45.

47.     The prosecution pressed Mr. Rothenberger to explain what other sources (other than the co-borrowing facility) the Rigases might conceivably have had to fund the purchase. *See* App. 38, Feeney Notes at 3 (prosecutor asked "What beside co-b[orrowing] draw downs could $375M borrowings have been?"). At one point, the prosecutor confronted Mr. Rothenberger by telling him that Chris Thurner (who was cooperating with the Government) "sitting in Carl's chair yesterday." App. 22, McLaughlin Notes at 7.

48.     Mr. Rothenberger never denied knowing of the possibility that co-borrowed funds were being used for share purchases. *See* App. 38, Feeney Notes at 1 (when asked whether there was a discussion about the source of funding, Mr. Rothenberger responded, "may have been, do not recall"); App. 22, McLaughlin Notes at 10 ("no recall that anyone told him from the Co-b"); *Id.* at 3 (could "not recall any specific" details about what he was told regarding how the Rigases would fund the stock purchase).

*Immediately Available Funds*

49.     The prosecution also alleged that the Rigases were guilty of fraud because the cross receipts and documents connected to the 2000 purchase and some other purchases spoke of Adelphia receiving "immediately available funds" in return for the shares. For example, the Government contended that the transfer of the $375 million to Adelphia through the journal entries in 2000 did not meet that description because: (a) no funds were actually wired; and (b) the Government looked at any funds involved as effectively having belonged to Adelphia in the first place. *See* Trial Tr., App. 33, at 10,496-500; Trial Tr., App. 8, at 10,534-45 (AUSA Clark's Summation); Trial Tr., App. 43, at 10,843-53, 10,856-58 (Mr. Grand's Summation).

50.     Mr. Rothenberger told the Government prior to trial that it was he—not any of the Rigases—who developed the "immediately available funds" formulation. Mr. Rothenberger explained that although he had not used that phrase in connection with earlier purchases, he used it in April 1999 because that purchase "represented [a change] in [the] way RF [Rigas Family] bought shares in connection w[ith] public offering." App. 38, Feeney Notes at 1. According to Mr. Rothenberger, the term "immediately available funds" meant that cash was "presumed transferred in connection with the sale of Adelphia stock."  App. 20, Johnson Mem. # 4. When asked how he understood the "immediately available funds" phrase, Mr. Rothenberger

14

acknowledged that it "usually means cash (although he had not researched this precise issue and it could also mean other than just cash)." App. 23, McLaughlin Mem # 2

51.     As it turned out, payment for the shares was accomplished by journal entries allocating to Adelphia the $375 million the Managed Entities had just received from the banks, which was being held, like most Managed Entity funds, in Adelphia bank accounts that were accounted for by the CMS. *See* Trial Tr., App. 44, at 4363-70 (testimony of James Helms).

52.     The drawdown from the banks for the 2000 purchase was initially intended to be wired to a Managed Entity's account, with the Managed Entity then wiring the funds to Adelphia. It was only by mistake that the funds came directly from the bank to Adelphia (at which time it was placed in an Adelphia account and accounted for by the CMS). Trial Tr., App. 44, at 4366-67, 4579-80 (Helms testimony). The Government's accounting witness testified that a wire from the Managed Entities would have qualified as "immediately available funds." Trial. Tr., App. XX at 8643-44, 8686) (testimony of James DiBella). Thus, but for that bank error, the pattern would have fit the one Mr. DiBella acknowledged would have qualified as transmittal of immediately available funds.

53.     Had the transaction proceeded with the money first being wired to the Managed Entity and the Managed Entity then wiring it to Adelphia, then Adelphia would have ended up with an influx of $375 million and the Managed Entities would have ended up with shares of stock as well as the bank debt connected with its borrowing to acquire those shares. This was the same result that followed by transferring $375 million to Adelphia though the journal entry used to allocate funds within the CMS. *See supra* ¶ 52.

54.     Mr. Rothenberger indicated that he worked with an Adelphia lawyer, Colin Higgin, on this transaction. *See* App. 20, Johnson Mem. # 3. He never suggested that he worked with the

Rigases on the matter or that the Rigases ever said anything misleading to him about the transaction. *See* App. 38, Feeney Notes; App. 21, Richey Notes; App. 20, Johnson Mem.; App. 23, McLaughlin Notes; App. 23, McLaughlin Memo.

55.     Despite what it heard from Mr. Rothenberger on February 20, 2004, the Government did not include any of this information about the "immediately available funds" language in the letter it sent to the defense on February 24, 2004 reporting that Mr. Rothenberger might have some exculpatory evidence about the timber rights issue. *See* App. 3, Preziosi Decl. ¶ 4, Ex. 2 (Letter from U.S. Att'y to Defense Counsel (Feb. 24, 2004)).

*The Schedule 10-K allegations*

56.     Adelphia's 10-K (Annual Report to the SEC) for the year 2000 stated the following about the co-borrowing facility:

> Certain subsidiaries of Adelphia are co-borrowers with Managed Entities under credit facilities for borrowings of up to $3,751,250,000.  Each of the coborrowers is liable for all the borrowings under the credit agreement, and may borrow up to the entire amount of the available credit under the facility. The lenders have no recourse against Adelphia other than against Adelphia's interests in such subsidiaries.

App. 47, Adelphia Communications Corporation 10-K for 2000 at 88.

57.     The Government alleged this disclosure was fraudulent because, although accurately disclosing the borrowing limit and hence the limit of Adelphia's exposure, it did not disclose the actual amount the managed entities had borrowed as of the end of the reporting year.  *See* Trial Tr., App. 48, at 6587-6605 (testimony of James Brown).

58.     As with many of its allegations, the Government built this claim on the testimony of James Brown. He testified that during March 2001 Deloitte & Touche (Adelphia's auditor) had suggested that Adelphia disclose in its 2000 10-K the amount actually borrowed from the co-borrowing facility. But, according to Mr. Brown, after a conversation with Tim Rigas on March

27 or 28, 2001, Mr. Brown was able to "sell [Deloitte] a story" that it was more conservative as an accounting matter to disclose the full amount of the co-borrowing credit facility (*i.e.*, the amount of corporate exposure) rather than the amount borrowed as of year's end.  Trial Tr., App. 48, at 6595-97.  Mr. Brown claimed that he sold this story to Deloitte knowing his proposal would deceive shareholders. *Id.* at 6596.

59.     Mr. Brown's account of pulling the wool over the eyes of Deloitte's accountants made no mention of Mr. Rothenberger having been involved in deciding what to disclose about the co-borrowing facility. Rather, Mr. Brown described how he and Tim Rigas unilaterally and fraudulently decided on the language, without ever mentioning that Mr. Rothenberger had been consulted about, and had approved of, the language. *Id*. at 6595-6605

60.     In his February 20, 2004 interview with the Government, Mr. Rothenberger explained that he had personally signed off on the propriety of the language that was used. Mr. Rothenberger told the Government that in March 2001 he had a meeting with Tim Werth, and perhaps Mr. Brown and/or Mr. Malone, to discuss including language in the co-borrowing description that included "risk disclosure" and that the managed entities could "borrow up to the full amount."  App. 38, Feeney Notes at 7; App. 22, McLaughlin Notes at 23.

61.     During the discussion of the role Mr. Rothenberger (and lawyers at Buchanan Ingersoll) played in the disclosure, the prosecutor confronted Mr. Rothenberger—declaring "Like it or not you guys endorsed these statements." App. 22, McLaughlin Notes at 24.

62.     Mr. Rothenberger testified in 2005 that, to the best of his recollection, he was the one who actually drafted the language that was used. App. 49, Dep. of Carl Rothenberger in *Adelphia Comm. Corp. v. Rigas*, No. 000598 (Penn. Ct. C.P.) (Oct. 26, 2005) at 493.

63.     Mr. Rothenberger never suggested that any of the Rigases were at all involved in the discussions about how the co-borrowing discourse should be formulated. *See* App. 38, Feeney Notes; App. 21, Richey Notes; App. 20, Johnson Mem.; App. 23, McLaughlin Notes; App. 23, McLaughlin Memo.

64.     Despite what it heard from Mr. Rothenberger on February 20, 2004, the Government did not include any of this information about the co-borrowing disclosure in the letter it sent to the defense on February 24, 2004 reporting that Mr. Rothenberger might have some exculpatory evidence about the timber rights issue. *See* App. 3, Preziosi Decl. ¶ 4, Ex. 2 (Letter from U.S. Att'y to Defense Counsel (Feb. 24, 2004)).

65.     Mr. Rothenberger's account of his role in the co-borrowing disclosure contradicts the testimony of James Brown, the Government's star witness. Mr. Brown testified in April 2004, pursuant to a cooperation agreement in which he pled guilty to three securities offenses (with a maximum sentence of 45 years). He told the jury that, pursuant to the letter he signed, all he expected from the Government was a letter to his sentencing judge describing his crimes and level of cooperation. Trial Tr., App. 50, at 6073-74. Mr. Brown read to the jury part of the agreement indicating that the sentence would be in the sole discretion of the judge, and the Government could not even recommend a sentence. All he hoped for, he explained, was to "receive a lesser sentence that I would if I had been convicted at trial." *Id*. at 6074; *see generally* Trial Tr., App. 51, 7007-30. It is now 13 years later and the prosecution still has not requested a sentencing hearing. *See* App. 52, Docket Report, 1:02-CR-01236-KMW-4 (run on April 25, 2017).

*Related Party Transactions*

66.     The Government claimed at trial that the Rigases had in various SEC filings fraudulently misreported (or failed to report) some related party transactions. These allegations touched on a great many of the areas that were the foci of the Government's case—including allegations regarding Adelphia's role in the co-borrowing (which were affiliated party transactions). According to the Government, the law required that each related party transaction be itemized and did not permit aggregation into a net number at year's end, as Adelphia had been doing. And the Government alleged that a significant number of related party transactions were never reported at all.  *See* Trial Tr., App. 53, at 645-46 (AUSA Owens's Opening); Trial Tr., App. 54, at 11,196 (AUSA Owens's Summation).

67.     To show the requisite *mens rea*, the Government asserted that LeMoyne Zacherl, a former CPA who had worked at Adelphia during the mid-1990s, explained the relevant requirements to Timothy Rigas in the summer of 1994. Trial Tr., App. 55, at 2617-30.

68.     At the February 20 interview, Mr. Rothenberger had acknowledged being responsible for the reporting of related party transactions. He had routinely inquired of Doug Malone (a qualified CPA with SEC experience who worked for Adelphia) to ensure he knew of the relevant transactions, and had then reviewed the 10-K with Mr. Malone.  As the Feeney notes describe:

> Financial Stmts - footnotes, related party transactions not otherwise disclosed
>
> Effort to determine if other related party transactions? Yes
>
> -reviewed 10-KA w D Mal – familiar w/ SEC reporting – Ask him what else under SK 404

App. 38, Feeney Notes at 4 (emphasis added).

69.     Mr. Rothenberger was explicit in reaffirming his view to the Government that year end reporting could be "net, not line item." *Id.* at 4.

70.     Mr. Rothenberger specifically stated that the "'net' number" he used was based on information provided by Mr. Malone.  App. 23, McLaughlin Mem. # 7.

71.     On a more general level, Mr. Rothenberger stated he "relied a lot on Malone, [he] asked Malone what else needed to be covered re: related party transactions and Carl relied on the answers." App. 21, Richey Notes ¶ 19; *see also* App. 20, Johnson Mem. ¶ 15  ("Malone had experience with SEC filings and Carl relied upon him to assure that the statements were complete and accurate"); App. 23, McLaughlin Notes at 12 (Mr. Rothenberger worked with Doug Malone on these issues, whom he described as the "day to day guy" who was "familiar with SEC rpt"). Mr. Rothenberger never suggested that any Rigas had any role in this.

72.     Mr. Malone had unrestricted access to Adelphia's books and records and fully understood the CMS. Robert DiBella (the Government's accounting witness) testified that anyone with access to those books could easily have identified the affiliated-party transactions, which were laid out in detail. Trial Tr., App. 46, at 8608-11. Indeed, that is how Mr. DiBella identified them. *See also* Trial Tr., App. 56, at 4520; Trial Tr., App. 45, at 4721-25 (James Helms).

73.     Mr. DiBella further testified there was nothing problematic with Adelphia's use of the CMS to manage both its and the Managed Entity's funds, and he acknowledged that use of journal entries to effect transactions is routine throughout many industries. Trial Tr., App. 46, at 8611, 8696-97.

74.     Despite what it heard from Mr. Rothenberger on February 20, 2004, the Government did not include any of this information about the related party transactions in the letter it sent to the defense on February 24, 2004 reporting that Mr. Rothenberger might have some exculpatory

evidence about the timber rights issue. *See* App. 3, Preziosi Decl. ¶ 4, Ex. 2 (Letter from U.S. Att'y to Defense Counsel (Feb. 24, 2004)).

> *The Golf Course Project*

75.     The prosecution accused the Rigases of surreptitiously using Adelphia funds to build a golf course on land partly owned by John Rigas. *See generally* App. 57, *United States v. Rigas*, 258 F. Supp. 2d 299, 302 (S.D.N.Y. 2003).

76.   The golf course allegation was front and center at trial. Just minutes into his opening argument, the prosecutor told the jury,

> "[Y]ou will learn that Tim Rigas liked golf so much that he had ACC pay $13 million to begin building his own golf course, a golf course that was [on land] partly owned by Adelphia[, and] partly . . . owned by the family. You will also learn . . . that Adelphia's independent members of the board of directors, its shareholders, its stockholder, its creditors, had no idea Tim Rigas was using their money to build a golf course."

Trial Tr., App. 53, at 625-26 (opening of Richard Owens).

77.     The Government then used its very first witness to begin building its golf course case. Trial Tr., App. 58, at 830 (testimony of Christopher Pelto). By the end of the trial, eight separate witnesses had testified about the golf course. *Id.* at 830, 853-55 (Pelto); Trial Tr., App. 59, at 1138 (Coyle); Trial Tr., App. 60, at 2064-65 (Cretekos); Trial Tr., App. 60, at 2128 (Scally); Trial Tr., App. 61, at 2370 (Pekarski); Trial Tr., App. 62, at 2928-53, 3020 (Raptis); Trial Tr., App. 63, at 3113-17, 3133-34, 3152-53, 3212 (Raptis); Trial Tr., App. 64, at 3501-03, 3513 (Thurner); Trial Tr., App. 65, at 9008 (Mulcahey); Trial Tr., App. 66, at 9701-08 (Mulcahey); Trial Tr., App. 67, at 9872-74 (Mulcahey). At closing, the Government told the jury, "You heard a lot of testimony about the golf course . . . that the public shareholders were never told about, that ACC's independent board numbers were never told about, and that was never approved as an affiliate transaction." Trial Tr., App. 8, at 10,613.

21

78.     Mr. Rothenberger had told the Government in his pre-trial interview that he had been contacted by Tim Rigas to discuss "formulating ownership/operation of GC [Golf Course]." App. 38, Feeney Notes at 6. Tim Rigas had explained that the golf course would be used by "vendors, supplier[s], general corp[orate] use—some employee usage, some unaffiliated (locals) use—no good golf course around Coudersport." *Ibid*; *see also* App. 21, Richey Notes ¶ 25; App. 20 Johnson Mem. ¶ 21. He also talked about its value in retaining employees. App. 22 McLaughlin Notes at 21.

79.     Tim Rigas "wanted BI's [Buchanan Ingersoll's] understanding on affiliate (or not) transaction" and about "who should own." App. 38, Feeney Notes at 6. In response to these inquiries, Mr. Rothenberger advised that "best legal structure that ACC [Adelphia] own the course, because majority of use for corporate purposes." *Ibid*.  And Mr. Rothenberger and Tim Rigas explored many ideas about the tax implications—including the possibility of "donation to town with lease back." *Ibid*.

80.     Mr. Rothenberger also told the Government that he and various individual directors had actually visited the site and "Bd. knew there was a golf course." App. 22, McLaughlin Notes at 22. *See also* App. 20, Johnson Mem. ¶ 21. ("Carl said he did know it was being constructed, as did the various directors who had visited the site."). Mr. Rothenberger's description made clear that that nothing about the golf course project was hidden from him, and he never considered it necessary to bring the matter before the Board for formal approval at that stage. App. 38, Feeney Notes at 6.

81.     Nor is there any indication any director who toured the site ever suggested this was a project needing formal board approval at that point. Rather, Mr. Rothenberger was of the view that it was only later, "once structured," that the golf course project would "require Bd approval

if *RF family continued to own land.*" *Ibid.* That time never arrived as construction of the course

came to a stop in May 2002. *See* Trial Tr., App. 62, at 2947 (Raptis Testimony).

82.     Despite what it heard from Mr. Rothenberger on February 20, 2004, the Government

did not include any of this information about the golf course in the letter it sent to the defense on

February 24, 2004 reporting that Mr. Rothenberger might have some exculpatory evidence about

the timber rights issue.  *See* App. 3, Preziosi Decl. ¶ 4, Ex. 2 (Letter from U.S. Att'y to Defense

Counsel (Feb. 24, 2004)).

## II.     FACTS PERTAINING TO *BRADY* VIOLATIONS RELATED TO THE MARKETING SUPPORT ALLEGATIONS.

83.     The Government alleged that the Rigases orchestrated phony "marketing support"

transactions with Scientific Atlanta Inc. and Motorola Communications Corp. as part of

"accounting magic" the Rigases used to increase Adelphia's EBITDA.  Trial Tr., App. 68, at

6240-41 (James Brown). *See also* Trial Tr., App. 8, at 10,584 (Government's summation: "the

first one of those bogus transactions we learned about was marketing support."). EBITDA is a

measure of operational earnings—standing for Earnings Before Interest, Taxes, Depreciation and

Amortization.

84.     The Second Circuit explained the allegations as follows:

> Adelphia agreed to pay Scientific Atlanta $339 for each cable converter box. The
> two entities later agreed that Scientific Atlanta would increase the price of each
> box by $31, and Adelphia would charge [Scientific Atlanta] an identical $31 per
> box for marketing support. Thus, Adelphia's capital expenses for each box were
> increased by $31 to $370. But Adelphia's current expenses were decreased, and
> its EBITDA was increased, by $31 per box. The effects of the marketing support
> scheme in the June 2000 and September 2000 quarters, for example, were an
> increase in Adelphia's EBITDA of $7 million and $12.8 million, respectively.
> The scheme with Motorola was similar, and had the same EBITDA-inflating
> effect.

App. 10, *Rigas*, 490 F.3d at 217 n.8.

85.    These allegations also were based on the testimony of the Government's star witness, James Brown. Mr. Brown testified that, in order to enhance EBITDA, he, Tim Rigas and others devised a "fake marketing support" scheme that used "wash transactions" to "fool the auditors." Trial Tr., App. 50, at 6127, 6121, 6125, 6140.

86.    The effect on EBITDA resulted from the fact that capital expenses are not treated as expenses for EBITDA purposes, but the marketing support payments do count as revenue. *See* App. 10, *Rigas*, 490 F.3d at 215 n.5; Trial Tr., App. 50, at 6120, 6126, 6161 (James Brown); Trial Tr., App. 69, at 7290 (James Brown).

87.    To support the claim that the transactions were fraudulent, the prosecution relied heavily on the fact that the agreements with Scientific Atlanta and Motorola were split into two documents—one involving the increased price Adelphia would pay the companies and one involving the marketing support payments the companies would pay Adelphia. Trial Tr., App. 50, at 6150-52. Mr. Brown testified this was done that way—as opposed to capturing the transaction in one document—to reduce the chances the auditors might notice what was happening. *Ibid.* This led the prosecution to tell the jury in closing argument that proof that "marketing support was just a fraudulent transaction," was evident from the fact that "they signed and discussed two dummy documents to try to throw the auditors off the track to this wash transaction." Trial Tr., App. 8, at 10,589, 10,585.

88.    The prosecution also elicited testimony to prove the fraudulent nature of the marketing support agreements through the claim that Adelphia started putting the changed figures on its books even before the time (according to the Government) Adelphia discussed the subject with the manufacturers.  Trial Tr., App. 50, at 6119-23, 6131-35 (James Brown).

89.     The "marketing support" evidence not only related to securities fraud and conspiracy counts, the issue of EBITDA-manipulation through marketing support also related to the bank fraud claims. The maximum statutory sentence for bank fraud is 30 years (18 U.S.C. § 1344), as opposed to the 10-year maximum on the securities fraud counts that applied at the time of the conduct here (15 U.S.C. § 78ff (1998)), so the bank fraud count was vital to the 17-year and 12-year sentences imposed on Tim and John Rigas, respectively.

90.     Shortly following the trial, two high-ranking officials from Scientific Atlanta and Motorola (whom the Government had not called as witnesses at trial) testified in civil depositions. *See* App. 70, Dep. of John Wharton (Dec. 22, 2005); App. 71, Dep. of John Tracy (Nov. 28, 2005). John Wharton (the sales finance person who supported North American Sales for Scientific Atlanta) testified that Adelphia had not "created" any sort of marketing support scheme. Rather, Scientific Atlanta's arrangement with Adelphia tracked precisely the agreement Scientific Atlanta had already negotiated with Charter Cable Company (an Adelphia competitor). App. 70, Wharton Dep. at 131-32. Likewise, John Tracy (Vice President of Finance at Motorola) testified that Motorola used the Charter Cable model in drawing up its marketing support agreement with Adelphia. App. 71, Tracy Dep. (Nov. 28, 2005) at 23-25, 121-24, 144-57.

91.     Both Messrs. Tracy and Wharton testified that the marketing support agreements (going back to the agreements with Charter) had been internally vetted and approved within their respective companies by lawyers and/or auditors. *Ibid.*; App. 70, Wharton Dep. at 45-48, 127-31.

92.     In 2007, when Petitioners moved to compel the Government to turn over any *Brady* material with regard to Scientific Atlanta and Motorola, the Government responded, "[t]here was no *Brady* disclosure triggered by any such witnesses whom the Government interviewed." App. 13, Gov't Mem. of Law in Opposition to Mot. to Compel at 6.

93.     At that time, Petitioners had no evidence that the Government had learned any materially exculpatory evidence relating to the marketing support allegations. The District Court denied the motion to compel (without having seen any materials), and the Second Circuit affirmed. App. 72, *United States v. Rigas*, 2007 WL 4145282 (S.D.N.Y. Nov. 30, 2007), *aff'd*, App. 11, 583 F.3d 108 (2d Cir. 2009).

94.     Petitioners informed this Court in 2014 that three witnesses from Scientific Atlanta and Motorola testified in recent depositions about the relevant events. These witnesses—Wallace Haislip, John Wharton and John Tracy—testified they had provided information (which Petitioners consider very exculpatory) to the prosecution before the Rigases' trial. *See* App. 73, Letter to Hon. Kimba M. Wood (Mar. 24, 2014), ECF No. 34.

95.     Based on these depositions, this Court granted Petitioners' request for discovery from regarding Scientific Atlanta and Motorola. App. 74, Order (June 20, 2016), ECF No. 39

96.     Through discovery, Petitioners have received eight memoranda of pre-trial interviews conducted by the Government between July 2002 and January 2003. They are:

| Name | Date | Entity | Position | Appendix |
|------|------|--------|----------|----------|
| Patrick Tylka | 8/23/02 | Scientific Atlanta | President of Worldwide Sales | App. 75 |
| Wallace Haislip | 8/23/02 | Scientific Atlanta | Chief Financial Officer | App. 76 |
| David Hansen | 8/28/02 | Scientific Atlanta | National Account Director | App. 77 |
| Thomas Nilson | 9/13/02 | Scientific Atlanta | V.P. & Manager, North America Sales | App. 78 |
| John Simons | 9/25/02 | Motorola | Sales Director | App. 79 |
| John Wharton | 10/10/02 | Scientific Atlanta | Finance Director For Financial Planning and Analysis | App. 80 |
| Marc Rothman | 12/13/02 | Motorola | V.P./Dir. of Finance for Broadband Sector | App. 81 |
| Anita Gifford | 1/24/03 | Scientific Atlanta | Vice President of Law Division & Deputy General Counsel | App. 82 |

97.     The Government was told during the interviews that Adelphia approached Scientific Atlanta asking for a Marketing Support agreement similar to agreements Scientific Atlanta and Motorola already had entered into with one of Adelphia's competitors, Charter Communications. *See* App. 82, Gifford Interview at 1506, 1508; App. 75, Tylka Interview at 1454; App. 78, Nilson Interview at 1486; App. 80, Wharton Interview at 1493; App. 77, Hansen Interview at 1475.

98.     The Government learned it was not surprising to Scientific Atlanta that Adelphia knew about the Charter agreement because the "cable industry is a small one and . . . people in the industry talk with one another." App. 77, Hansen Interview at 1475. Given Adelphia's "Most Favored Nation" agreement that entitled it to terms as favorable as any customer received, it seemed reasonable Adelphia would be seeking market support agreements like those Charter has received. *See* App. 78, Nilson Interview at 1483; App. 82, Gifford Interview at 1503.

99. Mr. Wharton would later explain that other companies, such as Comcast and Time Warner, also had similar marketing support agreements. App. 70, Wharton Dep. at 123-25.

100.    The Government was told that although Adelphia had originally proposed using contracts it drafted and sent, Scientific Atlanta persuaded Adelphia that the contracts should be modeled precisely after the ones used with Charter. *See* App. 82, Gifford Interview at 1507. Indeed, Scientific Atlanta sent Adelphia a draft of the proposed agreements that simply had the names and amounts associated with the Charter deal blacked out. *See ibid.*; App. 80, Wharton Interview at 1495.

101.    The Government was told that the reason Scientific Atlanta insisted on using the Charter contracts was that Scientific Atlanta's accountants and legal department had vetted those closely and the Scientific Atlanta executives were, therefore, confident about their legality and

propriety. *See* App. 80, Wharton Interview at 1491-92, 1495; App. 82, Gifford Interview at 1505, 1507.

102.    The Government was told that part of the very approach that had been vetted by Scientific Atlanta's and Motorola's lawyers and auditors with respect to the Charter agreement was the use of two separate contracts—one dealing with the price increase of each unit and one dealing with Charter's marketing support subsidy. Mr. Nilson told the Government the Adelphia agreement used two documents "because two documents had been used for the Charter Communications agreement." App. 78, Nilson Interview at 1485; *see also id.* at 1486 (Adelphia agreed to the two-contract approach when Mr. Nilson said he preferred to use a format previously used).  As Mr. Haislip told the Government, "two documents were needed to support a single contract because that was the format which had been used for the marketing support agreement reached with Charter Communications." App. 76, Haislip Interview at 1469; *see also* App. 82, Gifford Interview at 1505, 1507-08.

103.    At trial, the Government argued that fraud was obvious because the agreements were effectuated through two separate documents, and two sets of payment transactions, that did not cross-reference one another. *See* Trial Tr., App. 8, 10,589 (AUSA Clark's Summation); *supra* ¶ 87.

104.    The Government had been told by Mr. Wharton that Mr. Brown pressured Scientific Atlanta to complete the final documents by November 13. App. 80, Wharton Interview at 1495. That was the day the Audit Committee was meeting. App. 98, Adelphia Comm'c Corp., Minutes of Audit Committee Meeting at 2.

105.    Generally, the Government had been told that Scientific Atlanta was adamant about carrying out the transactions in ways acceptable to its auditors and lawyers. *See* App. 76, Haislip

Interview at 1466, 1468, 1469; App. 80, Wharton Interview at 1491-92, 1495; App. 82, Gifford Interview at 1505, 1507. Several individuals described for the Government Scientific Atlanta's insistence that the deal only go through if the amount of marketing support actually reflected Adelphia's true marketing expenditures. This began at the negotiation stage when Mr. Haislip rejected Mr. Brown's demand for marketing support in the range of 50%. Mr. Haislip told the Government "he gives each contract a test of 'commercial reasonableness,'" when negotiating contracts, and made it clear that the figure Mr. Brown was pushing was entirely unacceptable. *See* App. 76, Haislip Interview at 1466-67; App. 77, Hansen Interview at 1478. When Mr. Brown became, threatening and vulgar in response, Mr. Haislip insisted on speaking with Tim Rigas to reach a commercially reasonable figure. *See* App. 76, Haislip Interview at 1468; App. 80, Wharton Interview at 1494.

106.    The Government had been told that the general practice of marketing support agreements is common within the cable television industry and was reasonable here. App. 76, Haislip Interview at 1466, 1468.   Scientific Atlanta understood Adelphia's proposal was to designed to boost its EBITDA, but considered that appropriate, provided the deal reflected amounts spent that were properly attributable to marketing support. *See id.* at 1467-68.

107.    The Government was told that, although some of those interviewed were skeptical at first about whether Adelphia would actually spend money on marketing, those concerns were dissipated once they focused on Adelphia's marketing plan. *See* App. 75, Tylka Interview at 1452, 1457;   App. 76, Haislip Interview at 1469-70. Part of that plan involved Adelphia reporting back to Scientific Atlanta periodically on its marketing efforts. *See* App. 80, Wharton Interview at 1496-98. When Scientific Atlanta requested documentation that Adelphia was actually spending the money on marketing, Adelphia's Tim Werth sent Mr. Wharton "a financial

statement for the quarter ending September 30, 2011, which reflected that ACC spent $25 million to $26 million per quarter on marketing." *See* App. 80, Wharton Interview at 1498. This was fully in keeping with expectations. *Ibid*.

108.    The Government was told by Motorola's Marc Rothman that Motorola had no interest in trying to accommodate Adelphia if it was illegal. That was why Motorola was unwilling to proceed with the marketing support program unless its legal department signed off on it, and unless it learned that Adelphia's auditors were on board—which Tim Werth reported to be the case. App. 80, Rothman Interview at 1500.

109.    In his March 12, 2014 civil deposition testimony, John Tracy, who served as Motorola Communication's Vice President of Finance, testified that he was examined by the Government in 2002 or 2003 in an all-day session, and specifically identified Christopher Clark, the lead prosecutor in the Rigas case, as a person who asked questions. App. 83, Dep. of John Tracy (Mar. 12, 2014) at 6-7, 50. This account is confirmed by Mr. Tracy's 2005 testimony before the Securities and Exchange Commission. In that hearing, Mr. Tracy testified he had been interviewed by the United States Attorney's Office in "[e]nd of 2002. September 2002." App. 84, Test. of John Tracy, *In re Adelphia Comm'c Corp*, No. NY-7026-A (S.E.C.) (June 21, 2005) at 274-75. The Government has been unable to produce any notes, memoranda or transcripts from that interview.

110.    Per Mr. Tracy's sworn deposition, he told the Government in 2002 that the marketing support agreements were not some Adelphia concoction, but were based on existing contracts between Motorola and Charter Communications. App. 83, Tracy Dep. (Mar. 12, 2014) at 17-18; *see also* App. 71, Tracy Dep. (Nov. 28, 2005) at 167.

111.    Mr. Tracy also told the Government prior to trial that Motorola's agreement with Adelphia was drafted by Motorola. App. 83, Tracy Dep. (Mar. 12, 2014) at 23. As with the Charter agreement, Motorola used two separate contracts—one dealing with the new equipment price and one with marketing support payments. *Id.* at 23-25.

112.    In addition, Mr. Tracy told the Government prior to trial that he provided the Charter agreement to the group responsible for vetting Adelphia's similar request—a group that included "my boss, the CFO, all through the General Counsel and Legal. They even used outside counsel for various reasons." *Id.* at 19; *see also* App. 71, Tracy Dep. (Nov. 28, 2005) at 59, 152. These lawyers and others determined that the agreement—which included an increased price for equipment and a subsidy for marketing support—was appropriate. The Government was also told that Mr. Tracy and others learned from Tim Werth that Adelphia's auditors "were okay with" the agreements. App. 83, Tracy Dep. (Mar. 12, 2014) at 21; *see also* App. 71, Tracy Dep. (Nov. 28, 2005) at 41-43, 83-85, 158.

113.    The indictment alleged that Tim Rigas and Mr. Brown began recording the marketing support payments on Adelphia's books in August 2000, even though it was only in late October 2000 when, in an effort to give the appearance of legitimacy to those entries in Adelphia's books, discussions began with Scientific Atlanta and Motorola "in the hope of reaching an agreement for marketing support payments to Adelphia." App. 1, Indictment ¶ 115.

114.    During Mr. Brown's testimony, the prosecution stressed this timing, with Mr. Brown testifying that as of the summer of 2000, "[w]e hadn't had any discussions with them yet." Trial Tr., App. 50, at 6128; *see also id.* at 6131, 6134. Although he admitted in cross-examination that there possibly could have been earlier conservations between Adelphia and the companies (Trial Tr., App. 69, at 7298-99), no witness ever contradicted Mr. Brown's testimony.

115.    The defense sought to admit an exhibit (App. 85, Def. Trial Ex. 12,266 at 1), which was an August 11, 2000 internal Scientific Atlanta e-mail about their having the go-ahead for a marketing agreement with Adelphia, like the one with Charter. *See* Trial Tr., App. 86, at 9497. This, the defense argued, exposed the fallacy of Mr. Brown's claim that the first conversations occurred in October 2000. The prosecution fought against admission of the exhibit, claiming that "there's no reason, either in the record or in this email, that that's not consistent" with Scientific Atlanta having unilaterally planned to offer a marketing agreement in August, but never having discussed the issue with Adelphia at that time. *Id*. at 9549-50. The Government stated that if the defendants wished to prove differently, "they should call" witnesses from Scientific Atlanta. *Ibid.*

116.    The existence of that internal Scientific Atlanta e-mail led Judge Sand to formulate a stipulation that "the internal files of Scientific Atlanta reflect that as of August 11 consideration was being given to the drafting and submission to Adelphia of a marketing support agreement." *Id.* at 9546, 9565. As the prosecution had urged, the stipulation said nothing about Adelphia's involvement in the process during that summer (indeed, it simply spoke of Scientific Atlanta considering drafting and submitting a proposal).

117.    The prosecutor who told this to the court was the same prosecutor who conducted the interviews with Scientific Atlanta officials that countered this representation. For example, Thomas Nilson had told the prosecutor how the subject of marketing support first came up at a tradeshow during the summer of 2000, when Dan Liberatore of Adelphia proposed the arrangement. *See* App. 78, Nilson Interview at 1483-84.  In response, Mr. Nilson recommended arranging talks on the subject at the annual fishing trip Scientific Atlanta sponsors in June or July.  *Id.* at 1484. Another Scientific Atlanta employee told the prosecutor that during that July

2000 fishing trip, Dan Liberatore had received a phone call from someone at Adelphia "asking him to explore the possibility of [Scientific Atlanta's] entering into a marketing support agreement with ACC similar to an agreement [Scientific Atlanta] had with Charter Communications." App. 77, Hansen Interview at 1474-75.

118.   Despite knowing this, and despite having Mr. Brown testify to an account that contradicted these accounts, the prosecution (a) never made *Brady* disclosure of any of the documents that would have contradicted Mr. Brown's account and the allegation of the indictment; and (b) affirmatively told the Court that Scientific Atlanta might well have been thinking about marketing support in the summer without Adelphia's knowing about that until October. *See supra* ¶ 115-18.

## III.   FACTS PERTAINING TO THE *BRADY* VIOLATIONS RELATED TO SUBSCRIBER NUMBERS.

119.   The Government also built its case on the claim that the Rigases, in another effort to make Adelphia appear to be performing better than it was had fraudulently inflated Adelphia's reporting on the year 2000 and 2001 numbers of Adelphia cable subscribers. Trial Tr., App. 8, at 10,576-78 (Clark summation).

120.   Part of the dispute on this claim turned on determining the method of counting "bulk units"—apartment buildings or complexes with multiple individual subscribers—even though the building or complex managers pay only one bill for the entire complex. Within the industry there are different accepted methods for estimating the number of individual subscribers within these bulk units. Trial Tr., App. 87, at 5497 (testimony of Karen Chrosniak).

121.   Karen Chrosniak, who had served as Adelphia's Director of Investor Relations, testified at trial (pursuant to a non-prosecution agreement) as a prosecution witness that Adelphia had consistently used what is called the "prevailing rate" method in counting bulk units. She

testified that the numbers Adelphia reported in 2000 and 2001 exceeded what should have been reported under that methodology. *Id.* at 5501, 5508-13. James Brown similarly testified that inappropriate additions were made in order to fraudulently increase subscriber numbers. Trial Tr., App. 68, at 6264.

122.    By contrast, the defense sought to establish that Adelphia had used a number of different industry-accepted methods depending on the units involved, and that the reported numbers did not inflate the number of subscribers under these legitimate methods Adelphia had long utilized. *See* Trial. Tr., App. 8, 10,580-82 (AUSA Clark's Closing) (describing defense positions); Trial. Tr., App. 87, at 5500-05 (cross of Chrosniak).

123.    Following the criminal trial Petitioners learned about an August 9, 2002 letter from Adelphia's counsel to the Government. App. 88, Letter to U.S. Att'y Office (Aug. 9, 2002) at 30 n.1.

124.    In this letter, the new post-Rigas Adelphia, which was cooperating fully with the Government, made it clear that Adelphia had *not* traditionally been using the prevailing rate method, but that it was *only then* (in August 2002) that Adelphia was going to include that method in its reporting. The letter states:

> Historically, Adelphia calculated its number of subscribers by counting the number of households (or in the case of households with multiple billing accounts, the number of accounts) that receive signals from its cable system (the "Subscriber Accounts").  .  .  .  The Company's new management intends to improve the quality of the Company's public disclosure.  In connection with that effort, the Company intends to report two different subscriber numbers – the Subscriber Accounts and the "Equivalent Subscribers."  Equivalent Subscribers is a notional number that in general is obtained by dividing the total revenue for basic cable services in each market by the prevailing rate in the market. The difference between Subscriber Accounts and Equivalent Subscribers results principally from bulk billing for multiple dwelling units.

*Ibid.*

125.    In an effort to prove the legitimacy of its reporting, the defense sought to introduce a 10-K issued by the new (post-Rigas) Adelphia Board on June 10, 2002. That 10-K showed a subscriber figure substantially similar to the one that the earlier Rigas-controlled Board had announced. But the Government successfully fought admission of that 10-K, arguing that the new 10-K was using a counting method different than what Adelphia had been using earlier. The Government argued, "You can make an examination and if you use different criteria, you may come up with a different number." Trial Tr., App. 87, at 5531, 5540.


                                           /s/ Lawrence C. Marshall

                                           *Admitted Pro Hac Vice*
                                           Stanford Law School
                                           Stanford, CA 94305
                                           (650) 723-7572
                                           lmarshall@stanford.edu

APRIL 28, 2017