IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN J. RIGAS and TIMOTHY J. RIGAS, | |
| Petitioners, | 11 Civ. 6964 (KMW) |
| | 02 Cr. 1236 (KMW) |
| v. | |
| | ECF Case |
| UNITED STATES OF AMERICA, | |
| Respondent. | |

**SYNOPSIS OF MEMORANDUM OF LAW IN SUPPORT OF PETITIONERS'
MOTIONS FOR JUDGMENT ON THE CLAIMS ALLEGING VIOLATIONS OF
*BRADY v. MARYLAND*, 373 U.S. 83 (1963)**

LAWRENCE C. MARSHALL, ESQ.
ADMITTED PRO HAC VICE
STANFORD LAW SCHOOL
559 NATHAN ABBOTT WAY
STANFORD, CA 94305
(650) 723-7572

*Attorney for Petitioners,
John J. Rigas and Timothy J. Rigas*

Pursuant to this Court's Order (ECF 117), Petitioners submit this ten-page Synopsis of the arguments set forth in their Memorandum of Law in Support of Petitioners' Motion for Judgment on Various Claims Alleging Violations of *Brady v. Maryland*, 373 U.S 83 (1963).[1]

This § 2255 action involves the convictions of John and Timothy Rigas on securities fraud charges stemming from John's role as President and CEO, and Tim's role as CFO, of Adelphia Communications Corporation. Petitioners are advancing two sets of claims: One set involves the Government's suppression of material exculpatory evidence on a number of subjects (the "*Brady* Claims"). The other set deals with the Government unconstitutionally interfering with Petitioners' rights to prepare and fund their defense (the "Interference Claims").

In June 2014, this Court granted Petitioners discovery on both sets of claims. Discovery on the Interference Claims is ongoing and will take considerable time to complete. But discovery on many *Brady* claims is completed, and various *Brady* claims are now ripe for decision, as they turn on undisputed facts.[2] This Court has the power to decide potentially dispositive issues ripe for decision without waiting for slower-developing claims to catch up. It is now more than five years since Petitioners filed their § 2555 action, and they respectfully ask the Court to adjudicate these *Brady* claims now, in keeping with the promise that worthy petitioners are to be afforded as "swift and imperative remedy" as possible. *Fay v. Noia*, 372 U.S. 391, 400 (1963).

**I.     PETITIONERS ARE ENTITLED TO RELIEF BASED ON *BRADY* VIOLATIONS RELATED TO THE PROSECUTION'S PRE-TRIAL INTERVIEW WITH CARL ROTHENBERGER.**

Petitioners' defense against charges of securities fraud, wire fraud, and bank fraud turned on showing the jury that, even if there were problems with some of the financial disclosures at

---

[1] As a Synopsis, this document does not generally include record citations, but closes each paragraph with a reference to the page or pages of the Memorandum in which that paragraph's issues are addressed.

[2] Some other *Brady* claims are not amenable to summary judgment as they will require evidentiary hearings. Those are not relevant to the summary judgment motion being advanced here.

issue, (a) the relevant disclosures had been handled by their outside securities counsel and others at Adelphia, without Petitioners' involvement, and (b) everyone at Adelphia—and certainly Petitioners—reasonably relied on their lawyers' counsel as to the propriety of the reporting, meaning there was never any intent to defraud. There was one person in position to establish those points, which would have constituted a complete defense to the charges. That person was Carl E. Rothenberger, Adelphia's outside securities counsel from the Buchanan Ingersoll firm in Pittsburgh. Mr. Rothenberger knew exactly how things had been handled—including the identities of those with whom he had worked on the disclosures and the role he played in formulating the language at issue and advising on its propriety. *See* Mem. at 1.

Despite the vital importance of these points, Petitioners faced a basically insurmountable roadblock in presenting them to the jury: Mr. Rothenberger refused to speak with the defense prior to trial, rendering it out of the question to call him as a defense witness without knowing whether he would provide truthful exculpatory evidence or (in an effort to garner favor with the prosecutors) would testify falsely to what he thought the prosecution wanted to hear. Any conceivable doubts about whether to risk calling Mr. Rothenberger were erased on February 26, 2002, just four days before the beginning of the trial, when the defense received a letter from the Government indicating Mr. Rothenberger "may be able to provide information that is favorable to the defense concerning the timber rights transaction discussed in the Government Bill of Particulars." This letter was thoroughly disheartening to the defense. The "timber rights transaction" was an exceedingly minor part of the case, yet the Government was making it clear to the defense that this was the only area on which Mr. Rothenberger might "be able to provide information that is favorable to the defense." It goes without saying the defense never called Mr. Rothenberger, which led the prosecution to tell the jury, "[Y]ou better believe that if there was a

2

lawyer or accountant out there that had approved these transactions and said they were okay, we'd have seen them in this courtroom. You didn't see anything like that." *See* Mem. at 2-3.

Years later—after extensive litigation in which the Government continually claimed there was nothing else exculpatory in the notes—the defense secured the Government's notes from the Rothenberger interview. And several years after that—through discovery in this case—the defense secured additional documents memorializing that meeting. These documents reveal in no uncertain terms that Mr. Rothenberger provided the Government powerfully exculpatory information on many of the trial's central issues, and the Government violated *Brady* when it failed to disclose that information to the defense. *See* Mem. at 3-5.

*Issues Relating to Co-Borrowing*

One of the central issues—indeed, the most central issue—of the trial related to the co-borrowing facilities that Adelphia shared with various entities (the "Managed Entities") owned by the Rigases and managed by Adelphia pursuant to management contracts. These co-borrowing facilities were shared lines of credit allowing either Adelphia or the Managed Entities to draw down funds from participating banks. Amounts borrowed by Adelphia were recorded as Adelphia's debt and amounts borrowed by Managed Entities were recorded as Managed Entities' debt (although, as co-borrowers, each was liable for the other's debt in the event the other did not pay). This facility provided benefits to Adelphia, including (at times) allowing Adelphia to secure cash based on the Rigases' assets and (at times) allowing the Rigases to buy shares alongside the public even if the Rigases did not otherwise have adequate liquidity at the moment (which was important to Adelphia for numerous reasons). *See* Mem. at 17-19.

The Government alleged that in conjunction with some such purchases of Adelphia shares with co-borrowed funds, Petitioners' Schedule 13-D (Beneficial Ownership Report)

3

fraudulently indicated that the source of the Rigases' funds for the purchases included "affiliate borrowings." The Government conceded that statement was truthful, but argued it was only a half-truth because it did not indicate that the "affiliate" was Adelphia. The key to the Government's contention was that because both Adelphia and the Rigases were co-responsible for the loan, and because the funds had been drawn down from the banks into an Adelphia-managed account, the Managed Entities' drawing down money from the co-borrowing facility was tantamount to borrowing from Adelphia. The Government advanced this claim even though Adelphia's accounting system carefully tracked how much of the loan balance was Adelphia's and how much was the Managed Entities'. *See* Mem. at 19-20.

Similarly, the Government alleged that a stock purchase agreement for shares purchased with co-borrowed funds fraudulently indicated the Managed Entities were paying Adelphia in "immediately available funds." According to the Government, that was not accurate because the Managed Entities had paid through journal entries whereby Managed Entities' funds being held in Adelphia accounts were shifted over to Adelphia by journal entry. *See* Mem. at 28.

Aside from these transaction-focused claims, the Government asserted Petitioners caused Adelphia to file a 10-K that fraudulently reported on the co-borrowing facility. The 10-K disclosed that Adelphia affiliates are "co-borrowers with Managed Entities under credit facilities for borrowings of up to $3,751,250,000." The 10-K then disclosed, "Each of the coborrowers is liable for all the borrowings under the credit agreement, and may borrow up to the entire amount of the available credit under the facility." The Government alleged this was fraudulent because, although accurately disclosing the borrowing limit and limit of Adelphia's exposure, it did not disclose the amount the Managed Entities actually had borrowed at year's end. *See* Mem. at 31-32.

4

Mr. Rothenberger was at the epicenter of all this activity. Yet, when the Government interviewed him only days before the Rigases' criminal trial, with the unmistakable goal of eliciting evidence against the Rigases, Mr. Rothenberger provided powerful exculpatory evidence across a broad array of the charges. *See* Mem. at 22.

With regard to the "affiliate borrowing" language, Mr. Rothenberger acknowledged *he* developed that formulation, and believed it appropriate and accurate because there was no need to identify the affiliates by name. Mr. Rothenberger also told the Government that his contact person on the 13-Ds was Chris Thurner, to whom he sent the forms to review for accuracy. The Rigases were simply not involved in this Rothenberger-Thurner project. *See* Mem. at 22-28.

Mr. Rothenberger further explained he was the one to formulate the "immediately available funds" language. He did so to accommodate "changes in the ways in which the Rigases were buying stock in connection with a public offering." Not only did he indicate that—as senior counsel from a nationally known firm—he drafted (and approved) the language, he also described the origin of the language as having no Rigas involvement. *See* Mem. at 29-30.

Turning to the 10-K's co-borrowing language, the Government argued that it was necessary for Adelphia to disclose the actual amount that had been borrowed at the end of the reporting period.  Mr. Rothenberger told the Government that his discussion with two or three people from Adelphia—none of whom was John or Tim Rigas—culminated in a decision to disclose the amount of the co-borrowing facility and that both Adelphia and the Managed Entities could "borrow up to full amount." During the Government's interview of Mr. Rothenberger, it became clear that he and his law firm had approved the language. Thus, the prosecutor confronted Mr. Rothenberger saying, "Like it or not, you guys endorsed these statements." *See* Mem. at 31-34.

*Related Party Transactions*

With regard to related party transactions, the prosecution contended that the law requires that each related party transaction be itemized, not aggregated into a net number at year's end, as Adelphia had been doing. And the Government alleged that a significant number of Adelphia's related party transactions had not been reported. In his interview with the Government, Mr. Rothenberger acknowledged he was responsible for the reporting of related party transactions. And he stood by his view that aggregated ("net, not line item") reporting was permissible. Just as critically, he described in detail how he relied exclusively on Doug Malone (a CPA with SEC experience who worked for Adelphia) to gather all of the related party transactions that needed to be reported. The evidence showed that all related party transactions were readily identifiable in the books, and that both Messrs. Rothenberger and Malone had full access to those books, thus making them responsible for any failures to report. *See* Mem. at 34-36.

Once again the name conspicuously missing from this account is Rigas. Mr. Rothenberger was as clear as could be that it was Doug Malone, and Doug Malone alone, who worked with him on the disclosure of related party transactions. *See* Mem. at 35.

*The Golf Course Project*

The Government devoted extensive attention at trial to accusing Petitioners of surreptitiously using Adelphia funds to build a golf course on land partly owned by John Rigas. The defense, in contrast, sought to show that the golf course was a legitimate Adelphia project designed to help make the remote town of Coudersport more attractive to prospective employees. Unbeknownst to Petitioners, Mr. Rothenberger told the Government he had been contacted by Tim Rigas for legal advice about how the ownership of the golf course should be structured and whether it constituted a related party transaction that needed to be Board-approved and reported.

6

Mr. Rothenberger told Tim Rigas that the need for any Board approval or reporting would arise only if, "once structured," the Rigas Family "continued to own land." Mr. Rothenberger also explained he and various directors had visited the site and that "Bd. Knew there was a golf course." *Id.* This sharply contrasted with the Government's persistent accusation that the project was hidden from the Board. *See* Mem. at 37-40.

*The Government Was Required to Disclose the Rothenberger Notes.*

The withheld information conveyed by Mr. Rothenberger plainly meets the definition of materiality: had it been disclosed, there was a "significant possibility of a different result." *Strickler v. Greene*, 527 U.S. 263, 300 (1999). Evidence that a person told the Government that (a) he was responsible for the decisions for which the defendant was being accused and (b) the defendants were not even involved in the decisional process, is about as powerful as exculpatory evidence can be. And it went to the issues that were the central allegations of the case. Even were that not true, the verdict here pooled together all charged acts and was not specific about which acts the jury found Petitioners to have committed. When it is possible that a jury predicated its verdict on a particular allegation, and when material exculpatory evidence was withheld in connection with that allegation, a defendant is entitled to a new trial. *See* Mem. at 9-12.

The Government has previously argued it was exempt from any disclosure requirement under *Brady* because Petitioners were aware of "essential facts" regarding what Mr. Rothenberger knew. It claims support for this point in the District Court (summarily affirmed by the Second Circuit) having invoked the phrase "essential facts" in refusing to order the Government to tender the notes—at a time when neither Petitioner nor the courts had any idea about the notes' content. There is more than a little audacity to the Government's having misrepresented to the courts that the notes contained nothing exculpatory, and then invoking the

decisions effected by those misrepresentations even now that the exculpatory nature of the notes is evident. *See* Mem. at 54-56.

More generally, the Second Circuit's decision in *United States v. Mahaffy*, 696 F.3d 113 (2d Cir. 2012), deals with the precise "essential facts" issue involved here—a defendant was aware that witness *x* knew some information, but because witness *x* would not speak with the defense, the defendant did not know (and could not know) that witness *x* was willing to provide that information to the authorities (or at trial). The court in *Mahaffy* explained, "It is not enough that a defendant knew a potential witness's identity; the defendant had to know "or should have known the essential facts *permitting him to take advantage of any exculpatory evidence*." *Id.* at 131 n.11 (citation omitted). The facts of *Mahaffy* are on all fours with this case. *See* Mem. at 44-51.

Significantly, the Government's conduct in this case reveals its recognition that the "essential facts" doctrine did not absolve it of its duty to disclose exculpatory information it learned from Mr. Rothenberger. Recall that the Government did disclose information regarding the timber rights transaction. Moreover, the Government did this even though it involved a discussion Mr. Rothenberger described having with Tim Rigas himself—which would fall into the heartland of the "essential facts" doctrine the Government now espouses. *See* Mem. at 51.

The Government told Judge Sand it made that disclosure because "[i]t has long been the law and practice in the Second Circuit that the Government may fulfill its *Brady* obligation with respect to a particular witness by identifying the witness to the defendant and indicating that the witness may have favorable information *on a particular subject*." Thus, on the Government's own terms, if there was any material exculpatory information on issues other than timber rights, the Government had a duty to identify the "particular subject" of that information. It did not.

8

Worse yet, by making the partial disclosure it did, the Government lulled the defense into believing the Government had identified every subject about which Mr. Rothenberger had provided exculpatory information. That was worse than no disclosure at all. *See* Mem. at 41-43.

### II. PETITIONERS ARE ENTITLED TO RELIEF BASED ON THE *BRADY* VIOLATIONS RELATED TO THE MARKETING SUPPORT ALLEGATIONS.

The Government focused heavily at trial on Adelphia's contacts with Scientific Atlanta Inc. and Motorola Communications Corporation. The prosecutors sought to establish that the Rigases had devised a fraudulent way—through "marketing support" agreements—to manipulate Adelphia's contracts with these companies so as to "fool the auditors" and improve the appearance of Adelphia's profitability. In support, the Government presented testimony that the agreements were separated into two separate documents and transactions so that the auditors would not detect the fraud. The Government also presented testimony that the agreements were so phony that Adelphia put the revenue from them on its books before even approaching Scientific Atlanta and Motorola to propose the idea. *See* Mem. at 56-59.

It turns out that months before trial, prosecutors interviewed numerous individuals from these companies. Far from confirming the allegations, these individuals told the Government that the structure and forms of their contracts with Adelphia had actually been developed earlier in connection with another cable company altogether—one of Adelphia's competitors. They further told the Government that the agreements had been fully vetted by their lawyers and accountants and two separate documents were used because those lawyers and accountants had vetted that particular approach. Several of the Scientific Atlanta individuals also specified the time when Adelphia approached them with the proposal—information that contradicted the Government's claims that those contacts occurred only after Adelphia began booking the deal. *See* Mem. at 61-69.

The defense was not able to speak with any of these witnesses prior to trial and therefore could not call them. Had the defense learned what it was entitled to learn—that these witnesses provided highly exculpatory accounts to the Government—the trial would have looked very different on this issue. That is the definition of a *Brady* violation. *See* Mem. at 69-70.

### III. PETITIONERS ARE ENTITLED TO RELIEF BASED ON THE *BRADY* VIOLATIONS RELATED TO SUBSCRIBER NUMBERS

The third category of *Brady* claims relates to the Government's allegation that, to enhance its appearance of profitability, Adelphia fraudulently reported its number of cable subscribers. The defense maintained the figures reported were accurate given Adelphia's method of counting subscribers, but the Government presented testimony that Adelphia did not use that method. The Rigases later learned the Government possessed a letter from the Adelphia Board explaining that Adelphia, in fact, had been using the very method the defense identified (but could not prove). This letter was never disclosed pursuant to *Brady*. *See* Mem. at 71-73.

### CONCLUSION

It is difficult to understand how the Government could ever have concluded the information it withheld was not materially exculpatory. But it does not matter whether the Government acted in good faith or bad faith. What matters is that Petitioners were forced to stand trial without material information to which they were constitutionally entitled. High stakes cases can generate sharp practices—intentionally or otherwise. Habeas corpus stands as the engine for proving relief when those sharp practices violate the Constitution.

/s/ Lawrence C. Marshall

APRIL 28, 2017

*Admitted Pro Hac Vice*
559 Nathan Abbott Way
Stanford, CA 94305
(650) 723-7572
lmarshall@stanford.edu