**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| JOHN J. RIGAS and TIMOTHY J. RIGAS, | : | |
| | : | |
| Petitioners, | : | 11-CV-6964 (KMW) |
| | : | 02-CR-1236 (KMW) |
| *v.* | : | |
| | : | ECF Case |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Respondent. | : | |
| | : | |

**CORRECTED MEMORANDUM OF LAW IN SUPPORT OF PETITIONERS' MOTION
FOR JUDGMENT ON VARIOUS CLAIMS ALLEGING VIOLATIONS OF
*BRADY v. MARYLAND*, 373 U.S. 83 (1963)**

LAWRENCE C. MARSHALL, ESQ.
ADMITTED *PRO HAC VICE*
559 NATHAN ABBOTT WAY
STANFORD, CA 94305
(650) 723-7572
lmarshall@stanford.edu

*Attorney for Petitioners,
John J. Rigas and Timothy J. Rigas*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................iii

I.  INTRODUCTION ..................................................................................................... 2

II. PETITIONERS ARE ENTITLED TO RELIEF BASED ON THE *BRADY*
    VIOLATIONS RELATING TO THE PROSECUTION'S PRE-TRIAL INTERVIEW
    WITH CARL ROTHENBERGER. .......................................................................... 9

   A.  FACTUAL BACKGROUND ...................................................................... 12

      1.  *Pre-Trial and Trial Events* .............................................................. 12

      2.  *Post-Trial Events* ............................................................................ 13

      3.  *Disclosure of the Notes in the Pennsylvania Tax Case* ................. 16

   B.  THE EXCULPATORY INFORMATION MR. ROTHENBERGER CONVEYED IN HIS
       INTERVIEW WITH THE GOVERNMENT ................................................ 17

      1.  *The 13-D Allegations* ...................................................................... 19

      2.  *Immediately Available Funds* ......................................................... 28

      3.  *The Schedule 10-K allegations* ....................................................... 31

      4.  *Related Party Transactions* ............................................................. 34

      5.  *The Golf Course Project* ................................................................. 37

   C.  THE GOVERNMENT WAS REQUIRED TO DISCLOSE THE NOTES ........... 40

      1.  *Petitioners' General Knowledge About Mr. Rothenberger Did Not Negate the
          Government's Duty to Disclose the Exculpatory Information It Learned.* ................... 40

         a.  The Government's Own Conduct Refutes any Claim that There was no Need to
             Make any Disclosure Regarding Mr. Rothenberger. ................................... 40

         b.  The Partial Disclosure Created a Duty for Full Disclosure. ....................... 42

         c.  The "Essential Facts" Doctrine does not Relieve the Government of Its Obligation
             to Disclose the Exculpatory Information it Learned from Mr. Rothenberger ........... 45

  2. *The Information is Materially Exculpatory* .................................................... *52*

  3. *The Issue Has Not Been Decided* ..................................................................... *54*

III. PETITIONERS ARE ENTITLED TO RELIEF BASED ON *BRADY* VIOLATIONS
  RELATED TO THE MARKETING SUPPORT ALLEGATIONS. ................................... 57

 A. THE TRIAL AND APPEAL ...................................................................................... 57

 B. INFORMATION EMERGING POST-TRIAL ............................................................... 59

 C. DEPOSITIONS IN 2014 ........................................................................................ 60

 D. THE MATERIALS SECURED THROUGH DISCOVERY ............................................. 61

 E. THE EVIDENCE ABOUT THE TIMING OF THE DISCUSSIONS .................................. 67

 F. THE GOVERNMENT'S RESPONSES DO NOT MITIGATE THE IMPACT OF THE *BRADY*
  VIOLATION WITH REGARD TO THE MARKETING SUPPORT AGREEMENTS ............. 69

IV. PETITIONERS ARE ENTITLED TO RELIEF BASED ON THE *BRADY*
  VIOLATIONS RELATED TO SUBSCRIBER NUMBERS ............................................. 71

CONCLUSION ................................................................................................................. 73

**Cases**

*Ali v. Mukasey,*
    529 F.3d 478 (2d Cir. 2008)................................................................56

*Badalamenti v. United States,*
    201 F.3d 430 (2d Cir. 1999)...............................................................40

*Berger v. United States,*
    295 U.S. 78 (1935)...............................................................................1

*Blackledge v. Allison,*
    431 U.S. 63 (1977)...............................................................................7

*Brady v. Maryland,*
    373 U.S 83 (1963)........................................................................ *passim*

*Brady v. State,*
    174 A.2d 167 (Md. 1961), *aff'd sub nom. Brady v. Maryland,*
    373 U.S. 83 (1963)............................................................................49

*Browder v. Director, Dep't of Corr. of Ill.,*
    434 U.S. 257 (1978)............................................................................7

*DiSimone v. Phillips,*
    461 F.3d 181 (2d Cir. 2006)...............................................................54

*Fay v. Noia,*
    372 U.S. 391 (1963)............................................................................8

*Freeman v. Georgia,*
    599 F.2d 65 (5th Cir. 1979) ...............................................................52

*Giglio v. United States,*
    405 U.S. 150 (1972)....................................................................15, 70

*Goeke & Bottini v. Dep't of Justice,*
    2015 M.S.P.B. 1 (2015) ....................................................................50

*Gordon v. United States,*
    2011 WL 2638133 (S.D.N.Y. 2011)..................................................56

*Grant v. Alldredge,*
    498 F.2d 376 (2d Cir. 1974)...............................................................44

*Guippone v. United States,*
    741 F. Supp. 409 (S.D.N.Y. 1990) ...................................................7

*Kyles v. Whitley,*
    514 U.S. 419 (1995)..........................................................................10

*Lamberti v. United States,*
    22 F. Spp. 3d 60 (S.D.N.Y. 1998) ...................................................40

*Leka v. Portuondo,*
    257 F.3d 89 (2d Cir. 2001)....................................................10, 43, 45

*Machibroda v. United States,*
    368 U.S. 487 (1962)............................................................................7

*Puglisi v. United States,*
    586 F.3d 209 (2d Cir. 2009)..............................................................7

*Raley v. Ylst,*
    470 F.3d 792 (9th Cir. 2006) ...........................................................46

*Santamarina v. Sears, Roebuck & Co.,*
    466 F.3d 570 (7th Cir. 2006) ...........................................................56

*Strickler v. Greene,*
    527 U.S. 263 (1999)..........................................................................10

*United States v. Bagley,*
    473 U.S. 667 (1985)....................................................................10, 42

*United States v. Coppa,*
    267 F.3d 132 (2nd Cir. 2001)...........................................................70

*United States v. Eisenstein,*
    731 F.2d 1540 (11th Cir. 1984) .......................................................53

*United States v. Gil,*
    297 F.3d 93 (2d Cir. 2008)...............................................................48

*United States v. LeRoy,*
    687 F.2d 610 (2d Cir. 1982).............................................................45

*United States v. Kohring,*
    637 F.3d 895 (9th Cir. 2011) ...........................................................11

*United States v. Mahaffy,*
    693 F.3d 113 (2012).............................................................. *passim*

*United States v. Orena*,
   145 F.3d 551 (2d Cir. 1988)........................................................49

*United States v. Payne*,
   63 F.3d 1200 (2d Cir. 1995).............................................43, 44, 49

*United States v. Rigas*, No. 02-cr-1236,
   2008 WL 144824 (S.D.N.Y. Jan. 15, 2008) ............................ *passim*

*United States v. Rigas*,
   258 F. Supp. 2d 299 (S.D.N.Y. 2003) ......................................37

*United States v. Rigas*,
   490 F.3d. 208 (2d Cir. 2007)..................................... *passim*

*United States v. Rigas*,
   583 F.3d 108 (2nd Cir. 2009)..................................... *passim*

*United States v. Rigas*,
   779 F. Supp. 2d 408 (M.D. Pa. 2011) ...............................16, 46

*United States v. Rigas*,
   No. 02-cr-1236, 2008 WL 2544654 (S.D.N.Y. June 24, 2008).............9

*United States v. Rigas*,
   No. 4:05-CR-402 (M.D. Pa., Jan. 26, 2012) .........................16

*United States v. Rivas*,
   377 F.3d 195 (2d Cir. 2004)...........................................54

*United States v. Rodriguez*,
   496 F.3d 221 (2d Cir. 2007)........................................10, 43

*United States v. Salerno*
   868 F.2d 524 (2d Cir. 1989) (2d Cir. 1989).........................48

*United States v. Stewart*,
   513 F.2d 957 (2d Cir. 1975).........................................45, 46

*Walker v. Johnston*,
   312 U.S. 275 (1941)...................................................7

*Yates v. United States*,
   354 U.S. 298 (1957)..................................................11

**Statutes**

15 U.S.C. § 78ff (1998) ...................................................................................59

18 U.S.C. § 1344 ..............................................................................................59

28 U.S.C. § 2255 ......................................................................................... *passim*

**Other Authorities**

67 Fed. Reg. 3746 (Jan. 25, 2002) App. 101 ...................................................18

68 Fed. Reg. 5982 (Feb. 5, 2003) ...................................................................18

Dep't of Justice, Office of Prof. Resonsibility, Report on the Investigation of
    Allegations of Prosecutorial Misconduct in *United States v. Theodore F.*
    *Stevens*, Crim No. 08-231 (D.D.C. 2009) ...............................................50

Fed. R. Civ. P. 56(a) ....................................................................................7, 8

Restatement (Second) of Torts § 323 cmt. c...................................................44

Thea Johnson, *What You Should Have Know Can Hurt You: Knowledge,*
    *Access, and* Brady *in the* Balance, 28 Geo. J. Legal Ethics 1 (2015)..................................47

Petitioners seek judgment at this time on various claims in their First Amended Petition 28 U.S.C. § 2255 alleging violations of *Brady v. Maryland*, 373 U.S 83 (1963).[1]

There is nothing inherently wrong in zealous prosecution so long as that zeal does not cross the line into violating defendants' constitutional rights. "But, while he may strike hard blows, he is not at liberty to strike foul ones." *Berger v. United States*, 295 U.S. 78, 88 (1935). When evidence emerges showing the prosecution crossed that sacred line, it is incumbent on a court to take action to preserve the sanctity of constitutional rights and to ensure that convictions are not the product of such violations. At times, that evidence emerges prior to trial or at trial itself. At other times, though, the evidence comes to light only after the trial record is closed. In those latter cases, the route for seeking relief from a federal conviction is through a timely motion under 28 U.S.C. § 2225.

Our system is committed to finality, but it is committed even more to remedying miscarriages of justice and violations of fundamental constitutional rights. In the years since the Rigases were convicted, critical evidence has come to light showing that their constitutional rights were violated. This evidence has been uncovered through discovery in a second criminal case where the District Court ordered the production of many relevant documents and through discovery that this Court authorized in this action. Other information was obtained in civil discovery after the conclusion of the criminal trial here.

We do not make these allegations lightly. It would be irresponsible to loosely throw around accusations of this sort. But it would be even more irresponsible to shy away from putting these allegations forward given the powerful evidence supporting them. Even good

---

[1] As described below, adjudication of § 2255 petitions based on the paper record tracks adjudication of summary judgment motions in all ways relevant here. Many courts call them "summary judgment." *See infra* 7-8. The nomenclature question is of no moment here, so Petitioners are using the terms interchangeably.

people – including prosecutors – can cross lines at times. We have seen this repeatedly in recent years—perhaps most prominently in the prosecution of the late Senator Ted Stevens (a case in which, as will be discussed, the *Brady* violations bear close semblance to the violations here). Those lines were most certainly crossed in this case, in violation of the Constitution and to the grave detriment of John and Timothy Rigas.

## I.      INTRODUCTION

All of the Government's charges against John and Timothy Rigas depended on proving they possessed intent to defraud when they made or failed to make various disclosures relating to Adelphia Communications Corp. ("Adelphia"). There was one witness who could have countered those accusations. Adelphia's lead outside counsel Carl E. Rothenberger, a partner in the Pittsburgh law firm of Buchanan Ingersoll, was responsible for the filings and transactions and knew those at Adelphia had followed his directions. He also knew the Rigases were not the individuals with whom he had worked on these matters. There was one rub, though. Once the Government focused its investigation on the Rigases and others at Adelphia, Mr. Rothenberger refused to speak with the Rigases or their counsel. Accordingly, the defense had no way of knowing whether, in order to garner the prosecution's favor and avoid charges, Mr. Rothenberger had opted to deviate from the truth and tell the Government what he believed it wanted to hear. So the defense had no realistic choice. It had to forgo calling the one witness who could powerfully refute the Government's case.

The fact that Mr. Rothenberger was not called enabled the prosecution to tell the jury in its closing argument: "[Y]ou better believe that if there was a lawyer or accountant out there that

had approved these transactions and said they were okay, we'd have seen them in this courtroom. You didn't see anything like that." Trial Tr., App. 8, at 10,605-06.[2]

Years later, we now know this argument was a cynical exploitation of the Government's failure to comply with *Brady v. Maryland*, 373 U.S. 83 (1963). It turns out that on February 20, 2004, just six days before the criminal trial began, the Government had interviewed Mr. Rothenberger about the core issues in the case. But far from providing information advancing the Government's positions, Mr. Rothenberger told the Government how, in his capacity as corporate counsel, he had: (a) drafted or approved the disclosure language at issue; and (b) worked with others—not the Rigases—in securing the relevant information to formulate or approve the disclosures. Mr. Rothenberger was on the Government's witness list, but not surprisingly given this February 20 interview, the Government never called him to testify.

The information Mr. Rothenberger provided on February 20 was materially exculpatory under any measure. Had the Rigases known what he had told the Government, Mr. Rothenberger would almost certainly have been called as the lead defense witness.[3] But the defense did not know. For instead of making the required pre-trial *Brady* disclosure, the Government informed the defense only that Mr. Rothenberger might have exculpatory information on one minor point of the case (involving a timber rights transaction). The message to the defense was as

---

[2] All documents cited herein are part of the Appendix of Documents being filed together with this Memorandum. An affidavit of Lawrence C. Marshall attests to their accuracy. *See* Introduction to App.

[3] As things stood, the information the defense received powerfully suggested Mr. Rothenberger and Buchanan Ingersoll were watching out for themselves and were refusing to provide truthful accounts (*i.e.*, accounts exculpatory of the Rigases). This came across strongly from the May 2002 Form 8-K that Adelphia issued immediately following the Rigases' ouster from Adelphia (at the Government's insistence). That filing, which at the time the Rigases understood Mr. Rothenberger and Buchanan Ingersoll had prepared in large part, placed all of the blame on the Rigases. App. 7, Adelphia Communications Corp., Form 8-K (filed with the Securities and Exchange Commission on May 24, 2002).

unambiguous at it was disheartening: Mr. Rothenberger had provided no exculpatory evidence on any issue that actually mattered.

The evidence about what Mr. Rothenberger told the Government at that pre-trial meeting has been slow to come to light. The defense first learned generally of the meeting one year after trial in 2005, but the Government continued to maintain—to the defense, to Judge Sand, and to the Second Circuit—that Mr. Rothenberger had said nothing exculpatory of the Rigases (aside from information about timber rights). It was only in 2011 that a federal judge presiding over a related tax case in Pennsylvania ordered the Government to tender the set of notes that United States Postal Inspector Thomas Feeney had taken at the February 20 meeting ("Feeney Notes"). *See* App. 38 (notes of Thomas Feeney). It is the content of those notes that formed the core of the *Brady* claims advanced in the Rigases' October 4, 2011 motions to vacate their sentences, pursuant to 28 U.S.C. § 2255. ECF Nos. 1 & 2.

On June 20, 2014, this Court granted Petitioners' motion for discovery regarding that meeting (and other subjects). App. 74, Order, ECF No. 39. The Court held that the "specific allegations before the court show reason to believe that the petitioner[s] may, if the facts are fully developed, be able to demonstrate that [they are] . . . entitled to relief." *Id*. at 1, 2 (citation omitted).

Through that discovery, Petitioners have secured (following the Court's redactions) four additional documents memorializing the February 20 Rothenberger meeting. These are:

- A memorandum by J. Alan Johnson, who attended the meeting as counsel for Buchanan Ingersoll ("Johnson Memorandum") (App. 20) (mailed to counsel in conjunction with ECF No. 87);

- A summary of the meeting produced by P. Jerome Richey, a Buchanan Ingersoll partner ("Richey Notes") (App. 21) (mailed to counsel in conjunction with ECF No. 87);

- Notes taken by Patrick M. McLaughlin, who attended the meeting as counsel for Carl Rothenberger ("McLaughlin Notes") (App. 22) (mailed to counsel in conjunction with ECF No. 114); and

- A memorandum by Patrick McLaughlin with modifications to the Johnson Memorandum ("McLaughlin Memorandum") (App. 23) (mailed to counsel in conjunction with ECF No. 87).

As will be seen, these documents establish conclusively that Mr. Rothenberger conveyed materially exculpatory information to the prosecution one week prior to the criminal trial.

The discovery process has also uncovered evidence that establishes another *Brady* violation. In the months before trial, prosecutors interviewed numerous officials from two equipment manufacturers—Scientific Atlanta, Inc., and Motorola Communications Corp.—in an effort to secure support for its claim that the Rigases had devised a fraudulent way to structure Adelphia's contracts with these companies so as to "fool the auditors" and improve the appearance of Adelphia's profitability. But far from confirming those allegations, these individuals told the Government that their companies had developed and drafted these contracts earlier in connection with another cable company altogether—not at the Rigases' behest—and the contracts had been vetted exhaustively by Scientific Atlanta's and Motorola's lawyers and accountants. Once again, though, the Government failed to disclose this exculpatory information to the defense.

The third category of *Brady* claims being advanced here relates to the Government's allegation that, in order to enhance the appearance of profitability, Adelphia fraudulently reported the number of its cable subscribers. The defense maintained the figures were accurate given Adelphia's method of counting subscribers, but the Government presented testimony that Adelphia had not, in fact, used that method. The Rigases later learned the Government had in its possession a letter from the (post-Rigas) Adelphia Board explaining that Adelphia, in fact, used

the very method the defense identified (but could not prove). This letter was never disclosed pursuant to *Brady*.

These *Brady* claims entitle Petitioners to vacation of their convictions, independent of the disposition of the other set of claims—the "Interference Claims" and other *Brady* claims— Petitioners are advancing in this § 2255 action. The Interference Claims involve the Rigases' contention that the Government unconstitutionally interfered with their rights to prepare and present their defense when it caused potential defense witnesses to be unwilling to speak with the defense and when it caused Adelphia to deprive the Rigases of their contractual rights to fee advancement and indemnification.[4]

As this Court knows, discovery in this case has already taken an extended period and still has considerable time to go. Petitioners have worked with the Department of Justice ("DOJ") and the Securities and Exchange Commission ("SEC") to develop electronic searches that have produced various documents. Those productions still appear incomplete—a subject under discussion. The DOJ and SEC have also produced privilege logs, which will require litigation on issues of attorney-client privilege, work product doctrine, and deliberative process doctrine. As for Adelphia, the company has opened its document warehouse to Petitioners, who have been charged with reviewing about 6000 boxes of documents and massive amounts of digital data. Approximately 1600 boxes remain to be reviewed, as well as the digital data. Once again, it is anticipated there will be significant litigation over privilege and work product issues.

The ongoing discovery relates almost exclusively to the Interference Claims. By contrast, the discovery on almost all of the *Brady* claims is now completed. In light of this, the bulk of the

---

[4] On August 15, 2015, this Court rejected the Government's contention that discovery on these Interference Claims should be barred on the ground that the claims were procedurally defaulted. ECF No. 80.

*Brady* claims are now ripe for decision, as they turn on a body of undisputed facts. (Other *Brady* claims that turn on disputed facts are not being advanced in this Motion).[6]

As with civil cases in which summary judgment is sought, it is well settled that a court is to grant the writ of habeas corpus on the paper record where "it may appear that, as matter of law, the prisoner is entitled to the writ and to a discharge." *Browder v. Director, Dep't of Corr. of Ill.*, 434 U.S. 257, 266 n.10 (1978) (quoting *Walker v. Johnston*, 312 U.S. 275, 284 (1941)). *See generally Machibroda v. United States*, 368 U.S. 487, 494-96 (1962) (noting that habeas petitions may be "conclusively determined" by the paper record). For these reasons, the Court in *Blackledge v. Allison*, 431 U.S. 63, 82 (1977), adopted the summary judgment standard of Federal Rule of Civil Procedure 56 to ensure that judges are able to adjudicate appropriate habeas petitions "without the time and expense required for an evidentiary hearing." *See generally Puglisi v. United* States, 586 F.3d 209, 213 (2d Cir. 2009) (discussing similarities in this regard to the classic summary judgment standards set forth in Rule 56).[7]

---

[6] Petitioners have long argued that because the SEC and DOJ coordinated their investigations the SEC had a *Brady* obligation to disclose exculpatory evidence in its possession. The Government defeated that effort by telling Judge Sand and the Second Circuit that the SEC's investigation was completely independent of the prosecution and there was no coordination. *See, e.g.*, App. 16, Brief of the United States-Appellee at 134, *United States v. Rigas*, 583 F.3d 108 (2nd Cir. 2009) (No. 08-3485) ("In this matter, although the SEC conducted a parallel civil enforcement investigation with respect to Adelphia, the civil investigation was not jointly conducted with the criminal investigation."); App. 13, Gov't Mem. Opp'n Mot. to Compel at 8-9, *United States v. Rigas*, No. 02-Cr-1236 (SDNY Jan. 15, 2008) (Although the SEC conducted a parallel civil investigation with respect to Adelphia, the civil investigation was not jointly conducted with criminal investigation.") Hence, applying settled law, those courts rejected Petitioners' demands for SEC material. *See* App. 14, *United States v. Rigas*, 2008 WL 144824, at * 2 (S.D.N.Y. Jan. 15, 2008) ("Here, there was no joint investigation with the SEC . . ."). The discovery the Government has tendered to date reveals that the Government's representations were not accurate. The Postal Inspector's Memoranda of the prosecution's interviews with two Scientific Atlanta officials state that SEC lawyers were in attendance—Stephen E. Donohue, Branch Chief, and Angela Soo, of the "Division of Enforcement, Securities & Exchange Commission. *See* App. 75, Gov. Disc. p. 1488 (Patrick Tylka Aug. 23, 2002 interview); App. 78, Gov. Disc. p. 1488 (Thomas Nilson interview) (Sept. 13, 2002 interview). In the event judgment for Petitioners is not granted on the *Brady* claims now ripe for decision, Petitioners anticipate bringing a separate *Brady* claim involving the duties of the SEC. Similarly, the question of whether the Government took possession of various Adelphia documents containing exculpatory information is one that likely will have to be resolved in an evidentiary hearing, should that prove necessary.

[7] Both Petitioners and the Government have sought summary judgment in § 2255 cases. *See, e.g., Guippone v. United States*, 741 F. Supp. 409 (S.D.N.Y. 1990) ("Both the Government and petitioner have moved for summary

Part of the Court's toolbox is the power to decide potentially dispositive issues that are ripe for decision without waiting for slower-developing claims to catch up. *See* FED. R. CIV. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense or the part of each claim or defense on which summary judgment is sought."). *See generally id.* Advisory Committee's note to 2010 amendment ("[S]ummary judgment may be requested not only as to an entire case but also as to a claim, defense, or part of a claim or defense . . . whether or not the order grants all the relief requested by the motion.").

This process can not only expedite the prospects of a prisoner's timely release if relief is afforded on the adjudicated claim, it can also negate the need for ongoing litigation relevant to issues that may never need to be decided. Proceeding in this fashion helps keep alive the promise that worthy habeas petitioners are to be afforded a "swift and imperative remedy." *Fay v. Noia*, 372 U.S. 391, 400 (1963). For these reasons, Petitioners move for judgment based on the *Brady* claims described herein.

Given the Court's multiple rulings touching on the facts of this case, Petitioners will not burden the Court with a lengthy review of the evidence that led to their convictions on charges of conspiracy, securities fraud, and bank fraud. (The Second Circuit's Opinion on the direct appeal of the conviction contains a detailed description of the factual background in the light most favorable to the Government. *See* App. 89, *United States v. Rigas*, 490 F.3d. 208, 212-19 (2d Cir. 2007).) It is vital, though, to highlight a few central points about the case that inform many of the *Brady* claims advanced here. Most of these points involve the relationships between Adelphia and a group of privately held entities, known as the Rigas Managed Entities (or "Managed Entities"). Adelphia provided management services to these entities in return for

---

judgment on this 28 U.S.C. § 2255 petition."). Nothing at all turns here, though, on whether the motion is called one for judgment or one for summary judgment.

management fees. Adelphia and the Managed Entities also engaged in some coordinated borrowing and investments within the cable market.

This was a case about disclosures. There was no allegation that the coordinated borrowing or the ways in which Adelphia's funds were held with the Managed Entities' funds violated any laws.[10] Although the case dealt with numerous disclosure-based allegations (many described in detail below), a central focus of the prosecution was on disclosures regarding a joint credit line (the "co-borrowing facility") that the Managed Entities shared with Adelphia. It was the loss the Court attributed to these co-borrowing allegations that triggered the lion's share of the severe sentences of 12 and 17 years imposed on John and Timothy Rigas, respectively. *See United States v. Rigas*, No. 02-cr-1236, 2008 WL 2544654, at *6-7 (S.D.N.Y. June 24, 2008).

There were three key themes to the defense to this and the other allegations: (a) all disclosures at issue complied with the relevant laws and rules; (b) almost all of the disclosures at issue had been handled by others at Adelphia, without Petitioners' involvement; and (c) everyone at Adelphia reasonably relied on the counsel of their lawyers and auditors, and thus, even if the jury were to find irregularities, there was never any intent to defraud. As shown below, the withheld *Brady* material spoke to each of these issues.

## II.   PETITIONERS ARE ENTITLED TO RELIEF BASED ON THE *BRADY* VIOLATIONS RELATING TO THE PROSECUTION'S PRE-TRIAL INTERVIEW WITH CARL ROTHENBERGER.

Pursuant to the Due Process Clause, the Government must disclose to the defense any material information in the Government's possession that is materially exculpatory or that may

---

[10] Judge Sand charged the jury: "In considering any allegations related to these agreements, you should know that, like the commingling of funds, such coborrowing agreements are not alleged in this case to be in and of themselves illegal. . . . However, the government contends that the defendants fraudulently failed to disclose the amount of coborrowing debt on the books of Rigas family owned entities and fraudulently failed to disclose how the coborrowing facilities were used in connection with Rigas family purchases of Adelphia securities." Trial Tr., App. 90, at 11,399.

be used to impeach Government witnesses. *United States v. Bagley,* 473 U.S. 667, 676-77 (1985). In the context of interviews, the Government must disclose all material exculpatory information it learns, regardless of whether it reduces the statements to writing or takes written notes of the interview. *See United States v. Rodriguez,* 496 F.3d 221, 226 (2d Cir. 2007).

In assessing post-trial claims that the prosecution violated its *Brady* duties, it matters not whether the prosecution acted willfully or inadvertently. *Strickler v. Greene,* 527 U.S. 263, 281-82 (1999). Thus, a court need not decide whether "non-disclosure was a deliberate tactical concealment, or resulted from the mismanagement of information, or from sloppy thinking about the evidentiary significance of the material." *Leka v. Portuondo*, 257 F.3d 89, 103 (2d Cir. 2001). Rather, what matters is that evidence that should have been disclosed was not disclosed, resulting in the defendant suffering prejudice.

To show prejudice, a defendant need not prove he necessarily would have prevailed at trial had the information been disclosed. Rather, he need only show that there is a "significant possibility of a different result." *Strickler,* 527 U.S. at 300 (explaining that this is the meaning of the traditional "reasonable probability" standard). *See generally Kyles v. Whitley*, 514 U.S. 419, 433-35 (1995) (A "showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." (*citing Bagley*, 473 U.S. at 682)).

The individual counts in this case were broken down by specific securities issuances; they were not individually tied to any particular alleged misrepresentation or omission. For example, each of the 15 securities fraud counts referenced a particular issuance of stock or debt instrument. *See, e.g.*, App. 9, Verdict, Count Seven (asking whether the jury found the defendants guilty for "Securities Fraud in Connection with the Purchase or Sale of Adelphia

9.25% Senior Notes due 10/1/02"). The Government did not seek to relate particular disclosures or omissions to any particular purchase or sale of securities. Rather, the Government argued all such purchases and sales were tainted by securities fraud because each and any of the various alleged fraudulent misrepresentations and/or omissions polluted the market with respect to all later securities sales. *See, e.g.*, Trial Tr., App. 91, at 8819;  Trial Tr., App. 33, at 10,450-51.

Accordingly, because of the manner in which the counts were structured, there is no way of gleaning which or how many of the Government's factual allegations the jury found to be proven beyond a reasonable doubt. The jury could well have predicated its verdict on one or two specific areas of conduct—finding no fraud in the other areas, no Rigas involvement in some other areas, or that the Rigases acted in good faith in other areas of conduct. Indeed, having found a violation in one area of conduct, the jury would have had no reason to even consider other allegedly fraudulent misrepresentations or omissions. Thus, given the opacity of the verdict, materiality must be assessed with reference to any of the theories the Government advanced that could have led the jury to convict Petitioners.  *See generally Yates v. United States*, 354 U.S. 298, 311-12 (1957) (requiring reversal where a legal error has infected any of the charges upon which the jury may have relied).

In *United States v. Kohring*, 637 F.3d 895 (9th Cir. 2011), the Court of Appeals applied this standard to a *Brady* violation that impacted on some possible bases, but not all possible bases, of the jury's verdict. The court explained that even though the improperly suppressed evidence did not affect some of the prosecution's theories, it was material evidence "because it speaks to the acts that the jury *might have relied on* in reaching its verdicts."  *Id*. at 902-03 (emphasis added). In the case of the Rigases, the withheld material went to virtually all of the

prosecution's central theories. But even were that not the case, suppression of evidence material to any of the prosecution's theories would compel relief.

### A. Factual Background

#### 1. Pre-Trial and Trial Events

As noted above, had the prosecution informed the defense about the exculpatory information Carl Rothenberger had provided in the February 20 interview, the defense would almost certainly have called Mr. Rothenberger as its star witness. *See* App. 3, Decl. of Bernard Preziosi at ¶ 4. The need for that disclosure was particularly imperative because the Government knew Mr. Rothenberger refused to be interviewed by the defense. And the Government knew that when the Rigases sought permission to attend the prosecution's interview with any Buchanan Ingersoll personnel, that request was denied by the court. *See*, Pre-Trial Tr. of Dec. 10, 2003, App. 5, at 19-22; Pre-Trial Tr. of Feb. 3, 2004, App. 6, at 49-50. But not only did the prosecution fail to make the required *Brady* disclosure, it made a wholly misleading disclosure indicating that Mr. Rothenberger "may be able to provide information that is favorable to the defense *concerning the timber rights transaction discussed in the Government Bill of Particulars*." App 3, Preziosi Decl. at ¶ 4, Ex. 2 (Letter from U.S. Att'y to Defense Counsel (Feb. 24, 2004)) (emphasis added).

The message from this letter was unmistakable: The Government was telling the defense that the only exculpatory information in its possession regarding Mr. Rothenberger involved that one insignificant aspect of the case. As for the central aspects of the prosecution's allegation, the prosecution was declaring that Mr. Rothenberger had provided no exculpatory evidence. As one of the defense lawyers later explained, for the defense to call Mr. Rothenberger to the stand without knowing whether he would tell the truth (which the defense knew would be exculpatory) would have been unimaginable. *Id.* at 8-9 (Aff. of Peter Fleming Jr.).

So the jury ended up deliberating on the Rigases' guilt or innocence without ever hearing from the one non-party witness who knew that (a) the Rigases had not been personally involved in many of the specified transactions and disclosures and (b) the specified transactions and disclosures were all undertaken in good-faith reliance on the advice and instruction of experienced counsel. To be sure, the jury was instructed that good faith is a complete defense to fraud charges. *See, e.g.*, Trial Tr., App. 92, at 11,338, 11,348 (charge of Judge Sand). But that instruction was of no avail without the realistic ability to prove up that defense through the witness in the best position (on some issues, the only position) to credibly describe the events.

Indeed, as indicated, the very best evidence of the centrality Mr. Rothenberger's testimony would have played for the defense can be found in the prosecution's closing argument. The prosecutor told the jury that the absence of defense testimony from the relevant lawyer or auditor proved the hollowness of the Rigases' claim that they believed "any of the lawyers or auditors approved or supported what went on and was charged to be illegal." Trial Tr., App. 8, at 10,605-06 (AUSA Clark's summation).

### 2.    *Post-Trial Events*

It was only during depositions in a civil case in 2005—a year after the criminal trial— that the defense finally began to learn that Mr. Rothenberger remained true to what had actually happened and had many relevant exculpatory facts to share regarding the Rigases. Upon learning this, the defense approached the prosecutors, who acknowledged that many of these topics had been discussed during a pre-trial interview the Government conducted with Mr. Rothenberger, and that interview notes existed. The defense asked the prosecution to disclose all notes and information relating to that interview (App. 2, Decl. of Lawrence McMichael at ¶48), but the prosecution refused, assuring the defense that Mr. Rothenberger had said nothing exculpatory— other than the disclosed timber rights information.

The defense then moved to compel the prosecution to turn over its notes of the Rothenberger interview. The defense conceded it had no direct evidence at that time that Mr. Rothenberger had disclosed exculpatory evidence in that interview. But the defense argued that given the exculpatory information contained in Mr. Rothenberger's 2005 deposition testimony, and given the prosecution's acknowledgment that these same subjects were discussed during the 2004 pre-trial interview, "[i]t strains reason to believe that Mr. Rothenberger provided absolutely no exculpatory information" in the course of that interview. *See* App. 12, Mem. in Support of Rigas' Mot. to Compel at 1, *United States v. Rigas*, No. 02-Cr-1236 (S.D.N.Y. Jan. 15, 2008).

The Government fought strenuously to avoid disclosure. One of its central contentions was that it had followed the "law and practice in the Second Circuit that the Government may fulfill its *Brady* obligations with respect to a particular witness by identifying the witness to the defendant and indicating that the witness may have favorable information *on a particular subject*." *See* App. 13, Gov't Mem. Opp'n Mot. to Compel at 3, *United States v. Rigas*, No. 02-Cr-1236 (S.D.N.Y. Jan. 15, 2008) (emphasis added) (citations omitted). After hearing these representations, the District Court denied the Motion to Compel, invoking the "essential facts" doctrine for the proposition that the Government had no obligation beyond what it had disclosed. App. 14, *United States v. Rigas*, 2008 WL 144824, at *1 (Jan. 15, 2008).

In its appeal from that ruling, the defense again conceded it was necessarily only assuming (based on his 2005 civil deposition) that Mr. Rothenberger had provided exculpatory information to the prosecution in 2004. App. 15, Br. of Defendants-Appellants at 104, *United States v. Rigas*, 583 F.3d 108 (2nd Cir. 2009) (No. 08-3485). The Government responded by attacking the defense for unfounded "rank speculation." App. 16, Br. of Government-Appellee at 113, *Rigas*, 583 F.3d 108 (No. 08-3485). According to the Government,

Appellants . . . urge this Court (as they urged Judge Sand below) to overlook this *glaring deficiency in proof*, to look instead at Rothenberger's civil deposition testimony—which occurred two years after his interview with the Government and one year after the criminal trial had concluded, in a proceeding in which the Government was not a party, with *no specific testimony concerning what was said during the interview*—and to divine from that testimony that some exculpatory information 'must have been' communicated to the Government. *This temporal sleight of hand should not be tolerated. . . .*

. . . The Government is charged with the responsibility, in the first instance, of reviewing the information it obtains during the course of its investigation in order to comply with its obligations under *Brady* and cases like [*Giglio v. United States*], 405 U.S. 150 (1972). It takes this responsibility seriously, and it *fully recognizes the potentially drastic remedies that exist for failure to abide by these constitutional obligations (e.g., reversal of a conviction)*. That compliance with these obligations is crucial to guaranteeing defendants fair trials, however, does *not* mean—as Appellants' arguments suggest—that the responsibility should be taken away from the Government and thrust upon the trial or appellate courts, *particularly on the meager showing offered by Appellants here*.

*Id.* at 121-22 (some emphases added).

The Government then went well beyond simply telling the Court that the defense was without evidence of what Mr. Rothenberger said during the pre-trial interview. The Government declared that the defense's speculation was "belied by the Government's clear representation in the District Court that, apart from the information concerning the timber rights transactions, '[t]here is no other [*Brady*] material with respect to Mr. Rothenberger.'" *See id.* at 122-123 (alterations in original). The Government made a dozen or so similar statements throughout its Second Circuit Brief. *See, e.g., id.* at 116, 124-25 n.*, 129.

At oral argument, an Assistant United States Attorney began his arguments with this unequivocal declaration to the Court:

[L]et me make one thing very clear right up front. I have reviewed these notes personally, the Rothenberger notes. I have discussed them with the postal inspector who took them and the Assistant United States Attorney who was present at the time of the interview and there is nothing exculpatory in those notes beyond the limited disclosure that was made concerning the timber rights transaction. Full stop.

15

App. 17, Transcript of Oral Argument at 12-13, *Rigas*, 583 F.3d 108 (No. 08-3485).

Thus, when the Second Circuit affirmed the denial of the Motion to Compel in 2009 (*See* App. 11, *United States v. Rigas*, 583 F.3d 108, 125-26 (2nd Cir. 2009)), it was proceeding, as was the District Court, based on the Government's emphatic assurances that Mr. Rothenberger had said nothing at all exculpatory on any subject other than timber rights.

### 3. *Disclosure of the Notes in the Pennsylvania Tax Case*

In addition to the charges in this case, the Rigases faced related tax fraud charges in the Middle District of Pennsylvania. During April 2011 pre-trial proceedings in that case, the court recognized that Mr. Rothenberger had long been unwilling to be interviewed by the defense. App. 18, *United States v. Rigas*, 779 F. Supp. 2d 408, 414 (M.D. Pa. 2011). The court therefore refused to "accept the Government's assertion that the Defendants have equal access to Rothenberger, which then eliminates any potential *Brady* obligation." *Ibid.* The court concluded that "in view of [Mr.] Rothenberger's significant role in Adelphia and in the questioned transactions . . . the notes of his interviews could very well contain exculpatory information that may be of use to the Rigases at trial." *Ibid.* Accordingly, the court ordered "the Government to release any and all notes of interviews it conducted with [Mr.] Rothenberger." *Ibid.*

The notes turned over pursuant to that order exposed the falsehood of the Government's assurances that the notes and the interview were benign. It is notable that shortly after the notes were produced, the Government dropped its charges against the Rigases in the Pennsylvania case (after having pursued those charges for close to ten years). *See* App. 19, Order, *United States v. Rigas*, No. 4:05-CR-402 (M.D. Pa., Jan. 26, 2012). But the notes remain of vital importance to this case. And now that four additional documents memorializing that interview have been secured through discovery, their powerfully exculpatory nature is more evident than ever.

B.     **The Exculpatory Information Mr. Rothenberger Conveyed in his Interview with the Government**

As discussed above, the Managed Entities were privately owned by the Rigases and paid Adelphia for certain management services, including having their funds held by Adelphia and accounted for under Adelphia's Cash Management System ("CMS"). The CMS was a system that accounted for funds belonging to Adelphia as well as funds belonging to the Managed Entities. *See* App. 10, *Rigas*, 490 F.3d at 213, 218. Careful records were kept, through journal entries, as to what funds belonged to the Managed Entities and what funds belonged to Adelphia. *See* App. 24, Trial. Tr. 4129-32 (Helms testimony). All agree that a constant flow of Managed Entity money (such as that generated by their cable operations) was deposited in Adelphia accounts and treated by the CMS as Managed Entity funds. *See* App. 25, GX 101 (describing money flowing in from the Managed Entities).

It is undisputed that starting in 1996, with full knowledge of the Adelphia Board, Adelphia and the Managed Entities arranged for "co-borrowing facilities." *See* App. 26, at 1-2 (Minutes of March 13, 1996 Meeting of the Adelphia Board of Directors). These facilities allowed either Adelphia or the Managed Entities to tap into shared lines of credit. The co-borrowing arrangements were beneficial to Adelphia for a number of reasons. To begin with, at times Adelphia used the extra borrowing power made available by the Managed Entities' involvement. Trial Tr., App. 51, at 703;  Trial Tr., App. 29, at 7172-73 (testimony of James Brown).   At other times, the facility provided the Managed Entities sufficient liquidity to purchase Adelphia shares in offerings alongside the public. The underwriters of the securities issuances wanted the Rigases to make such purchases to demonstrate to the public their confidence in Adelphia. In addition, as a condition of several loans to Adelphia, some banks insisted the Rigases maintain controlling ownership of Adelphia, which required they purchase

some new shares as new shares were issued. *See* App. 10, *Rigas*, 490 F.3d at 213-14. There is no allegation that any commingling of funds, the CMS system, or the co-borrowing facility were in any way illegal or fraudulent.

Within Adelphia, careful records were kept of how much of the joint credit facility Adelphia was using and how much the Managed Entities were using. *See* Trial Tr., App. 31, at 8494-96 (Robert DiBella). The draw down amounts were generally deposited in an Adelphia account, and journal entries were used to establish whether the money had been borrowed for the sake of Adelphia or a Managed Entity. The amounts borrowed by Adelphia were put in the books and treated as Adelphia's debts owed to the banks. By contrast, the amounts used by the Managed Entities were put in the books and treated as debts the Managed Entities owed to the banks. Trial Tr. , App. 29, at 7067 (James Brown).

As would be the case with any person who co-signs a loan for another, the co-signer could theoretically be responsible for the debt of the other, but the co-signer would not typically consider the amount of the loan to be her own debt. Hence, Adelphia's auditors concluded that under the then-governing FAS 5 accounting protocols, this contingent debt was not to be treated as Adelphia debt. Trial Tr. , App. 29, at 7070-73 (James Brown).[14]

A good deal of the case involved the claim that the Rigases committed fraud in reporting co-borrowing activities—particularly in relation to Managed Entities' use of co-borrowed funds to purchase Adelphia shares. A Managed Entity's purchase of $375 million in Adelphia shares in 2000 (purchased in 1999; closed in 2000) was treated as a prototype of these transactions.

---

[14] This was all happening prior to December 29, 2003, when the SEC issued new rules on the reporting of contingent debt. *See* App. 32, Disclosure in Management's Discussion and Analysis About Off-Balance Sheet Arrangements and Aggregate Contractual Obligations, 68 Fed. Reg. 5981 (Feb. 5, 2003). It was the SEC's January 2002 statement changing its guidance on disclosures that triggered Adelphia's making new disclosures about the co-borrowing. *See* App. 101, 67 Fed. Reg. 3746 (Jan. 25, 2002).

Using that transaction as an example, the defense sought, through cross-examination, to show the jury how these transactions worked—and why there was nothing sinister about how they were disclosed. The starting premise was the universal agreement that a Managed Entity permissibly had drawn down $375 million from the co-borrowing facility. Like most Managed Entity funds, that $375 million was held in an Adelphia account and, through journal entries, were accounted for as Managed Entity funds. As a practical matter, it would have been easy at that stage for Adelphia to wire those funds to an outside account of the Managed Entity, at which point the Managed Entity would wire the funds back to Adelphia in payment for the shares the Managed Entity had purchased. But there was no point, the defense contended, in going through those superfluous steps when all that was necessary was for the Managed Entity, through use of a journal entry, to internally transfer to Adelphia the funds it had just borrowed, which were being held in an Adelphia account. See Trial Tr., App. 102, at 4936-42 (James Helms) (conceding that effect is the same). Thus, through a journal entry (a practice that all agree was legitimate), that $375 million from the co-borrowing facility was allocated to Adelphia, to do with it as Adelphia wished.[17]  And the obligation to repay the banks for that $375 million rested upon the Managed Entities. As will be seen, the Government disagreed with this factual analysis. As will also be seen, the withheld *Brady* information was material to the resolution of those disagreements.

<em>1.   The 13-D Allegations</em>

In accordance with SEC regulations, the Rigases filed a Schedule 13-D ("Beneficial Ownership Report") shortly after acquiring shares in the 2000 transaction. That Schedule indicated that "the source of the purchase price paid for each of these acquisitions was the respective personal or partnership funds or affiliate borrowings of each of such persons."  App.

---

[17] In point of fact, Adelphia opted to use $136 million to pay off a debt that was its alone, and used $232 million to pay down a portion of its debt within the co-borrowing facility. *See* Trial Tr., App. 44, at 4365 (James Helms); Trial Tr., App. 46, 8661-62 (Robert DiBella).

34, at 15 (Gov't Trial Ex. 4710A). The Government argued that this description was fraudulent because it failed to disclose that the "affiliate borrowings" came from Adelphia (*i.e.*, from the co-borrowing facility Managed Entities shared with Adelphia—which the Government argued should be treated as Adelphia funds). *See generally* Trial Tr., App. 35, at 6765-73 (testimony of James Brown). The Government contended that because Adelphia was co-responsible for the loans if the Managed Entities did not repay the banks, and because the co-borrowed funds had been held in an Adelphia account, the Managed Entities were necessarily borrowing Adelphia money when they drew down funds from the banks under the co-borrowing facility.

The defense, by contrast, sought to establish the statements' accuracy and, beyond that, to show that the language was formulated by Mr. Rothenberger, the securities lawyer for Adelphia and the Managed Entities. The defense further sought to show that the Rigases were not the ones responsible for providing the relevant background information to Mr. Rothenberger. This was designed to counter the Government's argument that it was unreasonable for the Rigases to rely on Mr. Rothenberger because they had given him false or incomplete information.

The Government was able to cut off the Rigases' defense on the 13-D allegations through the testimony of Chris Thurner, who had worked for John Rigas (and was testifying pursuant to a non-prosecution agreement). Mr. Thurner acknowledged that he worked on providing some information to Mr. Rothenberger regarding the 13-Ds. Trial Tr., App. 36, at 3654; Trial Tr., App. 37, at 3284-85. But he claimed at trial that his role was limited to providing information about the amounts of Rigas family stock holdings—not about the source of funds for their stock purchases. Trial Tr., App. 36, at 3654-55 Trial Tr., App. 37; Trial Tr., App. 36, at 3283-84, 3589-91. Mr. Thurner's testimony thus directly served to implicate the Rigases as having themselves worked on the 13-Ds with Mr. Rothenberger, thereby supporting the

prosecution's claim that the Rigases themselves deceived their lawyers about the source of the funds. Those deceits, the Government has recently contended, led Mr. Rothenberger to use the fraudulent "affiliate borrowing" formulation. Gov. Opp'n Mem. To Vacate, Set Aside, or Correct Sentences 32-33, ECF No. 16, (hereinafter "Gov. Opp'n Mem.").

The Government focused heavily on the Section 13-D allegation throughout its case. For example, in its closing argument the Government told the jury:

> [I]t says "the source of the purchase price paid for each of these acquisitions was the respective personal or partnership funds or affiliate borrowings of each of such persons."

> Well, I guess it's true that this was an affiliate borrowing, because they took the money from Adelphia. But don't you think Adelphia's shareholders would have liked to have known that the affiliate being talked about here was actually Adelphia? Because you've learned during this trial that there are hundreds of Rigas affiliates, and not necessarily all of them are Adelphia companies. So this disclosure didn't tell Adelphia's shareholders the one thing they needed to know about this transaction, that the Rigases took the cash from Adelphia to buy this stock.

> Ladies and gentlemen, this is a good example of a half-truth. It's technically true. I guess it was an affiliate borrowing. But it leaves out the most important information that the person reading this needs to know, that that affiliate was Adelphia. . . . Half-truths are misstatements under the securities laws, just like outright lies are, when they're meant to fool people. And this statement, which is a clever way of trying to skirt the issue and say affiliate borrowings, is one of those half-truths.

Trial Tr., App. 33, at 10,485-86 (emphasis added); *see also id.* at 10,545 (AUSA Clark's summation).

The Government's closing argument that the Rigases lied about the source of funds in the 13-Ds provides further evidence of the materiality of the 13-D allegations.

> And knowing that this transaction was not fair to Adelphia, that it was wrong, and that it couldn't be justified, these men lied about where the money came from, and they hid the truth about this transaction from Adelphia shareholders, and we can see that if we look at Government's Exhibit 4710A. . . . This form 13D was false, it was untrue, and it was not correct. . . . How hard would it have been to simply

say in this document, we got the cash from Adelphia? It would have been one sentence. It wouldn't have made it any longer or more complicated. The reason it's not in here is because these men knew it was wrong. They knew it was wrong because it's wrong to take other people's money, and *they knew it was wrong because they were told it was wrong.*

*Id.* at 10,474-78 (emphasis added).

The defense had answers to all these allegations, and proving them centered on one man: Carl Rothenberger. The Rigases would have found immense value in presenting evidence that (a) it was Adelphia's experienced corporate counsel who drafted the "affiliate borrowing" language and believed it appropriate; (b) in so doing, the lawyer did not believe it important to contact any Adelphia accountant or personnel to inquire about the sources of the borrowing—even though he was generally familiar with the co-borrowing facility and the Managed Entities' lack of financial capacity to otherwise fund a large purchase of shares; and (c) the lawyer was working on all this with Chris Thurner alone—meaning that neither of the Rigases worked with the lawyer on the 13-D or provided him the information relevant to the "affiliate borrowing" formulation.

In the course of the trial, Mr. Rothenberger's name was mentioned 290 times during witness examinations (89 times in Mr. Thurner's examination alone). He was at the epicenter of the relevant activity. Yet neither side called him.

We now know why the Government did not call him. Having spoken with him before trial, it knew he would hurt the Government's case badly. During the February 20 interview, the Assistant United States Attorney said "CR is an important witness! Need to meet again." App. 22, Notes of Patrick McLaughlin (Feb. 20, 2004) at 10. Yet no subsequent meeting apparently took place until well after trial—an October 25, 2004 interview in which AUSA Clark told Mr. Rothenberger that Buchanan Ingersoll "fucked up." App. 22, Notes of Patrick McLaughlin (Oct. 25, 2004) at 16. And he threatened Mr. Rothenberger, saying there is "nothing worse than me

(Clark) coming after you!" *Ibid.* The prosecutors' conclusion that Buchanan Ingersoll was at fault would have cut deeply against its efforts to convince the jury that the Rigases acted with any sort of criminal intent.

We also know why the defense did not call Mr. Rothenberger: It had no access to him. And it had received *Brady* disclosure indicating he had provided no significant exculpatory evidence. The defense understood, then, that he would not tell the jury the information that exculpated the Rigases. It was not until seven years after trial that the defense learned what it would have given anything to know at trial: That in his Government interview, Mr. Rothenberger had demonstrated his willingness to provide significant exculpatory evidence on the 13-D issues (and other central issues of the case).

The Feeney Notes that the defense secured in 2011, and the four documents the defense secured through discovery in 2015 and 2016, reveal that Mr. Rothenberger told the Government he believed the law required only a general description of the sources of funds and did not require specific identification of the source of the affiliate borrowings. The Feeney Notes state:

> -need to describe source-if from borrowing need to ID parties lending $
>
> "*affiliate borrowings*"- *Identify? No, not by name - general description*.

App. 38, Feeney Notes at 2 (emphasis added). Mr. Rothenberger asserted his position that the disclosures were "in line w[ith] 13-D Rule[.]"App. 38, Feeney Notes at 2. When asked "why think sufficient," Mr. Rothenberger replied it was an "accurate statement." App. 22, McLaughlin Notes at 7.

As significantly, Mr. Rothenberger acknowledged to the Government that *he was the one* who chose the "affiliate borrowing" formulation. This was not some term that Tim or John Rigas deceptively devised and pressured Mr. Rothenberger to approve. Rather, as Mr. Rothenberger

told the Government, he drafted the language because he believed it was accurate and adequate. He then had it reviewed by Mr. Thurner to confirm its accuracy. The Feeney Notes provide: "Early draft sent to CT w/blank in it for disclosure—sent that way if CER [Carl E. Rothenberger] did not know fact. . . . *CT [Chris Thurner] confirmed that 'affiliate borrowing' accurate*." App. 38, Feeney Notes at 2 (emphasis added); *see also* App. 22, McLaughlin Notes at 7. This account leaves no room to conclude that the Rigases were responsible, not to mention criminally culpable, for the acts of another, approved by yet another, with which they had no involvement.

The Richey Notes further describes Mr. Rothenberger's comments as follows:

> 13-D very focused inquire re: source and amount of funds. . . . Carl sent this document to Thurner who confirmed affiliate borrowing was accurate description. Carl was very busy at the time and he did not ask a lot of detail re: this.

App. 21, Richey Notes at ¶ 12. The Johnson Memorandum adds that Mr. Rothenberger stated that in using the "affiliate borrowing" formulation, he had not felt it necessary to ask Mr. Thurner "if the borrowings were from Adelphia."[18] App. 20, Johnson Mem. at ¶ 10. And, although Mr. Rothenberger had access to countless Adelphia employees, he never sought further information from them either. *See* App. 22, McLaughlin Notes at 7-8. Critically, Mr. Rothenberger never suggested to the Government that anyone lied to him, or misled him, in any way. He chose what to ask and whom to ask; and he asked his questions and received his answers from Mr. Thurner.

---

[18] Of course, despite the rhetoric, the borrowing cannot fairly be characterized as coming from Adelphia. The funds were borrowed from the banks. *See supra* 17-19. It is significant, then, that Mr. Rothenberger told the Government he knew generally about the indisputably permissible intermingling of funds that took place with the Managed Entities. App. 38, Feeney Notes at 4; *see also* App. 22, McLaughlin Notes at 15. He understood that "all cash went into the CMS and the issue was how it would be accounted for later." App. 21, Richey Notes at ¶ 22. (Mr. Rothenberger explained that he did not know that funds of those Rigas Entities that did not operate cable businesses—as opposed to the Managed Entities—were held in Adelphia accounts. In fact, they were not. This, too, was exculpatory evidence. To the extent that the Government was alleging that money used for the stock was Adelphia money because it had been held in an Adelphia account, the defense would have benefitted by informing the jury that the lawyer upon whom Adelphia and the Rigases relied knew how the money was being held, but never expressed any concern that funds being held for a Managed Entity might legally be deemed to be Adelphia funds.

The Government has argued that Petitioners are not entitled to have relied upon Mr. Rothenberger's drafting because Mr. Rothenberger was kept in the dark about the co-borrowing facility being used by the Managed Entities to buy Adelphia shares. App. 13, Gov. Opp'n Mem. at 33; *see also* Trial Tr., App. 8, at 10,603-06 (AUSA Clark's Summation). This argument is wrong.

To begin with, Mr. Rothenberger (despite the obvious incentives) never claimed the Rigases or anyone else misled him about the source of the funds for the stock purchase. Indeed, according to Mr. Rothenberger's February 20 statement, he did not recall whether he considered it important to ask Mr. Thurner or anyone else for details about the funding source. App. 23, McLaughlin Mem. at # 3. Rather, Mr. Rothenberger was satisfied that the "affiliate borrowing" language he drafted was appropriate and only wanted to know from Mr. Thurner whether it was "accurate" that the funds were coming from "affiliate borrowing." App. 20, Johnson Mem. at ¶ 10; App. 21, Richey Notes at ¶ 12. It is agreed, of course, that the formulation was accurate— as even the Government acknowledged to the jury, "Well, I guess it's true that this was an affiliate borrowing." Trial Tr., App. 33, at 10,485-86 (Clark summation).

The Government, of course, contended that more detail about the particular affiliate was needed in the Schedule 13-D, but the non-lawyers at Adelphia would only have known that (assuming it is true) had Mr. Rothenberger sought more detail about the source of the "affiliate borrowing." If he had not considered that essential—and his interview with the prosecutors made clear he had not—it would be unreasonable to conclude that the Rigases were supposed to have known what level of detail was required in the 13-Ds and are guilty of securities fraud for not having provided Mr. Rothenberger information he never sought about the source of borrowing.

Second, Mr. Rothenberger's decision to eschew inquiry into the particulars of the "affiliate borrowing" was not borne of ignorance about the possibility that the Managed Entities were funding the purchase with funds from the co-borrowing facility. He never denied knowing of this possibility. *See* App. 38, Feeney Notes at 1 (when asked whether there was a discussion about the source of funding, Mr. Rothenberger responded, "may have been, do not recall"); App. 22, McLaughlin Notes at 10 ("no recall that anyone told him from the Co-b"); *Id.* at 3 (could "not recall any specific" details about what he was told regarding how the Rigases would fund the stock purchase). And the documentary record (described below) leaves zero doubt about his knowing that the co-borrowing facility was a possible source—indeed almost certainly the actual source—of the funding. This evidence drives home that Mr. Rothenberger was not misled about anything.

Third, the documentary evidence goes even further and establishes that Mr. Rothenberger actually knew co-borrowing would likely be used to fund the purchase at issue here. A March 31, 1999 list of issues Mr. Rothenberger prepared asked: "In terms of closing time, are there any other liquidity considerations other than the closing and funding" of the co-borrowing agreement?" App. 41, E-mails from Carl Rothenberger at 1-2. This same question is asked in three separate e-mails sent on April 1, 1999. *Id.* at 3-10.

Fourth, numerous documents written to the Adelphia Board show that Mr. Rothenberger always understood the role the co-borrowing facility was designed to play in funding stock purchases by the Managed Entities. (Mr. Rothenberger attended all Board meetings and, as lead counsel, reviewed matters coming before the Board. *See, e.g.*, App. 39, Board of Directors Meeting Minutes of April 8, 1999; App. 39, Board of Directors Meeting of August 23, 1999.) In 1999, James Brown (Adelphia's Vice President of Finance) wrote a memorandum to the Board

describing the co-borrowing facility and explaining that "the Rigas family intends to *use the proceeds of this distribution to purchase equity securities* from Adelphia." App. 40, Grand Decl. Ex. A (emphasis added).

Similarly, in January 1998, Bruce Booken (a partner at Buchanan Ingersoll) sent a one-page memorandum to Carl Rothenberger and Paula Zawadzki (another partner at Buchanan Ingersoll). App. 40, Declaration of Paul Grand, Ex. B. The memo described a proposed co-borrowing transaction "which is primarily intended to provide liquidity to the Rigas family so that they can participate in future Adelphia stock offerings." *Ibid.* This planned use of funds was also explicit in the funding proposals Adelphia and the Managed Entities had submitted to the banks in seeking to establish co-borrowing facilities. *See* App. 42, Executive Summary of Proposal to Banks (Gov't Trial Ex. 1552-A); Trial Tr., App. 35, at 6799-80 (Brown testimony describing Gov't Trial Ex. 1552-A). Standing alone, these documents rebut any suggestion that Mr. Rothenberger drafted the "affiliate borrowing" language unaware that co-borrowing would likely (if not certainly) be used for the Managed Entities' purchase of Adelphia stock.[21]

It is true that Mr. Rothenberger told the Government on February 20 that he "did not know that purchases of Adelphia stock by [a Managed Entity] came from Adelphia and no one told him that the source of funds was from Adelphia bank accounts." App. 20, Johnson Mem. at # 11. That is because he most certainly believed that *Adelphia was not the source of the funds*— the banks funding the co-borrowing facility were. (To illustrate, if a person's mother co-signs for his bank loan, the son would never say that "my mother was the source of the funds.") The fact that the Government may take the view that co-borrowed funds are *ipso facto* Adelphia funds

---

[21] The prosecution itself recognized this in the February 20 interview when it grilled Mr. Rothenberger on what other sources (other than the co-borrowing facility) the Rigases might possibly have had to fund the purchase. *See* App. 38, Feeney Notes at 3 (prosecutor asked, "What beside co-b[orrowing] draw downs could $375M borrowings have been?"). At one point, the prosecutor confronted Mr. Rothenberger by telling him that Chris Thurner (who was cooperating with the Government) "was sitting in Carl's chair yesterday." App. 22, McLaughlin Notes at 7.

does not allow it to attribute that definition to Mr. Rothenberger. Nor does it minimize the power of the evidence to support the defense's theories of the case.

The point here is not to prove that Mr. Rothenberger knew the co-borrowing facility funded the stock purchase. Rather, the point is that everyone involved had every reason to understand that Mr. Rothenberger formulated the "affiliate borrowing" language with full awareness of the possible identities of the "affiliate," but he never suggested specification of the affiliate was necessary. The issue in controversy at trial was the Rigases' state of mind, not Mr. Rothenberger's. So what he in actuality did or did not know would only have been significant had it been proven that the Rigases acted in bad faith by: (a) themselves knowingly misleading Mr. Rothenberger or (b) knowing that Mr. Rothenberger was in the dark, intentionally keeping him there. No evidence began to show that.

As a result of the prosecution's failure to turn over information about the February 20 meeting, the jury deliberated on the Rigases' guilt with no information about their good-faith reliance on Mr. Rothenberger's drafting and legal judgment. That offends *Brady* to its core.

## 2.    *Immediately Available Funds*

The prosecution also alleged that the Rigases were guilty of fraud because the cross receipts connected to the 2000 purchase and some other purchases spoke of Adelphia receiving "immediately available funds" in return for the shares. The Government contended that the transfer of the $375 million to Adelphia through the CMS in 2000 did not meet that description because (a) no funds were actually wired, and (b) the Government looked at any funds involved as effectively having belonged to Adelphia in the first place. *See* Trial Tr., App. 33, at 10,496-500,; Trial Tr., App 8, at 10,534-45 (AUSA Clark's Summation); Trial Tr., App. 43, at 10,843-53, 10,856-58 (Mr. Grand's Summation). Once again, had information about the Rothenberger meeting been turned over, the trial would have taken on a very different complexion.

As with the "affiliate borrowing" language, the notes reveal that Mr. Rothenberger told the Government that it was he—not any of the Rigases—who developed the "immediately available funds" formulation. Mr. Rothenberger explained that although he had not used that phrase in connection with earlier purchases, he used it in April 1999 because that purchase "represented [a change] in [the] way RF [Rigas Family] bought shares in connection w[ith] public offering." App. 38, Feeney Notes at 1. According to Mr. Rothenberger, the term "immediately available funds" meant that cash was "presumed transferred in connection with the sale of Adelphia stock." App. 20, Johnson Mem., App, 20 at # 4. In other words, the phrase he used specifically conveyed that this might not be a third party wiring funds. Rather, payment might be conveyed in some other manner. As it turned out, it was accomplished by journal entries allocating to Adelphia the $375 million the Managed Entities had just drawn down from the banks into the Adelphia account that housed its funds (loans for which the Managed Entities were indebted to the banks).[22] When asked how he understood the "immediately available funds" phrase, Mr. Rothenberger acknowledged that it "*usually* means cash (although he had not researched this precise issue and *it could also mean other than just cash*)." App. 23, McLaughlin Mem. at # 2 (emphases added).[23]

That statement makes all the sense in the world and there would be no reason for a lay person to dismiss Mr. Rothenberger's formulation as improper. No one would be debating any

---

[22] During the interview, the Government asked Mr. Rothenberger whether he had been told the shares were being purchased in a "cashless" transaction. App. 38, Feeney Notes at 1. That Mr. Rothenberger disclaimed knowledge of a "cashless" transaction is hardly surprising—as that was never a term used. To the contrary, the common understanding was that the transaction yielded immediately available funds to Adelphia because Adelphia received $375 million from the Managed Entities—funds it did not have prior to the transaction. *See supra* 19 n. 17.

[23] According to the Johnson Memorandum, Mr. Rothenberger indicated that cash "was supposed to have" changed hands at the closing. App. 20 at # 3. But the notes reflect that Mr. Rothenberger clearly stated the "immediately available funds" formulation does not always requires cash, and that he adopted the formulation precisely because of the different way this purchase was being funded. App. 38, Feeney Notes at 1.

"immediately available funds" issue had the Managed Entities simply withdrawn cash from the bank's co-borrowing facility to their own account (as they were entitled to do) and then wired the funds to Adelphia. In that scenario, Adelphia would have received "immediately available funds," even though the funds originated from the co-borrowing facility.[24] In that transaction, Adelphia would have ended up with an influx of $375 million and the Managed Entities would have ended up with shares, as well as the bank debt connected with its borrowing to acquire those shares. The Managed Entities accomplished the same exact thing by transferring $375 million to Adelphia though the journal entry. The Managed Entities secured no benefit in proceeding that way as opposed to paying by wire transfer. It would, therefore, have been entirely reasonable for Mr. Rothenberger and anyone else to conclude that any of these scenarios qualify equally as transmitting "immediately available funds."[25]

Once again, what matters here is not whether Mr. Rothenberger actually did or did not know that the purchase was paid for by a journal entry that provided Adelphia with the funds the Managed Entities had borrowed. Nor does it matter whether Mr. Rothenberger's decision to use the phrase "immediately available funds" was wise or accurate. What matters is that *he* chose that phrase and he never claimed that the Rigases had anything to do with that—or that the

---

[24] The Government still might have had other concerns—such as the affiliate borrowing formulation—but that is a separate question from whether it would be fraudulent to speak of the transfer of "immediately available funds." The Government's accounting witness acknowledged that a wire from the Managed Entities would have qualified as cash. Trial Tr., App. 46, at 8643-44, 8686 (testimony of Robert DiBella). And Mr. Brown acknowledged, "actually moving the cash, as opposed to mere journal entries, would not change the substance of the transaction." App. 94, Defendant's Rule 33 Motion at 22 (discussing Fried Frank's May 28, 2002 Mem. of Interview with James Brown). *See* Trial Tr., App. 95, at 8133-34 (James Brown).

[25] Significantly, a Government witness testified that the draw down from the banks in this case was intended to be wired to a Managed Entity's account, with the Managed Entity then wiring the funds to Adelphia. It was only by mistake, he testified, that the funds came directly from the banks to Adelphia (at which time it was, by journal entry, allocated to Adelphia). Trial Tr., App. 44, at 4366-67, 4579-80 (testimony of James Helms). Thus, but for that bank error, the pattern would have fit what Mr. DiBella acknowledged qualifies as transmittal of immediately available funds. There was absolutely no evidence the Rigases knew of any of this mistake, making it all the more untenable to impose criminal liability on them based on the use of the "immediately available funds" language.

Rigases said anything even the least bit misleading to him about the transaction. And what matters is that he worked on this with another lawyer representing Adelphia, Colin Higgin. *See* App. 20, Johnson Mem. at # 3. The jury deliberating on whether to convict John and Tim Rigas needed to know all of that information. The only reason they did not was because the Government withheld information it was required to disclose.

### 3. The Schedule 10-K allegations

Adelphia's 10-K (Annual Report to the SEC) for the year 2000 stated the following about the co-borrowing facility:

> Certain subsidiaries of Adelphia are co-borrowers with Managed Entities under credit facilities for borrowings of up to $3,751,250,000. Each of the coborrowers is liable for all the borrowings under the credit agreement, and may borrow up to the entire amount of the available credit under the facility. The lenders have no recourse against Adelphia other than against Adelphia's interests in such subsidiaries.

App. 47, Adelphia Communications Corporation 10-K for 2000, at 88. The Government alleged this disclosure was fraudulent because, although accurately disclosing the borrowing limit and the limit of Adelphia's exposure, it did not disclose the actual amount the managed entities had borrowed as of the end of the reporting year.

As with many of its allegations, the Government built this claim on the testimony of James Brown.[27] He testified that during March 2001 Deloitte & Touche had suggested that

---

[27] There is a troubling matter regarding Mr. Brown. He testified in April 2004 pursuant to a cooperation agreement in which he pled guilty to three securities offenses (with a maximum sentence of 45 years). He told the jury that, pursuant to the letter he signed, all he expected from the Government was a letter to his sentencing judge describing his crimes and level of cooperation. Trial Tr., App. 50, at 6073-74 (James Brown). Mr. Brown read to the jury a passage of the agreement indicating that the sentence would be in the sole discretion of the judge, and the Government would not even recommend a sentence. All he hoped for, he explained, was to "receive a lesser sentence than I would if I had been convicted at trial." *Id.* at 6074; *see generally* Trial Tr., App. 51, at 7007-30. It is now 13 years later, and the prosecution still has not requested a sentencing hearing. *See* App. 52, Docket Report, 1:02-CR-01236-KMW-4 (run on April 25, 2017). It goes without saying that this delay is a massive benefit to Mr. Brown. Surely no jury hearing that Government could do more than make a sentencing recommendation would imagine that the Government would give Mr. Brown the benefit of at least a 13-year reprieve. This is an independent *Brady* matter that will be explored in the event of an evidentiary hearing.

Adelphia disclose in its 2000 10-K the amount actually borrowed from the co-borrowing facilities. But, according to Mr. Brown, after a conversation with Tim Rigas on March 27 or 28, 2001, Mr. Brown was able to "sell Deloitte a story" that it was more conservative to disclose the full amount of the co-borrowing credit facility (*i.e.*, the amount of corporate exposure) rather than the amount borrowed as of year's end. Trial Tr., App. 48, at 6595-97. Mr. Brown claimed that he sold this story to Deloitte knowing his proposal would deceive shareholders. *Id.* at 6596.

Mr. Brown's account of pulling the wool over the eyes of Deloitte's accountants made no mention of Mr. Rothenberger having been involved in deciding what to disclose about the co-borrowing facility. Rather, Mr. Brown described how he and Tim Rigas unilaterally and fraudulently decided on the language, without ever mentioning input from, or approval by, any legal advisers.[28]

The notes of the Rothenberger interview provide a very different account—one showing that no one was pulling anything over on anyone. Instead, Mr. Rothenberger explained that he had personally signed off on the propriety of the language that was used.[29] Mr. Rothenberger told the Government that in March 2001 he had a meeting with Tim Werth, and perhaps Mr. Brown and/or Mr. Malone, to discuss including language that either Adelphia or the Managed Entities could borrow up to the full amount of the available credit—the very language Mr. Brown claims he and Tim Rigas concocted in their rogue plot. The Feeney Notes state:

---

[28] The only mention Mr. Brown made of Mr. Rothenberger in connection with the 10-K was to describe a March 29, 2001 e-mail in which Mr. Rothenberger suggested language that the "amounts of indebtedness set forth for Adelphia and its subsidiaries do not include any amounts borrowed by the managed entity coborrowers under these credit facilities." Trial Tr., App. 35, at 6796-98 (describing Gov't Trial Ex. 1912A, App. 96). Mr. Brown testified he ignored this suggestion, having *never discussed it with anyone else*. *Id.* at 6797-98. In proceeding with the 10-K, Mr. Rothenberger never insisted on that language, and its absence is not the subject of any allegation in this case.

[29] Mr. Rothenberger testified in 2005 that, to the best of his recollection, he was the one who actually drafted the language that was used. App. 49, Deposition of Carl Rothenberger in *Adelphia Comm. Corp. v. Rigas*, No. 000598 (Penn. Ct. Common Pleas), at 493 (Oct. 26, 2005). Although the deposition occurred after trial, the statement speaks to materiality, for it shows that had the defense been given the *Brady* information, this information from Mr. Rothenberger would have been presented to the jury via Mr. Rothenberger's trial testimony.

3/01 discuss w/ TW ~ DMal ~ JB

- add language to co-b description in fin stmt. footnote

- risk disclosure

- borrow up to full amount

App. 38, Feeney Notes at 7. Similarly, the McLaughlin Notes recount Mr. Rothenberger stating:

Mar '01, a discussion w/ Tim Werth, (Doug Malone or Jim Brown)

Also, additional language to the description of the loan status, co-b footnote to add the Risk Disclosure → up to the full amount . . .

App. 22, McLaughlin Notes at 23. Indeed, it was so clear at the interview that Mr. Rothenberger (and lawyers at Buchanan Ingersoll) had approved the language, the prosecutor confronted him—declaring "Like it or not you guys endorsed these statements." *Id.* at 24.

Not only do these notes show that Mr. Rothenberger was involved in the decision to use the disclosure language, they show that neither Tim nor John Rigas was anywhere in that picture. Far from the fraudulent plot Mr. Brown claims he launched with Tim Rigas, the notes show that Adelphia (through others) sought legal advice about this part of its 2000 10-K from the securities law expert upon whom it had long relied.[30] And they show that the Government itself recognized that Mr. Rothenberger had "endorsed these statements." This withheld information supports the defense's contention that Petitioners' goal had always been to try in good faith to comply with the applicable securities laws, not to break them. There is surely a reasonable probability a jury

---

[30] The Government has observed (Gov. Opp'n Mem. 31) that the notes do not show Mr. Rothenberger knew about conversations with Deloitte & Touche on how to disclose co-borrowing. But what matters is that he knew the relevant underlying facts and advised that he was comfortable with the language used. The fact is, though, Deloitte & Touche agreed that the language used was acceptable. *See* Trial Tr., App. 48, at 6597 (James Brown); App. 97, Deposition of Gregory Dearlove (May 10, 2006), *Adelphia Comm'c Corp. v. Deloitte & Touche, LLP*, No. 000598 (C.P. Phila.) at 312. But even were it assumed that some accountants continued to offer contrary advice, a client is entitled to rely on advice from its attorney—even if not unanimously shared by every advisor.

would not have convicted John and Tim Rigas of having had the requisite *mens rea* to act fraudulently with regard to the 10-K had the jury heard this information.

4.    *Related Party Transactions*

The Government also contended that the Rigases had in various SEC filings fraudulently misreported (or failed to report) some related party transactions. These allegations touched on just about all of the areas that were the foci of the Government's case—including allegations regarding Adelphia's role in the co-borrowing (which were affiliated party transactions). According to the Government, the law required that each related party transaction be itemized and did not permit aggregation into a net number at year's end, as Adelphia had been doing. And the Government alleged that a significant number of related party transactions were never reported at all. To show the requisite *mens rea*, the Government asserted that LeMoyne Zacherl, a former CPA who had worked at Adelphia during the mid-1990s, had explained the relevant requirements to Tim Rigas in the summer of 1994. Trial Tr., App. 55, at 2617-30 (LeMoyne Zacherl). In its closing argument, the Government emphasized this evidence as showing that Tim Rigas had actual knowledge he was violating the law:

> Nor is there any real dispute that Adelphia's proxy statements and its 10-KAs did not disclose all these related-party transactions in an itemized way, which is what the law requires. Nor—and by the way, an itemized manner that the testimony of LeMoyne Zacherl shows he explained to Tim Rigas.

Trial Tr., App. 54, at 11,196 (AUSA Owens's Summation).

At the February 20 interview, Mr. Rothenberger acknowledged being responsible for the reporting of related party transactions. He had routinely inquired of Doug Malone (a qualified CPA with SEC experience, who worked for Adelphia) to ensure he knew of the relevant transactions, and had then reviewed the 10-K with Mr. Malone. The Feeney Notes state:

Financial Stmts - footnotes, related party transactions not otherwise disclosed

Effort to determine if other related party transactions? Yes

*-reviewed 10-KA w D Mal – familiar w/ SEC reporting – Ask him what else under SK 404*

App. 38, Feeney Notes, at 4 (emphasis added).

The various notes demonstrate the power of what Mr. Rothenberger said. First, he reaffirmed his view that "net, not line item." *Id.* at 4. The McLaughlin Memorandum echoes this account, also describing Mr. Rothenberger stating that the "'net' number" he used was based on information provided by Mr. Malone. App. 23, McLaughlin Mem. at # 7. Second, on a more general level, Mr. Rothenberger's stated he "relied a lot on Malone, Carl asked Malone what else needed to be covered re: related party transactions and Carl relied on the answers." App. 21, Richey Mem. at ¶ 19; *see also* App. 20, Johnson Mem. at ¶ 15 ("Malone had experience with SEC filings and Carl relied upon him to assure that the statements were complete and accurate"); App. 22, McLaughlin Notes, at 12 (Mr. Rothenberger worked with Doug Malone on these issues, whom he described as the "day to day guy" who was "familiar with SEC rpt").

There was one word glaringly missing from Mr. Rothenberger's account: Rigas. Even though it was only days before the Rigases' criminal trial, and the Government was plainly interviewing Mr. Rothenberger with the hope of eliciting evidence against the Rigases, Mr. Rothenberger was unambiguous that it was Doug Malone, and Doug Malone alone, who worked with him on the identification and disclosure of related party transactions.

This was material exculpatory information, to say the least. To begin with, Mr. Rothenberger's explanation that he considered it entirely permissible to report a net figure, readily disposes of any suggestion that Petitioners were guilty of fraud by virtue of the related party transactions having been reported by Mr. Rothenberger in that manner. And, on the

question of whether all transactions made their way into that net figure, the evidence was undisputed that Mr. Malone had unrestricted access to Adelphia's books and records and fully understood the CMS. Robert DiBella (the Government's accounting witness) testified that anyone with access to those books could easily have identified the affiliated-party transactions, which were laid out in detail. Trial Tr., App. 46, at 8608-11. *See also* Trial Tr., App. 56, at 4520; Trial Tr., App. 47, at 4721-25 (James Helms). Indeed, that is how Mr. DiBella identified them. Mr. DiBella further testified there was nothing problematic with Adelphia's use of the CMS to manage both Adelphia's and the Managed Entity's funds, and he acknowledged that the use of journal entries to effect transactions is routine throughout many industries. *Id.* at 8611, 8696-97.

It is plain from this testimony, then, that the transactions involved in the allegations about affiliated-party transactions—such as, but not limited to, reclassification of debt involving Adelphia and the Managed Entities, use of journal entries to reflect payment for Managed Entities' purchases of Adelphia stock, Adelphia's expenditures to build a golf course, and acquisition of timber rights from John Rigas—were all set forth clearly in Adelphia's records. The Rigases were hiding nothing—it was all readily visible to Mr. Malone and Mr. Rothenberger.[31] This is hardly the hallmark of a surreptitious fraudulent scheme.

The Government has argued before that none of this is exculpatory because "Malone was a Rigas co-conspirator; not surprisingly, Malone did not tell Rothenberger the relevant facts. Without knowledge of the relevant facts, Rothenberger's advice cannot give rise to an advice of counsel defense." Gov. Opp'n Mem. 32. This argument has no force. It is a powerful defense

---

[31] In seeking to minimize the impact of this information, the Government has pointed to a sentence in the Feeney Notes that states: "Any disclosure of ACC policy JR [John Rigas] draw up to $1M/month from ACC? Never told about, Should be disclosed? Yes." Gov. Opp'n Mem. 32. But this does not speak to Mr. Rothenberger's position that itemized reporting was simply not necessary. Nor does it affect the fact that any and all information about funds paid to members of the Rigas family were readily visible to those—such as Mr. Rothenberger or Mr. Malone—whose job it was to review the books, which all agree were kept in a transparent manner.

that someone else took the actions and made the decisions for which a defendant stands charged.

To be sure, the prosecution is entitled to try to defeat the power of such exculpatory evidence by arguing complicity, but that is a matter for trial, not a license to shrug off a *Brady* violation. Were there meaningful evidence of conspiracy with Mr. Malone, the prosecution could have sought to negate the Rigases' defense by presenting evidence to the jury proving a conspiracy on this matter. (Unlike the Rigases, the prosecution had unfettered access to Mr. Malone to prove this; the terms of his administrative leave from Adelphia—as approved by the prosecution—required that he cooperate with the Government, and only the Government. *See* Mots. To Vacate, Set Aside, or Correct Sentence ¶¶ 42-43, ECF Nos. 1, 2.) The jury would then have been instructed on co-conspirator liability. But none of that happened, and the Government may not now throw around unfounded and unproven accusations of conspiracy and unilateral assessments of credibility to evade the stark impact of the *Brady* violation: The Government's non-disclosure foreclosed the Rigases from putting forward their powerful defense against the related party transaction charges (which were material to almost all of the issues in the case).

### 5. *The Golf Course Project*

The interview materials reveal further that Mr. Rothenberger provided materially exculpatory information to the Government relating to the accusation that the Rigases surreptitiously used Adelphia funds to build a golf course partly on land owned by John Rigas. *See United States v. Rigas*, 258 F. Supp. 2d 299, 302 (S.D.N.Y. 2003). The prosecution used the golf course project as a particularly accessible example of fraud—as jurors were likely to understand this allegation far better than those relating to 10-Ks, 13-Ds, and the like.

The golf course allegation was front and center at trial. Just minutes into his opening argument, the prosecutor told the jury,

> [Y]ou will learn that Tim Rigas liked golf so much that he had [Adelphia] pay $13 million to begin building his own golf course, a golf course that was [on land] partly owned by Adelphia[, and] partly . . . owned by the family. You will also learn . . . that Adelphia's independent members of the board of directors, its shareholders, its stockholder, its creditors, had no idea Tim Rigas was using their money to build a golf course.

Trial Tr., App. 83, at 625-26 (AUSA Owens's Opening). The Government then used its very first witness to begin building its golf course case. Trial Tr., App. 58, at 830 (Christopher Pelto). By the end of the trial, eight separate witnesses had testified about the golf course. *See Id.* at 830, 853-55 (Christopher Pelto); Trial Tr., App. 59, at 1138 (Dennis Coyle); Trial Tr., App. 60, at 2064-65 (George Cretekos); Trial Tr., App. 60, at 2128 (Lisa Scally); Trial Tr., App. 61, at 2370 (Linda Pekarski); Trial Tr., App. 62, at 2928-53, 3020; Trial Tr., App. 63, at 3113-17, 3133-34, 3152-53, 3212 (Charles Raptis); Trial Tr., App. 64, at 3501-03, 3513 (Christopher Thurner); Trial Tr., App. 65, at 9008; Trial Tr., App. 66, at 9701-08; Trial Tr., App. 67, at 9872-74 (Michael Mulcahey). At closing, the Government told the jury, "You heard a lot of testimony about the golf course . . . that the public shareholders were never told about, that ACC's independent board numbers were never told about, and that was never approved as an affiliate transaction." Trial Tr., App. 8, at 10,613 (AUSA Clark's Summation).

Unbeknownst to the defense, the Government was in possession of information contradicting the very accusations the Government was lodging. Mr. Rothenberger had told the Government he had been contacted by Tim Rigas to discuss "formulating ownership/operation of GC [Golf Course]." App. 38, Feeney Notes, at 6. Tim Rigas had explained that the golf course would be used by "vendors, supplier[s], general corp[orate] use—some employee usage, some unaffiliated (locals) use—no good golf course around Coudersport." *Ibid*; *see also* App. 21, Richey Mem. at ¶ 25; App. 20, Johnson Mem. at ¶ 21. He also talked about its value in retaining employees. App. 22, McLaughlin Notes, at 21.

The Government had learned from Mr. Rothenberger that Tim Rigas "wanted BI's [Buchanan Ingersoll's] understanding on affiliate (or not) transaction" and about "who should own." App. 38, Feeney Notes at 6. In response to these inquiries, Mr. Rothenberger advised that "best legal structure that ACC [Adelphia] own the course, because majority of use for corporate purposes." *Ibid*. And Mr. Rothenberger and Tim Rigas explored many ideas about the tax implications—including the possibility of "donation to town with lease back." *Ibid*. Most critically, Mr. Rothenberger reported that he never considered it necessary to bring the matter before the Board for formal approval at that stage. *Ibid*. He advised that it was only later, "once structured," that the golf course project would "require Bd approval if RF [Rigas Family] continued to own land." *Ibid.* That time never arrived as construction of the course came to a stop in May 2002. *See* Trial Tr., App. 62, at 2947 (Raptis Testimony).

With regard to the claim that Petitioners were hiding the golf course project, Mr. Rothenberger had reported to the Government that he and various individual directors had actually visited the site and "Bd. knew there was a golf course." App. 22, McLaughlin Notes at 22. *See* also App. 20, Johnson Mem. at ¶ 21. ("Carl said he did know it was being constructed, as did the various directors who had visited the site."). Mr. Rothenberger's description made clear that nothing about the golf course project was hidden from him.

This description of transparency (with Adelphia's counsel and the board) belies the accusation that Tim Rigas was trying to hide the golf course from them. It is disturbing that after hearing what it heard from Adelphia's lead lawyer on February 20, 2004, the Government did not include any of this information in the letter it sent to the defense on February 24, 2004, reporting only that Mr. Rothenberger might have some exculpatory evidence about the unrelated timber rights issue. And it is distressing that, having explicitly been told several times by Mr.

Rothenberger that "Bd. knew there was a golf course," the prosecution repeatedly told the jury that the Rigases were guilty of fraud because the independent members of the Board did not know the golf course was being built.[34] And, finally, it is most disconcerting that the Government then stood up before Judge Sand and the Second Circuit and denied this was material exculpatory information. All these concerns aside, though, only one thing matters at this moment: this was undisclosed material exculpatory information.

### C.    The Government was Required to Disclose the Notes

Aside from its continued claims that none of the withheld material was exculpatory, the Government has previously offered the following three categories of argument in defense of its non-disclosure: (1) there was no duty to disclose anything about Mr. Rothenberger because Petitioners already knew about him and about the kind of work he had done; (2) even if some withheld evidence was exculpatory, it was not material to the outcome of the trial; and (3) the issues regarding the Rothenberger notes have been decided already in earlier proceedings. As will be seen, none of these points has merit.

> *1.    Petitioners' General Knowledge About Mr. Rothenberger Did Not Negate the Government's Duty to Disclose the Exculpatory Information It Learned.*

The Government has claimed that, under the "essential facts" doctrine, "[a] defendant cannot satisfy the suppression requirement if the defendant, directly or through counsel, 'either knew or should have known, of the essential facts permitting him to take advantage of [that] evidence.'" Gov. Opp'n Mem. 15-16 (alteration in original) (quoting *Lamberti v. United States*, 22 F. Supp. 2d 60, 66 (S.D.N.Y. 1998) (citation omitted), *aff'd*, *Badalamenti v. United States*,

---

[34] The prosecution also claimed that the shareholders, public, and creditors did not know about the golf course. But there was no legal reason a corporate decision to embark on a project of this sort would need to be the subject of any general public disclosure. Although part of the land being used belonged to John Rigas, it remained unclear whether he would simply deed the land to Adelphia, whether Adelphia would buy the land, or whether it would be donated to the City. That had to be decided before determining whether there would be a related party transaction to report.

201 F.3d 430 (2d Cir. 1999)). The Government's own conduct in this case demonstrates that the Government never believed that doctrine obviated the need for disclosure regarding Mr. Rothenberger. And, more critically, a series of Second Circuit decisions, particularly *United States v. Mahaffy*, 693 F.3d 113, 131 (2012), have flatly rejected any such position.

> a.     *The Government's Own Conduct Refutes any Claim that There was no Need to Make any Disclosure Regarding Mr. Rothenberger.*

In assessing the Government's claim that the "essential facts" doctrine absolved it of its duty to disclose, it is vital to recognize that the Government itself understood it had a *Brady* duty regarding Mr. Rothenberger. Hence the Government did disclose information regarding the timber rights issue. App. 3, Preziosi Decl. at ¶ 4, Ex. 2 (Letter from U.S. Att'y to Defense Counsel (Feb. 24, 2004)) (emphasis added). The Government did this, moreover, even though it involved a discussion Mr. Rothenberger described having with Tim Rigas himself—which would fall into the heartland of the "essential facts" doctrine the Government espouses.

This is how the Government later described its obligations:

> It has long been the law and practice in the Second Circuit that the Government may fulfill its *Brady* obligation with respect to a particular witness by identifying the witness to the defendant and indicating that the witness may have favorable information *on a particular subject*.

App. 13, Gov't Mem. Opp'n Mot. to Compel at 3, *United States v. Rigas*, No. 02-Cr-1236 (S.D.N.Y. Jan. 15, 2008) (emphasis added) (citation omitted).

Thus, the Government asserted that it had complied with *Brady* by disclosing: (a) Mr. Rothenberger's identity; and (b) that Mr. Rothenberger may have exculpatory information on the "particular subject" of the timber rights transactions. But the Government concedes it made no disclosure at all—even by its self-recognized duty to at least identify the subject matter—about central issues in the case, such as 13-D affiliate borrowing disclosures, 10-K co-borrowing

disclosures, the "immediately available funds" formulation, related party transactions, and the golf course project. Hence, *by the Government's own terms*, if it learned any materially exculpatory information from Mr. Rothenberger on any subject beyond timber rights, it failed to fulfill its *Brady* obligation.

b.      *The Partial Disclosure Created a Duty for Full Disclosure.*

The Government has previously advanced the odd claim that its duty to make *Brady* disclosure identifying each subject matter on which Mr. Rothenberger provided exculpatory information was satisfied because the disclosure about timber rights put the defense on notice that Mr. Rothenberger had been interviewed by the prosecution. Gov. Opp'n Mem. 25. Obviously, with regard to the other subjects, that disclosure never accomplished what the Government itself accepts as necessary: "indicating that the witness may have favorable information *on a particular subject*."  App. 13, Gov't Mem. Opp'n Mot. to Compel at 3, *United States v. Rigas*, No. 02-Cr-1236 (S.D.N.Y. Jan. 15, 2008) (emphasis added) (citation omitted). Even that vague level of disclosure on *particular subjects* (albeit insufficient) at least would have told the defense some of what it was entitled to know: That Mr. Rothenberger was providing exculpatory information (which Petitioners knew to be truthful) on central subjects of the trial.

Far from fulfilling the Government's *Brady* obligation, the partial disclosure was worse than no disclosure at all—as it compelled the defense to conclude: (a) the prosecution recognized its duty to identify the subjects of exculpatory information Mr. Rothenberger provided; and (b) Mr. Rothenberger had said nothing exculpatory other than about timber rights.  This was worse than no disclosure at all because it duped the defense into believing Mr. Rothenberger must have been "flipped" and was now unwilling to tell what the defendants knew to be the truth. *Cf. Bagley*, 473 U.S. at 682-83 (anticipating that the defense will reasonably assume from non-

disclosure that the exculpatory "evidence does not exist and [will] make pretrial and trial decisions on the basis of this assumption").

No competent defense lawyer receiving this communication from the Government would ever have been willing to call Mr. Rothenberger to the stand. *See Rodriguez*, 496 F.3d at 227-28 (There are scenarios in which partial disclosure impermissibly leaves defense counsel in the position of having to question a witness "blindly in the jury's presence, not knowing whether the answers elicited might seriously incriminate or prejudice the defendant."); *Leka v. Portuondo*, 257 F.3d 89, 103 (2d Cir. 2001) ("The opportunity [to] use [exculpatory information] under *Brady* is the opportunity for a responsible lawyer to use the information with some degree of calculation and forethought. A responsible lawyer could not put [the potential witness] on the stand without essential groundwork."). Indeed, the partial disclosure here had just that effect. Bernard Preziosi, one of John Rigas's lawyers, has described in an affidavit how receipt of the letter from the prosecution led the defense to rule out calling Mr. Rothenberger to the stand, even though it considered him a "key witness." App. 3, Preziosi Decl. at ¶ 4.

In *United States v. Payne*, 63 F.3d 1200 (2d Cir. 1995), the Second Circuit spoke directly to this point. A witness in that case, Deanne Wilkerson, pleaded guilty to various drug charges, and cooperated with the Government by testifying in Eric Payne's trial that she had sold drugs with him. *Id.* at 1204-05. The Government turned over some *Brady* material regarding Ms. Wilkerson, including arrest reports and her plea agreement. *Id.* at 1205. But the Government did not turn over an affidavit Ms. Wilkerson had filed in her own pre-trial proceedings denying that she had ever sold narcotics. *Ibid.* In addition to rejecting the Government's claim that the "essential facts" doctrine made disclosure unnecessary (a holding that is discussed below, *infra* 45-52), the court explained,

Further, the government produced for Payne a large volume of other materials concerning Wilkerson, including numerous documents relating to the federal investigation and her prosecution. Included were publicly available documents such as the transcript of Wilkerson's plea allocution. *A defendant receiving such documents from the Government could reasonably assume that the court files did not include other undisclosed exculpatory and impeachment documents pertaining to Wilkerson. . .*

*Id.* at 1209 (emphasis added); *see also Grant v. Alldredge*, 498 F.2d 376, 380, 382 (2d Cir. 1974) (holding the prosecution's "half-disclosure" that an eyewitness had failed to identify the defendant, without also disclosing that the eyewitness had identified another man as the culprit was "grossly unsatisf[ying]" and violated *Brady*).

It is paradoxical that, in a prosecution accusing the Rigases of deceiving the public through "half-truths," the prosecution would make a *Brady* disclosure that identifies one minor topic, but omits the long list of significant subjects about which Mr. Rothenberger provided exculpatory information. To quote the Government, "This is a good example of a half-truth. It's technically true . . . [b]ut it leaves out the most important information that the person reading this needs to know. . . . Half-truths are misstatements . . . ." Trial Tr., App. 33 at 10,486. Thus, even if the "essential fact" doctrine means that the Government had no duty to disclose any exculpatory evidence it learned from Mr. Rothenberger—and it most assuredly does not mean that—the Government was not permitted to pretend to be making a disclosure, while in fact hiding 99% of the ball. *Cf.* Restatement (Second) of Torts § 323 cmt. c (Am. Law Inst. 2016) (even when there is no duty to act, once one opts to perform an act one must do it in a manner that does not lull others into complacency about the continued need for diligence).

        *c.*      *The "Essential Facts" Doctrine does not Relieve the Government of Its Obligation to Disclose the Exculpatory Information it Learned from Mr. Rothenberger*

The "essential facts" doctrine, properly applied, stands for the proposition that "[e]vidence is not 'suppressed' if the defendant either knew, or should have known, of the essential facts *permitting him to take advantage of any exculpatory evidence*." *Leka*, 257 F.3d at 100 (emphasis added) (*quoting United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982) (citations omitted)). Or, put otherwise, the Government need not disclose information when the defendant is "on notice of the essential facts *which would enable him to call the witness and thus take advantage of any exculpatory testimony that he might furnish*." *United States v. Stewart*, 513 F.2d 957, 960 (2d Cir. 1975) (emphasis added) (citations omitted). As subsequent cases have revealed, the inquiry into whether the defense already had the knowledge enabling it to "take advantage" of the exculpatory evidence turns not only on whether the defense knew an underlying fact (such as what Mr. Rothenberger had actually done), but also on whether the defense knew the information that would make it possible, as a practical matter, to put that evidence before the trier of fact.

    In some cases, it is obvious that the defense does not need the Government to turn over the exculpatory evidence because disclosure is unnecessary to enable the defense to present the exculpatory evidence. For example, in *Raley v. Ylst*, 470 F.3d 792 (9th Cir. 2006), the defendant claimed the prosecution had violated *Brady* by not tendering copies of his medical records from pretrial detention—records that were exculpatory (or at least mitigating) in showing he was being seen by medical personnel and was being medicated. The Court rejected that claim, holding that the "essential facts" doctrine applied because the defendant knew he had been seen

by medical personnel, knew he had been medicated, and his defense had full access to the medical records simply by requesting them. *See id.* at 804.

By contrast, there are many cases in which the defense knows about some underlying information, but that information is *not accessible* as a practical matter (and hence not useful) to the defense without the Government conveying what it knows. Using the instant case as an example, the defense knew that Mr. Rothenberger or his firm had been involved in various disclosures and transactions in some capacity. And the defense knew that, in the course of all their interactions with Mr. Rothenberger, they never sought to break any laws or commit any fraud. But knowing all of that was useless because the defense did not know the key piece of information that "would enable [them] to call the witness and thus take advantage of any exculpatory testimony that he might furnish." *Stewart*, 513 F.2d at 960. The defense did not know what the Government did know: That even under the pressure to become a cooperating witness and provide an account that fit the Government's narrative, Mr. Rothenberger (who the prosecution knew was refusing to be interviewed by the defense) was continuing to provide an account of events that was highly exculpatory.

Indeed, the defense's inability (absent the Government's disclosure of the information from the meeting) to learn what Mr. Rothenberger would say if called to testify was the foundation of Judge Jones's ordering the prosecution to turn over its notes of the Rothenberger interview. *See Rigas*, 779 F. Supp. 2d at 414 ("Simply put, we do not accept the Government's assertion that the Defendants have equal access to Rothenberger, which then eliminates any potential *Brady* obligation.").

A recent article on the "essential facts" doctrine articulates the distinction this way: "having knowledge about a thing does not necessarily mean that one can obtain access to that

thing." Thea Johnson, *What You Should Have Known Can Hurt You: Knowledge, Access, and Brady in the Balance*, 28 GEO. J. LEGAL. ETHICS 1, 10 (2015). Here, without the information the Government withheld, the defense had no "access to th[e] thing" that mattered—*i.e.*, no access to Mr. Rothenberger's account—access indispensable to a decision to call him as a witness.

Any confusion that may have once existed about this subject in the Second Circuit was resolved definitively in *United States v. Mahaffy*, 693 F.3d 113 (2d Cir. 2012). In securing convictions there, the Government convinced the jury that the defendants' brokerage firms treated certain information as confidential. To help prove this, the Government called Jay Amore, a cooperating witness, who testified he had spoken with one of the defendants (David Ghysels) and had made it clear he would be using the information improperly. After trial, it came to light that the Government and the SEC had deposed numerous individuals prior to trial—many of whom supported the defense's positions. For example, Carlos Romero—who was Mr. Ghysels's partner at Lehman Brothers—had stated that Mr. Amore made clear he was using the information legitimately.

In words that apply directly here, the Second Circuit rejected the argument that the "essential facts" doctrine relieved the Government of its *Brady* duty:

> For the purposes of our *Brady* analysis, it simply does not matter that Ghysels knew that Romero, his former partner, had a conversation with Amore. Whatever Ghysels knew, he did not know what Romero told the SEC under oath. According to Ghysels, *Romero refused to meet with Ghysels's counsel prior to trial.* Not knowing what Romero might testify to, Ghysels did not call him at trial.

*Mahaffy*, 693 F.3d at 131 (emphasis added).

The Court expanded on this theme, as follows:

> The Government cites to cases that it contends establish that potentially exculpatory testimony is not considered suppressed where the defense knows the witness's identity. Those cases require more. It is not enough that a defendant knew a potential witness's identity; the defendant had to know "or should have

known the essential facts *permitting him to take advantage of any exculpatory evidence.*" *United States v. Salerno*, 868 F.2d 524, 542 (2d Cir. 1989) (quotation marks omitted) . . . Here, Ghysels did not know that Romero met with the SEC or that his previous testimony might be exculpatory.

*Mahaffy*, 693 F.3d at 131 n.11 (emphasis added).

The Court further explained that disclosure of the information was vital in another way:

Aside from exculpatory material, *Brady* applies to material that "would be an effective tool in disciplining witnesses during cross-examination." Armed with Romero's SEC testimony, Ghysels quite possibly would have called Romero at trial. If Romero testified consistent with his SEC testimony . . . Romero's testimony would have bolstered Ghysels's defense. If Romero testified otherwise, Ghysels could have confronted him with a prior inconsistent sworn statement in the form of Romero's SEC deposition transcript.

*Id.* at 131 (*quoting United States v. Gil*, 297 F.3d 93, 104 (2d Cir. 2002)).

The Court applied the same analysis to the withheld statement of Donald Lee, who had reported to the Government that Kenneth Mahaffy, another defendant in the case, never sought to involve him in any inappropriate trading schemes. Again, the Government claimed it had no duty to disclose Mr. Lee's statement because Mr. Mahaffy obviously knew what he had or had not said to Mr. Lee. The Court dismissed the argument as follows:

Next, just as Ghysels's knowledge that Romero spoke with Amore does not alter our *Brady* analysis, neither does Mahaffy's knowledge of his own relationship with Lee. . . . If Mahaffy had known what Lee told the SEC, Mahaffy would have had a reason to interview Lee prior to trial and perhaps to call him as a trial witness. Without Lee's deposition transcript, however, Mahaffy was unaware that Lee might contradict inferences the government urged based on evidence it introduced.

*Id.* at 132. In sum, because the required information was not disclosed, critical witnesses went unheard and "the jury viewed and heard primarily Government evidence." *Id.* at 127.

The conclusion in *Mahaffy* is consistent with *Brady* decisions going back to *Brady* itself. In *Brady*, the defendant admitted he had participated in a murder but claimed that a man named Charles Boblit had committed the actual killing. 373 U.S. at 84. Prior to trial, Mr. Boblit had told

authorities he committed the homicide, but the prosecutors never turned those statements over to Mr. Brady's defense. *Ibid.* Of course, under the broad reading of the "essential facts" doctrine proposed by the Government here, because Mr. Brady (who admitted being at the crime scene) obviously was aware that Mr. Boblit had strangled the victim—meaning that Mr. Brady knew that Mr. Boblit knew information exculpatory of Mr. Brady—there would have been no problem with the prosecution's withholding the statements. But what Mr. Brady did not know was that Mr. Boblit had been willing to provide this exculpatory information to the prosecution in a pre-trial interview. Had he known that, "Brady might have called Boblit as a witness." *Brady v. State*, 174 A.2d 167, 170 (Md. 1961), *aff'd sub nom. Brady v. Maryland*, 373 U.S. 83 (1963). The core of the ruling in *Brady* was that the defense had a right to know the witness had told the authorities information exculpatory of the defendant. That was the "essential fact." To accept the Government's arguments here would be to hold there was no *Brady* violation in *Brady* itself.

Many other decisions similarly support this proposition. For example, in *United States v. Orena*, 145 F.3d 551, 557 n.4 (2d Cir. 1988), the court explained that the Government had a duty to disclose what a witness told the FBI, because even though defendants may have known the general information about the witness's status, they "lacked evidence of the specific information exchanged between [the witness] and the FBI that has now become available." And in *Payne*, the Government argued it had no duty to turn over the affidavit of a witness (Wilkinson) because the defense knew of Wilkinson's existence and the issues on which she had information. *Payne*, 63 F.3d at 1209. The court soundly rejected that position, explaining that because the defendant did not know the witness had executed the affidavit, he was not aware of the "essential facts" that would have led him to discover the material exculpatory evidence. *Id.* at 1208-09.

Indeed, one of the most high-profile recent exposures of a *Brady* violation follows the pattern of this case quite closely. United States Senator Theodore Stevens was charged with having failed to report free services he allegedly received from VECO, a company that had done some work on the renovation of his home. One of his defenses focused on his having believed that VECO's charges had been folded into the bills he had paid to Christensen Construction Co., the company doing most of the work. He also defended himself by claiming he had made it clear to VECO personnel that he expected to be billed and wanted to pay for all VECO services. Prior to trial, the prosecution had interviewed Rocky Williams, the primary VECO employee on the project, who had interacted repeatedly with Senator Stevens and his wife. Mr. Williams had told the Government that he, too, believed that VECO's charges were being folded in to Christensen Construction's bills and that he had conversations with Senator Stevens and his wife in which they stressed their insistence on paying full freight for all services they received. The prosecution never disclosed this information to the defense, and the defense never called Mr. Williams to the stand. Only after Senator Stevens was convicted did it emerge that the prosecution had engaged in these conversations with Mr. Williams. *See* Dep't of Justice, Office of Prof. Responsibility, Report on the Investigation of Allegations of Prosecutorial Misconduct in *United States v. Theodore F. Stevens,* Crim. No. 08-231, at 277-359 (D.D.C. 2009) (EGS) (August 15, 2011).

Senator Stevens's conviction was overturned (for this and other reasons), and the ensuing Report of the Department of Justice's Office of Professional Responsibility found two prosecutors guilty of professional misconduct for not having disclosed to the defense the information that Mr. Williams had conveyed. *Id*. at 671.[38]

---

[38] The prosecutors' suspensions were later reversed by the Merit Systems Protection Board on the ground that the Department of Justice had not followed its own procedural rules for adjudicating such allegations. *See Goeke & Bottini v. Dep't of Justice,* 2015 M.S.P.B. 1 (2015).

These facts closely parallel ours. There was never any doubt that the defense in *Stevens* was aware of Mr. Williams's central role in the subject of the prosecution—including conversations with Senator and Mrs. Stevens themselves. Nor was there ever any doubt that Senator Stevens was aware that Mr. Williams knew material exculpatory information. What the Stevens defense did not know—but was entitled to know under *Brady*—was that Mr. Williams had revealed this exculpatory evidence to the prosecution, thus showing his willingness to so testify if called as a defense witness (or arming the defense with impeachment material). This is precisely what the Rigases did not know about Mr. Rothenberger. The *Brady* duty in the *Stevens* case was beyond question. The *Brady* duty here was every bit as forceful.

Indeed, the evidence of the defendant's knowledge of "essential facts" was stronger in *Stevens* than it is here. The conversations at issue there were between Mr. Williams and the Senator and Mrs. Stevens. Here, by contrast, most of the conversations at issue involved Mr. Rothenberger and third parties. For example, Mr. Rothenberger told the Government that: (a) he obtained information for the 13-Ds from Chris Thurner and some other individuals; (b) he had conversations with Tim Werth (and maybe Jim Brown or Doug Malone) regarding the 10-K disclosure; and (c) he worked with Mr. Malone to identify related party transactions that required disclosure. Neither John Rigas nor Timothy Rigas were party to these conversations and there is no evidence to suggest they knew or somehow should have known about them. Thus, even were there no duty to make disclosure about Mr. Rothenberger's account of his interactions with the Rigases themselves (and there is such a duty), the Government was undoubtedly obliged to disclose Mr. Rothenberger's exculpatory information about third parties upon whom he relied in preparing and approving the critical documents at issue.

## 2. *The Information is Materially Exculpatory.*

As soon as the Rigases learned (years after the trial) that the prosecution had notes of its pretrial interview with Mr. Rothenberger, the Rigases sought to obtain those notes or, at the very least, to have them turned over to the court for *in camera* review. The prosecution fought tooth and nail to avoid this—accusing the defense of engaging in unfounded speculation about the notes' content. The prosecution assured the defense, Judge Sand, and the Second Circuit that there was nothing even faintly exculpatory contained within them. At the time, it was difficult to comprehend why the Government was litigating so aggressively. If the notes were truly as benign as the Government contended, why did the Government not simply disclose them at that point—at least for *in camera* review by the court—and avoid the burden and expense of fighting to keep them secret? We now know why. The notes do, in fact, contain powerful exculpatory evidence that went to the defense's central themes in the case.

The Government entirely misses the point when it dismisses the information's materiality and asserts that the defense's decision not to call Mr. Rothenberger was "knowing and strategic." Gov. Opp'n Mem. 23, 26. The decision was certainly "strategic" in the sense that it resulted from decisions based on the available information. But it was by no means "knowing," given the Government's failure to disclose the information that would have led the defense to understand that Mr. Rothenberger was prepared to provide powerful exculpatory evidence. And it was by no means "knowing," given the ways in which the Government's disclosure limited to timber rights duped the defense into understanding that Mr. Rothenberger had provided no other exculpatory evidence. *Cf. Freeman v. Georgia*, 599 F.2d 65, 71-72 (5th Cir. 1979) (when the prosecution's *Brady* disclosure led the defense to believe the witness had no exculpatory evidence on a subject, the Government was not permitted to argue that the defendant waived the *Brady* claim by declining to call that witness).

The Government also has asserted that there is no need for a new trial as a result of any *Brady* violation because "it is extremely unlikely" the defense would call Mr. Rothenberger at a new trial. This unfounded prediction fails to recognize the impact of the withheld information. The defense did not call Mr. Rothenberger at the trial because it had no way of knowing what the Government knew—that he would provide exculpatory testimony. And the defense did not call him because the Government's limited disclosure necessarily indicated Mr. Rothenberger was not providing exculpatory information on anything of significance. *Under those circumstances*, as we have explained, no reasonable lawyer would have called Mr. Rothenberger blindly to the stand. At a new trial, in sharp contrast, the defense would not be blind: it would have the knowledge to which it was always entitled. Accordingly, the Rigases would fully expect to call him as their key witness. At that new trial, the prosecution would never be able to tell the jury: "If in fact these men really believed that any of the lawyers or auditors approved or supported what went on and was charged to be illegal, don't you think they would have called one of them as a witness in this trial?" Trial Tr., App. 8, at 10,605-06.

Moreover, a *Brady* violation of this sort can not only cause the defense to eschew calling a particular witness, it can also lead to the defendants themselves not testifying. Here, for example, in the absence of Mr. Rothenberger's corroboration, it would have been treacherous— and useless—for the defendants to testify about what their lawyer said and did. *Cf. United States v. Eisenstein*, 731 F.2d 1540, 1546 (11th Cir. 1984) (reversing conviction because the trial court barred a lawyer's testimony and thus deprived the defendant of testimony that could have corroborated his otherwise uncorroborated advice-of-counsel defense).

The Government has also argued that there was no need to disclose information about what Mr. Rothenberger told the prosecutor because there were other parts of the statement that it

deems to be inculpatory. Even were it true that Mr. Rothenberger also conveyed some inculpatory information—and Petitioners do not by any means accept that characterization—it would have no impact on the Government's duty under *Brady*. The Second Circuit has held that the Government must disclose any statement that "can be viewed as having both an inculpatory and exculpatory effect." *United States v. Rivas*, 377 F.3d 195, 199 (2d Cir. 2004); *see also DiSimone v. Phillips*, 461 F.3d 181, 195 (2d Cir. 2006) (holding that *Brady* duty applies to a partially exculpatory and partially inculpatory statement). Addressing this issue, the Court in *Mahaffy* explained, "Where suppressed evidence is inculpatory as well as exculpatory, and 'its exculpatory character harmonize[s] with the theory of the defense case,' a *Brady* violation has occurred." 693 F.3d at 130 (2d Cir. 2012) (alteration in original) (citation omitted).

Plainly, then, none of the Government's efforts to downplay the materiality of the information have force. For the reasons described within the discussion of each issue, the withheld information was most certainly material. The remedy for the violation is a new trial.

### 3. The Issue Has Not Been Decided

There is a surreal nature to the Government's contention that the *Brady* claims the Rigases are now advancing have already been adjudicated. Gov. Opp'n Mem. 17-29. The Government earlier succeeded in preventing meaningful adjudication of the Rigases' *Brady* claim on the very ground that the claim was unripe. No court has ever assessed the notes. It is rather audacious to now argue that the matter has already been resolved.

When the Rigases first tried to raise their *Brady* claim in a post-trial motion, they based their claim on information Mr. Rothenberger had revealed in his post-trial civil deposition. During that deposition, Mr. Rothenberger disclosed he had been interviewed by the prosecution days before the criminal trial began. He made many statements during that deposition that were exculpatory of the Rigases. The Rigases' *Brady* claim was based on their supposition that during

that pre-trial meeting Mr. Rothenberger had disclosed much of the same materially exculpatory information he discussed in the post-trial deposition. *See supra* 13-16.

The Government would have none of this. It conceded (as it does now) its duty to inform the defense of any witness with potentially exculpatory evidence and to specify the subject matter of the exculpatory evidence. *See* Gov. Opp'n Mem. 18. The Government argued, though, that the idea of a motion to compel is alien to *Brady* procedure, and that the dispositive fact was that the defense had no actual proof Mr. Rothenberger had revealed any exculpatory information (except in relation to the minor timber rights issue). *See supra* 13-16. The Government was unyielding in pressing this point and attacking the defense for having advanced the *Brady* claim in the absence of actual evidence about what Mr. Rothenberger had told the prosecution. *Ibid*. Indeed, as discussed above, the Government went further and represented that there was, in fact, nothing the least bit exculpatory in the notes—other than the information about the timber rights transaction. *See supra* 15-16.

The Government's argument prevailed and the *Brady* claim was rejected summarily without any consideration of the details of the Rigases' assertion that the prosecution had withheld materially exculpatory evidence on a wide array of issues. Obviously, the court never had occasion to determine whether the Government had complied with its duties—even the Government's self-recognized obligation to identify the subject matter of any exculpatory evidence it possessed. The court could not possibly have conducted any such review because the Government steadfastly refused to provide the notes in question to the court, even for *in camera* review. Thus, when the court rejected the Rigases' earlier *Brady* claim, it was relying on assurances by the prosecution that there was nothing the least bit exculpatory in the Rothenberger notes—aside from the timber rights information.

In light of this history, it is untenable for the Government to now argue the Rigases are barred from securing relief under *Brady* because the matter has already been adjudicated. This is no longer a motion to compel based on some uncertain evidence the Government can dismiss as conjectural. There is no longer some heightened standard that must be satisfied to justify a procedurally extraordinary order to compel. The defense now has the actual notes in question—having obtained them in pre-trial proceedings in the separate—but later dismissed— prosecution in Pennsylvania. And the defense has secured additional notes through discovery this Court authorized in this case. Those notes and memoranda reveal that the Government was disingenuous when it claimed the Rigases were off-base in their assumptions about what Mr. Rothenberger had told the prosecution prior to trial. This Court and the Second Circuit trusted the prosecution's assurances. Now that the notes are out in the open, the prosecution should be eating crow, not making the specious claim that the court has already passed judgment somehow on whether notes the court never saw contain exculpatory information.

In any event, even had this precise issue been addressed, the law of the case doctrine does not apply when there are "cogent" and "compelling" reasons for revisiting prior rulings such as clarifications of governing law. *See Ali v. Mukasey,* 529 F.3d 478, 490 (2d Cir. 2008). *See also Santamarina v. Sears, Roebuck & Co.,* 466 F.3d 570, 572 (7th Cir. 2006) (finding that the law of the case doctrine "authorizes such reconsideration if there is a compelling reason, such as a change in, or clarification of, law that makes clear that the earlier ruling was erroneous"). The Second Circuit's decision in *Mahaffy* constitutes just that. And the "availability of new evidence" is a classic reason for examine an issue afresh. *See Gordon v. United States*, 2011 WL 2638133, at *4 (S.D.N.Y. 2011) (Wood, J.). The law and now available facts clearly show today that there was a *Brady* violation and Petitioners are entitled to habeas relief.

III.    **PETITIONERS ARE ENTITLED TO RELIEF BASED ON *BRADY* VIOLATIONS RELATED TO THE MARKETING SUPPORT ALLEGATIONS.**

A.    **The Trial and Appeal**

Throughout the trial, the Government pressed its contention that the Rigases orchestrated phony "marketing support" transactions with Scientific Atlanta Inc. and Motorola Communications Corp. as part of "accounting magic" the Rigases used to increase Adelphia's EBITDA.[41] Trial Tr., App. 68, at 6240-41 (Brown testimony). *See also* Trial Tr., App. 8, at 10,584 (AUSA Clark's summation) ("The first one of those bogus transactions we learned about was marketing support.").

The Second Circuit explained the allegations, which focused mostly on Scientific Atlanta, as follows:

> Adelphia agreed to pay Scientific Atlanta $339 for each cable converter box. The two entities later agreed that Scientific Atlanta would increase the price of each box by $31, and Adelphia would charge [Scientific Atlanta] an identical $31 per box for marketing support. Thus, Adelphia's capital expenses for each box were increased by $31 to $370. But Adelphia's current expenses were decreased, and its EBITDA was increased, by $31 per box. The effects of the marketing support scheme in the June 2000 and September 2000 quarters, for example, were an increase in Adelphia's EBITDA of $7 million and $12.8 million, respectively. The scheme with Motorola was similar, and had the same EBITDA-inflating effect.

App. 10, *Rigas*, 490 F.3d at 217 n.8.[42]

As with many other accusations, these allegations were based on the testimony of the Government's star witness, James Brown. Mr. Brown testified that, in order to enhance

---

[41] EBITDA, which stands for Earnings Before Interest, Taxes, Depreciation and Amortization, is a commonly used measure of a company's operating performance.

[42] The effect on EBITDA resulted from the fact that capital expenses are not treated as expenses for EBITDA purposes, but the marketing support payments do count as revenue (which offsets the marketing costs the company was incurring). *See Rigas*, App. 10, 490 F.3d at 215 n.5; Trial Tr., App. 50, at 6120, 6126, 6161; Trial Tr., App. 69 at 7290. (Brown testimony). There is no dispute that this is the proper way to calculate EBITDA; the dispute is on whether the transactions themselves were legitimate.

EBITDA, he, Tim Rigas and others devised a "fake marketing support" scheme that used "wash transactions" to "fool the auditors." Trial Tr., App. 50, at 6127, 6121, 6125, 6140.[43]

To support the claim that the transactions were fraudulent, the prosecution relied heavily on the fact that the agreements with Scientific Atlanta and Motorola were split into two documents—one involving the increased price Adelphia would pay the companies and one involving the marketing support payments the companies would pay Adelphia. *Id.* at 6150-52. And, by the same token, the manufacturers would write checks back to Adelphia, as opposed to the manufacturers simply crediting amounts due to Adelphia against amounts Adelphia owed.

Mr. Brown testified this was done that way—as opposed to capturing the transactions in one document and one integrated payment—to reduce the chances the auditors might notice what was happening. *Ibid.* This led the prosecution to argue in summation that proof that "marketing support was just a fraudulent transaction" is evident because "they signed and discussed two dummy documents to try to throw the auditors off the track to this wash transaction." Trial Tr., App. 8, at 10,589, 10,585 (AUSA Clark's Summation). The prosecution also sought to prove the fraudulent nature of the marketing support agreements from the fact that Adelphia started putting changed figures on its books even before the time (according to the Government) Adelphia

---

[43] At first glance, agreements calling for Adelphia to pay an increased price per cable box and then receive that increased amount back for marketing support might appear questionable. But the facts show it was entirely reasonable and legitimate. Scientific Atlanta and Motorola (the "manufacturers") were trying to sell their digital equipment to Adelphia's customers. The manufacturers had two choices of how to market the product. They could have expended the marketing funds directly and built that into the cost they charged Adelphia for the equipment. In that event, Adelphia's payments at a higher price for the equipment would be a capital expenditure, which all agree is not accounted for as an expense for EBITDA purposes. The second approach involved the manufacturer telling Adelphia: "pay us less than you would if we were marketing the product ourselves and spend the difference on marketing." In that scenario, Adelphia's capital expenditure would be decreased and its expenses (for marketing) would be increased—even though it was, in actuality, paying the same net amount for the equipment and marketing as it would in the first scenario. This skewed EBITDA as compared to the first (functionally equivalent) approach. The new marketing support agreements modified the transactions in ways that reflected reality. Consistent with its competitors' practices, these agreements enabled Adelphia to treat the marketing expenditures and reimbursements in a way that accurately and fairly reflected its EBITDA.

discussed the subject with the manufacturers. Trial Tr., App. 50, at 6119-23, 6131-35 (Brown Testimony).

Ultimately, the "marketing support" evidence was vital to the case against the Rigases. Not only did it relate to the securities fraud and conspiracy counts, but the issue of EBITDA-manipulation through marketing support was part of the bank fraud claim.[44] The maximum statutory sentence for bank fraud is 30 years (18 U.S.C. § 1344), as opposed to the 10-year maximum on the securities fraud counts that applied at the time of the conduct here (15 U.S.C. § 78ff (1998)), so the bank fraud count was necessary to the 17-year and 12-year sentences imposed on Tim and John Rigas, respectively.

### B. Information Emerging Post-Trial

Shortly following the trial, two high-ranking officials from Scientific Atlanta and Motorola testified in civil depositions. App. 70, Deposition of John Wharton (Dec. 22, 2005); App. 71, Deposition of John Tracy (Nov. 28, 2005). The Government had not called either of them—or anyone else from Scientific Atlanta or Motorola—as witnesses at trial.

John Wharton (the sales finance person who supported North American Sales for Scientific Atlanta) testified in the deposition that Adelphia had never "created" any sort of marketing support program, much less scheme. Rather, Scientific Atlanta's arrangement with Adelphia tracked precisely the agreement Scientific Atlanta had already negotiated with an entirely separate cable company, Charter Cable Company (an Adelphia competitor). App. 70, Wharton Deposition at 131-32. Likewise, John Tracy (Vice President of Finance at Motorola) testified that Motorola used the Charter Cable model in drawing up its marketing support agreement with Adelphia. App. 71, Tracy Deposition at 23-25, 121-24, 144-57. Significantly,

---

[44] The Second Circuit upheld a bank fraud count based on the evidence that the EBITDA manipulations had the effect of generating a materially better leverage ratio for Adelphia, thus allowing it to pay lower interests rates under its agreements with various banks. *Rigas*, 490 F.3d at 230-37.

they both testified that the marketing support agreements (going back to the agreements with Charter) had been internally vetted and approved within their respective companies by executives, lawyers, and/or auditors. *Ibid.*; App. 70, Wharton Dep. at 45-48, 127-31. This testimony directly refuted the allegation that Adelphia had "created" the marketing support program in some sinister way to "fool the auditors."

On December 7, 2007, Petitioners brought a motion to compel the Government, pursuant to *Brady,* to tender any interview notes it possessed regarding Scientific Atlanta and Motorola personnel. In response to that latter Motion, the Government simply declared in conclusory fashion that "[t]here was no *Brady* disclosure triggered by any such witnesses whom the Government interviewed." App. 13, Gov. Mem. of Law in Opp. to Motion to Compel at 6 (Dec. 26, 2007). At that time, Petitioners had no evidence that the Government actually had learned any material exculpatory evidence relating to the marketing support allegations. The District Court denied the motion, explaining:

> [D]efendants' brief in support of their Rule 33 Motion documented their attempts to speak with these witnesses, and thus they cannot claim now that they were unaware of these witnesses' identities. As this Court noted in its November 20, 2007 Opinion, the Rigases did not take any steps to procure testimony from these witnesses, such as seeking immunity for the witnesses or subpoenaing them, and thus cannot now backtrack and claim that they were unaware of these witnesses' identities.

App. 14, *United States v. Rigas*, No. 02-CR-1236, 2008 WL 144824, at *2 (S.D.N.Y. Jan. 15, 2008). The Second Circuit affirmed. App. 11, *Rigas*, 583 F.3d at 124-26 (2nd Cir. 2009). On the *Brady* claim, the Court stated only, "'[w]e detect no error" in the District Court's order. *Id*. at 126.

### C.     Depositions in 2014

In 2014, Petitioners informed this Court that three witnesses from Scientific Atlanta and Motorola recently had testified in civil depositions about the relevant events. App. 73, Letter to

Hon. Kimba M. Wood, March 24, 2014, ECF No. 34.  Petitioners explained that these witnesses (Wallace Haislip, John Wharton and John Tracy) not only provided accounts highly exculpatory of the Rigases, they also testified they had told all of this exculpatory information to the prosecution before the Rigases' trial. Based on these depositions, this Court granted Petitioners' request for discovery from the Government regarding Scientific Atlanta and Motorola. App. 74, Order, June 20, 2016, ECF No. 39.

### D. The Materials Secured through Discovery

Through discovery, Petitioners have received eight memoranda of pre-trial interviews conducted by the Government between July 2002 and January 2003. They are:

| Name | Date | Entity | Position | Cite |
|------|------|--------|----------|------|
| Patrick Tylka | 8/23/02 | Scientific Atlanta | President of Worldwide Sales | App. 75 |
| Wallace Haislip | 8/23/02 | Scientific Atlanta | Chief Financial Officer | App. 76 |
| David Hansen | 8/28/02 | Scientific Atlanta | National Account Director | App. 77 |
| Thomas Nilson | 9/13/02 | Scientific Atlanta | V.P. & Manager, North America Sales | App. 78 |
| John Simons | 9/25/02 | Motorola | Sales Director | App. 79 |
| John Wharton | 10/10/02 | Scientific Atlanta | Finance Director For Financial Planning and Analysis | App. 80 |
| Marc Rothman | 12/13/02 | Motorola | V.P./Dir. of Finance for Broadband Sector | App. 81 |
| Anita Gifford | 1/24/03 | Scientific Atlanta | Vice President of Law Division & Deputy General Counsel | App. 82 |

The accounts these witnesses provided to the Government prior to trial consistently and unambiguously refuted Mr. Brown's testimony and the Government's accusations.

The Government was told during the interviews that Adelphia approached Scientific Atlanta asking for a Marketing Support agreement similar to agreements Scientific Atlanta and

Motorola already had entered into with one of Adelphia's competitors, Charter Communications. *See* App. 82, Gifford Interview at 1506, 1508; App. 75, Tylka Interview at 1454; App. 78, Nilson Interview at 1486; App. 80, Wharton Interview at 1493; App. 77, Hansen Interview at 1475. It was not surprising to Scientific Atlanta that Adelphia knew about the Charter agreement because the "cable industry is a small one and . . . people in the industry talk with one another." *Ibid*. Given Adelphia's "Most Favored Nation" agreement that entitled it to terms as favorable as any customer received, it seemed reasonable Adelphia would be seeking market support agreements along the same lines that Charter has received. *See* App. 78, Nilson Interview at 1483; Gifford Interview at 1503.[45]

Although Adelphia had originally proposed using a contract it drafted and sent, Scientific Atlanta persuaded Adelphia that the contracts should be modeled precisely after the ones developed with Charter. *See* App. 82, Gifford Interview at 1507. Indeed, Scientific Atlanta sent Adelphia a draft of the proposed agreement that simply had the names and amounts associated with the Charter deal blacked out. *See ibid.*; App. 80, Wharton Interview at 1495. The reason Scientific Atlanta insisted on using the Charter contracts was that Scientific Atlanta's accountants and legal department had vetted those closely and the Scientific Atlanta executives were, therefore, confident about their legality and propriety. *See* App. 80, Wharton Interview at 1491-92, 1495; App. 82, Gifford Interview at 1505, 1507.

At trial, the Government argued that fraud was obvious because the agreements were effectuated through two separate documents that did not cross-reference one another. *See supra* 58-59. But the Government had repeatedly learned before trial that this was not at all the case. Part of the very approach that had been vetted by Scientific Atlanta's and Motorola's lawyers

---

[45] As Mr. Wharton would later explain, other companies such as Comcast and Time Warner also had similar marketing support agreements. App. 70, Wharton Deposition at 126-31. This information would have come out had the defense been in a position to call Mr. Wharton and other similar witnesses to the stand.

and auditors with respect to the Charter agreement was the use of two separate contracts—one dealing with the price increase of each unit and one dealing with Charter's marketing support subsidy. Mr. Nilson told the Government the Adelphia agreement used two documents for one simple reason: "[B]ecause two documents had been used for the Charter Communications agreement." App. 78, Nilson Interview at 1485; *see also id.* at 1486 (Adelphia agreed to the two-contract approach when Mr. Nilson said he preferred to use a format previously used). As Mr. Haislip put it, "two documents were needed to support a single contract because that was the format which had been used for the marketing support agreement reached with Charter Communications." App. 76, Haislip Interview at 1469; *see also* App. 82, Gifford Interview at 1505, 1507-08.[46]

None of this had anything to do with deceiving auditors. Indeed, Mr. Wharton explained to the Government that two distinct documents would most certainly not be a way to shield the transaction from scrutiny. He explained, "any reasonable finance person . . . could link the documents despite a lack of internal reference." App. 80, Wharton Interview at 1493.

The witnesses made it clear to the Government that there was always an insistence on approval by both sets of auditors—Scientific Atlanta's and Adelphia's. App. 76, Haislip Interview at 1468. Mr. Wharton explained that Mr. Brown pressured Scientific Atlanta to complete the final documents by November 13, 2000. App. 80, Wharton Interview at 1495. That was the day the Audit Committee was meeting. App. 98, Minutes of Audit Committee at 2. So, it turns out, that Mr. Brown was not trying to keep the two sets of documents from the auditors; he was pressuring Scientific Atlanta for the documents precisely so he could share them with

---

[46] One advantage for Scientific Atlanta and Motorola of proceeding with two contracts was eliminating the need to adjust invoices on a monthly basis in connection with sales of each unit, as the marketing support payments could be made independently on a quarterly basis. *See* App. 75, Tylka Interview at 1455.

Adelphia's auditors. And the payment system used—one check going in and another going out—was the last thing one would do if trying to avoid auditors' attention. This is all in keeping with Mr. Brown's having explained to Scientific Atlanta that Adelphia's auditors were comfortable with the program. App. 77, Hansen Interview at 1478. Documentary evidence confirms Adelphia had been working closely with its auditors on the marketing support arrangement. *See, e.g.*, App. 99, August 21, 2000 Memorandum from Ivan Hoffman to Tim Werth; App. 99, August 24, 2000 Memorandum from Ivan Hoffman to Tim Werth.

On this issue and others, the Scientific Atlanta executives (including one lawyer) repeatedly told the Government that Scientific Atlanta was adamant about carrying out the transactions in ways acceptable to its auditors and lawyers. *See* App. 76, Haislip Interview at 1466, 1468, 1469; App. 80, Wharton Interview at 1491-92, 1495; App. 82, Gifford Interview at 1505, 1507. It is ironic that the two-contract method, chosen precisely because it had been cleared by lawyers and accountants, was used at trial as affirmative proof of a scheme to "fool the auditors."

Along these lines, several individuals told the Government about Scientific Atlanta's insistence that the deal only go through if the amount of marketing support actually reflected Adelphia's true marketing expenditures. This began at the negotiation stage when Mr. Haislip rejected Mr. Brown's demand for marketing support in the range of 50 percent. Mr. Haislip told the  Government that "he gives each contract a test of 'commercial reasonableness,'" when negotiating contracts, and made it clear that the figure Mr. Brown was pushing was entirely unacceptable. *See* App. 76, Haislip Interview at 1466-67; App. 77, Hansen Interview at 1478. When Mr. Brown became threatening and vulgar in response, Mr. Haislip insisted on speaking

with Tim Rigas to reach a commercially reasonable figure. *See* App. 76, Haislip Interview at 1468; App. 80, Wharton Interview at 1494.

As for the general practice of marketing support agreements, Mr. Haislip told the Government that marketing support is common within the television industry and was reasonable here. App. 76, Haislip Interview at 1466, 1468. Scientific Atlanta understood Adelphia's proposal was designed to boost its EBITDA, but that was entirely appropriate, provided the deal reflected amounts spent that were properly attributable to marketing support. *See Id*. at 1467-68.

Although some of those interviewed told the Government they were skeptical at first about whether Adelphia would actually spend the money on marketing, those concerns were dissipated once they focused on Adelphia's marketing plan. *See* App. 76, Tylka Interview at 1452, 1457; App. 76, Haislip Interview at 1469-70. Part of that plan involved Adelphia periodically reporting back to Scientific Atlanta on its marketing efforts. *See* App. 80, Wharton Interview at 1496-98. In that regard, when Scientific Atlanta requested documentation that Adelphia was actually spending the money on marketing, Adelphia's Tim Werth sent Mr. Wharton "a financial statement for the quarter ending September 30, 2011, which reflected that [Adelphia] spent $25 million to $26 million per quarter on marketing." *See* App. 80, Wharton Interview at 1498. This was fully in keeping with expectations.

For some reason, the discovery material the Government has tendered deals mostly with Scientific Atlanta, as opposed to Motorola. But two memoranda of interviews involving Motorola were disclosed. In one of those interviews, Motorola's Marc Rothman told the Government that Motorola was unwilling to proceed with the marketing support program unless its legal department signed off on it, and unless it learned that Adelphia's auditors were on board—which Tim Werth reported to be the case. App. 81, Rothman Interview at 1500.

A richer source of information about the Motorola agreement can be found in the March 12, 2014 civil deposition testimony of John Tracy, who served as Motorola Communication's Vice President of Finance. Mr. Tracy testified that he was examined by the Government in 2002 or 2003 in an all-day session, and specifically identified Christopher Clark, the lead prosecutor in the Rigas case, as a person who asked questions. App. 83, Tracy Deposition at 6-7, 50. This account is confirmed by Mr. Tracy's 2005 testimony before the SEC. In that hearing, Mr. Tracy testified he had been interviewed by the United States Attorney's Office in "[e]nd of 2002. September 2002." App. 84, Testimony of John Tracy at 274-75.[48]

In his 2014 deposition Mr. Tracy testified that he had explained to the prosecutor in 2002 that the marketing support agreements were not some Adelphia concoction, but were based on existing contracts between Motorola and Charter Communications. App. 83, Tracy Deposition at 17-18; *see also* App. 71, Tracy Deposition at 167. Mr. Tracy provided a copy of the Charter agreement to the group responsible for vetting Adelphia's similar request—a group that included "my boss, the CFO, all through the General Counsel and Legal. They even used outside counsel for various reasons." App. 71, Tracy Deposition at 19; *see also* App. 84, Tracy Deposition at 59, 152. These lawyers and others determined that the agreement—including the increased price for equipment and a subsidy for marketing support—was acceptable. Mr. Tracy and others were also told by Tim Werth that Adelphia's auditors "were okay with" the agreements. App. 83, Tracy Deposition at 21; *see also* App. 71, Tracy Deposition at 41-43, 83-85, 158.

---

[48] As indicated above (*supra* note 6), Petitioners are not relying in this Motion on the argument that the Government had a *Brady* duty to tender exculpatory evidence in the SEC's possession. For now, Mr. Tracy's testimony before the SEC is cited only to establish that he was, in fact, interviewed by the United States Attorneys' Office, whose *Brady* duty is not subject to question. It is troubling, though, that the Government has been unable to locate notes of the prosecutors' interview with Mr. Tracy. Given that unexplained ability to produce those notes, Mr. Tracy's testimony in his various depositions should be treated as accurately replicating what he told the prosecutors.

Mr. Tracy further told the Government in 2002 that Motorola's agreement with Adelphia was drafted by Motorola: "I think Adelphia had an agreement to start with, and we changed it to be consistent with the one we had from Charter." App. 83, Tracy Deposition at 23. As with the Charter agreement, Motorola used two separate contracts—one dealing with the new equipment price and one with marketing support payments. *Id*. at p. 23-25.

### E.    The Evidence About the Timing of the Discussions

The indictment alleged that Tim Rigas and Mr. Brown began recording the marketing support payments on Adelphia's books in August 2000, even though it was only in late October 2000 when, in an effort to give the appearance of legitimacy to those entries in Adelphia's books, discussions began with Scientific Atlanta and Motorola "in the hope of reaching an agreement for marketing support payments to Adelphia." App. 1, Indictment at ¶ 115. Throughout Mr. Brown's testimony, the prosecution stressed this timing, with Mr. Brown testifying that as of the summer of 2000, "[w]e hadn't had any discussions with them yet."  Trial Tr., App. 50, at 6128; *see also id.* at 6131, 6134. Although he admitted in cross-examination that there possibly could have been earlier conservations between Adelphia and the companies (Trial Tr., App. 69, 7298-99), no witness ever contradicted Mr. Brown's testimony.

The defense sought to admit as an exhibit (Def. App. 85, Trial Ex. 12,266 at 1) an August 11, 2000 internal Scientific Atlanta e-mail about its having the go-ahead for a marketing agreement with Adelphia, like Charter's. *See* Trial Tr., App. 86, at 9497.  This, the defense argued, exposed the fallacy of Mr. Brown's claim that the first conversations occurred in October 2000. The prosecution fought admission of the exhibit, claiming "there's no reason, either in the record or in this email, that that's not consistent" with Scientific Atlanta having unilaterally planned to offer a marketing agreement in August, but never having discussed it with Adelphia at

that time. *Id*. at 9549-50. The Government stated that if the defendants wished to prove differently, "they should call" witnesses from Scientific Atlanta. *Ibid.*

The discovery the Government now has produced establishes that the prosecutor who told this to the court was the same prosecutor who conducted the interviews with Scientific Atlanta officials who refuted his contention. For example, Thomas Nilson had told the prosecutor how the subject of marketing support first came up at a tradeshow during the summer of 2000, when Dan Liberatore of Adelphia proposed the arrangement. *See* App. 78, Nilson Interview at 1483-84. In response, Mr. Nilson recommended arranging talks on the subject at the annual fishing trip Scientific Atlanta sponsors in June or July. *Id.* at 1484. Another Scientific Atlanta official told the prosecutor that during that July 2000 fishing trip, Dan Liberatore had received a phone call from someone at Adelphia "asking him to explore the possibility of [Scientific Atlanta's] entering into a marketing support agreement with [Adelphia] similar to an agreement [Scientific Atlanta] had with Charter Communications." App. 77, Hansen Interview at 1474-75.

Despite knowing this, and despite having Mr. Brown testify to an account that flatly contradicted these neutral accounts, the prosecution (a) never made *Brady* disclosure of any of the documents that would have disproved Mr. Brown's account and the allegation of the indictment; (b) affirmatively (and, at best, disingenuously) told the Court that Scientific Atlanta might well have been thinking about marketing support in the summer without Adelphia's knowing about that until October; and (c) then had the gall to chide the defense for not calling the witnesses who would have been called had it not been for the prosecution's *Brady* violation.

The existence of that internal Scientific Atlanta e-mail did lead Judge Sand to formulate a stipulation that "the internal files of Scientific Atlanta reflect that as of August 11 consideration was being given to the drafting and submission to Adelphia of a marketing support agreement."

Trial Tr., App. 8, at 9546, 9565. But, as the prosecution had urged, the stipulation said nothing about Adelphia's involvement in the process during that summer (indeed, it simply spoke of Scientific Atlanta considering drafting and submitting a proposal). On the available record, that stipulation may have been fair. But the withheld *Brady* material would have established that it was Adelphia that initiated the discussion in July 2000—directly contrary to the prosecution's and the indictment's charges. Standing alone this violation supports relief.

F.      **The Government's Responses Do Not Mitigate the Impact of the *Brady* Violation with Regard to the Marketing Support Agreements**

When the Government earlier argued against discovery on marketing support, its primary substantive contention was that even if the marketing support agreements originated with another cable company, that "does nothing to undercut that the true purpose and effect of the 'marketing support' agreements was not disclosed to investors." App. 100, Letter from AUSAs Damian Williams and Brian Blais to the Hon. Kimba Wood, at 2-3 (August 29, 2014) (ECF 49). And the Government contended that the approval of these agreements by auditors [or lawyers] at Motorola and Scientific Atlanta "would have no bearing on whether these agreements were booked at Adelphia with the intent to mislead investors." Letter to Judge Wood 3, ECF No. 49.

This argument ignores the bedrock principle that the prosecution had the burden of showing Petitioners' actual intent to defraud. *See Rigas*, 490 F.3d at 233 n.34 ("[T]he Government had to prove Defendants' intent to defraud."). The Government used the two-separate-contract argument, the timing issue, and arguments about the general nature of marketing support to convince the jury of that fraudulent intent. The *Brady* information improperly withheld from the defense—information that would have enabled it to call those witnesses—would have refuted the Government's evidence and arguments. There is—at the very least—a reasonable probability that a jury exposed to this information would have concluded (a)

the marketing support approach was not a diabolical Adelphia concoction; (b) use of two documents actually proved intent to comport with the law, not to hide fraud; and (c) that the argument that Adelphia never even approached the manufacturers until well after it began booking the new agreements was flatly wrong. It is difficult to understand how the Government can dismiss all that as inconsequential to the jury's assessment of whether Petitioners subjectively engaged in fraudulent conduct with regard to marketing support.

In addition, rebutting Mr. Brown's testimony on these claims would have shown the jury he was not testifying truthfully—a showing that would have weakened (and, in many instances, negated) many of the prosecution's counts. *See Giglio v. United* States, 405 U.S. 150 (1972) (prosecution must disclose evidence that could be used to challenge the reliability and credibility of a prosecution witness); *United States v. Coppa*, 267 F.3d 132, 139 (2nd Cir. 2001) ("Favorable evidence includes not only evidence that tends to exculpate the accused, but also evidence that is useful to impeach the credibility of a Government witness.").

The Government has also argued that the issue is controlled by Judge Sand's ruling that the witnesses in question were not "unavailable" because the Rigases could have subpoenaed them or sought immunity in order to call them. This reasoning confuses whether evidence is "newly discovered" for purposes of a Rule 33 Motion with the very separate question of the prosecution's duties under *Brady*. It is circular to argue that the defense's decision not to subpoena a witness is a knowing and strategic choice that negates the prejudice from the prosecution's having withheld the very material to which the defense was entitled in order to make those choices. A prosecutor may not withhold *Brady* material and then seek refuge in the fact that the defense—without benefit of that material—never called the witnesses in question.

IV. **PETITIONERS ARE ENTITLED TO RELIEF BASED ON THE *BRADY* VIOLATIONS RELATED TO SUBSCRIBER NUMBERS**

The Government also built its case on the claim that the Rigases, in another effort to make Adelphia appear to be performing better than it was, had fraudulently inflated Adelphia's reporting on the numbers of Adelphia cable subscribers in 2000 and 2001. The dispute on this claim turned in large part on determining the method of counting "equivalent bulk units" ("EBUs")—apartment buildings or complexes with multiple individual subscribers. Even though there are many subscribers in such units, the building or complex manager pays only one bill for the entire complex. This makes counting the number of subscribers quite challenging, and within the industry there are different accepted methods for estimating the number of individual subscribers within these bulk units (Trial Tr., App. 87, at 5497 (testimony of Karen Chrosniak)).

Karen Chrosniak, who had served as Adelphia's Director of Investor Relations, testified (pursuant to a non-prosecution agreement) as a prosecution witness that Adelphia had consistently used a method called the "prevailing rate" method in counting EBUs and that the numbers Adelphia reported in 2000 and 2001 exceeded what should have been reported under that methodology.[50] *Id*. at 5501, 5508-13. Similarly, Mr. Brown testified that inappropriate additions were made in order to fraudulently increase subscriber numbers. *Id.* at 6264. By contrast, the defense sought to establish that Adelphia had used different industry-accepted methods of counting and that, under those methods, the reported number was an accurate count of United States subscribers.

---

[50] By way of background, the "prevailing rate" method will, by definition, yield a lower number of subscribers than is actually the case because it uses the demonstrably false assumption that buildings or complexes pay the same rate per individual unit that individual subscribers pay. The falsehood of that assumption lies in the fact that building or complex bulk units are securing service at a lower wholesale rate than the retail rate an individual subscriber pays. To illustrate, although individual subscribers might pay $25 per month at the retail level, it is not all the case that a building or complex paying $25,000 is paying for only 1,000 subscribers. This is because the $25,000 charge reflects lower rates per subscriber. If one assumes, for example, that the "wholesale" rate is $22.00 per estimated number of units, that $25,000 would reflect 1,136 subscribers.

Following the criminal trial, Petitioners learned about an August 9, 2002 letter from Adelphia's counsel to the Government. Adelphia at that time was cooperating fully with the Government and no Rigases remained involved. This letter refutes Ms. Chrosniak's and Mr. Brown's testimony by making it clear that Adelphia had *not* traditionally used the prevailing rate method, but that it was *only then* (in August 2002) going to start including that method in its reporting (in addition to the "Subscriber Accounts" number it had been using). The letter states:

> Historically, Adelphia calculated its number of subscribers by counting the number of households (or in the case of households with multiple billing accounts, the number of accounts) that receive signals from its cable system (the "Subscriber Accounts"). . . . The Company's new management intends to improve the quality of the Company's public disclosure. In connection with that effort, the Company intends to report two different subscriber numbers—the Subscriber Accounts and the "Equivalent Subscribers." Equivalent Subscribers is a notional number that in general is obtained by dividing the total revenue for basic cable services in each market by the prevailing rate in the market. The difference between Subscriber Accounts and Equivalent Subscribers results principally from bulk billing for multiple dwelling units.

App. 88, Letter to U.S. Att'y Office (Aug. 9, 2002) at 30 n.1.

This description is directly contrary to Ms. Chrosniak's and Mr. Brown's testimony that Adelphia exclusively used a prevailing rate method and Adelphia (through the Rigases) had then added inappropriate categories of subscribers to fraudulently increase subscriber numbers.[51] Had the defense been provided the August 9 letter, it would have given rise to powerful cross-examination of Ms. Chrosniak and Mr. Brown, and would have enabled the defense to call a witness from Adelphia on this point. As it stood, no one from Adelphia was allowed to speak with the defense (by Adelphia edict—in coordination, Petitioners allege, with the Government).

---

[51] Not surprisingly, when Adelphia's new board first reported subscribers based on both figures in November 2002—using its historical traditional method and using the new "prevailing rate" method—the traditional method yielded an estimate of about 400,000 (or 8%) higher than the prevailing rate method's estimate. As indicated, this is what one would expect because the "prevailing rate" method underestimates the number of actual subscribers. *See supra* n. 50.

The materiality of this issue is highlighted by the ways in which defense efforts to prove the legitimacy of its reporting were stymied. To show at trial that Adelphia's 2000 and 2001 reports were consistent with its historic method of counting, the defense sought to introduce a 10-K issued by the new Adelphia Board on June 10, 2002. That 10-K showed a subscriber figure substantially similar to the one that the earlier Rigas-controlled Board had announced. But the Government successfully fought admission of that 10-K, arguing that the new 10-K was using a counting method different than what Adelphia had been using earlier: "You can make an examination and if you use different criteria, you may come up with a different number." Trial Tr., App. 87, at 5531, 5540. The August 9 letter the Government had in its possession, but did not disclose, exposes the disingenuousness of that argument. That letter establishes that the method used in that 10-K was not a new method—it was precisely the same method that Adelphia historically used, as Petitioners sought to show at trial.

This *Brady* violation infected the entirety of the accusations of misreporting subscriber numbers. The Government argued that, because the actual number of United States subscribers was under the number Adelphia wanted to report, Adelphia fraudulently added other categories of subscribers, such as those in other countries. Trial Tr., App. 8, at 10,576-84 (AUSA Clark's Summation). The defense needed to prove that the report on United States subscribers was not inflated (under the method used), which would negate the Government's claims about subscriber numbers.

## CONCLUSION

In *Mahaffy*, the Second Circuit expressed "frustration" with the decision of the United States Attorneys' Office for the Southern District of New York to withhold the *Brady* material. *Mahaffy*, 693 F.3d at 133 n.12. The Court deemed the violation "entirely preventable" and

bemoaned how Government's failure to disclose the evidence "negatively impacted the case in two distinct but related ways" (both of which apply also to the Rigases' case):

> First, the two trials were both unfairly skewed against the defendants, who were forced to mount their defenses without the benefit of material exculpatory and impeaching sworn testimony. Second, the costs of this litigation—in terms of personal, financial and judicial resources and time—have ballooned as a result of the two trials, post-verdict litigation, and two appeals to this court.

*Id*. at 133.

The Court in *Mahaffy* recognized that the only remedy for these violations was reversal of the convictions. That is precisely the case here as well. The prosecutors told the Second Circuit in this case that the Government takes its *Brady* "responsibility seriously, and it fully recognizes the potentially drastic remedies that exist for failure to abide by these constitutional obligations (*e.g.*, reversal of a conviction)." App. 16, Br. of Government-Appellee at 113, *Rigas*, 583 F.3d 108 (No. 08-3485) at 121-22.  That is the remedy called for here.

For the reasons stated herein, Petitioners request that the Court grant relief on the *Brady* claims raised here and vacate their sentences pursuant to 28 U.S.C. § 2555.

 /s/ Lawrence C. Marshall
Lawrence C. Marshall
*Admitted Pro Hac Vice*
Stanford Law School
Stanford, CA 94305
(657) 723-7572

APRIL 28, 2017
(Corrected Copy, May 3, 2017)