UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   X

JOHN J. RIGAS and TIMOTHY J. RIGAS,                    :

                                :   11 Civ. 6964 (KMW)
                  Petitioners,        02 Cr. 1236 (KMW)
                                :

      - v. -                                           :

UNITED STATES OF AMERICA,                               :

                      Respondent.        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   X

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
IN OPPOSITION TO GROUND ONE OF THE PETITIONERS'
FIRST AMENDED PETITION FOR A WRIT OF HABEAS CORPUS
UNDER 28 U.S.C. § 2255**

                              JOON H. KIM
                              Acting United States Attorney for the
                              Southern District of New York
                              Attorney for the United States of America

Brian Blais
Damian Williams
Jessica Greenwood
Aline R. Flodr
Assistant United States Attorneys
– Of Counsel –

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND ...........................................................2

A.    THE INDICTMENT/SUPERSEDING INDICTMENT ....................................................2

B.    THE GOVERNMENT'S CASE AT TRIAL ..................................................................3

C.    THE DEFENSE CASE ...........................................................................................5

D.    THE TRIAL & JURY VERDICT ..............................................................................5

E.    THE FIRST SENTENCING .....................................................................................5

F.    THE INITIAL APPEAL ..........................................................................................7

G.    THE NEW TRIAL MOTION ...................................................................................7

H.    THE MOTION TO COMPEL DISCOVERY ................................................................8

I.    THE RESENTENCING .........................................................................................10

J.    THE SECOND APPEAL ........................................................................................10

K.    THE 2255 PETITION & MEMORANDUM .............................................................11

THE GOVERNMENT COMPLIED WITH ITS *BRADY* OBLIGATIONS .....................12

A.    APPLICABLE LAW .............................................................................................12

   1.   Legal Standard for Habeas Relief ................................................................12

   2.   Legal Standard for Attacking A Conviction To An Alleged Brady Violation ............12

B.    DISCUSSION .....................................................................................................15

   1.   There Was No *Brady* Violation with Respect to the Rothenberger Notes ..................17

      a.    The District Court Has Already Rejected the Rigases' Claims  Relating to
            Rothenberger ................................................................................17

         i.    *The 13-D Allegations and "Immediately Available Funds"* ................................26

i

ii.   *The 10-K Filing* ............................................................................................36

iii.   *The Related Party Transactions* ..........................................................39

iv.   *The Golf Course Project* ..................................................................41

2.   There Was No *Brady* Violation with Respect to the Scientific Atlanta & Motorola Interviews ............................................................................................49

   a.   Background ..........................................................................................50

   i.   *The Indictment* ..........................................................................50

   ii.   *Trial Testimony, Stipulation, and Summation* ........................52

   iii.   *The Scientific Atlanta and Motorola Interview Notes* ............57

   b.   Judge Sand Rejected the Rigases' Claims Relating to Scientific Atlanta & Motorola ............................................................................62

   c.   The Scientific Atlanta & Motorola Interviews are Not Materially  Exculpatory .....64

   d.   The Scientific Atlanta & Motorola Interviews were not Suppressed  Because the Rigases Knew the Identity of These Witnesses and the  Essential Facts Concerning Their Potential Testimony ..........................................................68

3.   There Was No *Brady* Violation with Respect to the Letter from Adelphia Management ..........................................................................................70

4.   Ground One of the 2255 Petition Should Otherwise be Denied ..................................74

**CONCLUSION** ..........................................................................................**75**

# TABLE OF AUTHORITIES

## CASES

*Adelphia Communications Corp. v. Deloitte & Touche LLP*, No. 02-000598 (Pa. Ct. Com. Pl. Phila. Co. 2002) ..................................................................................... 18

*Badalamenti v. United States*, 201 F.3d 430 (2d Cir. 1999) ....................................... 13

*Baez v. United States*, 96 Cr. 257 (DAB), No. 02 Civ. 8703 (DAB), (S.D.N.Y. Jan. 19, 2005) ............................................................................................................... 23, 24

*Brady v. Maryland*, 373 U.S. 83 (1963) ............................................................... *passim*

*Cabrera v. United States*, 972 F.2d 23 (2d Cir. 1992) ................................................ 12

*Campino v. United States*, 968 F.2d 187 (2d Cir. 1992) ............................................. 12

*Chin v. United States*, 622 F.2d 1090 (2d. Cir. 1980) .......................................... 18, 24

*Doe v. N.Y.C. Dep't of Soc. Servs.*, 709 F.2d 782 (2d Cir. 1983) .............................. 18

*Foster v. Chatman*, 136 S. Ct. 1737 (2016) ............................................................... 18

*Hill v. United States*, 368 U.S. 424 (1962) ................................................................ 12

*Lamberti v. United States*, 22 F. Supp. 2d 60 (S.D.N.Y. 1998) ................................. 13

*Restrepo v. United States*, 533 F. Supp. 2d 359 (S.D.N.Y. 2008) ....................... 13, 14

*Riascos–Prado v. United States*, 66 F.3d 30 (2d Cir. 1995) ................................. 12, 23

*Sanders v. United States*, 373 U.S. 1 (1963) .............................................................. 23

*Santiago Gonzalez v. United States*, 198 F. Supp. 2d 550 (S.D.N.Y. 2002) ............. 18

*Teague v. Lane*, 489 U.S. 288 (1989) ......................................................................... 25

*Turner* v. *United States* 137 S. Ct. 1885 (2017) ......................................................... 14

*United States* v. *Baez,* 7 F. App'x 91 (2d Cir. 2001) .................................................. 24

*United States* v. *Bagley*, 473 U.S. 667 (1985) ........................................................... 13

*United States v. Beasley*, 582 F.2d 337 (5th Cir. 1978)....................................................12, 48

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991)...................................................48

*United States v. Bokun*, 73 F.3d 8 (2d Cir. 1995) ..................................................................12

*United States v. Clark*, 984 F.2d 31 (2d Cir. 1993) ................................................................1

*United States v. Coppa*, 267 F.3d 132 (2d Cir.2001)........................................................11, 13

*United States v. Ebbers*, 458 F.3d 110 (2d Cir. 2006) ...........................................................47

*United States v. Exxon Corp.*, 94 F.R.D. 246 (D.D.C. 1981) ...............................................48

*United States v. Gaggi*, 811 F.2d 47 (2d Cir.1987) .........................................................11, 25

*United States v. Gil*, 297 F.3d 93 (2d Cir.2002) ....................................................................25

*United States v. Kohring* 637 F.3d 895 (9th Cir. 2011) .........................................................14

*United States v. Mahaffy*, 693 F.3d 113 (2d Cir. 2012)....................................................24, 25

*United States v. Matos*, 781 F. Supp. 273 (S.D.N.Y. 1991) ..................................................48

*United States v. Oshatz*, 700 F. Supp. 696 (S.D.N.Y. 1988) .................................................47

*United States v. Owen*, 500 F.3d 83 (2d Cir. 2007) ................................................................8

*United States v. Paulino*, 445 F.3d 211 (2d Cir.2006)...........................................................11

*United States v. Plugh*, 648 F.3d 118 (2d. Cir. 2011) ............................................................18

*United States v. Rigas*, 131 S. Ct. 140 (2010).................................................................11, 16

*United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007) .......................................................*passim*

*United States v. Rigas*, 583 F.3d 108 (2d Cir. 2009) .......................................................*passim*

*United States v. Rigas*, No. 02 Cr. 1236 (S.D.N.Y.)........................................................*passim*

*United States v. Rigas*, No. 05 Cr. 402 (M.D. Pa.) ................................................................11

*United States v. Sanin*, 252 F.3d 79 (2d Cir. 2001) ................................................................25

*United States v. Turkish*, 623 F.2d 769 (2d Cir. 1980) ...........................................................47

*Williams v. United States*, 984 F.2d 28 (2d Cir. 1993) ................................................................. 1

*Yates v. United States,* 354 U.S. 298 (1957) ................................................................. 14

## FEDERAL STATUTES

15 U.S.C. § 78ff ................................................................. 2

15 U.S.C. § 78j(b) ................................................................. 2

18 U.S.C. § 1343 ................................................................. 2

18 U.S.C. § 1344 ................................................................. 2

18 U.S.C. § 1346 ................................................................. 2

18 U.S.C. § 371 ................................................................. 2

28 U.S.C. § 2255 ................................................................. i, 1, 18, 74

U.S.S.G. § 2B1.1 ................................................................. 5, 6

U.S.S.G. § 3B1.3 ................................................................. 6

U.S.S.G. §3B1.1(a) ................................................................. 6

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in opposition to Ground One of the first amended petition for a writ of habeas corpus (Dkt.[1] 128, the "2255 Petition" or "2255 Pet.") filed by Petitioners John Rigas and Timothy Rigas (collectively, the "Rigases") under 28 U.S.C. § 2255, which alleges *Brady* violations by the Government.[2]   Specifically, the Rigases claim that the Government improperly withheld material exculpatory information when it failed to produce: (1) notes of an interview with Carl Rothenberger, the former lead outside corporate counsel for Adelphia; (2) notes of interviews with representatives of Scientific Atlanta and Motorola; and (3) a 2002 letter to the Government from Adelphia's then-counsel.

The Rigases' *Brady* claims are entirely meritless because, among other things, the Rigases ignore prior rulings of the District Court and the Second Circuit on many of the same issues they

---

[1] Given the use of two docket numbers in relation to this single criminal case, and to avoid confusion, filings made under the original criminal docket number and the supplemental civil docket number for the Rigases' habeas petition are cited herein as "Cr. Dkt." and "Dkt." respectively.

[2]  The Rigases refer to the concepts of "summary judgment" and "adjudication of a § 2255 petition[] based on the paper records" interchangeably.  (Pet.'s Mem. of Law in Supp. of their Section 2255 Pet. ("the 2255 Memorandum" or "2255 Mem.") at 1 n.1).  To be clear: the current habeas proceeding is not an ordinary civil matter governed by the Federal Rules of Civil Procedure.  The clerk's office in this district assigns a supplemental civil docket number to a Section 2255 motion as a matter of administrative convenience; however, the Second Circuit has repeatedly made clear that a Section 2255 motion is a motion filed in the criminal case, and not a new civil action.  *See, e.g., United States v. Clark*, 984 F.2d 31, 33 (2d Cir. 1993); *Williams v. United States*, 984 F.2d 28 (2d Cir. 1993); *see also* Advisory Committee Notes to Rule 1 of the Rules Governing Section 2255 Proceedings (on adoption of Rules: "a motion under § 2255 is a further step in the movant's criminal case and not a separate civil action").  As such, the Government's current opposition is styled as a response to Ground One of the 2255 Petition – the ground on which the Rigases now seek judgment "based on the paper record" – rather than a summary judgment response under Federal Rule of Civil Procedure 56.

now seek to re-litigate; they misleadingly quote out-of-context passages from the Rothenberger notes and other documents to suit their claims; and they seek post-trial "constitutional" relief for purported problems that could have been addressed by routine requests for adjournment of trial.

For the reasons set forth below, the Rigases' claims are meritless and this Court should deny Ground One of the 2255 Petition.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.  THE INDICTMENT/SUPERSEDING INDICTMENT

Indictment 02 Cr. 1236 (LBS) was filed on September 23, 2002, and a Superseding Indictment, S1 02 Cr. 1236 (LBS) (the "Indictment"), was filed on July 30, 2003, in 23 counts. (GX App. A, B (Cr. Dkts. 24, 80)).  The Indictment charged numerous offenses relating to the Rigases' (and others') conduct as officers and directors of Adelphia Communications Corporation ("Adelphia").  Count One charged John Rigas, Timothy Rigas, Michael Rigas, and Michael Mulcahey (the "defendants") with conspiracy to commit securities and wire fraud, to submit false filings to the United States Securities and Exchange Commission ("SEC"), to create false business records, and to commit bank fraud, in violation of Title 18, United States Code, Section 371. Counts Two through Sixteen charged the defendants with securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.  Counts Seventeen through Twenty-One charged the defendants with honest services wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1346.  Counts Twenty-Two and Twenty-Three charged the defendants with bank fraud, in violation of Title 18, United States Code, Section 1344.

### B. THE GOVERNMENT'S CASE AT TRIAL

The trial record[3] is described exhaustively in the Second Circuit's first opinion in this case, *United States* v. *Rigas*, 490 F.3d 208, 212-19 (2d Cir. 2007), and will not be repeated here.  Very briefly, the Government called sixteen witnesses at trial, including nine current and former employees of Adelphia and/or the Rigas family.  James Brown, Adelphia's former Vice President of Finance, testified generally about the process Adelphia followed each quarter to increase artificially its reported earnings in order to meet the stock market's expectations and to satisfy its loan covenants with its bank lenders.[4]  (*See, e.g.*, Tr. at 6109-14).  Brown also testified about specific sham transactions approved by the Rigases (*see, e.g.*, Tr. at 6117-70), and about various reports and "hybrid" financial statements that Brown prepared for the Rigases that compared Adelphia's actual results of operations with the higher, fraudulent numbers released to the public.  (*See, e.g.*, Tr. at 6241-57; GX App. V, BB (GX 2403, 6905)).

Several other current and former Adelphia employees testified about payments made by Adelphia on behalf of the Rigas family and described how those transactions were booked in Adelphia's accounting systems.  James Helms, an accountant in Adelphia's treasury department,

---

[3] To assist the Court in resolving the Rigases' claims, which are based in large part on self-serving excerpts and mischaracterizations of the record, the Government is providing the Court with a complete copy of the trial transcript, as well as key exhibits and other court filings.  The trial transcript, the Government's exhibits at trial, and the defendants' exhibits at trial, are cited herein as "Tr."; "GX"; and "DX," respectively.  A CD containing a courtesy copy of the trial transcript is being provided to the Court and defense counsel.  Copies of the cited trial exhibits can be found at Exhibits T through LL in the Government's Appendix, filed contemporaneously herewith.  Other exhibits to the Government's Appendix are cited herein as "GX App."  Exhibits to the Petitioners' Appendix are cited herein as "PX App."

[4] Brown pled guilty, pursuant to a cooperation agreement with the Government, to one count of conspiracy to commit securities fraud, one substantive count of securities fraud, and one count of bank fraud.  (Tr. at 6070-71).

testified about the Rigas family's purchases of $1.6 billion in Adelphia securities between 1998 and 2002.  Helms explained that, in many instances, Adelphia received no payment from the Rigas family for those purchases and accounted for the sales by recording various offsetting payables and receivables among Adelphia and various Rigas family companies to hide the fact that the securities were never paid for.  (*See, e.g.*, Tr. at 4377-93; GX App. HH (GX 11366-A to -E)).  Dennis Coyle, an attorney who was an independent member of Adelphia's Board of Directors, testified about disclosures (and non-disclosures) to the Board concerning various transactions between Adelphia and the Rigas family.[5]  (*See, e.g.*, Tr. at 908, 1122-38).  The Government also called a summary witness, Robert DiBella, who was an accountant retained by Adelphia, following the discovery of the Rigases' fraud, to help prepare Adelphia's restatement of its financial statements.  (Tr. at 8439-40).  DiBella walked the jury through a summary chart of certain information he retrieved from Adelphia's accounting records.  That chart, Government Exhibit 101, showed that as of April 30, 2002, Adelphia was owed more than $3.1 billion by the Rigas family and various companies owned by the Rigas family.  (*See, e.g.*, Tr. at 8452-8460, 8598).

In addition to testimonial evidence, the Government introduced thousands of pages of Adelphia's business records, including: bank records, wire transfer records, securities purchase records, property records, Adelphia's accounts payable and cash ledgers, general ledger journal

---

[5] Karen Chrosniak, Adelphia's former Director of Investor Relations, testified about the Rigases' roles in approving false press releases (*see, e.g.*, Tr. at 5021-23); false statements contained in presentations made by Timothy Rigas to investors during "road shows" to generate interest in Adelphia's debt and stock offerings (*see, e.g.*, Tr. at 5131-32, 5173-86); and her involvement with Timothy Rigas in inflating subscriber numbers reported to the public (Tr. at 5059-68).  Chris Thurner, who acted as controller for various companies privately owned by the Rigas family, testified about transactions for the benefit of the Rigas family that were paid for by Adelphia but not disclosed in Adelphia's public filings.  Chrosniak, Thurner, and Helms each testified pursuant to a non-prosecution agreement with the Government.  (Tr. at 3221, 4124, 5001).

entries, summary exhibits, and scores of documents signed by the Rigases relating to fraudulent transactions charged in the Indictment.

### C.  THE DEFENSE CASE

Timothy Rigas called no witnesses.  John Rigas called three witnesses – a character witness and two lawyers from Covington & Burling, who testified about prior interviews they conduct with Charles Raptis, a Government witness at trial, in effort to prove that Raptis had made a prior statement inconsistent with his trial testimony.  (Tr. 8861, 8873-84, 8884-96; GX App. II (GX 14104).

### D.  THE TRIAL & JURY VERDICT

The trial began on February 23, 2004, and ended on July 8, 2004, when the jury convicted John and Timothy Rigas of the conspiracy charge in Count One, all of the securities fraud charges, and all of the bank fraud charges.  All of the defendants were acquitted of the wire frauds charged in Counts Seventeen through Twenty-One.

### E.  THE FIRST SENTENCING

Prior to the Rigases' sentencings, the United States Probation Office (the "Probation Office") prepared a Presentence Investigation Report ("PSR" or "Presentence Report") for each defendant.  The Presentence Reports applied the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") to calculate the Rigases' offense level.  After concluding that the base offense level was six, pursuant to U.S.S.G. § 2B1.1, the Presentence Report for each defendant found that: (a) the offense level should be increased 26 levels, pursuant to U.S.S.G. § 2B1.1(b)(1)(N), because the loss resulting from the offense was in excess of $100 million; (b) four levels should be added, pursuant to U.S.S.G. § 2B1.1(b)(2), because the offense involved more than 50 victims; (c) two levels should be added, pursuant to U.S.S.G. § 2B1.1(b)(8)(C), because the offense involved

sophisticated means; (d) two levels should be added, pursuant to U.S.S.G. § 2B1.1(b)(12)(A), because the defendants derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense; (e) two levels should be added, pursuant to U.S.S.G. § 3B1.3 , because the defendants abused a position of public trust in a manner that significantly facilitated the concealment of the offense; and (f) four levels should be added, pursuant to U.S.S.G. § 3B1.1(a), because the defendants were leaders of criminal activity that involved five or more participants and was otherwise extensive.

As a result, the Presentence Report for each of the defendants concluded that his total offense level was 46, his Criminal History Category was I, and his resulting Guidelines range was lifetime imprisonment.  (John Rigas PSR ¶¶ 71-84, 85-87, 119; Timothy Rigas PSR ¶¶ 53-64, 65-67, 93).

On June 20, 2005, Judge Sand sentenced the Rigases.   After hearing exhaustive argument on Guidelines issues, Judge Sand ultimately adopted the findings and conclusions of each Presentence Report (and the Government's sentencing submission), noting that he had "considered the applicable guideline computations, and I believe that they are accurately set forth in the presentence report and in the government's submission."

Ultimately, Judge Sand granted substantial downward variances from the applicable Guidelines range.   Judge Sand sentenced John Rigas to an aggregate term of 15 years' imprisonment, to be followed by three years' supervised release.  He sentenced Timothy Rigas to an aggregate term of 20 years' imprisonment, to be followed by three years' supervised release.

The District Court did not impose a fine, and, in light of a settlement agreement reached among the Government, the Rigases, other members of the Rigas family, and Adelphia, did not

order the Rigases to pay restitution.  The District Court did impose the mandatory special assessments of $1,800 against each defendant.

### F.  THE INITIAL APPEAL

John and Timothy Rigas appealed their convictions, but did not challenge their sentences. On appeal, they argued that: (1) the Government failed to establish a violation of generally accepted accounting principles ("GAAP"), in part by failing to call an accounting expert to testify at trial; (2) the Government improperly introduced accounting expert testimony through accountant Robert DiBella; (3) the evidence on the bank fraud charges was insufficient; and (4) the District Court improperly admitted background evidence of the conspiracy.  On May 24, 2007, the Second Circuit rejected all of the Rigases' arguments except the bank fraud sufficiency challenge as to Count Twenty-Three.  *See generally United States* v. *Rigas*, 490 F.3d 208 (2d Cir. 2007).  On that count, the Court found that the evidence of materiality was insufficient, reversed the convictions, and remanded for resentencing.  *See id.* at 239.

### G.  THE NEW TRIAL MOTION

On July 5, 2007, the Rigases filed a motion and supporting brief seeking a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure (the "Rule 33 Motion"), contending that alleged "newly discovered evidence" of trial perjury by Government witness James Brown would have affected the outcome of their trial.  (*See generally* GX App. C (Cr. Dkt. 384)).  Further, the defendants argued that because certain witnesses refused to cooperate with defense counsel before and during trial, their respective civil deposition testimonies, which impeached Brown, constituted "newly discovered evidence."  (*See, e.g.*, GX App. C (Cr. Dkt. 384), *available at United States* v. *Rigas*, No. 02 Cr. 1236 (LBS), 2007 WL 7331467, at *18 (S.D.N.Y. Oct. 6, 2007)).

7

On November 20, 2007, the District Court denied the Rule 33 Motion.  *See generally*

*United States* v. *Rigas*, No. 02 Cr. 1236, 2007 WL 4145282 (S.D.N.Y. Nov. 20, 2007).  The

District Court ruled that Brown did not commit perjury in the portions of testimony that the Rigases

had highlighted, and that the post-trial deposition testimony upon which the Rigases relied was not

"newly discovered" but rather "newly available" pursuant to *United States* v. *Owen*, 500 F.3d 83

(2d Cir. 2007).  *See Rigas,* 2007 WL 4145282, at *5.  The District Court explained that the steps

defense counsel took to obtain the testimony of these witnesses were insufficient in that defense

counsel neither subpoenaed the witnesses nor requested that the Government grant them immunity.

*See id.*  Accordingly, the District Court concluded that "the Defendants' choice not to pursue this

testimony was a strategic decision, and cannot now form the basis for a new trial."  The District

Court also found that "the jury's verdict would not have been different had it considered the

allegedly conflicting testimony."  *Id.*  These rulings were ultimately affirmed on appeal.  *United*

*States* v. *Rigas*, 583 F.3d 108, 124-26 (2d Cir. 2009), *cert. denied*, 131 S. Ct. 140 (2010).

## H.  THE MOTION TO COMPEL DISCOVERY

On December 4, 2007, the Rigases filed a motion to compel (the "Motion to Compel") the

Government to produce notes of interviews of Carl Rothenberger, Adelphia's lead outside counsel,

representatives of Scientific Atlanta and Motorola, and other witnesses – none of whom were

called by either party during the criminal trial – on the ground that such notes constituted material

that should have been disclosed pursuant to *Brady* v. *Maryland*, 373 U.S. 83 (1963).  (*See generally*

GX App. F, G (Cr. Dkts. 394, 395)).  The Rigases also sought to compel production of notes taken

by SEC staff during its civil investigation of Adelphia.  (*See, e.g.*, GX App. G at 20-24 (Cr. Dkt.

395)).  The Government filed a brief opposing the Motion to Compel on December 26, 2007.  (*See*

*generally* GX App. H (Cr. Dkt. 400)).

On January 15, 2008, the District Court denied the Motion to Compel. *See generally United States* v. *Rigas*, No. 02 Cr. 1236 (LBS), 2008 WL 144824 (S.D.N.Y. Jan. 15, 2008). With respect to any notes of the Government's interview of Rothenberger, the District Court found that the Government was under no obligation to produce the notes, since Rothenberger was not a Government witness at trial. *See id.* at *2. The District Court also found that because the Rigases plainly knew or should have known of Rothenberger's existence and his role in the issues relevant to the criminal trial, the Government's *Brady* obligations had been satisfied. *Id.* In so ruling, the District Court noted that the Government had identified Rothenberger as a witness with potentially exculpatory material on a specified subject matter. *Id.* at *2. The Court further criticized the Rigases' argument that this limited disclosure "'effectively nullified' their information on what his testimony would be," finding that this argument ignored the Rigases' knowledge of relevant facts concerning Rothenberger. *Id.*

As to the other witnesses at issue in the Motion to Compel, including representatives of Scientific Atlanta and Motorola, the District Court rejected the Rigases' argument that the Government had a disclosure obligation "based on the fact that these witnesses gave exculpatory testimony in [a] subsequent civil suit." *Id.* The District Court found that the Rigases had known of these and other witnesses' identities before trial, yet failed to "take any steps to procure testimony from these witnesses, such as seeking immunity for the witnesses or subpoenaing them, and thus cannot now backtrack and claim that they were unaware of these witnesses' identities." *Id.* Judge Sand further concluded that the Rigases' request for the production of notes held by the SEC was meritless because "there was no joint investigation with the SEC, and the United States Attorney's Office cannot be obligated to produce documents in the custody of the SEC." *Id.*

In all respects, the District Court's denial of the Motion to Compel was also ultimately affirmed on appeal.  *Rigas*, 583 F.3d at 125-26.

## I.  THE RESENTENCING

On May 22, 2008, the District Court conducted a resentencing hearing.  On June 24, 2008, with the parties' consent, the District Court imposed sentence on the Rigases via a written opinion. (*See generally* Cr. Dkt. 428).

In that opinion, the District Court observed: "[W]e return to the question before the Court: What sentence alteration, if any, would fairly and adequately reflect the reversal of the conviction on count 23 the sentence for which was concurrent with that on count 22 which was affirmed." (*Id.* at 9)  The District Court concluded that "a minimal adjustment" was appropriate because the "reversal on count 23 did not alter the guidelines . . . More importantly it in no meaningful way altered the seriousness of defendants' crimes, nor the suffering which their conduct inflicted on so many people."  (*Id.* at 8-9).  The District Court then reduced John Rigas's sentence by three years, to 12 years, and reduced Timothy Rigas's sentence by three years, to 17 years.  (*Id.* at 9).

## J.  THE SECOND APPEAL

In their second appeal, the Rigases challenged their new, reduced sentences and the District Court's rulings on the Rule 33 Motion and the Motion to Compel.  The Second Circuit found that the new sentences were procedurally and substantively reasonable, and affirmed the District Court's rulings on the Rule 33 Motion and the Motion to Compel in all respects.  *Rigas*, 583 F.3d at 124-26.  In affirming the District Court's denial of the Motion to Compel the Government's production of "notes from interviews with various witnesses," including Rothenberger and the witnesses from Scientific Atlanta and Motorola, among others, the Second Circuit grounded its analysis in *Brady*:

In addition, the District Court found that the government was not in exclusive possession of any exculpatory information, since defendants knew of Rothenberger's role at Adelphia and the facts about which he could testify; accordingly, *Brady* did not compel disclosure of the government's interview notes with Rothenberger. *See United States* v. *Paulino*, 445 F.3d 211, 224 (2d Cir.2006) ("To establish a *Brady* violation, a defendant must show [*inter alia*, that] . . . the evidence must have been suppressed by the State, either willfully or inadvertently . . ." (internal quotation marks omitted)); *United States* v. *Gaggi*, 811 F.2d 47, 59 (2d Cir.1987) ("[N]o *Brady* violation occurs if the defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory evidence."). *See generally United States* v. *Coppa*, 267 F.3d 132, 140 (2d Cir.2001) ("Although the government's obligations under *Brady* may be thought of as a constitutional duty arising before or during the trial of a defendant, the scope of the government's constitutional duty—and, concomitantly, the scope of the defendant's constitutional right—is defined retroactively, by reference to the likely effect that the suppression of evidence had on the outcome of the trial.").

*Id.* at 125-26.  The Supreme Court later denied certiorari.  *United States* v. *Rigas*, 131 S. Ct. 140 (2010).

### K.  THE 2255 PETITION & MEMORANDUM

The Rigases filed their original 2255 petition on October 4, 2011 (Dkt. 3) and the current 2255 Petition on April 28, 2017 (Dkt. 128).  The Rigases filed a motion seeking judgment on a subset of their Section 2255 claims on April 28, 2017.  (Dkt. 123)  On May 17, 2017, the Rigases filed corrected versions of filings related to their motion for judgment, including a corrected 2255 Memorandum and appendix.  (Dkts. 134-37).

In Ground One of the 2255 Petition, as further detailed in the 2255 Memorandum, the Rigases claim that discovery in a now-dismissed federal criminal tax fraud matter in the Middle District of Pennsylvania, *United States* v. *Rigas*, No. 05 Cr. 402, and subsequent discovery in this proceeding, exposed purported violations of their constitutional rights.  Specifically, the 2255 Memorandum asserts that the Government violated its disclosure obligations under *Brady* v.

*Maryland*, 373 U.S. at 83, this time with respect to three sets of what the Rigases contend was "highly exculpatory" evidence (*see, e.g.*, 2255 Mem. at 46, 61): (1) information relating to, and notes of, the Government's February 2004 interview of Rothenberger, which the Rigases had previously sought in their Motion to Compel; (2) information relating to, and notes of, the Government's pretrial interviews of representatives of Scientific Atlanta and Motorola; and (3) a letter to the Government from the new management of Adelphia, dated August 9, 2002.

For the reasons stated below, the Rigases' *Brady* claims are entirely without merit. Accordingly, Ground One of the 2255 Petition should be denied.

## THE GOVERNMENT COMPLIED WITH ITS *BRADY* OBLIGATIONS

### A. APPLICABLE LAW

#### 1. Legal Standard for Habeas Relief

Collateral relief under Section 2255 is available "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which results in a complete miscarriage of justice.'" *United States* v. *Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (quoting *Hill* v. *United States*, 368 U.S. 424, 428 (1962)). A petitioner may not use a Section 2255 motion to "'relitigate questions that were raised and considered on direct appeal.'" *Riascos–Prado* v. *United States*, 66 F.3d 30, 33 (2d Cir. 1995) (quoting *Cabrera* v. *United States*, 972 F.2d 23, 25 (2d Cir. 1992)). Moreover, a petitioner who has failed to raise an issue on direct appeal may not do so in a Section 2255 petition. *See Campino* v. *United States*, 968 F.2d 187, 190 (2d Cir. 1992) ("failure to raise a claim on direct appeal is itself a default").

#### 2. Legal Standard for Attacking a Conviction for an Alleged *Brady* Violation

The Government has a well-established constitutional duty to disclose material evidence favorable to the defendant, whether or not requested. *See United States* v. *Bagley*, 473 U.S. 667,

675 (1985); *Brady*, 373 U.S. at 87.  This disclosure obligation is not without scope, however.  The *Brady* doctrine "does not require a prosecutor to 'deliver his entire file to defense counsel,' but only to produce information that is material to the defendant's guilt or punishment."  *Restrepo* v. *United States*, 533 F. Supp. 2d 359, 365 (S.D.N.Y. 2008) (citation omitted).  *See also United States* v. *Coppa*, 267 F.3d at 135 ("*Brady* does not, however, require the prosecution to disclose *all* exculpatory and impeachment material; it need disclose only material 'that, if suppressed, would deprive the defendant of a fair trial.'" (citing *Bagley*, 473 U.S. at 675)).

To demonstrate that the non-disclosure of a particular piece of evidence deprived a defendant of a fair trial, the defendant must show that: "(1) the Government, either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the defendant; and (3) the failure to disclose this evidence resulted in prejudice." *Coppa*, 267 F.3d at 140 (citation omitted).  However, "[a] defendant cannot satisfy the suppression requirement if the defendant, directly or through counsel, 'either knew, or should have known, of the essential facts permitting him to take advantage of [that] evidence.'" *Lamberti* v. *United States*, 22 F. Supp. 2d 60, 66 (S.D.N.Y. 1998) (citation omitted), *aff'd*, *Badalamenti* v. *United States*, 201 F.3d 430 (2d Cir. 1999).  As the District Court has already held in this case, "The *Brady* rule is designed to 'assure that the defendant will not be denied access to exculpatory evidence only *known to the Government*.' The government must disclose only 'information which had been known to the prosecution but unknown to the defense.'"  *Rigas*, 2008 WL 144824, at *1 (citations omitted) (emphasis in original).  Furthermore, "[i]n the context of *Brady*, a defendant is deprived of a fair trial only where there is a reasonable probability that the government's suppression affected the outcome of the case, or where the suppressed evidence 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Coppa*, 267 F.3d at 135

(citations omitted); *cf. Restrepo*, 533 F. Supp. 2d at 365 ("The test for 'reasonable probability' is not 'whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'" (citation omitted)).   "To make that determination, [a] Court 'evaluate[s]' the withheld evidence 'in the context of the entire record.'" *Turner* v. *United States* 137 S. Ct. 1885, 1887 (2017).[6]

---

[6] The Rigases cite the *Yates* and *Kohring* decisions in arguing that, because the verdict form used at trial did not include specific interrogatories or jury findings as to each and every misrepresentation or omission alleged by the Government at trial, "materiality must be assessed with reference to any of the theories the Government advanced that could have led the jury to convict Petitioners." (*See* 2255 Mem. at 11). Their reliance on these cases is misplaced.

First, *Yates v. United States* is entirely inapposite here. In *Yates*, the Government alleged that the defendants had engaged in a conspiracy to violate two separate paragraphs of a single offense statute. 354 U.S. 298, 299 (1957). The jury convicted, but the jury's general verdict did not specify what alleged offense conduct it determined was the object of the conspiracy. *Id.* at 311-12. After determining that the statute of limitations barred prosecution under one of the offense paragraphs at issue, and because it was "impossible to tell which ground the jury selected" in convicting on the conspiracy, the Supreme Court reversed. *Id.* *Yates* is irrelevant in this case, where the jury convicted the Rigases using a "Special Verdict Form" in which the jury made findings as to the objects of the charged conspiracy, and the methods by which the Rigases committed securities fraud and bank fraud. (*See generally* PX App. 9 (Special Verdict Form)).

Second, *United States v. Kohring* – in addition to not being binding on this Court – does nothing to change the well-established *Brady* standard set forth herein. In that case, the Ninth Circuit rejected the Government's argument that alleged *Brady* material was *per se* "irrelevant" to the issues at trial because it did not undermine videotape evidence of an act that would have furnished an independent basis for the defendant's convictions. *See* 637 F.3d 895, 902-03 (9th Cir. 2011). The court held that, because the evidence "speaks to the acts that the jury might have relied on in reaching its verdicts," the evidence was "relevant." *See id.* However, the court did not – as the Rigases incorrectly state in their 2255 Memorandum – find that the evidence was necessarily "material" for purposes of *Brady* or *Giglio* and, instead, conducted a materiality analysis, considering *all* of the evidence and theories at trial. *See id.* (noting that "*Brady/Giglio* claims are evaluated collectively"). This approach is entirely consistent with the Supreme Court's most recent description of the requisite *Brady* analysis in *Turner*.

## B.  DISCUSSION

In the 2255 Memorandum, the Rigases again make the very serious allegation that the Government withheld exculpatory evidence in violation of the Rigases' constitutional rights. (2255 Mem. at 1).  The Rigases raise these allegations with respect to information that was produced to them through discovery in the then-pending criminal tax case in the Middle District of Pennsylvania, namely: (1) notes of the Government's February 2004 pre-trial interview of Carl Rothenberger, Adelphia's former lead outside counsel[7]; and (2) an August 2002 letter from Adelphia's counsel to the Government.  (2255 Mem. at 2-3, 5).  The Rigases further contend that the Government withheld exculpatory information produced to them in discovery provided in connection with their 2255 Petition about pre-trial interviews that the Government conducted of individuals from Scientific Atlanta, Inc., and Motorola Communications Corporation.  (*Id.* at 5). In so doing, the Rigases give the back of the hand to the law of the case doctrine, the essential facts doctrine, and the underlying inculpatory nature of these documents.

With respect to the Rigases' first *Brady* claim – relating to information conveyed in the Rothenberger interview – the District Court and the Second Circuit have already held that the Government's *Brady* disclosure relating to Rothenberger was sufficient because the Rigases "knew of Rothenberger's existence, his role at Adelphia, and the facts on which he could [give]

---

[7] Throughout the 2255 Memorandum, the Rigases cite to additional notes memorializing the Government's pre-trial interview of Rothenberger.  (*See* PX App. 20 (Johnson Memorandum); PX App. 21 (Richey Notes); PX App. 22 (McLaughlin Notes); PX App. 23 (McLaughlin Memorandum)).  While these other notes may be relevant to the extent that they corroborate or otherwise inform the meaning of the notes taken by the Government, because these notes were drafted by third parties, may not have been contemporaneous to the interview, and were not in the Government's possession prior to or at the time of trial, the Government had no *Brady* obligations with respect to these notes.  As such, the only notes to which the Government's *Brady* obligations would have even arguably attached are the Government notes.  As explained throughout, the Rothenberger interview—as documented in the Government notes—contained no materially exculpatory information that the Government would have been required to disclose under *Brady*.

testimony." *Rigas*, 2008 WL 144824, at *1, *aff'd*, 583 F.3d 108, 125-26 (2d Cir. 2009), *cert. denied*, 131 S. Ct. 140 (2010).  Nothing in the Rigases' instant briefing alters that legal conclusion. Nor can the Rigases establish any prejudice stemming from the Government's failure to disclose the content of the Rothenberger interview because the notes of the interview are replete with inculpatory, rather than exculpatory, material, as described in further detail below.   Moreover, nothing in the notes changes the fact that the Rigases took no steps to secure Rothenberger's testimony or that the Rigases strategically avoided calling Rothenberger as a witness at trial, even knowing the essential facts about the work Rothenberger did for Adelphia. (2255 Mem. at 2).

Likewise, Judge Sand previously rejected the Rigases' claim that information provided to the Government in pre-trial interviews of certain Scientific Atlanta and Motorola representatives constituted *Brady* material, finding instead that the Rigases knew of these and other witnesses' identities before trial, yet failed to "take any steps to procure testimony from these witnesses, such as seeking immunity for the witnesses or subpoenaing them, and thus cannot now backtrack and claim that they were unaware of these witnesses' identities." *Rigas*, 2008 WL 144824, at *2.  The Second Circuit affirmed this holding on appeal. *Rigas*, 583 F.3d at 125-26.  Like the Rothenberger interview, the Scientific Atlanta and Motorola interviews were overwhelmingly inculpatory and, in any event, were not "suppressed" for purposes of *Brady* because the Rigases were aware of the purportedly exculpatory information at issue at the time of trial – and in fact used that information in cross-examining a Government witness – but made no attempt to call these witnesses at trial. Here, yet again, the Rigases attempt to re-cast a strategic trial decision as a constitutional violation.

In their third *Brady* claim, the Rigases point to an August 2002 letter from then-Adelphia management to the Government, which the Rigases argue contradicts the Government's evidence at trial with respect to their fraudulent manipulation of Adelphia's subscriber numbers.  This

argument is based on a tortured mischaracterization of the letter which, in fact, confirms the Government's fraud theories.

Finally, Ground One of the 2255 Petition generally refers to additional, unspecified *Brady* claims that the Rigases purport to reserve for a later date, at least some of which they refer to only in passing in the 2255 Memorandum.  This is an obvious and meritless attempt to skirt the statutory bar to successive habeas petitions by continuing to add additional claims to the present petition as they occur to counsel over the rest of the Rigases' custodial terms.[8]  Like the Rigases' specific *Brady* claims, this catchall claim should be denied.

### 1.  There Was No *Brady* Violation with Respect to the Rothenberger Notes

#### a.  The District Court Has Already Rejected the Rigases' Claims Relating to Rothenberger

The Rigases seek to re-litigate a matter already presented to Judge Sand and to the Second Circuit on direct appeal, namely, their contention that they should have been provided access to notes of the Rothenberger interview in advance of trial.  In support of those prior contentions, the Rigases advanced the very same arguments that they now advance to this Court.  Relitigation of this already-decided issue is barred by the law of the case doctrine.  Nothing about the fact that the Rigases are now in possession of the actual notes of the Rothenberger interview – the "Feeney Notes," taken by United States Postal Inspector Thomas Feeney – or anything about the contents of the Feeney Notes, changes the conclusion already reached by multiple courts on this issue.

---

[8]  On February 19, 2016, the Government filed a motion to modify John Rigas's term of imprisonment to time served because of his terminal medical condition and limited life expectancy.  (Cr. Dkt. 478).  This Court granted that motion on the same day and modified John Rigas's sentence to time served, to be followed by 6 months of supervised release.  (Cr. Dkt. 479).  As John Rigas has now completed the terms of his sentence, his claims are properly considered only as a petition for a writ of error *coram nobis.*

The law of the case doctrine ensures predictability and stability throughout the course of litigation: "[a]s a general matter, this Court will adhere 'to its own decision at an earlier stage of litigation.'"  *United States* v. *Plugh*, 648 F.3d 118, 123 (2d. Cir. 2011) (quoting *Doe* v. *N.Y.C. Dep't of Soc. Servs.*, 709 F.2d 782, 789 (2d Cir. 1983)).  As a result, a motion under 28 U.S.C. Section 2255 is procedurally barred if used as a vehicle to re-litigate matters that have been raised and decided on direct appeal.  *See Foster* v. *Chatman*, 136 S. Ct. 1737, 1758 (2016) (explaining that as a general rule federal prisoners cannot use motions under 28 U.S.C. § 2255 to attack a decision made on appeal); *see also Santiago Gonzalez* v. *United States*, 198 F. Supp. 2d 550, 554 (S.D.N.Y. 2002) ("Any claim that is raised and argued on direct appeal cannot be re-litigated on collateral review.").  Reconsideration in habeas proceedings of matters decided on direct appeal is proper "only where there has been an intervening change in the law and the new law would have exonerated a defendant had it been in force before the conviction was affirmed on direct appeal."  *Chin* v. *United States*, 622 F.2d 1090, 1092 (2d. Cir. 1980).

The Rigases' Motion to Compel, filed before Judge Sand in December 2007, sets forth much of the same purportedly exculpatory information that they now claim was revealed for the first time by the Feeney Notes.  In particular, in the Motion to Compel, the Rigases cited portions of Rothenberger's deposition transcript in the matter *Adelphia Communications Corp.* v. *Deloitte & Touche LLP*, No. 02-000598 (Pa. Ct. Com. Pl. Phila. Co. 2002), which they characterized as "providing compelling exculpatory evidence regarding the Rigases."  (GX App. G at 10-11 (Cr. Dkt. 395)).  Significantly, the Motion to Compel set forth the allegedly "exculpatory" components of Rothenberger's testimony, including the following three topics:

1) Rothenberger and his firm never raised any potential problems or concerns with the Rigases' 10-K and co-borrowing disclosures because they "did not find anything legally inadequate or deficient in the disclosures." (*Id.* at 11 (citing Rothenberger deposition transcript)). Rothenberger "was comfortable that *the amount of Rigas co-*

*borrowing debt did not need to be disclosed*," and he "*did not think that there was a legal problem with the joint and several liability of the co-borrowers* when the co-borrowing facilities were presented to the Board for approval."  (*Id.* at 11-12 (emphasis added) (citing Rothenberger deposition transcript));

2) Rothenberger "testified that *13-D filings did not need to disclose if money to purchase stock was received from affiliate lenders . . .*  Instead, the ultimate purchasers of stock needed to disclose their source of funds."  (*Id.* at 13).  Had he thought otherwise, "he would have made that disclosure."  (*Id.* (emphasis added) (citing Rothenberger deposition transcript)); and

3) Rothenberger's statements concerning the construction of a golf course using Adelphia funds, on land partially owned by John Rigas, including that the golf course was designed to "attract and retain Adelphia employees" and was part of a larger land-use development project, that Adelphia's board was "aware" of the golf course project, and that Timothy Rigas had "sought Buchanan's advice about the best ownership structure" for the golf course.  (*Id.* at 14-15) (citing Rothenberger deposition transcript)).

Thus, the Rigases presented Judge Sand with the very same arguments now presented to this Court as to why notes of the Rothenberger interview purportedly contained *Brady* material. Judge Sand rejected the Rigases' claims that this information was required to be disclosed under *Brady* because such information was already known by the defendants.  *Rigas*, 2008 WL 144824, at *2.  The Second Circuit, after noting that Judge Sand "found that the government was not in exclusive possession of any exculpatory information, since defendant's knew of Rothenberger's role at Adelphia and the facts about which he could testify," held that it "detect[ed] no error in the District Court's [ ] Order denying the defendants' motion to compel discovery."  583 F.3d at 125-26.  The Rigases' present arguments about whether the Feeney Notes are *Brady* material are thus barred by the law of the case doctrine.  The Rigases have already litigated this issue, advancing the very same arguments now advanced to this Court, and the issue has been resolved against them. They should be barred from relitigating it here.

In fact, the particular claims asserted here were specifically asserted in the Rigases' 2007 Motion to Compel.  With respect to the co-borrowing disclosures in Adelphia's 10-K filings (*see* item 1, *supra*), the Rigases assert in the 2255 Memorandum that "the notes show that Adelphia

19

(through others) sought legal advice about this part of its 2000 10-K from the securities law expert

upon whom it had long relied . . . [t]his withheld information supports the defense's contention

that Petitioners' goal had always been to try in good faith to comply with the applicable securities

laws, not to break them."  (2255 Mem. at 33).  This is precisely the argument the Rigases made in

their 2007 Motion to Compel, quoting swaths of Rothenberger's deposition transcript:

> From 1996 to 2001, Rothenberger understood that Adelphia's
> directors relied on him and his firm to provide legal advice as to the
> adequacy of the 10-K and co-borrowing disclosures . . . But
> Buchanan never raised any potential problems with disclosures
> because its attorneys did not find anything legally inadequate or
> deficient in the disclosures . . . Rothenberger also did not think that
> there was a legal problem with the joint and several liability of the
> co-borrowers when the co-borrowing facilities were presented to the
> Board for approval.

(GX App. G at 11-12 (Cr. Dkt. 395)).  Again, the Feeney Notes contain nothing new on this point,

as the Rigases had thoroughly presented this argument in their Motion to Compel.  Specifically,

the Rigases previously asserted that, "[w]hen Adelphia filed its 2000 10-K, Rothenberger was

comfortable that the amount of Rigas co-borrowing debt did not need to be disclosed.  Even though

he had received a draft 10-K for 2000 that contained the amount of RFE debt, Rothenberger did

not advise the Rigases to amend the disclosure related to their co-borrowing . . . [Rothenberger]

would have called it to the Board's attention if he thought that there was a problem."  (GX App.

G at 11-12 (Cr. Dkt. 395)).   In their 2255 Memorandum, the Rigases raise the very same point

based on the Feeney Notes, that is, that Rothenberger "signed off on the propriety of the language

that was used" in Adelphia's 10-K for 2000, which did not disclose the extent of the Rigases'

liabilities under the co-borrowing agreements.  (*See* 2255 Mem. at 32-33 (quoting PX App. 38 at

2 (Feeney Notes) ("3/01 discuss w/ TW [Timothy Werth], ~DMal [Doug Malone], ~JB [James

Brown] – add language to co-b description in fin stmt footnot – risk disclosure – borrow up to full

amount.")).

The same is true with respect to the 13-D filing (*see* item 2, *supra*) – the Rigases' current contention as to the purportedly exculpatory nature of the information in the Feeney Notes on this topic was already litigated and decided in the Motion to Compel.  In their present memorandum, the Rigases assert: "it was Adelphia's *experienced corporate counsel who drafted the 'affiliate borrowing' language* and believed it appropriate; [and]  . . . in so doing, the lawyer *did not believe it important to contact any Adelphia accountant or personnel to inquire about the sources of the borrowing*—even though he was generally familiar with the co-borrowing facility and the Managed Entities' lack of financial capacity to otherwise fund a large purchase of shares"  (2255 Mem. at 22 (emphasis added)).  However, the specific 13-D filing referenced in the Feeney Notes and cited in the instant 2255 Memorandum – namely, "Form Schedule 13D" filed "1/21/00" "Item 3: Source & amt of funds" (*see* 2255 Mem. at 23-24 (quoting PX App. 38 at 2 (Feeney Notes))) – is the very same example used by the Rigases in their 2007 Motion to Compel to illustrate exactly the same point:

> For example, *the 13-D filed on January 21, 2000* indicated that [affiliate lender] Highland 2000 purchased 5.9 million shares of class B common stock from Adelphia for $375 million.  Highland 2000 received the $375 million from "affiliate borrowings." Rothenberger understood "affiliate borrowings" to mean borrowings from affiliates, in this case affiliates of Highland 2000. Rather, only the ultimate purchaser needed to disclose where it was getting the money.  When this 13-D was filed, Rothenberger understood that there was no obligation to disclose where affiliates received the money to lend to Highland 2000 to come up with $375 million used to purchase stock in January 2000.

(GX App. G at 13 (Cr. Dkt. 395) (emphasis added)).

The 2255 Memorandum goes on to claim that not only did Rothenberger draft the "affiliate borrowing" language because "he believed it was accurate and adequate," but also then had it "*reviewed by [Chris] Thurner to confirm its accuracy*."  (2255 Mem. at 24 (emphasis added)).  To

the extent there is any exculpatory import here, it was already known by the Rigases and presented

to, and ultimately rejected by, the District Court, in the Motion to Compel:

> In addition to using information they already knew, Buchanan
> attorneys [such as Rothenberger] received information for preparing
> 13-Ds from Adelphia, Form 4s, *and Chris Thurner*.  Thurner worked
> as a controller for Wending Creek Farms, which was owned by John
> Rigas, and *was Rothenberger's contact for information regarding
> 13-Ds and Form 4s*.   Rothenberger found Thurner to be
> conscientious, thorough, and responsive to requests.   He
> encountered no resistance to his *obtaining necessary information for
> filing the 13-Ds*.

(GX App. G at 12 (Cr. Dkt. 395); *cf.* 2255 Mem. at 24 ("The Feeney notes provide: 'Early draft

sent to CT [Chris Thurner] w/ blank in it for disclosure – sent that way if CER [Carl E.

Rothenberger] did not know fact . . . *CT confirmed that 'affiliate borrowing' accurate* . . .) (quoting

PX App. 38 at 2 (Feeney Notes))).

Turning to the golf course allegations (item 3, *supra*), the 2255 Memorandum claims that

Rothenberger provided the Government with exculpatory information concerning a golf course,

which had been constructed with Adelphia funds on land that was majority-owned by John Rigas.

Here, the 2255 Memorandum points to Rothenberger's pretrial statements that he and Timothy

Rigas had discussed that the golf course would be used to entertain Adelphia's vendors and

suppliers and in retaining employees; that Rothenberger had been consulted about the best legal

structure of the golf course and its tax implications, and that Rothenberger believed that "once

structured" the golf course would need board approval if the land continued to be owned by the

Rigas family; and, finally, that the board knew there was a golf course and that certain directors

had visited the site.  (*See* 2255 Mem. at 38-39).  Again, this information closely tracks the facts

that the Rigases argued were *Brady* in their rejected Motion to Compel.  In the Rigases' Motion to

Compel, they cited civil deposition testimony in which Rothenberger stated that Adelphia's board

of directors was aware of the golf course project and the effort to make the area more attractive to

Adelphia's prospective and current employees; that Rothenberger was aware of the facts surrounding the ownership of the golf course and the underlying land; that Rothenberger's law firm advised Timothy Rigas on the ownership structure of the golf course and billed that work to Adelphia, which Rothenberger did not find problematic; and that final approval had never been sought from the board because the ownership structure was not ultimately resolved. (*See* GX App. at G (Cr. Dkt. 395)).

In sum, the arguments advanced by the Rigases in their Motion to Compel in support of their contention that notes of the Rothenberger interview contained *Brady* material closely parallel the arguments they now make in support of that very same proposition. Even though the Rigases now have access to the Feeney Notes, nothing has changed about the basis for the relief that they seek – that the Government's failure to turn over the notes was a *Brady* violation. Essentially, the Rigases seek to relitigate now the same issues decided by Judge Sand and affirmed by the Second Circuit ten years ago.

Unsurprisingly, courts have rejected this exact strategy, even on occasions where the "new" factual premise is not as redundant as the one presented here. "A Section 2255 petition containing new factual premises than those offered in the direct appeal may still be considered as requesting the same 'ground' for relief, and thus, to have been thoroughly litigated on direct appeal." *Baez* v. *United States*, No. 02 Civ. 8703 (DAB), 96 Cr. 257 (DAB) 2005 WL 106901, at *3 (S.D.N.Y. Jan. 19, 2005) (citing *Riascos-Prado* at 33); *see also Sanders* v. *United States*, 373 U.S. 1, 16 (1963) ("[I]dentical grounds may often be proved by different factual allegations."). In *Baez*, the petitioner sought to withdraw his guilty plea on direct appeal, claiming that the District Court "failed to ask him if his willingness to plead guilty was predicated on discussions with the prosecutor and defense counsel." *Baez* v. *United States,* No. 02 Civ. 8703 (DAB), 96 Cr. 257

(DAB), 2005 WL 106901, at *5 (citation omitted).  The Second Circuit found that Baez's plea was made voluntarily on the basis of a plea agreement, not on threats or inappropriate promises.  *United States* v.*Baez,* 7 F. App'x 91, at *1 (2d Cir. 2001).  When Baez subsequently filed a Section 2255 petition claiming that his plea was induced on promises and representations by the Government that he would not be subject to a mandatory minimum sentence, the District Court held that the petition was procedurally barred because Baez offered no new facts for the Court to reexamine the same ground for relief rejected on direct appeal – an allegedly improperly induced plea.  *Baez,* 2005 WL 106901, at *5.  Similarly, the grounds for relief offered by the Rigases in the Motion to Compel, which was thoroughly litigated on direct appeal, and their Section 2255 motion are the same; both allege that the Rigases are entitled to relief based on an alleged *Brady* violation for the government's failure to turn over the Feeney Notes prior to trial.  As in *Baez,* the Second Circuit's finding that the government did not have a *Brady* obligation to provide the Feeney Notes procedurally bars a habeas petition collaterally attacking the Rigases' convictions based on the same alleged *Brady* violation, particularly given that the Rigases' claims about the contents and significance of the Feeney Notes has not changed, even with the passage of many years.

Because the Rigases' Section 2255 motion seeks to relitigate issues that have already been considered and decided on direct appeal, it is procedurally barred unless there has been an intervening change in the law since their appeal and that new law would have exonerated the Rigases had it been in force before their convictions were affirmed on direct appeal.  *See Chin*, 622 F.2d at 1092.  Mindful of this infirmity, the Rigases claim that the Second Circuit's ruling in *United States* v. *Mahaffy*, 693 F.3d 113 (2d Cir. 2012), constitutes the kind of intervening change in law that should allow them to raise their otherwise procedurally barred habeas claims.  In order for a new court decision to constitute an intervening change in law that would allow the relitigation

24

of issues decided on direct appeal, it "must break new ground" or "impose a new obligation on the States or Federal Government." *Teague* v. *Lane*, 489 U.S. 288, 300 (1989); *see United States* v. *Sanin*, 252 F.3d 79 (2d Cir. 2001) (finding that an intervening decision did not constitute new law for the purposes of allowing a prisoner to relitigate an issue on a Section 2255 motion because it neither overruled a prior decision nor altered doctrines employed by the Second Circuit). The decision in *Mahaffy* did none of those things and, therefore, is not new law that should allow the Rigases to relitigate their *Brady* claim regarding the Feeney Notes.

In *Mahaffy*, the Court held that the government had an obligation to turn over exculpatory material that constituted prior inconsistent statements made under oath during an SEC investigation, because "[a]side from exculpatory material, *Brady* applies to material that 'would be an effective tool in disciplining witnesses during cross-examination.'" *Mahaffy*, 693 F.3d at 131 (citing *United States* v. *Gil*, 297 F.3d 93 (2d Cir.2002)). That requirement is not a new one, nor does it alter any doctrines employed by the Second Circuit; it is merely an application of *Brady* precedent. The *Mahaffy* case is further distinguishable because while the petitioner in *Mahaffy* knew the identities of the potential witnesses and that they had potentially relevant conversations with other people involved, he had no knowledge of the information to which they could testify, because he was not involved in the conversations. The Rigases, on the other hand – as Judge Sand held – knew of Rothenberger's existence, his central role as Adelphia's corporate counsel, and the relevant facts about which he could testify.

As the District Court has already decided – and the Second Circuit has affirmed – the information in the Feeney Notes was not *Brady* material because it was information to which the Rigases were or should have been privy to. *See Rigas*, 2008 WL 144824, at *2 (quoting *United States* v. *Gaggi*, 811 F.2d 47, 59 (2d Cir. 1987)). The factual allegations in the 2255 Petition and

25

Memorandum do not constitute a new ground for relief, but only another attempt by the Rigases to relitigate a *Brady* claim which has already been adversely resolved against them on direct appeal.  For this reason alone, the Rigases' *Brady* claim founded on the contents of the Feeney Notes should be dismissed as procedurally barred.

b.     **The Rothenberger Interview is Not Materially Exculpatory**

Even if the Feeney Notes argument was not precluded by the law of the case and the habeas relitigation bar, the argument would (again) fail on the merits.  Beyond the already-disclosed information about the timber rights transaction, there is nothing exculpatory in the Feeney Notes of the Rothenberger interview, and thus the Government had no obligation to disclose these notes in advance of trial.  Selective quotation by the Rigases aside, the Feeney Notes are overwhelmingly inculpatory and make clear that, had the Rigases called Rothenberger as a witness at a trial, his testimony would in reality have been materially harmful to their defense.  The Feeney Notes reiterate that significant information was withheld from Rothenberger during the time of the fraud, that he did not possess full information about the transactions that formed the heart of the Government's case, and that any advice of counsel defense proffered by the Rigases was therefore bound to fail.  As a result, the Rigases *Brady* claims fail at the most fundamental level because the notes at issue are not in any way exculpatory (much less "materially" exculpatory).

*i.     The 13-D Allegations and "Immediately Available Funds"*

Adelphia managed a group of entities privately held by the Rigases—the Rigas Managed Entities ("RMEs").  While Adelphia's management of these entities was disclosed, the Government argued during trial that the Rigases used the business arrangement between Adelphia and the RMEs to effect and conceal aspects of their frauds.  *United States* v. *Rigas*, 490 F.3d 208, 212-219 (2d Cir. 2007).  One of the frauds proved during trial centered on the Rigases' failure to

26

disclose their use of co-borrowing agreements, or loan facilities, entered into among the RMEs and Adelphia, for which each entity was jointly and severally liable, to effectuate the Rigases' purchases of Adelphia securities.  *Id.* at 214.  The purchase agreements for Adelphia's securities issuances required that by the closing date the Rigases would deliver to Adelphia the purchase price for the stock in "immediately available funds," that is, cash.  *Id.*  As the Rigases did not have sufficient cash to complete certain of these transactions, the Rigases caused Adelphia to "move" debt it owed under the co-borrowing agreements from its books to the books of one of the RMEs through journal entries in an amount equivalent to the purchase price for the stock.  *Id.*   Despite the fact that the RMEs assumed some of Adelphia's debt in this manner, Adelphia was adversely affected in two ways from its failure to receive cash from the Rigases: first, Adelphia remained liable for these debts because the co-borrowing agreements provided for joint and several liability; and second, had the Rigases paid cash, Adelphia would have had funds to pay down its debts consistent with its corporate goals.  *Id.*  Significantly, the Rigases misrepresented in Adelphia's and their public disclosures, including in their Schedule 13-D statements filed with the SEC, that they had paid cash for the stocks and had borrowed from Adelphia's affiliates to raise the necessary cash funds.  *Id.*

One example of one of these stock purchases, which was discussed by Rothenberger during his pretrial interview with the Government, occurred on January 21, 2000.  On April 9, 1999, the Rigases entered into a stock purchase agreement on behalf of Highland Holdings, an RME, pursuant to which Highland Holdings agreed to purchase 5,901,522 shares of Class B common stock from Adelphia in exchange for Highland Holdings delivering to Adelphia on the date of the sale "the purchase price for the shares in immediately available funds," or $375,000,000 in cash. (Tr. at 6764-66; GX App. DD at 3 (GX 11150)).  The Rigases consummated that purchase on

January 21, 2000; Highland Holdings[9] received the stock, but Adelphia did not receive the cash it was due from any Highland entity.  (Tr. at 4363-69, 6770-71; GX App. GG (GX 11164AR-CR)). Instead, an internal Adelphia cross-receipt documenting the stock purchase falsely stated that Adelphia had received "a wire transfer and/or bank or other transfer of immediately available funds in the aggregate amount of $375 million."[10]  (Tr. at 6768-71; GX App. EE (GX 11157)).  In Adelphia's and the Rigases' public filings concerning this stock purchase, Adelphia disclosed that it had received $375 million from Highland 2000 L.P.[11] and that the source of the funds the Rigases used to make the stock purchase was "affiliate borrowings."[12]  (Tr. at 6783-88; GX App. GG (GX 11164CR); GX App. Z at 48 (GX 4029); GX App. AA at 15 (GX 4710-A)).  As shown below, those representations were false.

---

[9] Before the sale closed, Highland Holdings had executed an assignment for the purchase of the stock to Highland 2000 L.P.  (GX App. AA at 15 (GX 4710A)).

[10]   Timothy Rigas signed off on the internal documentation of this stock purchase, including statements that Adelphia had in fact received "immediately available funds" in return for Adelphia's stock.  Specifically, Timothy Rigas signed a stock certificate on behalf of Adelphia wherein Adelphia issued stock in the name of Highland 2000 L.P.  (*See generally* GX App. FF (GX 11163B)).  He also signed a revised version of Adelphia's cross-receipt for the same transaction, which set forth the amount of immediately available funds Adelphia was supposed to have received from Highland 2000 L.P.  (*See generally* GX App. T (GX 1716)).

[11] Specifically, in Adelphia's 10-K for the year-end 2000, the following disclosure was made:  "On January 21, 2000, Adelphia closed the previously announced direct placement of 5,901,522 shares of class B common stock with Highland 2000, LP, a limited partnership owned by the Rigas family. Adelphia used a portion of the *proceeds of approximately $375 million* from this direct placement to repay borrowings under revolving credit facilities of its subsidiaries, which may be reborrowed and used for general corporate purposes."  (*See* GX App. Z at 48 (GX 4029)).

[12] On February 17, 2000, the Rigases filed a Schedule 13-D ("Beneficial Ownership Report"), in connection with the January 21, 2000 stock purchase.  Under the section titled "Source and Amount of Funds or Other Consideration" the Rigases stated the following: "On January 21, 2000, Highland 2000 (pursuant to an assignment from Highland Holdings) closed on the purchase of 5,901,522 shares of class B common stock, for a purchase price of $60.76 plus interest, or an aggregate of $375 million. *The source of such funds were affiliate borrowings.*" (GX App. AA at 15 (GX 4710-A)).

A few days before the stock purchase, on January 18, 2000, Rothenberger sent an email to Colin Higgin and Michael Mulcahey at Adelphia, attaching a draft version of the cross-receipt for purposes of the stock purchase.  (Tr. at 6772; GX App. JJ at 3 (DX 9698)).  The draft left blank the amount of immediately available funds supposedly received by Adelphia.  (Tr. at 6772; GX App. JJ at 3 (DX 9698)).  On February 2, 2000, a paralegal at Adelphia faxed Rothenberger a marked-up version of the cross-receipt with changes showing that Adelphia had received $375 million in immediately available funds in connection with the transaction, but there were no indications on the face of the document that Adelphia did not in fact receive these funds.  (Tr. at 6773-76; GX App. KK at 5 (DX 9699)).

Contrary to internal Adelphia business documents and public disclosures, what actually occurred to consummate the stock purchase was that Adelphia's fully-owned subsidiary UCA Corporation borrowed $368 million from a co-borrowing facility and sent only $136 million to Adelphia.  (Tr. 6777-88; GX App. GG (GX 11164AR)).  The remaining $232 million was immediately returned to the co-borrowing facility.  (Tr. 6777-88; GX App. GG (GX 11164AR)).  Not only did Adelphia not receive *any* immediately available funds from a Highland entity, or any other RME, but also any of the money Adelphia received was the result of Adelphia borrowing itself from a co-borrowing facility to which it was jointly and severally liable for any debt owed.[13]

---

[13] As during trial, the Rigases make much of the fact that there were internal journal entries on January 21, 2000 documenting that Highland Holdings had a payable assigned to Adelphia in the amount of $368 million and a separate RME, Hilton Head Communications, a party to the co-borrowing facility, had a $368 million debt recorded in favor of the co-borrowing facility. According to the Rigases, it was only due to a "bank error" that Adelphia's fully-owned subsidiary UCA Corporation received the funds directly from the co-borrowing facility instead of through Hilton Head Communications borrowing the same funds from the co-borrowing facility and paying Adelphia for the stock by wire transfer of those funds.  (2255 Mem. at 18-19, 24 n.18, 29-30 & nn. 24, 25).  The Rigases claim that Highland Holdings "accomplished the same exact same thing [that is, the transfer of 'immediately available funds'] by transferring $375 million to

(*Id.*).  Instead of using personal cash or cash borrowings from an RME, the Rigases were using funds from a co-borrowed facility that Adelphia was a party to in order to complete their stock transaction.  (Tr. at 6785).  Adelphia received no additional liquidity from this transaction and Adelphia actually increased the debt for which it was responsible.  (Tr. at 6786-88).  Essentially, the Rigases bought $375 million worth of Adelphia stock for themselves through one of their RMEs using money that Adelphia was fully liable for.  The public was misled about the material facts underlying this stock purchase and what Adelphia was doing with the alleged proceeds from the sale, and for this reason, among many others, the Rigases were convicted of violating federal securities laws and conspiring to do so.

The Rigases argue that the Feeney Notes reveal that Rothenberger was the author of the language in the Adelphia filings and the 13-D Schedules identifying the source of the funds for the

---

Adelphia through the journal entry" and Hilton Head Communications assuming the corresponding debt to the co-borrowing facility.  (2255 Mem. at 30).

Putting aside the Rigases' attempt to relitigate now a defense rejected thirteen years ago at trial, the Rigases' claims fail for three reasons.  First, the journal entry documenting that Highland 2000 L.P. had paid Adelphia was false and of no monetary significance because Adelphia did not in fact receive any cash from Highland 2000 L.P.  (Tr. at 6779-80; GX App. GG (GX 11164BR)).  Second, as Adelphia remained liable for all of the debt before and after the transaction with the co-borrowing facility, the reclassification of the debt to the co-borrowing facility to be from Hilton Head Communications instead of from Adelphia's fully-owned subsidiary through journal entries had no beneficial effect in favor of Adelphia.  (Tr. at 6780-81; GX App. GG (GX 11164BR)).  In fact, after this transaction, Adelphia had $136 million less that it could borrow from this particular co-borrowing facility.  (*Id.*).  Third, the fraud the Rigases were convicted of was not based on these false journal entries, but on the Rigases' failure to publicly disclose that Adelphia had not received immediately available funds, and that the funds Adelphia did receive were from a co-borrowing facility.  None of the witnesses the Rigases cite to in support their argument indicate otherwise; instead, they merely confirm that the substance of the transaction, and the Rigases' subsequent misleading disclosures to the public about Adelphia having received immediately available funds from the Rigases' affiliate borrowings would have been no less problematic had Hilton Head Communications directly drawn down from the co-borrowing facility to provide those funds to Adelphia.  (Tr. at 8133-34 (Brown); Tr. at 8643-47, 8685-86 (DiBella); Tr. at 4364-70, 4579-87 (Helms)).

Rigases' stock purchase as "affiliate borrowings," and that the Rigases would pay for this and other stock purchases with "immediately available funds." (2255 Mem. at 20, 23-24, 29-30). The Rigases argue that Rothenberger, as the author, "believed the law required only a general description of the sources of funds," (*see* 2255 Mem. at 23) and that even though he had the ability to discover the source of funds he decided to "eschew inquiry into the particulars of the 'affiliate borrowing.'" (*See id.* at 26). Similarly, the Rigases state that it was Rothenberger's decision to use the phrase "immediately available funds" and "he never claimed that the Rigases had anything to do with that—or that the Rigases said anything even the least bit misleading to him about the transaction." (*See id.* at 30-31). Accordingly, the Rigases maintain this was exculpatory information withheld from them that they could have used to support their advice of counsel defense.

The Rigases, however, mischaracterize the Feeney Notes in order to cast them as exculpatory. For example, the Rigases quote from a portion of the Feeney Notes in which Rothenberger was shown a "Schedule 13D" concerning the January 21, 2000 stock purchase and asked whether "affiliate borrowings" were identified in the document. (2255 Mem. at 23). Rothenberger answered, "No, not by name [but by] general description." (*See* PX App. 38 at 2 (Feeney Notes)). Instead of demonstrating, as the Rigases argue, that Rothenberger was the author of the general description of "affiliate borrowings," with knowledge that the Rigases were funding the stock purchase with funds from a co-borrowing facility, this passage merely reflects Rothenberger's reading of the Schedule 13-D at the time he was interviewed and his position that the Schedule 13-D need not identify the particular affiliate from which the Rigases borrowed. Moreover, the Rigases fail to note that the Feeney Notes reflect that Rothenberger advised the Government that he was "never told" about these co-borrowing drawdowns for stock purchases,

and that if he had been told this, he "would have looked at [the disclosures] closer" than he did. (*See* PX App. 38 at 3 (Feeney Notes)).  The Feeney Notes thus tend to inculpate, not exculpate, the Rigases.

Other passages in the Feeney Notes, ignored by the Rigases in their 2255 Memorandum, show that Rothenberger did not know the source of the funds used to buy the stock and thus, viewed as a whole, the Feeney Notes are not exculpatory as to the Rigases.  Rothenberger was not provided with the relevant facts necessary to support an advice of counsel defense; instead, such facts were concealed from him, thus vitiating any such defense.  For example, the Feeney Notes reflect that, when Rothenberger was asked whether he knew what the "'affiliate borrowings'" in fact were, as that term was used in the disclosures, Rothenberger answered, "No." (PX App. 38 at 2 (Feeney Notes)).  When asked whether Rothenberger asked for a definition of "affiliate borrowings," he answered, "No," and stated that he had confirmed the accuracy of the language in the 13-D with Chris Thurner, an individual who worked for John Rigas.[14]  (*Id.*).  In another passage cited by the Rigases on this issue (2255 Mem. at 24), they tellingly omit the key line – the line that makes clear that, when asked whether it would have been a "significant issue" if he had known that "'affiliate borrowings' [came] from ACC or [were] guaranteed by ACC," Rothenberger answered, "Yes."  (PX App. 38 at 3 (Feeney Notes)).  The Feeney Notes make clear that, at the relevant time, Rothenberger did not know the source of the funds used by the Rigases to buy the

---

[14] Regardless of whether Rothenberger should have followed up with Thurner to ascertain whether the Rigases were borrowing from Adelphia to complete their stock purchases, the point is that Rothenberger told the Government that he did not. (2255 Mem. at 24; PX App. 20, ¶ 10 (Johnson Memorandum)).  Without knowledge of the relevant underlying facts, Rothenberger could not have provided the Rigases with accurate legal guidance about their public disclosures.

Adelphia stock.[15]  Because he did not know the relevant facts, he could not have exculpated the

Rigases through an advice of counsel defense.  To the contrary, his testimony would have

inculpated them, as it would have been clear he had been kept in the dark about important details

of the payments so as to conceal the Rigases' scheme.

The Rigases suggest that Rothenberger knew the role co-borrowed funds would play in

funding stock purchases, and in particular the January 21, 2000 stock purchase by Highland

Holdings, based on a series of draft emails purportedly written by Rothenberger between March

31 and April 1, 1999, his attendance at Adelphia board meetings, and memoranda describing co-

borrowing transactions intended to provide liquidity to the Rigas family for future Adelphia stock

offerings.  (2255 Mem. at 26-27).  Attached to the e-mails is an "issues list" that lists the following

question: "In terms of closing timing, are there any other liquidity considerations other than the

closing and funding of the new HHC/ACC/etc. Credit agreement?"   (*Id.* (citing PX App. 41)).

Although the Rigases claim these draft emails prove Rothenberger "actually knew" co-borrowed

funds would be used to fund the January 21, 2000 stock purchase, the plain language of these draft

emails suggests no such thing. In fact, the cross-receipt that Rothenberger received for the stock

---

[15] The Rigases also cite to the McLaughlin Notes, Richey Notes, and Johnson Memorandum to claim that Rothenberger believed that "affiliate borrowings" was an accurate statement.  (*See* 2255 Mem. at 23, 25 (citing PX App. 22 at 7 (McLaughlin Notes); PX App. 20, ¶ 10 (Johnson Memorandum); PX App. 21, ¶ 12 (Richey Notes)).  Although Rothenberger might have believed that the Schedule 13-D did not need to provide further specificity as to which affiliate the Rigases were borrowing from, he did not know the fact that made the failure to disclose the specific affiliate material – that the Rigases had used co-borrowed funds drawn down by Adelphia or its subsidiaries to complete certain stock purchases.  (Tr. 10, 486 ("Ladies and gentlemen, this is a good example of a half-truth. It's technically true. I guess it was an affiliate borrowing.  But it leaves out the most important information that the person reading this needs to know, that that affiliate was Adelphia. And it shows you how a half-truth can be just as misleading as an outright lie, because this gives you no more information about the Rigas family taking this money from Adelphia than did the outright lie about using personal funds in the previous form 13-D.")).  When he met with the Government, Rothenberger indicated that such information would have been significant to his assessment of the veracity of the disclosures.  (*See* PX App. 38 at 3 (Feeney Notes)).

purchase fraudulently indicated that Adelphia received $375 million in immediately available funds. (Tr. at 6773-76; GX App. KK at 5 (DX 9699)). Similarly, Rothenberger's attendance at certain Adelphia board meetings and the memoranda describing co-borrowing transactions intended to provide liquidity to the Rigas family for future Adelphia stock offerings bear no obvious relationship to the January 21, 2000 stock purchase. More importantly, they provide no basis for the Rigases to assert a carte blanche advice of counsel defense to public disclosures about the source of funds for any and all future Adelphia stock purchases by the Rigases.

In any event, the Rigases' detour into what Rothenberger *supposedly knew* is irrelevant for purposes of *Brady* because what matters is what Rothenberger *represented to the Government* and whether that information was exculpatory. Several other passages in the Feeney Notes, ignored by the Rigases, clearly establish that Rothenberger represented to the Government that he did not know that the Rigases used Adelphia funds or co-borrowed funds to buy Adelphia stock. For instance:

(1) When asked whether he had "Conversations w/ACC personnel" regarding whether a cross-receipt could be issued if the transaction was cashless, Rothenberger answered, "No." When asked whether a cross-receipt could be issued for a cashless transaction, Rothenberger replied "No," because such a transaction was "not imm. available fnds." (*See* PX App. 38 at 2 (Feeney Notes)).

(2) According to Rothenberger, at the time of the closings, "CER [Rothenberger] understood RF [Rigas Family] get shares, ACC [Adelphia] gets $ (imm available funds)." (*Id.*).

(3) When Rothenberger was asked whether he had known the stock purchases were "cashless," "would [he] have advised ACC to make stmt (in Q or K) of use of $ anyway," he answered, "No." (*Id.* at 2).

(4) That, with respect to the use of the phrase "respective personal funds" in the "Form 13-D for 10/99," Rothenberger "would not have concluded" on his own that "respective personal funds" were purportedly used to purchase stock; rather, Rothenberger "would have been told" that such funds were used. (*Id.* at 3).

34

(5) When asked did he "know" that, to purchase the stock, the flow of "wires" went from "ACC" to "HH" (Highland Holdings, an RFE) to purchase the stock on the "NASDAQ," Rothenberger answered, "No." (*Id.* at 3).

(6) When asked, "What besides co-b[orrowing] drawdowns could [the] $375M borrowings have been?" Rothenberger answered, "Maybe liquidity, [or] other credit lines." Rothenberger further stated that he was "never told" about these co-borrowing drawdowns, and that if he had been told this, he "would have looked at it closer" than he did. (*Id.* at 3).

As these passages make clear, far from offering exculpatory information about the co-borrowing arrangements, Rothenberger would in fact have inculpated the Rigases as to the inappropriateness of the public disclosures Adelphia made with respect to the source and manner of stock purchases completed by the Rigases in the relevant time period. Accordingly, this issue cannot form the basis for a *Brady* claim.

In the same vein, the fact that Rothenberger might have chosen the phrase "immediately available funds" or that the Rigases might never have said anything "even the least bit misleading to [Rothenberger]" about the January 21, 2000 stock purchase is immaterial. What matters is that Rothenberger explained to the Government that *he was not aware that Adelphia did not receive any cash from any Highland entity in exchange for Adelphia stock*, which is what the Feeney Notes reflect. It was concealed from him. Specifically, Rothenberger told the Government that he "assumed immed.[iately] avail.[able] funds (i.e. cash) [were] transferred" to buy Adelphia stock because "the stock purchase agreement language called for it." (*See* PX App. 38 at 1 (Feeney Notes)). Rothenberger "[f]irst heard" in April or May 2002 that the "RF [Rigas Family]" purchases "of ACC stock" were "cashless or part cashless." (*Id.*). Further, he was never consulted on the question of whether "cashless = imm. avail. funds," that is, whether a "cashless" transaction could be considered "immediately available funds." (*Id.*). Based on his knowledge at the time, Rothenberger could not have exculpated the Rigases with respect to their public disclosures about Adelphia's receipt of cash in exchange for stock because he remained in the dark, along with the

rest of the public, about the truth—that Adelphia never received any benefit from selling its stock to the Rigases. As a result, the Rigases' *Brady* claim on this issue must fail because they cannot establish that the Government suppressed any exculpatory information, let alone "materially" exculpatory information.

### ii.    *The 10-K Filing*

With regard to Adelphia's 10-K filing for the year 2000, the Rigases incorrectly suggest that the Feeney Notes contain exculpatory material. On March 27, 2002, Adelphia publicly announced that it had approximately $2.2 billion in liabilities not previously reported on its consolidated balance sheet. *Rigas*, 490 F.3d at 212. Adelphia explained that these additional liabilities were the result of money borrowed by RMEs from co-borrowing facilities that Adelphia was jointly and severally liable for, but which were nonetheless not included in Adelphia's consolidated balance sheet, including for the year-end December 31, 2000. (*Id.* at 212 & n.2; *see also* Tr. 6586). At trial, James Brown testified that in March of 2001, Adelphia's accountants at Deloitte had suggested that Adelphia disclose in its 10-K filing for the year 2000 the amount that the RMEs had borrowed from the co-borrowing facilities. (*See, e.g.*, Tr. at 6586-87). Brown testified that even though he understood at the time that it was a material fact that Adelphia had a duty to disclose, he worked with Timothy Rigas to prevent such a disclosure because he knew that there would be "significant negative ramifications" from it. (*Id.* at 6587-88, 6595-96). After discussing the issue with Timothy Rigas, Brown was able to "sell [Deloitte] the story" that it would be more conservative to be consistent with Adelphia's past disclosures and only make public the maximum amount that could be borrowed under the co-borrowing facilities. (*Id.* at 6597). Ultimately, Deloitte did not insist upon the disclosure and Adelphia never disclosed in its 10-K

filing for the year 2000 the amount of co-borrowing debt that the RMEs (*i.e.*, the Rigases) were responsible for. (*Id.*).

The Rigases claim that the testimony of James Brown regarding conversations he had with Timothy Rigas in late March 2001 is undermined because the Feeney Notes showed that Brown had "sought legal advice about this part of the 2000 10-K from the securities law expert upon whom [Adelphia] had long relied." (2255 Mem. at 33).[16] In fact, the notes say no such thing. What they explicitly refer to is Rothenberger's recollection of a possible discussion with Brown ("~JB") and others – though not the Rigases – in March 2001 about the co-borrowing language. (*See* PX App. 38 at 7 (Feeney Notes) ("no restriction on borrowing more than security contributed → 3/01 discuss w/ TW [Timothy Werth], ~DMal [Doug Malone], ~JB [James Brown] – add language to co-b description in fin stmt footnot – risk disclosure – borrow up to full amount. – Discuss terms w/ ACC [Adelphia Communications Corp.] Bd? Do not recall. Any discussion <u>re</u>: use of other parties' borrowing ability if borrow more than put up? No. Ever explained to Bd? No.")). Nothing in these notes materially undermines Brown's extensive testimony about conspiring with Timothy Rigas about the disclosures, in conversations that, according to Brown, *did not involve Rothenberger.* (*See, e.g.*, Tr. at 6585-6610).

At most, the notes reflect that Rothenberger was involved in some discussion concerning the co-borrowing disclosure in Adelphia's 2000 10-K. The Feeney Notes are, however, tellingly silent on whether Rothenberger "had personally signed off on the language used" or

---

[16] The Rigases also claim that "that the Government itself recognized that Mr. Rothenberger had 'endorsed these statements.'" (2255 Mem. at 33 (citing PX App. 22 at 24 (McLaughlin Notes)). This is a mischaracterization of the plain language of the McLaughlin Notes. While the McLaughlin Notes state "Like it or not you guys endorsed these statements," nothing in the notes indicates who made this statement and what the statement was in reference to. This statement does not occur in the Feeney Notes, which was the only set of notes in the Government's possession.

Rothenberger's awareness of Brown's and Timothy Rigas's plan to "sell Deloitte a story" that it was more conservative to disclose the full amount of the co-borrowing credit facility rather than outline what the outstanding balances were under those credit facilities as Deloitte had originally requested.  (*See* 2255 Mem. at 32; Tr. at 6595-97).  In fact, Brown testified that even when Rothenberger suggested language for the co-borrowing disclosure, noting that "the amounts of indebtedness set forth for Adelphia and its subsidiaries *do not include any amounts borrowed by the managed entity coborrowers* under these credit facilities," Brown did not include Rothenberger's suggested language in Adelphia's 2000 10-K, nor did he recall discussing Rothenberger's suggestion with anyone else.  (*See* Tr. at 6797-98; *see also generally* GX App. U (GX 1912) (Rothenberger's March 31, 2001 e-mail to Doug Malone regarding a draft 10-K disclosure, stating: "The latest draft I received of the ADLAC [*i.e.* Adelphia] did not have any additional language in the note 4 discussion of co-borrower/affiliate facilities, either the sentence we sent to Jim B. [*i.e.*, Brown] that clarifies that ADLAC amounts do not include affiliate borrowings or the sentence you mentioned yesterday on the phone clarifying that the entire amount of capacity is available to affiliates.  Please advise.")).  Contrary to "personally signing off" on the language used in Adelphia's 2000 10-K, Rothenberger had requested a more fulsome disclosure that was pocket vetoed by Brown.[17]  But that fact and the notes on this topic – which make no mention of the Rigases – in no way "support[] the defense's contention that Petitioners' goal had

---

[17] At his post-trial civil deposition, Rothenberger testified that he had suggested additional language for the co-borrowing disclosure, which is consistent with the evidence introduced at the Rigases' trial.  (*See* Dkt. 7 at Comerford Decl. Ex. I (Rothenberger Dep. Tr. Oct. 26, 2005) (testimony by Rothenberger with respect to the Form 10-K for 2000, that: "I believe we suggested . . . the additional language which I believe ended up in the footnote that – to the effect that all parties to the credit – to the co-borrowing agreements can borrow the full amounts available under them" and which also discusses Rothenberger's March 2001 e-mails to Doug Malone on this issue)).

always been to try in good faith to comply with the applicable securities laws, not to break them."
(2255 Mem. at 33).

Significantly, the Feeney Notes do not mention Deloitte or Brown's conversations with
Deloitte about Adelphia's disclosure of the full amount of funds available under the co-borrowing
facilities or the outstanding borrowings of the RMEs. This is for good reason—because
Rothenberger had no knowledge of those conversations. In fact, the notes make clear that
Rothenberger did not even know that the Rigases had in fact borrowed more money than the RMEs
had assets to support, which was the true reason that Brown and the Rigases did not want the
amount actually borrowed to be disclosed. (*See* PX App. 38 at 7 (Feeney Notes) ("Any discussion
re: use of other party's borrowing ability if borrow more than put up? No. Ever explained to Bd?
No.")).

Again, at the risk of stating the obvious, the counsel upon whom the Rigases would like to
now rely was by design kept wholly in the dark about facts relevant to the fraud. He would, in
fact, have been an inculpatory witness if called at trial. The Feeney Notes, even when read line-
by-line and out of context, do not suggest otherwise. The Feeney Notes do not mention the Rigases
or any conversations between them and Rothenberger, and they explicitly state that Rothenberger
did not discuss the co-borrowing disclosures with Adelphia's Board. The notes on this subject,
therefore, do not support an advice of counsel defense on this subject, are not exculpatory, and do
not support a contention that the Government committed a *Brady* violation by not disclosing them.

### iii.    *The Related Party Transactions*

The Rigases also misrepresent the content of the Feeney Notes with regard to the related
party transactions, alternatively referred to as "affiliate transactions" at trial. (*See, e.g.*, Tr. at 644
(Gov't Opening)). The Government's trial evidence established that the Rigases made false or

39

misleading disclosures about the nature and scope of any related party or affiliate transactions between the Rigas family and Adelphia.  Several of the transactions that the Rigases failed to truthfully disclose as related party transactions in Adelphia's public filings were independently fraudulent for other reasons – including, for example, the co-borrowing arrangements that were used to deceive Adelphia investors, as detailed in part B.1.a.i above.  The fraud established by the Government at trial also included the Rigases' looting Adelphia's coffers for more than $200 million in personal gain, which was concealed in a series of undisclosed related party transactions. (*See, e.g.*, Tr. at 3373-3382).  As the Second Circuit noted in summarizing the trial record:

> The evidence at trial showed that throughout the period of the conspiracy, Defendants took over $200 million dollars from Adelphia's Cash Management System for personal expenses ranging from $200 to purchase 100 pairs of bedroom slippers for Timothy Rigas, to over $3 million to produce a film by Ellen Rigas, to $200 million to pay off Rigas family margin loans. The missing money was obscured by the commingling of cash between Adelphia and the RMEs and the RNCEs. Cash transfers for the benefit of the Rigas family needed only to be approved by a member of the Rigas family or James Brown. No promissory notes were ever signed in favor of Adelphia, and, in some instances, personal expenses were falsely recorded as Adelphia's expenses. Timothy Rigas also unilaterally changed the price allocation approved by Adelphia's Board of Directors regarding the co-purchase of certain cable systems; he shifted an extra $50 million of the purchase price from the RFEs to Adelphia without informing Adelphia's independent directors. The cash transfers to the Rigas family were not reported as compensation or loans, as required by the SEC, or disclosed to investors as related party transactions.

490 F.3d at 218 (internal footnote omitted).

As part of their current *Brady* claims, the Rigases attempt to undermine the overwhelming trial evidence with respect to related party transactions by misdirecting the focus to certain pre-trial statements made by Rothenberger.  Accordingly, the Rigases claim, based on the Feeney Notes, that "Mr. Rothenberger was unambiguous that it was Doug Malone, and Doug Malone alone, who worked with him on the identification and disclosure of related party transactions." (2255 Mem. at 35).  Again, this is simply not what the notes say.  The notes state: "Effort to

determine if other related party transactions? Yes. – reviewed 10-KA w/ DMal [Doug Malone] – familiar w/ SEC reporting – Ask him what else under SK404." (*See* PX App. 38 at 4 (Feeney Notes)). Tellingly, the Rigases omit the next several sentences of the notes: "Any disclosure of ACC policy JR [John Rigas] draw up to $1M/month from ACC? Never told about, Should be Disclosed? Yes. Debt reclass under co-b? No knowledge or understanding, None prior to 3/02." (*See id.*). Indeed, Doug Malone did have "unrestricted access to all of Adelphia's books and records and understood the CMS [Adelphia's cash management system]" and Rothenberger undoubtedly relied on information that Malone provided to him. (2255 Mem. at 36). But Malone was a Rigas co-conspirator; not surprisingly, as the Feeney Notes reflect, Malone did not tell Rothenberger the relevant facts. Without knowledge of the relevant facts, Rothenberger's advice cannot give rise to an advice of counsel defense. Thus, the Feeney Notes on this topic did not tend to exculpate the Rigases and were not required to be disclosed.

### iv. The Golf Course Project

The Rigases' claims with respect to the golf course project also fail. As Judge Sand correctly found in addressing these same facts previously, Rothenberger's statements concerning the golf course are not *Brady*. While Rothenberger's information is for the most part irrelevant to the issues at trial, it is nevertheless consistent with the Government's arguments and the trial testimony on this issue. The evidence at trial established that Adelphia paid nearly $13 million towards the construction of a golf course on land that was majority-owned by John Rigas and that these facts were not disclosed in Adelphia's public filings. (*See, e.g.*, Tr. at 829-30, 2928-29, 2942, 3724). An Adelphia stockholder testified that knowing this information would have been important to him in making its decision to invest in Adelphia. (Tr. at 829-30). Dennis Coyle, an independent director of Adelphia from 1995 through 2003, further testified that Adelphia's

construction of this golf course had not been approved by Adelphia's independent directors, as required by Adelphia's corporate resolutions concerning affiliate transactions. (*See, e.g.*, Tr. at 908, 1021-22). The Rigases elicited testimony at trial that the construction of the golf course was publicized in an Adelphia employee magazine and that golf courses in general could be valuable assets to corporations (*see, e.g.*, Tr. at 2128, 3113-15); however, the defense did not call a single witness – such as additional independent directors of Adelphia – to contradict the fact that neither Adelphia's independent board members nor its shareholders had approved the construction of the golf course or had been fully informed of the Rigases' ownership interest in the golf course project. In closing, the Government argued that the golf course project and related nondisclosures were among many examples of the Rigases engaging in fraud and self-dealing. (*See, e.g.*, Tr. at 10425, 10432, 10613-14).

The information that Rothenberger provided to the Government in no way undermines these facts. For example, the fact that Rothenberger understood that the golf course would be used to entertain corporate customers or employees does not change that the Rigases' ownership of the land on which the golf course was being constructed had not been disclosed to or approved by Adelphia's independent directors or shareholders. Likewise, the fact that Rothenberger may have understood and been consulted by the Rigases about the ownership structure of the golf course or that Adelphia was paying for its construction does not show that Adelphia's independent board of directors – even if they had visited the site – understood those critical facts or approved the golf course's construction. The Feeney Notes make this very point. While the notes indicate that the "Bd. knew there was a golf course," Rothenberger responded "no" when asked if he had ever told the board that the golf course was being constructed on "land 2/3 RF [Rigas Family]," or if he "[e]ver heard in Bd mtgs that ACC $ used to build course." (PX App. 38 at 6 (Feeney Notes)).

42

In short, Rothenberger's pretrial statements concerning the golf course project are not materially exculpatory.  As such, the Government did not have a *Brady* obligation to disclose this information to the defense prior to trial.

> ### c. The Rigases Decided Not to Call Rothenberger or Testify in Their Own Defense for Trial Strategy Reasons and Knew the Essential Facts About Rothenberger Before Trial

Even if the *Brady* claims raised by the Rigases had not already been decided ten years ago, and even if the Rigases were correct that the Feeney Notes contained materially exculpatory information, their claims would still fail under the essential facts doctrine – that is, because the Rigases knew the essential facts about the role Rothenberger played in connection with the drafting and approval of relevant company disclosures.  As discussed previously, Rothenberger was Adelphia's lead outside corporate counsel from Buchanan Ingersoll and in that role was involved in many, if not all, of the transactions and disclosures regarding the Rigas family and Adelphia during the relevant period charged in the Indictment (albeit while often operating without knowledge of relevant facts that the Rigases and others purposefully kept from him).  Although the Rigases were thoroughly aware of Rothenberger's pivotal role with respect to Adelphia and his knowledge of the relevant facts and issues raised in the Rigases' criminal cases, the Rigases made the strategic decision not to call Rothenberger as a witness at trial.

Recognizing that their claims fail under the essential facts doctrine, the Rigases suggest a novelty.  They argue that, with respect to Rothenberger, the *Brady* material produced by the Government before trial was misleading in that it somehow *prevented* them from calling their "star witness," Rothenberger, in their case-in-chief.  (2255 Mem. at 12).  That is, the Rigases would have been better off if the Government disclosed *no* information.  This claim was also advanced by the Rigases on appeal in 2008, where they alleged that the Government's February 2004 letter

"misled the Rigases into thinking Rothenberger did not possess significant exculpatory information and that they should not call him at trial." (PX App. 15 at 103 (Rigas Appeal Brief)).

This argument has already been rejected. As the District Court has already held, it is impossible to believe that the Rigases could have been misled on this point because they plainly knew that Rothenberger, *their own lawyer*, with whom they had had privileged communications, had knowledge about the facts and issues raised in the Rigases' criminal cases. Indeed, they continue to suggest that Rothenberger was the "one witness who could have countered" the Government's contention that the Rigases had the intent to defraud when they made or omitted disclosures relating to Adelphia, presumably through claiming good faith reliance on advice of counsel. (2255 Mem. at 2). The Rigases' decisions not to subpoena Rothenberger to testify at trial, or to request that the Government immunize him if he invoked his Fifth Amendment rights, were knowing and strategic. The instant *Brady* claims are little more than another round of "Monday-morning quarterbacking" concerning those decisions.[18]

Indeed, it defies logic for the Rigases to continue to blame the Government for their decision not to call Rothenberger. In their 2007 Motion to Compel, the Rigases acknowledged that they were well aware that Rothenberger "is one of the most important witnesses in any Adelphia matter, including this criminal case," and acknowledged "his key role at Adelphia and,

---

[18] Even without calling Rothenberger, the Rigases, who were uniquely situated to know the extent of material information provided to Adelphia's lawyers and auditors, made clear their position to the jury through questioning, admitted defense evidence and argument at trial, that they had relied in good faith on the advice of counsel and auditors to formulate the public disclosures at issue in their criminal cases. (*See, e.g.*, Tr. at 1321-30, 7070, 7301, 10771-73, 10844, 10849). Indeed, as the Rigases concede, the jury was properly instructed that good faith was a complete defense to the charge of securities fraud and that "the burden was on the government to prove fraudulent intent and consequent lack of good faith beyond a reasonable doubt." (Tr. at 11, 338; 2255 Mem. at 13). The jury rejected the Rigases' claim of good faith reliance on lawyers and auditors when they convicted the Rigases on all of the securities fraud-related charges in 2004.

in particular, his role with respect to the government's main allegations against the Rigases." (*See* GX App. G at 3 (Cr. Dkt. 395)).  They stated on appeal that "Rothenberger was a central figure . . . .  Rothenberger drafted all the SEC filings at issue in the criminal trial, and advised the Rigases and the Adelphia board on the approval and disclosure of the related-party transactions at issue, including the CBAs and the Rigases' purchases of Adelphia securities." (PX App. 15 at 102 (Rigas Appeal Brief)).  They state in the 2255 Memorandum that "the jury ended up deliberating on the Rigases' guilt and innocence without ever hearing from the one non-party witness [Rothenberger] who knew that (a) the Rigases had not been personally involved in many of the specified transactions and disclosures and (b) the specified transactions and disclosures were all undertaken in good faith reliance on the advice and instruction of experienced counsel." (2255 Mem. at 13; *see also* PX App. 4, Timothy Rigas Decl. ¶ 58 ("Buchanan partner, Carl Rothenberger, a securities and corporate governance attorney, led the team of Buchanan [ ] attorneys representing the Rigas family and Adelphia. Mr. Rothenberger was involved in virtually all of the transactions and disclosures regarding the Rigas family and Adelphia during this period.")).  The notion that the Government was in exclusive possession of the facts about which Rothenberger could testify or somehow prevented the Rigases from understanding the scope of Rothenberger's knowledge simply ignores the reality of the situation.[19]  As Adelphia's lead outside counsel, Rothenberger was deeply involved, *with the Rigases' knowledge*, in the events underlying the prosecution.

---

[19] Perhaps recognizing the absurdity of arguing that the Government caused them not to call a witness they supposedly knew at the time of trial would support a purported advice of counsel defense, the Rigases make the serious allegation that not only did the Government not call Rothenberger because it would hurt the "Government's case," but also that the Government threatened Rothenberger with prosecution at an October 25, 2004 meeting. (2255 Mem. at 22). The Rigases cite no evidence to support that this meeting occurred. In fact, the only evidence cited by the Rigases in support of this contention are notes from the *February 20, 2004* interview of Rothenberger – which the Rigases label in their brief as being notes from an *October 25, 2004* meeting. (*See id.*; PX App. 22).  Nevertheless, the Government's decision not to call Rothenberger

The Rigases' claim that Rothenberger was unavailable to them at trial was already rejected by this Court and by the Second Circuit.  Once the Government issued the February 2004 disclosure letter concerning Rothenberger, it was obviously clear to the Rigases' experienced trial counsel that Rothenberger had been interviewed by the Government.  The Rigases could have, but chose not to, taken steps to procure Rothenberger's availability for trial.  *See Rigas*, 2007 WL 4145282, at *5 ("Defendants argue that, despite their diligence, the witness[es]' [including Rothenberger's] refusal to cooperate rendered them unavailable before trial.  However, the steps that defense counsel took to obtain these witnesses' testimony were insufficient . . . [T]he testimony that defendants cite could have been available if defendants had subpoenaed these witnesses at the time of trial."); *Rigas*, 583 F.3d at 125.

The Rigases were also thoroughly aware of the essential facts that would have permitted them to take advantage of any testimony Rothenberger could have provided at trial.  In denying the Rigases' motion to compel production of the Feeney Notes, Judge Sand held, and the Second Circuit later affirmed, that under the essential facts doctrine the Rigases plainly knew or should have known about Rothenberger's existence and his role in the issues relevant to the Rigases' criminal trial, and that the Government had therefore satisfied its obligation under *Brady*.  *See Rigas*, 2008 WL 144824, at *2 ("Defendants knew of Rothenberger's existence, his role at Adelphia, and the facts on which he could [give] testimony, thus, the government's *Brady* obligation was satisfied here."); *Rigas*, 583 F.3d 108 at 126 (holding that the District Court committed no error in finding that "the government was not in exclusive possession of any exculpatory information, since defendants knew of Rothenberger's role at Adelphia and the facts

---

as a witness at trial has no bearing on whether the Government had a duty to disclose the notes of its pretrial interview with Rothenberger.

about which he could testify; accordingly *Brady* did not compel disclosure of the government's interview notes with Rothenberger"). Nothing in the 2255 Memorandum undermines these holdings.

The Rigases' decision not to attempt to compel the testimony of a witness they claim to be "one of the most important witnesses in any Adelphia matter, including this criminal case," was a strategic one. Because in truth, the Rigases knew better than *anyone* that Rothenberger could not exculpate them. He had been kept in the dark about the relevant facts surrounding the disclosures at the time of the fraud. The manufactured regret the Rigases' now harbor for making that decision is not a sufficient basis to allow them to transform the non-production of the Feeney Notes into a *Brady* violation. *See United States* v. *Turkish*, 623 F.2d 769, 777 (2d Cir. 1980); *United States* v. *Ebbers*, 458 F.3d 110, 117-22 (2d Cir. 2006); *United States* v. *Oshatz*, 700 F. Supp. 696, 698 (S.D.N.Y. 1988) ("By providing [the defendants] the names of the [witnesses] and informing them that these individuals may possess information helpful to the defense, the government has met its *Brady* obligation. It is now up to [the defendants] to subpoena these witnesses to take advantage of any exculpatory information they might furnish."). Judge Sand noted this failure in rejecting the Rigases' Rule 33 Motion based on the post-trial civil deposition testimony of Rothenberger, among other witnesses: "Defendants' choice not to pursue this testimony was a strategic decision, and cannot now form the basis for a new trial." *Rigas*, 2007 WL 4145282, at *5. For the Rigases again to claim in the 2255 Memorandum that they did not call Rothenberger to the witness stand because they "had no access to him" ignores the District Court's 2007 ruling on this very issue:

> Defendants argue that, despite their diligence, the witness' refusal to cooperate rendered them unavailable before trial. However, the steps that defense counsel took to obtain these witnesses' testimony were insufficient. Courts have denied Rule 33 motions where the defendant 'has produced no evidence of any attempts to subpoena either co-defendant before or during trial,' or 'to request that the

government grant them immunity.' Although defense counsel attempted to communicate with these witnesses voluntarily, neither of these steps was taken. Similarly, defendants claim that the government's Bill of Particulars and a memorandum from Adelphia's legal department both had a 'chilling effect' and precluded defense counsel from obtaining statements from a number of witnesses. Again, defense counsel does not allege that these witnesses would have defied a federal subpoena had they been called to testify at trial …. Defendants contend that counsel could not have been required to subpoena all possible witnesses, or to 'call all of those individuals to the stand without any indication of what they would say or whether they had any relevant information at all.' However, this argument has been squarely rejected by prior courts.

*Id.* (citations omitted); *see also United States* v. *Matos*, 781 F. Supp. 273, 279-280 (S.D.N.Y. 1991) ("The precise testimony of any potential witness cannot be known until it is had . . . The decision not to interview [a witness], and not to call [a] witness, whether wise or not, was a deliberate and strategic one. The defendant is not entitled to a new trial so that he may employ a different strategy.") (citing *United States* v. *Beasley*, 582 F.2d 337, 339 (5th Cir. 1978)).

Nor did the Rigases testify at trial themselves; such testimony would have been highly relevant to their purported advice of counsel defense, as they were best positioned to testify to their understanding of the advice they purportedly received. *See, e.g.*, *United States* v. *Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) (defendant's testimony "that he thought his actions were legal would have put his knowledge of the law and the basis for his understanding of what the law required in issue. His conversations with counsel regarding the legality of his schemes would have been directly relevant in determining the extent of his knowledge and, as a result, his intent."); *United States* v. *Exxon Corp.*, 94 F.R.D. 246, 248-49 (D.D.C. 1981) ("These defenses [of good faith reliance] do not solely relate to the 'objective' representations of DOE but directly concern Exxon's subjective interpretation and understanding of those representations; i.e., Exxon's corporate state of mind"). Indeed, it is disingenuous for the Rigases to complain now that "the jury ended up deliberating on the Rigases' guilt or innocence . . . without [the Rigases having] the

48

realistic ability to prove up [the good faith advice of counsel defense] through the witness in the best position (on some issues, the only position) to credibly describe the events" (2255 Mem. at 13), knowing full well that (1) they made inadequate efforts to have Rothenberger testify, as Judge Sand and the Second Circuit have already held, (2) they knew better than anyone that Rothenberger would not have been a helpful witness for the defense, and (3) they chose not to testify in their own defense to assert their supposed reliance upon counsel.   Having made these strategic decisions, the Rigases cannot now disavow them.

**2.   There Was No *Brady* Violation with Respect to the Scientific Atlanta & Motorola Interviews**

The Rigases next claim that the Government violated *Brady* by failing to disclose the notes of certain pretrial interviews with representatives of Scientific Atlanta and Motorola – companies that were designated by the Government as unindicted co-conspirators before trial.  (*See* Cr. Dkt. 301, Gov't Bill of Particulars).  The interviews concerned, among other topics, marketing support agreements that Adelphia entered into as part of its EBITDA manipulation scheme.

Like the remainder of the Rigases' claims, the *Brady* claims concerning the Scientific Atlanta and Motorola interviews lack merit.  First, the issue has already been litigated and resolved against the Rigases' position.  Judge Sand previously determined – as a matter of law – that the Scientific Atlanta and Motorola interviews were not *Brady* and thus were not required to be produced for *in camera* review after trial, a ruling that was affirmed on appeal.  The law of the case doctrine thus bars relitigation of this claim.  Second, the Scientific Atlanta and Motorola interviews are not materially exculpatory because they do nothing to undermine the overwhelming evidence at trial that the Rigases committed fraud by fraudulently inflating Adelphia's EBITDA and concealing the true nature of the marketing support transactions from Adelphia's auditors and investors.  To the contrary, the interview notes are overwhelmingly inculpatory.  Further, the notes

49

reflect information that the Rigases possessed at the time of trial, that the Rigases could have elicited at trial by calling the relevant witnesses, and that the Rigases in fact used at trial in cross-examining James Brown – the Government's primary witness on the marketing support allegations.

a.    **Background**

i.    *The Indictment*

The Government outlined its allegations concerning the marketing support agreements in the Indictment.  (*See, e.g.*, GX App. B (Superseding Indictment ¶¶ 108-26)).  For example, the Government alleged that "in or about June 2000," Timothy Rigas, together with James Brown and Timothy Werth, "devised a plan to enter into sham 'marketing support' agreements with [two corporations]" – Scientific Atlanta and Motorola – "for the purpose of artificially inflating Adelphia's EBITDA."  (*Id.* at 47 (Superseding Indictment ¶ 113)).  As alleged, "[i]n or about August 2000," Timothy Rigas, Brown, and Werth "caused Adelphia to record marketing support payments from [Scientific Atlanta and Motorola] as revenue on Adelphia's books and records . . . ."  (*Id.* at 47-48 (Indictment ¶ 114)).  Specifically, Adelphia recorded more than $7 million in marketing support payments for the quarter ending June 30, 2000, and more than $12.7 million in marketing support payments for the quarter ending September 30, 2000.  (*Id.*).  The Government alleged that these payments were recorded in Adelphia's books despite the fact that: "(1) no marketing support payments had been received from [Scientific Atlanta and Motorola]; (2) no such payments were owed to Adelphia; and (3) at the time, Adelphia had no agreements to receive marketing support payments from either [Scientific Atlanta or Motorola]."  (*Id.*).

The Indictment further alleged that "[i]n or about late October 2000," Timothy Rigas, Brown, and Werth "undertook various actions to give the appearance of legitimacy to the above-

50

described entries" prior to a 2000 year-end audit, including that they "caused Adelphia to begin negotiating with [Scientific Atlanta and Motorola], in the hope of reaching an agreement for marketing support payments to Adelphia." (*Id.* at 48 (Superseding Indictment ¶ 115)). Accordingly, Scientific Atlanta and Motorola agreed to pay Adelphia for "marketing support in connection with digital converters already purchased by Adelphia" and Adelphia, in turn, "agreed to a retroactive price increase for [the cable boxes] . . . in an identical amount" that was memorialized in separate documents not referenced in the marketing support contracts. (*Id.* at 50, 53 (Superseding Indictment ¶¶ 118, 122)). The marketing support contract with Scientific Atlanta claimed to apply retroactively to early 2000 "despite the fact that the first serious discussion of marketing support between [Scientific Atlanta] and Adelphia took place in late October 2000" (and was not included in the March 2000 purchase agreement with Scientific Atlanta), and "despite the fact that Adelphia did not raise the issue of marketing support with [Motorola] until October 2000." (*Id.* at 51, 53 (Superseding Indictment ¶¶ 120, 123)). As alleged, "these sham marketing support agreements lacked economic substance, had no legitimate business purpose, and were entered into for the sole purpose of artificially inflating Adelphia's EBITDA." (*Id.*). Likewise, the standalone price increase letter with Scientific Atlanta "falsely and fraudulently represented that, as a result of cost increases to [Scientific Atlanta], it was increasing the price Adelphia would be required to pay for digital converters" – when, in fact "the price increase . . . was calculated to equal exactly the amount of 'marketing support' payments agreed to by [Scientific Atlanta]," while the price increase letter with Motorola also contained "misleading statements about the reasons for the price increase and the user of marketing support payments by Adelphia." (*Id.* at 52, 53 (Superseding Indictment ¶¶ 121, 123)).

51

The Indictment alleged that these marketing support transactions were used to artificially inflate Adelphia's EBITDA because – instead of offsetting the marketing support payments and the "price increase" payments to reflect the reality that these payments were part of a "wash transaction" with no true impact on EBITDA – Tim Rigas, Brown, and Werth caused the "price increase" payments made by Adelphia to be recorded as capital expenditures, which by definition were excluded from EBITDA, while the marketing support payments received by Adelphia were recorded as revenue, or a "contra-expense" that lowered Adelphia's total marketing costs and increased its EBITDA.  (*See id.* at 54-55 (Superseding Indictment ¶¶ 123-26)).

### ii.   *Trial Testimony, Stipulation, and Summation*

At trial, Brown testified extensively with respect to the marketing support agreements. (*See, e.g.*, Tr. at 6117-79, 6232-41, 7989-90, 7995 (Brown direct and redirect); Tr. 7122-24, 7292-93, 7296-7306, 7418 (Brown cross)).  For example, on direct examination, Brown testified that in the "summer of 2000," Brown attended a meeting with Timothy Rigas and others where Rigas stated that they needed to "find a way to hide" significant marketing expenses that were being incurred by Adelphia in connection with the conversion from analog to digital cable boxes.  (Tr. at 6118-20).  When Timothy Rigas suggested that the marketing costs be capitalized, such that those costs would not impact EBITDA, either Brown or Werth – who was a director of accounting at Adelphia – responded that the accountants would "not allow" them to capitalize marketing costs directly but that Brown and Werth "understood what [Timothy Rigas] was trying to achieve and we would try to think up if there was another way to accomplish it."  (Tr. at 6118-22).  Within a few days or a week, Brown suggested to Timothy Rigas a "scheme . . . to do a wash transaction between Adelphia and Scientific Atlanta" which would require Scientific Atlanta's "cooperation in getting an agreement that would make this appear to be something than [what] it really was,"

because "the auditors would be wary of this if they saw documents that made it look like a wash transaction." (Tr. at 6121).  Brown and Timothy Rigas discussed their belief that Scientific Atlanta would work with Adelphia on the proposed scheme because Adelphia was one of their largest customers.  (Tr. at 6121-22).

Brown further testified that, as of August 14, 2000, when Timothy Rigas gave his approval to record marketing support payments in Adelphia's books and records for the quarter ending June 30, 2000, Adelphia did not have an agreement for the payment of marketing support, Adelphia had not received any payments for marketing support, and there was no legitimate basis for recording those payments.  (Tr. at 6122-23, 6127-28, 7293).  When asked on direct examination whether Adelphia had at that time engaged in discussions with Scientific Atlanta or Motorola about the marketing support deal, Brown testified that "[w]e hadn't had any discussions with them yet" and that those discussions first occurred in October 2000.  (Tr. at 6128, 6134).  On cross-examination, Brown clarified that he was not personally aware of any discussions between Adelphia and Scientific Atlanta in the summer of 2000 and acknowledged that those discussions could have begun earlier than he recalled, including as early as the summer of 2000.  (Tr. at 7296, 7299).

Notably, in cross-examining Brown about the timing of the marketing support discussions, defense counsel relied upon the notes of prior statements made to the Government by Dan Liberatore – an Adelphia engineer who was interviewed by the Government prior to trial.  Neither the Government nor the defense called Liberatore as a witness at trial.  However, the Government produced notes of Liberatore's prior statements to the defense (together with the notes of all pre-trial interviews of Adelphia employees), and the defense used those materials at trial.  Accordingly, counsel for Timothy Rigas asked Brown at trial whether he was "aware . . . that in the late spring [of 2000] Dan Liberatore . . . had discussions with Tom Nilson of Scientific Atlanta about market

support," or "that in July of [2000], Mr. Liberatore was on a fishing trip sponsored by Scientific Atlanta" and "had further discussions on that occasion with Dave Hansen and with a representative of Charter Communications."  (Tr. at 7297-98).  Defense counsel further asked whether Brown had been "told that Scientific Atlanta had entered into arrangements with Charter."  (Tr. at 7298). Counsel for Timothy Rigas later explained in a sidebar with Judge Sand that "my cross-examination of Mr. Brown about fishing trips in British Columbia . . . [t]hat all comes straight out of Liberatore's 3500 material, summer, June, July."  (Tr. at 9564).

In addition, the defense sought admission of an internal Scientific Atlanta email dated August 11, 2000, in which a representative of Scientific Atlanta stated that he had received the "go ahead to do [a] '[C]harter-like' marketing credit for Adelphia"; described how Scientific Atlanta would "get it done," including by "drafting an amendment" to the pre-existing sales contract with Adelphia; and that Scientific Atlanta would use the discussion "to get . . . in front of [Adelphia's] finance team."  (*See generally* PX App. 85).  The defense claimed that this email contradicted the Indictment and Brown's testimony that discussions with Scientific Atlanta had not begun until October 2000.  (*See, e.g.*, Tr. at 9541).  Having reviewed Brown's testimony at trial and the relevant paragraphs of the Indictment, Judge Sand disagreed, finding instead that "[e]verything is consistent in that Brown is saying that [if] there were discussions ongoing, he was unaware of it." (Tr. at 9539-46).  Here, the Government noted that if the defense wanted to establish that Liberatore had in fact engaged in discussions with Scientific Atlanta before October 2000 – as reflected in his 3500 materials – the defense was free to call Liberatore as a witness.  (Tr. at 9564). Further, the Government noted that if the defense wanted further explanation of the Scientific Atlanta email in the record, it "should call Mr. Hansen, Mr. Wharton, and Mr. Nelson [sic]" – three Scientific Atlanta representatives who were copied on the email – "to explain what they meant."

(Tr. at 9549-50).  The defense declined to call as trial witnesses Liberatore, Hansen, Wharton, or Nilson.  In assessing the email itself, the Court apparently could not identify a basis to determine that there was "a meeting of the minds with respect to the terms of the marketing support agreement" as of August 2000.  (*See* Tr. at 9549, 9551).  Ultimately, rather than admit the email as evidence, the Court and the parties formulated the following stipulation: "That internal correspondence at Scientific Atlanta indicates that as of August 11, 2000, consideration was being given to the entry of an agreement with Adelphia for market support.  No final agreement is reflected in this correspondence, but Scientific Atlanta indicated a willingness to enter into some type of agreement as part of its efforts to get Adelphia to make more timely payment of its bills." (Tr. at 10419).

When questioned about the October 2000 negotiations with Scientific Atlanta and Motorola that ultimately led to execution of the marketing support agreements, Brown explained that Adelphia began the discussions because "we had nothing to document or support the entries that we had already booked and that we needed to have something to show the auditors before the year [end audit]."  (Tr. at 6134-35).  Brown testified that Adelphia had entered into contracts with Scientific Atlanta and Motorola in May 2000 for the purchase of digital cable converter boxes, that those May 2000 purchase contracts did not provide for the payment of marketing support, and that Scientific Atlanta and Motorola later agreed to purported "price increases" under these contracts that were in reality designed as wash transactions that were accompanied by "offsetting" marketing support payments in the same amounts.  (Tr. at 6135-37, 6139).  Brown testified that each transaction was executed through two separate documents that did not reference each other or truthfully describe the nature of the transaction, in order to "fool the auditors"; for example, the Motorola price increase letter, which was signed in December 2000 and claimed to be retroactive

55

to January 2000, falsely claimed that the price increase was justified by "additional costs" incurred by Motorola to "secure incremental component volumes and factory capacity," and was followed by a separate marketing support agreement and the exchange of offsetting payments in 2001 and 2002.  (*See, e.g.*, Tr. at 6141-43, 6151-52).  Brown further testified as to a chart that demonstrated how the marketing support transactions artificially inflated EBITDA.  (*See generally* Tr. at 6123-27; GX App. CC (GX 9007)).

On cross-examination, Brown was asked whether he "understood that [Scientific Atlanta was] providing marketing support money to other competitors" and responded that "Scientific Atlanta . . . had a marketing support agreement with a company called Charter Communications." (Tr. at 7123-25).  Brown was further asked whether he knew that "the documents that ended up being used as the market support agreement with Scientific Atlanta and as the price increase letter were documents that followed the template or the form of Scientific Atlanta's agreements with Charter"; Brown could not say for sure.  (Tr. at 7305-06).

In summation, the Government argued that Adelphia, through the Rigases and others, used bogus transactions – including the marketing support agreements – to inflate its EBITDA in its public reporting.  (Tr. at 10585).  Here, the Government referenced Brown's testimony and supporting exhibits that "Adelphia got Scientific Atlanta to agree to pay it $31 a [digital converter box] in so-called marketing support, but then Adelphia just kicked that $31 a [digital converter box] right back to Scientific Atlanta to wash out the transaction," in addition to Brown's testimony that "this wash transaction would never get past Adelphia's auditors, so he and Timothy Rigas created a - -  signed, I don't want to say they created, they signed and discussed two dummy documents to try to throw the auditors off the track of this wash transaction," which did not "explain the full nature of the wash transaction."  (Tr. at 10585-86).

56

In connection with arguments made during the charge conference at trial, defense counsel stated that they had "made specific requests" to speak to "Scientific Atlanta witnesses" and "Motorola witnesses," among others, who "would [not] speak" to defense counsel but whom (again) the defense did not subpoena to testify.  (*See, e.g.*, Tr. at 9197, 9204, 9208).

### iii.    The Scientific Atlanta and Motorola Interview Notes

Prior to trial, the Government interviewed six representatives of Scientific Atlanta – Patrick Tylka, Wallace Haislip, David Hansen, Thomas Nilson, John Wharton, and Anita Gifford – and three representatives of Motorola – John Simons, March Rothman, and John Tracy.  (*See* PX App. 75-82 (interview notes); *see also* PX App. 83, 84 (John Tracy depositions)).[20]

In their pre-trial interviews, the Scientific Atlanta and Motorola representatives confirmed that when each company entered into a contract for Adelphia to purchase digital converter boxes in May 2000, there was no oral or written agreement with Adelphia regarding marketing support and marketing support had not even been discussed with Adelphia.  (*See, e.g.*, PX App. 75 at 6, 11 (SA-Tykla); PX App. 76 at 2-3 (SA-Haislip); PX App. 77 (SA-Hansen); PX App. 78 at 3 (SA-Nilson); PX App. 79 at 2 (Motorola-Simons); PX App. 80 at 2 (SA-Wharton)).

Hansen and Nilson from Scientific Atlanta recalled that the first person at Adelphia to raise the topic of marketing support was Dan Liberatore.  Specifically, Nilson recalled attending a trade show "long after the May 2000 contract" where Liberatore asked him and Hansen about the "concept of receiving marketing support payments."  (PX App. 78 at 3-4 (SA-Nilson)).  Nilson responded that a representative of Charter Communications – which "receives marketing support"

---

[20] The Government is unable to locate the notes of any pretrial interview with John Tracy. Assuming without conceding that any such interview occurred, the Government assumes for purposes of argument that the statements made by Tracy in subsequent depositions are generally consistent with any pretrial statements to the Government.  Even making these assumptions, Tracy's statements are not *Brady*.

– "would be on that trip and Liberatore could talk to [him] then." (*Id.*).  Hansen recalled that "[t]he first time anyone at ACC [Adelphia] mentioned marketing support to [him] was during a fishing trip in British Columbia, Canada, in late July 2000, . . . . [when] Dan Liberatore received a telephone call from someone at ACC asking him to explore the possibility of SA's entering into a marketing support agreement with ACC similar to an agreement SA had with Charter Communications."  (PX App.  77 at 5 (SA-Hansen)).

None of the Scientific Atlanta or Motorola representatives recalled any communications with Timothy Rigas, Brown, or Werth about marketing support in the summer of 2000.  Rather, they told the Government that the first serious negotiations with Adelphia concerning marketing support occurred at a meeting in October 2000 and that the marketing support agreements and accompanying price increase letters were not executed until late 2000 or early 2001.  (*See, e.g.*, PX App. 75 at 10-11 (SA-Tylka); PX 76 App. at 3 (SA-Haislip); PX 77 App. at 5-7 (SA-Hansen); PX App. 78 at 4, 6 (SA-Nilson); PX App. 79 at 2-3, 4 (Motorola-Simons); PX App. 80 at 5 (SA-Wharton); PX App. 81 at 2 (Motorola-Rothman); PX App. 82 at 5 (SA-Gifford)).  None of these representatives stated that any agreement or payments as to marketing support had been made to Adelphia prior to this time.

With respect to the way in which the marketing support transaction was executed, Wharton from Scientific Atlanta explained that he learned in November 2000 that Adelphia had requested a "Charter-like" agreement, which he understood to mean that there would be a "financially neutral marketing support payment."  (*See* PX App. 80 at 5 (SA-Wharton).  *See also, e.g.*, PX App. 82 at 5 (SA-Gifford) (explaining her understanding that the Adelphia transaction would be a "Charter-like" agreement, or a "price increase which would generate money to be paid back to the cable company as marketing support")).  Wharton further stated that prior to its agreement with Charter,

Scientific Atlanta had not previously engaged in a "wash" transaction.  (*See* PX App. 80 at 5 (SA-Wharton)).  In explaining why two documents were used to reflect a single transaction with Adelphia – a price increase letter, and a marketing support agreement – the Scientific Atlanta witnesses either did not know (*see, e.g.*, PX App. 77 at 7 (SA-Hansen)), or stated that Nilson had decided that two documents should be used because that approach had previously been approved by Scientific Atlanta in the Charter transaction (*see, e.g.*, PX App. 78 at 6 (SA-Nilson); PX App. 80 at 7 (SA-Wharton); *see also, e.g.*, PX App. 83 at 22:22-23:7 (Motorola-Tracy) ("I think Adelphia had an agreement to start with, and we changed it to be consistent with the one we had from Charter.")).  Haislip – Scientific Atlanta's CFO – stated "he had no idea why the Charter agreement was composed of two documents" and "noted that both he and his Chief Accounting Officer thought at the time that SA did not need two documents . . . Haislip agreed that two documents would be needed if one wanted to raise a price without giving the appearance of a rebate.  Otherwise . . . it would be obvious that a rebate was, in fact, being paid and no accounting benefit would accrue because, in the case of a rebate, the transaction could not be used to increase EBITDA."  (PX App. 76 at 7 (SA-Haislip)).

Next, the Scientific Atlanta and Motorola representatives with knowledge of the issue uniformly acknowledged that neither company – as represented in the price increase letters – had actually experienced a price increase for the components used to manufacture the digital converter boxes sold to Adelphia.  (*See, e.g.*, PX App. 75 at 6, 11, 14 (SA-Tykla); PX App. 76 at 8 (SA-Haislip); PX App. 77 at 7 (SA-Hansen); PX App. 78 at 5-6 (SA-Nilson); PX App. 80 at 7 (SA-Wharton); PX 81 at 2 (Motorola-Rothman); *see also, e.g.*, PX App. 82 at 7 (SA-Gifford) (deferring to Wharton)).  It was entirely a fabrication.  The Scientific Atlanta and Motorola representatives understood that the marketing support agreements and accompanying price increase letters were a

"wash" transaction without real economic impact, and that the companies had agreed to the transaction as an accommodation to Adelphia, a significant customer.  (*See, e.g.*, PX App. 75 at 7-8 (SA-Tykla); PX App. 77 at 6 (SA-Hansen); PX App. 78 at 4-5 (SA-Nilson); PX App. 80 at 6 (SA-Wharton); PX App. 81 at 2 (Motorola-Rothman)).

Even more, the interview notes make clear that while Scientific Atlanta refused to agree to marketing support payments in a higher amount initially proposed by Adelphia, and insisted on an amount that was more commercially reasonable by comparison to the cost of the digital converter boxes (*see, e.g.* PX App. 75 at 10 (SA-Tylka)), Scientific Atlanta made this proposal not because the marketing support transaction *was* legitimate but to make the wash transaction *seem* legitimate in order to survive scrutiny from the SEC, lawyers, or auditors.  (*See, e.g.*, PX App. 76 at 4-5 (SA-Haislip) ("Asked why a theoretical 50% margin number mattered when the marketing support agreement would have no effect [on] SA's margin, Haislip noted one had to be reasonable when negotiating contracts. . . . Haislip stated he was concerned about the scrutiny from external auditors and from lawyers . . . . Additionally, he noted, the percentage had to seem reasonable for SEC reporting purposes.  Haislip stated his belief that one should be especially sensitive when renegotiating a contract without an economic basis for doing so."); PX App. 77 at 8 (SA-Hansen) ("Wally Haislip set this limit [the "acceptable limit for SA's marketing support payments"] . . . so that 'our (SA's) auditors will not have a problem with it.'"); (PX App. 80 at 6 (SA-Wharton) ("Commercial reasonability is important, even in a wash transaction, because of the appearance it gives auditors, Wharton stated.  Wharton admitted he and others at SA understood ACC wanted the contract for financial, not marketing purposes.")).

The Scientific Atlanta representatives further told the Government that Scientific Atlanta did not expect that Adelphia would actually do additional marketing using the market support

payments, and they had not seen proof of such marketing by Adelphia.  (*See, e.g.*, PX App. 77 at 6, 10 (SA-Hansen); PX App. 78 at 7 (SA-Nilson); PX App. 80 at 8 (SA-Wharton).  *See also, e.g.*, PX App. 75 at 10 (SA-Tylka) ("Asked if anyone in the sales or marketing departments of SA honestly believed that ACC would do additional marketing based on a transaction in which they received no additional money, Haislip stated he believed they would.  He noted, however, that he never heard anyone else at SA opine that ACC would put forth additional marketing efforts without receiving money from SA."); PX App. 76 at 7 (SA-Haislip) (opining as to his personal belief that such marketing would occur but failing to identify anyone in the "sales or marketing department of SA [who] honestly believed that ACC would do additional marketing based on a transaction in which they received no additional money . . . [and] that he never heard anyone else at SA opine that ACC would put forth additional marketing efforts without receiving money from SA")).  By contrast, Charter had provided Scientific Atlanta with detailed proof of its marketing efforts pursuant to its marketing support agreement.  (*See, e.g.*, PX App. 80 at 9-10 (SA-Wharton) (noting that Haislip wanted "Charter-like" supporting documentation to show "when in what markets" Adelphia did its marketing, that after calling Haislip "anal," Werth eventually provided some materials, and that Wharton found the documentation "wanting" and that Adelphia did not appear to be spending "$20 million per year to market digital cable")).

With respect to the accounting treatment of the marketing support payments by Adelphia, two of the Scientific Atlanta representatives speculated that Adelphia had entered the transaction for "accounting purposes" or "to boost EBITDA . . . [by] reduc[ing] marketing expenses."  (*See, e.g.*, PX App. 76 at 5 (SA-Haislip); PX App. 82 at 5 (SA-Gifford)).  Hansen from Scientific Atlanta recalled that, in a conversation about Scientific Atlanta's concerns about the auditors, Brown had stated that "ACC's auditors had no problem," while Motorola representatives recalled being told

by Werth that "Adelphia's auditors had looked at it as well." (*See, e.g.*, PX App. 77 at 8 (SA-Hansen); PX App. 81 at 2 (Motorola-Rothman)).   The Scientific Atlanta attorney who was interviewed by the Government stated that her "goal in drafting or proofreading contracts was to ensure SA did not lose money," which was why she made certain changes to the price increase letter. (*See* PX App. 82 at 6-7 (SA-Gifford)).   None of the witnesses claimed to understand how Adelphia actually accounted for the marketing support payments, what Adelphia's accountants or outside auditors or lawyers had been told about the transactions, or how the expenses were publicly reported. (*See, e.g.*, PX App. 83 at 21:117 (Motorola-Tracy) (testifying "I think the comment came from . . . [Motorola] legal that said, we're accounting for it correctly.   We're not [Adelphia's] auditors.  If their auditors are comfortable with it, then so be it," and that Werth had commented to Tracy that "Adelphia['s] auditors, accountants were okay with it.")).

> **b.**   **Judge Sand Rejected the Rigases' Claims Relating to Scientific Atlanta & Motorola**

The core of the Rigases' claims with respect to the Government's pretrial interviews of Scientific Atlanta and Motorola representatives was raised and rejected long ago by Judge Sand in the District Court and by the Second Circuit.   The law of the case doctrine thus bars re-litigation of this issue here.

In the Motion to Compel, the Rigases sought to obtain – among other materials – notes of the Government's interviews of Scientific Atlanta and Motorola representatives who, according to the Rigases, "gave exculpatory testimony in [] subsequent civil depositions."  (GX App. F at 2, 22-24 (Cr. Dkt. 394)).   The Rigases argued that the "significant exculpating evidence" obtained from Scientific Atlanta and Motorola included that the companies "had used a model that had been used by other cable companies"; that "such arrangements were 'not unusual' in the cable industry"; that Scientific Atlanta "received the go-ahead to do a marketing support agreement with Adelphia

in an internal email dated August 11, 2000"; and that Scientific Atlanta and Motorola had approval for the marketing support agreements from "executives, counsel, and auditors."  (*Id.* at 23-24).

Judge Sand denied the Motion to Compel – including the Rigases' *Brady* arguments with respect to Scientific Atlanta and Motorola.  In doing so, he concluded that the Rigases had known of these and other witnesses' identities before trial, yet failed to "take any steps to procure testimony from these witnesses, such as seeking immunity for the witnesses or subpoenaing them, and thus cannot now backtrack and claim that they were unaware of these witnesses' identities." *Rigas*, 2008 WL 144824, at *2.  This decision was affirmed in its entirety on appeal.  *Rigas*, 583 F.3d at 124-25.

The Rigases' arguments about the Scientific Atlanta and Motorola interviews have not materially changed since 2007.  In the current 2255 Petition and Memorandum – as in the Motion to Compel – the Rigases point to testimony from Scientific Atlanta and Motorola that the marketing support agreements were "modeled precisely after" or "based on" pre-existing contacts with one of Adelphia's competitors; that "the cable industry is a small one" and "it seemed reasonable Adelphia would be seeking market support agreements along the same lines that [its competitor] ha[d] received"; that Scientific Atlanta had approval for a marketing support agreement with Adelphia as of an August 11, 2000 internal email; and that the agreements had been "vetted . . . closely" by accountants, lawyers, and executives.  (*Compare* 2255 Mem. at 61-62, 67, *with* GX App. F at 23-24 (Cr. Dkt. 394)).

The Government's response likewise has not changed.  Now, as then:  "Defendants' challenge to this evidence is nothing more than a semantical game.  Defendants claim that no marketing support agreements were 'created' solely for the scam because the 'form' of such agreements already existed and *was generated by the vendors, not Adelphia*."  (GX App. D at 24

63

(Cr. Dkt. 378, *available at United States* v. *Rigas*, No. 02 Cr. 1236 (LBS), 2007 WL 7331466 (S.D.N.Y. Oct. 1, 2007) (emphasis added)).  The Rigases offer this Court no explanation how the information purportedly learned in recent discovery—which is virtually indistinguishable from information they knew in 2007—warrants reopening this long-ago decided issue.

Ultimately, Judge Sand's conclusion, which was affirmed on appeal, controls: these Scientific Atlanta and Motorola witnesses were not made "practically" unavailable by Government action.  (*See* Dkt. 46 at 16).  The Rigases knew who the witnesses were and made the strategic choice not to pursue their testimony at trial.  And the so-called exculpatory information cited by the Rigases in the 2255 Memorandum mirrors the so-called exculpatory information cited by the Rigases in 2007.  For the same reasons as discussed previously with respect to Rothenberger (*see supra* pp. 17-18), the claims as to the Scientific Atlanta and Motorola interviews have been raised, decided, and are procedurally barred here.

      **c.**      **The Scientific Atlanta & Motorola Interviews are Not Materially Exculpatory**

The Rigases' current arguments likewise fail on the merits because the information obtained in the pretrial interviews with Scientific Atlanta and Motorola is not remotely exculpatory.

*First*, even if Scientific Atlanta and Motorola "created" the marketing support agreements, and based the forms of those agreements on prior contracts with Charter, an Adelphia competitor, that information is not exculpatory.  As the Government explained in 2007 when addressing this claim before Judge Sand, "[r]egardless of who 'created' the form, the cited evidence does nothing to undercut the fact that the true purpose and effect of the 'marketing support' agreements was not disclosed to investors."  (GX App. D at 24 (Cr. Dkt. 378)).  For example, whether Scientific Atlanta and Motorola "created" the forms that were used to execute the marketing support agreements

does not and cannot detract from Brown's testimony at trial that Adelphia entered into marketing support negotiations with Scientific Atlanta following a discussion between Brown, Werth, and Rigas about the need to conceal substantial marketing expenses in a way that would fool Adelphia's auditors and that Brown proposed a wash marketing support transaction with Scientific Atlanta, which would artificially inflate EBITDA, as a means to achieve that end.  (*See supra* pp. 52-53, 56-57).  Likewise, this information does nothing to undermine Brown's testimony and the supporting exhibits at trial showing that Adelphia prepared reports showing its internal, actual EBITDA versus its reported, inflated EBITDA.  (*See supra* pp. 56-57).

*Second*, whether the marketing support agreements with Scientific Atlanta and Motorola were "vetted" or approved by those companies' lawyers, auditors, and/or executives has no bearing on whether the agreements were used by Adelphia and the Rigases with the intent to mislead investors.  Perhaps recognizing this truism, the Rigases attempt to confuse the record.  The Rigases claim based on the Scientific Atlanta and Motorola interview notes that there was an insistence on approval by "both sets of auditors."  (*See* 2255 Mem. at 63).  Quite to the contrary, the interview notes show that while Scientific Atlanta and Motorola reviewed the agreements internally to satisfy their own lawyers and to ensure that the transactions were recorded properly in their own books, the Scientific Atlanta and Motorola representatives were not involved in Adelphia's accounting, did not have any direct discussions with Adelphia's auditors, and at most were (falsely) told by Brown and Werth – two of the participants in the EBITDA-inflating scheme – that Adelphia's auditors were comfortable with the transactions.  (*See supra* p. 62).

*Third,* the interview notes uniformly demonstrate that the transactions with Scientific Atlanta and Motorola were *not* legitimate – as the Rigases now claim.  The Scientific Atlanta and Motorola representatives with knowledge of the issue uniformly acknowledged that neither

65

company had in fact experienced a price increase as falsely represented in the price increase letters. (*See supra* pp. 59-60). Rather, the Scientific Atlanta and Motorola representatives understood that the marketing support agreements and accompanying price increase letters were a "wash" transaction without real economic impact, and that the companies had agreed to the transaction as an accommodation to Adelphia, a significant customer. (*See supra* p. 60). Even more, the interview notes establish that while Scientific Atlanta refused to agree to marketing support payments in a higher amount initially proposed by Adelphia, and insisted on an amount that was more commercially reasonable by comparison to the cost of the digital converter boxes, Scientific Atlanta made this proposal not because the marketing support transaction *was* legitimate but to make the wash transaction *seem* legitimate in order to survive scrutiny from the SEC, lawyers, or auditors. (*See supra* pp. 60-61). Consistent with their understanding that the marketing support transactions were a "wash" transaction not supported by any legitimate business purpose, the Scientific Atlanta representatives further told the Government that Scientific Atlanta did not expect that Adelphia would actually do additional marketing using the market support payments, or that they had seen no proof of such marketing by Adelphia. (*See supra* pp. 61-62).[21] Frankly, these witnesses, if called to testify at trial, would simply have provided further (redundant) evidence of fraud by Adelphia and the Rigases. Unsurprisingly, the Rigases declined to call them.

*Finally*, the Rigases' arguments with respect to timing of the initial discussions of marketing support are premised on repeated mischaracterizations of the allegations in the Indictment and the testimony at trial. The purported *Brady* material at issue here is that Dan Liberatore – prompted by a telephone call from someone at Adelphia – first raised the topic of

---

[21] By contrast, Charter had provided Scientific Atlanta with detailed proof of its marketing efforts pursuant to its marketing support agreement. (*See supra* p. 61).

marketing support with Scientific Atlanta representatives at a trade show or on a fishing trip in July or August of 2000. (*See supra* pp. 54, 58). This information bolsters the Government's fraud theory at trial – and is not, as the Rigases now claim "directly contrary to the prosecution's and the indictment's charges." (2255 Mem. at 69). It is undisputed that Adelphia recorded marketing support payments in its books and records for the time period of April 1, 2000 through September 30, 2000. (*See supra* pp. 52-53, 55-56). These entries were false because, as confirmed repeatedly in the Scientific Atlanta and Motorola interview notes, Adelphia had no marketing support agreement with Scientific Atlanta or Motorola and did not receive any marketing support payments from those companies until late 2000 or early 2001. (*See supra* pp. 55-56). The fact that Liberatore, at the direction of someone at Adelphia, "initiated the discussion" of marketing support with Scientific Atlanta "in July 2000" does nothing to suggest that these entries, which covered a time period *before* these discussions occurred, were supported by any basis in fact – such as an actual agreement or payments for marketing support. To the contrary, this information supports the Government's allegations in the Indictment that "in or about June 2000," Timothy Rigas, Brown, and Werth "devised a plan to enter into sham 'marketing support' agreements"; that "[i]n or about August 2000," Timothy Rigas, Brown, and Werth "caused Adelphia to record marketing support payments" for the quarter ending June 30, 2000, and subsequently for the quarter ending September 31, 2000; and that Timothy Rigas, Brown, and Werth began "negotiations" and had the "first serious discussion" of marketing support with Scientific Atlanta "in or about late October 2000," while Adelphia first raised the issue of marketing support with Motorola in "October 2000." (*See supra* at pp. 50-52). Likewise, the timing of these initial discussions between Liberatore and Scientific Atlanta in no way contradicts Brown's testimony at trial, where he explained that in the "summer of 2000," Timothy Rigas stated that Adelphia needed to "find a way to hide" significant

marketing expenses; that a few days to a week later, Brown proposed entering into a "wash" marketing support transaction with Scientific Atlanta; and that while Brown was not personally aware of discussions with Scientific Atlanta about marketing support before October 2000, it was possible that such discussions had begun as early as the summer of 2000. (*See supra* pp. 52-53, 55-57). This purported *Brady* material is also consistent with Scientific Atlanta's August 11, 2000 email. Precisely as the parties stipulated at trial, the internal Scientific Atlanta email reflects only that as of August 11, 2000, Scientific Atlanta was giving "consideration . . . to the entry of an agreement with Adelphia for market support. No final agreement is reflected in this correspondence, but Scientific Atlanta indicated a willingness to enter into some type of agreement . . . ." (*See supra* p. 55). The fact of Liberatore's discussions with Scientific Atlanta in July or August 2000 does nothing to undermine the accuracy of that stipulation. In short, the material concerning Liberatore's July 2000 discussions with Scientific Atlanta is not exculpatory in any way, much less in a "material" fashion.

> **d.    The Scientific Atlanta & Motorola Interviews were not Suppressed Because the Rigases Knew the Identity of These Witnesses and the Essential Facts Concerning Their Potential Testimony**

Yet another reason these claims fail is because – in addition to the law of the case and the lack of materially exculpatory information underlying them – the information contained in the Scientific Atlanta and Motorola interview notes was also not "suppressed" for purposes of *Brady* because the defense was aware of the identity of Scientific Atlanta and Motorola witnesses and knew the essential facts concerning the information they possessed.

Here, the Rigases undoubtedly knew the identities of the Scientific Atlanta and Motorola witnesses and the role they played in the relevant events. Indeed, at the charge conference, the defense made clear that they had attempted to speak to Scientific Atlanta and Motorola witnesses

but did not actually subpoena them to testify.  (*See supra* p. 57).  The record also establishes the Rigases or their lawyers knew or reasonably should have known that these witnesses possessed information on each of the purportedly exculpatory topics at issue in the 2255 Petition and Memorandum—namely, the timing of the marketing support discussions with Scientific Atlanta, whether the marketing support agreements reflected legitimate transactions, whether the marketing support agreements originated from Scientific Atlanta or Motorola and were based upon prior contracts with Charter, and whether those agreements had been vetted by Scientific Atlanta and Motorola's lawyers, auditors, and/or executives.  That is, undoubtedly, why the Rigases wanted to speak to them in the first place.

Accordingly, the undisputed testimony at trial – as corroborated by the Scientific Atlanta and Motorola interview notes – establishes that Timothy Rigas and John Rigas were personally involved in the marketing support negotiations with Scientific Atlanta and Motorola.  (*See supra* pp. 52-62).  Further, in 3500 materials produced by the Government for Dan Liberatore (a non-testifying cooperator and former Adelphia employee), the Government disclosed Liberatore's statements that he had spoken to Nilson and Hansen of Scientific Atlanta about marketing support as early as the "late spring [of 2000] or "July of [2000]."  (*See supra* p. 54).  The defense not only had this information available *but used it at trial* in cross-examining Brown about the timing of the marketing support discussions.  (*See supra* at p. 54).  Additional questions asked on cross-examination show that the defense was well aware of the purportedly exculpatory information that Scientific Atlanta and Motorola witnesses might possess, including about whether "Scientific Atlanta had entered into arrangements with Charter"; whether "[Scientific Atlanta was] providing marketing support money to other competitors," to which Brown responded "Charter"; and whether "the documents that ended up being used as the market support agreement with Scientific

Atlanta and as the price increase letter were documents that followed the template or the form of Scientific Atlanta's agreements with Charter." (*See supra* p. 56). Likewise, the defense sought to admit into evidence an August 2000 email that copied Hansen, Wharton, and Nilson and discussed Scientific Atlanta having the go-ahead to enter into a "Charter-like" marketing agreement with Adelphia, and how that would be done. (*See supra* pp. 54-55).

Despite having the foregoing information available to them, the Rigases made the decision not to subpoena these witnesses from Scientific Atlanta and Motorola or to call them at trial. With a complete understanding of these facts and the trial record, Judge Sand determined that the Rigases had no *Brady* claim based on the Government's interview of the Scientific Atlanta and Motorola witnesses. The same holds true today.

### 3.   There Was No *Brady* Violation with Respect to the Letter from Adelphia Management

The Rigases also claim that the Government impermissibly withheld an August 9, 2002 letter from Adelphia's then-new counsel, Boies Schiller, to the Government, which allegedly "contains material exculpatory information on the key issue of whether the Rigases inflated the number of subscribers in their reports in order to show the company was performing well." (Mot. at 71-73; PX App. 88).

Putting aside the fact that this letter would not be admissible at trial under any theory, the footnote that the Rigases cite simply does not establish that the company was not using a particular calculation method at the relevant time,[22] and it does not contradict the essential facts established beyond a reasonable doubt at trial.

---

[22] While the footnote states that Adelphia's new management "intends to improve the quality of the Company's public disclosures," this is an inculpatory fact, not an exculpatory one, because it indicates that the earlier disclosures were inadequate. (PX App. 88 at 2 n.1).

At trial, Brown and Chrosniak explained that, at the direction of Timothy Rigas, and with John Rigas' knowledge and approval, Adelphia disseminated materially misleading subscriber growth figures to the public from 2000 to 2002.  Chrosniak was responsible for coordinating the preparation of Adelphia's quarterly earnings press releases and providing drafts to John Rigas, Timothy Rigas and James Brown for their review and approval.  (Tr. at 5021-22).  She was also responsible for calculating the number of subscribers and the subscriber growth rates reported to the public. (Tr. at 5047).[23]   Chrosniak described for the jury a number of episodes in which Adelphia's reported subscriber growth was fraudulently manipulated at Timothy Rigas's direction or with his approval.

The first episode occurred in connection with the earnings release issued in May 2000 (GX App. X (GX 3042)), which fraudulently reported inflated numbers for both basic subscribers and the basic subscriber growth rate.  (Tr. at 5046-48).  Chrosniak explained that when her preliminary calculations showed little real growth, James Brown directed her to add approximately 14,500 basic cable subscribers who received service from a Brazilian cable company in which Adelphia owned an interest.  (Tr. at 5048-52).  Chrosniak further explained that these subscribers had never been counted by Adelphia before (Tr. at 5051) and that their inclusion artificially increased Adelphia's reported pro forma basic subscriber growth rate.  (*See* GX App. W (GX 2592-A)).

In preparation of the third quarter 2000 earnings release (GX App. Y (GX 3051)), Timothy Rigas directed Chrosniak to add 28,000 subscribers who received service from a Venezuelan

---

[23] Adelphia generally reported subscriber information in three categories: (1) basic subscribers (homes that subscribed to basic cable services); (2) digital subscribers (homes that subscribed to digital cable services at a premium rate); and (3) "Powerlink" subscribers (homes that subscribed to Adelphia's internet service). (Tr. at 5039-40). Adelphia's annual reports stated: "A home with one or more television sets connected to a cable system is counted as one basic subscriber." (GX App. Z at 12 (GX 4029)).

company in which Adelphia owned an interest.  (Tr. at 5061-68).  The Venezuelan subscribers had never been included in Adelphia's prior reports and their inclusion in that period fraudulently and artificially boosted the pro forma growth rate reported to investors.  (Tr. at 5069-72, GX App. W (GX 2592-A).  Similarly, in preparing the earnings release for the third of quarter 2001 (GX 3074), Chrosniak saw that basic subscriber growth numbers were flat.  (Tr. at 5103-05).  She told Brown, who asked her to speak directly with Timothy Rigas.  (Tr. at 5105-06).  When Chrosniak spoke with Timothy Rigas about her preliminary calculations, Timothy Rigas instructed her to add 60,000 home security subscribers.  (Tr. at 5106-09).  Chrosniak explained at trial that she had known at the time of this conversation that it was improper to include the home security service subscribers because if those customers did not subscribe to basic cable service they should not be counted, or if they did also subscribe to basic cable service, they would already have been included in Adelphia's numbers so that adding them would result in double-counting.  (*Id.* at 5108-09).  According to Chrosniak, she did not express this understanding to Timothy Rigas at the time because she did not want to confront him.  (*Id.* at 5109).

Trial testimony further established that Timothy Rigas also instructed Chrosniak to artificially inflate the year-end 2001 number of Powerlink internet service subscribers.  Timothy Rigas had given guidance to analysts throughout 2001 that Adelphia was likely to have 375,000 Powerlink subscribers by year-end.  (Tr. at 5101-02).  When he learned that Adelphia was likely to fall approximately 5,000 subscribers short, Timothy Rigas instructed Chrosniak to add 7,000 "pending installs" as actual subscribers.  (Tr. at 5115-19).  As both Timothy Rigas and Chrosniak knew, "pending installs" were customers who had ordered the Powerlink service but whose service had not yet been installed and who were not yet making payments to Adelphia.  (*Id.*).

The evidence at trial established that, taken together, James Brown and Timothy Rigas's fraudulent adjustments had a material impact on Adelphia's reported subscriber growth rates. For year-end 2000, Adelphia's actual subscriber growth rate was an anemic 0.5%, but with the bogus additions, Adelphia reported 1.3% growth. (Tr. at 5131; GX App. W (GX 2592-A)). For year-end 2001, Adelphia's actual growth rate was *negative* 1.2%, yet the manipulative additions permitted Adelphia to report positive growth of 0.5%. (Tr. at 5131; GX App. W (GX 2592-A)).

Nothing in the August 2002 memorandum undermines this evidence that tens of thousands of subscribers were fraudulently counted by the Rigases to inflate subscriber growth rates. Accordingly, the memorandum is not materially exculpatory, and need not have been disclosed. Indeed, the overall thrust of the letter is indisputably inculpatory. In it, counsel sets forth, on nearly every page, the harms suffered by the company on account of the longstanding and complicated fraud perpetuated by the Rigases. For example:

> [W]e do not believe that there is a meaningful risk that the Rigases will profit from such a recovery for equity holders, given the many tools available to the Company to prevent such a result and given the Company's clear willingness to do everything in its power – including continuing to provide assistance to this office and the Securities and Exchange Commission ("SEC") in connection with forfeiture, disgorgement and other claims – to ensure that the Rigases do not benefit from their wrongdoing.

(PX App. 88 at 6). The memorandum further states:

> Given the billions of dollars the Rigas Family owes to Adelphia and the effect that Adelphia's bankruptcy has had on the value of the pledged shares, there appears to be very little likelihood that the Rigas family will be able to repay their co-borrowing obligations to Adelphia – aggregating not less than $3.1 billion in all – and regain control of the pledged shares.

(*Id.* at 6; *see also id.* at 7 (discussing Adelphia's claims against the Rigases); *id.* at 8 ("[t]he claims of insiders (which the Rigases unquestionably are) are subordinated even where the insiders have engaged in misconduct that only procures an unfair advantage based on their position – in short,

where the misconduct is far less egregious than the breaches of fiduciary duty and frauds committed here."); *id.* at 9 ("[T]he current Adelphia remains committed, whether through assistance to the government in is actions, or through the bankruptcy process, to ensure that the Rigases do not profit at all from their wrongdoing and that they compensate the many victims of their conduct to the greatest extent possible.")).  Because the memorandum is not exculpatory, let alone "materially" so, it cannot serve as the basis for a *Brady* claim.[24]

### 4.   Ground One of the 2255 Petition Should Otherwise Be Denied

Finally, Ground One of the 2255 Petition should be denied to the extent it that it attempts to assert additional, unspecified *Brady* claims.  The 2255 Petition alleges that the information purportedly withheld by the Government in violation of *Brady* "included (but was not limited to)" the materials addressed in the 2255 Petition and Memorandum – that is, unspecified materials *other than* those related to Carl Rothenberger, the Scientific Atlanta and Motorola interviews, and the 2002 letter from Adelphia management.  (Dkt. 128 at 7 (emphasis added)).  This catchall claim – made years after the Rigases first filed their original 2255 Petition, and after the Rigases had the benefit of discovery and the opportunity to amend their *Brady* claims in the current 2255 Petition – lacks any specific factual support and conclusively provides no basis for relief.  *See* 28 U.S.C. § 2255(b).  Furthermore, the Rigases should not, by reliance on this general pleading, be allowed to continually retool failed arguments and assert purportedly new *Brady* claims under the guide of "amending" the previous petitions.  To countenance such an approach would be to annul the bar on successive habeas petitions and enable another thirteen years of post-trial litigation.  For all the

---

[24] The Rigases attempt to confuse this issue with an evidentiary ruling on the introduction of a 10-K.  (2255 Mem. at 31).  The Government's reasons for opposing the introduction of a document have no bearing on whether the letter should have been produced under *Brady*.

reasons set forth herein, the specific grounds asserted in Ground One of the 2255 Petition lack merit.  The remaining, unspecified *Brady* claims in Ground One should likewise be denied.[25]

## **CONCLUSION**

More than a decade has passed since trial, yet the Rigases still misapprehend why their actions were a fraud.  Judge Sand applied the law correctly in denying their current claims more than seven years ago.  In the intervening years, the law has not changed, the facts have not changed, and the ultimate conclusion is the same: the Rigases' *Brady* claims are meritless and have not improved with the considerable passage of time or with the benefit of discovery.  This reality once again means that the Rigases' *Brady* claims fail.[26]  Indeed, were the rule otherwise, defendants would be able to relitigate strategic trial decisions (such as which witnesses to call) in perpetuity.

For the foregoing reasons, Ground One of the 2255 Petition should be denied in its entirety without the need for an evidentiary hearing.

Dated: New York, New York
         August 10, 2017

JOON H. KIM
Acting United States Attorney

By:      _/s/ Brian R. Blais_____
         Brian Blais
         Damian Williams
         Jessica Greenwood
         Aline R. Flodr
         Assistant United States Attorneys

---

[25] For example, nowhere in their original or current 2255 Petition do the Rigases raise a potential *Brady* claim with respect to the timing of Brown's sentencing.  Yet, the Rigases now raise this as a potential "independent *Brady* matter that will be explored in the event of an evidentiary hearing," and bury this argument in a footnote in the 2255 Memorandum.  (*See* 2255 Mem. at 31 n. 27).

[26] Similarly, Judge Sand's decision that there was no joint investigation with the SEC should remain undisturbed.  The SEC was not a part of the prosecution team and, instead, conducted its own parallel investigation.  Accordingly, the Rigases are also not entitled to interview notes of Scientific Atlanta or Motorola witnesses that are in possession, custody, and control of the SEC.

75

**CERTIFICATE OF SERVICE**

I, Aline R. Flodr, Assistant United States Attorney for the Southern District of New York, hereby certify that on August 10, 2017, I caused a copy of the foregoing Memorandum of Law of the United States of America in Opposition to Ground One of the Petitioners' First Amended Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2255 to be served, via the Court's ECF filing system, upon:

> Lawrence C. Marshall
> Stanford Law School
> 559 Nathan Abbot Way
> Stanford, CA 94305
> Tel: 657-723-7572
> Email: lmarshall@stanford.edu
>
> Lawrence G. McMichael, Esq. (lmcmichael@dilworthlaw.com)
> Christie Callahan Comerford, Esq. (ccomerford@dilworthlaw.com)
> Kristin L. Repyneck (krepyneck@dilworthlaw.com)
> Patrick Michael Northen (pnorthen@dilworthlaw.com)
> Dilworth Paxton LLP
> 1500 Market Street, Suite 3500E
> Philadelphia, PA 19102-2101
> Tel: 215-575-7000

Dated: New York, New York
       August 10, 2017

                                    /s/ Aline R. Flodr_____
                                    Aline R. Flodr
                                    Assistant United States Attorney
                                    (212) 637-1110