**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOHN J. RIGAS and TIMOTHY J. RIGAS, : | |
| : | |
| Petitioners, : | 11-CV-6964 (KMW) |
| : | 02-CR-1236 (KMW) |
| *v.* : | |
| : | ECF Case |
| UNITED STATES OF AMERICA, : | |
| : | |
| Respondent. : | |
| : | |

**REPLY MEMORANDUM IN SUPPORT OF PETITIONERS' MOTION FOR
JUDGMENT ON VARIOUS CLAIMS ALLEGING VIOLATIONS OF
*BRADY v. MARYLAND*, 373 U.S. 83 (1963)**

LAWRENCE C. MARSHALL, ESQ.
ADMITTED *PRO HAC VICE*
559 NATHAN ABBOTT WAY
STANFORD, CA 94305
(650) 723-7572
lmarshall@stanford.edu

*Attorney for Petitioners,*
*John J. Rigas and Timothy J. Rigas*

1

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................... ii

I.   THERE IS NO BAR TO THE COURT'S CONSIDERATION OF THE ISSUES
     PETITIONERS ARE RAISING. .................................................................................... 2

II.  PROPER APPLICATION OF THE ESSENTIAL FACT DOCTRINE REQUIRES
     RELIEF. ........................................................................................................................... 8

III. THE   INFORMATION   MR.   ROTHENBERGER   PROVIDED   TO   THE
     GOVERNMENT WAS MATERIALLY EXCULPATORY BY ANY MEASURE. ............ 13

     A.   The 13-D Allegations and "Immediately Available Funds" ....................................... 16

     B.   The 10-K Filing ............................................................................................................ 19

     C.   Related Party Transactions .......................................................................................... 21

     D.   The Golf Course Project ............................................................................................... 22

VI.  PETITIONERS   ARE   ENTITLED   TO   RELIEF   BECAUSE   OF   THE   BRADY
     VIOLATIONS RELATING TO THE MARKETING SUPPORT AGREEMENTS. ............. 23

     A.   The Use of Two Documents to "Fool the Auditors" ..................................................... 23

     B.   Timing of the Negotiations and Auditor Approval ....................................................... 26

     C.   Timing of the Discussions ............................................................................................ 27

V.   PETITIONERS   ARE   WITHDRAWING   THEIR   CLAIM   RELATING   TO   THE
     AUGUST   9,   2002   LETTER   DEALING   WITH   THE   COUNTING   OF
     SUBSCRIBERS. ............................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**

*Abbey House Media, Inc. v. Simon & Schuster, Inc.*,
 __ F.3d __, 2017 WL 3013002 (2d Cir. 2017) ................................................................. 3

*Ali v. Mukasey*,
 529 F.3d 478 (2d Cir. 2008) ........................................................................................... 5

*Arizona v. California*,
 460 U.S. 605 (1983) ......................................................................................................... 5

*Blalock v. Smith*,
 No. 08-Civ-7528, 2012 WL 3283439 (S.D.N.Y. Aug. 13, 2012) ................................. 9

*Brady v. Maryland*,
 373 U.S. 83 (1963) .................................................................................................. *passim*

*Brown v. Myers*,
 137 F.3d 1154 (9th Cir. 1998) ..................................................................................... 10

*Cabrera v. United States*,
 972 F.2d 23 (2d Cir. 1992) ............................................................................................. 4

*Chin v. United States*,
 622 F.2d 1090 (2d Cir. 1980) ......................................................................................... 4

*Crawford v. Washington*,
 541 U.S. 36 (2004) ........................................................................................................... 4

*Davis v. United States*,
 417 U.S. 333 (1974) ......................................................................................................... 4

*Demjanjuk v. Petrovsky*,
 10 F.3d 338 (6th Cir. 1993) ............................................................................................ 7

*DiSimone v. Phillips*,
 461 F.3d 181 (2d Cir. 2006) ..................................................................................... 8, 13

*Ernst & Ernst v. Hochfelder*,
 425 U.S. 185 (1976) ....................................................................................................... 14

*Foster v. Chatman*,
 136 S.Ct. 1737 (2016) ...................................................................................................... 4

*Fuentes v. Griffin*,
829 F.3d 233 (2d Cir. 2016)........................................................................... 13

*Green v. Beer*,
No. 06 Civ. 4156, 2009 WL 3401256 (S.D.N.Y. Oct. 22, 2009) (Wood, J.) ................... 6

*In re Peters*,
642 F.3d 381 (2d Cir. 2011)........................................................................... 5

*Jackson v. Senkowski*,
814 F. Supp. 9 (S.D.N.Y. 1993)..................................................................... 9

*Jenkins v. Artuz*,
294 F.3d 284 (2d Cir. 2002)......................................................................... 29

*Lamberti v. United States*,
22 F. Supp. 2d 60 (S.D.N.Y. 1998)................................................................. 9

*Leka v. Portuondo*,
257 F.3d 89 (2d Cir. 2001)........................................................................... 8

*Miller v. Pate*,
386 U.S. 1 (1967)........................................................................................ 29

*Morissette v. United States*,
342 U.S. 246 (1952)................................................................................... 14

*Napue v. Illinois*,
360 U.S. 264 (1959)................................................................................... 29

*Rincon v. Burge*,
No. 05-Civ-0686, 2010 WL 6789121 (S.D.N.Y. Sept. 8, 2010) ............................... 9

*Sanders v. United States*,
373 U.S. 1 (1963)........................................................................................ 4

*St. Germain v. United States*,
No. 03 CV 8006, 2004 WL 1171403 (S.D.N.Y. May 11, 2004) ............................... 9

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*,
736 F.3d 198 (2d Cir. 2013)......................................................................... 5

*Strickler v. Greene*,
527 U.S. 263 (1999)................................................................................... 13

*Tecsec, Inc. v. Int'l Bus. Machines Corp.*,
    731 F.3d 1336 (Fed. Cir. 2013)......................................................................... 4

*United States v. Becker*,
    502 F.3d 122 (2d Cir. 2007)........................................................................... 4

*United States v. Diaz*,
    922 F.2d 998 (2d Cir. 1990)........................................................................... 9

*United States v. Dolah*,
    72 F. Supp. 2d 235 (S.D.N.Y. 1999).............................................................. 15

*United States v. Espinal*,
    96 F. Supp. 3d 53 (S.D.N.Y. 2015)................................................................ 13

*United States v. Fernandez*,
    No. 10 Cr 863, 2014 WL 7180225 (S.D.N.Y. Nov. 25, 2014)......................... 17

*United States v. Gonzalez*,
    110 F.3d 936 (2d Cir. 1997)........................................................................... 9

*United States v. Holloway*,
    630 F.3d 252 (1st Cir. 2011).......................................................................... 5

*United States v. Khedr*,
    343 F.3d 96 (2d Cir. 2003)............................................................................. 3

*United States v. Kohring*,
    637 F.3d 895 (9th Cir. 2011).......................................................................... 16

*United States v. LeRoy*,
    687 F.2d 610 (2d Cir. 1982)........................................................................... 9

*United States v. Mahaffy*,
    693 F.3d 113 (2d Cir. 2012)................................................................. *passim*

*United States v. Miller*,
    822 F.2d 828 (9th Cir. 1987).......................................................................... 7

*United States v. Oshatz*,
    700 F. Supp. 696 (S.D.N.Y. 1988)................................................................. 3

*United States v. Payne*,
    63 F.3d 1200 (2d Cir. 1995)........................................................................... 13

*United States v. Quintieri*,
    306 F.3d 1217 (2d Cir. 2002) ........................................................ 3

*United States v. Rigas*,
    583 F.3d 108 (2d Cir. 2009) .......................................................... 3

*United States v. Rigas*,
    779 F. Supp. 2d 408 (M.D. Pa. 2011) .......................................... 3

*United States v. Rivas*,
    377 F.3d 195 (2d Cir. 2004) ........................................................ 13

*United States v. Rodriguez*,
    496 F.3d 221 (2d Cir. 2007) ................................................... 8, 17

*United States v. Rowland*,
    826 F.3d 100 (2d Cir. 2016) ........................................................ 11

*United States v. Shamsideen*,
    No. 03-CR-1313, 2004 WL 1179305 (S.D.N.Y. Mar. 31, 2004) ...................................... 9

*United States v. Torres*,
    719 F.2d 549 (2d Cir. 1983) .......................................................... 9

*United States v. Uccio*,
    940 F.2d 753 (2d Cir. 1991) .......................................................... 7

*United States v. Valentine*,
    820 F.2d 565 (2d Cir. 1987) ........................................................ 29

*United States v. Wallach*,
    935 F.2d 445 (2d Cir. 1991) ........................................................ 26

*United States v. Williams*,
    205 F.3d 23 (2d Cir. 2000) ............................................................ 5

*Williams v. United States*,
    503 F.2d 995 (2d Cir. 1974) .......................................................... 9

*Yates v. United States*,
    354 U.S. 298 (1957) .................................................................... 16

**Other Authorities**

18B CHARLES ALAN WRIGHT & ARTHUR R. MILLER,
FEDERAL PRACTICE AND PROCEDURE § 4478 (2d ed. 2017) ........................................ 5

18B Charles Alan Wright & Arthur R. Miller,
Federal Practice and Procedure § 4478.1 (2d ed. 2017) ....................................................... 6

Fed. R. Evid. 603 ........................................................................................................... 11

The defining trait of the Government's Memorandum is its repeated refusal to engage with key points Petitioners have advanced. For example, the Government casually shrugs off *United States v. Mahaffy*, 693 F.3d 113 (2d Cir. 2012), as having said nothing significant about the contours of the essential facts doctrine. And because the Government ignores what the Second Circuit held in *Mahaffy*, the Government fails to acknowledge *Mahaffy*'s implications on application of the law-of-the-case doctrine. Nor does the Government own the implications that its conduct before Judge Sand and the Second Circuit has on the law-of-the-case doctrine in this case. Instead, the Government tries to cling to its contention that it learned nothing at all exculpatory during its interviews of Carl Rothenberger or personnel from Scientific Atlanta and Motorola ("SA/Mot"). To support this position, the Government distorts the law regarding reasonable reliance on counsel. It argues that because Mr. Rothenberger allegedly was "kept in the dark"—albeit by people other than the Rigases—the Rigases at trial would not have been able to use their reliance on Mr. Rothenberger to show that the prosecution failed to prove they had the required *mens rea* (intent to defraud or deceive) necessary to convict. Once this major premise of the State's argument is rejected, all that is left are some specific unfounded points the Government makes about the various undisclosed Rothenberger and SA/Mot notes.

Our Reply is presented in five parts. Part I deals with the law-of-the-case doctrine. Part II discusses *Mahaffy* and the essential facts doctrine. Part III addresses the Government's claim that the Rothenberger notes are not exculpatory because Mr. Rothenberger was kept "in the dark," as well as the Government's other claims about why there was no duty to disclose the Rothenberger notes, and Part IV does the same with regard to the Government's arguments in relation to the SA/Mot notes. Finally, Part V explains why Petitioners are withdrawing their claim relating to the August 9, 2002 letter dealing with counting subscribers.

## I. THERE IS NO BAR TO THE COURT'S CONSIDERATION OF THE ISSUES PETITIONERS ARE RAISING.

In arguing that Petitioners' claims are barred because they were considered before, the Government ignores the history of the case. As described in Petitioners' Opening Memorandum (Dkt. 137 at 14-16), after keeping the notes from Petitioners and the courts, the Government assured the courts they contained nothing at all exculpatory. Indeed, the Government accused the defense of engaging in rank speculation that the subjects the defense identified were ever discussed with Mr. Rothenberger. *See* Opening App. 13, Gov't Mem. Opp'n Mot. to Compel at 3, *United States v. Rigas*, No. 02-Cr-1236 (S.D.N.Y. Jan. 15, 2008) (emphasis added) (citations omitted). The Government also argued that under *Brady v. Maryland*, 373 U.S. 83 (1963), the entire idea of a motion to compel disclosure of potentially exculpatory material has no place in the law. Opening App. at 13. Most significantly, the prosecution explained it had followed the "law and practice in the Second Circuit that the Government may fulfill its *Brady* obligations with respect to a particular witness by identifying the witness to the defendant *and indicating that the witness may have favorable information on a particular subject*." *Ibid* (emphasis added).

So Judge Sand's ruling was in the context of the prosecution assuring him it *had* identified for the defense each and every "particular subject" about which Mr. Rothenberger or the SA/Mot personnel had related exculpatory information. From that foundation, Judge Sand ruled that, under the essential facts doctrine, the defense was entitled to nothing more—that the defense had been given the identity and subject-matter information allowing it to decide whether to subpoena the witnesses at trial. Accordingly, when the case went before the Second Circuit, the Government described Judge Sand's ruling as based on the following facts: (1) Appellants "knew of Rothenberger's existence, his role at Adelphia, and the facts on which he could [provide] testimony," *and (2) the Government had identified Rothenberger as a witness with potentially*

*exculpatory material on a specific subject matter.* Opening App. 16, Br. of Government-Appellee at 117, 129, *United States v. Rigas*, 583 F.3d 108 (No. 08-3485) (emphasis added).

The Second Circuit Brief of the Government was emphatic on this point. It explained, "[i]t has long been the law and practice in this Court and in the Southern District of New York that the Government may fulfill its *Brady* obligations with respect to a particular witness by identifying the witness to the defendant and indicating that the witness may have favorable information on a particular subject." *Id.* at 120. The Government declared, "[i]t is now up to [the defendants] to subpoena these witnesses to take advantage of any exculpatory information they might furnish." *Ibid.* (quoting *United States v. Oshatz*, 700 F. Supp. 696, 698 (S.D.N.Y. 1988)).

Judge Sand never saw the notes and hence could not verify the Government's guarantee it had identified each "particular subject" of exculpatory information. He ruled only on a post-trial motion to compel.[1] He never ruled on a *Brady* claim about specific information or about essential facts when the Government had not disclosed the identity of a person and particular subject of the information. There is, then, no law-of-the-case or other preclusion issue here.

The Government argues otherwise and asserts that, in addition to law-of-the-case principles, a habeas relitigation bar precludes the claims Petitioners are raising.[2] This position

---

[1] When the issue was later addressed in a pre-trial setting, the United States District Court for the Middle District of Pennsylvania in fact ordered the Government to disclose the notes. *See United States v. Rigas*, 779 F. Supp. 2d 408 (M.D. Pa. 2011).

[2] Although the Government argues that the traditional law-of-the-case doctrine and the relitigation bar preclude Petitioners' claim, the Government does not argue that the "mandate" rule applies here by virtue of the Second Circuit's affirmance of Judge Sand's Order. *See generally United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002) (discussing the "mandate rule" which "requires a trial court to follow an appellate court's previous ruling on an issue in the same case"). The Government is correct in not arguing that point (and has waived it by not raising it). The mandate of the Court of Appeals established only that the requested Motion to Compel should be denied, but there is no broader reasoning that binds District Courts here. The Court of Appeals provided no rationale for its affirmance. It stated only that "[w]e detect no error in the District Court's January 15, 2008 *Order* denying defendants' motion to compel discovery." *United States v. Rigas*, 583 F.3d 108, 126 (2d Cir. 2009) (emphasis added). This is very different than an opinion in which the Second Circuit adopts the reasoning of a district court. *See, e.g., Abbey House Media, Inc. v. Simon & Schuster, Inc.*, __ F.3d __, 2017 WL 3013002, at *1 (2d Cir. 2017) ("We affirm for the reasons set forth in the district court's thorough and well-reasoned written opinion, which we hereby adopt."); *United States v.*

contradicts the Second Circuit's holding in *United States v. Becker*, 502 F.3d 122 (2d Cir. 2007). During his federal trial and on appeal, Gregg Becker had argued that his Confrontation Clause rights were violated when out-of-court statements were introduced against him. Both courts rejected the claim. Later, after the Supreme Court decided *Crawford v. Washington*, 541 U.S. 36 (2004), Mr. Becker filed a § 2255 petition. Rather than ruling that a rigid relitigation bar doctrine precluded the claim, the court applied the law-of-the-case doctrine—and found the intervening modification of law rendered it proper to consider Mr. Becker's claim. Becker, 502 F. 3d at 128.[3]

To the extent, then, that the instant petition calls for any reassessment of earlier rulings (and as discussed above, it does not), the propriety of such reassessment is governed by the

---

*Khedr*, 343 F.3d 96, 102 (2d Cir. 2003) ("We agree with and adopt the District Court's reasoning."). *See generally Tecsec, Inc. v. Int'l Bus. Machines Corp.*, 731 F.3d 1336, 1341-43 (Fed. Cir. 2013) (holding that the scope of the mandate rule only extends to issues when it is necessarily the case that the decision was based on a particular ground).

In its Brief before the Second Circuit, the Government did not even raise the essential fact doctrine as its primary argument. It first argued Petitioners had no evidence there was anything exculpatory in the documents. Opening App. 16, Br. of Government-Appellee at 120-22, *United States v. Rigas*, 583 F.3d 108 (No. 08-3485). It also argued that granting a motion to compel would "subvert the process" by which *Brady* disclosures are made by taking away the Government's authority. *Id.* at 121. As for the essential facts doctrine, the Government mentioned it only twice in the 22-page section on the Motion to Compel. *See id.* at 119. There is, then, no basis to conclude that the Second Circuit issued a mandate dealing with essential facts, as opposed to the other grounds the Government put forth. As such, any law-of-the-case arguments here involve the impact of Judge Sand's ruling alone.

[3] The Court in *Becker* explained that its decision tracked *Davis v. United States*, 417 U.S. 333 (1974). The defendant there, Joseph Davis, had raised and lost an issue in federal district court and the Ninth Circuit. After the Ninth Circuit issued a decision in another case granting relief in circumstances akin to Mr. Davis's, he filed a § 2255 action to reassert his claim. The Supreme Court held that this claim could go forward—without any bar by virtue of its having been adjudicated in the direct proceedings. *Id.* at 346-47. The cases the Government cites do not call this proposition into question. For example, several of the cases upon which the Government relies, in turn rely upon *Cabrera v. United States*, 972 F.2d 23 (2d Cir. 1992). In *Cabrera*, the court stated that "section 2255 may not be employed to relitigate questions that were raised and considered on direct appeal (*id*. at 25 (citation omitted)), but the court explained that that was because Mr. Cabrera had "not met his burden of showing, that 'although the ground of the new application was determined against him'" it should still be relitigated because "'the ends of justice will be served.'" *Ibid*. (quoting *Sanders v. United States*, 373 U.S. 1, 17 (1963)). This "ends of justice" inquiry is a far cry from an absolute bar— indeed, it is an integral part of the classic law-of-the-case doctrine. Similarly, we take no issue with another case the Government cites, *Chin v. United States*, 622 F.2d 1090 (2d Cir. 1980), which holds no more than that when petitioners are asking a § 2555 court to reconsider a prior decision based on changes in the law, they must show that the change in the law "when applied to their claims, would result in a different disposition." *Id*. at 1092. And Justice Alito's concurrence in *Foster v. Chatman*, 136 S.Ct. 1737, 1758 (2016) (Alito, J., concurring), stated the uncontroversial point that § 2255 courts do not revisit earlier decisions "as a general rule," or "ordinarily," or "[a]bsent countervailing considerations." The importance of the discussion in *Foster* is that there is no bar to reconsideration when special circumstances so justify.

standard law-of-the-case doctrine. That rule merely "directs a court's discretion," but "does not limit the tribunal's power." *Arizona v. California*, 460 U.S. 605, 618 (1983). *See also United States v. Williams*, 205 F.3d 23, 34 (2d Cir. 2000) (holding that District Court's application of the law-of-the-case doctrine is reviewed only for abuse of discretion). The ultimate question is always whether there are "cogent and compelling reasons" to revisit a decision. *See In re Peters*, 642 F.3d 381, 386 (2d Cir. 2011) (internal quotations omitted). Still, courts look at these considerations to guide their exercise of discretion: whether (1) there have been changes or clarifications in the law; (2) there have been changes in the facts available to inform the decision; (3) revisiting the ruling will correct a clear error; or (4) revisiting the ruling will prevent manifest injustice. *See Starbucks Corp. v. Wolfe's Borough Coffee, Inc.,* 736 F.3d 198, 208 (2d Cir. 2013) (citing *Ali v. Mukasey*, 529 F.3d 478, 490 (2d Cir. 2008)). These are all independent reasons; the presence of any one opens the door for revisiting an earlier decision. Here, the record supports each of these reasons.

First, and dispositively, the Second Circuit's decision in *Mahaffy* reflects an important clarification and evolution of *Brady* and the essential facts doctrine. As described below (*infra* 9-12), it is nigh inconceivable that a court having the benefit of *Mahaffy* would have applied the essential facts doctrine as the Government contends it was applied here. This is the classic reason for reconsidering a prior decision. *See* 18B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 4478 (2d ed. 2017) ("Perhaps the most obvious justifications for departing from the law of the case arise" when there have been changes in the law, including when "legal doctrine has evolved since the time of an earlier decision."); *see also United States v. Holloway*, 630 F.3d 252, 258, 260 (1st Cir. 2011) (reconsidering earlier decision because the Supreme Court's reasoning in a recent decision "reveals a significant tension" with the earlier decision). A court that, based on an intervening decision, has "clear conviction of error

with respect to a point of law on which [the] previous decision was predicated," has a "cogent" or "compelling" reason to reconsider that decision. *Green v. Beer*, No. 06 Civ. 4156, 2009 WL 3401256, at *2 (S.D.N.Y. Oct. 22, 2009) (Wood, J.) (citations omitted).

Second, the notes that Petitioners secured through the Pennsylvania case and through discovery here constitute new evidence unavailable to prior courts. This evidence exposes the falsehood of the Government's claim that it informed the defense of the *particular subjects* on which identified individuals possessed exculpatory information. In addition, the notes make it clear that the exculpatory information Mr. Rothenberger and the SA/Mot personnel provided is far broader than Petitioners suspected when they filed their Motion to Compel. For example, it contains substantial new information about the related-party-transaction claims—and shows Mr. Brown was testifying falsely when he claimed that Tim Rigas was the person in charge of reporting of the transactions. *See infra* 21-22. In addition, the notes show that the Government was told about many conversations among third parties of which Petitioners were necessarily unaware.

Strangely, one of the ways the Government now seeks to distinguish *Mahaffy* is by claiming that "while the petitioner in *Mahaffy* knew the identities of the potential witnesses and that they had potentially relevant conversations with other people involved, *he had no knowledge of the information to which they could testify, because he was not involved in the conversations*." Gov. Opp., Dkt. 128, at 25 (emphasis added). The newly available Rothenberger and SA/Mot notes tell us that is precisely the case here as well. *See generally* WRIGHT & MILLER, § 4478.1 (identifying one justification for reconsidering an earlier ruling as when the prior ruling rested "on poorly developed facts that have been better developed by continuing proceedings").

Third, and closely related to the first consideration, the earlier application of the essential facts doctrine is clear error. Even if the Court were not to consider *Mahaffy* a significant enough

change or clarification of law to qualify under the first consideration, the earlier result here would constitute clear error for the reasons set forth in *Mahaffy*. One of two conditions exist here (once it is recognized—as it must be—that the earlier decision here is incompatible with *Mahaffy*): Either *Mahaffy* is new in a way that justifies revisiting the earlier ruling, or *Mahaffy* simply applies established Circuit precedent, which means the earlier ruling was plain error—another justification for revisiting earlier decisions. *See United States v. Uccio*, 940 F.2d 753, 758-59 (2d Cir. 1991) (explaining it is "well within" the District Court's discretion "to decline to deem itself bound by a ruling that it had come to view as wrong").

Finally, given the history of this case, considering Petitioners' claim is necessary to prevent manifest injustice. As spelled out in the Opening Memorandum (at 12-16), the Government has played fast and loose with the facts in this case. Even though the prosecutors knew Petitioners were almost entirely spot-on with their allegations, the Government repeatedly denounced Petitioners for having nothing more than rank speculation to support their efforts to secure the notes. *Id.* at 14-15. Then, in fighting against *in camera* review, the Government emphatically assured the courts there was nothing the least bit exculpatory in the notes.[4] *Id.* at 15-16. It would be manifestly unjust to reward the Government for its behavior and to deprive Petitioners of a decision actually based on the contents of these notes. *See generally Demjanjuk v. Petrovsky*, 10 F.3d 338, 349-56 (6th Cir. 1993) (vacating earlier decision based on finding that, even if Government attorneys did not suppress evidence deliberately, they acted with reckless disregard for the truth); *United States v. Miller*, 822 F.2d 828, 831-33 (9th Cir. 1987) (it would be a manifest injustice not to reconsider a ruling that was based on the Government's mistaken concession).

---

[4] To be clear, the Government's representation to the court was not that the notes were exempt from disclosure because they also contained incriminating information—one of the groundless arguments the Government advances here. Rather, the Government told the court there was simply not a drop of undisclosed exculpatory information on any subject.

## II. PROPER APPLICATION OF THE ESSENTIAL FACTS DOCTRINE REQUIRES RELIEF.

Prior to trial, the prosecution told the defense that of all the subjects with which he was intimately aware, Carl Rothenberger had provided exculpatory evidence only about timber rights. Mr. Rothenberger had refused to be interviewed by the defense, and the message to the defense was unmistakable: Mr. Rothenberger was cooperating with the Government and not disclosing exculpatory evidence on any key issues in the trial. So, unsurprisingly, the defense did not dare call him to the stand. Given the inadequate disclosure, the defense blindly "was left to gamble on what [the] witness would say." *United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007) (citing *Leka v. Portuondo*, 257 F.3d 89, 103 (2d Cir. 2001)).

Although we now know Mr. Rothenberger provided the Government with exculpatory evidence on a broad array of issues, the defense knew none of that when deciding whether to call him as a witness. Still, the Government now argues repeatedly that the Rigases made a knowing and strategic decision not to call Mr. Rothenberger, and all they had to do was subpoena him in order to secure his testimony. This cavalier ("let them eat cake") response flouts the most basic fundamentals of a trial. As the Government knows, no lawyer (on the prosecution or defense side) can responsibly call a witness at trial without knowing what the witness is prepared to say. Indeed, the Second Circuit has characterized the decision to "call a witness cold" as "suicidal." *DiSimone v. Phillips*, 461 F.3d 181, 197 (2d Cir. 2006) (quoting *Leka*, 257 F.3d at 103). That is true many times over when the lawyer knows the witness is talking only to the other side.

The Government feigns naiveté when it argues that, so long as the defense knows what the witness *should* say, the defense ought simply call him. But we all know witnesses do not invariably testify truthfully. There are many kinds of self-interest that frequently lead witnesses to give false testimony. Countless wrongful convictions stand as testament to this fact. And recognizing this is,

of course, the basis of the classic rule of impeachment for bias and interest. *See generally* Trial Tr. 11,306[5] (instructing jury to examine with care the testimony of a witness who has a deal with the Government because he "has a motive to testify falsely").

Indeed, the defense had every reason to believe Mr. Rothenberger was providing the Government with an account the defense knew to be untrue. No other conclusion could explain why someone the defense knew to possess so much exculpatory information had only provided the Government with exculpatory information about the minor timber rights issue, as the Government disclosed. It is somewhat surreal, then, to read the Government accusing the defense of "Monday-morning quarterbacking," (Gov. Opp. at 44), when it was the Government that "hid the ball" that was supposed to have been used on Sunday. A "necessary predicate" for "knowing and strategic" decisions about calling witnesses "is that the strategies selected were chosen after careful consideration of all constitutionally-compelled disclosure." *St. Germain v. United States*, No. 03 CV 8006, 2004 WL 1171403, at *18 (S.D.N.Y. May 11, 2004).

In advancing its "knowing and strategic choice" and essential facts arguments, the Government all but ignores *Mahaffy*, which so closely tracks the facts of this case, and which substantially clarified relevant Second Circuit law.[6] In our Opening Memorandum (at 45-51) we demonstrated that the essence of *Mahaffy* was its recognition that when a witness has made a

_____

[5] Citations to the trial transcript (Trial Tr.) can be found in the comprehensive trial record the Government attached to their Memorandum in Opposition.

[6] In Section I we discussed how *Mahaffy* represents an evolution or clarification of law so as to trigger an exception to the law-of-the-case doctrine. This is evident in the number of earlier decisions that used analysis inconsistent with the rules *Mahaffy* later established. *See, e.g., United States v. Gonzalez*, 110 F.3d 936 (2d Cir. 1997); *United States v. Diaz*, 922 F.2d 998 (2d Cir. 1990); *United States v. Torres*, 719 F.2d 549 (2d Cir. 1983); *United States v. LeRoy*, 687 F.2d 610 (2d Cir. 1982); *Williams v. United States*, 503 F.2d 995 (2d Cir. 1974); *Blalock v. Smith*, No. 08-Civ-7528, 2012 WL 3283439 (S.D.N.Y. Aug. 13, 2012); *Rincon v. Burge*, No. 05-Civ-0686, 2010 WL 6789121 (S.D.N.Y. Sept. 8, 2010); *United States v. Shamsideen*, No. 03-CR-1313, 2004 WL 1179305 (S.D.N.Y. Mar. 31, 2004); *Lamberti v. United States*, 22 F. Supp. 2d 60 (S.D.N.Y. 1998); *Jackson v. Senkowski*, 814 F. Supp. 9 (S.D.N.Y. 1993).

pretrial statement with exculpatory information to the Government, *two* kinds of essential facts are in play. First, was the defense aware this individual knew exculpatory information? Second, was the defense aware this individual was still providing an account with exculpatory facts? If the defendant was without that second category of information (particularly vis-à-vis a witness who refused to speak with the defense), then the defendant was without knowledge enabling him to take advantage of the exculpatory information. In such cases, *Brady* requires disclosure.

The bulk of the alleged *Brady* material at issue in *Mahaffy* involved statements by the defendants' co-workers, who had provided accounts to the SEC that, in large part, were exculpatory of the defendants. Echoing the Government's argument here, the Government in *Mahaffy* contended that "potentially exculpatory testimony is not considered suppressed where the defense knows the witness's identity." *Mahaffy*, 693 F.3d at 131 n.11. The Government cited eight cases for this proposition. App. A, Brief of Government-Appellee at 165-66, *Mahaffy*, 693 F.3d 113 (No. 09-5349) (2d Cir. 2011). But the court in *Mahaffy* rejected that position, and clarified the law regarding the essential facts doctrine. The court explained that the cases upon which the Government relied "require more. It is not enough that a defendant knew a potential witness's identity; the defendant had to know 'or should have known the essential facts permitting him to take advantage of any exculpatory evidence.'" *Mahaffy*, 693 F.3d at 131 n.11 (citation omitted). [7]

---

[7] One other general claim the Government makes is that the Rigases cannot complain about not receiving the withheld material because "they were best positioned to testify to their understanding of the advice they purportedly received." *See* Gov. Opp. at 48-49. This is another glib response. The Government surely understands that "without any corroborating witnesses, [a defendant's] bare testimony [leaves] him without any effective defense." *Brown v. Myers*, 137 F.3d 1154, 1158 (9th Cir. 1998). Petitioners may well have testified had Mr. Rothenberger been a witness, but without his testimony, their "bare testimony" would have been of little use, as the jury would inevitably ask, "where's the lawyer?" *See* Opening Mem. at 53 (discussing issue). Moreover, the argument has no relevance to this case, as much of the withheld evidence dealt with crucial conversations Mr. Rothenberger and SA/Mot personnel had with third parties—conversations about which the Petitioners themselves could not have testified.

Applying that principle to the case of David Gyhsels, one of the defendants in *Mahaffy*, the Court explained the issue was not simply whether Mr. Ghysels was aware that his former partner, Carlos Romero, knew exculpatory information. That was of little value because Mr. Romero "refused to meet with [the defense] prior to trial." *Id*. at 131. So "[n]ot knowing what Romero might testify to, Ghysels did not call him at trial." *Ibid.* The essential fact Mr. Ghysels needed to know before trial—but which the Government withheld—was that, in a pretrial interview, Mr. Romero had given the SEC an account that included information exculpatory of Mr. Ghysels.[8]

Instead of confronting *Mahaffy*'s obvious impact on this case, the Government seeks to reduce *Mahaffy* to a mundane holding that "*Brady* applies to material that 'would be an effective tool in disciplining witnesses during cross-examination.'" Gov. Opp. at 25 (quoting *Mahaffy*, 693 F.3d at 131). But far from supporting the Government's position, the passage the Government cites shows exactly why there was a *Brady* violation in the Rigases' case. The Court explained one reason it was imperative to let the defense know about the Government's interview with Mr. Romero was that, armed with information about the interview, the defense "quite possibly would have called Romero at trial." *Mahaffy*, 693 F.3d at 131. This is because, had Romero testified consistent with his earlier exculpatory statement, that would have bolstered the defense. And even had Romero testified otherwise, the defense could have confronted him with his prior inconsistent statement to the SEC.[9]  This is as true here as it was in *Mahaffy*.

A recent post-*Mahaffy* Second Circuit decision, *United States v. Rowland,* 826 F.3d 100 (2d Cir. 2016), shows how the analysis is now carried out. John Rowland was convicted of

---

[8] Mr. Ghysels was just one of the defendants who prevailed in showing a *Brady* violation in *Mahaffy*. We describe his case as illustrative.

[9] Regardless of whether the earlier statement could be introduced as substantive evidence, it would have been available to impeach the witness, if necessary. *See* FED. R. EVID. 613.

conspiring with a congressional candidate, Lisa Wilson-Foley, to work for her campaign, but to be paid by her husband's business so as to evade FEC reporting requirements. Following his conviction, Mr. Rowland learned for the first time that, when interviewed by the Government prior to trial, Ms. Wilson-Foley had explained to the Government that Mr. Rowland's work for her husband's business was not a sham. *Id.* at 112. Mr. Rowland raised a *Brady* issue on appeal, and under the approach the Government advocates here, the Second Circuit would have simply held that because Mr. Rowland knew Ms. Wilson-Foley's identity and the topics about which she had knowledge, the Government had no *Brady* obligation. But the Court in *Rowland* did no such thing. Rather, the court examined the information about the interview that the Government had already turned over and concluded it contained the same information as that withheld. *Id.* at 112-13. *That* is the proper application of the essential facts doctrine—the defense was given the essential information about the exculpatory information conveyed. The defendant had no right to word-for-word disclosure—only the essential facts of the account Ms. Wilson-Foley provided. That happened in *Rowland*, so the conviction was affirmed. It did not happen in *Mahaffy*, and the conviction was reversed. Nor did it happen here.

It is telling that the Government has declined to address several key points we raised on this issue in our Opening Memorandum. For example, we explained that under the view the Government espouses there was no *Brady* violation in *Brady* itself. Opening Mem. at 49. The Government has offered no explanation for why that is not so—and we can imagine none. Nor does the Government explain how it is that the conviction of Senator Ted Stevens was vacated and the Department of Justice issued a voluminous report vowing to better respect *Brady*, when the withheld information in *Stevens* so closely mirrors the withheld information here. *Id.* at 50-51.

The Government mocks Petitioners for suggesting the "novelty" that the defense would have been duped by the partial disclosure into believing that (a) the Government did feel obliged to disclose any exculpatory information it learned from Mr. Rothenberger, and (b) the only exculpatory information he conveyed was about timber rights. But there is nothing novel about this common-sense point, as spelled out in *United States v. Payne,* 63 F.3d 1200 (2d Cir. 1995) (discussed in Opening Mem. at 43-44), another case the Government simply ignores. Imagine the prosecution had sent a letter saying, "We have interviewed Mr. Rothenberger and the only exculpatory information he provided was about timber rights." There could be no disagreement that sending this letter without identifying other exculpatory information conveyed would violate *Brady* and Due Process in the extreme. What happened here tracks that perfectly. *See generally United States v. Espinal*, 96 F. Supp. 3d 53, 67 (S.D.N.Y. 2015) (explaining that Government's *Brady* "disclosures were inadequate. They were misleading in the sense that they did not reveal the full picture. When the government discloses only part of the story and omits matters that undercut its charges, it is not meeting its discovery obligations.").

### III. THE INFORMATION MR. ROTHENBERGER PROVIDED TO THE GOVERNMENT WAS MATERIALLY EXCULPATORY BY ANY MEASURE.

The Government's arguments about why the information Mr. Rothenberger provided the prosecution was not exculpatory are virtually all based on the same central premise.[10]  According to the Government, no matter how much the Rigases relied on Adelphia's and the Rigases'

---

[10] The Government inexplicably continues to argue that it had no duty to disclose exculpatory information if the notes also contained inculpatory information. As described in our Opening Memorandum (at 53-54) that proposition flies in the face of settled Second Circuit precedent. Even a decade ago, the Second Circuit announced that "this Court has already made it unmistakably clear that evidence 'having both an inculpatory and exculpatory effect' must be turned over the defense as *Brady* material.'" *DiSimone*, 461 F.3d at 195 (quoting *United States v. Rivas*, 377 F.3d 195, 199 (2d Cir. 2004)). *See also Fuentes v. Griffin*, 829 F.3d 233, 252 (2d Cir. 2016) ("[R]eliance on potentially inculpatory aspects of the suppressed document is not a proper application of *Brady* principles[.]") (citing *Strickler v. Greene*, 527 U.S. 263, 282 n.21 (1999))*.* So even if there were any merit to the Government's claim about incriminating information—and there is not—it would make absolutely no difference to its *Brady* obligation.

experienced counsel, the Rigases were not entitled to present that evidence to the jury to show they lacked intent to willfully defraud or deceive. This is not because the Government proved (or even alleges at this point) that the Rigases themselves ever hid anything from Mr. Rothenberger or that the Rigases knew Mr. Rothenberger was operating without full information. If those were clearly the facts (to the point that no jury could find otherwise), the Government's position would be unexceptional. But the Government is instead proposing the radical and unsupportable position that if, even *unbeknownst to the Rigases*, their counsel was not fully aware of all facts relevant to the disclosures and decisions, the Rigases had no right to argue that their good faith reliance is relevant to the jury's decision on whether the prosecution proved the necessary scienter.

According to the Government, because Mr. Rothenberger was "kept in the dark" by various people (other than the Rigases), nothing Mr. Rothenberger said or did can possibly be exculpatory of the Rigases. The Government presses this argument with regard to virtually every issue. *See* Gov. Opp. at 26, 32, 33, 35, 39, 41. But the argument reflects a fundamental misconception of how the role of counsel relates to the *mens rea* element of securities fraud.

It is a core principle of criminal law that, with narrow exceptions, criminal culpability requires criminal *mens rea*. *See generally Morissette v. United States*, 342 U.S. 246, 250 (1952) ("The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion."). In the context of fraud charges, which encompass all the charges in this case, the state of mind the Government must prove is that the defendant *intended* to "deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976).

Thus, the inquiry into reliance on counsel focuses on what the *defendant* knew and what the *defendant* did. If a jury determines that the *defendant* knew the lawyer lacked the necessary information, or that the *defendant* misled the attorney, then the defendant most certainly is not

entitled to invoke advice of counsel to counter an allegation of fraudulent intent. But if a jury finds

that the *defendant* reasonably believed the lawyer had all the information needed (for example,

where the defendant delegated to subordinates the task of providing information to the lawyer) the

*defendant* is entitled to acquittal for lack of *mens rea*—even if it turns out that lawyer did not get

what he needed from the individuals with whom he was working.

To identify the relevant *mens rea* here, one need look no further than the jury instructions

explaining that in order to convict, the jury had to find that the defendants acted "knowingly,

willfully, and with the intent to defraud." Trial Tr. at 11,337. "Knowingly," the Court explained,

means to act "voluntarily and deliberately." *Ibid*. "Willfully," the Court further explained, means

to act "knowingly and purposely *with an intent to do something the law forbids*." *Ibid*. (emphasis

added). And "intent to defraud" in the context of the securities laws means to "act knowingly and

*with the intent to deceive*." *Ibid*. (emphasis added).

> Then, in a passage of the instructions directly on point, the Court instructed the jury:
>
> Because an essential element of the crime charged is intent to defraud, it follows
> that *good faith on the part of the defendant is a complete* defense to the charge of
> securities fraud. *A defendant, however, has no burden to establish a defense of good
> faith. The burden is on the government to prove fraudulent intent and consequent
> lack of good faith* beyond a reasonable doubt.

*Id*. at 11,338 (emphases added). *See generally United States v. Dolah*, 72 F. Supp. 2d 235, 241

(S.D.N.Y. 1999) (endorsing this instructional language).

The Government's misconception of the required *mens rea* infects its approach to virtually

all of the areas of exculpatory evidence Petitioners have identified. And, as we will now explain,

to the extent that the Government also puts forth individualized challenges to specific areas upon

which Petitioners have focused, those challenges are without merit.[11]

---

[11] As discussed in the Opening Memorandum (at 11-12), withholding of exculpatory information material to any of
the alleged fraudulent conduct requires reversal of the conviction embodied in the verdict. Because the Government

In our Opening Memorandum (at 19-31) we demonstrated (a) it was Mr. Rothenberger who formulated the "affiliate borrowing" and "immediately available funds" language, (b) he worked with others (such as Chris Thurner and Collin Higgin, respectively) in gathering facts and (c) no Rigas played any role in providing information. The Government's dominant response is that Mr. Rothenberger was "kept in the dark," so it matters not how pure and reasonable the Rigases' reliance on him was. Gov. Opp. at 33. *See also* Gov. Opp. at 32 n.14, 34-35, 35-36.[12] The

---

misstates its meaning, it is necessary to focus on what the court held in *United States v. Kohring*, 637 F.3d 895 (9th Cir. 2011). In *Kohring*, the prosecution had presented the jury with multiple factual allegations—each of which could have supported the charges on which the jury's guilty verdict rested. One of those allegations was that the defendant solicited a $17,000 bribe—an allegation that itself was independently capable of supporting all the counts on which the jury convicted. Later, when it emerged that the Government had withheld exculpatory evidence, the Government argued that even if there was a *Brady* violation that affected many of the other factual allegations, that did not matter because there was one allegation—the one involving the $17,000 bribe—that was pristine and untainted by any *Brady* violation. The court accepted this characterization of the $17,000 bribe allegation, but rejected the Government's argument about what followed from that. The court explained it had no way of knowing whether the jury had convicted based on the untainted $17,000 bribe allegation or on one of the tainted allegations. So the court refused to immunize the verdict based on the $17,000 bribe allegation and proceeded to assess whether the withheld *Brady* information was material to any of the other allegations. Once it determined it was, the court reversed the conviction, despite the fact that the $17,000 bribe allegation was not impacted by the *Brady* violation. *See also Yates v. United States*, 354 U.S. 298 (1957).

The Government seeks to distinguish these cases on the ground that the verdicts were general ones here, while the verdict provided some detail in the case at bar. But that ignores the nature of the verdict here. Each of the substantive counts related to the sale of some particular securities—not to particular conduct. As to each count, the jury was asked only whether the Petitioners had (1) "[e]mployed a device scheme or artifice to defraud," (2) "[m]ade an untrue statement of a material fact or omitted to state a material fact which made what was said, under the circumstances, misleading," and (3) "[e]ngaged in an act, practice or course of business that operated, or would operate, as a fraud or deceit upon a purchase or seller." Opening App 9, Verdict. There is no way to discern from these forms whether the jury based its verdict on allegations concerning the 10-K, use of the "immediately available funds" formulation, the 13-D, the related party transactions, the golf course project, marketing support, some other activities, some combination of the above, or all of the above. So if the *Brady* violation is material to any factual allegation the jury could have relied upon, *Yates* and *Kohring* instruct that reversal is the remedy.

[12] The Government puts forward a six-point list of information Mr. Rothenberger allegedly did not know. Gov. Opp. at 34-35. Because the Rigases are not alleged to have misled Mr. Rothenberger, or to have kept information from him, the specifics of the six-point list are not significant, and we will not address each individually. It should be noted, though, that the Government's claim that Mr. Rothenberger stated that a transaction without cash would not constitute "immediately available funds" is not faithful to the record. Mr. Rothenberger told the Government that the "immediately available funds" language "*usually* means cash (although [he] indicated that had not researched this precise issue and *it could also mean other than just cash*.)" Opening App. 23, Memorandum from Patrick McLaughlin to J. Alan Johnson #2 (emphases added).

Government is asking the wrong question, and jettisoning the *mens rea* inquiry. The issue is not whether Mr. Rothenberger was "kept in the dark" (an issue that is hotly debated but, in the end, irrelevant). The issue is whether the Rigases kept him in the dark or knew he was in the dark.

In addition to that flawed claim, the Government advances several arguments specific to the 13-D and "immediately available funds" issues. These fare no better. For example, the Government argues there is nothing exculpatory in the Feeney notes stating: "*'affiliate borrowings' – Identify? No, not by name – general description.*" Opening App. 38, Notes of Thomas Feeney from Feb. 20, 2004 Interview at 2. The Government at first claims Mr. Rothenberger was simply reading the 13-D and observing it did not identify affiliates by name, but the Government ultimately acknowledges the notes reflect Mr. Rothenberger's "position that the Schedule 13-D need not identify the particular affiliate from the which the Rigases borrowed." Gov. Opp. at 31. Exactly. Mr. Rothenberger told the Government he did not believe the 13-D had to identify the specific affiliate. This enormously exculpatory fact is clear from the Feeney notes, as well as the four other sets of notes and memoranda that are available to reconstruct what Mr. Rothenberger told the Government.[13]

The Government counters that the notes are inculpatory because Mr. Rothenberger was never told the identity of the affiliate, and said he would have looked at it closer had he known the funds were coming from co-borrowing. Gov. Opp. at 32. That, of course, is the same faulty "kept in the dark" argument the Government advances throughout its brief.

---

[13] Despite clear precedent to the contrary, the Government persists to argue (without citation to any authority) that only the Feeney notes matter. As explained in our Opening Memorandum (at 9-10), *Brady* requires disclosure of *information* the prosecution learns, regardless of whether it is ever reduced to writing. So in those areas in which the other sets of notes capture things Mr. Rothenberger said, those other notes are as relevant as the Feeney notes— because they all reflect *information* the Government learned (regardless of whether it was in any writing in the Government's possession). *See generally, United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007); *United States v. Fernandez*, No. 10 Cr 863, 2014 WL 7180225, at *2 (S.D.N.Y. Nov. 25, 2014).

The Government also takes issue with our discussion of the many objective reasons the Rigases (or anyone else in their position) would have reasonably concluded Mr. Rothenberger knew of the likelihood—if not the certainty—that co-borrowing funds were being used to fund the purchase. The Government points to a passage in the Feeney notes in which Mr. Rothenberger disclaimed having known that the co-borrowing facility was being used in this particular transaction. *See* Gov. Opp. at 31-34. But the Government does not dispute our detailed description of the documents proving Mr. Rothenberger did, in fact, have actual knowledge that co-borrowing was generally being used for these specific types of purchases. Opening Mem. at 25-27.[14]

That evidence is highly significant. The relevant inquiry here is into the Rigases' reasonable reliance on Mr. Rothenberger, so evidence showing why it was reasonable for them to believe he understood the transaction is highly relevant (and ultimately a jury question). The Government's response is that Mr. Rothenberger's awareness that co-borrowing funds might generally be used, did not mean he knew co-borrowing funds were being used for the specific $375 million purchase that is the focus of attention here. Gov. Opp. at 33-34. But once again the Government is focusing on the wrong person's knowledge and understanding. Knowing that Mr. Rothenberger generally was aware that co-borrowed funds were being used for stock purchases, the Rigases had every reason to believe he was asking those with whom he was working on this all questions he deemed relevant and was ensuring compliance with all legal requirements.

---

[14] In our Opening Memorandum we surveyed the various documents Mr. Rothenberger drafted or received that show why it was so reasonable to believe he knew what was going on. *See* Opening Mem. at 26-27. The Government seeks to deflect this evidence with rather desperate claims, such as "the memoranda describing co-borrowing transactions intended to provide liquidity for the Rigas family for future Adelphia stock offerings bear no obvious relationship to the January 21, 2000 stock purchase." Gov. Opp. at 34. This claim ignores the fact that the memos that talk about that *specific* purchase. *See* Opening Mem. at 26. But that point aside, the argument repeats the same mistake that defines the Government's approach: it fails to ask *what the defendants reasonably believed*. The withheld evidence would have been highly relevant to that central inquiry.

The same is true for the "immediately available funds" formulation. In our Opening Memorandum we explained how the January 2000 purchase worked. The Managed Entities borrowed $368 million from the banks through the co-borrowing facility. *Those funds were wired to Adelphia from the banks*, meaning Adelphia did, in fact, receive $368 million in "immediately available funds." The books of the Managed Entities then reflected their debt to the banks as payment for the shares.[15] These are uncontestable facts.[16] The Government argues, though, that because Adelphia was co-liable for the borrowing, and because payment for the purchase was through an internal debt transfer, it did not reflect an influx of "immediately available funds." Gov. Opp. at 27, 30 n.13. But the relevant question is not whether the formulation was appropriate given the nature of the purchase—that was a debate for trial. The point here is that anyone understanding the transaction could reasonably conclude that the influx of cash to Adelphia qualified as "immediately available funds," and that Mr. Rothenberger's drafting of the phrase would not raise any flags that he was ignorant about how the purchase was being funded.

### B. The 10-K Filing

What the jury heard about the 10-K—in the absence of information from the Rothenberger notes—was Mr. Brown's testimony that he and Tim Rigas concocted a rogue plot to "sell a story" that was deceptive to DeLoitte & Touche about how best to report Adelphia's borrowing. What

---

[15] The Opening Memorandum's discussion of the bank error (about which the Government's witness, James Helms, testified) showed that had the bank, as instructed, wired the funds to a Rigas Managed Entity ("RME") account, instead of to an Adelphia account, there would have been a direct wire of cash from an RME account to Adelphia, which would even more obviously qualify as a transfer of "immediately available funds." *See* Opening Mem. at 30 n.25. Given how indistinguishable the two transactions are, it would have been entirely reasonable to assume that the "immediately available funds" formulation appropriately described the transaction accurately, regardless of whether the funds Adelphia received were routed from the banks or from an RME.

[16] The Government also suggests that the cross-receipts were false because Adelphia received only $136 million, while the "remaining $232 million was immediately returned to the co-borrowing facility." Gov. Opp. at 29. The Government never explains, though, why this matters. *Adelphia chose* to spend part of the cash it received to pay down *some of Adelphia's* independent debt to the banks under the co-borrowing facility. Adelphia could have chosen to spend the funds elsewise (as it did with $136 million); its choice to use some of the cash to pay down its own debt has no impact on whether it received that money.

the jury did not know—because Mr. Rothenberger was not called to the stand as a result of the *Brady* violation—was that Mr. Brown's account left out a critical fact: That Mr. Rothenberger personally signed off on the disclosure language after meeting with individuals (not including the Rigases).[17] Had the defense been able to get this information before the jury (*via* Mr. Rothenberger) it would have powerfully impeached Mr. Brown's account that he and Tim Rigas set out to defraud DeLoitte & Touche. That information would also have enabled the Rigases to show that the language came from Adelphia's lawyer and they acted in complete good faith (*i.e.* without the scienter necessary to a finding of guilt) in relying on that lawyer.

The Government responds, once again, with its "kept in the dark" argument, (Gov. Opp. at 39), which can easily be rejected for the reasons discussed above.[18] The Government's other response is that the notes show Mr. Rothenberger urged that additional language also be included to indicate that Adelphia was not reporting any of the RME's borrowing from the co-borrowing facility. (This was a different issue than the one being discussed here, which asks whether disclosing the overall borrowing limit—as shared by Adelphia and the RMEs—was an appropriate method of reporting.) As the Government puts it, "Rothenberger had requested a more fulsome disclosure that was pocket vetoed by Brown," who did not "recall discussing Rothenberger's

---

[17] The Government states that all Mr. Rothenberger reported was a "possible discussion with Brown ('≈JB') and others—though not the Rigases." Gov. Opp. at 37. Lest there be any confusion, although Mr. Rothenberger was certain he met with Mr. Werth on the subject, he was not sure about whether Mr. Brown and Mr. Malone were present. Mr. Rothenberger never said it was only possible he had a meeting about the language at issue. Of that he was certain. And he never suggested that the Rigases were at all involved in the discussions.

[18] Beyond the absence of any evidence the Rigases misled Mr. Rothenberger, or knew he had been misled, the evidence he was kept in the dark is generally questionable. To support its point, the Government notes there is no indication Mr. Rothenberger knew that Deloitte had expressed reservations about the proposed form of disclosure. Gov. Opp. at 39. Second, according to the Government, Mr. Rothenberger did not know "that the Rigases had in fact borrowed more money than the RMEs had assets to support[.]" *Ibid.* Even accepting for purposes of argument that these two propositions are true, these are not facts that spoke to the legal question Mr. Rothenberger was addressing: whether disclosure of the borrowing limit, as opposed to the actual borrowing, was sufficient.

suggestion with anyone else." Gov. Opp. at 38. The Government further points out that the notes on this subject "make no mention of the Rigases." *Ibid*. It is difficult to understand why the Government believes this supports its case. To the contrary, it shows that (a) Mr. Rothenberger was aware of the co-borrowing; (b) he personally signed off on the language about borrowing limits; (c) he suggested—but did not insist upon—some additional language; (d) James Brown unilaterally rejected that proposed additional language, and (e) none of this was brought to the Rigases' attention. Rather, all the Rigases saw was final language as approved by counsel. The Government nowhere suggests it was unreasonable for them to rely on that.

*C.    Related Party Transactions*

Petitioners' Opening Memorandum described how (unbeknownst to the defense at the time of trial) Mr. Rothenberger had told the Government (a) he was responsible for the reporting of related party transactions, (b) he believed it appropriate to report them in the aggregate and not to necessarily itemize them, and (c) his liaison at Adelphia was Doug Malone, a CPA responsible for providing him with a list of all related party transactions. The testimony the Government elicited at trial was wholly inconsistent with what Mr. Rothenberger had explained. Mr. Brown testified that it was Tim Rigas who was in charge of the preparation and filing of Adelphia's proxy statements, which were the forms that "detail all of the transactions that [Adelphia] has with affiliates, executives and directors of the company." Trial Tr. at 6716.

There is no way to excuse the Government's actions in presenting Mr. Brown's testimony on this point, much less failing to disclose to the defense that Mr. Rothenberger had provided an inconsistent account that excluded Tim Rigas from the process. This information was materially exculpatory as it would have enabled Petitioners to show they reasonably relied on those who had

worked on the reporting, and thus lacked the *mens rea* that is a predicate to conviction. And it would have allowed the defense to directly expose the falsehood of Mr. Brown's testimony.

Yet again, the Government's principal response is to argue its baseless "kept in the dark" theory. Otherwise, the Government's only reply is to assert that some of the related party transactions constituted looting or commingling. Gov. Opp. at 40. This is a red herring. The prosecution made clear that any talk of looting or commingling was about the failure to report matters as related party transactions. In its summation, the Government told the jury, "I want to make clear what's illegal about these looting transactions. As I said earlier, the securities laws are concerned with disclosure, with investors getting accurate information. And they, therefore prohibit misstatements and misleading omissions to the public about securities. That's the crime alleged here, the failure to tell the public about this looting." Trial Tr. at 10,607. So, for the Government to now enumerate another alleged unreported related party transaction does nothing to address the issue at hand: that the Rigases were deprived of exculpatory information that would have enabled them show they were not responsible for the reporting. Rather they relied on others (including Mr. Rothenberger and Mr. Malone) with regard to that reporting, without intent to deceive or defraud. And it would have allowed them to show that Mr. Brown was lying when he testified that Tim Rigas was in charge of reporting related party transactions. *Id*. at 6,716.

D.       *The Golf Course Project*

One of the charges the Government emphasized most was that, without the approval of Adelphia's independent directors, the Rigases had arranged for Adelphia to build a golf course on land partly owned by John Rigas. But there was something the Government knew that the defense and the jury never heard. The Government knew that Mr. Rothenberger had reported that he and Tim Rigas had discussed who should own the property, and *Mr. Rothenberger had affirmatively*

*advised Tim Rigas that there was no need to go to the board for approval* until the question of who would own the land was resolved. *See* Opening Mem. at 39. Plainly, this was exculpatory evidence of the highest order. Tim Rigas was being accused of securities fraud for not bringing the matter to the board—but was deprived of evidence showing that the company's lawyer explicitly told him that was unnecessary at that time.

Unlike other issues, the Government never challenges that Mr. Rothenberger had full information about the golf course. Even on the Government's own terms, then, the Rigases would have been allowed to defend themselves by showing they followed Mr. Rothenberger's advice to a tee. This would have been a powerful defense. The only reason it was never advanced was that the prosecution failed to produce the Rothenberger information, as required by *Brady*. Earlier in this case, the Government told the court that "it fully recognizes the potentially drastic remedies that exist for failure to abide by [*Brady*'s] constitutional obligations (*e.g.*, reversal of a conviction)." *See* Opening Mem. at 15 (quoting App. 16, Br. of Government-Appellee at 113, *United States v. Rigas*, 583 F.3d 108 (No. 08-3485) (2d Cir. 2009)). Those are exactly the remedies required here.

IV.    **PETITIONERS ARE ENTITLED TO RELIEF BECAUSE OF THE BRADY VIOLATIONS RELATING TO THE MARKETING SUPPORT AGREEMENTS.**

A.       *The Use of Two Documents to "Fool the Auditors"*

There is no disputing that the Government's accusations relating to Adelphia's marketing support agreements with Scientific Atlanta and Motorola stood or fell with the testimony of James Brown. He was the *only* witness who testified that these agreements were sham transactions intended only to artificially inflate Adelphia's EBITDA. This was a heavy burden to place on a

witness whose credibility was so suspect.[19] But the Government and Mr. Brown had one fact they used to corroborate Mr. Brown's account: that the agreements with each vendor were divided into two separate documents—one involving the price increase for the vendors, the other dealing with the market support payments for Adelphia.

On its face, it seemed curious that two documents would be used, but Mr. Brown offered an explanation that was touted as proof of his truthfulness. He told the jury that two separate documents were used, with neither one referencing the other, as part of the scheme he and others at Adelphia devised to "fool the auditors" so they would not connect the price increase with marketing support. This facet of Mr. Brown's testimony played center stage throughout the trial. At closing, the prosecution reminded the jury of Mr. Brown's testimony that he and Tim Rigas "signed and discussed two dummy documents to try and throw the auditors off the track of this washed transaction." Trial Tr. at 10,585-86.

The notes the Government withheld blow that story out of the water. They reveal that Mr. Brown did not conspire with others at Adelphia to come up with a two-document solution to evade detection by the auditors. Rather, the two-document approach came from *Scientific Atlanta and Motorola,* which (because the documents had been vetted by lawyers and auditors) insisted on using the same template they had used in their earlier agreements with Charter Communications. Those Charter contracts, drafted before Adelphia's marketing support even became an issue, used two documents to memorialize the agreements. The withheld notes reveal that no one at Adelphia had anything to do with this. There is simply no way to reconcile what (with the benefit of the notes) we now know with what was touted as the foundation of Mr. Brown's testimony.

---

[19] In our Opening Memorandum we noted that, despite the jury having heard that the only consideration Mr. Brown would receive for his testimony was a letter from the prosecution to the sentencing judge, in point of fact Mr. Brown has received the enormous benefit of deferred sentencing—at this point for over *13 years*. *See* Opening Mem. at 31 n.27. The Government complains about our raising this issue, but makes no effort to explain this extraordinary delay.

The Government seeks to escape the implications of this by offering the following circular reasoning. According to the Government, Mr. Brown testified generally that the marketing support agreements were undertaken with an intent to improperly inflate EBITDA reporting. Thus, the Government argues the withheld evidence was immaterial because it "does nothing to undercut" Mr. Brown's testimony that the true purpose and effect of the 'marketing support' agreements was not disclosed to investors." Gov. Opp. at 64. The flaw in this reasoning is patent. The very issue in controversy was Mr. Brown's veracity, so the Government cannot dismiss the impact of evidence that would have exposed him as a liar (on the central component of his testimony) by arguing that the withheld material did not directly refute his ultimate conclusion that the deals were fraudulent. Under this theory, it would not matter if the prosecution withheld evidence that an eyewitness originally described a suspect's appearance and height in ways inconsistent with the defendant, because so long as the eyewitness testified in court that the defendant is the person he saw, attacks on specifics would not be material.

This is plainly indefensible. The ways in which witnesses are challenged and impeached is precisely through details of their story—especially details held out as strong corroboration of their account. For this reason, the impact of the withheld evidence about the marketing support deals goes beyond the issue of marketing support. When a jury determines that a witness has lied about some important point, the jury has every reason to disregard that witness's testimony *in toto,* or on a variety of other points. Mr. Brown was the Government's key witness on a large number of vital points, such as general EBITDA manipulations, the cash management system, reporting coborrowing funds and the "immediately available funds" formulation, and the 10-K. *See* Trial Tr. at 6112-13, 6491-6501, 6796-6809. A jury that came to understand that he was testifying falsely about Adelphia having come up with the two-document approach in order to "fool the auditors"

would have had every reason to reject his testimony (or at least not believe anything he said was true beyond a reasonable doubt) on the many other subjects about which he testified as well. As the Second Circuit has explained, exposing the falsity of part of a witness's account "calls into question the veracity of the rest of his statements," and "[h]ad it been brought to the attention of the jury that [he] was lying . . . his entire testimony may have been rejected by the jury." *United States v. Wallach*, 935 F.2d 445, 458, 457 (2d Cir. 1991).

### B. Timing of the Negotiations and Auditor Approval

The Government also argues there is nothing exculpatory in the notes' references to Adelphia's auditors having approved the contracts. This ignores the notes' account of SA's preparation of the documents. The timeline is vital here. It is undisputed that Adelphia's Audit Committee met on Monday, November 13. Gov.'s Rule 56.1 Statement ¶ 104. A Sunday, November 12, 2000 memo from Ivan Hoffman at Deloitte & Touche indicates he reviewed the purchase order agreement as well as the marketing support agreement and agreed it should be recognized as a contra expense (the way Adelphia was booking it). App. B, November 12, 2000 Memorandum from Ivan Hofmann, at 1. The withheld notes provide a crucial fact that ties together those dates. The notes describe how Mr. Brown and Mr. Werth were pressuring SA to finish the documents that weekend, *i.e.*, in time for Adelphia's auditor to review them prior to the Audit Committee meeting. To accomplish this, the notes explain, Messrs. Wharton and Nilson bowed to Mr. Brown's demand and instructed one of SA's lawyers, Ms. Gifford, to work on Saturday, November 11, 2000, in order to complete the documents. Opening App. 82, Memorandum of Interview of Anita Gifford at 7.

It turns out, then—unbeknownst to the jury—that the documents were drafted on Saturday by an SA lawyer working off the Charter contracts, sent to Adelphia's auditors for Sunday review,

and brought before the Adelphia Audit Committee on Monday. There is no room in this timeline for any suggestion that someone at Adelphia played a role in the form of the documents. And there is no room in this account for the conclusion that Adelphia, which provided both documents together to the auditors, was implementing a grand effort to fool the auditors by keeping the documents separate.[20]

The withheld evidence, and the timeline it depicts, also rebuts the Government's recurring accusation that Petitioners are guilty because SA and Motorola executed price increase letters without actually incurring increased expenses. *See* Gov. Opp. at 51, 59, 65-66. That would only matter, of course, if there were some allegation that Petitioners played a role in devising the price increase letters (with knowledge the vendors would incur no increased expenses). Not only was there no such evidence, the withheld notes show that is plainly not what happened. For example, Ms. Gifford told the prosecution she simply copied the provisions from the Charter agreement and "[t]here were no discussions regarding the propriety of leaving the Charter component price increase language in the ACC price increase letter." Opening App. 82, Gifford Interview Mem. at 7. The genesis and implementation of the price increase letters simply had nothing to do with anyone at Adelphia—which the jury would have known had the notes been disclosed.

### C.     Timing of the Discussions

Another major issue at trial related to the month in which Adelphia began discussing marketing support with SA and Motorola. The indictment alleged Adelphia had begun recording

---

[20] As explained above, *Brady* demands the production of exculpatory information, even if the prosecution also learned incriminating information (or information the prosecution believes to be inculpatory) from the source. Not that it matters, then, but the Government's claims about how the notes are incriminating are flawed in many respects. For example, the Government cites Wallace Haislip (from SA) as indicating that the two-document approach ensured that the agreements did not have the appearance of a rebate. Gov. Opp. at 59.  But the Government never explains why SA's motivation in designing its earlier contracts with *Charter* says anything about the Petitioners' criminal culpability. Nor does the Government ever confront the fact that these were not rebates, so there is nothing sinister in shaping the documents to make sure they were not misinterpreted as rebates.

the marketing support payments in August 2000, and then, around late October 2000, began negotiating with SA and Motorola to "give the appearance of legitimacy" to what it had already recorded in its books. Opening App. 1, Indictment ¶ 115. The defense, by contrast, contended Adelphia had, with its auditors' blessings, begun booking the payments for the quarter ending June 30, 2000, because it was engaged in discussions with Scientific Atlanta and Motorola and anticipated the agreements being completed shortly and being (legitimately) made retroactive. *See* Opening App. 99, August 21, 2000 Memorandum from Ivan Hofmann to Tim Werth (indicating Deloitte & Touche reviewed the agreement).

In his direct testimony, Mr. Brown testified that as of the summer of 2000, Adelphia had not had "discussions" with SA and Motorola. Trial Tr. at 6128. (He admitted on cross-examination that there could, of course, possibly have been some discussions of which he was unaware. *Id*. at 7298-99.) The defense had evidence to demonstrate there had been discussions: an internal SA e-mail from August 11, 2000 (three days before Adelphia booked the agreements), indicating SA had given the "go ahead to do the 'Charter like' marketing credit for Adelphia." *Id*. at 9549. *See Id*. at 9497, 9500 (the defense put the authenticated document forward as substantive evidence).

Having conducted the interviews with SA personnel, the prosecution knew Adelphia had been discussing marketing support with SA since the early summer. *See* Opening Mem. at 68-69. It knew, therefore, exactly what the August 11 e-mail reflected: the summer discussions with Adelphia has culminated with SA management giving the go-ahead to the agreement Adelphia had proposed. Despite this knowledge, though, it argued successfully to Judge Sand (who was unaware of the interviews) that the e-mail could easily mean that—in the absence of any discussions with Adelphia—SA was giving its people the go ahead to make an unsolicited proposal to Adelphia. *See* Trial Tr. at 9549-50 ("There's no reason, either in the record or in this email, that that's not

consistent with [Scientific Atlanta personnel] saying, Hey, we should do what we did with Adelphia with Charter, let's get approval and propose it to Adelphia."). *See also Id*. at 9549 ("All this indicates is that there was an internal go-ahead at Scientific Atlanta to negotiate with Adelphia."). Let there be no mistake. What the prosecutors said was false and they knew it was false.[21] They knew with certainty that the e-mail was not about an out-of-thin-air proposal SA would make to Adelphia.

Based on these misrepresentations, Judge Sand refused to allow the defense to introduce the e-mail. Instead, he formulated a stipulation that "the internal correspondence at Scientific Atlanta indicates that as of August 11, 2000, consideration was being given to the entry of an agreement with Adelphia for market support." Trial Tr. at 10,419. This stipulation tracked the benign language the prosecutors had sold him, and did nothing to support the defense position that there had been discussions between Adelphia and SA over that summer.

All of this would have come out differently had the Government complied with its *Brady* duties. The defense would have then been in a position to call SA and Motorola witnesses to establish the exact opposite of Mr. Brown's testimony and the prosecutors' falsifications.

---

[21] Beyond these *Brady* violations, the prosecution's conduct regarding this issue implicates *Napue v. Illinois*, 360 U.S. 264 (1959). To begin with, knowing there had been discussions between Adelphia and SA throughout the summer, the prosecutor asked Mr. Brown, "Well, what if any discussions had anyone had from Adelphia with either SA or Motorola about this marketing support deal?" Trial Tr. at 6128. Mr. Brown answered, "We hadn't had any discussions with them yet." *Ibid.* (On cross-examination, Mr. Brown admitted the obvious point that there may have been discussions of which he was unaware, but that does nothing to mitigate the prosecution presenting a witness to promote what it knows to be a falsehood.) Similarly, it was highly deceptive to tell Judge Sand that the August 11 e-mail might well reflect SA preparing to reach out to offer Adelphia a marketing support agreement they had never discussed. *See generally United States v. Valentine*, 820 F.2d 565 (2d Cir. 1987) ("This violated the due process prohibition against a prosecutor's making 'knowing use of false evidence,' including by misrepresenting the nature of nontestimonial evidence." (quoting *Miller v. Pate*, 386 U.S. 1, 6-7 (1967))); *Jenkins v. Artuz*, 294 F.3d 284, 294 (2d Cir. 2002) (holding that prosecutor violated due process by introducing evidence that, even if technically true, was knowingly "phrased so as to reinforce [a] false impression").

## V. PETITIONERS ARE WITHDRAWING THEIR CLAIM RELATING TO THE AUGUST 9, 2002 LETTER DEALING WITH THE COUNTING OF SUBSCRIBERS.

Petitioners have previously asserted that the prosecution withheld a letter it received from Adelphia's new management indicating that, contrary to testimony the Government presented at trial, Adelphia had historically used a method of counting "bulk units" that was consistent with the position the defense advanced at trial. It remains true that this was exculpatory information that the Government withheld. However, in the course of reviewing discovery materials, Petitioners recently realized this same type of information was discussed in the report Adelphia submitted to the Government in the hopes of avoiding indictment. *See* App. C, Summary of Investigation from Covington & Burling for Special Committee of Independent Directors of Adelphia Communications Corporation, March 2003, at 280-83. This Report was, in fact, available to the defense before trial. Accordingly, Petitioners hereby withdraw their claim for relief based on the "bulk units" issue.

\* \* \* \* \*

For the reasons stated herein and in their Opening Memorandum, Petitioners request that the Court vacate their convictions and sentences pursuant to 28 U.S.C. § 2255.

/s/ Lawrence C. Marshall

*Admitted Pro Hac Vice*
Stanford Law School
559 Nathan Abbott Way
Stanford, CA 94305
650-723-7572
lmarshall@stanford.edu

SEPTEMBER 10, 2017