Petitioners seek judgment at this time on various claims in their First Amended 28 U.S.C. §2255 Petition alleging violations of *Brady v. Maryland*, 373 U.S 83 (1963).[1]

There is nothing inherently wrong in zealous prosecution so long as that zeal does not cross the line into violating defendants' constitutional rights. "But, while he may strike hard blows, he is not at liberty to strike foul ones." *Berger v. United States*, 295 U.S. 78, 88 (1935), *overruled on other grounds by Stirone v. United States*, 361 U.S. 212 (1960). When evidence emerges showing the prosecution crossed that sacred line, it is incumbent on a court to take action to preserve the sanctity of constitutional rights and to ensure that convictions are not the product of such violations. At times, that evidence emerges prior to trial or at trial itself. At other times, though, the evidence comes to light only after the trial record is closed. In those latter cases, the route for seeking relief from a federal conviction is through a timely motion under 28 U.S.C. §2255.

Our system is committed to finality, but it is committed even more to remedying miscarriages of justice and violations of fundamental constitutional rights. In the years since the Rigases were convicted, critical evidence has come to light showing that their constitutional rights were violated. This evidence has been uncovered through discovery in a second criminal case where the District Court ordered the production of many relevant documents and through discovery that this Court authorized in this action. Other information was obtained in civil discovery after the conclusion of the criminal trial here.

We do not make these allegations lightly. It would be irresponsible to loosely throw around accusations of this sort. But it would be even more irresponsible to shy away from

---

[1] As described below, adjudication of §2255 petitions based on the paper record tracks adjudication of summary judgment motions in all ways relevant here. Many courts call them "summary judgment." *See infra* at 6-8. The nomenclature question is of no moment here, so Petitioners are using the terms interchangeably.

putting these allegations forward given the powerful evidence supporting them. Even good people—including prosecutors—can cross lines at times. We have seen this repeatedly in recent years—perhaps most prominently in the prosecution of the late Senator Ted Stevens (a case in which, as will be discussed, the *Brady* violations bear close semblance to the violations here). Those lines were most certainly crossed in this case, in violation of the Constitution and to the grave detriment of John and Timothy Rigas.

## I.   INTRODUCTION

All of the government's charges against John and Timothy Rigas depended on proving they possessed intent to defraud when they made or failed to make various disclosures relating to Adelphia Communications Corp. ("Adelphia"). There was one witness who could have countered those accusations. Adelphia's lead outside counsel, Carl E. Rothenberger, a partner in the Pittsburgh law firm of Buchanan Ingersoll, was responsible for the filings and transactions and knew those at Adelphia had followed his directions. He also knew the Rigases were not the individuals with whom he had worked on most of these matters. There was one rub, though. Once the government focused its investigation on the Rigases and others at Adelphia, Mr. Rothenberger refused to speak with the Rigases or their counsel. Accordingly, the defense had no way of knowing whether, in order to garner the prosecution's favor and avoid charges, Mr. Rothenberger had opted to deviate from the truth and tell the government what he believed it wanted to hear. So the defense had no realistic choice. It had to forgo calling the one witness who could powerfully refute the government's case.

The fact that Mr. Rothenberger was not called enabled the prosecution to tell the jury in its closing argument: "[Y]ou better believe that if there was a lawyer or accountant out there that had approved these transactions and said they were okay, we'd have seen them in this courtroom.

You didn't see anything like that." Petitioners' Am. Rule 56.1 Statement of Material Facts ("Am. Rule 56.1 Statement") ¶ 15; *see also id.* at ¶¶ 14, 16.

Years later, we now know this argument was a cynical exploitation of the government's failure to comply with *Brady*. It turns out that on February 20, 2004, just six days before the criminal trial began, the government had interviewed Mr. Rothenberger about the core issues in the case. But far from providing information advancing the government's positions, Mr. Rothenberger told the government how, in his capacity as corporate counsel, he had: (a) drafted or approved the disclosure language at issue; and (b) worked with others—not the Rigases—in securing the relevant information to formulate or approve the disclosures. Mr. Rothenberger was on the government's witness list, but not surprisingly given this February 20 interview, the government never called him to testify.  Am. Rule 56.1 Statement ¶¶ 7, 13.

The information Mr. Rothenberger provided on February 20 was materially exculpatory under any measure. Had the Rigases known what he had told the government, Mr. Rothenberger would almost certainly have been called as the lead defense witness.[2] But the defense did not know. For instead of making the required pre-trial *Brady* disclosure, the government informed the defense only that Mr. Rothenberger might have exculpatory information on one minor point of the case (involving a timber rights transaction).  Am. Rule 56.1 Statement ¶¶ 8-9. The message to the defense was as unambiguous at it was disheartening: Mr. Rothenberger had provided no exculpatory evidence on any issue that actually mattered.

---

[2] As things stood, the information the defense received powerfully suggested Mr. Rothenberger and Buchanan Ingersoll were watching out for themselves and were refusing to provide truthful accounts (*i.e.*, accounts exculpatory of the Rigases). This came across strongly from the May 2002 Form 8-K that Adelphia issued immediately following the Rigases' ouster from Adelphia (at the Government's insistence). That filing, which at the time the Rigases understood Mr. Rothenberger and Buchanan Ingersoll had prepared in large part, placed all of the blame on the Rigases. Am. Rule 56.1 Statement ¶ 6.

The evidence about what Mr. Rothenberger told the government at that pre-trial meeting has been slow to come to light. The defense first learned generally of the meeting one year after trial in 2005, but the government continued to maintain—to the defense, to Judge Sand, and to the Second Circuit—that Mr. Rothenberger had said nothing exculpatory of the Rigases (aside from information about timber rights). *See infra* at 13-15. It was only in 2011 that a federal judge presiding over a related tax case in Pennsylvania ordered the government to tender the set of notes that United States Postal Inspector Thomas Feeney had taken at the February 20 meeting ("Feeney Notes"). Am. Rule 56.1 Statement ¶¶ 49-54. It is the content of those notes that formed the core of the *Brady* claims advanced in the Rigases' October 4, 2011 motions to vacate their sentences, pursuant to 28 U.S.C. § 2255. ECF Nos. 1 & 2.

On June 20, 2014, this Court granted Petitioners' motion for discovery regarding that meeting (and other subjects). ECF No. 39; *see also* Am. Rule 56.1 Statement ¶¶ 56-62 (discussing Court orders for the disclosure of additional materials). The Court ~~held~~found that the "specific allegations before the court show reason to believe that the petitioner[s] may, if the facts are fully developed, be able to demonstrate that [they are] . . . entitled to relief." ECF No. 39 at 1-2 (citation omitted).

Through that discovery, Petitioners have secured (following the Court's redactions) four additional documents memorializing the February 20 Rothenberger meeting. These are:

- A memorandum by J. Alan Johnson, who attended the meeting as counsel for Buchanan Ingersoll ("Johnson Memorandum") Am. Rule 56.1 Statement ¶ 57;

- A summary of the meeting produced by P. Jerome Richey, a Buchanan Ingersoll partner ("Richey Notes") *Id.* at ¶ 58;

- Notes taken by Patrick M. McLaughlin, who attended the meeting as counsel for Carl Rothenberger ("McLaughlin Notes") *Id.* at ¶ 59;

4

- A memorandum by Patrick McLaughlin with modifications to the Johnson Memorandum ("McLaughlin Memorandum") *Id.* at ¶60.

  Petitioners also secured a second set of notes from McLaughlin memorializing an October 25, 2004 government interview of Mr. Rothenberger. *Id.* at ¶62.

As will be seen, these documents establish conclusively that Mr. Rothenberger conveyed materially exculpatory information to the prosecution one week prior to the criminal trial.

The discovery process has also uncovered evidence that establishes another *Brady* violation. In the months before trial, prosecutors interviewed numerous officials from two equipment manufacturers—Scientific Atlanta, Inc., and Motorola Communications Corp.—in an effort to secure support for its claim that the Rigases had devised a fraudulent way to structure Adelphia's contracts with these companies so as to "fool the auditors" and improve the appearance of Adelphia's profitability.  Am. Rule 56.1 Statement ¶¶211-22, 239-309. But far from confirming those allegations, these individuals told the government that their companies had developed and drafted these contracts earlier in connection with another cable company altogether—not at the Rigases' behest—and the contracts had been vetted exhaustively by Scientific Atlanta's and Motorola's lawyers and accountants. *See infra* at 59-68. Once again, though, the government failed to disclose this exculpatory information to the defense.

The third category of *Brady* claims being advanced here relates to the Government's allegation that, in order to enhance the appearance of profitability, Adelphia fraudulently reported the number of its cable subscribers. The defense maintained the figures were accurate given Adelphia's method of counting subscribers, but the Government presented testimony that Adelphia had not, in fact, used that method. The Rigases later learned the Government had in its possession a letter from the (post-Rigas) Adelphia Board explaining that Adelphia, in

fact,  used

the very method the defense identified (but could not prove). This letter was never disclosed pursuant to *Brady*.

These *Brady* claims entitle Petitioners to vacation of their convictions, independent of the disposition of the other set of claims—the "Interference Claims" and other *Brady* claims—Petitioners are advancing in this § 2255 action. The Interference Claims involve the Rigases' contention that the government unconstitutionally interfered with their rights to prepare and present their defense when (1) it caused potential defense witnesses to be unwilling to speak with the defense, and when (2) it caused Adelphia to deprive the Rigases of their contractual rights to fee advancement and indemnification.[3] *See* Mem. of Law in Support of John J. Rigas's and Timothy J. Rigas's Motion to Vacate, Set Aside, or Correct a Sentence, ECF No. 3 at 32-68.

As this Court knows, discovery in this case has already taken an extended period and still has considerable time to go. Petitioners have worked with the Department of Justice ("DOJ") and the Securities and Exchange Commission ("SEC") to develop electronic searches that have produced various documents. Those productions still appear incomplete—a subject under discussion.. The DOJ and SEC have also produced privilege logs, which will require litigation on issues of attorney-client privilege, work product doctrine, and deliberative process doctrine. As for Adelphia, the company has opened its document warehouse to Petitioners, who have been charged with reviewing about 6000thousands of boxes of documents and massive amounts of digital data. Approximately 1600 boxes remain to be reviewed, as well as the digital dataThough Petitioners have made significant progress, document review is incomplete. Once again, it is anticipated there will be significant litigation over privilege and work product issues.

---

[3] On May 15, 2015, this Court rejected the Government's contention that discovery on these Interference Claims should be barred on the ground that the claims were procedurally defaulted. ECF No. 80.

The ongoing discovery relates almost exclusively to the Interference Claims. By contrast, the discovery on almost all of the *Brady* claims is now completed. In light of this, the bulk of the *Brady* claims are now ripe for decision, as they turn on a body of undisputed facts. (Other *Brady* claims that turn on disputed facts are not being advanced in this Motion.)[4]

As with civil cases in which summary judgment is sought, it is well settled that a court is to grant the writ of habeas corpus on the paper record where "it may appear that, as matter of law, the prisoner is entitled to the writ and to a discharge." *Browder v. Dir., Dep't of Corr. of Ill.*, 434 U.S. 257, 266 n.10 (1978) (quoting *Walker v. Johnston*, 312 U.S. 275, 284 (1941)). *See generally Machibroda v. United States*, 368 U.S. 487, 494-96 (1962) (noting that habeas petitions may be "conclusively determined" by the paper record). For these reasons, the Court in *Blackledge v. Allison*, 431 U.S. 63, 80-82 (1977), adopted the summary judgment standards of Federal Rule of Civil Procedure 56 to ensure that judges are able to adjudicate appropriate habeas petitions "without the time and expense required for an evidentiary hearing." *See*

---

[4] Petitioners have long argued that because the SEC and DOJ coordinated their investigations, the SEC had a *Brady* obligation to disclose exculpatory evidence in its possession. Am. Rule 56.1 Statement ¶310. The Government defeated that effort by telling Judge Sand and the Second Circuit that the SEC's investigation was completely independent of the prosecution and there was no coordination. *See id.* at ¶¶311-13 ("[A]lthough the SEC conducted a parallel civil enforcement investigation with respect to Adelphia, the civil investigation was not jointly conducted with the criminal investigation."); App. 13, Gov't Mem. Opp'n Mot. to Compel at 8-9, *United States v. Rigas*, No. 02-Cr-1236 (SDNY Jan. 15, 2008) (Although the SEC conducted a parallel civil investigation with respect to Adelphia, the civil investigation was not jointly conducted with criminal investigation.")."). Hence, applying settled law, the District Court rejected Petitioners' demands for SEC material. *Id.* at ¶312 ("[H]ere, there was no joint investigation with the SEC . . . "). The Second Circuit affirmed that Order. *Id.* at ¶313. The discovery the Government has tendered to date reveals that the government's representations were not accurate. The Postal Inspector's memoranda of the prosecution's interviews with two Scientific Atlanta officials state that SEC lawyers were in attendance—Stephen E. Donohue, Branch Chief, and Angela Soo, of the "Division of Enforcement, Securities & Exchange Commission." *Id.* at ¶314. In the event judgment for Petitioners is not granted on the *Brady* claims now ripe for decision, Petitioners anticipate bringing a separate *Brady* claim involving the duties of the SEC. Similarly, the question of whether the government took possession of various Adelphia documents containing exculpatory information is one that likely will have to be resolved in an evidentiary hearing, should that prove necessary.

*generally Puglisi v. United States*, 586 F.3d 209, 213 (2d Cir. 2009) (discussing similarities in this regard to the classic summary judgment standards set forth in Rule 56).[5]

Part of the Court's toolbox is the power to decide potentially dispositive issues that are ripe for decision without waiting for slower-developing claims to catch up. *See* Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense or the part of each claim or defense on which summary judgment is sought."). *See generally id.* advisory committee's note to 2010 amendment ("[S]ummary judgment may be requested not only as to an entire case but also as to a claim, defense, or part of a claim or defense . . . whether or not the order grants all the relief requested by the motion.").

This process can not only expedite the prospects of a prisoner's timely release if relief is afforded on the adjudicated claim, it can also negate the need for ongoing litigation relevant to issues that may never need to be decided. Proceeding in this fashion helps keep alive the promise that worthy habeas petitioners are to be afforded a "swift and imperative remedy." *Fay v. Noia*, 372 U.S. 391, 400 (1963*), abrogated on other grounds as stated in Coleman v. Thompson*, 501 U.S. 722, 744-51 (1991). For these reasons, Petitioners move for judgment based on the *Brady* claims described herein.

Given the Court's multiple rulings touching on the facts of this case, Petitioners will not burden the Court with a lengthy review of the evidence that led to their convictions on charges of conspiracy, securities fraud, and bank fraud. (The Second Circuit's opinion on the direct appeal of the conviction contains a detailed description of the factual background in the light most

---

[5] Both Petitioners and the government have sought summary judgment in § 2255 cases. *See, e.g.*, *Guippone v. United States*, 741 F. Supp. 409, 410 (S.D.N.Y. 1990) ("Both the government and petitioner have moved for summary judgment on this 28 U.S.C. § 2255 petition."). Nothing at all turns here, though, on whether the motion is called one for judgment or one for summary judgment.

favorable to the government. *See* App. 7, *United States v. Rigas*, 490 F.3d 208, 212-19 (2d Cir. 2007).) It is vital, though, to highlight a few central points about the case that inform many of the *Brady* claims advanced here. Most of these points involve the relationships between Adelphia and a group of privately held entities, known as the Rigas Managed Entities (or "Managed Entities"). Adelphia provided management services to these entities in return for management fees. Am. Rule 56.1 Statement ¶ 64. Adelphia and the Managed Entities also engaged in some coordinated borrowing and investments within the cable market. *See id.* at ¶¶ 67-71.

This was a case about disclosures. There was no allegation that the coordinated borrowing or the ways in which Adelphia's funds were held with the Managed Entities' funds violated any laws.[6] Although the case dealt with numerous disclosure-based allegations (many described in detail below), a central focus of the prosecution was on disclosures regarding a joint credit line (the "Co-Borrowing Facility") that the Managed Entities shared with Adelphia. *See, e.g.*, Am. Rule 56.1 Statement ¶¶ 78-79, 82-86. It was the loss the Court attributed to these co-borrowing allegations that triggered the lion's share of the severe sentences of 12 and 17 years imposed on John and Timothy Rigas, respectively. *See United States v. Rigas*, No. 02-cr-1236, 2008 WL 2544654, at *6-7 (S.D.N.Y. June 24, 2008).

There were three key themes to the defense to this and the other allegations: (a) all disclosures at issue complied with the relevant laws and rules; (b) almost all of the disclosures at issue had been handled by others at Adelphia, without Petitioners' involvement; and (c) everyone

---

[6] Judge Sand charged the jury: "In considering any allegations related to these that the co-borrowing agreements, you should know that, like the commingling of funds, such coborrowing agreements are were not "alleged in this case to be in and of themselves illegal. . . . However, the government contends that the defendants fraudulently failed to disclose the amount of coborrowing debt on the books of Rigas family owned entities and fraudulently failed to disclose how the coborrowing facilities were used in connection with Rigas family purchases of Adelphia securities." Am. Rule 56.1 Statement ¶ 76.

at Adelphia reasonably relied on the counsel of their lawyers and auditors, and thus, even if the jury were to find irregularities, there was never any intent to defraud. Am. Rule 56.1 Statement ¶81. As shown below, the withheld *Brady* material spoke to each of these issues.

## II. PETITIONERS ARE ENTITLED TO RELIEF BASED ON THE *BRADY* VIOLATIONS RELATING TO THE PROSECUTION'S PRE-TRIAL INTERVIEW WITH CARL ROTHENBERGER

Pursuant to the Due Process Clause, the government must disclose to the defense any material information in the government's possession that is materially exculpatory or that may be used to impeach government witnesses. *United States v. Bagley*, 473 U.S. 667, 676-77 (1985). In the context of interviews, the government must disclose all material exculpatory information it learns, regardless of whether it reduces the statements to writing or takes written notes of the interview. *See United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007).

In assessing post-trial claims that the prosecution violated its *Brady* duties, it matters not whether the prosecution acted willfully or inadvertently. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Thus, a court "need not decide whether the non-disclosure was a deliberate tactical concealment, or resulted from the mismanagement of information, or from sloppy thinking about the evidentiary significance of the material." *Leka v. Portuondo*, 257 F.3d 89, 103 (2d Cir. 2001). Rather, what matters is that evidence that should have been disclosed was not disclosed, resulting in the defendant suffering prejudice.

To show prejudice, a defendant need not prove he necessarily would have prevailed at trial had the information been disclosed. Rather, he need only show that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler*, 527 U.S. at 280 (quoting *Bagley*, 473 U.S. at 682); *United States v. Mahaffy*, 593 F.3d 113, 127 (2d Cir. 2012); *see also* there is a "significant possibility of

a different result." *Strickler*, 527 U.S. *Strickler*, 527 U.S. at at 297300 (Souter, J., concurring in part and dissenting in part) (explaining that this is the meaning of the traditional "reasonable probability" standardmeans "a significant possibility").; *Ssee generally Kyles v. Whitley*, 514 U.S. 419, 433-35 (1995) (A "showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." (citing *Bagley*, 473 U.S. at 682)).

The individual counts in this case were broken down by specific securities issuances; they were not individually tied to any particular alleged misrepresentation or omission. *See* Am. Rule 56.1 Statement ¶19. For example, each of the 15 securities fraud counts referenced a particular issuance of stock or debt instrument. *See, e.g.*, *id.* at ¶¶19-21 (verdict asked whether the jury found the defendants guilty for "securities fraud in connection with the purchase or sale of Adelphia 9.25% Senior Notes due 10/1/02"). The government did not seek to relate particular disclosures or omissions to any particular purchase or sale of securities. Rather, the government argued all such purchases and sales were tainted by securities fraud because each and any of the various alleged fraudulent misrepresentations and/or omissions polluted the market with respect to all later securities sales. *See id.* at ¶22.

Accordingly, because of the manner in which the counts were structured, there is no way of gleaning which or how many of the government's factual allegations the jury found to be proven beyond a reasonable doubt. The jury could well have predicated its verdict on one or two specific areas of conduct—finding no fraud in the other areas, no Rigas involvement in some other areas, or that the Rigases acted in good faith in other areas of conduct. Indeed, having found a violation in one area of conduct, the jury would have had no reason to even consider other allegedly fraudulent misrepresentations or omissions. Thus, given the opacity of the

verdict, materiality must be assessed with reference to any of the theories the government advanced that could have led the jury to convict Petitioners. *See generally Yates v. United States*, 354 U.S. 298, 311-12 (1957) (requiring reversal where a legal error has infected any of the charges upon which the jury may have relied*), overruled on other grounds by Burks v. United States, 437 U.S. 1 (1978)*).

In *United States v. Kohring*, 637 F.3d 895 (9th Cir. 2011), the Court of Appeals applied this standard to a *Brady* violation that impacted on some possible bases, but not all possible bases, of the jury's verdict. The court explained that even though the improperly suppressed evidence did not affect some of the prosecution's theories, it was material evidence "because it speaks to the acts that the jury *might have relied on* in reaching its verdicts." *Id.* at 902-03 (emphasis added). In the case of the Rigases, the withheld material went to virtually all of the prosecution's central theories. But even were that not the case, suppression of evidence material to any of the prosecution's theories would compel relief.

### A.      Factual Background

#### 1.      *Pre-Trial and Trial Events*

As noted above, had the prosecution informed the defense about the exculpatory information Carl Rothenberger had provided in the February 20 interview, the defense would almost certainly have called Mr. ~~Rothenberger as its star witness. *See* App. 3, Decl. of Bernard Preziosi at ¶ 4. The need for that disclosure was particularly imperative because the Government knew Mr. Rothenberger refused to be interviewed by the defense. And the Government knew that when the Rigases sought permission to attend the prosecution's interview with any Buchanan Ingersoll personnel, that request was denied by the court. *See*, Pre-Trial Tr. of Dec. 10, 2003, App. 5, at 19-22; Pre-Trial Tr. of Feb. 3, 2004, App. 6, at 49-50.~~Rothenberger as "a key"

witness. *See* Am. Rule 56.1 Statement ¶¶10-12. But not only did the prosecution fail to make the required *Brady* disclosure, it made a wholly misleading disclosure indicating that Mr. Rothenberger "may be able to provide information that is favorable to the defense *concerning the timber rights transaction discussed in the Government Bill of Particulars.*" *Id.* at ¶8 (emphasis added).

The message from this letter was unmistakable: The government was telling the defense that the only exculpatory information in its possession regarding Mr. Rothenberger involved that one insignificant aspect of the case. As for the central aspects of the prosecution's allegations, the prosecution was declaring that Mr. Rothenberger had provided no exculpatory evidence. As one of the defense lawyers later explained, for the defense to call Mr. Rothenberger to the stand without knowing whether he would tell the truth (which the defense knew would be exculpatory) would have been unimaginable.  Am. Rule 56.1 Statement ¶11.

So the jury ended up deliberating on the Rigases' guilt or innocence without ever hearing from the one non-party witness who knew that (a) the Rigases had not been personally involved in many of the specified transactions and disclosures and (b) the specified transactions and disclosures were all undertaken in good-faith reliance on the advice and instruction of experienced counsel. To be sure, the jury was instructed that good faith is a complete defense to fraud charges. *See* Am. Rule 56.1 Statement ¶17 (charge of Judge Sand). But that instruction was of no avail without the realistic ability to prove up that defense through the witness in the best position (and on some issues, the only position) to credibly describe the events.

Indeed, as indicated, the very best evidence of the centrality Mr. Rothenberger's testimony would have played for the defense can be found in the prosecution's closing argument. The prosecutor told the jury that the absence of defense testimony from the relevant lawyer or

auditor proved the hollowness of the Rigases' claim that they believed "any of the lawyers or auditors approved or supported what went on and was charged to be illegal." Am. Rule 56.1 Statement ¶¶ 14-16.

### 2. *Post-Trial Events*

It was only during depositions in a civil case in 2005—a year after the criminal trial— that the defense finally began to learn that Mr. Rothenberger remained true to what had actually happened and had many relevant exculpatory facts to share regarding the Rigases. Upon learning this, the defense approached the prosecutors, who acknowledged ~~that many of these topics had been discussed during a~~their pre-trial interview ~~the Government conducted~~ with Mr. Rothenberger, and that interview notes existed.  Am. Rule 56.1 Statement ¶¶ 26-29, 158. The defense asked the prosecution to disclose all notes and information relating to that interview, but the prosecution refused. *Id.* ~~, assuring the defense that Mr. Rothenberger had said nothing exculpatory    other than the disclosed timber rights information~~at ¶¶ 28-30.

The defense then moved to compel the prosecution to turn over its notes of the Rothenberger interview.  Am. Rule 56.1 Statement ¶ 31. The defense conceded it had no direct evidence at that time that Mr. Rothenberger had disclosed exculpatory evidence in that interview. *Id.* at ¶ 32. But the defense argued that given the exculpatory information contained in Mr. Rothenberger's 2005 deposition testimony, and given the prosecution's acknowledgment that these same subjects were discussed during the 2004 pre-trial interview, "[i]t strains reason to believe that Mr. Rothenberger provided absolutely no exculpatory information" in the course of that interview. *Id.* at ¶ 33.

The government fought strenuously to avoid disclosure. *See* Am. Rule 56.1 Statement ¶¶ 30, 34. One of its central contentions was that it had followed the law and practice in the

Second Circuit "that the Government may fulfill its *Brady* obligations with respect to a particular witness by identifying the witness to the defendant and indicating that the witness may have favorable information *on a particular subject*." *Id.* at ¶35 (emphasis added) (citations omitted). After hearing these representations, and without having seen the notes, the District Court denied the Motion to Compel, invoking the "essential facts" doctrine for the proposition that the government had no obligation beyond what it had disclosed. *Id.* at ¶¶36-37.

In its appeal from that ruling, the defense again conceded it was necessarily only assuming (based on his 2005 civil deposition) that Mr. Rothenberger had provided exculpatory information to the prosecution in 2004. Am. Rule 56.1 Statement ¶¶33, 39. The government responded by attacking the defense for unfounded "rank speculation." *Id.* at ¶40. According to the government,

> Appellants . . . urge this Court (as they urged Judge Sand below) to overlook this *glaring deficiency in proof*, to look instead at Rothenberger's civil deposition testimony—which occurred two years after his interview with the Government and one year after the criminal trial had concluded, in a proceeding in which the Government was not a party, with *no specific testimony concerning what was said during the interview*—and to divine from that testimony that some exculpatory information 'must have been' communicated to the Government. *This temporal sleight of hand should not be tolerated.*

> * * * * *

> . . . The Government is charged with the responsibility, in the first instance, of reviewing the information it obtains during the course of its investigation in order to comply with its obligations under *Brady* and cases like [*Giglio v. United States*], 405 U.S. 150 (1972). It takes this responsibility seriously, and it *fully recognizes the potentially drastic remedies that exist for failure to abide by these constitutional obligations (e.g., reversal of a conviction)*. That compliance with these obligations is crucial to guaranteeing defendants fair trials, however, does *not* mean—as Appellants' arguments suggest—that the responsibility should be taken away from the Government and thrust upon the trial or appellate courts, *particularly on the meager showing offered by Appellants here*.

*Id.* at ¶41 (some emphases added).

The government then went well beyond simply telling the Court that the defense was without evidence of what Mr. Rothenberger said during the pre-trial interview. The government declared that the defense's speculation was "belied by the Government's clear representation in the district court that, apart from the information concerning the timber rights transactions, '[t]here is no other [*Brady*] material with respect to Rothenberger.'" *See id.* at ¶42 (alterations in original). ~~The Government made a dozen or so similar statements throughout its Second Circuit Brief. at 116, 124-25 n.*, 129.~~

At oral argument, an Assistant United States Attorney began his arguments with this unequivocal declaration to the Court:

> [L]et me make one thing very clear right up front. I have reviewed these notes personally, the Rothenberger notes. I have discussed them with the postal inspector who took them and the Assistant United States Attorney who was present at the time of the interview and there is nothing exculpatory in those notes beyond the limited disclosure that was made concerning the timber rights transaction. Full stop.

*Id.* at ¶46.

Thus, when the Second Circuit affirmed the denial of the Motion to Compel in 2009, *see* Am. Rule 56.1 Statement ¶¶47-48, it was proceeding, as was the District Court, based on the government's emphatic assurances that Mr. Rothenberger had said nothing at all exculpatory on any subject other than timber rights.

3.      *Disclosure of the Notes in the Pennsylvania Tax Case*

In addition to the charges in this case, the Rigases faced related tax fraud charges in the Middle District of Pennsylvania.  Am. Rule 56.1 Statement ¶49. During April 2011 pre-trial proceedings in that case, the court ~~recognized~~accepted the defense's assertion that Mr. Rothenberger had long been unwilling to be interviewed by the defense. *See id.* at ¶50. The court therefore refused to "accept the Government's assertion that the Defendants have equal access to

Rothenberger, which then eliminates any potential *Brady* obligation." *Id.* at ¶51. The court concluded that "in view of [Mr.] Rothenberger's significant role in Adelphia and in the questioned transactions, we find the notes of his interviews could very well contain exculpatory information that may be of use to the Rigases at trial." *Id.* at ¶52. Accordingly, the court ordered "the Government to release any and all notes of interviews it conducted with [Mr.] Rothenberger." *Id.* at ¶53.

The notes turned over pursuant to that order exposed the falsehood of the government's assurances that the notes and the interview were benign. It is notable that shortly after the notes were produced, Am. Rule 56.1 Statement ¶54, the government dropped its charges against the Rigases in the Pennsylvania case (after having pursued those charges for close to ten years), *id.* at ¶55. *Rigas*, No. 4:05-CR-402 (M.D. Pa., Jan. 26, 2012). But the notes remain of vital importance to this case. And now that four additional documents memorializing that interview have been secured through discovery, *see id.* at ¶¶56-60, along with an additional document memorializing another interview with Rothenberger, *see id.* at ¶62, their powerfully exculpatory nature is more evident than ever.

## B. The Exculpatory Information Mr. Rothenberger Conveyed in His Interview with the Government

As discussed above, the Managed Entities were privately owned by the Rigases and paid Adelphia management fees for certain management services, including having their funds held by Adelphia managing and accounted accounting for under Managed Entities' funds though Adelphia's Cash Management System ("CMS"). Am. Rule 56.1 Statement ¶¶64-65. The CMS was a system that accounted for funds belonging to Adelphia as well as funds belonging to the Managed Entities. *See* App. 10, *Rigas*, 490 F.3d at 213, 218. Careful records were kept, through journal entries, as to what funds belonged to the Managed Entities and what funds belonged to

~~Adelphia. *See* App. 24, Trial. Tr. 4129-32 (Helms testimony).~~*Id.* at ¶¶ 65-66.  All agree that a constant flow of Managed Entity money (such as that generated by their cable operations) was deposited in Adelphia accounts and treated by the CMS as Managed ~~Entity funds. *See* App. 25, GX 101 (describing money flowing in from the Managed Entities).~~Entities' funds. *See id.* at ¶¶ 64-66.

It is undisputed that starting in 1996, with full knowledge of the Adelphia Board, Adelphia and the Managed Entities arranged for "co-borrowing facilities." Am. Rule 56.1 Statement ¶¶ 67-68. These facilities allowed either Adelphia or the Managed Entities to tap into shared lines of credit. *Id.* at ¶ 69. The co-borrowing arrangements were beneficial to Adelphia for a number of reasons. To begin with, at times Adelphia used the extra borrowing power made available by the Managed Entities' involvement. *Id.* at ¶ 70. At other times, the facility provided the Managed Entities sufficient liquidity to purchase Adelphia shares in offerings alongside the public. ~~The underwriters of~~*Id.* at ¶ 71. It had been explained to the ~~securities issuances wanted the Rigases to make such purchases to demonstrate to the~~ Board that Rigas family participation was a "~~their~~vote of confidence ~~of the family~~ in ~~Adelphia~~the company." *Id.* at ¶ 72. In addition, as a condition of several loans to Adelphia, some banks insisted the Rigases maintain controlling ownership of Adelphia, which required they purchase some new shares as new shares were issued. *See id.* at ¶ 73. There is no allegation that any commingling of funds, the CMS system, or the co-borrowing facility were in any way illegal or fraudulent. *Id.* at ¶ 76.

Within Adelphia, careful records were kept of how much of the joint credit facility Adelphia was using and how much the Managed Entities were using. *See* Am. Rule 56.1 Statement ¶ 74. The draw-down amounts were generally deposited in an Adelphia account, and journal entries were used to establish whether the money had been borrowed for the sake of

Adelphia or a Managed Entity. *See id.* at ¶¶ 74, 77.  The amounts borrowed by Adelphia were put in the books and treated as Adelphia's debts owed to the banks. *See id.* at ¶ 75. By contrast, the amounts used by the Managed Entities were put in the books and treated as debts the Managed Entities owed to the banks. *See id.* As would be the case with any person who co-signs a loan for another, the co-signer could theoretically be responsible for the debt of the other, but the co-signer would not typically consider the amount of the loan to be her own debt. Hence, Adelphia's auditors concluded that ~~under the then-governing FAS 5 accounting protocols~~ this contingent debt was not to be treated as Adelphia debt. ~~Trial Tr. , App. 29, at 7070-73 (James Brown).~~[2] *See id.* at ¶¶ 143, 149.[8]

A good deal of the case involved the claim that the Rigases committed fraud in reporting co-borrowing activities—particularly in relation to Managed Entities' use of co-borrowed funds to purchase Adelphia shares. Am. Rule 56.1 Statement ¶ 78. A Managed Entity's purchase of $375 million in Adelphia shares in 2000 (purchased in 1999; closed in 2000) was treated as a prototype of these transactions. *Id.* at ¶ 79.

Using that transaction as an example, the defense sought, through cross-examination, to show the jury how these transactions worked—and why there was nothing sinister about how they were disclosed. The starting premise was the universal agreement that a Managed Entity permissibly had drawn down $368 million from the co-borrowing facility. Am. Rule 56.1 Statement ¶¶ 76, 80, 133.  Like most Managed Entity funds, that $368 million was held in an Adelphia account and, through journal entries, was accounted for as Managed Entity funds. *Id.* at

---

[8] This was all happening prior to December 29, 2003, when the SEC issued new rules on the reporting of contingent debt. *See* Am. Rule 56.1 Statement ¶ 150. It was the SEC's January 2002 statement changing its guidance on disclosures that triggered Adelphia's making new disclosures about the co-borrowing. *See id.* at ¶¶ 151-52.

¶¶ 77, 133-34.  As a practical matter, it would have been easy at that stage for Adelphia to wire those funds to an outside account of the Managed Entity, at which point the Managed Entity would wire the funds back to Adelphia in payment for the shares the Managed Entity had purchased. But there was no point, the defense contended, in going through those superfluous steps when all that was necessary was for the Managed Entity, through use of a journal entry, to internally transfer to Adelphia the funds it had just borrowed, which were being held in an Adelphia account. *See* Am. Rule 56.1 Statement ¶ 137 (conceding that it would have "[e]ssentially the same net effect" ~~effect is the same~~). Thus, through a journal entry (a practice that all agree was legitimate), that $368 million from the co-borrowing facility was allocated to Adelphia, to do with it as Adelphia wished.[9] And the obligation to repay the banks for that $368 million rested upon the Managed Entities. As will be seen, the government disagreed with this factual analysis. As will also be seen, the government withheld *Brady* information that was material to the resolution of those disagreements.

1. *The 13-D Allegations*

In accordance with SEC regulations, the Rigases filed a Schedule 13-D ("Beneficial Ownership Report") ~~shortly~~ after acquiring shares in the 2000 transaction. Am. Rule 56.1 Statement ¶ 82. That form indicated that "affiliate borrowings" were the source of the ~~purchase price~~ funds paid ~~for each of these acquisitions was~~ in the ~~respective~~ $375 million transaction that closed in January 2000, and "personal ~~or partnership funds or affiliate borrowings of each of such persons." App. 34,~~ funds" were the source of funds for some other transactions. *Id.* at ~~15 (Gov't Trial Ex. 4710A).~~ ¶ 83. The government argued that this description was fraudulent because it failed to disclose that the "affiliate borrowings" came from Adelphia (*i.e.*, from the co-

---

[9] In point of fact, Adelphia opted to use $136 million to pay off a debt that was its alone, and used $232 million to pay down a portion of its debt within the co-borrowing facility. *See* Am. Rule 56.1 Statement ¶ 138.

borrowing facility Managed Entities shared with Adelphia—which the government argued should be treated as Adelphia funds). *Id.* at ¶84. The government contended that because Adelphia was co-responsible for the loans if the Managed Entities did not repay the banks, and because the co-borrowed funds had been held in an Adelphia account, the Managed Entities were necessarily borrowing Adelphia money when they drew down funds from the banks under the co-borrowing facility. *Id.* at ¶¶84-86.

The defense, by contrast, sought to establish the statements' accuracy and, beyond that, to show that the language was formulated by Mr. Rothenberger, the securities lawyer for Adelphia and the Managed Entities. *See, e.g.*, Am. Rule 56.1 Statement ¶¶88-89, 92-93. The defense further sought to show that the Rigases were not the ones responsible for providing the relevant background information to Mr. Rothenberger. *See, e.g.*, *id.* at ¶¶89-90. This was designed to counter the government's argument that it was unreasonable for the Rigases to rely on Mr. Rothenberger because they had given him false or incomplete information.

The government was able to cut off the Rigases' defense on the 13-D allegations through the testimony of Chris Thurner, who had worked for John Rigas (and was testifying pursuant to a non-prosecution agreement). *See* Am. Rule 56.1 Statement ¶87. Mr. Thurner acknowledged that he worked on providing some information to Mr. Rothenberger regarding the 13-Ds. *Id.* at ¶88. Mr. Thurner explained that his role during the relevant period was limited to providingprovide information about the amounts of Rigas family stock holdings—, and that the "only information regarding source of funds [he] would have provided to Rothenberger would be on any open market transactions by John Rigas, in purchasing Adelphia's securities through his brokerage accounts in the open market"—not about the source of funds for their stock purchases. *Id.* at ¶91. Mr. Thurner's testimony thus directly served to implicate the Rigases as having themselves

worked on the 13-Ds with Mr. Rothenberger, thereby supporting the prosecution's claim that the Rigases themselves deceived their lawyers about the source of the funds. Those deceits, the government has recently contended, led Mr. Rothenberger to use the fraudulent "affiliate borrowing" formulation. Gov't Opp'n Mem. To Vacate, Set Aside, or Correct Sentences 32-33, ECF No. 16 (hereinafter "Gov't Opp'n Mem.").

The government focused heavily on the Schedule 13-D allegation throughout its case. For example, in its closing argument the government told the jury:

> [I]t says "the source of the purchase price paid for each of these acquisitions was the respective personal or partnership funds or affiliate borrowings of each of such persons."

> Well, I guess it's true that this was an affiliate borrowing, because they took the money from Adelphia. But don't you think Adelphia's shareholders would have liked to have known that the affiliate being talked about here was actually Adelphia? Because you've learned during this trial that there are hundreds of Rigas affiliates, and not necessarily all of them are Adelphia companies. So this disclosure didn't tell Adelphia's shareholders the one thing they needed to know about this transaction, that the Rigases took the cash from Adelphia to buy this stock.

> Ladies and gentlemen, this is a good example of a half-truth. It's technically true. I guess it was an affiliate borrowing. But it leaves out the most important information that the person reading this needs to know, that that affiliate was Adelphia. . . . Half-truths are misstatements under the securities laws, just like outright lies are, when they're meant to fool people. And this statement, which is a clever way of trying to skirt the issue and say affiliate borrowings, is one of those half-truths.

Am. Rule 56.1 Statement ¶ 94.

The government's closing argument that the Rigases lied about the source of funds in the 13-Ds provides further evidence of the materiality of the 13-D allegations.

> [K]nowing that this transaction was not fair to Adelphia, that it was wrong, and that it couldn't be justified, these men lied about where the money came from, and they hid the truth about this transaction from Adelphia shareholders, and we can see that if we look at Government's Exhibit 4710A. . . . This form 13D was false, it was untrue, and it was not correct. . . . How hard would it have been to simply

say in this document, we got the cash from Adelphia? It would have been one sentence. It wouldn't have made it any longer or more complicated. The reason it's not in here is because these men knew it was wrong. They knew it was wrong because it's wrong to take other people's money, and *they knew it was wrong because they were told it was wrong*.

Am. Rule 56.1 Statement ¶¶ 95-96 (emphasis added).

The defense had answers to all these allegations, and proving them centered on one man: Carl Rothenberger. The Rigases would have found immense value in presenting evidence that (a) it was Adelphia's experienced corporate counsel who drafted the "affiliate borrowing" language and believed it appropriate; (b) in so doing, the lawyer did not believe it important to contact any Adelphia accountant or personnel to inquire about the sources of the borrowing, even though he was generally familiar with the co-borrowing facility and the Managed Entities' lack of financial capacity to otherwise fund a large purchase of shares; and (c) the lawyer was working on all this with Chris Thurner alone, meaning that neither of the Rigases worked with the lawyer on the 13-D or provided him the information relevant to the "affiliate borrowing" formulation.

In the course of the trial, Mr. Rothenberger's name was mentioned ~~290~~307 times during witness examinations (~~89~~118 times in Mr. Thurner's examination alone). Am. Rule 56.1 Statement ¶ 13. He was at the epicenter of the relevant activity. Yet neither side called him. *Id.*

We now know why the government did not call him. Having spoken with him before trial, it knew he would hurt the government's case badly. During the February 20, 2004 interview, the Assistant United States Attorney said "CR is an important witness! Need to meet again." *See* Am. Rule 56.1 Statement ¶ 61. Yet no subsequent meeting apparently took place until well after trial—an October 25, 2004 interview in which AUSA Clark told Mr. Rothenberger that Buchanan Ingersoll "fucked up." *Id.* at ¶ 63. And he threatened Mr.

Rothenberger, saying there is "nothing worse than me (Clark) coming after you!" *Id.* The prosecutors' conclusion that Buchanan Ingersoll was at fault would have cut deeply against its efforts to convince the jury that the Rigases acted with any sort of criminal intent.

We also know why the defense did not call Mr. Rothenberger: It had no access to him. And it had received *Brady* disclosure indicating he had provided no significant exculpatory evidence. Am. Rule 56.1 Statement ¶¶8-9. The defense understood, then, that he would not tell the jury the information that exculpated the Rigases. *Id.* at ¶¶10-12. It was not until seven years after trial that the defense learned what it would have given anything to know at trial: That in his government interview, Mr. Rothenberger had demonstrated his willingness to provide significant exculpatory evidence on the 13-D issues (and other central issues of the case).

The Feeney Notes that the defense secured in 2011, and the four documents the defense secured through discovery in 2015 and 2016, reveal that Mr. Rothenberger told the government he believed the law required only a general description of the sources of funds and did not require specific identification of the source of the affiliate borrowings. The Feeney Notes state: "re source and amount of funds":

> -need to describe source-if from borrowing need to ID parties lending $
>
> "*affiliate borrowings*"- *Identify? No, not by name - general description.*

Am. Rule 56.1 Statement ¶97 (emphasis added). Mr. Rothenberger asserted his position that the disclosures were "in line w[ith] 13-D Rule[.]" *Id.* at ¶99. When asked why he thought the "affiliate borrowings" description was sufficient, Mr. Rothenberger replied that it was an "accurate"[a]ccurate statement." *Id.* at ¶100.

As significantly, Mr. Rothenberger acknowledged to the government that he was the one who chose personally involved in the choice of "affiliate borrowing" formulation. This was not

some term that Tim or John Rigas deceptively devised and pressured Mr. Rothenberger to approve. Rather, as Mr. Rothenberger told the government, he ~~drafted~~ used the language because he believed it was accurate and adequate. Am. Rule 56.1 Statement ¶100; *see also id.* at ¶¶97-99. He then had it reviewed by Mr. Thurner to confirm its accuracy. *Id.* at ¶101. The Feeney Notes provide: "Early draft sent to CT w/blank in it for disclosure—sent that way if CER [Carl E. Rothenberger] did not know fact. . . . *CT [Chris Thurner] confirmed that 'affiliate borrowing' accurate.*" *Id.* at ¶98. This account leaves no room to conclude that the Rigases were responsible, not to mention criminally culpable, for the acts of another, approved by yet another, with which they had no involvement.

The Richey Notes further describe Mr. Rothenberger's comments as follows:

> 13-D very focused inquiry re: source and amount of funds. . . . Carl sent this document to Thurner who confirmed affiliate borrowing was accurate description. Carl was very busy at the time and he did not ask a lot of detail re: this.

Am. Rule 56.1 Statement ¶¶101-02. The Johnson Memorandum adds that Mr. Rothenberger stated that in using the "affiliate borrowing" formulation, he had not felt it necessary to ask Mr. Thurner "if the borrowings were from Adelphia."[10] *Id.* at ¶103. And, although Mr. Rothenberger had access to countless Adelphia employees, he never sought further information from them either. Critically, Mr. Rothenberger never suggested to the government that ~~anyone~~any of the Rigases lied to him, or misled him, in any way~~.~~ regarding the 13-D. *See id.* at ¶¶ 104-05. He

---

[10] Of course, despite the rhetoric, the borrowing cannot fairly be characterized as coming from Adelphia. The funds were borrowed from the banks. *See supra* at 16-18. It is significant, then, that Mr. Rothenberger told the government  he knew generally about Adelphia's indisputably permissible ~~handling~~intermingling of funds that took place with the Managed ~~Entities' funds.~~Entities. *See* Am. Rule 56.1 Statement ¶109. He understood that "all cash went into the CMS and the issue was how it would be accounted for later." *Id.* at ¶110. (Mr. Rothenberger explained that he did not know that funds of those Rigas Entities that did not operate cable businesses—as opposed to the Managed Entities—were held in Adelphia accounts. *Id.* at ¶111. In fact, they were not.) This, too, was exculpatory evidence. To the extent that the government was alleging that money used for the stock was Adelphia money because it had been held in an Adelphia account, the defense would have benefitted by informing the jury that the lawyer upon whom Adelphia and the Rigases relied knew how the money was being held, but never expressed any concern that funds being held for a Managed Entity might legally be deemed to be Adelphia funds.

chose what to ask and whom to ask, and he asked his questions and received his answers from Mr. Thurner.

The government has argued in the past that Petitioners are not entitled to have relied upon Mr. Rothenberger's drafting because Mr. Rothenberger was kept in the dark about the co-borrowing facility being used by the Managed Entities to buy Adelphia shares. Gov't Opp'n Mem. at 32-33. This argument is wrong.

To begin with, Mr. Rothenberger (despite the obvious incentives) never claimed the Rigases or anyone else misled him about the source of the funds for the stock purchase. Am. Rule 56.1 Statement ¶¶ 104-05. Indeed, according to Mr. Rothenberger's February 20 statement, he did not recall whether he considered it important to ask Mr. Thurner or anyone else for details about the funding source. *Id.* at ¶ 103. Rather, Mr. Rothenberger was satisfied that the "affiliate borrowing" language he drafted was appropriate and only wanted to know from Mr. Thurner whether it was "accurate" that the funds were coming from "affiliate borrowing." *Id.* at ¶¶ 98, 101. It is agreed, of course, that the formulation was accurate—as even the government acknowledged to the jury:  "Well, I guess it's true that this was an affiliate borrowing." *Id.* at ¶ 94.

The government, of course, contended that more detail about the particular affiliate was needed in the Schedule 13-D, *see, e.g.*, Am. Rule 56.1 Statement ¶ 94, but the non-lawyers at Adelphia would only have known that (assuming it is true) had Mr. Rothenberger sought more detail about the source of the "affiliate borrowing." If he had not considered that essential—and his interview with the prosecutors made clear he had not—it would be unreasonable to conclude that the Rigases were supposed to have known what level of detail was required in the 13-Ds and

are guilty of securities fraud for not having provided Mr. Rothenberger information he never sought about the source of borrowing.

Second, Mr. Rothenberger's decision to eschew inquiry into the particulars of the "affiliate borrowing" was not borne of ignorance about the possibility that the Managed Entities were funding the purchase with funds from the co-borrowing facility. He never denied knowing of this possibility. *See* Am. Rule 56.1 Statement ¶118 (when asked whether there was a discussion about the source of funding, Mr. Rothenberger responded, "may have been, do not recall"); *Id.* at ¶120 ("[n]o recall that anyone told him from the Co-B"); *Id.* at ¶119 (could "not recall any specific[ ]" details about what he was told regarding how the Rigases would fund the stock purchase). And the documentary record (described below) leaves zero doubt about his knowing that the co-borrowing facility was a possible source—indeed, almost certainly the actual source—of the funding. This evidence drives home that Mr. Rothenberger was not misled about anything.

Third, the documentary evidence goes even further and establishes that Mr. Rothenberger actually knew co-borrowing would likely be used to fund the purchase at issue here. A March 31, 1999 list of issues Mr. Rothenberger prepared asked: "In terms of closing time, are there any other liquidity considerations other than the closing and funding of the co-borrowing agreement?" Am. Rule 56.1 Statement ¶115. This same question is asked in three separate e-mails sent on April 1, 1999. *Id.* at ¶116.

Fourth, numerous documents written to the Adelphia Board show that Mr. Rothenberger always understood the role the co-borrowing facility was designed to play in funding stock purchases by the Managed Entities. (Mr. Rothenberger attended ~~all~~ Board meetings and, as lead counsel, reviewed <u>various</u> matters coming before the Board. *See* Am. Rule 56.1 Statement

¶¶ 107-08.) In 1999, James Brown (Adelphia's Vice President of Finance) wrote a memorandum to the Board describing the co-borrowing facility and explaining that "the Rigas family intends to *use the proceeds of this distribution to purchase equity securities* from Adelphia." *Id.* at ¶ 112 (emphasis added).

Similarly, in January 1998, Bruce Booken (a partner at Buchanan Ingersoll) sent a one-page memorandum to Carl Rothenberger and Paula Zawadzki (another partner at Buchanan Ingersoll). Am. Rule 56.1 Statement ¶ 113. The memo described a proposed letter-of-credit type co-borrowing transaction "~~which is~~ primarily intended to provide liquidity to the Rigas family so that they can participate in future Adelphia stock offerings." *Id.* at ¶ 114. This planned use of funds was also explicit in the funding proposals Adelphia and the Managed Entities had submitted to the banks in seeking to establish co-borrowing facilities. *See id.* at ¶ 117. Standing alone, these documents rebut any suggestion that Mr. Rothenberger drafted the "affiliate borrowing" language unaware that co-borrowing would likely (if not certainly) be used for the Managed Entities' purchase of Adelphia stock.[11]

It is true that Mr. Rothenberger told the government on February 20 that he "did not know that purchases of Adelphia stock by [a Managed Entity] came from Adelphia and no one told him that the source of funds was from Adelphia bank accounts." Am. Rule 56.1 Statement ¶ 121. That is because he most certainly believed that *Adelphia was not the source of the funds*— the banks funding the co-borrowing facility were. (To illustrate, if a person's mother co-signs for his bank loan, the son would never say that "my mother was the source of the funds.") The fact

---

[11] The prosecution itself recognized this in the February 20, 2004 interview when it grilled Mr. Rothenberger on what other sources (other than the co-borrowing facility) the Rigases might possibly have had to fund the purchase. *See* Am. Rule 56.1 Statement ¶ 122 (prosecutor asked, "What beside co-b[orrowing] drawdown[s] could $375 M borrowings have been?"). At one point, the prosecutor confronted Mr. Rothenberger by telling him that Chris Thurner (who was cooperating with the government) "was sitting in Carl's chair yesterday." *See id.* at ¶ 123.

that the government may take the view that co-borrowed funds are *ipso facto* Adelphia funds does not allow it to attribute that definition to Mr. Rothenberger. Nor does it minimize the power of the evidence to support the defense's theories of the case.

The point here is not to prove that Mr. Rothenberger knew the co-borrowing facility funded the stock purchase. Rather, the point is that everyone involved had every reason to understand that Mr. Rothenberger formulated the "affiliate borrowing" language with full awareness of the possible identities of the "affiliate," but he never suggested specification of the affiliate was necessary. The issue in controversy at trial was the Rigases' state of mind, not Mr. Rothenberger's. So what he in actuality did or did not know would only have been significant had it been proven that the Rigases acted in bad faith by: (a) themselves knowingly misleading Mr. Rothenberger or (b) knowing that Mr. Rothenberger was in the dark, intentionally keeping him there. No evidence began to show that.

As a result of the prosecution's failure to turn over information about the February 20 meeting, the jury deliberated on the Rigases' guilt with no information about their good-faith reliance on Mr. Rothenberger's drafting and legal judgment. That offends *Brady* to its core.

### 2.      *Immediately Available Funds*

The prosecution also alleged that the Rigases were guilty of fraud because the cross receipts connected to the 2000 purchase and some other purchases spoke of Adelphia receiving "immediately available funds" in return for the shares. Am. Rule 56.1 Statement ¶124. The government contended that the transfer of the $375 million to Adelphia through the CMS in 2000 did not meet that description because (a) no funds were actually wired, and (b) the government looked at any funds involved as effectively having belonged to Adelphia in the first

place. *Id.* at ¶125. Once again, had information about the Rothenberger meeting been turned over, the trial would have taken on a very different complexion.

As with the "affiliate borrowing" language, the notes reveal that Mr. Rothenberger told the ~~Government that it was he—not any of the Rigases—who developed~~ government about his role in developing the "immediately available funds" formulation.~~ Mr.~~ without the Rigases involvement. Mr. Rothenberger explained that although ~~he~~that phrase had not been used ~~that phrase~~in connection with earlier purchases, ~~he~~it was used ~~it~~in April 1999 because that purchase "represented [a change] in [the] way RF [Rigas Family] bought shares in connection w[ith] public offering." Am. Rule 56.1 Statement ¶127. According to Mr. Rothenberger, his understanding of the term "immediately available funds" meant that cash was "presumed transferred in connection with the sale of Adelphia stock." *Id.* at ¶129. In other words, the phrase he used specifically conveyed that this might not be a third party wiring funds. Rather, payment might be conveyed in some other manner. As it turned out, it was accomplished by journal entries allocating to Adelphia the $368 million the Managed Entities had just drawn down from the banks into the Adelphia account that housed its funds (loans for which the Managed Entities were indebted to the banks).[12] *Id.* at ¶¶133-37. When asked how he understood the "immediately available funds" phrase, Mr. Rothenberger acknowledged that it "*usually* means cash (although he had not researched this precise issue and *it could also mean other than just cash*)." *Id.* at ¶130 (emphases added).[13]

---

[12] During the interview, the government asked Mr. Rothenberger whether he had been told the shares were being purchased in a "cashless" transaction. *See* Am. Rule 56.1 Statement ¶131. That Mr. Rothenberger disclaimed knowledge of a "cashless" transaction is hardly surprising, *id.*—as that was never a term used. To the contrary, the common understanding was that the transaction yielded immediately available funds to Adelphia because Adelphia received $375 million from the Managed Entities—funds it did not have prior to the transaction. *See supra* at 17-18 & n.8 .

[13] According to the Johnson Memorandum, Mr. Rothenberger indicated that cash "was supposed to have"

That statement makes all the sense in the world and there would be no reason for a lay person to dismiss Mr. Rothenberger's formulation as improper. No one would be debating any "immediately available funds" issue had the Managed Entities simply withdrawn cash from the bank's co-borrowing facility to their own account (as they were entitled to do) and then wired the funds to Adelphia. In that scenario, Adelphia would have received "immediately available funds," even though the funds originated from the co-borrowing facility.[14] In that transaction, Adelphia would have ended up with an influx of $375 million and the Managed Entities would have ended up with shares, as well as the bank debt connected with its borrowing to acquire those shares. The Managed Entities accomplished the same exact thing by transferring $375 million to Adelphia though the journal entry. The Managed Entities secured no benefit in proceeding that way as opposed to paying by wire transfer. It would, therefore, have been entirely reasonable for Mr. Rothenberger and anyone else to conclude that any of these scenarios qualify equally as transmitting "immediately available funds."[15]

---

changed hands at the closing. Am. Rule 56.1 Statement ¶132. But the notes reflect that Mr. Rothenberger clearly stated the "immediately available funds" formulation does not always require cash, and that he adopted the formulation precisely because of the different way this purchase was being funded. *Id.* at ¶¶127-28, 130.

[14] The government still might have had other concerns—such as the affiliate borrowing formulation—but that is a separate question from whether it would be fraudulent to speak of the transfer of "immediately available funds." The government's accounting witness acknowledged that ~~a wire from the Managed Entities would have qualified as cash. Trial Tr., App. 46, at 8643-44, 8686 (testimony of Robert DiBella). And Mr. Brown acknowledged, "actually moving the cash, as opposed to mere journal entries, would not change the substance of the transaction." App. 94, Defendant's Rule 33 Motion at 22 (discussing Fried Frank's May 28, 2002 Mem. of Interview with James Brown). See Trial Tr., App. 95, at 8133-34 (James Brown).~~ had the funds been wired directly from the bank to the Managed Entities, followed by the Managed Entities wiring the funds to Adelphia, that would have "[e]ssentially the same net effect" as what occurred when the funds went straight from the banks to Adelphia. Am. Rule 56.1 Statement ¶137.

[15] Significantly, a government witness testified that the draw-down from the banks in this case was intended to be wired to a Managed Entity's account, with the Managed Entity then wiring the funds to Adelphia. It was only by mistake, he testified, that the funds came directly from the banks to Adelphia (at which time it was, by journal entry, allocated to Adelphia). Am. Rule 56.1 Statement ¶¶ 135-36. Thus, but for that bank error, the pattern would have fit what Robert DiBella, the government's accounting witness, acknowledged ~~qualifies as~~ would have "essentially" the "effect" of transmittal of immediately available funds. *Id.* at ¶137. There was absolutely no evidence the Rigases knew ~~of any~~ of this mistake, making it all the more untenable to impose

Once again, what matters here is not whether Mr. Rothenberger actually did or did not know that the purchase was paid for by a journal entry that provided Adelphia with the funds the Managed Entities had borrowed. Nor does it matter whether Mr. Rothenberger's decision to use the phrase "immediately available funds" was wise or accurate. What matters is that *he* chose that phrase and he never claimed that the Rigases had anything to do with that—or that the Rigases said anything even the least bit misleading to him about the transaction. *See* Am. Rule Statement 56.1 ¶¶ 140-41. And what matters is that he worked on this with another lawyer representing Adelphia, Colin Higgin. *See* Am. Rule 56.1 Statement ¶ 139. The jury deliberating on whether to convict John and Tim Rigas needed to know all of that information. The only reason they did not was because the government withheld information it was required to disclose.

3. *The Schedule 10-K Allegations*

Adelphia's 10-K (Annual Report to the SEC) for the year 2000 stated the following about the co-borrowing facility:

> Certain subsidiaries of Adelphia are co-borrowers with Managed Entities under credit facilities for borrowings of up to $3,751,250,000. Each of the coborrowers is liable for all the borrowings under the credit agreement, and may borrow up to the entire amount of the available credit under the facility. The lenders have no recourse against Adelphia other than against Adelphia's interests in such subsidiaries.

Am. Rule 56.1 Statement ¶ 143. The government alleged this disclosure was fraudulent because, although accurately disclosing the borrowing limit and the limit of Adelphia's exposure, it did not disclose the actual amount the Managed Entities had borrowed as of the end of the reporting year. *See id.* at ¶ 144.

---

criminal liability on them based on the use of the "immediately available funds" language.

As with many of its allegations, the government built this claim on the testimony of James Brown.[16] He testified that during March 2001 Deloitte & Touche had suggested that Adelphia disclose in its 2000 10-K the amount actually borrowed from the co-borrowing facilities. Am. Rule 56.1 Statement ¶145. But, according to Mr. Brown, after a conversation with Tim Rigas on March 27 or 28, 2001, Mr. Brown was able to "sell [Deloitte] a story" that it was more conservative to disclose the full amount of the co-borrowing credit facility (*i.e.*, the amount of corporate exposure) rather than the amount borrowed as of year's end. *Id.* at ¶146; *see also id.* at ¶147. Mr. Brown claimed that he sold this story to Deloitte knowing his proposal would deceive shareholders. *See id.* at ¶148.

Mr. Brown's account of pulling the wool over the eyes of Deloitte's accountants made no mention of Mr. Rothenberger having been involved in deciding what to disclose about the co-borrowing facility. Am. Rule 56.1 Statement ¶¶146-48. Rather, Mr. Brown described how he and Tim Rigas unilaterally and fraudulently decided on the language, without ever mentioning input from, or approval by, any legal advisers.[17] *See id.* at ¶¶146-48, 153-55.

---

[16] There is a troubling matter regarding Mr. Brown. He testified in April 2004 pursuant to a cooperation agreement in which he pled guilty to three securities offenses (with a maximum sentence of 45 years). Am. Rule 56.1 Statement ¶206. He told the jury that, pursuant to the letter he signed, all he expected from the government was a letter to his sentencing judge describing his crimes and level of cooperation. *Id.* at ¶208. Mr. Brown read to the jury a passage of the agreement indicating that the sentence would be in the sole discretion of the judge, and the government would not even recommend a sentence. *Id.* at ¶209. All he hoped for, he explained, was to "receive a lesser sentence than [I] would if [I] had been convicted at trial." *Id.* It is now almost 14 years later, and the prosecution still has not requested a sentencing hearing. *Id.* at ¶210. It goes without saying that this delay is a massive benefit to Mr. Brown. Surely no jury hearing that the government could do more than make a sentencing recommendation would imagine that the government would give Mr. Brown the benefit of at least a 13-year reprieve. This is an independent *Brady* matter that will be explored in the event of an evidentiary hearing.

[17] The only mention Mr. Brown made of Mr. Rothenberger in connection with the 10-K was to describe a March 29, 2001 e-mail in which Mr. Rothenberger suggested language that the "amounts of indebtedness set forth for Adelphia and its subsidiaries do not include any amounts borrowed by the managed entity coborrowers under these credit facilities." Am. Rule 56.1 Statement ¶154. Mr. Brown testified he ignored this suggestion, having *never discussed it with anyone else*. *Id.* at ¶155. In proceeding with the 10-K, Mr. Rothenberger never insisted on that language, and its absence is not the subject of any allegation in this case.

The notes of the Rothenberger interview provide a very different account—one showing that no one was pulling anything over on anyone. Instead, Mr. Rothenberger explained that he had personally signed off on the propriety of the language that was used.[18] Mr. Rothenberger told the government that in March 2001 he had a meeting with Tim Werth, and perhaps Mr. Brown and/or Doug Malone, to discuss including language that either Adelphia or the Managed Entities could borrow up to the full amount of the available credit—the very language Mr. Brown claims he and Tim Rigas concocted in their rogue plot. The Feeney Notes state:

> 3/01 discuss w/ TW ~ DMal ~ JB
>
> - add language to co-b description in fin stmt. footnote
>
> - risk disclosure
>   -
> - borrow up to full amount
>   -

Am. Rule 56.1 Statement ¶156. Similarly, the McLaughlin Notes recount Mr. Rothenberger stating:

> -   Mar '01, a discussion w/ Tim Werth, (Doug Malone or Jim Brown)
>
> -   Also, additional language to the description of the loan status, co-b footnote to add the Risk Disclosure →→ up to the full ~~amount . . .~~amt

*Id.* at ¶157. Indeed, it was so clear at the interview that Mr. Rothenberger (and lawyers at Buchanan Ingersoll) had approved the language, the prosecutor confronted him, declaring, "Like it or not you guys endorsed these statements." *Id.* at ¶160.

---

*See id.*

[18] Mr. Rothenberger testified in 2005 that, to the best of his recollection, he was the one who actually drafted the language that was used. Am. Rule 56.1 Statement ¶¶158-59. Although the deposition occurred after trial, the statement speaks to materiality, for it shows that had the defense been given the *Brady* information, this information from Mr. Rothenberger would have been presented to the jury via Mr. Rothenberger's trial testimony.

Not only do these notes show that Mr. Rothenberger was involved in the decision to use the disclosure language, they show that neither Tim nor John Rigas was anywhere in that picture. Far from the fraudulent plot Mr. Brown claims he launched with Tim Rigas, the notes show that Adelphia (through others) sought legal advice about this part of its 2000 10-K from the securities law expert upon whom it had long relied.[19] And they show that the government itself recognized that Mr. Rothenberger had "endorsed these statements." Am. Rule 56.1 Statement ¶ 160. This withheld information supports the defense's contention that Petitioners' goal had always been to try in good faith to comply with the applicable securities laws, not to break them. There is surely a reasonable probability a jury would not have convicted John and Tim Rigas of having had the requisite *mens rea* to act fraudulently with regard to the 10-K had the jury heard this information.

4.     *Related Party Transactions*

The government also contended that the Rigases had in various SEC filings fraudulently misreported (or failed to report) some related party transactions. Am. Rule 56.1 Statement ¶ 164. These allegations touched on just about all of the areas that were the foci of the government's case—including allegations regarding Adelphia's role in the co-borrowing (which were affiliated party transactions). According to the government, the law required that each related party transaction be itemized and did not permit aggregation into a net number at year's end, as Adelphia had been doing. *Id.* at ¶¶ 165-66. And the government alleged that a significant number of related party transactions were never reported at all. *Id.* at ¶ 167. To show the requisite *mens*

---

[19] The government has observed (Gov't Opp'n Mem. at 31) that the notes do not show Mr. Rothenberger knew about conversations with Deloitte & Touche on how to disclose co-borrowing. But what matters is that he knew the relevant underlying facts and advised that he was comfortable with the language used. The fact is, though, Deloitte & Touche agreed that the language used was acceptable. Am. Rule 56.1 Statement ¶ 149. But even were it assumed that some accountants continued to offer contrary advice, a client is entitled to rely on advice from its attorney—even if not unanimously shared by every advisor.

*rea*, the government asserted that LeMoyne Zacherl, a former CPA who had worked at Adelphia during the mid-1990s, had explained the relevant requirements to Tim Rigas in the summer of 1994. *Id.* at ¶¶170-71. In its closing argument, the government emphasized this evidence as showing that Tim Rigas had actual knowledge he was violating the law:

> Nor is there any real dispute that Adelphia's proxy statements and its 10-KAs did not disclose all these related-party transactions in an itemized way, which is what the law requires. Nor—and by the way, an itemized manner that the testimony of LeMoyne Zacherl shows he explained to Tim Rigas.

*Id.* at ¶172.

At the February 20, 2004 interview, Mr. Rothenberger acknowledged his key role in the reporting of related party transactions. *See* Am. Rule 56.1 Statement ¶¶173-74; *see also id.* at ¶¶175-80. He had routinely inquired of Doug Malone (a qualified CPA with SEC experience, who worked for Adelphia) to ensure he knew of the relevant transactions, and had then reviewed the 10-~~K~~KA with Mr. Malone. *Id.* at ¶174. The Feeney Notes state:

> Financial Stmts - footnotes, related party transactions not otherwise disclosed
>
> Effort to determine if other related party transactions? Yes
>
> *-reviewed 10-KA w D Mal – familiar w/ SEC reporting – Ask him what else under SK 404*

*Id.* at ¶175 (emphasis added).

The various notes demonstrate the power of what Mr. Rothenberger said. First, he reaffirmed his view that ~~"net, not line item."~~ "advances to related parties" could be reported "net, not line item." Am. Rule 56.1 Statement ¶176. The McLaughlin Memorandum echoes this account, also describing Mr. Rothenberger stating that the "net number" he used was based on information provided by Mr. Malone. *Id.* at ¶177. Second, on a more general level, Mr. Rothenberger stated he "relied a lot on Malone. [He] asked Malone what else needed to be

covered re: related party transactions and Carl relied on the answers." *Id.* at ¶179 (Richey Notes); *see also id.* at ¶180 (Johnson Memorandum) ("Malone had experience with S.E.C. filings and Carl relied upon him to assure that the statements were complete and accurate."); *id.* at ¶178 (McLaughlin Notes) (Mr. Rothenberger worked with Doug Malone on these issues, whom he described as the "day to day guy" who was "familiar with SEC rpt.").

There was one word glaringly missing from Mr. Rothenberger's account: Rigas. Even though it was only days before the Rigases' criminal trial, and the government was plainly interviewing Mr. Rothenberger with the hope of eliciting evidence against the Rigases, Mr. Rothenberger was unambiguous that it was Doug Malone, and Doug Malone alone, who worked with him on the identification and disclosure of related party transactions.

This was material exculpatory information, to say the least. To begin with, Mr. Rothenberger's explanation that he considered it entirely permissible to report a net figure, readily disposes of any suggestion that Petitioners were guilty of fraud by virtue of the related party transactions having been reported by Mr. Rothenberger in that manner. And, on the question of whether all transactions made their way into that net figure, the evidence was undisputed that Mr. Malone had ~~unrestricted~~full access to Adelphia's books and records and fully understood the CMS. Am. Rule 56.1 Statement ¶182. Robert DiBella (the government's accounting witness) testified that ~~anyone with access to those books could easily have~~he had identified the affiliated-party transactions~~, which were laid out in detail. Trial Tr., App. 46,~~ simply by examining Adelphia's books and records. *Id.* at ~~8608-11. *See also* Trial Tr., App. 56, at 4520; Trial Tr., App. 47, at 4721-25 (James Helms). Indeed, that is how~~¶184. Mr. ~~DiBella identified them. Mr.~~ DiBella further ~~testified there was nothing problematic with Adelphia's use of the CMS to manage both Adelphia's and the Managed Entity's funds, and he~~ acknowledged

that the use of journal entries to effect transactions (precisely what Adelphia did through the CMS) is routine throughout many industries. *Id.* at ¶185.

It is plain from this testimony, then, that the transactions involved in the allegations about affiliated-party transactions—such as, but not limited to, reclassification of debt involving Adelphia and the Managed Entities, use of journal entries to reflect payment for Managed Entities' purchases of Adelphia stock, Adelphia's expenditures to build a golf course, and acquisition of timber rights from John Rigas—were all set forth clearly in Adelphia's records. The Rigases were hiding nothing—it was all readily visible to Mr. Malone and Mr. Rothenberger.[20] This is hardly the hallmark of a surreptitious fraudulent scheme.

The government has argued before that none of this is exculpatory because "Malone was a Rigas co-conspirator; not surprisingly, Malone did not tell Rothenberger the relevant facts. Without knowledge of the relevant facts, Rothenberger's advice cannot give rise to an advice of counsel defense." Gov't Opp'n Mem. at 32. This argument has no force. It is a powerful defense that someone else took the actions and made the decisions for which a defendant stands charged.

To be sure, the prosecution is entitled to try to defeat the power of such exculpatory evidence by arguing complicity, but that is a matter for trial, not a license to shrug off a *Brady* violation. Were there meaningful evidence of conspiracy with Mr. Malone, the prosecution could have sought to negate the Rigases' defense by presenting evidence to the jury proving a conspiracy on this matter. (Unlike the Rigases, the prosecution had unfettered access to Mr.

---

[20] In seeking to minimize the impact of this information, the government has pointed (Gov't Opp. Mem., ECF 16, at 32) to a sentence in the Feeney Notes that states: "Any disclosure of ACC policy JR [John Rigas] draw up to $1M/month from ACC? Never told about, Should be disclosed? Yes."  Am. Rule 56.1 Statement ¶181. But this does not speak to Mr. Rothenberger's position that itemized reporting was simply not necessary. Nor does it affect the fact that any and all information about funds paid to members of the Rigas family were readily visible to those—such as Mr. Rothenberger or Mr. Malone—whose job it was to review the books, which all agree were kept in a transparent manner.

Malone to prove this; the terms of his administrative leave from Adelphia—as approved by the prosecution—required that he cooperate with the government, and only the government. *See* Mots. To Vacate, Set Aside, or Correct Sentence ¶¶ 42-43, No. 11-civ-6964, ECF Nos. 1, 2.) The jury would then have been instructed on co-conspirator liability. But none of that happened, and the government may not now throw around unfounded and unproven accusations of conspiracy and unilateral assessments of credibility to evade the stark impact of the *Brady* violation. The government's non-disclosure foreclosed the Rigases from putting forward their powerful defense against the related party transaction charges (which were material to almost all of the issues in the case).

5.    *The Golf Course Project*

The interview materials reveal further that Mr. Rothenberger provided materially exculpatory information to the government relating to the accusation that the Rigases surreptitiously used Adelphia funds to build a golf course partly on land owned by John Rigas. Am. Rule 56.1 Statement ¶189. The prosecution used the golf course project as a particularly accessible example of fraud—as jurors were likely to understand this allegation far better than those relating to 10-Ks, 13-Ds, and the like.

The golf course allegation was front and center at trial. Just minutes into his opening argument, the prosecutor told the jury:

> [Y]ou will learn that Tim Rigas liked golf so much that he had [Adelphia] pay $13 million to begin building his own golf course, a golf course that was [on land] partly owned by Adelphia[, and] partly . . . owned by the family. You will also learn . . . that Adelphia's independent members of the board of directors, its shareholders, its stockholder, its creditors, had no idea Tim Rigas was using their money to build a golf course.

~~Trial Tr., App. 83, at 625-26 (AUSA Owens's Opening). The Government then used its very first witness to begin building its golf course case. Trial Tr., App. 58, at 830 (Christopher Pelto).~~Am.

Rule 56.1 Statement ¶190. By the end of the trial, eight separate witnesses had testified about the golf course. *Id.* at ¶191. At closing, the government told the jury:

> You heard a lot of testimony about the golf course—. . ., ladies and gentlemen, that was built on land that was majority owned by John Rigas. If we look at GX 9598, we go to page 30, we see a total of $ 12.8 million spent to build the golf course that the public shareholders were never told about, that ACC's independent board numbers were never told about, and that was never approved as an affiliate transaction.

*Id.* at ¶192.

Unbeknownst to the defense, the government was in possession of information contradicting the very accusations the government was lodging. Mr. Rothenberger had told the government he had been contacted by Tim Rigas to discuss "formulating ownership/operation of GC [Golf Course]." Am. Rule 56.1 Statement ¶193. Tim Rigas had explained that the golf course would be used by "vendors, supplier[s], general corp[orate] use—some employee usage, some unaffiliated (locals) use—no good golf course around Coudersport." *Id.* at ¶194. He also talked about its value in retaining employees. *Id.* at ¶195.

The government had learned from Mr. Rothenberger that Tim Rigas "wanted BI's [Buchanan Ingersoll's] understanding on affiliate (or not) transaction" and about "who should own." Am. Rule 56.1 Statement ¶197. In response to these inquiries, Mr. Rothenberger advised that "best legal structure that ACC [Adelphia] own the course, because majority of use for corporate purposes." *Id.* at ¶198. And Mr. Rothenberger and Tim Rigas explored many ideas about the tax implications—including the possibility of "donation to town with lease back." *Id.* at ¶199. Most critically, Mr. Rothenberger reported that he never considered it necessary to bring the matter before the Board for formal approval at that stage. He advised that it was only later, "once structured," that the golf course project would "require Bd approval if RF [Rigas Family]

continued to own land." *Id.* at ¶202. That time never arrived as construction of the course came to a stop in May 2002. *See id.* at ¶203.

With regard to the claim that Petitioners were hiding the golf course project, Mr. Rothenberger had reported to the government that he and various individual directors had actually visited the site and "Bd. knew there was a golf course." Am. Rule 56.1 Statement ¶200. The Johnson Memorandum states, "Carl said he did know it was being constructed, as did the various directors who had visited the site." *Id.* at ¶201. Mr. Rothenberger's description made clear that nothing about the golf course project was hidden from him.

This description of transparency (with Adelphia's counsel and the board) belies the accusation that Tim Rigas was trying to hide the golf course from them. It is disturbing that after hearing what it heard from Adelphia's lead lawyer on February 20, 2004, the government did not include any of this information in the letter it sent to the defense on February 24, 2004, reporting only that Mr. Rothenberger might have some exculpatory evidence about the unrelated timber rights issue. And it is distressing that, having explicitly been told several times by Mr. Rothenberger that "Bd. knew there was a golf course," the prosecution repeatedly told the jury that the Rigases were guilty of fraud because the independent members of the Board did not know the golf course was being built.[21] And, finally, it is most disconcerting that the government then stood up before Judge Sand and the Second Circuit and denied this was material exculpatory information. All these concerns aside, though, only one thing matters at this moment: this was undisclosed material exculpatory information.

---

[21] The prosecution also claimed that ~~the~~Adelphia's public shareholders~~, public,~~ and creditors did not know about the golf course. Am. Rule 56.1 Statement ¶¶190, 192. But there was no legal reason a corporate decision to embark on a project of this sort would need to be the subject of any general public disclosure. Although part of the land being used belonged to John Rigas, it remained unclear whether he would simply deed the land to Adelphia, whether Adelphia would buy the land, or whether it would be donated to the City. That had to be decided before determining whether there would be a related party transaction to report.

### C.    The Government Was Required to Disclose the Notes

Aside from its continued claims that none of the withheld material was exculpatory, the government has previously offered the following three categories of argument in defense of its non-disclosure: (1) there was no duty to disclose anything about Mr. Rothenberger because Petitioners already knew about him and about the kind of work he had done; (2) even if some withheld evidence was exculpatory, it was not material to the outcome of the trial; and (3) the issues regarding the Rothenberger notes have been decided already in earlier proceedings. As will be seen, none of these points has merit.

1.    *Petitioners' General Knowledge About Mr. Rothenberger Did Not Negate the Government's Duty to Disclose the Exculpatory Information It Learned*

The government has claimed that, under the "essential facts" doctrine, "[a] defendant cannot satisfy the suppression requirement if the defendant, directly or through counsel, 'either knew or should have known, of the essential facts permitting him to take advantage of [that] evidence.'" Gov't Opp'n Mem. at 15-16 (alteration in original) (quoting *Lamberti v. United States*, 22 F. Supp. 2d 60, 66 (S.D.N.Y. 1998), *aff'd sub nom. Badalamenti v. United States*, 201 F.3d 430 (2d Cir. 1999) (unpublished table decision)). The government's own conduct in this case demonstrates that the government never believed that doctrine obviated the need for disclosure regarding Mr. Rothenberger. And, more critically, a series of Second Circuit decisions, particularly *United States v. Mahaffy*, 693 F.3d 113, 131 (2d Cir. 2012), have flatly rejected any such position.

a.    *The Government's Own Conduct Refutes Any Claim that There Was No Need to Make Any Disclosure Regarding Mr. Rothenberger*

In assessing the government's claim that the "essential facts" doctrine absolved it of its duty to disclose, it is vital to recognize that the government itself understood it had a *Brady* duty regarding Mr. Rothenberger. Hence the government did disclose information regarding the timber rights issue. Am. Rule 56.1 Statement ¶ 8. The government did this, moreover, even though it involved a discussion Mr. Rothenberger described having with Tim Rigas himself— which would fall into the heartland of the "essential facts" doctrine the government espouses.

This is how the government later described its obligations:

It has long been the law and practice in the Second Circuit that the Government may fulfill its *Brady* obligation with respect to a particular witness by identifying the witness to the defendant and indicating that the witness may have favorable information *on a particular subject*.

*Id.* at ¶ 35 (emphasis added) (citation omitted).

Thus, the government asserted that it had complied with *Brady* by disclosing: (a) Mr. Rothenberger's identity; and (b) that Mr. Rothenberger may have exculpatory information on the "particular subject" of the timber rights transactions. But the government concedes it made no disclosure at all—even by its self-recognized duty to at least identify the subject matter—about central issues in the case, such as 13-D affiliate borrowing disclosures, 10-K co-borrowing disclosures, the "immediately available funds" formulation, related party transactions, and the golf course project. Hence, *by the government's own terms*, if it learned any materially exculpatory information from Mr. Rothenberger on any subject beyond timber rights, it failed to fulfill its *Brady* obligation.

### a.b.    *The Partial Disclosure Created a Duty for Full Disclosure*

The government has previously advanced the odd claim that its duty to make a *Brady* disclosure identifying each subject matter on which Mr. Rothenberger provided exculpatory information was satisfied because the disclosure about timber rights put the defense on notice

that Mr. Rothenberger had been interviewed by the prosecution. Gov't Opp'n Mem. at 25. Obviously, with regard to the other subjects, that disclosure never accomplished what the government itself accepts as necessary: "indicating that the witness may have favorable information *on a particular subject*." Am. Rule 56.1 Statement ¶35 (emphasis added) (citation omitted). Even that vague level of disclosure on *particular subjects* (albeit insufficient) at least would have told the defense some of what it was entitled to know: That Mr. Rothenberger was providing exculpatory information (which Petitioners knew to be truthful) on central subjects of the trial.

Far from fulfilling the government's *Brady* obligation, the partial disclosure was worse than no disclosure at all—as it compelled the defense to conclude: (a) the prosecution recognized its duty to identify the subjects of exculpatory information Mr. Rothenberger provided; and (b) Mr. Rothenberger had said nothing exculpatory other than about timber rights. This was worse than no disclosure at all because it duped the defense into believing Mr. Rothenberger must have been "flipped" and was now unwilling to tell what the defendants knew to be the truth. *Cf. Bagley*, 473 U.S. at 682-83 (anticipating that the defense will reasonably assume from non-disclosure that the exculpatory "evidence does not exist, and [will] make pretrial and trial decisions on the basis of this assumption").

No competent defense lawyer receiving this communication from the government would ever have been willing to call Mr. Rothenberger to the stand. *See Rodriguez*, 496 F.3d at 227-28 (There are scenarios in which partial disclosure impermissibly leaves defense counsel in the position of having to question a witness "blindly in the jury's presence, not knowing whether the answers elicited might seriously incriminate or prejudice the defendant."); *Leka*, 257 F.3d at 103 ("The opportunity [to] use [exculpatory information] under *Brady* is the opportunity for a

responsible lawyer to use the information with some degree of calculation and forethought. A responsible lawyer could not put [the potential witness] on the stand without essential groundwork."). Indeed, the partial disclosure here had just that effect. Bernard Preziosi, one of John Rigas's lawyers, has described in an affidavit how receipt of the letter from the prosecution led the defense to rule out calling Mr. Rothenberger to the stand, even though it considered him a "key witness." *See* Am. Rule 56.1 Statement ¶¶ 10-12.

In *United States v. Payne*, 63 F.3d 1200 (2d Cir. 1995), the Second Circuit spoke directly to this point. A witness in that case, Deanne Wilkerson, pleaded guilty to various drug charges, and cooperated with the government by testifying in Eric Payne's trial that she had sold drugs with him. *Id.* at 1204-05. The government turned over some *Brady* material regarding Ms. Wilkerson, including arrest reports and her plea agreement. *Id.* at 1205. But the government did not turn over an affidavit Ms. Wilkerson had filed in her own pre-trial proceedings denying that she had ever sold narcotics. *Id.* In addition to rejecting the government's claim that the "essential facts" doctrine made disclosure unnecessary (a holding that is discussed below, *see infra* at 49), the court explained:

> Further, the government produced for Payne a large volume of other materials concerning Wilkerson, including numerous documents relating to the federal investigation and her prosecution. Included were publicly available documents such as the transcript of Wilkerson's plea allocution. *A defendant receiving such documents from the Government could reasonably assume that the court files did not include other undisclosed exculpatory and impeachment documents pertaining to Wilkerson. . .*

*Id.* at 1209 (emphasis added); *see also Grant v. Alldredge*, 498 F.2d 376, 380, 382 (2d Cir. 1974) (holding the prosecution's "half disclosure" that an eyewitness had failed to identify the defendant, without also disclosing that the eyewitness had identified another man as the culprit, was "grossly unsatisf[ying]" and violated *Brady*).

It is paradoxical that, in a prosecution accusing the Rigases of deceiving the public through "half-truths," the prosecution would make a *Brady* disclosure that identifies one minor topic, but omits the long list of significant subjects about which Mr. Rothenberger provided exculpatory information. To quote the government, "[T]his is a good example of a half-truth. It's technically true . . . [b]ut it leaves out the most important information that the person reading this needs to know. . . . Half-truths are misstatements . . . ." Am. Rule 56.1 Statement ¶ 94. Thus, even if the "essential facts" doctrine means that the government had no duty to disclose any exculpatory evidence it learned from Mr. Rothenberger—and it most assuredly does not mean that—the government was not permitted to pretend to be making a disclosure, while in fact hiding 99% of the ball. *Cf.* Restatement (Second) of Torts § 323 cmt. c (even when there is no duty to act, once one opts to perform an act, one must do it in a manner that does not lull others into complacency about the continued need for diligence).

> ~~b.~~c.     *The "Essential Facts" Doctrine Does Not Relieve the Government of Its Obligation to Disclose the Exculpatory Information It Learned from Mr. Rothenberger.*

The "essential facts" doctrine, properly applied, stands for the proposition that "[e]vidence is not 'suppressed' if the defendant either knew, or should have known, of the essential facts *permitting him to take advantage of any exculpatory evidence*." *Leka*, 257 F.3d at 100 (emphasis added) (quoting *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982) (citations omitted)). Or, put otherwise, the government need not disclose information when the defendant is "on notice of the essential facts *which would enable him to call the witness and thus take advantage of any exculpatory testimony that he might furnish*." *United States v. Stewart*, 513 F.2d 957, 960 (2d Cir. 1975) (emphasis added). As subsequent cases have revealed, the inquiry into whether the defense already had the knowledge enabling it to "take advantage" of

the exculpatory evidence turns not only on whether the defense knew an underlying fact (such as what Mr. Rothenberger had actually done), but also on whether the defense knew the information that would make it possible, as a practical matter, to put that evidence before the trier of fact.

In some cases, it is obvious that the defense does not need the government to turn over the exculpatory evidence because disclosure is unnecessary to enable the defense to present the exculpatory evidence. For example, in *Raley v. Ylst*, 470 F.3d 792, 803-04 (9th Cir. 2006), the defendant claimed the prosecution had violated *Brady* by not tendering copies of his medical records from pretrial detention—records that were exculpatory (or at least mitigating) in showing he was being seen by medical personnel and was being medicated. The Court rejected that claim, holding that the "essential facts" doctrine applied because the defendant knew he had been seen by medical personnel, knew he had been medicated, and his defense had full access to the medical records simply by requesting them. *See id.* at 804.

By contrast, there are many cases in which the defense knows about some underlying information, but that information is *not accessible* as a practical matter (and hence not useful) to the defense without the government conveying what it knows. Using the instant case as an example, the defense knew that Mr. Rothenberger or his firm had been involved in various disclosures and transactions in some capacity. And the defense knew that, in the course of all their interactions with Mr. Rothenberger, they never sought to break any laws or commit any fraud. But knowing all of that was useless because the defense did not know the key piece of information that "would enable [them] to call the witness and thus take advantage of any exculpatory testimony that he might furnish." *Stewart*, 513 F.2d at 960. The defense did not know what the government did know: That even under the pressure to become a cooperating witness and provide an account that fit the government's narrative, Mr. Rothenberger (who the

prosecution knew was refusing to be interviewed by the defense) was continuing to provide an account of events that was highly exculpatory.

Indeed, the defense's inability (absent the government's disclosure of the information from the meeting) to learn what Mr. Rothenberger would say if called to testify was the foundation of Judge Jones's ordering the prosecution to turn over its notes of the Rothenberger interview. *See United States v. Rigas*, 779 F. Supp. 2d 408, 414 (M.D. Pa. 2011) ("Simply put, we do not accept the Government's assertion that the Defendants have equal access to Rothenberger, which then eliminates any potential *Brady* obligation.").

 A recent article on the "essential facts" doctrine articulates the distinction this way: "having knowledge about a thing does not necessarily mean that one can obtain access to that thing." Thea Johnson, *What You Should Have Known Can Hurt You: Knowledge, Access, and* Brady *in the Balance*, 28 Geo. J. Legal Ethics 1, 10 (2015). Here, without the information the government withheld, the defense had no "access to th[e] thing" that mattered—*i.e.*, no access to Mr. Rothenberger's account—access indispensable to a decision to call him as a witness.

Any confusion that may have once existed about this subject in the Second Circuit was resolved definitively in *United States v. Mahaffy*, 693 F.3d 113 (2d Cir. 2012). In securing convictions there, the government convinced the jury that the defendants' brokerage firms treated certain information as confidential. *See Mahaffy*, 693 F.3d at 124-25, 127. To help prove this, the government called Jay Amore, a cooperating witness, who testified he had spoken with one of the defendants (David Ghysels) and had made it clear he would be using the information improperly. *See id.* at 124, 129. After trial, it came to light that the government and the SEC had deposed numerous individuals prior to trial—many of whom supported the defense's positions. *See id.* at 127-28. For example, Carlos Romero—who was Mr. Ghysels's partner at Lehman

Brothers—had stated that Mr. Amore made clear he was using the information legitimately. *Id.* at 129-30.

In words that apply directly here, the Second Circuit rejected the argument that the "essential facts" doctrine relieved the government of its *Brady* duty:

> For the purposes of our *Brady* analysis, it simply does not matter that Ghysels knew that Romero, his former partner, had a conversation with Amore. Whatever Ghysels knew, he did not know what Romero told the SEC under oath. According to Ghysels, *Romero refused to meet with Ghysels's counsel prior to trial.* Not knowing what Romero might testify to, Ghysels did not call him at trial.

*Mahaffy*, 693 F.3d at 131 (emphasis added).

The Court expanded on this theme, as follows:

> The Government cites to cases that it contends establish that potentially exculpatory testimony is not considered suppressed where the defense knows the witness's identity. Those cases require more. It is not enough that a defendant knew a potential witness's identity; the defendant had to know "or should have known the essential facts *permitting him to take advantage of any exculpatory evidence.*" *United States v. Salerno*, 868 F.2d 524, 542 (2d Cir. 1989) (quotation marks omitted) . . . . Here, Ghysels did not know that Romero met with the SEC or that his previous testimony might be exculpatory.

*Mahaffy*, 693 F.3d at 131 n.11 (emphasis added).

The Court further explained that disclosure of the information was vital in another way:

> Aside from exculpatory material, *Brady* applies to material that "would be an effective tool in disciplining witnesses during cross-examination." Armed with Romero's SEC testimony, Ghysels quite possibly would have called Romero at trial. If Romero testified consistent with his SEC testimony . . . Romero's testimony would have bolstered Ghysels's defense. If Romero testified otherwise, Ghysels could have confronted him with a prior inconsistent sworn statement in the form of Romero's SEC deposition transcript.

*Id*. at 131 (citation omitted) (quoting *United States v. Gil*, 297 F.3d 93, 104 (2d Cir. 2002)).

The Court applied the same analysis to the withheld statement of Donald Lee, who had reported to the government that Kenneth Mahaffy, another defendant in the case, never sought to involve him in any inappropriate trading schemes. *Mahaffy*, 693 F.3d at 130, 132. Again, the

government claimed it had no duty to disclose Mr. Lee's statement because Mr. Mahaffy obviously knew what he had or had not said to Mr. Lee. *Id.* at 132. The Court dismissed the argument as follows:

> Next, just as Ghysels's knowledge that Romero spoke with Amore does not alter our *Brady* analysis, neither does Mahaffy's knowledge of his own relationship with Lee. . . .  If Mahaffy had known what Lee told the SEC, Mahaffy would have had a reason to interview Lee prior to trial and perhaps to call him as a trial witness. Without Lee's deposition transcript, however, Mahaffy was unaware that Lee might contradict inferences the government urged based on evidence it introduced.

*Id.* In sum, because the required information was not disclosed, critical witnesses went unheard and "the jury viewed and heard primarily Government evidence." *Id.* at 127.

The conclusion in *Mahaffy* is consistent with *Brady* decisions going back to *Brady* itself. In *Brady*, the defendant admitted he had participated in a murder but claimed that a different man named Charles, Mr. Boblit, had committed the actual killing. 373 U.S. at 84. Prior to trial, Mr. Boblit had told authorities he committed the homicide, but the prosecutors never turned those statements over to Mr. Brady's defense. *Id.* Of course, under the broad reading of the "essential facts" doctrine proposed by the government here, because Mr. Brady (who admitted being at the crime scene) obviously was aware that Mr. Boblit had strangled the victim—meaning that Mr. Brady knew that Mr. Boblit knew information exculpatory of Mr. Brady—there would have been no problem with the prosecution's withholding the statements. *See id.* at 84, 88. But what Mr. Brady did not know was that Mr. Boblit had been willing to provide this exculpatory information to the prosecution in a pre-trial interview. *Id.* at 84. Had he known that, "Brady might have called Boblit as a witness." *Brady v. State*, 174 A.2d 167, 170 (Md. 1961), *aff'd sub nom. Brady v. Maryland*, 373 U.S. 83 (1963). The core of the ruling in *Brady* was that the defense had a right to know the witness had told the authorities information exculpatory of the defendant. That was

the "essential fact." To accept the government's arguments here would be to hold there was no *Brady* violation in *Brady* itself.

Many other decisions similarly support this proposition. For example, in *United States v. Orena*, 145 F.3d 551, 557 n.4 (2d Cir. 1998), the court explained that the government had a duty to disclose what a witness told the FBI, because even though defendants may have known the general information about the witness's status, they "lacked evidence of the specific information exchanged between [the witness] and the FBI that has now become available." And in *Payne*, the government argued it had no duty to turn over the affidavit of a witness (Ms. Wilkerson~~Wilkinson~~) because the defense knew of Ms. Wilkerson's~~Wilkinson's~~ existence and the issues on which she had information. *Payne*, 63 F.3d at 1209. The court soundly rejected that position, explaining that because the defendant did not know the witness had executed the affidavit, he was not aware of the "essential facts" that would have led him to discover the material exculpatory evidence. *Id.* at 1208-09.

Indeed, one of the most high-profile recent exposures of a *Brady* violation follows the pattern of this case quite closely. United States Senator Theodore Stevens was charged with having failed to report free services he allegedly received from VECO, a company that had done some work on the renovation of his home. Dep't of Justice, Office of Prof. Responsibility, Report on the Investigation of Allegations of Prosecutorial Misconduct in *United States v. Theodore F. Stevens,* Crim. No. 08-231, at 1 (D.D.C. 2009) (EGS) (August 15, 2011). One of his defenses focused on his having believed that VECO's charges had been folded into the bills he had paid to Christensen Construction Co., the company doing most of the work. *See id.* at 4, 333, 349, 354. He also defended himself by claiming he had made it clear to VECO personnel that he expected to be billed and wanted to pay for all VECO services. *Id.* at 7-8. Prior to trial, the

prosecution had interviewed Rocky Williams, the primary VECO employee on the project, who had interacted repeatedly with Senator Stevens and his wife. *Id.* at 4, 277, 284, 589-90. Mr. Williams had told the government that he, too, believed that VECO's charges were being folded in to Christensen Construction's bills and that he had conversations with Senator Stevens and his wife in which they stressed their insistence on paying full freight for all services they received. *Id.* at 278, 284, 349. The prosecution never disclosed this information to the defense, and the defense never called Mr. Williams to the stand. *Id.* at 4, 349. Only after Senator Stevens was convicted did it emerge that the prosecution had engaged in these conversations with Mr. Williams. *See id.* at 277-359.

Senator Stevens's conviction was overturned (for this and other reasons), Dep't of Justice, Office of Prof. Responsibility, *supra*, at 19, and the ensuing Report of the Department of Justice's Office of Professional Responsibility found two prosecutors guilty of professional misconduct for not having disclosed to the defense the information that Mr. Williams had conveyed. *Id.* at 670-71.[22]

These facts closely parallel ours. There was never any doubt that the defense in *Stevens* was aware of Mr. Williams's central role in the subject of the prosecution—including conversations with Senator and Mrs. Stevens themselves. Nor was there ever any doubt that Senator Stevens was aware that Mr. Williams knew material exculpatory information. What the Stevens defense did not know—but was entitled to know under *Brady*—was that Mr. Williams had revealed this exculpatory evidence to the prosecution, thus showing his willingness to so testify if called as a defense witness (or arming the defense with impeachment material). This is

---

[22] The prosecutors' suspensions were later reversed by the Merit Systems Protection Board on the ground that the Department of Justice had not followed its own procedural rules for adjudicating such allegations. *See Goeke & Bottini v. Dep't of Justice,* 2015 M.S.P.B. 1 (2015).

precisely what the Rigases did not know about Mr. Rothenberger. The *Brady* duty in the *Stevens* case was beyond question. The *Brady* duty here was every bit as forceful.

Indeed, the evidence of the defendant's knowledge of "essential facts" was stronger in *Stevens* than it is here. The conversations at issue there were between Mr. Williams and Senator and Mrs. Stevens. Here, by contrast, most of the conversations at issue involved Mr. Rothenberger and third parties. For example, Mr. Rothenberger told the government that: (a) he obtained information for the 13-Ds from Chris Thurner, *see* Am. Rule 56.1 Statement ¶¶ 98, 101-03; (b) he had conversations with Tim Werth (and maybe Jim Brown or Doug Malone) regarding the 10-K disclosure, *id.* at ¶¶ 156-57; and (c) he worked with Mr. Malone to identify related party transactions that required disclosure, *id.* at ¶¶173-80. Neither John Rigas nor Timothy Rigas were party to these conversations and there is no evidence to suggest they knew or somehow should have known about them. *See id.* at ¶¶ 104-05, 161-62, 186-87. Thus, even were there no duty to make disclosure about Mr. Rothenberger's account of his interactions with the Rigases themselves (and there is such a duty), the government was undoubtedly obliged to disclose Mr. Rothenberger's exculpatory information about third parties upon whom he relied in preparing and approving the critical documents at issue.

2.  *The Information is Materially Exculpatory*

As soon as the Rigases learned (years after the trial) that the prosecution had notes of its pre-trial interview with Mr. Rothenberger, the Rigases sought to obtain those notes or, at the very least, to have them turned over to the court for *in camera* review. Am. Rule 56.1 Statement ¶¶28, 36. The prosecution fought tooth and nail to avoid this, accusing the defense of engaging in unfounded speculation about the notes' content. *Id.* at ¶¶34, 40-42, 46. The prosecution assured the defense, Judge Sand, and the Second Circuit that there was nothing even faintly

exculpatory contained within them. *Id.* at ¶¶29-30, 34, 41-43, 46. At the time, it was difficult to comprehend why the government was litigating so aggressively. If the notes were truly as benign as the government contended, why did the government not simply disclose them at that point—at least for *in camera* review by the court—and avoid the burden and expense of fighting to keep them secret? We now know why. The notes do, in fact, contain powerful exculpatory evidence that went to the defense's central themes in the case.

The government entirely misses the point when it dismisses the information's materiality and asserts that the defense's decision not to call Mr. Rothenberger was "knowing and strategic." Gov't Opp'n Mem. at 23, 26. The decision was certainly "strategic" in the sense that it resulted from decisions based on the available information. But it was by no means "knowing," given the government's failure to disclose the information that would have led the defense to understand that Mr. Rothenberger was prepared to provide powerful exculpatory evidence. And it was by no means "knowing," given the ways in which the government's disclosure, limited to timber rights, duped the defense into understanding that Mr. Rothenberger had provided no other exculpatory evidence. *Cf. Freeman v. Georgia*, 599 F.2d 65, 71-72 (5th Cir. 1979) (when the prosecution's *Brady* disclosure led the defense to believe the witness had no exculpatory evidence on a subject, the government was not permitted to argue that the defendant waived the *Brady* claim by declining to call that witness).

The government also has asserted that there is no need for a new trial as a result of any *Brady* violation because "it is extremely unlikely" the defense would call Mr. Rothenberger at a new trial. Gov't Opp'n Mem. at 29. This unfounded prediction fails to recognize the impact of the withheld information. The defense did not call Mr. Rothenberger at the trial because it had no way of knowing what the government knew—that he would provide exculpatory testimony. And

the defense did not call him because the government's limited disclosure necessarily indicated that Mr. Rothenberger was not providing exculpatory information on anything of significance. *Under those circumstances*, as we have explained, no reasonable lawyer would have called Mr. Rothenberger blindly to the stand. At a new trial, in sharp contrast, the defense would not be blind—it would have the knowledge to which it was always entitled. Accordingly, the Rigases would fully expect to call him as their key witness. At that new trial, the prosecution would never be able to tell the jury: "If in fact these men really believed that any of the lawyers or auditors approved or supported what went on and was charged to be illegal, don't you think they would have called one of them as a witness in this trial?" Am. Rule 56.1 Statement ¶ 16.

Moreover, a *Brady* violation of this sort cannot only cause the defense to eschew calling a particular witness, it can also lead to the defendants themselves not testifying. Here, for example, in the absence of Mr. Rothenberger's corroboration, it would have been treacherous—and useless—for the defendants to testify about what their lawyer said and did. *Cf. United States v. Eisenstein*, 731 F.2d 1540, 1546 (11th Cir. 1984) (reversing conviction because the trial court barred a lawyer's testimony and thus deprived the defendant of testimony that could have corroborated his otherwise uncorroborated advice-of-counsel defense).

The government has also argued that there was no need to disclose information about what Mr. Rothenberger told the prosecutor because there were other parts of the statement that it deems to be inculpatory. Gov't Opp'n Mem. at 33-34. Even were it true that Mr. Rothenberger also conveyed some inculpatory information—and Petitioners do not by any means accept that characterization—it would have no impact on the government's duty under *Brady*. The Second Circuit has held that the government must disclose any statement that "can be viewed as having both an inculpatory and exculpatory effect." *See United States v. Rivas*, 377 F.3d 195, 199-200

(2d Cir. 2004); *see also DiSimone v. Phillips*, 461 F.3d 181, 195 (2d Cir. 2006) (holding that *Brady* duty applies to a partially exculpatory and partially inculpatory statement). Addressing this issue, the Court in *Mahaffy* explained, "Where suppressed evidence is inculpatory as well as exculpatory, and 'its exculpatory character harmonize[s] with the theory of the defense case,' a *Brady* violation has occurred." 693 F.3d at 130 (2d Cir. 2012) (alteration in original) (citation omitted).

Plainly, then, none of the government's efforts to downplay the materiality of the information has force. For the reasons described within the discussion of each issue, the withheld information was most certainly material. The remedy for the violation is a new trial.

3.      *The Issue Has Not Been Decided*

There is a surreal nature to the government's contention that the *Brady* claims the Rigases are now advancing have already been adjudicated. Gov't Opp'n Mem. at 17-29. The government earlier succeeded in preventing meaningful adjudication of the Rigases' *Brady* claim on the very ground that the claim was unripe. No court has ever assessed the notes. It is rather audacious to now argue that the matter has already been resolved.

When the Rigases first tried to raise their *Brady* claim in a post-trial motion, they based their claim on information Mr. Rothenberger had revealed in his post-trial civil deposition. During that deposition, Mr. Rothenberger disclosed he had been interviewed by the prosecution days before the criminal trial began. He made many statements during that deposition that were exculpatory of the Rigases. The Rigases' *Brady* claim was based on their supposition that during that pre-trial meeting Mr. Rothenberger had disclosed much of the same materially exculpatory information he discussed in the post-trial deposition. *See supra* at 13-15.

The government would have none of this. It conceded (as it does now) its duty to inform the defense of any witness with potentially exculpatory evidence and to specify the subject matter of the exculpatory evidence. *See* Gov't Opp'n Mem. at 18. The government argued, though, that the idea of a motion to compel is alien to *Brady* procedure, and that the dispositive fact was that the defense had no actual proof Mr. Rothenberger had revealed any exculpatory information (except in relation to the minor timber rights issue). *See supra* at 13-15. The government was unyielding in pressing this point and attacking the defense for having advanced the *Brady* claim in the absence of actual evidence about what Mr. Rothenberger had told the prosecution. *Id*. Indeed, as discussed above, the government went further and represented that there was, in fact, nothing the least bit exculpatory in the notes—other than the information about the timber rights transaction.

The government's argument prevailed and the *Brady* claim was rejected summarily without any consideration of the details of the Rigases' assertion that the prosecution had withheld materially exculpatory evidence on a wide array of issues. Obviously, the court never had occasion to determine whether the government had complied with its duties—even the government's self-recognized obligation to identify the subject matter of any exculpatory evidence it possessed. The court could not possibly have conducted any such review because the government steadfastly refused to provide the notes in question to the court, even for *in camera* review. Thus, when the court rejected the Rigases' earlier *Brady* claim, it was relying on assurances by the prosecution that there was nothing the least bit exculpatory in the Rothenberger notes—aside from the timber rights information.

In light of this history, it is untenable for the government to now argue the Rigases are barred from securing relief under *Brady* because the matter has already been adjudicated. This is

no longer a motion to compel based on some uncertain evidence the government can dismiss as conjectural. There is no longer some heightened standard that must be satisfied to justify a procedurally extraordinary order to compel. The defense now has the actual notes in question—having obtained them in pre-trial proceedings in the separate—but later dismissed—prosecution in Pennsylvania. And the defense has secured additional notes through discovery this Court authorized in this case. Those notes and memoranda reveal that the government was disingenuous when it claimed the Rigases were off base in their assumptions about what Mr. Rothenberger had told the prosecution prior to trial. This Court and the Second Circuit trusted the prosecution's assurances. Now that the notes are out in the open, the prosecution should be eating crow, not making the specious claim that the court has already passed judgment somehow on whether notes the court never saw contain exculpatory information.

In any event, even had this precise issue been addressed, the law of the case doctrine does not apply when there are "cogent" and "compelling" reasons for revisiting prior rulings such as clarifications of governing law. *See Ali v. Mukasey,* 529 F.3d 478, 490 (2d Cir. 2008). *See also Santamarina v. Sears, Roebuck & Co.,* 466 F.3d 570, 572 (7th Cir. 2006) (finding that the law of the case doctrine "authorizes such reconsideration if there is a compelling reason, such as a change in, or clarification of, law that makes clear that the earlier ruling was erroneous"). The Second Circuit's decision in *Mahaffy* constitutes just that. And the "availability of new evidence" is a classic reason for examine an issue afresh. *See Gordon v. United States*, No. 10-cv-5366, 2011 WL 2638133, at *4 (S.D.N.Y. July 1, 2011) (Wood, J.). The law and now-available facts clearly show today that there was a *Brady* violation and Petitioners are entitled to habeas relief.

## III.   PETITIONERS ARE ENTITLED TO RELIEF BASED ON *BRADY* VIOLATIONS RELATED TO THE MARKETING SUPPORT ALLEGATIONS

### A.   The Trial and Appeal

Throughout the trial, the government pressed its contention that the Rigases orchestrated phony "marketing support" transactions with Scientific Atlanta Inc. and Motorola Communications Corp. as part of "accounting magic" the Rigases used to increase Adelphia's EBITDA.[23] Am. Rule 56.1 Statement ¶211; *see also id.* ("The first one of those bogus transactions we learned about was marketing support.").

The Second Circuit explained the allegations, which focused mostly on Scientific Atlanta, as follows:

> Adelphia agreed to pay Scientific Atlanta $339 for each cable converter box. The two entities later agreed that Scientific Atlanta would increase the price of each box by $31, and Adelphia would charge [Scientific Atlanta] an identical $31 per box for marketing support. Thus, Adelphia's capital expenses for each box were increased by $31 to $370. But Adelphia's current expenses were decreased, and its EBITDA was increased, by $31 per box. The effects of the marketing support scheme in the June 2000 and September 2000 quarters, for example, were an increase in Adelphia's EBITDA of $7 million and $12.8 million, respectively. The scheme with Motorola was similar, and had the same EBITDA-inflating effect.

Am. Rule 56.1 Statement ¶ 214.[24]

As with many other accusations, these allegations were based on the testimony of the government's star witness, James Brown. Mr. Brown testified that, in order to enhance EBITDA, he, Tim Rigas, and others devised a fake marketing support" scheme that used "wash transactions" to "fool the auditors." Am. Rule 56.1 Statement ¶215.[25]

---

[23] EBITDA, which stands for Earnings Before Interest, Taxes, Depreciation and Amortization, is a commonly used measure of a company's operating performance. Am. Rule 56.1 Statement ¶212.

[24] The effect on EBITDA resulted from the fact that capital expenses are not treated as expenses for EBITDA purposes, but the marketing support payments do count as revenue (which offsets the marketing costs the company was incurring). *See* Am. Rule 56.1 Statement ¶¶214, 216. There is no dispute that this is the proper way to calculate EBITDA; the dispute is about whether the transactions themselves were legitimate.

[25] At first glance, agreements calling for Adelphia to pay an increased price per cable box and then receive that increased amount back for marketing support might appear questionable. *See, e.g.,* Am. Rule 56.1 Statement ¶214. But the facts show it was entirely reasonable and legitimate. Scientific Atlanta and Motorola (the

To support the claim that the transactions were fraudulent, the prosecution relied heavily on the fact that the agreements with Scientific Atlanta and Motorola were split into two documents—one involving the increased price Adelphia would pay the companies and one involving the marketing support payments the companies would pay Adelphia. Am. Rule 56.1 Statement ¶217. And, by the same token, the manufacturers would write checks back to Adelphia, as opposed to the manufacturers simply crediting amounts due to Adelphia against amounts Adelphia owed.

Mr. Brown testified this was done that way—as opposed to capturing the transactions in one document and one integrated payment—to reduce the chances the auditors might notice what was happening. Am. Rule 56.1 Statement ¶218. This led the prosecution to argue in summation that marketing support was a fraudulent transaction because "they signed and discussed two dummy documents to try to throw the auditors off the track of this wash transaction." *Id.* at ¶220. The prosecution also sought to prove the fraudulent nature of the marketing support agreements from the fact that Adelphia started putting changed figures on its books even before the time (according to the government) Adelphia discussed the subject with the manufacturers. *Id.* at ¶221.

---

"manufacturers") were trying to sell their digital equipment to Adelphia's customers. The manufacturers had two choices of how to market the product. They could have expended the marketing funds directly and built that into the cost they charged Adelphia for the equipment. In that event, Adelphia's payments at a higher price for the equipment would be a capital expenditure, which all agree is not accounted for as an expense for EBITDA purposes. The second approach involved the manufacturer telling Adelphia: "pay us less than you would if we were marketing the product ourselves and spend the difference on marketing." In that scenario, Adelphia's capital expenditure would be decreased and its expenses (for marketing) would be increased—even though it was, in actuality, paying the same net amount for the equipment and marketing as it would in the first scenario. This skewed EBITDA as compared to the first (functionally equivalent) approach. The new marketing support agreements modified the transactions in ways that reflected reality. Consistent with its competitors' practices, these agreements enabled Adelphia to treat the marketing expenditures and reimbursements in a way that accurately and fairly reflected its EBITDA. *See, e.g.*, *id.* at ¶¶265-68, 271.

Ultimately, the "marketing support" evidence was vital to the case against the Rigases. Not only did it relate to the securities fraud and conspiracy counts, but the issue of EBITDA-manipulation through marketing support was part of the bank fraud claim.[26] Am. Rule 56.1 Statement ¶ 222. The maximum statutory sentence for bank fraud is 30 years (18 U.S.C. § 1344), as opposed to the 10-year maximum on the securities fraud counts that applied at the time of the conduct here (15 U.S.C. § 78ff (1998)), so the bank fraud count was necessary to the 17-year and 12-year sentences imposed on Tim and John Rigas, respectively.

### B.    Information Emerging Post-Trial

Shortly following the trial, two high-ranking officials from Scientific Atlanta and Motorola testified in civil depositions. Am. Rule 56.1 Statement ¶¶ 223, 227. The government had not called either of them—or anyone else from Scientific Atlanta or Motorola—as witnesses at trial. Am. Rule 56.1 Statement ¶¶ 219, 224, 228.

John Wharton (the sales finance person who supported North American Sales for Scientific Atlanta, Am. Rule 56.1 Statement ¶ 223) testified in the deposition that Adelphia had never "created" any sort of marketing support program, much less scheme. Rather, Scientific Atlanta's arrangement with Adelphia ~~tracked precisely~~was modeled after and essentially the same as the agreement Scientific Atlanta had already negotiated with an entirely separate cable company, Charter Cable Company (an Adelphia competitor). *See id.* at ¶¶ 225, 257-65. Likewise, John Tracy (Vice President of Finance at Motorola) testified that Motorola used the Charter Cable model in drawing up its marketing support agreement with Adelphia. *Id.* at ¶ 229. Significantly, they both testified that the marketing support agreements (going back to the

---

[26] The Second Circuit upheld a bank fraud count based on the evidence that the EBITDA manipulations had the effect of generating a materially better leverage ratio for Adelphia, thus allowing it to pay lower interest rates under its agreements with various banks. *See* App. 7, *United States v. Rigas*, 490 F.3d 208, 235 (2d Cir. 2007).

agreements with Charter) had been internally vetted and approved within their respective companies by executives, lawyers, and/or auditors. *Id.* at ¶¶226, 230. This testimony directly refuted the allegation that Adelphia had "created" the marketing support program in some sinister way to "fool the auditors."

On December 7, 2007, Petitioners brought a motion to compel the government, pursuant to *Brady,* to tender any interview notes it possessed regarding Scientific Atlanta and Motorola personnel. Am. Rule 56.1 Statement ¶231. In response to that latter Motion, the government simply declared in conclusory fashion that "[t]here was no *Brady* disclosure triggered by any such witnesses whom the Government interviewed." *Id.* at ¶232. At that time, Petitioners had no evidence that the government actually had learned any material exculpatory evidence relating to the marketing support allegations. The District Court denied the motion, without ever seeing the notes, explaining:

> [D]efendants' brief in support of their Rule 33 Motion documented their attempts to speak with these witnesses, and thus they cannot claim now that they were unaware of these witnesses' identities. As this Court noted in its November 20, 2007 Opinion, the Rigases did not take any steps to procure testimony from these witnesses, such as seeking immunity for the witnesses or subpoenaing them, and thus cannot now backtrack and claim that they were unaware of these witnesses' identities.

*Id.* at ¶¶233-34. The Second Circuit affirmed. *Id.* at ¶235. On the *Brady* claim, the Court stated only, " '[w]e detect no error" in the District Court's order. *Id.* at ¶236.

## C.    Depositions in 2014

In 2014, Petitioners informed this Court that three witnesses from Scientific Atlanta and Motorola recently had testified in civil depositions about the relevant events. Am. Rule 56.1 Statement ¶237. Petitioners explained that these witnesses (Wallace Haislip, John Wharton and John Tracy) not only provided accounts highly exculpatory of the Rigases, they also testified

they had ~~told all of this~~related exculpatory information to the prosecution before the Rigases'
trial. *See id.* at ¶¶237-38. Based on these depositions, this Court granted Petitioners' request for
discovery from the government regarding Scientific Atlanta and Motorola. *Id.* at ¶239.

### D.     The Materials Secured Through Discovery

Through discovery, Petitioners have received eight memoranda of pre-trial interviews
conducted by the government between ~~July~~August 2002 and January 2003. They are:

| Name | Date | Entity | Position | Cite |
|------|------|--------|----------|------|
| Patrick Tylka | 8/23/02 | Scientific Atlanta | President of Worldwide Sales | Am. Rule 56.1 Statement ¶241 |
| Wallace Haislip | 8/23/02 | Scientific Atlanta | Chief Financial Officer | Am. Rule 56.1 Statement ¶242 |
| David Hansen | 8/28/02 | Scientific Atlanta | National Account Director, NE Region Telephone Sales Force | Am. Rule 56.1 Statement ¶243 |
| Thomas Nilson | 9/13/02 | Scientific Atlanta | V.P. & Manager, North American Sales | Am. Rule 56.1 Statement ¶244 |
| John Simons | 9/25/02 | Motorola | Sales Director | Am. Rule 56.1 Statement ¶245 |
| John Wharton | 10/10/02 | Scientific Atlanta | Finance Director For Financial Planning and Analysis | Am. Rule 56.1 Statement ¶246 |
| Marc Rothman | 12/13/02 | Motorola | V.P./Dir. of Finance for Broadband Sector | Am. Rule 56.1 Statement ¶247 |
| Anita Gifford | 1/24/03 | Scientific Atlanta | Vice President of Law Division & Deputy General Counsel | Am. Rule 56.1 Statement ¶248 |

The accounts these witnesses provided to the government prior to trial consistently and
unambiguously refuted Mr. Brown's testimony and the government's accusations.

The government was told during the interviews that Adelphia approached Scientific
Atlanta asking for a Marketing Support agreement similar to agreements Scientific Atlanta and

58

Motorola already had entered into with one of Adelphia's competitors, Charter Communications. *See* Am. Rule 56.1 Statement ¶249 (Tylka Interview); *id.* at ¶250 (Nilson Interview); *id.* at ¶251 (Wharton Interview); *id.* at ¶252 (Hansen Interview). It was not surprising to Scientific Atlanta that Adelphia knew about the Charter agreement because the "cable industry is a small one and . . . people in the industry talk with one another." *Id.* at ¶253. Given Adelphia's "Most Favored Nation" agreement that entitled it to terms as favorable as any customer received, it seemed reasonable Adelphia would be seeking ~~market~~marketing support agreements along the same lines that Charter has received. *See id.* at ¶254 (Nilson Interview). *See generally id.* at ¶255 (Gifford Interview).[27]

Although Adelphia had originally proposed using a contract it drafted and sent, Scientific Atlanta persuaded Adelphia that the contracts should be modeled precisely after the ones developed with Charter. *See* Am. Rule 56.1 Statement ¶259. Indeed, Scientific Atlanta sent Adelphia a draft of the proposed agreement that simply had the names and amounts associated with the Charter deal blacked out. *See id.* at ¶¶258, 262. The reason Scientific Atlanta insisted on using the Charter contracts was that Scientific Atlanta's accountants and legal department had vetted those closely and the Scientific Atlanta executives were, therefore, confident about their legality and propriety, and could execute them more quickly. *See id.* at ¶¶257, 263.

At trial, the government argued that fraud was obvious because the agreements were effectuated through two separate documents that did not cross-reference one another. But the government had repeatedly learned before trial that this was not at all the case. Part of the very approach that had been vetted by Scientific Atlanta's and Motorola's lawyers and auditors with

---

[27] As Mr. Wharton would later explain, other companies such as Comcast and Time Warner also had similar marketing support agreements. Am. Rule 56.1 Statement ¶256. This information would have come out had the defense been in a position to call Mr. Wharton and other similar witnesses to the stand.

respect to the Charter agreement was the use of two separate contracts—one dealing with the price increase of each unit and one dealing with Charter's marketing support subsidy. Mr. Nilson told the government that the Adelphia agreement used two documents for one simple reason: "[B]ecause two documents had been used for the Charter Communications agreement." Am. Rule 56.1 Statement ¶264. Mr. Nilson stated that Adelphia agreed to the two-contract approach because he preferred to use a format previously used. *Id.* at ¶261. As Mr. Haislip put it, "two documents were needed to support a single contract because that was the format which had been used for the marketing support agreement reached with Charter Communications." *Id.* at ¶265; *see also id.* at ¶266.[28]

None of this had anything to do with deceiving auditors. Indeed, Mr. Wharton explained to the government that two distinct documents would most certainly not be a way to shield the transaction from scrutiny. He explained, "any reasonable finance person . . . could link the documents despite a lack of internal reference." Am. Rule 56.1 Statement ¶267.

~~The witnesses made it clear to the Government that there was always an insistence on approval by both sets of auditors  Scientific Atlanta's and Adelphia's. App. 76, Haislip Interview at 1468.~~ Mr. Wharton explained that Mr. Brown pressured Scientific Atlanta to complete the final documents by November 13, 2000. Am. Rule 56.1 Statement ¶284. That was the day the Audit Committee was meeting. *Id.* at ¶286. So, it turns out, Mr. Brown was not trying to keep the two sets of documents from the auditors; he was pressuring Scientific Atlanta for the documents precisely so he could share them with Adelphia's auditors. And the payment system used—one check going in and another going out—was the last thing one would

---

[28] One advantage for Scientific Atlanta and Motorola of proceeding with two contracts was eliminating the need to adjust invoices on a monthly basis in connection with sales of each unit, as the marketing support payments could be made independently on a quarterly basis. *See* Am. Rule 56.1 Statement ¶268.

do if trying to avoid auditors' attention. This is all in keeping with Mr. Brown having explained to Scientific Atlanta that Adelphia's auditors were comfortable with the program. *Id.* at ¶278. Documentary evidence confirms Adelphia had been working closely with its auditors on the marketing support arrangement. *See id.* at ¶279.

On this issue and others, the Scientific Atlanta executives (including one lawyer) repeatedly told the government that Scientific Atlanta was adamant about carrying out the transactions in ways acceptable to its auditors and lawyers. Am. Rule 56.1 Statement ¶¶257, 259, 263-65. It is ironic that the two-contract method, chosen precisely because it had been cleared by lawyers and accountants, was used at trial as affirmative proof of a scheme to "fool the auditors."

Along these lines, several individuals told the government about Scientific Atlanta's insistence that the deal only go through if the amount of marketing support ~~actually reflected Adelphia's true marketing expenditures.~~was reasonable. This began at the negotiation stage when Mr. Haislip rejected Mr. Brown's demand for marketing support in the range of $50 ~~percent.~~. *See* Am. Rule 56.1 Statement ¶270. Mr. Haislip told the government that ~~"he gives~~his role as CFO of Scientific Atlanta "was to give each contract a test of "commercial reasonableness~~,'" when negotiating contracts~~," *id.* at ¶276, and made it clear that the figure Mr. Brown was pushing was entirely unacceptable, *see id.* at ¶¶270-71. When Mr. Brown became threatening and vulgar in response, Mr. Haislip insisted on speaking with Tim Rigas to reach a commercially reasonable figure. *See id.* at ¶273.

As for the general practice of marketing support agreements, Mr. Haislip told the government that he had a standard of reasonableness in mind with respect to marketing support ~~is common within.~~ Am. Rule 56.1 Statement ¶¶269, 275-76. Given Mr. Haislip's reasonableness test and given that Scientific Atlanta entered into the ~~television industry and~~ marketing support

agreement with Adelphia, it was clear to the government that Scientific Atlanta believed the agreement was reasonable here. App. 76, Haislip Interview at 1466, 1468. Scientific Atlanta understood Adelphia's proposal was designed to boost its EBITDA, but that was entirely appropriate, provided the deal reflected amounts spent that were properly attributable to marketing support. *See id.* at ¶¶ 272, 275, 277, 280.

Although some of those interviewed told the Government they were skeptical at first about whether Adelphia would actually spend the money on marketing, those concerns were dissipated once they focused on Adelphia's marketing plan. *See* App. 76, Tylka Interview at 1452, 1457; App. 76, Haislip Interview at 1469-70. Messrs. Tylka and Haislip both believed that Adelphia would spend funds pursuant to the marketing support agreement. Am. Rule 56.1 Statement ¶¶ 277, 280. Part of that plan involved Adelphia periodically reporting back to Scientific Atlanta on its marketing efforts. *See id.* at ¶ 281. In that regard, when Scientific Atlanta requested documentation that Adelphia was actually spending the money on marketing, Adelphia's Tim Werth sent Mr. Wharton "a financial statement for the quarter ending September 30, 2011, which reflected that [Adelphia] spent $25 million to $26 million per quarter on marketing." *See* App. 80, Wharton Interview at 1498. This was fully in keeping with expectations *id.* at ¶ 282.

For some reason, the discovery material the government has tendered deals mostly with Scientific Atlanta, as opposed to Motorola. But two memoranda of interviews involving Motorola were disclosed. In one of those interviews, Motorola's Marc Rothman told the Government Motorola was unwilling to proceed with the marketing support program unless its legal department signed off on it, and unless it learned that Adelphia's auditors were on board—which Tim Werth reported to be the case. App. 81, Rothman Interview at government he would

only accommodate Adelphia's request if it was legal—which he was satisfied was the case given that Motorola and Adelphia ultimately reached an agreement. *See* Am. Rule 56.1 Statement ¶283.

A richer source of information about the Motorola agreement can be found in the March 12, 2014 civil deposition testimony of John Tracy, who served as Motorola Communication's Vice President of Finance. Mr. Tracy testified that he was examined by the government in 2002 or 2003 in an all day session, and specifically identified Christopher Clark, the lead prosecutor in the Rigas case, as a person who asked questions. Am. Rule 56.1 Statement ¶287. This account is confirmed by Mr. Tracy's 2005 testimony before the SEC. In that hearing, Mr. Tracy testified he had been interviewed by the United States Attorney's Office in "[e]nd of 2002. September 2002." *Id.*[29]

In his 2014 deposition Mr. Tracy testified that he had explained to the prosecutor in 2002 that the marketing support agreements were not some Adelphia concoction, but were based on existing contracts between Motorola and Charter Communications. Am. Rule 56.1 Statement ¶¶288-90. Mr. Tracy had provided a copy of the Charter agreement to the group responsible for vetting Adelphia's similar request—a group that included "my bossexecutives, the CFO, all through the General Counsel and Legal. They even usedothers in Motorola's legal department and outside counsel." *Id.* at ¶291. These lawyers and others determined that the agreement—including the increased price for equipment and a subsidy for marketing support—was

---

[29] As indicated above, *see supra* note 4, Petitioners are not relying in this Motion on the argument that the government had a *Brady* duty to tender exculpatory evidence in the SEC's possession. For now, Mr. Tracy's testimony before the SEC is cited only to establish that he was, in fact, interviewed by the United States Attorneys' Office, whose *Brady* duty is not subject to question. It is troubling, though, that the government has been unable to locate notes of the prosecutors' interview with Mr. Tracy. Given that unexplained ability to produce those notes, Mr. Tracy's testimony in his various depositions should be treated as accurately replicating what he told the prosecutors.

acceptable. Additionally, Mr. Tracy testified in the deposition that he and others were also told by Tim Werth that Adelphia's auditors "were okay with" the agreements. *Id.* at ¶292.

Mr. Tracy further told the government in 2002 that Motorola's agreement with Adelphia was drafted by Motorola: "I think Adelphia had an agreement to start with, and we changed it to be consistent with the one we had from Charter." Am. Rule 56.1 Statement ¶290. As with the Charter agreement, Motorola used two separate contracts—one dealing with the new equipment price and one with marketing support payments. *Id.* at ¶289.

### E.      The Evidence About the Timing of the Discussions

The indictment alleged that Tim Rigas and Mr. Brown began recording the marketing support payments on Adelphia's books in August 2000, even though it was only in late October 2000 when, in an effort to give the appearance of legitimacy to those entries in Adelphia's books, discussions began with Scientific Atlanta and Motorola "in the hope of reaching an agreement for marketing support payments to Adelphia." Am. Rule 56.1 Statement ¶¶293-95. Throughout Mr. Brown's testimony, the prosecution stressed this timing, with Mr. Brown testifying that as of the summer of 2000, we "hadn't had any discussions with them yet." *Id.* at ¶296. Although he admitted in cross-examination that there possibly could have been earlier conservations between Adelphia and the companies, *id.* at ¶297, no witness ever contradicted Mr. Brown's testimony.

The defense sought to admit as an exhibit an August 11, 2000 internal Scientific Atlanta e-mail about its having the go-ahead for a marketing agreement with Adelphia, like Charter's. *See* Am. Rule 56.1 Statement ¶298. This, the defense argued, exposed the fallacy of Mr. Brown's claim that the first conversations occurred in October 2000. *Id.* at ¶299. The prosecution fought admission of the exhibit, claiming "there's no reason, either in the record or in this email, that that's not consistent" with Scientific Atlanta having unilaterally planned to

offer a marketing agreement in August, but never having discussed it with Adelphia at that time. *Id.* at ¶300. The government stated that if the defendants wished to prove differently, "they should call" witnesses from Scientific Atlanta. *Id.* at ¶302.

The discovery the government now has produced establishes that the prosecutor who told this to the court was the same prosecutor who conducted the interviews with Scientific Atlanta officials who refuted his contention. For example, Thomas Nilson had told the prosecutor how the subject of marketing support first came up at a tradeshow during the summer of 2000, when Dan Liberatore of Adelphia proposed the arrangement. *See* Am. Rule 56.1 Statement ¶305. In response, Mr. Nilson recommended arranging talks on the subject at the annual fishing trip Scientific Atlanta sponsors in June or July. *Id.* at ¶307. Another Scientific Atlanta official told the prosecutor that during that July 2000 fishing trip, Dan Liberatore had received a phone call from someone at Adelphia "asking him to explore the possibility of [Scientific Atlanta's] entering into a marketing support agreement with [Adelphia] similar to an agreement [Scientific Atlanta] had with Charter Communications." *Id.* at ¶308.

Despite knowing this, and despite having Mr. Brown testify to an account that flatly contradicted these neutral accounts, the prosecution (a) never made a *Brady* disclosure of any of the documents that would have disproved Mr. Brown's account and the allegation of the indictment; (b) affirmatively (and, at best, disingenuously) told the Court that Scientific Atlanta might well have been thinking about marketing support in the summer without Adelphia's knowing about that until October; and (c) then had the gall to chide the defense for not calling the witnesses who would have been called had it not been for the prosecution's *Brady* violation. The existence of that internal Scientific Atlanta e-mail did lead Judge Sand to formulate a

stipulation that "the internal files of Scientific Atlanta reflect that ~~as of~~during the period beginning, during the period from August ~~11~~through October, consideration was being given to the drafting and submission to Adelphia of a marketing ~~support~~credit agreement." Am. Rule 56.1 Statement ¶303; *see also id.* at 304 (a similar stipulation as ultimately read to the jury). But, as the prosecution had urged, the stipulation said nothing about Adelphia's involvement in the process during that summer (indeed, according to the government, it simply spoke of Scientific Atlanta considering drafting and submitting a proposal). *See id.* at ¶¶ 300-01. On the available record, that stipulation may have been fair. But the withheld *Brady* material would have established that it was Adelphia that initiated the discussion in July 2000—directly contrary to the prosecution's and the indictment's charges. Standing alone this violation supports relief.

### F.   The Government's Responses Do Not Mitigate the Impact of the *Brady* Violation with Regard to the Marketing Support Agreements

When the government earlier argued against discovery on marketing support, its primary substantive contention was that even if the marketing support agreements originated with another cable company, that "does nothing to undercut the fact that the true purpose and effect of the 'marketing support' agreements was not disclosed to investors." App. 100, Letter from AUSAs Damian Williams and Brian Blais to the Hon. Kimba Wood, at 2-3, ECF 49, August 29, 2014. And the government contended that the approval of these agreements by auditors [or lawyers] at Motorola and Scientific Atlanta "would have no bearing on whether these agreements were booked at Adelphia with the intent to mislead investors." *Id.* at 3.

This argument ignores the bedrock principle that the prosecution had the burden of showing Petitioners' actual intent to defraud. *See Rigas*, 490 F.3d at 233 n.34 ("[T]he government had to prove Defendants' intent to defraud."). The government used the two-separate-contract argument, the timing issue, and arguments about the general nature of

marketing support to convince the jury of that fraudulent intent. The *Brady* information improperly withheld from the defense—information that would have enabled it to call those witnesses—would have refuted the government's evidence and arguments. There is—at the very least—a reasonable probability that a jury exposed to this information would have concluded that (a) the marketing support approach was not a diabolical Adelphia concoction; (b) use of two documents actually proved intent to comport with the law, not to hide fraud; and (c) the argument that Adelphia never even approached the manufacturers until well after it began booking the new agreements was flatly wrong. It is difficult to understand how the government can dismiss all that as inconsequential to the jury's assessment of whether Petitioners subjectively engaged in fraudulent conduct with regard to marketing support.

In addition, rebutting Mr. Brown's testimony on these claims would have shown the jury he was not testifying truthfully—a showing that would have weakened (and, in many instances, negated) many of the prosecution's counts. *See Giglio v. United* States, 405 U.S. 150 (1972) (prosecution must disclose evidence that could be used to challenge the reliability and credibility of a prosecution witness); *United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001) ("Favorable evidence includes not only evidence that tends to exculpate the accused, but also evidence that is useful to impeach the credibility of a government witness.").

The government has also argued that the issue is controlled by Judge Sand's ruling that the witnesses in question were not "unavailable" because the Rigases could have subpoenaed them or sought immunity in order to call them. This reasoning confuses whether evidence is "newly discovered" for purposes of a Rule 33 Motion with the very separate question of the prosecution's duties under *Brady*. It is circular to argue that the defense's decision not to subpoena a witness is a knowing and strategic choice that negates the prejudice from the

prosecution's having withheld the very material to which the defense was entitled in order to make those choices. A prosecutor may not withhold *Brady* material and then seek refuge in the fact that the defense—without benefit of that material—never called the witnesses in question.

**Former Part IV ("Petitioners Are Entitled to Relief Based on the *Brady* Violations Related to Subscriber Numbers") has been deleted.**

## IV.    CONCLUSION

In *Mahaffy*, the Second Circuit expressed "frustration" with the decision of the United States Attorneys' Office for the Southern District of New York to withhold the *Brady* material. *Mahaffy*, 693 F.3d at 133 n.12. The Court deemed the violation "entirely preventable" and bemoaned how the government's failure to disclose the evidence "negatively impacted the case in two distinct but related ways" (both of which apply also to the Rigases' case):

> First, the two trials were both unfairly skewed against the defendants, who were forced to mount their defenses without the benefit of material exculpatory and impeaching sworn testimony. Second, the costs of this litigation—in terms of personal, financial and judicial resources and time—have ballooned as a result of the two trials, post-verdict litigation, and two appeals to this court.

*Id*. at 133.

The Court in *Mahaffy* recognized that the only remedy for these violations was reversal of the convictions. That is precisely the case here as well. The prosecutors told the Second Circuit in this case that the government takes its *Brady* "responsibility seriously, and it fully recognizes the potentially drastic remedies that exist for failure to abide by these constitutional obligations (*e.g.*, reversal of a conviction)." Am. Rule 56.1 Statement ¶41. That is the remedy called for here.

For the reasons stated herein, Petitioners request that the Court grant relief on the *Brady* claims raised here and vacate their convictions pursuant to 28 U.S.C. § 2255.

Dated: February 7, 2018

Respectfully submitted,
*Attorneys for Petitioners*
*John J. Rigas and Timothy J. Rigas*

s/ Steven F. Molo

LAWRENCE C. MARSHALL, ESQ.
ADMITTED *PRO HAC VICE*
559 NATHAN ABBOTT WAY
STANFORD, CALIFORNIA 94305
(650) 723-7572
lmarshall@law.stanford.edu

STEVEN F. MOLO
MOLOLAMKEN LLP
430 PARK AVENUE
NEW YORK, NEW YORK 10022
(212) 607-8160
smolo@mololamken.com

MEGAN CUNNIFF CHURCH
JORDAN RICE
ADMITTED *PRO HAC VICE*
MOLOLAMKEN LLP
300 NORTH LASALLE STREET
CHICAGO, ILLINOIS 60654
(312) 450-6700
mchurch@mololamken.com
jrice@mololamken.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 7th day of February, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all parties with an e-mail address of record who have appeared and consent to electronic service in this action.

Dated:  February 7, 2018

s/ Steven F. Molo
STEVEN F. MOLO
MOLOLAMKEN LLP
430 PARK AVENUE
NEW YORK, NEW YORK 10022
(212) 607-8160
smolo@mololamken.com

*Attorney for Petitioners*