# Exhibit 1

*United States v. Rigas*, No. 02-Cr-1236
(S.D.N.Y.), Indictment, ECF No. 80



DOC #80

FILE COPY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA            :

                                    :   INDICTMENT

JOHN J. RIGAS,                      :   S1 02 Cr. 1236 (LBS)
TIMOTHY J. RIGAS,
MICHAEL J. RIGAS and                :
MICHAEL C. MULCAHEY,
                                    :
          Defendants.
                                    :

- - - - - - - - - - - - - - - - - - - - x

### COUNT ONE

(Conspiracy to Commit Securities Fraud,
Wire Fraud, False Statements in SEC Filings,
False Books and Records and Bank Fraud)

The Grand Jury charges:

### BACKGROUND

I.   Relevant Parties and Entities

1.   At all relevant times, Adelphia Communications
Corporation ("Adelphia") was a Delaware corporation with its
principal place of business in Coudersport, Pennsylvania.  In or
about 1986, Adelphia was organized as a holding company, which
conducted its primary business operations through various
subsidiaries and affiliates.  At all relevant times, Adelphia's
principal business was operating cable television systems
throughout the United States.  As of December 31, 2000, Adelphia
was the sixth largest cable television provider in the United
States and operated cable systems in at least approximately 32

states with approximately five million subscribers, including
subscribers in the Southern District of New York.  On or about
June 25, 2002, Adelphia filed a bankruptcy petition in the United
States Bankruptcy Court for the Southern District of New York.

2.    At all relevant times, JOHN J. RIGAS, the
defendant, was the Chairman of the Board of Directors, President,
and Chief Executive Officer of Adelphia.  Until his resignation
in or about May 2002, JOHN J. RIGAS was principally and
ultimately responsible for the management of Adelphia's business.
JOHN J. RIGAS is the father of TIMOTHY J. RIGAS and MICHAEL J.
RIGAS, the defendants.  Members of the family of JOHN J. RIGAS,
including his wife, sons, daughter and son-in-law, are referred
to collectively herein as "the Rigas Family."

3.    At all relevant times, TIMOTHY J. RIGAS, the
defendant, was Executive Vice President, Chief Financial Officer,
Chief Accounting Officer and Treasurer of Adelphia, and was a
member of the Board of Directors of Adelphia.  Until his
resignation in or about May 2002, TIMOTHY J. RIGAS was
responsible for the financial management of Adelphia and reported
to JOHN J. RIGAS.  From in or about December 1992 through in or
about June 2001, TIMOTHY J. RIGAS was the Chairman of the Audit
Committee of the Board of Directors of Adelphia.

4.    At all relevant times, MICHAEL J. RIGAS, the
defendant, was Executive Vice President for Operations,

-2-

Secretary, and a member of the Board of Directors of Adelphia. Until his resignation in or about May 2002, MICHAEL J. RIGAS was responsible for the business operations of Adelphia and reported to JOHN J. RIGAS.'

    5.   At all relevant times, MICHAEL C. MULCAHEY, the defendant, was Director of Internal Reporting for Adelphia.  At all relevant times, MULCAHEY reported to TIMOTHY J. RIGAS. MULCAHEY participated in, among other things, the management of Adelphia's treasury functions, including the supervision of money flowing into and out of Adelphia, its reporting to lenders and debt security holders regarding its financial condition, and its internal record keeping regarding expenditures on behalf of, among other things, the Rigas Family and entities that they owned and controlled.

    6.   At all relevant times, James R. Brown and Timothy A. Werth, co-conspirators not charged as defendants in this Indictment, were officers of Adelphia.

    a.   At all relevant times, Brown was Vice President of Finance for Adelphia.  Until his resignation in or about May 2002, Brown reported to TIMOTHY J. RIGAS.  Brown participated in, among other things, raising capital through securities transactions, bank loans and other methods, preparing Adelphia's financial statements and public disclosures regarding its operating and financial performance and Adelphia's

-3-

communications with investors, securities analysts, credit rating agencies and the public.

        b.    From in or about February 2000 through in or about May 2000, Werth was the Director of External Reporting for Adelphia.  From in or about May 2000 through in or about May 2002, WERTH was the Director of Accounting for Adelphia.  In both those positions, WERTH's responsibilities included supervising the preparation of Adelphia's financial statements and other books and records, including, among other things, financial statements included in:  filings with the SEC; Adelphia press releases; and information provided to creditors of Adelphia and its affiliates.

## II.  Rigas Family Control of Adelphia

        7.    At all relevant times, two classes of Adelphia common stock were issued and outstanding:  Class A, which exercises one vote per share, and Class B, which exercises 10 votes per share.  As of in or about January 2002, the Rigas Family owned or controlled only approximately 12.5 percent of Adelphia's approximately 186,683,167 outstanding Class A shares. However, at all relevant times, JOHN J. RIGAS, TIMOTHY J. RIGAS and MICHAEL J. RIGAS, together with other members of the Rigas Family, owned and controlled approximately 100 percent of Adelphia's Class B Shares.  As of in or about January 2002, approximately 25,055,365 shares of Class B common stock were

issued and outstanding.  Thus, although the Rigas family did not own or control a majority of Adelphia's outstanding Class A common stock, as a result of the above-described two-class share structure and the voting power of the Class B common stock, at all relevant times, the Rigas Family controlled a majority of Adelphia shareholder votes.

8.   Under Adelphia's Certificate of Incorporation, Adelphia Class A shares elect only one of Adelphia's nine directors.  Thus, at all relevant times prior to in or about May 2002, as a result of the Rigas Family's stock ownership, Adelphia's Certificate of Incorporation, and an agreement among the Class B stockholders, members of the Rigas Family had the power to elect, and did elect, eight of nine Adelphia directors. At all relevant times, five of Adelphia's nine directors -- including JOHN J. RIGAS, TIMOTHY J. RIGAS and MICHAEL J. RIGAS, the third son of JOHN J. RIGAS, and the son-in-law of JOHN J. RIGAS -- were members of the Rigas Family.  At all relevant times, one or more members of the Board of Directors were not members of the Rigas Family.  The members of Adelphia's Board of Directors who were not members of the Rigas Family are referred to herein as the "Outside Directors."

9.   At all relevant times prior to on or about June 3, 2002, Adelphia's Class A common stock was registered with the United States Securities and Exchange Commission ("SEC") and was

publicly traded on the NASDAQ National Market System.  On or about January 2, 2002, the closing price for Adelphia's Class A common stock was approximately $31.85.  On or about June 3, 2002, Adelphia's Class A common stock was delisted by NASDAQ, and at all relevant times thereafter was traded on the over-the-counter market at pennies per share.

10.  Based on the Rigas Family's control of the Adelphia shareholder votes and Board of Directors, the Rigas Family controlled all of Adelphia's corporate affairs, including decisions on matters such as amendments to Adelphia's Certificate of Incorporation and Bylaws, mergers and acquisitions, and other fundamental corporate transactions such as compensation for officers, the issuance of stock, and the use of Adelphia's capital.

11.  At all relevant times, pursuant to, among other things, the corporate bylaws of Adelphia, it was required that transactions between Adelphia and its directors or officers, or any entity owned or controlled by any of them, be approved by the board of directors, or by the shareholders.  Based on such requirements, contracts or transactions between Adelphia and the Rigas Family, or entities owned or controlled by them, were required to be approved by the Board of Directors of Adelphia, or by the shareholders, after disclosure of the material facts

concerning the Rigas Family's relationship to, or interest in, such contracts or transactions.

## III. Rigas Family Entities

### A.   Cable RFEs

12.   At all relevant times, in addition to controlling Adelphia, the Rigas Family owned and controlled various entities (Rigas Family Entities or "RFEs"), including certain cable television properties ("Cable RFEs") that were managed and operated by Adelphia pursuant to certain management agreements. Under the management agreements, Adelphia managed all aspects of the Cable RFEs' businesses, including marketing, billing, and payment of operating expenses.  In exchange, the Cable RFEs agreed to pay Adelphia a management fee of approximately five per cent of their revenues for each quarter.

### B.   Other RFEs (Non-Cable RFEs)

13.   In addition to the Cable RFEs, the Rigas Family owned and controlled a number of entities which did not provide cable television service to consumers ("Other RFEs").  For example, members of the Rigas Family owned and controlled such businesses as a furniture and interior design company, as well as numerous partnerships and other entities the sole function of which was to hold securities and other assets.

14.   Although the Other RFEs had no cable business for Adelphia to manage, the operations and financial dealings of the

Other RFEs were commingled with Adelphia, its subsidiaries, and the Cable RFEs. For example, Adelphia employees regularly performed work for the Other RFEs, their accounts payable were regularly paid with funds held in Adelphia's bank accounts, and they were not required to settle their debts to Adelphia in cash, but were permitted to accrue balances owing to Adelphia, often on an interest-free basis.

15. In addition, these Other RFEs often used Adelphia's capital to conduct their activities. Thus, although the Other RFEs were not Adelphia subsidiaries and were wholly owned by the Rigas Family, they were treated in effect as if they were Adelphia entities, with little or no recognition of their divergent ownership or interests.

IV. Adelphia's Cash Management System

16. At all relevant times, the operating revenues and expenses of Adelphia, its subsidiaries, and the RFEs (including both Cable RFEs and certain Other RFEs) were organized, collected, and expended through a centralized cash management system ("CMS"). The accounts that made up the Adelphia CMS were maintained at First Union National Bank ("First Union") in Pensacola, Florida.

17. From in or about October 2001, up to and including May 2002, under the CMS, all cash received by Adelphia, its subsidiaries, or the RFEs was swept, on a regular basis, into a

-8-

central cash management account from which nearly all expenses of Adelphia, its subsidiaries, and the RFEs were paid. Revenues and expenses of particular entities within the CMS were accounted for through inter-company debits and credits within the CMS.

18. For example, under the CMS, if a Cable RFE received a payment from a subscriber, the cash from that payment would be swept into Adelphia's central cash management account, and that RFE would receive an inter-company credit in the amount of the payment. Similarly, if a Cable RFE incurred an expense to an entity outside Adelphia, a check or wire transfer would be drawn on Adelphia's central cash management account, and the particular entity would receive an inter-company debit in the amount of the payment.

19. Under the CMS, no distinction was drawn between Adelphia, its subsidiaries, and the RFEs (whether Cable or Other). Adelphia maintained the books and records for certain of the RFEs on a general ledger system shared with Adelphia and its subsidiaries. In addition, no regular policy for billing and collection of interest resulting from balances under the CMS was maintained with regard to Adelphia's subsidiaries or the RFEs.

20. Although the financial affairs of Adelphia and the RFEs were commingled, and although Adelphia managed nearly all aspects of the RFEs' business affairs, the financial results of

-9-

the RFEs were not consolidated or combined with Adelphia's results on Adelphia's financial statements.

21.   Adelphia's Board of Directors did not approve the commingling of Adelphia's funds and the funds of the RFEs under the CMS, and the Outside Directors were not advised of this commingling.

V.   Adelphia's Rapid Expansion Through Leveraged Acquisitions

22.   From on or about December 31, 1998 through on or about December 31, 1999, Adelphia's basic cable subscribers increased from approximately 2,200,000 to approximately 5,000,000.  The principal reason for that increase was Adelphia's acquisition of other cable operators.  The largest of those acquisitions were the following:

a.   On or about October 1, 1999, Adelphia acquired Century Communications Corporation ("Century"), which served approximately 1,610,000 basic subscribers located primarily in California and Puerto Rico.  In connection with the acquisition of Century, Adelphia paid approximately $811,900,000 in cash and approximately 47,800,000 shares of newly issued Class A common stock, and assumed approximately $1.7 billion of debt.

b.   On or about October 1, 1999, Adelphia acquired Frontier Vision Holdings, L.P. ("Frontier Vision"), which served approximately 710,000 basic subscribers located primarily in Ohio, Kentucky, New England and Virginia.  In

-10-

connection with the acquisition of Frontier Vision, Adelphia paid approximately $543,300,000 in cash and approximately 6,900,000 shares of newly issued Class A common stock, and assumed approximately $1.15 billion of debt.

        c.    On or about October 1, 1999, Adelphia acquired Harron Communications Corp. ("Harron"), which served approximately 296,000 basic subscribers located primarily in southeastern Pennsylvania, Michigan, Massachusetts and New Hampshire.  In connection with the acquisition of Harron, Adelphia paid approximately $1,211,704,000.

        23.   The aggregate purchase price for Adelphia's acquisitions in or about 1999, including the acquisitions described above, was at least approximately $9,859,000,000.

## VI.  Adelphia's Highly Leveraged Capital Structure

        24.   From on or about December 31, 1998 through on or about December 31, 1999, Adelphia's total reported debt increased from approximately $3.53 billion to approximately $9.29 billion. By December 31, 2000, Adelphia's total reported debt had increased to approximately $12.6 billion.

        25.   At all relevant times, based upon, among other things, its rapid expansion through leveraged acquisitions and the fact that it consistently spent more money on its operations than those operations generated, Adelphia's capital structure was highly leveraged.  As set forth in paragraphs 27-43, below,

Adelphia raised capital from three principal sources (1) secured loans from banks; (2) the sale of debt securities to the public; and (3) the sale of equity securities to the public.

26.   From at least in or about 1999 through the filing of Adelphia's bankruptcy petition in or about June 2002, investors, lenders, securities analysts, and credit rating agencies publicly and repeatedly expressed concerns about Adelphia's ability to service its debt.  Adelphia's publicly reported performance and publicly reported ratios of debt-to-equity and cash-flow-to-debt were therefore carefully watched by creditors and investors.

A.   **Adelphia's Secured Syndicated Bank Loans and the Co-Borrowing Agreements**

27.   At all relevant times, all of the operating assets used in Adelphia's business were owned by subsidiaries of Adelphia.  Adelphia, as a holding company, was the indirect owner of those assets.  It therefore was necessary for Adelphia to accomplish secured borrowing through its subsidiaries, which possessed the assets that served as security for loans.  From time to time, a number of Adelphia subsidiaries were combined into a "borrowing group" for purposes of obtaining capital through secured syndicated bank loans.

28.   At all relevant times, Adelphia, through its subsidiaries, owed billions of dollars under these and similar credit facilities.  For example, as of in or about June 2002,

-12-

Adelphia, through various subsidiaries, was organized into approximately six borrowing groups, and had outstanding debt of approximately $6.8 billion in secured syndicated bank loans under approximately six different credit facilities.

29.   At all relevant times, based on, among other things, Adelphia's substantial indebtedness as a percentage of cash flow and total assets, the agreements establishing each of Adelphia's credit facilities required that the borrowing group that was a party to the agreement not exceed (1) certain specified leverage ratios; (2) certain specified ratios of annualized operating cash flow to pro forma debt service; and (3) certain specified ratios of operating cash flow to interest expense.  Each of the agreements further provided that if a borrowing group's ratio of cash flow to indebtedness fell below a specified threshold, that borrowing group was not in compliance with its credit agreement and was considered in default.

30.   At all relevant times, the agreements establishing certain of Adelphia's credit facilities required that Adelphia report to its lenders, each quarter, as to whether the borrowing group that was a party to the agreement was in compliance with the terms of the credit facility, and, in particular, whether the borrowing group was within the specified ratios discussed in paragraph 29, above.

31.  At all relevant times prior to in or about 1996, only Adelphia subsidiaries were borrowers under these secured credit facilities.  In or about March 1996, Adelphia's borrowing practices changed.  From that time forward, Adelphia subsidiaries entered into a number of so-called "Co-Borrowing Facilities" together with various Cable RFEs.  As a result, various Cable RFEs borrowed substantial sums of money, for which Adelphia's subsidiaries were jointly and severally liable, to finance business operations that were wholly owned by the Rigas Family, or to buy assets that were held for the sole benefit of the Rigas Family.  Thus, the Rigas Family benefitted from loans for which the publicly held company, Adelphia, through its affiliates, was liable, and which diminished Adelphia's liquidity and access to working capital, without any economic benefit to Adelphia.

32.  Beginning in or about March 1996 through in or about September 2001, as set forth in paragraph 35, below, in connection with the secured credit facilities established by the borrowing groups made up of its subsidiaries, Adelphia caused a number of borrowing groups to enter into agreements ("Co-Borrowing Agreements") with various Cable RFEs.

33.  These Co-Borrowing Agreements provided that (1) a member of the borrowing group ("Co-Borrower") could borrow up to the entire amount of credit available under a given facility; and (2) each Co-Borrower was jointly and severally liable for the

full amount of indebtedness under the credit facility, without regard to which of the Co-Borrowers actually received funds borrowed under the facility.

34.   As a result of these and other provisions of the Co-Borrowing Agreements, certain Cable RFEs were permitted to borrow amounts up to the total amount available under a given credit facility, and each member of the borrowing group of Adelphia subsidiaries would be jointly and severally liable for the full amount of the debt.

35.   Adelphia subsidiaries were parties to, and jointly and severally liable with, certain Cable RFEs for credit extended under the Co-Borrowing Facilities identified below:

a.   On or about March 29, 1996, Telsat Acquisition L.P. and Global Acquisition Partners L.P., both of which were Adelphia subsidiaries, together with Highland Video Associates, a Cable RFE, as a Co-Borrower, entered into a credit agreement for a syndicated, secured credit facility in the amount of approximately $200,000,000.

b.   On or about May 6, 1999, UCA Corp., UCA, LLC, National Cable Acquisition Associates, L.P., Grand Island Cable, Inc., SVHH Cable Acquisition, L.P., and Tele-Media Company of Hopewell-Prince George, all of which were Adelphia subsidiaries, together with Hilton Head Communications, L.P., a Cable RFE, as a Co-Borrower, entered into a credit agreement for a syndicated,

secured credit facility in the amount of approximately $850,000,000. This facility is referred to herein as the "UCA Co-Borrowing Facility."

c.  On or about April 14, 2000, Century Cable Holdings, LLC and Ft. Myers Cablevision, LLC, both of which were Adelphia subsidiaries, together with Highland Prestige Georgia, Inc., a Cable RFE, as a Co-Borrower, entered into a credit agreement for a syndicated, secured, credit facility in the amount of approximately $2.25 billion.  The bank syndicate included Chase Securities, Inc., the Chase Manhattan Bank, Barclays Bank PLC (New York Branch), the Bank of New York, the Bank of Montreal (New York Branch) and the Bank of Nova Scotia (New York Branch), all of which were located in New York, New York.  This facility is referred to herein as the "Century Co-Borrowing Facility."

d.  On or about September 28, 2001, Olympus Cable Holdings, LLC and Adelphia Company of Western Connecticut, both of which were Adelphia subsidiaries, together with Highland Video Associates, LP, Coudersport Cable Television Company, and Adelphia Holdings, 2001, LLC, all of which were Cable RFEs, as Co-Borrowers, entered into a credit agreement for a syndicated, secured, credit facility in the amount of approximately $2.03 billion.  The bank syndicate included the Bank of New York, the Bank of Nova Scotia (New York Branch), the Bank of Montreal (New

-16-

York Branch), Citicorp USA and the Chase Manhattan Bank, all of which were located in New York, New York.  This facility is referred to herein as the "Olympus Co-Borrowing Facility."

36.   Each of the Co-Borrowing Facilities described above are syndicated loans made by a group, or "syndicate," of banks and institutional investors.  At all relevant times, the Co-Borrowing Facilities were traded on the secondary market for syndicated loans, and were among the most widely quoted loans traded on that market.

B.   Adelphia's Publicly Issued Notes and Preferred Stock

37.   At various times, Adelphia, as well as its subsidiaries, issued and sold to the public bonds, debentures, notes and other debt securities, as well as preferred stock and various convertible securities.  As of on or about June 1, 2002, Adelphia had approximately $6.9 billion in outstanding publicly issued debt securities and approximately $1.6 billion in convertible preferred stock, and various subsidiaries of Adelphia had a total of at least approximately $2.6 billion outstanding in publicly issued debt securities.  At all relevant times, debt securities of Adelphia and its subsidiaries were registered with the SEC, and were traded in the over-the-counter market for such securities by dealers in New York, New York and elsewhere.

38.   On or about the dates set forth below, Adelphia issued the following debt securities, among others:

-17-

| ISSUE DATE | SECURITY | MATURITY | AMOUNT ISSUED |
|---|---|---|---|
| 3/11/93 | 9.875% SENIOR DEBENTURES | 3/1/05 | $130,000,000 |
| 2/15/94 | 9.50% SENIOR NOTES | 2/15/04 | $150,000,000 |
| 2/26/97 | 9.875% SENIOR NOTES | 3/1/07 | $350,000,000 |
| 7/7/97 | 10.50% SENIOR NOTES | 7/15/04 | $150,000,000 |
| 9/25/97 | 9.25% SENIOR NOTES | 10/01/02 | $325,000,000 |
| 1/21/98 | 8.375% SENIOR NOTES | 2/1/08 | $150,000,000 |
| 7/2/98 | 8.125% SENIOR NOTES | 7/15/03 | $150,000,000 |
| 11/12/98 | 8.375% SENIOR NOTES | 2/1/08 | $150,000,000 |
| 1/13/99 | 7.50% SENIOR NOTES | 1/15/04 | $100,000,000 |
| 1/13/99 | 7.75% SENIOR NOTES | 1/15/09 | $300,000,000 |
| 4/28/99 | 7.875% SENIOR NOTES | 5/1/09 | $350,000,000 |
| 11/16/99 | 9.375% SENIOR NOTES | 11/15/09 | $500,000,000 |
| 9/20/00 | 10.875% SENIOR NOTES | 10/1/10 | $750,000,000 |
| 6/12/01 | 10.25% SENIOR NOTES | 6/15/11 | $1,000,000,000 |
| 10/25/01 | 10.25% SENIOR NOTES | 11/1/06 | $500,000,000 |

39.   At all relevant times, debt securities issued by Adelphia and its subsidiaries, including the securities set forth in paragraph 38, above, were assigned credit ratings by various credit rating agencies, including Moody's Investors Service, Inc. ("Moody's") and Standard & Poor's Ratings Services ("S&P"), both of which are located in New York, New York.  At all relevant times, in New York, New York, Moody's and S&P periodically published their credit ratings and analyses of Adelphia and its debt securities, which were routinely relied upon by investors in connection with the purchase and sale of Adelphia securities.

-18-

40. At all relevant times, indentures relating to Adelphia's publicly issued debt securities required Adelphia to report, each quarter, as to whether Adelphia was in compliance with certain permissible leverage ratios.

41. From at least in or about 1996 through in or about 1998, the vast majority of Adelphia's capital was raised through the above-described secured syndicated bank debt or publicly issued notes.

## C.   Adelphia's Common Stock

42. In or about late 1999, in connection with its rapid expansion through leveraged acquisitions, Adelphia issued large amounts of common stock to help pay for such acquisitions, as set forth in paragraph 22, above.

43. Because the Rigas Family's control of Adelphia was based on, among other things, the voting power of its stock, each issuance of additional common stock threatened the Rigas Family with further dilution and potential loss of control of Adelphia. From in or about 1998 through in or about March 2002, in connection with each major public offering of Adelphia Class A common stock, a "Rigas Direct Placement" was conducted, in which Adelphia issued Class B common stock directly to the Rigas Family in order to maintain the Rigas Family's economic ownership and voting control of Adelphia.

-19-

## VII. Adelphia's Financial Disclosures

### A.   Periodic Financial Disclosures

44.   At all relevant times, in order to sell securities to members of the public and maintain public trading of its securities in the United States, Adelphia was required to comply with provisions of the federal securities laws, including the Securities Exchange Act of 1934, and rules and regulations promulgated thereunder, which were designed to ensure that the company's financial information was accurately recorded and disclosed to the public.

45.   Under these regulations, Adelphia was required to, among other things (a) file with the SEC annual financial statements audited by an independent accountant; (b) file with the SEC quarterly updates of its financial statements that disclosed its financial condition and the results of its business operations for each three-month period; (c) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that the company's transactions were recorded as necessary to permit preparation of financial statements in conformity with Generally Accepted Accounting Principles ("GAAP") and other applicable criteria; and (d) make and keep books, records, and accounts that accurately and fairly reflected the company's business transactions.

46.   From in or about 1999 through in or about May 2002, JOHN J. RIGAS, TIMOTHY J. RIGAS and MICHAEL J. RIGAS, together with Brown, Werth and other Adelphia employees, participated in preparing, reviewing and certifying consolidated financial statements for Adelphia that purported to conform with applicable regulatory requirements (hereinafter, the "Financial Statements").   The Financial Statements were filed with the SEC in Washington, D.C., and directly disseminated to the public, through press releases, quarterly reports on SEC Forms 10-Q and annual reports on SEC Forms 10-K, and in other communications with investors, credit rating agencies, bank lenders and securities analysts.

47.   The Financial Statements filed with Adelphia's Forms 10-Q and Forms 10-K purported to disclose, among other things, Adelphia's earnings, net income and capital expenditures. In addition, in its Forms 10-Q and Forms 10-K, Adelphia reported other information about its performance, including its number of "basic cable subscribers."

B.   Additional Material Disclosures

48.   At all relevant times, in addition to its periodic financial reporting obligations, Adelphia routinely disclosed additional material information about its business and performance to the public.

1.   Press Releases Announcing Quarterly Results

49.   From at least on or about August 20, 1997 through on or about March 27, 2002, JOHN J. RIGAS, TIMOTHY J. RIGAS and MICHAEL J. RIGAS, together with Brown, Werth and other Adelphia employees, prepared, issued, reviewed, and approved a press release after the end of each quarter, which purported to outline Adelphia's operating results for the preceding quarter. These quarterly press releases purported to disclose, among other things, Adelphia's (1) EBITDA for the quarter; (2) EBITDA growth for the quarter; (3) number of "basic cable subscribers; (4) growth of "basic cable subscribers;" (5) number of digital cable subscribers; and (6) number of high speed data subscribers.

50.   At all relevant times, it was the policy and practice of Adelphia, instituted by TIMOTHY J. RIGAS and MICHAEL J. RIGAS, that each and every press release announcing quarterly results was reviewed and approved by every member of the Rigas Family before it was released.

51.   Each and every such press release was transmitted by means of wire communications in interstate commerce, including facsimile transmissions and distribution on the Internet, to news organizations, financial institutions and individuals in New York, New York and elsewhere.

2.   Conference Calls Announcing Quarterly Results

52.   From at least on or about August 20, 1997 through on or about March 27, 2002, JOHN J. RIGAS, TIMOTHY J. RIGAS and MICHAEL J. RIGAS, together with Brown, Werth and other Adelphia employees, routinely participated in a conference call at or about the end of each quarter to discuss the company's results from the preceding quarter and the Adelphia press release announcing those results.  These conference calls were announced to the public in advance, and were targeted to securities analysts, credit rating agency analysts and institutional investors in Adelphia.

53.   At various times, JOHN J. RIGAS, TIMOTHY J. RIGAS and MICHAEL J. RIGAS, along with Brown and other Adelphia employees, made oral presentations on such conference calls concerning Adelphia's results, and responded to questions and comments from other participants on the calls.

54.   At various times in the course of such conference calls, TIMOTHY J. RIGAS, MICHAEL J. RIGAS, along with Brown and other Adelphia employees, made representations about, among other things, Adelphia's (1) EBITDA for the quarter; (2) EBITDA growth for the quarter; (3) number of "basic cable subscribers"; (4) "basic cable subscriber" growth for the quarter; (5) number of digital cable subscribers; and (6) number of high speed data subscribers.

-23-

55. Each and every quarterly conference call was transmitted by means of wire communications in interstate commerce to conference call participants and others in New York, New York and elsewhere.

### 3. Other Disclosures

56. From at least in or about 1999 through in or about May 2002, JOHN J. RIGAS, TIMOTHY J. RIGAS and MICHAEL J. RIGAS, together with Brown and other Adelphia employees acting at their direction, presented information about Adelphia's performance to the members of the investing public in a variety of one-on-one communications. Those communications included "road show" presentations, in which Adelphia representatives promoted Adelphia and its securities to investors, analysts and other market participants. Adelphia representatives also conducted one-on-one meetings with substantial investors, securities analysts, credit rating agencies and other market participants, in which they provided information concerning Adelphia's financial condition, performance and other matters in connection with the market for Adelphia's securities. In addition, Adelphia representatives communicated frequently with analysts, investors and other market participants by telephone, e-mail, facsimile transmission and other forms of communication.

57. In the course of these presentations, JOHN J. RIGAS, TIMOTHY J. RIGAS and MICHAEL J. RIGAS, together with Brown

and other Adelphia employees acting at their direction, made representations about, among other things (1) Adelphia's progress in upgrading or "rebuilding" its cable plant to enable delivery of digital cable, internet connections, video-on-demand and other services; (2) Adelphia's EBITDA and EBITDA growth; (3) the number and growth of Adelphia's "basic cable subscribers"; and (4) the number of Adelphia's high speed data subscribers.

### THE SCHEME TO DEFRAUD

58.  From in or about 1999 through in or about May 2002, as a result of Adelphia's rapid expansion and its large and growing debt load, Adelphia faced intense pressure to generate high levels of earnings to service that debt, and to take steps to reduce its debt.  Among the sources of that pressure were the following:

a.   Adelphia faced pressure to meet the financial performance expectations of investors and securities analysts, and risked a decline in the price of its publicly traded common stock if it failed to do so.  Such a decline would not only have affected Adelphia adversely, but also would have had a direct and material adverse effect on the Rigas Family, whose personal wealth was largely invested in Adelphia securities.

b.   Adelphia faced pressure from credit rating agencies to generate consistently high levels of earnings and to reduce its financial leverage (that is, its debt-to-equity

ratio), and risked reductions in its credit ratings if it failed to do so. Such reductions would have affected Adelphia adversely by limiting its access to additional capital, increasing its interest costs and decreasing the market price for its securities.

   c. Adelphia faced pressure from its lenders, and the holders of its public debt securities, to comply with financial covenants under the Co-Borrowing Agreements, other loan agreements and the indentures related to its debt securities, and risked defaulting on its debts and other adverse consequences if it failed to do so.

   59. As a result of those and other pressures, the financial results and activities of Adelphia were closely scrutinized, and Adelphia faced substantial adverse consequences if it failed to meet the expectations of investors, securities analysts, rating agencies and other market participants.

   60. From in or about 1999 through in or about May 2002, Adelphia's true performance consistently failed to meet those expectations. During the same period, Adelphia's already high debt burden continued to grow.

   61. In order to conceal Adelphia's failure to perform and its large and growing debt burden, JOHN J. RIGAS, TIMOTHY J. RIGAS, MICHAEL J. RIGAS, and MICHAEL C. MULCAHEY, together with Brown, Werth and their co-conspirators, participated in a scheme

to create the false appearance that Adelphia's operating
performance was consistently in line with the expectations of
investors, analysts and other market participants, and that
Adelphia was systematically deleveraging through, among other
means, sales of equity securities to the Rigas Family.

62.  From at least in or about 1999 through in or about
May 2002, JOHN J. RIGAS, TIMOTHY J. RIGAS and MICHAEL J. RIGAS,
in violation of their fiduciary duties as officers and directors
of Adelphia, its subsidiaries and affiliates, used Adelphia funds
and other assets for their personal benefit, and that of other
members of the Rigas Family.  Among other things, the Rigas
Family used Adelphia funds to construct a golf course on land
primarily owned by JOHN J. RIGAS; routinely used Adelphia's
corporate aircraft for their personal affairs, without
reimbursement to Adelphia; and used at least approximately
$252,157,176 in Adelphia funds to pay margin calls against loans
to the Rigas Family.  These uses of Adelphia funds and assets for
the benefit of the Rigas Family were not presented to or
authorized by the Adelphia Board of Directors, were not disclosed
to the Outside Directors, and were not disclosed to the public.

63.  From in or about 1999 through in or about May
2002, JOHN J. RIGAS, TIMOTHY J. RIGAS, MICHAEL J. RIGAS and
MICHAEL C. MULCAHEY, together with Brown, Werth and their co-
conspirators, participated in a scheme to defraud Adelphia's

-27-

creditors and investors, by, among other things, making false and misleading statements, including misrepresentations and omissions concerning the following material facts:

     a.   Adelphia's "off-balance-sheet" debt, in particular, Adelphia's joint and several liabilities under the Co-Borrowing Agreements, as set forth in paragraphs 64-72, below; the extent and circumstances of reductions in Adelphia's debt through, among other things, sales of securities to the Rigas Family and the public, as set forth in paragraphs 73-91, below;

     b.   Adelphia's operating performance, including, among other things, its earnings and other financial results, the number and growth of its "basic cable subscribers," and its progress toward completing the "rebuild" of its cable plant, as set forth in paragraphs 92-158, below;

     c.   Adelphia's compliance with certain debt covenants under the Co-Borrowing Agreements and Adelphia's bond indentures, as set forth in paragraphs 159-66, below; and

     d.   the unauthorized and unreimbursed use and conversion of Adelphia's funds and assets by the Rigas Family, as set forth in paragraphs 167-98, below.

I.   **Fraud in Connection with Adelphia's Liabilities Under the Co-Borrowing Agreements**

     64.   From at least in or about 1999 through in or about 2002, JOHN J. RIGAS, TIMOTHY J. RIGAS, MICHAEL J. RIGAS and MICHAEL C. MULCAHEY, together with Brown, caused Adelphia to make

-28-

false and misleading statements of material fact, and to omit to state material facts, concerning Adelphia's liabilities under the Co-Borrowing Facilities.

65. As set forth in paragraph 31, above, each of the Co-Borrowing Agreements provided that each co-borrower was jointly and severally liable for the entire amount of indebtedness under the applicable credit facility.

66. At all relevant times, Adelphia treated portions of its joint and several liabilities under the Co-Borrowing Facilities as "off-balance-sheet" liabilities. Accordingly, Adelphia did not report such portions of its liabilities on the consolidated balance sheets contained in its financial statements.

67. Pursuant to GAAP, Adelphia was required, among other things, to disclose the full amount of its joint and several liabilities under the Co-Borrowing Facilities in the notes accompanying its financial statements.

68. From in or about 1999 through in or about May 2002, JOHN J. RIGAS, TIMOTHY J. RIGAS, MICHAEL J. RIGAS and MICHAEL C. MULCAHEY, together with Brown, caused Adelphia to issue financial statements that contained material misrepresentations of fact, and omitted to state material facts, concerning Adelphia's joint and several liabilities under the Co-Borrowing Facilities.

69. On or about March 30, 2000, JOHN J. RIGAS, TIMOTHY J. RIGAS, MICHAEL J. RIGAS, and MICHAEL C. MULCAHEY, together with Brown, caused Adelphia to file a Form 10-K containing financial statements for the year ended December 31, 1999. The consolidated balance sheet included in those financial statements reported only a portion of Adelphia's joint and several liabilities under the Co-Borrowing Facilities, and omitted at least approximately $250,000,000 of such liabilities. The notes accompanying the financial statements failed to disclose the full amount of Adelphia's outstanding joint and several liabilities under the Co-Borrowing Facilities. The consolidated balance sheet and notes accompanying the financial statements were false and misleading in that, among other things, they concealed the full amount of Adelphia's outstanding joint and several liabilities under the Co-Borrowing Facilities that were treated as "off-balance-sheet" liabilities by Adelphia.

70. On or about May 30, 2001, JOHN J. RIGAS, TIMOTHY J. RIGAS, MICHAEL J. RIGAS and MICHAEL C. MULCAHEY, together with Brown, caused Adelphia to file a Form 10-K containing financial statements for the year ended December 31, 2000. The consolidated balance sheet included in those financial statements reported only a portion of Adelphia's joint and several liabilities under the Co-Borrowing Facilities, and omitted at least approximately $1.5 billion of such liabilities. The notes

-30-

accompanying the financial statements failed to disclose the full amount of Adelphia's outstanding joint and several liabilities under the Co-Borrowing Facilities.  The consolidated balance sheet and notes accompanying the financial statements were false and misleading in that, among other things, they concealed the full amount of Adelphia's outstanding joint and several liabilities under the Co-Borrowing Facilities that were treated as "off-balance-sheet" liabilities by Adelphia.

71.  On or about March 27, 2002, JOHN J. RIGAS, TIMOTHY J. RIGAS, MICHAEL J. RIGAS and MICHAEL C. MULCAHEY, together with Brown, caused Adelphia to issue a press release reporting its results for the fourth quarter and full year 2001.  In a footnote near the end of that document, Adelphia disclosed that, as of December 31, 2001, the outstanding balance under the Co-Borrowing Agreements was approximately $2,284,000,000 greater than the liabilities disclosed on Adelphia's balance sheet.  This was the first time that Adelphia disclosed (1) the actual indebtedness under the Co-Borrowing Agreements; and (2) that the liabilities disclosed on its balance sheet did not include the amount of indebtedness under the Co-Borrowing Agreements.

72.  Subsequent to that disclosure, the market price for Adelphia's Class A common stock fell sharply, from a closing price of approximately $20.39 per share on or about March 26, 2002, to a closing price of approximately $14.90 per share on

-31-

March 29, 2002. By April 26, 2002, the closing price of
Adelphia's Class A common stock had fallen to approximately $6.00
per share.

## II. Fraud in Connection with Adelphia's Purported Deleveraging

73. From at least in or about 2001 through in or about
March 2002, in response to the concerns of investors, lenders and
analysts about Adelphia's debt burden, JOHN J. RIGAS, TIMOTHY J.
RIGAS, MICHAEL J. RIGAS and MICHAEL C. MULCAHEY, together with
Brown and their co-conspirators, repeatedly represented that
Adelphia was making substantial reductions in its debt. In
addition, the defendants and their co-conspirators repeatedly
represented that the Rigas Family was demonstrating its
commitment to reducing Adelphia's debt, by purchasing substantial
amounts of Adelphia securities, and that the Rigas Family would
and did pay Adelphia for those securities in immediately
available funds.

74. As set forth in paragraphs 75-91, below, JOHN J.
RIGAS, TIMOTHY J. RIGAS, MICHAEL J. RIGAS and MICHAEL C.
MULCAHEY, together with Brown and their co-conspirators, omitted
to disclose that, in fact, certain sales of Adelphia securities
to the Rigas Family did not reduce Adelphia's debt, because
Adelphia did not receive any funds in return for those
securities. Rather, Adelphia purportedly was compensated for
those securities by "assumptions" by certain RFEs of debt owed by

Adelphia under certain Co-Borrowing Facilities.  However, Adelphia's liabilities were not reduced by those purported assumptions, because Adelphia remained jointly and severally liable for all such debts under the terms of the applicable Co-Borrowing Agreements.

A.    The January 2001 Rigas Direct Placements

75.  At all relevant times, Adelphia was routinely characterized by market participants as one of the most highly leveraged cable operators.  At various times from at least in or about June 1999, through approximately January 2002, JOHN J. RIGAS and TIMOTHY J. RIGAS acknowledged in public statements that Adelphia was highly leveraged, and represented that Adelphia was systematically reducing its leverage.

76.  At all relevant times, Highland 2000, L.P. ("Highland 2000") was a Delaware limited partnership owned and controlled by JOHN J. RIGAS, TIMOTHY J. RIGAS, and MICHAEL J. RIGAS and members of their immediate family.

77.  On or about January 17, 2001, JOHN J. RIGAS, TIMOTHY J. RIGAS, and MICHAEL J. RIGAS caused Adelphia's Board of Directors to approve two direct sales of securities to Highland 2000.  Those transactions included (a) the sale of approximately 5,819,367 shares of Adelphia Class B common stock for approximately $259,900,000; and (b) the sale of $167,400,000 aggregate principal amount 6 percent convertible subordinated

-33-

notes due 2006, for approximately $163,000,000 ("Rigas Direct Placements").

78.   In order to induce the Outside Directors to approve the Rigas Direct Placements, JOHN J. RIGAS, TIMOTHY J. RIGAS and MICHAEL J. RIGAS caused Highland to agree to pay for those securities in "immediately available funds" not later than on or about October 22, 2001.

79.   On or about January 17, 2001, MICHAEL J. RIGAS executed written agreements between Highland 2000 and Adelphia, in which Highland 2000 agreed to pay for the Rigas Direct Placements in immediately available funds.  MICHAEL J. RIGAS signed those agreements on behalf of both Adelphia and Highland 2000.

80.   In violation of that agreement, Highland 2000 never paid Adelphia for the Rigas Direct Placements, and JOHN J. RIGAS, TIMOTHY J. RIGAS and MICHAEL J. RIGAS failed to disclose that fact to the Outside Directors.

81.   On or about October 23, 2001, JOHN J. RIGAS, TIMOTHY J. RIGAS and MICHAEL J. RIGAS caused Adelphia to issue a press release, which stated that it had closed on the Rigas Direct Placements, but which omitted to state the material fact that Adelphia had not received payment in immediately available funds, as required by the agreements between Adelphia and Highland 2000.

-34-

82.  In or about January 2002, TIMOTHY J. RIGAS and MICHAEL C. MULCAHEY caused Adelphia employees to make false and misleading entries in the books and records of Adelphia, including false and misleading journal entries on Adelphia's general ledger, which purported to show that, on or about October 22, 2001, Highland 2000 had paid a total of approximately $423,375,076 to Adelphia, as consideration for the Rigas Direct Placements.  For the purpose of creating supporting documentation for those false and misleading entries TIMOTHY J. RIGAS and MULCAHEY took the following steps:

a.  Prepared fictitious notices addressed to Bank of Montreal as administrative agent under the Olympus Co-Borrowing Facility, and inserted those notices into the books and records of Adelphia.  Those notices referred to a purported borrowing and a purported paydown pursuant to that agreement, both in the amount of approximately $423,375,076, on or about October 22, 2001.  The notices, which were signed by MULCAHEY, were falsely backdated to October 22, 2001, and were never sent to Bank of Montreal.

b.  Prepared false and misleading receipts, which purported to acknowledge that, on or about October 22, 2001, Adelphia received a total of approximately $423,375,076 in immediately available funds from Highland 2000, and inserted those receipts into the books and records of Adelphia.  Those

receipts were falsely backdated to October 22, 2001, and were signed by TIMOTHY J. RIGAS and MULCAHEY.

**B.   Misrepresentations to Moody's Investors Service**

83.   As set forth more fully below, this sham investment of additional cash by Highland 2000 had a material impact on Adelphia's credit rating and the price of its securities.   Prior to this sham investment, on or about June 14, 2000, Moody's had placed Adelphia's credit ratings under review for a possible downgrade, citing, among other things, "Adelphia's significant appetite for acquisitions, at high cash flow multiples and management's propensity to finance the same predominantly with debt."

84.   On or about August 15, 2000, Moody's concluded its review and lowered all but one of Adelphia's credit ratings. Moody's stated that Adelphia "has placed notably greater financial strain on its balance sheet over the past year by continuing to effect acquisitions at increasingly higher purchase prices per subscriber with predominantly debt financing." Moody's also noted its "expectation that Adelphia will issue new equity over the near term in order to mitigate further deterioration of its core credit profile."

85.   On or about June 7, 2001, Moody's assigned a rating to Adelphia's proposed issuance of approximately $400,000,000 in senior unsecured notes.   Moody's stated that its

rating reflected, among other things, Adelphia's "very high financial leverage." Moody's also "cautioned that management must continue to execute operationally at a very high level, and must successfully demonstrate that it possesses both the ability and the desire to materially deleverage its balance sheet over the next 18 to 24 months (and to remain more conservatively capitalized thereafter) in order to maintain the current stable rating outlook, and potentially the current ratings altogether."

86. On or about August 20, 2001, Moody's changed its rating outlook for Adelphia to negative. Moody's stated that "Adelphia's extremely high financial leverage, both on an absolute basis and on a relative level within its peer group, continues to be cause for concern," and noted that Adelphia was "one of the most highly leveraged companies in the cable sector." However, Moody's also noted that Adelphia had "financial support from the Rigas Family," in the form of recent purchases of equity securities.

87. On or about October 22, 2001, Moody's placed all of Adelphia's credit ratings under review for possible downgrade.

88. On or about January 18, 2002, TIMOTHY J. RIGAS, together with Brown and other Adelphia employees, attended a meeting with representatives of Moody's at 99 Church Street in Manhattan. During that meeting, in order to induce Moody's not to downgrade Adelphia's credit ratings, TIMOTHY J. RIGAS and

-37-

Brown made misrepresentations of material fact, and omitted to state material facts, including among others the following:

a.    TIMOTHY J. RIGAS and Brown stated that Adelphia's bank debt was approximately $1.223 billion, and omitted to state the actual amount of Adelphia's off-balance-sheet debt, when in fact, as TIMOTHY J. RIGAS and Brown well knew, Adelphia's bank debt also included at least approximately $2.3 billion in off-balance-sheet debt for which Adelphia was jointly and severally liable under the Co-Borrowing Agreements;

b.    TIMOTHY J. RIGAS and Brown stated that Adelphia's debt had been reduced by approximately $471,000,000 as a result of the Rigas Direct Purchases, but omitted to state that such purchases were not paid for in immediately available funds, but rather were financed by means of the Co-Borrowing Facilities, for which Adelphia was jointly and severally liable, such that Adelphia's debt was not in fact reduced by such amounts.

89.    On or about January 22, 2002, in New York, New York, Moody's issued a press release stating that it had concluded the review of Adelphia's credit ratings that it began in or about October 2001.  Based in part on the material misrepresentations and omissions made by TIMOTHY J. RIGAS and Brown on or about January 18, 2002, Moody's confirmed certain of those ratings, upgraded other ratings, and stated that its rating outlook for Adelphia was stable.  Among other things, Moody's

-38-

cited "the continued sponsorship of the Rigas Family" in purchasing hundreds of millions of dollars worth of Adelphia securities.

90.  On or about March 28, 2002, after Adelphia disclosed that it had at least approximately $2,284,000,000 in off-balance-sheet debt under the Co-Borrowing Agreements, Moody's issued a press release stating that it was reinitiating its review of Adelphia's credit ratings for possible downgrade. Moody's stated that it was "not fully aware of . . . the absolute magnitude and recent spike in these off-balance sheet borrowings [under the Co-Borrowing Agreements], and the fact that these proceeds were utilized (particularly at such a material level) to fund the Rigas Family's" purchases of Adelphia securities, "thereby diminishing somewhat the value of the 'true' equity contributions that ultimately led to the prior rating confirmations."

91.  On or about May 3, 2002, May 15, 2002 and June 5, 2002, Moody's further lowered various credit ratings of Adelphia.

**III. Fraudulent Reporting of Adelphia's Operating Results**

92.  From at least on or about August 20, 1997, through on or about March 27, 2002, JOHN J. RIGAS, TIMOTHY J. RIGAS, MICHAEL J. RIGAS, and MICHAEL C. MULCAHEY, together with Brown and Werth, caused Adelphia to fraudulently misrepresent numerous material facts about its performance contained in each of

-39-

Adelphia's Forms 10-Q, Forms 10-K, quarterly results press releases and quarterly results conference calls.

93.   Among the material facts that the defendants misrepresented in Adelphia's public disclosures were (1) Adelphia's EBITDA; (2) Adelphia's number of basic cable subscribers; and (3) Adelphia's progress in rebuilding its cable plant to provide internet access and other services.

A.   **Misrepresentations Concerning EBITDA**

94.   As a result of its highly leveraged capital structure, Adelphia was under pressure to deliver a consistently high level of operating performance.

95.   At all relevant times, the amount and growth of a cable operator's EBITDA was considered to be important by investors, analysts and other market participants.  EBITDA is a measure of corporate earnings that stands for "earnings before interest, taxes, depreciation and amortization."

96.   From in or about 1999 through in or about May 2002, JOHN J. RIGAS, TIMOTHY J. RIGAS, MICHAEL J. RIGAS and MICHAEL C. MULCAHEY, along with Brown, Werth and other Adelphia employees, engaged in a pattern and practice of misrepresenting Adelphia's performance by artificially inflating the EBITDA disclosed by Adelphia in its Forms 10-K, Forms 10-Q, quarterly results press releases, and quarterly results conference calls. The defendants and other Adelphia employees artificially inflated

-40-

Adelphia's publicly disclosed EBITDA by, among other means (1) engaging in sham transactions with affiliates to create the false appearance of revenue to Adelphia; and (2) engaging in sham transactions with other corporations to give the false appearance of revenue to Adelphia.  Through these and other methods, the defendants and other Adelphia employees artificially inflated Adelphia's publicly disclosed EBITDA by approximately $160 million in 2000, and approximately $210 million in 2001.

1.    **Fraudulent Affiliate Fee Transactions**

97.  In or about October 2000, TIMOTHY J. RIGAS, along with Brown, Werth and other Adelphia employees, discovered that Adelphia's actual EBITDA for the third quarter of 2000 was below Adelphia's publicly disclosed predictions and market expectations.  From at least October 2000 through on or about March 23, 2002, TIMOTHY J. RIGAS, along with Brown, Werth and other Adelphia employees, devised and executed a scheme to artificially inflate Adelphia's publicly disclosed EBITDA by causing Adelphia and certain of the RFEs to engage in transactions conceived and executed after the closing of the relevant financial reporting period, which misrepresented the amount of revenue earned by Adelphia from those RFEs.

98.  As discussed above, the Rigas Family controlled not only Adelphia, but the RFEs, many of which were managed by Adelphia and were part of the Adelphia CMS.  From time to time,

pursuant to various management agreements, the Cable RFEs, and certain Other RFEs entered into management agreements with Adelphia pursuant to which they paid Adelphia a management fee equal to approximately five percent of their revenue for each quarter.

99.  By definition, EBITDA includes a company's operating income, such as the five percent management fees owed to Adelphia by the Cable RFEs.

100. Beginning in or about October 2000, TIMOTHY J. RIGAS, together with Brown, Werth and other Adelphia employees, met after the close of each quarter to review, among other things, Adelphia's actual EBITDA for the preceding quarter. During these meetings and at follow-up meetings, TIMOTHY J. RIGAS, together with Brown, Werth and other Adelphia employees, discussed the artificial inflation of Adelphia's publicly disclosed EBITDA through, among other means, the creation of post-closing transactions between Adelphia and certain RFEs for the purpose of artificially inflating Adelphia's publicly disclosed EBITDA, and the creation of bogus journal entries in Adelphia's books and records reflecting fraudulent transactions.

101. In particular, TIMOTHY J. RIGAS, together with Brown, Werth and other Adelphia employees acting at their direction, would determine a target number for Adelphia's publicly disclosed EBITDA, and would attempt to justify that

-42-

figure by creating transactions -- after the books and records
for the relevant financial reporting period had already closed --
between Adelphia and certain RFEs in which those RFEs would agree
to pay money to Adelphia that Adelphia could book as revenue.
These sham transactions lacked any economic or business basis,
did not result in any actual funds being paid to Adelphia and
misleadingly were recorded on Adelphia's books and records as
having taken place during the relevant financial reporting period
so as to affect that period's publicly disclosed EBITDA, although
the transactions had been created and recorded after the end of
that period.

102. After the end of each fiscal quarter, from in or
about October 2000 through on or about March 23, 2002, TIMOTHY J.
RIGAS, together with Brown, Werth and other Adelphia employees
acting at their direction, caused Adelphia to book as revenue
"management fees" from certain RFEs that had no economic or
business purpose, and were conceived and memorialized after the
end of the period in which they were booked on Adelphia's books
and records, among other reasons, for the purpose of artificially
inflating Adelphia's publicly-disclosed EBITDA.

103. Consistent with the nature of the sham
transaction, the amount of the "management fees" charged to the
RFEs was not subject to *bona fide* negotiation was not based on
any actual management services provided by Adelphia to the RFEs

paying the fees, but rather was determined according to the amount by which JOHN J. RIGAS, TIMOTHY J. RIGAS and MICHAEL J. RIGAS, and other Adelphia employees sought to artificially inflate Adelphia's publicly disclosed EBITDA for that quarter.

104. For the year 2001, TIMOTHY J. RIGAS, together with Brown, Werth and other Adelphia employees acting at their direction, fraudulently and misleadingly represented that approximately $5 million in interest expense owed by the RFEs to Adelphia was actually owed as management fees.  As a result, TIMOTHY J. RIGAS, together with Brown, Werth and other Adelphia employees acting at their direction, fraudulently inflated Adelphia's publicly disclosed EBITDA by approximately $5 million for the year 2001.

105. In addition to the circular, sham transaction relating to management fees described above, TIMOTHY J. RIGAS, together with Brown, Werth and other Adelphia employees acting at their direction, caused Adelphia to record as revenue other baseless fees owed by RFEs and Adelphia subsidiaries to Adelphia for the purpose of inflating Adelphia's publicly disclosed EBITDA.

106. For example, in or about October 2000, TIMOTHY J. RIGAS, together with Brown, Werth and other Adelphia employees acting at their direction, caused Adelphia to record as revenue at least approximately $8 million in so-called debt placement

-44-

fees from Cable RFEs, even though Adelphia had never in the past, and never again, charged the Cable RFEs a fee for debt placement. This fee was conceived and recorded for the sole purpose of inflating Adelphia's publicly disclosed EBITDA, and had no business purpose.  Moreover, the amount of the fee had no basis in fact, but rather was determined by TIMOTHY J. RIGAS, Brown and Werth based on the amount they sought to artificially inflate Adelphia's EBITDA in that quarter.

107. Similar fraudulent transactions relating to RFE management fees were undertaken in each quarter from at least on or about January 1, 2000 through on or about December 31, 2001. As a result of these and similar fraudulent transactions, in or about 2000, Adelphia's publicly reported EBITDA was artificially inflated by approximately $34.9 million, or approximately 10 percent.  Similarly, in or about 2001, Adelphia's publicly reported EBITDA was artificially inflated by approximately $32.2 million, or approximately 14 percent.

### 2.   Fraudulent Marketing Support Transactions With Cable Converter Box Manufacturers

108. From in or about June 2000 through in or about May 2002, TIMOTHY J. RIGAS, together with Brown, Werth and their co-conspirators, in addition to causing Adelphia to enter into sham transactions with affiliates for the purpose of artificially inflating Adelphia's EBITDA, also caused Adelphia to enter into sham transactions with other companies for the same purpose.

-45-

a.   Background

109. Beginning in or about the late 1990s, digital cable television service became a high-margin, high-growth business for Adelphia.  At all relevant times, in order to provide digital cable television service, it was necessary for Adelphia to purchase digital cable converter boxes for installation in customers' homes.  As a result of competitive pressure to provide digital cable service, purchases of digital cable converter boxes became a large capital expense for Adelphia, and made Adelphia an important customer of two of the largest manufacturers of such converter boxes, Corporation No. 1 and Corporation No. 2.

110. On or about May 23, 2000, Adelphia entered into a purchase agreement with Corporation No. 1 for digital converter boxes.  This purchase agreement provided that Corporation No. 1 would provide certain quantities of converter boxes to Adelphia during 2000 and 2001 at certain specified prices.  The purchase agreement further specified that Adelphia was guaranteed prices that were no less favorable than those offered to Corporation No. 1's other customers.  The purchase agreement did not provide for or mention payments for marketing support from Corporation No. 1 to Adelphia.

111. On or about May 23, 2000, Adelphia entered into a purchase agreement with Corporation No. 2 for digital converter

-46-

boxes.  This purchase agreement provided that Corporation No. 2
would provide certain quantities of converter boxes to Adelphia
during 2000 and 2001 at certain specified prices.  The purchase
agreement did not provide for or mention payments for marketing
support from Corporation No. 1 to Adelphia.

> b.   The False Journal Entries

112. In or about June 2000, TIMOTHY J. RIGAS, together
with Brown and Werth, determined that, based on its actual
performance in the Second Quarter of 2000, Adelphia's EBITDA was
below its predictions and the expectations of analysts and other
market participants.

113. In or about June 2000, in order to fraudulently
inflate Adelphia's EBITDA, TIMOTHY J. RIGAS, together with Brown
and Werth, devised a plan to enter into sham "marketing support"
agreements with Corporation No. 1 and Corporation No. 2, for the
purpose of artificially inflating Adelphia's EBITDA. "Marketing
support" was a term used in the cable industry to refer to
payments made by a vendor to a cable operator as compensation for
the cost of marketing efforts undertaken by the cable operator on
behalf of the vendor or the vendor's products.

114. Beginning in or about August 2000, TIMOTHY J.
RIGAS, together with Brown and Werth, caused Adelphia to record
marketing support payments from Corporation No. 1 and Corporation
No. 2 as revenue on Adelphia's books and records for the purpose

of artificially inflating Adelphia's EBITDA.  For the quarter ending June 30, 2000, TIMOTHY J. RIGAS, Brown and Werth caused Adelphia to record approximately $7,035,004 in marketing support payments from Corporations No. 1 and No. 2.  For the quarter ending September 31, 2000, TIMOTHY J. RIGAS, Brown and Werth caused Adelphia to record $12,778,772 in such payments.  TIMOTHY J. RIGAS, Brown and Werth caused Adelphia to record these amounts as revenue despite the facts that (1) no marketing support payments had been received from Corporations No. 1 and No. 2; (2) no such payments were owed to Adelphia; and (3) at the time, Adelphia had no agreements to receive marketing support payments from either Corporation No. 1 or Corporation No. 2.

115.  In or about late October 2000, TIMOTHY J. RIGAS, together with Brown and Werth, undertook various actions to give the appearance of legitimacy to the above-described entries of revenue on Adelphia's books and records before Adelphia's financial statements were audited at the end of 2000. Accordingly, TIMOTHY J. RIGAS, Brown and Werth caused Adelphia to begin negotiating with Corporations No. 1 and No. 2, in the hope of reaching an agreement for marketing support payments to Adelphia.

116.  Because Adelphia had entered into purchase agreements with Corporations No. 1 and No. 2 in May 2000 which specified the quantities and prices of digital converter

-48-

purchases by Adelphia, Corporations No. 1 and No. 2 were not willing to provide marketing support payments that would change the economic arrangements memorialized in the May 2000 contracts. In particular, Corporations No. 1 and No. 2 were unwilling to make payments to Adelphia that would reduce the actual price per converter box provided for in the May purchase agreements because, among other things, such payments would erode those corporations' margin on any converter boxes sold to Adelphia.

117. Faced with the unwillingness of Corporations No. 1 and No. 2 to re-negotiate the terms of the converter box purchases, Adelphia proposed marketing support agreements to Corporations No. 1 and No. 2 in which no economic benefit would be exchanged - i.e., circular, "wash" transactions. In particular, on or about October 20, 2000, TIMOTHY J. RIGAS, together with Brown and Werth, caused Adelphia to propose to representatives of Corporation No. 1 an agreement pursuant to which Adelphia would pay approximately $18 more per cable converter box than Adelphia was required to pay under the May 2000 purchase agreement, and, in return, Corporation No. 1 would promptly pay $18 per cable box back to Adelphia as "marketing support." TIMOTHY J. RIGAS, Brown and Werth explained to the representatives of Corporation No. 1 that such an agreement would have no net economic effect, but would allow Adelphia to decrease its operating expenses and increase its EBITDA. In or about late

-49-

October 2000, TIMOTHY J. RIGAS, Brown and Werth caused Adelphia to propose an identical agreement with Corporation No. 2.

c.   The Marketing Support Agreements

118. On or about January 2, 2002, TIMOTHY J. RIGAS, together with Brown and Werth, caused Adelphia to enter into a "marketing support" agreement with Corporation No. 1.  Pursuant to this agreement, Corporation No. 1 agreed to pay Adelphia $18,052,960 in marketing support in connection with digital converters already purchased by Adelphia in 2000 pursuant to the May 23, 2000 purchase agreement and, in exchange, Adelphia agreed to a retroactive price increase for the converters it had already purchased, in an identical amount.  As TIMOTHY J. RIGAS, Brown and Werth well knew, these sham marketing support agreements lacked economic substance, had no legitimate business purpose, and were entered into for the sole purpose of artificially inflating Adelphia's EBITDA.

119. In order to conceal the fact that this marketing support agreement was a circular "wash" transaction with no economic substance, the "marketing support" agreement between Corporation No. 1 and Adelphia was memorialized in two separate documents, neither of which referenced or mentioned the other. These two documents were used to conceal the fact that the payments by Corporation No. 1 to Adelphia for "marketing support" were being immediately returned, as part of the same agreement,

to Corporation No. 1 as a purported price increase.  Accordingly, one contract was created to set up payments due from Corporation No. 1 to Adelphia for marketing support, and a separate document was created setting up payments from Adelphia to Corporation No. 1, in the exact same amounts, refunding all of the marketing support payments.

120. On or about January 2, 2000, TIMOTHY J. RIGAS, together with Brown and Werth, caused Adelphia to enter into a "contract for spot telecasting and digital marketing support fees" (the "Spot Telecasting Contract") with Corporation No. 1. The Spot Telecasting Contract provided that Corporation No. 1 would pay Adelphia $5,600,000 in each quarter in marketing support fees.  The Spot Telecasting Contract, although not executed by Brown until January 2, 2000, was falsely and fraudulently backdated to November 13, 2000, in order to ensure its effect on Adelphia's financial statements for the year 2000. In addition, the Spot Telecasting Contract provided that it applied retroactively to April 1, 2000, despite the fact that the first serious discussion of marketing support fees between Corporation No. 1 and Adelphia took place in late October 2000, and despite the fact that the May 23, 2000 purchase agreement between Adelphia and Corporation No. 1 made no mention of marketing support fees.  Finally, the figure of $5,600,000 per quarter in marketing support payments provided for in the Spot

-51-

Telecasting Contract was not based on any understanding that such a sum would actually be spent on marketing (and in fact represented a sum equal to almost twenty-five per cent of Adelphia's entire marketing budget in any given quarter) but was simply an amount Adelphia sought in order to inflate its EBITDA.

121. As set forth above, TIMOTHY J. RIGAS, together with Brown and Werth, agreed with representatives of Corporation No. 1 that, in order to disguise the sham nature of the wash marketing support transaction, the return payments by Adelphia to Corporation No. 1 would be memorialized in a separate "letter agreement," (the Price Increase Letter"), dated January 2, 2001. The Price Increase Letter falsely and fraudulently represented that, as a result of cost increases to Corporation No. 1, it was increasing the price Adelphia would be required to pay for digital converters. In truth and in fact, Corporation No. 1 had not experienced such price increases, and the price increase memorialized in the Price Increase Letter represented the return by Adelphia of the "marketing support" payments agreed to by Corporation No. 1. In fact, the price increase established in Price Increase Letter was calculated to equal exactly the amount of "marketing support" payments agreed to by Corporation No. 1. Thus, the Price Increase Letter assured that the "marketing support" agreement would be a wash transaction, while concealing

-52-

d.   Use of the Marketing Support Agreements to
Artificially Inflate Adelphia's EBITDA

123. In or about early 2001, TIMOTHY J. RIGAS, together
with Brown and Werth, directed Adelphia employees to record
marketing support payments from Corporation No. 1 and Corporation
No. 2 to Adelphia as a "contra-expense" to Adelphia's marketing
costs in the books and records of Adelphia.  This accounting
treatment lowered the amount of Adelphia's recorded marketing
expenses and, in turn, artificially inflated Adelphia's EBITDA.

124. In or about early 2001, TIMOTHY J. RIGAS, together
with Brown and Werth, directed Adelphia employees to record as
capital expenditures the payments owed by Adelphia to Corporation
No. 1 and Corporation No. 2 pursuant to the price increase
provisions of the sham marketing support agreements.  By
definition, capital expenditures are excluded from EBITDA.  By
causing such payments to be recorded as capital expenditures on
the books and records of Adelphia, TIMOTHY J. RIGAS, Brown and
Werth artificially inflated Adelphia's EBITDA.

125. In or about early 2001, TIMOTHY J. RIGAS, together
with Brown and Werth, caused Adelphia employees to record on the
books and records of Adelphia at least approximately $34,400,000
in purported marketing support payments from Corporation No. 1
and Corporation No. 2 as contra-expenses for the year ending
December 31, 2000.  In addition, TIMOTHY J. RIGAS, Brown and
Werth caused Adelphia employees to record at least approximately

-54-

$34,400,000 in payments from Adelphia to Corporation No. 1 and Corporation No. 2 as capital expenditures for the same period. As a result, TIMOTHY J. RIGAS, Brown and Werth artificially inflated Adelphia's EBITDA for the year ending December 31, 2000 by at least approximately $34,400,000.

126. In or about early 2002, TIMOTHY J. RIGAS, together with Brown and Werth, directed Adelphia employees to record at least approximately $53,000,000 in sham marketing support payments from Corporation No. 1 and Corporation No. 2 for the year ending December 31, 2001, thereby inflating Adelphia's publicly disclosed EBITDA by that amount. In or about early 2002, TIMOTHY J. RIGAS, together with Brown and Werth, directed Adelphia employees to record at least approximately $7,300,000 in sham marketing support payments from Corporation No. 1 and Corporation No. 2 for the quarter ending March 31, 2002.

B.   Misrepresentations Concerning "Basic Cable Subscribers"

127. At all relevant times, the number and growth rate of a cable operator's basic cable subscribers was widely considered to be an important measure of the company's financial condition and performance, in part because a company's basic subscriber base (as opposed to subscribers to pay channels and other services) provides a steady and predictable flow of subscription income.

128. At all relevant times, Adelphia publicly reported that it used the term "basic cable subscribers" to mean "a home with one or more television sets connected to a cable system."

129. By at least in or about the late 1990s, the growth of "basic cable subscribers" in the cable television industry had slowed, due to, among other things, the expansion of satellite television service and the maturation of cable markets. By in or about 2000, approximately one or two percentage points in basic subscriber growth per quarter was the industry average.

130. In or about early 2000, TIMOTHY J. RIGAS and MICHAEL J. RIGAS, along with Brown and other Adelphia employees, became aware that the number and growth rate of Adelphia's basic subscriber numbers for the first quarter of 2000 would fail to meet Adelphia's predictions and industry averages. As JOHN J. RIGAS, TIMOTHY J. RIGAS, MICHAEL J. RIGAS and Brown well knew, even a relatively small adjustment to the overall "basic cable subscribers" could make a negative growth figure positive, and put Adelphia's results in line with market expectations.

131. Thereafter, in response to the slow and/or negative growth of subscribers, TIMOTHY J. RIGAS and MICHAEL J. RIGAS, together with Brown and other Adelphia employees, engaged in a pattern and practice of fraudulently misrepresenting the number of Adelphia's "basic cable subscribers" in Adelphia's

Forms 10-K, quarterly results press releases, quarterly results conference calls, and at "road show" presentations.

132. From in or about August 15, 2000 through on or about March 23, 2002, at the direction of TIMOTHY J. RIGAS and Brown, and with the knowledge and approval of JOHN J. RIGAS and MICHAEL J. RIGAS, Adelphia employees fraudulently and misleadingly inflated the number of Adelphia's "basic cable subscribers" by (1) misleadingly including in its publicly reported number of "basic cable subscribers," categories of subscribers that were not "basic cable subscribers" as publicly reported by Adelphia; and (2) by failing to disclose that when new categories of subscribers were added to the number of "basic cable subscribers" for a given quarter, the numbers for the preceding twelve months were not adjusted to include those additional categories of subscribers. As a result, Adelphia's subscriber growth rate, which already had been inflated fraudulently, was inflated even further.

133. In particular, on or about May 15, 2000, TIMOTHY J. RIGAS and Brown, with the knowledge and approval of JOHN J. RIGAS and MICHAEL J. RIGAS, who reviewed Adelphia's subscriber statistics and reviewed and approved all of Adelphia's public disclosures, directed Adelphia employees, in its press release and conference call announcing its results for the first quarter of 2000, to fraudulently and misleadingly claim that Adelphia had

-57-

5,300,517 "basic cable subscribers," a growth rate of approximately 1.6 percent over the preceding twelve months. In order to inflate the number of "basic cable subscribers" disclosed on or about May 15, 2000, TIMOTHY J. RIGAS and Brown, with the knowledge and approval of JOHN J. RIGAS and MICHAEL J. RIGAS, and other Adelphia employees, included in the number of "basic cable subscribers" approximately 43,000 subscribers to cable services in Brazil and Venezuela provided by a company in which Adelphia held only a minority interest.

134. To compound the misrepresentation created by this baseless addition, TIMOTHY J. RIGAS and Brown, with the knowledge and approval of JOHN J. RIGAS and MICHAEL J. RIGAS, and other Adelphia employees, did not adjust the "basic cable subscriber" numbers for the preceding twelve months to include these Brazilian and Venezuelan subscribers, resulting in the misleading appearance of significant "basic cable subscriber" growth.

135. Similarly, on or about August 14, 2001, TIMOTHY J. RIGAS and Brown, with the knowledge and approval of JOHN J. RIGAS and MICHAEL J. RIGAS, directed Adelphia employees, in Adelphia's press release and conference call announcing its results for the second quarter of 2001, fraudulently and misleadingly to claim that Adelphia had 5,672,225 "basic cable subscribers," a growth rate of approximately 1.0 percent over the preceding twelve months. In order to inflate the number of "basic cable

subscribers" disclosed on or about August 14, 2000, TIMOTHY J.
RIGAS and Brown, with the knowledge and approval of JOHN J. RIGAS
and MICHAEL J. RIGAS, and other Adelphia employees included in
the "basic cable subscriber" number approximately 33,000
subscribers to Adelphia's internet service who did not subscribe
to any Adelphia cable television service whatsoever.  Also
included were the subscribers in Brazil and Venezuela described
above.

136.  To compound the misrepresentation created by these
baseless additions, TIMOTHY J. RIGAS and Brown, with the
knowledge and approval of JOHN J. RIGAS and MICHAEL J. RIGAS, and
other Adelphia employees, did not adjust the "basic cable
subscriber" numbers for the preceding twelve months to include
these internet-only subscribers in the preceding number of
reported "basic cable subscribers," resulting in the misleading
appearance of significant "basic cable subscriber" growth.

137.  Similarly, on or about March 27, 2002, TIMOTHY J.
RIGAS and Brown, with the knowledge and approval of JOHN J. RIGAS
and MICHAEL J. RIGAS, directed Adelphia employees, in Adelphia's
press release and conference call announcing its results for the
fourth quarter and year 2001, fraudulently and misleadingly claim
that Adelphia had 5,810,253 "basic cable subscribers," a growth
rate of approximately 0.5 percent over the preceding twelve
months.  In order to inflate the number of "basic cable

subscribers" disclosed on or about March 27, 2002, TIMOTHY J.
RIGAS and Brown, with the knowledge and approval of JOHN J. RIGAS
and MICHAEL J. RIGAS, and other Adelphia employees included in
the number of "basic cable subscribers" approximately 60,000
subscribers to Adelphia's home security service who did not
subscribe to any Adelphia cable television service whatsoever.
Also included were the subscribers in Brazil and Venezuela and
the internet-only subscribers described above.

138. To compound the misrepresentation created by these
baseless additions, TIMOTHY J. RIGAS and Brown, with the
knowledge and approval of JOHN J. RIGAS and MICHAEL J. RIGAS, and
other Adelphia employees, did not adjust the "basic cable
subscriber" numbers for the preceding twelve months to include
these internet-only subscribers in the preceding number of
reported "basic cable subscribers," resulting in the misleading
appearance of significant "basic cable subscriber" growth.

C.   **Misrepresentations Concerning High-Speed Internet
     Subscribers**

139. In or about November 2001, JOHN J. RIGAS, TIMOTHY
J. RIGAS and MICHAEL J. RIGAS, along with Brown and other
Adelphia employees, learned that Adelphia's high-speed internet
subscriber base was substantially lower than market expectations.
As JOHN J. RIGAS, TIMOTHY J. RIGAS, MICHAEL J. RIGAS and Brown
well knew, by late 2001, cable investors placed great

significance on the number of a cable company's subscribers to high-margin internet services.

140. On or about November 9, 2001, TIMOTHY J. RIGAS and Brown, with the knowledge and approval of JOHN J. RIGAS and MICHAEL J. RIGAS, directed Adelphia employees, in Adelphia's quarterly results press release and quarterly results conference call for the third quarter of 2001, to fraudulently and misleadingly represent that Adelphia had 315,104 high speed internet subscribers.

141. In order to overstate the number of high-speed internet subscribers disclosed on or about November 13, 2001, TIMOTHY J. RIGAS and Brown, with the knowledge and approval of JOHN J. RIGAS and MICHAEL J. RIGAS, and other Adelphia employees, included in the number of Adelphia high-speed internet subscribers approximately 10,000 subscribers to high-speed internet service provided by Cable RFEs that were not owned or controlled by Adelphia.

142. To compound the misrepresentation created by this baseless addition, TIMOTHY J. RIGAS and Brown, with the knowledge and approval of JOHN J. RIGAS and MICHAEL J. RIGAS, and other Adelphia employees did not revise Adelphia's high-speed internet subscriber numbers for the preceding twelve months to include the subscribers added in November 2001 from the RFEs, resulting in

the misleading appearance of a larger high-speed internet subscriber base.

### D.   Misrepresentations Concerning Progress in Rebuilding Cable Systems

143.  Beginning in or about the late 1990s, in response to competition from digital satellite television services, telephone companies and other sources, many cable operators began to rebuild their systems to make them capable of providing such services as digital cable television, high-speed internet access service, video-on-demand and other services.  Because the internet is interactive, however, it requires a system of cables that can both send signals to customers (such as a television show), and receive signals from customers (such as data inputted into an internet search engine).

144.  At all relevant times, traditional coaxial cable systems generally were not capable of providing the two-way transmission necessary for internet service.  In order to provide two-way service on older, lower bandwith systems, it was necessary to "rebuild" the systems, using newer, high bandwith cable and transmission equipment.  The rebuilding process, which requires re-laying miles of cable, was very costly.

145.  At all relevant times, because of such modernization, rebuilding efforts typically absorbed a large proportion of a cable operator's resources.  As a result, investors, analysts and other market participants considered the

-62-

operator's rebuild efforts to be important. The higher the percentage of rebuild completion, the sooner the company would be relieved of the enormous expense of rebuilding. Moreover, the higher the percentage of rebuild completion, the higher the company's potential income from such new and high-margin services as digital cable and high-speed internet access.

146. At all relevant times, cable companies with high percentages of two-way-capable systems were more attractive to investors because (1) they had more ability to provide high-margin internet service; and (2) they had less expensive rebuilding to do.

147. From in or about late 1999 through on or about March 28, 2002, JOHN J. RIGAS, TIMOTHY J. RIGAS and MICHAEL J. RIGAS, along with Brown and other Adelphia employees, engaged in a pattern and practice of fraudulently misrepresenting Adelphia's percentage of two-way-capable cable systems, and the corresponding percentage of systems requiring rebuilds.

148. At all relevant times, JOHN J. RIGAS, TIMOTHY J. RIGAS, MICHAEL J. RIGAS and Brown were aware of the true extent of Adelphia's two-way-capable cable plant and progress in completing its rebuild, based on, among other things, Adelphia internal business records.

149. From in or about 1999 through in or about May 2002, JOHN J. RIGAS, TIMOTHY J. RIGAS and MICHAEL J. RIGAS,

together with Brown and other Adelphia employees acting at their direction, fraudulently and misleadingly inflated Adelphia's percentage of two-way-capable capacity above the percentages reported within Adelphia in numerous communications with the public, including quarterly results conference calls, equity road shows, and other disclosures.

150. From in or about 1999 through on or about March 28, 2002, JOHN J. RIGAS, TIMOTHY J. RIGAS and MICHAEL J. RIGAS, together with Brown and other Adelphia employees acting at their direction, presented to participants in road shows demonstrative aids that overstated Adelphia's percentage of two-way-capable cable plant by approximately 10 to 15 percentage points.

151. For example, in late 1999, Brown disclosed to road show participants a document indicating that 50 percent of Adelphia's systems were two-way-capable, when, in truth and in fact, as Brown well knew, only approximately 35 percent of Adelphia's systems were two-way-capable at that time. From in or about 1999 through in or about 2002, the fraudulent document used by Brown was used at hundreds of road show presentations by Brown and other Adelphia employees. This document was frequently revised to include numbers on the percentage of two-way-capable systems that were fraudulently inflated and inconsistent with Adelphia's internal reports regarding the percentage of two-way-capable cable plant and its progress in rebuilding that plant.

-64-

152. Similarly, on or about November 15, 2000, TIMOTHY J. RIGAS stated in a public conference call, which was transmitted to various locations in New York, New York and elsewhere, that approximately 60 percent of Adelphia's systems were "two-way" capable. On or about August 15, 2000, in another conference call, TIMOTHY J. RIGAS, told financial analysts that approximately 60 percent of Adelphia's systems had been rebuilt, when, in truth and in fact, as TIMOTHY J. RIGAS well knew, only approximately 50 percent of Adelphia's systems were two-way capable in August 2000.

E.   Fraudulent Rigas Converter Transaction

153. From at least in or about 1998 through in or about May 2002, as a result of, among other things, the need to rebuild Adelphia's cable systems to make them two-way-capable, and the need to purchase digital cable converter boxes, Adelphia had significant capital expenditures in every quarter. Because Adelphia was heavily leveraged and had limited liquidity under its credit agreements, securities analysts and investors closely watched Adelphia's capital expenditures for signs of material increases that might negatively affect the company.

154. In or about late 2001, TIMOTHY J. RIGAS and MICHAEL J. RIGAS, along with Brown, Werth and other Adelphia employees, became aware that Adelphia's capital expenditures for the third quarter of the 2001 fiscal year were approximately $725

million, an increase of approximately $100 million over the previous year and above market expectations. TIMOTHY J. RIGAS, MICHAEL J. RIGAS, Brown and Werth, along with other Adelphia employees determined that, among other things, capital expenditures had increased because during the year Adelphia had purchased a large quantity of digital converter cable boxes.

155. In or about October 2001, TIMOTHY J. RIGAS and MICHAEL J. RIGAS, along with Brown and other Adelphia employees, conceived a scheme to fraudulently and misleadingly under-represent to the public Adelphia's capital expenditures for the third quarter of 2001. As part of the scheme, TIMOTHY J. RIGAS and Brown directed Werth and other Adelphia employees to cause Adelphia to purport to sell more than 350,000 digital cable converter boxes and other electronic equipment, worth approximately $101 million, to Highland Holdings, L.P., an Other RFE with no cable business. Highland Holdings had no use for the converter boxes, and was chosen as the recipient of the boxes because its financial statements were not audited. There was no business purpose for the transaction, and no expectation that Adelphia would be paid for the converter sale.

156. In or about October 2001, TIMOTHY J. RIGAS and MICHAEL J. RIGAS, together with Brown, Werth and other Adelphia employees, fraudulently and misleadingly caused Highland Holdings to record approximately $101 million in digital cable converters

as an asset on Highland Holding's books, and caused Adelphia to remove those converters from its books.  TIMOTHY J. RIGAS, MICHAEL J. RIGAS, together with Brown, Werth and other Adelphia employees, further caused Adelphia fraudulently and misleadingly to remove the cost of the transferred converters, which Adelphia had purchased, from Adelphia's capital expenditures for the purpose of artificially decreasing Adelphia's publicly reported capital expenditures.  Rather, Adelphia's books reflected an inter-company receivable from Highland Holdings in the amount of approximately $101 million.

157. In or about November 2001, TIMOTHY J. RIGAS and MICHAEL J. RIGAS, together with Brown, Werth and other Adelphia employees, caused Adelphia, in its Form 10-Q and in its press release and conference call announcing its quarterly results, to make false and misleading statements about its capital expenditures in the third quarter of 2001 in that it fraudulently understated the amount of its capital expenditures by approximately $101 million.

158. In or about December 2001, Werth created journal entries on Adelphia's books that reversed the sale of digital converters from Adelphia to Highland Holdings, L.P., for the purpose of making Adelphia's books accurately reflect its true condition at the close of the year 2001.  In or about January 2002, when Brown was made aware of those reversing journal

-67-

entries, Brown directed Werth to create new entries which purported to sell the converters and electronic equipment to Highland Holdings, effective December 31, 2001.  These new journal entries directed by Brown ensured that the digital converters continued to appear to be an asset of Highland Holdings, L.P.  and ensured that the associated capital expenditures would not appear an Adelphia's books and records for 2001.

IV.   Fraud in Connection with Adelphia's Compliance with the Terms of Its Bank Loans and Debt Securities

A.   Misrepresentations Concerning Bank Debt

159. As set forth in paragraphs 29-30, above, the agreements creating Adelphia's syndicated, secured credit facilities required it to make quarterly reports to its lenders regarding each borrowing group's compliance with the conditions of the credit facilities, and, in particular, its ratio of cash flow to indebtedness.

160. From at least in or about 1999 through in or about March 23, 2002, TIMOTHY J. RIGAS and MICHAEL C. MULCAHEY, along with Brown and other Adelphia employees, prepared and submitted to lenders loan compliance reports that fraudulently misrepresented, among other things, the cash flow of the reporting entities.

161. As set forth in paragraphs 31-35, above, Adelphia's secured bank borrowings were made through "borrowing

groups" of its subsidiaries.  At the close of each quarter, Brown and other Adelphia employees, along with TIMOTHY J. RIGAS and MICHAEL C. MULCAHEY, would meet to review the financial statements of each borrowing group and to prepare the required loan compliance report.

162.  Where an Adelphia borrowing group was not in compliance with its loan covenants, and in many cases where a borrowing group was in compliance but could obtain better loan rates by reporting a more favorable ratio of cash flow to indebtedness, TIMOTHY J. RIGAS and MICHAEL C. MULCAHEY, together with Brown and other Adelphia employees, routinely made one or more fraudulent adjustments to the financial information disclosed in the required loan compliance documents.

163.  Such fraudulent adjustments to financial information submitted to banks took a number of forms.  Often, TIMOTHY J. RIGAS and MICHAEL C. MULCAHEY, together with Brown, would record revenue due from affiliates, without any factual basis, and direct Adelphia employees to credit such revenue to a particular borrowing group so that it would be in compliance.  At other times, TIMOTHY J. RIGAS and MULCAHEY would direct Adelphia employees either to lower the borrowing group's actual costs or increase its actual revenues, again with no factual basis.  Such fraudulent adjustments had the effect of increasing the cash flow

for a particular borrowing group so as to bring it into compliance with its loan agreements.

### B.   Misrepresentations Concerning Notes Issued to the Public

164. As set forth in paragraph 40, above, the indentures creating Adelphia's publicly issued notes required it to make quarterly reports to the holders of its notes regarding its compliance with the provisions of the indentures.

165. From at least in or about 2001 through in or about May 2002, TIMOTHY J. RIGAS and MICHAEL C. MULCAHEY, together with Brown, caused Adelphia to issue certifications of compliance with the indentures when, in numerous cases, Adelphia had not even undertaken the financial calculations necessary for determining whether Adelphia was actually in compliance.

166. For example, on or about August 31, 2001, Adelphia filed a certification (actually due on August 19, 2001) reporting that it was in compliance with the financial conditions of its public indentures, when it had not undertaken the financial calculations necessary to determine whether it was in compliance. In fact, in every quarter of 2001, Adelphia failed to comply with certain material financial conditions of its public indentures, including conditions relating to the maximum leverage Adelphia was permitted.

V.   Fraud in Connection with Rigas Family Self-Dealing

167. As set forth in paragraphs 7-11, above, at all relevant times, JOHN J. RIGAS, TIMOTHY J. RIGAS, and MICHAEL J. RIGAS, by virtue of their positions as the most senior executive officers of Adelphia, controlled Adelphia and its assets.   Among other things, they had the ability to cause funds to be disbursed from the Adelphia CMS.

168. From at least in or about 1999 through in or about May 2002, JOHN J. RIGAS, TIMOTHY J. RIGAS, and MICHAEL J. RIGAS, in violation of the fiduciary duties, used Adelphia assets for their own purposes and those of other members of the Rigas Family, without reimbursement to Adelphia, without the authorization of the Adelphia Board of Directors, and without disclosing such use to the Outside Directors or to the public.

A.   Undisclosed Payments from Adelphia to JOHN J. RIGAS, TIMOTHY J. RIGAS, MICHAEL J. RIGAS and Other Members of the Rigas Family

169. From at least in or about 1999 through in or about April 2002, Adelphia advanced millions of dollars in cash to JOHN J. RIGAS, TIMOTHY J. RIGAS and MICHAEL J. RIGAS, in excess of their publicly disclosed compensation.   In addition, Adelphia advanced substantial amounts of cash to other members of the Rigas Family.   Those advances were executed through the Adelphia CMS, either by transferring funds directly from Adelphia to a member of the Rigas Family, or by transferring funds from

-71-

Adelphia to an RFE, and then subsequently transferring such funds from the RFE to the recipient. From in or about 1999 through in or about April 2002, at least the following amounts of cash were advanced from Adelphia to members of the Rigas Family, directly or indirectly, as set forth below:

| RIGAS FAMILY MEMBER | APPROXIMATE AMOUNT OF CASH ADVANCES |
|---|---|
| JOHN J. RIGAS | $46,457,411 |
| TIMOTHY J. RIGAS | $1,053,707 |
| MICHAEL J. RIGAS | $1,000,849 |
| Other Rigas Family Members | $3,813,238 |
| TOTAL | $52,325,205 |

170. At all relevant times, JOHN J. RIGAS maintained bank accounts at a branch of the Bank of New York, based in New York, New York.

171. In or about early 2001, TIMOTHY J. RIGAS advised MICHAEL C. MULCAHEY that JOHN J. RIGAS had been spending unacceptably large amounts of Adelphia funds. In response, TIMOTHY J. RIGAS instructed MULCAHEY that requests for disbursements of more than a total of approximately $1,000,000 per month to JOHN J. RIGAS would thereafter require the approval of TIMOTHY J. RIGAS.

172. From at least in or about early 2001 through in or about early 2002, JOHN J. RIGAS, TIMOTHY J. RIGAS and MICHAEL C. MULCAHEY caused Adelphia to make cash payments to JOHN J. RIGAS

-72-

in the amount of at least approximately $1,000,000 per month.
Those cash payments were made through the CMS, and were wire
transferred to the account of JOHN J. RIGAS at the Bank of New
York.  Those cash advances were not presented to or authorized by
the Adelphia Board of Directors, and were not disclosed to the
Outside Directors or to the public.  During that period, at least
approximately $12,000,000 was wire transferred from the CMS to
the personal bank account of JOHN J. RIGAS at the Bank of New
York.

173.  On or about April 30, 2001, JOHN J. RIGAS, TIMOTHY
J. RIGAS and MICHAEL J. RIGAS, together with Brown, caused
Adelphia to file an amended annual report on Form 10-K, which
falsely understated the total amount of compensation to JOHN J.
RIGAS, TIMOTHY J. RIGAS, MICHAEL J. RIGAS and another member of
the Rigas Family by failing to include the cash advances set
forth in paragraph 169, above.

B.  Adelphia's Undisclosed Payments of Margin Calls Against
    Rigas Family Loans

174.  From on or about December 31, 1998 through on or
about June 2, 2002, JOHN J. RIGAS, TIMOTHY J. RIGAS, and MICHAEL
J. RIGAS, together with other members of the Rigas Family, caused
Adelphia to issue at least approximately 197,000,000 shares of
Class A common stock, resulting in an increase of more than
approximately 700 percent in the number of such shares
outstanding from approximately 31,258,843 on or about December

31, 1998, to approximately 228,600,000 on or about June 2, 2002.
As set forth in paragraph 7, above, the majority of Adelphia's
Class A common stock was owned and controlled by persons other
than members of the Rigas Family.

175. During that same period, JOHN J. RIGAS, TIMOTHY J.
RIGAS, and MICHAEL J. RIGAS, together with other members of the
Rigas Family, caused Adelphia to issue at least approximately
14,000,000 shares of Class B common stock.  As noted above, the
issuance of such stock enabled the Rigas Family to maintain
control over Adelphia, notwithstanding the issuance of millions
of shares of Class A common stock to third parties.

176. In order to finance the Rigas Family purchases of
Adelphia securities, JOHN J. RIGAS, TIMOTHY J. RIGAS, and MICHAEL
J. RIGAS, together with other members of the Rigas Family, caused
at least approximately 23,200,000 shares of Adelphia common stock
that was owned and controlled by the Rigas Family to be pledged
as collateral for margin loans, and used the proceeds of such
loans to pay for such securities.

177. At all relevant times, Highland Preferred
Communications 2001, LLC; Highland Communications; Highland
Holdings II, G.P.; and Highland Preferred Communications and
Doris Holdings, L.P. were entities owned and controlled by JOHN
J. RIGAS, TIMOTHY J. RIGAS and MICHAEL J. RIGAS, together with
other members of the Rigas Family.

178. At all relevant times, Highland Preferred Communications 2001, LLC maintained a brokerage account at Deutsche Bank, which was associated with a margin loan account. At all relevant times, Highland Communications maintained a brokerage account at Salomon Smith Barney, which was associated with a margin loan account. At all relevant times, Highland Holdings II, G.P. maintained a brokerage account at Goldman Sachs & Co., which was guaranteed by the account of Doris Holdings, L.P. At all relevant times, Highland Preferred Communications was the borrower on a loan from Bank of America that was secured by Adelphia Class A common stock. The four loans described above are referred to collectively as the "Rigas Family Stock Loans."

179. At all relevant times, under the terms of each of the Rigas Family Stock Loans, the Rigas Family was required to pay interest on outstanding loan balances, and to meet margin requirements with respect to the Adelphia Class A common stock pledged as collateral. Under such margin requirements, if the market value of the Adelphia common stock declined, the lender could make a "margin call" against the Rigas Family. In the event of a margin call, the Rigas Family would be required to provide additional cash or securities to increase the value of the lender's collateral. If the Rigas Family did not satisfy the margin call, the lender could sell the Adelphia common stock

pledged to secure the loan on the open market, and use the proceeds of that sale to reduce the balance of the loan.

180. From in or about 1999 through in or about May 2002, JOHN J. RIGAS, TIMOTHY J. RIGAS, and MICHAEL J. RIGAS, together with other members of the Rigas Family, caused Adelphia Class A common stock to be pledged as collateral in connection with each of the Rigas Family Stock Loans.

181. As of on or about December 10, 2001, the Rigas Family had pledged a total of at least approximately 23,040,877 shares of Adelphia Class A common stock as collateral for aggregate loan balances on the Rigas Family Stock Loans of at least approximately $188,750,000, as set forth below:

| LENDER | BORROWER | APPROXIMATE NUMBER OF SHARES PLEDGED | APPROXIMATE LOAN BALANCE |
|--------|----------|--------------------------------------|--------------------------|
| Bank of America | Highland Preferred Communications | 4,147,999 | $47,000,000 |
| Deutsche Bank | Highland Preferred Communications 2001, LLC | 5,285,963 | $50,050,000 |
| Goldman Sachs | Highland Holdings II, G.P.; Doris Holdings, L.P. (guarantor) | 5,398,151 | $30,100,000 |
| Salomon Smith Barney | Highland Communications | 8,208,764 | $61,600,000 |

182. From in or about July 2000 through in or about May 2002, the market price for Adelphia common stock declined steadily from more than approximately $40.00 per share in or about July 2000 to less than approximately $6.00 per share in or about mid-May 2002. As a result of the decline in the market price for Adelphia's common stock, a series of margin calls was made against the Rigas Family Stock Loans, as set forth below:

a.     From on or about July 31, 2000 through on or about April 1, 2002, Bank of America made approximately 6 margin calls on the Highland Preferred Communications loan account, for a total of approximately $52,089,668.

b.     From on or about September 27, 2000 through on or about May 9, 2002, Goldman Sachs made a total of approximately 27 margin calls on the Highland Holdings II, G.P. brokerage account, for a total of approximately $71,109,178.

c.     From on or about July 11, 2001 through on or about May 10, 2002, Salomon Smith Barney made a total of approximately 28 margin calls on the Highland Communications brokerage account, for a total of approximately $78,673,145.

d.     From on or about March 28, 2002 through on or about April 3, 2002, Deutsche Bank made a total of approximately 4 margin calls on the Highland Preferred Communications 2001, LLC brokerage account, for a total of approximately $50,285,185.

183. From in or about July 2000 through in or about May 2002, JOHN J. RIGAS, TIMOTHY J. RIGAS, MICHAEL J. RIGAS and MICHAEL C. MULCAHEY, together with Brown, caused Adelphia to pay a total of at least approximately $252,157,176 to satisfy the margin calls described above.

184. The funds used to pay those margin calls were wire transferred from the Adelphia CMS to the respective lenders. For example, the following payments made to satisfy margin calls against the Goldman Sachs brokerage account of Highland Holdings II, G.P. were made through interstate wire transfers from Adelphia CMS accounts held at First Union in Pensacola, Florida to a Goldman Sachs account held at J.P. Morgan Chase Bank ("Chase") in New York, New York, as set forth below:

| APPROXIMATE DATE | APPROXIMATE AMOUNT | TRANSFEROR ACCOUNT |
|---|---|---|
| September 27, 2000 | $8,250,000 | Highland Holdings |
| August 17, 2001 | $1,700,000 | Adelphia |
| August 23, 2001 | $2,700,000 | Adelphia |
| August 29, 2001 | $2,100,000 | Adelphia |
| September 18, 2001 | $5,000,000 | Adelphia |
| September 20, 2001 | $500,000 | Adelphia |
| September 21, 2001 | $5,000,000 | Adelphia |
| September 25, 2001 | $3,500,000 | Adelphia |
| September 27, 2001 | $1,750,000 | Adelphia |
| October 1, 2001 | $4,500,000 | Adelphia |
| October 3, 2001 | $2,500,000 | Adelphia |
| November 15, 2001 | $150,000 | Adelphia |

| APPROXIMATE DATE | APPROXIMATE AMOUNT | TRANSFEROR ACCOUNT |
|---|---|---|
| November 19, 2001 | $75,000 | Adelphia |
| February 21, 2002 | $2,352,592 | Highland Holdings II |
| February 22, 2002 | $798,926 | Highland Holdings II |
| March 28, 2002 | $6,359,647 | Highland Holdings II |
| March 29, 2002 | $3,886,669 | Highland Holdings II |
| April 2, 2002 | $3,934,629 | Highland Holdings II |
| April 3, 2002 | $2,786,446 | Highland Holdings II |
| April 4, 2002 | $1,705,815 | Highland Holdings II |
| April 5, 2002 | $2,245,631 | Highland Holdings II |
| April 12, 2002 | $4,296,928 | Highland Holdings II |
| April 15, 2002 | $2,180,853 | Highland Holdings II |
| April 22, 2002 | $1,554,668 | Highland Holdings II |
| April 23, 2002 | $971,667 | Highland Holdings II |
| April 29, 2002 | $43,185 | Highland Holdings II |
| May 9, 2002 | $266,522 | Highland Holdings II |
| TOTAL | $71,109,178 | |

185. The Rigas Family did not reimburse Adelphia for the funds used to pay the margin calls described above. In addition, Adelphia's payment of those margin calls substantially increased the amount of Adelphia's liabilities under the Co-Borrowing Agreements.

186. The use of at least approximately $252,157,176 in Adelphia funds to satisfy margin calls against the Rigas Family Stock Loans was not presented to or authorized by the Adelphia Board of Directors, was not disclosed to the Outside Directors, and was not disclosed to the public.

-79-

187. At all relevant times, based on the fact that members of the Rigas Family were the principal owners of Adelphia, and exercised control over Adelphia's affairs, investors and analysts generally considered the Rigas Family's financial situation to be material to the market for Adelphia's securities.  In particular, investors and analysts were concerned that a decline in the market price of Adelphia's common stock would have a material adverse effect on the Rigas Family's financial situation.  As a result, the Rigas Family's ability to provide financial support to Adelphia would be adversely affected by such a decline.

188. By at least on or about December 17, 2001, based on Adelphia's SEC filings, the public was aware that the Rigas Family had pledged a large amount of Adelphia common stock in connection with margin loans.  As the market price for Adelphia's stock declined throughout 2001 and 2002, investors and analysts expressed concern that the Rigas Family's financial situation would be adversely affected by substantial margin calls against the Rigas Family Stock Loan Accounts.

189. On various occasions in or about 2001 and 2002, investors and analysts requested information from TIMOTHY J. RIGAS and Brown concerning the likelihood of substantial margin calls against the Rigas Family's Adelphia common stock holdings.

190. For example, on or about May 2, 2002, during a meeting held at the offices of Moody's at 99 Church Street in New York, New York, a representative of Moody's asked TIMOTHY J. RIGAS for information about the risk that margin calls would be made against the Rigas Family's Adelphia common stock holdings. In response, TIMOTHY J. RIGAS made false and misleading statements that led the Moody's representative to believe that payments of the Rigas Family's margin had not increased Adelphia's liabilities.

C.   **Rigas Family Use of Adelphia Corporate Aircraft**

191. At all relevant times, Adelphia maintained and operated approximately three airplanes (the "Adelphia Airplanes"). The Adelphia Airplanes were operated from an airport in Wellsville, New York. Adelphia paid all maintenance costs for the Adelphia Airplanes, including the salaries of approximately seven full-time pilots and various other employees.

192. From at least in or about 1999 through in or about May 2002, JOHN J. RIGAS, TIMOTHY J. RIGAS, and MICHAEL J. RIGAS, and other members of the Rigas Family, routinely used the Adelphia Airplanes for personal travel. The cost of the Rigas Family's personal travel on the Adelphia Airplanes was paid by Adelphia. Adelphia was not reimbursed by the Rigas Family for that cost.

193. The Rigas Family's use of the Adelphia Airplanes for personal travel without reimbursement to Adelphia was not presented to or authorized by the Adelphia Board of Directors, was not disclosed to the Outside Directors, and was not disclosed to the public.

D.   The Golf Course

194. From at least in or about June 2001 through in or about May 2002, JOHN J. RIGAS and TIMOTHY J. RIGAS caused Adelphia to begin construction of a golf course and club on a parcel of approximately 830 acres of land located near Coudersport, Pennsylvania.  Of the 830 acres of land on which the golf facilities were located, approximately 169 acres were owned by an Adelphia subsidiary.  The remaining land was owned and controlled, directly or indirectly, by JOHN J. RIGAS.

195. From in or about March 2000 through in or about May 2002, JOHN J. RIGAS and TIMOTHY J. RIGAS caused approximately $13,000,000 of Adelphia funds to be spent on equipment, development and construction costs for the golf facilities.  The estimated cost to complete the golf facilities as planned was at least approximately $40,000,000.  Adelphia did not execute any written leases or make any lease payments for use of the portion of the 830 acres owned and controlled by JOHN J. RIGAS.

196. The use of Adelphia's funds and assets to construct golf facilities on land primarily owned by JOHN J.

RIGAS was not presented to or authorized by Adelphia's Board of Directors, and was not disclosed to the Outside Directors or to the public.

197. From in or about 2000 through in or about May 2002, JOHN J. RIGAS and TIMOTHY J. RIGAS falsely represented to certain of the Outside Directors that TIMOTHY J. RIGAS was paying for the construction of the golf facilities with his personal funds when, as JOHN J. RIGAS and TIMOTHY J. RIGAS well knew, they and their co-conspirators caused Adelphia to pay for such construction.

## THE CONSPIRACY

198. From in or about 1999, up to and including in or about May 2002, in the Southern District of New York and elsewhere, JOHN J. RIGAS, TIMOTHY J. RIGAS, MICHAEL J. RIGAS and MICHAEL C. MULCAHEY, the defendants, together with James R. Brown, Timothy A. Werth and others known and unknown, unlawfully, willfully and knowingly did combine, conspire, confederate and agree together and with others to commit offenses against the United States, to wit, violations of Title 15, United States Code, Sections 78j(b), 78m(b)(2)(A), 78m(b)(5) and 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.13b2-1; and Title 18, United States Code, Sections 1343, 1344 and 1346.

## OBJECTS OF THE CONSPIRACY

### Securities Fraud

199. It was a part and object of the conspiracy that JOHN J. RIGAS, TIMOTHY J. RIGAS, MICHAEL J. RIGAS and MICHAEL C. MULCAHEY, together with Brown, Werth and others known and unknown, unlawfully, willfully and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon the purchaser and seller, all in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

### Wire Fraud

200. It was a further part and object of the conspiracy that JOHN J. RIGAS, TIMOTHY J. RIGAS, MICHAEL J. RIGAS and

MICHAEL C. MULCAHEY, together with Brown, Werth and others known and unknown, unlawfully, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, to wit, a scheme and artifice, among other things, to (a) deprive Adelphia Communications Corp. ("Adelphia") and its shareholders of the intangible right to the honest services of Adelphia directors and officers; (b) violate the fiduciary and other duties of Adelphia directors, officers and employees to Adelphia and its shareholders; and (c) obtain Adelphia's money and property, would and did transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures and sounds for the purposes of executing such scheme and artifice, all in violation of Title 18, United States Code, Sections 1343 and 1346.

### False Statements in SEC Filings

201. It was a further part and object of the conspiracy that JOHN J. RIGAS, TIMOTHY J. RIGAS, MICHAEL J. RIGAS and MICHAEL C. MULCAHEY, together with Brown, Werth and others known and unknown, unlawfully, willfully and knowingly, in applications, reports, and documents required to be filed under the Securities Exchange Act of 1934 and the rules and regulations thereunder, would and did make and cause to be made statements

-85-

which were false and misleading with respect to material facts, in violation of Title 15, United States Code, Section 78ff.

### False Books and Records

202. It was a further part and object of the conspiracy that JOHN J. RIGAS, TIMOTHY J. RIGAS, MICHAEL J. RIGAS and MICHAEL C. MULCAHEY, together with Brown, Werth and others known and unknown, unlawfully, willfully and knowingly, would and did, directly and indirectly, falsify and cause to be falsified books, records, and accounts subject to Section 13(b)(2) of the Securities Exchange Act of 1934, to wit, books, records and accounts of Adelphia, an issuer with a class of securities registered pursuant to the Securities Exchange Act of 1934, which Adelphia was required to make and keep in reasonable detail, accurately and fairly reflecting the transactions and dispositions of the assets of Adelphia, in violation of Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5) and 78ff, and Title 17, Code of Federal Regulations, Section 240.13b2-1.

### Bank Fraud

203. It was a further part and object of the conspiracy that JOHN J. RIGAS, TIMOTHY J. RIGAS, MICHAEL J. RIGAS and MICHAEL C. MULCAHEY, together with Brown and others known and unknown, unlawfully, willfully and knowingly, would and did execute, and attempt to execute, a scheme and artifice to defraud a financial institution, and to obtain moneys, funds, credits,

-86-

assets, securities and other property owned by, and under the custody and control of, a financial institution whose deposits were insured by the Federal Deposit Insurance Corporation, by means of false and fraudulent pretenses, representations and promises, all in violation of Title 18, United States Code, Sections 1344.

## MEANS AND METHODS

204. Among the means and methods by which JOHN J. RIGAS, TIMOTHY J. RIGAS, MICHAEL J. RIGAS and MICHAEL C. MULCAHEY, together with Brown, Werth and their co-conspirators, would and did carry out the conspiracy were the following:

a.   The defendants and their co-conspirators caused Adelphia employees to make false and misleading statements in documents filed with the SEC concerning, among other things, the amount of Adelphia's joint and several liabilities under the Co-Borrowing Facilities;

b.   The defendants and their co-conspirators made false and misleading statements to investors, securities analysts, credit rating agencies, other market participants and the public concerning, among other things, Adelphia's efforts to reduce its financial leverage;

c.   The defendants and their co-conspirators caused Adelphia to issue securities to entities owned and controlled by them and other members of the Rigas Family;

d.   The defendants and their co-conspirators caused Adelphia employees to create fictitious, backdated documents, and to make false and fraudulent entries in Adelphia's books and records, concerning the sale of Adelphia securities to the Rigas Family;

e.   The defendants and their co-conspirators made false and misleading statements to various credit rating agencies in order to induce them not to lower the credit ratings assigned to Adelphia securities;

f.   The defendants and their co-conspirators caused Adelphia to enter into sham transactions with affiliates of Adelphia, involving the payment of management fees and debt placement fees, the purchase and sale of equipment and other matters, for the sole purpose of fraudulently manipulating Adelphia's financial condition and results, including, among other things, artificially inflating Adelphia's EBITDA;

g.   The defendants and their co-conspirators caused Adelphia to enter into sham transactions with unaffiliated third parties, involving the purchase and sale of equipment, the payment of marketing support fees and other matters, for the sole purpose of fraudulently manipulating Adelphia's financial condition and results, including, among other things, artificially inflating Adelphia's EBITDA;

h.   The defendants and their co-conspirators caused Adelphia's books and records to be falsified by, among other things, improperly recording revenues, expenses and other items;

i.   The defendants and their co-conspirators provided false and misleading information concerning Adelphia's business, financial condition, performance and other matters to outside auditors, financial institutions, the SEC, investors, securities analysts, credit rating agencies and other market participants, and to the public;

j.   The defendants and their co-conspirators caused Adelphia to make material misrepresentations of fact concerning matters relating to Adelphia, including its business, financial condition and performance, in press releases, public conference calls, meetings with investors, securities analysts and other market participants, and in other communications with the public;

k.   The defendants and their co-conspirators transmitted and caused to be transmitted by means of wire communications in interstate and foreign commerce, press releases, SEC filings, public conference calls, electronic mail messages, telephone calls and other matters, and otherwise used means and instrumentalities of interstate commerce, and of the

-89-

mails, to disseminate false and misleading information to the public;

l.   The defendants and their co-conspirators falsified Adelphia's books and records by, among other things, making baseless additions to the number of Adelphia's basic cable subscribers, high-speed internet subscribers and other statistics;

m.   The defendants and their co-conspirators made misrepresentations concerning the number and growth of Adelphia's basic cable subscribers in SEC filings, press releases and other communications with the public;

n.   The defendants and their co-conspirators made misrepresentations concerning the number of Adelphia's high-speed internet service subscribers in press releases and other communications with the public;

o.   The defendants and their co-conspirators made misrepresentations concerning Adelphia's progress in completing the rebuild of its cable systems in public conference calls and other communications with the public;

p.   The defendants and their co-conspirators made misrepresentations concerning other matters relating to Adelphia, including its business, financial condition and performance, in press releases, public conference calls, meetings with investors,

securities analysts and other market participants, and in other communications with the public;

q.   The defendants and their co-conspirators caused Adelphia to submit false and misleading compliance reports, and to make other false and misleading statements, to banks and holders of Adelphia's corporate debt;

r.   The defendants and their co-conspirators caused Adelphia to engage in sham transactions with affiliates for the purpose of substantiating Adelphia's false and fraudulent loan compliance reports;

s.   The defendants and their co-conspirators caused Adelphia to record false and misleading entries in its books and records for the purpose of substantiating Adelphia's false and fraudulent loan compliance reports;

t.   The defendants caused Adelphia and certain subsidiaries to enter into fraudulent securities transactions, in which Adelphia and/or the Rigas Family received securities without paying full compensation for such securities;

u.   The defendants and their co-conspirators caused material amounts of Adelphia funds and other assets to be used for the benefit of themselves and other members of the Rigas Family, and caused Adelphia to enter into contracts and transactions with entities owned and controlled by them, without

required approval of Adelphia's Board of Directors or shareholders;

v.    The defendants made false and misleading statements to the Outside Directors in connection with contracts and transactions involving the Rigas Family and entities owned and controlled by them;

w.    The defendants caused Adelphia to enter into contracts and transactions, and to modify existing contracts and transactions, which benefitted the Rigas Family at the expense of Adelphia; and

x.    The defendants and their co-conspirators used the means and instrumentalities of interstate and foreign commerce and the mails, and the facilities of national securities exchanges, to carry out the scheme to defraud.

## OVERT ACTS

205. In furtherance of the conspiracy, and to effect the illegal objects thereof, JOHN J. RIGAS, TIMOTHY J. RIGAS, MICHAEL J. RIGAS and MICHAEL C. MULCAHEY, and their co-conspirators, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.    On or about March 30, 2000, JOHN J. RIGAS, TIMOTHY J. RIGAS and MICHAEL J. RIGAS caused Adelphia to issue a press release announcing Adelphia's results for the fourth

quarter of 1999, which was distributed throughout the United States, including in New York, New York;

b. In or about March 2000, JOHN J. RIGAS, TIMOTHY J. RIGAS and MICHAEL J. RIGAS caused Adelphia to begin construction of a golf course and club on a parcel of land located near Coudersport, Pennsylvania that was primarily owned by JOHN J. RIGAS;

c. On or about May 15, 2000, JOHN J. RIGAS, TIMOTHY J. RIGAS and MICHAEL J. RIGAS caused Adelphia to issue a press release announcing Adelphia's results for the first quarter of 2000, which was distributed throughout the United States, including in New York, New York;

d. On or about August 14, 2000, JOHN J. RIGAS, TIMOTHY J. RIGAS and MICHAEL J. RIGAS caused Adelphia to issue a press release announcing Adelphia's results for the second quarter of 2000, which was distributed throughout the United States, including in New York, New York;

e. On or about November 15, 2000, TIMOTHY J. RIGAS stated in a public conference call, which was transmitted to various locations in New York, New York and elsewhere, that approximately 60 percent of Adelphia's systems were "two-way" capable;

f. On or about November 14, 2000, JOHN J. RIGAS, TIMOTHY J. RIGAS and MICHAEL J. RIGAS caused Adelphia to issue a

-93-

press release announcing Adelphia's results for the third quarter

of 2000, which was distributed throughout the United States,

including in New York, New York;

g.   On or about January 17, 2001, MICHAEL J.

RIGAS executed agreements between Adelphia and Highland 2000,

L.P. concerning the purchase and sale of Adelphia securities;

h.   On or about April 2, 2001, JOHN J. RIGAS,

TIMOTHY J. RIGAS and MICHAEL J. RIGAS caused Adelphia to issue a

press release announcing Adelphia's results for the fourth

quarter and full year of 2000, which was distributed throughout

the United States, including in New York, New York;

i.   On or about May 14, 2001, JOHN J. RIGAS,

TIMOTHY J. RIGAS and MICHAEL J. RIGAS caused Adelphia to issue a

press release announcing Adelphia's results for the first quarter

of 2001, which was distributed throughout the United States,

including in New York, New York;

j.   On or about August 14, 2001, JOHN J. RIGAS,

TIMOTHY J. RIGAS and MICHAEL J. RIGAS caused Adelphia to issue a

press release announcing Adelphia's results for the second

quarter of 2001, which was distributed throughout the United

States, including in New York, New York;

k.   On or about August 31, 2001, TIMOTHY J. RIGAS

caused Adelphia to file a certification concerning its compliance

with the financial conditions of its public indentures;

-94-

l.    On or about September 18, 2001, JOHN J. RIGAS, TIMOTHY J. RIGAS, MICHAEL J. RIGAS and MULCAHEY caused approximately $5,000,000 to be wire transferred from First Union in Florida to Chase in New York, New York;

m.    In or about the quarter ending September 30, 2001, TIMOTHY J. RIGAS directed Adelphia employees to credit Adelphia with in excess of $1.5 million in management fees from certain affiliates of Adelphia;

n.    On or about October 1, 2001, JOHN J. RIGAS, TIMOTHY J. RIGAS, MICHAEL J. RIGAS and MULCAHEY caused approximately $4,500,000 to be wire transferred from First Union in Florida to Chase in New York, New York;

o.    On or about November 9, 2001, JOHN J. RIGAS, TIMOTHY J. RIGAS and MICHAEL J. RIGAS caused Adelphia to issue a press release announcing Adelphia's results for the third quarter of 2001, which was distributed throughout the United States, including in New York, New York;

p.    In or about January 2002, TIMOTHY J. RIGAS and MULCAHEY prepared certain notices addressed to Bank of Montreal, which were backdated to October 22, 2001;

q.    On or about January 18, 2002, at 99 Church Street in New York, New York, TIMOTHY J. RIGAS participated in a meeting with representatives of Moody's;

-95-

r.   On or about March 27, 2002, JOHN J. RIGAS, TIMOTHY J. RIGAS, MICHAEL J. RIGAS and MULCAHEY caused Adelphia to issue a press release reporting its results for the fourth quarter and full year 2001;

s.   On or about March 28, 2002, JOHN J. RIGAS, TIMOTHY J. RIGAS, MICHAEL J. RIGAS and MULCAHEY caused approximately $6,359,647 to be wire transferred from First Union in Florida to Chase in New York, New York;

t.   On or about March 29, 2002, JOHN J. RIGAS, TIMOTHY J. RIGAS, MICHAEL J. RIGAS and MULCAHEY caused approximately $3,886,669 to be wire transferred from First Union in Florida to Chase in New York, New York;

u.   In or about April 2002, TIMOTHY J. RIGAS and MULCAHEY prepared certain receipts, which purported to acknowledge the receipt, on or about October 22, 2001, by Adelphia Communications Corp. from Highland 2000, L.P., of approximately $423,375,076 in immediately available funds; and

v.   On or about April 12, 2002, JOHN J. RIGAS, TIMOTHY J. RIGAS, MICHAEL J. RIGAS and MULCAHEY caused approximately $4,296,928 to be wire transferred from First Union in Florida to Chase in New York, New York.

(Title 18, United States Code, Section 371).

## COUNTS TWO THROUGH SIXTEEN

### (Securities Fraud)

The Grand Jury further charges:

206. The allegations contained in paragraphs 1-197 and 204-05 of this Indictment are repeated and realleged as if fully set forth herein.

207. From in or about 1999, up to and including in or about May 2002, in the Southern District of New York and elsewhere, JOHN J. RIGAS, TIMOTHY J. RIGAS, MICHAEL J. RIGAS and MICHAEL C. MULCAHEY, the defendants, unlawfully, willfully and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities, to wit, the securities set forth below, manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which operated and would operate as a fraud and deceit upon purchasers and sellers of such securities as set forth below:

-97-

| COUNT | SECURITY |
|---|---|
| TWO | Adelphia Class A Common Stock |
| THREE | Adelphia   9.875% Senior Debentures due 3/1/05 |
| FOUR | Adelphia    9.50% Senior Notes due 2/15/04 |
| FIVE | Adelphia   9.875% Senior Notes due 3/1/07 |
| SIX | Adelphia   10.50% Senior Notes due 7/15/04 |
| SEVEN | Adelphia    9.25% Senior Notes due 10/1/02 |
| EIGHT | Adelphia   8.375% Senior Notes due 2/1/08 |
| NINE | Adelphia   8.125% Senior Notes due 7/15/03 |
| TEN | Adelphia    7.50% Senior Notes due 1/15/04 |
| ELEVEN | Adelphia    7.75% Senior Notes due 1/15/09 |
| TWELVE | Adelphia   7.875% Senior Notes due 5/1/09 |
| THIRTEEN | Adelphia   9.375% Senior Notes due 11/15/09 |
| FOURTEEN | Adelphia 10.875% Senior Notes due 10/1/10 |
| FIFTEEN | Adelphia   10.25% Senior Notes due 6/15/11 |
| SIXTEEN | Adelphia   10.25% Senior Notes due 11/1/06 |

(Title 15, United States Code, Sections 78j(b) and 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5;
Title 18, United States Code, Section 2).

## COUNTS SEVENTEEN THROUGH TWENTY-ONE

### (Wire Fraud)

The Grand Jury further charges:

208. The allegations contained in paragraphs 1-197 and 204-05 of this Indictment are repeated and realleged as if fully set forth herein.

209. On or about the dates set forth below, in the Southern District of New York and elsewhere, JOHN J. RIGAS, TIMOTHY J. RIGAS, MICHAEL J. RIGAS and MICHAEL C. MULCAHEY, the defendants, unlawfully, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations and promises, to wit, a scheme and artifice, among other things, to (a) deprive Adelphia and its shareholders of the intangible right to the honest services of Adelphia directors and officers; (b) violate the fiduciary and other duties of Adelphia directors and officers to Adelphia and its shareholders; and (c) obtain Adelphia's money and property, would and did transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures and sounds for the purposes of executing such scheme and artifice, to wit, the defendants caused Adelphia to make the wire transfers set forth below:

-99-

| COUNT | APPROXIMATE DATE | APPROXIMATE AMOUNT | WIRE TRANSMISSION |
|---|---|---|---|
| SEVENTEEN | September 18, 2001 | $5,000,000 | Wire transfer from First Union in Florida to Chase in New York, New York |
| EIGHTEEN | October 1, 2001 | $4,500,000 | Wire transfer from First Union in Florida to Chase in New York, New York |
| NINETEEN | March 28, 2002 | $6,359,647 | Wire transfer from First Union in Florida to Chase in New York, New York |
| TWENTY | March 29, 2002 | $3,886,669 | Wire transfer from First Union in Florida to Chase in New York, New York |
| TWENTY-ONE | April 12, 2002 | $4,296,928 | Wire transfer from First Union in Florida to Chase in New York, New York |

(Title 18, United States Code, Sections 1343, 1346 and 2).

COUNTS TWENTY-TWO THROUGH TWENTY-THREE

(Bank Fraud)

The Grand Jury further charges:

210. The allegations contained in paragraphs 1-197 and 204-05 of this Indictment are repeated and realleged as if fully set forth herein.

211. On or about the dates set forth below, in the Southern District of New York and elsewhere, JOHN J. RIGAS, TIMOTHY J. RIGAS, MICHAEL J. RIGAS and MICHAEL C. MULCAHEY, the defendants, unlawfully, willfully and knowingly, would and did execute, and attempt to execute, a scheme and artifice to defraud a financial institution, and to obtain moneys, funds, credits,

assets, securities and other property owned by, and under the custody and control of a financial institution whose deposits were insured by the Federal Deposit Insurance Corporation, by means of false and fraudulent pretenses, representations and promises, to wit, the defendants falsely represented that the borrowers on the credit agreements set forth below were in compliance with certain material terms of those credit agreements:

| COUNT | APPROXIMATE DATES | CREDIT AGREEMENT |
|---|---|---|
| TWENTY-TWO | April 14, 2000 through May 2002 | $2,250,000,000 Credit Agreement dated April 14, 2000 among Century Cable Holdings, LLC and other Adelphia affiliates, as borrowers, and Chase Manhattan Bank, Bank of America, Bank of New York, CIBC, Citibank, First Union National Bank, Fleet National Bank, Mellon Bank, National City Bank of Pennsylvania, SunTrust Bank, U.S. Bank and other lenders, including numerous financial institutions located in New York, New York |
| TWENTY-THREE | September 28, 2001 through May 2002 | $2,030,000,000 Credit Agreement among Olympus Cable Holdings, LLC and other Adelphia affiliates, as borrowers, and Fleet National Bank, Bank of America, Citicorp, First Union National Bank, Bank of New York and other lenders, including numerous financial institutions located in New York, New York |

(Title 18, United States Code, Sections 1344 and 2.)

-101-

## FORFEITURE ALLEGATION

The Grand Jury further charges:

212. The allegations contained in paragraphs 1-197 and 204-05 of this Indictment are repeated and realleged as if fully set forth herein.

213. As the result of committing one or more of the foregoing securities frauds, wire frauds, bank frauds or conspiracies to commit said offenses, as alleged in Counts One through Twenty-Four of this Indictment, JOHN J. RIGAS, TIMOTHY J. RIGAS, MICHAEL J. RIGAS and MICHAEL C. MULCAHEY, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of such offenses, including but not limited to a sum of money equal to at least $2,533,000,000 in United States currency, representing the amount of proceeds obtained as a result of the securities fraud, wire fraud and bank fraud offenses and conspiracy to commit said offenses, for which the defendants are jointly and severally liable.

### Substitute Asset Provision

214. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

     a.    cannot be located upon the exercise of due diligence;

     b.    has been transferred or sold to, or deposited with, a third person;

     c.    has been placed beyond the jurisdiction of the Court;

     d.    has been substantially diminished in value; or

     e.    has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendants up to the value of the above forfeitable property.

    (Title 18, United States Code, Sections 981, 1343, 1344, 1346, and 2; Title 28, United States Code, Section 2461; Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5)

_____
FOREPERSON

_____
JAMES B. COMEY
United States Attorney

-104-

Form No. USA-33s-274 (Ed. 9-25-58)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

No. S1 02 Cr. 1236 (LBS)

UNITED STATES OF AMERICA

- v. -

JOHN J. RIGAS,
TIMOTHY J. RIGAS,
MICHAEL J. RIGAS and
MICHAEL C. MULCAHEY,

Defendants.

## INDICTMENT

(Title 15, United States Code Sections
78j(b) and 78ff; Title 18, United States
Code Sections 2, 371, 1343, 1344, 1346
and 981; Title 28, United States Code,
Section 2461; Title 17, Code of Federal
Regulation, Section 240.10b-5).

JAMES B. COMEY
United States Attorney.

A TRUE BILL

D. Foreperson.