UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   X

JOHN J. RIGAS and TIMOTHY J. RIGAS,                          :

                                      Petitioners,           :        11 Civ. 6964 (KMW)
                                                                      02 Cr. 1236 (KMW)
                                                             :

               - v. -
                                                             :

UNITED STATES OF AMERICA,

                                      Respondent.            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   X


**AMENDED STATEMENT OF THE UNITED STATES OF AMERICA PURSUANT TO
LOCAL RULE 56.1 IN OPPOSITION TO THE PETITIONERS' AMENDED MOTION
FOR JUDGMENT ON VARIOUS CLAIMS ALLEGING VIOLATIONS OF
_BRADY v. MARYLAND_**


                                           GEOFFREY S. BERMAN
                                           United States Attorney for the
                                           Southern District of New York
                                           Attorney for the United States of America

Brian Blais
Damian Williams
Jessica Greenwood
Aline R. Flodr
Assistant United States Attorneys
- Of Counsel -

Respondent United States of America (the "Government"), by its attorney, Geoffrey S. Berman, United States Attorney for the Southern District of New York, respectfully submits this response to petitioners John J. Rigas and Timothy J. Rigas's ("Petitioners") Amended Statement Pursuant to Local Rule 56.1 ("Statement of Material Facts" or the "Statement") in Support of Petitioners' Amended Motion for Judgment on Various Claims Alleging Violations of *Brady v. Maryland* (the "2255 Motion").

As a preliminary matter, Petitioners' Amended Statement – while improved – still does not comply with Local Rule 56.1 as it is not a "short and concise statement . . . of material facts," Local Civ. R. 56.1(a), but rather is replete with alleged facts that are not material to the question of whether the Government upheld its legal obligations under *Brady v. Maryland*, 373 U.S. 83 (1963). To the extent the Government nonetheless provides a substantive response, these responses are not intended to be, and should not be considered as, a concession that any of the "facts" contained in those paragraphs are material to Petitioners' 2255 Motion or are otherwise in any way relevant to its resolution. Moreover, the Statement improperly offers legal arguments and legal conclusions and, contrary to Local Civ. R. 56.1(d) and Fed. R. Civ. P. 56(c), includes statements not supported by citations to admissible evidence. The Court should disregard the portions of the Statement that allege facts not material to the issue before the Court, that offer legal arguments or legal conclusions, or that fail to cite to admissible evidence.[1]

---

[1] Petitioners refer to the concepts of "summary judgment" and "adjudication of a § 2255 petition[] based on the paper records" interchangeably. (Pet.'s Mem. of Law in Supp. of their Section 2255 Pet. ("the 2255 Memorandum" or "2255 Mem.") at 1 n.1). To be clear: the current habeas proceeding is not an ordinary civil matter governed by the Federal Rules of Civil Procedure. The clerks' office in this district assigns a supplemental civil docket number to a Section 2255 motion as a matter of administrative convenience; however, the Second Circuit has

## STATEMENT OF MATERIAL FACTS

**I.  ISSUES RELATING TO THE CARL ROTHENBERGER INTERVIEW**

    **A.  Pretrial Activity Involving Carl Rothenberger**

        1.      In July 2003, a grand jury issued a superseding indictment as to Petitioners John J. Rigas and Timothy J. Rigas on charges of conspiracy, securities fraud, wire fraud and bank fraud in connection with their actions and omissions involving Adelphia Communications Corporation ("Adelphia").   *See* App. 1, Indictment; App. 58, *United States v. Rigas*, 02-cr-1236 (S.D.N.Y), Docket.

        **Response:**  Not disputed.

        2.      In preparing for their criminal trial, Petitioners sought to interview Carl E. Rothenberger, a partner in the Pittsburgh law firm, Buchanan, Ingersoll & Rooney.   *See* App. 2, Lawrence McMichael Decl. ¶ 42; App. 3, Bernard Preziosi Decl. ¶ 3 & Ex.1, Ex. A at 5-6 (adopting Affidavit of Peter Fleming); App. 4, Timothy Rigas Decl. ¶ 59.

        **Response:**  Not disputed to the extent the information provided in the declarations cited is true and accurate.

---

repeatedly made clear that a Section 2255 motion is a motion filed in the criminal case, and not a new civil action.   *See, e.g.*, *United States v. Clark*, 984 F.2d 31, 33 (2d Cir. 1993); *Williams v. United States*, 984 F.2d 28, 30 (2d Cir. 1993); *see also* Advisory Committee Notes to Rule 1 of the Rules Governing Section 2255 Proceedings (on adoption of Rules: "a motion under § 2255 is a further step in the movant's criminal case and not a separate civil action").   As such, while the Government is responding to Petitioners' Amended Statement pursuant to Local Federal Rule of Civil Procedure 56.1 at the Court's direction and for the Court's convenience, the Government does not concede that Petitioners' Section 2255 Motion is properly considered under Federal Rule of Civil Procedure 56.

3.      Mr. Rothenberger had served as the long-time outside securities counsel for Adelphia and for the Rigas Family.   *See* App. 3 at ¶ 3; App. 4 at ¶ 58; Trial Tr.1 1416-17 (testimony of Dennis Coyle).

**Response:**   Not disputed to the extent the information provided in the declarations cited is true and accurate.

4.      Mr. Rothenberger had been involved in many of the disclosures and transactions that would be at issue in the trial.   *See* App. 3 at ¶ 3; App. 4 at ¶ 58.

**Response:**   Not disputed to the extent the information provided in the declarations cited is true and accurate.

5.      Mr. Rothenberger refused to be interviewed by defense counsel.   *See* App. 2 at ¶ 42; App. 3 at ¶ 3; App. 4 at ¶ 59.

**Response:**   Not disputed to the extent the information provided in the declarations cited is true and accurate.

6.      The May 2002 Form 8-K that Adelphia issued immediately following the Petitioners' ouster from Adelphia implicitly blamed the Petitioners for the matters under investigation by the Special Committee of Adelphia's Board of Directors, including relationships and transactions involving Adelphia and certain of its subsidiaries, and members of the Rigas family and entities controlled by the Rigas family.   *See* App. 5, Adelphia Communications Corp., Schedule 8-K (filed with the Securities and Exchange Commission on May 24, 2002).

**Response:**   The Government respectfully refers the Court to PX App. 5 for a full and accurate copy of Adelphia Communication Corporation's May 8, 2002 Form 8-K.

7.       On January 27, 2004, the government sent the Petitioners a list of witness statements that included memoranda of interviews of Carl Rothenberger conducted by counsel to Adelphia's Special Committee.   *See* App. 2 at ¶ 40; App. 59, Letter from U.S. Attorney to Defense Counsel (Jan. 27, 2004).

**Response:**   Not disputed to the extent the information provided in the declarations cited is true and accurate.

8.       On Feb. 24, 2004, the Government sent Petitioners a letter stating, "The Government writes to inform you that Carl Rothenberger, Esq. may be able to provide information that is favorable to the defense concerning the timber rights transaction discussed in the Government Bill of Particulars."   App. 3 at ¶ 4, Ex. 2 (Letter from U.S. Attorney to Defense Counsel (Feb. 24, 2004)).

**Response:**   Not disputed.

9.       That reference to timber rights involved an allegation that Petitioners had not properly reported a particular related party transaction.   Trial Tr. 2910-13 (testimony of Charles Raptis); Trial Tr. 4426-28 (testimony of James Helms).

**Response:**   Not disputed.

10.       Based on the February 24, 2004 letter, the Petitioners concluded that, aside from information about timber rights, any testimony Mr. Rothenberger would give was likely to be inculpatory.   *See* App. at 3 ¶¶ 3-4.

**Response:**   The Government does not dispute that it disclosed exculpatory information regarding the timber rights transaction, but with regard to the defense's understanding, the cited evidence more accurately indicates that the defense made a strategic decision not to call

Rothenberger as a witness at trial because "other information he provided to the Government would likely have been inculpatory of the Rigases," and the defense chose to avoid the "substantial risk" that Rothenberger would "testify adversely for whatever reason . . ."   (*See* PX App. 3, Preziosi Decl. ¶ 4; *Id.* at ¶ 4, Ex. 1 at 8-9 (Aff. of Peter Fleming Jr.)).[2]   The Government respectfully refers the Court to the language of the declarations for a full and accurate description of their contents.

11.      One of the defense lawyers has explained that for the Petitioners to call Mr. Rothenberger to the stand without knowing whether he would testify in a manner exculpatory of the Petitioners would have been unimaginable.   App. 3 at ¶¶ 3-4 & Ex. A (adopting Affidavit of Peter Fleming, ¶¶ 8-9).

**Response:**   The Government incorporates by reference its response to paragraph 10, *supra*.

12.      Based on the February 24, 2004 letter, "the defense determined not to call Mr. Rothenberger as a witness in the case," even though he was considered a "key witness."   *See* App. 3 at ¶¶3-4.

**Response:**   The Government incorporates by reference its response to paragraph 10, *supra*.

---

[2] To assist the Court in resolving the Rigases' claims, which are based in large part on self-serving excerpts and mischaracterizations of the record, the Government previously provided the Court with a complete copy of the trial transcript, as well as key exhibits and other court filings. The trial transcript, the Government's exhibits at trial, and the defendants' exhibits at trial, are cited herein as "Tr."; "GX"; and "DX," respectively.   Other exhibits to the Government's Appendix are cited herein as "GX App."   Exhibits to the Petitioners' Appendix are cited herein as "PX App."

13. During the course of the trial, Mr. Rothenberger's name was mentioned approximately 307 times (118 times during the testimony of Chris Thurner), but he was never called to testify. *See* ECF No. 142, full set of trial transcripts submitted by the government.

**Response:** The Government does not dispute that Mr. Rothenberger's name was mentioned frequently at trial and that he was not called to testify. However, this fact is irrelevant and immaterial to resolution of the 2255 Motion.

**B. The Government's Trial Comments on Advice of Counsel**

14. At trial, the government referred to the fact that the Petitioners had called no lawyers or auditors to support the defense claim that they had acted on the advice and instruction of counsel. Trial Tr. 10602-06.

**Response:** The Government disputes this statement to the extent it mischaracterizes the cited evidence. The Government respectfully refers the Court to the Trial Transcript at 10,602:12-10,607:1 for complete context surrounding the statement made during the Government's closing argument on June 17, 2004.

15. During closing arguments, the government told the jury, "They don't have a burden, but, ladies and gentlemen, you better believe that if there was a lawyer or accountant out there that had approved these transactions and said they were okay, we'd have seen them in this courtroom. You didn't see anything like that. So you have to think about if lawyers and accountants really approved or endorsed any of these transactions, why didn't you hear from any of them?" Trial Tr. 10606.

**Response:** The Government respectfully refers the Court to the Trial Transcript at 10,602:12-10,607:1 for more complete context surrounding the quoted statement made during

the Government's closing statement on June 17, 2004.   The Government otherwise does not

dispute that the quotation in this paragraph is accurate.

16.      The government also asked the jury, "If in fact these men really believed that any

of the lawyers or auditors approved or supported what went on and was charged to be illegal,

don't you think they would have called one of them as a witness in this trial?"   Trial Tr. 10605-

06.

**Response:**   The Government respectfully refers the Court to the Trial Transcript at

10,602:12-10,607:1 for more complete context surrounding the quoted statement made during

the Government's closing statement on June 17, 2004.   The Government otherwise does not

dispute that the quotation in this paragraph is accurate.

17.      The district court instructed the jury with regard to the charges of security fraud

and wire fraud that "[b]ecause an essential element of the crime charged is intent to defraud, it

follows that good faith on the part of defendant is a complete defense to the charge of securities

fraud."   Trial Tr. 11338; *see also* Trial Tr. 11348.

**Response:**   Not disputed.

**C. The Convictions, Appeal, Sentencing**

18.      On July 15, 2004, Petitioners were convicted of all charges, with the exception of

the wire fraud charges.   *See* App. 9, Verdict Form.

**Response:**   Not disputed.

19.      The verdict form was broken down by counts tied to specific security issuances,

and the jury was not asked to reveal the specific conduct it had found supported each individual

count.   App. 6.

**Response:**   The Government respectfully refers the Court to PX App. 6 for a full and accurate copy of the verdict form.   The Government does not dispute that, with respect to each of the substantive securities fraud counts charged in Counts Two through Sixteen, the verdict form referred to securities fraud "in Connection with the Purchase or Sale of" a particular securities or classes of securities.

20.     For example, with regard to one of the counts, the verdict form asked whether the jury found the Petitioners guilty for "securities fraud in connection with the purchase or sale of Adelphia 9.25% Senior Notes due 10/1/02."   App. 6 at Count Seven.

**Response:**   The Government respectfully refers the Court to PX App. 6 for a full and accurate copy of the verdict form.   Not disputed with respect to the quoted language from Count Seven.

21.     As to each count, the jury was asked whether the Petitioners had (1) "[e]mployed a device, scheme or artifice to defraud," (2) "[m]ade an untrue statement of a material fact or omitted to state a material fact which made what was said, under the circumstances, misleading," and (3) "[e]ngaged in an act, practice or course of business that operated, or would operate, as a fraud or deceit upon a purchase or seller."   App. 6 at Count Seven.

**Response:**   The Government respectfully refers the Court to PX App. 6 for a full and accurate copy of the verdict form.   The Government does not dispute that, with respect to each of the substantive securities fraud counts charged in Counts Two through Sixteen, the verdict form requested the jury to indicate "[b]y which of the following methods do you find that the defendant you are considering committed securities fraud.   Please check all that apply" and that this language was followed by the language quoted by the Petitioners above.

9

22.     At trial, the government did not relate particular omissions or disclosures to particular purchases or sales of securities for purposes of the securities fraud charges (Counts Two through Sixteen of the Indictment), arguing instead that the various fraudulent misrepresentations and/or omissions affected the public markets with respect to later sales of Adelphia's securities.   *See, e.g.*, Trial Tr. 10449-51, 10469-70 (Government's Closing Argument).

**Response:**   The Government disputes this statement as a misleading and incomplete characterization of the record.   The Government respectfully refers the Court to the Trial Transcript at 10,424-10,502 and 10,534-10,681 for more complete context surrounding the Government's closing statement on June 16-17, 2004.

23.     The U.S. Court of Appeals for the Second Circuit affirmed the convictions, with the exception of one bank fraud count.   *See* App. 7, *United States v. Rigas*, 490 F.3d 208, 211-12 (2d Cir. 2007).

**Response:**   Not disputed.

24.     Petitioners were resentenced based on the reversal of the one bank fraud count.

**Response:**   Not disputed.

25.     Petitioner John Rigas was sentenced to 12 years in prison and Petitioner Tim Rigas was sentenced to 17 years in prison.   *See* App. 8 at 113.

**Response:**   Not disputed.

**D. Post-Trial Developments Regarding Carl Rothenberger**

26.     Following the criminal trial, the Petitioners learned from the civil deposition testimony of Carl Rothenberger that Mr. Rothenberger had spoken with the government prior to

the criminal trial about some of the subjects involved in the charges against the Petitioners.   *See* App. 2 at ¶¶ 41-47.

**Response:**   Disputed to the extent the cited appendix materials do not support the factual statements in this paragraph.   The Government does not dispute that Rothenberger was interviewed by the Government prior to trial.   The Government further contends that Petitioners provide no support or citation to admissible evidence for their statement, in reference to Rothenberger's civil deposition testimony, that Petitioners learned Rothenberger had "spoken with the government prior to the criminal trial about some of the subjects involved in the charges against the Petitioners."

27.     The Petitioners believed that Mr. Rothenberger provided exculpatory information relating to the Petitioners' criminal convictions during that deposition.   *See* App. 2 at ¶ 44.

**Response:**   The Government disputes this statement in its entirety as a legal conclusion and, therefore, improperly included in Petitioners' Statement.   The Government, in any case, for the reasons set forth in its opposition to Petitioners' 2255 Motion, disputes that any of Rothenberger's statements to the Government, beyond those regarding timber rights, were exculpatory of Petitioners.   The cited appendix material also does not support the factual statement in this paragraph, which is irrelevant and immaterial to resolution of the 2255 Motion.

28.     The Petitioners asked the government to disclose notes and information relating to its interview with Mr. Rothenberger.   *See* App. 2 at ¶ 48.

**Response:**   Not disputed to the extent the information provided in the declaration cited is true and accurate.

29.     The government acknowledged it had notes of its pre-trial interview of Mr. Rothenberger.  *See* App. 2 at ¶ 48.

**Response:**   Not disputed to the extent the information provided in the declaration cited is true and accurate.

30.     The government refused to tender the notes of the interview, indicating that Mr. Rothenberger had said nothing new in those depositions other than the disclosed timber rights information.  *See* App. 2 at ¶ 48.

**Response:**   The Government disputes Petitioners' characterization of conversations they had with the Government regarding Rothenberger's statements to the Government.   The Government, in any case, disputes that any of Rothenberger's statements to the Government, beyond those regarding timber rights, were exculpatory of Petitioners.   The Government does not dispute that its pretrial *Brady* disclosure with respect to Rothenberger disclosed that "Carl Rothenberger, Esq. may be able to provide information that is favorable to the defense concerning the timber rights transaction discussed in the Government's Bill of Particulars."  PX App. 3 at Preziosi Decl., Ex. 2.  That document speaks for itself.  The Government also does not dispute that no additional *Brady* disclosures were made concerning Rothenberger.

31.     The Petitioners then moved to compel the government to turn over its notes of the Rothenberger interview.  *See* App. 9, Memorandum of Law in Support of John Rigas and Timothy Rigas' Motion to Compel Production of Notes Taken During Government Interviews, at 1, ECF No. 395, *United States v. Rigas*, No. 02-Cr-1236 (S.D.N.Y. Dec. 6, 2007).

**Response:**   Not disputed as to the Motion to Compel excerpted at PX App. 9.

32.     The Petitioners did not claim to have direct evidence at that time that Mr.
Rothenberger had disclosed exculpatory evidence in the interview.   *See* App. 9 at 1.

**Response:**   Not disputed that the Petitioners did not claim, in the pages excerpted from
the Motion to Compel at PX App. 9, to have direct evidence that Rothenberger had disclosed
exculpatory evidence in the interview.   However, the Government disputes this statement in its
entirety as a legal conclusion and, therefore, improperly included in Petitioners' Statement.   The
Government, in any case, disputes that any of Rothenberger's statements to the Government,
beyond those regarding timber rights, were exculpatory of Petitioners.

33.     The Petitioners argued that given the exculpatory information contained in Mr.
Rothenberger's 2005 deposition testimony, and given the government's acknowledgment of the
2004 pre-trial interview, "[i]t strains reason to believe that Mr. Rothenberger provided absolutely
no exculpatory information regarding his involvement in the myriad of securities and related
party transactions on which he worked on behalf of Adelphia and the Rigases" in the course of
two days of interviews.   *See* App. 9 at 1.

**Response:**   Not disputed that the quoted language appears in the pages excerpted from
the Motion to Compel at PX App. 9.   However, the Government disputes this statement in its
entirety as a legal conclusion and, therefore, improperly included in Petitioners' Statement.   The
Government, in any case, disputes that any of Rothenberger's statements to the Government,
beyond those regarding timber rights, were exculpatory of Petitioners.

34.     The government opposed the requested disclosure order.   *See* App. 10,
Government's Memorandum of Law in Opposition to the Defendants' Motion to Compel

Production of Notes Taken During Government Interviews, at 1, ECF No. 400, United States v.

Rigas, No. 02-Cr-1236 (S.D.N.Y. Dec. 26, 2007).

**Response:**   Not disputed as to the contents of the Government's Memorandum of Law

in Opposition to the Defendants' Motion to Compel at PX App. 10..

35.     The Government told the district court that it had complied with its Brady

obligations, stating, "It has long been the law and practice in the Second Circuit that the

Government may fulfill its Brady obligations with respect to a particular witness by identifying

the witness to the defendant and indicating that the witness may have favorable information on a

particular subject."   App. 10 at 3.

**Response:**   The Government does not dispute that it adhered to the law and practice in

the Second Circuit with respect to its *Brady* obligations throughout Petitioners' trial and in

particular with respect to its pre-trial interview of Rothenberger.   Not disputed as to the contents

of the Government's Memorandum of Law in Opposition to the Defendants' Motion to Compel

at PX App. 10.

36.     Without reviewing the notes in question prior to issuing its ruling, the district

court denied the Petitioners' request for an order compelling the government to produce the

Rothenberger notes to the district court in advance of oral argument.   *See* App. 11, Brief for the

United States of America, at 130, *United States v. Rigas*, Nos. 08-3485-cr, et al., (2d Cir. Nov.

19, 2008).

**Response:**   Not disputed.

37.     The district court denied the Motion to Compel, holding that under the "essential

facts" doctrine, the government had no obligation beyond what it had disclosed.   App. 12, ECF

No. 401, *United States v. Rigas*, No. 02-cr-1236, 2008 WL 144824, at *1 (S.D.N.Y. Jan. 15, 2008).

**Response:**   Not disputed.

38.    The Petitioners appealed from that ruling.   App. 13, Joint Brief for Defendants-Appellants, at 106, *United States v. Rigas*, No. 08-3485-cr, et al. (2d Cir. 2008).

**Response:**   Not disputed.

39.    In that appeal, the Petitioners did not claim to have any direct evidence that Mr. Rothenberger had provided exculpatory information to the government in 2004.   *See generally* App. 13 at 104-05.

**Response:**   The Government disputes this statement as a legal conclusion to the extent it claims that Rothenberger had provided exculpatory information to the Government beyond information about the timber rights transaction and, therefore, this contention is improperly included in the Petitioners' Statement.   The Government, in any case, disputes that any of Rothenberger's statements to the Government, beyond those regarding timber rights, were exculpatory of Petitioners.   Moreover, the Government respectfully refers the Court to PX App. 13 at 104-05 for a true and accurate description of its contents, which the Government contends does not support Petitioners' statement that they *conceded* on appeal that they "necessarily only assum[ed]" the statements Rothenberger made to the Government were exculpatory, as Petitioners actually argued on appeal that Rothenberger had *in fact* "offered a vast amount of exculpatory evidence on various issues."   (PX App. 13 at 104-05).

40.    In its response, the government asserted that the Petitioners were engaged in "rank speculation."   App. 11 at 113.

15

**Response:**   Not disputed.

41.     The government stated:

> Appellants . . . urge this Court (as they urged Judge Sand below) to overlook this glaring deficiency in proof, to look instead at Rothenberger's civil deposition testimony—which occurred two years after his interview with the Government and one year after the criminal trial had concluded, in a proceeding in which the Government was not a party, with no specific testimony concerning what was said during the interview—and to divine from that testimony that some exculpatory information 'must have been' communicated to the Government. This temporal sleight-of-hand should not be tolerated.
>
> . . The Government is charged with the responsibility, in the first instance, of reviewing the information it obtains during the course of its investigation in order to comply with its obligations under Brady and cases like [Giglio v. United States], 405 U.S. 150 (1972). It takes this responsibility seriously, and it fully recognizes the potentially drastic remedies that exist for failure to abide by these constitutional obligations (e.g., reversal of a conviction). That compliance with these obligations is crucial to guaranteeing defendants fair trials, however, does not mean—as Appellants' arguments suggest—that the responsibility should be taken away from the Government and thrust upon the trial or appellate courts, particularly on the meager showing offered by Appellants here.

App. 11 at 121-22.

**Response:**   Not disputed.

42.     The government further stated that the Petitioners' speculation was "belied by the Government's clear representation in the district court that, apart from the information concerning the timber rights transactions, '[t]here is no other [Brady] material with respect to Rothenberger.'"   App. 11 at 123.

**Response:**   The Government does not dispute the quotations from previously filed materials are transcribed accurately.   The Government does not dispute that it adhered to the law

and practice in the Second Circuit with respect to its *Brady* obligations throughout Petitioners'

trial and in particular with respect to its pre-trial interview of Rothenberger.

43.     Throughout its brief, the government made similar representations to the Second

Circuit regarding its compliance with *Brady* and the absence of exculpatory material with respect

to Mr. Rothenberger.   *See, e.g.*, App. 11 at 116 n.*, 117, 121-24, 129.

**Response:**   The Government does not dispute that it adhered to the law and practice in

the Second Circuit with respect to its *Brady* obligations throughout Petitioners' trial and in

particular with respect to its pre-trial interview of Rothenberger.   The Government respectfully

refers the Court to PX App. 11 for a true and accurate description of the contents of the

Government's appellate brief.

44.     In addition, the government noted that Judge Sand had observed that "Appellants

'knew of Rothenberger's existence, his role at Adelphia, and the facts on which he could

[provide] testimony,' " and that the government did make disclosure regarding the timber rights

transaction.    App. 11 at 117.

**Response:**   The Government does not dispute that it adhered to the law and practice in

the Second Circuit with respect to its *Brady* obligations throughout Petitioners' trial and in

particular with respect to its pre-trial interview of Rothenberger.   The Government does not

dispute the accuracy of the quoted statement and respectfully refers the Court to PX App. 11 for

a true and accurate description of the contents of the Government's appellate brief.

45.     In its brief before the Second Circuit, the government did not advance the

essential facts doctrine as its primary argument, mentioning it only twice in the 22-page section

addressing the Motion to Compel.   *See* App. 11 at 119.

**Response:**   The Government disputes this statement as irrelevant and immaterial to resolution of the 2255 Motion.

46.     At oral argument, an Assistant United States Attorney began his arguments by stating, *"*[L]et me make one thing very clear right up front.   I have reviewed these notes personally, the Rothenberger notes.   I have discussed them with the postal inspector who took them and the Assistant United States Attorney who was present at the time of the interview and there is nothing exculpatory in those notes beyond the limited disclosure that was made concerning the timber rights transaction.   Full stop."

App. 14, Tr. of Oral Arg. At 12-13, *Rigas*, 583 F.3d 108 (No. 08-3485).

**Response:**   The Government disputes this statement as a misleading and incomplete characterization of the record.   In particular, Petitioners fail to reference a statement by the Assistant United States Attorney made directly following the quotation that is provided, which is that the trial transcript offered contemporaneous corroboration for the Assistant United States Attorney's statement:   "Judge Sand, at one point, asked whether the government would stipulate that appellants' use of co-borrowed facilities to purchase securities was disclosed to, among others, the Buchanan lawyers.   The AUSA responded at that time: We have been told by Mr. Rothenberger that he was not aware of that fact."   (*See* PX App. 14, Tr. of Oral Arg. at 13, *Rigas*, 583 F.3d 108 (No. 08-3485)).   The Government otherwise does not dispute the accurate transcription of the quoted statement from the oral argument before the Second Circuit.

47.     The Second Circuit affirmed the denial of the Motion to Compel.   *See* App. 8, *Rigas*, 583 F.3d at 125-26.

**Response:**   Not disputed.

18

48.     In affirming the denial of the Motion to Compel, the Second Circuit stated, "We detect no error in the District Court's January 15, 2008 Order denying defendants' motion to compel discovery."   App. 8 at 126.

**Response:**   Not disputed.

**E.  The Pennsylvania Proceedings**

49.     In addition to the charges in this case, the Rigases faced related tax fraud charges in the Middle District of Pennsylvania, beginning in 2005.   App. 15, *United States v. Rigas*, 779 F. Supp. 2d 408, 414 (M.D. Pa. 2011).

**Response:**   Not disputed.

50.     During April 2011 pre-trial proceedings in that case, the district court relied on the Petitioners' assertion that Mr. Rothenberger had been unwilling to be interviewed by the defense in finding that the information in the notes of the Rothenberger interviews was unavailable to them.   App. 15 at 413-14.

**Response:**   Not disputed.

51.     The district court stated that it did not "accept the Government's assertion that the Defendants have equal access to Rothenberger, which then eliminates any potential Brady obligation."   App. 15 at 414.

**Response:**   Not disputed.

52.     The district court concluded that "in view of [Mr.] Rothenberger's significant role in Adelphia and in the questioned transactions . . . the notes of his interviews could very well contain exculpatory information that may be of use to the Rigases at trial."   App. 15 at 414.

**Response:**   Not disputed.

19

53.     Accordingly, the district court ordered "the Government to release any and all notes of interviews it conducted with [Mr.] Rothenberger."   App. 15 at 414.

**Response:**   Not disputed.

54.     In compliance with that order, the government disclosed seven pages of notes taken by Postal Inspector Thomas Feeney ("Feeney Notes").   App. 17.

**Response:**   Not disputed.

55.     Shortly after the notes were produced, the Government dropped its charges against the Rigases in the Pennsylvania case (after having pursued those charges for close to ten years).   *See* App. 16, Order, *United States v. Rigas*, No. 4:05-CR-402 (M.D. Pa., Jan. 26, 2012); App. 55, Gov't Production of Documents, *United States v. Rigas*, No. 4:05-CR-402 (M.D. Pa., June 6, 2011).

**Response:**   The Government disputes this statement as irrelevant and immaterial to resolution of the 2255 Motion.   Moreover, Petitioners mischaracterize the reasons why the Government dismissed the tax fraud charges in Pennsylvania.   According to the Order cited by Petitioners in support of this contention, the Government did not drop the charges because of insufficient evidence to prove the tax fraud charges or because of any concerns arising from the production of the Rothenberger notes, but because the prosecutors in the Pennsylvania case had concluded that any conviction of the Rigases would not result in substantial, additional prison time, and, as such, any tax evasion violations were better addressed through remedies available to the IRS.   (*See* PX App. 16, Order at 2, *United States v. Rigas*, No. 4:05-CR-402 (M.D. Pa., Jan. 26, 2012)).

**F.  This Court Orders That Other Notes Be Disclosed**

20

56.     In 2015 and 2016, this Court ordered disclosure of four additional sets of materials memorializing what was said at the Government's February 20, 2004 interview of Mr. Rothenberger.   *See* ECF No. 87, Order (Aug. 25, 2015); ECF No. 114, Opinion and Order (August 24, 2016).[3]

**Response:**   Not disputed.

57.     One of the items the Court ordered disclosed was a memorandum by J. Alan Johnson, who attended the meeting as counsel for Buchanan Ingersoll ("Johnson Memorandum").   App. 18 (mailed to counsel in conjunction with ECF No. 87, Order (Aug. 25, 2015)).

**Response:**   Not disputed.

58.     Another item the Court ordered disclosed was a summary of the meeting produced by P. Jerome Richey, a Buchanan Ingersoll partner ("Richey Notes").   App. 19 (mailed to counsel in conjunction with ECF No. 87, Order (Aug. 25, 2015)).

**Response:**   Not disputed.

---

[3] Throughout their 2255 Memorandum and Statement, Petitioners cite to additional notes memorializing the Government's pre-trial interview of Rothenberger.   (*See* PX App. 20 (Johnson Memorandum); PX App. 21 (Richey Notes); PX App. 22 (McLaughlin Notes); PX App. 23 (McLaughlin Memorandum)).   While these other notes may be relevant to the extent that they corroborate or otherwise inform the meaning of the notes taken by the Government, because these notes were drafted by third parties, may not have been contemporaneous to the interview, and were not in the Government's possession prior to or at the time of trial, the Government had no *Brady* obligations with respect to these notes.   As such, the only notes to which the Government's *Brady* obligations would have even arguably attached are the Government notes of the Rothenberger interview.   As explained throughout, the Rothenberger interview—as documented in the Government notes—contained no materially exculpatory information that the Government would have been required to disclose under *Brady*.

59.     The Court also ordered disclosure of notes taken by Patrick M. McLaughlin, who attended the meeting as counsel for Carl Rothenberger ("McLaughlin Notes").   App. 20 (mailed to counsel in conjunction with ECF No. 114, Opinion and Order (August 24, 2016)).

**Response:**   Not disputed.

60.     In addition, the Court ordered disclosure of a Memorandum by Patrick McLaughlin with modifications to the Johnson Memorandum ("McLaughlin Memorandum"). App. 21 (mailed to counsel in conjunction with ECF No. 87, Order (Aug. 25, 2015)).

**Response:**   Not disputed.

61.     The McLaughlin Notes contain a reference, "CR [Carl Rothenberger] is an important witness. Need to meet again."   App. 20 at 10 (McLaughlin Notes).

**Response:**   The Government does not dispute that the quoted language appears in PX App. 20 at 10.

62.     A second set of McLaughlin notes that the government turned over memorialized AUSA Christopher Clark's October 25, 2004 interview of Mr. Rothenberger ("McLaughlin October Notes").   App. 22 (mailed to counsel in conjunction with ECF No. 114, Opinion and Order (August 24, 2016)).

**Response:**   The Government does not dispute the notes that appear at PX App. 22.

63.     The "Closing Remarks" section of the McLaughlin October Notes states, "BI [Buchanan Ingersoll] 'fucked up' " and "nothing worse than me (Clark) coming after you!'" App. 22 at 16.

**Response:**   The Government does not dispute that the quoted language appears in PX App. 22 at 16.   That document speaks for itself.

22

**G. Trial Evidence Relating to the *Brady* Issue Involving Mr. Rothenberger**

64.    The Rigas family privately owned a group of Managed Entities, for which
Adelphia provided certain management services in return for a fee.   *See* Trial Tr. 4129-32
(testimony of James Helms); Trial Tr. 917, 1128-29, 1142, 1360 (testimony of Dennis Coyle).

**<u>Response:</u>**   The Government disputes this statement to the extent Petitioners
mischaracterize the evidence cited and because this statement is irrelevant and immaterial to the
2255 Motion.   With the exception of the cited testimony at Trial. Tr. 917, the trial testimony of
James Helms and Dennis Coyle fails to support Petitioners' contention that the Rigas Managed
Entities paid fees to Adelphia in exchange for management services.   To the contrary, as noted
by the Second Circuit at PX App. 7, the Petitioners "took over $200 million dollars from
Adelphia's Cash Management System for personal expenses" and obscured the missing money
"by the commingling of cash between Adelphia and the RMEs and the RNCEs."   *United States
v. Rigas*, 490 F.3d 208, 218.   The Second Circuit further stated that "Adelphia's financial
statements and annual reports did little to apprise shareholders of what the Rigas family owed
Adelphia."   *See id.*

65.    Adelphia accounted for the Managed Entities' funds held by Adelphia through its
Cash Management System ("CMS").   *See* Trial Tr. 4129-32 (testimony of James Helms).

**<u>Response:</u>**   The Government disputes this statement to the extent Petitioners
mischaracterize the evidence cited and because this statement is irrelevant and immaterial to the
2255 Motion.   As noted by the Second Circuit at PX App. 7, the Petitioners "took over $200
million dollars from Adelphia's Cash Management System for personal expenses" and obscured
the missing money "by the commingling of cash between Adelphia and the RMEs and the

23

RNCEs." *United States v. Rigas*, 490 F.3d 208, 218.   The Second Circuit further stated that "Adelphia's financial statements and annual reports did little to apprise shareholders of what the Rigas family owed Adelphia."   *See id.*

66.     The CMS accounted for these funds as Managed Entity funds.  *See* Trial Tr. 8379; Trial Tr. 8441-44, 8446-49, 8452-53, 8481, 8608-11 (testimony of Robert DiBella); App. 23, Gov't Trial Ex. 101, *United States v. Rigas*, No. 02-Cr-1236 (S.D.N.Y.), at 1.

**Response:**   The Government disputes this statement to the extent Petitioners mischaracterize the evidence cited and because this statement is irrelevant and immaterial to the 2255 Motion.   The Government further incorporates by reference its response to paragraph 65, *supra*.

67.     Starting in 1996, Adelphia and the Managed Entities arranged for borrowing facilities in which Adelphia and various Managed Entities were "co-borrowers."   *See* App. 24 at 1-2 (Minutes of March 13, 1996 Meeting of the Adelphia Board of Directors); Trial Tr. 968, 1151-52, 1278-84 (testimony of Dennis Coyle).

**Response:**   The Government does not dispute the statement to the extent it claims that Adelphia and certain Rigas Managed Entities entered into several co-borrowing facilities starting in 1996, an example of which was the Chelsea Credit facility, which was approved by the Adelphia Board on March 13, 1996.

68.     This co-borrowing was done with approval of the Adelphia Board.   *See* App. 24 at 1-4; Trial Tr. 968, 1153, 1278-80, 1512 (testimony of Dennis Coyle).

**Response:**   The Government does not dispute the statement to the extent it claims that Adelphia and certain Rigas Managed Entities entered into the Chelsea Credit facility, which was

approved by the Adelphia Board on March 13, 1996.   Otherwise the Government disputes this statement as vague and because this statement is irrelevant and immaterial to the 2255 Motion.

69.     These various co-borrowing facilities allowed either Adelphia or the Managed Entities to tap into shared lines of credits.   *See* Trial Tr. 1151-52, 1278-84 (testimony of Dennis Coyle).

**Response:**   The Government disputes this statement to the extent Petitioners mischaracterize the evidence cited and because this statement is irrelevant and immaterial to the 2255 Motion.

70.     At times, the co-borrowing facilities allowed Adelphia to use the extra borrowing power made available by the Managed Entities' involvement.   Trial Tr. 1151-52 (testimony of Dennis Coyle); Trial Tr. 7172-73 (testimony of James Brown).

**Response:**   The Government disputes this statement to the extent Petitioners mischaracterize the evidence cited and because this statement is irrelevant and immaterial to the 2255 Motion.

71.     At other times, the co-borrowing facilities provided the Managed Entities sufficient liquidity to purchase Adelphia shares alongside the public.   *See* App. 25, Paul Grand Decl., Ex. A (1999 Memorandum by James Brown to the Adelphia Board at A22340514), Ex. B (1998 Memorandum by Bruce Booken to Adelphia Board at BIPC2677606).

**Response:**   The Government disputes this statement to the extent Petitioners mischaracterize the evidence cited and because this statement is irrelevant and immaterial to the 2255 Motion.

72.     It had been explained to the Board that Rigas family participation in purchases of stock offerings was a "public vote of confidence of the family in the company."   Trial Tr. 1042, 1066-67 (testimony of Dennis Coyle).

**Response:**   The Government disputes this statement to the extent Petitioners mischaracterize the evidence cited and because this statement is irrelevant and immaterial to the 2255 Motion.   Further, the Government disputes, as argumentative and unsupported by the cited evidence, the contention that the Rigases' purchases of Adelphia shares or maintenance of controlling ownership of Adelphia was "a public vote of confidence," as the evidence at trial demonstrated that the Rigases' criminal conduct, including that relating to share purchases, led to the downfall and ultimate bankruptcy of Adelphia.

73.     In addition, as a condition of several loans to Adelphia, some banks insisted the Rigas family maintain controlling ownership of Adelphia, which required they purchase some new shares as new shares were issued.   Trial Tr. 1436-40 (testimony of Dennis Coyle); *see also* App. 7 at 213-14.

**Response:**   The Government disputes these statements to the extent Petitioners mischaracterize the evidence cited and because these statements are irrelevant and immaterial to the 2255 Motion.   Petitioners also fail to cite to any admissible evidence to support their statement that "as a condition of several loans to Adelphia, some banks insisted the Rigases maintain controlling ownership of Adelphia, which required they purchase some new shares as new shares were issued."

26

74.     Within Adelphia, records were kept of how much of the joint credit facility Adelphia was drawing down and how much the Managed Entities were drawing down.   *See* Trial Tr. 8494-96 (testimony of Robert DiBella).

**Response:**   Not disputed.

75.     Internally at Adelphia, the amounts borrowed by Adelphia under the co-borrowing agreements were recorded in a certain account, while amounts borrowed by the Managed Entities under the co-borrowing agreements were recorded by Adelphia as drawn down by the Managed Entities.   *See* Trial Tr. 7066-67 (testimony of James Brown).

**Response:**   Not disputed, but this statement is incomplete and misleading, as Adelphia was jointly and severally liable for the amounts that the Managed Entities drew down from the co-borrowing facilities.   (*See, e.g.*, Trial Tr. 6787:3-18).

76.     Judge Sand charged the jury that the co-borrowing agreements were "not alleged in this case to be in and of themselves illegal. . . .   However, the government contends that the defendants fraudulently failed to disclose the amount of coborrowing debt on the books of Rigas family owned entities and fraudulently failed to disclose how the coborrowing facilities were used in connection with Rigas family purchases of Adelphia securities."   Trial Tr. 11399.

**Response:**   The Government does not dispute that Judge Sand used the quoted language in his jury charge.

77.     The draw down amounts—whether being borrowed for the sake of Adelphia or one of the Managed Entities—were generally deposited in Adelphia accounts with Managed Entities funds subsequently reclassified to the Managed Entities.   *See* Trial Tr. 7067 (testimony of James Brown).

**Response:**   Disputed to the extent this statement is not supported by the cited trial testimony.   As such, Petitioners fail to cite to admissible evidence to support this statement.

78.     One of the various allegations against the Petitioners involved the claim that they committed fraud in connection with the co-borrowing activities—particularly in relation to Managed Entities' use of co-borrowed funds to purchase Adelphia shares.   Trial Tr. 10441, 10485-86 (Government's Closing Argument).

**Response:**   The Government does not dispute this statement except to the extent that it is misleading or incomplete as to the nature of the Government's allegations.   As set forth in the Superseding Indictment and exhaustively outlined by the Second Circuit, the conduct underlying the charges brought against the Rigases included, but was not limited to the Rigas family's fraudulent stock purchases, the Rigases fraudulently representing Adelphia's operating performance, the Rigases defrauding Adelphia's bank lenders, and the fraudulent looting of Adelphia's cash management system of over $200 million dollars for personal expenses of the Rigases.   (*See generally United States v. Rigas*, 490 F.3d 208, 212-218 (2d Cir. 2007)).

79.     The government treated the purchase of $375 million in Adelphia shares in 2000 (purchased in 1999; closed in 2000) by a Managed Entity as a representative example of these transactions.   Trial Tr. 10485-86, 10545 (Government's Closing Argument); App. 26 (Gov't Trial Ex. 4710-A at 15).

**Response**:   The Government does not dispute this statement except to the extent that it is misleading or incomplete as to the nature of the Government's allegations.   As set forth in the Superseding Indictment and exhaustively outlined by the Second Circuit, the conduct underlying the charges brought against the Rigases included, but was not limited to the Rigas family's

fraudulent stock purchases, the Rigases fraudulently representing Adelphia's operating performance, the Rigases defrauding Adelphia's bank lenders, and the fraudulent looting of Adelphia's cash management system of over $200 million dollars for personal expenses of the Rigases.   (*See generally United States v. Rigas*, 490 F.3d 208, 212-218 (2d Cir. 2007)).

80.     In January 2000, a Managed Entity drew down $368 million through a co-borrowing facility, which funds were credited to an account of an Adelphia subsidiary.   *See* Trial Tr. 4363-68, 4571-73 (testimony of James Helms); Trial Tr. 6778-80 (testimony of James Brown).

**Response**:   The Government disputes this statement to the extent Petitioners mischaracterize the evidence cited.   The Government does not dispute this statement to the extent that it claims that to consummate a January 21, 2000 stock purchase, Adelphia's fully-owned subsidiary UCA Corporation borrowed $368 million from a co-borrowing facility and sent only $136 million to Adelphia.   *See* Tr. 6777-88; GX App. GG (GX 11164AR).   The remaining $232 million was immediately returned to the co-borrowing facility.   *See* Tr. 6777-88; GX App. GG (GX 11164AR).

81.     At trial, Petitioners argued in their defense, and based on their questions to the government's witnesses, that (a) all disclosures at issue complied with the relevant laws and rules; (b) almost all of the disclosures at issue had been handled by others at Adelphia, without Petitioners' involvement; and (c) everyone at Adelphia reasonably relied on the counsel of their lawyers and auditors, and thus, even if the jury were to find irregularities, there was never any intent to defraud.   *See* Trial Tr. 678, 689-90, 698-702 (J. Rigas Opening Statement); Trial Tr. 716, 724-26 (T. Rigas Opening Statement); 10652-53, 10662-63, 10698-99 (J. Rigas Closing

Argument); 10747, 10771-73 (T. Rigas Closing Argument); *see also* Trial Tr. 1359, 1419-20, 1427, 1430, 1452-53 (testimony of Dennis Coyle).

**Response**:  Not disputed.

**H. The 13-D Allegations**

82.     The Petitioners filed a Schedule 13-D ("Beneficial Ownership Report") relating to their January 2000 acquisitions of Adelphia shares through several transactions.   App. 26.

**Response:**  Not disputed.

83.     That form indicated that "affiliate borrowings" were the source of the funds paid for the $375 million transaction that closed in January 2000, and "personal funds" were the source of some other acquisitions.

**Response:**  The Government respectfully refers the Court to PX App. 26 for a true and complete statement of the contents of the Schedule 13-D filed in connection with the January 21, 2000 Adelphia stock purchase.   Otherwise, not disputed.

84.     The Government argued at trial that this description was fraudulent because it failed to disclose that the "affiliate borrowings" came from Adelphia (*i.e.*, from the co-borrowing facility the Managed Entities shared with Adelphia—which the Government argued should be treated as Adelphia funds).   *See generally* Trial Tr., App. 35, at 6765-73 (James Brown).

**Response:**  Not disputed.

85.     The government contended that "when the Rigases borrowed money under those facilities, Adelphia was just as liable as the Rigases were to pay the banks back.   And when the Rigases gave Adelphia coborrowed money for stock, Adelphia really got nothing because it was

liable to the banks to pay that money back."   Trial Tr. 10537-38 (Government's Closing Argument).

**Response:**   Not disputed that the quoted language is an accurate quotation from the Government's closing argument at trial.

86.     The government also argued that Adelphia was the source of the funds for the Adelphia stock purchases by the Managed Entities because Adelphia was joint and severally liable for the co-borrowed funds, which were deposited into Adelphia's accounts, and the Managed Entities did not give Adelphia additional funds for the stock purchases.   Trial Tr. 10441-42, 10474-75, 10534-36 (Government's Closing Argument).

**Response:**   The Government does not dispute this statement except to the extent that it is misleading or incomplete as to the nature of the Government's closing arguments with respect to the securities purchases that the Rigas family made between 1999 and 2002.   The Government respectfully refers the Court to the Trial Transcript at 10,424-10,502 and 10,534-10,681 for the complete and accurate representation of the Government's closing statement on June 16-17, 2004.

87.     The Government presented the testimony of Chris Thurner, who had worked for John Rigas (and was testifying pursuant to a non-prosecution agreement).   Trial Tr. 3220-22 (testimony of Chris Thurner).

**Response:**   Not disputed.

88.     Mr. Thurner acknowledged that he worked on providing some information to Mr. Rothenberger regarding the 13-Ds.   Trial Tr. 3284-85, 3654 (testimony of Chris Thurner).

**Response**:   Not disputed.

89.    On cross examination, Mr. Thurner further acknowledged that Mr. Rothenberger had incorporated his recommended changes to a Schedule 13-D that Mr. Rothenberger had drafted.    Trial Tr. 3632-38 (testimony of Chris Thurner).

**Response:**    The Government does not dispute this statement to the extent it refers only to the particular "recommended changes" discussed at Trial Tr. 3632:5 to 3638:23.

90.    On cross examination, Mr. Thurner acknowledged that he and Mr. Rothenberger prepared the Schedule 13-Ds by exchanging drafts and information until they were both satisfied that they had it right, the final was prepared and sent to the SEC for filing, and only then was a final version given to Michael Rigas for his signature.    Trial Tr. 3639 (testimony of Chris Thurner).

**Response:**    The Government disputes these statements to the extent they mischaracterize the evidence cited and are incomplete and misleading.

91.    Mr. Thurner explained that his role in preparing the 13-Ds during the relevant period was to provide information about the amounts of Rigas family stock holdings, and that the "only information regarding source of funds [he] would have provided to [Mr. Rothenberger] would be on any open market transactions by John Rigas in purchasing Adelphia securities through his brokerage accounts in the open market."    Trial Tr. 3654 (testimony of Chris Thurner).    *See also* Trial Tr. 3284-85, 3590 (Testimony of Chris Thurner).

**Response**:    The Government disputes this statement to the extent it mischaracterizes the evidence cited and is incomplete and misleading.    With respect to Chris Turner's role in the preparation of draft 13-Ds, Chris Thurner testified that he "primarily served as a second set of

eyeballs, so to speak, for Mr. Rothenberer to review the information." *See* Tr. 3654. The Government otherwise does not dispute that the quotation in this paragraph is accurate.

92.     On cross-examination, James Helms reviewed a Schedule 13-D shown by defense counsel and stated he did not know who prepared the Schedule 13-D but acknowledged that Carl Rothenberger was the person authorized to receive the notices of communications for the 13-D. Tr. 4705-07 (testimony of James Helms).

**Response**:   The Government disputes this statement to the extent it mischaracterizes the evidence cited and is incomplete and misleading.   James Helms testified that he did not know who had drafted the particular Schedule 13-D discussed at Trial Tr. 4705 to 4707.   Mr. Helms also testified that on page 2 of GX 4710H, Mr. Rothenberger was listed as a person authorized to receive notices of communications for that particular Schedule 13-D.   *See* Trial Tr. 4707.

93.     On cross-examination, James Brown testified that he was not involved in drafting or reviewing 13-D filings but was told that Carl Rothenberger was involved in that process.   Tr. 7394 (testimony of James Brown).

**Response**:   Not disputed.

94.     With regard to the Section 13-D allegation, the government told the jury:

But it says "the source of the purchase price paid for each of these acquisitions was the respective personal or partnership funds or affiliate borrowings of each of such persons."

Well, I guess it's true that this was an affiliate borrowing, because they took the money from Adelphia. But don't you think Adelphia's shareholders would have liked to have known that the affiliate being talked about here was actually Adelphia? Because you've learned during this trial that there are hundreds of Rigas affiliates, and not necessarily all of them are Adelphia companies. So this disclosure didn't tell Adelphia's shareholders the one thing they needed to know about this transaction, that the Rigases took the cash from Adelphia to buy this stock.

Ladies and gentlemen, this is a good example of a half-truth. It's technically true. I guess it was an affiliate borrowing. But it leaves out the most important information that the person reading this needs to know, that that affiliate was Adelphia. And it shows you how a half-truth can be just as misleading as an outright lie, because this gives you no more information about the Rigas family taking this money from Adelphia than did the outright lie about using personal funds in the previous Form 13-D. Half-truths are misstatements under the securities laws, just like outright lies are, when they're meant to fool people. And this statement, which is a clever way of trying to skirt the issue and say affiliate borrowings, is one of those half-truths.

Trial Tr. 10485-86; *see also* Trial Tr. 10545 (Government's Closing Argument).

**Response**:   Not disputed that the quoted language is an accurate quotation from the Government's closing argument at trial.

95.      In its closing argument, the government stated with regard to a similar 13-D, "[K]nowing that this transaction was not fair to Adelphia, that it was wrong, and that it couldn't be justified, these men lied about where the money came from, and they hid the truth about this transaction from Adelphia shareholders. And we can see that if we look at Government's Exhibit 4710A [the 13-D involving the January 2000 $375 million stock purchase]....   This form 13D was false, it was untrue, and it was not correct."   Trial Tr. 10474-77 (Government's Closing Argument).

**Response**:   The Government disputes this statement as the quotation omits over one page of relevant testimony from the trial transcript, thereby mischaracterizing the evidence and taking it out of context. Where the ellipses are located, the prosecutor discusses the 13-D violations in detail, including the fact that Michael Rigas signed a document acknowledging a reasonable inquiry of the Schedule 13-D contents, in addition to testimony given by James Helms that the funds for the shares came from Adelphia.   The Government respectfully refers

the Court to the full trial transcript at Tr. 10,473:17-10,478:3.   Furthermore, the Government disputes the statement's characterization of the quotation from the Government's closing statement as a discussion of "a similar 13-D" as vague and out of context.

96.    In its closing argument, the government continued, "How hard would it have been to simply say in this document, We got the cash from Adelphia?   It would have been one sentence.   It wouldn't have made it any longer or more complicated.   The reason it's not in here is because these men knew it was wrong.   They knew it was wrong because it's wrong to take other people's money, and they knew it was wrong because they were told it was wrong."   Trial Tr. 10477-78 (Government's Closing Argument).

**Response**:   Not disputed that the quoted language is an accurate quotation from the Government's closing argument at trial.

97.    The Feeney Notes memorializing Mr. Rothenberger's pre-trial interview with the government stated, with regard to the 13-Ds and the "[s]ource and amount of funds":

-need to describe source-if from borrowing need to ID parties lending $

"affiliate borrowings"- Identify? No, not by name - general description

App. 17 at 2 (Feeney Notes).

**Response**:   The Government disputes this statement to the extent it takes out-of-context the plain language of the notes.   The Government respectfully refers the Court to the language of the Feeney Notes for a full and accurate description of their contents.   *See* PX App. 17.

98.    The Feeney Notes further stated the following about the pre-trial interview with Mr. Rothenberger on the subject of the 13-D:

Early draft sent to CT [Chris Thurner] w/blank in it for disclosure – sent that way if CER [Carl E. Rothenberger] did not know fact

-        Send e-mail

-        CT confirmed that "affiliate borrowing" accurate

-        CT lawyer? No

App. 17 at 2.

**Response**:   The Government disputes this statement to the extent it takes out-of-context the plain language of the notes.   The Government respectfully refers the Court to the language of the Feeney Notes for a full and accurate description of their contents.   *See* PX App. 17.

99.     The Feeney Notes also contained a line that states, "In line with 13D Rule? Yes." App. 17 at 2.

**Response**:   The Government disputes this statement to the extent it takes out-of-context the plain language of the notes.   The Government respectfully refers the Court to the language of the Feeney Notes for a full and accurate description of their contents.   *See* PX App. 17.

100.     The McLaughlin Notes recorded part of the conversation as follows:

Affiliate borr was accurate

*     *     *     *     *

Why think sufficient?

"Accurate statement"

App 20 at 7 (McLaughlin Notes).

**Response**:   The Government disputes this statement as a misleading, out-of-context characterization of the plain language of the notes and one that improperly claims McLaughlin Notes reflect a "recorded part of the conversation."   The Government refers the Court to the

36

language of the McLaughlin Notes for a full and accurate description of their contents.   *See* PX App. 20.

101.    According to the Richey Notes, Mr. Rothenberger further explained that he sent the 13-D document to Mr. Thurner, "who confirmed affiliate borrowing was accurate description. Carl [Rothenberger] was very busy at the time and he did not ask a lot of detail re: this." App. 19 ¶ 12 (Richey Notes).

**Response**:   The Government disputes this statement to the extent it takes out-of-context the plain language of the notes.   The Government respectfully refers the Court to the language of the Richey Notes for a full and accurate description of their contents.   *See* PX App. 19.

102.    Specifically, the Richey Notes stated, "13-D very focused inquiry re: source and amount of funds.   Use of word affiliate.   In '97 Carl was specific re: Salomon Brothers as source of funds.   But thereafter he was not specific.   Use of "affiliates" is ambiguous.   Carl sent this document to Thurner who confirmed affiliate borrowing was accurate description.   Carl was very busy at the time and he did not ask a lot of detail re: this.   Thurner was also the source of the 97 information."   App. 19 ¶ 12 (Richey Notes).

**Response**:   The Government disputes this statement to the extent it takes out-of-context the plain language of the notes.   The Government respectfully refers the Court to the language of the Richey Notes for a full and accurate description of their contents.   *See* PX App. 19.

103.    The Johnson Memorandum stated that Mr. Rothenberger stated that Mr. Thurner confirmed that "affiliates" was accurate.   Mr. Rothenberger said he "was very busy at the time and not spending a lot of time on this."   Mr. Rothenberger "did not ask if the borrowings were from Adelphia."   App. 18 ¶ 10 (Johnson Memorandum).

**Response**:   The Government disputes this statement to the extent it takes out-of-context the plain language of the notes.   The Government respectfully refers the Court to the language of the Johnson Memorandum for a full and accurate description of their contents.   *See* PX App. 18.

104.    None of the six sets of notes or memoranda indicated that Mr. Rothenberger stated that he worked with the Petitioners on the 13-Ds.   *See* App. 17 (Feeney Notes); App. 19 (Richey Notes); App. 18 (Johnson Memorandum); App. 20 (McLaughlin Notes); App. 21 (McLaughlin Memorandum); App. 22 (McLaughlin October notes).

**Response**:   The Government disputes this statement as a characterization of the plain language of the notes and one that implies there is significance to the absence of a note.   The Government respectfully refers the Court to PX App. 17, 18, 19, 20, and 21 for true and complete statements of each appendix exhibit's contents.

105.    None of the six sets of notes or memoranda indicated that Mr. Rothenberger stated that the Petitioners ever said anything misleading to him in relation to the 13-D.   *See* App. 17 (Feeney Notes); App. 19 (Richey Notes); App. 18 (Johnson Memorandum); App. 20 (McLaughlin Notes); App. 21 (McLaughlin Memorandum); App. 22 (McLaughlin October notes).

**Response**:   The Government disputes this statement in its entirety as immaterial and irrelevant to the 2255 Motion because Rothenberger would not have needed to know that he was misled in order to lack sufficient, material information to provide the Rigases with an advice of counsel defense regarding their public disclosures.   Here, for example, what matters for purposes of the 2255 Motion is that Rothenberger made clear to the Government that he did not

know that Petitioners used Adelphia funds or co-borrowed funds to buy Adelphia stock.   *See* PX

App. 17 at 3 (Feeney Notes).

106.    The government's Brady disclosure regarding Mr. Rothenberger's February 20,

2004 statements mentioned only a timber rights transaction and did not mention anything about

the 13-Ds.   *See* App. 3 at ¶ 4, Ex. 2.

**Response**:   The Government does not dispute that its pretrial *Brady* disclosure with

respect to Rothenberger disclosed that "Carl Rothenberger, Esq. may be able to provide

information that is favorable to the defense concerning the timber rights transaction discussed in

the Government's Bill of Particulars."   PX App. 3 at Preziosi Decl., Ex. 2.   That document

speaks for itself.   The Government also does not dispute that no additional *Brady* disclosures

were made concerning Rothenberger.   The Government, in any case, disputes that any of

Rothenberger's statements to the Government, beyond those regarding timber rights, were

exculpatory of Petitioners.

107.    Mr. Rothenberger attended and participated in Adelphia Board meetings in his

capacity as counsel to Adelphia.   *See, e.g.*, App. 27 at A-RA014975 (Adelphia Communications

Corporation Board of Directors Meeting Minutes of April 8, 1999); *id.* at A-RA015023

(Adelphia Communications Corporation Board of Directors Meeting Minutes of August 23,

1999); Trial Tr. 1079-81, 1091-92, 1416-17, 1425, 1427, 1430-33, 1438, 1453-54, 1487-89,

1507-08.

**Response**:   The Government does not dispute that Rothenberger attended certain board

meetings and reviewed certain matters coming before the Board.   The Government does dispute

that any of these facts are material to or relevant for the 2255 Motion.

39

108.    As Adelphia's outside counsel, Mr. Rothenberger reviewed matters coming before the Board and offered explanations regarding certain transactions and agreements to the Board.   *See, e.g.*, Trial Tr. 1091-92, 1613 (Coyle Testimony); App. 27.

**Response**:   The Government does not dispute that Rothenberger attended certain board meetings and reviewed certain matters coming before the Board.   The Government does dispute that any of these facts are material to or relevant for the 2255 Motion.

109.    Mr. Rothenberger told the government he generally understood Adelphia's handling of the Managed Entities' funds.   *See* App. 20 at 15 (McLaughlin Notes).

**Response**:   The Government disputes this statement as a misleading, out-of-context characterization of the plain language of the notes and one that improperly draws conclusions about the meaning or significance of the contents of the McLaughlin Notes, which is improper in a Rule 56.1 statement.   The Government respectfully refers the Court to the language of the McLaughlin Notes for a full and accurate description of their contents.   *See* PX App. 20.   The Government further disputes that these facts are material to or relevant for the 2255 Motion.

110.    Mr. Rothenberger informed the government that he understood that "all cash went into the CMS and the issue was how it would be accounted for later." App. 19 at ¶22 (Richey Notes).

**Response**:   The Government disputes this statement to the extent it characterizes and takes out-of-context the plain language of the notes.   The Government respectfully refers the Court to the language of the Richey Notes for a full and accurate description of their contents. *See* PX App. 19.   The Government further disputes that these facts are material to or relevant for the 2255 Motion.

111.    Mr. Rothenberger explained that he did not know that "private entities" could reach into the CMS and take Adelphia money.   App. 19 at ¶22 (Richey Notes).

**Response**:   The Government disputes this statement to the extent it characterizes and takes out-of-context the plain language of the notes.   The Government respectfully refers the Court to the language of the Richey Notes for a full and accurate description of their contents. *See* PX App. 19.   The Government further disputes that these facts are material to or relevant for the 2255 Motion.

112.    In 1999, James Brown (Adelphia's Vice President of Finance) wrote a memorandum to the Board describing a co-borrowing facility and explaining that "[t]he Rigas family intends to use the proceeds of this distribution to purchase equity securities from Adelphia."   App. 25, Paul Grand Decl. (Oct. 4, 2011), Ex. A.

**Response**:   The Government does not dispute that Brown wrote a memorandum to the Board regarding the co-borrowing facility.   The Government does dispute that any of these facts are material to or relevant for the 2255 Motion.

113.    On January 9, 1998, Bruce Booken (a partner at Buchanan Ingersoll) sent a one-page memorandum to Carl Rothenberger and Paula Zawadzki (another partner at Buchanan Ingersoll). App. 25 at ¶7, Ex. B.

**Response**:   Not disputed.

114.    That memorandum described a proposed transaction in which Adelphia would, through a letter of credit, guaranty some loans being taken by Managed Entities, a proposal he described as "primarily intended to provide liquidity to the Rigas family so that they can participate in future Adelphia stock offerings."   App. 25, Ex. B.

41

**Response**:   The Government does not dispute that such a memorandum was written and that the memorandum is quoted accurately.   The Government does dispute that any of these facts are material to or relevant for the 2255 Motion.

115.     A March 31, 1999 list of issues Mr. Rothenberger sent regarding the Class B sale of shares (which the Rigases planned to acquire) asked, "In terms of closing time, are there any other liquidity considerations other than the closing and funding of the new HHC/ACC/etc. [co-borrowing agreement]?"   App. 28, March 31, 1999 E-mail from Carl Rothenberger, at ¶ 12.

**Response**:   The Government disputes these statements in their entirety as immaterial and irrelevant to the 2255 Motion.   Although the Rigases claim in their 2255 Memorandum that these draft emails prove Rothenberger "actually knew" co-borrowed funds would be used to fund the January 21, 2000 stock purchase, the plain language of these draft emails suggest no such thing.   Moreover, it is not clear from the evidence cited whether Rothenberger in fact "prepared" the "Issues List for Class B Sale" document attached to the e-mail.

116.     The same question was asked in three separate e-mails sent on April 1, 1999.   *See* App. 28, April 1, 1999 (2:22 PM) E-mail from Carl Rothenberger, at ¶ 12; App. 28, April 1, 1999 (6:01 PM) E-mail from Carl Rothenberger, at ¶ 12; App. 28, April 1, 1999 (6:02 PM) E-mail from Carl Rothenberger, at ¶ 12.

**Response**:   The Government disputes these statements in their entirety as immaterial and irrelevant to the 2255 Motion.   Although the Rigases claim in their 2255 Memorandum that these draft emails prove Rothenberger "actually knew" co-borrowed funds would be used to fund the January 21, 2000 stock purchase, the plain language of these draft emails suggest no such

thing.   Moreover, it is not clear from the evidence cited whether Rothenberger in fact "prepared" the "Issues List for Class B Sale" attached to the emails.

117.    The Executive Summary of the proposal for bank funding of the co-borrowing facility that would fund the $375 million purchase of Adelphia securities by the managed entities stated: "The initial use of the proceeds from the new credit facility will be to repay existing indebtedness of UCA and HHC [an Adelphia subsidiary and a managed entity] and to make a distribution to the Rigas family. The Rigas family intends to use the proceeds of this distribution to purchase equity securities from Adelphia."   App. 29, Gov't Ex. 1552-A; *see also* Trial Tr. 6799-80 (testimony of James Brown).

**Response**:   The Government disputes this statement to the extent it mischaracterizes the evidence cited.   Otherwise not disputed that the statement reflects an accurate quotation from PX App. 29.

118.    During his February 20, 2004 pre-trial interview with the government, when Mr. Rothenberger was asked whether there was a discussion about the Rigas family's source of funding for the purchase, he responded, "may have been, do not recall."   *See* App. 17 at 1 (Feeney Notes).

**Response**:   The Government disputes this statement to the extent it characterizes and takes out-of-context the plain language of the notes.   The Government respectfully refers the Court to the language of the Feeney Notes for a full and accurate description of their contents. (*See* PX App. 17).

119.    According to the McLaughlin Notes, during his February 20, 2004 pre-trial interview with the government, when Mr. Rothenberger was asked about "[a]ny discussions on

how Rigases would fund these obligations," he responded that he did "not recall any specifics." App. 20 at 3 (McLaughlin Notes).

**Response**:  The Government disputes this statement to the extent it characterizes and takes out-of-context the plain language of the notes.  The Government respectfully refers the Court to the language of the McLaughlin Notes for a full and accurate description of their contents.  (*See* PX App. 20).

120.  According to the McLaughlin Notes, during his February 20, 2004 pre-trial interview with the government, Mr. Rothenberger stated regarding the source of funds that he had "[n]o recall that anyone told him from Co-B [co-borrowing] entity."  App. 20 at 10 (McLaughlin Notes).

**Response**:  The Government disputes this statement to the extent it characterizes and takes out-of-context the plain language of the notes.  The Government respectfully refers the Court to the language of the McLaughlin Notes for a full and accurate description of their contents.  (*See* PX App. 20).

121.  According to the Johnson Memorandum, during his February 20, 2004 pre-trial interview with the government, Mr. Rothenberger stated that he "did not know that purchases of Adelphia stock by Highland Holdings came from Adelphia and no one told him that the source of funds was from Adelphia bank accounts."  App. 18 at ¶ 11 (Johnson Memorandum).

**Response**:  The Government disputes this statement to the extent it characterizes and takes out-of-context the plain language of the notes.  The Government respectfully refers the Court to the language of the Johnson Memorandum for a full and accurate description of their contents.  (*See* PX App. 18).

122.    According to the Feeney Notes, the government asked Mr. Rothenberger, "what besides co-b drawdown could $375 M borrowings have been?" App. 17 at 3 (Feeney Notes).

**Response**:   The Government disputes this statement to the extent it characterizes and takes out-of-context the plain language of the notes.   The Government respectfully refers the Court to the language of the Feeney Notes for a full and accurate description of their contents. (*See* PX App. 17).

123.    At one point, a prosecutor told Mr. Rothenberger that Chris Thurner (who was cooperating with the government) "was sitting in Carl's chair yesterday." App. 20 at 7 (McLaughlin Notes).

**Response**:   The Government disputes this statement to the extent it characterizes and takes out-of-context the plain language of the notes.   The Government respectfully refers the Court to the language of the McLaughlin Notes for a full and accurate description of their contents.   *See* PX App. 20.   The implication that Mr. Rothernberger was aware that Chris Thurner was "cooperating with" the Government at that time is a characterization unsupported by the plain language of the cited notes.

**I.  Allegations Regarding Immediately Available Funds**

124.    The government also alleged that the Rigases were guilty of fraud because the cross receipts and documents connected to the 2000 purchase of Adelphia stock and some other purchases spoke of Adelphia receiving "immediately available funds" in return for the shares, and the Rigases never publicly disclosed that Adelphia had not received "immediately available funds" for the purchased shares.   *See* Trial Tr. 10452, 10497-500, 10534-45 (Government's Closing Argument).

**Response**:   The Government disputes these statements to the extent they mischaracterize the basis for the fraud charges related to the January 21, 2000 Adelphia stock purchase.   In particular, the fraud of which the Rigases were convicted was not premised on these false journal entries or cross-receipts, but on the Rigases' failure to publicly disclose that Adelphia had not received immediately available funds and that the funds Adelphia did receive were from a co-borrowing facility.

125.    The government contended that the transfer of the $375 million to Adelphia for the purchase of stock through the journal entries in 2000 did not meet that description because (a) no funds were actually wired, Adelphia recorded a receivable by journal entry; (b) the funds paid to Adelphia came from Adelphia's own subsidiary, not from the Managed Entity receiving the stock; and (c) immediately available funds, meaning cash, were not used to purchase the stock. *See* Trial Tr. 10496-500, 10534-45 (Government's Closing Argument).

**Response**:   The Government disputes these statements to the extent they mischaracterize the basis for the fraud charges related to the January 21, 2000 Adelphia stock purchase.   In particular, the fraud of which the Rigases were convicted was not premised on these false journal entries or cross-receipts, but on the Rigases' failure to publicly disclose that Adelphia had not received immediately available funds and that the funds Adelphia did receive were from a co-borrowing facility.

126.    In his February 20, 2004 pre-trial interview with the government, Mr. Rothenberger explained that his firm, Buchanan Ingersoll, had drafted the closing documents, Mr. Rothenberger understood that the Rigas Family received the shares, and Adelphia received

"$," meaning "imm[ediately] available funds."   App. 17 at 2 (Feeney Notes); App. 20 at 4 (McLaughlin Notes).

**Response**:   The Government disputes this statement to the extent it characterizes and takes out-of-context the plain language of the notes.   The Government respectfully refers the Court to the language of the Feeney Notes for a full and accurate description of their contents. (*See* PX App. 17).

127.   In response to a question as to why the "immediately available funds" language, which had not been used in connection with earlier purchases, was used in April 1999, Mr. Rothenberger stated that the April 1999 purchase "represented [a change] in [the] way RF [the Rigas Family] bought shares in connection w[ith] public offering."   App. 17 at 1 (Feeney Notes).

**Response**:   The Government disputes this statement to the extent it characterizes and takes out-of-context the plain language of the notes.   The Government respectfully refers the Court to the language of the Feeney Notes for a full and accurate description of their contents. (*See* PX App. 17).

128.   According to the Johnson Memorandum, after the government asked "why is the term 'immediately available funds' in a document and/or closing document that took place in mid 1999 but not in a previous letter or document in early 1999," Mr. Rothenberger responded, "that the conditions most likely changed. Carl [Rothenberger] said future transactions involved underwriters wanting the Rigas family to commit to buy 'side-by-side' with the public."   *See* App. 18 at ¶4 (Johnson Memorandum).

47

**Response**:   The Government disputes this statement to the extent it characterizes and takes out-of-context the plain language of the notes.   The Government respectfully refers the Court to the language of the Johnson Memorandum for a full and accurate description of their contents.   (*See* PX App. 18).

129.   According to the Johnson Memorandum, Mr. Rothenberger stated "his understanding of the term 'immediately available funds' meant that cash was immediately available and presumed transferred in connection with the sale of Adelphia stock."   App. 18 at ¶ 4 (Johnson Memorandum).

**Response**:   The Government disputes this statement to the extent it characterizes and takes out-of-context the plain language of the notes.   The Government respectfully refers the Court to the language of the Johnson Memorandum for a full and accurate description of their contents.   (*See* PX App. 18).

130.   According to the McLaughlin Memorandum, when asked how he understood the "immediately available funds" phrase, Mr. Rothenberger stated that it "usually means cash (although Carl [Rothenberger] indicated that he had not researched this precise issue and it could also mean other than just cash)."   App. 21 at ¶ 2 (McLaughlin Memorandum).

**Response**:   The Government disputes this statement to the extent it characterizes and takes out-of-context the plain language of the notes.   The Government respectfully refers the Court to the language of the McLaughlin Memorandum for a full and accurate description of their contents.   (*See* PX App. 21).

131.    According to the Feeney Notes, in his February 20, 2004 pre-trial interview with the government Mr. Rothenberger indicated "[n]ever consulted that cashless = immed avail funds."   App. 17 at 1 (Feeney Notes).

**Response**:   The Government disputes this statement to the extent it takes out-of-context the plain language of the notes.   The Government respectfully refers the Court to the language of the Feeney Notes for a full and accurate description of their contents.   (*See* PX App. 17).

132.    According to the Johnson Memorandum, in the February 20, 2004 pre-trial interview with the government, Mr. Rothenberger "was asked about whether cash changed hands, at the closing, in payment for Adelphia's stock. Carl's response was that it was supposed to have."   App. 18 at ¶3 (Johnson Memorandum).

**Response**:   The Government disputes this statement to the extent it characterizes and takes out-of-context the plain language of the notes.   The Government respectfully refers the Court to the language of the Johnson Memorandum for a full and accurate description of their contents.   (*See* PX App. 18).

133.    In connection with the January 2000 purchase of common stock by the Rigases, Adelphia journal entries recorded the $368 million the Managed Entities had drawn down as payment for the shares.   Trial Tr. 4363-68 (testimony of James Helms).

**Response**:   The Government disputes this statement in its entirety as misleading and inconsistent with the cited evidence.   Specifically, James Helms affirmed twice during his testimony that these internal journal entries were not "immediately available funds."   (Trial Tr. at 4363-70).

134.    The funds received from the lending group of banks was wired into an Adelphia

subsidiary's [UCA] bank account and accounted for by the CMS.   *See* Trial Tr. 4363-70, 4579-

81 (testimony of James Helms).

**Response**:   Not disputed.

135.    The drawdown from the banks for the 2000 purchase was initially intended to be

wired to a Managed Entity's account.   Trial Tr. 4366-67, 4572-73, 4579-80 (testimony of James

Helms).

**Response**:   Not disputed.   Nevertheless, none of the witnesses Petitioners cite to in

support of their factual assertion indicate that Adelphia's public disclosures about the January 21,

2000 stock purchase would have been accurate had the co-borrowed funds been wired straight

from the banks to a Rigas Managed Entity and then provided to Adelphia.   Instead, each witness

merely confirms that Petitioners' misleading disclosures to the public about the January 21, 2000

stock purchase would have been no less problematic had a Rigas Managed Entity directly drawn

down from the co-borrowing facility to provide those funds to Adelphia.   (Tr. at 8133-34

(Brown); Tr. at 8643-47, 8685-86 (DiBella); Tr. at 4364-70, 4579-87 (Helms)).

136.    It was only by mistake that the funds came directly from the bank to Adelphia.

Trial Tr. 4366-67, 4572, 4579-80 (testimony of James Helms).

**Response**:   Not disputed to the extent the statement refers to that fact that to

consummate a January 21, 2000 stock purchase, Adelphia's fully-owned subsidiary UCA

Corporation borrowed $368 million from a co-borrowing facility and sent only $136 million to

Adelphia.   (*See* Tr. 6777-88; GX App. GG (GX 11164AR)).   Nevertheless, none of the

witnesses Petitioners cite to in support of their factual assertion indicate that Adelphia's public

disclosures about the January 21, 2000 stock purchase would have been accurate had the co-borrowed funds been wired straight from the banks to a Rigas Managed Entity and then provided to Adelphia.   Instead, each witness merely confirms that Petitioners' misleading disclosures to the public about the January 21, 2000 stock purchase would have been no less problematic had a Rigas Managed Entity directly drawn down from the co-borrowing facility to provide those funds to Adelphia.   (Tr. at 8133-34 (Brown); Tr. at 8643-47, 8685-86 (DiBella); Tr. at 4364-70, 4579-87 (Helms)).

137.    When asked about whether the effect of the journal entries involving money coming straight from the banks to Adelphia was the same as would have been the case had the money been drawn into a Managed Entity's account and then transferred to the Adelphia account, the government's accounting witness testified, "[e]ssentially the same net effect, yes." Trial Tr. 8643-44, 8685-86 (testimony of Robert DiBella).   *See also* Trial Tr. 4583-84 (testimony of James Helms).

**Response**:   The Government disputes these statements in their entirety as a mischaracterization of the evidence cited and as an improper conclusion regarding the legal meaning or significance of the cited evidence.   None of the witnesses the Rigases cite to in support of their factual assertion indicate that Adelphia's public disclosures about the January 21, 2000 stock purchase would have been accurate had the co-borrowed funds been wired straight from the banks to a Rigas Managed Entity to then provide to Adelphia.   Instead, each witness merely confirms that the Rigases' misleading disclosures to the public about the January 21, 2000 stock purchase would have been no less problematic had a Rigas Managed Entity directly

drawn down from the co-borrowing facility to provide those funds to Adelphia.   (Tr. at 8133-34 (Brown); Tr. at 8643-47, 8685-86 (DiBella); Tr. at 4364-70, 4579-87 (Helms)).

138.    Adelphia used $136 million of the $368 million to pay off a debt that was its alone and used $232 million to pay down a portion of its debt within the co-borrowing facility. *See* Trial Tr. 4365, 4573-74, 4585-89 (testimony of James Helms); Trial Tr. 8661-62 (testimony of Robert DiBella).

**Response**:   The Government disputes these statements in their entirety as a mischaracterization of the evidence.   Adelphia's fully-owned subsidiary UCA Corporation borrowed $368 million from a co-borrowing facility and sent only $136 million to Adelphia. (*See* Tr. 6777-88; GX App. GG (GX 11164AR).   The remaining $232 million was immediately returned to the co-borrowing facility.   (*See* Tr. 6777-88; GX App. GG (GX 11164AR)).

139.    According to the Johnson Memorandum, Mr. Rothenberger indicated that an Adelphia lawyer, Colin Higgin, was present at the closing on the stock transfers.   *See* App. 18 at ¶ 3 (Johnson Memorandum).

**Response**:   The Government disputes this statement to the extent it characterizes and takes out-of-context the plain language of the notes.   The Government respectfully refers the Court to the language of the Johnson Memorandum for a full and accurate description of their contents.   (*See* PX App. 18).

140.    None of the six sets of notes or memoranda indicated that Mr. Rothenberger suggested that he worked with the Petitioners on the "immediately available funds" formulation. *See* App. 17 (Feeney Notes); App. 19 (Richey Notes); App. 18 (Johnson Memorandum); App. 20

(McLaughlin Notes); App. 21 (McLaughlin Memorandum); App. 22 (McLaughlin October notes).

      **Response**:   The Government disputes this statement in its entirety as immaterial and irrelevant to the 2255 Motion because it does not accurately reflect what Rothenberger told the Government and implies there is significance to the absence of a note.   As reflected in the Feeney Notes, Rothenberger explained to the Government that *he was not aware that Adelphia did not receive any cash from any Rigas Managed Entity in exchange for Adelphia stock*. Specifically, Rothenberger told the Government that he "assumed immed.[iately] avail.[able] funds (i.e. cash) [were] transferred" to buy Adelphia stock because "the stock purchase agreement language called for it."   (*See* PX App. 38 at 1 (Feeney Notes)).

      141.   None of the six sets of notes or memoranda indicated that Mr. Rothenberger stated that the Petitioners ever said anything misleading to him in relation to the "immediately available funds" formulation.   *See* App. 17 (Feeney Notes); App. 19 (Richey Notes); App. 18 (Johnson Memorandum); App. 20 (McLaughlin Notes); App. 21 (McLaughlin Memorandum); App. 22 (McLaughlin October notes).

      **Response**:   The Government disputes this statement in its entirety as immaterial and irrelevant to the 2255 Motion because it does not accurately reflect what Rothenberger told the Government and that implies there is significance to the absence of a note.   As reflected in the Feeney Notes, Rothenberger explained to the Government that *he was not aware that Adelphia did not receive any cash from any Rigas Managed Entity in exchange for Adelphia stock*. Specifically, Rothenberger told the Government that he "assumed immed.[iately] avail.[able]

funds (i.e. cash) [were] transferred" to buy Adelphia stock because "the stock purchase
agreement language called for it."   (*See* PX App. 38 at 1 (Feeney Notes)).

142.    The government did not include any information about the "immediately available
funds" language in the letter it sent to the Petitioners on February 24, 2004.   *See* App. 3 at ¶ 4,
Ex. 2.

**Response**:   The Government does not dispute that its pretrial *Brady* disclosure with
respect to Rothenberger disclosed that "Carl Rothenberger, Esq. may be able to provide
information that is favorable to the defense concerning the timber rights transaction discussed in
the Government's Bill of Particulars."  (PX App. 3 at Preziosi Decl., Ex. 2).   That document
speaks for itself.   The Government also does not dispute that no additional *Brady* disclosures
were made concerning Rothenberger.   The Government disputes that anything the Government
heard from Rothenberger on February 20, 2004 necessitated a *Brady* disclosure beyond that
provided by the Government in the February 24, 2004 letter.

**J.  The Schedule 10-K Allegations**

143.    Adelphia's 10-K (Annual Report to the SEC) for the year 2000 stated the
following about the co-borrowing facility:

> Certain subsidiaries of Adelphia are co-borrowers with Managed Entities under
> credit facilities for borrowings of up to $3,751,250,000.   Each of the co-borrowers
> is liable for all the borrowings under the credit agreements, and may borrow up to
> the entire amount of the available credit under the facility. The lenders have no
> recourse against Adelphia other than against Adelphia's interests in such
> subsidiaries.

App. 30, Adelphia Communications Corporation 10-K for 2000, at 88.

**Response**:   Not disputed.

144.    The government alleged that disclosures, such as Adelphia's 10-K for the year 2000, were fraudulent because they did not disclose (1) the amount the Managed Entities had borrowed as of the end of the reporting year; (2) that the Rigases and Managed Entities borrowed against Adelphia's assets, not based on cash or assets the Managed Entities contributed to the co-borrowing arrangements, and (3) that the Rigases and Managed Entities lacked the cash flow to cover even their interest payment obligations.   *See* Trial Tr. 11251-53 (Government's Rebuttal); see also Trial Tr. 6587-6605 (testimony of James Brown).

**Response**:   The Government does not dispute this statement to the extent it claims that that the disclosure quoted in paragraph 143 failed to disclose the amount that the Rigas Managed Entities had borrowed under the co-borrowing facilities and that those Rigas Managed Entities' liabilities were not reported in Adelphia's consolidated balance sheet as of the year-end 2000 and that the Government pointed to these facts during its closing statement and rebuttal to the jury.

145.    James Brown testified that during March 2001, Deloitte & Touche (Adelphia's auditor) had suggested that Adelphia disclose in its 2000 10-K the amount actually borrowed from the co-borrowing facility.   Trial Tr. 6594-95 (testimony of James Brown).

**Response**:   Not disputed.

146.    According to Mr. Brown, after a conversation with Timothy Rigas on March 27 or 28, 2001, Mr. Brown tried to "sell [Deloitte] [a] story that it was a more conservative disclosure" as an accounting matter to disclose the full amount of the co-borrowing credit facility (i.e., the amount of corporate exposure) rather than the amount borrowed as of year's end.   Trial Tr. 6595-97.

**Response**:   Not disputed.

147.     Mr. Brown testified that he told Timothy Rigas, "[M]aybe we can convince them that it's actually a more conservative disclosure by saying that each of the entities could borrow up to the maximum amount, that by putting in the specific dollar amount, you know, it might mislead the investor into thinking that it was somehow lower than it really was because they could go above that amount, try to describe that to Deloitte as the more conservative disclosure." Trial Tr. 6596.

**Response**:   Not disputed.

148.     Mr. Brown testified that when he "sold" this story to Deloitte he did not believe it was a more conservative disclosure.   Trial Tr. 6596-97.

**Response**:   Not disputed.

149.     Deloitte & Touche agreed to sign the language that was proposed.   *See* Trial Tr. 6597 (testimony James Brown); App. 31, Deposition of Gregory Dearlove (May 10, 2006), *Adelphia Commc'ns Corp. v. Deloitte & Touche, LLP*, No. 000598 (C.P. Phila.), at 310-17.

**Response**:   The Government disputes this statement as a misleading and incomplete characterization of the record.   Specifically, James Brown testified that Deloitte & Touche ultimately agreed to "sign the opinion, but they wanted to make it clear that these were Adelphia's management's financial statements, not theirs.   (*See* Tr. at 6597:9-11).

150.     The discussions regarding the co-borrowing disclosures occurred prior to December 29, 2003, when the SEC issued new rules on the reporting of contingent debt.  *See* App. 32, Disclosure in Management's Discussion and Analysis About Off-Balance Sheet Arrangements and Aggregate Contractual Obligations, 68 Fed. Reg. 5982 (Feb. 5, 2003).

**Response**:   The Government disputes the statement to the extent it implies that Adelphia's accounting was in line with the SEC's rules on reporting of debt prior to December 19, 2003, and because it is irrelevant and immaterial to the 2255 Motion.

151.   In January 2002, the SEC issued a statement changing its guidance on disclosures regarding liquidity and capital resources, including off-balance sheet arrangements, certain trading activities that include non-exchange traded contracts accounted for at fair value, and effects of transactions with related and certain other parties.   *See* App. 33, 67 Fed. Reg. 3746 (Jan. 25, 2002).

**Response**:   The Government disputes the statement to the extent it implies that Adelphia's accounting was in line with the SEC's rules on reporting of debt prior to January 2002, and because it is irrelevant and immaterial to the 2255 Motion.

152.   The January 2002 SEC guidance triggered Adelphia's disclosures regarding the co-borrowing.   *See, e.g.*, App. 5, Adelphia Commc'ns Corp., Schedule 8-K (May 24, 2002).

**Response**:   The Government disputes the statement to the extent it implies that Adelphia's accounting was in line with the SEC's rules on reporting of debt prior to January 2002, and because it is irrelevant and immaterial to the 2255 Motion.   Moreover, the Government disputes that Petitioners' statement is an accurate characterization of the reasoning for and purpose of PX App. 5.   The Government respectfully refers the Court to PX App. 5 for a true and complete statement of its contents.

153.   In his testimony, Mr. Brown never stated that Mr. Rothenberger had been consulted about the 10-K language or had approved of the language.   *See* Trial Tr. 6595-6605.

**Response**:   The Government does not dispute this statement to the extent it states that James Brown testified extensively about conspiring with Timothy Rigas about the disclosures, in conversations that, according to Brown, *did not involve Rothenberger*.   (*See, e.g.*, Tr. at 6585-6610).   The Government otherwise does not dispute that the evidence cited supports that Rothenberger was not consulted about nor did he approve the final language of the disclosures regarding co-borrowing contained in Adelphia's 10-K for the year-end 2000.

154.     In his testimony, the only mention Mr. Brown made of Mr. Rothenberger in connection with the 10-K was to describe a March 29, 2001 e-mail in which Mr. Rothenberger suggested language that the "amounts of indebtedness set forth for Adelphia and its subsidiaries do not include any amounts borrowed by the managed entity coborrowers under these credit facilities."   Trial Tr. 6796-98 (describing App. 34, Gov't Trial Ex. 1912-A).

**Response**:   The Government does not dispute this statement to the extent it states that James Brown testified extensively about conspiring with Timothy Rigas about the disclosures, in conversations that, according to Brown, *did not involve Rothenberger*.   (*See, e.g.*, Tr. at 6585-6610).   The Government otherwise does not dispute the accuracy of the quotation from the trial transcript.

155.     Mr. Brown testified that he did not include the suggested disclosure from Mr. Rothenberger in the Form 10-K; he did not recall discussing the disclosure with anyone else; and nothing was done with the suggested disclosure.   Trial Tr. 6797-98.

**Response**:   Not disputed.

156.     In his February 20, 2004 interview, Mr. Rothenberger told the government that in March 2001, he met with Tim Werth, and perhaps Mr. Brown and/or Mr. Malone ("3/01 discuss

w/ TW ~ DMal ~ JB"), to discuss "add language to c-b description in fin stmt. footnote," "risk disclosure" and "borrow up to full amount."   App. 17 at 7 (Feeney Notes).

**Response**:   The Government disputes this statement to the extent it characterizes and takes out-of-context characterization of the plain language of the cited notes.   The Government refers the Court to the language of the Feeney Notes for a full and accurate description of their contents.   (*See* PX App. 17).

157.   The McLaughlin Notes indicated that during his February 20, 2004 interview with the government, Mr. Rothenberger stated: "Mar '01, a discussion w/ Tim Werth, (Doug Malone or Jim Brown)," "Also, additional language to the description of the loan status, co-b footnote to add" and "the Risk Disclosure ☐up to the full amt [amount] of the agreement."   App. 20 at 23 (McLaughlin Notes).

**Response**:   The Government disputes this statement to the extent it characterizes and takes out-of-context characterization of the plain language of the cited notes.   The Government refers the Court to the language of the McLaughlin Notes for a full and accurate description of their contents.   (*See* PX App. 20).

158.   Mr. Rothenberger testified in an October 26, 2005 deposition that he believed the co-borrowing disclosure language "was a Buchanan & Ingersoll suggestion."   App. 35, Dep. of Carl Rothenberger, Adelphia Commc'ns Corp. v. Deloitte & Touche, LLP, No. 000598 (C.P. Phila.) (Oct. 26, 2005), at 486.

**Response**:   The Government disputes this statement to the extent it mischaracterizes the plain language of Rothenberger's post-trial civil deposition testimony.   The Government refers the Court to the language of Rothenberger's deposition testimony for a full and accurate

description of their contents.   (*See* PX App. 35).   In fact, Rothenberger testified that he did not

"recall specifically reviewing the final language" for the disclosure that was filed with the SEC,

but generally recalled that he believes he did.   (PX App. 49 at 492).   Rothenberger stated that

the language that ended up in the final version of the 10-K was, to the best of his recollection, the

language that "in substance [he] suggested be added to the disclosure."   (PX App. 49 at 492).

159.    Mr. Rothenberger testified in the October 26, 2005 deposition that the language

was based on the "request from the company was [for] to us to come up with additional

disclosures with respect to this footnote to clarify or add information, and we were in agreement

that that's what this language did."   App. 35 at 493.

**Response**:   The Government disputes this statement to the extent it mischaracterizes the

plain language of Rothenberger's post-trial civil deposition testimony and is an incomplete

representation of that testimony.   The Government refers the Court to the language of

Rothenberger's deposition testimony for a full and accurate description of their contents, but

notes that the deposition testimony ends before Rothenberger's testimony about why the

language Rothenberger had suggested in his March 29, 2001 e-mail was not included in the final

language of the disclosure.   (*See* PX App. 35).

160.    The last passage of the McLaughlin Notes stated, "Like it or not you guys

endorsed these statements."   App. 20 at 24 (McLaughlin Notes).

**Response**:   The Government disputes this statement to the extent it characterizes and

takes out-of-context characterization of the plain language of the cited notes.   The Government

refers the Court to the language of the McLaughlin Notes for a full and accurate description of

their contents.   (*See* PX App. 20).

60

161.     None of the six sets of notes or memoranda indicated that Mr. Rothenberger suggested that he worked with the Petitioners on the co-borrowing disclosure language.   *See* App. 17 (Feeney Notes); App. 19 (Richey Notes); App. 18 (Johnson Memorandum); App. 20 (McLaughlin Notes); App. 21 (McLaughlin Memorandum); App. 22 (McLaughlin October notes).

**Response**:   The Government disputes this statement as a characterization of the plain language of the notes and one that implies there is significance to the absence of a note.   The Government respectfully refers the Court to PX App. 17, 18, 19, 20, and 21 for true and complete statements of each appendix exhibit's contents.

162.     None of the six sets of notes or memoranda indicated that Mr. Rothenberger stated that the Petitioners ever said anything misleading to him in relation to the co-borrowing disclosure language.   *See* App. 17 (Feeney Notes); App. 19 (Richey Notes); App. 18 (Johnson Memorandum); App. 20 (McLaughlin Notes); App. 21 (McLaughlin Memorandum); App. 22 (McLaughlin October notes).

**Response**:   The Government disputes this statement in its entirety as immaterial and irrelevant to the 2255 Motion because Rothenberger would not have needed to know that he was misled in order to lack sufficient, material information to provide the Rigases with an advice of counsel defense regarding their public disclosures.   Here, for example, what matters for purposes of the 2255 Motion is that Rothenberger made clear to the Government that he did not know that Petitioners used Adelphia funds or co-borrowed funds to buy Adelphia stock.   (*See* PX App. 17 at 3 (Feeney Notes)).

163.    The government did not include any information about the co-borrowing disclosure language in the letter it sent to the Petitioners on February 24, 2004.   *See* App. 3 at ¶ 4, Ex. 2.

**Response**:   The Government does not dispute that its pretrial *Brady* disclosure with respect to Rothenberger disclosed that "Carl Rothenberger, Esq. may be able to provide information that is favorable to the defense concerning the timber rights transaction discussed in the Government's Bill of Particulars."  (PX App. 3 at Preziosi Decl., Ex. 2).   That document speaks for itself.   The Government also does not dispute that no additional *Brady* disclosures were made concerning Rothenberger.   The Government disputes that anything the Government heard from Rothenberger on February 20, 2004 necessitated a *Brady* disclosure beyond that provided by the Government in the February 24, 2004 letter.

## K. Related Party Transactions

164.    The government alleged that the Petitioners had fraudulently misreported (or failed to report) various related party transactions in various SEC filings.   Trial Tr. 10441-42, 10609-18 (Government's Closing Argument).

**Response**:   The Government does not dispute that the allegations at trial included the fraudulent reporting or non-reporting of related party transactions, and that the related party transactions were not disclosed in an itemized manner as required.   (*See, e.g.*, Tr. at 645-46 (Gov't Opening) Tr. at 11,196 (Gov't Summation)).

165.    The government told the jury that the law required Adelphia to itemize each related party transaction in its proxy statements and its 10-Ks, which Adelphia had not done.

*See* Trial Tr. 645-46 (Government's Opening Statement); Trial Tr. 11196 (Government's Rebuttal).

      **<u>Response</u>**:   The Government does not dispute that the allegations at trial included the fraudulent reporting or non-reporting of related party transactions, and that the related party transactions were not disclosed in an itemized manner as required.  (*See, e.g.*, Tr. at 645-46 (Gov't Opening) Tr. at 11,196 (Gov't Summation)).

      166.    Instead, Adelphia had aggregated its transactions into a net number at year's end. *See, e.g.*, Trial Tr. 1126-1132, 1451-52 (testimony of Dennis Coyle); Trial Tr. 3685-89 (testimony of Chris Thurner); *see also*, App. 7, 490 F.3d at 218 ("Adelphia's financial statements and annual reports did little to apprise shareholders of what the Rigas family owed Adelphia. All related party transactions between Adelphia and the Rigas family and the RNCEs were combined and 'netted out' against transactions with the RMEs, which obscured what the Rigas family actually owed Adelphia.").

      **<u>Response:</u>**   Not disputed.

      167.    The government also argued to the jury that certain related party transactions were never reported at all.  *See* Trial Tr. 657-58 (Government's Opening Statement).

      **<u>Response</u>**:   The Government does not dispute that the allegations at trial included the fraudulent reporting or non-reporting of related party transactions, and that the related party transactions were not disclosed in an itemized manner as required.  (*See, e.g.*, Tr. at 645-46 (Gov't Opening) Tr. at 11,196 (Gov't Summation)).

      168.    The government was not alleging that the failure to report the related party transactions could support a verdict against the Petitioners based simply on a finding that they

had looted.   *See* Trial Tr. 10607 (Government's Closing Argument) ("I want to make clear

what's illegal about these looting transactions.   As I said earlier, the securities laws are

concerned with disclosure, with investors getting accurate information.   And they, therefore,

prohibit misstatements and misleading omissions to the public about securities. That's the crime

alleged here, the failure to tell the public about this looting.").

**Response:**   The Government does not dispute that the language quoted in this statement

is an accurate quote from the Government's summation at trial.   This quotation speaks for itself.

169.   James Brown testified that Timothy Rigas was in charge of reporting related party

transactions in Adelphia's proxy statements.   Trial Tr. 6716.

**Response:**   Disputed to the extent that the Petitioners mischaracterize the testimony at

trial, which speaks for itself.   The cited testimony of James Brown was as follows:

> "Q:    Were you in charge of the preparation and filing of Adelphia's proxy statements?
> A:    No.
> Q:    Who was?
> A:    Tim Rigas."

(Tr. at 6716:13-17).

170.   The government presented the testimony of LeMoyne Zacherl, a former CPA who

had worked at Adelphia from 1993 through 1995.   *See* Trial Tr. 2499-2503.

**Response:**   The Government does not dispute that its trial evidence included testimony

by Zacherl, who was an accountant who began working at Adelphia in November 1993 as a vice

president of financial operations and administration.   (*See* Tr. at 2502, 2509).

171.    Mr. Zacherl testified that he explained relevant reporting requirements for related party transactions to Timothy Rigas in the summer of 1994.   *See* Trial Tr. 2536, 2548-50, 2616-19.

**Response:**    The Government does not dispute that Zacherl testified that he explained to Tim Rigas the proper way for Adelphia to make certain disclosures, among other subject matters. (Tr. at 2617-30).   The cited portions of Zacherl's testimony speak for themselves.

172.    In its closing argument, the government stated:

Nor is there any real dispute that Adelphia's proxy statements and its 10-KAs did not disclose all these related-party transactions in an itemized way, which is what the law requires. Nor—and by the way, an itemized manner that the testimony of LeMoyne Zacherl shows he explained to Tim Rigas.

Trial Tr. 11196 (Government's Closing Argument).

**Response:**    The Government does not dispute that the language quoted in this statement is an accurate quote from the Government's summation at trial.   This quotation speaks for itself.

173.    At the February 20, 2004 pre-trial interview with the government, Mr. Rothenberger acknowledged having been involved in the reporting of related party transactions. *See* App. 17 at 4 (Feeney Notes).

**Response:**    The Government disputes the Petitioners' contentions as characterization about the contents of the Feeney Notes, which speak for themselves.

174.    At that interview, Mr. Rothenberger told the government that his practice had been to review the 10-KAs with Doug Malone ("D Mal") (a CPA with SEC experience who worked for Adelphia and was "familiar w[ith] SEC reporting").   App. 17 at 4 (Feeney Notes); *see also* Trial Tr. 7358-59 (testimony of James Brown).

**Response:**   The Government does not dispute that the Feeney Notes contain the quoted language set forth in this paragraph.   The cited trial testimony speaks for itself.   The Government disputes the remainder of Petitioners' contentions as characterization about the contents of the Feeney Notes, which speak for themselves.   The Government notes for inclusiveness that Feeney Notes also state, as omitted from this paragraph: "Any disclosure of ACC policy JR [John Rigas] draw up to $1M/month from ACC? Never told about, Should be Disclosed? Yes.   Debt reclass under co-b? No knowledge or understanding, None prior to 3/02." (*See* PX App. 17 at 4 (Feeney Notes)).

175.   In this regard, the Feeney notes stated:

Financial Stmts - footnotes, related party transactions not otherwise disclosed

Effort to determine if other related party transactions? Yes

-reviewed 10-KA w D Mal – familiar w/ SEC reporting – Ask him what else under SK

404

App. 17 at 4 (Feeney Notes).

**Response:**   The Government does not dispute that the Feeney Notes contain the quoted language set forth in this paragraph.   The Government disputes the remainder of Petitioners' contentions as characterization about the contents of the Feeney Notes, which speak for themselves.   The Government notes for inclusiveness that next several sentences of the Feeney Notes, omitted from this paragraph, state: "Any disclosure of ACC policy JR [John Rigas] draw up to $1M/month from ACC? Never told about, Should be Disclosed? Yes.   Debt reclass under co-b? No knowledge or understanding, None prior to 3/02."   (*See* PX App. 17 at 4 (Feeney Notes)).

176.     During the course of the February 20, 2004 interview, in discussing "advances to related parties," Mr. Rothenberger stated, "net, not line item." App. 17 at 4 (Feeney Notes).

**Response:**     The Government does not dispute that the Feeney Notes contain the quoted language, which speaks for itself.

177.     The McLaughlin Memorandum described Mr. Rothenberger as stating that the "net number" he used was based on information provided by Mr. Malone.   *See* App. 21 at ¶ 7 (McLaughlin Memorandum).

**Response:**   The Government disputes this statement, as the cited evidence says nothing about either Mr. Malone or the use of a "net" number.

178.     The McLaughlin Notes indicated that Mr. Rothenberger described working with Doug Malone on these issues, whom he described as the "day to day guy" who was "familiar with SEC rpt."   App. 20 at 12 (McLaughlin Notes).

**Response:**   The Government does not dispute that the language from the McLaughlin Notes quoted in this paragraph appear on the cited page of that exhibit.   The Government notes for inclusiveness, however, that this document and others cited by Petitioners elsewhere also show that Rothenberger told the Government he was either not aware of or did not have the full factual background as to several of the related party transactions alleged at trial.   *See, e.g.*, PX App. 18, ¶ 18 (Johnson Memorandum) ("Carl said that he did not understand the mechanics of the CMS [Adelphia's Cash Management System] or that non-Adelphia entities could draw down on the Adelphia account"); PX App. 19, ¶¶ 15, 17, 22 (Richey Notes) ("Carl said he did not know [the Rigases] were using co-borrowing money until the problems arose in 2002"; that he "does not recall" knowing "about loans to John Rigas from [Highland Holdings] to Adelphia";

67

and that he "did not know about intermingling [in Adelphia's Cash Management System] until 2002" or that "private entities could reach into that account and take Adelphia money."); PX App. 20 at 13 (McLaughlin Notes) ("Anyone ever tell you that JR [John Rigas] could draw down up to $1M a month?   No.").   The contents of these notes speak for themselves.

179.   According to the Richey Notes, Mr. Rothenberger told the government during the interview that he "relied a lot on Malone. [He] asked Malone what else needed to be covered re: related party transactions and Carl relied on the answers."   App. 19 at ¶ 19 (Richey Notes).

**Response:**   The Government does not dispute that the language from the Richey Notes quoted in this paragraph appear on the cited page of that exhibit.   The Government further incorporates by reference its response to paragraph 178, *supra*.

180.   According to the Johnson Memorandum, when Mr. Rothenberger was asked during the interview about "what had to be disclosed in other areas of the financial statements as to 'related parties.' Carl responded that he would inquire of Malone, at Adelphia, what else had to be covered in various disclosure statements because Malone had experience with S.E.C. filings and Carl relied upon him to assure that the statements were complete and accurate." App. 18 at ¶ 15 (Johnson Memorandum).

**Response:**   The Government does not dispute that the language from the Johnson Memorandum quoted in this paragraph appear on the cited page of that exhibit.   The Government further incorporates by reference its response to paragraph 178, *supra*.

181.   The Feeney Notes stated, "Any disclosure of ACC policy JR [John Rigas] draw up to $1M/month from ACC? Never told about, Should be disclosed? Yes."   App. 17 at 4 (Feeney Notes).

**Response:**   The Government does not dispute that the Feeney Notes contain the quoted language set forth in this paragraph, which speaks for itself.   The Government notes for inclusiveness that the next portion of the Feeney Notes, omitted from this paragraph, states: "Debt reclass under co-b? No knowledge or understanding, None prior to 3/02."   (*See* PX App. 17 at 4 (Feeney Notes)).

182.     Mr. Malone had full access to all of Adelphia's books and records and understood Adelphia's cash management system.   App. 54, Gov't Opp. Memorandum, ECF No. 16 at 32; *see also* Trial Tr. 9063 (testimony of Michael Mulcahey).

**Response:**   Not disputed.

183.     Adelphia's treasury group kept track of all of the money that went through Adelphia's CMS.   Trial Tr. 4721-22 (testimony of James Helms).

**Response:**   Not disputed that James Helms testified at trial that Adelphia's treasury group kept track of all the money that came through the cash management system.   (Tr. at 4721:19-21).   His testimony speaks for itself.

184.     The government's accounting witness, Robert DiBella, testified that he had identified the related party transactions by examining data from Adelphia's books and records. Trial Tr. 8440-44, 8446-49, 8452-53, 8608-11 (testimony of Robert DiBella); Trial Tr. 8379 (AUSA Owens referencing Government Exhibit 101, App. 23, and explaining that "[i]t lays out on a combined basis all of the intercompany balances and receivables, all of the debts owed by all of the Rigas-owned entities and Rigas individuals with Adelphia").

**Response:**   The Government disputes the Petitioners' misleading characterization of the contents of the cited DiBella testimony, particularly with respect to the detailed and document-

intensive analysis conducted by DiBella of Adelphia's books and records at the request of the
United States Attorney's Office.   This testimony speaks for itself.

185.   Mr. DiBella acknowledged that use of journal entries is routine throughout many
industries.   Trial Tr. 8611, 8696-97 (testimony of Robert DiBella).

**Response:**   The Government disputes Petitioners' characterization of DiBella's
testimony, which speaks for itself, as incomplete and misleading.   While DiBella did testify that
the use of journal entries is routine, he did not testify that Adelphia's use of the CMS was not
problematic.

186.   None of the six sets of notes or memoranda indicated that Mr. Rothenberger
suggested that he worked with the Petitioners on the related party transactions disclosure.   *See*
App. 17 (Feeney Notes); App. 19 (Richey Notes); App. 18 (Johnson Memorandum); App. 20
(McLaughlin Notes); App. 21 (McLaughlin Memorandum); App. 22 (McLaughlin October
notes).

**Response:**   The Government disputes Petitioners' characterization of the contents or
non-contents of the relevant notes, which speak for themselves.   The Government also disputes
this statement as irrelevant and immaterial to the resolution of the 2255 Motion.

187.   None of the six sets of notes or memoranda indicated that Mr. Rothenberger
stated that the Petitioners ever said anything misleading to him in relation to the related party
transactions disclosure.   *See* App. 17 (Feeney Notes); App. 19 (Richey Notes); App. 18
(Johnson Memorandum); App. 20 (McLaughlin Notes); App. 21 (McLaughlin Memorandum);
App. 22 (McLaughlin October notes).

**Response:**   The Government disputes Petitioners' characterization of the contents or

70

Case 1:11-cv-06964-KMW   Document 189   Filed 05/18/18   Page 71 of 114

non-contents of the relevant notes, which speak for themselves.   The Government also disputes this statement as irrelevant and immaterial to the resolution of the 2255 Motion.

188.    The government did not include any information about the related party transactions disclosure in the letter it sent to the Petitioners on February 24, 2004.   *See* App. 3 at ¶ 4, Ex. 2.

**<u>Response</u>:**   The Government does not dispute that its pretrial *Brady* disclosure with respect to Rothenberger disclosed that "Carl Rothenberger, Esq. may be able to provide information that is favorable to the defense concerning the timber rights transaction discussed in the Government's Bill of Particulars."   (PX App. 3 at Preziosi Decl., Ex. 2).   That document speaks for itself.   The Government also does not dispute that no additional *Brady* disclosures were made concerning Rothenberger.   The Government disputes that anything the Government heard from Rothenberger on February 20, 2004 necessitated a *Brady* disclosure beyond that provided by the Government in the February 24, 2004 letter.

### L.  The Golf Course Project

189.    The government accused the Petitioners of surreptitiously using Adelphia funds to build a golf course on land partly owned by John Rigas.   *See generally* App. 1 at ¶¶ 194-97.

**<u>Response</u>:**   The Government disputes this statement to the extent it mischaracterizes the evidence and theories at trial.   The evidence at trial established that Adelphia paid nearly $13 million towards the construction of a golf course on land that was majority-owned by John Rigas and that these facts were not disclosed in Adelphia's public filings.   (*See, e.g.*, Tr. at 829-30, 2928-29, 2942, 3724).   An Adelphia stockholder testified that knowing this information would have been important to him in making its decision to invest in Adelphia.   (Tr. at 829-30).

Dennis Coyle, who served as an independent director of Adelphia from 1995 through 2003,
further testified that Adelphia's construction of this golf course had not been approved by
Adelphia's independent board of directors, as required by Adelphia's corporate resolutions
concerning affiliate transactions.   (*See, e.g.*, Tr. at 908, 1021-22).

190.    In its opening statement, the government told the jury,

"[Y]ou will learn that Tim Rigas liked golf so much that he had Adelphia pay $13
million to begin building his own golf course, a golf course that was [on land] partly
owned by Adelphia[, and] partly . . . owned by the family. You will also learn,
ladies and gentlemen, that Adelphia's independent members of the board of
directors, its shareholders, its stockholder, its creditors, had no idea Tim Rigas was
using their money to build a golf course."

Trial Tr. 625-26 (Government's Opening Statement).

**Response:**   The Government does not dispute that (setting aside non-substantive
differences from the trial transcript) the language quoted in this paragraph was included in
the Government's opening statement at trial.   (*See* Tr. at 625-26).   The cited portions of
the trial transcript speak for themselves.

191.    Eight witnesses testified about the golf course allegations.   *See* Trial Tr. 830, 853-
55 (testimony of Christopher Pelto);   Trial Tr. 1138 (testimony of Dennis Coyle); Trial Tr. 2064-
65 (testimony of George Cretekos);   Trial Tr. 2128 (testimony of Lisa Scally);   Trial Tr. 2370
(testimony of Linda Pekarski); Trial Tr. 2928-53, 3020, 3113-17, 3212 (testimony of Charles
Raptis); Trial Tr. 3501-03, 3513 (testimony of Christopher Thurner); Trial Tr. 9872-74 (testimony
of Michael Mulcahey).

**Response:**   The Government does not dispute that eight trial witnesses testified about the
golf course, although it would note that at least four of the witnesses cited by Petitioners –

Cretekos, Scally, Thurner, and Mulcahey – were only asked about the golf course for the first time during cross-examination by counsel for one of the defendants and were not asked about the golf course during their direct examination.

192.    At closing, the government argued, "You heard a lot of testimony about the golf course, ladies and gentlemen, that was built on land that was majority owned by John Rigas.   If we look at Government's Exhibit 9598, we go to page 30, we see a total of $12.8 million spent to build this golf course that the public shareholders were never told about, that Adelphia's independent board numbers were never told about, and that was never approved as an affiliate transaction . . . ."   Trial Tr. 10613.

**Response:**    The Government does not dispute that the quotation from the closing argument is accurate.

193.    Mr. Rothenberger told the government in his February 20, 2004 pre-trial interview that he had been contacted by Timothy Rigas in late 2000 or early 2001 to discuss "formulating ownership/operation of GC [Golf Course]."   App. 17 at 6 (Feeney Notes).

**Response:**    The Government does not dispute that the Feeney Notes are quoted accurately, but disputes any characterization of those notes, which speak for themselves.

194.    Mr. Rothenberger told the government that Timothy Rigas had explained that the golf course would be used by "vendors, supplier[s], general corp[orate] use—some employee usage, some unaffiliated (locals) use—no good golf course around [Coudersport]."   App. 17 at 6 (Feeney Notes).

**Response:**    The Government does not dispute that the Feeney Notes are quoted accurately, but disputes any characterization of those notes, which speak for themselves.

195.    The McLaughlin Notes indicated that Mr. Rothenberger told the government that Timothy Rigas had also explained that the golf course would be useful in "retaining employees." App. 20 at 21 (McLaughlin Notes).

**Response:**   The Government does not dispute that the McLaughlin Notes are quoted accurately, but disputes any characterization of those notes, which speak for themselves.

196.    The Richey Notes reported that during the interview Mr. Rothenberger told the government with regard to the golf course that "Tim Rigas called Carl [Rothenberger] and asked how should this be handled. It would be used heavily for corporate employees and as a recruiting device. Issue was who should own the course."   App. 19 at ¶ 25 (Richey Notes); *see also* App. 18 at ¶ 21 (Johnson Memorandum); App. 20 at 21 (McLaughlin Notes).

**Response:**   The Government does not dispute that the Richey Notes are quoted accurately, but disputes any characterization of those notes, which speak for themselves.   The Government notes for completeness that the next two sentences of the McLaughlin Notes state: "Did Carl every tell anyone to tell or not to tell the Board that Adelphia $ being used to construct a course on Rigases property?   No recall . . . ."   (PX App. 19 at ¶ 25).

197.    Mr. Rothenberger also told the government that Timothy Rigas had "wanted BI's [Buchanan Ingersoll's] understanding on affiliate (or not) transaction" and about "who should own."   App. 17 at 6 (Feeney Notes).

**Response:**   The Government does not dispute that the Feeney Notes are quoted accurately, but disputes any characterization of those notes, which speak for themselves.

198.    Mr. Rothenberger told the government that he advised that "best legal structure that ACC [Adelphia] own the course, because majority of use for corporate purposes."   App. 17 at 6

74

(Feeney Notes).

**Response:**   The Government does not dispute that the Feeney Notes are quoted accurately, but disputes any characterization of those notes, which speak for themselves.

199.   Mr. Rothenberger further told the government that many ideas were explored about the tax implications—including the possibility of "donation to town with lease back."   App. 17 at 6 (Feeney Notes).

**Response:**   The Government does not dispute that the Feeney Notes are quoted accurately, but disputes any characterization of those notes, which speak for themselves.

200.   According to the McLaughlin Notes, Mr. Rothenberger told the government during the interview that he and various individual directors had visited the site and "Bd. knew there was a golf course."   App. 20 at 22 (McLaughlin Notes).

**Response:**   The Government does not dispute that the McLaughlin Notes are quoted accurately, but disputes any characterization of those notes, which speak for themselves.

201.   The Johnson Memorandum reported that "Carl said he did know it [the golf course] was being constructed, as did the various directors who had visited the site."   App. 18 at ¶ 21 (Johnson Memorandum).

**Response:**   The Government does not dispute that the Johnson Memorandum is quoted accurately, but disputes any characterization of those notes, which speak for themselves.

202.   Mr. Rothenberger explained to the government that he was of the view that "once structured, would require Bd approval if RF [Rigas Family] family continued to own land."   App. 17 at 6 (Feeney Notes).

**Response:**   The Government does not dispute that the Feeney Notes are quoted accurately,

but disputes any characterization of those notes, which speak for themselves.

203.    That time never arrived as construction of the course stopped in May 2002.  *See* Trial Tr. 2947 (testimony of Charles Raptis).

**Response**:   The Government does not dispute that construction of the golf course came to a stop in May 2002.

204.    None of the six sets of notes or memoranda indicated that Mr. Rothenberger stated that the Petitioners ever said anything misleading to him in relation to the golf course.  *See* App. 17 (Feeney Notes); App. 19 (Richey Notes); App. 18 (Johnson Memorandum); App. 20 (McLaughlin Notes); App. 21 (McLaughlin Memorandum); App. 22 (McLaughlin October notes).

**Response:**   The Government disputes Petitioners' characterization of the contents or non-contents of the relevant notes, which speak for themselves.   The Government also disputes this statement as irrelevant and immaterial to the resolution of the 2255 Motion.

205.    The government did not include any information about the golf course in the letter it sent to the Petitioners on February 24, 2004.  *See* App. 3 at ¶ 4, Ex. 2.

**Response:**   The Government does not dispute that its pretrial *Brady* disclosure with respect to Rothenberger disclosed that "Carl Rothenberger, Esq. may be able to provide information that is favorable to the defense concerning the timber rights transaction discussed in the Government's Bill of Particulars."  (PX App. 3 at Preziosi Decl., Ex. 2).  That document speaks for itself.   The Government also does not dispute that no additional *Brady* disclosures were made concerning Rothenberger.   The Government disputes that anything the Government heard from Rothenberger on February 20, 2004 necessitated a *Brady* disclosure beyond that provided by the Government in the February 24, 2004 letter.

76

### M. Testimony of James Brown

206.    James Brown testified in April 2004 pursuant to a cooperation agreement in which he pled guilty to three securities offenses (with a maximum sentence of 45 years). Trial Tr. 6069-74, 7016 (testimony of James Brown).

**Response**:   Not disputed that, as described in the cited trial testimony, Brown testified at trial pursuant to a cooperation agreement under which he pled guilty to a conspiracy count, securities fraud, and bank fraud, with a maximum total exposure of 45 years' imprisonment. However, the Government disputes this paragraph as irrelevant and immaterial to resolution of the 2255 Motion.

207.    Mr. Brown testified, inter alia, regarding general EBITDA manipulations, the cash management system, reporting coborrowing funds, the "immediately available funds formulation," and the 10-Ks.   *See* Trial Tr. 6112-13, 6491-6501, 6796-6810.

**Response**:   The Government does not dispute that the foregoing topics, among others, were addressed during Brown's trial testimony, which speaks for itself.   However, the Government disputes this paragraph as irrelevant and immaterial to resolution of the 2255 Motion.

208.    Mr. Brown told the jury that, pursuant to the letter he signed, he expected the government to send a letter to his sentencing judge describing his crimes and level of cooperation. Trial Tr. 6073-74.

**Response:**   The Government does not dispute Brown's trial testimony, which speaks for itself, but disputes this paragraph as irrelevant and immaterial to resolution of the 2255 Motion.

209.    Reading a passage of his plea agreement to the jury, Mr. Brown stated that his sentence would be in the sole discretion of the judge, the government would not recommend a

sentence, and he hoped to "receive a lesser sentence than [he] would if [he] had been convicted at trial."  Trial Tr. 6074; *see generally* Trial Tr. 7014-30.

**Response:**  The Government does not dispute Brown's trial testimony, which speaks for itself, but disputes this paragraph as irrelevant and immaterial to resolution of the 2255 Motion.

210.    As of February 1, 2018, the government has not requested a sentencing hearing for Mr. Brown.  *See* App. 36, Docket Report, 1:02-CR-01236-KMW-4 (run on Feb. 1, 2018).

**Response:**  The Government disputes this paragraph as irrelevant and immaterial to resolution of the 2255 Motion.

## II.    FACTS PERTAINING TO *BRADY* VIOLATIONS RELATED TO THE MARKETING SUPPORT ALLEGATIONS

### A.  The Government's Allegations

211.    The government alleged that the Petitioners orchestrated phony "marketing support" transactions with Scientific Atlanta Inc. and Motorola Communications Corp. in order to fraudulently increase Adelphia's EBITDA.   *See* App. 1 at ¶¶ 108-26; *see also* Trial Tr. 10584-85 (Government's Closing Argument) ("The first one of the bogus transactions we learned about was marketing support."); Trial Tr. 6240-41 (testimony of James Brown) (referring to "accounting magic").

**Response:**  Not disputed.

212.    EBITDA is a measure of operational earnings—standing for Earnings Before Interest, Taxes, Depreciation and Amortization.   Trial Tr. 933-34 (testimony of Dennis Coyle).

**Response:**  Not disputed.

213.    The government alleged that Adelphia secured agreements with Scientific Atlanta

and Motorola whereby Adelphia would pay an extra amount per cable box, and would then

receive that exact amount back from the companies as "marketing support."   App. 1 at ¶¶ 117-

19.  *See generally* App. 7 at 217 & n.8.

> **Response:**   Not disputed.

214.     The Second Circuit explained the allegations, which focused mostly on Scientific

Atlanta, as follows:

> Adelphia agreed to pay Scientific Atlanta $339 for each cable converter box. The
> two entities later agreed that Scientific Atlanta would increase the price of each box
> by $31, and Adelphia would charge [Scientific Atlanta] an identical $31 per box
> for marketing support. Thus, Adelphia's capital expenses for each box were
> increased by $31 to $370. But Adelphia's current expenses were decreased, and its
> EBITDA was increased, by $31 per box. The effects of the marketing support
> scheme in the June 2000 and September 2000 quarters, for example, were an
> increase in Adelphia's EBITDA of $7 million and $12.8 million, respectively.   The
> scheme with Motorola was similar, and had the same EBITDA-inflating effect.

App. 7 at 217 n.8.

> **Response:**   Not disputed.

215.     James Brown testified that, in order to enhance EBITDA, he, Timothy Rigas, and

others devised a fake "marketing support" scheme that used "wash transactions" to "fool the

auditors."   Trial Tr. 6121-28, 6140.

> **Response:**   The Government admits that the quoted portions of Brown's trial testimony

are accurate and that the Government's evidence at trial concerning the Scientific Atlanta and

Motorola agreements was based in part on this testimony, among other testimony and evidence

at trial.   (*See, e.g.*, Tr. at 6117-79, 6232-41, 7989-90, 7995 (Brown direct and redirect); Tr.

7122-24, 7292-93, 7296-7306, 7418 (Brown cross)).   The Government disputes any

characterization of the trial testimony, which speaks for itself.

216.     James Brown testified that Adelphia overstated its publicly reported EBITDA because the marketing support payments counted as revenue while capital expenses were not treated as expenses for EBITDA purposes.   *See* App. 7 at 215 n.5; Trial Tr. 6120, 6126, 6161, 7290-91 (testimony of James Brown).

**Response:**   The Government disputes this statement to the extent it mischaracterizes the facts established at trial.   The Government does not dispute that – as booked at Adelphia – the marketing support transactions with Scientific Atlanta and Motorola inflated Adelphia's EBITDA because the marketing support payments were booked as revenue that reduced Adelphia's total marketing expenses while the payments in the same amounts to Scientific Atlanta and Motorola under the fraudulent "price increase" letters had no offsetting impact on Adelphia's EBITDA and were instead "added to the balance sheet and then later on deducted as depreciation expense."   (*See, e.g.*, Tr. at 6126-27).   This accounting treatment and its impact on EBITDA were the result of fraud by Petitioners and others.   (*See, e.g.*, Tr. at 6117-79, 6232-41, 7989-90, 7995 (Brown direct and redirect); Tr. 7122-24, 7292-93, 7296-7306, 7418 (Brown cross)).   In reality, the marketing support agreements were nothing more than "wash transaction[s]" that had "no economic impact" for Adelphia.   (*See, e.g.*, Tr. at 6121, 6126-27).

217.     To support its position, one of the claims the government put forward was that "[i]n order to conceal the fact that this marketing support agreement was a circular 'wash' transaction with no economic substance, the 'marketing support' agreement . . . was memorialized in two separate contracts, neither of which referenced or mentioned the other."   App. 1 at ¶ 119.

**<u>Response:</u>**   The Government does not dispute that the quotation above accurately reflects language in the Indictment, but the Government disputes any characterization of the Indictment, which speaks for itself.

218.   Mr. Brown testified this was done that way—as opposed to capturing the transaction in one document—to reduce the chances the auditors might notice what was happening. Trial Tr. 6150-52 (testimony of James Brown).

**<u>Response:</u>**   The Government does not dispute that this paragraph accurately summarizes Brown's trial testimony, which in any event speaks for itself.  The Government disputes any characterization of that trial testimony, which speaks for itself.

219.   The government did not call any witnesses from Scientific Atlanta or Motorola to testify at trial.  *See* ECF 142, full set of trial transcripts submitted by the government.

**<u>Response:</u>**   Not disputed except to the extent that this statement is not relevant or material to the resolution of the 2255 Motion.

220.   The government argued to the jury that the marketing support arrangement was a fraudulent transaction because "they signed and discussed two dummy documents to try to throw the auditors off the track of this wash transaction."  Trial Tr. 10585-86 (Government's Closing Argument).

**<u>Response:</u>**   The Government admits that the quoted portions of the Government's closing argument is accurate, but disputes any characterization of that argument, which speaks for itself.

221.   The government also elicited testimony that Adelphia started putting the changed figures on its books even before the time the government contended Adelphia discussed the subject

with the manufacturers.   Trial Tr. 6109, 6122-23, 6131-35 (testimony of James Brown).

**Response:**   The Government disputes this statement to the extent it mischaracterizes the facts established at trial.   Brown testified at trial that, as of August 14, 2000, when Timothy Rigas gave his approval to record marketing support payments in Adelphia's books and records for the quarter ending June 30, 2000, Adelphia did not have an agreement in place for the payment of marketing support, Adelphia had not received any payments for marketing support, and there was no legitimate basis for recording those payments.   (Tr. at 6122-23, 6127-28, 7293).   When asked on direct examination whether Adelphia had at that time engaged in discussions with Scientific Atlanta or Motorola about the marketing support deal, Brown testified that "[w]e hadn't had any discussions with them yet" and that those discussions first occurred in October 2000.   (Tr. at 6128, 6134).   On cross-examination, Brown clarified that he was not personally aware of any discussions between Adelphia and Scientific Atlanta in the summer of 2000 and acknowledged that those discussions could have begun earlier than he recalled, including as early as the summer of 2000.   (Tr. at 7296, 7299).

When questioned about the October 2000 negotiations with Scientific Atlanta and Motorola that ultimately led to execution of the marketing support agreements, Brown explained that Adelphia began the discussions because "we had nothing to document or support the entries that we had already made and that we needed to have something to show the auditors before the year [end audit]."   (Tr. at 6134-35).   Brown testified that Adelphia had entered into contracts with Scientific Atlanta and Motorola in May 2000 for the purchase of digital cable converter boxes, that those May 2000 purchase contracts did not provide for the payment of marketing support, and that Scientific Atlanta and Motorola later agreed to purported "price increases"

82

under these contracts that were in reality designed as wash transactions that were accompanied by "offsetting" marketing support payments in the same amounts.   (Tr. at 6135-37, 6139).

222.    The "marketing support" evidence related to the bank fraud counts, in addition to the securities fraud and conspiracy counts.   *See* App. 7 at 215-16, 231-36.

**Response:**   The Government does not dispute that the "marketing support" evidence related to the surviving bank fraud count, in addition to the remaining counts.

### B.  The Post-Trial Developments

223.    In December 2005, John Wharton, the sales finance person who supported North American Sales for Scientific Atlanta, testified in a civil deposition.   *See* App. 37, Dep. of John Wharton, Adelphia Commc'ns Corp. v. Deloitte & Touche, No. 000598 (C.P. Phila.) (Dec. 22, 2005).

**Response:**   Not disputed.

224.    Mr. Wharton had not been called as a witness at trial. *See* ECF 142, full set of trial transcripts submitted by the government.

**Response:**   Not disputed.

225.    Mr. Wharton testified in the civil deposition that Scientific Atlanta's arrangement with Adelphia was modeled after an agreement Scientific Atlanta had already negotiated with Charter Cable Company (an Adelphia competitor).   *See* App. 37 at 131-32 (Wharton Deposition).

**Response:**   The cited deposition testimony (*see* PX App. 37 at 131 (John Wharton Dep. at 131:2-5) (answering "Right" when asked whether the "Adelphia marketing support documents were modeled after the Charter marketing support documents") (emphasis added)) speaks for

itself.

226.    Mr. Wharton also testified that the marketing support agreements had been internally reviewed and approved by Scientific Atlanta's lawyers, auditors and executives.  *See id.* at 48, 129-30.

**Response:**    The Government disputes this statement as an insufficient summary and improper characterization of the deposition testimony, and inconsistent with the Government's interviews of these witnesses.   For example, the Scientific Atlanta attorney who was interviewed by the Government stated that her "goal in drafting or proofreading contracts was to ensure SA did not lose money," which was why she made certain changes to the price increase letter.   (*See* PX App. 48 at 6-7 (SA-Gifford)).   None of the witnesses interviewed by the Government claimed to understand how Adelphia actually accounted for the marketing support payments, what Adelphia's accountants or outside auditors or lawyers had been told about the transactions, or how the expenses were publicly reported.   (*See, e.g.*, PX App. 51 at 21:117 (Motorola-Tracy) (testifying "I think the comment came from . . . [Motorola] legal that said, we're accounting for it correctly.   We're not [Adelphia's] auditors.   If their auditors are comfortable with it, then so be it," and that Werth had commented to Tracy that "Adelphia['s] auditors, accountants were okay with it.")).

227.    On November 28, 2005, John Tracy (Vice President of Finance at Motorola), also testified in a civil deposition.   App. 38, Deposition of John Tracy, Adelphia Commc'ns Corp. v. Deloitte & Touche, No. 000598 (C.P. Phila. Nov. 28, 2005).

**Response:**    Not disputed.

228.    Mr. Tracy had not been called as a witness at trial.   *See* ECF No. 142, full set of

trial transcripts submitted by the government.

**Response:**   Not disputed.

229.   Mr. Tracy testified that Motorola's marketing support agreement with Adelphia was the same type of marketing support agreement Motorola had with Charter.   *See* App. 38 at 23-25, 121-24 (Tracy Deposition).

**Response:**   The cited deposition testimony (*see* PX App. 38 (Tracy Dep. at 23:21-23) (answering "Basically, yes" when asked "And was it the same type of agreement that you had done with Charter?")) speaks for itself.

230.   Mr. Tracy testified that executives (including the President of the division), in-house lawyers and outside counsel had all reviewed the marketing support agreements.   *See* App. 38 at 148-53.

**Response:**   The Government disputes this statement as an insufficient summary and improper characterization of the deposition testimony, and inconsistent with the Government's interviews of these witnesses.   The Government further incorporates by reference its response to paragraph 226, *supra*.

231.   In 2007, the Petitioners moved to compel the government to turn over any Brady material with regard to Scientific Atlanta and Motorola.   *See* ECF No. 394, Motion to Compel Production of Notes Taken During Government Interviews, United States v. Rigas, No. 02-CR-1236 (Dec. 7, 2007), at 22-24.

**Response:**   Not disputed.

232.   The government responded, "[t]here was no Brady disclosure triggered by any such witnesses whom the Government interviewed."   App. 10 at 5-6.

85

**Response:**   Not disputed.

233.   The district court denied the motion to compel, explaining:

[D]efendants' brief in support of their Rule 33 Motion documented their attempts to speak with these witnesses, and thus they cannot claim now that they were unaware of these witnesses' identities. As this Court noted in its November 20, 2007 Opinion, the Rigases did not take any steps to procure testimony from these witnesses, such as seeking immunity for the witnesses or subpoenaing them, and thus cannot now backtrack and claim that they were unaware of these witnesses' identities.

App. 12 at *2.

**Response:**   Not disputed.

234.   Without reviewing any of the Government notes regarding Scientific Atlanta or Motorola, the district court denied the Petitioners' request for an order compelling the government to produce its notes.   *See* App. 11 at 129.

**Response:**   Not disputed.

235.   The Second Circuit affirmed the denial of the Motion to Compel. *See* App. 8 at 125-26.

**Response:**   Not disputed.

236.   In affirming the denial of the Motion to Compel, the Second Circuit stated, "We detect no error in the district court's January 15, 2008 Order denying defendants' motion to compel discovery."   App. 8 at 126.

**Response:**   Not disputed.

237.   In 2014, Petitioners informed this Court that three witnesses from Scientific Atlanta and Motorola—Wallace Haislip, John Wharton and John Tracy—had testified in then-recent depositions about the relevant events.   *See* App. 39, ECF No. 34, Letter to Hon. Kimba

M. Wood (Mar. 24, 2014), at 3-4.

**Response:**   Not disputed that the Petitioners informed the Court about the then-recent civil depositions of Haislip, Wharton, and Tracy, but disputed as to the characterization of the significance of those depositions.

238.   Petitioners contended that these depositions indicated that the witnesses had provided exculpatory information to the government before the Petitioners' trial.   App. 39 at 4-5.

**Response:**   The Government disputes this statement in its entirety as a legal conclusion and, therefore, improperly included in Petitioners' Statement.   The Government, in any case, disputes that any of the Government's pretrial interviews with representatives of Scientific Atlanta and Motorola were exculpatory of Petitioners.   The Petitioners' contentions to the contrary are irrelevant and immaterial to resolution of the 2255 Motion.

239.   Based on these depositions, this Court granted the Petitioners' request for discovery from the government regarding information the government learned from Scientific Atlanta and Motorola personnel prior to trial.   App. 40, ECF No. 39, Order (June 20, 2014).

**Response:**   The Government does not dispute that the Court granted Petitioners' request for discovery.

240.   Through discovery, the Petitioners received eight memoranda of pre-trial interviews conducted by the government between July 2002 and January 2003.   *See* Apps. 41-48.

**Response:**       Not disputed.

241.   One of the memoranda is the government's August 23, 2002 interview of Patrick

87

Tylka, who was then Scientific Atlanta's President of Worldwide Sales.   App. 41 at 1448-49.

      **Response:**    Not disputed.

242.    The government also tendered notes of its August 23, 2002 interview of Wallace Haislip, who was then Scientific Atlanta's Chief Financial Officer and Treasurer.   App. 42 at 1463.

      **Response:**    Not disputed.

243.    In addition, the government tendered notes of its August 28, 2002 interview of David Hansen, who was then part of Scientific Atlanta's Northeast Region Telephone Sales Force.   App. 43 at 1472.

      **Response:**    Not disputed.

244.    The government also tendered notes of its September 13, 2002 interview of Thomas Nilson, who was then Scientific Atlanta's Vice President and Manager of North American Sales.   App. 44 at 1481-82.

      **Response:**    Not disputed.

245.    In addition, the government tendered notes of its September 25, 2002 interview of John Simons, who was then Motorola's Sales Director.   App. 45 at 820.

      **Response:**    Not disputed.

246.    The government also tendered notes of its October 10, 2002 interview of John Wharton, who was then Scientific Atlanta's Finance Director for Financial Planning and Analysis.   App. 46 at 1489-90.

      **Response:**    Not disputed.

247.    In addition, the government tendered notes of its December 13, 2002 interview of

Marc Rothman, who was then Motorola's Vice President and Director of Finance for Motorola's

Broadband Sector.   App. 47 at 812.

     **Response:**     Not disputed.

     248.     The government also tendered notes of its January 24, 2003 interview of Anita

Gifford, who was then Scientific Atlanta's Vice President of Law Division & Deputy General

Counsel.   App. 48 at 1502-03.

     **Response:**     Not disputed.

     249.     During his interview with the government, Mr. Tylka stated that he was aware

that Adelphia was seeking a marketing support arrangement similar to the one Scientific Atlanta

already had with Charter.   App. 41 at 1454 (Tylka Interview).

     **Response:**     The Government disputes any characterization of the summaries of

statements made during the interviews, which speak for themselves.   In explaining why two

documents were used to reflect a single transaction with Adelphia – a price increase letter, and a

marketing support agreement – the Scientific Atlanta witnesses either did not know (*see, e.g.*, PX

App. 43 at 7 (SA-Hansen)), or stated that Nilson had decided that two documents should be used

because that approach had previously been approved by Scientific Atlanta in the Charter

transaction (*see, e.g.*, PX App. 44 at 6 (SA-Nilson); PX App. 46 at 7 (SA-Wharton); *see also,*

*e.g.*, PX App. 51 at 22:22-23:7 (Motorola-Tracy) ("I think Adelphia had an agreement to start

with, and we changed it to be consistent with the one we had from Charter."))   Haislip –

Scientific Atlanta's CFO – stated "he had no idea why the Charter agreement was composed of

two documents" and "noted that both he and his Chief Accounting Officer thought at the time

that SA did not need two documents . . . Haislip agreed that two documents would be needed if

one wanted to raise a price without giving the appearance of a rebate.   Otherwise . . . it would be obvious that a rebate was, in fact, being paid and no accounting benefit would accrue because, in the case of a rebate, the transaction could not be used to increase EBITDA."   (PX App. 42 at 7 (SA-Haislip)).

Further, the Scientific Atlanta and Motorola representatives with knowledge of the issue uniformly acknowledged that neither company – as represented in the price increase letters – had actually experienced a price increase for the components used to manufacture the digital converter boxes sold to Adelphia.   (*See, e.g.*, PX App. 41 at 6, 11, 14 (SA-Tykla); PX App. 42 at 8 (SA-Haislip); PX App. 43 at 7 (SA-Hansen); PX App. 44 at 5-6 (SA-Nilson); PX App. 46 at 7 (SA-Wharton); PX 81 at 2 (Motorola-Rothman); *see also, e.g.*, PX App. 48 at 7 (SA-Gifford) (deferring to Wharton)).   The Scientific Atlanta and Motorola representatives understood that the marketing support agreements and accompanying price increase letters were a "wash" transaction without real economic impact, and that the companies had agreed to the transaction as an accommodation to Adelphia, a significant customer.   (*See, e.g.*, PX App. 41 at 7-8 (SA-Tykla); PX App. 43 at 6 (SA-Hansen); PX App. 44 at 4-5 (SA-Nilson); PX App. 46 at 6 (SA-Wharton); PX App. 47 at 2 (Motorola-Rothman)).

250.   During his interview with the government, Mr. Nilson stated that the transaction with Adelphia used "essentially the same paperwork as the Charter transaction" and that "[t]he name . . . was simply changed from Charter to ACC."   App. 44 at 1486 (Nilson Interview).

**Response:**      The Government disputes any characterization of the summaries of statements made during the interviews, which speak for themselves.   The Government further incorporates by reference its response to paragraph 249, *supra*.

251.    During his interview with the government, Mr. Wharton stated that he had been told that "ACC wanted a 'Charter-like' marketing agreement."   App. 46 at 1493 (Wharton Interview).

**Response:**    The Government disputes any characterization of the summaries of statements made during the interviews, which speak for themselves. The Government further incorporates by reference its response to paragraph 249, *supra*.

252.    During his interview with the government, Mr. Hansen stated that in July 2000 he learned that Adelphia had been exploring "the possibility of SA's entering into a marketing support agreement with ACC similar to an agreement SA had with Charter Communications." App. 43 at 1475 (Hansen Interview).

**Response:**    The Government disputes any characterization of the summaries of statements made during the interviews, which speak for themselves.

253.    During his interview with the government, Mr. Hansen stated that he did not know exactly how Adelphia knew about the Charter agreement, but he knew that the "cable industry is a small one and that people in the industry talk with one another."   App. 43 at 1475 (Hansen Interview).

**Response:**    The Government disputes any characterization of the summaries of statements made during the interviews, which speak for themselves.

254.    During his interview with the government, Mr. Nilson stated that Adelphia's "Most Favored Nation" agreement entitled it to pricing terms as favorable as any customer received.   *See* App. 44 at 1483 (Nilson Interview).

**Response:**   The Government disputes any characterization of the summaries of

statements made during the interviews, which speak for themselves.   In particular, while the notes of the Nilson interview reference Adelphia's "most favored nation" status, Nilson did not state that it was reasonable for Adelphia to have a marketing support agreement similar to the Charter agreement.

255.   During her interview with the government, Ms. Gifford stated that Scientific Atlanta contracts "commonly contain" Most Favored Nation clauses.   App. 48 at 1503 (Gifford Interview).

**Response:**   The Government disputes any characterization of the summaries of statements made during the interviews, which speak for themselves.   In particular, while the notes of the Gifford interview reference Adelphia's "most favored nation" status, Gifford did not state that it was reasonable for Adelphia to have a marketing support agreement similar to the Charter agreement.

256.   Mr. Wharton later explained in a civil deposition that other companies, such as Comcast and Time Warner, also had marketing support agreements.   App. 37 at 123-25.

**Response:**   The Government disputes any characterization of the deposition testimony, which speaks for itself.   In particular, the Government disputes that the cite evidence supports the contention that the marketing support agreements entered into with Comcast and Time Warner were "similar" to the Adelphia agreement.   First, Wharton testified that other agreements weren't corporate "marketing co-op deals," but instead were entered into with a particular division of the various cable companies.   Second, Wharton testified that the arrangements were structured as a "credit" rather than a "marketing support advertising arrangement."   As such, the arrangements were structured as a credit, rather than a price

increase, as in the Adelphia agreement.   Finally, unlike the Adelphia agreement, the arrangements with other cable companies were entered into at the same time as the purchase agreements for set-top boxes and not negotiated after the fact, as was the case for Adelphia. (PX App. 37 at 123-25).

257.   During her interview with the government, Ms. Gifford stated that she learned that Scientific Atlanta's "Sales & Marketing department talked ACC into using the Charter version, explaining it would save time as that transaction had already been approved" by Scientific Atlanta.   App. 48 at 1507 (Gifford Interview).

**Response:**   The Government disputes any characterization of the summaries of statements made during the interviews, which speak for themselves.   The Government further incorporates by reference its response to paragraph 249, *supra*.

258.   During her interview with the government, Ms. Gifford stated that Scientific Atlanta sent Adelphia a draft of the proposed agreement that was the Charter agreement with the names and amounts associated with the Charter deal redacted.   App. 48 at 1507 (Gifford Interview).

**Response:**   The Government disputes any characterization of the summaries of statements made during the interviews, which speak for themselves.   The Government further incorporates by reference its response to paragraph 249, *supra*.

259.   During her interview with the government, Ms. Gifford also stated that while she was revising documents proposed by Adelphia, someone told her that someone in Scientific Atlanta's Sales & Marketing department talked Adelphia into using the Charter version, explaining it would save time as that transaction had already been approved by Scientific

Atlanta.   App. 48 at 1507 (Gifford Interview).

**Response:**   The Government disputes any characterization of the summaries of statements made during the interviews, which speak for themselves.   The Government further incorporates by reference its response to paragraph 249, *supra*.

260.   With regard to the language in the agreement that attributed the increase in price per unit to Scientific Atlanta's rising costs, Ms. Gifford told the government that she simply copied the language from the Charter agreement and there "were no discussions regarding the propriety of leaving the Charter component price increase language in the ACC price increase letter."   App. 48 at 1508.

**Response:**   The Government disputes any characterization of the summaries of statements made during the interviews, which speak for themselves.   The Government further incorporates by reference its response to paragraph 249, *supra*.

261.   During his interview, Mr. Nilson stated that Adelphia agreed to the two-contract approach when Mr. Nilson said he preferred to use a format previously used.   App. 44 at 1486 (Nilson Interview).

**Response**:   The Government disputes any characterization of the summaries of statements made during the interviews, which speak for themselves.   The Government further incorporates by reference its response to paragraph 249, *supra*.

262.   During his interview with the government, Mr. Wharton stated that the draft agreements Scientific Atlanta sent to Adelphia were the Charter agreements, with all references to Charter blacked out.   App. 46 at 1495 (Wharton Interview).

**<u>Response</u>**:   The Government disputes any characterization of the summaries of statements made during the interviews, which speak for themselves.   The Government further incorporates by reference its response to paragraph 249, *supra*.

263.    During his interview with the government, Mr. Wharton stated that Scientific Atlanta proposed using the Charter contracts because, as that contract was already approved, it would be faster to use a tried method.   *See* App. 46 at 1495 (Wharton Interview).

**<u>Response</u>**:   The Government disputes any characterization of the summaries of statements made during the interviews, which speak for themselves.   The Government further incorporates by reference its response to paragraph 249, *supra*.

264.    During his interview with the government, Mr. Nilson stated that Scientific Atlanta agreed with Adelphia to use two documents "because two documents had been used for the Charter Communications agreement."   App. 44 at 1485 (Nilson Interview).

**<u>Response:</u>**   The Government disputes any characterization of the summaries of statements made during the interviews, which speak for themselves.   The Government further incorporates by reference its response to paragraph 249, *supra*.

265.    During his interview with the government, Mr. Haislip stated that the reason "two documents were needed to support a single contract" between Scientific Atlanta and Adelphia was "because that was the format which had been used for the marketing support agreement reached with Charter Communications."   App. 42 at 1469 (Haislip Interview).

**<u>Response:</u>**   The Government disputes any characterization of the summaries of statements made during the interviews, which speak for themselves.   The Government further incorporates by reference its response to paragraph 249, *supra*.

266.     During her interview with the government, Ms. Gifford stated that in working on the agreements, she understood it "should have been a two-piece contract if it were to be, as she understood it should be, 'Charter-like.' "   App. 48 at 1507 (Gifford Interview).

**Response:**   The Government disputes any characterization of the summaries of statements made during the interviews, which speak for themselves.   The Government further incorporates by reference its response to paragraph 249, *supra*.

267.     During his interview with the government, Mr. Wharton explained that "any reasonable finance person who read the penalty clause could link the documents despite a lack of internal reference."   App. 46 at 1493 (Wharton Interview).

**Response:**   The Government disputes any characterization of the summaries of statements made during the interviews, which speak for themselves.   The Government further incorporates by reference its response to paragraph 249, *supra*.

268.     In his interview with the government, Mr. Tylka stated that an advantage for Scientific Atlanta of proceeding with the marketing support agreement that was neutral on money exchanged between Adelphia and Scientific Atlanta was that there was no need to adjust the sales invoices on a monthly basis in connection with sales of each unit, as the marketing support payments could be made independently on a quarterly basis.   *See* App. 41 at 1455 (Tylka Interview).

**Response:**   The Government disputes any characterization of the summaries of statements made during the interviews, which speak for themselves.   The Government further incorporates by reference its response to paragraph 249, *supra*.

269.     During his interview with the government, Mr. Haislip explained that a marketing

96

support amount needed to reflect "commercial reasonableness" because "one had to be reasonable when negotiating contracts."   *See* App. 42 at 1466 (Haislip Interview).

      **Response**:   The Government disputes any characterization of the summaries of statements made during the interviews, which speak for themselves.   In particular, the interview notes make clear that while Scientific Atlanta refused to agree to marketing support payments in a higher amount initially proposed by Adelphia, and insisted on an amount that was more commercially reasonable by comparison to the cost of the digital converter boxes (*see, e.g.* PX App. 41 at 10 (SA-Tylka)), Scientific Atlanta made this proposal not because the marketing support transaction *was* legitimate but to make the wash transaction *seem* legitimate in order to survive scrutiny from the SEC, lawyers, or auditors.   (*See, e.g.*, PX App. 42 at 4-5 (SA-Haislip) ("Asked why a theoretical 50% margin number mattered when the marketing support agreement would have no effect [on] SA's margin, Haislip noted one had to be reasonable when negotiating contracts. . . . Haislip stated he was concerned about the scrutiny from external auditors and from lawyers . . . . Additionally, he noted, the percentage had to seem reasonable for SEC reporting purposes.   Haislip stated his belief that one should be especially sensitive when renegotiating a contract without an economic basis for doing so."); PX App. 43 at 8 (SA-Hansen) ("Wally Haislip set this limit [the "acceptable limit for SA's marketing support payments"] . . . so that 'our (SA's) auditors will not have a problem with it.'"); (PX App. 46 at 6 (SA-Wharton) ("Commercial reasonability is important, even in a wash transaction, because of the appearance it gives auditors, Wharton stated.   Wharton admitted he and others at SA understood ACC wanted the contract for financial, not marketing purposes.")).

The Scientific Atlanta representatives further told the Government that Scientific Atlanta did not expect that Adelphia would actually do additional marketing using the market support payments, and they had not seen proof of such marketing by Adelphia.   (*See, e.g.*, PX App. 43 at 6, 10 (SA-Hansen); PX App. 44 at 7 (SA-Nilson); PX App. 46 at 8 (SA-Wharton).   *See also, e.g.*, PX App. 41 at 10 (SA-Tylka) ("Asked if anyone in the sales or marketing departments of SA honestly believed that ACC would do additional marketing based on a transaction in which they received no additional money, Haislip stated he believed they would.   He noted, however, that he never heard anyone else at SA opine that ACC would put forth additional marketing efforts without receiving money from SA."); PX App. 42 at 7 (SA-Haislip) (opining as to his personal belief that such marketing would occur but failing to identify anyone in the "sales or marketing department of SA [who] honestly believed that ACC would do additional marketing based on a transaction in which they received no additional money . . . [and] that he never heard anyone else at SA opine that ACC would put forth additional marketing efforts without receiving money from SA")).   By contrast, Charter had provided Scientific Atlanta with detailed proof of its marketing efforts pursuant to its marketing support agreement.   (*See, e.g.*, PX App. 46 at 9-10 (SA-Wharton) (noting that Haislip wanted "Charter-like" supporting documentation to show "when in what markets" Adelphia did its marketing, that after calling Haislip "anal," Werth eventually provided some materials, and that Wharton found the documentation "wanting" and that Adelphia did not appear to be spending "$20 million per year to market digital cable")).

270.     During his interview with the government, Mr. Haislip stated that he rejected Adelphia's proposal of $50 marketing support per box because the amount was so large that he did not entertain the concept long or discuss it at length.   *See* App. 42 at 1465-66, 1468 (Haislip

Interview).

**Response:**   The Government disputes any characterization of the summaries of statements made during the interviews, which speak for themselves.   The Government further incorporates by reference its response to paragraph 268, *supra*.

271.   During his interview with the government, Mr. Haislip stated that he had experience with marketing support agreements, which never entered into double digits.   App. 42 at 1466 (Haislip Interview).

**Response:**   The Government disputes any characterization of the summaries of statements made during the interviews, which speak for themselves.   The Government further incorporates by reference its response to paragraph 268, *supra*.

272.   During his interview with the government, Mr. Haislip stated that he proceeded with the marketing support agreement knowing that Adelphia was entering the agreement "to capitalize expenses, lower marketing costs, and raise EBITDA," and "that marketing support money which would come from an increase in price would, in fact, help reduce marketing expenses, therefore boosting EBITDA."   App. 42 at 1467-68 (Haislip Interview).

**Response:**   The Government disputes any characterization of the summaries of statements made during the interviews, which speak for themselves.   For example, while the cited evidence indicates that Haislip understood Adelphia's proposal was designed to boost EBITDA, nothing in the cited evidence supports the contention that Haislip believed the appropriateness of a marketing support arrangement turned on whether it reflected amounts properly attributable to marketing support.   Instead, Haislip stated that the touchstone of the appropriateness of the arrangement was whether it would pass legal scrutiny and gain the

approval of both sets of auditors.   (PX App. 42 at 1466, 1468).   Haislip also stated that he was

concerned about SEC scrutiny, and noted that "one should be especially sensitive when

renegotiating a contract without an economic basis for doing so."   (PX App. 42 at 1467).

273.   During his interview with the government, Mr. Haislip stated that when Mr.

Brown "became furious and used vulgar language" during the negotiations on the amount of

marketing support, Mr. Haislip asked to speak with Timothy Rigas, with whom he believed a

reasonable agreement would be reached.   App. 42 at 1468 (Haislip Interview).

**Response:**   The Government disputes any characterization of the summaries of

statements made during the interviews, which speak for themselves.   The Government further

incorporates by reference its response to paragraph 268, *supra*.

274.   Mr. Haislip was familiar with marketing support from his employment within the

television industry.   App. 42 at 1466 (Haislip Interview).

**Response:**   The Government disputes any characterization of the summaries of

statements made during the interviews, which speak for themselves.   The Government further

incorporates by reference its response to paragraph 271, *supra*.

275.   Mr. Haislip understood that one has to be reasonable when negotiating contracts

and the terms one enters into when restructuring a contract have to be reasonable at the time of

the original contract, not the restructuring.   App. 42 at 1466 (Haislip Interview).

**Response:**   The Government disputes any characterization of the summaries of

statements made during the interviews, which speak for themselves.   The Government further

incorporates by reference its response to paragraph 268, *supra*.

276.   Mr. Haislip stated that his role as CFO of Scientific Atlanta was to give each

contract a test of "commercial reasonableness." App. 42 at 1466 (Haislip Interview).

**Response:**   The Government disputes any characterization of the summaries of statements made during the interviews, which speak for themselves.   The Government further incorporates by reference its response to paragraph 268, *supra*.

277.   During his interview with the government, Mr. Tylka stated that he was of the view that Adelphia would spend money to market Scientific Atlanta's product.   *See* App. 41 at 1457 (Tylka Interview).

**Response:**   The Government disputes any characterization of the summaries of statements made during the interviews, which speak for themselves.   The Government further incorporates by reference its response to paragraph 268, *supra*.

278.   During his interview with the government, Mr. Hansen stated that Mr. Brown had indicated that Adelphia's auditors had no problem with any marketing support number and thus Adelphia did not have to worry about an artificially imposed number.   App. 43 at 1478 (Hansen Interview).

**Response**:   The Government disputes this statement as an insufficient summary and improper characterization of the deposition testimony, and inconsistent with the Government's interviews of these witnesses.   The Government further incorporates by reference its response to paragraph 226, *supra*.

279.   Documentary evidence shows that Adelphia had been working with its auditors on the marketing support agreements.   *See* App. 50, August 21, 2000 Mem. from Ivan Hoffman to Tim Werth, at DT00323432; App. 50, August 24, 2000 Mem. from Ivan Hoffman to Tim Werth, at DT00299727.

**Response**:   The Government disputes this statement as irrelevant and immaterial to the resolution of the 2255 Motion.   For completeness, the Government also notes that the Scientific Atlanta and Motorola witnesses did not express any understanding about what Adelphia told its lawyers or accountants.   The Government further incorporates by reference its response to paragraph 226, *supra*.

280.   During his interview with the government, when asked by the government whether anyone at Scientific Atlanta honestly believed that Adelphia would do additional marketing based on a transaction in which they received no additional money, Mr. Haislip "stated he believed they would."   App. 42 at 1469 (Haislip Interview).

**Response**:   The Government disputes any characterization of the summaries of statements made during the interviews, which speak for themselves.   The Government further incorporates by reference its response to paragraph 268, *supra*.

281.   During his interview with the government, Mr. Wharton stated that Scientific America requested proof from Adelphia of marketing done pursuant to their agreement, and Adelphia's Tim Werth (who was not a marketing or advertising employee) provided some documentation, which Scientific America found wanting.   *See* App. 46 at 1496-97 (Wharton Interview).

**Response**:   The Government disputes any characterization of the summaries of statements made during the interviews, which speak for themselves.   The Government further incorporates by reference its response to paragraph 268, *supra*.

282.   During his interview with the government, Mr. Wharton stated that when Scientific Atlanta requested documentation that Adelphia was actually spending the money on

marketing, Adelphia's Tim Werth sent Mr. Wharton "a financial statement for the quarter ending September 30, 2001, which reflected that ACC spent $25 million to $26 million per quarter on marketing."   App. 46 at 1498 (Wharton Interview).

**Response**:   The Government disputes any characterization of the summaries of statements made during the interviews, which speak for themselves.   The Government further incorporates by reference its response to paragraph 268, *supra*.

283.   During his interview with the government, when asked why Motorola wanted to accommodate Adelphia, Mr. Rothman stated that Motorola wanted to accommodate the customer, explaining "we'll accommodate something if it's legal."   App. 47 at 813 (Rothman Interview).

**Response**:   The Government disputes any characterization of the summaries of statements made during the interviews, which speak for themselves.   In particular, the Government disputes any implication from this statement that Rothman made a judgment as to the legal propriety of the marketing support agreements, a fact that is irrelevant and immaterial to the resolution of the 2255 Motion.   Further, as Rothman made clear in his interview, although he would not proceed with an agreement he believed was illegal, he "acknowledged the transaction was not common and had no valid business reason behind it," and only assumed that Motorola had obtained a letter from the FCC about Adelphia not capitalizing its costs.   (*See, e.g.*, PX App. 47 at 813).

284.   During his interview with the government, Mr. Wharton stated that Mr. Brown pressured Scientific Atlanta to complete the final documents prior to a meeting scheduled for Monday, November 13, 2000.   App. 46 at 1495 (Wharton Interview).

103

**Response**:   The Government disputes any characterization of the summaries of statements made during the interviews, which speak for themselves.   In particular, the cited evidence does not support the contention that Brown pressured Scientific Atlanta to complete the final documents by November 13.   In fact, the summary of Wharton's interview indicated that "*ACC* told SA the deal had to be completed quickly, demanding final documents be drafted over the weekend prior to a meeting scheduled for Monday, November 13."   (PX App. 46 at 1495). The Wharton summary further states "Complaining that the SA and ACC had already talked about it for two months, Jim Brown demanded that the deal get done quickly, without giving a reason for the haste."  (PX App. 46 at 1495).   Thus, there is no basis in the cited evidence to support the assertion that Brown insisted on completion by November 13.

285.   A memorandum dated Sunday, November 12, 2000, from Ivan Hoffman at Deloitte & Touche, indicated that Hoffman had reviewed the purchase order agreement as well as the marketing support agreement and agreed marketing support fees should be recognized as a contra expense (the manner in which Adelphia intended to book the expense).   App. 57, Mem. from Ivan Hoffman at 1 (Nov. 12, 2000).

**Response**:   The cited evidence is immaterial and irrelevant to resolution of the 2255 Motion.   For example, the evidence does nothing to undermine the Government's allegation and overwhelming evidence at trial that the Petitioners committed fraud by fraudulently inflating Adelphia's EBITDA and concealing the true nature of the marketing support transactions from Adelphia's auditors and investors.   Thus, the cited document does nothing more than describe the transaction that Adelphia entered into using the marketing support agreements and does not disclose that the transaction was in fact a "wash" transaction without any business or economic

justification, and that Adelphia did not intend to or actually do additional marketing using the market support payments, so as to justify the booking of those costs as a contra-expense to the market support revenue.

286.     Adelphia's Audit Committee met on November 13, 2000.   App. 49, Adelphia Communications Corp., Minutes of Audit Committee Meeting.

**Response**:   Not disputed.

287.     In a session 2002 or 2003, government officials, including Assistant United States Attorney Christopher Clark, examined John Tracy, who served as Motorola Communication's Vice President of Finance.   App. 51, Deposition of John Tracy in Rigas v. Deloitte & Touche, No. 03-MDL-1529 (S.D.N.Y. Mar. 12, 2014), at 6-7, 50; App. 52, Testimony of John Tracy, In re Adelphia Commc'ns Corp, No. NY-7026-A (S.E.C. June 21, 2005), at 275 (Indicating he had been interviewed by the United States Attorney's Office in the "[e]nd of 2002. September 2002.").

**Response:**   The Government does not dispute that an interview of Tracy occurred as described above.   The Government disputes any characterization of that interview as an "examin[ation]."

288.     Mr. Tracy testified that the marketing support agreements were drafted by Motorola, based on a similar agreement between Motorola and Charter Communications.   App. 51 at 17-18, 23; *see also* App. 38 at 167.

**Response**:   The Government disputes any characterization of the deposition testimony, which speaks for itself.

289.     Mr. Tracy testified that Motorola's use of two separate contracts—one dealing

with the new equipment price and one with marketing support payments—tracked the form of the Charter agreements.   App. 51 at 23-24.

**Response**:   The Government disputes any characterization of the summaries of statements made during the interviews, which speak for themselves.   The Government further incorporates by reference its response to paragraph 249, *supra*.

290.   Mr. Tracy testified that Motorola's agreement with Adelphia was drafted by Motorola: "I think Adelphia had an agreement to start with, and we changed it to be consistent with the one we had from Charter."   App. 51 at 23.

**Response**:   The Government disputes any characterization of the deposition testimony, which speaks for itself.   The Government disputes that Tracy's deposition testimony was about what "he told the Government in 2002" or that any conclusion can be drawn from his 2004 deposition testimony about what he may have told the Government in any purported meeting in 2002.   The cited evidence does not support the contention that Motorola "drafted" the marketing support agreement, only that it made changes to the agreement provided by Adelphia in order to make it consistent with the Charter arrangement (PX App. 51 at 23).   The Government does not dispute that the marketing support arrangement was embodied in two different contracts.

291.   Mr. Tracy reported that he provided the Adelphia agreement to the group responsible for vetting Charter's similar request—a group that included executives, the CFO, the General Counsel, others in Motorola's legal department, and outside counsel.   App. 51 at 19; *see also* App. 38 at 59, 149-54.

**Response**:   The Government disputes any characterization of the deposition testimony, which speaks for itself.   The Government disputes any imputation that the cited testimony

supports the contention that Motorola's lawyers and auditors were provided the Charter agreement; in fact, Tracy simply testified that this group "vetted" the Adelphia transaction.   (PX App. 51 at 19).   Petitioners provide no citation for their contention that those vetting the Adelphia marketing support arrangement concluded that it was appropriate.

292.    Mr. Tracy told the government in 2002 or 2003 that he and others learned from Tim Werth that Adelphia's auditors and legal "were okay with" the proposed agreements.   App. 51 at 21; *see also* App. 38 at 41-43, 83-85, 158.

**Response**:   The Government disputes any characterization of the deposition testimony, which speaks for itself.   The Government disputes that Tracy's deposition testimony was about what "he told the Government in 2002" or that any conclusion can be drawn from his 2004 deposition testimony about what he may have told the Government in any purported meeting in 2002.   In particular, the Government disputes that the cited testimony supports the contention that Motorola's lawyers and auditors were provided the Charter agreement; in fact, Tracy simply testified that this group "vetted" the Adelphia transaction.   (PX App. 51 at 19).   Petitioners provide no citation for their contention that those vetting the Adelphia marketing support arrangement concluded that it was appropriate.   Finally, the Government does not dispute that Tracy testified that he learned from Werth that Adelphia's auditors were comfortable with the marketing support arrangement.   (PX App. 51 at 42).

293.    The indictment alleged that Timothy Rigas, James Brown, and Timothy Werth caused Adelphia to record the marketing support payments on Adelphia's books beginning in August 2000.   App. 1 at ¶ 114.

**Response**:   Not disputed.

294.    The indictment further alleged that in or about late October 2000, Timothy Rigas, James Brown, and Timothy Werth, "undertook various actions to give the appearance of legitimacy" to the revenue entries they had begun making in August 2000.   App. 1 at ¶ 115.

**Response**:   Not disputed.

295.    The indictment alleged that Timothy Rigas, James Brown, and Timothy Werth accordingly "caused Adelphia to begin negotiating" with a vendor "in the hope of reaching an agreement for marketing support payments to Adelphia."   App. 1 at ¶ 115.

**Response**:   Not disputed.

296.    At trial, Mr. Brown testified that as of the summer of 2000, Adelphia "hadn't had any discussions" yet with Scientific Atlanta or Motorola.   Trial Tr. 6127-28; *see also* Trial Tr. 6131, 6134.

**Response**:   The Government does not dispute that Petitioners have accurately cited Brown's trial testimony.

297.    Mr. Brown later admitted in cross-examination that there possibly could have been earlier conservations between Adelphia and the companies.   Trial Tr. 7298-99.

**Response**:   The Government does not dispute that Petitioners have accurately cited Brown's trial testimony.

298.    The Petitioners sought to admit an exhibit (App. 85, Def. Trial Ex. 12,266 at 1), which was an August 11, 2000 internal Scientific Atlanta e-mail about Scientific Atlanta having the "go-ahead to do the 'Charter-like' marketing credit for Adelphia."   *See* Trial Tr. 9497.

**Response:**   Not disputed.

299.    The Petitioners argued that this exhibit showed that there was discussion of an

agreement between Adelphia and Scientific Atlantic prior to the time James Brown testified he was aware of it.   Trial Tr. 9499-9500, 9546-47.

**Response**:   Not disputed.

300.   The government objected to admission of the exhibit, claiming that "there's no reason, either in the record or in this email, that that's not consistent" with Scientific Atlanta having planned to propose a marketing agreement in August having never discussed the issue with Adelphia.   Trial Tr.   9549-50.

**Response**:   Not disputed.

301.   The government told the Court, "All this indicates is that there was an internal go-ahead at Scientific Atlanta to negotiate with Adelphia."   Trial Tr. 9499.

**Response**:   Not disputed.

302.   The government argued that if the Petitioners wished to prove differently, "they should call" witnesses from Scientific Atlanta.   Trial Tr. 9549-9550.

**Response**:    Not disputed.

303.   Based on the internal Scientific Atlanta e-mail, Judge Sand formulated a stipulation that "the internal files of Scientific Atlanta reflect that during the period beginning, during the period from August through October, consideration was being given to the drafting and submission to Adelphia of a marketing credit agreement."   Trial Tr. 9546, 9565.

**Response**:   Not disputed.

304.   After modifying the language, the jury was read a stipulation stating, "That internal correspondence at Scientific Atlanta indicates that as of August 11, 2000, consideration was being given to the entry of an agreement with Adelphia for market support. No final

agreement is reflected in this correspondence, but Scientific Atlanta indicated a willingness to enter into some type of agreement as part of its efforts to get Adelphia to make more timely payment of its bills."   Trial Tr. 10419.

      **Response**:   Not disputed.

      305.   In his pre-trial interview with the government, Scientific Atlanta's Mr. Nilson told the government that the subject of marketing support first arose during a tradeshow in 2000 when Dan Liberatore of Adelphia asked about the concept.   *See* App. 44 at 1483-84 (Nilson Interview).

      **Response**:   The Government disputes any characterization of the summaries of statements made during the interviews, which speak for themselves.   The Government further disputes any imputation in this statement that there was anything inaccurate about the representation in the stipulation that "the internal files of Scientific Atlanta reflect that as of August 11 consideration was being given to the drafting and submission to Adelphia of a marketing support agreement."   In any event, the timing of the initial discussions between Liberatore and Scientific Atlanta in no way contradicts Brown's testimony at trial, where he explained that in the "summer of 2000," Timothy Rigas stated that Adelphia needed to "find a way to hide" significant marketing expenses; that a few days to a week later, Brown proposed entering into a "wash" marketing support transaction with Scientific Atlanta; and that while Brown was not personally aware of discussions with Scientific Atlanta about marketing support before October 2000, it was possible that such discussions had begun as early as the summer of 2000.   (Tr. at 6122-23, 6127-28, 7293, 7296, 7299).

      306.   Mr. Nilson told the government that the conversation with Dan Liberatore

occurred after a May 2000 contract between Scientific America was signed but prior to an annual

fishing trip that occurs in July or August.   App. 44 at 1483-84 (Nilson Interview).

   **Response**:   The Government disputes any characterization of the summaries of

statements made during the interviews, which speak for themselves.   The Government further

incorporates by reference its response to paragraph 305, *supra*.

   307.   Mr. Nilson also explained that when Adelphia raised the subject, he

recommended arranging talks on the subject at the annual fishing trip Scientific Atlanta sponsors

in June or July.   App. 44 at 1484 (Nilson Interview).

   **Response**:   The Government disputes any characterization of the summaries of

statements made during the interviews, which speak for themselves.   The Government further

incorporates by reference its response to paragraph 305, *supra*.

   308.   In his pre-trial interview with the government, Mr. Hansen of Scientific Atlanta

explained that during the July 2000 fishing trip, Adelphia's Dan Liberatore received a phone call

from someone at Adelphia "asking him to explore the possibility of [Scientific Atlanta's]

entering into a marketing support agreement with [Adelphia] similar to an agreement [Scientific

Atlanta] had with Charter Communications."   App. 43 at 1474-75 (Hansen Interview).

   **Response**:   The Government disputes any characterization of the summaries of

statements made during the interviews, which speak for themselves.   The Government further

incorporates by reference its response to paragraph 305, *supra*.

   309.   The government never disclosed any information it learned from Scientific

Atlanta or Motorola personnel, and contended that "[t]here was no Brady disclosure triggered by

any such witnesses whom the Government interviewed."   App. 10 at 6.

**Response**:   The Government does not dispute that it made no *Brady* disclosures regarding the interviews of Scientific Atlanta and Motorola employees.   The Government disputes that any information provided in these interviews was exculpatory or that it had any *Brady* obligation to disclose any such information.

### III.    Materials in the Possession of the Securities and Exchange Commission

310.    Petitioners argued to the district court and the U.S. Court of Appeals for the Second Circuit that because the Securities and Exchange Commission and the Department of Justice coordinated their investigations of the Rigases, the government had a duty under *Brady* to turn over any exculpatory evidence in the possession of the Securities and Exchange Commission.   *See* App. 13, Joint Brief of Defendants-Appellants, *United States v. Rigas*, No. 08-3485-cr, at 117-118.

**Response:**   Not disputed.

311.    The government responded that "although the SEC conducted a parallel civil enforcement investigation with respect to Adelphia, the civil investigation was not jointly conducted with the criminal investigation."   *See* App. 11 at 134.

**Response:**   Not disputed.

312.    The district court rejected Petitioners' demands for material in the possession of the Securities and Exchange Commission, finding that "[h]ere, there was no joint investigation with the SEC."   App. 14 at *2.

**Response:**   Not disputed.

313.    The Second Circuit affirmed that Order.   *See* App. 8 at 126.

**Response:**   Not disputed.

112

314.    The recently disclosed Postal Inspector's Memoranda of the government's interviews with two Scientific Atlanta employees state that two SEC lawyers were in attendance—Stephen E. Donohue, Branch Chief, and Angela Soo, of the "Division of Enforcement, Securities & Exchange Commission."   *See* App. 41 at 1462 (Tylka Interview); App. 44 at 1488 (Nilson Interview).

**Response:**   Not disputed.


Dated:  New York, New York
        May 18, 2018

                                        GEOFFREY S. BERMAN
                                        United States Attorney


                                By:    /s/  *Jessica Greenwod*_____
                                        Brian Blais
                                        Damian Williams
                                        Jessica Greenwood
                                        Aline R. Flodr
                                        Assistant United States Attorneys

**CERTIFICATE OF SERVICE**

I, Jessica Greenwood, Assistant United States Attorney for the Southern District of New York, hereby certify that on May 18, 2018, I caused a copy of the foregoing Amended Statement of the United States of America Pursuant to Local Rule 56.1 in Opposition to the Petitioners' Motion for Judgment on Various Claims Alleging Violations of *Brady v. Maryland* to be served, via the Court's ECF filing system, upon:

    Lawrence C. Marshall
    Stanford Law School
    Email: lmarshall@stanford.edu

    Lawrence G. McMichael, Esq. (lmcmichael@dilworthlaw.com)
    Christie Callahan Comerford, Esq. (ccomerford@dilworthlaw.com)
    Kristin L. Repyneck (krepyneck@dilworthlaw.com)
    Patrick Michael Northen (pnorthen@dilworthlaw.com)
    Dilworth Paxton LLP

    Steven Francis Molo (smolo@mololamken.com)
    Jordan Andrew Rice (jrice@mololamken.com)
    Megan Cunniff Church (mchurch@mololamken.com)
    Mololamken LLP

Dated: New York, New York
       May 18, 2018

                                      _/s/ *Jessica Greenwood*_
                                        Jessica Greenwood
                                        Assistant United States Attorney
                                        (212) 637-1090