**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | : | |
| JOHN J. RIGAS and TIMOTHY J. RIGAS, | : | |
| | : | |
| *Petitioners*, | : | 11-CV-6964 (KMW) |
| | : | 02-CR-1236 (KMW) |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| *Respondent*. | : | |
| | : | |

**PETITIONERS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION
FOR JUDGMENT ON THE INTERFERENCE CLAIMS**

LAWRENCE C. MARSHALL, ESQ.
ADMITTED *PRO HAC VICE*
STANFORD LAW SCHOOL
559 NATHAN ABBOTT WAY
STANFORD, CALIFORNIA 94305
(650) 723-7572
lmarshall@law.stanford.edu

STEVEN F. MOLO
MOLOLAMKEN LLP
430 PARK AVENUE
NEW YORK, NEW YORK 10022
(212) 607-8160
smolo@mololamken.com

MEGAN CUNNIFF CHURCH
JORDAN RICE
ADMITTED *PRO HAC VICE*
MOLOLAMKEN LLP
300 NORTH LASALLE STREET
CHICAGO, ILLINOIS 60654
(312) 450-6700
mchurch@mololamken.com
jrice@mololamken.com

*Attorneys for Petitioners
John J. Rigas and Timothy J. Rigas*

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................ 1

PROCEDURAL POSTURE AND RELIEF UNDER SECTION 2255 ......................................... 2

THE GOVERNMENT VIOLATED THE RIGASES' CONSTITUTIONAL RIGHTS BY
 CAUSING ADELPHIA TO WITHDRAW ADVANCEMENT OF LEGAL FEES
 AND BY BARRING ACCESS TO CRITICAL WITNESSES AND EVIDENCE ........... 4

A. Background Facts ................................................................................................ 4

 1. The Context: The Prosecution of the Rigases Was a Must-Win Case
  for the Government During an Era of Exceptionally Aggressive
  Prosecutorial Tactics ................................................................................ 4

 2. The Actions Taken by Adelphia ............................................................ 7

  a. The Ouster of the Rigases and the Terms of Severance ............................ 7

  b. Adelphia's Abrupt About-Face ................................................................ 9

  c. Barring Access to Witnesses .................................................................... 10

  d. Freezing of Assets .................................................................................. 11

 3. Revelations About the Role of the Government ...................................... 11

  a. The Ouster and Decision to Refuse Indemnification ................................. 12

  b. Other Government Control of Adelphia in May 2002 ............................... 18

  c. The Administrative Leave Agreements .................................................... 18

  d. The Government's Continued Control in 2003 ........................................ 21

  e. Adelphia's Pleas to the Government ....................................................... 22

  f. The Bankruptcy Proceedings .................................................................. 24

  g. Barring the Rigases' Access to Witnesses ............................................... 25

h.   Adelphia's November 2004 Presentation to the Government.................................................................... 27

i.    Post-Trial Conduct Demonstrating the Government's Role..................... 30

4.   Assembling Defense Teams..................................................................31

B.   Adelphia's Interference with the Rigases' Defense Constituted State Action Given Adelphia's Close Relationship and Coordination with the Government............. 32

C.   The Government's Policies and Actions with Regard to Indemnification and Advancement of Fees Violated the Rigases' Sixth Amendment Rights............... 40

1.   The Right to Counsel of Choice............................................................ 41

2.   Impairment of Counsel's Efficacy ....................................................... 43

a.   General Principles ....................................................................44

b.   Some Examples of the Limitations .............................................46

c.   Some Examples of the Effects of the Limitations......................49

d.   The Funds the Rigases Eventually Secured for Their Defense Did Not Cure the Injury They Had Suffered ............................. 53

D.   The Closing Off of the Defense's Access to Witnesses and Evidence Violated the Rigases' Fifth Amendment Rights to Due Process............................................... 59

CONCLUSION.............................................................................................................74

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Blackledge v. Allison,*
    431 U.S. 63 (1977) ............................................................................................ 3

*Blum v. Yaretsky,*
    457 U.S. 991 (1982) ..........................................................................................35

*Brady v. Maryland,*
    373 U.S. 83 (1963) .................................................................................. *passim*

*Browder v. Dir., Dep't of Corr.,*
    434 U.S. 257 (1978) ............................................................................................3

*Caplin & Drysdale, Chartered v. United States,*
    491 U.S. 617 (1989) ..........................................................................................41

*Clay v. United States,*
    537 U.S. 522 (2003) ..........................................................................................42

*Fenenbock v. Dir. of Corr.,*
    692 F.3d 910 (9th Cir. 2012) ...........................................................................60

*Freeman v. State of Georgia,*
    599 F.2d 65 (5th Cir. 1979) .............................................................................60

*Gregory v. United States,*
    369 F.2d 185 (D.C. Cir. 1966) ...................................................................60, 61

*Griffith v. Kentucky,*
    479 U.S. 314 (1987) ..........................................................................................42

*Holmes v. South Carolina,*
    547 U.S. 319 (2006) ..........................................................................................60

*IBM Corp. v. Edelstein,*
    526 F.2d 37 (2d Cir. 1975) ..............................................................................60

*Jackson v. Metro. Edison Co.,*
    419 U.S. 345 (1974) ..........................................................................................34

*Jones v. Barnes,*
    463 U.S. 745 (1983) ..........................................................................................52

*Leka v. Portuondo,*
  257 F.3d 89 (2d Cir. 2001)..................................................................66

*Luis v. United States,*
  136 S. Ct. 1083 (2016)......................................................................41

*Machibroda v. United States,*
  368 U.S. 487 (1962)............................................................................3

*Maine v. Moulton,*
  474 U.S. 159 (1985)..........................................................................41

*Powell v. Alabama,*
  287 U.S. 45 (1932)............................................................................47

*Puglisi v. United States,*
  586 F.3d 209 (2d Cir. 2009)................................................................3

*Rigas v. United States,*
  562 U.S. 947 (2010)..........................................................................42

*Rock v. Arkansas,*
  483 U.S. 44 (1987)............................................................................51

*Schulz v. Marshal,*
  345 F. App'x 627 (2d Cir. 2009) .......................................................66

*Skinner v. Ry. Labor Execs. Ass'n,*
  489 U.S. 602 (1989)....................................................................35, 36

*Triana v. United States,*
  205 F.3d 36 (2d Cir. 2000)..................................................................2

*United States v. Agostino,*
  132 F.3d 1183 (7th Cir. 1997) ...........................................................60

*United States v. Carmichael,*
  216 F.3d 224 (2d Cir. 2000)..............................................................74

*United States v. Desena,*
  287 F.3d 170 (2d Cir. 2002)..............................................................65

*United States v. Ebrahimi,*
  137 F. Supp. 3d 886 (E.D. Va. 2015) ...............................................61

*United States v. Goldfarb,*
  No. CR-07-260, 2008 WL 4531694 (D. Ariz. 2008)...........................61

*United States v. Gonzalez-Lopez*,
    548 U.S. 140 (2006)......................................................................................42, 43

*United States v. Linder*,
    No. 12-cr-22, 2013 WL 812382 (N.D. Ill. Mar. 5, 2013) .................................66, 67

*United States v. Pinto*,
    755 F.2d 150 (10th Cir. 1985) ...........................................................................60

*United States v. Rigas*,
    490 F.3d 208 (2d Cir. 2007)...............................................................................70

*United States v. Rigas*,
    No. 05-cr-402, 2011 WL 2371554 (M.D. Pa. June 14, 2011) .............................12

*United States v. Stein*,
    435 F. Supp. 2d 330 (S.D.N.Y. 2006)...........................................................*passim*

*United States v. Stein*,
    495 F. Supp. 2d 390 (S.D.N.Y. 2007)...........................................................*passim*

*United States v. Stein*,
    541 F.3d 130 (2d Cir. 2008)..........................................................................*passim*

*United States v. Valenzuela-Bernal*,
    458 U.S. 858 (1982)......................................................................................*passim*

**Statutes**

28 U.S.C. § 2255 .............................................................................................*passim*

**Other Authorities**

Fed. R. Civ. P. 56...................................................................................................3

Mary Jo White, *Corporate Criminal Liability: What Has Gone Wrong? in* 2 37th
    Annual Institute on Securities Regulation (PLI Corp. Law & Practice, Course
    Handbook Series No. B-1517, 2005)...................................................................36

U.S. Const. amend. V....................................................................................*passim*

U.S. Const. amend. VI ..................................................................................*passim*

## INTRODUCTION

The prosecution of Petitioners John and Tim Rigas occurred during a time in which the government was under immense and unparalleled pressure to secure convictions in cases involving alleged corporate misconduct. The government had declared a war on corporate crime and had armed its prosecutors with since discredited and withdrawn weapons. These included the Holder and Thompson Memoranda—directives from the Department of Justice that used threats of corporate indictment to force corporations to cooperate with the government in interfering with individual defendants' rights to mount a meaningful defense. The Second Circuit has squarely held that tactics prosecutors were using at that time violated core constitutional rights of those being prosecuted. *United States v. Stein*, 541 F.3d 130 (2d Cir. 2008). What happened to the Rigases is just as egregious—and in some ways more so—than what the Second Circuit and District Court condemned in *Stein*. The Rigases' convictions therefore cannot stand.

As set forth below, the government deployed the DOJ directives against Adelphia to secure Adelphia's cooperation as its foot soldier in the prosecution of the Rigases. In doing so, the government violated the Rigases' Fifth and Sixth Amendment rights under the Constitution. The Rigases have undeniable proof that the government worked fist-in-glove with Adelphia to terminate the Rigases' indemnification and to deny them access to witnesses who could assist in their defense. The effects of the government's conduct were enormous: the Rigases were denied counsel of their choice; they were deprived of the ability to mount a meaningful defense, including the ability to review massive discovery productions; and they were denied the opportunity to speak to witnesses who had information material to their defense. The only appropriate remedy for these constitutional violations is to grant the Rigases' §2255 petition,

vacate their convictions, and dismiss their indictments. Petitioners respectfully request that this Court do so.

## PROCEDURAL POSTURE AND RELIEF UNDER SECTION 2255

Petitioners' pursuit of relief under 28 U.S.C. § 2255 rests on two pillars. First, as described in the Memorandum already submitted (the "*Brady* Memorandum," R. 163-2), the government violated *Brady v. Maryland*, 373 U.S. 83 (1963), when it failed to disclose significant chunks of material exculpatory evidence to the defense (the "Brady Claims"). Second, as described in this Memorandum, the government violated Petitioners' Fifth and Sixth Amendment rights when it interfered with the Rigases' access to resources with which to fund their defense, and interfered with their access to witnesses and evidence with which to mount their defense (the "Interference Claims"). Doctrinally, these two claims are distinct, and the Court can decide to grant relief on one without reaching the other. But that should not obscure the fact that the two claims share a common theme: The government distorted the adversarial process by depriving the Rigases' of the information, resources, and access to which they were entitled. To use the words of *Brady*, the government placed itself "in the role of an architect of a proceeding that does not comport with standards of justice." 373 U.S. at 88. Thus, in gauging the nature of the prejudice Petitioners suffered from either set of violations, the Court should not ignore the ways in which one set of violations compounded the injury of the other, leading to a verdict that cannot be trusted as the result of a fair proceeding. Taken independently or together, Petitioners have proven their entitlement to relief by the requisite preponderance of the evidence. *See Triana v. United States*, 205 F.3d 36, 40 (2d Cir. 2000) (explaining that a petitioner in a § 2255 proceeding must prove her claims by a preponderance of the evidence).

As a procedural matter, the Interference Claims are now postured identically with the *Brady* Claims in the sense that discovery has been completed and the materials that are being submitted entitle Petitioners to relief on the current record. As with civil cases in which summary judgment is sought, it is well settled that a court may grant the writ of habeas corpus on the paper record where "it may appear that, as matter of law, the prisoner is entitled to the writ and to a discharge." *Browder v. Dir., Dep't of Corr.*, 434 U.S. 257, 266 n.10 (1978) (quoting *Walker v. Johnston*, 312 U.S. 275, 284 (1941)); *see generally Machibroda v. United States*, 368 U.S. 487, 494-96 (1962) (noting that habeas petitions may be "conclusively determined" by the paper record). For these reasons, the court in *Blackledge v. Allison*, adopted the summary-judgment standard of Federal Rule of Civil Procedure 56 to ensure that judges may adjudicate appropriate habeas petitions "without the time and expense required for an evidentiary hearing." 431 U.S. 63, 80-82 (1977); *see Puglisi v. United States*, 586 F.3d 209, 213 (2d Cir. 2009) (discussing similarities between summary judgment and the procedure for resolving § 2255 claims).[1]

Petitioners ask, therefore, that the Court grant relief based on the current record, which—through undisputable factual evidence—demonstrates that their constitutional rights were violated. Of course, in the event that the Court concludes there are some issues of fact that are material to the decision and require resolution through an evidentiary hearing, Petitioners stand ready to make their case in such a proceeding. In the event that the Court does conclude that one set of claims (be it the *Brady* Claims or the Interference Claims) requires a hearing and the other entitles Petitioners to relief without the need for a hearing, Petitioners respectfully submit that for the sake of efficiency,[2] the Court ought to simply grant relief on the claims that require no

---

[1] The Rigases have filed a Statement of Material Facts pursuant to Local Rule 56.1 and the Court's individual practices.

[2] Tim Rigas has been in custody since August 13, 2007. The Bureau of Prisons lists his release date as June 3, 2022. The imperative of effectively presenting his claims and gathering all available evidence in support of the claims has

hearing. To be clear, though, Petitioners maintain for reasons set forth in the *Brady* Memorandum and in this Memorandum that there is no need for any evidentiary hearing on either set of claims and that the Court should grant relief on one or the other or both at this time.

## THE GOVERNMENT VIOLATED THE RIGASES' CONSTITUTIONAL RIGHTS BY CAUSING ADELPHIA TO WITHDRAW ADVANCEMENT OF LEGAL FEES AND BY BARRING ACCESS TO CRITICAL WITNESSES AND EVIDENCE

### A.    Background Facts

1.    *The Context: The Prosecution of the Rigases Was a Must-Win Case for the Government During an Era of Exceptionally Aggressive Prosecutorial Tactics*

The government prosecuted the Rigases in the wake of some of the highest-profile corporate scandals in United States history—such as Enron, WorldCom, Tyco, and Arthur Andersen. *See* Rule 56.1 Statement of Material Facts ("56.1 Statement") ¶1. These cases spawned public outrage and demand for action. *See id.* at ¶¶3, 6. In response, President George W. Bush and his administration launched their extraordinarily aggressive attack on alleged corporate misbehavior. Treasury Secretary Paul O'Neill declared, "I think people who abuse our trust, we ought to hang them from the very highest branch." *See id.* at ¶2. And President Bush himself stated, "[t]he best ethics course is to handcuff one of the b[astards]." *See id.* at ¶13.

This was not empty rhetoric. In July 2002, President Bush created the Corporate Fraud Task Force (the "Task Force") by executive order to "function as a financial crimes SWAT team." *See* 56.1 Statement ¶¶4-5, 8, 10. The message was clear: the United States government had declared an all-out "war" on corporate crime. *See id.* at ¶11.

The Rigases, who were directors and top executives at Adelphia Communications Corporation ("Adelphia"), were arrested about two weeks after the Task Force's first meeting.

---

led to a prolonged §2255 proceeding, but to the extent that granting relief on one claim would expedite decision here, that would plainly serve the interests of justice, given the time that Tim Rigas has already served.

56.1 Statement ¶¶ 12, 14. In early 2002, in response to SEC changes in accounting policies after the corporate scandals involving Enron and WorldCom, Adelphia followed the new advice of its auditors, Deloitte & Touche, and made additional disclosures specifying the precise amounts of co-borrowing allocated to Adelphia and the amounts allocated to the private Rigas Managed Entities (RMEs)—private, Rigas-owned companies that had been managed by Adelphia pursuant to contractual agreements.[3] That disclosure was made on March 27, 2002. *See id.* at ¶ 42. The price of Adelphia's stock dropped at that time and the government eventually launched its investigation into Adelphia and the Rigases. *Id.* at ¶¶ 43-44.

The arrests were made a public spectacle. Although the Rigases had made clear their willingness to turn themselves in, the government insisted that they be paraded in handcuffs before reporters and TV cameras in an orchestrated "perp walk." 56.1 Statement ¶¶ 24-26.

The arrests were celebrated publicly at the highest levels within the Administration. Deputy Attorney General Larry Thompson, the Task Force Chair, held a press conference hailing the Rigases' arrests as an achievement for the Task Force and the president. *See* 56.1 Statement ¶¶ 9, 15-19. Further adding to the fanfare, at a press conference, the White House Press Secretary touted the arrests of the Rigases as "a day of action and accomplishment in the President's fight against corporate corruption, in his effort to vigorously enforce the laws and protect employees and investors against corporate wrongdoing." *Id.* at ¶ 20; *see also id.* at ¶¶ 21-23. In sum, the president and his Task Force held out the arrests of the Rigases as a signature achievement in the face of mounting pressure to crack down on corporate crime.

At the time the Task Force was created, the Department of Justice's Holder Memorandum—which set forth the factors for prosecutors to consider when deciding whether to

---

[3] Many background facts relevant to the Interference Claims are set forth in the *Brady* Memorandum and will not be belabored here.

indict a corporation—was in effect. 56.1 Statement ¶¶27-33. The Holder Memorandum made clear that if a corporation advanced legal expenses to a director or officer suspected of wrongdoing, it weighed in favor of indicting the corporation. *Id.* at ¶33. The Thompson Memorandum, which replaced the Holder Memorandum in 2003, carried forward that aspect of the Holder Memorandum. *Id.* at ¶¶34, 36.

Given all of the hoopla over the arrest, the political pressure on the prosecutors was, to say the least, extreme. The government had given itself no option but to win. This, combined with the Holder Memorandum, created a climate in which, as will be seen, the government crossed a line by using the threat of indictment to force Adelphia to (1) cut off the Rigases' access to funds for their defense, and (2) cut off the Rigases' access to witnesses.

The prosecution of the Rigases is merely one example of the government's then-existing *modus operandi* of applying unconstitutional pressure on corporations to secure convictions of individual directors, officers, and employees. The tide on these practices began to turn in 2006, when the court in *United States v. Stein*, 435 F. Supp. 2d 330 (S.D.N.Y. 2006), *aff'd*, 541 F.3d 130 (2d Cir. 2008), applied clearly established law to hold that the government had violated the defendants' constitutional rights by pressuring the accounting giant KPMG to withhold indemnification from various individuals the government was prosecuting. Later that year, the Department of Justice withdrew the then-governing Thompson Memorandum—which had driven the government's conduct with respect to indemnification—and issued a new set of policies (through the McNulty Memorandum) that scaled back on some of the particularly egregious provisions it had adopted, such as those pertaining to indemnification, fee advancement, and waiver of privilege. 56.1 Statement ¶41; *see also id.* at ¶¶34-40.

Thus, the prosecution of the Rigases, the first case brought by the Task Force, took place during that brief era in which the prosecution's role in co-opting corporations to secure their cooperation was at its peak. Although the government's role in interfering with the defense did not come to light until well after the Rigases were convicted, it is now evident that the government—through the Holder Memorandum and through extensive direct interactions with Adelphia—pressured Adelphia in manners that violated the Rigases' rights under the Fifth and Sixth Amendments.

> 2.     *The Actions Taken by Adelphia*

During the months following the drop in Adelphia's stock, Adelphia took a series of actions that had dramatic impact on the Rigases and the outcome of the trial.

> a.     *The Ouster of the Rigases and the Terms of Severance*

In mid-May 2002, despite the turmoil at Adelphia, members of Adelphia's Special Committee[4] made it clear they did not believe the Rigases had engaged in wrongdoing. *See* 56.1 Statement ¶¶ 45-46; *see also id.* at ¶¶ 54-55, 64. On May 15 and 16, Adelphia issued press releases announcing that although John and Tim would resign their positions as officers, (1) the Board "elected [John Rigas] Chairman Emeritus" and he would "continue to serve on the Company's Board of Directors," *id.* at ¶¶ 47-48, and (2) Tim Rigas would remain a member of the Board, *id.* at ¶¶ 49-50. Erland Kailbourne, a member of the Special Committee of Adelphia's Board of Directors and then interim CEO, also advised Tim Rigas that Tim would remain a principal financial advisor to Mr. Kailbourne. *Id.* at ¶ 51.

---

[4] The Special Committee of Adelphia's Board of Directors was created in early March 2002 to review certain transactions involving Adelphia and a company controlled by the Rigases. 56.1 Statement ¶ 52. It ultimately became the key Adelphia entity investigating the transactions and disclosures at the center of the Rigases' criminal case. *Id.* at ¶ 53.

On May 18, even Mr. Kailbourne told the Rigases that the company needed them to step down, but he reaffirmed the view that the Rigases had not engaged in wrongdoing. 56.1 Statement ¶¶ 51, 63-64. The Board then moved forward with creating written agreements regarding the Rigases' resignation as officers, discussing severance terms that included severance payments to the Rigases. *Id.* at ¶¶ 59-60. There was a significant amount of back-and-forth between Adelphia and the Rigases during these discussions, but the Rigases remained firm on their position that Adelphia must firmly commit that the severance package would include indemnification of defense costs, as well as fee advancement to cover those costs. *See id.* at ¶¶ 70-71. Adelphia repeatedly agreed and assured the Rigases that it would not cut off indemnification or fee advancement. *See id.* at ¶ 72. Board member Peter Metros's notes from a May 22 meeting also confirmed that: "Co. By laws will indemnify. Officers & Bd. Directors" and "INDEMNIFY THEM." *See id.* at ¶¶ 73-74.

On May 23, 2002, Adelphia and the Rigases executed an agreement (the "Agreement"), which they understood to be a binding contract, that set forth the terms they had negotiated. *See* 56.1 Statement ¶ 75, 81, 84-85. On their part, John and Tim Rigas would resign from the Board (as would John's two other sons, James and Michael), would undertake various steps to make their assets available to pay down the co-borrowing debt attributed to the family entities, and would provide collateral to repay the fee advancement in the event repayment were required.[5] *See id.* at ¶¶ 75, 77-79. On Adelphia's part, it agreed to honor its prior obligation to extend a severance package that provided some payments and other benefits to John Rigas. *Id.* at ¶ 80. Most critically to the Rigases, Adelphia explicitly reaffirmed that it would advance legal fees and

---

[5] This was all before the Rigas's assets were frozen. *See infra*, § C.2.d. So it would have been possible for them to provide such collateral, even though once their assets were frozen, they had limited access to their money and property.

indemnify the Rigas family members, as Adelphia had never refused to do for other directors and officers in the past. *See id.* at ¶¶ 81, 106-107.

Specifically, under the Agreement, Adelphia committed itself to indemnifying the Rigases "according to the bylaws and Delaware law" if the Rigases undertook to repay Adelphia per the bylaws. *See* 56.1 Statement ¶ 81. Adelphia's bylaws required the corporation to advance legal fees whenever a person is made (or is threatened to be made) a party to any proceeding, civil or criminal, "by reason of the fact that the person . . . is or was a director or officer of the corporation" if the director or officer undertakes to repay the amounts advanced "to the extent that a court of competent jurisdiction ultimately determines that such a person is not entitled to indemnification." *See id.* at ¶¶ 82-83; *see also id.* at ¶ 81. Advancement of fees was not required, however, if the "Board of Directors or independent legal counsel reasonably determines that such person deliberately breached his duty to the Corporation or its shareholders." *Id.* at ¶ 83.

b.    *Adelphia's Abrupt About-Face*

Just eight days later, Adelphia made a dramatic about-face. On June 1, 2002, the Special Committee summarily declared a resolution that:

> John Rigas, Mike Rigas, [and] Tim Rigas . . . breached their duties to the Company and its shareholders by failing to cooperate with the Special Committee in its investigation by declining to provide full and complete answers to the Special Committee and by participating in related party transactions for their benefit to the detriment of the Company without appropriate disclosures and approval of the Board of Directors.

56.1 Statement ¶ 102; *see also id.* at ¶ 105. Even as it backed out of its obligation to advance legal fees on June 1, 2002, Adelphia stood by its obligation to provide severance payments and benefits to John Rigas, at least until Adelphia declared bankruptcy on June 25. *Id.* at ¶¶ 108-109.

On its face, this resolution was more than puzzling. With respect to the Special Committee's first reason—that the Rigases had somehow failed to cooperate with the Special

Committee's investigation—the Special Committee did not indicate how the Rigases supposedly failed to cooperate with its investigation in the eight days between May 23, 2002 and June 1, 2002. And, more fundamentally, there was absolutely no basis for withholding indemnification and fee advancement because of "non-cooperation." As for the Special Committee's second reason, it is beyond implausible that in slightly over a week, the Special Committee had conducted the kind of investigation necessary to reach a determination regarding related-party transactions in this extraordinarily complex matter.

c.    *Barring Access to Witnesses*

Two months after the Rigases were indicted, and as they had begun the process of preparing their defense (as best they could without access to advancement of fees from Adelphia), Adelphia issued a series of directives barring all Adelphia employees from having any contact with the Rigases or their representatives. *See* 56.1 Statement ¶¶ 154-164. An October 14, 2002 memorandum from General Counsel Randy Fisher ("Fisher Memorandum") directed all Adelphia employees that if approached by the Rigases or any of their defense team, the employees should tell them "it would be inappropriate to answer any questions or provide any information." *Id.* ¶ 160. As a result of this directive, the Rigases were stymied in their efforts to interview vital witnesses. *See id.* at ¶ 177.

In the wake of the October 14, 2002 Memorandum and other Adelphia employee directives, a former Adelphia employee in the accounting department, Robert Leete, described how "[t]here was never a sense of 'feel free to talk to the Rigases because they are equally entitled to information.'" 56.1 Statement ¶¶ 165, 167. Rather, he "understood that Adelphia was cooperating with the federal government as much as possible and that meant don't talk to the Rigases." *Id.* at ¶ 168. Mr. Leete recalled that the Rigases attempted to speak to certain Adelphia employees, but "they were afraid to talk to the Rigases." *Id.* at ¶ 169. Similarly, Andrew

Zorichak—another Adelphia employee who worked in accounting and engineering—reported that the Rigases wanted to speak with him and he wanted to speak with them because he "felt that all sides needed to be heard in everything." *Id.* at ¶¶ 170-173. Nonetheless, Mr. Zorichak did not speak to them for fear of losing his job. *Id.* at ¶ 174.

d.    *Freezing of Assets*

On a separate front, throughout the pre-trial and trial periods, Adelphia also worked aggressively to restrict the Rigases' access to their *own personal resources* to fund their defense. As part of the Adelphia bankruptcy proceedings, Adelphia secured a restraining order against the Rigases' selling their own property in order to pay their criminal defense attorneys. 56.1 Statement ¶¶ 216-219. Thus, the Rigases were forced to go to the bankruptcy court and litigate extensively over how much money they could use to defend themselves—a process that delayed payments extensively, impaired the defense preparation and investigation in irreparable ways, and itself cost millions of dollars in litigation costs. *See id.* at ¶¶ 216-253, 276.

*   *   *   *   *

As will be explained below, these measures had devastating impact on the Rigases' ability to mount their defense. Nonetheless, there was nothing the Rigases could do at that time to challenge Adelphia's actions as unconstitutional. Given Adelphia's apparent status as a private actor, there was no constitutional impediment to Adelphia's taking any of these actions. Hence, the Rigases had no choice but to proceed to trial without any possibility of attacking the various obstacles Adelphia had placed in their way.

3.    *Revelations About the Role of the Government*

In the years since they were convicted, the Rigases have obtained evidence that dramatically alters the constitutional implications of the injuries they suffered. This information has been secured from a variety of sources, including discovery in Adelphia's civil action against

11

them, other civil discovery, various administrative proceedings, discovery ordered by Judge Jones in the since-dismissed tax prosecution against the Rigases in the Middle District of Pennsylvania, and the discovery that has taken place in this § 2255 action.

It is now clear that Adelphia was not acting as a purely private actor but was instead acting in concert with, and at the behest of, the government in significant ways. The information now available paints a picture of an extraordinarily close working relationship between Adelphia and the government. The evidence reveals that the Adelphia Board placed the goal of appeasing the government to avoid corporate indictment as its highest imperative and, as a result of the Holder Memorandum and the government's pressure, understood that the only way to accomplish this goal was to meld its behavior to each of the factors set forth in that Memorandum. Adelphia worked hand-in-hand with the government and allowed the government to call the shots in directing and approving Adelphia's decisions vis-à-vis the Rigases and other key players in this prosecution. As Judge Jones stated once some of the evidence about the government's role came to light, the government does not dispute that it put pressure "upon the company to cooperate against the Rigases or face potential corporate indictment." *United States v. Rigas*, No. 05-cr-402, 2011 WL 2371554, at *2 (M.D. Pa. June 14, 2011).

a.     *The Ouster and the Decision to Refuse Indemnification*

The first example of the government's role in directing Adelphia's actions was the government exercising extreme pressure on Adelphia to oust the Rigases. On or around May 15, 2002, one of the Fried Frank attorneys told Adelphia's Board that the government was disappointed with the level of Adelphia's cooperation and that a continued failure to cooperate (as the government viewed it) would be met with serious consequences, including potential indictment of Adelphia. *See* 56.1 Statement ¶¶ 54, 56. Indeed, according to Philip Korologos (a

12

Boies attorney representing Adelphia's Special Committee), the government advised that around May 15, 2002, the government was on the verge of shutting Adelphia down and had trailers ready to be sent to Adelphia's headquarters in Coudersport, Pennsylvania to seize control of the company. *See id.* at ¶ 58.

Some of those present at the meeting when the government expressed its disappointment with Adelphia's cooperation, including Erland Kailbourne (a member of Adelphia's independent Special Committee), indicated they were "shock[ed]" by the government's contention that Adelphia was being less than fully cooperative with the investigation at that stage. *See* 56.1 Statement ¶¶ 55, 57. Nor did the Fried Frank attorney who reported on the government's disappointment know what the government was referring to in terms of non-cooperation. *See id.* at ¶ 57. The government provided no explanation.

The government's insistence on Adelphia's cooperation rapidly became more specific. On May 17, 2002, when lawyers from the government met with lawyers representing Adelphia and several directors, the government lawyers conveyed the message that the only way for Adelphia to avoid indictment would be for it to oust the Rigases from the company. *See* 56.1 Statement ¶¶ 59-63.

Heeding the government's stern warnings, the Adelphia Board met on May 18, 2002 and discussed the need to secure the resignations of all Rigas family members from the Adelphia Board. *See* 56.1 Statement ¶¶ 54, 56, 62-63. At that meeting, the Board heard a report on the three-hour meeting that had been held with the prosecutors and the SEC, and Mr. Kailbourne told the Board that the government was demanding the resignations and this would be the only way to save the Company (despite Mr. Kailbourne's expressing his view that the Rigases had not engaged in any wrongdoing). *See id.* at ¶¶ 63-65. The Board also discussed various severance

13

packages that might be offered to John and Tim Rigas for their resignations. *See id.* at ¶ 60. With regard to one of the severance packages being discussed, an outside attorney for the Special Committee cautioned that "*the government might not permit that type of arrangement* if the members of the Rigas family did not cooperate with the investigation of the Special Committee." *Id.* at ¶ 61 (emphasis added).

Notes taken by attorney Bruce Booken (of Buchanan Ingersoll) indicate that *the government's* "*focus*" *at the meeting was to* "*stop the flow $ or control flow $ to Rigas family.*" *See* 56.1 Statement ¶ 66 (emphasis added). Similarly, notes taken by attorney Carl Rothenberger describe the *government's focus as the* "*need to stop flow of funds to family.*" *Id.* at ¶¶ 67-68 (emphasis added).

As described above, between May 18, 2002 and May 23, 2002, the Rigas family and Adelphia engaged in negotiations over the terms of the Rigases' resignations from the Board. *See* 56.1 Statement ¶¶ 69-70. The issue of most significance to the Rigases was that the company provide indemnification and fee advancement. *See id.* at ¶¶ 71-72, 81. On May 23, a final agreement was reached with the Board under which the Rigases would resign from the Board and put up a large amount of collateral for payment of private bank debts and repayment of advanced legal fees, and Adelphia established a severance package that included indemnification and fee advancement. *See id.* at ¶¶ 75, 77-81. Additionally, with respect to John Rigas, the Agreement provided that Adelphia would honor its commitment to make severance payments to him for three years, in addition to providing other benefits. *Id.* at ¶ 80.

Despite its May 23 indemnification Agreement, Adelphia abruptly changed course with regard to its obligations within just a week. At the time, this seemed quite inexplicable, but now-available evidence establishes how and why Adelphia abandoned its commitment. It turns out

that during a Special Committee meeting two days after the Agreement—on Saturday, May 25, 2002—the Committee was given a report by Mark Stein, a Fried Frank partner, on the substance of discussions with the government on the evening of May 23. *See* 56.1 Statement ¶¶ 86-88. He described the government's dismay at the severance package being afforded the Rigases. *See id.* at ¶¶ 86-89. Notes taken by Board member Peter Metros indicate that there had been *a conversation on "Thur. PM"* [May 23, 2002] *with the "Chief Secu./Fraud" and that the government was "appalled at the deal." Id.* at ¶¶ 88-89. After expressing its disgust, the government threatened that it "[m]ay indict the company." *See id.* at ¶ 90. Mr. Metros's notes also indicate that "People who were Part of The negotiations should talk to the US Attorneys Office [and] 'Put together a story.' " *Id.* at ¶ 91.

During the week following that May 25 meeting during which the Board learned that the government was "appalled," Adelphia decided it would renege on its May 23 agreement with the Rigases and would not offer them any indemnification or fee advancement after all.[6] As described above, in a June 1 Board meeting, the Special Committee summarily announced it had determined that indemnification was inappropriate because the Rigases were failing to cooperate with the Special Committee and had participated in improper related-party transactions. *See* 56.1 Statement ¶ 102. Once again, this was quite perplexing to anyone ignorant of the government's behind-the-scenes machinations. *See supra*, § A.3.a.

---

[6] The government has suggested previously that the reference to its being "appalled" was to the part of the severance agreement that involved payments to the Rigases—not the part of the severance agreement that stood by the guaranteed indemnification. R. 16, Mem. Opp'n § 2255 Mots., at 56. This suggestion strains credulity. We know that the government was operating under the Holder Memorandum, which was explicit in its focus on indemnification as a key factor in determining whether to indict a corporation. It is unreasonable to conclude, therefore, that the government was "appalled" at other aspects of the severance agreement but was agnostic as to a prominent facet of the Holder Memorandum. 56.1 Statement ¶ 33. Between the government's expression that it was appalled and the Holder Memorandum, it was abundantly clear to Adelphia that it must stop advancing fees to the Rigases to avoid indictment of the corporation. Moreover, John Rigas continued to receive severance payments from Adelphia until after Adelphia filed for bankruptcy in late June 2002. *Id.* at ¶ 108.

The billing records of Mark Stein and other Fried Frank attorneys reveal that Adelphia quickly created the pretext for withdrawing fee advancement to placate the government after it expressed its disgust with the Agreement. The subject of indemnification arose during Mr. Stein's conversations with AUSAs Coleman and Clark over the week following May 23. On May 23, Mr. Stein wrote, "[A]ttendance at presentation to SEC/USAO by PWC; . . . t/c w/USAO re: Rigas transaction; t/c's meetings re same; work on memo re: indemnification." 56.1 Statement ¶92. On May 24, he wrote: "t/c w/[USAO] T. Coleman; t/c w/[USAO] C. Clark, . . . prepare memo re: indemnification issues; review of documentation of Rigas deal." 56.1 Statement ¶92.

Other Fried Frank billing records show that the Fried Frank lawyers had conversations with the government about fee advancement. A May 26 time entry by a Fried Frank associate stated: "Drafted talking points re: advancement." *Id.* at ¶93. Two days later, Mr. Stein's records indicated: "review draft talking points for USAO." *Id.* at ¶94.[7] Thus, between May 23 and May 28, Fried Frank "put together the story" that the Special Committee needed to avoid indictment.

The June 1 resolution denying the Rigases fee advancement makes all the sense in the world in light of the pressure the government was applying with regard to Adelphia's severance agreement with the Rigases. At the June 1 meeting, the Special Committee delivered a report of its May 29, 2002 meeting with the United States Attorney's Office. *See* 56.1 Statement ¶96. Mr. Metros's notes indicate that the Special Committee "share[d] progress [illegible] we've made Δ [change] in control"—undoubtedly relaying the talking points Fried Frank recently had created. *See id.* at ¶97. And, the notes state, the government "[i]ndicat[ed] their pleasure." *See id.* at ¶98.

---

[7] It is, of course, possible that there were two sets of talking points involved, or that the May 24 time entry is talking about two distinct subjects. But given the rest of the evidence that indemnification and advancement (and every other matter involving Adelphia's treatment of the Rigases) were discussed with the government, the most natural reading is that the time entries do, in fact, reflect Fried Frank conversations with the government on the subjects of indemnification and fee advancement in late May.

The report to the Board from Special Committee Member Les Gelber also directly connects the government to the decisions that were being made. Mr. Gelber explained that he had described to SEC and DOJ officials the Special Committee's progress and the Agreement, and "that the officials with whom Mr. Gelber had met appeared satisfied at the progress of the Special Committee." *Id.* at ¶99. Other notes from the meeting similarly indicated that the government expressed "[p]leasure at what happened." *See id.* at ¶¶100-101. In just one week, the government came a long way from being "appalled." Significantly, the only change in the severance agreement as of June 1 was the withdrawal of fee advancement; the other portions of the severance agreement, such as the payments to John Rigas, remained intact. *Id.* at ¶¶108-109.

As to the impact of the June 1 decisions, Mr. Metros's notes state: "Special Committee Section 6.2–Atty Fees; Bd of Directors <u>will be breached</u>/No attys fees." *See* 56.1 Statement ¶103. Ultimately, consistent with the terms of the Holder Memorandum, the threat of indictment prompted Adelphia to withhold indemnification and fee advancement from its constituents.

To summarize this evidence regarding the indemnification and fee advancement issues:

- May 23, 2002 AM: The Rigases reach an agreement with Adelphia in which Adelphia will provide indemnification and fee advancement, and the Rigases will resign, repay debt, and post collateral for repayment of fees, if convicted.
- May 23, 2002 PM: Fried Frank meets with the government, which is "appalled at the deal."
- May 23-28: Fried Frank puts together talking points for the U.S. Attorney's Office regarding fee advancement.
- May 25, 2002: The Special Committee meets and learns that the government is "appalled." The notes reflect the need to "come up with a story."
- June 1, 2002: Adelphia announces that it is reneging on its agreement to provide indemnification and fee advancement.

17

b.       *Other Government Control of Adelphia in May 2002*

During that same period, the government was deeply involved in dictating to whom it would allow Adelphia to speak. For example, the government forbade Adelphia from speaking with some key employees in Adelphia's accounting department. *See* 56.1 Statement ¶¶110-112. The Board adhered to this instruction, even as it and its counsel described its level of access to employees as insufficient and discussed the difficulty of filing an 8-K disclosure without being able to communicate with key Adelphia personnel. *See id.*

Given all of this, the subsequent testimony of Dennis Coyle, who was an Adelphia director and member of the Special Committee—and who was the former General Counsel of Florida Power & Light—should come as no surprise. Mr. Coyle testified that the Committee had virtually no role in its own investigation, because its attorneys had been "co-opted by the government." 56.1 Statement ¶125; s*ee also id.* at ¶114 (Covington & Burling, the Special Committee's outside counsel, was ordered to "aid . . . the United States Attorney's Office in any way possible").

c.       *The Administrative Leave Agreements*

The now-available evidence reveals that the government's micromanagement of Adelphia's decisions and the government's pressure on Adelphia continued unabated in the months following the June decision to revoke the fee advancement and indemnification agreement. The government dictated the terms by which Adelphia placed employees on administrative leave and, ultimately, terminated their employment.

For example, there was a group of Adelphia employees (Karen Chrosniak, Edward Hartman, Luke Healy, Carla Brown Horn, Douglas Malone, Dean Marshall and Timothy Werth) whom the Special Committee identified as having knowingly participated in alleged improper activities. 56.1 Statement ¶¶113, 128. Because of this, Adelphia intended to terminate these

18

employees. *Id.* at ¶ 113. The government, however, intervened and instructed Adelphia to instead place these employees on administrative leave. *Id.* [8]

In late July, Adelphia formulated the exact terms of the agreements through which these employees would be placed on paid administrative leave. *See id.* at ¶ 131. A central theme of the agreements was that the employees agreed to make themselves "available as reasonably necessary to answer questions, provide complete and truthful information as is reasonably requested by the Company (and those acting on the Company's behalf, including, the Company's auditors, the Special Committee and their counsel), the United States Attorney's [O]ffice for the Southern District of New York and the Middle District of Pennsylvania, the [SEC], and other governmental authorities." *Id.* at ¶¶ 131-132. These agreements included a confidentiality provision that stated that these employees were only allowed to speak with the government or Adelphia and no one else, which of course included the Rigases. *Id.* at ¶¶ 133-134. The confidentiality section of these agreements, created at the government's behest, along with the government preventing *anyone*—including Covington and Adelphia—from speaking to key witnesses, precluded the Rigases from having any access to those with the most knowledge of the issues relevant to the Rigases' case.

The events of late July concerning the administrative leave agreements provide one of the most striking examples of the government's direct role in controlling Adelphia's actions. On July 30, Covington lawyer Bruce Baird, who represented the Special Committee, emailed a draft of the administrative leave agreements to AUSA Christopher Clark. 56.1 Statement ¶ 136. Mr. Baird asked, "*Chris, does this do the trick?*" *Id.* (emphasis added). AUSA Clark answered the following day, with an email stating, "*new agreement is okay, provided that our agreement*

---

[8] Previously, in June 2002, these employees were advanced the cost of their legal representation in connection with the Adelphia investigation in exchange for their cooperation with the Special Committee "as well as any other investigation, proceeding or action brought by any governmental agency or authority." *Id.* at ¶ 129-130.

*relating to your interviews of our co-operators in [sic] still in effect.*" *Id.* at ¶137 (emphasis added). The reference to "our" earlier agreement referred to Adelphia's prior agreement (described above) not to interview any witnesses identified by the government as off-limits. *See id.* at ¶¶110-113.

AUSA Clark did not stop with these steps to isolate the Rigases. He wrote that the agreement with the seven employees "*will have to be revised* to reflect the changes in the contract. Please confirm via email that it will be so revised." 56.1 Statement ¶138 (emphasis added). AUSA Clark asked for email confirmation that the revisions would be made, and ended his email by stating, "*[w]ith those provisos, it's fine.*" *Id.* (emphasis added). There was no ambiguity in this exchange about who was calling the shots about the terms of the administrative leave agreements—including the provisions affording the government the opportunity to speak with the witnesses about Adelphia-related issues, but denying the Rigases from that same access.

As a result of these forceful instructions from the government, General Counsel Fisher later sent a new letter out to the administrative-leave employees:

> As you know, in connection with your administrative leave with Adelphia Communications Corporation (the "Company"), which began effective July 29, 2002, you were asked to sign a letter describing the terms of the administrative leave, and a general release of claims. *As you also know, the U.S. Department of Justice requested certain clarifying changes to the release*, which were incorporated into the final version of the release that was executed by you and the Company.

56.1 Statement ¶139 (emphasis added).

The government's cooperation requirement was not empty rhetoric. For example, when Edward Hartman—one of the individuals on administrative leave—was later deemed not to be cooperating sufficiently with the government, he was terminated. 56.1 Statement ¶140. Adelphia also informed him of the "end[] [to] the company's obligation to provide you with any legal

counsel with regard to the Government's investigation of the relationship between the Rigas Family and the Company," and noted that the "Company reserves its rights to pursue claims against you with regard to the undertaking you signed to reimburse the Company for failure to cooperate with the Government with respect to the above-reference[d] litigation." *Id.* at ¶141. The message was plain to all: failure to cooperate would result in termination and potential litigation, threatening employees with financial disaster. Indeed, Peter Metros's notes of the May 22, 2002 Special Committee meeting make clear that Adelphia's policy was to discharge employees who refused to cooperate by pleading the Fifth Amendment. *Id.* at ¶143 ("Plead the 5th—Discharge them.").

> d.   *The Government's Continued Control in 2003*

On February 5, 2003, lawyers from Buchanan Ingersoll—the firm that had been longtime counsel to Adelphia and the Rigases—asked Mr. Korologos (of Boies Schiller, one of Adelphia's outside law firms) to review a letter Buchanan Ingersoll was considering sending to some of the Rigases' current lawyers. *See* 56.1 Statement ¶193. The letter dealt with the Rigases' requests for various files and information, including "[a] listing of all files relating to the Firm's former representation of Adelphia." *Id.* at ¶¶194-195. With regard to that request, Buchanan Ingersoll's proposed response was, "we have asked the firm of Boies, Schiller & Flexner if they have any objection to our providing a list of all Adelphia files to you. They have not yet responded to our inquiry." *Id.* at ¶195. About 20 minutes after Mr. Korologos received this letter, he sent it to AUSAs Clark and Coleman, indicating that he had asked the lawyer at Buchanan Ingersoll "to inform me (so I could tell you) before he sent anything like this." *Id.* at ¶196.

Another example of the immense power the AUSAs in the Southern District of New York were asserting over who got to speak to whom and when was seen in a May 8, 2003 email

from Mr. Korologos to AUSA Clark. The email informed AUSA Clark that the IRS wanted to interview Adelphia accounting employee, Joe Sabol. *See* 56.1 Statement ¶ 191. Mr. Clark responded: "Interview is off. No one should interview Sabol tomorrow or anytime without my say so." *Id*. at ¶ 192.

e.  *Adelphia's Pleas to the Government*

Shortly after Adelphia's compliance with the government's demands in late July 2002 regarding the administrative leave agreements, Covington sent a letter to the government making clear that Adelphia's actions were the result of its compliance with the government's instructions and the Holder Memorandum. The letter forcefully made the case for why Adelphia should not be indicted, 56.1 Statement ¶ 144, explaining that Adelphia had complied "to the letter" with the Holder Memorandum, which was attached as Exhibit A, *id.* at ¶¶ 145-146. Addressing the section of the Holder Memorandum that assesses a company's cooperation with the prosecution (including the denial of indemnification), the letter declared that Adelphia "has done everything the government could wish for." *Id.* at ¶ 148. According to the letter,

> The Company has shielded no one, forcing the resignation of the Rigases and working with the government to coordinate the appropriate replacement of employees found to have knowingly participated in improper activities. Simply stated, the Company, through the Special Committee, has taken as its mandate the duty to provide *complete and unqualified assistance to the government* in its efforts to bring charges against the Company's former executives.

*Id.* at ¶ 146 (emphasis added). Strikingly, the letter indicated that Adelphia's response to the investigation was driven by the "government's approval of this response, indeed*, its insistence that no less is acceptable*." *Id.* at ¶ 147 (emphasis added).

The letter enumerated some of the myriad ways in which Adelphia had made it its mission to work with and serve the government. The list included:

- As of the beginning of August 2002, Adelphia provided the government with "millions of pages" of documents. 56.1 Statement ¶ 115.

- Adelphia turned documents over to the government "without prior review and without the assertion of privilege in advance of production." 56.1 Statement ¶ 116.

- Adelphia provided documents to the government as quickly as possible. 56.1 Statement ¶ 117.

- Through its counsel, Adelphia interviewed approximately 70 witnesses by the end of July 2002, some "at the request of the United States Attorney's Office." 56.1 Statement ¶ 118; *see also id.* at ¶ 124 (Adelphia shared dozens of employee-interview memoranda with the government).

- Adelphia provided information regarding the interviews to the government "promptly" and "often in draft form to avoid any delay." 56.1 Statement ¶ 119.

- Adelphia "retained an investigative firm for the purpose of recovering assets from the Rigas family and [wa]s actively sharing information discovered by that company with the United States Attorney's Office." 56.1 Statement ¶ 120.

- Adelphia sued the Rigas family and entities that it controlled only "after having *met with the government to advise it of the Company's intention and to insure that any concerns were addressed*." 56.1 Statement ¶ 121 (emphasis added).

- Adelphia "made witnesses available" to the government, including senior executives, on short notice. 56.1 Statement ¶ 122.

- Adelphia "wrest[ed] . . . control from the Rigases" and "forcibly removed [them]" from their positions. 56.1 Statement ¶ 149.[9]

Around that same day, Adelphia terminated nine employees it thought to be potentially involved in fraudulent conduct. 56.1 Statement ¶ 142. These employees "were previously kept at the request of the DOJ for their investigation." *Id.*

---

[9] It is no surprise that Adelphia did not list withdrawal of indemnification or closing off access to witnesses as among the ways it aided the government. Adelphia was bound to provide indemnification unless the bylaws created an exception. The bylaws had no "the government told us to" exception, so for Adelphia to declare it had acted at the government's behest on this issue would be to admit that Adelphia breached its obligations under the bylaws and the Agreement. Moreover, given the government's familiarity with the Adelphia investigation, it was enough to simply claim that Adelphia forced the Rigases to leave the company. 56.1 Statement ¶ 149. Similarly, with regard to the closing off of witnesses to the defense, it would have been extremely reckless to create a paper record of Adelphia having worked with the government on such a blatantly unconstitutional endeavor.

f.     *The Bankruptcy Proceedings*

A few weeks later, on August 22, 2002, one of the lawyers from Boies Schiller who was representing Adelphia wrote an email to AUSA Timothy Coleman forwarding a draft application to the bankruptcy court. 56.1 Statement ¶ 151. The application was to be filed for Adelphia (which had filed for Chapter 11 bankruptcy in June 2002) to authorize Adelphia to pay various cooperating witnesses' lawyers. *Id.* The Application expressly stated that Adelphia wished to pay the cooperators' attorneys' fees because there was a chance that these employees might cease cooperating with the government if Adelphia was unable to pay for their counsel. *Id.* at ¶ 152. And the application requested that all fee requests these individuals' lawyers would submit to the Bankruptcy Court be held confidential, because public disclosure of the information "would potentially interfere with or hinder the Government's investigations." *See id.* at ¶ 153.

The government's close control of access to witnesses is also evident in what happened when Adelphia told the government about its desire to seek a "temporary restraining order freezing the Rigas defendants' assets." 56.1 Statement ¶ 179. In a November 20, 2002 email from a Boies attorney to AUSA Coleman, the Boies attorney indicated that "[w]e would like to coordinate efforts and want to make sure that the bringing of this motion would not interfere with your office's activities." *Id.* at ¶ 180. Then, in planning for a subsequent bankruptcy court hearing on freezing assets—at which the Rigases would have the opportunity to cross-examine Les Gelber, an Adelphia Board member whose direct testimony would be presented by affidavit—Mr. Korologos of Boies Schiller consulted with the government on February 13, 2003 to assure the government that the cross-examination of the witness be limited in scope. *See id.* at ¶¶ 187-189. Six days later, Mr. Korologos sent a draft of Mr. Gelber's affidavit to AUSAs Clark

and Coleman, explaining "I do not believe anything mentioned in this affidavit should cause you any concern . . . but I wanted to make sure we showed it to you in advance. *Id.* at ¶ 190.

The same day Mr. Korologos sent that draft of Mr. Gelber's affidavit, Mr. Korologos also sent an email to the government, which speaks directly to the government's role in controlling the Rigases' access to information:

> Attached is a fax I received today in which the Rigases' counsel asks for depositions of the pre-petition independent directors and the Company. *Clearly this request relates to the issues we have previously discussed regarding your desire not to have these depositions occur.* I am sure these are depositions you continue not to want to take place prior to resolution of the criminal action against the Rigases.

56.1 Statement ¶ 181 (emphasis added).

A statement the government made to the Bankruptcy Court in January 2004 exposes the degree of the government's attempt to cover up the role it was playing. Despite the government's deep engagement in the bankruptcy issues and the undeniable ways in which the government had micromanaged so many of Adelphia's decisions affecting the Rigas's defense, the government represented to the court that it did not control Adelphia in any way. The government told the Bankruptcy court that because Adelphia is a corporation, "[i]t can do what it wants. We don't have any power over them." 56.1 Statement ¶ 199. That is truly a laughable claim. If this case shows anything it is the immense power the government had over Adelphia.

g.     *Barring the Rigases' Access to Witnesses*

To fully "cooperate" with the government, Adelphia went so far as to expressly prohibit its employees from speaking to the Rigases and placed its employees on notice that any contact with the Rigases might be reported to the government.  Specifically, the October 14, 2002 Memorandum (the "Fisher Memorandum") from Adelphia's General Counsel Randy Fisher to all Adelphia employees, *see id.* at ¶ 154, explicitly barred all Adelphia employees from

25

communicating with the Rigases or their representatives. *Id.* at ¶¶157-164. It indicated that Adelphia was taking this step because it was committed to cooperating with the government in order to "help the company avoid prosecution." *Id.* at ¶155. The Fisher Memorandum further explained the various ways in which Adelphia was working with the prosecutors and then stated that "[a]s part of this process, I have been asked to direct everyone" to follow specific procedures if contacted by any of the Rigases or their representatives. *Id.* at ¶157. The Memorandum made clear, in the section concerning direct contact by the Rigases or their representatives, that "**[t]here is no exception to this situation**." *Id.* at ¶159 (emphasis in original).

Critically, the Fisher Memorandum explained that, with regard to all communications, "*Adelphia continues to cooperate . . . by reviewing with the government . . . [its] communications with members of the Rigas Family*, Rigas Family private entities employees, former Adelphia executives under indictment or any of their actual or purported counsel or representatives." 56.1 Statement ¶156 (emphasis added). The Memorandum further indicated that in deciding whether a particular communication with the Rigases would be acceptable, "the Legal Department will review the matter and *may refer the matter to appropriate government agencies* and litigation counsel for review." *Id.* at ¶164 (emphasis added). The Fisher Memorandum placed Adelphia employees on notice that any contact with the Rigases might lead to the involvement of government agencies. Indeed, Adelphia had established a system to report communications with the Rigases to the government.

A particularly stark example of the government's direct role in interfering with access to witnesses involves an accountant named Rob Cavallari. On October 28, 2003, the Rigases requested access, via a conference call, to four members of Adelphia's accounting staff, including Mr. Cavallari. 56.1 Statement ¶183. (Adelphia and the Rigases had earlier stipulated

that the Rigases would have some limited access to this group regarding certain specified issues. *Id.* at ¶184.) One of the Boies Schiller lawyers forwarded this request to AUSA Clark, asking whether he had any objections to Adelphia allowing the Rigases to interview these witnesses. *Id.* at ¶185. The following day, Mr. Clark responded that "I object to Rob Cavileri [sic]." *Id.* at ¶186. And, he added, "I would like a postal inspector present during the meeting." *Id.*

Dean Marshall, who worked directly for Jim Brown (the government's star witness) in the Corporate Finance Department of Adelphia, has presented direct evidence on the subject of governmental interference. Mr. Marshall had extensive knowledge invaluable to the defense. *See* infra, §D. Yet, he refused to speak with the defense prior to the trial—and as a result was not called as a witness. Mr. Marshall has testified in a deposition that he was told "*the government* did not want me communicating directly with anybody from the Rigas family." 56.1 Statement ¶175; *see also id.* at ¶176 (testifying that "the one thing that was guiding or directing the choices I was making [to cooperate with the government] w[as] the government's instructions").

h.     *Adelphia's November 2004 Presentation to the Government*

The intensity of the coordination between the government and Adelphia is explicitly acknowledged in the presentation Adelphia made to the United States Attorney's Office on November 5, 2004. *See* 56.1 Statement ¶204. This presentation, entitled "Thompson Memorandum Factors," was part of Adelphia's continued effort to persuade the prosecution not to indict the company. *See id.* at ¶¶204-205. A dominant theme in the presentation was that Adelphia took extraordinary measures to work with the government in the prosecution of the Rigases. *Id.* at ¶206.

The presentation divided this cooperation into five categories. 56.1 Statement ¶207. The first category, labeled "Providing Access to Privileged Materials," detailed how Adelphia

provided the government with extensive information developed by the Special Committee and its outside counsel. *Id.* at ¶208. This included a "450-page privileged investigation prepared by Special Committee's outside counsel," as well as "privileged summaries of more than 100 witness interviews conducted by counsel to the Special Committee, including summaries of seven witnesses who testified for the government at the *United States v. Rigas* trial." *Id.*

The second area of cooperation set forth in the presentation was titled "Production of Documents and Other Information." 56.1 Statement ¶209. In this regard, Adelphia told the government that it had produced for the government's benefit over 10 million pages of documents, 25 imaged local computer drives, 228 compact disks, and access to the computer database. *Id.* The presentation also referenced a July 17, 2002 agreement under which Adelphia undertook to "produce materials to the government as quickly as possible, even before conducting a privilege review." *Id.*

The third category of cooperation Adelphia heralded was its "Assistance Before and During the *United States v. Rigas* Trial." 56.1 Statement ¶210. This particular slide merits full quotation as it reveals the powerful degree to which Adelphia and the government were working hand-in-hand throughout the prosecution of the Rigases:

- Adelphia has provided extraordinary assistance for over two years in connection with prosecution of the Rigases and others:
  - Detailed comments on the draft criminal complaint
  - Adelphia's forensic accountants made available to the Government on short notice
  - Assistance in the preparation of key witnesses
  - Real-time data analysis and other assistance during the trial
  - Review of 70,000 pages produced by the Rigases on the eve of trial

28

- - Completed in one week (400 hours of work)

  o Analysis of all transactions between Adelphia and the Rigas entities over a 3 ½ year period to rebut Rigases' defense that they could have repaid their debts to the company

    - Completed before the end of the Government's case-in-chief (3,000 hours of work)

  o Adelphia spent several million dollars assisting the Government in connection with the trial.[10]

*Id.*

The presentation's fourth set of "cooperation" factors described Adelphia's assistance to the government in the tax investigation of the Rigases. 56.1 Statement ¶211. This included collection and review of documents, and assuring the availability of Adelphia employees and forensic auditors to the government. *Id.*

The final category of "cooperation" Adelphia put forth was entitled, "Adelphia Did Not Obstruct the Government's Investigation." 56.1 Statement ¶212. This discussion, in particular, reveals the extent to which the steps that Adelphia took vis-à-vis the Rigases during the early stages of the investigation were taken in concert with the government. The presentation proclaimed "Adelphia has provided extraordinary cooperation since the Rigases were removed from their positions at the Company." *Id.* In particular, it explains that the "Special Committee *moved immediately to oust Rigases once it learned of Government's concerns*" and that the "Special Committee's decisive action enabled Government to promptly identify culpable individuals and conduct extensive investigation." *Id.* at ¶213 (emphasis added).

Adelphia's plan of appeasing the government worked. After hearing Adelphia's presentation, which emphasized all the ways in which it cooperated to facilitate the Rigases'

---

[10] In point of fact, Adelphia had spent well over $160 million to aid the investigation and prosecution. *See* 56.1 Statement ¶322.

convictions, the government chose not to indict the company (or any of the outside Board members who had been involved in many of the transactions that were the subject of the charges against the Rigases). 56.1 Statement ¶214.

i.    *Post-Trial Conduct Demonstrating the Government's Role*

The interactions between the government and Adelphia in late 2004—after the Rigases' criminal trial—shed yet more light on the nature of the Government's role throughout the process. At that time, the Rigas Managed Entities (private companies owned by the Rigases that Adelphia managed, Am. Rule 56.1 Statement, R. 163-1, ¶64) were providing some advancement of attorneys' fees for the Rigases' defense. The government approached Adelphia's counsel and expressed its extreme displeasure with this practice and *explicitly threatened to indict the RMEs if they continued to offer any indemnification and fee advancement to the Rigases. Id.* at ¶254. This incident demonstrates how the government had no qualms about threatening to indict companies (particularly companies connected to the Rigases) in order to force the company to withhold indemnification and fee advancement—the very behavior condemned as unconstitutional in *Stein*.

\* \* \*

The relationship between Adelphia and the government demonstrates that the Adelphia Board and the Special Committee had become the government's faithful foot soldiers in relation to the investigation and the prosecution of the Rigases. It has now become obvious that the various actions Adelphia took that crippled the Rigases' defense (beginning with their ouster from the company through the interference with access to funding and evidence) were actions taken either at the behest of the government or in response to clear signals that the government would be looking kindly at this type of "cooperation" (indeed "insisting" on nothing less) in

deciding whether to indict the company. These new revelations have enormous legal significance, as we will now explain.

### 4. *Assembling Defense Teams*

During the months leading up to and following their September 2002 indictments, Petitioners interviewed law firms and lawyers in order to assemble their defense team. For example, Tim Rigas retained Paul Grand and John Rigas retained Peter Fleming to represent them in their criminal case, but they both concluded that it necessary to bring on additional counsel given the complexity of the case and the magnitude of the materials to be reviewed. *See, e.g.*, 56.1 Statement ¶¶270-278. Accordingly, the Rigases attempted on multiple occasions to retain attorneys to supplement defense counsel.

The Rigases, for example, engaged Dewey Ballantine to assist criminal counsel in analyzing the sophisticated transactions at issue, but ultimately were unable to continue to retain the firm due to a lack of funds. 56.1 Statement ¶¶266-269. Similarly, in the summer of 2002, a team from Kirkpatrick & Lockhart traveled to the Rigases' home in Coudersport, Pennsylvania to discuss potentially representing the Rigases on a variety of issues, including criminal issues. *Id.* at ¶¶270-272. Despite being impressed with the firm, the Rigases were unable to retain Kirkpatrick due to the firm's estimated budget of over $15 million. *Id.* at ¶272.

Additionally, after receiving the 3500 material from the government shortly before trial began in February 2004, the Rigases interviewed and intended to hire Nixon Peabody, which was willing to represent the Rigases in their criminal case. 56.1 Statement ¶274. Due to the absence of fee advancement, however, the Rigases could not retain the firm. *Id.* at ¶275.

Ultimately, the Rigases used Dilworth Paxson (which was primarily the Rigases' civil firm) to supplement their criminal counsel. 56.1 Statement ¶276. Dilworth appeared in the

criminal case, *id.* at ¶277, and the bankruptcy court permitted Dilworth to receive funds released shortly before the trial for their work on the criminal case. *Id.* at ¶278.

Another impact of the government's anti-indemnification policy involved the Fried Frank law firm. Fried Frank had been retained earlier to represent the Rigases and Adelphia, with the promise that if a conflict ever developed between the Rigases and Adelphia, then Fried Frank would withdraw from representing Adelphia and go forward representing the Rigases. *See* 56.1 Statement ¶¶255-262, 265. Yet, by late May 2002, Fried Frank did an about face of its own and ended up representing Adelphia, not the Rigases. *Id.* at ¶263-264. (It did this, moreover, without ever getting any sort of consent from the Rigases waiving the firm's obvious conflict in now representing Adelphia.) The chain of events leading to Fried Frank's withdrawal makes clear that the government's interference with the Rigases' right to fee advancement and indemnification caused the Rigases to lose the representation of their counsel of choice.

### B.   Adelphia's Interference with the Rigases' Defense Constituted State Action Given Adelphia's Close Relationship and Coordination with the Government

The government's intensive role in coordinating, directing, and pressuring Adelphia on its decisions regarding the Rigases establishes that Adelphia's actions constitute state action. Accordingly, the Constitution protects the Rigases from Adelphia's actions interfering with the defense every bit as much as had the government acted directly.

Even had the only source of coercion been the extreme pressure exerted through the now-repudiated Holder Memorandum, that alone would be enough to make the government responsible for the intended resultant consequences. *See Stein*, 541 F.3d at 148 (The Thompson Memorandum "forced KPMG to adopt its constricted Fees Policy"). What happened here went far beyond that, as the government inserted itself as the active and ultimate decisionmaker on a wide array of decisions that directly affected the Rigases' opportunity (and constitutional rights)

32

to defend themselves. As the Second Circuit put it, through its communications, the government "reinforced" the message of the Memorandum in no uncertain terms. *Id.*; *see also United States v. Stein* ("*Stein I*"), 435 F. Supp. 2d 330, 365 (S.D.N.Y. 2006) ("The actions of the USAO in this case *compounded* the problem that the Thompson Memorandum created." (emphasis added)).

Adelphia did not unilaterally take its actions with the generalized hope that they might find favor in the government's eyes. Quite the contrary, Adelphia's actions were "a direct consequence of the government's overwhelming influence." *Stein*, 541 F.3d at 136. The government explicitly threatened Adelphia with the corporate death sentence of indictment if Adelphia did not follow its directions. *See supra*, § A.3.a. And the government was decidedly not shy about making its specific wishes known. It let Adelphia's lawyers know that it was "appalled at the deal" Adelphia had made with the Rigases in mid-May 2002—an agreement that provided indemnification and other severance benefits to the Rigases. *See id.* And when Adelphia asked for the government's approval ("does this do the trick", *see supra*, § A.3.c) of its agreements with employees being put on administrative leave pending the criminal trial, the government instructed Adelphia that those agreements "will have to be revised." *See id.* Consistent with all this, when Adelphia presented the government with the long list of ways in which it had "provide[d] complete and unqualified assistance to the government in its efforts to bring charges against" the Rigases, *Adelphia reminded the government that this* "*response to the investigation was driven*" *by the government's* "*insistence that no less is acceptable.*" 56.1 Statement ¶¶ 146-147 (emphasis added). As the Second Circuit observed in *Stein*, the government's threat "was easily sufficient to convert its adversary into its agent." *Stein*, 541 F.3d at 151.

This evidence more than satisfies the established standards for treating Adelphia's actions as "state action," triggering the protections of the Fifth and Sixth Amendments. In *Stein*, the

Second Circuit thoroughly reviewed the Supreme Court's state action decisions in reaching the conclusion that the terms of the Thompson Memorandum (functionally identical to the Holder Memorandum) and the government's encouragement of KPMG's decisions constituted state action. *Stein*, 541 F.3d at 146-151. These precedents compel the identical conclusion here. The Holder Memorandum explicitly called on prosecutors when deciding whether to indict (and thereby destroy) a company to consider the various ways that companies were "cooperating" with the prosecution's requests—including whether they were advancing fees and indemnifying those whom the prosecution believed were culpable.[11] And the history of the government's pressure on Adelphia leaves no doubt that the government aggressively pushed its desires on Adelphia (to the point of ordering Adelphia what to do on various key issues affecting the Rigases). As was the case in *Stein*, "prosecutors became entwined in the control" of Adelphia. *Stein*, 541 F.3d at 148 (*quoting Flagg v. Yonkers Sav. & Loan Ass'n*, 396 F.3d 178, 187 (2nd Cir. 2005)). And, as was the case in *Stein*, "[t]he government is therefore legally 'responsible for the specific conduct of which the [criminal defendants] complain[ ].'" *Stein*, 541 F.3d at 147 (second and third alterations in original) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)).

A private actor's actions constitute state action when "there is a sufficiently close nexus between the State and the challenged action of the [private] entity so that the action of the latter may be fairly treated as that of the State itself." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974). This close nexus is present not only where the government affirmatively directs the

---

[11] The Holder Memorandum and the Thompson Memorandum are virtually identical in all ways relevant here. With regard to the "cooperation and advancing of legal fees by business entities," the Thompson Memorandum (issued on January 20, 2003) "carried forward" the language of the Holder Memorandum "without change." *Stein I*, 435 F. Supp. 2d at 338. The key difference between the two memoranda was that, unlike the Holder Memorandum which prosecutors could choose to not to follow, the Thompson memo was binding on all federal prosecutors. That difference is of no moment here as the United States Attorney's Office most certainly chose to follow the Holder Memorandum. And, in any event, a great deal of the pre-trial period occurred between the January 2003 promulgation of the Thompson Memorandum and the February 2004 start of the trial.

private behavior, but also when the government has "provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum*, 457 U.S. at 1004.

For example, in *Skinner v. Railway Labor Executives Association*, 489 U.S. 602 (1989), the Federal Railroad Administration had promulgated regulations that *allowed—but did not compel*—railroads to conduct drug and alcohol testing of railroad employees in the absence of a warrant or even reasonable suspicion that alcohol or drug use was involved in the incident under investigation. The Supreme Court held that whether the decision of a private railroad to institute such testing constituted state action "necessarily turns on the degree of the Government's participation in the private party's activities." *Id*. at 614. There, the government "did more than adopt a passive position toward the underlying private conduct" because generally applicable regulatory provisions demonstrated the government's "strong preference for testing." *Id*. at 614-15. Accordingly, the Court held that the circumstances showed that the "Government's encouragement, endorsement, and participation" sufficed constitute state action despite the fact that the actual decision to implement the testing was made by a private actor. *Id*. at 615-16.

Here, the Holder Memorandum and the government's direct interactions with Adelphia show that the government did much more than adopt a "passive position." Rather, through the Holder Memorandum and the government's direct pressure on Adelphia, there was clear "encouragement, endorsement and participation" of the various decisions Adelphia made vis-à-vis the Rigases and the prosecution of the case.

To begin with, the Holder Memorandum made clear that a company seeking to avoid indictment would be evaluated, in part, by whether it was "cooperating" with the government. 56.1 Statement ¶30. The Holder Memorandum specified that "cooperation" meant denying

indemnification and advancement of attorneys' fees to employees and agents whom the government believes to be culpable. *Id*. at ¶¶ 32-33. In addition, the Memorandum specifies that a corporation "cooperates" by refusing to retain employees the government considers culpable. *Id*. at ¶ 33. The Memorandum further specified that "cooperation" included a company's waiving privilege and providing the government access to any and all interviews conducted through an internal investigation. *Id.* at ¶ 31. These are just some examples of adequate "cooperation"—all of which Adelphia satisfied. As a former United States Attorney has written, the climate created by the Holder and Thompson Memoranda led the government to invoke their "criteria at the outset at every investigation and immediately start 'grading' a company on its performance in the government's investigation." Mary Jo White, *Corporate Criminal Liability: What Has Gone Wrong? in* 2 37th Annual Institute on Securities Regulation 815, 820 (PLI Corp. Law & Practice, Course Handbook Series No. B-1517, 2005); *see also id.* at 818 (memoranda were used "by some prosecutors, not so much as factors in making their charging decisions, but as means to force companies to behave and reform themselves as the prosecutors" wished).

In beseeching the government to spare it indictment, Adelphia touted to the government that it complied with the Holder Memorandum "to the letter" and did "everything the government could wish for." 56.1 Statement ¶¶ 146, 148. Thus, even were this a case in which the government had only encouraged Adelphia's actions through the adoption of the Holder Memorandum, that would be more than enough to satisfy the standards of encouragement and to treat Adelphia's actions as those in which the government was implicated. *See Skinner*, 489 U.S. at 614-16 (concluding that generally applicable regulations revealing the government's "strong preference" were sufficient to constitute state action).

36

The government's role here, however, went well beyond the issuance of the Holder Memorandum. As detailed above, the government actively expressed approval—and sometimes disapproval that triggered reversal—of many decisions that Adelphia made regarding the Rigases and other former Adelphia personnel. These decisions included: (a) the ousting of the Rigases from their positions as officers and directors and thereby wresting control of Adelphia away from them (*see supra*, §A.3.a); (b) the refusal to advance legal fees and indemnify the Rigases, contrary to the Rigases' severance agreements (*see id.*); (c) the design of administrative leaves for selected employees that predicated continued payment and the advancement of legal fees on their cooperation with the government and non-cooperation with the Rigases (*see supra*, §A.3.c); (d) the review (with government involvement) of any request for communication with the Rigases (*see supra*, §A.3.d, g); (e) restricting the scope of the Rigases' opportunity to cross-examine an Adelphia witness during a civil action (*see supra*, §A.3.f); and (f) restricting Adelphia employees from communicating with the Rigases (*see supra*, §A.3.d, g). There was, by any measure, robust and active governmental involvement in directing, approving and encouraging Adelphia's cooperation with the government's battle against the Rigases.

Comparing the circumstances here with those the Second Circuit considered in *Stein* drives home this point forcefully. In *Stein*, the company's actions (as here) were affected by the governmental policy directive (in that case, the Thompson Memorandum), which was "compounded" by comments from the specific prosecutors working on the KPMG investigation. *See Stein I*, 435 F. Supp. 2d at 365. Given the terms of the Thompson Memorandum, the court observed, "the only safe course was [for KPMG] to allow the government to become (in effect) paymaster." *Stein*, 541 F.3d at 148. And as occurred here, the KPMG Board committed to providing advancement of fees but then made an abrupt change contemporaneous with pressure

from the government to enhance its level of cooperation. *Id.* Just as in *Stein,* then, the prosecutors here "intervened in [the] decisionmaking" and were not shy about expressing "their 'strong preference' as to what the firm should do, and their 'desire to share the fruits of such intrusions.'" *Id.* (quoting *Skinner*, 489 U.S. at 615).

Another striking similarity between what happened in *Stein* and what happened here is the way the government forced the company to use its power of indemnification (and, here, its power to continue paying employees' salaries while on administrative leave) to coerce individuals (who could otherwise invoke their Fifth Amendment rights) to speak with and "cooperate" with the government. In *Stein,* the government was involved in KPMG's decision to pay the legal fees of some employees, but not to "pay legal fees for employees who declined to cooperate with the government." *Stein I*, 435 F. Supp. 2d at 342; *see also id.* at 345. In condemning the conditioning of indemnification on a person's cooperation with the government, the court wrote:

> These actions are significant not only in themselves, but also for the insight they
> provide into the prosecutors' actions with respect to payment of legal fees. For
> they demonstrate a willingness by the prosecutors to use their life and death
> power over KPMG to induce KPMG to coerce its personnel to bend to the
> government's wishes notwithstanding the fact that the Constitution barred the
> government from doing directly what it forced KPMG to do for it.

*United States v. Stein* ("*Stein IV*"), 495 F. Supp. 2d 390, 414 (S.D.N.Y. 2007), *aff'd*, 541 F.3d 130 (2d Cir. 2008).

Every word of this applies to what the government did here. Per Adelphia's arrangement with the government, the employees placed on administrative leave (all of whom were suspects of alleged wrongdoing and all of whom were key potential witnesses, 56.1 Statement ¶¶ 113, 128) had their legal fees and salaries paid by Adelphia *provided* that they cooperated with the government (thereby waiving their Fifth Amendment privileges). *See supra*, § A.3.c. Adelphia

refused to enter into these administrative leave agreements until the government signed off on them—which the government did only after demanding certain changes. *See id.* And, as was the case in *Stein* (541 F.2d at 138-39), Adelphia complied with its own commitment to the government to terminate any employees who were deemed uncooperative. *See id.*

All of this demonstrates that, as in *Stein*, "[t]he government brought home to [Adelphia] that its survival depended on its role in a joint project with the government to advance government prosecutions." *Stein,* 541 F.3d at 147. This is by no means surprising. The same office prosecuted both the Adelphia and the KPMG cases and used very similar tactics in both cases. The Holder and Thompson Memoranda mandated many of these tactics. Others came about through the United States Attorney's Office for the Southern District of New York's particularly aggressive methods of enforcing these policies.[12] *Stein* was not the only case in which this kind of cooperation was coerced. United States Attorney David Kelley later indicated that the government's practices had been going on for some time. In rebuffing KPMG's plea not to be indicted (despite the many ways KPMG had assisted the government), he told KPMG that its cooperation was subpar: "Let me put it this way. I've seen a lot better from big companies." *Stein I*, 435 F. Supp. 2d at 348.

The record leaves no doubt that from early on in the investigation, the Adelphia Board came to the view—correctly—that its survival depended on satisfying the government's every wish. The government held "the proverbial gun" to Adelphia's head, and Adelphia responded like most would with a gun held to the head: it agreed to do anything and everything the aggressor wanted. *See Stein I*, 435 F. Supp. 2d at 336.

---

[12] Indeed, Judge Kaplan has noted in a speech that, like the KPMG case, the government's prosecution of Adelphia executives (*i.e.*, the Rigases) raised questions about its practice of using the threat of criminal prosecution of companies in order to gain leverage in investigations of alleged wrongdoing by company employees. Evan Perez, *KPMG Judge Questions Laws, Tactics Used in Corporate Cases*, Wall St. J. (Sept. 28, 2007) (attached at Ex. 75 to the May 25, 2018 Declaration of Lawrence Marshall).

The evidence shows that had it not been for the government's pressure and encouragement of Adelphia (through the Holder Memorandum, repeated demands for "cooperation," and direct coordination), Adelphia would have stood by its obligations. Given the May 23 Agreement, the bylaws, and Delaware law, all the evidence points toward the conclusion that Adelphia would have advanced the required fees to the Rigases, as Adelphia never refused to do in the past. In *Stein*, the court noted that KPMG similarly had never before withheld fees-advancement and indemnification and had explicitly promised to provide indemnification. *Stein IV*, 495 F. Supp. 2d at 405; *Stein I*, 435 F. Supp. 2d at 339-340. That is all true here as well.

In *Stein I*, the District Court explained that "[f]ew if any competent defense lawyers would advise a corporate client at risk of indictment that it should feel free to advance legal fees to individuals in the face of the language of the Thompson Memorandum itself." *Stein I*, 435 F. Supp. 2d at 364.[13] Even fewer would give such advice after the government expresses its disgust with an agreement that provides fee advancement to directors and officers suspected of wrongdoing. Adelphia was guided by savvy lawyers who determined early on—as the government had made clear—that Adelphia's survival required it become the government's agents. There was a direct causal relationship between the government's policies and statements and Adelphia's course of action.

## C.    The Government's Policies and Actions with Regard to Indemnification and Advancement of Fees Violated the Rigases' Sixth Amendment Rights

As the Second Circuit explained in *Stein*, Supreme Court precedent demonstrates that governmental interference with a defendant's right to secure advancement of legal fees and indemnification from a company violates the Sixth Amendment. The Supreme Court's decision

---

[13] In *Stein IV*, the court surveyed "an abundance of published statements and literature" establishing the coercive impact of the Holder and Thompson Memoranda, ranging from former United States Attorney General Edwin Meese III to the American Bar Association. *Stein IV*, 495 F. Supp. 2d at 397-99.

in *Maine v. Moulton*, 474 U.S. 159 (1985), summed up the governing principle when it explained that the Sixth Amendment's right to counsel

> means more than simply that the State cannot prevent the accused from obtaining the assistance of counsel. The Sixth Amendment also imposes on the State an affirmative obligation to respect and preserve the accused's choice to seek this assistance. . . . [A]t the very least, the prosecutor and police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel.

*Id*. at 170-71.

1.      *The Right to Counsel of Choice*

The right to counsel includes the right to be represented by counsel of choice. As the Supreme Court has explained, "the Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire." *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624-25 (1989). The Second Circuit has put it this way: "In a nutshell, the Sixth Amendment protects against unjustified governmental interference with the right to defend oneself using whatever assets one has or might reasonably and lawfully obtain." *Stein*, 541 F.3d at 156; *see generally Luis v. United States*, 136 S. Ct. 1083 (2016) (part of the right to counsel is that the government may not deprive a defendant of the opportunity to pay lawyers with assets to which the defendant is legitimately entitled).

Here, the government's interference prevented the Rigases from hiring Kirkpatrick & Lockhart, which would have worked on criminal defense matters, in addition to other issues. *See supra*, § A.4. The government's actions also prevented the Rigases from retaining Dewey Ballantine and Nixon Peabody, both of which similarly would have become part of the defense team. *See id.* But in all these instances, the absence of fee advancement meant that they could not retain those firms. *See* 56.1 Statement ¶¶ 266-275.

Similarly, the government (directly and through Adelphia) interfered with the Rigases' choice of counsel by, among other ways, causing Fried Frank to withdraw from representing the Rigases. *See supra id.* Despite its assurances that if a conflict between Adelphia and the Rigases arose, it would continue to represent the Rigases and withdraw from representing Adelphia, Fried Frank went on to represent Adelphia alone. The reason a firm in Fried Frank's position would choose to continue on with Adelphia, as opposed to the Rigases, is obvious: Once it was clear that Adelphia was stripping the Rigases of indemnification and fee advancement, the only client who would reliably be able to pay fees was Adelphia.

This interference with choice of counsel is *per se* reversible error. *See United States v. Gonzalez-Lopez,* 548 U.S. 140, 148-52 (2006); *Stein*, 541 F.3d at 157. In *Gonzalez-Lopez*,[14] the Court explained:

> We have little trouble concluding that erroneous deprivation of the right to counsel of choice, "with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as 'structural error.'" . . . Different attorneys will pursue different strategies with regard to investigation and discovery, development of the theory of defense, selection of the jury, presentation of the witnesses, and style of witness examination and jury argument. And the choice of attorney will affect whether and on what terms the defendant cooperates with the prosecution, plea bargains, or decides instead to go to trial.

*Gonzalez-Lopez*, 548 U.S. at 150 (internal citations omitted). Based on these "myriad aspects of representation," the Court held:

> [T]he erroneous denial of counsel bears directly on the "framework within which the trial proceeds," . . .—or indeed on whether it proceeds at all. It is impossible to know what different choices the rejected counsel would have made, and then to

---

[14] A conviction becomes final on direct review for purposes of retroactive application of new decisions when the Supreme Court "affirms a conviction on the merits on direct review or denies a petition for a writ of certiorari, or when the time for filing a certiorari petition expires." *Clay v. United States*, 537 U.S. 522, 527 (2003). The Supreme Court denied the Rigases' Petition for Certiorari on direct review on October 4, 2010. *See Rigas v. United States*, 562 U.S. 947 (2010). *Gonzalez-Lopez* was decided in 2006, more than four years before the Rigases' convictions became final. Hence, even if *Gonzalez-Lopez* is treated as a new rule, it applies to this case. *See generally Griffith v. Kentucky*, 479 U.S. 314, 328 (1987) ("We therefore hold that a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final . . . .").

quantify the impact of those different choices on the outcome of the proceedings. Many counseled decisions, including those involving plea bargains and cooperation with the government, do not even concern the conduct of the trial at all. Harmless-error analysis in such a context would be a speculative inquiry into what might have occurred in an alternate universe.

*Id.*

The Rigases wanted additional (and in some cases, different) counsel to work on their criminal case. *See* 56.1 Statement ¶¶255-278. The impairment of their ability to do that violated their Sixth Amendment rights. In *Stein IV*, the court explained:

> [A]s the Supreme Court and the Second Circuit have recognized, a criminal defendant has a constitutional right "to control the presentation of his defense." "Inherent in a defendant's right to control the presentation of his defense is the right to choose the counsel who presents it." *This includes the right to a second lawyer or law firm* if the defendant can afford it, either from his own resources or from resources lawfully available to him from others.

*Stein IV,* 495 F. Supp. 2d at 422 (emphasis added). It makes no difference whether one thinks different counsel or additional counsel would have made a difference to the outcome. That is the point of calling it structural error: "In sum, the right at stake here is the right to counsel of choice, not the right to a fair trial; and that right was violated because the deprivation of counsel was erroneous. No additional showing of prejudice is required to make the violation 'complete.'" *Gonzalez-Lopez*, 548 U.S. at 146. For this reason alone, Petitioners are entitled to relief.

2.      *Impairment of Counsel's Efficacy*

Beyond the interference with the Rigases' choice of counsel, the government (via Adelphia) violated the Rigases' Sixth Amendment rights by hampering their ability (through existing counsel) to mount as robust and aggressive of a defense as they could have, had they received the fee advances and indemnification to which Adelphia had agreed—and to which they were entitled.

43

a.    *General Principles*

There are specific examples of ways in which the government hampered the defense's efforts. These will be discussed shortly. *See infra*, § C.2.b-d. But while those illustrations provide some sense of the relevant injury, the Second Circuit has held (adopting the District Court's conclusion in *Stein I*) that "[d]efendants need not make a 'particularized showing' of how their defense was impaired . . . because '[v]irtually everything the defendants do in this case may be influenced by the extent of the resources available to them,' . . . and 'what the . . . Defendants can pay their lawyers to do.'" *Stein*, 541 F.3d at 151 (quoting *Stein I*, 435 F. Supp. 2d at 371-72). "Therefore," the court continued, "the Sixth Amendment violation 'is complete irrespective of the quality of the representation they receive." *Stein*, 541 F.3d at 151 (quoting *Stein I*, 435 F. Supp. 2d at 369). Indeed, the court noted that the government itself conceded that dismissal of the indictment was the proper remedy assuming the district court was correct in finding that the deprivation of fee advancement "'caused them to restrict the activities of their counsel,' and thus to limit the scope of their pre-trial investigation and preparation." *Stein*, 541 F.3d at 157 (quoting *Stein IV*, 495 F. Supp. 2d at 418).

In reaching this conclusion, the Second Circuit looked to the complexity and scope of that case, and upheld the District Court's determination that the defendants had "been forced to limit their defenses . . . for economic reasons and . . . they would not have been so constrained if KPMG paid their expenses." *Stein*, 541 F.3d at 157 (quoting *Stein IV*, 495 F. Supp. 2d at 419). The District Court had spelled out some of the ways in which the defense was constrained, including how it

> limited or precluded their attorneys' review of the documents produced by the government in discovery, prevented them from interviewing witnesses, caused them to refrain from retaining expert witnesses, and/or left them without information technology assistance necessary for dealing with the mountains of

44

electronic discovery. The government has not contested these assertions. The Court therefore has no reason to doubt, and hence finds, that all of them have been forced to limit their defenses in the respects claimed for economic reasons and that they would not have been so constrained if KPMG paid their expenses subject only to the usual sort of administrative requirements typically imposed by corporate law departments on outside counsel fees.

*Stein IV*, 495 F. Supp. 2d at 418-19. The Second Circuit adopted these findings. *See Stein*, 541 F.2d at 151 n.10. As will be seen, these are the very same kinds of limitations the Rigas defense suffered as a result of the withholding of fee advancement and indemnification. *See generally* 56.1 Statement ¶¶ 279-320.

Because the *Stein* case involved a pre-trial challenge to the government's actions, the court observed that it was not ruling on the following scenario: "A defendant moves unsuccessfully in the district court to dismiss the indictment on the same Sixth Amendment theory. The defendant proceeds to trial with his or her chosen attorney, and the attorney is forced to limit the scope of his or her efforts due to the defendant's financial constraints. The defendant is convicted based on overwhelming evidence of his or her guilt." *Stein*, 541 F.3d at 158 n.15. That caveat has no bearing here. As discussed in the *Brady* Memorandum, the evidence in this case was tenuous on many issues involving the role that only others—not the Rigases—played in the contested activity, and on whether the Rigases were relying on these other individuals and on advice of counsel in ways that precluded any finding that they had fraudulent intent. The evidence was far from "overwhelming," especially in light of the undisclosed *Brady* material.

The hotly disputed issues at trial included: (a) what Petitioners knew about the reporting requirement for co-borrowing and the adequacy of the "affiliate borrowing" language, and whether they acted with an intent to defraud (*Brady* Memorandum at 19-28); (b) whether Petitioners were responsible for the use of the "immediately available funds" formulation and, if so, whether they acted with an intent to defraud (*id.* at 28-30); (c) what Petitioners knew about

45

the propriety of disclosing the limits of the co-borrowing exposure versus the actual amount borrowed at a given time, and whether they acted with an intent to defraud (*id.* at 30-33); (d) what role Petitioners had in reporting related party transactions and whether they acted with an intent to defraud (*id.* at 34-37); (e) whether Petitioners fraudulently used Adelphia money to build a golf course for their private use and whether they surreptitiously hid information about the golf course from the Adelphia Board with intent to defraud (*id.* at 37-40); and (f) whether Petitioners acted fraudulently with regard to the marketing support agreements (*id.* at 57-68). The evidence on these and other issues was tenuous at best, particularly when viewed in light of the undisclosed *Brady* material, and most certainly does not qualify as "overwhelming evidence" of Petitioners' guilt. Accordingly, the analysis of prejudice must proceed just as the Second Circuit set forth in *Stein.*

b.    *Some Examples of the Limitations*

There are many examples of how the withdrawal of indemnification and fee advancement limited the Rigases' defense. The ones that stand out most, though, are the extensive problems associated with document review. Even though the government and Adelphia produced literally millions of documents (approximately 8 million pages through January 2003 alone), 56.1 Statement ¶301, the Rigases were unable to afford paying their attorneys to conduct the usual document review. *See generally id.* at ¶¶281-307.[15] Instead, they compiled a small team of family members and a few former Adelphia employees to review documents. *See id.* at ¶¶284-286, 290, 302. The documents were produced to the Rigases mostly in .TIFF format, which meant that each page needed to be reviewed individually rather than a document-by-document

---

[15]   The Rigases used Navigant, a litigation support firm, to review a very small portion of the material – primarily documents turned over by Deloitte. But they could not afford to pay Navigant (much less pay the law firms representing them) to review the lion's share of the documents that needed to be examined and analyzed. 56.1 Statement ¶¶281-287, 289, 300-304.

review. *Id.* at ¶291. Given the number of irrelevant documents provided, this page-by-page review was tedious and time consuming. *Id.* at ¶¶285-286, 291-293. Indeed, many of the disks that were eventually turned over to the defense were corrupt and could not be opened, but there was simply insufficient manpower to follow up on these countless problems. *Id.* at ¶297.

These challenges were not all dissimilar to those the court described in *Stein*. *See Stein IV*, 495 F. Supp. 2d at 417. There, the court noted that the government's production of electronic documents in various different formats, the impossibility of running electronic searches within the database, and problems with the electronic materials produced by the government exacerbated the impact of having reduced resources with which to fund the defense.

The magnitude of this problem cannot be exaggerated. As explained by Paul Grand, a very experienced criminal defense lawyer (and former chief of the United States Attorney's Securities Fraud Unit), this prosecution was "historic in terms of its overall complexity and scope." 56.1 Statement ¶300. The stark reality is that the massive undertaking of reviewing *millions* of documents required massive resources—which the government had precluded the Rigases from securing. Without the investment in trial preparation, the trial ran the risk of being an empty ritual. *See generally Powell v. Alabama*, 287 U.S. 45, 57 (1932) ("[T]he most critical period of the proceeding against these defendants [was] from the time of their arraignment until the beginning of their trial, when consultation, thorough-going investigation and preparation were vitally important.").

Additionally, at the time of the review, the Rigases had no idea of the ultimate breadth of the government's case, which vastly expanded just before trial. 56.1 Statement ¶239. The documents were not searchable, so anything not identified as relevant during review in 2002 and 2003 could not, as a practical matter, later be located. *See id.* at ¶¶285, 292, 305-308. At trial, the

47

government ended up focusing on a large number of uncharged acts dating back to the early 1990s—far before the period covered in the indictment. Because the Rigases could not even afford to review all the documents relevant to the charged conduct, they were most certainly incapable of countering the government's evidence about the earlier uncharged conduct, which would have required an extensive expansion of the scope of documents to be analyzed.

Moreover, Adelphia produced the Buchanan Ingersoll documents (although it never produced all of them) to the Rigases on a rolling basis beginning just a few months before trial. 56.1 Statement ¶¶295-296. Many documents were not produced until so close to trial that an effective review could not be accomplished at all given the staffing and budget available. 56.1 Statement ¶¶293, 295, 308.

In stark contrast, Adelphia provided the same documents to the government in a searchable database containing documents that were coded. 56.1 Statement ¶¶209, 231, 305. Thus, the government did not have the problem of having to invest innumerable hours mindlessly paging through useless material to find something relevant. (And, of course, the government, through applying pressure on Adelphia to "cooperate," had minions of Covington lawyers and Adelphia personnel working on document review on the Government's behalf throughout the pre-trial and trial periods. *See supra*, §A.3.e, h.) This was just another way in which Adelphia "cooperated" with the prosecution to the great detriment of the Rigases. First, Adelphia deprived the Rigases of the funds they needed. Then, despite the fact that Adelphia was providing a searchable database to the government, Adelphia refused to provide the same documents to the Rigases in a useful form unless the Rigases could come up with money, which they did not have precisely because of Adelphia's non-advancement of fees. *See* 56.1 Statement ¶¶231, 292, 307.

48

In *Stein*, the court noted that "the government recently and commendably agreed to build, at its expense, a searchable electronic database containing many of the documents that have been produced in discovery for use by the defendants." *Stein IV*, 495 F. Supp. 2d at 417. The court explained why that offer would not overcome the limitations caused by deprivation of indemnity and fee advancement. But even that type of offer was not forthcoming in this case. Even though the government had access to such a database and searchable documents, it made no effort to help ensure that the defense would have similar opportunities to find critical evidence.

All of this is by no means after-the-fact reasoning. In July 2003, the Rigases moved in Bankruptcy Court for the release of frozen assets from the private Rigas entities so they could pay legal fees and fund their defense. (These assets had been frozen at Adelphia's request, in coordination with the government—without any attempt to show probable cause that the funds were tainted. *See* 56.1 Statement ¶¶179-180, 216-219). Later, when the Rigases attempted to access the frozen assets, they explained that their:

> inability to adequately defend themselves against the criminal and civil charges against them has now reached a critical stage. The criminal trial starts in a little over five months. There are millions of documents to review, index and assimilate into the defense. This is a labor intensive process, and consequently very expensive. Without defense cost funding, the Rigases ability to defend themselves fully and fairly will be impaired. By way of example only, the tasks required of the Rigases and their counsel include analysis of millions of pages of documents, retention of experts to help understand and articulate the complicated accounting and business issues and, in light of these analyses, develop trial strategy and testimony.

*Id.* at ¶¶229-230. This, among other things, led John Rigas's chief attorney, Peter Fleming, to announce just days before the trial began that the defense was "underprepared." *Id.* at ¶319.

c.    *Some Examples of the Effects of the Limitations*

As explained above, it is not Petitioners' burden to identify particular documents that would have been uncovered by the kind of document search that would have occurred absent the

49

interference with fee advancement and indemnification. Nonetheless, some examples can help provide the court with a flavor of the kind of documents that went undiscovered.

One of the documents that (unbeknownst to the defense) had been turned over to the defense before trial was a 1999 memorandum from James Brown to the Adelphia Board regarding co-borrowing. 56.1 Statement ¶¶ 308-309. Contrary to the government's arguments— and contrary to Mr. Brown's trial testimony—the memorandum explicitly disclosed to the Board that the Rigases were using co-borrowed funds for their purchases of Adelphia stock. *Id.* at ¶¶ 309, 352; *see, e.g.*, R. 163-1, Am. Rule 56.1 Statement, R. 163-1, ¶¶ 83-123. And, significantly, the memorandum was attached to letters from multiple banks indicating that they knew and approved of the use of the funds for stock purchases. *Id.* at ¶ 310. These documents, of course, went to the core of the government's case—they belied any arguments that the Rigases were hiding the source of their funding for the purchases. *Yet, the defense had not located the document at the time of trial.* The reason was simple: the absence of fee advancement from Adelphia made it impossible to undertake the kind of methodical review of tendered documents that is *de rigueur* in a sophisticated case alleging financial fraud of this sort.

A second example of a crucial document turned over to the defense but never uncovered during the deficient document review was a 1998 communication between Carl Rothenberger and Bruce Booken (two of Adelphia's lawyers at Buchanan Ingersoll), which was part of the Buchanan discovery production. 56.1 Statement ¶¶ 311-312. This document reflects a conversation with Dean Marshall (Head of Finance at Adelphia) about how the Rigases could use Adelphia credit availability to fund purchases of stock. *Id.* at ¶ 311. Again, this evidence belies the government's core claim that the Rigases had no right to rely on their counsel because they were hiding things from their own lawyers. *Id.* at ¶ 353. Yet, here again, *the defense had not*

*located the document at the time of trial.* Finding this pivotal piece of evidence—this needle in a haystack—amidst an avalanche of documents required funds which the Rigases simply did not have as a result of the absence of fee advancement.

The severe shortage of funds prior to trial also led to a series of difficult decisions that had other adverse impacts on the trial. *See* 56.1 Statement ¶¶279-320. For example, because the available funds were being depleted by motion practice and whatever document reviews the Rigases could afford, the Rigases' counsel lacked funds to mount their own robust investigation (as was evident from the fact that the Rigas defendants ultimately presented only three brief witnesses—one who was simply a character witness, and two who were called to impeach a government witness on an exceedingly minor point.) *See, e.g., id.* at ¶¶280, 297, 299-318.

Indeed, these financial limitations also affected the core decision of whether Petitioners would testify. Throughout the pre-trial period and during the trial itself, they both assumed they would take the stand as part of a vigorous defense case (especially one that included a defense of reliance on others). Yet, the defense lawyers, who were limited in their staffing of the case because of the lack of fee advancement and indemnification, were never able to find the massive time necessary to prepare Petitioners to testify. 56.1 Statement ¶¶279, 315-318. Thus, when it came time for the defendants to tell the Court about their decision on whether to testify, that decision was a *fait accompli. Id.* It was out of the question, of course, for them to take the stand without having been extensively prepared. The reason they had no meaningful choice traces directly back to the absence of fee advancement. Had the resources for funding a defense in a case of this magnitude been available on a timely basis, there was no shortage of lawyers who could have prepared the Rigases so that they could have made a meaningful choice on whether to exercise their constitutional right to testify. *See generally Rock v. Arkansas,* 483 U.S. 44, 49

(1987) (a defendant has a constitutional right to testify in her own defense); *Jones v. Barnes*, 463

U.S. 745, 751 (1983) (recognizing defendant's right personally to decide whether to testify).[16]

The Second Circuit's description of what occurred in *Stein* bears close resemblance to

what occurred here:

> [T]hese defendants can easily demonstrate interference in their relationships with
> counsel and impairment of their ability to mount a defense based on Judge
> Kaplan's non-erroneous findings that the post-indictment termination of fees
> "caused them to restrict the activities of their counsel," and thus to limit the scope
> of their pre-trial investigation and preparation. Defendants were indicted based on
> a fairly novel theory of criminal liability; they faced substantial penalties; the
> relevant facts are scattered throughout over 22 million documents regarding the
> doings of scores of people; the subject matter is "extremely complex[]"; technical
> expertise is needed to figure out and explain what happened; and trial was
> expected to last between six and eight months. As Judge Kaplan found, these
> defendants "have been forced to limit their defenses . . . for economic reasons and
> . . . they would not have been so constrained if KPMG paid their expenses." We
> therefore hold that these defendants were also deprived of their right to counsel
> under the Sixth Amendment.

---

[16] Adelphia (and through it, the government) also used the weapon of withholding attorneys' fees to shape the testimony of James Brown, the prosecution's key witness. Mr. Brown, who had been charged in the indictment along with the Rigases and others, approached Timothy Rigas in a panic when Adelphia advised that it would no longer pay his legal costs. 56.1 Statement ¶ 354. Mr. Brown told Tim Rigas that he could not afford to retain counsel and did not believe he was eligible for a public defender. *See id.* at ¶¶ 354-357. So he asked the Rigas family for a loan to pay his legal costs. *Id.* at ¶ 355. Mr. Brown indicated at the time that he did not think anybody at the Company had done anything wrong, and he believed the charges against him were defensible, but he was worried about how he would defend against charges arising out of such complex transactions without a source of funding for his defense attorneys. *Id.* at ¶¶ 356-357. He explained that his wife would not stay with him were he to be sentenced to prison. He further suggested that the absence of funding for his defense might force him into a plea if he could get a good deal. (Michael Rigas recently won a judgment in Pennsylvania state court based on Mr. Brown's failure to pay back this loan. 56.1 Statement ¶ 359. The Court "f[ound], by clear and convincing evidence, that Defendant James Brown did contract with Plaintiff Michael Rigas and Timothy Rigas to borrow $400,000.00 by an oral contract in July 2002 and that Defendant James Brown, in refusing to repay this unsecured loan, breached said contract." *Id.* at ¶ 360.)

Ultimately, confronted with these pressures, Mr. Brown did enter a guilty plea and became the government's chief cooperating witness. *See, e.g.*, *Brady* Memorandum at 31-33 57-58. The benefits of doing that—even if it meant lying on many of the central issues in the case—became irresistible, given the perils of trying to defend himself without the resources to retain adequate defense counsel. As turns out, those benefits turned out to be massive. It is now 14 years since the Rigases' trial and more than 14 years since Mr. Brown's plea to the same types of fraud charges that led to the extensive sentences for John and Tim Rigas. Mr. Brown told the jury in the Rigases' trial that the only benefit he expected to receive from his plea deal was a letter from the government to his sentencing judge documenting his cooperation. *Id.* at 31 n.15. *Yet, as of today, 14 years later, Mr. Brown has yet to be sentenced.* We have raised this issue in our Memorandum on the *Brady* Claims. *See id.* at 31 n.15. We address it here to highlight the carrot and stick power the government had at its disposal: if you don't cooperate, you will have no money to pay a lawyer in this highly complex case; if you do cooperate, you will secure a deal that will not only lead to a reduced sentence, but may lead to no sentence (or sentencing at all)—for at least a decade and a half.

*Stein*, 541 F.3d at 157 (citations omitted).[17]

> d.   *The Funds the Rigases Eventually Secured for Their Defense Did Not Cure the Injury They Had Suffered*

Based on arguments the government has advanced previously, we expect the government will argue here that the Rigases suffered no prejudice because they were eventually able to secure some of their own funds from their private companies to fund their defense. The answer to this argument lies in one word: timing. The harm to the Rigases occurred primarily during the vital pre-trial period. No matter how much money became available shortly before, during, or after trial, the damage had already been done. The dispositive fact here is that Petitioners went into trial far less prepared in material ways than would have been the case had the prosecution not interfered with their access to funds.

The Rigases were arrested in July 2002. By then, Adelphia (under pressure from the government) had already reneged on its agreement to advance defense costs to them. So the Rigases attempted to sell some of their property to fund their defense. 56.1 Statement ¶ 215. Upon learning of this in August 2002, Adelphia obtained a restraining order from the Bankruptcy Court enjoining the Rigases from selling any of their real property. *Id.* at ¶¶ 216-217. That restraining order was expanded in November to cover all Rigas assets. *Id.* at ¶¶ 218-219. After months of negotiations, Adelphia finally agreed to permit the Rigases to sell a limited number of properties to fund their defense costs. *Id.* at ¶ 220. Yet, despite the Rigases' best efforts during

---

[17] *See also Stein I*, 435 F. Supp. 2d at 371, explaining:

> The government has spent years investigating the case, presumably reviewing millions of pages of documents and interviewing scores of witnesses if not more. The KPMG Defendants, however, have limited resources. Although each defendant is represented by retained counsel, the government's interference almost inevitably has affected at least some lawyer selections and, equally important, limited what the KPMG Defendants can pay their lawyers to do. At least most of them likely will be unable to afford to pay their attorneys to review all or even most of the documents the government has produced or, perhaps, to interview even a fraction of the witnesses the government has interviewed.

the next few months, only one such property could be sold, for a sum of approximately $500,000. *Id.* at ¶221.

Because of a complete lack of funding and Adelphia's refusal to allow the Rigases to sell properties not subject to the November agreement, as of June 30, 2003, the Rigases' criminal and civil counsel and experts were owed a total of approximately $2.5 million. 56.1 Statement ¶¶222-225. Most notably, Navigant Consulting, which had been retained in January 2003 to assist in document review with the promise of being funded out of property sales, was owed approximately $800,000. *Id.* at ¶226. The Rigases could not afford Navigant's modest review team, let alone the much larger review team the Rigases required. *See id.* at ¶¶281-289, 293-295, 302-304. With the harm to their defense mounting, Petitioners sought fee advancement and indemnification (to which they were entitled) from the privately owned cable companies. *Id.* at ¶¶227-228. When Adelphia, which managed the private companies, refused to permit funds to be paid to the Rigases, the Rigases moved for an order directing Adelphia to cause the Rigases' private cable companies to advance fees to the Rigases in an amount up to $15 million. *See id.* at ¶¶228-229. The $15 million figure was an estimated sum the Rigases were led to believe would fund criminal costs (for all of the four defendants) and civil defense costs, and was based upon an assumption that the criminal trial would last a total of approximately eight weeks, commencing in early January 2004 and concluding in early March 2004. *See id.* at ¶237. The motion noted that funding for the criminal defense was at "a critical stage" and further explained how the criminal defense had been hampered thus far due to a lack of funds to the point of imperiling the Rigases' ability "to defend themselves fully and fairly." *See id.* at ¶¶230-232. On August 1, 2003, the Bankruptcy Court granted the Rigases' motion, leading to the eventual disbursement of funds in October 2003. *Id.* at ¶¶233, 235.

The October 2003 disbursement came a full *15 months* into the pre-trial period (*i.e.* after 80% of the period from arrest to trial had passed). In other words, Petitioners did not receive a penny of these funds until trial was four months away. It is no surprise that Tim Rigas's attorney, Paul Grand, declared that "[h]ad this money been available earlier in the case, defense counsel could have done far more to prepare for the upcoming trial, which at that point was scheduled to begin in less than three months." 56.1 Statement ¶320. And even when disbursed, the $15 million had to cover all criminal proceedings for four separate defendants, had to cover some civil matters (and there were many), *see id.* at ¶236, and had to be rationed to cover anticipated attorneys' fees and expenses throughout the upcoming trial. A good chunk of it, moreover, went to the lawyers who worked for a year fighting for release of the funds. *Id.* at ¶¶216-241, 280.

At the end of the day, as Michael F. Maloney (Managing Director in the Disputes and Investigations practice of Navigant Consulting, Inc.) explained, "the Government CD Production was likely not adequately reviewed in preparation for the criminal trial." 56.1 Statement ¶293. And productions made by Buchanan Ingersoll, he explained, "[were] not adequately reviewed in preparation for the criminal trial." *Id.* at ¶295. All this was because of limited resources—so that "if Navigant had been given a larger budget at the commencement of our Engagement, [Navigant would have been] in a position to add, and would have added, additional skilled professional resources to [its] team. Had that occurred, [Mr. Maloney] believe[d] the review of documents in this case from the commencement of [Navigant's] Engagement until August 2003 likely may have been much more productive and effective." *Id.* at ¶289.

The $15 million request was premised on assumptions that ultimately proved incorrect when several events significantly increased the estimated cost of the criminal defense and imposed additional burdens on civil counsel. 56.1 Statement ¶¶237, 239. Among other things,

the government's estimate of the length of its case doubled, and the case was expanded substantially by the government's filing of a Bill of Particulars that added new issues shortly before trial. *Id.* at ¶239. For all these reasons, the original funding was nearly exhausted by the end of January, 2004—a month before the rescheduled trial was to commence. *Id.* at ¶240.

As a result, the Rigases filed another motion in Bankruptcy Court seeking an order that Adelphia cause the private companies to provide an additional $12.8 million to the defense. 56.1 Statement ¶¶241-242. The $12.8 million estimate for consulting and testifying experts and for counsel for the defense of the criminal case through June 2004 was based upon the revised trial schedule and the government's last-minute expansion of its case. *Id.* The Bankruptcy Court held a hearing on the motion on February 18, 2004. *Id.* at ¶243. Although the criminal trial was set to start just a few days later, lead counsel from each of the Rigas defendants attended the hearing, which they deemed vital to securing funds to mount a high quality defense. *See id.* at ¶¶243-252. Each of them told the court how critical it was that additional funds be provided. *See id.* For example, Andrew Levander, Michael Rigas's attorney, explained that the case "[was] exponentially larger" than any other case he had worked on in his career, and he noted his team "[j]ust [couldn't] cope with the magnitude." *See id.* at ¶¶244-247. He further explained that the Rigases "h[ad] a number of experts" who "w[ould] be charging substantial sums of money, and they [would not] show unless we can pay them." *Id.* at ¶248. In short, the Rigases were in "desperate need" of funds. *Id.* at ¶249; *see also id.* at ¶252 (Peter Fleming (John Rigas's attorney): "I've never seen anything like this. We will be there. We will be crippled without additional funds, but we will be there.").

Based largely on those arguments, the Bankruptcy Court granted an additional $12.8 million from the private cable companies. In doing so, the Bankruptcy Court stated:

> I noted last time that the amount requested by the Rigases, while plainly very large in absolute terms, was a drop in the bucket in the context of the fee requests in these cases, and I believe that even with the incremental amount sought here, that remains true. . . .[T]he Rigases, nevertheless, were fair in pointing out that in the context of the total fees the estate is bearing, and understandably so, *the amount they are asking is still a drop in the bucket. And it is hardly excessive in amount when compared to the fees charged by other professionals. Boies Schiller, Covington & Burling, and PWC, who have been focusing on Rigas-related matters.*

56.1 Statement ¶¶241, 253 (emphasis added).

Indeed, through October 31, 2003, counsel for John and Tim Rigas (and Navigant) had billed just over $4.2 million versus almost $60 million billed by Boies, Covington, and Price Waterhouse Cooper ("PWC") (which had been focusing on Rigas–related matters). 56.1 Statement ¶321. Adelphia's 10-K disclosure to the SEC dated October 6, 2005 reports that it "incurred costs . . . related to the investigation of the alleged actions of Rigas Management and related efforts to comply with applicable laws and regulations." *Id.* at ¶322. The costs "include[d] re-audit, legal and forensic consulting fees" amounting to $125 million in 2004 and $52 million in 2003. *Id.* Focusing just on Adelphia's work on creating a catalogued index of Adelphia's documents for the government's benefit, Adelphia paid professionals for approximately 15,000 to 16,000 hours of work. *Id.* at ¶305. And in addition to having the benefit of the enormous amounts Adelphia spent on lawyers, accountants, and consultants, the government had virtually unlimited resources of its own available.

Ultimately, of the $27.8 million in defense funding permitted by the bankruptcy court, John Rigas's criminal defense counsel received $5.1 million and Tim Rigas's defense counsel received $4.1 million. 56.1 Statement ¶323. In addition, each of the defendants paid Navigant Consulting (for document search and management) approximately $1.2 million. Between John and Tim Rigas, then, approximately $11.6 million was available for their criminal defense. This

is far less than a quarter of what Boies, Covington, and PWC charged in just the first 15 months and a small fraction of what Adelphia spent on its investigation. *Id.* at ¶¶ 321-322.[18]

We recognize that, at first glance, it may seem strange to argue that defendants who each ultimately had access to $5.8 million on average were impaired in their ability to prepare and present their case. But once one considers the timing of the funds becoming available just a few months before trial, the magnitude of the case (and its expansion shortly before trial) and the amounts that were being spent by the prosecution and by Adelphia in aiding the prosecution, it becomes evident that the defense was at a significant disadvantage and the money available to them was inadequate. As Judge Gerber explained, although the numbers involved here were large, they were only a "drop in the bucket" compared to the vast amounts being spent by the government and non-governmental entities in support of the prosecution. 56.1 Statement ¶ 253. This is especially so when no money was made available at all until just four months before trial.

The average $5.8 million that John and Tim Rigas each had to spend on his defense pales in comparison to what a defense has cost in other similar cases. Consider, for example, the $70 million spent on the defense of Jeffrey Skilling in the Enron case, the $25 million spent on the defense of Kenneth Lay in that case, the $24 million spent on the defense of E. Kirk Shelton in the Cendant case, or the $32 million spent on the defense of Richard Scrushy in the HealthSouth case. *See Stein IV*, 495 F. Supp. 2d at 424 (collecting figures). In the KPMG case itself, the average estimate by defense counsel to defend one defendant was $13 million. *Id.*

---

[18] Because the prosecution case took longer than the government had predicted, the funds authorized by the Bankruptcy Court were exhausted well before the end of the prosecution case. 56.1 Statement ¶ 324. In fact, the criminal defense firms were collectively owed approximately $1.1 million for work through the date of the jury's verdict—all retainers having long since been exhausted. *Id*. at ¶ 325.

Ultimately, the operative question is not what resources a defendant had, but what resources were improperly kept from the defendant. The Second Circuit has held that the Sixth Amendment is violated when the government's interference with access to funds causes the defense "'to limit their defenses . . . for economic reasons and that they would not have been so constrained if [the company] paid their expenses.'" *Stein*, 541 F.3d at 145 (*quoting Stein IV*, 495 F. Supp. 2d at 419). This proposition is self-evident. By way of analogy, had the government illegally intercepted checks mailed to the defense, the government could not argue that the defendant had enough money otherwise, so he has no right to complain that he could not access the stolen checks to help mount his defense. The analogy is an extreme one, but the principle that drives it illustrates the inappropriateness of the government asserting the right to decide that the defendants had enough money with which to defend themselves even without the funds they would have received but for the government's unconstitutional interference.

> **D.**  **The Closing Off of the Defense's Access to Witnesses and Evidence Violated the Rigases' Fifth Amendment Rights to Due Process**

Another major category of the government's interference with the defense involved the numerous steps the government and Adelphia (acting in coordination with, or at the behest of, the government) took to prevent the defense from having access to witnesses and evidence material to the defense case. It is axiomatic that, through "what might loosely be called the area of constitutionally guaranteed access to evidence," the Constitution bars the government from interfering with a defendant's access to actual or potential witnesses. *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982). In *Valenzuela-Bernal*, the government had deported two undocumented individuals whom the defendant claimed could possibly have had information valuable to the defense. The Court held that the government's unique responsibility to regulate immigration justified the deportations because all that could be said was that the

individuals might conceivably have information beneficial to the defense. *Id.* at 864-66. But the need to regulate immigration does not, the Court held, permit government action rendering individuals unavailable when there is "some plausible showing of how their testimony would have been both material and favorable" to the defense. *Id.* at 867. And, the Court explained, the power to deport undocumented individuals does not mean that the government may hide or render unavailable a witness in the non-immigration setting.[19]

In keeping with this, courts have uniformly held that the constitutional right (through the Sixth Amendment and Due Process Clause) to present a complete defense, *see Holmes v. South Carolina*, 547 U.S. 319 (2006), prohibits the government from directing or advising an individual to avoid interacting with the defense. *See, e.g.*, *IBM Corp. v. Edelstein*, 526 F.2d 37, 44 (2d Cir. 1975) (due process right to a fair trial bars the government from seeking to impede parties' access to witnesses by instructing witnesses not to cooperate); *Gregory v. United States*, 369 F.2d 185, 188-89 (D.C. Cir. 1966) (government violated "elemental fairness and due process" when it advised witnesses not to speak with the defense unless the government lawyers were also present); *see also Fenenbock v. Dir. of Corr.*, 692 F.3d 910, 917 (9th Cir. 2012) (It is "well established that the prosecution may not interfere with a witness's decision to grant or refuse pretrial access."); *United States v. Agostino*, 132 F.3d 1183, 1192 (7th Cir. 1997) ("Governmental interference occurs when the Government *instructs* the witness not to speak . . . or *artificially restricts* defense counsel access to . . . witnesses." (emphasis in original)); *United States v. Pinto*, 755 F.2d 150, 152 (10th Cir. 1985) ("[T]he prosecution may not interfere with the free choice of a witness to speak with the defense absent justification 'by the clearest and

---

[19] Citing *Freeman v. State of Georgia*, 599 F.2d 65 (5th Cir. 1979)—a case in which a detective had concealed the location of a witness—the Court observed that government action in the immigration context "is not to be judged by standards which might be appropriate if the Government's only responsibility were to prosecute criminal offenses." *Valenzuela-Bernal*, 458 U.S. at 865-66.

most compelling considerations'" (quoting *Kines v. Butterworth*, 669 F.2d 6, 9 (1st Cir. 1981)));

*United States v. Ebrahimi*, 137 F. Supp. 3d 886 (E.D. Va. 2015) (prosecution violated

defendant's rights when it asked witnesses to (1) notify the government if they were contacted by

the defense, and (2) insist that government agents attend any interviews); *United States v.*

*Goldfarb*, No. CR-07-260, 2008 WL 4531694 (D. Ariz. 2008) (same).

These cases—and there are scores more—give life to the admonition that "[w]itnesses,

particularly eye witness," as were involved in the Rigases' thwarted investigation, "are the

property of neither the prosecution nor the defense. Both sides have an equal right, and should

have an equal opportunity, to interview them." *Gregory*, 369 F.2d at 188.

The evidence here shows that many of the steps Adelphia took regarding access to

potential witnesses were taken in conjunction with the government. The role of the government

in these actions is described in detail above (*see, e.g.*, *supra*, § A.3.c-d, f-g) and will not be

repeated here. Rather, the purpose of this section is to show how those steps directly prevented

the Rigases from having access to witnesses and evidence vital to the defense.

The October 14, 2002 Fisher Memorandum is Exhibit A in this regard. *See* 56.1

Statement ¶¶ 154-164. That memo applied to each and every Adelphia employee—the very

group of people who would have information about the transactions and disclosures that were at

the center of the case against the Rigases. Some of these employees had far more knowledge of

Adelphia's complex accounting system than any of the Rigases. Yet, pursuant to the Fisher

Memorandum, if a member of the Rigas Family or their representative sought to make contact

with any Adelphia employee, they should be told that "it would be inappropriate to answer any

questions or provide any information." *Id.* at ¶ 160. The Adelphia employee must also report the

contact to the Legal Department which "will review the matter and *may refer the matter to*

61

*appropriate government agencies* and litigation counsel for review." *Id.* at ¶164 (emphasis added). The memo declared, **"There is no exception to this situation."** *Id.* at ¶159 (bold in original). In the event of a voicemail from a Rigas family member or associate, the memo instructed the Adelphia employee that he or she should "Report the contact to the Legal Department immediately," and "Do not attempt to return the phone call." *Id.* at ¶163.

The agreements for the seven employees placed on administrative leave provide another example of how the defense was crippled in its attempt to interview key potential witnesses. These employees were threatened with termination and loss of indemnification if they failed to sufficiently cooperate with Adelphia's and the government's investigations. *See* 56.1 Statement ¶¶128-132. At least by October 14, 2002 (the date of the Fisher Memorandum), cooperation explicitly included refusal to speak with the Rigases. *See id.* at ¶¶154-164. To be sure, as Adelphia employees, these seven individuals were then also bound by the Fisher Memorandum independently, but the effect of the administrative leave agreements was to hold over their heads the extraordinarily coercive threat of losing fee advancement and indemnification.

The administrative leaves are an important example of how the government operated. As Adelphia's investigation unfolded, the company identified a group of employees that, according to Adelphia, "knowingly participated in alleged improper activities." *Id.* at ¶113. Adelphia was prepared to terminate these employees, but then something remarkable happened. The government stepped in to request that six of these employees "first [be] placed on [paid] administrative leave before being terminated by the company." *Id.* at ¶¶113, 131. And the Board indicated that "any employee status changes, such as firing of an employee, should be reported to the USAO." *Id.* at ¶123. There is no doubt about the government's intent here. If an employee was terminated, there would be no leverage to ensure that the employee would refuse to talk with

the defense. The government thus exercised exceptional power to decide who should stay and who should leave at Adelphia, and used that power as a way of interfering with the defense.

The February 2003 correspondence involving the Rigases' request for a list of Buchanan Ingersoll files pertaining to its former representation of Adelphia is also illustrative. *See id.* at ¶¶ 193-196. Buchanan Ingersoll proposed telling the Rigases that the decision rested with Boies Schiller, and Mr. Korologos of Boies Schiller in turn sent the request to AUSAs Clark and Coleman for their review. *Id.* at ¶¶ 195-196. There is, of course, nothing inherently wrong with a company deciding on its own what its law firm can share. But when the company's decision is made in concert with the government in the context of a criminal prosecution, then keeping information away from the criminal defendant falls directly into the constitutional prohibition of prosecutorial interference with defense access to witnesses and evidence.

The same is true for the government's and Adelphia's coordination of efforts to limit the scope of the Rigases' cross-examination of an Adelphia employee in a civil case. In crafting the affidavit that would be the subject of the cross-examination, Mr. Korologos sent a draft affidavit to AUSAs Clark and Coleman to make sure it did not cause the government any concern. 56.1 Statement ¶¶ 187-190. Again, were it acting as a private actor, Adelphia would be entitled to craft affidavits however it wished. But Adelphia was hardly a private actor in all of these instances, including this one. And it violates the Constitution for the government to be working with a company on ways to be sure a criminal defendant gets as little information as possible.

All of this was not an instance of a company simply closing ranks and instructing its employees and agents not to speak with *anyone*. Rather, Adelphia was affirmatively pressuring those under its control to be interviewed and otherwise cooperate with the government. Employees who refused were terminated and had their advancement of fees and indemnification

guarantees withdrawn. Similarly, through control of the attorney-client privilege, Adelphia (working with the government) was able to call the shots on whether lawyers at Buchanan Ingersoll would share information and be interviewed. With regard to both Adelphia and Buchanan Ingersoll personnel, the outcome was the same. No one was allowed to speak with or provide any documents to the defense (at least without government approval) and everyone was ordered to speak with and provide all documents to the government. The Constitution does not permit the government to be involved in such decisions in any way.

This interference with access to witnesses and evidence was particularly egregious with regard to Buchanan Ingersoll. That firm had not only represented Adelphia; it had also served as longtime counsel to John Rigas and the Rigas family businesses dating back years before Adelphia was created. 56.1 Statement ¶298. Yet, the Rigases were unable to retrieve any information relating to the work of their very own lawyers. *See id.* ¶¶200-201 (Buchanan Ingersoll would not speak to the Rigases, which Mr. Fleming found "shock[ing]").

As a result of the directive to Adelphia personnel that they refuse to speak with the defense, the Rigases' attorneys hit a series of brick walls in their efforts to interview witnesses. Adelphia employees who were approached consistently indicated they were prohibited from even speaking with anyone associated with the Rigases. *See, e.g.*, *supra*, §A.2.c, A.3.g. In addition, witnesses from Buchanan Ingersoll and Deloitte—witnesses who were vital to the Rigases' reasonable-reliance-on-counsel defense—also refused to speak with the defense. 56.1 Statement ¶203.

In *Valenzuela-Bernal*, the Supreme Court held that a defendant asserting unconstitutional interference with access need not provide a detailed account of how the witnesses whom the government kept from him would have testified. Rather, the defendant must only "make some

plausible showing of how their testimony would have been both material and favorable to his defense." 458 U.S. at 867; *see also United States v. Desena*, 287 F.3d 170, 176 (2d Cir. 2002) ("Where the prosecution is responsible for the unavailability of a witness, the defendant's burden is lighter in this respect . . . but does not disappear altogether.").

This standard, the Court explained, takes into account that a defendant who has been denied the opportunity to interview a witness cannot fairly be required to prove exactly what that witness would have said at trial. *See Valenzuela-Bernal*, 458 U.S. at 871. Rather, a court's assessment of "the events to which a witness might testify, and the relevance of those events to the crime charged, may well demonstrate either the presence or absence of the required materiality." *Id*. This standard is satisfied here, as is any reasonable standard of materiality.

Two essential themes of the defense case at trial were that the Rigases were not at all involved in many of the transactions and disclosures at issue, and the Rigases at all times relied on their lawyers and accountants thereby negating any allegation of fraudulent intent. *See, e.g.*, *Brady* Memorandum at 9; 56.1 Statement ¶353. Any juror considering these defenses had to have been left with some glaring questions: Where were the defense witnesses regarding these points? Where were all the Adelphia employees to corroborate the defense's arguments about the actual nature of the transactions at issue and about the role of John and Tim Rigas? Where were the witnesses from Buchanan Ingersoll or Deloitte to support the Rigases' defense that they reasonably relied on the advice and direction of qualified professionals?

The prosecution pounced on this in its closing argument, telling the jury: "If in fact these men really believed that any of the lawyers or auditors approved or supported what went on and was charged to be illegal, don't you think they would have called one of them as a witness in this trial." Am. 56.1 Statement, R. 163-1 at ¶16. A reasonable juror was left with just one conclusion:

no such witnesses were called by the defense because no such witnesses existed. No matter what the defense counsel suggested in their cross-examinations or closing arguments, the absence of witnesses to support the defense's assertions was overpowering.

That juror would have been profoundly wrong in making that assumption. There were scores of witnesses from within Adelphia, Buchanan Ingersoll, and Deloitte who were in a position to substantiate the defense. The reason they were not called is that Adelphia (acting in coordination with the government) had forbidden anyone within its control from speaking with defense investigators or lawyers prior to trial.[20] In the absence of a contemporaneous report on what a witness would say at trial, no lawyer worth his salt would ever blindly call a witness who refused to be interviewed. *See Leka v. Portuondo*, 257 F.3d 89, 103 (2d Cir. 2001) (a "responsible lawyer" cannot put a witness "on the stand without essential groundwork"); *see also Schulz v. Marshal*, 345 F. App'x 627 (2d Cir. 2009) (counsel was ineffective in not interviewing a witness). The prejudice the defense suffered as a result of the witnesses' refusal to be interviewed was, without exaggeration, devastating.

A decision of the Northern District of Illinois drives home these points in the context of dismissing an indictment due to interference with the defense. *United States v. Linder*, No. 12-cr-22, 2013 WL 812382 (N.D. Ill. Mar. 5, 2013). Relying on both the Due Process Clause and the Sixth Amendment's Compulsory Process Clause, the court in *Linder* described the significance of pretrial interference: "'The importance to a litigant of interviewing potential witnesses is undeniable. In particular, in criminal cases, where a defendant's very liberty is at stake, such interviews are especially crucial. Thus it is . . . one of the first things responsible counsel does in

---

[20] There was another reason in some instances as well: the government's failure to disclose *Brady* material that would have provided the defense assurances about what the witness would say, and would have thereby enabled the defense to call that witness even without a pre-trial interview. *See generally Brady* Memorandum.

preparing a case is to seek to interview those witnesses involved in the litigation.' " *Id.* at *43 (quoting *United States v. Fischel*, 686 F.2d 1082, 1092 (5th Cir. 1982)).

Although Petitioners are entitled to relief without the need to identify particular witnesses and the specific content of what those witnesses would have been expected to testify (*see Valenzuela-Bernal*, 458 U.S. at 867), a few examples help provide a concrete sense of the kinds of anticipated testimony the jury would have heard were it not for the government's interference. We now know through depositions in various other proceedings that many witnesses who were directed not to speak with the Rigases or their representatives prior to trial had evidence extremely helpful to the defense. For example, had witnesses not been improperly dissuaded from talking with defense counsel, the Rigases would have learned the following information that has been brought out in various post-trial proceedings.

*Carl Rothenberger.* To begin with, in the *Brady* Memorandum the Rigases detailed the many subjects on which (we now know) Carl Rothenberger had material exculpatory information. These subjects included (a) the source and use of the "affiliate borrowing" formulation in the 13-D (*Brady* Memorandum at 19-28); (b) the source and use of the "immediately available funds" formulation in the stock purchase agreement (*see id.* at 28-31); (c) the source and ways in which the co-borrowing was disclosed in the 10K (*see id.* at 31-34); (d) the source and ways in which related party transactions were disclosed and who was responsible for disclosing them (*see id.* at 34-37); and (e) the ways in which the Rigases had been transparent with the Board and with Mr. Rothenberger regarding the golf course project (*see id.* at 37-40). The *Brady* Claims focus on the fact that Mr. Rothenberger told all of this information to the government in a pre-trial interview, yet the defense did not know Mr. Rothenberger was prepared to provide this exculpatory information because *the defense itself was not able to interview Mr.*

*Rothenberger prior to trial*. But for the unconstitutional interference with access to witnesses,[21] the defense would have, in fact, learned all of this and would have been in a position to call Mr. Rothenberger to the stand as its key witness.

The *Brady* violations and the interference violations combined to create a harm greater than the sum of its parts. First, the government caused Adelphia to deprive the defense of access to interview Mr. Rothenberger. Second, the government, which had ready access to Mr. Rothenberger, failed to turn over its own interview notes showing that Mr. Rothenberger knew material exculpatory information. The commonality is that the defense was kept from learning information that might well have changed the outcome of the trial.

*Paula Zawadzki*. Similarly, Paula Zawadzki, another Buchanan Ingersoll partner who represented Adelphia with respect to the co-borrowing agreements, understood that the co-borrowers (Adelphia and the Rigas Managed Entities) would have rights of contribution against each other if one co-borrower had to repay the bank for funds used by another co-borrower. 56.1 Statement ¶ 326. This spoke to a critical aspect of the government's allegations regarding the co-borrowing: that Adelphia had no recourse against the Rigas Managed Entities in the event that they failed to repay their portions of the loans.[22]

---

[21] As described above, there is direct evidence that Adelphia was controlling to whom Mr. Rothenberger and Buchanan Ingersoll could talk, and that the government was working with Adelphia on giving those directions. *See supra* § A.3.d, D.

[22] As described at length in the *Brady* Memorandum, the defendants tried mightily at trial to show their deep reliance on Buchanan Ingersoll's advice and direction. The government has always countered that because the Rigases did not disclose all relevant information to Buchanan Ingersoll, they could not rely on any sort of advice-of-counsel defense. It is significant, then, that when Petitioners' counsel later secured access to various Buchanan Ingersoll documents, they showed the firm's knowledge regarding the transactions at issue and thus tended to exculpate Petitioners. Former AUSA Christopher Clark also commented that the government was aware of this information about Buchanan Ingersoll and would have indicted the firm if the government had one more shred of evidence against the firm. 56.1 Statement ¶ 351. So it turns out that the government—which had access to the exculpatory evidence all along—recognized that Buchanan Ingersoll knew about the nature of the transactions. Had the defense been armed with these same documents, it could have convinced the jury of that very proposition.

*Dean Marshall.*    Dean Marshall, the Director of Finance at Adelphia, testified at civil depositions in 2006 and 2014. He provided considerable information that would have been of great use to the defense at the criminal trial—if only Adelphia (and, thus, the government) had not barred him from being interviewed by the defense.

For example, Mr. Marshall testified that Adelphia's Board was well aware that the Rigases were using co-borrowing facilities to generate cash to buy stock in Adelphia. 56.1 Statement ¶¶ 340, 346. He explained that it was "commonly understood" by those familiar with the Rigas family and their businesses that "to the extent that the Rigas family was purchasing securities of Adelphia, that the capital for those securities was coming" through proceeds of co-borrowing facilities. *Id.* at ¶ 341. Mr. Marshall further testified that Buchanan Ingersoll attorneys knew about the co-borrowing transactions. *Id.* at ¶ 346. And neither Bruce Booken from Buchanan Ingersoll nor anyone else indicated that there was anything improper about the Rigases using co-borrowing proceeds to purchase Adelphia stock. *Id.* at ¶ 343. Similarly, Deloitte was aware of how the co-borrowing was used. *Id.* at ¶ 346. Nobody ever instructed Mr. Marshall to withhold the truth about the use of co-borrowing proceeds from Deloitte. *Id.* at ¶¶ 342-344. In sum, when asked whether Mr. Marshall held the view that there was anything inappropriate about using co-borrowed funds to buy stock, he testified, "I didn't have the view and I was not aware that anybody else had that view." *Id.* at ¶ 347. Indeed, Mr. Marshall expressed surprise that the market reacted as it did to the March 2002 disclosures because, given the information that was already known, the disclosure was not "revelatory." *Id.* at ¶ 348.

Mr. Marshall's testimony would have been invaluable at trial. It contradicts the government's core argument that the Rigases hid the source of the funds used to purchase Adelphia stock from their lawyers, the public, and the company. *See Brady* Memorandum at 19-

28. The jury would have heard instead that the Rigases did not "conceal" the source of the funds; rather, the source of the funds was "*commonly understood*," including by Buchanan Ingersoll.

On a separate subject, Mr. Marshall testified in a deposition that Deloitte carefully monitored Adelphia's accounting affecting EBITDA (Earnings Before Interest, Taxes, Depreciation and Amortization), including with respect to capitalization of labor.[23] *Id.* at ¶ 349. His testimony at the criminal trial to this effect would have countered the government's claim that Adelphia's EBITDA was fraudulently inflated, including through capitalization. *Id.* at ¶ 350. This was especially significant because it went to the bank fraud charges, *United States v. Rigas*, 490 F.3d 208, 235 (2d Cir. 2007), which carried the lion's share of the hefty sentences imposed.

Finally, Mr. Marshall testified that he understood that the Rigases could have repaid any debt to Adelphia. *Id.* at ¶ 345. This testimony, if given at trial, would have supported the Rigases' contention that they lacked the intent to defraud, as they too expected to repay any debt.

*Mike Brady*. Another example of how the interference with access affected the defense involves Mike Brady—the VP of Financial Operations. At the Rigases' criminal trial, James Brown (the government's star witness) had testified that the Rigases were involved in manipulating Adelphia's EBITDA figures to make the company appear more profitable than it actually was. *See, e.g.*, 56.1 Statement ¶ 350; Am. Rule 56.1 Statement, R. 163-1, ¶¶ 211-212, 215-216; *see also Rigas*, 490 F.3d at 217. He told the jury that he had discussed these fraudulent manipulations with Mr. Brady. 56.1 Statement ¶ 327. Having, by virtue of the interference with their access to potential witnesses, had no opportunity to interview Mr. Brady about this subject,

---

[23] Capitalizing labor involves accounting for labor on a long-term capital project as part of the value of the project, which then depreciates over time. A different way to account for labor is to treat it as an expense when the labor is performed. Capitalizing labor generally yields a higher EBITDA.

the Rigases had no way of rebutting that claim.[24] It was only much later, during post-trial civil proceedings, that Mr. Brady testified, contrary to James Brown's testimony, that he had no knowledge about Adelphia having ever manipulated its EBITDA. 56.1 Statement ¶¶ 328-329 (Mr. Brady testified that he "certainly didn't know that [anyone was] manipulating EBITDA" and that he never even questioned whether the senior financial executives of the company were doing things that were meant to overstate or manipulate EBITDA).

Mr. Brady also testified that he "knew that Scientific Atlanta and Motorola were structuring" the marketing support agreements with Adelphia and that his sense was that "there [wasn't] anything wrong" with the agreements. 56.1 Statement ¶ 330. At trial, the government contended that the Rigases orchestrated phony marketing support transactions with Scientific Atlanta and Motorola as part of "accounting magic" to increase Adelphia's EBITDA. *See Brady Memorandum* at 57. Mr. Brady's testimony, however, contradicts the government's case, as he knew that Scientific Atlanta and Motorola, rather than the Rigases, structured the marketing support agreements and did not believe at the time that there was anything wrong with them.

*Andrew Zorichak.* Andrew Zorichak worked for Adelphia in the accounting, treasury, and engineering departments. 56.1 Statement ¶ 170. In the engineering department, Mr. Zorichak was responsible for producing a report detailing Adelphia's rebuilding of cable lines ("rebuilds"). *Id.* at ¶ 331. This was meant only as an internal report to be used by the engineering department to track various projects that were ongoing. *Id.* at ¶ 332. At trial, the government relied heavily on the accuracy of those reports and claimed that the Rigases were guilty of fraud because the levels of rebuilds they caused Adelphia to report externally were false, as evidenced by the fact that

---

[24] Mr. Brady did speak to defense counsel on two or three occasions, but subsequently, when approached by a defense team investigator after the Fisher Memorandum had issued, refused to be interviewed. At his deposition, Brady confirmed that, while defense counsel attempted to speak with him on several occasions, he "wasn't willing to talk to them." 56.1 Statement ¶ 178.

they were higher than the levels described in Mr. Zorichak's reports. Both Ms. Chrosniak and Mr. Brown testified extensively about the Zorichak reports being the true measure of the rebuilds. *See id.* at ¶¶335-336 (testifying, for example, that Mr. Zorichak's reports showed a rebuild completion percentage more than 10% below what was reported to investors).

Mr. Zorichak has recently told the defense that the information in his reports came from the engineers in the field, which was not always complete. *Id.* at ¶¶333-334. Accordingly, he conceded that his reports were not always as accurate as they could have been. *Id.* at ¶334. Additionally, Mr. Zorichak explained that his reports, which were intended for internal engineering functions, did not capture work in progress. *Id.* at ¶¶332, 337-338. Specifically, in his reports, "cable plant was considered rebuilt only when every single step in the rebuild process, however small, had been completed and reverse activation occurred, meaning that the cable plant had two-way capabilities." *Id.* at ¶338. Thus, even if "99% of the capital necessary to upgrade a particular cable plant had been spent, but that plant was not yet reverse activated, the internal report would reflect 0% plant upgraded, as opposed to 99%, which would be the completion percentage in terms of dollars spent." *Id.*

Mr. Zorichak's explanations would have been very valuable evidence for the defense to present at trial. If Mr. Zorichak's reports were not accurate or reliable, then proof that Adelphia external reports deviated from the Zorichak reports would not support any finding that the external reports were false, much less fraudulent. Moreover, Mr. Zorichak's testimony would have allowed the defense to explain that the internal reports targeted engineering and operations (so only a fully operational plant was considered "complete") while Adelphia's disclosures to investors targeted progress on capital projects (which tracked progress—the amount of capital expended and the amount left to spend). This explanation would have severely undercut the

government's case for proving fraud. But the government's conduct kept Mr. Zorichak from speaking to the Rigases despite his wishes to do so. 56.1 Statement ¶¶ 170-174.

*Dan Liberatore.*   The indictment alleged that Tim Rigas and James Brown began recording marketing support payments on Adelphia's books in August 2000, even though it was only in late October 2000 when, in an effort to give the appearance of legitimacy to those entries in Adelphia's books, discussions began with Scientific Atlanta and Motorola "in the hope of reaching an agreement for marketing support payments to Adelphia." Am. Rule 56.1 Statement, R. 163-1. at ¶¶ 293-295. The government stressed this timing throughout Mr. Brown's testimony. *See Brady* Memorandum at 66-67.

Adelphia employee Dan Liberatore, however, could have exposed the falsity of the government's contentions relating to the timing of the marketing support agreements. *See Brady* Memorandum at 66-68. For example, Dan Liberatore discussed marketing support agreements with Scientific Atlanta during the summer of 2000. *Id.* at 67. Accordingly, not only did the government withhold material exculpatory evidence, but it also cut off another route to discover the evidence by preventing the Rigases from accessing witnesses.

\* \* \* \* \*

These are by no means intended to be an exhaustive account of information kept from the defense as a result of the witness interference. The point of these examples is simply to drive home that Petitioners have most certainly made "some plausible showing of how [witnesses'] testimony would have been both material and favorable" to the defense. *Valenzuela-Bernal*, 458 U.S. at 867. Because they have made that showing, Petitioners are entitled to relief.

That relief is dismissal of the indictment, whether based on the interference with funding or the interference with access to witnesses and evidence, just as in *Stein*, where the Second

Circuit held there was nothing that could be done at that stage to create a fair trial as should have been the case initially. *See Stein*, 541 F.3d at 144-146. Adelphia is now bankrupt and is in no position to provide the kinds of funds it would take to support any semblance of a just proceeding. And all the indications are that, given what has transpired, Adelphia would refuse indemnification at this point—even though it would have been provided back in 2002 had the government not interfered. *See id.* at 145 (explaining it was "unrealistic to expect KPMG to exercise uncoerced judgment" at a later time "as if it had never experienced the government's pressure in the first place"). And as for the access to witnesses, it goes without saying that many individuals who would have remembered information had they been interviewed back in 2004 have long since forgotten what they once knew.

It is a fundamental tenet of constitutional law that a defendant is entitled to a remedy that restores him "to the circumstances that would have existed had no constitutional error occurred." *United States v. Carmichael*, 216 F.3d 224, 225 (2d Cir. 2000); *see also Stein*, 541 F.3d at 146 (applying this principle in affirming dismissal of the indictment). Of course, granting a new trial would still be a great improvement over the *status quo*, but dismissal of the indictment is the only true way of placing the Rigases in the positions they would have been in but for the constitutional violations.

## CONCLUSION

Whether through withholding *Brady* material or thwarting the defense's capacity to mount the kind of defense it could have without governmental interference, the government's actions in this case led to a trial far removed from the constitutional imperative of a trial in which each side is able to mount its best case without obstruction by the adversary. This Court has the opportunity—indeed the duty—to remedy the government's constitutional violations by granting

relief on the *Brady* Claims, the Interference Claims, or both. And this relief can be granted at this very moment, without the need for any further proceedings.

The court in *Stein IV* observed: "The Court well understands . . . that prosecutors can and should be aggressive in the pursuit of the public interest. It respects the distinguished record of the United States Attorney's Office for the Southern District of New York, which long has been, and continues to be, a model for the nation. But there are limits on the permissible actions of even the best prosecutors." *Stein IV*, 495 F. Supp. 2d at 427. This particular prosecution was marked by intense passion and pressure on the prosecution to convict—starting with the Presidential press conference announcing the arrests as the first salvo in the war on corporate crime. The Constitution—which embodies our deepest commitment to fairness and human rights—stands to safeguard liberty precisely at moments in which passions and political pressure generate incentives to sacrifice those timeless values to short-term goals. But the Constitution is not self-executing; it requires courts – which possess the requisite perspective and neutrality—to enforce those rights and to ensure fidelity to these core commitments.

For the reasons stated herein, Movants request that the Court:

(a) Grant appropriate relief under 28 U.S.C. § 2255, including vacating the Rigases' convictions and

        i.   dismissal of the Indictment;

        ii   a new trial; or

        iii.  a new sentencing hearing; or

(b) Hold an evidentiary hearing on the claims they have brought.

Dated: May 25, 2018

Respectfully submitted,

*Attorneys for Petitioners*
*John J. Rigas and Timothy J. Rigas*

STEVEN F. MOLO
MOLOLAMKEN LLP
430 PARK AVENUE
NEW YORK, NEW YORK 10022
(212) 607-8160
smolo@mololamken.com

MEGAN CUNNIFF CHURCH
JORDAN RICE
ADMITTED *PRO HAC VICE*
MOLOLAMKEN LLP
300 NORTH LASALLE STREET
CHICAGO, ILLINOIS 60654
(312) 450-6700
mchurch@mololamken.com
jrice@mololamken.com

/s/ Lawrence C. Marshall
LAWRENCE C. MARSHALL
ADMITTED *PRO HAC VICE*
STANFORD LAW SCHOOL
559 NATHAN ABBOTT WAY
STANFORD, CALIFORNIA 94305
(650) 723-7572
lmarshall@law.stanford.edu

76

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 25th day of May, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all parties with an e-mail address of record who have appeared and consent to electronic service in this action.

Dated: May 25, 2018

/s/ Lawrence C. Marshall
LAWRENCE C. MARSHALL, ESQ.
ADMITTED *PRO HAC VICE*
STANFORD LAW SCHOOL
559 NATHAN ABBOTT WAY
STANFORD, CALIFORNIA 94305
(650) 723-7572
lmarshall@law.stanford.edu

*Attorney for Petitioners*