# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| JOHN J. RIGAS and TIMOTHY J. RIGAS, | : | |
| | : | |
| *Petitioners*, | : | 11-CV-6964 (KMW) |
| | : | 02-CR-1236 (KMW) |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| *Respondent*. | : | |

**PETITIONERS' RULE 56.1 STATEMENT OF MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR JUDGMENT ON THE INTERFERENCE CLAIMS**

LAWRENCE C. MARSHALL, ESQ.
ADMITTED *PRO HAC VICE*
STANFORD LAW SCHOOL
559 NATHAN ABBOTT WAY
STANFORD, CALIFORNIA 94305
(650) 723-7572
lmarshall@law.stanford.edu

STEVEN F. MOLO
MOLOLAMKEN LLP
430 PARK AVENUE
NEW YORK, NEW YORK 10022
(212) 607-8160
smolo@mololamken.com

MEGAN CUNNIFF CHURCH
JORDAN RICE
ADMITTED *PRO HAC VICE*
MOLOLAMKEN LLP
300 NORTH LASALLE STREET
CHICAGO, ILLINOIS 60654
(312) 450-6700
mchurch@mololamken.com
jrice@mololamken.com

*Attorneys for Petitioners*
*John J. Rigas and Timothy J. Rigas*

Petitioners submit this Rule 56.1 Statement of Material Facts in Support of their Motion for Judgment on the Interference Claims. In addition, Petitioners incorporate herein the evidentiary support set forth in the May 25, 2018 Declaration of Lawrence Marshall and the Exhibits attached thereto.

## I.      The Creation of the Corporate Fraud Task Force and the Rigases' Arrest

1.      In late 2001 and 2002, several high-profile corporate fraud and accounting scandals received extensive media coverage, including those involving Enron, WorldCom, Tyco, and Arthur Andersen. *See, e.g.*, Ex. 1, Lisa Griffin, *Compelled Cooperation and the New Corporate Criminal Procedure*, 82 N.Y.U. L. Rev. 311, 326 (2007); Ex. 2, Kathleen F. Brickey, *In Enron's Wake: Corporate Executives on Trial*, 96 J. Crim. L. & Criminology 397, 397-400 (2006); Ex. 3.[1]

2.      The New York Times reported that on June 13, 2002, then-Treasury Secretary Paul O'Neill said, "I think people who abuse our trust, we ought to hang them from the very highest branch," when referring to perceived malfeasance by corporate executives. Ex. 4, Stephen Labaton, *Bush Doctrine: Lock 'Em Up*, N.Y. Times (June 16, 2002).

3.      The New York Times reported that in late June 2002, then-President George W. Bush pledged "to hold people accountable" in reference to the WorldCom accounting scandal. Ex. 5, Tim Race, *New Economy; Scandals Appall Some Longtime Corporate Chiefs*, N.Y. Times (July 1, 2002).

---

[1] Allen R. Myerson, *With Enron's Fall, Many Dominoes Tremble*, N.Y. Times (Dec. 2, 2001); Kurt Eichenwald & Jonathan D. Glater, *Justice Dept. to Form Task Force to Investigate Collapse of Enron*, N.Y. Times (Jan. 10, 2002); Seth Schiesel & Simon Romero, *Technology; WorldCom: Out of Obscurity to Under Inquiry*, N.Y. Times (Mar. 13, 2002); Alex Berenson & William K. Rashbaum, *Tyco Ex-Chief is Said to Face Wider Inquiry into Finances*, N.Y. Times (June 7, 2002); Flynn McRoberts et al., *The Fall of Andersen*, Chi. Trib. (Sept. 1, 2002) (noting scandals at Arthur Andersen, Enron, WorldCom, and Waste Management); Andrew Ross Sorkin, *2 Top Tyco Executives Charged with $600 Million Fraud Scheme*, N.Y. Times (Sept. 13, 2002).

4.      On July 9, 2002, President Bush established the Corporate Fraud Task Force by executive order. Ex. 6, Exec. Order No. 13271, Establishment of the Corporate Fraud Task Force (July 9, 2002).

5.      The day he issued the Executive Order, President Bush gave a speech in which he announced the creation of the Corporate Fraud Task Force (the "Task Force"). Ex. 7, *Text of President Bush's Speech*, CNN (July 9, 2002).

6.      In his speech, President Bush said that "faith in the fundamental integrity of American business leaders is being undermined" and that "[n]early every week brings . . . a discovery of fraud and scandal." Ex. 7 at 1.

7.      President Bush also said, "[W]e will use the full weight of the law to expose and root out corruption." Ex. 7 at 2.

8.      The president explained that "[t]he task force will function as a financial crimes SWAT team" that "will target major accounting fraud and other criminal activity in corporate finance." Ex. 7 at 2.

9.      Deputy Attorney General Larry Thompson was announced as the Chair of the Task Force, and Treasury Secretary Paul O'Neill and then-FBI Director Robert Mueller were also members. *See* Ex. 6; Ex. 10, Press Release, President's Corporate Fraud Task Force Compiles Strong Record, Office of the Press Secretary, The White House (July 9, 2002); Ex. 11, Associated Press, *Bush Fraud Squad Gets It On*, CBS News (July 12, 2002).

10.     A summary of President Bush's policy announcement highlighted the Bush administration's "[s]trong [r]ecord of [e]nforcement & [r]eform" as well as the president's "aggressive corporate reform agenda." Ex. 8, Press Release, Summary: A New Ethic of Corporate Responsibility, Office of the Press Secretary, The White House (July 9, 2002).

2

11.     Some commentators and journalists referred to President Bush's announcement of the Task Force's creation as a "tough stance" or a "war" on corporate crime. *See, e.g.*, Ex. 1 at 314-15; Ex. 9.[2]

12.     The Task Force met for the first time on July 12, 2002. Ex. 11.

13.     The Wall Street Journal reported that President Bush said at the meeting that "the best ethics course is to handcuff one of the b[astards]." Ex. 12, John R. Wilke, *President Praises Work of Task Force on Business Crime*, Wall St. J. (Sept. 27, 2002).

14.     Timothy, Michael, and John Rigas were arrested on July 24, 2002. Ex. 13, *United States v. Rigas*, No. 02-cr-1236 (S.D.N.Y. July 24, 2002) (July 24, 2002 Docket Entries).

15.     Larry Thompson, James Comey (then the U.S. Attorney for the Southern District of New York), other S.D.N.Y. prosecutors, Steve Cutler (Director of Enforcement for the SEC), and Ken Newman (Deputy Chief Postal Inspector) announced the arrests of the Rigases at a press conference. Ex. 14, C-Span, Adelphia Executive Arrests (July 24, 2002), https://www.c-span.org/video/?171459-1/adelphia-executives-arrests.

16.     At the press conference, Larry Thompson said, "As chairman of the president's corporate fraud task force, I am particularly pleased to announce that the task force is fulfilling the president's directive to marshal federal law enforcement resources to search out and eradicate corporate fraud." Ex. 14 at 1:20-1:40.

17.     Chairman Thompson explained that the Task Force had focused on the investigation of the Rigases. Ex. 14 at 6:06-6:40.

18.     Chairman Thompson repeatedly referenced the Task Force, its involvement in the investigation, and cited the investigation of the Rigases as a success for the Task Force. Ex. 14.

---

[2] David E. Sanger, *Corporate Conduct: The Overview; Bush, on Wall St., Offers Tough Stance*, N.Y. Times (July 10, 2002); *Bush Whacked*, The Economist (July 19, 2007).

19.     Chairman Thompson said, "The full force of the federal government will be brought to bear on those who are responsible." Ex. 14 at 14:8-14:18.

20.     On the day of the arrests of the Rigases, Ari Fleischer, the White House Press Secretary, said at a press briefing:

> On the matter of presidential priorities, today marks a day of action and accomplishment in the President's fight against corporate corruption, in his effort to vigorously enforce the laws and protect employees and investors against corporate wrongdoing. The arrest today of five former corporate executives on charges of securities fraud, wire fraud and bank fraud, is a clear sign of this administration's commitment to enforce the laws so justice can be done.
>
> The President's corporate fraud task force is hard at work in fulfilling the President's directive to fight corporate fraud. The actions today, of course, come on top of the administration's earlier successful prosecution of Arthur Andersen for obstruction of justice.

Ex. 15, Press Briefing, Ari Fleischer, Office of the Press Secretary, The White House (July 24, 2002).

21.     Secretary Fleischer referred to the day as "a day of accomplishment and results here in Washington" because the Task Force led to the arrest of the Rigases. Ex. 15.

22.     One member of the press asked Secretary Fleischer:

> [Y]our discussion today of these five arrests is a little bit unusual, in that there have been many, many other arrests or indictments on corporate issues that have not been celebrated from this podium before. Was the White House particularly involved in these five?

Ex. 15.

23.     Secretary Fleischer responded by noting that President Bush created the task force, met with the Task Force a week before, and that the arrests were "a result of the corporate task force." Ex. 15.

4

24.     Although the Rigases' attorneys offered to have them surrender voluntarily to the police, they were arrested by five armed U.S. Postal Inspectors. Ex. 68 at 1, Benjamin Weiser, *Same Walk, Nicer Shoes; Parading of Executives in Custody Fuels New Debate*, N.Y. Times (Nov. 26, 2002); Ex. 20, T. Rigas Decl. (Oct. 2, 2011), at ¶¶ 54-55.

25.     John, Michael, and Tim Rigas "were escorted in handcuffs out of the main post office building near Pennsylvania Station to be driven to court." Ex. 68; Ex. 20 at ¶¶ 54-55.

26.     "The scene was splashed across newspaper front pages and television news accounts." Ex. 68; Ex. 20 at ¶¶ 54-55.

## II.     The Holder Memorandum, Its Progeny, and Its Demise

27.     On June 16, 1999, then-Deputy Attorney General Eric Holder issued a memorandum (the "Holder Memorandum") to all U.S. Attorney's Offices entitled "Bringing Criminal Charges Against Corporations." Ex. 16, Eric Holder, Dep't of Justice, Bringing Criminal Charges Against Corporations (June 16, 1999).

28.     The Holder Memorandum "provide[d] guidance as to what factors should generally inform a prosecutor in making the decision whether to charge a corporation in a particular case." Ex. 16.

29.     It provides that "[i]n all cases involving corporate wrongdoing, prosecutors should consider the factors discussed herein." Ex. 16 at §I.A.

30.     One factor prosecutors were to consider under the Holder Memorandum was "[t]he corporation's timely and voluntary disclosure of wrongdoing and its willingness to cooperate in the investigation of its agents, including, if necessary, the waiver of the corporate attorney-client and work product privileges." Ex. 16 at §II.A.4.

31.     With respect to cooperation, the Holder Memorandum provides:

> In gauging the extent of the corporation's cooperation, the prosecutor may consider the corporation's willingness to identify the culprits within the corporation, including senior executives, to make witnesses available, to disclose the complete results of its internal investigation, and to waive the attorney-client and work product privileges.

Ex. 16 at § VI.A.

32.     Another factor under the "cooperation" section of the Holder Memorandum "to be weighed by the prosecutors is whether the corporation appears to be protecting its culpable employees and agents." Ex. 16 at § VI.B.

33.     The Holder Memorandum provided that with respect to this factor, prosecutors could consider "a corporation's promise of support to culpable employees and agents, either through the advancing of attorneys fees, through retaining the employees without sanction for their misconduct, or through providing information to the employees about the government's investigation pursuant to a joint defense agreement, may be considered by the prosecutor in weighing the extent and value of a corporation's cooperation." Ex. 16 at § VI.B.

34.     On January 20, 2003, Deputy Attorney General Larry Thompson issued a memo entitled "Principles of Federal Prosecution of Business Organizations." Ex. 17, Larry Thompson, Dep't of Justice, Principles of Federal Prosecution of Business Organizations (Jan. 20, 2003) (the "Thompson Memorandum").

35.     One factor to be considered by prosecutors deciding whether to indict a corporation was "the corporation's timely and voluntary disclosure of wrongdoing and its willingness to cooperate in the investigation of its agents, including, if necessary, the waiver of corporate attorney-client and work product protection." Ex. 17 at 3.

36.     Under the factor of "Cooperation and Voluntary Disclosure," the Thompson memorandum states:

> Another factor to be weighed by the prosecutor is whether the corporation appears to be protecting its culpable employees and agents. Thus, while cases will differ depending on the circumstances, a corporation's promise of support to culpable employees and agents, either through the advancing of attorneys fees, through retaining the employees without sanction for their misconduct, or through providing information to the employees about the government's investigation pursuant to a joint defense agreement, may be considered by the prosecutor in weighing the extent and value of a corporation's cooperation.

Ex. 17 at 7-8.

37.     In 2006, the Department of Justice replaced the Thompson Memorandum with the "McNulty Memorandum." Ex. 1 at 316; Ex. 67, Paul J. McNulty, Dep't of Justice, Principles of Federal Prosecution of Business Organizations (Dec. 12, 2006).

38.     The McNulty Memorandum states that "[p]rosecutors generally should not take into account whether a corporation is advancing attorneys' fees to employees or agents under investigation and indictment." Ex. 67 at 11.

39.     The McNulty Memorandum also notes that many corporations agree to advance attorneys' fees prior to a determination of guilt, and that a corporation adhering to its obligations to advance fees "cannot be considered a failure to cooperate." Ex. 67 at 11.

40.     The McNulty Memorandum provides that waiver of privilege is not "a prerequisite to a finding that a company has cooperated in the government's investigation," and that "[p]rosecutors may only request waiver of attorney-client or work product protections when there is a legitimate need for the privileged information to fulfill their law enforcement obligations." Ex. 67 at 8.

41.     The McNulty Memorandum scaled back on the Thompson Memorandum's requirements that prosecutors consider whether a company waived privilege and refused to advance attorneys' fees to former executives, board members, or employees. Ex. 69, Andrew

Weissman & Ana R. Bugan, *The McNulty Memorandum*, Nat'l L. J. (Feb 5, 2007); *compare* Ex. 17, *with* Ex. 67.

### III.   The Government's Unconstitutional Interference with the Rigases' Defense

42.     On March 27, 2002, Adelphia issued a press release specifying the amounts of co-borrowing allocated to Adelphia and the amounts allocated to Rigas family entities. Ex. 18, Press Release, Adelphia Commc'ns Corp., at 2661806 n.6; Ex. 19, *United States v. Rigas*, 490 F.3d 208, 212 & n.2 (2d Cir. 2007).

43.     The stock price fell about 25% after the disclosure to $20.39. Ex. 19 at 212.

44.     The March 27, 2002 disclosure and subsequent fall in stock price ultimately led to the government's investigation of Adelphia and the Rigases. Ex. 20 at ¶2; Ex. 19 at 212.

#### A.     The Government Caused Adelphia to Cut Off Fee Advancement and Indemnification

45.     As of at least May 23, 2002, independent Adelphia directors did not believe the Rigases had engaged in any wrongdoing. Ex. 20 at ¶19; Ex. 21, J. Rigas Decl. (Oct. 4, 2011), at ¶¶5, 8.

46.     In mid-May 2002, independent directors for Adelphia as well as Adelphia's outside counsel, David Boies, asked John and Tim Rigas to resign their positions as officers of Adelphia but continue their affiliation with the company, including in roles on the Adelphia Board of Directors (the "Board"). Ex. 20 at ¶¶15-16; Ex. 21 at ¶5.

47.     On May 15, 2002, Adelphia issued a press release announcing John Rigas's resignation as CEO and Chairman. Ex. 22, Press Release, Adelphia Commc'ns Corp., John J. Rigas Steps Down as Chairman and CEO of Adelphia (May 15, 2002).

48.     The press release also announced that the Board "elected [John Rigas] Chairman Emeritus" and that he "will continue to serve on the Company's Board of Directors." *Id.*

49.     On May 16, 2002, Adelphia issued another press release announcing that Tim Rigas would step down from his role as an Adelphia officer. Ex. 23, Press Release, Adelphia Commc'ns Corp., Timothy J. Rigas Steps Down as Executive at Adelphia (May 16, 2002).

50.     The press release also announced that Tim Rigas would remain a member of the Board. Ex. 23.

51.     Erland Kailbourne, a member of the Special Committee and the acting CEO for Adelphia after Tim Rigas stepped down, informed Tim Rigas that in addition to remaining a member of the Board, he would also serve as Kailbourne's principal financial advisor. Ex. 94, T. Rigas Supp. Decl. (May 23, 2018), at ¶2.

52.     The Adelphia Special Committee was created on March 6, 2002 to review certain financial transactions between Adelphia and another entity controlled by the Rigas family. Ex. 93, Covington & Burling, *Summary of Investigation Reported to the Special Committee of Independent Directors of Adelphia Communications Corporation*, at ACI 350517.

53.     The Special Committee ultimately became the key Adelphia entity to investigate the transactions and disclosures at the center of the Rigases criminal case. Ex. 93 at ACI 350518.

54.     Around approximately May 16, 2002 at a meeting of Adelphia directors and outside counsel, an attorney from Fried Frank reported on discussions with the government, which had advised that Adelphia was not cooperating with the government's investigation. Ex. 20 at ¶17; Ex. 21 at ¶6; Ex. 25, Erland Kailbourne Grand Jury Testimony, at 84.

55.     Those present at the meeting on Adelphia's behalf, including outside director and Special Committee member Erland Kailbourne, were "shock[ed]" by the government's position regarding cooperation. Ex. 25 at 84; Ex. 20 at ¶17; Ex. 21 at ¶7.

56.     The Fried Frank attorney further reported that the government said that a continued failure to cooperate would be met with serious consequences, including indictment of Adelphia. Ex. 20 at ¶17; Ex. 21 at ¶6.

57.     Neither the Fried Frank attorney nor anyone else present at the meeting knew why the government believed Adelphia was uncooperative. Ex. 20 at ¶17; Ex. 21 at ¶7.

58.     According to Philip Korologos, shortly after the government expressed its displeasure at Adelphia's level of cooperation, the government was on the verge of shutting Adelphia down and had trailers ready to be sent to Coudersport to seize control of the Company. Ex. 89, McMichael Decl., *United States v. Rigas*, No. 4:05-cr-402 (M.D. Pa. Feb. 6, 2011), at ¶5.

59.     At a May 18, 2002 Adelphia Board meeting, the Board sought to create written agreements with Tim and John Rigas as to their resignations as officers. Ex. 24, Adelphia Commc'ns Corp., Board Meeting Minutes (May 18, 2002), at 2.

60.     The Board discussed severance terms, including payments that one independent Board member suggested should be made over time. Ex. 24 at 2.

61.     Outside counsel for Adelphia's Special Committee said that the "government might not permit [certain severance terms] if the members of the Rigas Family did not cooperate with the investigation of the Special Committee." Ex. 24 at 2.

62.     The Special Committee also encouraged the Rigas family to resign from the Board to appease the government, which had previously demanded the Rigases' resignation. Ex. 24 at 2; Ex. 20 at ¶18-19.

63.     Special Committee member Erland Kailbourne told the Rigases at the May 18 Board meeting that all Rigas family members would have to resign from the Board to save the company. Ex. 20 at ¶19; Ex. 21 at ¶5.

64.    During the May 18, 2002 Board meeting, Kailbourne, however, reaffirmed that he continued to believe the Rigases had not engaged in wrongdoing. Ex. 20 at ¶19.

65.    Also during the May 18, 2002 Board meeting, there was a report on a three-hour meeting with the SEC and U.S. Attorney's Office. Ex. 26, Notes of Bruce Booken (May 18, 2002), at 2; Ex. 20 at ¶18.

66.    According to handwritten notes of Buchanan Ingersoll attorney Bruce Booken, it was reported that the government was "focus[ed]" on "stop flow $ or control flow $ to Rigas Family." Ex. 26 at 2.

67.    Carl Rothenberger's notes also indicate that Leonard Chazen, a lawyer from the Special Committee's law firm Covington & Burling, reported that the government was "focus[ed] on stopping flow of assets . . . to [the Rigas] Family." Ex. 27, Notes of Carl Rothenberger (May 18, 2002), at 2.

68.    Rothenberger's notes further indicate that the government made clear that Adelphia "need[ed] to stop flow of funds to [the Rigas] family." Ex. 27 at 3.

69.    After the May 18, 2002 meeting, the Rigas family and Adelphia began to negotiate an agreement for the Rigases' resignation from the Board. Ex. 20 at ¶20.

70.    There was a significant amount of back-and-forth between Adelphia and the Rigases during the negotiations. Ex. 20 at ¶21; Ex. 28, Letter from Covington & Burling to AUSA Timothy Coleman (Aug. 1, 2002), at 4.

71.    During the negotiations, the Rigases prioritized Adelphia agreeing to pay their legal costs. Ex. 20 at ¶21.

72.    Adelphia assured the Rigases that it would not cut off funding the Rigases defense costs. Ex. 20 at ¶22; Ex. 21 at ¶3.

73.     Board member Peter Metros's notes of a May 22, 2002 meeting reflect a discussion regarding indemnification. Ex. 32, Peter Metros, Meeting Notes (May 22, 2002), at 7.

74.     The notes indicate: "Co. By laws will indemnify. Officers & Bd. Directors" and "INDEMNIFY Them." Ex. 32 at 7.

75.     On the morning of Thursday, May 23, 2002, the Rigas family and Adelphia reached an agreement (the "Agreement") resulting in John, Tim, Michael, and James Rigas resigning from their positions on the Board. Ex. 30, May 23, 2003 Agreement, at ¶1; Ex. 28 at 4.

76.     The Agreement provided that the Rigas family could designate two non-family members to be appointed to the Board. Ex. 30 at ¶1.

77.     Under the Agreement, the Rigases agreed to place their Adelphia stock in a voting trust until all obligations of the Rigas family to Adelphia for loans, advances, or borrowings under the co-borrowing agreements were satisfied. Ex. 30 at ¶3.

78.     Under the Agreement, Rigas family's Managed Entities would "use all of their free cash flow to pay down the co-borrowing debt," and the Rigas family pledged their equity in the Managed Entities "until all obligations of the Rigas Family to [Adelphia] for loans, advances or borrowings under the co-borrowing agreements or otherwise are satisfied." Ex. 30 at ¶4.

79.     Under the Agreement, all Adelphia shares owned by the Rigas family would be pledged to secure the repayment of co-borrowing facilities and "to secure the undertaking to repay Adelphia for indemnification payments." Ex. 30 at ¶8.

80.     Under the Agreement, Adelphia agreed to "honor its commitment" to pay John Rigas $1.4 million per year over three years and provide some other benefits, including use of an office, healthcare coverage, and use of an Adelphia airplane for emergency reasons with Adelphia's permission. Ex. 30 at ¶10.

81.     Under the Agreement, Adelphia agreed to indemnify the Rigases "according to the Bylaws and Delaware law" if the Rigases "undertake to repay Adelphia per the Bylaws." Ex. 30 at ¶ 11.

82.     Among other things, Adelphia's bylaws required the corporation, "[e]xcept to the extent prohibited by law, to indemnify "any person made, or threatened to be made, a party to" a threatened or pending legal proceeding or investigation "by reason of the fact that the person . . . is or was a director or officer of the Corporation." Ex. 29, Adelphia Commc'ns Corp., Amended and Restated Bylaws §§ 6.1-6.3 (Sept. 30, 1999).

83.     Adelphia's bylaws also entitled directors and officers (both current and former) to advancement of legal expenses and fees if the director or officer "shall undertake to repay such amounts advanced to the extent that a court of competent jurisdiction ultimately determines that such a person is not entitled to indemnification . . . unless the Board of Directors or independent legal counsel reasonably determines that such person deliberately breached his duty to the Corporation or its shareholders." Ex. 29 at §§ 6.2-6.3.

84.     John and Tim Rigas signed letters to Adelphia, dated May 23, 2002, requesting the advancement of legal costs and undertaking to repay the amounts advanced if a court of competent jurisdiction determined that they are not entitled to indemnification. Ex. 31, Letters from John Rigas & Tim Rigas to Adelphia Commc'ns Corp. (May 23, 2002).

85.     The parties understood the Agreement to be a binding contract. Ex. 20 at ¶ 24; Ex. 30.

86.     The Special Committee held a meeting on Saturday, May 25, 2002. Ex. 33, Peter Metros, Meeting Notes (May 25, 2002).

87.     The notes contain a section regarding a presentation that Fried Frank partner Mark Stein gave on "Gov't Status." Ex. 33 at 4.

13

88.     Stein reported on a meeting with the U.S. Attorney's Office held on Thursday, May 23, 2002. Ex. 33 at 4 ("Thurs. PM," "Chief. Secu./Fraud").

89.     Stein reported that the government was "appalled at the Deal [between Adelphia and the Rigases]." Ex. 33 at 4.

90.     Stein reported that the government explained that it "[m]ay indict the Company." Ex. 33 at 4.

91.     Metros's notes indicate that "People who were Part of The negotiations should talk to the US Attorneys Office [and] 'Put together a story.'" Ex. 33 at 4.

92.     Fried Frank partner Mark Stein's billing entries indicate:

- 5/23/02: "[A]ttendance at presentation to SEC/USAO by PWC; . . . t/c w/USAO re: Rigas transaction; t/c's/meetings re: same; work on memo re: indemnification." Ex. 34, Fried Frank Billing Entries, at 1.

- 5/24/02: "t/c w/T. Coleman; t/c w/C. Clarke; . . . prepare memo re: indemnification issues; review of documentation of Rigas deal." Ex. 34 at 2.

93.     A Fried Frank associate attorney's billing entry for May 26, 2002 indicates "Drafted talking points re: advancement." Ex. 34 at 5.

94.     Mark Stein's May 28, 2002 billing entry indicates "review draft talking points for USAO." Ex. 34 at 7.

95.     A Fried Frank associate's billing entry for May 29, 2002 indicates "conf. call w/USAO." Ex. 34 at 9.

96.     Peter Metros's handwritten notes of a Saturday, June 1, 2002 Board meeting indicate that the Special Committee reported on a meeting with the U.S. Attorney's Office on Wednesday, May 29, 2002. Ex. 35, Peter Metros, Meeting Notes (June 1, 2002), at 2.

14

97.     Metros's notes indicate that the Special Committee "share[d] progress [illegible] we've made Δ [change] in control." Ex. 35 at 2.

98.     Metros's notes say that the government "[i]ndicat[ed] their pleasure." Ex. 35 at 2.

99.     The June 1, 2002 Board minutes indicate that Special Committee member Les Gelber reported on a meeting with the U.S. Attorney's Office during which he described to SEC and DOJ officials the Special Committee's progress and the "agreement between the Rigas Family and the Company regarding the family resignations as Directors," and the government "appeared satisfied at the progress of the Special Committee." Ex. 36, Adelphia Commc'ns Corp., Board Meeting Minutes (June 1, 2002), at 2-3.

100.    Informal notes of the June 1, 2002 Board meeting also indicate that the Special Committee met with the U.S. Attorney's Office on Wednesday, May 29, 2002. Ex. 37, Adelphia Commc'ns Corp., Board Meeting Notes (June 1, 2002), at 2.

101.    The notes indicate that the Special Committee "[w]alked through agreement with the Rigas Family" and the government expressed "[p]leasure at what happened." Ex. 37 at 2.

102.    At the June 1, 2002 Board meeting, immediately after discussing the Wednesday, May 29, 2002 meeting with the government, the Special Committee read a unanimous resolution "stating that John Rigas, Mike Rigas, [and] Tim Rigas . . . breached their duties to the Company and its shareholders by failing to cooperate with the Special Committee in its investigation by declining to provide full and complete answers to the Special Committee and by participating in related party transactions for their benefit to the detriment of the Company without appropriate disclosures and approval of the Board of Directors." Ex. 36 at 3; *see also* Ex. 35 at 3; Ex. 37 at 2.

103.    Peter Metros's notes indicate:

"Section 6.2 – Atty Fees; Bd of Directors"

"Will be breached/ No Atty fees." Ex. 35 at 3.

104.    Between May 23, 2002 and June 1, 2002, the Special Committee did not ask Timothy Rigas to cooperate in any regard. Ex. 20 at ¶ 27.

105.    In a June 6, 2002 8-K disclosure, Adelphia noted that "[t]he Board of Directors, based on the recommendation of the Special Committee and consultation with counsel to the Special Committee" determined that John, Timothy, and Michael Rigas deliberately breached their duty to the "Company and/or its shareholders" and were no longer entitled to the advancement of legal costs or fees. Ex. 38, Adelphia Commc'ns Corp., June 6, 2002 8-K.

106.    Before deciding not to advance legal expenses to the Rigases, Adelphia had not previously refused a request for fee advancement from a director or officer under Adelphia's bylaws. Ex. 21 at ¶ 2.

107.    Before deciding not to advance legal expenses to the Rigases, Adelphia had not previously undertaken to determine whether a director or officer intentionally breached his/her fiduciary duties before advancing legal expenses. Ex. 21 at ¶ 2.

108.    John Rigas received severance payments under the May 23, 2002 agreement with Adelphia until Adelphia filed for bankruptcy on June 25, 2002. Ex. 96, J. Rigas Supp. Decl. (May 24, 2018), at ¶¶ 2-4.

109.    Apart from denying indemnification and the advancement of legal expenses, Adelphia honored all of its commitments under the May 23, 2002 agreement at least as of the beginning of June 2002. Ex. 96 at ¶¶ 2-4.

**B.      The Government Co-opted Adelphia and Closed Off the Rigases' Access to Witnesses and Evidence (May – October 2002)**

1.      *Adelphia Acquiesced to the Government's Demands to Forego Interviews with Key Witnesses, Even to Adelphia's Detriment*

110.    The government did not permit Adelphia or its counsel to speak to key witnesses, affecting the accuracy and "completeness" of Adelphia's investigation. *See* Ex. 93, Covington & Burling, *Summary of Investigation Reported to the Special Committee of Independent Directors of Adelphia Communications Corporation*, at ACI 350516, 350522 (noting that (1) the Covington report should "not be viewed or used as a comprehensive analysis of all evidence" because "a number of key witnesses . . . were not available to Covington," and (2) "[A] number of other critical witnesses in managerial and supervisory positions within the accounting, finance, treasury, and external reporting functions were, at the direction of the Government, either at the outset of Covington's investigation or thereafter, not directly available to Covington for substantive interviews concerning their knowledge of practices at the Company.").

111.    Peter Metros's notes of the May 22, 2002 Board meeting indicate that the information in the 8K scheduled to be "filed tomorrow" is "[i]ncomplete but . . . . must be filed." Ex. 32 at 6 (ellipses in original).

112.    Peter Metros's notes further indicate that the there was a question as to whether Erland Kailbourne could sign the 8K due to the incomplete information included. Ex. 32 at 6.

113.    According to a December 10, 2004 10A report written by Willkie Farr & Gallagher and sent to Adelphia's Audit Committee in advance of the company's yearly 10-K disclosure:

> As the Special Committee's investigation unfolded, certain employees [including Dean Marshall, Karen Chrosniak, Timothy Werth, Luke Healy, Douglas Malone, and James Helms] were identified as having knowingly participated in alleged improper activities and the Special Committee and interim management took steps to evaluate each employee's conduct. At the government's

17

> request some of these employees were first placed on administrative leave before being terminated by the company."

Ex. 63, Willkie Farr & Gallagher, Memorandum (Dec. 10, 2004), at 7-8 & n.5; Ex. 44, Email from Covington & Burling to Timothy Coleman & Christopher Clark (July 29, 2002).

2. *Adelphia and Its Counsel Effectively Functioned as an Arm of the Government*

114. Covington & Burling, the Special Committee's outside counsel, was ordered to "aid . . . the United States Attorney's Office in any way possible." Ex. 40, Letter from Covington & Burling to SEC (June 12, 2002), at 1.

115. As of the beginning of August 2002, Adelphia provided the government with "millions of pages" of documents. Ex. 41, Letter from Covington & Burling to U.S. Attorney's Office (Aug. 1, 2002), at 6.

116. Adelphia turned documents over to the government "without prior review and without the assertion of privilege in advance of production." Ex. 41 at 7.

117. Adelphia provided documents to the government "as quickly as possible." *See* Ex. 41 at 6-7.

118. Through its counsel, Adelphia interviewed approximately 70 witnesses by the end of July 2002, some "at the request of the United States Attorney's Office." Ex. 41 at 6.

119. Adelphia provided information regarding the interviews to the government "promptly" and "often in draft form to avoid any delay." Ex. 41 at 6.

120. Adelphia "retained an investigative firm for the purpose of recovering assets from the Rigas family and [wa]s actively sharing information discovered by that company with the United States Attorney's Office. Ex. 41 at 7.

121.    Adelphia sued the Rigas family and entities that it controlled only "after having met with the government to advise it of the Company's intention and to insure that any concerns were addressed." Ex. 41 at 7.

122.    Adelphia "made witnesses available" to the government, including senior executives, on short notice. Ex. 41 at 11.

123.    The Board agreed in an August 2002 meeting that "any employee status changes, such as firing of an employee, should be reported to the USAO." Ex. 43, Adelphia Commc'ns Corp., Board Meeting Minutes (Aug. 28, 2002), at 7.

124.    Over the course of the government's investigation of the Rigases, Covington & Burling and other law firms representing Adelphia shared dozens of employee-interview memoranda with the government. Ex. 42, 3500 Disclosures, *United States v. Rigas*, No. 02 Cr. 1236 (S.D.N.Y. Jan. 27. 2004); Ex. 41 at 6.

125.    Covington & Burling, the Special Committee's outside counsel, was "co-opted by the government" and did not report to the Special Committee. Ex. 39, Coyle Dep., *Adelphia Commc'ns Corp. v. Deloitte & Touche, LLP*, No. 00598 (Phila. Ct. C.P. May 18, 2006), at 640-41.

126.    As late as November 13, 2003, Covington & Burling kept its report confidential at the government's request because the government "only permitted a limited number of Adelphia senior executives to review the Covington report." Ex. 52, Letter from Willkie Farr & Gallagher to SEC (Nov. 17, 2003), at 17.

127.    At an April 25, 2003 Board meeting, the Board resolved to extend the Special Committee's charter until the Rigas criminal trial concluded. Ex. 61, Adelphia Commc'ns Corp., Board Meeting Minutes (Apr. 25, 2003), at 8.

a.    *The U.S. Attorney's Office Oversaw the Process of Placing Key Employees on Paid Leave and Advancing Their Legal Costs Contingent on their Cooperation*

128.    On July 29, 2002, seven Adelphia employees – Karen Chrosniak, Edward Hartman, Luke Healy, Carla Brown Horn, Douglas Malone, Dean Marshall, and Timothy Werth (the "Leave Employees") – were placed on administrative leave. Ex. 44.

129.    Previously, in June 2002, Adelphia's General Counsel, Randy Fisher, sent these employees a letter setting forth the terms and conditions under which Adelphia would advance costs of their legal representation in connection with the Special Committee's investigation and related matters. *See, e.g.*, Ex. 45, Letters from Randy Fisher to Luke Healy, Tim Werth, Dean Marshall, and Doug Malone (June 6, 2002); Ex. 46, Letter from Randy Fisher to Carla Brown Horn (June 13, 2002).

130.    In exchange for the advancement of legal costs, the employees agreed to cooperate in all respects with the Special Committee's investigation "as well as any other investigation, proceeding or action brought by any governmental agency or authority." *See, e.g.*, Ex. 45.

131.    On July 29, 2002, Randy Fisher sent the Leave Employees a letter placing them on administrative leave with full pay and benefits subject to an employee agreeing to "make yourself available as reasonably necessary to answer questions, provide complete and truthful information about which you have knowledge, and take other action as is reasonably requested by the Company and those acting on its behalf, including, the Company's auditors and the Special Committee, its counsel, as well as the United States Attorney's [O]ffice for the Southern District of New York and the Middle District of Pennsylvania, the United States Securities and Exchange Commission, and other governmental authorities." *See, e.g.*, Ex. 47, Letter from Randy Fisher to Dean Marshall (July 29, 2002), at 1.

132.    The Leave Employees also were required to sign, as a condition of the leave agreement, a release of claims under which each Leave Employee agreed to "make himself available as reasonably necessary to answer questions, provide complete and truthful information as is reasonably requested by the Company (and those acting on the Company's behalf, including, the Company's auditors, the Special Committee and their counsel), the United States Attorney's [O]ffice for the Southern District of New York and the Middle District of Pennsylvania, the [SEC], and other governmental authorities." Ex. 47, Release of All Claims, at ¶6.

133.    As part of the administrative leave agreement, the employees were required to keep confidential all "technical, business, or financial information regarding [Adelphia] or any of its subsidiaries and affiliates or the respective activities of such entities" along with trade secrets and all "other material, non-public information of or regarding [Adelphia]." Ex. 47 at 4-5.

134.    Employees could disclose such confidential information to the government (the S.D.N.Y. and M.D. Pa. U.S. Attorney's Offices and the SEC). Ex. 47 at 5.

135.    After the employees were placed on administrative leave, Bruce Baird confirmed Adelphia's action with AUSAs Chris Clark and Timothy Coleman. Ex. 44.

136.    On July 30, 2002, Adelphia's outside counsel emailed AUSA Clark with revisions to the release agreement, asking "Chris, does this do the trick?" Ex. 48, Email thread between Peter Haller, Christopher Clark, and Bruce Baird (July 30-31, 2002).

137.    AUSA Clark responded on July 31, 2002 that the "new agreement is okay, provided that our agreement relating to your interviews of our co-operators in [sic] still in effect." Ex. 48.

138.   AUSA Clark further noted that the July 29, 2002 letter to the Leave Employees "will have to be revised to reflect the changes in the contract. Please confirm via email that it will be so revised. With those provisos, it's fine." Ex. 48.

139.   On August 30, 2002, Randy Fisher sent a letter to the Leave Employees that said:

> As you know, in connection with your administrative leave with Adelphia Communications Corporation (the "Company"), which began effective July 29, 2002, you were asked to sign a letter describing the terms of the administrative leave, and a general release of claims. As you also know, the U.S. Department of Justice requested certain clarifying changes to the release, which were incorporated into the final version of the release that was executed by you and the Company. However, the changes were not reflected in the July 29, 2002 letter to you. Accordingly, to the extent there is an inconsistency between the scope of your assistance to the Company and others during the administrative leave period as described in the July 29th letter and in Section 6 of the release, the terms of Section 6 of the release will control.

*See, e.g.*, Ex. 49, Letter from Randy Fisher to Dean Marshall (Aug. 30, 2002).

140.   If an employee—for example, Edward Hartman—was deemed not to cooperate sufficiently with the government, he was terminated. *See, e.g.*, Ex. 73, Letter from Randy Fisher to Edward Hartman (Aug. 30, 2002).

141.   In terminating an employee for non-cooperation, Adelphia also declared an "end[ ] [to] the company's obligation to provide you with any legal counsel with regard to the Government's investigation of the relationship between the Rigas Family and the Company," and noted that the "Company reserves its rights to pursue claims against you with regard to the undertaking you signed to reimburse the Company for failure to cooperate with the Government with respect to the above-reference[d] litigation." Ex. 73.

142.   Around August 1, 2002, Adelphia terminated nine employees thought to be potentially involved in fraudulent conduct "who were previously kept at the request of the DOJ

for their investigation." Ex. 60, Greenhill & Co., LLC, Adelphia Communications – Summary of Greenhill Meetings at Adelphia Headquarters in Coudersport, Pennsylvania (Aug. 1, 2002), at 2.

143.    Peter Metros's May 22, 2002 notes of the Board meeting indicate "Plead the 5th—Discharge them." Ex. 32 at 7.

> b.    *The Holder Memorandum and the U.S. Attorney's Office's Pressure Dictated Adelphia's Decisionmaking with Respect to the Government's Investigation*

144.    On August 1, 2002, Covington & Burling sent a letter to the government making the case for why Adelphia should not be indicted. Ex. 41.

145.    The introductory section of the letter entitled "Overview" began with reference to the Holder memorandum, which was attached to the letter as Exhibit A. Ex. 41 at 1.

146.    In the letter, Covington wrote in a section addressing the section of the Holder Memorandum that assesses a company's cooperation with the prosecution:

> The Company has followed the Memorandum's guidelines to the letter. The Company has shielded no one, forcing the resignations of the Rigases and working with the government to coordinate the appropriate replacement of employees found to have knowingly participated in improper activities. Simply stated, the Company, through the Special Committee, has taken as its mandate the duty to provide complete and unqualified assistance to the government in its efforts to bring charges against the Company's former executives.

Ex. 41 at 11.

147.     The letter indicated that Adelphia's response to the investigation was driven by the "government's approval of [its] response, indeed, its insistence that no less is acceptable." Ex. 41 at 2.

148.    In its August 1, 2002 letter to the government, Covington said it "has done everything the government could wish for in response to evidence of corporate wrongdoing." Ex. 41 at 2.

149.    The letter touts that Adelphia "wrest[ed] . . . control from the Rigases," and claims that the company "forcibly removed the Rigases" from their positions.  *See* Ex. 41 at 9.

> c.    *The Government Micromanaged Adelphia to Ensure Witnesses' Cooperation with the Government and Non-contact with the Rigases*

150.    On June 25, 2002, Adelphia filed a voluntary petition for Chapter 11 Bankruptcy. Ex. 51, *In re Adelphia Commc'ns Corp.*, No. 02-41729-shl, Dkt. No. 1 (Bankr. S.D.N.Y. June 25, 2002).

151.    On August 22, 2002, an attorney from Boies Schiller representing Adelphia wrote an email to AUSA Coleman forwarding a draft Application to the Bankruptcy Court for Adelphia to have funds authorized for Adelphia to pay various cooperating witnesses' lawyers. Ex. 50, Email from Philip Korologos to Timothy Coleman (Aug. 22, 2002).

152.    As a justification for the need for funds, the Application stated that employees may cease cooperating if Adelphia cannot pay for their counsel. Ex. 50 at 6.

153.    The application requested that all fee requests for these employees be kept confidential because public disclosure "would potentially interfere with or hinder the Government's investigations." Ex. 50 at ¶ 17.

154.    On October 14, 2002, Adelphia General Counsel Randy Fisher sent a memo to all Adelphia employees regarding "[c]ontact with members of the Rigas Family, employees of Rigas Family private companies or former employees indicted by the Federal Government." Ex. 53, Letter from Randy Fisher to Adelphia Employees (Oct. 14, 2002), at 1.

155.    In the memorandum, Fisher began by explaining that Adelphia "is committed to cooperating with [the government]" to "help the Company avoid prosecution." Ex. 53 at 1.

24

156.    Fisher stated "Adelphia continues to cooperate with [the government] by reviewing with the government . . . its communications with members of the Rigas Family, Rigas Family private entities employees, former Adelphia executives under indictment or any of their actual or purported counsel or representatives." Ex. 53 at 1.

157.    After explaining that Adelphia was cooperating with the government's investigation, Fisher stated, "As part of this process, I have been asked to direct everyone to use the following procedures regarding contact with either any member of the Rigas Family, any employee of any of the Rigas Family private companies, any former executive of Adelphia currently under indictment or any of their actual or purported counsel or representatives." Ex. 53 at 1-2.

158.    Fisher stated that in the case of direct contact regarding a business matter between the Rigases (or their representatives) and Adelphia in any setting, the employee contacted should refuse to speak, refer the individual to Adelphia's legal department, and "report the contact to Adelphia's legal department." Ex. 53 at 2.

159.    The letter made clear that "**There is no exception to this situation.**" Ex. 53 at 2 (emphasis in original).

160.    Fisher's October 14, 2002 memorandum directed that if approached by the Rigases or any of their defense team, "the person making the contact should be told that it would be inappropriate to answer any questions or provide any information." *See* Ex. 53 at 2.

161.    For any contact with the Rigases or their representatives in a social setting, Fisher directed employees to "use good judgment" and "not disclose or divulge any confidential information concerning the Company, the ongoing investigation or the bankruptcy proceeding." Ex. 53 at 2.

162.    Fisher further directed employees to report all social contacts with the Rigases or their representatives to the Adelphia legal department. Ex. 53 at 2.

163.    Fisher also advised employees of the procedures for indirect contact (like a voicemail): "1. Report the contact to the Legal Department immediately. 2. Do not attempt to return the phone call." Ex. 53 at 2.

164.    Fisher further explained that the "Legal Department will review the matter and may refer the matter to appropriate government agencies and litigation counsel for review." Ex. 53 at 2.

165.    According to Adelphia accounting employee Robert Leete, someone at Adelphia told Adelphia employees not to speak to the Rigases and that "if Adelphia learned that we had spoken to the Rigases, we would not be working at Adelphia any longer." Ex. 83, Leete Decl. ¶9.

166.    "The understanding from Adelphia was 'better not talk to the Rigases or else . . . .'" Ex. 83 at ¶9.

167.    At Adelphia, "[t]here was never a sense of 'feel free to talk to the Rigases because they are equally entitled to the information.'" Ex. 83 at ¶9.

168.    Leete "understood that Adelphia was cooperating with the federal government as much as possible and that meant don't talk to the Rigases." Ex. 83 at ¶10.

169.    Leete recalled the Rigases attempting to reach out to certain Adelphia employees, but "they were afraid to talk to the Rigases." Ex. 83 at ¶11.

170.    Former Adelphia employee Andrew Zorichak, who worked in Adelphia's engineering, treasury, and accounting departments, recalled that "the Rigases asked to speak to some of us [Adelphia employees] during the criminal investigation." Ex. 84, Zorichak Decl. (May 18, 2018), at ¶¶2-9, 15.

26

171.    During the Rigas investigation, "Adelphia was saying that if you wanted to keep your job, and as long as you cooperated with the Adelphia side, you should not speak to the Rigases." Ex. 84 at ¶ 15.

172.    Zorichak "understood that it was frowned upon to cooperate with the Rigases because you might lose your job and that sort of thing." Ex. 84 at ¶ 15.

173.    Zorichak wanted to speak to the Rigases because he "felt that all sides needed to be heard in everything." Ex. 84 at ¶ 17.

174.    Zorichak did not speak to the Rigases because he feared that he would lose his job. Ex. 84 at ¶¶ 15-17.

175.    Dean Marshall, who worked directly for James Brown in the Corporate Finance Department, testified in a deposition that "the government did not want me communicating directly with anybody from the Rigas family." Ex. 54, Marshall Dep. Tr., *Rigas v. Brown*, No. 2006-305 (Phila. Ct. C.P. Dec. 13, 2011), at 17; *see also* Ex. 90, Marshall Dep., *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 03 MDL 1529 (JMF) (S.D.N.Y. Feb. 27, 2014), at 109-11.

176.    Dean Marshall testified that "the one thing that was guiding or directing the choices I was making [to cooperate with the government] w[as] the government's instructions." Ex. 90 at 118-19.

177.    The Rigases and their counsel made numerous unsuccessful attempts to speak to witnesses. *See, e.g.*, Ex. 70, Letter from Paul Grand to Judge Sand (June 7, 2004), at 2 (enumerating witnesses who would not speak with the Rigases); Ex. 84, Zorichak Decl. ¶ 17 (explaining that Andrew Zorichak wanted to speak with the Rigases but did not out of fear he

would lose his job); Ex. 83, Leete Decl. ¶11 (Rob Leete noting that he recalled the Rigases attempting to reach out to Adelphia employees but they would not speak to them).

178. Mike Brady testified at a deposition when the Rigases' defense counsel attempted to speak with him, he told them that "he wasn't willing to talk to them." Ex. 86, Brady Dep., *Adelphia Commc'ns Corp. v. Deloitte & Touche, LLP*, No. 000598 (C.P. Phila. Mar. 10, 2005), at 176-77.

### C. Interference Beyond October 2002

##### 1. *The Government Continues to Restrict the Rigases' Access to Witnesses*

179. On November 20, 2002, a Boies attorney emailed AUSA Coleman noting that Philip Korologos wanted to discuss a "proposed motion for a temporary restraining order freezing the Rigas defendants' assets." Ex. 57, Email from George Carpinello to Timothy Coleman (Nov. 20, 2002).

180. The Boies attorney included a draft of the motion and explained, "We would like to coordinate efforts and want to make sure that the bringing of this motion would not interfere with your office's activities." Ex. 57.

181. On February 19, 2003, Philip Korologos emailed the government, stating:

> Attached is a fax I received today in which the Rigases' counsel asks for depositions of the pre-petition independent directors and the Company. Clearly this request relates to the issues we have previously discussed regarding your desire not to have these depositions occur. I am sure these are depositions you continue not to want to take place prior to resolution of the criminal action against the Rigases.

Ex. 56, Email from Philip Korologos to Timothy Coleman, et al. (Feb. 19, 2003).

182.    On May 8, 2003, AUSA Chris Clark canceled an interview with Adelphia accountant Joe Sabol involving at least the IRS and U.S. Attorney for the Middle District of Pennsylvania. Ex. 59, Email from Chris Clark to Philip Korologos (May 8, 2003).

183.    On October 28, 2003, the Rigases requested access, via a conference call, to four members of Adelphia's accounting staff. Ex. 79, Email thread between William Marsillo and Chris Clark (Oct. 2003).

184.    As of October 2003, the Rigases were permitted limited access to certain accounting employees regarding a limited number of topics under a stipulation from civil litigation with Adelphia. Ex. 79.

185.    A Boies Schiller attorney forwarded the request to AUSA Clark, and asked him if he had "any objections" to allowing the Rigases to interview these witnesses. Ex. 79.

186.    The next day, AUSA Clark responded, "I object to [Adelphia Vice President of Accounting] Rob Cavileri [sic], and I would like a postal inspector present during the meeting." Ex. 79.

187.    On February 13, 2003, Philip Korologos emailed AUSAs Coleman and Clark (along with other outside counsel for Adelphia, Bruce Baird from Covington and Marc Abrams from Willkie Farr) regarding the in-court testimony of Les Gelber, an Adelphia Board member, during bankruptcy proceedings. Ex. 62, Email from Philip Korologos to Tim Coleman, et al. (Feb. 13, 2003).

188.    Korologos noted that Les Gelber's direct testimony would be presented via affidavit, but that he will be subject to live cross-examination. Ex. 62.

189.    Korologos wrote:

> I am assuming based on my discussion with you on Monday that
> by not addressing the scope of cross in [a] stipulation that we will

> collectively make sure at the hearing that any issues relating to scope of cross or the questioning of Les (e.g., by the Rigases who are at least a party in interest in the bankruptcy) are limited to the direct testimony of the submitted affidavit. If you don't intend to do it this way, you may want to get the parties to stipulate, and the court to enter it as a protective order, that the scope of cross examination at the hearing will be so limited. I believe we can take care of this at the time of the hearing, but want to make sure you are comfortable with that.

Ex. 62.

190.    On February 19, 2003, Philip Korologos sent a draft of the affidavit of Les Gelber's affidavit to AUSAs Clark and Coleman and explained, "I do not believe anything mentioned in this affidavit should cause you any concern in light of the stipulation, but I wanted to make sure we showed it to you in advance." Ex. 66, Email from Philip Korologos to Tim Coleman, et al. (Feb. 19, 2003).

191.    On May 8, 2003, Philip Korologos informed AUSA Clark that the IRS wanted to interview Adelphia accounting employee Joe Sabol. Ex. 64, Email thread between Philip Korologos and Chris Clark (May 8, 2003).

192.    AUSA Clark responded, "Interview is off. No one should interview Sabol tomorrow or anytime without my say so." Ex. 64.

193.    On February 5, 2003, lawyers from Buchanan Ingersoll asked Philip Korologos to review a letter Buchanan Ingersoll was considering sending to the Rigases' civil counsel regarding the Rigases' counsel's request for documents. Ex. 65, Email from Philip Korologos to Tim Coleman & Chris Clark (Feb. 5, 2003).

194.    The Rigases' attorneys had requested, among other things, "[a] listing of files relating to the Firm's former representation of Adelphia." Ex. 65.

195.    With regard to that request, Buchanan Ingersoll's draft response was "we have asked the firm of Boies, Schiller & Flexner if they have any objection to our providing a list of all Adelphia files to you. They have not yet responded to our inquiry." Ex. 65.

196.    About 20 minutes after Korologos received this letter from Buchanan Ingersoll, he sent it to AUSAs Clark and Coleman, indicating that he had asked the lawyer at Buchanan Ingersoll "to inform me (so I could tell you) before he sent anything like this." Ex. 65.

197.    On December 9, 2004, Philip Korologos emailed an SEC representative in response to a question of whether Adelphia filed a complaint against a company in Pennsylvania. Ex. 58, Email thread between Philip Korologos and Gwen Licardo (Dec. 9, 2004).

198.    Korologos said, "We have not yet filed an action because of requests by [SDNY AUSA] Richard Owens to hold off on doing so for the time being. If that changes, I will let you know." Ex. 58.

199.    At a January 2003 hearing in the bankruptcy court, the government told the Court that "[Adelphia] can do what it wants. We don't have any power over them." Ex. 78, Gov't Opp'n Br., R. 16 (Feb. 22, 2012), at 42 (quoting Hr'g Tr., *In re Adelphia Communications Corp.*, 02-41729 (REG) (S.D.N.Y.), at 22-23).

200.    The Rigases' former attorneys from Buchanan Ingersoll refused to speak to the Rigases. Ex. 82, Fleming Decl., Ex. A at 6 (July 3, 2007).

201.    Defense attorney Peter Fleming was "shocked" that Buchanan Ingersoll would not speak to defense counsel. Ex. 72, Ex. F at 116-17.

202.    Counsel for the Rigases attempted in vain to speak to many Adelphia employees. Ex. 82, Ex. A at 6-7.

203.    Personnel from Deloitte refused to speak with Rigases. Ex. 82, Ex. A at 5, 7-8.

31

2. *Adelphia's November 2004 Presentation to the Government*

204. On November 5, 2004, Covington & Burling made a presentation to the U.S. Attorney's Office entitled "Thompson Memorandum Factors." Ex. 55, Vinegrad Decl., *In re Adelphia Commc'ns Corp.*, No. 02-ap-41729, Ex. 3, Thompson Memorandum Factors, (Bankr. S.D.N.Y.).

205. Covington made the presentation to convince the government not to indict Adelphia. Ex. 55 at ¶¶ 20-22.

206. A key component of the presentation concerned Adelphia's cooperation with the government. Ex. 55, Ex. 3 at 6 (pdf p. 21).

207. The cooperation category was broken down into five subcategories: (1) providing access to privileged materials, (2) production of documents and other information, (3) assistance before and during the Rigas criminal trial, (4) assistance in the tax investigation, and (5) non-obstruction of the government's investigation. Ex. 55, Ex. 3 at 6 (pdf p. 21).

208. The first category detailed how Adelphia provided the government a "450-page privileged draft summary of investigation prepared by Special Committee's outside counsel," and "[p]rivileged summaries of more than 100 witness interviews conducted by counsel to the Special Committee, including summaries for seven witnesses who testified for the Government at the *United States v. Rigas* trial," as well as other privileged internal documents and outside counsel documents. Ex. 55, Ex. 3 at 7 (pdf p. 22).

209. The second category—"Production of Documents and Other Information"—detailed how Adelphia provided 1,315 boxes of documents (10 million pages), "25 imaged local computer drives," "228 compact discs," and "[a]ccess to computer database," all under an

agreement "to produce materials to the government as quickly as possible, even before conducting a privilege review." Ex. 55, Ex. 3 at 8 (pdf p. 23).

210. With respect to the third category—Assistance Before and During the *United States v. Rigas* Trial—the slide stated:

- Adelphia has provided extraordinary assistance for over two years in connection with prosecution of the Rigases and others:
    - o Detailed comments on the draft criminal complaint
    - o Adelphia's forensic accountants made available to the Government on short notice
    - o Assistance in preparation of key witnesses
    - o Real-time data analysis and other assistance during the trial
    - o Review of 70,000 pages produced by the Rigases on the eve of trial
        - ▪ Completed in one week (400 hours of work)
    - o Analysis of all transactions between Adelphia and the Rigas entities over a 3½ year period to rebut Rigases' defense that they could have repaid their debts to the Company
        - ▪ Completed before the end of the Government's case-in-chief (3,000 hours of work)
- Adelphia spent several million dollars assisting the Government in connection with the trial

Ex. 55, Ex. 3 at 9 (pdf p. 24).

211. The fourth category concerned Adelphia's extensive efforts to assist in the related tax investigation, including hundreds of hours collecting/reviewing documents, and making employees and forensic accountants available. Ex. 55, Ex. 3 at 10 (pdf p. 25).

212. The final category—entitled "Adelphia Did Not Obstruct the Government's Investigation"—explained that "Adelphia has provided extraordinary cooperation since the Rigases were removed from their positions at the Company." Ex. 55, Ex. 3 at 11 (pdf p. 26).

213. In that category, Covington noted that the "Special Committee moved immediately to oust Rigases once it learned of Government's concerns" and that the "Special Committee's decisive action enabled Government to promptly identify culpable individuals and conduct extensive investigation." Ex. 55, Ex. 3 at 11 (pdf p. 26).

214.    On April 25, 2005, the government notified Adelphia that it would not prosecute it subject to certain terms including a continuing obligation to cooperate and providing restitution. Ex. 74, Letter from Richard Owens to Alan Vinegrad & Philip Korologos (Apr. 25, 2005).

## IV.    The Rigases' Efforts to Obtain Funds for Their Defense

215.    When Adelphia decided not to advance legal expenses to the Rigases, they were forced to liquidate certain real estate assets to fund their defense. Ex. 72, McMichael Decl. (Oct. 3, 2011), at ¶5.

216.    On August 26, 2002, Adelphia moved for a temporary restraining order in a bankruptcy adversary proceeding against the Rigases to block the Rigases from selling property. Ex. 71, *Adelphia Commc'ns Corp. v. Rigas*, No. 02-8051-cgm, Dkt. No. 5 (Bankr. S.D.N.Y. Aug. 26, 2002); Ex. 72 at ¶6.

217.    The bankruptcy court granted that motion. Ex. 72 at ¶¶6-7.

218.    On November 25, 2002, Adelphia moved to freeze all of the Rigases' assets. Ex. 72 at ¶7; Ex. 71 at Dkt. 53 (Nov. 25, 2002).

219.    The bankruptcy court granted that motion. Ex. 72 at ¶7.

220.    In February 2003, after months of negotiations, counsel for Adelphia and counsel for the Rigases agreed in principle to permit the Rigases to sell certain real estate to fund their criminal and civil defense. Ex. 72 at ¶8.

221.    Despite the Rigases' best efforts over the next few months, only one property was sold for approximately $500,000. Ex. 72 at ¶8.

222.    During this time period, the Rigases also requested that Adelphia consent to the sale of additional pieces of property not subject to the agreement allowing the Rigases to sell certain real estate to generate funds for their legal expenses. Ex. 72 at ¶9.

223.   Adelphia's counsel made it clear that it would reject the Rigases' continued efforts to fund their defense through the sale of properties. Ex. 72 at ¶9.

224.   The Rigases attempted unsuccessfully to obtain funds for criminal defense costs from Adelphia's directors' and officers' liability policies. Ex. 72 at ¶10.

225.   As of June 23, 2003, because of a lack of funding, the Rigases' criminal and civil counsel and experts were owed approximately $2.5 million. Ex. 72 at ¶11.

226.   Most notably. Navigant Consulting, which had been retained to assist in document review with the promise of payment being funded out of property sales, was owed approximately $800,000. Ex. 72 at ¶11.

227.   Around June 2003, the Rigases' criminal counsel approached their civil counsel regarding the critical need to get funding in place immediately to retain experts, review documents, and prepare for trial. Ex. 72 at ¶12.

228.   Around May 2003, Adelphia refused the Rigases' request to obtain indemnification and legal-expense advancement from the privately-owned Rigas cable systems that Adelphia managed. Ex. 72 at ¶13.

229.   On July 18, 2003, the Rigases filed a Motion to Modify the Temporary Restraining Orders to Permit Funding of Criminal and Civil Defense Costs from Cash Generated by Private Cable Companies, seeking to cause the private cable companies owned by the Rigases to advance up to $15 million in legal expenses. Ex. 72 at ¶14, Ex. C (pdf pp. 22, 33).

230.   The Motion explained the severe funding issue that was facing the Rigases:

> The Rigases' inability to adequately defend themselves against the criminal and civil charges against them has now reached a critical stage. The criminal trial starts in a little over five months. There are millions of documents to review, index and assimilate into the defense. This is a labor intensive process, and consequently very expensive. Without defense cost funding, the Rigases ability to

> defend themselves fully and fairly will be impaired. By way of example only, the tasks required of the Rigases and their counsel include analysis of millions of pages of documents, retention of experts to help understand and articulate the complicated accounting and business issues and, in light of these analyses, develop trial strategy and testimony.

Ex. 72 at ¶ 14, Ex. C (pdf p. 23).

231.    The Rigases' Motion "further explained the difficulties facing the Rigases' trial preparation because of Adelphia's refusal to provide the defense with the same searchable CDs provided to the government unless the Rigases paid Adelphia an exorbitant amount of money to reimburse it for costs in scanning the documents onto CDs. Ex. 72 at ¶ 15, Ex. C at ¶ 35, n.9 (pdf p. 34).

232.    At the August 1, 2003 hearing concerning the Motion, counsel for John Rigas explained the need for funding:

> We're at a critical point, where I can represent to this Court that without money we cannot come close to providing an adequate – what I and co-counsel believe would be adequate defense of the Rigases, in a case – and I can represent, Your Honor, in a case which I consider to be highly defendable, where I believe there has been major misunderstandings of relevant facts, and I believe the possibility of the defense are good and strong.

Ex. 72 at ¶ 16. Ex. D at 41 (pdf p. 38).

233.    When the hearing concluded, the bankruptcy court granted the Rigases' motion and modified the temporary restraining orders to allow the private cable companies to pay up to $15 million of the Rigases' defense costs. Ex. 72 at ¶ 17.

234.    The bankruptcy court noted, however, that the $15 million dollars was a "drop in the bucket." Ex. 72 at ¶ 17, Ex. D at 137-38, 160.

235.    The $15 million dollars the bankruptcy court permitted the Rigases to access was provided around October 2003. Ex. 20 at ¶ 35.

236.   The funds the Rigases received in October 2003 had to cover amounts already owed to professionals and vendors as well as civil and criminal defense costs for all defendants. Ex. 72, Ex. C at ¶¶ 2-3 (pdf p. 23).

237.   The $15 million figure was an estimated sum of civil and criminal defense costs based on assumption of an 8-week criminal trial commencing January 5, 2004 and concluding in early March 2004. Ex. 72 at ¶ 21.

238.   The $15 million dollar figure was also "subject to reconsideration, in the event of a material change in the facts, or to deal with new needs, but subject to fine tuning, with respect to authorized expenses, not for a do-over of the matters [the Court has] decided today." Ex. 72 at ¶ 20.

239.   The $15 million figure proved incorrect due to changed circumstances, including that the government's estimate in the length of the prosecution case doubled, trial was postponed for two months, and the case was expanded substantially by the government filing a bill of particulars on the eve of trial. Ex. 72 at ¶ 22; Ex. 20 at ¶ 39.

240.   By January 2004, the original funding for the Rigases defense was nearly exhausted. Ex. 72 at ¶ 22.

241.   In January 2004, the Rigases filed a motion seeking an additional $12.8 million for the criminal defense based on estimates for experts, the cost of counsel, and the trial schedule. Ex. 72 at ¶ 23, Ex. E.

242.   In that Motion, the Rigases explained:

> One of the reasons for the postponement of the criminal trial date was the recent production by the Government, Adelphia and Buchanan Ingersoll PC of millions of pages of new documentary evidence. In addition, criminal defense counsel has recently received from the Government 20 boxes of proposed trial exhibits and thousands of pages of 3500 materials, including statements of

> more than 150 witnesses. The legal and factual issues in the criminal case have also expanded substantially by the Government's filing of a Bill of Particulars and 404(B) notice. Because of this onslaught of additional documents and expansion of the criminal case, the Rigases have incurred substantial unanticipated expenses in the review and analysis of this new evidence and in additional trial preparation.

Ex. 72 at ¶24, Ex. E at ¶14 (pdf p. 47).

243. The bankruptcy court held a hearing on the Rigases' motion to access additional funds for their defense on February 18, 2004, which lead counsel for each of the Rigas defendants attended. Ex. 72 at ¶25.

244. One of the Rigases' attorneys, Andrew Levander, noted that "this case is of a magnitude of no other that I have ever been involved with" as a defense attorney and federal prosecutor, and that the case "is not incrementally larger, it is exponentially larger." Ex. 72, Ex. F, Hr'g Tr., *In re Adelphia Commc'ns Corp.*, No. 02-41729 (Bankr. S.D.N.Y. Feb. 18, 2004), at 58-59.

245. Mr. Levander noted further that the pretrial period and the trial period were expanded, the defense received millions of pages of documents more than anticipated (including handwritten notes), and the government identified by name 158 witnesses in its 18 U.S.C. §3500 materials. Ex. 72, Ex. F at 60-61.

246. Mr. Levander explained how the government's bill of particulars expanded the scope of charges, including by adding "charges that date back 15 years prior to the original charges in the indictment." Ex. 72, Ex. F at 65.

247. Mr. Levander noted that he had to hire additional paralegals and an attorney, and that his team "[j]ust can't cope with the magnitude." Ex. 72, Ex. F at 65.

248.    Mr. Levander said "we have a number of experts" who "will be charging us substantial sums of money, and they are not going to show unless we can pay them." Ex. 72, Ex. F at 113.

249.    Mr. Levander explained that he and the other defense attorneys "have shown changed circumstances" and "desperate need." Ex. 72, Ex. F at 115.

250.    Paul Grand, Timothy Rigas's attorney, explained that the government's bill of particulars added conduct relevant to the criminal case as background to the conspiracy going back long before the time periods covered in the indictment Ex. 72, Ex. F at 73.

251.    Mr. Grand explained "[w]e get all of these charges added onto an already enormous indictment seven weeks before trial . . . we are having to prepare both for the original indictment and for this – I'll call it a new indictment under the guise of a bill of particulars." Ex. 72, Ex. F at 74-75.

252.    Peter Fleming, a very experienced criminal lawyer, said, "I've never seen anything like this. We will be there. We will be crippled without additional funds, but we will be there." Ex. 72, Ex. F at 75.

253.    The bankruptcy court granted the Rigases' motion on February 18, 2004, stating:

> I noted last time that the amount requested by the Rigases, while plainly very large in absolute terms, was a drop in the bucket in the context of the fee requests in these cases, and I believe that even with the incremental amount sought here, that remains true . . . . [T]he Rigases, nevertheless, were fair in pointing out that in the context of the total fees the estate is bearing, and understandably so, the amount they are asking for is still a drop in the bucket. And it is hardly excessive in amount when compared to the fees charged by other professionals, Boies Schiller, Covington & Burling, and PWC, who have been focusing on Rigas related matters.

Ex. 72 at ¶26, Ex. F at 130-31 (pdf pp. 88-89).

254.     Counsel for the Special Committee, Covington attorney Alan Vinegrad, advised Larry McMichael, Adelphia's civil counsel, that in late 2004, the government informed Adelphia's counsel that if the Rigas Managed Entities ("RMEs") continued to indemnify and advance attorney's fees and defense costs for the Rigases, the government would indict the RMEs. Ex. 72 at ¶52.

## V.     The Effect of the Lack of Funds on the Rigases' Defense and Their Attempts to Retain Counsel

### A.     The Rigases' Attempts to Retain Counsel

255.     In the days after the March 27, 2002 co-borrowing disclosure, the Rigases, in search of counsel, sought the recommendation of Salomon Smith Barney (the Rigases' financial advisors). Ex. 20 at ¶4.

256.     Solomon Smith Barney recommended Stephen Fraidin from the law firm Fried Frank. Ex. 20 at ¶4.

257.     On March 31, 2002, the Rigases met with Mr. Fraidin and Mark Stein (another Fried Frank attorney) to discuss the possibility of Fried Frank representing the Rigases. Ex. 20 at ¶5.

258.     Fried Frank agreed to represent the Rigases. Ex. 20 at ¶6.

259.     Fried Frank was to be paid by Adelphia for its representation of the Rigases. Ex. 20 at ¶6.

260.     Mr. Fraidin stated that he did not believe there was a conflict of interest between the Rigases and Adelphia. Ex. 20 at ¶6.

261.     Mr. Fraidin added that he thought Fried Frank could be more effective if it represented Adelphia in addition to the Rigases, but if a conflict arose, Fried Frank would continue representing the Rigases and withdraw from representing Adelphia. Ex. 20 at ¶6.

262.    Accordingly, the Rigases understood that Fried Frank was representing both the Rigas family and Adelphia. Ex. 20 at ¶ 7.

263.    Fried Frank never formally resigned from representing the Rigases, nor did it notify the Rigases that it believed a conflict existed based on representing Adelphia and the Rigases. Ex. 20 at ¶ 7.

264.    It subsequently became clear that Fried Frank was representing Adelphia and not the Rigases. Ex. 20 at ¶ 8.

265.    Special Committee member Les Gelber testified at a deposition that Mr. Fraidin indicated he intended to represent both the Rigases and Adelphia and that Tim Rigas was blindsided by Mr. Fraidin suggesting that Fried Frank would decide later whether it would represent Adelphia or the Rigases in the event of a conflict, contrary to what he previously told Tim Rigas. Ex. 80, Gelber Dep., *Adelphia Commc'ns Corp. v. Deloitte & Touche, LLP* (C.P. Phila. Sept. 20, 2006), at 228-33.

266.    The Rigases engaged Dewey Ballantine to "supplement" criminal counsel "due to the sophisticated nature of the transactions under investigation." Ex. 20 at ¶ 29.

267.    The Rigases were eventually forced to terminate Dewey Ballantine due to a lack of funds to pay the firm. Ex. 20 at ¶ 29.

268.    The Rigases were precluded from paying Dewey Ballantine from the $12.8 dollars that the bankruptcy court permitted the Rigases to access in February 2004. Ex. 91, Hr'g Tr., *In re Adelphia Commc'ns Corp.*, No. 02-41729 (Bankr. S.D.N.Y. Feb. 18, 2004), at 139.

269.    The Rigases were unable to continue to retain Dewey Ballantine, which, as of September 2004 at least, did not receive complete payment for its work for the Rigases due to the

Rigases' lack of funds. Ex. 92, Hr'g Tr., *In re Adelphia Commc'ns Corp.*, No. 02-41729 (Bankr. S.D.N.Y. Feb. 18, 2004), at 40-41.

270.    Additionally, in the summer of 2002, the Rigases were interested in retaining Kirkpatrick & Lockhart, a law firm that was highly recommended to them, to supplement their criminal counsel given the magnitude of materials that needed to be reviewed and the overall scope of the case. Ex. 20 at ¶30; Ex. 94, T. Rigas Supp. Decl. (May 23, 2018), at ¶¶3-5; Ex. 96 at ¶5.

271.    A team from Kirkpatrick traveled to Coudersport to meet with the Rigases and discuss Kirkpatrick representing the Rigases on a variety of issues, including some relevant to the criminal case.  Ex. 94 at ¶5; Ex. 95, M. Rigas Decl. (May 23, 2018), at ¶3; Ex. 96 at ¶5.

272.    Despite the Rigases being impressed with Kirkpatrick, they could not retain the firm due to an estimated budget of $15-20 million and a requirement of a substantial retainer. Ex. 20 at ¶30; Ex. 94 at ¶5; Ex. 95 at ¶3; Ex. 96 at ¶5.

273.    The Rigases interviewed various New York law firms, but could not retain them due to their high fees. Ex. 20 at ¶30.

274.    In late December 2003 or early January 2004, after receiving the 3500 material from the government, the Rigases interviewed and intended to hire Nixon Peabody, which was willing to represent the Rigases in their criminal case.  Ex. 94 at ¶7.

275.    Due to a lack of funds, however, the Rigases were unable to retain Nixon Peabody. Ex. 94 at ¶7.

276.    The Rigases attempted to use their civil counsel, Dilworth Paxson, to perform some work related to the criminal case, but were limited in their ability to do so because Dilworth had

to devote its efforts to obtaining funds so the Rigases could fund their civil and criminal defense. Ex. 20 at ¶32.

277.    Dilworth Paxson attorneys appeared in the Rigases' criminal case. Ex. 13.

278.    When the bankruptcy court released $12.8 million in 2004 for the Rigases' criminal defense, the Court permitted Dilworth Paxson to be compensated out of the newly released funds for their work on the criminal case. Ex. 91 at 150.

### B.    The Rigases' Lack of Funds Impaired Their Defense

279.    For the counsel the Rigases were able to retain, defense counsel advised, based on the lack of a consistent source of funds, that each defense firm's participation at trial would be limited to a single attorney per defendant absent the Rigases obtaining access to more money. Ex. 20 at ¶33.

280.    Much of the Rigases' funds available for counsel went to efforts in the bankruptcy court to obtain additional funds for their defense. Ex. 20 at ¶34.

281.    The three law firms representing the Rigases in their criminal case retained Navigant Consulting in January 2003. Ex. 76, Maloney Decl. (Sept. 30, 2011), at ¶2.

282.    Navigant was retained to, among other things, review documents in the Rigases' criminal case. Ex. 76 at ¶3.

283.    According to the Managing Director in the Disputes and Investigations practice of Navigant, Navigant was asked to review a "small subset of what [he] recall[s] to be over 400 CDs containing documents relevant to the case produced by the government." Ex. 76 at ¶4.

284.    Navigant was only asked to review a small subset because the Rigases would review the remaining documents themselves in order to save money. *See* Ex. 76 at ¶5.

285.    The Rigases and their non-professional review team were forced to conduct a page-by-page review in a non-searchable format using an unsophisticated coding system. Ex. 20 at ¶37.

286.    The Rigases and their team also reviewed hundreds of boxes of hardcopy documents. Ex. 20 at ¶38.

287.    The Rigases asked Navigant initially to use a small review team (about three full-time professionals) to lower cost. Ex. 76 at ¶10.

288.    Once the Rigases received funding from the bankruptcy court, Navigant expanded its team to 10-20 professionals. Ex. 76 at ¶12.

289.    According to Navigant's Managing Director Michael Maloney: "[I]f Navigant had been given a larger budget at the commencement of our Engagement, we were in a position to add, and would have added, additional skilled professional resources to our team. Had that occurred, I believe the review of documents in the case from the commencement of our Engagement until August 2003 likely may have been much more productive and effective." Ex. 76 at ¶11.

290.    The Rigas personal, non-Navigant review team was of a "modest size" according to the Navigant Managing Director. Ex. 76 at ¶7.

291.    Many of the documents that Navigant reviewed could only be reviewed on a page-by-page basis because they were in .TIFF format. Ex. 76 at ¶6.

292.    The documents in the Government's CD Production were not searchable. Ex. 76 at ¶6.

293.    Based on the condition of the government's production, the resulting cumbersome review process, and the Rigases' review team taking on most of the review, the Managing

Director of Navigant said that in his view, "the Government CD Production was likely not adequately reviewed in preparation for the criminal trial (which began in early 2004)." Ex. 76 at ¶ 7.

294.    If the government production of documents had been searchable and capable of "coding," review could have been more effective. Ex. 76 at ¶ 8.

295.    Close to the criminal trial, Buchanan Ingersoll made large document productions that, in Michael Maloney's opinion (a Managing Director at Navigant), "[were] not adequately reviewed in preparation for the criminal trial." Ex. 76 at ¶ 9.

296.    Many of the documents provided by Buchanan Ingersoll were not provided until two-to-three months before trial and were not reviewed by anyone. Ex. 20 at ¶ 40.

297.    Some CDs provided by the government were corrupt and could not be reviewed, but the Rigases lacked the resources to follow-up. Ex. 20 at ¶ 40.

298.    Buchanan Ingersoll represented the Rigas family for many years going back to the time before Adelphia became a public company, and was therefore an important source of information relating to transactions at issue in the criminal case. Ex. 20 at ¶ 44.

299.    Buchanan Ingersoll had hundreds of boxes of hardcopy documents related to the firm's representation of the Rigases through the mid-1990s that Tim Rigas, a former Adelphia employee, and a junior associate at the Rigases' civil firm could only briefly review over a day or two. Ex. 20 at ¶ 45.

300.    Tim Rigas's trial counsel, Paul Grand, learned shortly into his representation that the Rigases had few available liquid assets with which to pay experts, consultants, and counsel, after initial retainers were exhausted, and that the Rigases' prosecution "would be historic in terms of its overall complexity and scope." Ex. 77, Grand Decl. (Oct. 3, 2011), at ¶ 4.

45

301.    From late 2002 through early 2003, the Rigases received approximately 8 million pages of documents that had to be reviewed for the Rigases' defense. Ex. 77 at ¶5.

302.    Although Grand recommended and preferred to have attorneys and an outside consultant conduct the document review, the Rigases and a team of former Adelphia employees undertook the bulk of the review due to a lack of funds. Ex. 77 at ¶6.

303.    Grand did not think the Rigases' non-professional team's review would be as complete or useful as a review conducted by counsel and consultants. Ex. 77 at ¶6.

304.    Navigant was retained in January 2003 to conduct a professional review, but even after Navigant was retained, the Rigases conducted the majority of the review of documents produced by the U.S. Attorney's Office. Ex. 77 at ¶6.

305.    In 2003, Grand learned that Adelphia and its Special Litigation Committee paid professionals for approximately 15,000 to 16,000 hours of work to create an index of Adelphia documents on an issue-by-issue basis. Ex. 77 at ¶8.

306.    The Rigases could not afford to create such an index. Ex. 77 at ¶8.

307.    The Rigases moved to compel production of that index, but their motion was denied. Ex. 77 at ¶8.

308.    Due to their lack of resources, the Rigases missed significant exculpatory documents. Ex. 77 at ¶7; Ex. 20 at ¶41.

309.    Once such document was a 1999 memorandum from James Brown to Adelphia's Board dealing with the concept of co-borrowing and explicitly disclosing to the Board that the Rigases were using co-borrowed funds for their purchases of Adelphia stock. Ex. 77 at ¶7, Ex. A.

310.    The exculpatory 1999 memorandum from James Brown was attached to letters from multiple banks indicating that the banks knew of and approved the use of the co-borrowed funds for stock purchases. Ex. 20 at ¶42.

311.    Another such document was a January 1998 memorandum from Bruce Booken to Carl Rothenberger and Paula Zawadzki memorializing a conversation with Dean Marshall regarding how the Rigases could use Adelphia credit availability to fund purchases of stock. Ex. 77 at ¶7, Ex. B; Ex. 20 at ¶43.

312.    The 1998 communication between Booken and Rothenberger was part of the Buchanan Ingersoll production. Ex. 20 at ¶43.

313.    Due to Adelphia's refusal to advance defense costs, the Rigases' attorneys could not mount a defense in the same way they would have if Adelphia had advanced fees. Ex. 20 at ¶36.

314.    The Rigases and their counsel were limited in their ability to interview third-party witnesses due to cost constraints. Ex. 20 at ¶47.

315.    Financial constraints impaired the Rigases' ability to mount an affirmative defense due in part to the amount of time necessary to prepare a witness to testify. Ex. 20 at ¶48.

316.    The Rigases' attorneys' inability to properly prepare witnesses played a critical role in Tim Rigas's decision not to testify. Ex. 20 at ¶48.

317.    Although each of the Rigas defendants had separate counsel, the Rigases' lack of funds made it cost-prohibitive to fully educate each attorney on all the issues in the case. Ex. 20 at ¶49.

318.    Consequently, for example, Tim Rigas was forced to rely on lawyers other than his own counsel to rebut the government's arguments on particular issues. Ex. 20 at ¶49.

319.    On February 18, 2004, in a bankruptcy court hearing regarding the Rigases' motion to unfreeze assets to fund their defense, Peter Fleming, one of the Rigases' criminal attorneys, indicated that the defense was "underprepared." Ex. 72, Ex. F, Hr'g Tr., *In re Adelphia Commc'ns Corp.*, No. 02-41729 (Bankr. S.D.N.Y. Feb. 18, 2004), at 115-16.

320.    Tim Rigas's criminal defense attorney, Paul Grand, said with respect to the funds the bankruptcy court made available to the Rigases in the fall of 2003 that "[h]ad this money been available earlier in the case, defense counsel could have done far more to prepare for the upcoming trial, which at that point was scheduled to begin in less than three months." Ex. 77 at ¶ 9.

### C.    The Amount of Money the Rigases Ultimately Received Was Insufficient to Remedy the Damage Caused by Their Initial Lack of Funds

321.    Counsel for the Rigases (and Navigant) billed about $4.2 million as compared to $60 million billed by Boies, Covington, and PWC through October 2003. Ex. 72 at ¶¶ 27-33.

322.    In Adelphia's 10-K filed October 6, 2005, Adelphia reported:

> *Investigation and re-audit related fees.*  We incurred costs that, although not directly related to the Chapter 11 filing, are related to the investigation of the alleged actions of Rigas Management and related efforts to comply with applicable laws and regulations. These expenses include re-audit, legal and forensic consulting fees and aggregated $125 million and $52 million for the years ending December 31, 2004 and 2003, respectively.

Ex. 81, Adelphia Commc'ns Corp., 10-K (Oct. 6, 2005).

323.    Of the $27.8 million in criminal defense funding permitted by the bankruptcy court in its two orders, the Rigases' defense counsel received a total under $14 million (about $5.1 million for Mr. Fleming's firm, $4.1 million for Mr. Grand, and $4.6 million for Navigant. Ex. 72 at ¶ 34.

324.    The funds authorized by the bankruptcy court were exhausted before the end of the end of the prosecution's case. Ex. 72 at ¶35.

325.    The criminal defense firms were owed, collectively, over $1.1 million for work completed through the date of the jury's verdict, after exhausting their retainers. Ex. 72 at ¶35.

## VI.    The Rigases' Inability to Access Witnesses Harmed Their Defense

326.    Paula Zawadzki, a Buchanan Ingersoll partner who represented Adelphia with respect to the co-borrowing agreements, understood that the co-borrowers (Adelphia and the Managed Entities) would have rights of contribution against each other if one co-borrower repaid the bank for funds used by another co-borrower. *See* Ex. 85, Zawadzki Dep., *Adelphia Commc'ns Corp. v. Deloitte & Touche, LLP*, No. 000598 (C.P. Phila. Aug. 14, 2006), at 27, 179-84.

327.    At trial, James Brown testified that he discussed with Mike Brady, among others, how Adelphia "was not reporting its true EBITDA results to the public." Trial Tr. 6234.

328.    Mike Brady, Adelphia Vice President of Financial Operations, testified at a deposition that he "certainly didn't know that [anyone was] manipulating EBITDA." Ex. 86 at 41.

329.    Mike Brady did not question whether the senior financial executives of Adelphia were doing things meant to overstate or manipulate EBITDA. Ex. 86 at 41, 52-56, 226-27.

330.    Mike Brady testified that he "knew that Scientific Atlanta and Motorola were structuring" the marketing support agreements with Adelphia and that his sense at the time was that "there [wasn't] anything wrong" with the agreements. Ex. 86 at 117-18.

331.    In the engineering department, Andrew Zorichak was responsible for producing a report detailing Adelphia's rebuilding of cable lines. Ex. 84 at ¶8.

332.     The reports included "the percentage completions" of the rebuild efforts, which "were meant only as an internal report to be used by the engineering and operations departments as an up-to-date resource on the status of the various projects that were ongoing." Ex. 84 at ¶¶ 8, 10.

333.     Zorichak "relied on the engineers in the field to submit their numbers to me on a weekly basis" to create the reports. Ex. 84 at ¶ 8.

334.     Zorichak "did not always receive all of the information from the engineers, which meant that sometimes [his] reports were not as accurate as they would have been with the information." Ex. 84 at ¶ 8.

335.     At trial, Karen Chrosniak testified that Adelphia overstated to investors its "plant rebuild" metrics (metrics regarding the progress of Adelphia's cable infrastructure projects) as compared to internal reports made by Andrew Zorichak. *E.g.*, Trial Tr. 5230-77 (testifying, for example, that Zorichak's reports showed a rebuild completion percentage more than 10% below what was reported to investors).

336.     James Brown also testified that Adelphia overstated to investors its "plant rebuild" metrics. *E.g.*, Trial Tr. 6294-97, 6336-39.

337.     Mr. Zorichak explained that he knew that the numbers in his internal reports "did not always fully capture work in progress." Ex. 84 at ¶ 8.

338.     Specifically, Mr. Zorichak's reports only captured fully completed upgrades to cable plant. Ex. 84 at ¶ 8 ("My reports only reflected the percentage of plant that had been submitted. For example, cable plant was considered rebuilt only when every single step in the rebuild process, however small, had been completed and reverse activation occurred, meaning that the cable plant had two-way capabilities. If 99% of the capital necessary to upgrade a particular cable plant had been spent, but that plant was not yet reverse activated, the internal report would

reflect 0% plant upgraded, as opposed to 99%, which would be the completion percentage in terms of dollars spent.").

339.    Mr. Zorichak was not in charge of confirming whether publicly reported rebuild completion percentages were accurate. Ex. 84 at ¶ 10.

340.    At a deposition, Dean Marshall recalled that the Board of Directors of Adelphia was aware that the Rigases were using co-borrowing facilities to generate cash to buy stock in Adelphia. Ex. 88, Dean Marshall Dep., *Adelphia Commc'ns Corp. v. Deloitte & Touche LLP* (Feb. 2, 2006), at 190.

341.    Marshall testified, "I think it was commonly understood that the Rigas family did not have liquidity sources outside of its investment in cable properties. And so its primary mechanism to raise capital for the purpose of – for any purpose was based on leveraging existing cash flow owned by their cable properties. And so I think it was commonly understood by people that were familiar with these activities that, to the extent that the Rigas family was purchasing securities of Adelphia, that the capital for those securities was coming through borrowings on these – through these credit facilities." Ex. 88 at 205.

342.    Marshall testified that Buchanan Ingersoll worked on the co-borrowing transactions. Ex. 88 at 211.

343.    Marshall did not recall Bruce Booken from Buchanan Ingersoll or anyone else indicating that there was anything improper about the Rigases using the proceeds of a co-borrowing transaction to purchase Adelphia securities. Ex. 88 at 209-11.

344.    Nobody ever told Marshall that the use of co-borrowing proceeds should be withheld from Deloitte. Ex. 88 at 244.

345.    Marshall also testified that he understood that the Rigases had the ability to pay back any of their debts to Adelphia. Ex. 88 at 94-95.

346.    At a deposition in 2014, Dean Marshall testified that he, Adelphia's Board, Buchanan Ingersoll, and Deloitte were aware that the Rigases had used co-borrowed funds to buy Adelphia stock. Ex. 90 at 31-33.

347.    At his 2006 deposition, when asked whether he held the view that there was anything inappropriate about using co-borrowed funds to buy stock, Dean Marshall testified, "I didn't have the view and I was not aware that anybody else had that view." Ex. 88 at 79.

348.    Dean Marshall was surprised by the market's reaction to Adelphia's disclosures in late March 2002 because he did not believe the disclosures regarding co-borrowing were "revelatory." Ex. 90 at 82.

349.    Dean Marshall testified that Deloitte "closely monitored" and "closely reviewed" Adelphia's accounting affecting EBITDA, including with respect to capitalization of labor. Ex. 90 at 62-63.

350.    At trial, the government elicited testimony from James Brown to prove that the Rigases fraudulently inflated Adelphia's EBITDA through, among other things, capitalization of labor. Trial Tr. at 6256, 7291, 10588-89 (testimony of James Brown and government's closing statement).

351.    When the Rigases' former counsel Larry McMichael mentioned exculpatory documents from Buchanan Ingersoll that he had discovered after the trial to AUSA Clark, AUSA Clark said the documents were not new and that "the government would have indicted Buchanan if it had one more shred of evidence against it." Ex. 72 at ¶ 47.

352.     James Brown testified at trial that Adelphia's Board was not aware that the Rigas family intended to use co-borrowing funds to purchase Adelphia securities. *See, e.g.*, Trial Tr. 6799-80, 6803.

353.     At trial, the government argued in its closing that the Rigases "misled" and "tried to trick" their attorneys and accountants, including Buchanan Ingersoll, who did not have the full information about the Rigases' relevant conduct. Trial Tr. at 10,603-04.

## VII.     James Brown Did Not Have the Funds to Mount a Defense, Influencing His Decision to Cooperate with the Government

354.     James Brown approached Tim Rigas in a panic when Adelphia advised that it would no longer pay his legal costs. Ex. 20 at ¶ 50.

355.     Mr. Brown asked the Rigas family for a loan to pay for an attorney. Ex. 20 at ¶ 50.

356.     Mr. Brown indicated that he did not believe anyone at Adelphia had done anything wrong, and believed that the charges against him were defensible. Ex. 20 at ¶ 50.

357.     Mr. Brown was concerned, however, about how he would be able to defend against charges arising out of such complex transactions without a source of funding for his defense attorneys. Ex. 20 at ¶ 50.

358.     The Rigases agreed to lend Mr. Brown $400,000 to partially cover an $800,000-$900,000 retainer. Ex. 20 at ¶ 50.

359.     In April 2013, Michael Rigas won a judgment in Pennsylvania state court based on Mr. Brown's failure to pay back the $400,000 loan. Ex. 87, Notice of Filing of Foreign Judgment.

360.     The Court "f[ound], by clear and convincing evidence, that Defendant James Brown did contract with Plaintiff Michael Rigas and Timothy Rigas to borrow $400,000.00 by an oral

contract in July of 2002 and that Defendant James Brown, in refusing to repay this unsecured loan, breached said contract." Ex. 87.

Dated: May 25, 2018                          Respectfully submitted,
                                             *Attorneys for Petitioners*
                                             *John J. Rigas and Timothy J. Rigas*

STEVEN F. MOLO                               /s/ Lawrence C. Marshall
MOLOLAMKEN LLP                               LAWRENCE C. MARSHALL
430 PARK AVENUE                              ADMITTED *PRO HAC VICE*
NEW YORK, NEW YORK 10022                     STANFORD LAW SCHOOL
(212) 607-8160                               559 NATHAN ABBOTT WAY
smolo@mololamken.com                         STANFORD, CALIFORNIA 94305
                                             (650) 723-7572
MEGAN CUNNIFF CHURCH                         lmarshall@law.stanford.edu
JORDAN RICE
ADMITTED *PRO HAC VICE*
MOLOLAMKEN LLP
300 NORTH LASALLE STREET
CHICAGO, ILLINOIS 60654
(312) 450-6700
mchurch@mololamken.com
jrice@mololamken.com

54

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 25th day of May, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all parties with an e-mail address of record who have appeared and consent to electronic service in this action.

Dated: May 25, 2018

/s/ Lawrence C. Marshall

LAWRENCE C. MARSHALL, ESQ.
ADMITTED *PRO HAC VICE*
STANFORD LAW SCHOOL
559 NATHAN ABBOTT WAY
STANFORD, CALIFORNIA 94305
(650) 723-7572
lmarshall@law.stanford.edu

*Attorney for Petitioners*