# Exhibit 2

0091-4169/06/9602-0397
THE JOURNAL OF CRIMINAL LAW & CRIMINOLOGY Vol. 96, No. 2
Copyright © 2006 by Northwestern University School of Law Printed in U.S.A.

# IN ENRON'S WAKE: CORPORATE EXECUTIVES ON TRIAL

KATHLEEN F. BRICKEY*

*There may never have been a worse time to be a corporate criminal.*[1]

*I wish we had never heard of Bernie Ebbers.*[2]

## I. INTRODUCTION

It was December, 2001—a few months after Enron CEO Ken Lay was warned of an "elaborate accounting hoax"[3] that had disguised fraud on a magnificent scale, and not long after Enron had publicly disclosed record fourth quarter shortfalls. Notwithstanding these dire financial straits, Enron executives behaved like pigs at the trough, doling out more than $100 million in bonuses to themselves and delivering the checks by plane on the eve of the largest corporate bankruptcy filing in United States history.[4] It soon became evident that Enron's collapse was only the first in a wave of accounting fraud scandals that would inflict huge financial losses and erode public confidence in the nation's financial markets.

Fast forward to December, 2005. Ken Lay and two other top Enron executives, former President and CEO Jeff Skilling and Chief Accounting

---

* James Carr Professor of Criminal Jurisprudence, Washington University School of Law. I am grateful to Jim Brickey for his inspiration and unflagging support, and to Darren Grady and Barry Wormser for their able research assistance.

[1] Shawn Young & Peter Grant, *More Pinstripes to Get Prison Stripes*, WALL ST. J., June 20, 2005, at C1.

[2] Suzanne Craig, *Citigroup Quells Investor Claim over Research: Panel Rejects Charge That Analyst Misled Client on WorldCom Stock; Victory Highlights Trend on Street*, WALL ST. J., Dec. 8, 2005, at C1 (quoting Citigroup CEO Charles Prince).

[3] Anonymous Memorandum from Sherron Watkins, Vice President of Corporate Development, Enron, to Kenneth Lay, Chairman, Enron (Aug. 15, 2001) [hereinafter Anonymous Watkins Memorandum] (on file with author).

[4] Official Employment-Related Issues Comm. of Enron Corp. v. Arnold (*In re* Enron Corp.), No. 01-16034, at 20 (Bankr. S.D. Tex. Dec. 9, 2005) (Mem.) (on file with author). The bankruptcy court later determined that many of these transfers were fraudulent and ordered the money returned. *Id.* at 98.

Officer Richard Causey, were then under indictment and only a month away from their criminal trial.[5] But here, the customary pretrial courtroom maneuvers were embellished by Lay's strategic effort to regain public relations momentum.

Speaking before a group of 500 Houston business and academic leaders, Lay blamed Enron's downfall on a handful of bad apples[6] and—perhaps borrowing a leaf from Mark Twain's album[7]—claimed that most of what had been said about Enron's demise was either "grossly exaggerated" or just plain wrong.[8] Moreover, he charged, the Enron Task Force, which spearheads Enron-related investigations and prosecutions, had unleashed a "wave of terror" through the relentless pursuit of innocent businessmen, the bullying of witnesses, and a host of other prosecutorial excesses.[9]

Following closely on the heels of Lay's highly charged speech, co-defendant Rick Causey rearranged the legal landscape for the trial by striking a deal with the prosecutors and agreeing to cooperate.[10] Former

---

[5] The charges against Lay were far more limited than those against his co-defendants and former colleagues Jeff Skilling (former Enron President and CEO) and Rick Causey (former Enron Chief Accounting Officer). *See* Indictment, United States v. Causey, CRH-04-25 (S.D. Tex. Jan. 21, 2004) (on file with author).

[6] But for "the illegal conduct of less than a handful of employees," he charged, Enron would not have needed to seek protection in bankruptcy. Kenneth L. Lay, Speech, "Guilty, Until Proven Innocent" (Dec. 13, 2005) [hereinafter Lay Speech] (on file with author).

[7] After the American press mistakenly published his obituary, Twain sent a cable from London declaring that "reports of my death are greatly exaggerated." THE NEW DICTIONARY OF CULTURAL LITERACY 137 (E.D. Hirsch, Jr. et al. eds., 2002).

[8] "Most of what was and is still being said . . . is either grossly exaggerated, distorted, or just flat out false." Lay Speech, *supra* note 6.

[9] *Id.* In taking this stance, he joined a chorus of other Justice Department critics who had been caught up in the prosecutorial net. *See, e.g.*, Jonathan D. Glater, *Indictment Broadens in Shelters at KPMG*, N.Y. TIMES, Oct. 18, 2005, at C1 (quoting defense lawyers representing two of seventeen defendants in the KPMG tax shelter prosecution, who charged that prosecutors are taking "a misguided, overly aggressive, unprecedented view of a complicated legal area" and are "seriously overreaching" in bringing the charges); *HealthSouth: Scrushy Enters Not Guilty Plea to Charges He Bribed Governor*, CHI. TRIB., Oct. 29, 2005, at C2 (reporting that Richard Scrushy's lawyer claimed that Scrushy's indictment for political bribery was a product of overzealous prosecutors); Gretchen Ruethling, *Four Additional Charges for Black in Hollinger Case*, N.Y. TIMES, Dec. 16, 2005, at C4 (quoting Conrad Black's lawyer, who characterized new charges against his client as "unfounded" and "a blatant example of overreaching by the prosecutor"); Press Release, Arthur Andersen, LLP, Statement by Arthur Andersen, LLP (Mar. 14, 2002) (asserting that prosecution of the accounting firm would be unjust and "an extraordinary abuse of prosecutorial discretion") [hereinafter Andersen Mar. 14 Press Release] (on file with author).

[10] John R. Emshwiller & John M. Biers, *Enron Prosecutors Gain New Ally: Causey Plea May Offer Look into Top Officers' Actions Before Company's Collapse*, WALL ST. J., Dec. 29, 2005, at A3.

Enron Treasurer Andy Fastow, who was widely credited with engineering much of the Enron fraud, had already pled guilty and been cooperating for more than a year.[11] Causey's last minute defection, while not widely anticipated, was not without precedent. Surprise plea agreements reached on the eve of the Rite Aid trial, for example, left Rite Aid's Chief Legal Officer holding the bag.[12]

It is axiomatic that most criminal cases are resolved through guilty pleas, and the recent corporate fraud prosecutions are no exception. And, like Fastow and Causey, most corporate executives who have pled guilty have also become cooperating witnesses, agreeing to help the government build criminal cases against their former colleagues and friends.

I have written elsewhere about this building block technique and how it facilitates charging higher-ups like Skilling and Lay.[13] But this article turns to that rarer phenomenon of post-Enron prosecutions—cases that have actually gone to trial.

We know relatively little about the corporate fraud trials because executives on trial have been relatively few and far between. It has taken roughly three years for these prosecutions to reach the trial stage and yield enough trial-related data to report and analyze.[14] Thus, until now, our

---

[11] Lay publicly placed most of the blame for Enron's woes at Fastow's feet. Lay Speech, *supra* note 6. Since Fastow had been accused of reaping enormous profits from the fraud and Causey had not, the addition of Causey to the prosecution's team was a strategic government home run. In addition, there was some suggestion that the defense lawyers would try to smear Fastow in the jury's eyes by introducing evidence of pornography habits "so extensive that when his computer files were seized they were submitted to the FBI for criminal investigation." Carrie Johnson, *Lawyers Take Aim at Enron Witnesses*, WASH. POST, Jan. 10, 2006, at D3 (quoting unspecified court filings submitted by the defense).

[12] *See infra* Appendix 1, at Rite Aid; *see also Ex-Chief Pleads Guilty in RiteAid Case*, N.Y. TIMES, June 18, 2003, at C10; *2 Defendants in Rite Aid Case Expected to Plead Guilty Today*, N.Y. TIMES, June 26, 2003, at C6; *Former Rite Aid Office Pleads Guilty*, N.Y. TIMES, June 6, 2003, at C4; Mark Maremont, *Rite Aid's Former Vice Chairman Doesn't Plead Guilty as Expected*, WALL ST. J., June 27, 2003, at A8; Mark Maremont, *Rite Aid's Ex-CEO Pleads Guilty: Grass Is First Executive Held Criminally Liable in Major Accounting Fraud*, WALL ST. J., June 18, 2003, at A3; *cf. Ex-Lawyer for Rite Aid Is Found Guilty*, N.Y. TIMES, Oct. 18, 2003, at C2; *Rite Aid Ex-Counsel Is Convicted: Guilty Verdict Marks First by a Jury in Current Crop of Corporate Scandals*, WALL ST. J., Oct. 20, 2003, at C8.

[13] Kathleen F. Brickey, *Enron's Legacy*, 8 BUFF. CRIM. L. REV. 221, 263-75 (2004) [hereinafter Brickey, *Enron's Legacy*]; Kathleen F. Brickey, *From Enron To WorldCom and Beyond: Life and Crime After Sarbanes-Oxley*, 81 WASH. U. L.Q. 357, 370-75 (2003) [hereinafter Brickey, *Enron to WorldCom and Beyond*].

[14] In Brickey, *Enron's Legacy*, *supra* note 13, at 275, I examined the criminal enforcement environment and explored some of the principal characteristics of major corporate fraud prosecutions, including parallel civil and criminal enforcement activity, charging practices in criminal cases, and disposition of criminal charges. As few cases had

knowledge about these trials has been largely anecdotal. But after a brief hiatus following Arthur Andersen's obstruction of justice conviction in 2002,[15] high profile executives began to find themselves in the dock—beginning with Adelphia CEO John Rigas (guilty), WorldCom CEO Bernie Ebbers (guilty), HealthSouth CEO Richard Scrushy (not guilty),[16] and Enron CEOs Jeff Skilling and Ken Lay (currently on trial).

Now that we are deeply enough into the prosecution cycle that major cases have been tried, jury verdicts returned, and sentences imposed, this seems an opportune time to take a closer look at these prosecutions through the prism of newly compiled data on the trials. Although the number of cases is relatively small, the data set provides the most comprehensive picture of executives on trial available to date.

Part II of this article addresses a range of questions about corporate fraud trials and verdicts. Which and how many cases have gone to trial, who has been tried, and what is a typical outcome? Does the government enjoy a high degree of success at trial, or are high-profile executives more likely to win juries over to their side? Part II addresses these and other core trial-related questions.

Part III then turns to the flip side of the coin—cases that have ended in mistrials—and considers whether mistrials have been major government setbacks. How often have mistrials been declared? What factors come into play when a trial ends without a verdict? Were cases that ended in mistrials flawed from the outset? Are prosecutors' decisions about whether to retry a defendant a reliable gauge of the relative strength of the case? Are decisions to retry accompanied by discernable shifts in trial strategy? Part III provides a framework for taking a preliminary look at this intriguing set of issues.

---

yet gone to trial at that time, the dispositions consisted primarily of guilty pleas, with a smattering of verdicts, mistrials, and dismissals.

[15] After a month-long trial, Andersen was convicted on the single count indictment charging the firm with violating 18 U.S.C. § 1512(b)(2) (2000). United States v. Arthur Andersen, LLP, 374 F.3d 281, 284 (6th Cir. 2004), *rev'd*, 125 S. Ct. 2129 (2005); *see* Kathleen F. Brickey, *Andersen's Fall from Grace*, 81 WASH U. L.Q. 917 (2003). The Supreme Court later reversed, holding that the trial court's instructions did not correctly inform the jury of the mens rea required to prove a violation of 18 U.S.C. § 1512(b). Arthur Andersen, LLP v. United States, 125 S. Ct. 2129, 2136-37 (2005). The government ultimately decided not to retry the now-defunct firm and did not object to a motion made by David Duncan, the government's star cooperating witness in the Andersen case, to withdraw his guilty plea. John R. Emshwiller, *Andersen Figure Files to Withdraw His Guilty Plea*, WALL ST. J., Nov. 23, 2005, at C3.

[16] Scrushy has since been indicted on unrelated federal political bribery charges and is now awaiting trial. Milt Freudenheim, *Scrushy Faces New Charges of Bribing State Officials*, N.Y. TIMES, Oct. 27, 2005, at C18.