# Exhibit 63

# ⊁Adelphia

# MEMORANDUM

**TO:**     Audit Committee

**FROM:**   Scott Macdonald

**DATE:**   December 10, 2004

**RE:**     10A Report

**Cc:**     Vanessa Wittman, Luci Altman, Donnell Heistand,
           Tom Garrett (PwC)

Attached please find a final draft of the 10A Report. For your reference, the 10A Report represents the summary of the investigation into whether illegal acts occurred at Adelphia during the fiscal years ended December 31, 1999, 2000 and 2001 and January through May 2002 (the "Relevant Time Period"). To the extent a determination has been made that illegal acts occurred during the Relevant Time Period, this Report indicates the nature and scope of the illegal activity, the possible effects of the illegal acts on the Company's financial statements and the remedial actions the Company has taken.

The 10A Report has numerous attachments; pursuant to my conversations with Ken Wolfe, we have included for your review the exhibit number listing and our restatement issue summary matrix (Exhibit 4). We have not included the other exhibits as you have already seen certain of them (e.g., Corporate Governance Guidelines, Code of Ethics, etc.) or they are summarized in the 10A Report in some detail (e.g., restatement issue summaries).

As discussed at the December 1, 2004 Audit Committee Meeting, please review the report as we would like to obtain your approval of the report at the December 17, 2004 Telephonic Audit Committee Meeting. Your approval of the 10A Report is necessary prior our filing of our Annual Report on Form 10-K. Please don't hesitate to contact Luci Altman (303) 268-6320 or myself (303) 268-6370 if you have any questions.



EXHIBIT
D 116
9·28·07   JEH
PENGAD 800-631-6989

WF&G Draft 12/10/04
Attorney-Client Communication
Attorney Work Product
Privileged and Confidential

I.    Executive Summary

   A.    Introduction – The Investigation

        This Report stems from an investigation undertaken to determine whether illegal acts occurred at Adelphia Communications Corporation (the "Company," "Adelphia" or "ACC") during the fiscal years ended December 31, 1999, 2000 and 2001 and January through May 2002 (the "Relevant Time Period"). There were two main components of this investigation, first, the investigation undertaken by Covington & Burling ("Covington") at the behest of the Special Committee of the Board of Directors (the "Covington Investigation") which was conducted primarily from May 2002 to March 2003, and second, an examination of the Company's books and records performed in connection with the restatement of the Company's financial statements for the fiscal years ended December 31, 1999 and 2000 and the preparation of its audited financial statements for the years ended December 31, 2001, 2002 and 2003 (the "Books and Records Investigation"). To the extent a determination has been made that illegal acts occurred during the Relevant Time Period, this Report indicates the nature and scope of the illegal activity, the possible effects of the illegal acts on the Company's financial statements and the remedial actions the Company has taken.

        The Covington Investigation set out to investigate a broad range of accounting and disclosure problems and related party transactions between the Company and Rigas family members and entities that may have operated to the detriment of Adelphia. Covington conducted numerous interviews and reviewed approximately 3,000 boxes of documents. The Covington Investigation found that misconduct had occurred. The existence of at least such misconduct confirmed the existence of significant deficiencies in the Company's system of internal control.

        The Books and Records Investigation identified material misstatements in the Company's previously issued financial statements. As part of this investigation, the Company produced "Issue Summaries" which address each of the accounting items identified in the Covington Report or during the Books and Records Investigation that potentially require correction in the Company's restated financial statements. An index (the "Matrix") to these "Issue Summaries" has been prepared. The Matrix contains a description of each accounting item, a cross reference, if any, to the Covington Report and a determination as to whether the accounting item constitutes (1) a potentially illegal act, (2) a weakness in internal controls, rising to the level of a "material weakness" and/or (3) an accounting error omission. Only those activities that the Company has determined were potentially illegal are addressed in this Report.

   B.    Summary of Accounting, Financial and Other Illegal Acts

        Adelphia's investigations in the period following the resignation of members of the Rigas family from their positions as officers and directors of Adelphia, and other events, including the jury verdict of guilty returned against John J. Rigas and Timothy J. Rigas on, among other charges, bank fraud and securities fraud as described below, support a variety of allegations against Rigas management, including those described in Section III of this Report and in certain actions the Company has instituted against the Rigas family. Rigas management

PWC-EB0004863

materially misstated the Company's operating performance, levels of debt and other significant information. Rigas management failed to disclose the extent of this highly leveraged capital structure to investors, and in SEC filings by, among other deficiencies failing to report the total borrowings under the Co-Borrowing Facilities for which the Company was jointly and severally liable. Rigas management also failed to disclose that the Rigas family used a substantial portion of $2,800 million in indebtedness under the Co-Borrowing Facilities to purchase the Company's securities, and represented that the Company received cash or other consideration for such purchases when it did not.

Rigas management commingled Company funds with funds from the Rigas Entities through operation of the Cash Management System. Rigas management misused the CMS and the Rigas Entities to access money from the Company and the Company's credit for personal use. The improper operation of the CMS resulted in continuous commingling of funds among the participants in the CMS, which included Adelphia and its subsidiaries, the Rigas Entities and members of the Rigas family. Among other transactions, Rigas management allegedly misused the CMS to purchase cable and other assets for their personal benefit, including the acquisition of real estate, Adelphia debt and equity securities.

The alleged misuse of the CMS by Rigas management permitted the Rigas Entities to "settle" their debts to the Company through journal entries that, on a quarterly basis beginning in September 2000, purported to "reclassify" debt from the books of an Adelphia subsidiary to the books of one of the Rigas Entities even though the Adelphia subsidiary in fact remained jointly and severally liable for this debt even after "reclassification." Thus, Rigas management deemed the Rigas Entities to have satisfied their obligations to the Company, even though the Company was not released from the underlying debt and did not receive equivalent consideration, if any, in return.

Other improprieties allegedly committed by Rigas management included:

- failing to apply the proper accounting or provide required disclosures with respect to a variety of related party transactions, including (i) the Co-Borrowing Facilities pursuant to which certain subsidiaries of Adelphia and the Rigas Co-Borrowing Entities were jointly and severally liable, and (ii) purchases of Adelphia securities by the Rigas Entities;

- engaging in sham transactions and record keeping and other financial manipulations in order to (i) overstate revenue, understate expenses and manipulate other measures of the Company's operating results, (ii) artificially reduce reported debt and increase reported equity, and (iii) meet financial covenants of debt facilities;

- otherwise misappropriating and improperly using corporate assets; and

- covering up such misappropriations.

C.     Impact on Financial Statements

As a result of the Books and Records Investigation, the Company determined that it would record restatement adjustments to its previously issued financial statements for the years ended

PWC-EB0004864

December 31, 1999 and 2000. The overall effect of these restatement adjustments was to reduce previously reported revenue by $_____ and $_____, increase previously reported pre-tax net loss by $_____ and $_____ and decrease previously reported total assets and total liabilities and stockholders' equity by $_____ and $_____, respectively.

*update*

### D.   Remedial Actions

       Section IV of this Report discusses in detail the remedial actions the Company has taken to ensure that the alleged fraud perpetuated by the Rigases was stopped and will not re-occur. The Company has taken a number of steps that it expects will improve the effectiveness of the Company's internal control environment, including the following:

- Adelphia has appointed new members to its Board and Audit Committee such that all current members of the Board and the Audit Committee were appointed subsequent to the discovery of the alleged wrongdoing. All Board members, except the Chief Executive Officer, and all Audit Committee members are independent of the Company.

- The Board created the position of lead independent director in April 2003 in light of current best governance practices for cases where a company's chief executive officer also serves as the chairperson of the Board, as currently is the case. In December 2003, Anthony Kronman, former Dean of the Yale Law School, was elected Lead Director.

- Adelphia appointed a new Chairman and Chief Executive Officer during the first quarter of 2003, a new Chief Financial Officer and a new Chief Accounting Officer during the first half of 2003 and a new General Counsel in July 2003.

- Adelphia created a Corporate Governance and Nominating Committee which assists the Board by: (i) recommending to the Board, carrying out and maintaining the Company's corporate governance policies and processes; (ii) identifying qualified individuals for membership on the Board and its committees; (iii) recommending the composition and procedures of the Board and its committees; and (iv) assessing the effectiveness of the Board and its committees.

- Adelphia has adopted a revised charter for the Audit Committee and a new charter for the Corporate Governance and Nominating Committee.

- The Board has established the new Code of Ethics to include company-wide principles for maintaining the integrity of the Company's compliance, accounting and reporting systems. The Code of Ethics has been disseminated to all Company employees, and employees are required to certify their agreement to abide by the Code of Ethics.

- Adelphia has adopted a whistleblower policy and has established a reporting process for employees by telephone hotline, e-mail, facsimile or physical address. Adelphia's General Counsel serves as Corporate Governance Officer and along with the Vice President of Internal Audit reports whistleblower concerns directly to the Audit Committee of the Board.

PWC-EB0004865

- Adelphia has established a Disclosure Committee, consisting of senior executives from the Company's operating, finance and legal groups. The Disclosure Committee was established to assist in the administration of disclosure controls and procedures with respect to the Company's public disclosures, including SEC filings.

- The Company has reorganized and restructured its accounting department. The Company has:

  - replaced substantially all of the senior finance and accounting employees;

  - implemented a new organizational structure in the department; and

  - segregated duties to mitigate the risk of any one employee being able to manipulate financial transactions or to falsify the entry, approval or reconciliation of accounting records.

- The Company has also established policies and procedures that are intended to ensure that the resolution of accounting issues are supported by appropriate documentation and approval.

- The Company significantly expanded the resources devoted to the Company's internal audit function and has revised internal audit reporting lines such that the Vice President of Internal Audit now reports directly to the Audit Committee. The Company hired a Vice President of Internal Audit in September 2003 who undertook a review of the existing internal audit function and established revised audit scopes, policies, methods and procedures. Subsequently, the internal audit group completed a comprehensive company-wide risk assessment in January 2004 and is in the process of updating the risk assessment for 2005. Internal audit identified business processes that were qualitatively and/or quantitatively of higher risk and implemented a risk-based audit plan, including status assessments of previously identified unresolved internal control deficiencies.

- The Company has performed a review and analysis of all general ledger accounts from December 1998 through December 2003, and implemented new or revised accounting policies and procedures designed to comply with GAAP, rules and regulations of the SEC and, where applicable, cable industry practice.

- The Company has completely revised its policies and procedures with respect to the capitalization of labor, materials and overhead costs associated with construction and installation activities. The Company has implemented a centralized organization for counting and reporting subscribers to ensure proper controls and consistent practices across all regions.

- The Company continues to work to improve its internal control. In this regard, we are currently in the process of completing our documentation and testing requirements under Section 404 of the Sarbanes-Oxley Act of 2002. The majority of the documentation, testing and identification of remediation items have been completed, with the remainder expected to be completed during the first quarter of 2005. Based on its preliminary assessments to date,

- 4 -

PWC-EB0004866

the Company believes that it will have, as of December 31, 2004, one or more material weaknesses in its internal control report over financial reporting.

### E. Individual Conduct

During the course of the investigation, the Company evaluated the conduct of certain current and former Company employees to assess their involvement in the activities discussed in this Report including the degree of fault, if any, for the instances of erroneous and improper accounting at the Company during the Relevant Time Period. In addition, with respect to those employees still employed by the Company after March 1, 2003, current management has also assessed their role, if any, in the restatement and re-auditing process, the quality and accuracy of their work, the level of cooperation they provided as part of the restatement effort and whether their work has compromised the restatement. Section V of this Report also addresses corrective actions the Company has undertaken to ensure that employees are properly trained and supervised.

## II. Introduction

This Report stems from an investigation undertaken to determine whether illegal acts occurred at Adelphia Communications Corporation (the "Company," "Adelphia" or "ACC") during the fiscal years ended December 31, 1999, 2000 and 2001 and January through May 2002 (the "Relevant Time Period"). There were two main components of this investigation, first, the investigation undertaken by Covington & Burling ("Covington") at the behest of the Special Committee of the Board of Directors (the "Covington Investigation"), and second, an examination of the Company's books and records performed in connection with the restatement of the Company's financial statements for the fiscal years ended December 31, 1999 and 2000 and the preparation of its audited financial statements for the years ended December 31, 2001, 2002 and 2003 (the "Books and Records Investigation"). The scope of each of these investigations is outlined below. To the extent a determination has been made that illegal acts occurred during the Relevant Time Period, this Report indicates the nature and scope of the illegal activity, the possible effects of the illegal acts on the Company's financial statements and the remedial actions the Company has taken. Capitalized terms used but not defined herein have the meanings ascribed to them in the Covington Report.

### A. Background: The Special Committee of the Board of Directors

On March 6, 2002, a Special Committee (the "Special Committee") was appointed by the Board of Directors of the Company (the "Board"), consisting of independent directors Leslie Gelber, as Chairman and Messrs. Erland Kailbourne and Dennis Coyle. Its mandate was to review and make recommendations to the Board concerning financial arrangements between the Company and Adelphia Business Solutions, Inc. ("ABIZ"), a company that had been "spun-off" from Adelphia on January 11, 2002, and a majority of whose voting shares were held by Rigas family members or entities controlled by them. John Rigas and his sons Timothy, Michael and James, all of whom served as directors of Adelphia, also were

PWC-EB0004867

executive officers and directors of ABIZ, as were Messrs. Peter Venetis, John Rigas' son in-law, and Pete Metros.[1]

By the end of March 2002, significant questions had emerged regarding Adelphia's disclosure and reporting of debt that had been allocated to the Rigas family entities. These borrowings were made pursuant to the Co-Borrowing Facilities (as defined below). On March 27, 2002, in a footnote to its 2001 earnings announcement, Adelphia disclosed for the first time the extent of the co-borrowing allocated to the Rigas family entities, stating the amount as approximately $2.3 billion.[2]

On March 29, 2002, Covington was hired by the Special Committee to provide counsel with respect to ABIZ, and, as the Special Committee's concerns grew, in regard to other relationships between the Company and the entities controlled by members of the Rigas family.[3] On May 15, 2002, the charter of the Special Committee was widened to include an investigation on a broad range of accounting and disclosure problems and related party transactions between Adelphia entities and Rigas family members and entities that may have operated to the detriment of Adelphia, and the Special Committee requested Covington to conduct an investigation on its behalf.[4] During the month of April, the United States Attorney's Offices for the Southern District of New York and the Middle District of Pennsylvania served the Company with grand jury subpoenas. On May 16, 2002 Covington began its investigative work on behalf of the Special Committee. It retained the firm of Urbach Kahn & Werlin ("Urbach Kahn"), which served as forensic accountants until approximately the end of June 2002 in order to assist in the initial phases of the investigation, and worked with forensic accountants from PricewaterhouseCoopers LLP ("PWC Forensic") which was engaged in an analysis of the Company's books and records.

Covington investigated these transactions and prepared a draft summary of its investigation (the "Covington Report").

B.    First Steps

1.    Resignations of the Rigas Family and the Rigas Family Agreement

As the alleged improprieties of the Rigas family continued to come to light, the Special Committee obtained the resignations of the Rigas family members from their positions at Adelphia. On May 15, 2002, Adelphia announced that John Rigas agreed to resign as President and Chief Executive Officer of ACC and to step down as Chairman of the Board. At that time, Erland Kailbourne assumed the position of Chairman and became ACC's interim Chief Executive Officer. On May 16, 2002 Adelphia announced that Timothy Rigas agreed to resign

---

[1]    Messrs. Venetis and Metros also served on Adelphia's Board of Directors.

[2]    See Covington Report at 2.

[3]    Id. at 3.

[4]    Id. at 3.

PWC-EB0004868

as Executive Vice President, Chief Financial Officer, Chief Accounting Officer and Treasurer. As further evidence of the Rigas' alleged improper acts were uncovered, by agreement dated May 23, 2002 (the "Rigas Family Agreement"), the Special Committee obtained the agreement of John, Tim, Michael and James Rigas to resign from all of their remaining positions as officers and directors of ACC.  The Rigas Family Agreement also provides that, among other things:  (1) the Rigas family members may designate two non-family members to be appointed to the Board until the earliest of December 31, 2006, the sale of entities owned by the Rigas family that operate cable systems and are managed by the Company (the "Managed Cable Entities") and the repayment of the Rigas family's obligations; (2) free cash flow from the Managed Cable Entities will be used to support the Rigas family's obligations under the Co-Borrowing Facilities; (3) ACC debt held by the Rigas family, totaling approximately $567 million, will be transferred to ACC in exchange for satisfaction of the $202 million obligation of the Rigas family under existing stock purchase agreements and a transfer to ACC of primary liability for approximately $365 million under the Co-Borrowing Facilities; (4) certain Managed Cable Entities selected by Adelphia will be transferred to ACC or to a third party designated by ACC in exchange for (a) payments equal to the taxes owed by the Rigas family as a result of such transfer and (b) a reduction in the amount of the family's primary obligations under the Co-Borrowing Facilities in an amount equal to the difference between the transferred Managed Cable Entities' appraised value and the amount of related taxes incurred; (5) all ACC stock owned by the Rigas family will be placed in a voting trust until all obligations of the Rigas family to ACC for loans, advances or borrowings under the Co-Borrowing Facilities or otherwise are satisfied; (6) ACC will provide indemnification to members of the Rigas family (pursuant to the ACC Bylaws and Delaware law) as long as Rigas family members undertake to repay ACC pursuant to the ACC Bylaws; (7) all ACC common stock and preferred stock held by the Rigas family will be pledged to ACC as security for (a) the balance of the Rigas family's obligations to the lenders under the Co-Borrowing Facilities and (b) the undertaking to repay ACC for indemnification payments; (8) all equity interests in the Managed Cable Entities will be pledged to ACC as security for the obligations of the Rigas family to ACC under the Co-Borrowing Facilities and other obligations to ACC; and (9) subject to certain exceptions (including that the severance arrangements will terminate if John Rigas is convicted of a felony), ACC will honor its commitment to make the following severance arrangements for John Rigas with (a) cash compensation of $1.4 million per year for three years, (b) healthcare coverage for him and his wife for the remainder of their lives, (c) the use of an office, computer and telephone equipment and secretary, (d) vested stock options exercisable for their term and (e) the use of ACC's planes for emergency purposes as available and as authorized by ACC.  As of the date of this Report, Adelphia has not assumed or rejected the Rigas Family Agreement (to the extent such agreement is executory).

2.      Termination of Senior Management

        As the Special Committee's investigation unfolded, certain employees were identified as having knowingly participated in alleged improper activities and the Special Committee and interim management took steps to evaluate each employee's conduct.  At the government's request some of these employees were first placed on administrative leave before

PWC-EB0004869

being terminated by the Company.[5]  Between May 2002 and December 2002, the Company terminated, among others, substantially all of the members of senior management in the Accounting and Finance Departments (exclusive of members of the Rigas family).  The conduct and evaluation of these individuals is discussed in Section V(B) of this Report.

### 3.   Dismissal of Deloitte & Touche

Adelphia dismissed Deloitte as its independent auditors on June 9, 2002.  Based on Adelphia's decision to restate certain of its historical financial statements, Deloitte subsequently withdrew the audit report it had issued with respect to Adelphia's financial statements.  In November 2002, Adelphia brought an action against Deloitte for professional negligence, breach of contract, aiding and abetting breach of fiduciary duty, fraud, negligent misrepresentation and contribution in connection with its work auditing Adelphia's financial statements during the time of the Rigas family's alleged wrongdoing, and this action is currently pending.

### C.   Scope of the Covington Investigation

The Covington Investigation was primarily conducted from May 2002 through March 2003.  As more fully detailed in the Covington Report,[6] Covington lawyers interviewed more than 100 witnesses, a significant number of them more than once.  Among those interviewed were:  the Company's accounting, financing, tax, operations and labor relations departments, construction personnel, its in-house legal department, the four independent directors, Peter Venetis, attorneys at the law firm of Buchanan Ingersoll (which served as Adelphia's corporate counsel with respect to many of the matters investigated), former assistants to the Rigas family members, other former employees, and a number of individuals not employed by the Company.  A list of these individuals is included as Exhibit 1 to this Report.  Covington also made use of a series of interviews conducted by Fried, Frank, Harris, Shriver & Jacobson ("Fried Frank") during April and May 2002, as well as Fried Frank summaries of meetings.[7]  Those interviewed included Timothy and James Rigas, James Brown, Michael Mulcahey, and a number of other Adelphia employees for whom access later became restricted.

As part of its investigation, Covington reviewed what it estimates to be the equivalent of more than 3,000 boxes of Company documents, electronic files, and other media.  In addition, it reviewed selected files that were retrieved from the imaged local computer drives of 24 current or former Adelphia employees.  A list of these individuals is included on Exhibit 2 to this Report.  As discussed in more detail in the Covington Report, these documents and

---

[5]     The individuals placed on administrative leave were Dean Marshall (Director of Finance); Karen Chrosniak (Director of Investor Relations), Timothy Werth (Director of Accounting), Luke Healy (Regional Budget Director and Former Director of Accounting), Douglas Malone (Director of External Reporting) and James Helms (Treasury Manager).

[6]     Id. at 5ff.

[7]     Fried Frank was retained by the Company with respect to the Securities and Exchange Commission investigation that was opened after the March 27, 2002 disclosure discussed above.

PWC-EB0004870

materials were selected for collection by Fried Frank (and ultimately by Covington for review) in response to various government subpoenas of considerable breadth that Adelphia had received.[8] All of these materials were produced to either the SEC, the United States Attorney's Office for the Southern District of New York or the United States Attorney's Office for the Middle District of Pennsylvania in response to those subpoenas. Covington reviewed this large volume of produced materials for their pertinence to the particular issues that had been identified for investigation and segregated them by issue into more than 500 issue binders.

      In identifying the issues that are the subject of the Covington Report, Covington not only interviewed the employees that are discussed in Section V of this Report, but also reviewed a vast amount of material from these individuals' personal files.

D.    The Books and Records Investigation

      In connection with the efforts to restate its financial statements for the fiscal years ended December 31, 1999 and 2000 and the preparation of its audited financial statements for the years ended December 31, 2001, 2002 and 2003, the Company has undertaken a comprehensive examination of its books and records. This examination included a review and analysis of all general ledger accounts from December 1998 through December 2003. The Company also reviewed the December 1998 balance sheet accounts to determine an accurate starting point for the restatement efforts. As part of the examination, all accounts were compared to supporting documentation and adjustments were recorded as necessary. In addition to the potentially wrongful or questionable accounting matters identified in the Covington Report, the Company has identified additional potential accounting or disclosure errors. The Company has produced "Issue Summaries" which address each of the accounting items identified in the Covington Report or during the Books and Records Investigation that potentially require correction in the Company's restated financial statements, a copy of which is attached hereto as Exhibit 3. In addition, attached hereto as Exhibit 4 is an index to the Issue Summaries (the "Matrix"). The Matrix contains a description of each accounting item, a cross reference, if any, to the Covington Report and a determination as to whether the accounting item constitutes (1) a potentially illegal act, (2) a weakness in internal controls, rising to the level of a "material weakness" and/or (3) an accounting error or omission. The criteria used to make these determinations is described in Section III of this Report.

      As part of the Books and Records Investigation, the supporting documentation (e.g., work papers) created by the individuals discussed in Section V was reviewed and discussed. These reviews and discussions, combined with the information contained in the Covington Report and the underlying process by which it was obtained, have assisted current management with the assessment of the level of complicity, if any, of each individual in the wrongful or questionable practices and transactions. Furthermore, with respect to the individuals who are still employed by Adelphia, current management has had over a year to assess each employee's work product and approach to practice.

---

[8]    See Footnote 7 to the Covington Report at 8.

-9-

PWC-EB0004871

E.     Additional Document Review

In addition to the Covington Investigation and the Books and Records Investigation, the Company and its counsel have reviewed various legal documents, public filings, corporate documents, minutes of meetings of the Board of Directors, and such other documents as it deemed necessary to ensure that all issues required to be addressed by this Report have been examined.[9]

F.     Summary

Given the vast amount of material reviewed by Covington and the Company in the course of their respective investigations, the Company believes that it has appropriately identified and detailed the potential illegal acts that may have occurred during the Relevant Time Period.  The Company also believes that by conducting such an examination, it has been able to assess certain employees' conduct in the potential illegal acts and has made appropriate determinations regarding their retention with the Company.  Furthermore, new management has overhauled the Company's system of internal controls and implemented numerous corporate governance changes which are described more fully in Section IV of this Report.

III.     Summary of Accounting, Financial & Other Alleged Illegal Acts

A.     Cash Management System and Co-Borrowing Facilities

1.     Summary of the Cash Management System

Adelphia uses and historically has used a centralized cash management system, ("CMS"), that controls substantially all cash transactions of the Company and its affiliates, including certain managed entities owned by the Rigas family (including their cable companies and other non-cable entities).  The CMS is the central repository for all cash generated from operations or otherwise obtained through debt financings or other investment activities.  In addition, the CMS is used to fund all payments on behalf of the Company including operating expenses, capital expenditures, debt repayments, and all inter-affiliate funding requirements.  Although the CMS commingles cash on behalf of Adelphia and its affiliates, the Company's accounting system captures all financial transactions by cost center in order to prepare separate financial statements for each legal entity.

The structure of Adelphia's cash management platform is not unique or unusual; in fact, many companies across America effectively utilize such centralized systems.  However,

---

[9]     See Securities and Exchange Commission v. Adelphia Communications Corp., et al. (S.D.N.Y. 02 CV 5776)(Complaint filed July 24, 2002); United States v. John Rigas, Michael Rigas, Tim Rigas, James Brown, and Michael Mulcahey (S.D.N.Y. 02 CRIM 1236)(Indictment of September 23, 2002); Adelphia Communications Corp. v. Deloitte & Touche (Pa. Ct. of Common Pleas, Phil. Cty, Nov. Term 2002, No. 000598)(Complaint filed November 6, 2002); Disclosure Statement, In re Adelphia Communications Corp. et al., Case No. 02-41729 (REG) (Bankr. S.D.N.Y. Feb. 25, 2004); May 24, 2002 Form 8-K filed by Adelphia Communications Corporation; June 10, 2002 Form 8-K filed by Adelphia Communications Corporation; February 28, 2003 Form 8-K filed by Adelphia Communications Corporation.

- 10 -

PWC-EB0004872

at Adelphia there was both commingling in the CMS of Adelphia and Rigas Entity (as defined herein) funds coupled with a complete lapse of internal controls and extensive management override of the accounting, procurement and disbursement functions. As addressed at length in the Covington Report,[10] the Rigases effected payment of millions of dollars to themselves and/or their personal holding companies. The Company's treasury staff was routinely directed to access the CMS to make significant wire transfer payments to or for the benefit of the Rigases with little or no supporting documentation and the accounts payable department regularly processed check disbursements directly to the Rigases or to vendors for payment of personal expenses on their behalf. In addition, Ellen Rigas Venetis and Doris Rigas had signing authority for Company bank accounts with unrestricted access to manual check stock. They were able to write a significant volume of checks on behalf of the Company for purchases that were of a questionable business nature with little or no supporting documentation.

As discussed elsewhere in this Report, Adelphia's new management team has implemented significant internal control and corporate governance improvements to prevent improper use of the CMS in the future. Specifically, the Company has:

a. introduced new limits of authority guidelines delineating employees' ability to bind the Company for certain operating and capital expenditure commitments. A copy of these guidelines is attached hereto as Exhibit 5;

b. purchased a new treasury workstation from Selkirk Financial Technologies to track and control all wire transfer payments and other cash activities in Adelphia's main bank accounts. The centralized workstation utilizes secure electronic links to communicate with financial institutions and also incorporates strong internal control policies and procedures to govern the input and approval of all wire transfer payments and access to cash activity (e.g., two approvals are now necessary to authorize any wire transfer);

c. implemented strict policies over the approval and payment of cash disbursements. All payment requests must now be accompanied by adequate supporting documentation before a check or a wire transfer is approved;

d. limited the number of employees who are authorized to sign checks and approve wire transfers (authorized individuals are now limited to any one of the Chief Executive Officer, President and Chief Operating Officer, Chief Financial Officer, Chief Accounting Officer, Sr. Vice President Finance and the Treasurer);

---

[10]   See Covington Report at 12 and 31.

- 11 -

PWC-EB0004873

e.     introduced a new purchasing card program to control purchases by field employees;

f.     implemented strict procedures over the handling and storage of manual checks to ensure access is limited to a few authorized individuals;

g.     closed over 400 bank accounts and implemented an automatic sweep of regional cash balances into the Company's main concentration accounts to more tightly control cash on a daily basis; and

h.     implemented new policies and procedures over the handling of cash by the regional offices and local field technicians.  A copy of these policies and procedures is attached hereto as Exhibit 6.

As described in the following section, an important source of funding for the CMS was the Company's ability to access certain co-borrowing facilities in which various Adelphia subsidiaries and Rigas-owned cable companies were participants.

2.     The Co-Borrowing Facilities

During the Relevant Time Period, Rigas management established three credit facilities accessible by both the Company and certain Rigas Entities (such Rigas Entities and their subsidiaries are collectively referred to as the "Rigas Co-Borrowing Entities"), of which $4,576 million in principal amount (collectively, the "Co-Borrowing Facilities") was outstanding on June 25, 2002 (the "Petition Date").  The Co-Borrowing Facilities allowed the Rigas Co-Borrowing Entities, based on the creditworthiness of the Company, to incur indebtedness beyond their ability to repay, as the Company was jointly and severally liable for all borrowing under each Co-Borrowing Facility regardless of whether the Company actually borrowed the total indebtedness.  Under the terms of each of the Co-Borrowing Facilities, each of the Rigas Co-Borrowing Entities that were co-borrowers could borrow up to the entire amount of available credit under the applicable Co-Borrowing Facility.

On March 27, 2002, the Company disclosed that it was jointly and severally liable for more than $2 billion of borrowings under the Co-Borrowing Facilities attributed to various Rigas Co-Borrowing Entities that were not reflected as debt on the Company's publicly disclosed consolidated financial statements.  A portion of the borrowings for which the Company was jointly and severally liable had been advanced to the Managed Cable Entities to finance purchases of the Company's securities by other Rigas Entities.

The Co-Borrowing Facilities provided financial support to the Rigases in two important ways.  First, the Co-Borrowing Facilities gave the Rigases access to financing that would not have been supportable solely by their own assets.  Second, the Co-Borrowing Facilities made possible a way of accounting for large scale transactions, however questionable, that avoided public disclosure of both the volume of payments to the Rigases and the way in which the Rigas' purchases of Adelphia securities were financed.

- 12 -

PWC-EB0004874

As noted above, a key feature of the Co-Borrowing Facilities was the fact that any borrower that was part of the publicly-held Company was also subject to joint and several liability for obligations incurred on behalf of the privately-held Rigas entities. By entering into these joint and several obligations with subsidiaries of the Company, the Rigases were able to leverage the Company's assets to access a much larger pool of financing. In short, the Co-Borrowing Facilities gave the Rigases access to billions of dollars of credit, the economic responsibility for which could ultimately lie with the Company.

Although the applicable Rigas Co-Borrowing Entities of the Company entered into assumption agreements dated as of May 6, 2002, pursuant to which the applicable Rigas Co-Borrowing Entities purport to confirm their previous agreement with the applicable subsidiaries of the Company to repay the amount of any borrowings that are recorded on its books, the Company has concluded that it remains fully liable to the lenders under the Co-Borrowing Facilities for the full amount of such borrowings. Accordingly, all amounts outstanding under co-borrowing arrangements have been reflected in the Company's consolidated balance sheets as of the dates that such arrangements were in effect. To the extent that amounts attributed to the Rigas Entities have been reflected in the Company's debt balances, the Company has recorded equal and offsetting increases to the amounts due from the Rigas Entities, net.

B.  Irregular Accounting and Other Disclosure Issues

The Company has attempted to determine what potentially illegal acts occurred during the Relevant Time Period. To the extent such a determination has been made, this Report describes the nature and scope of the potential illegal activity. This section summarizes these findings and summarizes the Company's accounting conclusions related to the possible irregular accounting and disclosure issues uncovered in its investigations. The enumerated items in this section each reference a particular Issue Summary (e.g., G-3). Reference should be made to the Matrix where the Issue Summary is listed, along with a reference to the Covington Report, if any, where a detailed description can be found regarding the nature and scope of the potential illegal activity. The Issue Summary reference on the Matrix also contains the Company's determination with respect to the activity identified in each Issue Summary was (1) potentially illegal, (2) resulted from a weakness in internal controls, rising to the level of a "material weakness" and/or (3) an accounting error or omission. In making this evaluation the Company applied the following criteria:

- An issue was classified as a potential illegal act if it was identified in the Covington Report or if it was determined to be so in the course of the Books and Records Investigation.

- An accounting error or omission was determined based on the appropriate application of generally accepted accounting principles applicable or analogous to the specific issue.

- all accounting errors or omissions were considered to be material weaknesses in internal controls if they result in adjustments to the account balances in the Company's general ledger.

- 13 -

PWC-EB0004875

Only those activities that the Company has determined were potentially illegal are addressed in this Report.

1.     Accounting for Rigas Entities (G-3)

The Company addressed the accounting and financial statement presentation of advances to Rigas family entities (the "Rigas Entities") during the Relevant Time Period and concluded that they should be accounted for as advances and presented as an offset to shareholders' equity in the restated financial statements. This presentation stems from the fact that significant portions of the advances were used by the Rigases to acquire the Company's equity securities. In addition, the advances have no underlying agreements, interest rates, repayment terms, or history of repayment. The advances are impaired in the period deemed uncollectible based on the estimated value of each entity's underlying assets in relation to that entity's outstanding advances.

2.     Review of Other Post Closing Entries (G-5)

During the Relevant Time Period the adjustments made after the end of a quarter to manipulate earnings generally involved adjustments to management fees, interest charges, or other fees, such as purchasing fees or transaction-related fees. In the restated financial statements, management fees and affiliate interest charges were reversed in total and replaced by a systematic methodology for computing such charges. In most cases, the Company reversed non-recurring fees (e.g. purchasing fees and transaction-related fees) unless they were supported by a contract. (See Issues M-1, M-17, M-18, and M-19.) Transfers of expenses or adjustments of reserves or other accruals also were addressed in connection with specific issues. (See Issues S-1, P-1, M-11, and T-4.) The Company's review has focused solely on the accounting treatment for transaction related fees and no determination has been made as to the validity of the contracts under which these fees were charged.

3.     Subscriber Numbers (G-6)

The Company recomputed and restated its subscriber numbers for all periods. The revised subscriber numbers are based on a consistent rational approach for computing bulk subscriber numbers and exclude inappropriate and arbitrary adjustments. In addition, they include only cable subscribers and exclude subscribers for non-consolidated entities.

4.     Investment and Minority Interest in ABIZ (G-10)

The Company has reviewed the accounting for the initial public offering, the second stock offering and the rights offering of its then consolidated subsidiary, ABIZ, including the transaction in which $150 million of cash was transferred back and forth between Adelphia and ABIZ. While the basis for these cash transfers is not readily apparent, current management believes the basic accounting for these transactions was appropriate. Because of the spin-off of ABIZ in January 2002, the Company no longer controls ABIZ's disclosures.

PWC-EB0004876

5.     Calculation of Allowance for Bad Debts (S-1)

The Company has restated its allowance for bad debts for all periods by applying a consistent methodology for computing the required amount. In its restated financial statements the Company is also providing, in the proper period, for the incremental losses that resulted from the premature implementation of the Convergence billing system (see Issue R-2).

6.     Programming Audit Reserves (P-1)

In connection with its restatement, the Company has estimated its exposure at each balance sheet date during the Relevant Time Period for probable adjustments related to audits of amounts paid to programmers. The most notable exposure involves non-payment by the Company of fees to programming providers for bulk subscribers. Based on its estimated exposure, the Company has adjusted its liability at each period end to reflect probable losses for programming audits. These adjustments negate the effect of previous under accruals as well as previous accrual reversals.

7.     Programming Expense Methodology (P-2)

The Company has concluded that the accounting for the HBO and Cinemax contracts, which recorded less expense in the early periods than the amount paid under the contracts, was not acceptable under generally accepted accounting principles. The unacceptable methodology assumed maximum incentives under the contracts and accelerated recognition of projected benefits from a lower effective cost per subscriber in later years of the contract. In its restated financial statements, the Company has revised its accounting for these contracts to recognize expense as the payments accrue.

8.     Film Production Advances (I-1)

As part of the Books and Records Investigation, the Company reviewed the advances made by Adelphia to Rigas Entertainment (now, ErgoArts, Inc.) and SongCatcher Films as well as the interest charged on those advances. While there is no record that the Board ever approved these related party transactions, the Company has concluded that the disbursements were appropriately accounted for as advances and that no adjustments from an accounting standpoint are required. However, revenue recognition for the interest portion has been reversed, and the advances have been impaired when deemed uncollectible. The portion of the advances guaranteed by John Rigas and Ellen Rigas Venetis has been impaired in a manner consistent with other advances made to the Rigas family. The remainder has been deemed tied to the financial success of the film and impaired when recovery was unlikely.

9.     Briar's Creek Golf Investment (I-8)

The Company reviewed the agreements supporting the payments related to the Briar's Creek Golf Club and concluded that the payments for the membership deposit and for the investment in the Golf Club will continue to be recorded as Company assets and impaired when deemed appropriate. The Company is trying to sell these assets.

PWC-EB0004877

10. Foreign Investment – Brazil (I-10)

The Company reviewed the accounting method used to account for its investments in the Brazilian entities and concluded that all three of its Brazilian subsidiaries, including STV and Brazil SA, should be consolidated for all periods from their inception. The Company's restated financial statements have consolidated these entities for all periods.

11. All Other Investments (I-13)

The Company reviewed all of its investments not specifically addressed in connection with other issues and concluded that its investment in Sagir, Inc. ("Sagir"), a highly leveraged telecommunications company owned by a nephew of John Rigas, should be reclassified from investments and included with other advances to Rigas Entities. Based on financial information provided by Sagir, collectibility of the advances to Sagir was impaired as of December 31, 1998 and the advances were written off accordingly. All revenue recognized by the Company for the interest on the advances will be reversed.

12. Capitalization of Labor (F-4)

The Company determined that, due to the pervasiveness and magnitude of erroneous and improper accounting inherent in the Company's process for capitalizing labor during the Relevant Time Period, a new methodology was required to identify the proper labor costs that should have been capitalized for construction activities. As part of this new methodology, the Company developed standard labor rates to be applied to capitalizable activities. These standard rates were determined based on the length of time required to complete an activity, the number of occurrences of each activity, and the percentage of time that activities were performed by internal personnel versus by subcontractors. (See Issue F-14, Capitalization of Overheads.)[11] Trouble calls and reconnects have been specifically excluded from capitalizable activities.

13. Retirements (F-5)

During the Relevant Time Period, the Company generally did not retire old equipment that was taken out of service. In connection with the restatement, the Company has developed a methodology to identify and retire plant and distribution equipment that was previously taken out of service as a result of a system rebuild. For fixed assets for which specific retirements could not be identified, such as converters, a systematic methodology has been developed to enable the Company to estimate and retire fully depreciated equipment no longer in service.

14. Convergence Billing System (F-7)

The Company reviewed approximately $144 million of capitalized costs associated with the development of a comprehensive billing system, including costs for

---

[11] See also February 28, 2003 Form 8-K filed by Adelphia Communications Corporation.

- 16 -

PWC-EB0004878

developing a similar system for ABIZ.  The Company identified nearly $18 million of costs that had not been charged to ABIZ previously and charged them to ABIZ accordingly.  Certain costs were identified as capitalized in error and were charged to expense in the period incurred.  The remaining capitalized costs were written off in September 2002 upon abandonment of the Convergence project.

15.     Renovations for Condominiums and Similar Assets (F-9)

The Company has identified capitalized assets related to personal properties of the Rigas family and reclassified the costs to the appropriate advance accounts.[12]  The Company has reversed the March 1996 transfer of the Roslyn properties from the Rigas Entities to Adelphia as if the transaction had never occurred.  Although title was not conveyed to Adelphia until March 1, 2004, the Company will retain the Basak House as an asset.

16.     Marketing Support Agreements (F-10)

The Company reviewed the marketing support arrangements under which the Company agreed to pay higher costs for its digital converter boxes in exchange for marketing support payments from its vendors.  The Company has reversed the additional costs that were capitalized as converter costs (as well as subsequent depreciation) and has reclassified them as marketing expense to offset the credits to marketing expense recorded as a result of the marketing support received from converter vendors.

17.     Intercompany Transfers of Converter Boxes (F-13)

Based on the review by the Special Committee, the Company concluded that the converter boxes should be recorded on the books of the Company and should not be transferred to the Rigas Entities.  All journal entries to transfer them to the Rigas Entities have been reversed accordingly.

18.     Capitalization of Overheads (F-14)

While it was in the process of standardizing its labor costs (Issue F-4 above), the Company reviewed the various types of overheads that are capitalizable and incorporated into its standard costs the portion of capitalizable overheads that were specifically associated with construction activities.  Capitalizable overheads include benefit costs, truck costs, other direct support costs, and other indirect support costs.  System power costs and other costs not associated with construction activities are not eligible for capitalization.

19.     Coudersport Golf Course (F-15)

As part of the Books and Records Investigation, the Company reviewed the $12.7 million of costs for the construction of the golf course, as well as any underlying contracts, the parties being invoiced, and other facts and circumstances.  The Company concluded that the golf

---

[12]     Impairment of the advance was assessed in connection with Issue G-3.  See Section III(B)(1) *supra*.

PWC-EB0004879

course should be treated for accounting purposes as if it had been a Company project and capitalized as property, plant and equipment. When construction ceased in May 2002, certain assets were redeployed and the remaining costs were written down to their estimated net realizable value.

20.    Capitalization of Software Component of Gemstar Payments (F-19)

The Company examined the accounting for the Gemstar contract and concluded that the payments should be charged to programming expense in the period in which the services were received. The inappropriate capitalization and depreciation of the software component of the contract has been reversed in the restated financial statements.

21.    Three-Way Asset Swap with Comcast (A-1)

In its restated financial statements, the Company has modified the accounting for the Comcast swap. While the total value of the exchange transaction did not change, the Company determined that the transaction should not be accounted for as two equal exchanges. Rather, the total acquisition price has been allocated between the Adelphia systems and the Rigas systems based on the relative fair values of the systems swapped in, and the total divestiture price has been allocated based on the relative fair values of the systems swapped out. This change resulted in an adjustment of $2.5 million in favor of Adelphia.

22.    Allocation of Value on Prestige Acquisition (A-2)

In December 1999, the Company entered into a Stock Purchase Agreement with Prestige Communications Inc. ("Prestige Georgia") and an Asset Purchase Agreement with Prestige Communications of NC, Inc. ("Prestige North Carolina") to purchase the Prestige Georgia and Prestige North Carolina systems, respectively. In the spring of 2000, the Board approved the participation of Highland Georgia, a Rigas entity, in the transaction, and on July 5, 2000 Adelphia purchased both of the Prestige cable systems. Immediately thereafter, Highland Georgia acquired the Prestige Georgia system from the Company and the Company retained the Prestige North Carolina system. The price to the Rigas family equaled Adelphia's contractual acquisition price plus approximately $100 million of future cash flows. In connection with its restatement work, the Company retained an independent third-party appraiser to determine the fair value of the two systems at the time of the acquisition. Based on this appraisal, the Company concluded that the difference between the price that the Rigas family agreed to pay for Prestige Georgia ($400 million) and the fair value based on an allocation from the appraisal ($365 million) should be recorded as an adjustment of paid-in-capital. The Company has reversed an arbitrary $50 million adjustment of purchase price recorded 15 months after the original transaction.

23.    Launch Fees (A-6)

The Company reviewed the accounting for all launch incentives, including those received under contracts with QVC and Hallmark. The majority of the launch incentives from QVC represent a fee paid by QVC to Adelphia to reposition QVC within the channel line-up. Prior management recognized this revenue on a straight-line basis over the 10-year life of the contract. The launch support from Hallmark was recognized as contra-expense based on

- 18 -

PWC-EB0004880

progress toward the specified target. The Company will modify revenue recognition in its restated financial statements for the QVC contract to recognize revenue commencing when channel repositioning is attained. The Hallmark launch fee will be recognized as a contra-expense over the remaining life of the contract commencing when penetration levels exceed the penalty threshold established in the contract.

### 24. Co-borrowing and Commingling of Funds (D-1)

The Company reviewed the accounting for the Co-Borrowing Facilities and determined that all debt for which the Company is jointly and severally liable should be included on its consolidated balance sheet. Co-borrowing debt attributed to the Rigas Co-Borrowing Entities (approximately $2.8 billion as of June 30, 2002), has been recorded on the Company's balance sheet for all prior periods. Because co-borrowing interest was not recorded in a consistent manner during the Relevant Time Period, the Company has reversed all interest charges to the Rigas Co-Borrowing Entities and replaced them with interest charges based on the actual co-borrowing interest charged by the banks and allocated among the co-borrowers based on their relative co-borrowing debt.

### 25. Debt Compliance and Debt Covenant Compliance (D-2)

Through the numerous issues addressed in connection with the restatement, the Company believes it has reversed all of the arbitrary adjustments that were recorded for purposes of meeting debt covenants or achieving certain leverage ratios to obtain more favorable interest rates. In connection with this issue, the Company reversed cash transfers made at the end of a month that resulted in overstated cash balances. Also, the Company has accrued additional interest costs for all historical periods associated with higher interest rates attributable to its restated financial statements.

### 26. Debt and Interest Expense (D-5)

The Company reviewed the accounting, among other items, for the mortgage on Tim Rigas' Beaver Creek condominium in which a portion of the mortgage was recorded as debt on the Company's balance sheet. The recording of this debt was reversed, and subsequent payments of principal and interest were reclassified to Tim Rigas' advance account.[13]

### 27. New York Jobs Grant (R-1)

Adelphia has confirmed that the revenue previously recognized by the Company for the New York Jobs Creation Grant, in fact, had been reversed. In the course of its restatement project, the Company pushed the revenue reversal back to the period in which the revenue was originally recognized.

---

[13]  Impairment of the advance was assessed in connection with Issue G-3. See Section III(B)(1) *supra*.

PWC-EB0004881

28.    Deferred Billing Arrangements (R-3)

The Company has concluded that during the Relevant Time Period, revenue was prematurely recognized for promotional customers who were not contractually obligated to purchase services for any period of time. Therefore, the Company has reversed all subscriber revenue that was previously recognized during the free service months for those promotional subscribers.

29.    Management Fees and Allocation of Shared Service Costs (M-1)

The Company performed a detailed analysis of management fees and concluded that a reversal of all management fees charged during the Relevant Time Period was appropriate to ensure that all arbitrary adjustments were reversed. The Company has adopted a systematic approach under which the terms of existing management agreements will be honored for entities that are not wholly owned by the Company. For subsidiaries and for entities without management agreements, costs are allocated to the entities receiving the services based on a percentage of revenue. The cost allocation is believed to approximate the fair value of the services provided.

30.    Other Miscellaneous Transactions Benefiting Rigas Family (M-2)

In the course of the Books and Records Investigation, the Company identified payments of expenses on personal condominiums charged to corporate cost centers and in its restated financial statements has reclassified them to the Rigas advance accounts. The Company will not attempt to adjust corporate expenses for rent of Cancun condominiums or aircraft expenditures because a definitive separation between business and personal expenditures can no longer readily be made. Preston Motors, the car dealership, is not deemed to be under common control with the Company because John Rigas holds a minority interest in Preston. Consequently, no adjustments are required for vehicle purchases.

31.    Transactions with Sabres, Inc. and NFHLP (M-3)

The Company concluded that all of the funding provided in connection with the Buffalo Sabres and NFHLP should be accounted for as a related party loan. Therefore, the advances to NFHLP will be included with other advances to Rigas Entities and presented as an offset to shareholders' equity. The advances to NFHLP have been impaired using the underlying value of the team as the basis for determining the estimated recoverable amount at each balance sheet date.

32.    Margin Loan Calls (M-4)

The Company reviewed payments made on behalf of the Rigas family in connection with their margin loans. Such payments were appropriately accounted for as advances.[14]  Accordingly, no adjustments have been made.

---

[14]    Impairment of the advance was assessed in connection with Issue G-3. See Section III(B)(1) supra.

PWC-EB0004882

33.   Loans and Guarantees of Loans to Employees (M-5)

During the course of its investigation, the Company was unable to locate any evidence of a $700,000 loan by the Company to James Brown. Other employee loans were reviewed and an appropriate allowance for losses was established at each balance sheet date during the Relevant Time Period based on estimated collectibility of the loans considering amounts in dispute and past practices of forgiving loans.

34.   Purchases by Highland 2000 of ACC Securities (M-6)

The Company reviewed the purchases by various Rigas holding companies of debt and equity securities of Adelphia and ABIZ, including open market purchases. Amounts funded by the Company were appropriately accounted for as advances.[15] The advances to the Rigas Entities will be presented as an offset to shareholders' equity so that the Company's equity does not increase as a result of the equity transactions. For the debt offerings, the Company paid interest to the Rigas Entity at the debt coupon rate from the date of the public offering. Simultaneously, the Rigas Entity paid interest to the Company to compensate it for lost interest due to the 270-day delayed closing. The Company will correct its accounting for the 2002 interest income and offset it against the interest expense.

35.   Timber Rights (M-9)

The Company reviewed the accounting for the $26.5 million purchase and the $20.0 million sale of land and the related timber rights, including the allocation of price between the Company (for the timber rights) and the Rigas family (for the land). The Company concluded that, in general, the accounting presented the transactions in accordance with the underlying contracts. The Company determined that it could not accurately value the reversion rights contained in the contract and therefore would not adjust the original accounting for the transactions.

36.   General Related Party Issues from 8-K (M-10)

In its restated financial statements, the Company will record recurring purchases of goods and services at the established price (e.g., maintenance services from Wending Creek, rent payments to various Rigas Entities and salary payments to Ellen Rigas Venetis). No adjustments will be made for these purchases. Non-recurring purchases (e.g., furniture from Eleni Interiors) will be capitalized at the estimated cost of the seller because of the common control of the entities. The mark-up on furniture purchases will be recorded as a reduction of paid-in-capital. The contract with Wending Creek was terminated in 2002, and some Wending Creek employees were hired by Adelphia to perform the same services.

---

[15]   Impairment of the advance was assessed in connection with Issue G-3. See Section III(B)(1) *supra*.

- 21 -

PWC-EB0004883

37.    Expense Transfer from ACC to Rigas Entity (M-11)

The Company reviewed several transactions in which costs were arbitrarily moved from Adelphia's books to those of the Rigas Entities. These arbitrary transfers have been reversed. In addition, amounts charged by Adelphia to the Rigas Entities under Programming Supply Agreements have been reversed.

38.    Dorellenic Property Transaction (M-12)

The Company reviewed the 1994 purchase of properties from the Rigas Entities, including those for which title was never transferred, and concluded that they would remain on the Company's books. The Company is working with the Rigases to transfer titles.[16] In addition, the Company reversed the 1992 prepaid rent recorded for the buyout of a capital lease for properties that were sold to the Company in the 1994 transaction.

39.    Dividends from FVP and Century (M-13)

The Company reviewed the $20 million quarterly dividend payments made by FrontierVision Partners and the $275 million dividend by Century Holdings. The Company concluded that no adjustments were necessary for the FrontierVision dividends because the dividend payments had appropriate authorization, and they did not affect the consolidated financial results of Adelphia or any of its other SEC filers. The impact on the loan covenant computations is no longer relevant. However, the $275 million dividend by Century Holdings was not authorized and appeared to be an arbitrary recharacterization of a previous payment to enable covenant compliance. The Company has reversed all adjustments recording the Century dividend payment.

40.    Monthly Payments to John Rigas (M-14)

The Company reviewed the payments to John Rigas that were booked as advances.[17] These payments primarily were payments by Adelphia to Highland Holdings, which in turn transferred the funds to John Rigas. Other payments were made to or on behalf of Rigas family members. These payments were appropriately accounted for as advances to the party to whom the funds were transferred.

41.    Personal Use of Corporate Credit Cards (M-15)

The Company reviewed the payments made by the Company for the corporate credit cards of the Rigas executives and concluded that a definitive conclusion could no longer be reached in all cases regarding those expenses that were personal in nature and those that had a valid business purpose. Therefore, the Company concluded that it would not attempt to separate

---

[16]    Several deeds were turned over to the Company on March 1, 2004.

[17]    Impairment of the advance was assessed in connection with Issue G-3. See Section III(B)(1) supra.

PWC-EB0004884

the costs and that the costs would remain as a Company expense. Appropriate disclosure of the payments will be made.

42.    ABIZ-PECO JV Expense Allocation (M-16)

The management fee of $4.5 million charged to the PECO joint venture in the fourth quarter of 2001 was, in fact, reversed by the Company in May 2002 effective December 2001. The Company has determined that one additional restatement entry was required to ensure that the net effect on all financial statement line items was zero.

43.    Transaction Related Fee Income (M-17)

The Company reviewed transaction-related fees charged to Devon Mobile, ABIZ, and the Rigas Entities and concluded that, in general, if the fees were charged in accordance with a signed agreement, the fees would not be reversed. The Company also reviewed the costs incurred by the Company in connection with the services performed in exchange for the fees received. In general, during the Relevant Time Period, the costs incurred would be allocated to the applicable entity, and any difference between the fees charged and the allocated costs would be recorded as an adjustment of paid-in-capital. Fees charged to the Company's affiliate, Devon Mobile, are accounted for under the equity method, and are eliminated against the Company's share of Devon Mobile's losses. Following the Company's restatement adjustments, none of the transaction fees charged to affiliates will favorably affect the Company's revenue or operating results. The Company's review has focused solely on the accounting treatment for transaction related fees, and no determination has been made as to the validity of the contracts under which these fees were charged.

44.    Affiliate Interest (M-18)

The Company has reversed in full all interest previously allocated by the Company to the Rigas Entities and by the Rigas Entities to the Company. In connection with the Restatement, no interest other than co-borrowing interest, as described in Issue D-1, will be charged to the Rigas Entities except when specific contractual agreements exist (e.g., NFHLP and Rigas Entertainment).

45.    Intercompany Fees for Purchasing Power (M-19)

During the Relevant Time Period, the Company periodically charged its affiliates purchasing fees for making third party capital equipment purchases on their behalf. The Company generally recognized the fees as revenue while the affiliates capitalized the fees. In the restated financial statements, all purchasing fees charged to consolidated entities have been reversed. For non-consolidated entities (e.g., Rigas Entities and Devon Mobile), if the fee was charged in accordance with a signed agreement, it has not been reversed. However, if a signed agreement was not in place, the purchasing fee has been reversed. Fees charged to Rigas Entities were reversed because a signed agreement was not in place. The purchasing fees charged to Devon have not been reversed although the Company reversed its revenue recognition for those fees. The Company's review has focused solely on the accounting treatment for intercompany purchasing fees and no determination has been made as to the validity of the contracts under which these fees were charged.

- 23 -

PWC-EB0004885

46.     Intercompany Account Analysis (M-21)

The Company undertook a project to categorize all activity affecting intercompany accounts for all periods from 1999 through 2003 to enable the Company to readily review that activity and identify any transactions that do not appear reasonable or appropriate. Inappropriate activity identified in connection with this project has been reversed.

47.     Praxis Capital (C-1)

The Company has essentially consolidated its investment in Praxis. Management fees of $3.2 million were recorded from 2001 through 2003. Total investments of $8.5 million (Ensemble and Wasabi) have been written down to $800,000. In connection with its bankruptcy filing, the Company rejected the Praxis contracts in late 2003.

48.     ML Media JV Arrangement (C-2)

Certain of the legal entities comprising the ML Media Joint Venture filed for bankruptcy in September 2002. In connection with Adelphia's bankruptcy, the Company rejected the ML Media Recapitalization Agreement. Pending resolution of various legal matters, the Joint Venture continues to operate, and Adelphia continues to manage it. The Company concluded that no further action is required at this time. During the Relevant Time Period, the Company properly accounted for its funding of the $10 million deposit as an advance to Highland Holdings, a Rigas Entity.[18]

49.     Property Tax Accrual Reversal (T-4)

The Company has performed a detailed analysis of its prepaid and accrued property taxes at each balance sheet date during the Relevant Time Period. This detailed analysis includes the Company's estimated liability for the settlement of the Kentucky dispute.[19] The Company has adjusted its prepaid and accrued property tax accounts at each balance sheet date to agree with its underlying analysis. These adjustments negate the effect of previous under accruals as well as previous accrual reversals made during the Relevant Time Period.

C.     Rigas Family Use of Adelphia Resources

The table prepared by PwC Forensic on pages 27-28 of the Covington Report (Adelphia Communications Corporation: Analysis of Amounts Owed by the Rigases and their Entities Through May 2002) summarizes the use of Adelphia's financial resources for the benefit of the Rigas family and various entities and interests controlled by them. As noted in the Covington Report, a number of questionable related party transactions were omitted from the portion of the analysis that quantifies amounts owed by Rigas entities because some service or other benefit was received by the Company in consideration for the expenditure or similarly

---

[18]     Impairment of the advance was assessed in connection with Issue G-3. See Section III(B)(1) *supra*.

[19]     See Covington Report at 241-243.

PWC-EB0004886

because the Company, under the direction of its previous management, determined that the transaction entailed a legitimate Company disbursement. However, in the Books and Records Investigation current management reviewed these transactions in detail. Current management's determinations with respect to these items is discussed in Section III(B) of this Report.[20] As discussed in the Covington Report, the transfer of funds from the Cash Management System to individual members of the Rigas family and Rigas entities graphically illustrates how the Rigases were able to use the Cash Management System for their personal benefit[21], and the Co-Borrowing Facilities played a critical role in providing funds for payments and services to the Rigas family, most notably the financing of the acquisition of Adelphia securities by the Rigas family and payments made on margin loans and margin calls.[22] The Covington Report further details other potentially improper or questionable uses of Adelphia resources for the benefit of the Rigas family, including funds used for real estate[23], charitable donations[24], Ellen Rigas' movie and sound recording projects[25], the Rigas-Venetis Wedding[26], golf club memberships[27], settlement of a dispute with an architect[28], snowmobile purchases[29] and personal use of the Company aircrafts.[30, 31] The accounting treatment for these transactions is discussed in Section III(B).

### D.    Other Related Party Transactions

In addition to the use of Adelphia resources to benefit the Rigas family described in III(C) above, the Rigases and the Company engaged in numerous related party transactions at

---

[20]    See the Matrix for a complete list the issues the Company has reviewed, as well as for an evaluation of those issues.

[21]    See Covington Report at 31-33.

[22]    See Id. at 34ff.

[23]    Id. at 57-75.

[24]    Id. at 172-175.

[25]    Id. at 176-179.

[26]    Id. at 180-185.

[27]    Id. at 186-192.

[28]    Id. at 193-194.

[29]    Id. at 195-197.

[30]    Id. at 156-171.

[31]    See also Securities and Exchange Commission v. Adelphia Communications Corp., et al. (S.D.N.Y. 02 CV 5776)(July 24, 2002 Complaint); United States v. John Rigas, Michael Rigas, Tim Rigas, James Brown, and Michael Mulcahey (S.D.N.Y. 02 CRIM 1236)(Indictment of September 23, 2002); Issue Summary at Exhibit 3.

PWC-EB0004887

least many of which operated to the detriment of Adelphia. The Covington Report identifies the following transactions as problematic: related party cable acquisitions[32], the Comcast swap[33], the sale of Adelphia home satellite service to Adelphia[34], the ML Media Transaction[35], Adelphia's investment in Praxis[36], furniture purchases[37], investments in Wending Creek Farms[38], vehicle purchases from Preston Auto Truck Center[39], the Coudersport Golf Course construction[40], the Potter County timber rights transaction[41], accounting treatment for affiliate transactions[42], and loans to officers and employees[43]. Current management has analyzed these transactions and others during the Books and Records Investigation and determined whether the accounting employed by prior management was improper or erroneous. If current management determined that the accounting was improper or erroneous, the proper accounting treatment was determined and is discussed in Section III(B) of this Report. The Matrix also identifies these transactions by their reference to the Covington Report and provides a cross reference to the Issue Summary that outlines the accounting treatment determined by the Company. The Matrix also includes a cross reference to the Issue Summary for all other issues reviewed by the Company during the Books and Records Investigation that were not deemed to be potential illegal acts.

      E.    Remedial Actions

      Section V of this Report discusses in detail the remedial actions the Company has taken to ensure that the fraud perpetuated by the Rigases was stopped and will not re-occur. As discussed below, the Company has made significant improvements to its internal controls and taken numerous other corporate governance actions in accordance with "best practices." In order to correct the erroneous financial results and disclosures that occurred as a result of the Rigases

---

[32]    See Covington Report at 76-83.

[33]    Id. at 84-88.

[34]    Id. at 89-90.

[35]    Id. at 90-115.

[36]    Id. at 116-124.

[37]    Id. at 125-129.

[38]    Id. at 130-136.

[39]    Id. at 137-140.

[40]    Id. at 141-147.

[41]    Id. at 148-155.

[42]    Id. at 260-270.

[43]    Id. at 195-197.

PWC-EB0004888

actions, the Company is restating its financial statements for the years ended December 31, 1999 and 2000.

F.   Impact on Financial Statements

As a result of the Books and Records Investigation, the Company determined that it would record restatement adjustments to its previously issued financial statements for the years ended December 31, 1999 and 2000. The overall affect of these restatement adjustments was to reduce previously reported revenue by $_____ and $_____, increase previously reported pre-tax net loss by $_____ and $_____ and decrease previously reported total assets and total liabilities and stockholders' equity by $_____ and $_____, respectively.

IV.   Management and Board Changes; Internal Control Improvements and Other Corporate Governance Actions Taken by the Company to Avoid the Recurrence of Illegal Acts in the Future.

A.   Management and Board Changes

1.   Appointment of the New Board

As discussed above, prior to May 2002, the Rigas family held a majority of the positions on the Board. At that time, the Board consisted of John Rigas, Michael Rigas, Timothy Rigas, James Rigas, Peter Venetis and four other directors: Erland Kailbourne, Pete Metros, Leslie Gelber and Dennis Coyle (collectively, "Carryover Directors"). In May 2002, John, Michael, Timothy and James Rigas resigned from the Board and, in June 2002, Peter Venetis resigned from the Board. During the pendency of the Chapter 11 Cases, the Company has appointed seven new directors, and all of the Carryover Directors have resigned.

Adelphia's seven new directors, the first six of whom have been determined by the Board to be independent pursuant to the listing standards of Nasdaq, are: (1) E. Thayer Bigelow, former President and CEO of Time Warner Cable Programming and former Acting CEO of Courtroom Television Network LLC; (2) Rodney Cornelius, a former cable industry executive and current investor; (3) Anthony Kronman, Sterling professor of Law and former Dean of Yale Law School; (4) Philip Lochner, former SVP and Chief Administrative Officer of Time Warner, Inc. and a former Commissioner of the SEC; (5) Susan Ness, a former Commissioner of the FCC; (6) Kenneth Wolfe, former Chairman and CEO of Hershey Foods Corporation; and (7) William Schleyer, CEO of Adelphia.

2.   Appointment of New Management

Effective March 18, 2003, the Company appointed William T. Schleyer to serve as its new Chief Executive Officer and Chairman and Ron Cooper to serve as its new President and Chief Operating Officer. Mr. Schleyer replaced Erland Kailbourne, the interim Chief Executive Officer since May 2002. On March 7, 2003, the Bankruptcy Court entered an order approving the employment of Messrs. Schleyer and Cooper.

Shortly after the appointments of Messrs. Schleyer and Cooper, the Board and these new officers hired a new senior management team, including Vanessa A. Wittman, as

- 27 -

PWC-EB0004889

Executive Vice President and Chief Financial Officer, Brad Sonnenberg, as Executive Vice President, General Counsel and Secretary, and Scott D. Macdonald, as Chief Accounting Officer. Each of these officers has in turn hired new executives who report to them. As discussed below, these executives have, among other things, adopted and implemented new internal controls and procedures designed to prevent a recurrence of the alleged improper acts that occurred during the period that the Rigas family members held their positions as officers and directors of Adelphia.

B.     Internal Controls

Following the discovery in April and May 2002 of the erroneous and improper accounting activities, Adelphia implemented significant changes in the internal audit and accounting areas to strengthen the internal control environment.

1.     Internal Audit

In September 2003, the Company upgraded the Internal Audit function with the hiring of Donnell Heistand, Vice President of Internal Audit. Ms. Heistand reports directly to the Audit Committee of the Board of Directors. The Company has implemented new policies and procedures within the Internal Audit department. These procedures include, but are not limited to, providing monthly reports to the Audit Committee, meeting with the Audit Committee at least quarterly, augmenting the internal staff with co-source partner, Jefferson Wells International and conducting Internal Audit activity in accordance with the "Standards for the Professional Practice of Internal Auditing."

One of Internal Audit's objectives is to provide management with information that can be used to mitigate the impact and exposure of identified risks. In order to ensure that enterprise wide risks are appropriately identified and properly managed, the Company conducted an enterprise wide risk assessment (the "ERA") in the fourth quarter of 2003. The purpose of the ERA was to identify, measure, and prioritize business risks that could prevent Adelphia from achieving its goals and strategic objectives. Internal Audit's 2004 Audit Plan was then developed based on an assessment of these risks and exposures.

The ERA methodology was designed, at a macro level, to address the organization as a whole. As part of this process detailed interviews lasting at least one hour were conducted with over 90 business unit managers, senior management, PWC and the Audit Committee. In addition, Internal Audit utilized risk assessment best practices and the Jefferson Wells Risk Assessment Methodology and Tool. Specific steps included:

a.     Determining the Audit Universe

The ERA identified 27 enterprise wide functional areas to be included in the Company's internal audits. In addition, all five of the Company's geographic locations will be subject to internal audits.

b.     Developing Risk Factors and Exposure Areas

The ERA identified 25 factors specific to Adelphia's business, a list of which is included as Exhibit 7 attached hereto. These risk factors cover the 27 business processes

- 28 -

PWC-EB0004890

throughout the organization. Certain of the risk factors identified by the ERA were assigned additional weighting due to the higher nature of the risk as it related to Adelphia's business (e.g., management information, external reporting, technology and policies and procedures).

c.    Ranking the Business Processes

The business processes were then ranked as high, medium or low risk. The high risk areas are discussed below.

As noted above, the results of the ERA were used to develop the Company's 2004 Internal Audit Plan. Although the 2004 Audit Plan is intended to be flexible and may be modified as needed, it is intended to address the high risk business processes through (a) internal control reviews (including Sarbanes-Oxley), (b) financial reviews and (c) process reviews. The Audit Plan will be reviewed with the Audit Committee on a quarterly basis. In addition, the Audit Committee receives a monthly update from the Vice President, Internal Audit regarding audit reports issued, including the detailed audit reports, audits or process improvements in progress, updated audit calendar and other pertinent information.

Internal Audit is currently in the process of completing the 2005 ERA and developing the 2005 Annual Internal Audit Plan. In order to provide consistency and develop trends and benchmarking, the same process, risk factors and business processes that were used in the 2004 ERA are used in the 2005 ERA. The 2005 ERA and Internal Audit Plan are expected to be completed in January 2005 and presented to the Audit Committee.

The following business processes are identified as high risk and are the focus of the 2004 Audit Plan.[44]

• **Sarbanes-Oxley 404 Compliance Efforts**

The majority of Internal Audit's focus for 2004 was on Sarbanes-Oxley 404 compliance efforts. Through this effort, Internal Audit addressed the high risk areas identified in the ERA. Internal Audit's role in the Sarbanes-Oxley project included representation on the Sarbanes-Oxley steering committee; providing input and guidance to the project team related to scope, methodology, training, execution, and remediation, tracking and resolution. An Internal Audit resource was assigned to each business process to review documentation, provide guidance on key controls, review process owner testing, perform over-testing, and follow up on remediation items. Internal Audit also led efforts for Information Technology ("IT") general and application control's documentation and testing   Finally, Internal Audit is completing the Company level control testing and assessment of anti-fraud controls.

The Company has completed its documentation, testing and identification of remediation issues for all business processes except fixed assets accounting. For fixed assets accounting, remediation items have been identified and documentation and testing will occur in the first quarter of 2005. While the Company continues to improve its internal controls, to date

---

[44]    The bullet points address the Internal Audit work being performed in each area.

PWC-EB0004891

over 700 remediation items have been identified. Process owners are in the process of or have completed remediation items and Internal Audit is in the process of following up. Based on its preliminary assessments to date, the Company believes that it will have, as of December 31, 2004, one or more material weaknesses in its internal control report over financial reporting.

- **Revenue Assurance/Recognition**

  o This area is being addressed through the Sarbanes-Oxley 404 Compliance Efforts.

  o As part of the 2005 Audit Plan, Internal Audit expects to develop and complete high level analytical testing around revenue assurance/recognition.

- **Accounting/Financial Reporting**

  o This area is being addressed through the Sarbanes-Oxley 404 Compliance Efforts.

- Credit, Collections and Cash  / *Bold*

  o The Treasury Department and the Internal Audit Department established a cross functional Treasury and Cash Management Task Force in January, 2004 to address these areas. The Task Force distributed enterprise wide Cash Handling, Collection, and Credit policies. Also, the Task Force addressed lock box efficiencies, allowing third party collection agencies to post to the billing system and bank account review.

- **Fixed Assets**

  o This area is being addressed through the Sarbanes-Oxley 404 Compliance Efforts which have focused on identifying remediation items. The Company expects to begin its documentation and testing efforts in January 2005.

  o As part of the 2005 Audit Plan, Internal Audit expects to test on a quarterly basis compliance with the capitalization policy.

- **Inventory Management**

  o This area is being addressed through the Sarbanes-Oxley 404 Compliance Efforts.

  o Internal Audit conducted surprise physical inventory observations in February 2004 and observed the first quarter 2004 physical inventory.

PWC-EB0004892

- o Beginning with the second quarter of 2004, Internal Audit began conducting surprise physical inventory observations for each quarterly physical inventory.

- **Information Systems**

  - o Internal Audit initiated the first ever Enterprise-wide Discovery and Risk Assessment ("EDRA") for the Adelphia Information Technology Department which provides executive and IT management with a documented universe of all mission critical internal IT systems, the in-place security and controls for these systems, a summary of IT risks and made recommendations for improvement.

  - o As part of the 2005 Internal Audit Plan an update of the EDRA is expected to occur including a review of the Sarbanes-Oxley work. This will help to determine the 2005 IT audit plan which will be integrated with non-IT audits.

- **Capital Project Expenditures**

  - o This area is being addressed through the Sarbanes-Oxley 404 Compliance Efforts.

  - o As part of 2005 Audit Plan, Internal Audit expects to consider a process improvement project with respect to the capital authorization request process.

- **Procurement/Purchasing**

  - o This area is being addressed through the Sarbanes-Oxley 404 Compliance Efforts.

- **Follow up to audit issues**

  - o Internal Audit will continue to follow up on open audit issues including Sarbanes-Oxley remediation items.

  - o Internal Audit has developed an Audit Remediation policy with respect to audit follow up and a tracking tool regarding remediation of audit issues for 2004 and Sarbanes-Oxley follow up.

The Internal Audit Department also has administrative responsibility for implementing the Company's procedures with respect to complaints regarding accounting matters or other wrongdoing. These procedures, and the Internal Audit Committee's responsibilities, are described in detail in Section IV(B)(4)(b) of this Report.

The Audit Committee has approved, and the Internal Audit Group has implemented, an Internal Audit Charter based on Institute of Internal Auditors' guidelines.

- 31 -

PWC-EB0004893

2.      Accounting

In the late spring of 2002, the Company began the process of reorganizing and restructuring its accounting department (the "Accounting Reorganization"). The focus of the Accounting Reorganization was to improve the accuracy and integrity of the accounting process to ensure that the financial information created by the Company for both internal and external users could be relied upon.

The first step in the Accounting Reorganization was to replace substantially all of the senior finance and accounting employees who were involved in the alleged erroneous and improper accounting activities, including Timothy Rigas, James Brown, Michael Mulcahey, Timothy Werth and others. Section V of this Report addresses employee matters. Next, in May, 2002, the Company hired an interim Chief Accounting Officer, Steve Teuscher. Mr. Teuscher focused on stabilizing the accounting function so as not to lose employees critical to the restatement and re-auditing efforts. This included the establishment of a new organization structure for the accounting department. The new structure included:

a.      A focus on segregation of duties to mitigate the risk of any one employee being able to manipulate financial transactions or to falsify the entry, approval or reconciliation of accounting records;

b.      The establishment of policies and procedures that are intended to ensure that the resolution of accounting issues are supported by appropriate documentation and approval;

c.      The creation of an interactive environment between employees and managers whereby accounting polices and procedures are discussed with the accounting staff before the policies and procedures are implemented;

d.      An increased focus on employee training and supervision to empower employees to be able to correctly interpret and apply accounting principles in accordance with GAAP;

e.      The development of written policies and procedures to document the Company's position with respect to certain accounting transactions (e.g. capital vs. expense treatment, cost allocations, etc);

f.      The creation of a culture where employees can express concerns without repercussions;

g.      The hiring of a new Vice President of Accounting, Terry Donovan. Mr. Donovan is a CPA with over 15 years of accounting experience, including strong supervisory and technical accounting skills.

- 32 -

PWC-EB0004894

In March 2003, the Company hired a permanent Chief Accounting Officer, Scott D. Macdonald. Mr. Macdonald continued Mr. Teuscher's organizational structure changes and the Company continued to improve the organizational structure for the accounting department as follows:

<blockquote>

a.  Hired a new Assistant Controller, Robert M. DeLucia and a new Vice President of External Reporting and Corporate Accounting, Janet Dickinson. Each of Mr. DeLucia and Ms. Dickinson is a certified public accountant with over 15 years of accounting experience;

b.  Moved the corporate accounting and external reporting activities to the Company's new headquarters in Denver. Hired Denver based employees with significant cable or satellite television experience to staff these functions;

c.  Focused the Coudersport, PA accounting employees on providing support for the Company's operating regions and accounting restatement effort. They are no longer distracted by corporate accounting and external reporting activities which are now handled by the Denver based employees;

d.  Modified job duties to properly align the employees skills with their job responsibilities;

</blockquote>

The Company's accounting department organization chart is included as Exhibit 8.

The second step in the Accounting Reorganization was to perform a review and analysis of all general ledger accounts from December 1998 through December 2003. This review and analysis was the basis for the Company's restatement and re-auditing efforts. This analysis also included the review and analysis of the December 1998 balance sheet accounts to ensure an accurate starting point for the restatement efforts. All account balances were compared to supporting documentation and adjustments were recorded as necessary. This effort resulted in accounting policy and procedure improvements, e.g., new fixed asset capitalization policies and procedures.

The third step in the Accounting Reorganization was the implementation of new or revised accounting policies and procedures. These policies have been designed to comply with GAAP, rules and regulations of the SEC and where applicable cable industry practice. This process continues to evolve as the Company continues to review and improve its accounting policies and procedures. The new or revised accounting policies and procedures address the business processes that were identified as high risk in the ERA as well as issues identified during the Company's Sarbanes-Oxley 404 Compliance Efforts and include:

<blockquote>

a.  Fixed asset capitalization, including internal labor and overhead and internal use software;

</blockquote>

PWC-EB0004895

b. Depreciation of useful lives for fixed assets;

c. Retirements of fixed assets;

d. Interest capitalization;

e. Impairment of long-lived assets;

f. Franchise renewal costs (costs incurred to renew cable franchises);

g. Allowance for doubtful accounts;

h. Programming and launch support, including advertising purchased by programmers, treatment of free programming periods and audit reserves;

i. Management fees, cost allocations and affiliate interest charges;

j. Limits of authority guidelines (spending approval levels for company employees);

k. Monthly liability accrual processes, including capital/purchase order accrual to address cut-off issues;

l. Implementation of quarterly physical inventory requirements for customer premise equipment and maintenance and construction materials at all warehouse locations, nationwide;

m. Monthly general ledger account reconciliation requirements, including bank account reconciliations.

The Company also implemented revised non-accounting related policies and procedures for subscriber and cable plant status reporting. The Company believes that these revised policies are consistent with current industry practice. Although these items are not accounting related, they are included in the Company's public disclosure.

C. Corporate Governance Initiatives

Since May 2002, the Board and senior management extensively reformed the Company's corporate governance practices. Although the Board and management's work in this area is currently ongoing, they have implemented corporate governance policies and procedures that meet or exceed the requirements of the Sarbanes-Oxley Act of 2002 and other applicable rules, and have incorporated corporate governance principles from stock exchange listing requirements, suggestions from various shareholder advocacy groups and best practices and procedures from other major public corporations. The Company has kept the SEC apprised of its corporate governance reforms.

- 34 -

PWC-EB0004896

1.    Reorganization of the Board Committees

In addition to the significant changes made to the composition of the Board discussed in Section IV(A) above under "Appointment of the New Board," the Company has also made substantial changes with respect to its various committees. Prior to May 2002, the Board had three standing committees, the Audit Committee, the Nominating Committee and the Compensation Committee. During the tenure of Rigas management, the Nominating Committee was comprised of four non-independent directors, John Rigas, Michael Rigas, Timothy Rigas and James Rigas, and the Audit Committee included Timothy Rigas until June 2001.

Following the departure of Rigas family members from the Board, the Board created a Corporate Governance Committee, which was later combined with the Nominating Committee to form the Corporate Governance and Nominating Committee. The Board also has adopted written charters for the Corporate Governance and Nominating Committee and the Compensation Committee and has amended the previous Audit Committee charter.[45] Each of these charters was prepared to meet applicable legal and stock exchange requirements, and to incorporate current progressive corporate governance practices. Pursuant to each committee charter, each of the Corporate Governance and Nominating Committee, the Audit Committee and the Compensation Committee are to be comprised solely of independent directors as determined in accordance with the Company's Corporate Governance Guidelines.

The Corporate Governance and Nominating Committee assists the Board by: (i) recommending to the Board, carrying out and maintaining the Company's corporate governance policies and processes; (ii) identifying qualified individuals for membership on the Board and its committees; (iii) recommending the composition and procedures of the Board and its committees; and (iv) assessing the effectiveness of the Board and its committees.

The Audit Committee assists the Board by: (i) monitoring the integrity of Adelphia's financial statements (and audits thereof) and its financial and accounting reporting processes, audit process, procedures and systems of internal controls regarding finance, accounting and legal and regulatory compliance which management and the Board have established; (ii) monitoring the independence, qualifications and performance of Adelphia's independent public accountants and internal auditing department; and (iii) providing an open avenue of communication among the independent public accountants, management, the internal auditing department and the Board.

The Compensation Committee assists the Board by: (i) providing a forum for independent judgment as to the fairness of director, executive and employee compensation arrangements at the Company; and (ii) determining the terms of such compensation arrangements.

---

[45]    The Corporate Governance and Nominating Committee Charter is attached as Exhibit 9 to this Report; the Compensation Committee Charter is attached as Exhibit 10 and the Audit Committee Charter is attached as Exhibit 11.

PWC-EB0004897

2.    Creation of Lead Director Position

In April 2003, the Board established the position of Lead Director (the "Lead Director") to be elected on an annual basis by a majority of the independent members of the Board. Adelphia's independent directors elected Anthony Kronman as the Lead Director in December 2003. In light of current best governance practices, the Board created the Lead Director position for periods when Adelphia's CEO also serves as the chairperson of the Board, as is currently the case. The Lead Director is responsible for, among other things:

- calling and presiding over executive sessions of the independent directors;

- serving as a liaison between the independent directors and the non-independent directors and management regarding matters addressed in executive sessions;

- acting as chairperson of the Board in the absence of the chairperson of the Board;

- advising the chairperson of the Board and the committee chairpersons as to the agenda for meetings of the Board and its committees;

- serving as the director contact for shareholder communications; and

- providing leadership in the event of the incapacitation of the chairperson of the Board or a crisis or other event or circumstance that would make management leadership ineffective or inappropriate.

A copy of the Corporate Governance Guidelines which, among other things, outlines the duties and responsibilities of the Lead Director is set forth in Exhibit 12 to this Report.

3.    Corporate Governance Guidelines

Pursuant to the recommendation of the Corporate Governance and Nominating Committee, the Board in July 2004 approved corporate governance guidelines for ACC (the "Corporate Governance Guidelines"). The Corporate Governance Guidelines, together with all applicable laws, Adelphia's Certificate of Incorporation and Bylaws, the Code of Business Conduct and Ethics and the various committee charters, are intended to provide a comprehensive framework for the governance of Adelphia. The Corporate Governance Guidelines incorporate new legal requirements and best practices with respect to the function and composition of the Board, selection of new directors, tenure of directors, Lead Director position, meetings of the Board, executive sessions of independent directors, committees of the Board, access of the Board to management and outside advisors, compensation of directors, director and officer conduct, evaluation of the Board, evaluation of senior management, management succession, director orientation and continuing education, stock ownership and conflicts.

PWC-EB0004898

4.    Code of Business Conduct and Ethics

In April 2003, the Board adopted a code of business conduct and ethics (the "Code of Ethics"), which sets forth ACC's policies for directors, officers (including Adelphia's principal executive officer, principal financial officer and principal accounting officer) and employees in connection with, among other things, the maintenance of accurate company records, communications with the public, conflicts of interest, treatment of confidential information, use of company assets, anti-nepotism, the reporting of accounting complaints and illegal and unethical behavior, compliance with laws relating to discrimination and harassment, commercial bribery, competition and fair dealing, and insider trading. The Code of Ethics has been disseminated to all Adelphia employees, and employees are required to certify their agreement to abide by the Code of Ethics. In addition, Managers have met with their employee teams to discuss the policies embodied in the Code of Ethics and to emphasize the importance the Company places on adherence to it. A copy of the Code of Ethics is attached hereto as Exhibit 13.

a.    Corporate Governance Officer

The Code of Ethics contemplates the appointment of a corporate governance officer ("CGO"). The role of the CGO is to assist with the administration and implementation of the Code of Ethics and, among other things, to serve as the central point of contact for employees wishing to report any illegal or unethical behavior. Brad M. Sonnenberg, Adelphia's General Counsel, serves as the CGO.

b.    Complaints Regarding Accounting Matters or Other Wrongdoing

As part of its implementation of the Code of Ethics, Adelphia has established procedures for the receipt of all complaints regarding any alleged wrongdoings. These procedures include the establishment of a dedicated toll-free hotline number, a U.S. mailing address and an e-mail address to facilitate such communications, whether from employees or outside interested parties. The Company has drafted written guidelines for how investigations will be handled.[46] The CGO receives and oversees the investigation of all such complaints in the first instance.

Furthermore, the Audit Committee and the Board have adopted a whistleblower policy (the "Whistleblower Policy") a copy of which is attached hereto as Exhibit 14, which links the Code of Ethics and the existing Sarbanes-Oxley requirements by addressing the receipt, retention and handling of all complaints received by Adelphia (whether audit-related or not).

As noted earlier in this Report, the Internal Audit Department has administrative responsibility for implementing the procedures outlined above. Specifically, the Internal Audit Department is responsible for:

---

[46]    See page 9 of Code of Ethics at Exhibit 13.

PWC-EB0004899

- Reviewing employee reports taken by National Hotline Service (the Company's independent service provider) or received via the Corporate Ethics email;

- Logging each report for tracking purposes;

- Assigning each report to the appropriate Corporate and/or Regional representative for investigation;

- Participating in or conducting investigations that relate to internal controls, employee fraud, accounting or financial reporting matters;

- Monitoring the status of on-going investigations;

- Ensuring investigations are completed in a timely manner subject to the general oversight of the Corporate Governance Officer; and

- Reporting hotline activity periodically to the Audit Committee of the Board of Directors and the Corporate Governance Officer.

5.    Creation of Disclosure Committee

In December 2003, the Company established a Disclosure Committee to ensure that accurate and complete information regarding the Company and its operations and financial performance is provided to securities holders and the investment community in a timely manner and in a clear, concise and understandable format as required by applicable laws and stock exchange requirements. The Disclosure Committee will work with the Company's outside counsel to review the adequacy of the disclosure in the Company's Annual Report on Form 10-K. Going forward, the Disclosure Committee will be charged with reviewing the Company's public disclosure and assisting the Company's Chief Executive Officer and Chief Financial Officer to discharge their responsibilities in certifying as to the Company's periodic reports under the Securities Exchange Act of 1934, as amended. The Disclosure Committee is currently comprised of Ron Cooper, Vanessa Wittman, Brad Sonnenberg, Scott D. Macdonald, Connie Campbell, Janet Dickinson, Paul Jacobson, Jim Buckley and Luci Altman. A copy of the Disclosure Committee Charter is attached as Exhibit 15 to this Report.

V.    Summary of Individual Conduct

A.    Introduction

During the course of the investigation, the Company evaluated the conduct of certain current and former Company employees to assess their involvement in the activities discussed in this Report including the degree of fault, if any, for the instances of erroneous and improper accounting at the Company during the Relevant Time Period. In addition, with respect to those employees still employed by the Company after March 1, 2003, current management has also assessed their role, if any, in the restatement and re-auditing process, the quality and accuracy of their work, the level of cooperation they provided as part of the restatement effort

- 38 -

and whether their work has compromised the restatement. This section also addresses corrective actions the Company has undertaken to ensure that employees are properly trained and supervised.

### 1. Recommendations of Interim Management

In the fall of 2002, prior to the appointment of current management, the Board of Directors and management of the Company at that time ("Interim Management") reviewed the role of individual employees with respect to the erroneous and improper accounting activities discussed in this Report. Interim Management considered the following factors in its evaluation: whether the individual knowingly participated in wrong-doing, the extent to which the individual was aware of wrong-doing and failed to take steps to correct or prevent it, whether the individual cooperated with Interim Management and the Special Committee's investigation and the position of the individual in the Company. Based on this evaluation, individuals were either recommended for termination, reprimand or retention.

Termination of employment was recommended for the following individuals: Michael Brady, Karen Chrosniak, Robert Cavallari, Hugh Coudriet, Luke Healy, James Helms, Brett Klein, Douglas Malone, Dean Marshall and Timothy Werth. These individuals are discussed in Sections V(C) and (E) of this Report. Messrs. Cavallari, Coudriet and Klein, however, were not terminated by Interim Management and current management has determined that Messrs. Coudriet and Klein should be retained as employees of the Company as discussed in Section V(F) below. Mr. Cavallari is discussed in Section V(E) of this Report.

The Company proposed reprimand of certain employees who were aware of potential issues, but whose level of awareness was insufficient to justify termination. The Company proposed the reprimand of Jeff Abbas, Dan Liberatore, Jason Holmberg and Robert Leete. These individuals are discussed in Sections V(E) and (F) below.

The Company proposed retention of individuals who appear not to have had any involvement in or awareness of potential issues and junior employees who had only slight awareness of potential issues. The Company proposed retaining the following individuals: George Cretekos, Randy Fisher, Keith Horn, Scott Johnson, Terri McMullen, Linda Pekarski, Ron Rapp, Charlie Raptis, Joseph Sabol, Glenn Smith, Sherri Snyder, Kathy Szarowicz, Nan Tanner, and Jason Woolcock. These individuals are discussed in Sections V(E) and (F) below.

### 2. Current Management

When the current management team arrived in March 2003, one of its first priorities was to evaluate the existing employees, particularly in the accounting and finance departments. In making our evaluation we have reviewed the Covington Report[47], conducted additional interviews and reviewed each employee's prior work product (including, without limitation, work papers, journal entries and memoranda). In addition, with respect to certain

---

[47]   The scope of the investigation is described in detail in the Introduction to the Covington Report. See Covington Report at 5-10.

PWC-EB0004901

employees Willkie Farr & Gallagher LLP conducted additional interviews. Section V(F) describes in detail the criteria current management used in its evaluations.

B.    The Rigas Family

The members of the Rigas family were not available to Covington for interviews. As discussed in the Covington Report, the information contained therein comes chiefly from early interviews of certain of the Rigases conducted by Fried Frank in April and early May 2002, the proffers on behalf of witnesses to whom Covington had limited or no direct access, and Covington's interviews of others, including other Company employees, the independent directors and third parties. Certain documents reviewed during the course of the Covington Investigation also contributed to the information learned.[48]

1.    John Rigas. John Rigas served as Chairman of the Board of Directors and Chief Executive Officer of the Company until his resignation on May 15, 2002. The Covington Report describes his involvement in a wide variety of questionable activities which are set forth on pages 303-307 therein. In July 2004 Mr. Rigas was convicted of conspiracy, fifteen counts of securities fraud and two counts of bank fraud.

2.    Timothy Rigas. Timothy Rigas resigned from his positions of Chief Financial Officer and Treasurer of Adelphia on May 16, 2002. The Covington Report states that Timothy Rigas "appears to have had substantial knowledge of and involvement in various accounting and related party issues under investigation." See pages 307-317 for a description of his involvement. In July 2004, Mr. Rigas was convicted of conspiracy, fifteen counts of securities fraud and two counts of bank fraud.

3.    Michael Rigas. Michael Rigas served as the Chief Operating Officer of Adelphia until his resignation on May 22, 2002. His awareness and involvement in potential accounting improprieties is discussed on pages 317-320 of the Covington Report. In July 2004, Michael Rigas was found not guilty of conspiracy and wire fraud but the jury remained undecided on the securities fraud and bank fraud charges against him. On July 9, 2004, the court declared a mistrial on the remaining charges against Mr. Rigas after the jurors were unable to reach a verdict as to those charges. The bank fraud charges against Mr. Rigas have since been dismissed with prejudice, but the Department of Justice has requested that a new trial date be set to retry Michael Rigas on the securities fraud charges. On November 1, 2004, Michael Rigas' post-trial motion for dismissal of all charges was denied.

4.    James Rigas. Until his resignation on May 22, 2002, James Rigas served as the Executive Vice President for Strategic Planning at Adelphia as well

---

[48]    See Covington Report at 302ff.

PWC-EB0004902

as Vice Chairman and Chief Executive Officer of ABIZ. He resigned from his positions at ABIZ on June 4, 2002. See pages 320-321 of the Covington Report for a discussion of his involvement in the matters under examination in the Covington Investigation.

5.     **Doris Rigas.** Doris Rigas, wife of John Rigas, had no official position with the Company. However as discussed on pages 321-323, Mrs. Rigas had connections to certain of the matters investigated by Covington.

6.     **Ellen Rigas Venetis.** Ellen Rigas Venetis is the daughter of John and Doris Rigas and the wife of former Company director Peter Venetis. Mrs. Venetis benefited from Company resources as discussed on pages 323-324 of the Covington Report.

7.     **Peter Venetis.** Mr. Venetis served on Adelphia's Board of Directors until his resignation in June, 2002. See pages 324-326 of the Covington Report regarding information Covington learned from Mr. Venetis during the course of its investigation.

C.     Senior Financial and Accounting Staff

The following individuals were terminated by or resigned from the Company prior to March 1, 2003.

1.     **James Brown.** James Brown was Vice President of Finance from August 13, 1984 until his resignation on May 17, 2002. According to the Covington Report, Mr. Brown worked closely with Timothy Rigas on significant financial business development, and accounting matters affecting the Company. The Covington Report states that "Covington has strong evidence that Mr. Brown exercised significant discretion and provided direction to others on many of the issues under investigation." See pages 327-330 of the Covington Report. On November 14, 2002, Mr. Brown pleaded guilty to one count each of conspiracy, bank fraud and securities fraud.[49]

2.     **Karen Chrosniak.** Karen Chrosniak was the Director of Investor Relations for the Company from December 7, 2000. Ms. Chrosniak was placed on administrative leave in May 2002 and subsequently terminated on December 31, 2002. See pages 331-332 of the Covington Report with respect to Ms. Chrosniak's awareness of certain improper activities.

3.     **Luke Healy.** According to the Covington Report, Luke Healy worked at Adelphia in various accounting positions from May 1992 until early 2000,

---

[49]     See Covington Report at 327-328 and United States v. John Rigas, Michael Rigas, Tim Rigas, James Brown, and Michael Mulcahey (S.D.N.Y. 02 CRIM 1236)(Indictment of September 23, 2002).

PWC-EB0004903

when he left his position as Director of Accounting to join another company. In 2001, Mr. Healy returned to Adelphia in a position in the operations group as a Regional Budget Director. Mr. Healy was placed on administrative leave in May 2002 until his termination from the Company on December 31, 2002. Mr. Healy provided information to Covington on the Cash Management System and related party balances and on affiliate fees charged to Devon Mobile, Inc. See page 332 of the Covington Report.

4.   James Helms. Mr. Helms was a Treasury Manager and reported directly to Michael Mulcahey. He was placed on administrative leave on July 29, 2002 and subsequently terminated on December 31, 2002. See pages 342-343 of the Covington Report regarding Mr. Helms' involvement in certain matters under investigation.

5.   Douglas Malone. Douglas Malone was the Director of External Reporting and reported to James Brown. He served in this capacity from September 7, 2000 until he was placed on administrative leave in May 2002. He was subsequently terminated on December 31, 2002. See pages 334-335 of the Covington Report for the activities that Mr. Malone was involved in.

6.   Dean Marshall. Mr. Marshall was Director of Finance for Adelphia and reported to James Brown. He was placed on administrative leave in May 2002 until his termination on December 31, 2002. See pages 332-333 of the Covington Report for a description of information that Mr. Marshall provided to Covington regarding matters under investigation.

7.   Michael Mulcahey. Michael Mulcahey was the Vice President and Assistant Treasurer until he was placed on administrative leave in May 2002. He was arrested in July 2002 at which time he was terminated.[50] See pages 335-337 of the Covington Report for a discussion of Mr. Mulcahey's involvement in the matters under investigation. Mr. Mulcahey was acquitted of all the counts against him.

8.   Timothy Werth. Timothy Werth was the Company's Director of Accounting from February 7, 2000 to December 31, 2002. He was placed on administrative leave in May 2002 and subsequently terminated on December 31, 2002. According to the Covington Report "Mr. Werth appears to have had significant involvement in many of the accounting issues investigated by Covington, often in collaboration with James Brown." See pages 337-339 of the Covington Report. In January 2003, Mr. Werth pleaded guilty to one count each of conspiracy, bank fraud and securities fraud.

---

[50]   See United States v. John Rigas, Michael Rigas, Tim Rigas, James Brown, and Michael Mulcahey (S.D.N.Y. 02 CRIM 1236)(Indictment of September 23, 2002) for charges.

PWC-EB0004904

D.   Other Senior Staff

1.   Carla Brown-Horn.  Carla Brown-Horn was an attorney for the Company
who worked on special projects, but was not a member of Adelphia's legal
department.  She was terminated on December 31, 2002.  See pages 359-
361 of the Covington Report for a description of the various activities Ms.
Brown-Horn was involved in.

2.   Ed Hartman.  Mr. Hartman worked both as the Vice President of Finance
and Development for NFHLP, the Rigas entity which previously owned
the Buffalo Sabres and for Adelphia in special projects.  He was
terminated on August 26, 2002.  See pages 356-357 of the Covington
Report regarding Mr. Hartman's involvement in matters under
investigation.

3.   Colin Higgin.  Colin Higgin was Deputy General Counsel of Adelphia
from November 16, 1992 until his resignation on July 8, 2002.  He
reported directly to Timothy Rigas.  His involvement in various matters is
described on pages 357-358 of the Covington Report.

E.   Terminations or Resignations of Senior Staff after March 1, 2003

The following individuals were employed by the Company after March 1, 2003
but subsequently resigned or were terminated.

1.   Jeff Abbas.  Mr. Abbas served as Vice President of Programming until his
resignation on August 31, 2003.  Mr. Abbas' involvement in matters under
investigation is discussed on pages 351-352 of the Covington Report.  Mr.
Abbas' duties involved negotiating programming contracts on behalf of
the Company.  Mr. Abbas was not involved in the Company's restatement
and re-auditing process.

2.   Joseph Michael Brady.  Mr. Brady served as Vice President of Financial
Operations until his termination on May 23, 2003.  Mr. Brady's
involvement in matters under investigation during the Relevant Time
Period is discussed on pages 353-354 of the Covington Report.  After
March 1, 2003, Mr. Brady's duties included work on the Company's 2003
re-budgeting effort.  Mr. Brady was not involved in the Company's
restatement and re-auditing process.

3.   Robert Cavallari.  During the Relevant Time Period Mr. Cavallari served
as Director of Finance, Contract Accounting.  In conjunction with the
Accounting Reorganization, Mr. Cavallari was promoted to Vice President
-- Disbursement Control, the position he held until his termination on
October 29, 2004.  Mr. Cavallari's involvement in matters under
investigation during the Relevant Time Period is discussed on page 340 of
the Covington Report.  In addition, Willkie Farr & Gallagher LLP, counsel
to the Company, conducted a follow up interview of Mr. Cavallari to

- 43 -

PWC-EB0004905

2004.[51]  Mr. Holmberg was not involved in the Company's accounting activities during the Relevant Time Period and has not been involved in the Company's restatement or re-auditing of its books and records.  The Covington Report identifies Mr. Holmberg of being aware of the Co-Borrowing Facilities and the Potter County Timber Rights transaction.[52]  In May 2004 Mr. Holmberg was formally reprimanded by Mr. Bagan for his work related to the Co-Borrowing Facilities and the Timber Rights transaction.

7.      Keith Horn.  Keith Horn was a Vice President who was responsible for tax, workers compensation, benefits and compensation matters until his termination on May 2, 2003.  His involvement in the matters under investigation is discussed on pages 361-362 of the Covington Report.  After March 1, 2003, Mr. Horn's duties and responsibilities were substantially curtailed.  Mr. Horn was not involved in the Company's restatement and re-auditing process.

8.      Dan Liberatore.  Mr. Liberatore was Vice President of Engineering from 1986 until his termination on November 1, 2004.[53]  Mr. Liberatore's involvement in matters under investigation during the Relevant Time Period is discussed on page 363 of the Covington Report.  His responsibilities during the Relevant Time Period included overseeing plant maintenance and upgrade as well as purchasing and FCC compliance.  He also was involved in acquisitions if technical or compliance issues arose.  Until his departure, Mr. Liberatore reported to Marwan Fawaz, Senior Vice President and Chief Technology Officer and in April 2003 he was formally reprimanded regarding his involvement in the events surrounding the converter purchases and marketing support discussed in the Covington Report (See Issue Summary F-10 and Section III(B)(16) above).  .Mr. Liberatore was not involved with the restatement or re-auditing of the Company's books and records.

9.      Jason Woolcock.  Mr. Woolcock served as an accounting supervisor at Adelphia until October 1, 2002 at which time he was promoted to accounting manager.  Mr. Woolcock resigned from the Company on July 11, 2003.  Mr. Woolcock identified several issues that he viewed to be problematic during the Relevant Time Period.  See pages 349-352 of the Covington Report.  Prior to his resignation, Mr. Woolcock was involved in

---

[51]   Mr. Holmberg's employment with the Company ended on December 6, 2004 due to downsizing of the Company's Commercial Services Business.

[52]   See Covington Report at 358-359.

[53]   Mr. Liberatore's employment with the Company ended on November 1, 2004 due to downsizing in the Company's engineering department.

PWC-EB0004906

discuss these matters on July 8, 2004. Until his departure, Mr. Cavallari was significantly involved in the restatement and re-auditing of the Company's books and records related to programming, accounts payable, franchise and copyright fees and had coordination responsibilities for the ABIZ restatement and re-auditing effort. Mr. Cavallari's performance on the restatement was closely supervised by Robert DeLucia and Scott Macdonald. All restatement issues and adjustments associated with Mr. Cavallari's areas have been reviewed and approved by Scott Macdonald and PWC has been consulted on all such issues and adjustments.

4.   Hugh Coudriet. During the Relevant Time Period Mr. Coudriet was an Accounting Manager and reported to Luke Healy and Timothy Werth. Mr. Coudriet was responsible for the accounting for fixed assets, revenue, franchise fees, copyrights and cash reconciliation. In conjunction with the Accounting Reorganization, Mr. Coudriet was assigned responsibility for fixed assets and was promoted to Senior Manager - Fixed Assets, the position he held until his resignation from the Company, effective October 29, 2004. Mr. Coudriet's involvement in matters under investigation during the Relevant Time Period is discussed on page 341 of the Covington Report. In addition, Willkie Farr & Gallagher LLP, counsel to the Company, conducted a follow up interview with Mr. Coudriet to discuss these matters on July 8, 2004. Until his departure, Mr. Coudriet was significantly involved in the restatement and re-auditing of the Company's fixed asset records. Mr. Coudriet's performance on the restatement was closely supervised and all accounting policies and procedures in the fixed asset area as a result of the Company's restatement and re-auditing process have been reviewed in detail by Terry Donovan and Scott Macdonald and PWC has been consulted on such policies and procedures.

5.   Randy Fisher. Randy Fisher served as General Counsel of the Company until his resignation on July 26, 2003. Mr. Fisher provided background information on certain matters under investigation which are summarized on pages 355-356 of the Covington Report. After March 1, 2003, Mr. Fisher's duties were substantially curtailed and he had no input into any of the accounting functions of the Company. Mr. Fisher was not involved in the Company's restatement and re-auditing process.

6.   Jason Holmberg. During the Relevant Time Period, Mr. Holmberg was a junior employee who worked on business development projects and reported to Timothy Rigas. For the period March 2003 to December 2003, Mr. Holmberg served as Director, Business Development reporting to Joe Bagan, Senior Vice President and Chief Administration Officer. In January 2004, Mr. Holmberg was appointed Director, Commercial Services, the position that he held until his termination on December 6,

- 44 -

the restatement effort associated with prepaid expense accounts. Mr. Woolcock made progress on, but did not complete the restatement of the prepaid expense accounts prior to his resignation. His work product (work papers, restatement journal entries, etc.) was reviewed in detail by Janet Dickinson, Vice President of Corporate Accounting and External Reporting.

F.    Other Financial and Accounting Staff Currently Employed by Adelphia

With respect to those employees who remain with the Company, Current Management considered the following factors in its evaluation of these individuals:

- Role in the Potential Illegal Acts. Did the employee create the accounting that led to the potential illegal act occurring? Did the employee simply make an accounting error or exercise poor judgment or did the employee intend to commit an illegal act? Was the potential illegal act an error in accounting or judgment versus a potential illegal act?

- Job Responsibility. What was the employee's position in the organization at the time the potential illegal act occurred? Was the employee in a position to exercise discretion over the accounting treatment, process or procedure employed that gave rise to the potential illegal act?

- Cooperation with the Investigation. Did the employee cooperate fully with Covington and PWC Forensic during the investigation?

- Restatement Efforts. Has the employee fully cooperated and work diligently to help restate the Company's books and records? As part of the restatement, did the employee cooperate fully with PwC?

- Job Performance. Has the employee's job performance been satisfactory since June 2002?

In addition, current management has determined what remedial actions were necessary with respect to each employee.

1.    Brett Klein

During the Relevant Time Period, Mr. Klein was an Accounting Supervisor reporting to Bill Hau, Accounting Manager. Mr. Klein was responsible for compiling data on subscriber numbers for external purposes. In conjunction with the Accounting Reorganization, Mr. Klein has been assigned responsibility as an Accounting Supervisor for IT systems. He continues to report to Bill Hau. Mr. Klein has not been significantly involved with the restatement and re-auditing of the Company's books and records and was not involved in the Company's effort to restate its subscriber numbers. He primarily performed data gathering activities and assisted the revenue accounting group with the retrieval of supporting

- 46 -

PWC-EB0004908

documentation for PWC. Current management moved the responsibility for subscriber reporting from the Accounting Department to the Operational Finance Department.

### a.    Role in the Potential Illegal Acts

The Covington Report identifies Mr. Klein as being involved with the following activity during the Relevant Time Period[54]:

- Public Representations Regarding Subscriber Numbers.

Willkie Farr & Gallagher LLP conducted a follow up interview of Mr. Klein on July 8, 2004 to better understand his role in this matter.

### b.    Job Responsibility

Mr. Klein prepared the subscriber information used by the Company for external purposes, including its SEC filings. Developing subscriber information in the cable industry is not an exact science and with respect to many aspects of calculating subscriber numbers there are no clear industry standards.

In performing his work, Mr. Klein collated data obtained from various sources within the Company (principally, the billing department) and after making various adjustments to this data developed the final subscriber numbers that were released to the public. The adjustments implemented by Mr. Klein were determined by his superiors. As an Accounting Supervisor, Mr. Klein was not in a position to exercise discretion with respect to the data provided to him and the adjustments he was told to make. Mr. Klein did not determine that the adjustments were unreasonable or improper. Mr. Klein was told, from time to time, that various of the adjustments had been reviewed and approved by Deloitte.

Mr. Klein advised during the follow-up interview that Tim Werth and Douglas Malone told him on occasion that he should review his subscriber information and implied that the numbers should be increased. Mr. Klein stated that he did not increase the numbers in response to these conversations.

### c.    Cooperation with the Investigation

Mr. Klein was cooperative in his interviews that were conducted as part of the investigation. Mr. Klein also cooperated fully during his follow-up interview with Willkie Farr & Gallagher LLP.

---

[54]    Id. at 343. Based on the Company's investigation, current management is not aware of Mr. Klein being involved in any other potential illegal acts during the Relevant Time Period or thereafter.

PWC-EB0004909

d.     Restatement Efforts

As discussed above, Mr. Klein is no longer involved in the preparation of subscriber numbers and has not had significant involvement with the restatement and re-auditing efforts.

e.     Job Performance

Mr. Klein's performance since the Relevant Time Period has been excellent (he was given a performance rating of 4.3 out of a possible 5).

f.     Remedial Action

Over the past year, Mr. Klein's work product (data retrieval, accounting system maintenance and accounting month end processing) has been closely supervised by Bill Hau and the Company's assistant controller, Robert DeLucia. Mr. Klein is responsible for accounting IT processes within the Accounting Department and not with the recording of accounting transactions or the implementation of accounting procedures.

Current management has concluded that Mr. Klein did not exercise discretion in preparing the subscriber numbers reported by the Company and merely followed the instructions of his superiors. Given his current job performance, current management has concluded that Mr. Klein should retain his position with the Company.

\*\*\*\*\*\*\*\*

As noted in Section V(A) above, Interim Management recommended that a number of employees be retained by the Company. Current management's evaluation of these individuals is discussed below.

2.     Scott Johnson

During the Relevant Time Period, Mr. Johnson was Director of Corporate Development reporting to Timothy Rigas. In this capacity, Mr. Johnson was responsible for analyzing potential acquisitions of cable systems by the Company. In this capacity he would assess the value of a particular cable company, create cash flow models, run models and create a business plan to determine whether an acquisition was appropriate. In his interviews, Mr. Johnson stated that although he had responsibility for cable deals, he had very limited knowledge of other transactions the Company was engaged in beyond the fact of their existence (i.e. Eleni Interiors, the timber rights transaction; the Beaver Creek Condominiums and the Buffalo Sabres). In conjunction with the Accounting Reorganization, Mr. Johnson transferred to the Accounting Department and was assigned responsibility as a Director of Accounting reporting to Terry Donovan. In this role, Mr. Johnson has responsibility for cost allocations (management fees, corporate overhead, regional overhead, call centers, reorganization expenses, non-recurring expenses, etc.) and has been the Company's liaison in dealing with its Comcast Joint Venture Partners. More recently, Mr. Johnson has also been assisting in the supervision of long distance telephony accounting. Mr. Johnson has been heavily involved with the restatement and re-auditing of the Company's books and records. In particular, he has been given overall

- 48 -

PWC-EB0004910

responsibility for the restatement and re-auditing efforts for prepaid expenses and other assets and allocations.

### a.    Role in the Potential Illegal Acts

The Covington Report identifies Mr. Johnson as being involved with the following activities during the Relevant Time Period[55]:

- Public Representations Regarding Subscriber Numbers

- Related Party Acquisitions

- Comcast Swap

- The ML Media Transaction

Based on the Company's investigation, Mr. Johnson was aware of adjustments made to subscriber numbers, but was not involved in the preparation of these adjustments or the communication to external parties.  As noted above, In his role as Director of Corporate Development, Mr. Johnson, was principally involved in the business aspects of analyzing and consummating acquisitions but it does not appear that he exercised significant discretion with respect to the issues investigated.

### b.    Job Responsibility

During the Relevant Time Period, Mr. Johnson was not involved in the accounting activities of the Company.  As described above, he was involved in providing Timothy Rigas with analyses related to acquisitions.  He was not involved in analyzing a transaction for a Rigas Entity.  In his interviews Mr. Johnson stated he did not make presentations to analysts and he was not responsible for providing information outside of the Company.

### c.    Cooperation with the Investigation

Mr. Johnson was cooperative in his interviews that were conducted as part of the investigation.

### d.    Restatement Efforts

Mr. Johnson has worked diligently throughout the Company's restatement and re-auditing efforts.  He has cooperated with the PwC auditors.

---

[55]    Id. at 362.  Based on its investigation, the Company is not aware of Mr. Johnson being involved in any other potential illegal acts during the Relevant Time Period or thereafter.

PWC-EB0004911

e.     Job Performance

Mr. Johnson's job performance since the Relevant Time Period has been very strong. In his most recent evaluation, he was given an above average rating of 4.0 out of a possible 5.

f.     Remedial Action

Over the past year, Mr. Johnson has been closely supervised by Terry Donovan. Mr. Donovan reviews his work product and approves accounting journal entries, analysis, etc. prepared by Mr. Johnson.

Current management has concluded that Mr. Johnson did not exercise discretion related to the Company's acquisition activities, but merely prepared analyses for Timothy Rigas. Since the Relevant Time Period his job performance has been strong. Accordingly, we have concluded that Mr. Johnson should retain his position with the Company.

3.     Teri McMullen

During the Relevant Time Period, Ms. McMullen was an Accounting Manager reporting to Timothy Werth. In this capacity, she was primarily responsible for the accounting for the Century acquisition and the day-to-day accounting for the Arahova entities. In conjunction with the Accounting Reorganization, Ms. McMullen was promoted to Senior Accounting Manager reporting to Terry Donovan. In this role, Ms. McMullen has responsibility for, among other items, intercompany and related party transactions, pole rent, payroll and special projects. Ms. McMullen has been heavily involved with the restatement and re-auditing of the Company's books and records. She has led the Company's restatement work with respect to intercompany and related party accounts, pole rent and assisted with the restatement work associated with the Century acquisition, among other tasks. Since July 2002, Ms. McMullen has also been a critical player in answering the extensive and exhaustive lists of questions raised by the Company's creditors.

a.     Role in the Potential Illegal Acts

The Covington Report identifies Ms. McMullen as being involved with the following activity during the Relevant Time Period[56]:

- End-of-Quarter Journal Entries

Ms. McMullen made end-of-quarter journal entries that adjusted management fees and affiliate interest. She made these entries at the direction of Michael Mulcahey. Based on the Company's investigation, Ms. McMullen did not exercise discretion with respect to these entries and believed that the entries were legitimate.

---

[56]    Id. at 344-345. Based on its investigation, the Company is not aware of Ms. McMullen being involved in any other potential illegal acts during the Relevant Time Period or thereafter.

PWC-EB0004912

b.    Job Responsibility

As an Accounting Manager, Ms. McMullen would be expected to possess knowledge of general accounting principles and how to apply these principles with respect to her specific area of responsibility, but she would not be expected to be a technical accounting expert. Managers would follow the accounting guidance provided to them by their superiors and instruct their employees (supervisors, staff accountants, etc.) to do the same. Accounting Managers would not be expected to possess the accounting skills to handle complex technical accounting matters. Current management has concluded that as an Accounting Manager, Ms. McMullen was not in a position to create the erroneous and improper accounting related to end-of-quarter management fees and affiliate interest. She was not an expert with respect to the Company's debt agreements and relied upon Mr. Mulcahey's expertise in such agreements given his role as Vice President and Assistant Treasurer.

c.    Cooperation with the Investigation

Ms. McMullen was cooperative in her interviews that were conducted as part of the investigation.

d.    Restatement Efforts

Ms. McMullen has worked diligently throughout the Company's restatement and re-auditing efforts. She has cooperated with the PwC auditors.

e.    Job Performance

Ms. McMullen's has been a strong performer since the Relevant Time Period. In her most recent evaluation, she was given an above average rating of 3.8 out of a possible 5.

f.    Remedial Action

Over the past year Ms. McMullen has been closely supervised by Terry Donovan. Mr. Donovan reviews her work product and approves accounting journal entries, analysis, etc. prepared by Ms. McMullen.

Current management has concluded that Ms. McMullen did not exercise discretion related to the erroneous and improper accounting for end-of-quarter journal entries, but merely recorded the entries at the direction of Mr. Mulcahey. Her job performance has been strong and she cooperated with the investigation and has worked diligently on the Company's restatement and re-auditing efforts. Accordingly, we have concluded that Ms. McMullen should retain her position with the Company.

4.    Linda Pekarski

During the Relevant Time Period, Ms. Pekarski was the Accounts Payable Manager reporting to Bill Hau, Accounting Manager. Ms. Pekarski was responsible for payment of the Company's bills from its vendors. In conjunction with the Accounting Reorganization, Ms. Pekarski was promoted to Senior Accounts Payable Manager, reporting to Robert Cavallari.

- 51 -

PWC-EB0004913

Ms. Pekarski has been involved with the restatement and re-auditing of the Company's books and records, primarily by assisting others in the Accounting Department by supplying them with needed supporting documentation (e.g., invoices). Ms. Pekarski has also been a critical player in the preparation of the Company's Statement of Financial Affairs and other critical bankruptcy reporting requirements.

### a.  Role in the Potential Illegal Acts

The Covington Report identifies Ms. Pekarski as being involved with the following activity during the Relevant Time Period[57]:

- Cash Management System

Ms. Pekarski was responsible for all vendor payments made via a check drawn on a Company bank account, including payments made that were related to Rigas Entities. While Ms. Pekarski processed payments to the Rigas Entities, she did not process or pay invoices on behalf of them. Based on the Company's investigation, when Ms. Pekarski was uncertain as to whether the Company or a Rigas Entity was responsible for a payment to be made she sought approval from Michael Mulcahey. She did not have discretion with respect to payment matters.

### b.  Job Responsibility

As discussed above, Ms. Pekarski is responsible for the Company's vendor payments. She does not have discretion with respect to payments made by the Accounts Payable Department and sought approval for payments made related to Rigas Entities from Mr. Mulcahey. Ms. Pekarski does not record or create accounting journal entries. She manages over 40 employees in the Accounts Payable department. Each month the Company processes thousands of accounts payable payment transactions. Given the volume, Ms. Pekarski is not in a position to review each and every payment processed by the Accounts Payable department. She relies on her staff to present her with payment requests that appear out of the ordinary or not approved in accordance with the Company's limits of approval process.

### c.  Cooperation with the Investigation

Ms. Pekarski was cooperative in her interviews that were conducted as part of the investigation.

### d.  Restatement Efforts

Ms. Pekarski has worked diligently throughout the Company's restatement and re-auditing efforts. She has cooperated with the PwC auditors. At the request of the U.S. Attorney's office for the Southern District of New York, she has also testified in the criminal trial brought by the Department of Justice against certain members of the Rigas family.

---

[57]   Id. at 345. Based on its investigation, the Company is not aware of Ms. Pekarski being involved in any other potential illegal acts during the Relevant Time Period or thereafter.

PWC-EB0004914

e. Job Performance

Ms. Pekarski has been a strong performer since the Relevant Time Period. In her most recent evaluation, she was given an above average rating of 4 out of a possible 5.

f. Remedial Action

Over the past year, Ms. Pekarski has been closely supervised by Robert Cavallari until his departure and Robert DeLucia. She consistently consults Mr. Macdonald with respect to accounts payable requests that are out of the ordinary before processing the payments.

Current management has concluded that Ms. Pekarski did not exercise discretion related to payments made by the Company and sought approval from Michael Mulcahey for payments made that were related to Rigas items. Her job performance has been strong and she cooperated with the investigation and has worked diligently on the Company's restatement and re-auditing efforts. Accordingly, we have concluded that Ms. Pekarski should retain her position with the Company.

5. Ron Rapp

During the Relevant Time Period, Mr. Rapp was an Accounting Manager reporting to Luke Healy and Timothy Werth. Mr. Rapp was responsible for the accounting for the FrontierVision and Olympus systems. In conjunction with the Accounting Reorganization, Mr. Rapp was assigned responsibility as an Accounting Manager reporting to Terry Donovan. In this role, Mr. Rapp has responsibility for the accounting for the Company's Northeast region as well as various accrued liability and related expense accounts. Mr. Rapp has been heavily involved with the restatement and re-auditing of the Company's books and records. Mr. Rapp led the Company's restatement work with respect to many of the Company's accrued liability accounts, including the billing accrual, high speed Internet circuit expense accrual and litigation reserves.

a. Role in the Potential Illegal Acts

The Covington Report identifies Mr. Rapp as being involved with the following activities during the Relevant Time Period[58]:

- End-of-Quarter Journal Entries

- Accrual of Reserves for Legal Contingencies

- Comcast Swap

- Use of Company Aircraft

---

[58] Id. at 345-346. Based on its investigation, the Company is not aware of Mr. Rapp being involved in any other potential illegal acts during the Relevant Time Period or thereafter.

- 53 -

PWC-EB0004915

Willkie Farr & Gallagher LLP conducted a follow-up interview with Mr. Rapp in person on July 8, 2004, and a telephone interview on July 12, 2004 to better understand his role in the matters identified in the Covington Report.

As was the case with Ms. McMullen, Mr. Rapp made end-of-quarter journal entries that adjusted management fees and affiliate interest at the direction of Michael Mulcahey. Based on Willkie Farr's interview and the Company's own investigation, Mr. Rapp did not exercise discretion with respect to these entries and believed that the entries were legitimate based on his reliance upon Mr. Mulcahey's expertise as Vice President and Assistant Treasurer. Further, Mr. Mulcahey instructed Mr. Rapp to direct all questions from Deloitte regarding management fees to him.

At the direction of Timothy Werth, Mr. Rapp instructed his accounting staff to reverse certain legal contingency reserves. The recording of legal contingency reserves is one of the more subjective areas in accounting. Mr. Rapp relied upon Mr. Werth's expertise as Director of Accounting with respect to the accounting for the legal contingency reserves. Based upon Willkie Farr's interview, Mr. Werth and Mr. Rapp received information from the legal department that indicated a year-end liability probable and estimable in the amount of $2.6 million for certain Kentucky property taxes owed by FrontierVision. FrontierVision had accrued a reserve of $5.2 million for this liability. Mr. Werth directed Mr. Rapp to reverse the full amount of the reserve. Mr. Rapp suggested reversing only $2.6 million and leaving $2.6 million on reserve. Mr. Werth told Mr. Rapp that no reserve was necessary. Mr. Rapp simply carried out Mr. Werth's instructions. He did not have an independent basis for determining the propriety of this adjustment.

Mr. Rapp also participated in the accounting for the Comcast cable system swap in 2001. Based on Willkie Farr's interview, Mr. Rapp recorded the disposition of the assets Adelphia swapped to Comcast, and recorded the assets acquired from Comcast by Adelphia on the balance sheet. With respect to the valuation of the assets, Mr. Rapp was only responsible for calculating "intangibles," which were simply a plug number for the total value less fixed assets, and working capital. He had no involvement with the valuation of the swapped fixed assets.

As a result of the Company's investigation, the Company concluded that it would restate certain aspects of the accounting for this transaction (See Section III(B)(21) above and Issues Summary A-1 at Exhibit 3). This transaction was one of the more difficult and complex restatement issues faced by current management. The Company determined that restatement adjustments were necessary only after extensive discussions with PwC. As an Accounting Manager Mr. Rapp would not have been the technical accounting expert. Instead he relied upon Mr. Werth to properly assess the appropriate accounting.

Mr. Rapp was also minimally involved in the accounting for the use of Company aircraft. Based on the Company's investigation, Mr. Rapp and his staff simply tracked the usage of the aircraft among the various Company entities based upon flight schedules received from George Crekos. It was learned during Willkie Farr's interview that Mr. Rapp had made only one allocation. Based on instructions received from Mr. Werth following a meeting between Mr. Rapp, Mr. Werth and Mr. Babcock, VP of Finance of ABIZ, Mr. Rapp allocated a portion of flight operation costs to ABIZ during the second quarter of 2001. Mr. Rapp was later told by

- 54 -

PWC-EB0004916

Mr. Werth not to record such an allocation in future quarters. In a Company with multiple legal entities and related parties, allocation of costs is not unusual. The Company believes that Mr. Rapp relied upon Mr. Werth's expertise with respect to when to record allocations of costs associated with the Company's flight operations.

### b. Job Responsibility

As an Accounting Manager, Mr. Rapp would be expected to possess knowledge of general accounting principles and how to apply these principles with respect to his specific area of responsibility, but he would not be expected to be a technical accounting expert. The accounting directors and vice presidents would have greater technical accounting expertise. Given the complexity of accounting rules, many companies employ individuals that exclusively research technical accounting matters. Managers would follow the accounting guidance provided to them by their superiors and instruct their employees (supervisors, staff accountants, etc.) to do the same. Accounting Managers would not be expected to possess the accounting skills to handle complex technical accounting matters. Current management has concluded that as an Accounting Manager, Mr. Rapp was not in a position to create the erroneous and improper accounting related to the items discussed above. He relied upon Mr. Werth's expertise as one of the Company's technical accounting experts and on Mr. Mulcahey's expertise as Vice President and Assistant Treasurer with respect to the accounting matters discussed above. Mr. Rapp was also comforted by Deloitte's acceptance of the financial statements ultimately included in the Company's Annual Reports on Form 10-K.

### c. Cooperation with the Investigation

Mr. Rapp was cooperative in his interviews that were conducted as part of the investigation. Mr. Rapp also cooperated fully during his follow-up interviews with Willkie Farr & Gallagher LLP.

### d. Restatement Efforts

Mr. Rapp has worked diligently throughout the Company's restatement and re-auditing efforts. He has cooperated with the PwC auditors.

### e. Job Performance

Mr. Rapp has been an excellent performer since the Relevant Time Period. In October 2003, Mr. Rapp was promoted to Senior Accounting Manager. In his most recent review, he was given an above average rating of 4.4 out of a possible 5.

### f. Remedial Action

Over the past year Mr. Rapp has been closely supervised by Terry Donovan. Mr. Donovan reviews his work product and approves accounting journal entries, analysis, etc. prepared by Mr. Rapp.

Current management has concluded that Mr. Rapp did not exercise discretion related to the erroneous and improper accounting for end-of-quarter journal entries, accrual of

PWC-EB0004917

reserves for legal contingencies, the Comcast swap and the use of Company aircraft. Mr. Rapp relied upon the expertise of Mr. Werth as Director of Accounting and one of the Company's technical accounting experts and Mr. Mulcahey as Vice President and Assistant Treasurer. His job performance has been excellent (one of the top performing Accounting Managers) and he has cooperated with the investigation and worked diligently on the Company's restatement and re-auditing efforts. Accordingly, we have concluded that Mr. Rapp should retain his position with the Company.

### 6.    Joseph Sabol

During the Relevant Time Period, Mr. Sabol was an Accounting Manager reporting to Timothy Werth and Douglas Malone. Mr. Sabol was primarily responsible for the preparation of SEC filings for the Company. In conjunction with the Accounting Reorganization, in 2003, Mr. Sabol was assigned responsibility as an Accounting Manager reporting to Terry Donovan. In this role, Mr. Sabol has responsibility for the accounting for the Company's Southeast region. Mr. Sabol has been heavily involved with the restatement and re-auditing of the Company's books and records. Mr. Sabol led the Company's restatement work with respect to the Company's investment and equity accounts.

#### a.    Role in the Potential Illegal Acts

The Covington Report identifies Mr. Sabol as being involved with the following activity during the Relevant Time Period[59]:

- Disclosures of Co-Borrowing Amounts

Mr. Sabol, through his attorney, provided Covington with information regarding the discussions between the Company and Deloitte regarding disclosures related to the amount of the co-borrowing debt in the Company's Annual Report on Form 10-K for the year ended December 31, 2000. Mr. Sabol was not involved in determining the appropriate disclosures in the Form 10-K related to the co-borrowing debt. Those decisions were made by Timothy Rigas, James Brown and Douglas Malone.

#### b.    Job Responsibility

As an Accounting Manager, Mr. Sabol would be expected to possess knowledge of how to prepare SEC reports (e.g., Forms 10-K, 10-Q, etc.), but would not be expected to make decisions with respect to whether or not certain matters such as the co-borrowing debt should be disclosed. Douglas Malone, as Director of External Reporting, along with James Brown and Timothy Rigas would be expected to be the technical disclosure experts. Current management has concluded that as an Accounting Manager, Mr. Sabol was not in a position to determine the appropriate disclosures associated with the co-borrowing debt.

---

[59]    Id. at 346. Based on its investigation, the Company is not aware of Mr. Sabol being involved in any other potential illegal acts during the Relevant Time Period or thereafter.

PWC-EB0004918

c.     Cooperation with the Investigation

Mr. Sabol is a material witness with respect to the prosecution of members of the Rigas family and Michael Mulcahey. Accordingly, at the request of the U.S. Attorney's office, Covington's investigation of Mr. Sabol was conducted through his attorney. Mr. Sabol has been cooperative with current management throughout its investigation.

d.     Restatement Efforts

Mr. Sabol has worked diligently throughout the Company's restatement and re-auditing efforts. He has cooperated with the PwC auditors.

e.     Job Performance

Mr. Sabol has been a strong performer since the Relevant Time Period. In October 2003, Mr. Sabol was promoted to Senior Accounting Manager. In his most recent review, he was given an above average rating of 4.2 out of a possible 5.

f.     Remedial Action

Over the past year Mr. Sabol has been closely supervised by Terry Donovan. Mr. Donovan reviews his work product and approves accounting journal entries, analysis, etc. prepared by Mr. Sabol.

Current management has concluded that Mr. Sabol was not responsible for determining the appropriate disclosures related to the co-borrowing debt. His job performance has been strong and he cooperated with the investigation and has worked diligently on the Company's restatement and re-auditing efforts. Accordingly, we have concluded that Mr. Sabol should retain his position with the Company.

7.     Glenn Smith

During the Relevant Time Period, Mr. Smith was an Accounting Supervisor reporting to Mr. Sabol. Mr. Smith assisted Messrs. Sabol and Malone with the Company's SEC reporting process. In conjunction with the Accounting Reorganization, Mr. Smith was assigned responsibility as an Accounting Manager reporting to Terry Donovan. In this role, Mr. Smith has responsibility for the accounting for the Company's California region. Mr. Smith has been heavily involved with the restatement and re-auditing of the Company's books and records. Mr. Smith led the Company's restatement work with respect to tracking all of the restatement adjustments and their impact on the Company's financial statements, property taxes, intercompany and affiliate interest calculations and entries and various other assorted restatement tasks.

PWC-EB0004919

a. Role in the Potential Illegal Acts

The Covington Report identifies Mr. Smith as being involved with the following activities during the Relevant Time Period[60]:

- End-of-Quarter Journal Entries

- Accrual of Reserves for Legal Contingencies

As was the case with Ms. McMullen and Mr. Rapp, Mr. Smith made end-of-quarter journal entries that adjusted management fees and affiliate interest at the direction of Michael Mulcahey.

Mr. Smith discussed the need to record a reserve related to a property tax dispute between the Company and the State of Kentucky with Timothy Werth on several occasions. Mr. Werth, in his role as Director of Accounting, determined that a reserve should not be recorded. Mr. Smith consistently raised the possibility that a reserve needed to be booked for this matter with Mr. Werth and relied upon Mr. Werth's judgment not to record one.

b. Job Responsibility

As an Accounting Supervisor, Mr. Smith would be expected to possess knowledge of general accounting principles and how to apply these principles with respect to his specific area of responsibility, but he would not be expected to be a technical accounting expert. The accounting directors and vice presidents would have greater technical accounting expertise. Given the complexity of accounting rules, many companies employ individuals that exclusively research technical accounting matters. Accounting Supervisors would follow the accounting guidance provided to them by their superiors and instruct their employees (supervisors, staff accountants, etc.) to do the same. Accounting Supervisors would not be expected to possess the accounting skills to handle complex technical accounting matters, such as the timing and appropriate amount to record related to a litigation reserve. Current management has concluded that as an Accounting Supervisor, Mr. Smith was not in a position to create the erroneous and improper accounting related to the items discussed above.

c. Cooperation with the Investigation

Mr. Smith was cooperative in his interviews that were conducted as part of the investigation.

d. Restatement Efforts

Mr. Smith has worked diligently throughout the Company's restatement and re-auditing efforts. He has cooperated with the PwC auditors.

---

[60] Id. at 346-347. Based on its investigation, the Company is not aware of Mr. Smith being involved in any other potential illegal acts during the Relevant Time Period or thereafter.

PWC-EB0004920

e.      Job Performance

Mr. Smith has been a very strong performer since the Relevant Time Period.  In October 2003, Mr. Smith was promoted to Accounting Manager.  In his most recent review, he was given an above average rating of 4.0 out of a possible 5.

f.      Remedial Action

Over the past year Mr. Smith has been closely supervised by Terry Donovan.  Mr. Donovan reviews his work product and approves accounting journal entries, analysis, etc. prepared by Mr. Smith.

Current management has concluded that Mr. Smith did not exercise discretion related to the erroneous and improper accounting for end-of-quarter journal entries and the accrual of reserves for legal contingencies.  Mr. Smith relied upon the expertise of Mr. Werth and Mr. Mulcahey.  His job performance has been very strong and he has cooperated with the investigation and worked diligently on the Company's restatement and re-auditing efforts. Accordingly, we have concluded that Mr. Smith should retain his position with the Company.

8.      Sherri Snyder, Accounting Supervisor

During the Relevant Time Period, Ms. Snyder was an Accounting Supervisor reporting to Kathy Szarowicz.  Ms. Snyder assisted Ms. Szarowicz with the Company's programming accounting.  In conjunction with the Accounting Reorganization, Ms. Snyder continued in her role as an Accounting Supervisor in the programming accounting area, until May 2004, at which time, she transferred to the Company's Programming Department.[61]  Ms. Snyder was heavily involved with the restatement and re-auditing of the Company's books and records.  Ms. Snyder, along with Mr. Cavallari until his departure and Ms. Szarowicz, led the Company's restatement work with respect programming liabilities and related expense accounts. She has also assisted with the reconciliation and restatement of intercompany and related party accounts and the Telemedia accounts.

a.      Role in the Potential Illegal Acts

The Covington Report identifies Ms. Snyder as being involved with the following activity during the Relevant Time Period[62]:

- Accrual of Programming Liabilities and Audit Reserves

During the investigation, Ms. Snyder informed Covington that during the first three quarters of 2001, Timothy Werth directed her and Ms. Szarowicz to record journal entries

---

[61]    The Programming Department is responsible for negotiating programming contracts with third party vendors.

[62]    See Covington Report at 347.  Based on its investigation, the Company is not aware of Ms. Snyder being involved in any other potential illegal acts during the Relevant Time Period or thereafter.

PWC-EB0004921

to reverse certain programming audit reserves.  Mr. Werth also directed the reversal of a positive programming balance sheet account balance that existed at the end or the first quarter of 2001. Mr. Werth, in his role as Director of Accounting, determined that the reserves should be reversed.  In its Report, Covington states that it "has no reason to believe that Ms. Snyder exercised discretion in carrying out the instructions given by Mr. Werth."

        b.      Job Responsibility

As an Accounting Supervisor, Ms. Snyder would be expected to possess knowledge of general accounting principles and how to apply these principles with respect to her specific area of responsibility, but she would not be expected to be a technical accounting expert. The accounting directors and vice presidents would have greater technical accounting expertise. Given the complexity of accounting rules, many companies employ individuals that exclusively research technical accounting matters.  Accounting Supervisors would follow the accounting guidance provided to them by their superiors and instruct their employees (staff accountants, etc.) to do the same.  Accounting Supervisors would not be expected to possess the accounting skills to handle complex technical accounting matters, such as "if" and "when" liability reserves should be established or reversed.  Current management has concluded that as an Accounting Supervisor, Ms. Snyder was not in a position to create the erroneous and improper accounting related to the accrual of programming liabilities and audit reserves.

        c.      Cooperation with the Investigation

Ms. Snyder was cooperative in her interviews that were conducted as part of the investigation.

        d.      Restatement Efforts

Ms. Snyder has worked diligently throughout the Company's restatement and re-auditing efforts.  She has cooperated with the PwC auditors.

        e.      Job Performance

Ms. Snyder has been an excellent performer since the Relevant Time Period.  In her most recent evaluation, she was given an above average rating of 4.5 out of a possible 5.

        f.      Remedial Action

Over the past year Ms. Snyder has been closely supervised by Ms. Szarowicz who in turn was supervised by Mr. Cavallari until his departure and Messrs. DeLucia and Macdonald. Ms. Szarowicz reviews her work product and approves accounting journal entries, analysis, etc. prepared by Ms. Snyder.

Current management has concluded that Ms. Snyder did not exercise discretion related to the erroneous and improper accounting associated with the accrual of programming liabilities and audit reserves.  Her job performance has been excellent and she cooperated with the investigation and has worked diligently on the Company's restatement and re-auditing

- 60 -

PWC-EB0004922

efforts. Accordingly, we have concluded that Ms. Snyder should retain her position with the Company.

### 9. Kathy Szarowicz

During the Relevant Time Period, Ms. Szarowicz was an Accounting Manager reporting to Timothy Werth. Ms. Szarowicz was responsible for the Company's programming accounting. In conjunction with the Accounting Reorganization, Ms. Szarowicz was promoted to Senior Accounting Manager and continued to be responsible for the Company's programming accounting, reporting to Robert Cavallari. Ms. Szarowicz was heavily involved with the restatement and re-auditing of the Company's books and records. Ms. Szarowicz, along with Mr. Cavallari and Ms. Snyder, led the Company's restatement work with respect programming liabilities and related expense accounts. Ms. Szarowicz is a certified public accountant.

#### a. Role in the Potential Illegal Acts

The Covington Report identifies Ms. Szarowicz as being involved with the following activities during the Relevant Time Period[63]:

- End-of-Quarter Journal Entries

- Programming Contract Accounting – Launch Incentives

- Accrual of Programming Liabilities and Audit Reserves

Ms. Szarowicz made end-of-quarter journal entries that adjusted management fees and affiliate interest. She made these entries at the direction of Michael Mulcahey. Based on the Company's investigation, Ms. Szarowicz did not exercise discretion with respect to these entries.

At the direction of Robert Cavallari, Ms. Szarowicz recorded journal entries to record prospective launch incentives received from programming suppliers on a pro rata basis. As discussed elsewhere in this Report, the Company has concluded that errors were made with respect to the accounting for the Company's programming contracts, but does not believe the errors to be illegal acts. With respect to this matter, Ms. Szarowicz carried out Mr. Cavallari's instructions.

During the investigation, Ms. Szarowicz informed Covington that during the first three quarters of 2001, Timothy Werth directed Sherri Snyder and her to record journal entries to reverse certain programming audit reserves. Mr. Werth also directed the reversal of a positive programming balance sheet account balance that existed at the end or the first quarter of 2001.

---

[63]     Id. at 347-348. Based on its investigation, the Company is not aware of Ms. Szarowicz being involved in any other potential illegal acts during the Relevant Time Period or thereafter.

PWC-EB0004923

b.      Job Responsibility

As an Accounting Manager, Ms. Szarowicz would be expected to possess knowledge of general accounting principles and how to apply these principles with respect to her specific area of responsibility, but she would not be expected to be a technical accounting expert. The accounting directors and vice presidents would have greater technical accounting expertise. Given the complexity of accounting rules, many companies employ individuals that exclusively research technical accounting matters. Accounting Managers would follow the accounting guidance provided to them by their superiors and instruct their employees (supervisors, staff accountants, etc.) to do the same. Accounting Managers would not be expected to possess the accounting skills to handle complex technical accounting matters, such as the programming accounting matters listed above. Current management has concluded that as an Accounting Manager, Ms. Szarowicz was not in a position to create the erroneous and improper accounting related to end-of-quarter journal entries, programming launch incentives and the accrual of programming liabilities and audit reserves. She relied upon Messrs. Mulcahey's, Werth's and Cavallari's expertise as finance and accounting technical experts.

c.      Cooperation with the Investigation

Ms. Szarowicz was cooperative in her interviews that were conducted as part of the investigation.

d.      Restatement Efforts

Ms. Szarowicz has worked diligently throughout the Company's restatement and re-auditing efforts. She has cooperated with the PwC auditors.

e.      Job Performance

Ms. Szarowicz has been an excellent performer since the Relevant Time Period. In October 2003, Ms. Szarowicz was promoted to Senior Accounting Manager. In her most recent review, she was given an above average rating of 4.5 out of a possible 5.

f.      Remedial Action

Over the past year Ms. Szarowicz has been closely supervised by Messrs. Cavallari, DeLucia and Macdonald. Mr. Cavallari reviews her work product and approves accounting journal entries, analysis, etc. prepared by Ms. Szarowicz. Mr. Macdonald reviews all technical accounting issues associated with the Company's programming contracts.

Current management has concluded that Ms. Szarowicz did not exercise discretion related to the erroneous and improper accounting associated with end-of-quarter journal entries, programming launch incentives and the accrual of programming liabilities and audit reserves. Ms. Szarowicz followed the direction of Messrs. Mulcahey, Werth and Cavallari. Her job performance has been excellent (she is one of the top rated Accounting Managers) and she has cooperated with the investigation and re-auditing efforts. Accordingly, we have concluded that Ms. Szarowicz should retain her position with the Company.

- 62 -

PWC-EB0004924

10.  Nan Tanner, Treasury Assistant

During the Relevant Time Period, Ms. Tanner was a Treasury Assistant reporting to Robert Leete. In conjunction with the reorganization of the Treasury Group, Ms. Tanner transferred to the Accounting Department as a Staff Accountant I and in that capacity prepares bank account reconciliations. She now reports to Kay Soble a Senior Accountant in Terry Donovan's group. Ms. Tanner has been involved with the restatement and re-auditing of the Company's bank account reconciliations.

a.  Role in the Potential Illegal Acts

The Covington Report identifies Ms. Tanner as being involved with the following activity during the Relevant Time Period[65]:

• Cash Management System

During the Relevant Time Period, Ms. Tanner had responsibility for overseeing the Highland Holdings bank account (a Rigas Entity account). She was directed by Mr. Mulcahey or Messrs. John, Tim, Michael or James Rigas to move funds into or out of the Highland Holdings account via wire transfers, including transfers to John Rigas' private account.

b.  Job Responsibility

Ms. Tanner, as a Treasury Assistant, was very junior in the Company's organizational structure. She would not possess the knowledge to know whether or not the movement of funds in and out of the Highland Holdings account was improper or illegal. She would have relied upon Mr. Mulcahey or Messrs. John, Tim, Michael and James Rigas to authorize the movement of funds and would follow their directions.

c.  Cooperation with the Investigation

Ms. Tanner was cooperative in her interviews that were conducted as part of the investigation.

d.  Restatement Efforts

Ms. Tanner has worked diligently throughout the Company's restatement and re-auditing efforts. She has cooperated with the PwC auditors.

e.  Job Performance

Ms. Tanner has been a satisfactory performer since the Relevant Time Period. In her most recent evaluation for 2003, she was given an average rating of 3.0 out of a possible 5.

---

[65]  Id. at 348. Based on its investigation, the Company is not aware of Ms. Tanner being involved in any other potential illegal acts during the Relevant Time Period or thereafter.

- 63 -

PWC-EB0004925

     f.     Remedial Action

Over the past year Ms. Tanner has been closely supervised by Ms. Soble. Ms. Soble reviews her work product and approves accounting journal entries, analysis, etc. prepared by Ms. Tanner.

Current management has concluded that Ms. Tanner was not in a position to exercise discretion with respect to the Highland Holdings account or the Cash Management System in general. Accordingly, we have concluded that Ms. Tanner should retain her position with the Company.

******

As noted in Section V(A) above, Interim Management recommended that certain individuals be retained by the Company but be reprimanded. Current management's evaluation of these individuals is discussed below.

     11.     Robert Leete

During the Relevant Time Period, Mr. Leete served as a senior analyst for the corporate allocations group, which was located in the Treasury Department. In that capacity, Mr. Leete reported to Michael Mulcahey. Mr. Leete was primarily involved in managing a database that tracked cash receipts and disbursements and in developing projections about cash levels. Since the Relevant Time Period, Mr. Leete has reported to the Company's Assistant Treasurer. Mr. Leete is now responsible for the technical management of various systems used by the Treasury department, including the Treasury Workstation, lockboxes and electronic payment interfaces. Mr. Leete was not involved in the accounting activities of the Company during the Relevant Time Period, and his involvement in the restatement and reauditing of the Company's books and records has been minimal.

     a.     Role in the Potential Illegal Acts

The Covington Report identifies Mr. Leete as having been involved in the following activity[1]:

     •     Debt Covenant Compliance Practices

Based on the Company's investigation, it is the Company's belief that although Mr. Leete played a role in executing the circular bank transfers that were effectuated to meet

---

[1] Id. at 344. Based on its investigation, the Company is not aware of Mr. Leete being involved in any other potential illegal acts during the Relevant Time Period.

PWC-EB0004926

debt compliance covenants, his role was largely ministerial.  It also appears that Mr. Leete was unaware that the transfers were improper.

          b.     Job Responsibility

As a senior analyst in the Treasury Department, Mr. Leete was primarily involved in managing a database that tracked cash receipts and disbursements and in developing projections about cash levels As a senior analyst, Mr. Leete was not in a position to exercise discretion and rather, was responsible for carrying out directives given by other more senior members of the Treasury Department including  Mr. Mulcahey.

          c.     Cooperation with the Investigation

Mr. Leete was cooperative and provided Covington with background information on the circular bank transfers that were made by the Company for debt compliance purposes. (See Issue D-2 and Section II(B)(25) above.

          d.     Restatement Efforts

Mr. Leete 's involvement in the Company's restatement and re-auditing of its books and records was limited to supporting a reconciliation project for the Accounts Payable team and answering miscellaneous questions from other accounting teams on cash receipts and disbursements.

          e.     Job Performance

Mr. Leete's performance since the Relevant Time Period has been satisfactory. He was promoted to Manager in October 2002 and was given a 4 out of a possible 5 for the October 2002–October 2003 period.

          f.     Remedial Action

Over the past year, Mr. Leete has been closely supervised by the Assistant Treasurer and by Christine Morris, the Company's Treasurer. Mr. Leete's work product is regularly reviewed by the Assistant Treasurer through weekly staff meetings and any changes to the treasury workstation or in the handling of lockbox transactions or electronic payments must be approved by the Treasurer before being implemented.  Mr. Leete does not have the ability to initiate or authorize wire transfer payments on behalf of the Company.

Current management has concluded that although Mr. Leete was involved in executing the circular transfers that were effectuated to enable the Company to comply with its debt covenants, his role was largely ministerial and he was unaware that the transfers were improper. Mr. Leete cooperated fully with the investigation and since the Relevant Time Period, his job performance has been satisfactory.  Accordingly, we have concluded that Mr. Leete should retain his position with the Company.

- 65 -

PWC-EB0004927

# Adelphia Communications Corporation
## Exhibits to 10A Report

| Tab | Title |
|-----|-------|
| 1. | List of Witnesses Interviewed by Covington & Burling |
| 2. | List of Users of Imaged Computer Drives Reviewed by Covington & Burling |
| 3. | Issues Summaries (separate binders) |
| 4. | Index to Issue Summaries - the Matrix |
| 5. | Adelphia Limits of Authority Guidelines |
| 6. | Adelphia Cash Control and Handling Policies and Procedures |
| 7. | Enterprise Risk Assessment |
| 8. | Adelphia Controller's Department Organizational Chart |
| 9. | Charter of the Corporate Governance and Nominating Committee of the Board of Directors |
| 10. | Charter of the Compensation Committee of the Board of Directors |
| 11. | Charter of the Audit Committee of the Board of Directors |
| 12. | Corporate Governance Guidelines |
| 13. | Code of Ethics |
| 14. | Whistleblower Policy and Procedures |
| 15. | Disclosure Committee Charter |

PWC-EB0004928