# Exhibit 84

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

JOHN J. RIGAS and TIMOTHY J. RIGAS,

Petitioners,

*v.*

UNITED STATES OF AMERICA,

Respondent.

11-CV-6964 (KMW)
02-CR-1236 (KMW)

**DECLARATION OF ANDREW ZORICHAK**

1. My name is Andrew Zorichak. I live in Uniontown, Pennsylvania. I currently work as an accountant for a real estate company in Morgantown, West Virginia. I have held this position since approximately Labor Day of 2017.

2. Prior to moving to Uniontown, Pennsylvania, I spent approximately thirty years working in the cable industry. I worked for Adelphia Communications Corporation from July 7, 1986 until 2006, when I obtained employment with Time Warner Cable. I then worked for Time Warner Cable for ten years.

3. At Adelphia, I started as an accountant. I moved through the accounting department, becoming a senior accountant, then accounting supervisor. In the accounting department, my responsibilities included working with Adelphia's financial statements and that sort of thing.

4. I then worked for Michael Mulcahey in Adelphia's treasury department, where I was responsible for debt and interest payments. I used spreadsheets to track the payments. In the treasury department, I also worked with Tim Rigas and Jim Brown.

5. From the treasury department, I started working in the capital projects area and then ended up in Adelphia's engineering department. There was a need for an analyst in engineering because Adelphia was performing a lot of rebuilds and upgrades. Engineering needed an accountant to keep track of the plant as it was upgraded, and I had that responsibility.

6. I worked in the engineering department until an accounting position opened back up in Coudersport. I stayed there until I left Adelphia for Time Warner Cable.

7. Over the course of my time at Adelphia, I had many different supervisors. I reported to Mike Mulcahey, Tim Rigas, and Jim Brown when I was in accounting. When I went to capital projects, my supervisors were Hugh Coudriet and Luke Healy. When I was in engineering, I reported to Tom Niddel and Dan Liberatore.

8. While I worked in engineering, I was responsible for producing an internal report regarding the rebuild numbers. Specifically, I reported on the percentage completions, which I compiled into a report. I relied on the engineers in the field to submit their numbers to me on a weekly basis. I did not always receive all of the information from the engineers, which meant that sometimes my reports were not as accurate as they would have been with the information, but I did my best to put the reports together.

9. I also know that the internal numbers in the reports did not always fully capture work in progress. During my time in engineering, Adelphia was performing a myriad of plant rebuilds that were in various stages of production. My reports did not fully capture this activity in their computation of completion percentages. My reports only reflected the percentage of plant that had been submitted. For example, cable plant was considered rebuilt only when every single step in the rebuild process, however small, had been completed and reverse activation occurred, meaning that the cable plant had two-way capabilities. If 99% of the capital necessary

to upgrade a particular cable plant had been spent, but that plant was not yet reverse activated, the internal report would reflect 0% plant upgraded, as opposed to 99%, which would be the completion percentage in terms of dollars spent.

10. In my mind, the reports were meant only as an internal report to be used by the engineering and operations departments as an up-to-date resource on the status of the various projects that were ongoing. The reports provided a snapshot of progress at different points in time. It wasn't my job to confirm the percentages reported regarding the rebuild completions on Adelphia's 10-Qs or 10-Ks. I also know that Tim Rigas spoke with engineers personally about the rebuild numbers.

11. While I worked in the Adelphia's accounting department, I had no concerns about Adelphia's ability to pay on its outstanding debt because we always made payments on time. I also know that Adelphia relied on the advice of its outside counsel, Buchanan Ingersoll, which directed Adelphia on what to do and what not to do. Everything was also audited by Deloitte and Touche. I believed that Adelphia was run the right way. Adelphia did not hire a small auditor; they had one of the biggest auditors to make sure that everything was done correctly.

12. I remember being shocked when I learned of the criminal investigation of the Rigases. I don't remember exactly how I first learned about the investigation, whether it was from someone inside Adelphia or from newspaper articles. It all happened quickly after the quarterly conference call, which happened at the end of March 2002. I was buying a house in Coudersport at that time, and I thought that things would blow over. I started to get a little nervous when we were a week or two outside of the closing on the house and the investigation was not over because I did not know what would happen.

13. I was interviewed as part of the criminal investigation. I remember that I had to go to New York quickly to testify in front of the grand jury. When I arrived, I remember seeing Dan Liberatore, Scott Johnson, and Ron Rapp, who were also there to testify before the grand jury. I was interviewed by Assistant U.S. Attorneys before I testified. And I remember testifying about my responsibilities in reporting the rebuilds and upgrade in an internal report. I remember the government was saying that the Rigases were reporting inflated numbers.

14. Adelphia provided me with a lawyer from Covington and Burling, who seemed to arrange the schedule for the grand jury and meeting with the government. I don't remember the name of the lawyer.

15. I remember that the Rigases asked to speak to some of us at Adelphia during the criminal investigation. At that point, Adelphia was saying that if you wanted to keep your job, and as long as you cooperated with the Adelphia side, you should not speak to the Rigases. I understood that it was frowned upon to cooperate with the Rigases because you might lose your job and that sort of thing.

16. I don't remember exactly how I learned that I was not supposed to speak to the Rigases. I understood that it was best not to talk to them and that we should let things play out. Adelphia would let us know if we needed to talk to the Rigases.

17. It bothered me that I could not speak to the Rigases because I am a very honest person. I felt that all sides needed to be heard in everything. I wanted to talk to them but I feared that I would lose my job if I did. I understood that I needed to listen to Adelphia, and Adelphia stopped everything.

18. This declaration is a summary of what I remember regarding my employment with Adelphia and the events and circumstances surrounding the criminal prosecution of the Rigases. If I think about these events more, I may remember additional information.

I declare under penalty of perjury that the foregoing is true and correct under 28 U.S.C. § 1746.

EXECUTED ON: May 18, 2018

Andrew Zorichak