# Exhibit 93

> PRIVILEGED AND CONFIDENTIAL
> Attorney-Client Communication
> Attorney Work Product

DRAFT

Summary of Investigation

Reported to

The Special Committee of Independent Directors

of

Adelphia Communications Corporation

Covington & Burling
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 662-6000
March 2003



EXHIBIT
A-T-1180
Nw 9-18-06

ACI   350500

> **PRIVILEGED AND CONFIDENTIAL**
> **Attorney-Client Communication**
> **Attorney Work Product**

**DRAFT**

I. Introduction

This summary stems from the investigation conducted by Covington & Burling ("Covington") at the behest of the Special Committee of Independent Directors ("Special Committee") of the Board of Directors ("the Board") of Adelphia Communications Corporation ("Adelphia" or "the Company"). Set forth herein is what has been learned to date, through witness interviews, document review, and analyses by forensic accountants and investigators regarding a wide range of potentially wrongful or questionable practices and transactions at Adelphia. ==The summary should not be viewed or used as a comprehensive analysis of all evidence relevant to a given topic, both because a number of key witnesses and certain sources of documentary evidence were not available to Covington and because all potentially relevant information may not have been gathered or later culled from the vast number of documents that were reviewed.==

A. Adelphia's Management Structure

Headquartered in Coudersport, Pennsylvania, Adelphia is the sixth-largest cable company in the United States. Founded by John Rigas in 1952, the Company was closely-held until 1986, when it became a public company. At that time, Adelphia's executive positions were filled by John Rigas and his sons, Timothy, Michael, and James, and members of the Rigas family owned a majority of the voting shares of the Company and controlled a majority of the seats on the Board. The Rigas family, through a number of privately held entities, owned cable companies as well, which were managed by Adelphia. In the fall of 1999, Adelphia grew dramatically, both in terms of subscriber numbers and revenue, as the result of its acquisition of three large cable companies.

When concerns about the Company began to surface in March 2002, the Rigas family was still in charge. John Rigas was the Chairman, President, and Chief Executive Officer of Adelphia. Timothy Rigas was Executive Vice-President, Chief Financial Officer, Chief Accounting Officer, and Treasurer. Michael Rigas was Executive Vice President, Operations and Secretary. James Rigas was Executive Vice President, Strategic Planning. Each of them, together with Peter Venetis (the husband of John Rigas's daughter, Ellen Rigas), sat on Adelphia's then nine-person Board. Neither John Rigas's wife, Doris Rigas, nor Ellen Rigas held positions with the Company or sat on its Board, although both of them were involved in related businesses. The four independent, non-family members of the Board were, at that time, Leslie J. Gelber, Erland E. Kailbourne, Dennis P. Coyle, and Pete J. Metros (collectively referred to as "the independent directors").

1

ACI   350516

> PRIVILEGED AND
> CONFIDENTIAL
> Attorney-Client Communication
> Attorney Work Product

**DRAFT**

### B. The Special Committee

On March 6, 2002, a Special Committee was appointed by the Board, consisting of Mr. Gelber, as Chairman, and Messrs. Kailbourne and Coyle. Its mandate was to review and make recommendations to the Board concerning financial arrangements or agreements between the Company and Adelphia Business Solutions, Inc. ("ABIZ"), a company that had been "spun-off" from Adelphia on January 11, 2002,[1] and a majority of whose voting shares were held by Rigas family members or entities controlled by them. John Rigas and his sons also were executive officers and directors of ABIZ, and Messrs. Venetis and Metros also served as its directors.

By the end of March 2002, significant questions had emerged regarding Adelphia's disclosure and reporting of debt that had been borrowed by Rigas family entities. These borrowings were made pursuant to co-borrowing agreements that rendered Adelphia's subsidiaries jointly and severally liable for the debt but had not been disclosed on the Company's consolidated balance sheet. On March 27, in a footnote to its 2001 earnings announcement, Adelphia disclosed for the first time the extent of the co-borrowing by Rigas family entities, stating the amount as approximately $2.3 billion. (Tab 1, at SC-9).[2] At the end of a Company conference call with analysts and investors that day, an analyst focused on the disclosure, questioning whether the assets of Rigas cable businesses could support that debt. (Tab 2, at SC-23). Within a week, the Securities and Exchange Commission ("SEC") opened an investigation, and the law firm of Fried, Frank, Harris, Shriver & Jacobson ("Fried Frank") had been retained by Timothy Rigas to represent the Company with respect to the Government's investigation. The law firm of Boies, Schiller & Flexner LLP ("Boies Schiller") later was retained as counsel to the Company.

---

[1] This spin-off was accomplished through the Company's distribution of all the common stock it held in ABIZ to the common stockholders of the Company.

[2] Documents referenced in this summary are tabbed and numbered sequentially and are contained in the compilation of referenced documents that accompanies the summary. An index to these exhibits is attached as Appendix A. Interviews conducted by Covington and prior Company counsel are referenced as source material but work product records of these interviews are not included in that compilation.

Appendix B lists all known "cost centers" maintained as part of the Company's CMS that relate to the Rigas family members and the entities that they controlled, as well as other Adelphia cost centers that are referenced in this summary. Appendix C lists all individuals who have been interviewed by Covington, or others on its behalf, during the course of its investigation, either personally or through the proffers of their attorneys.

ACI 350517

PRIVILEGED AND
CONFIDENTIAL
Attorney-Client Communication
Attorney Work Product

DRAFT

B.      The Special Committee

On March 6, 2002, a Special Committee was appointed by the Board, consisting of Mr. Gelber, as Chairman, and Messrs. Kailbourne and Coyle. Its mandate was to review and make recommendations to the Board concerning financial arrangements or agreements between the Company and Adelphia Business Solutions, Inc. ("ABIZ"), a company that had been "spun-off" from Adelphia on January 11, 2002,[1] and a majority of whose voting shares were held by Rigas family members or entities controlled by them. John Rigas and his sons also were executive officers and directors of ABIZ, and Messrs. Venetis and Metros also served as its directors.

By the end of March 2002, significant questions had emerged regarding Adelphia's disclosure and reporting of debt that had been borrowed by Rigas family entities. These borrowings were made pursuant to co-borrowing agreements that rendered Adelphia's subsidiaries jointly and severally liable for the debt but had not been disclosed on the Company's consolidated balance sheet. On March 27, in a footnote to its 2001 earnings announcement, Adelphia disclosed for the first time the extent of the co-borrowing by Rigas family entities, stating the amount as approximately $2.3 billion. (Tab 1, at SC-9).[2] At the end of a Company conference call with analysts and investors that day, an analyst focused on the disclosure, questioning whether the assets of Rigas cable businesses could support that debt. (Tab 2, at SC-23). Within a week, the Securities and Exchange Commission ("SEC") opened an investigation, and the law firm of Fried, Frank, Harris, Shriver & Jacobson ("Fried Frank") had been retained by Timothy Rigas to represent the Company with respect to the Government's investigation. The law firm of Boies, Schiller & Flexner LLP ("Boies Schiller") later was retained as counsel to the Company.

---

[1]     This spin-off was accomplished through the Company's distribution of all the common stock it held in ABIZ to the common stockholders of the Company.

[2]     Documents referenced in this summary are tabbed and numbered sequentially and are contained in the compilation of referenced documents that accompanies the summary. An index to these exhibits is attached as Appendix A. Interviews conducted by Covington and prior Company counsel are referenced as source material but work product records of these interviews are not included in that compilation.

Appendix B lists all known "cost centers" maintained as part of the Company's CMS that relate to the Rigas family members and the entities that they controlled, as well as other Adelphia cost centers that are referenced in this summary. Appendix C lists all individuals who have been interviewed by Covington, or others on its behalf, during the course of its investigation, either personally or through the proffers of their attorneys.

2

ACI   350517

> **PRIVILEGED AND CONFIDENTIAL**
> **Attorney-Client Communication**
> **Attorney Work Product**

**DRAFT**

On March 29, 2002, Covington was hired by the Special Committee to provide counsel with respect to ABIZ, and, as the Special Committee's concerns grew, in regard to other relationships between the Company and entities controlled by members of the Rigas family. In particular, the Special Committee sought Covington's counsel when the independent directors concluded that an agreement regarding a cable venture in Puerto Rico -- detrimental to the Company but beneficial to the Rigas family -- had been signed in a form not approved by the Board. Management's failure to have this agreement approved by the Board as well as efforts by management to win Board approval for a reclassification of debt under bond indentures alerted the Special Committee to the possibility that the Company was in default under its debt covenants. Other allegations of wrongdoing continued to surface,[3] and during the first two weeks of April, the United States Attorney's Offices for the Southern District of New York and the Middle District of Pennsylvania served the Company with grand jury subpoenas.

C.   The Special Committee's Investigation

1.   First Steps

In response to these and other issues, on May 15, 2002, the charter of the Special Committee was widened to include an investigation of a broad range of accounting and disclosure problems and related party transactions between Adelphia entities and Rigas family members and entities that may have operated to the detriment of Adelphia, and the Special Committee asked Covington to conduct this investigation on the Committee's behalf. On May 16, 2002, Covington began its investigative work on behalf of the Special Committee. It retained the firm of Urbach Kahn & Werlin ("Urbach Kahn"), which served as forensic accountants until approximately the end of June 2002 in

---

[3]   For example, at an April 12, 2002, meeting of the Company's Audit Committee, its chairman, Mr. Kailbourne, was shown charts by an Adelphia employee that detailed co-borrowed debt. Mr. Kailbourne raised questions concerning a $200 million discrepancy in the numbers and learned that the money had been used to make payments on Rigas margin loans. Late in April, Deloitte & Touche, LLP ("Deloitte"), which had served as the Company's independent accountants since its initial public offering in 1986, brought to Mr. Kailbourne's attention journal entries that had moved digital converter boxes from the Company's books to those of Rigas entities. This prompted interviews of management by the Audit Committee, resulting in the Audit Committee's directive that those entries be reversed. In mid-May, Deloitte informed Mr. Kailbourne that journal entries and documents had been created by the Company after-the-fact that purported to show that a Rigas entity had paid more than $400 million for Adelphia securities. (Interview of Erland Kailbourne, August 20, 2002).

3

ACI   350518

> PRIVILEGED AND
> CONFIDENTIAL
> Attorney-Client Communication
> Attorney Work Product

**DRAFT**

Certain pivotal individuals, however, refused to be interviewed, notably John, Timothy, Michael, and James Rigas and James R. Brown, former Vice President of Finance. Covington made repeated efforts to schedule interviews with ABIZ personnel, in particular, John Glicksman, General Counsel of ABIZ, and Ed Babcock, Chief Financial Officer of ABIZ, but as of the present date, they have not been interviewed. With respect to Deloitte, the Company's former independent auditors, Covington was unable to secure their agreement to interviews. Furthermore, a number of other critical witnesses in managerial and supervisory positions within the accounting, finance, treasury, and external reporting functions were, at the direction of the Government, either at the outset of Covington's investigation or thereafter, not directly available to Covington for substantive interviews concerning their knowledge of practices at the Company. Instead their knowledge was communicated through their attorneys' proffers, and in some instances, in response to questions submitted by Covington or in a limited discussion on particular topics.[6] The unavailability of certain key witnesses and the limited access to others has inevitably affected the completeness of the investigation.

Covington also has made use of a series of interviews conducted by Fried Frank during April and early May 2002, as well as Fried Frank summaries of meetings. Those interviewed included Timothy and James Rigas, Mr. Brown, Michael Mulcahey (Adelphia's former Vice President and Assistant Treasurer), and a number of other Adelphia employees for whom access later became restricted.

4. Document Review

As part of its investigation, Covington has reviewed what it estimates to be the equivalent of more than 3,000 boxes of Company documents, electronic files, and other media. In addition, it has reviewed selected files that were retrieved from the imaged local computer drives of 24 current or former Adelphia employees. All of these materials were produced to either the SEC, the United States Attorney's Office for the

---

[6] These individuals are Michael Mulcahey (Vice-President and Assistant Treasurer), who was terminated from employment with the Company; Dean Marshall (Director of Finance), Karen Chrosniak (Director of Investor Relations), Timothy Werth (Director of Accounting), Luke Healy (Regional Budget Director and Former Director of Accounting), Douglas Malone (Director of External Reporting), and James Helms (Treasury Manager), all of whom were placed on administrative leave; and Brett Klein (Accounting Supervisor), Joseph Sabol (Accounting Supervisor), Glenn Smith (Accounting Supervisor), and Jason Woolcock (Accounting Supervisor), all of whom remain with the Company.

7