UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X

JOHN J. RIGAS and TIMOTHY J. RIGAS,               :

                       Petitioners,               :

          - v. -                         :        11 Civ. 6964 (KMW)

UNITED STATES OF AMERICA,                         :        02 Cr. 1236 (KMW)

                     Respondent.               :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X


# MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN OPPOSITION TO PETITIONERS' MOTION FOR A JUDGMENT OF LAW ON THE <u>INTERFERENCE CLAIMS</u>

GREGORY S. BERMAN
United States Attorney for the
Southern District of New York
Attorney for the United States of America

Brian Blais
Damian Williams
Kyle A. Wirshba
Daniel H. Wolf
Assistant United States Attorneys
– Of Counsel –

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ......................................................................................... 1

RELEVANT FACTUAL BACKGROUND ....................................................................... 3

    A. THE RIGASES' CONTROL OF ADELPHIA .................................................... 3

    B. THE RIGASES' LOOTING OF ADELPHIA ..................................................... 4

    C. PUBLIC DISCLOSURES OF THE RIGASES' MALFEASANCE AND THE PRECIPITOUS HARM TO THE COMPANY AND SHAREHOLDERS .................... 4

    D. FORMATION OF THE SPECIAL COMMITTEE AND EXPANSION OF ITS MANDATE ............................................................................................................ 5

    E. THE MAY 23, 2002 AGREEMENT AND PETITIONERS' REQUEST FOR FEE ADVANCEMENT ................................................................................................... 7

    F. THE BOARD'S JUNE 1, 2002 DENIAL OF FEE-ADVANCEMENT ....................... 9

    G. ADELPHIA'S ADVERSARY PROCEEDING AGAINST PETITIONERS .............. 11

    H. PETITIONERS' ACCESS TO "THE BEST CRIMINAL DEFENSE THAT MONEY CAN BUY" .......................................................................................................... 12

    I. PETITIONERS' ARREST AND INDICTMENT, AND THE SEC'S LAWSUIT ...... 12

    J. THE HOLDER AND THOMPSON MEMORANDA .................................................. 13

    K. THE FISHER MEMORANDUM AND ADELPHIA'S GUIDANCE TO ITS EMPLOYEES REGARDING CONTACTS WITH THE RIGASES .......................... 15

    L. COVINGTON'S ADVOCACY BEFORE THE GOVERNMENT ON BEHALF OF ADELPHIA ........................................................................................................... 17

    M. THE NPA AND THE BANKRUPTCY COURT'S APPROVAL OF IT .................. 20

RELEVANT PROCEDURAL HISTORY ....................................................................... 21

    A. THE CRIMINAL TRIAL AND OTHER LITIGATION ............................................. 21

    B. THE PETITION, DISCOVERY, AND PROCEDURAL DEFAULT LITIGATION . 22

ARGUMENT .................................................................................................................... 24

    I. LEGAL STANDARD GOVERNING PETITIONERS' 2255 MOTION ................. 25

    II. PETITIONERS HAVE NOT ADDUCED ANY COMPETENT EVIDENCE SHOWING THAT THE GOVERNMENT INTERFERED WITH THEIR CHOICE OF COUNSEL ...................................................................................................... 26

       A. Legal Standard on Choice of Counsel Claim ...................................................... 26

       B. The Government Exercised No "Overwhelming Influence" Over Adelphia's Choice of Whether to Pay Legal Costs for Petitioners ......................................... 28

          1. Petitioners Must Show More Than an Effort to Comply with the Holder Memorandum ................................................................................................. 29

2.   The Board's Actions Were Undertaken Pursuant to Lawful Authority ............. 30

3.   Evidence Contemporaneous to the Board's Actions Does Not Support a Finding of State Action ..................................................................................................... 31

4.   Covington's Advocacy to the Government Reinforces the Lack of Coercion Concerning Fee-Advancement ............................................................................ 37

5.   The Purported Double-Hearsay "Threat" by the Government to the RMEs Does Not Support Petitioners' Version of Events ...................................................... 38

C.   Petitioners Are Not Entitled to a Hearing on their Fee-Advancement Claim ....... 40

III.  PETITIONERS HAVE NOT ADDUCED ANY COMPETENT EVIDENCE SHOWING THAT THE GOVERNMENT INTERFERED WITH THEIR ACCESS TO WITNESSES ......................................................................................................... 40

A.   The Right to Present a Defense ............................................................................. 41

B.   Petitioners Identify No Connection between the Government and Any Interference ........................................................................................................... 42

1.   Causation Standard ............................................................................................. 42

C.   Petitioners Cannot Show Bad Faith by the Government ....................................... 51

D.   Petitioners Cannot Demonstrate a Lack of Fundamental Fairness ....................... 52

E.   The Testimony of Petitioners' Witnesses Would Not Be Material ....................... 54

**CONCLUSION** ..................................................................................................................... **56**

# TABLE OF AUTHORITIES

**Cases**                                                                                                   **Page(s)**

*Adelphia Commc'ns Corp. v. Rigas (In re Adelphia)*,
    317 B.R. 612 (Bankr. S.D.N.Y. 2004) ............................................................. 21

*Adelphia Commc'ns Corp. v. Rigas (In re Adelphia)*,
    323 B.R. 345 (Bankr. S.D.N.Y. 2004) ....................................................... 11, 12

*Adelphia Commc'ns Corp. v. Rigas (In re Adelphia)*,
    No. 02-41729 (REG), 2004 WL 2186582 (S.D.N.Y. Sept. 27, 2004) ................. 10, 12, 39

*Adelphia Commc'ns, Corp. v. Deloitte & Touche LLP*,
    2007 WL 5958219 (Pa. Ct. C.P. Aug. 10, 2007) ........................................... 21

*Adelphia Commc'ns Corp. v. Rigas (In re Adelphia)*,
    323 B.R. 356 (Bankr. S.D.N.Y 2005) .................................................. 8, 11, 12

*In re Adelphia Commnc'ns Corp.*,
    327 B.R. 143 (Bankr. S.D.N.Y. 2005) ................................................... *passim*

*In re Adelphia Commnc'ns Corp.*,
    327 B.R. 175 (Bankr. S.D.N.Y. 2005) ........................................................ 12

*Arizona v. Youngblood*,
    488 U.S. 51 (1988) ................................................................... 51, 52

*Buie v. Sullivan*,
    923 F.2d 10 (2d Cir. 1990) .......................................................... 41, 51

*Craig v. Colonial Penn Ins. Co.*,
    335 F. Supp. 2d 296 (D. Conn. 2004) .................................................... 51

*Dalli v. United States*,
    491 F.2d 758 (2d Cir. 1974) ............................................................ 49

*David v. United States*,
    134 F.3d 470 (1st Cir. 1998) ........................................................... 49

*F.D.I.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
    205 F.3d 66 (2d Cir. 2000) ............................................................. 51

*Fenenbock v. Dir. of Corr. for California*,
    692 F.3d 910 (9th Cir. 2012) ........................................................ 45, 54

*Graziano v. United States*,
    83 F.3d 587 (2d Cir. 1996) ............................................................. 25

*Gregory v. United States,*
    369 F.2d 185 (D.C. Cir. 1966) ................................................................ 42, 44

*Griffin v. Davies,*
    929 F.2d 550 (10th Cir. 1991) ................................................................. 43

*Int'l Bus. Machines Corp. v. Edelstein,*
    526 F.2d 37 (2d Cir. 1975) ..................................................................... 49

*LoCascio v. United States,*
    395 F.3d 51 (2d Cir. 2005) ..................................................................... 49

*Mateo v. Bristow,*
    No. 12 Civ. 5052 RJS, 2013 WL 3863865 (S.D.N.Y. July 16, 2013)............................... 42

*Puglisi v. United States,*
    586 F.3d 209 (2d Cir. 2009) ................................................................... 25

*Quintero v. Rite Aid of New York, Inc.,*
    No. 09 CIV. 6084 JLC, 2011 WL 5529818 (S.D.N.Y. Nov. 10, 2011) ............................. 38

*Rigas v. United States,*
    583 F.3d 108 (2d Cir. 2009) ................................................................... 55

*Rigas v. United States,*
    No. 11-CV-6964 KMW, 2015 WL 3403861 (S.D.N.Y. May 15, 2015) ................... *passim*

*Rothgery v. Gillespie Cty., Tex.,*
    554 U.S. 191 (2008) ............................................................................ 26

*Sec. & Exch. Comm'n v. Adelphia Commc'ns Corp.,*
    No. 02 CIV. 5776 (PKC), 2006 WL 8406833 (S.D.N.Y. Nov. 16, 2006) ................ *passim*

*Siao-Pao v. Keane,*
    878 F. Supp. 468 (S.D.N.Y. 1995) ............................................................. 33

*Skinner v. Railway Labor Executives Association,*
    489 U.S. 602 (1989) ............................................................................ 29

*Soo Park v. Thompson,*
    851 F.3d 910 (9th Cir. 2017) ................................................................. 42, 43

*In re Terrorist Bombings of U.S. Embassies in E. Africa,*
    552 F.3d 93 (2d Cir. 2008) ..................................................................... 41

*United States v. Aiello,*
    814 F.2d 109 (2d Cir. 1987) ................................................................... 25, 46

*United States v. Augenblick,*
    393 U.S. 348 (1969) ............................................................................ 53

*United States v. Bin Laden*,
　116 F. Supp. 2d 489 (S.D.N.Y. 2000) ....................................................... 53, 54

*United States v. Blackwell*,
　694 F.2d 1325 (D.C. Cir. 1982) ................................................................. 43

*United States v. Catalano*,
　No. 12 CR 725 KMW, 14 WL 656065 (S.D.N.Y. Feb. 20, 2014) ............................ 42, 52

*United States v. Chase*,
　No. 2:04-CR-135, 2005 WL 3263910 (D. Vt. Nov. 30, 2005) ......................................... 54

*United States v. Desena*,
　287 F.3d 170 (2d Cir. 2002) ....................................... 41, 42, 44

*United States v. Ebrahimi*,
　137 F. Supp. 3d 886 (E.D. Va. 2015) .............................................. 42

*United States v. Hoffman*,
　832 F.2d 1299 (1st Cir. 1987) ................................................. 43, 44, 51

*United States v. Linder*,
　No. 12 CR 22, 2013 WL 812382 (N.D. Ill. Mar. 5, 2013) .................................. 42, 44, 54

*United States v. Long*,
　449 F.2d 288 (8th Cir. 1971) .............................................. 43

*United States v. Moore*,
　670 F.3d 222 (2d Cir. 2012) .......................................... 27

*United States v. Olis*,
　No. H-07-3295, 2008 WL 5046342 (S.D. Tex. Nov. 21, 2008) ........................... 29

*United States v. Pinto*,
　850 F.2d 927 (2d Cir. 1988) ............................................ 41

*United States v. Rigas*,
　490 F.3d 208 (2d Cir. 2007) ...................................... 4, 21, 55

*United States v. Rigas*,
　No. 02-CR-1236 (LBS), 2007 WL 4145282 (S.D.N.Y. Nov. 20, 2007) ...................... 55

*United States v. Rigas*,
　No. 4:05-CR-402, 2011 WL 2371554 (M.D. Pa. June 14, 2011) .......................... 1, 21, 52

*United States v. Silverstein*,
　732 F.2d 1338 (7th Cir. 1984) ...................................... 43

*United States v. Stein*,
　435 F. Supp. 2d 330 (S.D.N.Y. 2006) .................................. *passim*

*United States v. Stein*,
541 F.3d 130 (2d Cir. 2008) .......................................................... 14, 27, 28, 30

*United States v. Stein*,
No. 05 CR 888, (LAK), 2006 WL 1063298 (S.D.N.Y Apr. 12, 2006) ............................ 40

*United States v. Valenzuela-Bernal*,
458 U.S. 858 (1982) .................................................................... *passim*

*United States v. Weddell*,
800 F.2d 1404 (5th Cir.) ................................................................ 43

*United States v. Williams*,
205 F.3d 23 (2d Cir. 2000) ........................................................ 41, 44, 51

*Wood v. Bartholomew*,
516 U.S. 1 (1995) ...................................................................... 48

*Yaron v. United States*,
586 F. App'x 819 (2d Cir. 2014) ........................................................ 41

*Yick Man Mui v. United States*,
614 F.3d 50 (2d Cir. 2010) ............................................................. 25

**Statutes**

28 U.S.C. § 1746 ....................................................................... 38

28 U.S.C. § 2255 ................................................................... 24, 25, 49

Del. Code Ann. tit. 8, § 102 ............................................................. 9

## PRELIMINARY STATEMENT[1]

Despite ample opportunity to do so, Petitioners still cannot offer any evidence that the decision made by Adelphia ("Adelphia" or the "company") to treat Petitioners as legal adversaries beginning in spring 2002 was a product of government coercion of Adelphia rather than "nothing short of typical business practice[s]." *United States v. Rigas*, No. 4:05-CR-402, 2011 WL 2371554, at *2 (M.D. Pa. June 14, 2011). Petitioners instead attempt to paint the inevitable actions taken by Adelphia as a full-blown government conspiracy. For Petitioners, denials of misconduct by the Government and Adelphia should be treated as further proof of malfeasance, and gaps of contemporaneous evidence can be explained only by contemporaneous efforts by the Government and Adelphia to talk in code. As Petitioners would have it, the only testimony that can be trusted is inadmissible hearsay and/or testimony obtained years after the events in question. Such a narrative is hardly sufficient for Petitioners to obtain relief on Ground Two of their Petition.

Petitioners principally take issue with two actions taken by Adelphia following Adelphia's discovery of Petitioners' rampant misconduct: (1) Adelphia's denial of fee-advancement to Petitioners after a special committee of the board ("Special Committee") found Petitioners to be in breach of their fiduciary duties to the company; and (2) Adelphia's request that employees contact in-house counsel if contacted by Petitioners, the company's legal adversaries. But none of the actions about which Petitioners complain can be attributed to the Government—a fatal flaw that stands in the way of both their claims.

---

[1] Unless otherwise noted, capitalized terms in this brief have the same meaning ascribed to them in the Government's memorandum of law in opposition to Ground One of the 2255 Petition, dated August 10, 2017 (Dkt. No. 143) ("Gov't's *Brady* Mem.").

On the issue of fee-advancement, there remains no evidence whatsoever of the Government ever having conditioned a decision to forego criminal prosecution of Adelphia on Adelphia's denial of fee-advancement to Petitioners. To the contrary, the primary evidence that Petitioners rely upon to claim Government denial of fee-advancement are disparate facts showing that: Adelphia committed to cooperate with the Government; Adelphia's outside lawyers reasonably examined Adelphia's obligation to provide fee-advancement to Petitioners *after* Petitioners requested fee-advancement from Adelphia; and, on no more than Petitioners' own self-serving recollections, the Special Committee was insincere when it determined that Petitioners breached their fiduciary duties to the company. These facts are plainly insufficient to establish a constitutional violation.

On the issue of interference with witnesses, Petitioners stunningly fail to acknowledge the multi-factor standard for establishing a constitutional violation and provide no basis for its disregard. Petitioners assert—on their own authority and nothing more—that their only obligation is to proffer evidence that the witnesses to whom (based on their own conclusory assertion) they were denied access would have provided material and favorable testimony. That approach illogically elides any inquiry into whether the Government caused Petitioners' purported injury, acted in bad faith, or violated notions of fundamental fairness—all of which must be demonstrated to prevail on a claim for unconstitutional denial of witness-access. But even if Petitioners had recognized the proper standard for asserting a witness interference claim, they still would lack evidence demonstrating that they meet it. The only employee at Adelphia, General Counsel Randal Fisher, who communicated the company's desire for its employees not to cooperate with Petitioners has flatly denied under oath that he was acting at the Government's behest. Not only do Petitioners completely ignore that testimony—solicited at Petitioners'

request in April 2018 as they were undoubtedly preparing their submission—but they also proffer no evidence to call into question Fisher's veracity.

Petitioners have now had several years to develop support for their claims that actions indisputably taken by Adelphia were, in effect, taken by Adelphia under pressure from the Government and therefore should be attributed to the Government. They have developed no such support because none exists. Accordingly, Petitioners' Interference Claims should be denied.

## RELEVANT FACTUAL BACKGROUND[2]

Much of what Petitioners complain about are actions taken by Adelphia in response to the company's discovery that Petitioners abused their absolute control over Adelphia to commit a massive accounting fraud to the detriment of the company and its shareholders. A brief recitation of the relevant facts, many of which are lacking from Petitioners' submission, is in order so that Adelphia's response to Petitioners' complaints can be properly contextualized.

### A. THE RIGASES' CONTROL OF ADELPHIA

Before its bankruptcy, Adelphia was one of the largest cable television providers in the country. It was founded by Petitioner John Rigas in the early 1950s and, until the events relevant here, controlled by the Rigas family, which provided the family with control over five of Adelphia's nine board seats. Petitioner John Rigas was the company's Chairman and Chief Executive Officer through May 2002. Petitioner Timothy Rigas (John Rigas's son) similarly exercised a position of substantial power at the company, having served as a Board member, Executive Vice President, and the company's Chief Financial Officer.

---

[2] The Government incorporates by reference the factual background set forth in its Ground One Brief.

**B. THE RIGASES' LOOTING OF ADELPHIA**

Beginning in the late 1990s, the Rigases arranged for their privately owned entities, the Rigas Managed Entities ("RMEs"), to enter borrowing agreements covering the receipt of approximately $2.8 billion for which both the RMEs and Adelphia were jointly and severally liable. *United States v. Rigas*, 490 F.3d 208, 213, 215 (2d Cir. 2007). Through this arrangement, the Rigases created massive liabilities for Adelphia without disclosing them on Adelphia's balance sheet, while Adelphia remained liable for the full amount of the debts incurred by the RMEs. *Id.* at 215. The only benefit, if any, Adelphia received from this scheme was the fraudulent appearance of lower indebtedness created by the nondisclosure of liabilities now on the RMEs' books. *Id.* By contrast, the Rigases used proceeds from the arrangement as if they were their own and for all manner of the Rigases' own purposes. *Id.* at 218.

**C. PUBLIC DISCLOSURES OF THE RIGASES' MALFEASANCE AND THE PRECIPITOUS HARM TO THE COMPANY AND SHAREHOLDERS**

The Rigases' misconduct first came into public view when Adelphia revealed $2.3 billion in previously undisclosed co-borrowing liabilities in a footnote of its March 27, 2002 earnings statement. *Rigas*, 490 F.3d at 212-13; Pet'rs' 56.1 Ex. 93 (Special Committee's March 2003 investigation report), at 2. The following day, Adelphia's stock price declined twenty-five percent. *Rigas*, 490 F.3d at 212.

Mere days later, on April 1, 2002, Adelphia notified investors of further undisclosed losses from the 2000 and 2001 fiscal years "primarily due" to RME-related write-downs; it also announced a delay of its upcoming 10-K submission. Gov't's 56.1 Ex. D (Adelphia April 1, 2002 Form 10-K), at 2-3. The delay announced on April 1, 2002, was extended even further on April 16, 2002, when Adelphia announced additional disclosures would follow as it continued to "review the accounting treatment for matters related to its co-borrowing agreements" with its

auditor.  Gov't's 56.1 Ex. E (Adelphia's Apr. 16, 2002 press release), at 3.  With the company's

stock price in freefall, on April 16, 2002, NASDAQ determined that the company's failure to

comply with annual reporting requirements made its "securities . . . subject to delisting from the

Nasdaq Stock Market."  Gov't's 56.1 Ex. F (Adelphia's Apr. 18, 2002 press release), at 3.

On May 14, 2002, after weeks of back and forth discussion, the company's auditor,

Deloitte & Touche, LLC, suspended its audit work on Adelphia's past financial statements in

large part because of Adelphia's misrepresentations.  *Sec. & Exch. Comm'n v. Adelphia*

*Commc'ns Corp.*, No. 02 CIV. 5776 (PKC), 2006 WL 8406833, at \*11 (S.D.N.Y. Nov. 16,

2006).  With no audit report, Adelphia could not publish its Form 10-K.  As a result, its delisting

from NASDAQ became inevitable.

On May 14, 2002, the company's troubles expanded.  NASDAQ followed through on its

warning from the prior month, suspending trading in Adelphia stock.  The next day, May 15,

2002, the company defaulted on its obligations to several lenders.  Gov't's 56.1 Ex. G at 24.  By

the end of the month, the company's "liquidity crisis" was so deep that it had "two to three

weeks of remaining cash to fund its operations."  Pet'rs' 56.1 Ex. 36 (Board's June 1, 2002

meeting minutes), at 4-5.

Left without any other options, on June 25, 2002—just shy of three months after the

company first disclosed its massive adjustments—Adelphia filed for Chapter 11 bankruptcy.

Gov't's 56.1 Ex. H (Adelphia's June 25, 2002 press release), at 2.

### D.  FORMATION OF THE SPECIAL COMMITTEE AND EXPANSION OF ITS MANDATE

On March 6, 2002, three weeks prior to Adelphia's first disclosure of accounting issues,

the Adelphia Board of Directors ("Board") appointed a special committee of three independent

directors who were not members of the Rigas family ("Special Committee").  At first, the

Special Committee had a limited mandate "to review and make recommendations to the Board concerning financial arrangements between the Company" and an RME, Adelphia Business Solutions, Inc. ("ABIZ"). Pet'rs' 56.1 Ex. 93 at 2. On March 29, 2002—two days after the first disclosure of accounting issues in a footnote to a Form 8-K—the Special Committee retained the law firm of Covington & Burling ("Covington") to provide counsel in connection with its review of ABIZ. Around that time (late March 2002), the Special Committee's mandate was expanded to encompass review of relationships between Adelphia and RMEs other than ABIZ. Pet'rs' 56.1 Ex. 28 at 3 (Counsel to the Special Committee's August 2002 letter to the Government).

In April 2002, as markets reacted to the company's initial disclosure of March 27th and the company's value plummeted, the company learned that both the Securities and Exchange Commission ("SEC") and the Department of Justice ("DOJ")[3] had begun investigations of Adelphia. Evidence of Petitioners' misconduct continued to mount. On April 12, 2002, for example, Special Committee member Erland Kailbourne learned that the Rigases had used $200 million of co-borrowed funds to pay off personal margin loans. Pet'rs' 56.1 Ex. 93 at 3 n.3. Adelphia's auditor, Deloitte, soon notified Kailbourne that certain company assets had inexplicably been moved to RMEs' books. *Id.* After interviewing management, he directed the assets be returned to Adelphia's books. *Id.* The early weeks of May 2002 brought further discoveries: an RME had bought $400 million in Adelphia securities, sold for the purpose of righting the company's debt problem, through an arrangement that allowed the Rigases to purchase stock by creating more liabilities for Adelphia. *Id.*

---

[3] Investigations by DOJ were initially carried out by the United States Attorneys' Offices for the Southern District of New York and Middle District of Pennsylvania. Unless otherwise noted, all references in this memorandum to the "Government" and "DOJ" refer to the United States Attorney's Office for the Southern District of New York.

The scope of the Special Committee's mandate expanded further on May 15, 2002, when independent directors to the company successfully (a) convinced Petitioner John Rigas to resign as Chairman, President, and CEO of the company and (b) pushed the full Board to broaden the Special Committee's charter to include "an investigation of any and all self-dealing or other wrongdoing that the Special Committee itself felt worthy of investigation." Pet'rs' 56.1 Ex. 93 at 4. The following day, May 16, 2002, Petitioner Timothy Rigas resigned his position as Executive Vice President, Chief Financial Officer and Treasurer of the company. *Id.* These changes in management notwithstanding, the Rigas family remained in control of the Board and, ultimately, the company's response to the nascent DOJ investigation.

## E. THE MAY 23, 2002 AGREEMENT AND PETITIONERS' REQUEST FOR FEE ADVANCEMENT

In the "early morning hours of May 23, 2002," Pet'rs' 56.1 Ex. 28 at 4, Petitioners and their family members executed an agreement (the "May 23 Agreement") with the Board that provided for the removal of Petitioners and their family members from the Board and for procedures intended to facilitate fulfillment of "all obligations of the Rigas Family to the Company for loans, advances, or borrowings under co-borrowing agreements." Pet'rs' 56.1 Ex. 30 ¶¶ 3, 1-9, 14 (the May 23 Agreement). As a result of the May 23 Agreement, for the first time, the Board was controlled by independent directors rather than Petitioners and their family members. Pet'rs' 56.1 Ex. 28 at 5.

Paragraph 11 of the May 23 Agreement, pertaining to "indemnification," provided:

> The Company will provide indemnification to family members (*according to the Bylaws and Delaware law*) as long as Rigas Family members undertake to repay Adelphia per the Bylaws. This undertaking will be collateralized as per paragraph 8 above.

Pet'rs' 56.1 Ex. 30 ¶ 11 (emphasis added). In turn, paragraph 8 of the May 23 Agreement provided that "Adelphia shares owned directly or indirectly by the Rigas Family will be

pledged . . . [*inter alia*,] to secure the undertaking to repay Adelphia for indemnification payments discussed in paragraph 11." *Id.* ¶ 8. No other paragraph in the May 23 Agreement refers to "indemnification." Further, the May 23 Agreement is silent as to advancement of attorneys' fees to Rigas family members or whether the term "indemnification" was intended to encompass advancement of attorneys' fees.[4]

The company's bylaws ("Bylaws") and Delaware law, both of which were expressly incorporated into Paragraph 11 of the May 23 Agreement, also provided no indication that the company regarded "indemnification," as provided for in Paragraph 11, to encompass fee-advancement. The section of the Bylaws concerning fee-advancement to directors, provided in Section 6.2 of the Bylaws, made clear that any obligation for the company to advance fees to a director would be negated if "*the Board of Directors or independent legal counsel reasonably determines that such person deliberately breached his duty to the Corporation or its shareholders.*" Pet'rs' 56.1 Ex. 29 § 6.2 (Adelphia Bylaws) (emphasis added).

The Bylaws' bestowal of discretion upon the Board to deny fee-advancement for a breach of fiduciary duties was (and is) consistent with Delaware law, which itself prohibited a corporation from "eliminating or limiting the personal liability of a director to the corporation . . . for breach of fiduciary duty" if the director breached his or her duty of loyalty, perpetrated "acts

---

[4] Petitioners repeatedly and incorrectly conflate indemnification and advancement. While the rights are related, Delaware law treats them as "distinct types of legal rights" and thus "a bylaw requiring a corporation 'to indemnify' does not obligate it 'to advance.'" *Adelphia Commc'ns Corp. v. Rigas (In re Adelphia),* 323 B.R. 356, 376 (Bankr. S.D.N.Y 2005). Indemnification would not have provided funds for trial preparation or trial, when Petitioners assert their injury occurred, because indemnification compensation arrives only after a "final determination of the merits of the claim" is made. *Id.* Petitioners have not put forth (let alone pled) any facts showing they were denied indemnification (as opposed to fee-advancement) prior to their convictions and that any such denial was caused by the Government. To the extent Petitioners premise their claim on vague notions that State action deprived them of indemnification, that claim cannot succeed.

or omissions not in good faith or which involve intentional misconduct or a knowing violation of law," or entered into "any transaction from which the director derived an improper personal benefit." Del. Code Ann. tit. 8, § 102(b)(7).

On the same day that the May 23 Agreement was executed, Petitioners submitted identical letters to Adelphia (but for the letterhead and signature lines) requesting, "[p]ursuant to Section 6.2 of the Bylaws," that the company "advance expenses incurred by me in defending the Actions (as such term is defined in the Bylaws) now pending against me and which may be initiated against me in the future by reason of the fact that I am and was a director and/or officer of the Company." Pet'rs' 56.1 Ex. 31 (Petitioners' May 23, 2002 advancement requests). Petitioners represented that they would "undertake to repay the amounts advanced to the extent that a court of competent jurisdiction ultimately determines that I am not entitled to indemnification under Article VI of the Bylaws or otherwise." *Id*. As noted above, Article VI of the Bylaws allowed for the denial of fee-advancement upon a reasonable determination by the Board or "independent legal counsel" that the person requesting fee advancement "deliberately breached his duty to the Corporation or its shareholders." Pet'rs' 56.1 Ex. 29 § 6.2.

Significantly, despite now claiming that they contemporaneously believed the May 23 Agreement provided fee-advancement, Petitioners did not reference the May 23 Agreement in their letters requesting fee-advancement. Nor do the letters refer to any contemporaneous representations by the Board that it would advance Petitioners legal fees—representations which Petitioners now (16 years later) claim to have been made.

## F. THE BOARD'S JUNE 1, 2002 DENIAL OF FEE-ADVANCEMENT

During its meeting on June 1, 2002, the Board denied Petitioners' request for fee-advancement. According to the minutes from that meeting, the Special Committee reported to the Board that Petitioners had:

deliberately breached their duties to the Company and its shareholders by failing to cooperate with the Special Committee in its investigation by declining to provide full and complete answers to the Special Committee and by participating in related party transactions for their benefit to the detriment of the Company without appropriate disclosures and approval of the Board of Directors. As a consequence, such officers and directors were no longer entitled to the advancement of defense expenses under the Company's Bylaws.

Pet'rs' 56.1 Ex. 36 at 3. The full Board unanimously approved the Special Committee's findings concerning non-cooperation[5] and its decision regarding fee-advancement. *Id.*

Petitioners appear to have accepted the Board's decision as permissible under the May 23 Agreement despite now claiming, as noted above, that they contemporaneously believed the May 23 Agreement provided for fee-advancement, and that the June 1st decision "seemed quite inexplicable" at the time. Pet'rs' Mem. 14. Although the May 23 Agreement provided for binding arbitration to resolve any disputes over that document's meaning, Pet'rs' 56.1 Ex. 30 at ¶¶ 13, 15, Petitioners have put forth no evidence that Petitioners ever exercised (or even contemplated exercising) their arbitration rights by challenging the Board's June 1st denial of

---

[5] Although not explained in detail in the minutes to the Board's June 1 meeting, exhibits submitted to the Court by Petitioners convincingly demonstrate that the Board did not obtain Petitioners' cooperation. Minutes from the Board's May 18, 2002 meeting indicate that, at that meeting, the Board had to "reiterate[] the Special Committee's request for interviews of the Rigas Family." Pet'rs' 56.1 Ex. 24 (Board's May 18, 2002 meeting minutes), at 2. In an extensive Form 8-K issued by Adelphia on May 24, 2002, disclosing the Company's extant knowledge of the Rigases' misconduct, the company stated that the Rigases had "refused to review, or provide information for" the disclosure. Gov't's 56.1 Ex. G (Adelphia May 24, 2002 form 8-K), § 2. Finally, a report by Covington to the Special Committee in 2004 stated that, in the course of Covington's investigation on behalf of the Special Committee, "[c]ertain pivotal individuals . . . refused to be interviewed, notably John, Timothy, Michael, and James Rigas . . . ." Pet'rs' 56.1 Ex. 93 at 4. The basis for the Board's non-cooperation finding is also supported by Judge Lynch's undisturbed factual finding that "[t]he record reveal[ed] that the Rigases repeatedly failed to provide disclosure of assets requested by Adelphia." *Adelphia Commc'ns Corp. v. Rigas (In re Adelphia)*, No. 02-41729 (REG), 2004 WL 2186582, at *13 (S.D.N.Y. Sept. 27, 2004).

fee-advancement under the May 23 Agreement.  Petitioners also have put forth no evidence of

Petitioners ever having exercised (or even contemplated exercising) a Bylaws' provision that

would have granted them indemnification for any "expenses incurred in connection with

successfully establishing" their "right[s] to indemnification."  Pet'rs' 56.1 Ex. 29 ¶ 6.2.  Put

differently, faced with an indemnified opportunity to challenge the Board's interpretation of the

June 1st decision, Petitioners apparently took no action to express what they now claim was their

contemporaneous disagreement with that interpretation.

### G. ADELPHIA'S ADVERSARY PROCEEDING AGAINST PETITIONERS

On July 25, 2002, Adelphia, then in bankruptcy proceedings presided over by Judge

Gerber, brought an adversary proceeding against the Rigas family alleging, *inter alia*, breaches of

fiduciary duty and self-dealing.  *Adelphia Commc'ns Corp. v. Rigas (In re Adelphia)*, 323 B.R.

345, 358 (Bankr. S.D.N.Y. 2005).

Approximately one month later, on August 26, 2002, Adelphia sought and obtained a

temporary restraining order ("TRO") preventing Petitioners and their family members from selling

certain real estate interests.  *Id.*  Adelphia later sought, on November 25, 2002, a second TRO

restraining the disposition of all the Rigases' assets, excepting funds necessary for "reasonable

living expenses and attorneys' fees."  *Id.* at 358-59.

On November 26, 2002, Judge Gerber granted Adelphia's motion for a second TRO but

made clear on the record that his order "was without prejudice to the rights of the members of the

Rigas family to come back for greater authorization, if necessary, to pay for their defense,

especially their criminal defense, but also their defense of civil proceedings."  Gov't's 56.1 Ex. B

(Bankruptcy Court hearing transcript), at 69.  Judge Gerber promised that if his order were ever

"to have the effect of impairing the Rigases from defending themselves, . . . they can come back

on three hours' notice for adjustments to eliminate that effect."  *Id.*

## H. PETITIONERS' ACCESS TO "THE BEST CRIMINAL DEFENSE THAT MONEY CAN BUY"

To the Government's knowledge, Judge Gerber never went back on his promise. He granted each and every request from Petitioners for funds in support of their legal defense, amounting to $27.8 million for defense costs. As Judge Lynch observed in reviewing Judge Gerber's attorneys' fees ruling, Judge Gerber "heavily weighted his balancing of the equities in this case toward providing the Rigases whatever funds they requested *for the best criminal defense that money can buy*." *Adelphia Commc'ns Corp. v. Rigas (In re Adelphia)*, No. 02-41729 (REG), 2004 WL 2186582, at *13 (S.D.N.Y. Sept. 27, 2004) (emphasis added). *See also Adelphia Commc'ns Corp. v. Rigas (In re Adelphia)*, 323 B.R. 345, 389 n.151 (Bankr. S.D.N.Y. 2005) (finding that financing provided by the Bankruptcy Court to Petitioners gave them "a full and fair opportunity for them to defend themselves" at trial and during post-trial motions before Judge Sand).

## I. PETITIONERS' ARREST AND INDICTMENT, AND THE SEC'S LAWSUIT

Pursuant to a complaint and arrest warrant, Petitioners were arrested on July 24, 2002, on charges of conspiracy to commit securities fraud, wire fraud, and bank fraud. Crim. Dkt. No. 1. Petitioners were presented that day and bailed on a variety of conditions. Crim. Dkt. No. 11. The SEC filed an action against Petitioners (and others) on the same day. Gov't 56.1 Ex. J (SEC July 24, 2002 press release), at 1.

Approximately two months later, on September 23, 2002, the Grand Jury indicted Petitioners. Crim. Dkt. No. 24. Although Adelphia itself was not indicted, at no point did the Government rule out such a possibility until it entered a Non-Prosecution Agreement ("NPA") with Adelphia in 2005. *See In re Adelphia Commc'ns Corp.*, 327 B.R. 143, 149, 158 (Bankr. S.D.N.Y. 2005), *adhered to on reconsideration*, 327 B.R. 175 (Bankr. S.D.N.Y. 2005).

**J. THE HOLDER AND THOMPSON MEMORANDA**

At all times relevant both to Adelphia's actions culminating in its denial of fee-advancement on June 1, 2002, and to the Government's arrest of Petitioners on July 24, 2002, the Government's decision-making process in connection with weighing whether to criminally charge a corporation was guided by a June 1999 memorandum by then-Deputy Attorney General Eric Holder (commonly known as the "Holder Memorandum").[6]

By its terms, the Holder Memorandum was *not* intended to impose any requirements upon federal prosecutors. It expressly stated that the "factors" referenced in the memorandum were "not outcome determinative and are only guidelines. Federal prosecutors are not required to reference these factors in a particular case, nor are they required to document the weight they accorded specific factors in reaching their decision." Pet'rs' 56.1 Ex. 16 at ECF page 2 (Eric Holder, Bringing Criminal Charges Against Corporations, June 16, 1999). The Holder Memorandum was intended merely to "provide[] guidance as to what factors should generally inform a prosecutor in making the decision whether to charge a corporation in a particular case." Pet'rs' 56.1 Ex. 16 at ECF page 2.

---

[6] At great length, and under the guise of providing the Court with "context" for assessing their claims, Petitioners flagrantly allege that the Government's prosecution of Petitioners was motivated by politics rather than the law and facts. Pet'rs' Mem. 4-7. These allegations—*e.g.*, "[g]iven all the hoopla over the arrest, the political pressure on the prosecutors was, to say the least, extreme" (Pet'rs' Mem. at 6)—are premised on President Bush's creation by executive order of a "Corporate Fraud Taskforce" in July 2002. Not only do Petitioners fail to explain how a task force that did not exist until July 2002 could have influenced the Government's or Adelphia's actions vis-à-vis Petitioners before July 2002 (*e.g.*, when the Government began its investigation of Petitioners and when Adelphia denied Petitioners' request for fee-advancement), but they also fail to offer a single piece of evidence showing the task force influencing the career prosecutors who prosecuted Petitioners. The task force and contemporaneous political environment are of no relevance to Petitioners' claims, and Petitioners' related allegations and argument should be disregarded in their entirety.

The Holder Memorandum's guidance focused on several factors aimed at assessing whether a corporation as a whole should be treated as a criminal actor. For one of the factors, "timely and voluntary disclosure of wrongdoing and [a corporation's] willingness to cooperate with the government's investigation," the Holder Memorandum advised U.S. Attorneys to consider several issues, including "whether the corporation appears to be protecting its culpable employees and agents." Pet'rs' 56.1 Ex. 16 at ECF page 4. The Holder Memorandum provided that:

> while cases will differ depending on the circumstances, a corporation's promise of support to culpable employees and agents, either through the advancing of attorneys [sic] fees, through retaining the employees without sanction for their misconduct, or through providing information to the employees about the government's investigation pursuant to a joint defense agreement, may be considered by the prosecutor in weighing the extent and value of a corporation's cooperation.

Pet'rs' 56.1 Ex. 16 at ECF page 7 (emphasis added).

In January 2003, as part of the work of the DOJ's Corporate Fraud Task Force, then-Deputy Attorney General Larry Thompson issued a revision of the Holder Memorandum in the form of a memorandum (commonly known as the "Thompson Memorandum") to all United States Attorneys. The Thompson Memorandum was substantially the same as the Holder Memorandum and, as such, was essentially a continuation of the well-known principles governing federal corporate prosecutions that had been in place for years. But unlike the Holder Memorandum, the Thompson required federal prosecutors to consider its factors rather than suggesting as much. *See United States v. Stein*, 435 F. Supp. 2d 330, 338 (S.D.N.Y. 2006), *aff'd*, 541 F.3d 130 (2d Cir. 2008) ("Unlike [the Holder Memorandum], the Thompson Memorandum is binding on all federal prosecutors."). Once issued by DOJ in 2003 (*i.e.*, after the Rigases had

been arrested and indicted but before their trial had concluded), the Thompson Memorandum

remained in effect throughout the pendency of the Government's investigation of Adelphia.

### K. THE FISHER MEMORANDUM AND ADELPHIA'S GUIDANCE TO ITS EMPLOYEES REGARDING CONTACTS WITH THE RIGASES

On October 14, 2002, Randall D. Fisher, general counsel to Adelphia, issued a

memorandum (the "Fisher Memorandum") to all Adelphia employees regarding "[c]ontact with

the members of the Rigas Family."  Pet'rs' 56.1 Ex. 53 at 1.   It stated:

> The Company is committed to cooperating with these federal
> agencies, because it is the right thing to do and because
> cooperating with the government will help recover damages done
> by the Rigases and will help the Company avoid prosecution. . . .
> Also, Adelphia continues to pursue its own claims against the
> Rigas Family. . . .
>
> . . .  In the case of any contact regarding a business matter
> between the Rigas Family or Rigas Family private company and
> Adelphia, whether at work or in a social setting, please refer all
> contacts to the Legal Department. . . .
>
> There is no exception to this situation. . . .
>
> . . .  [I]f such meetings occur, employees will not disclose
> or divulge any confidential information concerning the Company,
> the ongoing investigation or the bankruptcy proceeding. . . .
>
> . . . .
>
> The Legal Department will review the matter and may refer
> the matter to appropriate government agencies and litigation
> counsel for review.

*Id*. at 1-2.

The Fisher Memorandum does not state that its policy is in any way a result of a request

from the Government.  *See generally id.*  Indeed, when asked during a Bankruptcy Court

proceeding in 2004 about the Government's role in crafting the Fisher Memorandum or the

policy underlying it, Assistant United States Attorney ("AUSA") Christopher Clark flatly denied one, stating in open court:

> I should note also that there are at least a couple of references in the brief to the Government trying to stop people from talking to Adelphia witnesses. . . We have never directed Adelphia, nor could we, as far as we know, tell them not to have their employees talk to anyone. It's a corporation. It can do what it wants. We don't have any power over them. If Adelphia directed its employees not to talk to other people, I think they could still talk to other people; but certainly that is not something that we have done, and that is not something that is within our control.

Gov't's 56.1 Ex. C (Bankruptcy Court February 4, 2003 hearing transcript), at 22-23.

Unwilling to accept AUSA Clark's denial, Petitioners took Fisher's deposition earlier this year with the hope of furthering a counter-narrative to the Fisher Memorandum's plain language and AUSA Clark's comments. That deposition, which is not referenced in Petitioners' submission, did not satisfy Petitioners' desire. When Fisher was asked about his namesake memorandum, he testified as follows:

> Q: Do you know why you were directed to send this out?
>
> A: Yes. Somebody, and I don't remember who, got word that John Rigas was calling employees and asking in classic John style, "What's going on?"
>
> Q: Uh-huh.
>
> A: And that there was concern that giving out information out [sic] to people that didn't work for the company. Because I think at this point they did not.
>
> Q: Yes. October 14, 2002.
>
> A: So that it would have been no different than giving insider trading information to – so we also had not filed for bankruptcy at this point, I don't think. So I think there was a serious concern about any information, and people from the outside world probably didn't have as easy a time accessing information as the Rigases might.

Gov't's 56.1 Ex. A (Fisher April 16, 2018 deposition), at 61-62.  Then later, when asked about

the Government's involvement, Fisher confirmed it had none.  He stated:

> Q: Did anyone from the government direct you to send this letter out?
>
> A: No.
>
> Q: You testified earlier that it was outside counsel that asked you to send this letter out?
>
> A: That's correct.
>
> Q: Did outside counsel ever tell you that the government had requested the implementation of this no contact policy?
>
> A. No, they did not.

Gov't's 56.1 Ex. A at 93.

The Government is aware of no other record evidence that sheds light on the

Government's involvement (or lack thereof) in the Fisher Memorandum.

### L.  COVINGTON'S ADVOCACY BEFORE THE GOVERNMENT ON BEHALF OF ADELPHIA

As counsel to the Special Committee, Covington assisted the company in responding to a

grand jury subpoena issued to Adelphia in early April 2002 by the U.S. Attorney's Office for the

Southern District of New York.  Pet'rs' 56.1 Ex. 93 at 3.  As part of that assistance, Covington

produced documents to the Government, proffered to the Government findings from Covington's

investigation, and advocated that the Government should not indict the company for misconduct

undertaken at the direction of the Rigases.  Pet'rs' 56.1 Ex. 28 at 2, 5, 7.  As would be expected,

Covington's advocacy was tailored first to the factors laid out in the Holder Memorandum and

then, after January 2003, the Thompson Memorandum.  *See* Pet'rs' 56.1 Ex. 28 at 2; *see also*

Pet'rs' 56.1 Ex. 55 at ECF page 17 (Covington presentation on the Thompson Memorandum

factors).

Within a week of Petitioners' arrest, on August 1, 2002, Covington submitted a letter to the Government on behalf of Adelphia addressing "whether the Company should be indicted in connection with the criminal charges for which [Petitioners and others] recently were arrested." Pet'rs' 56.1 Ex. 28 at 1. The Holder Memorandum, which was then in effect, was attached to the letter as an exhibit, and the letter relied on the "particular factors" laid out in the Holder Memorandum to argue that that "an indictment of the Company would violate the guidelines set forth in the [Holder] Memorandum." *Id.* at 1-2.

With respect to the Holder Memorandum's emphasis on corporate cooperation, the letter stated that "[t]he Company has followed the Memorandum's guidelines to the letter," including a paragraph-length description of how it did so. *Id.* at 11. That description included the following sentence concerning the Holder Memorandum's "factor" of whether the "corporation appears to be protecting its culpable employees and agents," Pet'rs' 56.1 Ex. 16 at 7:

> The Company has shielded no one, forcing the resignations of the Rigases and working with the government to coordinate the appropriate replacement of employees found to have knowingly participated in improper activities.

Pet'rs' 56.1 Ex. 28 at 11. Thus, on the topic of shielding culpable employees and agents, the letter expressly invoked the Holder Memorandum's guidance that a prosecutor may take into account a corporation's retention of employees without sanction, but it did *not* invoke its guidance that a prosecutor may take into account "advancing of attorneys [sic] fees" or "providing information to the employees about the government's investigation pursuant to a joint defense agreement." *Compare* Pet'rs' 56.1 Ex. 28 at 11 *with* Pet'rs' 56.1 Ex. 16 at 7. Similarly, the letter said nothing about keeping its employees or attorneys from meeting with the Rigases or their counsel. Pet'rs' 56.1 Ex. 28. The Government put off discussion of resolving its investigation of Adelphia until the conclusion of the Government's criminal trial against

18

Petitioners.  *See generally In re Adelphia Commnc'ns Corp.*, 327 B.R. 143, 158 (Bankr. S.D.N.Y. 2005).

In July 2004, as Petitioners' criminal trial came to a close, the Government and Adelphia resumed resolution discussions.  Both DOJ and the SEC initially proposed a global resolution of their claims against Adelphia amounting to payment of a $1 billion criminal penalty.  Pet'rs' 56.1 Ex. 55 ¶ 13 (Alan Vinegrad May 13, 2005 declaration).  Covington then proceeded to make a series of written presentations and submissions to the Government in an effort to persuade the Government that: a financial penalty of far less than $1 billion was warranted; the Government should not indict the company; and the Government should not indict the RMEs.  *Id*. ¶¶ 22, 27, 28.  This written advocacy was made on several occasions, including October 28, 2004; November 5, 2004; and January 18, 2005.  *Id.* ¶¶ 16, 21, 30.  Although each instance of the foregoing advocacy is referenced in a declaration that Covington's lead lawyer at the time, Alan Vinegrad, submitted to the Bankruptcy Court in support of gaining approval of the company's settlement, the only written advocacy relied upon by Petitioners is Covington's November 5, 2004, presentation.  Pet'rs' Mem. at 27.

The November 5, 2004, presentation is a 39-page slide-deck titled "Adelphia Communications Corp. Thompson Memorandum Factors."  Pet'rs' 56.1 Ex. 55 at ECF page 17. Several of the slides address the company's efforts at adhering to the Thompson Memorandum's emphasis (which mirrored the same emphasis in the Holder Memorandum) on corporate cooperation and voluntary disclosure of wrongdoing.  *Id.* at ECF pages 22-27.  None of those slides make reference to—let alone tout—Adelphia's decision to deny fee-advancement to Petitioners or restrict the Rigases' access to Adelphia employees or attorneys.  *See generally id.*

## M. THE NPA AND THE BANKRUPTCY COURT'S APPROVAL OF IT

Ultimately, on April 25, 2004, Adelphia entered into a Non-Prosecution Agreement ("NPA") with the Government under which the Government agreed not to prosecute Adelphia, and Adelphia agreed to provide restitution of $715 million to victims of the fraudulent conduct Adelphia engaged in under the Rigases. Pet'rs' 56.1 Ex. 74 (Adelphia's April 25, 2005 NPA), at 3. Adelphia further agreed, for a period of the later of two years or the conclusion of the prosecution of the Rigases, to cooperate fully with the Government. *Id.* at 2. Adelphia moved for approval of the NPA in Bankruptcy Court (and two other settlement agreements with the SEC and the Rigas family, respectively) on April 28, 2005. Gov't's 56.1 Ex. I (Joint motion for Order approving NPA), at 14-15.

In an opinion dated May 20, 2005, the Bankruptcy Court approved the NPA as being "in the best interests of the estate and fair and equitable." *In re Adelphia Commc'ns Corp.*, 327 B.R. 143, 147 (Bankr. S.D.N.Y. 2005), *adhered to on reconsideration*, 327 B.R. 175 (Bankr. S.D.N.Y. 2005). In so doing, the Bankruptcy Court addressed several objections to the NPA raised by unsecured creditors, including an objection that the NPA "arose from Government coercion—indeed, what one Board member described as a 'shakedown.'" *Id.* at 166. The Bankruptcy Court flatly rejected that objection, stating that it "stretches the 'coercion' concept too far." *Id.* As the Bankruptcy Court reasoned:

> where the "coercion" results from differences in bargaining power, as a consequence of law or fact, or governmentally granted authority and discretion (such as the authority and discretion we grant to prosecutors, to achieve a common good), that is a wholly different kind of "coercion." As one of the bank's counsel aptly noted, it is what we call "leverage."

*Id.* On this conclusion and others, the Court found there was "a compelling inference that the negotiators [for Adelphia] got the best deal obtainable and, at the least, that their deal falls well within the range of reasonableness." *Id.* at 167.

**RELEVANT PROCEDURAL HISTORY**

**A. THE CRIMINAL TRIAL AND OTHER LITIGATION**

In March 2004, the Court held a four and a half month long trial during which the Government offered testimony of twenty witnesses and hundreds of exhibits. *United States v. Rigas*, 490 F.3d 208, 219 (2d Cir. 2007). Petitioners received voluminous discovery including extensive interview notes of Adelphia employees. *See* Gov't's *Brady* Mem. 53. Petitioners chose to call no witnesses.

Following trial, the jury found Petitioners guilty of conspiracy to commit bank fraud, securities fraud, and bank fraud, and conspiracy to make and cause to be made false statements in filings with the SEC. *Rigas*, 490 F.3d at 211. Petitioners were acquitted of wire fraud and conspiracy to commit wire fraud. *Id.*

Since the criminal trial, Petitioners have been involved in various proceedings—both criminal and civil—which have provided the opportunity to seek various forms of relief and collect additional discovery. These include Petitioners' 2005 sentencings, their 2007 direct appeal, their 2007 new trial motion, their 2007 motion to compel, their 2008 resentencing, and their second appeal in 2009. Gov't's *Brady* Mem. 6-10. The Rigases also received, in addition to their criminal trial discovery, further information in bankruptcy proceedings, *Adelphia Commc'ns Corp. v. Rigas (In re Adelphia)*, 317 B.R. 612, 619 (Bankr. S.D.N.Y. 2004), tax proceedings, *United States v. Rigas*, No. 4:05-CR-402, 2011 WL 2371554 (M.D. Pa. June 14, 2011), and various civil suits, *see, e.g.*, *Adelphia Commc'ns, Corp. v. Deloitte & Touche LLP,* 2007 WL 5958219 (Pa. Ct. C.P. Aug. 10, 2007).

## B. THE PETITION, DISCOVERY, AND PROCEDURAL DEFAULT LITIGATION

On October 4, 2011, the Rigases filed their first 2255 petition to set aside the verdict. Dkt. No. 3. This petition raised for the first time arguments that Petitioners were entitled to relief in light of the Government's purported interference with Adelphia's advancement of fees and the Government's interference with certain witnesses (collectively, the "Interference Claims"). Dkt. No. 1, at 32-68. Days after filing their original petition, Petitioners moved for discovery. On May 17, 2013, the case was reassigned to this Court.

On June 19, 2014, this Court granted Petitioners discovery on their *Brady* claims and solicited briefing about whether the Interference Claims had been procedurally defaulted. In their briefing on the Interference Claims, Petitioners argued that the evidence of which they were aware during and shortly after their trial was insufficient to put them on notice of a factual basis for a potential claim that the Government interfered with their attorneys' fees or witnesses. Dkt. No. 61-1 (Petitioners' surreply on procedural default), at 9-17.

On May 15, 2015, this Court issued an opinion holding that Petitioners had procedurally defaulted the Interference Claims by not raising them on direct appeal, but that this default was excused. Petitioners, the Court held, did not possess a sufficient factual basis to be on notice that they should pursue the Interference Claims. *Rigas v. United States*, No. 11-CV-6964 KMW, 2015 WL 3403861, at *12 (S.D.N.Y. May 15, 2015). In particular, the Court found that the following evidence did not amount to a factual basis for notice of the existence of a fee advancement claim: (i) the substance of the May 15, 2002 Adelphia Board meeting; (ii) the contents of the May 18, 2002 Adelphia Board meeting; (iii) the May 23, 2002 agreements setting out the Rigases' resignations; (iv) Adelphia's June 1, 2002 decision not to advance legal fees; and (v) the existence of the Holder and Thompson Memoranda. *Id*. at *8-11. The Court referred to this evidence as "at best[,] negligible circumstantial evidence that the prosecution had

compelled Adelphia to deny fee advancement." *Id*. at *12. According to the Court, this

evidence amounted to only a "faint possibility of coercion" that "was undercut by several other

facts known to Petitioners at the time of default." *Id*. The Court explained:

> Adelphia's decision to deny fee advancement was explained convincingly by the company's bylaws and its adversary bankruptcy proceeding against Petitioners. In June 2002, Adelphia concluded that Petitioners "had deliberately breached their duties to the Company and its shareholders . . . by participating in related party transactions for their benefit to the detriment of the Company without appropriate disclosures and approval of the Board of Directors." Under Adelphia's bylaws, that determination relieved the company of any obligation to advance legal fees. Adelphia then commenced the adversary proceeding, which sought to recover the funds Petitioners had allegedly misappropriated from the company. From that point forward, *it was virtually unthinkable that Adelphia would voluntarily advance fees*, as Petitioners had become the company's legal adversaries.
>
> Moreover, the minutes of Adelphia's June 1, 2002 board meeting— which Petitioners received before trial—suggested that the Government had raised *no* concerns about indemnification or fee advancement. According to those minutes, an Adelphia director reported that he had informed government officials about the Special Committee's progress, including the terms of Petitioners' resignations. The director then explained that the officials "appeared satisfied at the progress of the Special Committee." The minutes contain no mention of any government objection to the terms of Petitioners' resignations, including Adelphia's conditional promise of indemnification.

*Id*. at *13 (internal citation omitted) (emphasis added).

Similarly, the Court held that the evidence available to Petitioners also did not amount to

a factual basis for a claim for witness interference. This evidence included the contents of the

May 15, 2002 Board meeting, the Fisher Memorandum, and a co-defendant's unsuccessful

motion in another proceeding that the Government interfered with witnesses. *Id*. at *10. The

Court concluded that this evidence "would perhaps have raised a faint possibility of improper

coercion" but that "[a]ny overtone of prosecutorial interference . . . was extremely tenuous and

circumstantial." *Id*. at *11-12. "Other, more innocuous interpretations of the meeting and the memorandum were far more compelling at the time," the Court said, "and undercut any reasonable ground for raising the [witness interference claim]." These included that in early May 2002, "the investigations into related-party transactions were relatively young . . . [and] it was perfectly legal—and expected—for the Government to request Adelphia's cooperation with its factfinding, and to mention that a lack of cooperation might contribute to an indictment." *Id*. at *11. The Court continued:

> Nothing about the Government's communication suggested that it planned to use the threat of corporate prosecution to hinder Petitioners' access to evidence once they resigned. Further, by the time Adelphia's general counsel issued the memorandum on October 14, 2002, Adelphia had sued Petitioners for millions of dollars. At that point, it was perfectly legal—and expected—for the company to funnel all communications from Petitioners through its counsel, without any pressure from the prosecution to do so.

*Id*. at *11-12.

The Court granted Petitioners' remaining discovery requests. *Id.* at *14-15. In response to the discovery requests, the Government produced responsive documents, Dkt. No. 186 at 1 (Court's May 11, 2018 Order), and Petitioners were permitted to take the deposition of Randall D. Fisher, Gov't's 56.1 Ex. A.

On April 27, 2018, the Court closed discovery after it had "been pending for nearly four years." Dkt. No. 186 at 1. On April 28, 2017, Petitioners filed their first motion for summary judgment related to the *Brady* claims and an amended 2255 petition (the "Petition"). Dkt. No. 128. On May 25, 2018, Petitioners filed the instant brief on the Interference Claims.

<u>**ARGUMENT**</u>

**I.     LEGAL STANDARD GOVERNING PETITIONERS' 2255 MOTION**

Section 2255 of Title 28 of the United States Code provides:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

Relief under Section 2255 is available "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in [a] complete miscarriage of justice." *Graziano v. United States*, 83 F.3d 587, 590 (2d Cir. 1996) (per curiam) (internal quotation marks and citation omitted). "Because collateral challenges are in tension with society's strong interest in the finality of criminal convictions, the courts have established rules that make it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack." *Yick Man Mui v. United States*, 614 F.3d 50, 53 (2d Cir. 2010) (internal quotation marks and citations omitted).

In order to warrant an evidentiary hearing in the district court on a § 2255 petition, the "application must contain assertions of fact that a petitioner is in a position to establish by competent evidence . . . . Airy generalities, conclusory assertions and hearsay statements will not suffice. . . ." *United States v. Aiello*, 814 F.2d 109, 113 (2d Cir. 1987). Nor is the court required to presume the credibility of factual assertions "where the assertions are contradicted by the record in the underlying proceeding." *Puglisi v. United States*, 586 F.3d 209, 214 (2d Cir. 2009). Moreover, if it "plainly appears from the motion, any attached exhibits, and the record of prior

proceedings that the moving party is not entitled to relief, the judge must dismiss the motion."

*Id.* at 213 (citations omitted).

## II. PETITIONERS HAVE NOT ADDUCED ANY COMPETENT EVIDENCE SHOWING THAT THE GOVERNMENT INTERFERED WITH THEIR CHOICE OF COUNSEL

Petitioners cannot sustain their claim that State action denied them advancement of legal fees once their Sixth Amendment rights attached. Discovery, now complete, confirms that the Government did not exercise any unconstitutional coercive power with respect to Petitioners' legal fees. Petitioners thus remain bound to a record lacking any indication that Adelphia declined to advance legal fees because the Government coerced Adelphia to do so. In fact, the record contains uncontroverted and explicit evidence that Adelphia denied Petitioners advancement of fees because Petitioners breached their fiduciary duties to the company. As the Court has previously observed, such a record suggests "overwhelmingly, that Adelphia . . . declined to advance Petitioners' legal fees for its own reasons" and not because of unconstitutional conduct. *Rigas*, 2015 WL 3403861, at *13. For that reason, and those described below, Petitioners' claim premised on the denial of advancement of fees must be denied.

### A. Legal Standard on Choice of Counsel Claim

"The Sixth Amendment right of the accused to assistance of counsel in all criminal prosecutions is limited by its terms: it does not attach until a prosecution is commenced." *Rothgery v. Gillespie Cty., Tex.*, 554 U.S. 191, 198 (2008) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991)). It is well settled that "attachment" of Sixth Amendment rights therefore does not occur until "the first appearance [by the accused] before a judicial officer at which a defendant is told of the formal accusation against him and restrictions are imposed on his liberty." *Id.* at 194. For example, "[a]bsent a formal charge, arrest on a warrant, even one issued

pursuant to a criminal complaint sworn out by prosecutors, is insufficient prior to the initial appearance before a judicial officer" to trigger the right to counsel. *United States* v. *Moore*, 670 F.3d 222, 234 (2d Cir. 2012).

Notwithstanding that Sixth Amendment protections do not apply until attachment, the Second Circuit recognized in *United States v. Stein*, 541 F.3d 130, 156 (2d Cir. 2008), that a violation of those protections can be premised on pre-attachment government conduct. In *Stein*, the Second Circuit found that the Government violated the right to counsel of a group of individual defendants through its pre-indictment coercion of KPMG, which led to KPMG terminating fee-advancement to the employees once they were indicted. *Id.* at 153. KPMG itself was subject to a criminal investigation by the Government; as part of its efforts to avoid indictment, the company denied fee-advancement to certain employees that the Government viewed as culpable at the point that those employees were indicted. *Id.* at 152. The Second Circuit's holding that KPMG's efforts upon indictment were attributable to the Government was based on three factual predicates found by Judge Kaplan during proceedings in the district court. *See id.* at 144.

*First*, Judge Kaplan found that existing DOJ policies (specifically, the Thompson Memorandum) caused KPMG to reconsider its longstanding practice of paying legal fees for its employees as the company became subject to an investigation by the Government for potential criminal conduct. *Id*. at 141. Judge Kaplan found the Thompson Memorandum led KPMG representatives to seek reassurance from the Government specifically that KPMG could pay fees without sanction. *Id*. *Second*, Judge Kaplan found that the Government did not assuage KPMG's fears, but rather "deliberately . . . reinforced the threat inherent in the Thompson Memorandum" through statements that were reasonably construed as threats of prosecution if the

27

company paid fees to culpable employees upon indictment. *Stein*, 435 F. Supp. 2d at 352-53. *Third*, Judge Kaplan found that the Thompson Memorandum and the threats of prosecutors caused KPMG to cut off fees to its former employees once the employees were indicted—or, as Judge Kaplan put it, the decision to cut off fees was "the direct consequence of the pressure applied by the Thompson Memorandum and the [United States Attorney's Office]." *Id*. at 353.

In light of those findings, the Second Circuit concluded that "the government's pre-indictment conduct was of a kind that would have post-indictment effects of Sixth Amendment significance, and did." *Stein*, 541 F.3d at 153. The Second Circuit "reject[ed] the government's argument that its actions (virtually all pre-indictment) [were] immune from scrutiny under the Sixth Amendment" because, in light of those actions, "it was virtually certain that KPMG would terminate defendants' fees upon indictment." *Id*. The Court found that the Government's conduct had therefore violated the defendants' Sixth Amendment rights. *Id*. at 136.

**B.    The Government Exercised No "Overwhelming Influence" Over Adelphia's Choice of Whether to Pay Legal Costs for Petitioners**

Petitioners are unable to fit their square-peg accusations into the round-hole of *Stein* because there is no competent evidence that the Government exercised "overwhelming influence" over the Board's rejection of Petitioners' request for advancement of attorneys' fees. *Stein*, 541 F.3d at 136. As credited by the Second Circuit, the district court in *Stein* found that the U.S. Attorney's Office expressly made clear to KPMG's counsel in that case—at its very first meeting with them in February 2004 (nearly two years after the USAO first began investigating Adelphia)—that payment of legal fees of individuals under investigation by KPMG would be looked at "under a microscope." *Stein*, 435 F. Supp. 2d at 344, 341-43. Thereafter, as found by the district court, KPMG's outside counsel reported to the Government that KPMG would condition advancement of fees to a current or former employee based on whether that individual

28

cooperated with the company and the Government in their respective investigations—and that

KPMG did exactly that. *Id*. at 344-45. Try as they might by repeatedly invoking the specter of

*Stein* in their submission to this Court, Petitioners do not come close to establishing comparable

facts to those found by the district court in *Stein*.

### 1. Petitioners Must Show More Than an Effort to Comply with the Holder Memorandum

Petitioners are wrong to assert that the Holder Memorandum "alone would be enough to

make the government responsible for" Adelphia's denial of fee-advancement to Petitioners.[7]

Pet'rs' Mem. 32. As this Court has already held, the Holder Memorandum by itself does "not

constitute a factual basis for accusing prosecutors of *improperly coercing* a corporation to

terminate fee advancement." *Rigas*, 2015 WL 3403861, at *13 n.15 (emphasis in original)

(citing *United States v. Olis*, No. H-07-3295, 2008 WL 5046342, at *8 (S.D. Tex. Nov. 21,

2008)). Instead, as Petitioners admit, the Holder Memorandum expresses mere guidance that

"prosecutors could choose not to follow."[8] Pet'rs' Mem. 34 n.11; *see also Rigas*, 2015 WL

3403861, at *13 n.15 (stating that the Holder Memorandum "suggest[s] that prosecutors *might*

consider fee advancement to an indicted former employee non-cooperative, which *might* weigh

in favor of corporate indictment" (emphasis in original)).

---

[7] Petitioners concede that only the Holder Memorandum—and not the Thompson
Memorandum—was operative during the time period that Petitioners allege the Government
coerced Adelphia into denying fee-advancement to Petitioners. *See* Pet'rs' Mem. 34 n. 11.

[8] For this reason, *Skinner* v. *Railway Labor Executives Association*, 489 U.S. 602 (1989) (cited
and discussed at Pet'rs' Mem. 35-36) is inapposite. At issue in that case were regulations
promulgated by the Federal Railroad Administration pursuant to statutory mandate and by
following a formal notice-and-comment period that were intended to be binding. *Id*. at 606-13.
The same cannot be said of non-binding DOJ guidance to federal prosecutors.

Petitioners misleadingly assert that Second Circuit found in *Stein* that "*[t]he Thompson Memorandum* 'forced KPMG to adopt its constricted Fees Policy.'" Pet'rs' Mem. 32 (citing *Stein*, 541 F.3d at 148) (emphasis added). That is not correct and relies on a selective quotation of the Second Circuit's opinion. The entirety of the sentence excerpted by Petitioners makes this clear, providing: "State Action is established here as a matter of law because *the government forced KPMG to adopt its constricted Fees Policy.*" *Stein*, 541 F.3d at 148 (emphasis added). Nowhere does the Second Circuit's opinion say, as Petitioners claim it does, that DOJ guidance, by itself, constitutes State action. In fact, the Second Circuit quite clearly said the opposite: "the district court's ultimate finding of fact [was] that absent the Thompson Memorandum *and the prosecutors' conduct* KPMG would have advanced fees without condition or cap . . . ." *Id*. at 143 (emphasis added). It is plain that Petitioners must put forth something more than the mere existence of written DOJ guidance to establish State action. As demonstrated below, Petitioners cannot do so.

### 2. The Board's Actions Were Undertaken Pursuant to Lawful Authority

Because the Court has already held that the Holder Memorandum itself cannot be viewed as State action, the only route to relief for Petitioners is to establish that the Special Committee's denial of fee-advancement resulted from pressure by the Government. *See Stein*, 541 F.3d at 143-144, 155. Tellingly, Petitioners are unable to cite to a single example of the Government advocating to the Special Committee (or, for that matter, anyone else at Adelphia) that it should adopt a false narrative for the purpose of denying Petitioners access to fee-advancement. Petitioners instead attempt to cobble together a coherent story by cherry-picking innocuous facts and resorting to conjecture and conspiracy theory.

It bears emphasizing that Petitioners do not—because they cannot—challenge the Board's authority to deny fee-advancement based on a breach of fiduciary duty. The source of

the Board's authority to strip Petitioners of advancement of fees derived from an agreement between Petitioners and the Board, which itself derived from the company's Bylaws, which themselves unequivocally stated that a director's "Right to Advancement of Defense Expenses" can be denied if "the Board of Directors or independent legal counsel reasonably determines that such person deliberately breached his duty to the Corporation or its shareholders."  Pet'rs' 56.1 Ex. 29. § 6.2.

On this authority, and as reflected in the minutes of Adelphia's June 1, 2002 Board meeting, the Board determined that Petitioners were not "entitled to the advancement of defense expenses under the Company's Bylaws" because they "had deliberately breached their duties to the Company and its shareholders by failing to cooperate with the Special Committee in its investigation by declining to provide full and complete answers to the Special Committee and by participating in related party transactions for their benefit and to the detriment of the Company without appropriate disclosures and approval of the Board of Directors."  Pet'rs' 56.1 Ex. 36 at 4.

Given the significance of the June 1 corporate action, on June 6, 2002, the company disclosed through a Form 8-K filed with the SEC that Petitioners had breached their fiduciary duties and that the company was denying them an advancement of legal fees.  Pet'rs' 56.1 Ex. 38 (Adelphia June 6, 2002 Form 8-K).  The Government is unaware of Petitioners, who were substantial shareholders of Adelphia at the time, ever having pursued a derivative action against the company or any other action attacking the veracity of the Form 8-K.

### 3. Evidence Contemporaneous to the Board's Actions Does Not Support a Finding of State Action

Given that the Bylaws "explained convincingly" the Board's action on June 1st, *Rigas*, 2015 WL 3403861, at *13, Petitioners' fundamental proposition is that the Board's exercise of its authority under the Bylaws was no more than a "pretext . . . to placate the government after

[the government] expressed its disgust with" the May 23 Agreement. Pet'rs' Mem. 16. To support that proposition, Petitioners cite to the following contemporaneous evidence, none of which shows any actual consideration (let alone, coercion) by the Government of Adelphia's fee-advancement to Petitioners:

- Notes and minutes relating to a May 18, 2002 board meeting that reflect an unknown attendee of the board meeting reported that the Government's "focus" as of May 18th was to "stop the flow $ or control flow $ to Rigas family," Pet'rs' Mem. 14 (quoting Pet'rs' 56.1 Ex. 26 (Bruce Booken May 18, 2002 notes), at 2);

- The May 23 Agreement between Petitioners and Adelphia under which Petitioners resigned their Board seats, Pet'rs' Mem. 17;

- Informal notes regarding a report given by Mark Stein, a partner at Fried Frank and outside counsel to the company, to the Board on May 25, 2002, about statements by the Government to Stein and others on May 23, 2002, noting that the Government was "appalled at the deal" reached between Adelphia and Petitioners on that day, Pet'rs' 56.1 Ex. 33 (Peter Metros May 25, 2002 Board meeting notes), at 3;

- Billing records showing that an associate at Fried Frank assisting Stein prepared "talking points" on May 26, 2002, Pet'rs' 56.1 Ex. 34 (Fried Frank billing entries), at 5;

- Billing records showing that Stein reviewed, on May 28, 2002, "talking points" that Petitioners concede might not even be the same talking points referred to in the associate's billing records from May 26, *id.* at 7; and

- Minutes from the June 1, 2002 Board meeting stating that the Special Committee reported that during a discussion on May 29, 2002, the Government "appeared satisfied at the progress of the Special Committee," Pet'rs' 56.1 Ex. 36.

As discussed below, none of this evidence provides a causal link between Government action and the Board's finding that Petitioners breached their fiduciary duties and were not entitled to fee-advancement.

### (a) The Contemporaneous Evidence Does Not Actually Refer to Fee-Advancement

The first flaw in Petitioners' contention that the Government coerced Adelphia to renege on a pledge in the May 23 Agreement to advance fees to Petitioners is that the May 23

Agreement had no such pledge. As noted above, *supra* Factual Background § E, the May 23 Agreement does not contain a single reference to fee-advancement. There is similarly no competent evidence to support Petitioners' claim that "[t]he issue of most significance to the Rigases [in negotiating the May 23 Agreement] was that the company provide indemnification and fee advancement." Pet'rs' Mem. 14. To the contrary, Petitioners' claim is supported exclusively by self-serving declarations submitted by Petitioners in unrelated litigation nearly a decade after the May 23 Agreement was negotiated. *Id.* (citing Pet'rs' 56.1 Ex. 20 ¶¶ 21-22 (Timothy Rigas October 2011 declaration), Ex. 21 ¶ 3 (John Rigas October 2011 declaration), Ex. 30 (the May 23 Agreement)). That "evidence" is legally insufficient to support Petitioners' argument, *see Siao-Pao v. Keane*, 878 F. Supp. 468, 472 (S.D.N.Y. 1995) (Wood, J.) (casting doubt on "a habeas petitioner's self-serving testimony" in the ineffective assistance context), especially given that it is contradicted by an examination of Petitioners' contemporaneous conduct. For example, Petitioners have never availed themselves of the May 23 Agreement's arbitration clause to challenge the company's interpretation of the May 23 Agreement not to cover fee-advancement.

Petitioners compound their error by claiming without support that the company backtracked from this (non-existent) commitment to advance fees because notes taken at a Board meeting suggest the Government was "appalled" at the May 23 Agreement. At most, that double-hearsay statement shows that the Government was "appalled" at the totality of the severance package extended to Petitioners and their family, which included the authority for the Rigas family to designate two board seats, Pet'rs' 56.1 Ex. 30 ¶ 1, yearly compensation to John Rigas of $1.4 million per year for three years, *id.* ¶ 10, the ability for John Rigas to use "the Company planes for emergency reasons," *id.*, and other perks relating to health insurance and

stock options, *id.* Just five days earlier, on March 18, 2002, the Government reportedly emphasized a need to stop the "flow" of money from Adelphia to Petitioners—*i.e.*, individuals who had been concealing that they were diverting money from Adelphia to their own, related entities—and the May 23 Agreement left open a substantial flow of benefits to John Rigas and his family.

Petitioners are likewise unconvincing in asserting that the Special Committee's report to the Board on June 1, 2002, about a May 29, 2002 meeting that the Special Committee had with the Government, "*directly connects* the government to the decisions [regarding fee-advancement] that were being made." Pet'rs' Mem. 17 (emphasis added). According to the Board minutes, at the June 1 Board meeting, Special Committee member Les Gelber reported that during an earlier discussion with the Special Committee three days earlier, the Government "appeared satisfied at the progress of the Special Committee." Pet'rs' Mem. 17. The Government's generalized statement of being "satisfied" with the Special Committee without any reference whatsoever to "fee-advancement" can hardly be said to "directly connect[]" the Government to the Board's action relating to fee-advancement. Pet'rs' Mem. 17.

### (b) Contemporaneous Billing Records Provide No Link between the Government and the Denial of Fee-Advancement

Petitioners' *ipse dixit* that "Fried Frank billing records show that the Fried Frank lawyers had conversations with the government about fee advancement" rests on nothing more than speculation about the meaning of vague, 16 year-old billing records. Pet'rs' Mem. 16 & n.7. The billing records provide in relevant part that:

- On May 23, 2002, Fried Frank partner Mark Stein's billing narrative included "work on memo re: indemnification," Pet'rs' 56.1 Ex. 34 at 36;

- On May 24, 2002, Stein's billing narrative included "prepar[ing] memo re: indemnification issues," *id.* at 39;

- On May 24, 2002, Fried Frank associate Brett Jaffe's billing narrative included "draft/revise talking points" without any reference to the subject matter of those talking points, *id.*;

- On May 26, 2002, Fried Frank associate Lisa Bebchick's billing narrative included "[d]rafted talking points re: advancement," *id.* at 42;

- On May 28, 2002, Stein's billing narrative included telephone calls "re: meeting w/USAO" and "review draft talking points for USAO," *id.* at 44;

- On May 31, 2002, Fried Frank partner Peter Simmons' billing narrative included "[discussions with] Jaffe, Stein re indemnification and advancement," *id.* at 52; and

- On May 31, 2002, Jaffe's billing narrative included "mtg. w/Simmons re: indemnification," *id.*

From these billing records, Petitioners conclude that, at the Government's request, "between May 23 and 28, Fried Frank 'put together a story' that the Special Committee needed to avoid indictment" by denying fee-advancement to Petitioners under the pretense that Petitioners violated their fiduciary duties. Pet'rs' Mem. 16. Petitioners' conclusions, however, are based on a selective version of the facts. Instead, the billing records likely reflect an effort to make a good-faith assessment of Petitioners' written request for fee-advancement rather than a conspiratorial plot. Based on the evidence proffered by Petitioners, the first day Fried Frank billed Adelphia for services related to a "memo re: indemnification"—*i.e.*, May 23, 2002—is the same day that Petitioners requested fee-advancement from the Board by invoking Article VI of the Bylaws. Pet'rs' 56.1 Ex. 31, Ex. 34 at 36. Based on the same evidence, the last day Fried Frank billed Adelphia for services related to indemnification—*i.e.*, May 31, 2002—was the day before the Board adopted the Special Committee's conclusion that Petitioners were not entitled to fee-advancement.

Petitioners ignore these critical and undisputed facts while maintaining that the billing records "reflect Fried Frank conversations with the government on the subjects of

indemnification and fee advancement in late May." Pet'rs' Mem. at 16 n.7. Yet, the only billing entry that even refers to a possible "conversation with the government" is Stein's May 28th entry reporting "re: meeting w/USAO" and "review draft talking points for USAO" but neither of those entries support Petitioners' bold claim that "conversations with the government" were "about fee advancement." Pet'rs' Mem. 16. Indeed, that billing record says nothing about fee advancement at all. Accordingly, Petitioners' interpretation of the records rests on all of the following assumptions being true: (a) the talking points prepared by Jaffe and/or Bebchick on May 26th were reviewed by Stein; (b) the talking points that Stein reviewed on May 28th actually related to fee-advancement; (c) Stein actually delivered any of the talking points developed by Jaffe or Bebchick to the Government; (d) any talking points that were delivered to the Government were a product of Government coercion; *and* (e) the billing records cannot be explained as a response on behalf of Fried Frank's client, Adelphia, to Petitioners' request for advancement of fees on May 23, 2002.[9]

After four years of discovery, such attenuated conjecture is plainly insufficient to undo sixteen year old convictions. Petitioners' conclusion cannot bear the weight of those multiple assumptions.

---

[9] Petitioners strive to build their credibility by acknowledging—in a footnote—that "[i]t is, of course, possible, that there were *two* sets of talking points involved," but their footnote actually detracts from their credibility. Pet'rs' Mem. 16 n.7 As demonstrated above, their proffered evidence demonstrates *three* references to talking points by *three* different lawyers and which may represent *three* (not two) distinct sets of talking points. *Id*. (emphasis added).

### 4. Covington's Advocacy to the Government Reinforces the Lack of Coercion Concerning Fee-Advancement

Petitioners fare no better in their assertion that written advocacy to the Government after the Board's June 1 determination shows that the June 1 determination was a product of Government coercion.

On August 1, 2002, Covington wrote a letter to the Government outlining how the company was adhering to the Holder Memorandum without *any* reference to the denial of advancement of fees to Petitioners as example of that adherence. Pet'rs' 56.1 Ex. 41 (Covington Aug. 1, 2002 letter to the Government). In addition, in November 2004, following Petitioners' convictions, Covington made a presentation to the Government advocating that the Government's investigation should be resolved without indictment because of Adelphia's cooperation. Pet'rs' 56.1 Ex. 55. The November 2004 presentation was accompanied by a 39-page slide-deck that itemized Adelphia's cooperation in great detail without *any* reference to the denial of advancement of fees to Petitioners as example of that cooperation. *Id.*

Petitioners cite this advocacy by Covington—indisputably undertaken after the Board denied fee-advancement but prior to *Stein*—as evidence of "the powerful degree to which Adelphia was working hand-in-hand throughout the prosecution." Pet'rs' Mem. 28. But aside from their own say-so, Petitioners offer no explanation for why this advocacy constitutes evidence *with respect to the denial of fee advancement*. That is because there is none. *Cf. Stein*, 435 F. Supp. 2d at 348 (emphasis added) ("KPMG repeatedly tried to convince the USAO not to indict the firm, *touting* its cooperation with the investigation and *its limitation of attorneys' fees . . . .*").

**5. The Purported Double-Hearsay "Threat" by the Government to the RMEs Does Not Support Petitioners' Version of Events**

Petitioners are doubly wrongheaded in appealing to a purported threat by the Government in 2004 to Covington attorney Alan Vinegrad that the Government would "indict the RMEs if they continued to offer any indemnification and fee advancement to the Rigases" *after* the Rigases' criminal trial had concluded in 2004. Pet'rs' Mem. 30.

*First*, despite any evidence of Vinegrad's unavailability during four years' of discovery, Petitioners' only evidence for the threat derives exclusively from an inadmissible, double-hearsay statement in a declaration dated February 6, 2011, filed in the Rigases' tax prosecution by the Rigases own lawyer, Lawrence G. McMichael.[10] *Id*. (citing Pet'rs' 56.1 Ex. 89 (Lawrence G. McMichael February 6, 2011 declaration)). In that declaration, McMichael claims that Vinegrad advised McMichael in an unspecified place and at an unspecified time that "[i]n late 2004, the Government informed Adelphia that if the [RMEs] continued to indemnify and advance attorney's fees and defense costs for the Rigases, the Government would indict the RMEs." Pet'rs' 56.1 Ex. 89 ¶ 7. To the Government's knowledge, Petitioners are relying on McMichael's statement without ever having attempted to solicit testimony from Vinegrad in discovery to assess the veracity of McMichael's claims. Petitioners' reliance on inadmissible

---

[10] As an initial matter, the McMichael declaration's evidentiary value is undermined by its failure to comply with 28 U.S.C. § 1746. Rather than comply with that statute, the McMichael declaration states only that McMichael made "this Declaration pursuant to the penalties applicable for unsworn falsification to authority," Pet'rs' 56.1 Ex. 89 ¶ 17, and fails to reference the statute or state that the statements are made under penalty of perjury, *see Quintero v. Rite Aid of New York, Inc.*, No. 09 CIV. 6084 JLC, 2011 WL 5529818, at *5 (S.D.N.Y. Nov. 10, 2011) (describing the requirements of Section 1746). McMichael's omission is particularly curious in light of McMichael's other declaration submitted by Petitioners, which abides by Section 1746. Pet'rs' 56.1 Ex. 72 (Lawrence G. McMichael October 3, 2011 declaration), at ECF page 15 ("I declare under penalty of perjury that the foregoing is true and correct under 28 U.S.C. § 1746.").

hearsay, despite a four-year opportunity to clarify the record through discovery, lessens the credibility of McMichael's claim that the Government threatened to indict the RMEs in 2004 if the RMEs continued to advance fees to Petitioners. [11]

*Second*, even if the purported threat could be considered as competent evidence, its existence only underscores that the proper interpretation of this purported statement is that there was no explicit focus on fee-advancement in connection with the criminal trial. Petitioners rely on McMichael's declaration to "demonstrate[] how the government had no qualms about threatening to indict companies (particularly companies connected to the Rigases) in order to force the company to withhold indemnification and fee advancement." Pet'rs' Mem. 30. That interpretation proves too much. Given that the Government appears to have believed in good faith that it was permitted to penalize a corporation for advancing fees to culpable individuals,[12] and expressly threatened to do so in this very matter after the criminal trial, the lack of evidence showing the Government expressly conditioned indictment of Adelphia on the denial of fee-advancement to Petitioners demonstrates there is no such evidence.[13]

---

[11] Instead, the Court should credit Vinegrad's declaration-testimony submitted to the Bankruptcy Court in 2005 to obtain approval for Adelphia to enter into the NPA, in which Vinegrad represented that in November 2004 prosecutors informed him that they were prepared to indict the RMEs in response to a threat by Adelphia's creditors committee to place the RMEs in bankruptcy as a way of insulating the RMEs' assets from forfeiture. Pet'rs' 56.1 Ex. 55 ¶ 26. Vinegrad's discussion of the Government's threat to indict the RMEs contains no reference to fee advancement.

[12] Prior to Judge Kaplan's rulings in *Stein*, the Government had no reason to be anything other than explicit if and when it chose to consider fee-advancement as an aspect of a corporation's cooperation.

[13] Petitioners separately contend that the denial of fee advancement had the effect of "hampering their ability (through existing counsel) to mount as robust and aggressive of a defense as they could have." Pet'rs' Mem. 43. But as Judge Lynch made clear in 2004, while the defense was being mounted, the funds made available to Petitioners through the Bankruptcy Court provided them with "the best criminal defense that money can buy." *In re Adelphia Commc'ns Corp.*,

## C. Petitioners Are Not Entitled to a Hearing on their Fee-Advancement Claim

Petitioners also have failed to establish any basis for an evidentiary hearing. In *Stein*, the court ordered an evidentiary hearing because the Thompson Memorandum was in effect *and* because the government had "concede[d] that the lead prosecutor in [the] case inquired in February 2004 about KPMG's obligations and plans with respect to payment of legal fees of partners and employees." *United States* v. *Stein*, No. 05 CR 888 (LAK), 2006 WL 1063298, at *1 (S.D.N.Y Apr. 12, 2006). "Against the background of the Thompson [M]emorandum, the inquiry [with respect to payment of employees' and partners' fees] itself arguably was a signal to KPMG as to actions that would promote its chances of avoiding prosecution." *Id.* No similar analysis is possible here given there is no evidence the Government ever made an inquiry into the payment of attorneys' fees in the first place. All available evidence is to the contrary.

## III. PETITIONERS HAVE NOT ADDUCED ANY COMPETENT EVIDENCE SHOWING THAT THE GOVERNMENT INTERFERED WITH THEIR ACCESS TO WITNESSES

As with their attorneys' fees argument, Petitioners cannot sustain their claim that the Government unlawfully interfered with their access to witnesses. Not only do Petitioners fail even to cite the governing standard in this Circuit for their claim, but they also adduce virtually no evidence in support of their claim and ignore evidence that flatly contradicts it. Having had the benefit of four years of discovery, Petitioners are no more able to establish Government interference now than at the end of their trial, when this Court concluded that "[a]ny overtone of prosecutorial interference . . . was extremely tenuous and circumstantial." *Rigas*, 2015 WL 3403861, at *2.

---

2004 WL 2186582, at *13. At this stage, Petitioners' "buyers' remorse" can be attributed to none other than the buyers themselves—here, Petitioners—rather than the Government or any other third party.

## A.     The Right to Present a Defense

A criminal defendant's right to present a defense stems from the Sixth Amendment right to compulsory process and Fifth Amendment right to due process. *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 93, 127 (2d Cir. 2008). In protecting this right, "courts have held that judicial or prosecutorial intimidation that dissuades a potential defense witness from testifying for the defense can, under certain circumstances, violate the defendant's right to present a defense." *United States v. Williams*, 205 F.3d 23, 29 (2d Cir. 2000); *see also United States v. Desena*, 287 F.3d 170, 176 (2d Cir. 2002).

According to the Second Circuit, to succeed on a claim of prosecutorial interference with witnesses, a defendant must establish (1) that the Government caused the purported interference, *Desena*, 287 F.3d at 176; (2) that the Government acted in bad faith; (3) that the interference infected the trial with a lack of fundamental fairness; and (4) that the interfered with testimony was material, non-cumulative, and favorable to the defense. *Williams*, 205 F.3d at 29-30. *See also Yaron v. United States*, 586 F. App'x 819, 822 (2d Cir. 2014) (reiterating the standard); *Desena*, 287 F.3d at 176; *Buie v. Sullivan*, 923 F.2d 10, 13 (2d Cir. 1990); *United States v. Pinto*, 850 F.2d 927, 932 (2d Cir. 1988).

Petitioners fail to cite or otherwise acknowledge this standard and put forth argument solely as it relates to the materiality of the testimony they claim was unfairly denied. The standard's other requirements of causation, bad faith, and fundamental fairness are completely unaddressed. This silence is deafening.[14] Not only have petitioners waived any argument on

---

[14] It must be noted that these requirements are not hidden in inscrutable Second Circuit jurisprudence, but plainly stated in precedent that is directly on point. *See Williams*, 205 F.3d at 29-30 (describing that, in case about Government threats to witnesses, "[t]o establish a violation of the right, a criminal defendant must generally show that he was deprived of material and exculpatory evidence that could not be reasonably obtained by other means . . . must show bad

these elements, *United States v. Catalano*, No. 12 CR 725 KMW, 2014 WL 656065, at *5 n.1 (S.D.N.Y. Feb. 20, 2014) (Wood, J.) (quoting *Mateo v. Bristow*, No. 12 Civ. 5052 RJS, 2013 WL 3863865, at *8 (S.D.N.Y. July 16, 2013) ("It is well established . . . that a court should not consider arguments that are raised for the first time in a reply brief.")), but they would not be able to satisfy the requirements if given the opportunity.[15]

## B. Petitioners Identify No Connection between the Government and Any Interference

### 1. Causation Standard

As a threshold matter, a petitioner seeking relief based on the Government's unconstitutional interference with witnesses must establish some causal relationship between the Government's actions and the unavailability of the witness. *See Desena*, 287 F.3d at 176 (rejecting interference with witness claim because "there is no allegation or proof that the prosecution caused or contributed to [the witness's] absence"). Although the Second Circuit has addressed this requirement only implicitly, *see id.*, every other Circuit Court of Appeals to examine the issue has explicitly required some causal link between the Government's action and the alleged interference. *See Soo Park v. Thompson*, 851 F.3d 910, 921 (9th Cir. 2017), *cert.*

---

faith on the part of the government . . . [and] must demonstrate that the absence of fundamental fairness infected the trial." (internal citations and quotation marks omitted)).

[15] In each of the out-of-circuit cases cited by Petitioners in which courts have found constitutionally impermissible interference, courts have not analyzed the bad faith and fundamental fairness elements required in the Second Circuit. *See* Petr's' Mem. 59-66 (citing *Gregory v. United States*, 369 F.2d 185 (D.C. Cir. 1966) (no bad faith or fundamental fairness analysis); *United States v. Ebrahimi*, 137 F. Supp. 3d 886 (E.D. Va. 2015) (no bad faith analysis); *United States v. Linder*, No. 12 CR 22, 2013 WL 812382, at *34 (N.D. Ill. Mar. 5, 2013) (same)).

*denied*, 138 S. Ct. 642 (2018) (collecting cases) ("[O]ur precedent clearly requires some 'causal link' between the Government's conduct and the witness's decision not to testify.").[16]

Petitioners improperly elide this requirement by limiting their burden to no more than asserting that they "are entitled to relief without the need to identify particular witnesses and the specific content of what those witnesses would have been expected to testify." Pet'rs' Mem. 67. In support, they cite to *Valenzuela-Bernal*, Pet'rs' Mem. 67 (citing *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982)), but that case cannot be read to require the limited showing Petitioners claim is required of them. In *Valenzuela-Bernal* the Court concluded that the Government did *not* violate the defendant's Fifth or Sixth Amendment rights when it deported a potential defense witness. As part of its analysis, the Court stated that a defendant must offer "some plausible explanation of the assistance he would have received from the testimony of the deported witnesses." *Id*. at 871. Moreover, as several Circuits have found, the Court "strongly intimated that . . . the contested act or omission must be attributable to the sovereign and must be

_____

[16] These circuits include the First, Fifth, Sixth, Seventh, Eighth, Ninth, and D.C. Circuits. *See Soo Park*, 851 F.3d at 921; *Griffin v. Davies*, 929 F.2d 550, 553 (10th Cir. 1991) ("There must be a plausible showing that an act by the government caused the loss or erosion of testimony that was both material and favorable to the defense."); *United States v. Hoffman*, 832 F.2d 1299, 1303 (1st Cir. 1987) ("[A]n accused must, at a minimum, demonstrate some plausible nexus between the challenged government conduct and the absence of certain testimony."); *United States v. Weddell*, 800 F.2d 1404, 1412 (5th Cir.), opinion amended, 804 F.2d 1343 (5th Cir. 1986) (remanding to the district court for an evidentiary hearing on "whether or not [the witness], except for the actions of the government, would have indeed testified for her husband and that her testimony would have had any effect on the jury verdict."); *United States v. Silverstein*, 732 F.2d 1338, 1345-46 (7th Cir. 1984) (concluding that trial judge's misstatements to a witness about the potential for a perjury prosecution were not the "decisive factor in [the witness's] decision not to testify" and any error was therefore harmless); *United States v. Blackwell*, 694 F.2d 1325, 1343 (D.C. Cir. 1982) (rejecting claim in light of "the lack of a direct nexus between the judge's and prosecutor's remarks and [the defendant's] loss of [the witness's] testimony."); *United States v. Long*, 449 F.2d 288, 295-96 (8th Cir. 1971) (declining to find witness interference where a witness did not want to talk to defense counsel and there was "no evidence that his reluctance to talk to the defendants' attorneys resulted from any interference by the Government or its attorneys").

causally related to the inability to present the evidence." *United States v. Hoffman*, 832 F.2d 1299, 1303 (1st Cir. 1987) (citing *Valenzuela-Bernal*, 458 U.S. at 867). In light of the specific nature of these arguments, the failure to identify a causal link between Government conduct and witness unavailability would be fatal, especially where, as here, Petitioners have not only conducted discovery in multiple lawsuits over ten years, but also conducted discovery in this matter.

## 2. Application

Petitioners identify six witnesses with whose testimony they claim the Government interfered: Carl Rothenberger, Paula Zawadzki, Dean Marshall, Mike Brady, Andrew Zorichak, and Dan Liberatore. Petitioners have failed to establish causation for each of these witnesses.

Generally, the causal nexus between the Government's conduct and alleged witness interference is self-evident. This is so where, for example, the Government deports a witness, *see, e.g.*, *Valenzuela-Bernal*, 458 U.S. at 870; threatens to prosecute a witness, *see, e.g.*, *Williams*, 205 F.3d at 30; or instructs a witness not to speak with the defense, either at all or without a government agent present, *see, e.g.*, *Gregory v. United States*, 369 F.2d 185 (D.C. Cir. 1966). Where, by contrast, a court cannot identify any action by the Government that would cause the witness not to testify, no interference with constitutional rights occurs. *See Desena*, 287 F.3d at 177.

When a third-party interferes with a defendant's access to witnesses, courts find constitutional violations only when the third-party's conduct is fairly attributable to the Government. *See United States v. Linder*, No. 12 CR 22, 2013 WL 812382 (N.D. Ill. Mar. 5, 2013) (finding witness interference where U.S. Marshal's service explicitly prohibited its employees, who also would have been defense witnesses, from speaking with defense counsel).

When the Government does not directly cause the third party to interfere, however, no constitutional violation occurs, even when a third party has some connection with the Government. *See Fenenbock v. Dir. of Corr. for California*, 692 F.3d 910, 918 (9th Cir. 2012) ("Petitioner cannot demonstrate *prosecutorial* interference by pointing to the independent conduct of a state social services agency that was acting in loco parentis [for the witness].").

Petitioners appear to acknowledge that the Government had no direct contact with the six identified witnesses, relying instead on an argument that the Government caused two third-party organizations, Adelphia and its law firm Buchanan Ingersoll, to interfere. Yet Petitioners offer absolutely no evidence of Government involvement in the acts of interference supposedly undertaken by these private actors. Petitioners instead retreat to irrelevant examples of the Government's contacts with Buchanan Ingersoll and Adelphia on issues unrelated to the availability of the six identified witnesses. These commonplace instances of Government contact with a company and its counsel are insufficient to support Petitioners' allegations after four years of discovery and, in any event, are unpersuasive in showing the Government's influence over these institutions on matters of witness interference.

### (a) Buchanan Ingersoll Partners

Two of Petitioners' proffered witnesses, Carl Rothenberger and Paula Zawadzki, were partners at the law firm Buchanan Ingersoll. Petitioners identify what evidence these witnesses might provide, but offer nothing to support the premise that the Government interfered with the Rigases' access to these partners. Indeed, Petitioners offer neither evidence that they attempted to meet with these particular individuals, nor evidence of why these individuals chose not to speak. In place of evidence regarding these particular people, Petitioners speak in generalizations. They state that "witnesses from Buchanan Ingersoll . . . refused to speak with the defense." Pet'rs' Mem. 64. Surely, that cannot be enough to satisfy the causation

requirement, otherwise any witness who chose on their own not to speak with a defendant would create a Due Process violation. *See Aiello*, 814 F.2d at 113.

The only specific instance of Government conduct to which Petitioners' refer relates to a February 2003 request by the Rigases for files from Buchanan Ingersoll. Pet'rs' Mem. 63. As told by Petitioners, lawyers for Buchanan Ingersoll asked Adelphia's additional outside counsel, Boies Schiller, to review a letter that was to be sent to the Rigases' counsel. *Id*. at 21. Boies Schiller then forwarded that message to the Government. *Id*. There is no indication that the Government responded *or even read* the message. From this, Petitioners ascribe the "immense power the AUSAs . . . were asserting over who got to speak to whom and when." *Id*. This hyperbole is just too much for this single anecdote to bear.

Put simply, Petitioners have offered no evidence of the Government's attempts to interfere with Petitioners' access to Rothenberger and Zawadzki.

### (b) Adelphia Employees

Similarly, Petitioners offer no evidence linking the Government with Adelphia's actions restricting Petitioners' access to the other identified witnesses who were at one time employees of Adelphia: Dean Marshall, Mike Brady, Andrew Zorichak, and Dan Liberatore. Petitioners argue that Adelphia prevented the Rigases from speaking with these four individuals at the instruction of the Government. They are wrong.

The principal piece of evidence cited by Petitioners purportedly evincing Government pressure on Adelphia employees not to speak with the Rigases is the October 14, 2002 Fisher Memorandum. *See* Pet'rs' Mem. 61 ("The . . . Fisher Memorandum is Exhibit A in this regard."). As described by this Court, the Fisher Memorandum "explained that Adelphia was cooperating with several government investigations, and 'continue[d] to pursue its own claims against' Petitioners [and] . . . then instructed Adelphia's employees not to speak to Petitioners or

their counsel directly, and to refer communications from them to the company's legal

department." *Rigas*, 2015 WL 3403861, at *2 (quoting Pet'rs' 56.1 Ex. 53 at 1-2) (first

alteration in original). Yet this Court went on to find that from the Fisher Memorandum itself,

"[a]ny overtone of prosecutorial interference . . . was extremely tenuous and circumstantial"

because "[o]ther, more innocuous interpretations of the meeting and the memorandum were far

more compelling at the time, and undercut any reasonable ground for raising the Witness Access

Claim." *Rigas*, 2015 WL 3403861, at *12. As the Court noted,

> by the time Adelphia's general counsel issued the memorandum on
> October 14, 2002, Adelphia had sued Petitioners for millions of
> dollars. At that point, it was perfectly legal—and expected—for the
> company to funnel all communications from Petitioners through its
> counsel, without any pressure from the prosecution to do so.

*Id.*

Since this Court's prior conclusions about the Fisher Memorandum, what record evidence

have Petitioner's developed about Government involvement in the policy set out in the memo?

None. In fact, the primary evidence developed in discovery by Petitioners on their witness

interference claim conclusively reinforces this Court's prior conclusion that the Government had

no role in the Fisher Memorandum or its policies. And so Petitioners have chosen to ignore it.

As noted above, *supra* Factual Background § K, in an April 2018 deposition taken as part

of this litigation and at Petitioners' request, Fisher testified that the impetus for the policy was

"that John Rigas was calling employees and asking in classic John style, 'What's going on.'"

Gov't 56.1 Ex. A at 61. Then, when pressed about Government involvement in particular,

Fisher testified:

> Q: Did anyone from the government direct you to send this letter
> out?
>
> A: No.

Q: You testified earlier that it was outside counsel that asked you to send this letter out?

A: That's correct.

Q: Did outside counsel ever tell you that the government had requested the implementation of this not contact policy?

A. No, they did not tell me that.

Gov't's 56.1 Ex. A at 93.  This testimony is fully consistent with AUSA Clark's contemporaneous representations before the Bankruptcy Court that "[w]e have never directed Adelphia, nor could we, as far as we know, tell them not to have their employees talk to anyone." Pet'rs' 56.1 Ex. 78 (Gov't's Feb. 22, 2012 Opp'n Mem. to 2255 Pet.), at 42 (quoting Gov't's 56.1 Ex. C at 22-23).

Despite having fought tooth-and-nail to obtain Fisher's deposition, Petitioners make no attempt in their brief to acknowledge—let alone grapple with—Fisher's damning testimony. Instead, Petitioners obfuscate and distract with unrelated evidence of supposed Government interference with witnesses whom Petitioners do not identify as material to their case.  In particular they cite purported Government interference with Rob Cavileri and Joe Sabol, two Adelphia accountants.  Pet'rs' Mem. 21-22, 26-27.  Importantly, however, Petitioners identify no favorable and non-cumulative information possessed by these individuals.  They ask the Court instead to speculate that because the Government was involved in discussions about interviews with these two individuals who do not form the basis of their claim, the Government *must* have discussed access to the six witnesses that do form the basis of their claim.  While this conjecture may have sufficed at an earlier stage it the litigation, it cannot warrant a hearing at this stage after four years of discovery.  *See Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (warning against granting "habeas relief on the basis of little more than speculation with slight support");

*LoCascio v. United States*, 395 F.3d 51, 58 (2d Cir. 2005) (quoting *Dalli v. United States*, 491 F.2d 758, 760 (2d Cir. 1974)) ("[M]ere generalities or hearsay statements will not normally entitle the applicant to a hearing on motion [under § 2255] . . . ; rather, petitioner must set forth specific facts which he is in a position to establish by competent evidence."). And it surely cannot call into question the direct evidence from Fisher and AUSA Clark that the Fisher Memorandum was not influenced by the Government. *See David v. United States*, 134 F.3d 470, 478 (1st Cir. 1998) ("To progress to an evidentiary hearing, a habeas petitioner must do more than proffer gauzy generalities or drop self-serving hints that a constitutional violation lurks in the wings.").

Without the Fisher Memorandum to cast a general shadow over all Adelphia employees, Petitioners are left with no evidence of Government interference with these witnesses. Petitioners offer no evidence that they even approached Dan Liberatore, let alone that the Government influenced him to refuse to speak with the Rigases. *See* Pet'rs' Mem. 73. As for Andrew Zorichak, he stated in an affidavit that he felt pressure not to speak to the Rigases, but stated that that pressure came from Adelphia and his coworkers. *See* Pet'rs' 56.1 Ex. 84 ¶¶ 14-17 (Andrew Zorichak May 18, 2018 declaration). And Mike Brady, who also refused to speak with the Rigases, declined to give a reason for his refusal and, in any event, had already spoken with a defense investigator on more than one occasion.[17] *See* Pet'rs' Mem. 71 n.24; Pet'rs' 56.1 Ex. 86 (Mike Brady March 10, 2005 deposition), at 176-77.

---

[17] In a footnote, Petitioners argue that Mike Brady spoke with a defense investigator prior to the release of the Fisher Memorandum but refused thereafter, in an apparent attempt to paint the Fisher Memorandum as the impetus for this change. Misleadingly, however, Petitioners have offered no evidence of those prior meetings, citing only Brady's deposition testimony that he wasn't willing to speak with the Rigases. Pet'rs' Mem. 71 n.24; Pet'rs' 56.1 ¶ 178. The Court, therefore, can draw no inference from the timing of Brady's change in attitude. And again—at

Petitioners' arguments about Dean Marshall require additional explanation but are equally unavailing. First, Petitioners note that the Government had a role in suggesting that Adelphia keep Marshall on administrative leave instead of firing him, but do not—and cannot— point to any evidence that the Government or even Adelphia instructed him not to speak with the Rigases. Pet'rs' Mem. 19-20, 27, 69-70. An examination of the documents signed as part of Marshall's administrative leave reveals that they obligate Marshall to cooperate with prosecutors but do not state that he may not do so with the Rigases.[18]

Second, Petitioners assert that Marshall "testified in a [2011] deposition that he was told 'the government did not want me communicating directly with anybody from the Rigas family.'" Pet'rs' Mem. 27 (quoting Pet'rs' 56.1 Ex. 54 (Dean Marshall December 13, 2011 deposition)). Critically, however, even accepting that Marshall held this belief in the Government's wishes, Marshall had absolutely no recollection of how he came to that conclusion. In the same 2011 deposition, Marshall stated that he "d[id]n't recall" whether the Government's supposed request was "communicated directly to you or to your attorney." Pet'rs' 56.1 Ex 54 at 17. Things were no clearer for Marshall in 2014, when he again testified at a deposition that he was "generally encouraged not to talk to anybody about this" including "the Rigases or their counsel" and, again, did not specify whether his knowledge of the Government's desire that he not speak with

_____

the risk of belaboring the obvious—even if the Fisher Memorandum had been the impetus for change, Fisher himself indicated that the Government did not influence the issuance of the Fisher Memorandum.

[18] Petitioners also note that six other Adelphia employees were placed on administrative leave. As with Marshall, however, nothing, including the agreements executed by the six employees placed on leave states that they were not permitted to speak with the Rigases, let alone that the Government so required. *See generally* Pet'rs' 56.1 Ex. 44-47. And, in any event, the individuals placed on administrative leave are not among those identified by Petitioners as possessing material information with the exception of Dean Marshall. *See* Pet'rs' 56.1 Ex. 44 (listing the employees placed on leave).

the Rigases "was received by you or your counsel from the government."  Pet'rs' 56.1 Ex. 90

(Dean Marshall February 27, 2014 deposition), at 109-11.

Petitioners ignore the complete absence of competent evidence that the Government itself

caused Marshall to hold the view that the Government did not want him communicating with the

Rigases.  *See Hoffman*, 832 F.2d at 1303 ("There can be no violation of the defense's right to

present evidence, we think, unless some contested act or omission . . . can be attributed to the

sovereign . . . .").  Marshall's testimony thus presents no more evidence that the Government

acted to cause Marshall's belief than that Marshall's lawyers (or some other third party) so

informed him.  *See F.D.I.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 205 F.3d 66, 75 (2d

Cir. 2000) ("[V]ague denials and memory lapses . . . do not create genuine issues of material

fact."); *Craig v. Colonial Penn Ins. Co*., 335 F. Supp. 2d 296, 305 (D. Conn. 2004) ("[A]

witness's non-denial does not create a genuine issue of material fact when the witness has

testified to a lack of memory and no affirmative evidence has been introduced.").

Because Petitioners offer no evidence that the Government caused the complained of

restricted access to the six witnesses purportedly possessing material information, Petitioners'

witness interference claim fails.

### C.     Petitioners Cannot Show Bad Faith by the Government

If the Court were to excuse the lack of competent evidence that the Government caused

the Rigases' inability to interview either the Buchanan Ingersoll partners or Adelphia employees,

Petitioners' interference claim would still fail due to a lack of bad faith on the part of the

Government.

The Second Circuit has explicitly required a showing of bad faith, *Williams*, 205 F.3d at

29-30, but has not expounded on that term other than to note that "[s]peculation . . . does not

permit a determination of bad faith on the part of the prosecutor . . . ." *Buie*, 923 F.2d at 12.

Other circuits addressing interference claims employ a standard articulated in *Arizona v. Youngblood*, 488 U.S. 51 (1988), which defined bad faith as "official animus" or a "conscious effort to suppress exculpatory evidence." *Id.* at 57. Petitioners have neither attempted to establish bad faith under either of these theories nor would they be able to do so if the arguments were not waived. *See Catalano*, 2014 WL 656065, at *5 (Wood, J.).

As the lack of evidence of Government interference makes clear, Petitioners' theory—at its absolute strongest—can be described as suggesting that the Government's general influence over Adelphia and Adelphia's desire to cooperate with the Government caused Adelphia and its attorneys at Buchanan Ingersoll to limit the Rigases' access to the six identified witnesses. Even accepting *arguendo* that the evidence supports this theory (which it does not), the Government's conduct in convincing Adelphia to cooperate with its investigation demonstrates no bad faith. As this Court concluded when it granted discovery, "it was perfectly legal—and expected—for the Government to request Adelphia's cooperation with its factfinding, and to mention that a lack of cooperation might contribute to an indictment." *Rigas*, 2015 WL 3403861, at *12. Put simply, the Government's expectation that Adelphia would cooperate was entirely common, appropriate, and permissible under existing law. *Rigas*, 2015 WL 3403861, at *12; *Rigas*, 2011 WL 2371554, at *2. To the extent Adelphia and its attorneys took it upon themselves to interfere with the Rigases' access to Adelphia's employees and attorneys, such interference, even if somehow influenced by a desire to please the Government, cannot constitute a constitutional violation because Petitioners can identify no evidence of bad faith.

### D.       Petitioners Cannot Demonstrate a Lack of Fundamental Fairness

As with bad faith, Petitioners do not and cannot argue that the Government's actions interfered with the fundamental fairness of the trial. *See Catalano*, 2014 WL 656065, at *5 (Wood, J.). In describing the fundamental fairness requirement, the Court in *Valenzuela-Bernal*

explained that Government interference with witnesses will "rise to the level of due process violations only when they so infect the fairness of the trial as to make it 'more a spectacle or trial by ordeal than a disciplined contest.'" 458 U.S. at 872 (quoting *United States v. Augenblick*, 393 U.S. 348, 356 (1969)). Petitioners, whose legal team received $27.8 million in RME funds from court orders and a further $11.5 million such funds from the Adelphia settlement, surely cannot meet this high standard. *See* Gov't 56.1 Ex. I at 12, 19.

The most significant stumbling block to the argument Petitioners could make on this element—if they had made any argument at all—is the actual availability of each of the six identified witnesses. None of the witnesses was called to testify and, as far as Petitioners assert, none had a basis to refuse a trial subpoena. Where a defendant offers no evidence that the witnesses would, in actuality, be unavailable to testify, the burden to demonstrate a lack of fundamental fairness is greater. *See United States v. Bin Laden*, 116 F. Supp. 2d 489, 494-95 (S.D.N.Y. 2000) (noting that "it is impossible for the Court to evaluate whether the alleged interferences will deprive the Defendant of a fair trial" where defendant "merely states that his potential witnesses 'might very well' be induced to invoke their Fifth Amendment privilege" and "can only postulate that [a refusal to testify] is 'most likely due to fear of reprisals by the government'").

Here, even accepting that the Government somehow influenced two private actors, Adelphia and Buchanan Ingersoll, to advise their employees not to speak with the Rigases, this interference with witness preparation did not turn the trial into "more a spectacle or trial by ordeal than a disciplined contest." *Valenzuela-Bernal*, 458 U.S. at 872. Petitioners argue that the actual availability of the witnesses at trial is irrelevant, citing to cases expounding on the importance of witness interviews to trial preparation. Pet'rs' Mem. 60 (citing *Int'l Bus.*

*Machines Corp. v. Edelstein*, 526 F.2d 37, 44 (2d Cir. 1975) (civil case about a judicial order)). But no court in this Circuit appears to have found a constitutional violation where the witnesses were actually available to testify. *See, e.g.*, *United States v. Chase*, No. 2:04-CR-135, 2005 WL 3263910, at *2 (D. Vt. Nov. 30, 2005) (detailing Government's repeated subpoena of defense witnesses and noting that while "the government's actions have the potential to deter expert witnesses from testifying on his behalf, he provides no evidence that any witness has actually been dissuaded from testifying."); *Bin Laden*, 116 F. Supp. 2d at 494-95. Although courts outside this Circuit have found that the Government's interference with a defendant's pretrial access to witnesses undermines fundamental fairness, they have done so only where the Government conduct is particularly egregious. *Compare Linder*, 2013 WL 812382, *45 (finding witness interference in prosecution of former Deputy U.S. Marshal where Deputy U.S. Marshals testified that they feared disciplinary action for speaking with defense in light of the issuance of "specific rules . . . to not discuss any matter about the case with [the defendant] or anyone else except as authorized or as a matter of official duty") *with Fenenbock*, 692 F.3d at 918 (finding no witness interference where California Child Protective Services ("CPS") made material witness repeatedly available to prosecution but not defendant, and where CPS hired private therapists who "coached" the witness that the prosecutor was working for the witnesses' interests and the defense would attempt to "trick" him).

**E. The Testimony of Petitioners' Witnesses Would Not Be Material**

Finally, the court must evaluate materiality—the only issue addressed by Petitioners. The materiality requirement demands that the defendant make "a plausible showing that the testimony of the [interfered with] witnesses would have been . . . favorable to his defense, in ways not merely cumulative to the testimony of available witnesses." *Valenzuela-Bernal*, 458

U.S. at 873. Petitioners cannot meet even this modest standard for the six witnesses it proffered here.

Regarding Carl Rothenberger and Paula Zawadzki, their proffered testimony regarding Buchanan Ingersoll's knowledge and beliefs about the co-borrowing agreements and disclosures would not be exculpatory on the issue of whether Adelphia's statements, as attributed to Petitioners, misled the public. *See* Gov't's *Brady* Mem. 37-38; *see also United States v. Rigas*, 490 F.3d 208, 214 n.4 (2d Cir. 2007) ("Defendants continue to . . . assert they were acting on the advice of investment advisors with only the best intentions of Adelphia in mind. We do not think these arguments preclude Defendants' criminal liability."). For the same reasons, the testimony of Dean Marshall on the awareness of Adelphia's Board, Deloitte, and Buchanan Ingersoll about the co-borrowing scheme and EBITDA manipulation does not exculpate Petitioners, and Marshall's belief that the Rigases *could* repay their debt with Adelphia does not support the contention that the Rigases intended to do so. Dan Liberatore's testimony would be cumulative of the cross-examination of James Brown, during which Petitioners made extensive use of Liberatore's 3500 material.[19] *See* Gov't *Brady* Mem. 53-55. Mike Brady would not have testified "that 'there [wasn't] anything wrong'" with the marketing agreements, as Petitioners claim, but instead would have offered inculpatory testimony both that "the economics of [the marketing deals] didn't make complete sense" and that his "sense" about the legality of the agreements stemmed from his belief that "other operators are doing it" and Scientific Atlanta and

_____

[19] Petitioners assert that, through Adelphia, the Government "used the weapon of withholding attorneys' fees" to induce James Brown to plead guilty and perjure himself at the Rigases' trial. Pet'rs' Mem. 52 n.16. Petitioners' twice-denied perjury argument need not be taken seriously on this third occasion. *United States v. Rigas*, No. 02-CR-1236 (LBS), 2007 WL 4145282 at *5 (S.D.N.Y. Nov. 20, 2007) (finding Brown did not commit perjury), *aff'd*, 583 F.3d 108, 125 (2d Cir. 2009) (affirming no perjury finding).

Motorola drafted the agreements. Pet'rs' 56.1 Ex. 86 at 118. Whether others were doing it, and who drafted the documents, is of course irrelevant to whether and how Adelphia calculated EBITDA. And finally, Andrew Zorichak's proffered testimony is too vague to be material; although Zorichak states that some of the reports on which he worked were not entirely accurate, Pet'rs' 56.1 Ex. 64 ¶¶ 9-10, Petitioners do not identify on which reports Zorichak worked that the Government relied on during the trial.

## CONCLUSION

For the foregoing reasons, Ground Two of the 2255 Petition should be denied in its entirety without the need for an evidentiary hearing.


Dated: New York, New York
June 22, 2018

GREGORY S. BERMAN
United States Attorney

By:    /s/ Brian R. Blais
       Brian R. Blais
       Damian Williams
       Kyle A. Wirshba
       Daniel H. Wolf
       Assistant United States Attorneys