UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

JOHN J. RIGAS and TIMOTHY J. RIGAS,

         Petitioners,

    - v. -

UNITED STATES OF AMERICA,

         Respondent.

11 Civ. 6964 (KMW)
02 Cr. 1236 (KMW)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**RESPONDENT UNITED STATES OF AMERICA'S RESPONSE TO PETITIONERS'
STATEMENT OF UNDISPUTED MATERIAL FACTS,
AND COUNTERSTATEMENT OF ADDITIONAL FACTS,
PURSUANT TO LOCAL CIVIL RULE 56.1**

    Respondent United States of America (the "Government"), by its attorney, Geoffrey S

Berman, United States Attorney for the Southern District of New York, respectfully submits this

response to petitioners John J. Rigas and Timothy J. Rigas's ("Petitioners") Local Civil Rule

56.1 Statement of Material Facts (the "Statement") in Support of their Motion for Judgment on

the Interference Claims ("the 2255 Motion"):

**I.   THE GOVERNMENT'S RESPONSES TO PETITIONERS' STATEMENT OF
    UNDISPUTED FACTS**

    **I.    The Creation of the Corporate Fraud Task Force and the Rigases' Arrest[a]**

---

[a] The Government disputes this section heading and every other section heading included in the
Statement because they lack any reference to competent evidence and consist entirely of legal
argument. Each of the section headings should be stricken for violating Local Civil Rule 56.1.

1

1.      In late 2001 and 2002, several high-profile corporate fraud and accounting scandals received extensive media coverage, including those involving Enron, WorldCom, Tyco, and Arthur Andersen.  *See, e.g.*, Ex. 1, Lisa Griffin, *Compelled Cooperation and the New Corporate Criminal Procedure*, 82 N.Y.U. L. Rev. 311, 326 (2007); Ex. 2, Kathleen F. Brickey, *In Enron's Wake: Corporate Executives on Trial*, 96 J. Crim. L. & Criminology 397, 397-400 (2006); Ex. 3.[1]

**Response:**   The Government disputes this statement as it is irrelevant and immaterial to the issues set forth in the 2255 Motion.  The Government also disputes this statement to the extent Petitioners characterize Petitioners' Exhibits 1 and 2, as well as the secondary sources cited in footnote 1 of the Statement, and respectfully refers the Court to those underlying documents, which speak for themselves.

2.      The New York Times reported that on June 13, 2002, then-Treasury Secretary Paul O'Neill said, "I think people who abuse our trust, we ought to hang them from the very highest branch," when referring to perceived malfeasance by corporate executives.  Ex. 4, Stephen Labaton, *Bush Doctrine: Lock 'Em Up*, N.Y. Times (June 16, 2002).

**Response:**   The Government disputes this statement as it is irrelevant and immaterial to the issues set forth in the 2255 Motion.  The Government also disputes this statement to the extent

---

[1] Allen R. Myerson, *With Enron's Fall, Many Dominoes Tremble*, N.Y. Times (Dec. 2, 2001); Kurt Eichenwald & Jonathan D. Glater, *Justice Dept. to Form Task Force to Investigate Collapse of Enron*, N.Y. Times (Jan. 10, 2002); Seth Schiesel & Simon Romero, *Technology; WorldCom: Out of Obscurity to Under Inquiry*, N.Y. Times (Mar. 13, 2002); Alex Berenson & William K. Rashbaum, *Tyco Ex-Chief is Said to Face Wider Inquiry into Finances*, N.Y. Times (June 7, 2002); Flynn McRoberts et al., *The Fall of Andersen*, Chi. Trib. (Sept. 1, 2002) (noting scandals at Arthur Andersen, Enron, WorldCom, and Waste Management); Andrew Ross Sorkin, *2 Top Tyco Executives Charged with $600 Million Fraud Scheme*, N.Y. Times (Sept. 13, 2002).

Petitioners characterize Petitioners' Exhibit 4 and respectfully refers the Court to Petitioners' Exhibit 4, which speaks for itself.

3.  The New York Times reported that in late June 2002, then-President George W. Bush pledged "to hold people accountable" in reference to the WorldCom accounting scandal. Ex. 5, Tim Race, *New Economy; Scandals Appall Some Longtime Corporate Chiefs*, N.Y. Times (July 1, 2002).

**Response:**  The Government disputes this statement as it is irrelevant and immaterial to the issues set forth in the 2255 Motion. The Government also disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 5 and respectfully refers the Court to Petitioners' Exhibit 5, which speaks for itself.

4.  On July 9, 2002, President Bush established the Corporate Fraud Task Force by executive order. Ex. 6, Exec. Order No. 13271, Establishment of the Corporate Fraud Task Force (July 9, 2002).

**Response:**  The Government disputes this statement as it is irrelevant and immaterial to the issues set forth in the 2255 Motion.

5.  The day he issued the Executive Order, President Bush gave a speech in which he announced the creation of the Corporate Fraud Task Force (the "Task Force"). Ex. 7, *Text of President Bush's Speech*, CNN (July 9, 2002).

**Response:**  The Government disputes this statement as it is irrelevant and immaterial to the issues set forth in the 2255 Motion. The Government also disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 7 and respectfully refers the Court to Petitioners' Exhibit 7, which speaks for itself.

6.    In his speech, President Bush said that "faith in the fundamental integrity of American business leaders is being undermined" and that "[n]early every week brings . . . a discovery of fraud and scandal."  Ex. 7 at 1.

**Response:**    The Government disputes this statement as it is irrelevant and immaterial to the issues set forth in the 2255 Motion.  The Government also disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 7 and respectfully refers the Court to Petitioners' Exhibit 7, which speaks for itself.

7.    President Bush also said, "[W]e will use the full weight of the law to expose and root out corruption."  Ex. 7 at 2.

**Response:**    The Government disputes this statement as it is irrelevant and immaterial to the issues set forth in the 2255 Motion.  The Government also disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 7 and respectfully refers the Court to Petitioners' Exhibit 7, which speaks for itself.

8.    The president explained that "[t]he task force will function as a financial crimes SWAT team" that "will target major accounting fraud and other criminal activity in corporate finance."  Ex. 7 at 2.

**Response:**    The Government disputes this statement as it is irrelevant and immaterial to the issues set forth in the 2255 Motion.  The Government also disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 7 and respectfully refers the Court to Petitioners' Exhibit 7, which speaks for itself.

9.    Deputy Attorney General Larry Thompson was announced as the Chair of the Task Force, and Treasury Secretary Paul O'Neill and then-FBI Director Robert Mueller were also members.  *See* Ex. 6; Ex. 10, Press Release, President's Corporate Fraud Task Force Compiles

Strong Record, Office of the Press Secretary, The White House (July 9, 2002); Ex. 11, Associated Press, *Bush Fraud Squad Gets It On*, CBS News (July 12, 2002).

**Response:**   The Government disputes this statement as it is irrelevant and immaterial to the issues set forth in the 2255 Motion.  The Government also disputes this statement to the extent Petitioners characterize Petitioners' Exhibits 6, 7, and 11, and respectfully refers the Court to Petitioners' Exhibits 6, 7, and 11, which speak for themselves.

10.     A summary of President Bush's policy announcement highlighted the Bush administration's "[s]trong [r]ecord of [e]nforcement & [r]eform" as well as the president's "aggressive corporate reform agenda."  Ex. 8, Press Release, Summary: A New Ethic of Corporate Responsibility, Office of the Press Secretary, The White House (July 9, 2002).

**Response:**   The Government disputes this statement as it is irrelevant and immaterial to the issues set forth in the 2255 Motion.  The Government also disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 8 and respectfully refers the Court to Petitioners' Exhibit 8, which speaks for itself.

11.     Some commentators and journalists referred to President Bush's announcement of the Task Force's creation as a "tough stance" or a "war" on corporate crime.  *See, e.g.*, Ex. 1 at 314-15; Ex. 9.[2]

**Response:**   The Government disputes this statement as it is irrelevant and immaterial to the issues set forth in the 2255 Motion.  The Government also disputes this statement to the extent Petitioners characterize Petitioners' Exhibits 1 and 9, as well as the secondary sources cited in footnote 2 of the Statement, and respectfully refers the Court to those underlying documents,

---

[2] David E. Sanger, *Corporate Conduct: The Overview; Bush, on Wall St., Offers Tough Stance*, N.Y. Times (July 10, 2002); *Bush Whacked*, The Economist (July 19, 2007).

which speak for themselves.  Further, the Government disputes this statement to the extent that Petitioners rely, in part, on support which is not competent evidence insofar as the support, among other things, constitutes inadmissible hearsay and an improper opinion.

12.     The Task Force met for the first time on July 12, 2002.  Ex. 11.

**Response:**   The Government disputes this statement as it is irrelevant and immaterial to the issues set forth in the 2255 Motion.  The Government also disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 11 and respectfully refers the Court to Petitioners' Exhibit 11, which speaks for itself.

13.     The Wall Street Journal reported that President Bush said at the meeting that "the best ethics course is to handcuff one of the b[astards]."  Ex. 12, John R. Wilke, *President Praises Work of Task Force on Business Crime*, Wall St. J. (Sept. 27, 2002).

**Response:**   The Government disputes this statement as it is irrelevant and immaterial to the issues set forth in the 2255 Motion.  The Government also disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 12 and respectfully refers the Court to Petitioners' Exhibit 12, which speaks for itself.

14.     Timothy, Michael, and John Rigas were arrested on July 24, 2002.  Ex. 13, *United States v. Rigas*, No. 02-cr-1236 (S.D.N.Y. July 24, 2002) (July 24, 2002 Docket Entries).

**Response:**   Not disputed.

15.     Larry Thompson, James Comey (then the U.S. Attorney for the Southern District of New York), other S.D.N.Y. prosecutors, Steve Cutler (Director of Enforcement for the SEC), and Ken Newman (Deputy Chief Postal Inspector) announced the arrests of the Rigases at a press conference.  Ex. 14, C-Span, Adelphia Executive Arrests (July 24, 2002), https://www.c-span.org/video/?171459-1/adelphia-executives-arrests.

**Response:**  The Government disputes this statement as it is irrelevant and immaterial to the issues set forth in the 2255 Motion.  The Government also disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 14 and respectfully refers the Court to Petitioners' Exhibit 14, which speaks for itself.

16.     At the press conference, Larry Thompson said, "As chairman of the president's corporate fraud task force, I am particularly pleased to announce that the task force is fulfilling the president's directive to marshal federal law enforcement resources to search out and eradicate corporate fraud."  Ex. 14 at 1:20-1:40.

**Response:**  The Government disputes this statement as it is irrelevant and immaterial to the issues set forth in the 2255 Motion.  The Government also disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 14 and respectfully refers the Court to Petitioners' Exhibit 14, which speaks for itself.

17.     Chairman Thompson explained that the Task Force had focused on the investigation of the Rigases.  Ex. 14 at 6:06-6:40.

**Response:**  The Government disputes this statement as it is irrelevant and immaterial to the issues set forth in the 2255 Motion.  The Government also disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 14 and respectfully refers the Court to Petitioners' Exhibit 14, which speaks for itself.

18.     Chairman Thompson repeatedly referenced the Task Force, its involvement in the investigation, and cited the investigation of the Rigases as a success for the Task Force.  Ex. 14.

**Response:**  The Government disputes this statement as it is irrelevant and immaterial to the issues set forth in the 2255 Motion.  The Government also disputes this statement to the extent

Petitioners characterize Petitioners' Exhibit 14 and respectfully refers the Court to Petitioners' Exhibit 14, which speaks for itself.

19. Chairman Thompson said, "The full force of the federal government will be brought to bear on those who are responsible." Ex. 14 at 14:8-14:18.

**Response:** The Government disputes this statement as it is irrelevant and immaterial to the issues set forth in the 2255 Motion. The Government also disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 14 and respectfully refers the Court to Petitioners' Exhibit 14, which speaks for itself.

20. On the day of the arrests of the Rigases, Ari Fleischer, the White House Press Secretary, said at a press briefing:

> On the matter of presidential priorities, today marks a day of action and accomplishment in the President's fight against corporate corruption, in his effort to vigorously enforce the laws and protect employees and investors against corporate wrongdoing. The arrest today of five former corporate executives on charges of securities fraud, wire fraud and bank fraud, is a clear sign of this administration's commitment to enforce the laws so justice can be done.
>
> The President's corporate fraud task force is hard at work in fulfilling the President's directive to fight corporate fraud. The actions today, of course, come on top of the administration's earlier successful prosecution of Arthur Andersen for obstruction of justice.

Ex. 15, Press Briefing, Ari Fleischer, Office of the Press Secretary, The White House (July 24, 2002).

**Response:** The Government disputes this statement as it is irrelevant and immaterial to the issues set forth in the 2255 Motion. The Government also disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 15 and respectfully refers the Court to Petitioners' Exhibit 15, which speaks for itself.

21.     Secretary Fleischer referred to the day as "a day of accomplishment and results here in Washington" because the Task Force led to the arrest of the Rigases.  Ex. 15.

**Response:**   The Government disputes this statement as it is irrelevant and immaterial to the issues set forth in the 2255 Motion.  The Government also disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 15 and respectfully refers the Court to Petitioners' Exhibit 15, which speaks for itself.

22.     One member of the press asked Secretary Fleischer:

> [Y]our discussion today of these five arrests is a little bit unusual, in that there have been many, many other arrests or indictments on corporate issues that have not been celebrated from this podium before.  Was the White House particularly involved in these five?

Ex. 15.

**Response:**   The Government disputes this statement as it is irrelevant and immaterial to the issues set forth in the 2255 Motion.  The Government also disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 15 and respectfully refers the Court to Petitioners' Exhibit 15, which speaks for itself.

23.     Secretary Fleischer responded by noting that President Bush created the task force, met with the Task Force a week before, and that the arrests were "a result of the corporate task force."  Ex. 15.

**Response:**   The Government disputes this statement as it is irrelevant and immaterial to the issues set forth in the 2255 Motion.  The Government also disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 15 and respectfully refers the Court to Petitioners' Exhibit 15, which speaks for itself.

24.     Although the Rigases' attorneys offered to have them surrender voluntarily to the police, they were arrested by five armed U.S. Postal Inspectors.  Ex. 68 at 1, Benjamin Weiser,

*Same Walk, Nicer Shoes; Parading of Executives in Custody Fuels New Debate*, N.Y. Times (Nov. 26, 2002); Ex. 20, T. Rigas Decl. (Oct. 2, 2011), at ¶¶ 54-55.

**Response:**   The Government disputes this statement as it is irrelevant and immaterial to the issues set forth in the 2255 Motion.  The Government also disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 68 and respectfully refers the Court to Petitioners' Exhibit 68, which speaks for itself.  Further, the Government disputes this statement to the extent that Exhibit 20 constitutes inadmissible hearsay and self-serving statements by one of the Petitioners.

25.     John, Michael, and Tim Rigas "were escorted in handcuffs out of the main post office building near Pennsylvania Station to be driven to court."  Ex. 68; Ex. 20 at ¶¶ 54-55.

**Response:**   The Government disputes this statement as it is irrelevant and immaterial to the issues set forth in the 2255 Motion.  The Government also disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 68 and respectfully refers the Court to Petitioners' Exhibit 68, which speaks for itself.  Further, the Government disputes this statement to the extent that Exhibit 20 constitutes inadmissible hearsay and self-serving statements by one of the Petitioners.

26.     "The scene was splashed across newspaper front pages and television news accounts."  Ex. 68; Ex. 20 at ¶¶ 54-55.

**Response:**   The Government disputes this statement as it is irrelevant and immaterial to the issues set forth in the 2255 Motion.  The Government also disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 68 and respectfully refers the Court to Petitioners' Exhibit 68, which speaks for itself.  Further, the Government disputes this statement to the extent

that Exhibit 20 constitutes inadmissible hearsay and self-serving statements by one of the Petitioners.

**II.      The Holder Memorandum, Its Progeny, and Its Demise**

27.      On June 16, 1999, then-Deputy Attorney General Eric Holder issued a memorandum (the "Holder Memorandum") to all U.S. Attorney's Offices entitled "Bringing Criminal Charges against Corporations."  Ex. 16, Eric Holder, Dep't of Justice, Bringing Criminal Charges against Corporations (June 16, 1999).

**Response:**   Not disputed.

28.      The Holder Memorandum "provide[d] guidance as to what factors should generally inform a prosecutor in making the decision whether to charge a corporation in a particular case." Ex. 16.

**Response:**   Not disputed.

29.      It provides that "[i]n all cases involving corporate wrongdoing, prosecutors should consider the factors discussed herein."  Ex. 16 at § I.A.

**Response:**   Not disputed.

30.      One factor prosecutors were to consider under the Holder Memorandum was "[t]he corporation's timely and voluntary disclosure of wrongdoing and its willingness to cooperate in the investigation of its agents, including, if necessary, the waiver of the corporate attorney-client and work product privileges."  Ex. 16 at § II.A.4.

**Response:**   The Government disputes this statement to the extent Petitioners characterize the Holder Memorandum to require consideration by prosecutors of any particular factor in deciding whether to criminally prosecute a corporation, and respectfully refers the Court to Petitioners' Exhibit 16, which speaks for itself

31.    With respect to cooperation, the Holder Memorandum provides:

> In gauging the extent of the corporation's cooperation, the prosecutor may consider the corporation's willingness to identify the culprits within the corporation, including senior executives, to make witnesses available, to disclose the complete results of its internal investigation, and to waive the attorney-client and work product privileges.

Ex. 16 at § VI.A.

**Response:**   Not disputed.

32.    Another factor under the "cooperation" section of the Holder Memorandum "to be weighed by the prosecutors is whether the corporation appears to be protecting its culpable employees and agents."  Ex. 16 at § VI.B.

**Response:**   The Government disputes this statement to the extent Petitioners characterize the Holder Memorandum to require consideration by prosecutors of any particular factor in deciding whether to criminally prosecute a corporation, and respectfully refers the Court to Petitioners' Exhibit 16, which speaks for itself

33.    The Holder Memorandum provided that with respect to this factor, prosecutors could consider "a corporation's promise of support to culpable employees and agents, either through the advancing of attorneys fees, through retaining the employees without sanction for their misconduct, or through providing information to the employees about the government's investigation pursuant to a joint defense agreement, may be considered by the prosecutor in weighing the extent and value of a corporation's cooperation." Ex. 16 at § VI.B.

**Response:**   Not disputed.

34.    On January 20, 2003, Deputy Attorney General Larry Thompson issued a memo entitled "Principles of Federal Prosecution of Business Organizations."  Ex. 17, Larry

Thompson, Dep't of Justice, Principles of Federal Prosecution of Business Organizations (Jan. 20, 2003) (the "Thompson Memorandum").

**Response:**   Not disputed.

35.   One factor to be considered by prosecutors deciding whether to indict a corporation was "the corporation's timely and voluntary disclosure of wrongdoing and its willingness to cooperate in the investigation of its agents, including, if necessary, the waiver of corporate attorney-client and work product protection."  Ex. 17 at 3.

**Response:**   Not disputed.

36.   Under the factor of "Cooperation and Voluntary Disclosure," the Thompson memorandum states:

> Another factor to be weighed by the prosecutor is whether the corporation appears to be protecting its culpable employees and agents.   Thus, while cases will differ depending on the circumstances, a corporation's promise of support to culpable employees and agents, either through the advancing of attorneys fees, through retaining the employees without sanction for their misconduct, or through providing information to the employees about the government's investigation pursuant to a joint defense agreement, may be considered by the prosecutor in weighing the extent and value of a corporation's cooperation.

Ex. 17 at 7-8.

**Response:**   Not disputed.

37.   In 2006, the Department of Justice replaced the Thompson Memorandum with the "McNulty Memorandum."  Ex. 1 at 316; Ex. 67, Paul J. McNulty, Dep't of Justice, Principles of Federal Prosecution of Business Organizations (Dec. 12, 2006).

**Response:**   Not disputed.

38.     The McNulty Memorandum states that "[p]rosecutors generally should not take into account whether a corporation is advancing attorneys' fees to employees or agents under investigation and indictment."  Ex. 67 at 11.

**Response:**   Not disputed.

39.     The McNulty Memorandum also notes that many corporations agree to advance attorneys' fees prior to a determination of guilt, and that a corporation adhering to its obligations to advance fees "cannot be considered a failure to cooperate."  Ex. 67 at 11.

**Response:**   Not disputed.

40.     The McNulty Memorandum provides that waiver of privilege is not "a prerequisite to a finding that a company has cooperated in the government's investigation," and that "[p]rosecutors may only request waiver of attorney-client or work product protections when there is a legitimate need for the privileged information to fulfill their law enforcement obligations."  Ex. 67 at 8.

**Response:**   Not disputed.

41.     The McNulty Memorandum scaled back on the Thompson Memorandum's requirements that prosecutors consider whether a company waived privilege and refused to advance attorneys' fees to former executives, board members, or employees.  Ex. 69, Andrew Weissman & Ana R. Bugan, *The McNulty Memorandum*, Nat'l L. J. (Feb 5, 2007); *compare* Ex. 17, *with* Ex. 67.

**Response:**   Not disputed

## III.     The Government's Unconstitutional Interference with the Rigases' Defense

42.     On March 27, 2002, Adelphia issued a press release specifying the amounts of co-borrowing allocated to Adelphia and the amounts allocated to Rigas family entities.  Ex. 18,

Press Release, Adelphia Commc'ns Corp., at 2661806 n.6; Ex. 19, *United States v. Rigas*, 490 F.3d 208, 212 & n.2 (2d Cir. 2007).

**Response:** The Government disputes this statement to the extent Petitioners characterize Petitioners' Exhibits 18 and 19, and respectfully refers the Court to Exhibits 18 and 19, which speak for themselves.

43. The stock price fell about 25% after the disclosure to $20.39. Ex. 19 at 212.

**Response:** Not disputed.

44. The March 27, 2002 disclosure and subsequent fall in stock price ultimately led to the government's investigation of Adelphia and the Rigases. Ex. 20 at ¶2; Ex. 19 at 212.

**Response:** The Government disputes this statement to the extent that Petitioners rely, in part, on support which is not competent evidence insofar as the support cited, among other things, constitutes inadmissible hearsay and self-serving statements by one of the Petitioners. The Government also disputes this statement to the extent Petitioners characterize Petitioners' Exhibits 19 and 20 and respectfully refers the Court to Petitioners' Exhibit s 19 and 20, which speak for themselves.

> **A. The Government Caused Adelphia to Cut Off Fee Advancement and Indemnification**

45. As of at least May 23, 2002, independent Adelphia directors did not believe the Rigases had engaged in any wrongdoing. Ex. 20 at ¶19; Ex. 21, J. Rigas Decl. (Oct. 4, 2011), at ¶¶5, 8.

**Response:** The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support cited, among other things, constitutes inadmissible hearsay and self-serving statements by one of the Petitioners.

46.     In mid-May 2002, independent directors for Adelphia as well as Adelphia's outside counsel, David Boies, asked John and Tim Rigas to resign their positions as officers of Adelphia but continue their affiliation with the company, including in roles on the Adelphia Board of Directors (the "Board").  Ex. 20 at ¶¶ 15-16; Ex. 21 at ¶ 5.

**Response:**   The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support cited, among other things, constitutes inadmissible hearsay and self-serving statements of the Petitioners.

47.     On May 15, 2002, Adelphia issued a press release announcing John Rigas's resignation as CEO and Chairman.  Ex. 22, Press Release, Adelphia Commc'ns Corp., John J. Rigas Steps Down as Chairman and CEO of Adelphia (May 15, 2002).

**Response:**   Not disputed.

48.     The press release also announced that the Board "elected [John Rigas] Chairman Emeritus" and that he "will continue to serve on the Company's Board of Directors."  *Id.*

**Response:**   Not disputed.

49.     On May 16, 2002, Adelphia issued another press release announcing that Tim Rigas would step down from his role as an Adelphia officer.  Ex. 23, Press Release, Adelphia Commc'ns Corp., Timothy J. Rigas Steps Down as Executive at Adelphia (May 16, 2002).

**Response:**   Not disputed.

50.     The press release also announced that Tim Rigas would remain a member of the Board.  Ex. 23.

**Response:**   Not disputed.

51.     Erland Kailbourne, a member of the Special Committee and the acting CEO for Adelphia after Tim Rigas stepped down, informed Tim Rigas that in addition to remaining a

member of the Board, he would also serve as Kailbourne's principal financial advisor.  Ex. 94, T. Rigas Supp. Decl. (May 23, 2018), at ¶ 2.

**Response:**  The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support cited, among other things, constitutes inadmissible hearsay and self-serving statements by one of the Petitioners.

52.  The Adelphia Special Committee was created on March 6, 2002 to review certain financial transactions between Adelphia and another entity controlled by the Rigas family.  Ex. 93, Covington & Burling, *Summary of Investigation Reported to the Special Committee of Independent Directors of Adelphia Communications Corporation*, at ACI 350517.

**Response:**  The Government disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 93 and respectfully refers the Court to Petitioners' Exhibit 93, which speaks for itself.

53.  The Special Committee ultimately became the key Adelphia entity to investigate the transactions and disclosures at the center of the Rigases criminal case.  Ex. 93 at ACI 350518.

**Response:**  The Government disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 93 and respectfully refers the Court to Petitioners' Exhibit 93, which speaks for itself.

54.  Around approximately May 16, 2002 at a meeting of Adelphia directors and outside counsel, an attorney from Fried Frank reported on discussions with the government, which had advised that Adelphia was not cooperating with the government's investigation.  Ex. 20 at ¶ 17; Ex. 21 at ¶ 6; Ex. 25, Erland Kailbourne Grand Jury Testimony, at 84.

**Response:**  The Government disputes this statement to the extent that Petitioners rely, in part, on support which is not competent evidence insofar as the support cited, among other

things, constitutes inadmissible hearsay and self-serving statements by one of the Petitioners. Further, the Government disputes the extent to which Petitioners have provided supporting documentation in a format which is missing pages and, therefore, devoid of necessary context.

55.     Those present at the meeting on Adelphia's behalf, including outside director and Special Committee member Erland Kailbourne, were "shock[ed]" by the government's position regarding cooperation.  Ex. 25 at 84; Ex. 20 at ¶ 17; Ex. 21 at ¶ 7.

**Response:**  The Government disputes this statement to the extent that Petitioners rely, in part, on support which is not competent evidence insofar as the support cited, among other things, constitutes inadmissible hearsay and self-serving statements by one of the Petitioners.  Further, the Government disputes the extent to which Petitioners have provided supporting documentation in a format which is missing pages and, therefore, devoid of necessary context.

56.     The Fried Frank attorney further reported that the government said that a continued failure to cooperate would be met with serious consequences, including indictment of Adelphia. Ex. 20 at ¶ 17; Ex. 21 at ¶ 6.

**Response:**   The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support cited, among other things, constitutes inadmissible hearsay and self-serving statements of Petitioners.

57.     Neither the Fried Frank attorney nor anyone else present at the meeting knew why the government believed Adelphia was uncooperative.  Ex. 20 at ¶ 17; Ex. 21 at ¶ 7.

**Response:**   The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support cited, among other things, constitutes inadmissible hearsay and self-serving statements Petitioners.  The Government

further disputes this statement, as the support cited—declarations by Petitioners—provides no support for the assertion as to what was "known" by anyone other than the Petitioners.

58.     According to Philip Korologos, shortly after the government expressed its displeasure at Adelphia's level of cooperation, the government was on the verge of shutting Adelphia down and had trailers ready to be sent to Coudersport to seize control of the Company.  Ex. 89, McMichael Decl., *United States v. Rigas*, No. 4:05-cr-402 (M.D. Pa. Feb. 6, 2011), at ¶ 5.

**Response:**   The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay.  The Government further disputes this statement to the extent that the McMichael declaration cited in support fails to comply with 28 U.S.C. § 1746 in that it states only "this Declaration pursuant to the penalties applicable for unsworn falsification to authority." Pet'rs' 56.1 Ex. 89 ¶ 17.

59.     At a May 18, 2002 Adelphia Board meeting, the Board sought to create written agreements with Tim and John Rigas as to their resignations as officers.  Ex. 24, Adelphia Commc'ns Corp., Board Meeting Minutes (May 18, 2002), at 2.

**Response:**   Not disputed.

60.     The Board discussed severance terms, including payments that one independent Board member suggested should be made over time.  Ex. 24 at 2.

**Response:**   Not disputed.

61.     Outside counsel for Adelphia's Special Committee said that the "government might not permit [certain severance terms] if the members of the Rigas Family did not cooperate with the investigation of the Special Committee."  Ex. 24 at 2.

**Response:**   The Government does not dispute that the minutes of the May 18, 2002 board meeting are quoted accurately, but respectfully refers the Court to Petitioners' Exhibit 24, which speaks for itself.

62.   The Special Committee also encouraged the Rigas family to resign from the Board to appease the government, which had previously demanded the Rigases' resignation.  Ex. 24 at 2; Ex. 20 at ¶ 18-19.

**Response:**   The Government disputes this statement in its entirety because nothing in Exhibit 24 supports the assertion made and because Exhibit 20, the declaration of Timothy Rigas, constitutes inadmissible hearsay and self-serving statements by one of the Petitioners, is not competent evidence which can be relied upon by the Court.

63.   Special Committee member Erland Kailbourne told the Rigases at the May 18 Board meeting that all Rigas family members would have to resign from the Board to save the company.  Ex. 20 at ¶ 19; Ex. 21 at ¶ 5.

**Response:**   The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay and self-serving statements of both of the Petitioners.  Indeed, the only evidence cited in support of this assertion is the declarations of the Petitioners, which are not competent evidence.

64.   During the May 18, 2002 Board meeting, Kailbourne, however, reaffirmed that he continued to believe the Rigases had not engaged in wrongdoing.  Ex. 20 at ¶ 19.

**Response:**   The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay and self-serving statements by one of the Petitioners.  Indeed, the only

evidence cited in support of this assertion is the declarations of the Petitioners, which are not competent evidence as to Kailbourne's beliefs.

65.     Also during the May 18, 2002 Board meeting, there was a report on a three-hour meeting with the S.E.C. and U.S. Attorney's Office.  Ex. 26, Notes of Bruce Booken (May 18, 2002), at 2; Ex. 20 at ¶ 18.

**Response:**   The Government disputes this statement to the extent that Petitioners rely on support which is not competent evidence insofar as the support cited, among other things, constitutes inadmissible hearsay, improper opinion, and self-serving statements by one of the Petitioners.  The Government also disputes that an attendee's notes of a meeting are competent evidence of what in fact occurred at the meeting, as such notes are inadmissible hearsay.

66.     According to handwritten notes of Buchanan Ingersoll attorney Bruce Booken, it was reported that the government was "focus[ed]" on "stop flow $ or control flow $ to Rigas Family."  Ex. 26 at 2.

**Response:**   The Government does not dispute that these statements appear in Booken's notes.

67.     Carl Rothenberger's notes also indicate that Leonard Chazen, a lawyer from the Special Committee's law firm Covington & Burling, reported that the government was "focus[ed] on stopping flow of assets . . . to [the Rigas] Family."  Ex. 27, Notes of Carl Rothenberger (May 18, 2002), at 2.

**Response:**   The Government does not dispute that these statements appear in Rothenberger's notes.

68.     Rothenberger's notes further indicate that the government made clear that Adelphia "need[ed] to stop flow of funds to [the Rigas] family."  Ex. 27 at 3.

**Response:** The Government does not dispute that the quoted statement appears in Rothenberger's notes. The Government disputes that the quoted language can be attributed to the Government because no such attribution appears in Rothenberger's notes. In any event, Rothernberger's notes are inadmissible hearsay and not competent evidence that can support this assertion.

69.     After the May 18, 2002 meeting, the Rigas family and Adelphia began to negotiate an agreement for the Rigases' resignation from the Board. Ex. 20 at ¶20.

**Response:** The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay and self-serving statements by one of the Petitioners, as the only evidence cited is an declaration of Timothy Rigas.

70.     There was a significant amount of back-and-forth between Adelphia and the Rigases during the negotiations. Ex. 20 at ¶21; Ex. 28, Letter from Covington & Burling to AUSA Timothy Coleman (Aug. 1, 2002), at 4.

**Response:** The Government disputes this statement to the extent that Petitioners rely, in part, on support which is not competent evidence insofar as the support, among other things, constitutes inadmissible hearsay and self-serving statements by one of the Petitioners. The Government also disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 28 and respectfully refers the Court to Petitioners' Exhibit 28, which speaks for itself.

71.     During the negotiations, the Rigases prioritized Adelphia agreeing to pay their legal costs. Ex. 20 at ¶21.

**Response:** The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes

inadmissible hearsay and self-serving statements by one of the Petitioners, as the only evidence cited is an declaration of Timothy Rigas.

72.     Adelphia assured the Rigases that it would not cut off funding the Rigases defense costs.  Ex. 20 at ¶ 22; Ex. 21 at ¶ 3.

**Response:**  The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay and self-serving statements of both of the Petitioners, as the only evidence cited are declarations of the Petitioners.

73.     Board member Peter Metros's notes of a May 22, 2002 meeting reflect a discussion regarding indemnification.  Ex. 32, Peter Metros, Meeting Notes (May 22, 2002), at 7.

**Response:**  The Government does not dispute that Metros's notes reference the concept of indemnification, but disputes that an attendee's notes of a meeting are competent evidence of what in fact occurred at the meeting, as such notes are inadmissible hearsay.

74.     The notes indicate: "Co. By laws will indemnify.  Officers & Bd. Directors" and "INDEMNIFY Them."  Ex. 32 at 7.

**Response:**  The Government does not dispute that the quoted language appears in Metros's notes, but disputes that an attendee's notes of a meeting are competent evidence of what in fact occurred at the meeting, as such notes are inadmissible hearsay.

75.     On the morning of Thursday, May 23, 2002, the Rigas family and Adelphia reached an agreement (the "Agreement") resulting in John, Tim, Michael, and James Rigas resigning from their positions on the Board.  Ex. 30, May 23, 2003 Agreement, at ¶ 1; Ex. 28 at 4.

**Response:**  Not disputed.

76.     The Agreement provided that the Rigas family could designate two non-family members to be appointed to the Board.  Ex. 30 at ¶ 1.

**Response:**   Not disputed.

77.     Under the Agreement, the Rigases agreed to place their Adelphia stock in a voting trust until all obligations of the Rigas family to Adelphia for loans, advances, or borrowings under the co-borrowing agreements were satisfied.  Ex. 30 at ¶ 3.

**Response:**   Not disputed.

78.     Under the Agreement, Rigas family's Managed Entities would "use all of their free cash flow to pay down the co-borrowing debt," and the Rigas family pledged their equity in the Managed Entities "until all obligations of the Rigas Family to [Adelphia] for loans, advances or borrowings under the co-borrowing agreements or otherwise are satisfied."  Ex. 30 at ¶ 4.

**Response:**   Not disputed.

79.     Under the Agreement, all Adelphia shares owned by the Rigas family would be pledged to secure the repayment of co-borrowing facilities and "to secure the undertaking to repay Adelphia for indemnification payments."  Ex. 30 at ¶ 8.

**Response:**   Not disputed.

80.     Under the Agreement, Adelphia agreed to "honor its commitment" to pay John Rigas $1.4 million per year over three years and provide some other benefits, including use of an office, healthcare coverage, and use of an Adelphia airplane for emergency reasons with Adelphia's permission.  Ex. 30 at ¶ 10.

**Response:**   Not disputed.

81.     Under the Agreement, Adelphia agreed to indemnify the Rigases "according to the Bylaws and Delaware law" if the Rigases "undertake to repay Adelphia per the Bylaws."  Ex. 30 at ¶ 11.

**Response:**  Not disputed.

82.     Among other things, Adelphia's bylaws required the corporation, "[e]xcept to the extent prohibited by law, to indemnify "any person made, or threatened to be made, a party to" a threatened or pending legal proceeding or investigation "by reason of the fact that the person . . . is or was a director or officer of the Corporation."  Ex. 29, Adelphia Commc'ns Corp., Amended and Restated Bylaws §§ 6.1-6.3 (Sept. 30, 1999).

**Response:**  The Government does not dispute that the bylaws are accurately quoted.

83.     Adelphia's bylaws also entitled directors and officers (both current and former) to advancement of legal expenses and fees if the director or officer "shall undertake to repay such amounts advanced to the extent that a court of competent jurisdiction ultimately determines that such a person is not entitled to indemnification . . . unless the Board of Directors or independent legal counsel reasonably determines that such person deliberately breached his duty to the Corporation or its shareholders." Ex. 29 at §§ 6.2-6.3.

**Response:**  The Government does not dispute that the bylaws are accurately quoted.

84.     John and Tim Rigas signed letters to Adelphia, dated May 23, 2002, requesting the advancement of legal costs and undertaking to repay the amounts advanced if a court of competent jurisdiction determined that they are not entitled to indemnification.  Ex. 31, Letters from John Rigas & Tim Rigas to Adelphia Commc'ns Corp. (May 23, 2002).

**Response:**  Not disputed.

85. The parties understood the Agreement to be a binding contract. Ex. 20 at ¶ 24; Ex. 30.

**Response:** The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay and self-serving statements by one of the Petitioners, as the only evidence cited is the May 23 Agreement itself and an declaration of Timothy Rigas, which are not competent to establish the understanding of parties to the agreement other than Timothy Rigas.

86. The Special Committee held a meeting on Saturday, May 25, 2002. Ex. 33, Peter Metros, Meeting Notes (May 25, 2002).

**Response:** Not disputed.

87. The notes contain a section regarding a presentation that Fried Frank partner Mark Stein gave on "Gov't Status." Ex. 33 at 4.

**Response:** The Government does not dispute that the notes contain the quoted language, but disputes that an attendee's notes of a meeting are competent evidence of what in fact occurred at the meeting, as such notes are inadmissible hearsay.

88. Stein reported on a meeting with the U.S. Attorney's Office held on Thursday, May 23, 2002. Ex. 33 at 4 ("Thurs. PM," "Chief. Secu./Fraud").

**Response:** The Government does not dispute that the notes contain the quoted language, but disputes that an attendee's notes of a meeting are competent evidence of what in fact occurred at the meeting, as such notes are inadmissible hearsay.

89. Stein reported that the government was "appalled at the Deal [between Adelphia and the Rigases]." Ex. 33 at 4.

**Response:**  The Government does not dispute that the notes contain the quoted language, but disputes that an attendee's notes of a meeting are competent evidence of what in fact occurred at the meeting, as such notes are inadmissible hearsay.

90.  Stein reported that the government explained that it "[m]ay indict the Company."  Ex. 33 at 4.

**Response:**  The Government does not dispute that the notes contain the quoted language, but disputes that an attendee's notes of a meeting are competent evidence of what in fact occurred at the meeting, as such notes are inadmissible hearsay.

91.  Metros's notes indicate that "People who were Part of The negotiations should talk to the US Attorneys Office [and] 'Put together a story.'"  Ex. 33 at 4.

**Response:**  The Government does not dispute that the notes contain the quoted language, but disputes that an attendee's notes of a meeting are competent evidence of what in fact occurred at the meeting, as such notes are inadmissible hearsay.

92.  Fried Frank partner Mark Stein's billing entries indicate:

- 5/23/02: "[A]ttendance at presentation to SEC/USAO by PWC; . . . t/c w/USAO re: Rigas transaction; t/c's/meetings re: same; work on memo re: indemnification."  Ex. 34, Fried Frank Billing Entries, at 1.

- 5/24/02: "t/c w/T. Coleman; t/c w/C. Clarke; . . . prepare memo re: indemnification issues; review of documentation of Rigas deal."  Ex. 34 at 2.

**Response:**  The Government does not dispute that the billing entries contain the quoted language.

93.  A Fried Frank associate attorney's billing entry for May 26, 2002 indicates "Drafted talking points re: advancement."  Ex. 34 at 5.

**Response:** The Government does not dispute that the billing entries contain the quoted language.

94. Mark Stein's May 28, 2002 billing entry indicates "review draft talking points for USAO." Ex. 34 at 7.

**Response:** The Government does not dispute that the billing entries contain the quoted language.

95. A Fried Frank associate's billing entry for May 29, 2002 notes indicates "conf. call w/USAO." Ex. 34 at 9.

**Response:** The Government does not dispute that the billing entries contain the quoted language.

96. Peter Metros's handwritten notes of a Saturday, June 1, 2002 Board meeting indicate that the Special Committee reported on a meeting with the U.S. Attorney's Office on Wednesday, May 29, 2002. Ex. 35, Peter Metros, Meeting Notes (June 1, 2002), at 2.

**Response:** The Government disputes that an attendee's notes of a meeting are competent evidence of what in fact occurred at the meeting, as such notes are inadmissible hearsay

97. Metros's notes indicate that the Special Committee "share[d] progress [illegible] we've made Δ [change] in control." Ex. 35 at 2.

**Response:** The Government does not dispute that the notes contain the quoted language, but disputes that an attendee's notes of a meeting are competent evidence of what in fact occurred at the meeting, as such notes are inadmissible hearsay..

98. Metros's notes say that the government "[i]ndicat[ed] their pleasure." Ex. 35 at 2.

**Response:** The Government does not dispute that the notes contain the quoted language, but disputes that an attendee's notes of a meeting are competent evidence of what in fact occurred at the meeting, as such notes are inadmissible hearsay.

99. The June 1, 2002 Board minutes indicate that Special Committee member Les Gelber reported on a meeting with the U.S. Attorney's Office during which he described to SEC and DOJ officials the Special Committee's progress and the "agreement between the Rigas Family and the Company regarding the family resignations as Directors," and the government "appeared satisfied at the progress of the Special Committee." Ex. 36, Adelphia Commc'ns Corp., Board Meeting Minutes (June 1, 2002), at 2-3.

**Response:** The Government does not dispute that the minutes contain the quoted language.

100. Informal notes of the June 1, 2002 Board meeting also indicate that the Special Committee met with the U.S. Attorney's Office on Wednesday, May 29, 2002. Ex. 37, Adelphia Commc'ns Corp., Board Meeting Notes (June 1, 2002), at 2.

**Response:** The Government does not dispute that the notes reflect such a meeting, but disputes that an attendee's notes of a meeting are competent evidence of what in fact occurred at the meeting, as such notes are inadmissible hearsay.

101. The notes indicate that the Special Committee "[w]alked through agreement with the Rigas Family" and the government expressed "[p]leasure at what happened." Ex. 37 at 2.

**Response:** The Government does not dispute that the notes contain the quoted language, but disputes that an attendee's notes of a meeting are competent evidence of what in fact occurred at the meeting, as such notes are inadmissible hearsay.

102. At the June 1, 2002 Board meeting, immediately after discussing the Wednesday, May 29, 2002 meeting with the government, the Special Committee read a unanimous resolution

"stating that John Rigas, Mike Rigas, [and] Tim Rigas . . . breached their duties to the Company and its shareholders by failing to cooperate with the Special Committee in its investigation by declining to provide full and complete answers to the Special Committee and by participating in related party transactions for their benefit to the detriment of the Company without appropriate disclosures and approval of the Board of Directors." Ex. 36 at 3; *see also* Ex. 35 at 3; Ex. 37 at 2.

**Response:** The Government does not dispute that such a resolution was read at the June 1 board meeting.

103.    Peter Metros's notes indicate:

"Section 6.2 – Atty Fees; Bd of Directors"

"Will be breached/ No Atty fees."  Ex. 35 at 3.

**Response:** The Government does not dispute that the notes contain the quoted language, but disputes that an attendee's notes of a meeting are competent evidence of what in fact occurred at the meeting, as such notes are inadmissible hearsay.

104.    Between May 23, 2002 and June 1, 2002, the Special Committee did not ask Timothy Rigas to cooperate in any regard.  Ex. 20 at ¶ 27.

**Response:** The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay and self-serving statements, as the only evidence cited is the declaration of Timothy Rigas.

105.    In a June 6, 2002 8-K disclosure, Adelphia noted that "[t]he Board of Directors, based on the recommendation of the Special Committee and consultation with counsel to the Special Committee" determined that John, Timothy, and Michael Rigas deliberately breached their duty

to the "Company and/or its shareholders" and were no longer entitled to the advancement of legal costs or fees.  Ex. 38, Adelphia Commc'ns Corp., June 6, 2002 8-K.

**Response:**  Not disputed.

106.  Before deciding not to advance legal expenses to the Rigases, Adelphia had not previously refused a request for fee advancement from a director or officer under Adelphia's bylaws.  Ex. 21 at ¶ 2.

**Response:**  The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay and self-serving statements by one of the Petitioners, as the only evidence cited is the declaration of John Rigas.

107.  Before deciding not to advance legal expenses to the Rigases, Adelphia had not previously undertaken to determine whether a director or officer intentionally breached his/her fiduciary duties before advancing legal expenses.  Ex. 21 at ¶ 2.

**Response:**  The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay and self-serving statements by one of the Petitioners, as the only evidence cited is the declaration of John Rigas.

108.  John Rigas received severance payments under the May 23, 2002 agreement with Adelphia until Adelphia filed for bankruptcy on June 25, 2002.  Ex. 96, J. Rigas Supp. Decl. (May 24, 2018), at ¶¶ 2-4.

**Response:**  The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes

inadmissible hearsay and self-serving statements by one of the Petitioners, as the only evidence cited is the declaration of John Rigas.

109. Apart from denying indemnification and the advancement of legal expenses, Adelphia honored all of its commitments under the May 23, 2002 agreement at least as of the beginning of June 2002. Ex. 96 at ¶¶ 2-4.

**Response:** The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay and self-serving statements by one of the Petitioners, as the only evidence cited is the declaration of John Rigas.

**B. The Government Co-opted Adelphia and Closed Off the Rigases' Access to Witnesses and Evidence (May – October 2002)**

1. *Adelphia Acquiesced to the Government's Demands to Forego Interviews with Key Witnesses, Even to Adelphia's Detriment*

110. The government did not permit Adelphia or its counsel to speak to key witnesses, affecting the accuracy and "completeness" of Adelphia's investigation. *See* Ex. 93, Covington & Burling, *Summary of Investigation Reported to the Special Committee of Independent Directors of Adelphia Communications Corporation*, at ACI 350516, 350522 (noting that (1) the Covington report should "not be viewed or used as a comprehensive analysis of all evidence" because "a number of key witnesses . . . were not available to Covington," and (2) "[A] number of other critical witnesses in managerial and supervisory positions within the accounting, finance, treasury, and external reporting functions were, at the direction of the Government, either at the outset of Covington's investigation or thereafter, not directly available to Covington for substantive interviews concerning their knowledge of practices at the Company.").

**Response:**   The Government does not dispute that the Covington report is quoted accurately, but disputes the remaining assertions, including that certain witnesses were "key" or that the accuracy and completeness of the internal investigation was impacted in any way, as not supported by the cited evidence.

111.    Peter Metros's notes of the May 22, 2002 Board meeting indicate that the information in the 8K scheduled to be "filed tomorrow" is "[i]ncomplete but . . . . must be filed."  Ex. 32 at 6 (ellipses in original).

**Response:**   The Government does not dispute that the notes contain the quoted language, but disputes that an attendee's notes of a meeting are competent evidence of what in fact occurred at the meeting, as such notes are inadmissible hearsay.

112.    Peter Metros's notes further indicate that the there was a question as to whether Erland Kailbourne could sign the 8K due to the incomplete information included.  Ex. 32 at 6.

**Response:**   The Government does not dispute that the notes contain the following language in the section headed "8K Status":  "incomplete but . . . . must be filed" and "Information incomplete – can E. Kailbourne sign."  The Government nonetheless disputes that an attendee's notes of a meeting are competent evidence of what in fact occurred at the meeting, as such notes are inadmissible hearsay.

113.    According to a December 10, 2004 10A report written by Willkie Farr & Gallagher and sent to Adelphia's Audit Committee in advance of the company's yearly 10-K disclosure:

> As the Special Committee's investigation unfolded, certain employees [including Dean Marshall, Karen Chrosniak, Timothy Werth, Luke Healy, Douglas Malone, and James Helms] were identified as having knowingly participated in alleged improper activities and the Special Committee and interim management took steps to evaluate each employee's conduct.  At the government's request some of these employees were first placed on administrative leave before being terminated by the company."

Ex. 63, Willkie Farr & Gallagher, Memorandum (Dec. 10, 2004), at 7-8 & n.5; Ex. 44, Email from Covington & Burling to Timothy Coleman & Christopher Clark (July 29, 2002).

**Response:** The Government does not dispute that the 10A report is quoted accurately.

2. *Adelphia and Its Counsel Effectively Functioned as an Arm of the Government*

114. Covington & Burling, the Special Committee's outside counsel, was ordered to "aid . . . the United States Attorney's Office in any way possible." Ex. 40, Letter from Covington & Burling to SEC (June 12, 2002), at 1.

**Response:** The Government disputes this statement to the extent it suggest that anyone other than the Special Committee ordered its counsel to aid the United States Attorney's Office. Indeed, the cited evidence states, in relevant part, "the Special Committee has mandated that we aid . . . the United States Attorney's Office in any way possible."

115. As of the beginning of August 2002, Adelphia provided the government with "millions of pages" of documents. Ex. 41, Letter from Covington & Burling to U.S. Attorney's Office (Aug. 1, 2002), at 6.

**Response:** The Government does not dispute the cited evidence is quoted accurately.

116. Adelphia turned documents over to the government "without prior review and without the assertion of privilege in advance of production." Ex. 41 at 7.

**Response:** The Government does not dispute the cited evidence is quoted accurately.

117. Adelphia provided documents to the government "as quickly as possible." *See* Ex. 41 at 6-7.

**Response:** The Government does not dispute the cited evidence is quoted accurately.

118. Through its counsel, Adelphia interviewed approximately 70 witnesses by the end of July 2002, some "at the request of the United States Attorney's Office." Ex. 41 at 6.

**Response:** The Government does not dispute the cited evidence is quoted accurately.

119. Adelphia provided information regarding the interviews to the government "promptly" and "often in draft form to avoid any delay." Ex. 41 at 6.

**Response:** The Government does not dispute the cited evidence is quoted accurately.

120. Adelphia "retained an investigative firm for the purpose of recovering assets from the Rigas family and [wa]s actively sharing information discovered by that company with the United States Attorney's Office. Ex. 41 at 7.

**Response:** The Government does not dispute the cited evidence is quoted accurately.

121. Adelphia sued the Rigas family and entities that it controlled only "after having met with the government to advise it of the Company's intention and to insure that any concerns were addressed." Ex. 41 at 7.

**Response:** The Government does not dispute the cited evidence is quoted accurately.

122. Adelphia "made witnesses available" to the government, including senior executives, on short notice. Ex. 41 at 11.

**Response:** The Government does not dispute the cited evidence is quoted accurately.

123. The Board agreed in an August 2002 meeting that "any employee status changes, such as firing of an employee, should be reported to the USAO." Ex. 43, Adelphia Commc'ns Corp., Board Meeting Minutes (Aug. 28, 2002), at 7.

**Response:** The Government does not dispute the cited evidence is quoted accurately.

124. Over the course of the government's investigation of the Rigases, Covington & Burling and other law firms representing Adelphia shared dozens of employee-interview

memoranda with the government.  Ex. 42, 3500 Disclosures, *United States v. Rigas*, No. 02 Cr. 1236 (S.D.N.Y. Jan. 27. 2004); Ex. 41 at 6.

**Response:**  The Government does not dispute that it received interview memoranda from Adelphia's counsel, but disputes that the cited evidence provides support for the assertion that "dozens" of such interview memoranda were provided.

125.    Covington & Burling, the Special Committee's outside counsel, was "co-opted by the government" and did not report to the Special Committee.  Ex. 39, Coyle Dep., *Adelphia Commc'ns Corp. v. Deloitte & Touche, LLP*, No. 00598 (Phila. Ct. C.P. May 18, 2006), at 640-41.

**Response:**  The Government does not dispute that Coyle made such a statement during his deposition, but does dispute that one witness's subjective belief about such co-option in any way establishes that Covington & Burling was in fact co-opted.

126.    As late as November 13, 2003, Covington & Burling kept its report confidential at the government's request because the government "only permitted a limited number of Adelphia senior executives to review the Covington report."  Ex. 52, Letter from Willkie Farr & Gallagher to SEC (Nov. 17, 2003), at 17.

**Response:**  The Government does not dispute that the cited evidence is quoted accurately. The Government does dispute the characterization of the confidentiality of the report as vague.

127.    At an April 25, 2003 Board meeting, the Board resolved to extend the Special Committee's charter until the Rigas criminal trial concluded.  Ex. 61, Adelphia Commc'ns Corp., Board Meeting Minutes (Apr. 25, 2003), at 8.

**Response:**  Not disputed.

a. *The U.S. Attorney's Office Oversaw the Process of Placing Key Employees on Paid Leave and Advancing Their Legal Costs Contingent on their Cooperation*

128.  On July 29, 2002, seven Adelphia employees – Karen Chrosniak, Edward Hartman, Luke Healy, Carla Brown Horn, Douglas Malone, Dean Marshall, and Timothy Werth (the "Leave Employees") – were placed on administrative leave.  Ex. 44.

**Response:**  The Government disputes this statement as it is irrelevant and immaterial to the issues set forth in the 2255 Motion.

129.  Previously, in June 2002, Adelphia's General Counsel, Randy Fisher, sent these employees a letter setting forth the terms and conditions under which Adelphia would advance costs of their legal representation in connection with the Special Committee's investigation and related matters.  *See, e.g.*, Ex. 45, Letters from Randy Fisher to Luke Healy, Tim Werth, Dean Marshall, and Doug Malone (June 6, 2002); Ex. 46, Letter from Randy Fisher to Carla Brown Horn (June 13, 2002).

**Response:**  The Government disputes this statement as it is irrelevant and immaterial to the issues set forth in the 2255 Motion.

130.  In exchange for the advancement of legal costs, the employees agreed to cooperate in all respects with the Special Committee's investigation "as well as any other investigation, proceeding or action brought by any governmental agency or authority."  *See, e.g.*, Ex. 45.

**Response:**  The Government disputes this statement as it is irrelevant and immaterial to the issues set forth in the 2255 Motion.

131.  On July 29, 2002, Randy Fisher sent the Leave Employees a letter placing them on administrative leave with full pay and benefits subject to an employee agreeing to "make yourself available as reasonably necessary to answer questions, provide complete and truthful

information about which you have knowledge, and take other action as is reasonably requested by the Company and those acting on its behalf, including, the Company's auditors and the Special Committee, its counsel, as well as the United States Attorney's [O]ffice for the Southern District of New York and the Middle District of Pennsylvania, the United States Securities and Exchange Commission, and other governmental authorities." *See, e.g.*, Ex. 47, Letter from Randy Fisher to Dean Marshall (July 29, 2002), at 1.

**Response:** The Government disputes this statement as it is irrelevant and immaterial to the issues set forth in the 2255 Motion.

132. The Leave Employees also were required to sign, as a condition of the leave agreement, a release of claims under which each Leave Employee agreed to "make himself available as reasonably necessary to answer questions, provide complete and truthful information as is reasonably requested by the Company (and those acting on the Company's behalf, including, the Company's auditors, the Special Committee and their counsel), the United States Attorney's [O]ffice for the Southern District of New York and the Middle District of Pennsylvania, the [SEC], and other governmental authorities." Ex. 47, Release of All Claims, at ¶ 6.

**Response:** The Government disputes this statement as it is irrelevant and immaterial to the issues set forth in the 2255 Motion.

133. As part of the administrative leave agreement, the employees were required to keep confidential all "technical, business, or financial information regarding [Adelphia] or any of its subsidiaries and affiliates or the respective activities of such entities" along with trade secrets and all "other material, non-public information of or regarding [Adelphia]." Ex. 47 at 4-5.

**Response:**  The Government disputes this statement as it is irrelevant and immaterial to the issues set forth in the 2255 Motion.

134.    Employees could disclose such confidential information to the government (the S.D.N.Y. and M.D. Pa. U.S. Attorney's Offices and the SEC).  Ex. 47 at 5.

**Response:**  The Government disputes this statement as it is irrelevant and immaterial to the issues set forth in the 2255 Motion.

135.    After the employees were placed on administrative leave, Bruce Baird confirmed Adelphia's action with AUSAs Chris Clark and Timothy Coleman.  Ex. 44.

**Response:**  The Government disputes this statement as it is irrelevant and immaterial to the issues set forth in the 2255 Motion.

136.    On July 30, 2002, Adelphia's outside counsel emailed AUSA Clark with revisions to the release agreement, asking "Chris, does this do the trick?"  Ex. 48, Email thread between Peter Haller, Christopher Clark, and Bruce Baird (July 30-31, 2002).

**Response:**  The Government disputes this statement as it is irrelevant and immaterial to the issues set forth in the 2255 Motion.

137.    AUSA Clark responded on July 31, 2002 that the "new agreement is okay, provided that our agreement relating to your interviews of our co-operators in [sic] still in effect."  Ex. 48.

**Response:**  The Government disputes this statement as it is irrelevant and immaterial to the issues set forth in the 2255 Motion.

138.    AUSA Clark further noted that the July 29, 2002 letter to the Leave Employees "will have to be revised to reflect the changes in the contract.  Please confirm via email that it will be so revised.  With those provisos, it's fine."  Ex. 48.

**Response:**  The Government disputes this statement as it is irrelevant and immaterial to the issues set forth in the 2255 Motion.

139.    On August 30, 2002, Randy Fisher sent a letter to the Leave Employees that said:

> As you know, in connection with your administrative leave with Adelphia Communications Corporation (the "Company"), which began effective July 29, 2002, you were asked to sign a letter describing the terms of the administrative leave, and a general release of claims.  As you also know, the U.S. Department of Justice requested certain clarifying changes to the release, which were incorporated into the final version of the release that was executed by you and the Company.  However, the changes were not reflected in the July 29, 2002 letter to you.  Accordingly, to the extent there is an inconsistency between the scope of your assistance to the Company and others during the administrative leave period as described in the July 29th letter and in Section 6 of the release, the terms of Section 6 of the release will control.

*See, e.g.*, Ex. 49, Letter from Randy Fisher to Dean Marshall (Aug. 30, 2002).

**Response:**  The Government disputes this statement as it is irrelevant and immaterial to the issues set forth in the 2255 Motion.

140.    If an employee—for example, Edward Hartman—was deemed not to cooperate sufficiently with the government, he was terminated.  *See, e.g.*, Ex. 73, Letter from Randy Fisher to Edward Hartman (Aug. 30, 2002).

**Response:**  The Government disputes this statement as it is irrelevant and immaterial to the issues set forth in the 2255 Motion.

141.    In terminating an employee for non-cooperation, Adelphia also declared an "end[ ] [to] the company's obligation to provide you with any legal counsel with regard to the Government's investigation of the relationship between the Rigas Family and the Company," and noted that the "Company reserves its rights to pursue claims against you with regard to the

undertaking you signed to reimburse the Company for failure to cooperate with the Government with respect to the above-reference[d] litigation." Ex. 73.

**Response:**   The Government disputes this statement as it is irrelevant and immaterial to the issues set forth in the 2255 Motion.

142.    Around August 1, 2002, Adelphia terminated nine employees thought to be potentially involved in fraudulent conduct "who were previously kept at the request of the DOJ for their investigation."  Ex. 60, Greenhill & Co., LLC, Adelphia Communications – Summary of Greenhill Meetings at Adelphia Headquarters in Coudersport, Pennsylvania (Aug. 1, 2002), at 2.

**Response** The Government disputes this statement as it is irrelevant and immaterial to the issues set forth in the 2255 Motion.

143.    Peter Metros's May 22, 2002 notes of the Board meeting indicate "Plead the 5th—Discharge them." Ex. 32 at 7.

**Response:**   The Government does not dispute that the notes contain the quoted language, but disputes that an attendee's notes of a meeting are competent evidence of what in fact occurred at the meeting, as such notes are inadmissible hearsay.

> b.    *The Holder Memorandum and the U.S. Attorney's Office's Pressure Dictated Adelphia's Decisionmaking with Respect to the Government's Investigation*

144.    On August 1, 2002, Covington & Burling sent a letter to the government making the case for why Adelphia should not be indicted.  Ex. 41.

**Response:**   Not disputed.

145.    The introductory section of the letter entitled "Overview" began with reference to the Holder memorandum, which was attached to the letter as Exhibit A. Ex. 41 at 1.

**Response:**  Not disputed.

146.    In the letter, Covington wrote in a section addressing the section of the Holder Memorandum that assesses a company's cooperation with the prosecution:

> The Company has followed the Memorandum's guidelines to the letter.  The Company has shielded no one, forcing the resignations of the Rigases and working with the government to coordinate the appropriate replacement of employees found to have knowingly participated in improper activities.  Simply stated, the Company, through the Special Committee, has taken as its mandate the duty to provide complete and unqualified assistance to the government in its efforts to bring charges against the Company's former executives.

Ex. 41 at 11.

**Response:**  Not disputed.

147.    The letter indicated that Adelphia's response to the investigation was driven by the "government's approval of [its] response, indeed, its insistence that no less is acceptable."  Ex. 41 at 2.

**Response:**  The Government disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 41 and respectfully refers the Court to Petitioners' Exhibit 41, which speaks for itself.  In particular, the cited evidence provides no support for the assertion that Adelphia's response was "driven" by the Government's approval of such response.

148.    In its August 1, 2002 letter to the government, Covington said it "has done everything the government could wish for in response to evidence of corporate wrongdoing."  Ex. 41 at 2.

**Response:**  Not disputed.

149.    The letter touts that Adelphia "wrest[ed] ... control from the Rigases," and claims that the company "forcibly removed the Rigases" from their positions.  See Ex. 41 at 9.

**Response:**   The Government disputes this statement to the extent Petitioners characterize

Petitioners' Exhibit 41 and respectfully refers the Court to Petitioners' Exhibit 41, which speaks

for itself.

        c.      *The Government Micromanaged Adelphia to Ensure Witnesses'*
                *Cooperation with the Government and Non-contact with the*
                *Rigases*

150.    On June 25, 2002, Adelphia filed a voluntary petition for Chapter 11 Bankruptcy.  Ex.

51, *In re Adelphia Commc'ns Corp.*, No. 02-41729-shl, Dkt. No. 1 (Bankr. S.D.N.Y. June 25,

2002).

**Response:**   Not disputed.

151.    On August 22, 2002, an attorney from Boies Schiller representing Adelphia wrote an

email to AUSA Coleman forwarding a draft Application to the Bankruptcy Court for Adelphia to

have funds authorized for Adelphia to pay various cooperating witnesses' lawyers.  Ex. 50,

Email from Philip Korologos to Timothy Coleman (Aug. 22, 2002).

**Response:**   Not disputed.

152.    As a justification for the need for funds, the Application stated that employees may

cease cooperating if Adelphia cannot pay for their counsel.  Ex. 50 at 6.

**Response:**   The Government disputes this statement to the extent Petitioners characterize

Petitioners' Exhibit 50 and respectfully refers the Court to Petitioners' Exhibit 50, which speaks

for itself.  In fact, Exhibit 50 says nothing about employees ceasing to cooperate.  Instead,

Exhibit 50 said that without the requested payment for lawyers, many cooperating employees

might "be unwilling or unable to obtain adequate representation," which could hinder the

progress of and impede the completion of the Government's investigation.  Ex. 50 ¶ 11.

153.    The application requested that all fee requests for these employees be kept confidential because public disclosure "would potentially interfere with or hinder the Government's investigations."  Ex. 50 at ¶17.

**Response:**   The Government disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 50 and respectfully refers the Court to Petitioners' Exhibit 50, which speaks for itself.

154.    On October 14, 2002, Adelphia General Counsel Randy Fisher sent a memo to all Adelphia employees regarding "[c]ontact with members of the Rigas Family, employees of Rigas Family private companies or former employees indicted by the Federal Government."  Ex. 53, Letter from Randy Fisher to Adelphia Employees (Oct. 14, 2002), at 1.

**Response:**   Not disputed.

155.    In the memorandum, Fisher began by explaining that Adelphia "is committed to cooperating with [the government]" to "help the Company avoid prosecution."  Ex. 53 at 1.

**Response:**   The Government disputes this statement on the grounds that language selectively provided by the Petitioners distorts the text as it appears plainly within the document.  The Government also disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 53 and respectfully refers the Court to Petitioners' Exhibit 53, which speaks for itself.

156.    Fisher stated "Adelphia continues to cooperate with [the government] by reviewing with the government . . . its communications with members of the Rigas Family, Rigas Family private entities employees, former Adelphia executives under indictment or any of their actual or purported counsel or representatives."  Ex. 53 at 1.

**Response:**   The Government disputes this statement on the grounds that language selectively provided by the Petitioners distorts the text as it appears plainly within the document.  The

Government also disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 53 and respectfully refers the Court to Petitioners' Exhibit 53, which speaks for itself.

157. After explaining that Adelphia was cooperating with the government's investigation, Fisher stated, "As part of this process, I have been asked to direct everyone to use the following procedures regarding contact with either any member of the Rigas Family, any employee of any of the Rigas Family private companies, any former executive of Adelphia currently under indictment or any of their actual or purported counsel or representatives." Ex. 53 at 1-2.

**Response:** The Government disputes this statement on the grounds that language selectively provided by the Petitioners distorts the text as it appears plainly within the document. The Government also disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 53 and respectfully refers the Court to Petitioners' Exhibit 53, which speaks for itself.

158. Fisher stated that in the case of direct contact regarding a business matter between the Rigases (or their representatives) and Adelphia in any setting, the employee contacted should refuse to speak, refer the individual to Adelphia's legal department, and "report the contact to Adelphia's legal department." Ex. 53 at 2.

**Response:** The Government disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 53 and respectfully refers the Court to Petitioners' Exhibit 53, which speaks for itself.

159. The letter made clear that "**There is no exception to this situation.**" Ex. 53 at 2 (emphasis in original).

**Response:** The Government disputes this statement on the grounds that language selectively provided by the Petitioners distorts the text as it appears plainly within the document. The

Government disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 53 and respectfully refers the Court to Petitioners' Exhibit 53, which speaks for itself.

160.     Fisher's October 14, 2002 memorandum directed that if approached by the Rigases or any of their defense team, "the person making the contact should be told that it would be inappropriate to answer any questions or provide any information." *See* Ex. 53 at 2.

**Response:**     The Government disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 53 and respectfully refers the Court to Petitioners' Exhibit 53, which speaks for itself.

161.     For any contact with the Rigases or their representatives in a social setting, Fisher directed employees to "use good judgment" and "not disclose or divulge any confidential information concerning the Company, the ongoing investigation or the bankruptcy proceeding." Ex. 53 at 2.

**Response:**     The Government disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 53 and respectfully refers the Court to Petitioners' Exhibit 53, which speaks for itself.

162.     Fisher further directed employees to report all social contacts with the Rigases or their representatives to the Adelphia legal department.  Ex. 53 at 2.

**Response:**     The Government disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 53 and respectfully refers the Court to Petitioners' Exhibit 53, which speaks for itself.

163.     Fisher also advised employees of the procedures for indirect contact (like a voicemail): "1. Report the contact to the Legal Department immediately.  2. Do not attempt to return the phone call."  Ex. 53 at 2.

**Response:**   The Government disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 53 and respectfully refers the Court to Petitioners' Exhibit 53, which speaks for itself.

164.   Fisher further explained that the "Legal Department will review the matter and may refer the matter to appropriate government agencies and litigation counsel for review."  Ex. 53 at 2.

**Response:**   The Government disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 53 and respectfully refers the Court to Petitioners' Exhibit 53, which speaks for itself.

165.   According to Adelphia accounting employee Robert Leete, someone at Adelphia told Adelphia employees not to speak to the Rigases and that "if Adelphia learned that we had spoken to the Rigases, we would not be working at Adelphia any longer."  Ex. 83, Leete Decl. ¶9.

**Response:**   The Government disputes this statement in its entirety due to Petitioners' failure to provide competent evidence insofar as the support, among other things, constitutes inadmissible hearsay.

166.   "The understanding from Adelphia was 'better not talk to the Rigases or else . . . .' "  Ex. 83 at ¶9.

**Response:**   The Government disputes this statement in its entirety due to Petitioners' failure to provide competent evidence insofar as the support, among other things, constitutes inadmissible hearsay and improper speculation.

167.   At Adelphia, "[t]here was never a sense of 'feel free to talk to the Rigases because they are equally entitled to the information.' "  Ex. 83 at ¶9 .

**Response:** The Government disputes this statement in its entirety due to Petitioners' failure to provide competent evidence insofar as the support, among other things, constitutes inadmissible hearsay and improper speculation.

168. Leete "understood that Adelphia was cooperating with the federal government as much as possible and that meant don't talk to the Rigases." Ex. 83 at ¶ 10.

**Response:** The Government disputes this statement in its entirety due to Petitioners' failure to provide competent evidence insofar as the support, among other things, constitutes inadmissible hearsay and improper speculation.

169. Leete recalled the Rigases attempting to reach out to certain Adelphia employees, but "they were afraid to talk to the Rigases." Ex. 83 at ¶ 11.

**Response:** The Government disputes this statement in its entirety due to Petitioners' failure to provide competent evidence insofar as the support, among other things, constitutes inadmissible hearsay and improper speculation.

170. Former Adelphia employee Andrew Zorichak, who worked in Adelphia's engineering, treasury, and accounting departments, recalled that "the Rigases asked to speak to some of us [Adelphia employees] during the criminal investigation." Ex. 84, Zorichak Decl. (May 18, 2018), at ¶¶ 2-9, 15.

**Response:** The Government disputes this statement in its entirety due to Petitioners' failure to provide competent evidence insofar as the support, among other things, constitutes inadmissible hearsay.

171. During the Rigas investigation, "Adelphia was saying that if you wanted to keep your job, and as long as you cooperated with the Adelphia side, you should not speak to the Rigases." Ex. 84 at ¶ 15.

**Response:** The Government disputes this statement in its entirety due to Petitioners' failure to provide competent evidence insofar as the support, among other things, constitutes inadmissible hearsay.

172.     Zorichak "understood that it was frowned upon to cooperate with the Rigases because you might lose your job and that sort of thing." Ex. 84 at ¶ 15.

**Response:** The Government disputes this statement in its entirety due to Petitioners' failure to provide competent evidence insofar as the support, among other things, constitutes inadmissible hearsay.

173.     Zorichak wanted to speak to the Rigases because he "felt that all sides needed to be heard in everything." Ex. 84 at ¶ 17.

**Response:** The Government disputes this statement in its entirety due to Petitioners' failure to provide competent evidence insofar as the support, among other things, constitutes improper opinion.

174.     Zorichak did not speak to the Rigases because he feared that he would lose his job. Ex. 84 at ¶¶ 15-17.

**Response:** The Government disputes this statement in its entirety due to Petitioners' failure to provide competent evidence insofar as the support, among other things, constitutes improper opinion.

175.     Dean Marshall, who worked directly for James Brown in the Corporate Finance Department, testified in a deposition that "the government did not want me communicating directly with anybody from the Rigas family." Ex. 54, Marshall Dep. Tr., *Rigas v. Brown*, No. 2006-305 (Phila. Ct. C.P. Dec. 13, 2011), at 17; *see also* Ex. 90, Marshall Dep., *In re Adelphia*

*Commc'ns Corp. Sec. & Derivative Litig.*, 03 MDL 1529 (JMF) (S.D.N.Y. Feb. 27, 2014), at 109-11.

**Response:** The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay.

176. Dean Marshall testified that "the one thing that was guiding or directing the choices I was making [to cooperate with the government] w[as] the government's instructions." Ex. 90 at 118-19.

**Response:** The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay.

177. The Rigases and their counsel made numerous unsuccessful attempts to speak to witnesses. *See, e.g.*, Ex. 70, Letter from Paul Grand to Judge Sand (June 7, 2004), at 2 (enumerating witnesses who would not speak with the Rigases); Ex. 84, Zorichak Decl. ¶17 (explaining that Andrew Zorichak wanted to speak with the Rigases but did not out of fear he would lose his job); Ex. 83, Leete Decl. ¶11 (Rob Leete noting that he recalled the Rigases attempting to reach out to Adelphia employees but they would not speak to them).

**Response:** The Government disputes this statement to the extent Petitioners characterize Petitioners' Exhibits 70, 83, and 84, and respectfully refers the Court to Petitioners' Exhibits 70, 83, and 84, which speak for themselves.

178. Mike Brady testified at a deposition when the Rigases' defense counsel attempted to speak with him, he told them that "he wasn't willing to talk to them." Ex. 86, Brady Dep.,

*Adelphia Commc'ns Corp. v. Deloitte & Touche, LLP*, No. 000598 (C.P. Phila. Mar. 10, 2005), at 176-77.

**Response:** The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay.

### C. Interference Beyond October 2002

#### 1. *The Government Continues to Restrict the Rigases' Access to Witnesses*

179.    On November 20, 2002, a Boies attorney emailed AUSA Coleman noting that Philip Korologos wanted to discuss a "proposed motion for a temporary restraining order freezing the Rigas defendants' assets." Ex. 57, Email from George Carpinello to Timothy Coleman (Nov. 20, 2002).

**Response:** Not disputed.

180.    The Boies attorney included a draft of the motion and explained, "We would like to coordinate efforts and want to make sure that the bringing of this motion would not interfere with your office's activities." Ex. 57.

**Response:** Not disputed.

181.    On February 19, 2003, Philip Korologos emailed the government, stating:

> Attached is a fax I received today in which the Rigases' counsel asks for depositions of the pre-petition independent directors and the Company. Clearly this request relates to the issues we have previously discussed regarding your desire not to have these depositions occur. I am sure these are depositions you continue not to want to take place prior to resolution of the criminal action against the Rigases.

Ex. 56, Email from Philip Korologos to Timothy Coleman, et al. (Feb. 19, 2003).

**Response:** Not disputed.

182.    On May 8, 2003, AUSA Chris Clark canceled an interview with Adelphia accountant Joe Sabol involving at least the IRS and U.S. Attorney for the Middle District of Pennsylvania. Ex. 59, Email from Chris Clark to Philip Korologos (May 8, 2003).

**Response:**    The Government disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 59 and respectfully refers the Court to Petitioners' Exhibit 59, which speaks for itself.

183.    On October 28, 2003, the Rigases requested access, via a conference call, to four members of Adelphia's accounting staff.  Ex. 79, Email thread between William Marsillo and Chris Clark (Oct. 2003).

**Response:**    The Government disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 79 and respectfully refers the Court to Petitioners' Exhibit 79, which speaks for itself.

184.    As of October 2003, the Rigases were permitted limited access to certain accounting employees regarding a limited number of topics under a stipulation from civil litigation with Adelphia.  Ex. 79.

**Response:**    The Government disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 79 and respectfully refers the Court to Petitioners' Exhibit 79, which speaks for itself.  In fact, Exhibit 79 states that, pursuant to the stipulation, Petitioners were permitted access to Adelphia's accounting staff to discuss tax and accounting issues related to the RMEs.

185.    A Boies Schiller attorney forwarded the request to AUSA Clark, and asked him if he had "any objections" to allowing the Rigases to interview these witnesses.  Ex. 79.

**Response:**    The Government disputes the statement to the extent it suggests that Petitioners were seeking to interview these witnesses in connection with anything other than tax and

accounting issues related to the RMEs, as allowed by the stipulation entered in the civil litigation.

186.    The next day, AUSA Clark responded, "I object to [Adelphia Vice President of Accounting] Rob Cavileri [sic], and I would like a postal inspector present during the meeting." Ex. 79.

**Response:**   Not disputed.

187.    On February 13, 2003, Philip Korologos emailed AUSAs Coleman and Clark (along with other outside counsel for Adelphia, Bruce Baird from Covington and Marc Abrams from Willkie Farr) regarding the in-court testimony of Les Gelber, an Adelphia Board member, during bankruptcy proceedings.  Ex. 62, Email from Philip Korologos to Tim Coleman, et al. (Feb. 13, 2003).

**Response:**   The Government disputes the Petitioners' inclusion of this information as it is irrelevant and immaterial to the issues set forth in their 2255 Motion, as it has nothing to do with Petitioners' access to witnesses.  The Government further disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 62 and respectfully refers the Court to Petitioners' Exhibit 62, which speaks for itself.

188.    Korologos noted that Les Gelber's direct testimony would be presented via declaration, but that he will be subject to live cross-examination.  Ex. 62.

**Response:**   The Government disputes the Petitioners' inclusion of this information as it is irrelevant and immaterial to the issues set forth in their 2255 Motion, as it has nothing to do with Petitioners' access to witnesses.  The Government further disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 62 and respectfully refers the Court to Petitioners' Exhibit 62, which speaks for itself.

189.    Korologos wrote:

> I am assuming based on my discussion with you on Monday that by not addressing the scope of cross in [a] stipulation that we will collectively make sure at the hearing that any issues relating to scope of cross or the questioning of Les (e.g., by the Rigases who are at least a party in interest in the bankruptcy) are limited to the direct testimony of the submitted declaration. If you don't intend to do it this way, you may want to get the parties to stipulate, and the court to enter it as a protective order, that the scope of cross examination at the hearing will be so limited. I believe we can take care of this at the time of the hearing, but want to make sure you are comfortable with that.

Ex. 62.

   **Response:**   The Government disputes the Petitioners' inclusion of this information as it is irrelevant and immaterial to the issues set forth in their 2255 Motion, as it has nothing to do with Petitioners' access to witnesses.

190.    On February 19, 2003, Philip Korologos sent a draft of the declaration of Les Gelber's declaration to AUSAs Clark and Coleman and explained, "I do not believe anything mentioned in this declaration should cause you any concern in light of the stipulation, but I wanted to make sure we showed it to you in advance." Ex. 66, Email from Philip Korologos to Tim Coleman, et al. (Feb. 19, 2003).

   **Response:**   The Government disputes the Petitioners' inclusion of this information as it is irrelevant and immaterial to the issues set forth in their 2255 Motion, as it has nothing to do with Petitioners' access to witnesses. The Government further disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 66 and respectfully refers the Court to Petitioners' Exhibit 66, which speaks for itself.

191.     On May 8, 2003, Philip Korologos informed AUSA Clark that the IRS wanted to interview Adelphia accounting employee Joe Sabol.  Ex. 64, Email thread between Philip Korologos and Chris Clark (May 8, 2003).

**Response:**   The Government disputes the Petitioners' inclusion of this information as it is irrelevant and immaterial to the issues set forth in their 2255 Motion, as it has nothing to do with Petitioners' access to witnesses.  The Government further disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 64 and respectfully refers the Court to Petitioners' Exhibit 64, which speaks for itself.

192.     AUSA Clark responded, "Interview is off.  No one should interview Sabol tomorrow or anytime without my say so."  Ex. 64.

**Response:**   The Government disputes the Petitioners' inclusion of this information as it is irrelevant and immaterial to the issues set forth in their 2255 Motion, as it has nothing to do with Petitioners' access to witnesses.  The Government further disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 64 and respectfully refers the Court to Petitioners' Exhibit 64, which speaks for itself.

193.     On February 5, 2003, lawyers from Buchanan Ingersoll asked Philip Korologos to review a letter Buchanan Ingersoll was considering sending to the Rigases' civil counsel regarding the Rigases' counsel's request for documents.  Ex. 65, Email from Philip Korologos to Tim Coleman & Chris Clark (Feb. 5, 2003).

**Response:**   The Government disputes the Petitioners' inclusion of this information as it is irrelevant and immaterial to the issues set forth in their 2255 Motion, as it has nothing to do with Petitioners' access to witnesses.  The Government further disputes this statement to the extent

Petitioners characterize Petitioners' Exhibit 65 and respectfully refers the Court to Petitioners' Exhibit 65, which speaks for itself.

194.    The Rigases' attorneys had requested, among other things, "[a] listing of files relating to the Firm's former representation of Adelphia."  Ex. 65.

**Response:**    The Government disputes the Petitioners' inclusion of this information as it is irrelevant and immaterial to the issues set forth in their 2255 Motion, as it has nothing to do with Petitioners' access to witnesses.  The Government further disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 65 and respectfully refers the Court to Petitioners' Exhibit 65, which speaks for itself.

195.    With regard to that request, Buchanan Ingersoll's draft response was "we have asked the firm of Boies, Schiller & Flexner if they have any objection to our providing a list of all Adelphia files to you.  They have not yet responded to our inquiry."  Ex. 65.

**Response:**    The Government disputes the Petitioners' inclusion of this information as it is irrelevant and immaterial to the issues set forth in their 2255 Motion, as it has nothing to do with Petitioners' access to witnesses.  The Government further disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 65 and respectfully refers the Court to Petitioners' Exhibit 65, which speaks for itself.

196.    About 20 minutes after Korologos received this letter from Buchanan Ingersoll, he sent it to AUSAs Clark and Coleman, indicating that he had asked the lawyer at Buchanan Ingersoll "to inform me (so I could tell you) before he sent anything like this."  Ex. 65.

**Response:**    The Government disputes the Petitioners' inclusion of this information as it is irrelevant and immaterial to the issues set forth in their 2255 Motion, as it has nothing to do with Petitioners' access to witnesses.  The Government further disputes this statement to the extent

Petitioners characterize Petitioners' Exhibit 65 and respectfully refers the Court to Petitioners' Exhibit 65, which speaks for itself.

197.    On December 9, 2004, Philip Korologos emailed an SEC representative in response to a question of whether Adelphia filed a complaint against a company in Pennsylvania.  Ex. 58, Email thread between Philip Korologos and Gwen Licardo (Dec. 9, 2004).

   **Response:**   The Government disputes the Petitioners' inclusion of this information as it is irrelevant and immaterial to the issues set forth in their 2255 Motion, as it has nothing to do with Petitioners' access to witnesses.  The Government further disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 58 and respectfully refers the Court to Petitioners' Exhibit 58, which speaks for itself.

198.    Korologos said, "We have not yet filed an action because of requests by [SDNY AUSA] Richard Owens to hold off on doing so for the time being.  If that changes, I will let you know."  Ex. 58.

   **Response:**   The Government disputes the Petitioners' inclusion of this information as it is irrelevant and immaterial to the issues set forth in their 2255 Motion, as it has nothing to do with Petitioners' access to witnesses.  The Government further disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 58 and respectfully refers the Court to Petitioners' Exhibit 58, which speaks for itself.

199.    At a January 2003 hearing in the bankruptcy court, the government told the Court that "[Adelphia] can do what it wants.  We don't have any power over them."  Ex. 78, Gov't Opp'n Br., R. 16 (Feb. 22, 2012), at 42 (quoting Hr'g Tr., *In re Adelphia Communications Corp.*, 02-41729 (REG) (S.D.N.Y.), at 22-23).

   **Response:**   Not disputed.

200.    The Rigases' former attorneys from Buchanan Ingersoll refused to speak to the Rigases.  Ex. 82, Fleming Decl., Ex.  A at 6 (July 3, 2007).

**Response:**   The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay.  Further, the Government disputes this statement to the extent it omits that the Buchanan Ingersoll attorneys were acting on advice of counsel.  Ex. 82, Fleming Decl., Ex. A at 6.

201.    Defense attorney Peter Fleming was "shocked" that Buchanan Ingersoll would not speak to defense counsel.  Ex. 72, Ex. F at 116-17.

**Response:**   The Government does not dispute that Fleming made such a statement during a court proceeding.  The Government disputes the statement, however, because it is derived from a selective quotation from the transcript without inclusion of other portions of it necessary for context and background.

202.    Counsel for the Rigases attempted in vain to speak to many Adelphia employees.  Ex. 82, Ex.  A at 6-7.

**Response:**   The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay.

203.    Personnel from Deloitte refused to speak with Rigases.  Ex. 82, Ex. A at 5, 7-8.

**Response:**   The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay.

2. *Adelphia's November 2004 Presentation to the Government*

204. On November 5, 2004, Covington & Burling made a presentation to the U.S.

Attorney's Office entitled "Thompson Memorandum Factors." Ex. 55, Vinegrad Decl., *In re*

*Adelphia Commc'ns Corp.*, No. 02-ap-41729, Ex. 3, Thompson Memorandum Factors, (Bankr.

S.D.N.Y.).

**Response:** The Government disputes the Petitioners' inclusion of this information as it is

irrelevant and immaterial to the issues set forth in their 2255 Motion, as it has nothing to do with

Petitioners' access to witnesses.

205. Covington made the presentation to convince the government not to indict Adelphia.

Ex. 55 at ¶¶ 20-22.

**Response:** The Government disputes the Petitioners' inclusion of this information as it is

irrelevant and immaterial to the issues set forth in their 2255 Motion, as it has nothing to do with

Petitioners' access to witnesses. The Government further disputes this statement insofar as

Petitioners' support relies upon improper speculation.

206. A key component of the presentation concerned Adelphia's cooperation with the

government. Ex. 55, Ex. 3 at 6 (pdf p. 21).

**Response:** The Government disputes the Petitioners' inclusion of this information as it is

irrelevant and immaterial to the issues set forth in their 2255 Motion, as it has nothing to do with

Petitioners' access to witnesses. The Government further disputes this statement to the extent

Petitioners characterize Petitioners' Exhibit 55 and respectfully refers the Court to Petitioners'

Exhibit 55, which speaks for itself.

207. The cooperation category was broken down into five subcategories: (1) providing

access to privileged materials, (2) production of documents and other information, (3) assistance

before and during the Rigas criminal trial, (4) assistance in the tax investigation, and (5) non-obstruction of the government's investigation.  Ex. 55, Ex. 3 at 6 (pdf p. 21).

**Response:**   The Government disputes the Petitioners' inclusion of this information as it is irrelevant and immaterial to the issues set forth in their 2255 Motion, as it has nothing to do with Petitioners' access to witnesses.  The Government further disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 55 and respectfully refers the Court to Petitioners' Exhibit 55, which speaks for itself.

208.    The first category detailed how Adelphia provided the Government a "450-page privileged draft summary of investigation prepared by Special Committee's outside counsel," and "[p]rivileged summaries of more than 100 witness interviews conducted by counsel to the Special Committee, including summaries for seven witnesses who testified for the Government at the *United States v. Rigas* trial," as well as other privileged internal documents and outside counsel documents.  Ex. 55, Ex. 3 at 7 (pdf p. 22).

**Response:**   The Government disputes the Petitioners' inclusion of this information as it is irrelevant and immaterial to the issues set forth in their 2255 Motion, as it has nothing to do with Petitioners' access to witnesses.  The Government further disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 55 and respectfully refers the Court to Petitioners' Exhibit 55, which speaks for itself.

209.    The second category—"Production of Documents and Other Information"—detailed how Adelphia provided 1,315 boxes of documents (10 million pages), "25 imaged local computer drives," "228 compact discs," and "[a]ccess to computer database," all under an agreement "to produce materials to the Government as quickly as possible, even before conducting a privilege review."  Ex. 55, Ex. 3 at 8 (pdf p. 23).

**Response:** The Government disputes the Petitioners' inclusion of this information as it is irrelevant and immaterial to the issues set forth in their 2255 Motion, as it has nothing to do with Petitioners' access to witnesses. The Government further disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 55 and respectfully refers the Court to Petitioners' Exhibit 55, which speaks for itself.

210.    With respect to the third category—Assistance Before and During the *United States v. Rigas* Trial—the slide stated:

- Adelphia has provided extraordinary assistance for over two years in connection with prosecution of the Rigases and others:
    - o Detailed comments on the draft criminal complaint
    - o Adelphia's forensic accountants made available to the Government on short notice
    - o Assistance in preparation of key witnesses
    - o Real-time data analysis and other assistance during the trial
    - o Review of 70,000 pages produced by the Rigases on the eve of trial
        - ▪ Completed in one week (400 hours of work)
    - o Analysis of all transactions between Adelphia and the Rigas entities over a 3½ year period to rebut Rigases' defense that they could have repaid their debts to the Company
        - ▪ Completed before the end of the Government's case-in-chief (3,000 hours of work)
- Adelphia spent several million dollars assisting the Government in connection with the trial

Ex. 55, Ex. 3 at 9 (pdf p. 24).

**Response:** The Government disputes the Petitioners' inclusion of this information as it is irrelevant and immaterial to the issues set forth in their 2255 Motion, as it has nothing to do with Petitioners' access to witnesses.

211.    The fourth category concerned Adelphia's extensive efforts to assist in the related tax investigation, including hundreds of hours collecting/reviewing documents, and making employees and forensic accountants available. Ex. 55, Ex. 3 at 10 (pdf p. 25).

**Response:**    The Government disputes the Petitioners' inclusion of this information as it is irrelevant and immaterial to the issues set forth in their 2255 Motion, as it has nothing to do with Petitioners' access to witnesses.  The Government further disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 55 and respectfully refers the Court to Petitioners' Exhibit 55, which speaks for itself.

212.    The final category—entitled "Adelphia Did Not Obstruct the Government's Investigation"—explained that "Adelphia has provided extraordinary cooperation since the Rigases were removed from their positions at the Company."  Ex. 55, Ex. 3 at 11 (pdf p. 26).

**Response:**    The Government disputes the Petitioners' inclusion of this information as it is irrelevant and immaterial to the issues set forth in their 2255 Motion, as it has nothing to do with Petitioners' access to witnesses.  The Government further disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 55 and respectfully refers the Court to Petitioners' Exhibit 55, which speaks for itself.

213.    In that category, Covington noted that the "Special Committee moved immediately to oust Rigases once it learned of Government's concerns" and that the "Special Committee's decisive action enabled Government to promptly identify culpable individuals and conduct extensive investigation."  Ex. 55, Ex. 3 at 11 (pdf p. 26).

**Response:**    The Government disputes the Petitioners' inclusion of this information as it is irrelevant and immaterial to the issues set forth in their 2255 Motion, as it has nothing to do with Petitioners' access to witnesses.  The Government further disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 55 and respectfully refers the Court to Petitioners' Exhibit 55, which speaks for itself.

214.    On April 25, 2005, the government notified Adelphia that it would not prosecute it subject to certain terms including a continuing obligation to cooperate and providing restitution. Ex. 74, Letter from Richard Owens to Alan Vinegrad & Philip Korologos (Apr. 25, 2005).

**Response:**    The Government disputes the Petitioners' inclusion of this information as it is irrelevant and immaterial to the issues set forth in their 2255 Motion, as it has nothing to do with Petitioners' access to witnesses.  The Government further disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 55 and respectfully refers the Court to Petitioners' Exhibit 55, which speaks for itself.

## IV.    The Rigases' Efforts to Obtain Funds for Their Defense

215.    When Adelphia decided not to advance legal expenses to the Rigases, they were forced to liquidate certain real estate assets to fund their defense.  Ex. 72, McMichael Decl. (Oct. 3, 2011), at ¶5.

**Response:**    The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay and an improper opinion.

216.    On August 26, 2002, Adelphia moved for a temporary restraining order in a bankruptcy adversary proceeding against the Rigases to block the Rigases from selling property. Ex. 71, *Adelphia Commc'ns Corp. v. Rigas*, No. 02-8051-cgm, Dkt. No. 5 (Bankr. S.D.N.Y. Aug. 26, 2002); Ex. 72 at ¶6.

**Response:**    The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the docket does not support the statement and the declaration constitutes inadmissible hearsay.  The Government also disputes this

statement to the extent Petitioners characterize Petitioners' Exhibit 71 and respectfully refers the Court to Petitioners' Exhibit 71, which speaks for itself.

217.    The bankruptcy court granted that motion.  Ex. 72 at ¶¶ 6-7.

**Response:**   The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay.

218.    On November 25, 2002, Adelphia moved to freeze all of the Rigases' assets.  Ex. 72 at ¶ 7; Ex. 71 at Dkt. 53 (Nov. 25, 2002).

**Response:**   The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the docket does not support the statement and the declaration constitutes inadmissible hearsay.  The Government respectfully refers the court to Petitioners' Exhibit 71 which speaks for itself.

219.    The bankruptcy court granted that motion.  Ex. 72 at ¶ 7.

**Response:**   The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay.

220.    In February 2003, after months of negotiations, counsel for Adelphia and counsel for the Rigases agreed in principle to permit the Rigases to sell certain real estate to fund their criminal and civil defense.  Ex. 72 at ¶ 8.

**Response:**   The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay.

221.    Despite the Rigases' best efforts over the next few months, only one property was sold for approximately $500,000. Ex. 72 at ¶8.

**Response:**   The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay.

222.    During this time period, the Rigases also requested that Adelphia consent to the sale of additional pieces of property not subject to the agreement allowing the Rigases to sell certain real estate to generate funds for their legal expenses. Ex. 72 at ¶9.

**Response:**   The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay.

223.    Adelphia's counsel made it clear that it would reject the Rigases' continued efforts to fund their defense through the sale of properties. Ex. 72 at ¶9.

**Response:**   The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay.

224.    The Rigases attempted unsuccessfully to obtain funds for criminal defense costs from Adelphia's directors' and officers' liability policies. Ex. 72 at ¶10.

**Response:**   The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay.

225.    As of June 23, 2003, because of a lack of funding, the Rigases' criminal and civil counsel and experts were owed approximately $2.5 million. Ex. 72 at ¶11.

**Response:**   The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay.

226.   Most notably.  [sic] Navigant Consulting, which had been retained to assist in document review with the promise of payment being funded out of property sales, was owed approximately $800,000.  Ex. 72 at ¶ 11.

**Response:**   The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay.

227.   Around June 2003, the Rigases' criminal counsel approached their civil counsel regarding the critical need to get funding in place immediately to retain experts, review documents, and prepare for trial.  Ex. 72 at ¶ 12.

**Response:**   The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay.

228.   Around May 2003, Adelphia refused the Rigases' request to obtain indemnification and legal-expense advancement from the privately-owned Rigas cable systems that Adelphia managed.  Ex. 72 at ¶ 13.

**Response:**   The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay. The Government also disputes this statement on the ground that Exhibit 72 ¶ 13 provides no evidence that the Rigases requested "indemnification and legal-expense advancement" in the first place around May 2003.  Petitioners' Exhibit 72 ¶ 13 states only that

Petitioners then-counsel, Lawrence McMichael, requested that Adelphia consent to permitting Petitioners' defense costs be funded from cash flow generated by the RMEs that, at the time, was frozen pursuant to a Bankruptcy Court order.  *See* Pet'rs' Ex. 13 ¶ 13; Pet'rs' Ex. 13, Ex. B at 2 (requesting that counsel to Adelphia agree to consent to permitting Petitioners "to use a small portion of" cash flow from the RMEs and acknowledging that "the Bankruptcy Court froze all of the Rigas assets but permitted those assets to be used for, *inter alia*, payment of defense costs, leaving it to the parties to determine which assets to use and how to use them").  Further, the Government disputes this statement because it states a legal conclusion by equating a request for, and denial of, "payment of defense costs" from assets frozen by the Bankruptcy Court to a request for, and denial of, indemnification and legal-expense advancement.

229.    On July 18, 2003, the Rigases filed a Motion to Modify the Temporary Restraining Orders to Permit Funding of Criminal and Civil Defense Costs from Cash Generated by Private Cable Companies, seeking to cause the private cable companies owned by the Rigases to advance up to $15 million in legal expenses.  Ex. 72 at ¶ 14, Ex. C (pdf pp. 22, 33).

**Response:**   The Government disputes this statement to the extent that Petitioners rely, in part, on support which is not competent evidence insofar as the support, among other things, constitutes inadmissible hearsay.

230.    The Motion explained the severe funding issue that was facing the Rigases:

> The Rigases' inability to adequately defend themselves against the criminal and civil charges against them has now reached a critical stage.  The criminal trial starts in a little over five months.  There are millions of documents to review, index and assimilate into the defense.  This is a labor intensive process, and consequently very expensive.  Without defense cost funding, the Rigases ability to defend themselves fully and fairly will be impaired.  By way of example only, the tasks required of the Rigases and their counsel include analysis of millions of pages of documents, retention of experts to help understand and articulate the complicated

> accounting and business issues and, in light of these analyses,
> develop trial strategy and testimony.

Ex. 72 at ¶ 14, Ex. C (pdf p. 23).

**Response:**   The Government disputes this statement to the extent that Petitioners imply that

the supporting documentation spoke to the current state of affairs, when in fact, the captioned

language was forward looking.   The Government disputes this statement to the extent Petitioners

characterize Petitioners' Exhibit 72, Ex. C and respectfully refers the Court to Petitioners'

Exhibit 72, Ex. C, which speaks for itself.

231.   The Rigases' Motion "further explained the difficulties facing the Rigases' trial

preparation because of Adelphia's refusal to provide the defense with the same searchable CDs

provided to the government unless the Rigases paid Adelphia an exorbitant amount of money to

reimburse it for costs in scanning the documents onto CDs." Ex. 72 at ¶ 15, Ex. C at ¶ 35, n.9

(pdf p. 34).

**Response:**   The Government disputes this statement to the extent it implies that the quoted

material is from the "motion" first referred to in paragraph 229.

232.   At the August 1, 2003 hearing concerning the Motion, counsel for John Rigas

explained the need for funding:

> We're at a critical point, where I can represent to this Court that
> without money we cannot come close to providing an adequate –
> what I and co-counsel believe would be adequate defense of the
> Rigases, in a case – and I can represent, Your Honor, in a case which
> I consider to be highly defendable, where I believe there has been
> major misunderstandings of relevant facts, and I believe the
> possibility of the defense are good and strong.

Ex. 72 at ¶ 16.  Ex. D at 41 (pdf p. 38).

**Response:** The Government disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 72, Ex. D and respectfully refers the Court to Petitioners' Exhibit 72, Ex. D, which speaks for itself.

233. When the hearing concluded, the bankruptcy court granted the Rigases' motion and modified the temporary restraining orders to allow the private cable companies to pay up to $15 million of the Rigases' defense costs. Ex. 72 at ¶ 17.

**Response:** The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay.

234. The bankruptcy court noted, however, that the $15 million dollars was a "drop in the bucket." Ex. 72 at ¶ 17, Ex. D at 137-38, 160.

**Response:** The Government disputes this statement because it selectively excerpts the bankruptcy court's statement. In fact, the bankruptcy court said that the $15 million was a "drop in the bucket in comparison to the fees by the professionals for the estate and the Committee in this case, the damages for which the Rigases will be liable if they lose, and the liabilities to ACC, to its bank, unsecured and postpetition Creditors." Ex. 72 at ¶ 17, Ex. D at 137-38. The Government respectfully refers the Court to Petitioners' Exhibit 72, Ex. D, which speaks for itself.

235. The $15 million dollars the bankruptcy court permitted the Rigases to access was provided around October 2003. Ex. 20 at ¶ 35.

**Response:** The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay and self-serving statements by one of the Petitioners.

236.     The funds the Rigases received in October 2003 had to cover amounts already owed to professionals and vendors as well as civil and criminal defense costs for all defendants.  Ex. 72, Ex. C at ¶¶ 2-3 (pdf p. 23).

**Response:**   The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay.  The Government also disputes this statement the extent that Petitioners' statement is unnecessarily vague in light of specific figures available within Petitioners' Exhibit 72, Ex. C.  The Government respectfully refers the Court to Petitioners' Exhibit 72, Ex. C, which speaks for itself.

237.     The $15 million figure was an estimated sum of civil and criminal defense costs based on assumption of an 8-week criminal trial commencing January 5, 2004 and concluding in early March 2004.  Ex. 72 at ¶ 21.

**Response:**   The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay.

238.     The $15 million dollar figure was also "subject to reconsideration, in the event of a material change in the facts, or to deal with new needs, but subject to fine tuning, with respect to authorized expenses, not for a do-over of the matters [the Court has] decided today."  Ex. 72 at ¶ 20.

**Response:**   The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay.  The Government disputes this statement to the extent Petitioners

characterize Petitioners' Exhibit 72, Ex. D and respectfully refers the Court to Petitioners' Exhibit 72, Ex. D, which speaks for itself.

239.    The $15 million figure proved incorrect due to changed circumstances, including that the government's estimate in the length of the prosecution case doubled, trial was postponed for two months, and the case was expanded substantially by the government filing a bill of particulars on the eve of trial.  Ex. 72 at ¶22; Ex. 20 at ¶39.

**Response:**    The Government disputes this statement to the extent that Petitioners rely, in part, on support which is not competent evidence insofar as the support, among other things, constitutes inadmissible hearsay and at least in part self-serving statements by one of the Petitioners.

240.    By January 2004, the original funding for the Rigases defense was nearly exhausted. Ex. 72 at ¶22.

**Response:**    The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay.

241.    In January 2004, the Rigases filed a motion seeking an additional $12.8 million for the criminal defense based on estimates for experts, the cost of counsel, and the trial schedule. Ex. 72 at ¶23, Ex. E.

**Response:**    The Government disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 72, Ex. E and respectfully refers the Court to Petitioners' Exhibit 72, Ex. E, which speaks for itself.

242.    In that Motion, the Rigases explained:

> One of the reasons for the postponement of the criminal trial date was the recent production by the Government, Adelphia and

> Buchanan Ingersoll PC of millions of pages of new documentary evidence. In addition, criminal defense counsel has recently received from the Government 20 boxes of proposed trial exhibits and thousands of pages of 3500 materials, including statements of more than 150 witnesses. The legal and factual issues in the criminal case have also expanded substantially by the Government's filing of a Bill of Particulars and 404(B) notice. Because of this onslaught of additional documents and expansion of the criminal case, the Rigases have incurred substantial unanticipated expenses in the review and analysis of this new evidence and in additional trial preparation.

Ex. 72 at ¶ 24, Ex. E at ¶ 14 (pdf p. 47).

**Response:**   Not disputed.

243.    The bankruptcy court held a hearing on the Rigases' motion to access additional funds for their defense on February 18, 2004, which lead counsel for each of the Rigas defendants attended.  Ex. 72 at ¶ 25.

**Response:**   Not disputed.

244.    One of the Rigases' attorneys, Andrew Levander, noted that "this case is of a magnitude of no other that I have ever been involved with" as a defense attorney and federal prosecutor, and that the case "is not incrementally larger, it is exponentially larger."  Ex. 72, Ex. F, Hr'g Tr., *In re Adelphia Commc'ns Corp.*, No. 02-41729 (Bankr. S.D.N.Y. Feb. 18, 2004), at 58-59.

**Response:**   Not disputed.

245.    Mr. Levander noted further that the pretrial period and the trial period were expanded, the defense received millions of pages of documents more than anticipated (including handwritten notes), and the government identified by name 158 witnesses in its 18 U.S.C. § 3500 materials.  Ex. 72, Ex. F at 60-61.

**Response:**   The Government disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 72, Ex. F and respectfully refers the Court to Petitioners' Exhibit 72, Ex. F, which speaks for itself.

246.   Mr. Levander explained how the government's bill of particulars expanded the scope of charges, including by adding "charges that date back 15 years prior to the original charges in the indictment."  Ex. 72, Ex. F at 65.

**Response:**   The Government disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 72, Ex. F and respectfully refers the Court to Petitioners' Exhibit 72, Ex. F, which speaks for itself.

247.   Mr. Levander noted that he had to hire additional paralegals and an attorney, and that his team "[j]ust can't cope with the magnitude."  Ex. 72, Ex. F at 65.

**Response:**   The Government disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 72, Ex. F and respectfully refers the Court to Petitioners' Exhibit 72, Ex. F, which speaks for itself.

248.   Mr. Levander said "we have a number of experts" who "will be charging us substantial sums of money, and they are not going to show unless we can pay them."  Ex. 72, Ex. F at 113.

**Response:**   The Government disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 72, Ex. F and respectfully refers the Court to Petitioners' Exhibit 72, Ex. F, which speaks for itself.

249.   Mr. Levander explained that he and the other defense attorneys "have shown changed circumstances" and "desperate need."  Ex. 72, Ex. F at 115.

**Response:** The Government disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 72, Ex. F and respectfully refers the Court to Petitioners' Exhibit 72, Ex. F, which speaks for itself.

250. Paul Grand, Timothy Rigas's attorney, explained that the government's bill of particulars added conduct relevant to the criminal case as background to the conspiracy going back long before the time periods covered in the indictment Ex. 72, Ex. F at 73.

**Response:** The Government disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 72, Ex. F and respectfully refers the Court to Petitioners' Exhibit 72, Ex. F, which speaks for itself.

251. Mr. Grand explained "[w]e get all of these charges added onto an already enormous indictment seven weeks before trial . . . we are having to prepare both for the original indictment and for this – I'll call it a new indictment under the guise of a bill of particulars." Ex. 72, Ex. F at 74-75.

**Response:** The Government disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 72, Ex. F and respectfully refers the Court to Petitioners' Exhibit 72, Ex. F, which speaks for itself.

252. Peter Fleming, a very experienced criminal lawyer, said, "I've never seen anything like this. We will be there. We will be crippled without additional funds, but we will be there." Ex. 72, Ex. F at 75.

**Response:** The Government disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 72, Ex. F and respectfully refers the Court to Petitioners' Exhibit 72, Ex. F, which speaks for itself.

253. The bankruptcy court granted the Rigases' motion on February 18, 2004, stating:

> I noted last time that the amount requested by the Rigases, while plainly very large in absolute terms, was a drop in the bucket in the context of the fee requests in these cases, and I believe that even with the incremental amount sought here, that remains true . . . . [T]he Rigases, nevertheless, were fair in pointing out that in the context of the total fees the estate is bearing, and understandably so, the amount they are asking for is still a drop in the bucket. And it is hardly excessive in amount when compared to the fees charged by other professionals, Boies Schiller, Covington & Burling, and PWC, who have been focusing on Rigas related matters.

Ex. 72 at ¶26, Ex. F at 130-31 (pdf pp. 88-89).

**Response:** Not disputed.

254. Counsel for the Special Committee, Covington attorney Alan Vinegrad, advised Larry McMichael, Adelphia's civil counsel, that in late 2004, the government informed Adelphia's counsel that if the Rigas Managed Entities ("RMEs") continued to indemnify and advance attorney's fees and defense costs for the Rigases, the government would indict the RMEs. Ex. 72 at ¶52.

**Response:** The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay.

## V. The Effect of the Lack of Funds on the Rigases' Defense and Their Attempts to Retain Counsel

### A. The Rigases' Attempts to Retain Counsel

255. In the days after the March 27, 2002 co-borrowing disclosure, the Rigases, in search of counsel, sought the recommendation of Salomon Smith Barney (the Rigases' financial advisors). Ex. 20 at ¶4.

**Response:**  The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay and is an improper self-serving statement by one of the Petitioners.

256.    Solomon Smith Barney recommended Stephen Fraidin from the law firm Fried Frank. Ex. 20 at ¶4.

**Response:**  The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay and is an improper self-serving statement by one of the Petitioners.

257.    On March 31, 2002, the Rigases met with Mr. Fraidin and Mark Stein (another Fried Frank attorney) to discuss the possibility of Fried Frank representing the Rigases.  Ex. 20 at ¶5.

**Response:**  The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay and is an improper self-serving statement by one of the Petitioners.

258.    Fried Frank agreed to represent the Rigases.  Ex. 20 at ¶6.

**Response:**  The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay and is an improper self-serving statement by one of the Petitioners.

259.    Fried Frank was to be paid by Adelphia for its representation of the Rigases.  Ex. 20 at ¶6.

**Response:**  The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay and is an improper self-serving statement by one of the Petitioners.

260.    Mr. Fraidin stated that he did not believe there was a conflict of interest between the Rigases and Adelphia.  Ex. 20 at ¶ 6.

**Response:**   The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay and is an improper self-serving statement by one of the Petitioners.

261.    Mr. Fraidin added that he thought Fried Frank could be more effective if it represented Adelphia in addition to the Rigases, but if a conflict arose, Fried Frank would continue representing the Rigases and withdraw from representing Adelphia.  Ex. 20 at ¶ 6.

**Response:**   The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay and is an improper self-serving statement by one of the Petitioners.

262.    Accordingly, the Rigases understood that Fried Frank was representing both the Rigas family and Adelphia.  Ex. 20 at ¶ 7.

**Response:**   The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay and is an improper self-serving statement by one of the Petitioners.

263.    Fried Frank never formally resigned from representing the Rigases, nor did it notify the Rigases that it believed a conflict existed based on representing Adelphia and the Rigases.  Ex. 20 at ¶ 7.

**Response:**   The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay and is an improper self-serving statement by one of the Petitioners.  The

Government also disputes this statement the extent that Petitioners' support relies upon improper speculation.

264.    It subsequently became clear that Fried Frank was representing Adelphia and not the Rigases.  Ex. 20 at ¶ 8.

**Response:**   The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, is an improper self-serving statement by one of the Petitioners.  The Government also disputes this statement the extent Petitioners are asserting a legal conclusion.  .

265.    Special Committee member Les Gelber testified at a deposition that Mr. Fraidin indicated he intended to represent both the Rigases and Adelphia and that Tim Rigas was blindsided by Mr. Fraidin suggesting that Fried Frank would decide later whether it would represent Adelphia or the Rigases in the event of a conflict, contrary to what he previously told Tim Rigas.  Ex. 80, Gelber Dep., *Adelphia Commc'ns Corp. v. Deloitte & Touche, LLP* (C.P. Phila. Sept. 20, 2006), at 228-33.

**Response:**   The Government disputes this statement due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay.

266.    The Rigases engaged Dewey Ballantine to "supplement" criminal counsel "due to the sophisticated nature of the transactions under investigation."  Ex. 20 at ¶ 29.

**Response:**   The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, is inadmissible hearsay and a self-serving statement by one of the Petitioners.

267. The Rigases were eventually forced to terminate Dewey Ballantine due to a lack of funds to pay the firm. Ex. 20 at ¶ 29.

**Response:** The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay, constitutes improper opinion testimony, and is an improper self-serving statement by one of the Petitioners.

268. The Rigases were precluded from paying Dewey Ballantine from the $12.8 dollars that the bankruptcy court permitted the Rigases to access in February 2004. Ex. 91, Hr'g Tr., *In re Adelphia Commc'ns Corp.*, No. 02-41729 (Bankr. S.D.N.Y. Feb. 18, 2004), at 139.

**Response:** The Government disputes this statement because the evidence cited says nothing about precluding Petitioners from paying Dewey Ballantine. In any event, to the extent the Petitioners were precluded from making such a payment, such preclusion was ordered by the bankruptcy judge at the request of ACC, not the Government. Ex. 91, at 139-40.

269. The Rigases were unable to continue to retain Dewey Ballantine, which, as of September 2004 at least, did not receive complete payment for its work for the Rigases due to the Rigases' lack of funds. Ex. 92, Hr'g Tr., *In re Adelphia Commc'ns Corp.*, No. 02-41729 (Bankr. S.D.N.Y. Feb. 18, 2004), at 40-41.

**Response:** The Government disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 92 and respectfully refers the Court to Petitioners' Exhibit 92, which speaks for itself. In fact, Exhibit 92 states that Dewey Ballantine had not been paid in full, but provides no explanation for the reason why.

270. Additionally, in the summer of 2002, the Rigases were interested in retaining Kirkpatrick & Lockhart, a law firm that was highly recommended to them, to supplement their

criminal counsel given the magnitude of materials that needed to be reviewed and the overall scope of the case.  Ex. 20 at ¶30; Ex. 94, T. Rigas Supp. Decl. (May 23, 2018), at ¶¶3-5; Ex. 96 at ¶5.

**Response:**  The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay and the self-serving statements of Petitioners.

271.    A team from Kirkpatrick traveled to Coudersport to meet with the Rigases and discuss Kirkpatrick representing the Rigases on a variety of issues, including some relevant to the criminal case.  Ex. 94 at ¶5; Ex. 95, M. Rigas Decl. (May 23, 2018), at ¶3; Ex. 96 at ¶5.

**Response:**  The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay and the self-serving statements of Petitioners.

272.    Despite the Rigases being impressed with Kirkpatrick, they could not retain the firm due to an estimated budget of $15-20 million and a requirement of a substantial retainer.  Ex. 20 at ¶30; Ex. 94 at ¶5; Ex. 95 at ¶3; Ex. 96 at ¶5.

**Response:**  The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay and the self-serving statements of Petitioners.

273.    The Rigases interviewed various New York law firms, but could not retain them due to their high fees.  Ex. 20 at ¶30.

**Response:**  The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay and the self-serving statements by one of the Petitioners.

274.     In late December 2003 or early January 2004, after receiving the 3500 material from the government, the Rigases interviewed and intended to hire Nixon Peabody, which was willing to represent the Rigases in their criminal case.  Ex. 94 at ¶ 7.

**Response:**   The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay and the self-serving statements by one of the Petitioners.

275.     Due to a lack of funds, however, the Rigases were unable to retain Nixon Peabody. Ex. 94 at ¶ 7.

**Response:**   The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay and the self-serving statements by one of the Petitioners.

276.     The Rigases attempted to use their civil counsel, Dilworth Paxson, to perform some work related to the criminal case, but were limited in their ability to do so because Dilworth had to devote its efforts to obtaining funds so the Rigases could fund their civil and criminal defense. Ex. 20 at ¶ 32.

**Response:**   The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay and the self-serving statements by one of the Petitioners.

277.     Dilworth Paxson attorneys appeared in the Rigases' criminal case.  Ex. 13.

**Response:**   Not disputed.

278.     When the bankruptcy court released $12.8 million in 2004 for the Rigases' criminal defense, the Court permitted Dilworth Paxson to be compensated out of the newly released funds for their work on the criminal case.  Ex. 91 at 150.

**Response:** The Government disputes this statement to the extent that Petitioners imply by this statement that Dilworth Paxson was not already working on the Rigases' criminal case. The Government respectfully refers the Court to Petitioners' Exhibit 91 which plainly indicates that Dilworth Paxson was already keeping time sheets for their work on the criminal case before these funds were made available.

### B. The Rigases' Lack of Funds Impaired Their Defense

279. For the counsel the Rigases were able to retain, defense counsel advised, based on the lack of a consistent source of funds, that each defense firm's participation at trial would be limited to a single attorney per defendant absent the Rigases obtaining access to more money. Ex. 20 at ¶33.

**Response:** The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay and self-serving statements by one of the Petitioners.

280. Much of the Rigases' funds available for counsel went to efforts in the bankruptcy court to obtain additional funds for their defense. Ex. 20 at ¶34.

**Response:** The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay and self-serving statements by one of the Petitioners

281. The three law firms representing the Rigases in their criminal case retained Navigant Consulting in January 2003. Ex. 76, Maloney Decl. (Sept. 30, 2011), at ¶2.

**Response:** Not disputed.

282. Navigant was retained to, among other things, review documents in the Rigases' criminal case. Ex. 76 at ¶3.

**Response:**  The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay.

283.  According to the Managing Director in the Disputes and Investigations practice of Navigant, Navigant was asked to review a "small subset of what [he] recall[s] to be over 400 CDs containing documents relevant to the case produced by the government."  Ex. 76 at ¶4.

**Response:**  The Government does not dispute that the Managing Director made these statements.

284.  Navigant was only asked to review a small subset because the Rigases would review the remaining documents themselves in order to save money.  *See* Ex. 76 at ¶5.

**Response:**  The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay.

285.  The Rigases and their non-professional review team were forced to conduct a page-by-page review in a non-searchable format using an unsophisticated coding system.  Ex. 20 at ¶37.

**Response:**  The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay and a self-serving statement by one of the Petitioners.  Further, this statement is disputed to the extent that supporting evidence provided by Petitioners does not support the assertion that the Rigas team was a "non-professional review team."

286.  The Rigases and their team also reviewed hundreds of boxes of hardcopy documents.  Ex. 20 at ¶38.

**Response:**  The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes self-serving statements by one of the Petitioners.

287.   The Rigases asked Navigant initially to use a small review team (about three full-time professionals) to lower cost.  Ex. 76 at ¶ 10.

**Response:**  The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay.

288.   Once the Rigases received funding from the bankruptcy court, Navigant expanded its team to 10-20 professionals.  Ex. 76 at ¶ 12.

**Response:**  The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay.

289.   According to Navigant's Managing Director Michael Maloney: "[I]f Navigant had been given a larger budget at the commencement of our Engagement, we were in a position to add, and would have added, additional skilled professional resources to our team.  Had that occurred, I believe the review of documents in the case from the commencement of our Engagement until August 2003 likely may have been much more productive and effective."  Ex. 76 at ¶ 11.

**Response:**  The Government does not dispute that Maloney made this statement.  The Government disputes the extent to which Petitioners imply by reference to this quote that Navigant's review, as a whole, was underfunded because this quote only speaks to the period

until August 2003.  The Government also disputes this statement to the extent that Petitioners' support relies upon improper speculation.

290.    The Rigas personal, non-Navigant review team was of a "modest size" according to the Navigant Managing Director.  Ex. 76 at ¶7.

**Response:**  The Government does not dispute that Maloney made this statement.

291.    Many of the documents that Navigant reviewed could only be reviewed on a page-by-page basis because they were in .TIFF format.  Ex. 76 at ¶6.

**Response:**  The Government disputes this statement to the extent that it implies that the Government produced documents to Petitioners in a format outside the normal course of discovery.

292.    The documents in the Government's CD Production were not searchable.  Ex. 76 at ¶6.

**Response:**  The Government disputes this statement to the extent that it implies that the Government produced documents to Petitioners in a format outside the normal course of discovery.

293.    Based on the condition of the government's production, the resulting cumbersome review process, and the Rigases' review team taking on most of the review, the Managing Director of Navigant said that in his view, "the Government CD Production was likely not adequately reviewed in preparation for the criminal trial (which began in early 2004)."  Ex. 76 at ¶7.

**Response:**  The Government disputes this statement to the extent that Petitioners rely, in part, on support which is not competent evidence insofar as the support, among other things, constitutes impermissible opinion evidence.  Further, the Government disputes this statement to

the extent that Petitioners' support relies upon improper speculation and to the extent Petitioners imply the Government produced documents to Petitioners in a format outside the normal course of discovery.

294.    If the government production of documents had been searchable and capable of "coding," review could have been more effective.  Ex. 76 at ¶ 8.

**Response:**   The Government disputes this statement to the extent that Petitioners rely, in part, on support which is not competent evidence insofar as the support, among other things, constitutes impermissible opinion evidence.  Further, the Government disputes this statement to the extent that Petitioners' support relies upon improper speculation and to the extent Petitioners imply the Government produced documents to Petitioners in a format outside the normal course of discovery.

295.    Close to the criminal trial, Buchanan Ingersoll made large document productions that, in Michael Maloney's opinion (a Managing Director at Navigant), "[were] not adequately reviewed in preparation for the criminal trial."  Ex. 76 at ¶ 9.

**Response:**   The Government disputes this statement to the extent that Petitioners rely, in part, on support which is not competent evidence insofar as the support, among other things, constitutes improper opinion evidence.  The Government also disputes this statement to the extent that Petitioners' support relies upon improper speculation or implies productions by Buchanan Ingersoll were made improperly and/or at the Government's direction.

296.    Many of the documents provided by Buchanan Ingersoll were not provided until two-to-three months before trial and were not reviewed by anyone.  Ex. 20 at ¶ 40.

**Response:**   The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes

inadmissible hearsay and self-serving statements by one of the Petitioners. The Government also disputes this statement to the extent that it implies productions by Buchanan Ingersoll were made improperly and/or at the Government's direction.

297. Some CDs provided by the government were corrupt and could not be reviewed, but the Rigases lacked the resources to follow-up. Ex. 20 at ¶ 40.

**Response:** The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay, improper opinion testimony, and self-serving statements by one of the Petitioners. The Government also disputes this statement to the extent Petitioners imply the Government produced documents to Petitioners in a format outside the normal course of discovery.

298. Buchanan Ingersoll represented the Rigas family for many years going back to the time before Adelphia became a public company, and was therefore an important source of information relating to transactions at issue in the criminal case. Ex. 20 at ¶ 44.

**Response:** The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay and self-serving statements by one of the Petitioners. The Government also disputes this statement to the extent that Petitioners are asserting a legal conclusion and to the extent that it constitutes improper speculation about the importance of information maintained by Buchanan Ingersoll.

299. Buchanan Ingersoll had hundreds of boxes of hardcopy documents related to the firm's representation of the Rigases through the mid-1990s that Tim Rigas, a former Adelphia

employee, and a junior associate at the Rigases' civil firm could only briefly review over a day or two.  Ex. 20 at ¶ 45.

**Response:**  The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay and self-serving statements by one of the Petitioners.  The Government also disputes this statement to the extent that Petitioners' support relies upon improper speculation.

300.    Tim Rigas's trial counsel, Paul Grand, learned shortly into his representation that the Rigases had few available liquid assets with which to pay experts, consultants, and counsel, after initial retainers were exhausted, and that the Rigases' prosecution "would be historic in terms of its overall complexity and scope."  Ex. 77, Grand Decl. (Oct. 3, 2011), at ¶ 4.

**Response:**  The Government disputes this statement to the extent that Petitioners rely, in part, on support which is not competent evidence insofar as the support, among other things, constitutes improper opinion testimony and speculation.  The Government also disputes this statement to the extent that Petitioners are asserting a legal conclusion.

301.    From late 2002 through early 2003, the Rigases received approximately 8 million pages of documents that had to be reviewed for the Rigases' defense.  Ex. 77 at ¶ 5.

**Response:**  The Government disputes this statement to the extent that Petitioners rely, in part, on support which is not competent evidence insofar as the support, among other things, constitutes improper opinion testimony.  The Government also disputes this statement to the extent that Petitioners are asserting a legal conclusion.  Further, the Government disputes this statement to the extent that Petitioners' support relies upon improper speculation.

302.    Although Grand recommended and preferred to have attorneys and an outside consultant conduct the document review, the Rigases and a team of former Adelphia employees undertook the bulk of the review due to a lack of funds.  Ex. 77 at ¶ 6.

**Response:**    The Government disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 77 and respectfully refers the Court to Petitioners' Exhibit 77, which speaks for itself.

303.    Grand did not think the Rigases' non-professional team's review would be as complete or useful as a review conducted by counsel and consultants.  Ex. 77 at ¶ 6.

**Response:**    The Government disputes this statement to the extent that Petitioners rely, in part, on support which is not competent evidence insofar as the support, among other things, constitutes improper opinion testimony.  The Government also disputes this statement to the extent that Petitioners' support relies upon improper speculation.  Further, the Government disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 77 and respectfully refers the Court to Petitioners' Exhibit 77, which speaks for itself.

304.    Navigant was retained in January 2003 to conduct a professional review, but even after Navigant was retained, the Rigases conducted the majority of the review of documents produced by the U.S. Attorney's Office.  Ex. 77 at ¶ 6.

**Response:**    The Government disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 77 and respectfully refers the Court to Petitioners' Exhibit 77, which speaks for itself.

305.    In 2003, Grand learned that Adelphia and its Special Litigation Committee paid professionals for approximately 15,000 to 16,000 hours of work to create an index of Adelphia documents on an issue-by-issue basis.  Ex. 77 at ¶ 8.

**Response:**   The Government disputes this statement due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay.

306.    The Rigases could not afford to create such an index.  Ex. 77 at ¶8.

**Response:**   The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay.  The Government also disputes this statement to the extent that Petitioners are asserting a legal conclusion.  Further, the Government disputes this statement to the extent that Petitioners fail to provide information regarding the true cost of developing such an index in relation to funds that were available to the Rigases.

307.    The Rigases moved to compel production of that index, but their motion was denied. Ex. 77 at ¶8.

**Response:**   The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay.

308.    Due to their lack of resources, the Rigases missed significant exculpatory documents. Ex. 77 at ¶7; Ex. 20 at ¶41.

**Response:**   The Government disputes this statement to the extent that Petitioners rely, in part, on support which is not competent evidence insofar as the support, among other things, constitutes inadmissible hearsay and self-serving statements.  Further, the Government disputes this statement to the extent that Petitioners are asserting a legal conclusion by characterizing the referenced documents as exculpatory.  The Government also disputes the extent to which

Petitioners' statement assumes that the reason these documents were not found was caused by a lack of resources.

309.    Once such document was a 1999 memorandum from James Brown to Adelphia's Board dealing with the concept of co-borrowing and explicitly disclosing to the Board that the Rigases were using co-borrowed funds for their purchases of Adelphia stock.  Ex. 77 at ¶7, Ex. A.

**Response:**    The Government disputes this statement to the extent that Petitioners rely, in part, on support which is not competent evidence insofar as the support constitutes an improper opinion.  The Government also disputes this statement to the extent that Petitioners are asserting a legal conclusion by characterizing the referenced documents as exculpatory.  Further, the Government disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 77, Ex. A, and respectfully refers the Court to Petitioners' Exhibit 77, Ex. A, which speaks for itself.

310.    The exculpatory 1999 memorandum from James Brown was attached to letters from multiple banks indicating that the banks knew of and approved the use of the co-borrowed funds for stock purchases.  Ex. 20 at ¶42.

**Response:**    The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes an improper opinion and includes self-serving statements by one of the Petitioners.  The Government also disputes this statement to the extent that Petitioners are asserting a legal conclusion by characterizing the referenced documents as exculpatory.  Further, the Government disputes this statement the extent that Petitioners' support relies upon improper speculation.

311.    Another such document was a January 1998 memorandum from Bruce Booken to Carl Rothenberger and Paula Zawadzki memorializing a conversation with Dean Marshall

regarding how the Rigases could use Adelphia credit availability to fund purchases of stock. Ex. 77 at ¶7, Ex. B; Ex. 20 at ¶43.

**Response:**   The Government disputes this statement to the extent that Petitioners rely, in part, on support which is not competent evidence insofar as the support constitutes an improper opinion and includes self-serving statements by one of the Petitioners. The Government also disputes this statement to the extent that Petitioners are asserting a legal conclusion by characterizing the referenced documents as exculpatory. The Government further disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 77, Ex. B and respectfully refers the Court to Petitioners' Exhibit 77, Ex. B, which speaks for itself.

312.   The 1998 communication between Booken and Rothenberger was part of the Buchanan Ingersoll production. Ex. 20 at ¶43.

**Response:**   The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes self-serving statements by one of the Petitioners. The Government also disputes this statement to the extent that Petitioners are asserting a legal conclusion by characterizing the referenced documents as exculpatory.

313.   Due to Adelphia's refusal to advance defense costs, the Rigases' attorneys could not mount a defense in the same way they would have if Adelphia had advanced fees. Ex. 20 at ¶36.

**Response:**   The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes self-serving statements by one of the Petitioners, and an improper opinion. The Government also disputes this statement in its entirety because it states a legal conclusion. Further, the

Government disputes this statement the extent that Petitioners' support relies upon improper speculation.

314.    The Rigases and their counsel were limited in their ability to interview third-party witnesses due to cost constraints.  Ex. 20 at ¶47.

**Response:**    The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay, self-serving statements by one of the Petitioners, and an improper opinion. The Government also disputes this statement to the extent that Petitioners are asserting a legal conclusion.  Further, the Government disputes this statement the extent that Petitioners' support relies upon improper speculation.

315.    Financial constraints impaired the Rigases' ability to mount an affirmative defense due in part to the amount of time necessary to prepare a witness to testify.  Ex. 20 at ¶48.

**Response:**    The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay, self-serving statements by one of the Petitioners, and an improper opinion. The Government also disputes this statement to the extent that Petitioners are asserting a legal conclusion.  Further, the Government disputes this statement the extent that Petitioners' support relies upon improper speculation.

316.    The Rigases' attorneys' inability to properly prepare witnesses played a critical role in Tim Rigas's decision not to testify.  Ex. 20 at ¶48.

**Response:**    The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay, self-serving statements by one of the Petitioners, and an improper opinion.

The Government also disputes this statement to the extent that Petitioners are asserting a legal conclusion. Further, the Government also disputes this statement the extent that Petitioners' support relies upon improper speculation.

317.     Although each of the Rigas defendants had separate counsel, the Rigases' lack of funds made it cost-prohibitive to fully educate each attorney on all the issues in the case. Ex. 20 at ¶ 49.

**Response:**    The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay, self-serving statements by one of the Petitioners, and an improper opinion. The Government also disputes this statement to the extent that Petitioners are asserting a legal conclusion. Further, the Government also disputes this statement the extent that Petitioners' support relies upon improper speculation.

318.     Consequently, for example, Tim Rigas was forced to rely on lawyers other than his own counsel to rebut the government's arguments on particular issues. Ex. 20 at ¶ 49.

**Response:**    The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes self-serving statements by one of the Petitioners, and an improper opinion. The Government also disputes this statement to the extent that Petitioners are asserting a legal conclusion. Further, the Government also disputes this statement the extent that Petitioners' support relies upon improper speculation.

319.     On February 18, 2004, in a bankruptcy court hearing regarding the Rigases' motion to unfreeze assets to fund their defense, Peter Fleming, one of the Rigases' criminal attorneys,

indicated that the defense was "underprepared."  Ex. 72, Ex. F, Hr'g Tr., *In re Adelphia Commc'ns Corp.*, No. 02-41729 (Bankr. S.D.N.Y. Feb. 18, 2004), at 115-16.

**Response:**  The Government does not dispute that Fleming made the quoted statement.  The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes an improper opinion.  The Government also disputes this statement to the extent that Petitioners are asserting a legal conclusion.

320.  Tim Rigas's criminal defense attorney, Paul Grand, said with respect to the funds the bankruptcy court made available to the Rigases in the fall of 2003 that "[h]ad this money been available earlier in the case, defense counsel could have done far more to prepare for the upcoming trial, which at that point was scheduled to begin in less than three months."  Ex. 77 at ¶9.

**Response:**  The Government does not dispute that Grand made the quoted statement.  The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes an improper opinion.  The Government also disputes this statement to the extent that Petitioners are asserting a legal conclusion.  The Government also disputes this statement to the extent that Petitioners' support relies upon improper speculation.

### C.  The Amount of Money the Rigases Ultimately Received Was Insufficient to Remedy the Damage Caused by Their Initial Lack of Funds

321.  Counsel for the Rigases (and Navigant) billed about $4.2 million as compared to $60 million billed by Boies, Covington, and PWC through October 2003.  Ex. 72 at ¶¶27-33.

**Response:**  The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes

inadmissible hearsay.  Further, the government disputes the extent to which Petitioners' inclusion of this statement is misleading because it implies that the work of the Special Committee and the criminal defense are comparable in size and scope.

322.    In Adelphia's 10-K filed October 6, 2005, Adelphia reported:

> *Investigation and re-audit related fees.*    We incurred costs that, although not directly related to the Chapter 11 filing, are related to the investigation of the alleged actions of Rigas Management and related efforts to comply with applicable laws and regulations. These expenses include re-audit, legal and forensic consulting fees and aggregated $125 million and $52 million for the years ending December 31, 2004 and 2003, respectively.

Ex. 81, Adelphia Commc'ns Corp., 10-K (Oct. 6, 2005).

**Response:**  Not disputed.

323.    Of the $27.8 million in criminal defense funding permitted by the bankruptcy court in its two orders, the Rigases' defense counsel received a total under $14 million (about $5.1 million for Mr. Fleming's firm, $4.1 million for Mr. Grand, and $4.6 million for Navigant.  Ex. 72 at ¶ 34.

**Response:**   The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay.  The Government also disputes the accuracy of this statement to the extent that at least two law firms, Dilworth Paxson and Davis Polk & Wardwell, are omitted from the total sum.

324.    The funds authorized by the bankruptcy court were exhausted before the end of the end of the prosecution's case.  Ex. 72 at ¶ 35.

**Response:**   The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay.

325.   The criminal defense firms were owed, collectively, over $1.1 million for work completed through the date of the jury's verdict, after exhausting their retainers.  Ex. 72 at ¶ 35.

**Response:**   The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay.

## VI.    The Rigases' Inability to Access Witnesses Harmed Their Defense

326.   Paula Zawadzki, a Buchanan Ingersoll partner who represented Adelphia with respect to the co-borrowing agreements, understood that the co-borrowers (Adelphia and the Managed Entities) would have rights of contribution against each other if one co-borrower repaid the bank for funds used by another co-borrower.  *See* Ex. 85, Zawadzki Dep., *Adelphia Commc'ns Corp. v. Deloitte & Touche, LLP*, No. 000598 (C.P. Phila. Aug. 14, 2006), at 27, 179-84.

**Response:**   The Government disputes this statement to the extent Petitioners have provided supporting documentation in a format which is missing pages and, therefore, devoid of necessary context.  The Government also disputes this statement to the extent that the language relied upon by Petitioners is perfunctory and vague such that it lacks the clarity required to derive meaning with certainty.  Further, the Government disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 85 and respectfully refers the Court to Petitioners' Exhibit 85, which speaks for itself.

327.   At trial, James Brown testified that he discussed with Mike Brady, among others, how Adelphia "was not reporting its true EBITDA results to the public."  Trial Tr. 6234.

**Response:** Not disputed.

328. Mike Brady, Adelphia Vice President of Financial Operations, testified at a deposition that he "certainly didn't know that [anyone was] manipulating EBITDA." Ex. 86 at 41.

**Response:** The Government disputes this statement to the extent Petitioners have provided supporting documentation in a format which is missing pages and, therefore, devoid of necessary context. The Government also disputes this statement insofar as it implies anything about whether others were manipulating EBITDA as opposed to Brady's knowledge of such facts. Further, the Government disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 86 and respectfully refers the Court to Petitioners' Exhibit 86, which speaks for itself.

329. Mike Brady did not question whether the senior financial executives of Adelphia were doing things meant to overstate or manipulate EBITDA. Ex. 86 at 41, 52-56, 226-27.

**Response:** The Government disputes this statement to the extent Petitioners have provided supporting documentation in a format which is missing pages and, therefore, devoid of necessary context. The Government also disputes this statement insofar as it implies anything about whether others were manipulating EBITDA as opposed to Brady's knowledge of such facts. The Government respectfully refers the Court to the plain language of Petitioners' Exhibit 86, the language of which speaks for itself.

330. Mike Brady testified that he "knew that Scientific Atlanta and Motorola were structuring" the marketing support agreements with Adelphia and that his sense at the time was that "there [wasn't] anything wrong" with the agreements. Ex. 86 at 117-18.

**Response:** The Government does not dispute that Brady testified as quoted. The Government disputes this statement to the extent that Petitioners rely, in part, on support which

is not competent evidence insofar as the support, among other things, constitutes an improper

opinion.  The Government also disputes this statement to the extent Petitioners have provided

supporting documentation in a format which is missing pages and, therefore, devoid of necessary

context.  The Government respectfully refers the Court to the plain language of Petitioners'

Exhibit 86, the language of which speaks for itself.

331.    In the engineering department, Andrew Zorichak was responsible for producing a

report detailing Adelphia's rebuilding of cable lines.  Ex. 84 at ¶8.

**Response:**   Not disputed.

332.    The reports included "the percentage completions" of the rebuild efforts, which "were

meant only as an internal report to be used by the engineering and operations departments as an

up-to-date resource on the status of the various projects that were ongoing."  Ex. 84 at ¶¶8, 10.

**Response:**   Not disputed.

333.    Zorichak "relied on the engineers in the field to submit their numbers to me on a

weekly basis" to create the reports.  Ex. 84 at ¶8.

**Response:**   Not disputed.

334.    Zorichak "did not always receive all of the information from the engineers, which

meant that sometimes [his] reports were not as accurate as they would have been with the

information."  Ex. 84 at ¶8.

**Response:**   The Government disputes this statement to the extent that Petitioners rely, in

part, on support which is not competent evidence insofar as the support, among other things,

constitutes inadmissible hearsay and an improper opinion.

335.    At trial, Karen Chrosniak testified that Adelphia overstated to investors its "plant

rebuild" metrics (metrics regarding the progress of Adelphia's cable infrastructure projects) as

compared to internal reports made by Andrew Zorichak. *E.g.*, Trial Tr. 5230-77 (testifying, for example, that Zorichak's reports showed a rebuild completion percentage more than 10% below what was reported to investors).

**Response:** The Government disputes this statement to the extent Petitioners characterize the trial transcript and respectfully refers the Court to the trial transcript, which speaks for itself.

336. James Brown also testified that Adelphia overstated to investors its "plant rebuild" metrics. *E.g.*, Trial Tr. 6294-97, 6336-39.

**Response:** The Government disputes this statement to the extent Petitioners characterize the trial transcript and respectfully refers the Court to the trial transcript, which speaks for itself.

337. Mr. Zorichak explained that he knew that the numbers in his internal reports "did not always fully capture work in progress." Ex. 84 at ¶8.

**Response:** The Government disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 84 and respectfully refers the Court to Petitioners' Exhibit 84, which speaks for itself.

338. Specifically, Mr. Zorichak's reports only captured fully completed upgrades to cable plant. Ex. 84 at ¶8 ("My reports only reflected the percentage of plant that had been submitted. For example, cable plant was considered rebuilt only when every single step in the rebuild process, however small, had been completed and reverse activation occurred, meaning that the cable plant had two-way capabilities. If 99% of the capital necessary to upgrade a particular cable plant had been spent, but that plant was not yet reverse activated, the internal report would reflect 0% plant upgraded, as opposed to 99%, which would be the completion percentage in terms of dollars spent.").

**Response:**   The Government disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 84 and respectfully refers the Court to Petitioners' Exhibit 84, which speaks for itself.

339.    Mr. Zorichak was not in charge of confirming whether publicly reported rebuild completion percentages were accurate.  Ex. 84 at ¶ 10.

**Response:**   The Government disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 84 and respectfully refers the Court to Petitioners' Exhibit 84, which speaks for itself.

340.    At a deposition, Dean Marshall recalled that the Board of Directors of Adelphia was aware that the Rigases were using co-borrowing facilities to generate cash to buy stock in Adelphia. Ex. 88, Dean Marshall Dep., *Adelphia Commc'ns Corp. v. Deloitte & Touche LLP* (Feb. 2, 2006), at 190.

**Response:**   The Government disputes this statement to the extent that Petitioners rely, in part, on support which is not competent evidence insofar as the support, among other things, constitutes inadmissible hearsay.  The Government also disputes this statement to the extent to which Petitioners have provided supporting documentation in a format which is missing pages and, therefore, devoid of necessary context.  Further, the Government disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 88 and respectfully refers the Court to Petitioners' Exhibit 88, which speaks for itself.

341.    Marshall testified, "I think it was commonly understood that the Rigas family did not have liquidity sources outside of its investment in cable properties.  And so its primary mechanism to raise capital for the purpose of – for any purpose was based on leveraging existing cash flow owned by their cable properties.  And so I think it was commonly understood by

people that were familiar with these activities that, to the extent that the Rigas family was purchasing securities of Adelphia, that the capital for those securities was coming through borrowings on these – through these credit facilities." Ex. 88 at 205

**Response:** The Government does not dispute that Marshall testified as quoted. The Government disputes this statement to the extent that Petitioners rely, in part, on support which is not competent evidence insofar as the support, among other things, constitutes an improper opinion. The Government also disputes this statement to the extent Petitioners have provided supporting documentation in a format which is missing pages and, therefore, devoid of necessary context.

342.    Marshall testified that Buchanan Ingersoll worked on the co-borrowing transactions. Ex. 88 at 211.

**Response:** The Government disputes this statement to the extent that Petitioners rely, in part, on support which is not competent evidence insofar as the support, among other things, constitutes inadmissible hearsay. The Government also disputes this statement to the extent Petitioners have provided supporting documentation in a format which is missing pages and, therefore, devoid of necessary context. Further, the Government disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 88 and respectfully refers the Court to Petitioners' Exhibit 88, which speaks for itself.

343.    Marshall did not recall Bruce Booken from Buchanan Ingersoll or anyone else indicating that there was anything improper about the Rigases using the proceeds of a co-borrowing transaction to purchase Adelphia securities. Ex. 88 at 209-11.

**Response:** The Government disputes the Petitioners' inclusion of this information as it is irrelevant and immaterial to the issues set forth in their 2255 Motion. The Government also

disputes this statement to the extent to which Petitioners have provided supporting documentation in a format which is missing pages and, therefore, devoid of necessary context. Further, the Government disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 88 and respectfully refers the Court to Petitioners' Exhibit 88, which speaks for itself.

344.    Nobody ever told Marshall that the use of co-borrowing proceeds should be withheld from Deloitte.  Ex. 88 at 244.

**Response:**    The Government also disputes this statement to the extent that Petitioners have provided supporting documentation in a format which is missing pages and, therefore, devoid of necessary context.  Further, the Government disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 88 and respectfully refers the Court to Petitioners' Exhibit 88, which speaks for itself.

345.    Marshall also testified that he understood that the Rigases had the ability to pay back any of their debts to Adelphia.  Ex. 88 at 94-95.

**Response:**    The Government disputes this statement to the extent that Petitioners rely, in part, on support which is not competent evidence insofar as the support, among other things, constitutes inadmissible hearsay and an improper opinion.  Further, the Government disputes this statement to the extent that Petitioners' support relies upon improper speculation and supporting documentation that is in a format which is missing pages and, therefore, devoid of necessary context.  The Government disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 88 and respectfully refers the Court to Petitioners' Exhibit 88, which speaks for itself.

346. At a deposition in 2014, Dean Marshall testified that he, Adelphia's Board, Buchanan Ingersoll, and Deloitte were aware that the Rigases had used co-borrowed funds to buy Adelphia stock. Ex. 90 at 31-33.

**Response:** The Government disputes this statement to the extent that Petitioners rely, in part, on support which is not competent evidence insofar as the support, among other things, constitutes inadmissible hearsay and an improper opinion. Further, the Government disputes this statement to the extent that Petitioners' support relies upon improper speculation and Petitioners have provided supporting documentation in a format which is missing pages and, therefore, devoid of necessary context. The Government disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 90 and respectfully refers the Court to Petitioners' Exhibit 90, which speaks for itself.

347. At his 2006 deposition, when asked whether he held the view that there was anything inappropriate about using co-borrowed funds to buy stock, Dean Marshall testified, "I didn't have the view and I was not aware that anybody else had that view." Ex. 88 at 79.

**Response:** The Government does not dispute that Marshall testified as quoted. The Government disputes this statement to the extent that Petitioners rely, in part, on support which is not competent evidence insofar as the support, among other things, constitutes inadmissible hearsay and an improper opinion. Further, the Government disputes this statement to the extent that Petitioners have provided supporting documentation in a format which is missing pages and, therefore, devoid of necessary context. The Government disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 88 and respectfully refers the Court to Petitioners' Exhibit 88, which speaks for itself.

348.     Dean Marshall was surprised by the market's reaction to Adelphia's disclosures in late March 2002 because he did not believe the disclosures regarding co-borrowing were "revelatory."  Ex. 90 at 82.

   **Response:**   The Government does not dispute that Marshall testified as quoted.  The Government disputes this statement to the extent that Petitioners rely, in part, on support which is not competent evidence insofar as the support, among other things, constitutes inadmissible hearsay and an improper opinion.  Further, the Government disputes this statement to the extent that Petitioners have provided supporting documentation in a format which is missing pages and, therefore, devoid of necessary context.  The Government disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 90 and respectfully refers the Court to Petitioners' Exhibit 90, which speaks for itself.

349.     Dean Marshall testified that Deloitte "closely monitored" and "closely reviewed" Adelphia's accounting affecting EBITDA, including with respect to capitalization of labor.  Ex. 90 at 62-63.

   **Response:**   The Government does not dispute that Marshall testified as quoted.  The Government disputes this statement to the extent that Petitioners rely, in part, on support which is not competent evidence insofar as the support, among other things, constitutes inadmissible hearsay and an improper opinion.  Further, the Government disputes this statement to the extent that Petitioners have provided supporting documentation in a format which is missing pages and, therefore, devoid of necessary context.  The Government disputes this statement to the extent Petitioners characterize Petitioners' Exhibit 90 and respectfully refers the Court to Petitioners' Exhibit 90, which speaks for itself.

350.     At trial, the government elicited testimony from James Brown to prove that the Rigases fraudulently inflated Adelphia's EBITDA through, among other things, capitalization of labor.  Trial Tr. at 6256, 7291, 10588-89 (testimony of James Brown and government's closing statement).

**Response:**   The Government disputes this statement to the extent Petitioners characterize the trial transcript and respectfully refers the Court to the trial transcript, which speaks for itself.

351.     When the Rigases' former counsel Larry McMichael mentioned exculpatory documents from Buchanan Ingersoll that he had discovered after the trial to AUSA Clark, AUSA Clark said the documents were not new and that "the government would have indicted Buchanan if it had one more shred of evidence against it."  Ex. 72 at ¶47.

**Response:**   The Government disputes this statement as misleading in that it implies that the quoted language was stated by Clark verbatim, but Petitioners' Exhibit 72 reflects that McMichael was paraphrasing.  The Government also disputes this statement because Petitioners are asserting a legal conclusion by characterizing the referenced documents as exculpatory. Further, the Government disputes this statement to the extent Petitioners' statement assumes that the reason these documents were not found was, in fact, caused by a lack of resources, and that Petitioners rely, in part, on support which constitutes an improper opinion.  Finally, the Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay

352.     James Brown testified at trial that Adelphia's Board was not aware that the Rigas family intended to use co-borrowing funds to purchase Adelphia securities.  *See, e.g.*, Trial Tr. 6799-80, 6803.

**Response:** The Government disputes this statement to the extent Petitioners characterize the trial transcript and respectfully refers the Court to the trial transcript, which speaks for itself.

353.  At trial, the government argued in its closing that the Rigases "misled" and "tried to trick" their attorneys and accountants, including Buchanan Ingersoll, who did not have the full information about the Rigases' relevant conduct.  Trial Tr. at 10,603-04.

**Response:** Not disputed.

## VII. James Brown Did Not Have the Funds to Mount a Defense, Influencing His Decision to Cooperate with the Government

354.  James Brown approached Tim Rigas in a panic when Adelphia advised that it would no longer pay his legal costs.  Ex. 20 at ¶ 50.

**Response:** The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay and self-serving statements by one of the Petitioners.  The Government also disputes the Petitioners' inclusion of this information as it is irrelevant and immaterial to the issues set forth in their 2255 Motion.

355.  Mr. Brown asked the Rigas family for a loan to pay for an attorney.  Ex. 20 at ¶ 50.

**Response:** The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay and self-serving statements by one of the Petitioners.  The Government also disputes the Petitioners' inclusion of this information as it is irrelevant and immaterial to the issues set forth in their 2255 Motion.

356.  Mr. Brown indicated that he did not believe anyone at Adelphia had done anything wrong, and believed that the charges against him were defensible.  Ex. 20 at ¶ 50.

**Response:**   The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay and self-serving statements by one of the Petitioners.  The Government also disputes the Petitioners' inclusion of this information as it is irrelevant and immaterial to the issues set forth in their 2255 Motion.

357.    Mr. Brown was concerned, however, about how he would be able to defend against charges arising out of such complex transactions without a source of funding for his defense attorneys.  Ex. 20 at ¶ 50.

**Response:**   The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes inadmissible hearsay and self-serving statements by one of the Petitioners.  The Government also disputes the Petitioners' inclusion of this information as it is irrelevant and immaterial to the issues set forth in their 2255 Motion.

358.    The Rigases agreed to lend Mr. Brown $400,000 to partially cover an $800,000-$900,000 retainer.  Ex. 20 at ¶ 50.

**Response:**   The Government disputes this statement in its entirety due to Petitioners' failure to provide competent supporting evidence insofar as the support, among other things, constitutes self-serving statements by one of the Petitioners.  The Government also disputes the Petitioners' inclusion of this information as it is irrelevant and immaterial to the issues set forth in their 2255 Motion.

359.    In April 2013, Michael Rigas won a judgment in Pennsylvania state court based on Mr. Brown's failure to pay back the $400,000 loan.  Ex. 87, Notice of Filing of Foreign Judgment.

**Response:**   The Government also disputes the Petitioners' inclusion of this information as it is irrelevant and immaterial to the issues set forth in their 2255 Motion.

360.    The Court "f[ound], by clear and convincing evidence, that Defendant James Brown did contract with Plaintiff Michael Rigas and Timothy Rigas to borrow $400,000.00 by an oral contract in July of 2002 and that Defendant James Brown, in refusing to repay this unsecured loan, breached said contract." Ex. 87.

**Response:**   The Government also disputes the Petitioners' inclusion of this information as it is irrelevant and immaterial to the issues set forth in their 2255 Motion.

## II.    THE GOVERNMENT'S STATEMENT OF ADDITIONAL MATERIAL FACTS

361.    On October 14, 2002, Randall Fisher, Adelphia's General Counsel, sent a memorandum to Adelphia employees (the "Fisher Memorandum") entitled, "Contact with members of the Rigas Family, employees of Rigas Family private companies or former employees indicted by the Federal Government." Pet'rs' 56.1 Ex. 53 at 1 (Randall Fisher's memorandum to Adelphia employees regarding contact with the Rigases dated October 14, 2002).

362.    The Fisher Memorandum stated:

> The Company is committed to cooperating with these federal agencies, because it is the right thing to do and because cooperating with the government will help recover damages done by the Rigases and will help the Company avoid prosecution. . . .  Also, Adelphia continues to pursue its own claims against the Rigas Family. . . .
>
> . . .  In the case of any contact regarding a business matter between the Rigas Family or Rigas Family private company and Adelphia, whether at work or in a social setting, please refer all contacts to the Legal Department. . . .
>
> There is no exception to this situation. . . .

> . . . [I]f such meetings occur, employees will not disclose or divulge any confidential information concerning the Company, the ongoing investigation or the bankruptcy proceeding. . . .
>
> . . . .
>
> The Legal Department will review the matter and may refer the matter to appropriate government agencies and litigation counsel for review.

Pet'rs' 56.1 Ex. 53 at 1-2.

363.    In a deposition dated April 16, 2018, Randall Fisher ("Fisher Deposition") testified as follows:

> Q: Did anyone from the government direct you to send this letter out?
>
> A: No
>
> Q: You testified earlier that it was outside counsel that asked you to send this letter out?
>
> A: That's correct.
>
> Q: Did outside counsel ever tell you that the government had requested the implementation of this no contact policy?
>
> A. No, they did not tell me that.

Declaration of Daniel H. Wolf in Support of the United States of America's Memorandum of Law in Opposition to Petitioners' Motion for a Judgment of Law on the Interference Claims ("Wolf Decl."), Ex. A (Tr. of April 16, 2018 Dep. of Randall Fisher), at 93.

364.    During the Fisher Deposition, Randall Fisher also testified:

> Q: Do you know why you were directed to send this out?
>
> A: Yes.  Somebody, and I don't remember who, got word that John Rigas was calling employees and asking in classic John style, "What's going on?"
>
> Q: Uh-huh.

A: And that there was concern that giving out information out [sic] to people that didn't work for the company. Because I think at this point they did not.

Q: Yes. October 14, 2002.

A: So that it would have been no different than giving insider trading information to – so we also had not filed for bankruptcy at this point, I don't think. So I think there was a serious concern about any information, and people from the outside world probably didn't have as easy a time accessing information as the Rigases might.

Wolf Decl., Ex. A, at 61:17-62:12.

365. On February 4, 2003, AUSA Christopher Clark stated the following at a hearing before Judge Gelber:

I should note also that there are at least a couple of references in the brief to the Government trying to stop people from talking to Adelphia witnesses, the need for Rigases to have money for their defense. Again, we have never objected, we have never taken a position on orders of the Court allowing the Rigases to sell assets to fund their defense or make whatever arrangements they need to fund their defense, nor will we. We don't have an objection to that. We don't have an interest in trying to stop them from funding their defense in this or the criminal action. We have never directed Adelphia, nor could we, as far as we know, tell them not to have their employees talk to anyone. It's a corporation. It can do what it wants. We don't have any power over them. If Adelphia directed its employees not to talk to other people, I think they could still talk to other people; but certainly that is not something that we have done, and that is not something that is within our control.

Tr. of Hr'g, *In re Adelphia Comm. Corp.*, No. 02-41729 (Bankr. S.D.N.Y. Feb. 4, 2003), Exhibit C at 22-23.

366. On March 27, 2002, in a footnote to its 2001 earnings announcement, Adelphia disclosed for the first that it was jointly and severally liable through co-borrowing agreements with the Rigas Managed entities for an amount up to $2.3 billion. Pet'rs' 56.1 Ex. 93 at 2 (Special Committee's report on its investigation).

367.   On April 1, 2002, Adelphia filed a Form 10-K with the SEC which stated:

> In connection with the preparation of the Registrant's financial statements for the year ended December 31, 2001, the Registrant is reviewing certain accounting matters relating to co-borrowing credit facilities which the Registrant is party to. This review could not be completed in sufficient time for the Registrant to complete its financial statements, receive its independent auditors' report thereon, and file the Form 10-K within the prescribed time period without unreasonable effort or expense.

Wolf Decl. Ex. D (Adelphia Commc'ns Corp., Form 10-K, (Apr. 1, 2002)), at 2.

368.   The April 1, 2002, Form 10-K also stated:

> The Registrant's financial results for the fiscal year ended December 31, 2001 are anticipated to decline on a basis comparable to the fiscal year ended December 31, 2000. The Registrant currently estimates that net loss applicable to common stockholders will increase from approximately $602,484,000 to approximately $1,711,811,000 for the fiscal years ended December 31, 2000 and 2001, respectively. The decline in the financial performance of the Registrant is primarily due to an approximate $1,152,656,000 impairment write-down of long-lived assets associated with a formerly consolidated subsidiary, Adelphia Business Solutions, Inc.

Exhibit D at 3.

369.   In a press release dated April 16, 2002, Adelphia stated that it was, "together with its independent auditor, Deloitte & Touche LLP, [ ] continuing to review the accounting treatment for matters related to its co-borrowing agreements."  Wolf Decl. Ex. E (Adelphia Commc'ns Corp., Form 8-K, Ex. 99.01 (Apr. 16, 2002 Press Release) (Apr. 18, 2002)), at 3.

370.   On April 18, 2002, Adelphia stated in a press release that it had "received a Nasdaq Staff Determination letter on April 17, 2002, indicating that it [was not in compliance] with Marketplace Rule 4310(c)(14) for failing to timely file with the Securities and Exchange Commission its Annual Report on Form 10-K for the year ended December 31, 2001. Accordingly, its securities [were] subject to delisting from the Nasdaq Stock Market."  Wolf Decl. Ex. F (Adelphia Commc'ns Corp., Form 8-K, Ex. 99.01 (Apr. 18, 2002 Press Release) (Apr. 26, 2002)), at 3.

371.  In a press release on April 16th, 2002, Adelphia stated:

> In conjunction with the review of these co-borrowing agreements, there are a number of possible outcomes with respect to the Company's consolidated financial statements for 2001 and certain prior years regarding amounts recorded by Rigas family owned entities under these co-borrowing agreements.  However, with the exception of any changes in the treatment of the obligations under these co-borrowing agreements, the Company does not believe this review will result in any other material changes to historical amounts that were reported in its press release on March 27, 2002 titled "Adelphia Communications Announces Fourth Quarter and Full Year 2001 Results."

Wolf Decl. Ex. E (Adelphia Commc'ns Corp., Form 8-K, Ex. 99.01 (Apr. 16, 2002 Press Release) (Apr. 18, 2002)), at 3.

372.  In a press release on May 23, 2002 Adelphia stated, "Based on information currently available, the Company believes that at April 30, 2002, the total amount of co-borrowings by entities affiliated with the Rigas family for which Adelphia is jointly and severally liable was approximately $3.1 billion."  Wolf Decl. Ex. G (Adelphia Commc'ns Corp., Form 8-K, Ex. 99.02 (May 23, 2002 Press Release) (May 24, 2002)), at 24.

373.  On May 14, 2002, NASDAQ suspended the trading of Adelphia's shares.  Ex. G at 24.

374.  In a May 23 press release, Adelphia stated:

> As previously announced, on May 15, 2002, Adelphia and its subsidiaries failed to make interest payments totaling approximately $38.3 million on outstanding debt securities and an approximately $6.5 million dividend payment on a series of preferred shares.  The failure to make these interest payments will, unless cured, give rise to an event of default under the relevant public indentures and a cross-default under the indentures governing other public debt securities of Adelphia.  In addition, various lenders under credit facilities of Adelphia's subsidiaries have given notices of default relating to failure to deliver financial statements and comply with information delivery and other requirements.

Ex. G at 24.

375. On June 25, 2002, Adelphia filed for Chapter 11 bankruptcy. Wolf Decl. Ex. H (Adelphia Commc'ns Corp., Form 8-K, (June 25, 2002)), at 2.

376. On June 6, 2002, Adelphia stated in a Form 8-K filed with the Securities and Exchange Commission ("SEC") that:

> [T]he Board of Directors, based on the recommendation of the Special Committee and consultation with counsel to the Special Committee, has determined that each of John Rigas, Timothy Rigas, Michael Rigas, Peter Venetis and James Brown deliberately breached his duty to the Company and/or its shareholders. As a result, under the Company's bylaws, these individuals are no longer entitled to have the expenses (including the fees and expenses of their counsel) incurred in defending actions against them advanced to them by the Company.

Pet'rs' 56.1 Ex. 38 at 3 (Adelphia Commc'ns Corp., Form 8-K (Jun. 6, 2002)).

377. Minutes for a May 18, 2002, meeting of the Board state that Leonard Chazen, a lawyer at Covington & Burling LLP, "reiterated the Special Committee's request for interviews of the Rigas Family" at the meeting. Pet'rs' 56.1 Ex. 24 at 2 (Minutes of the Board's May 18, 2002 meeting).

378. On May 24, 2002, Adelphia filed a Form 8-K with the SEC which stated that "The Rigas Parties have refused to review, or provide information for, this Form 8-K." Ex. G at 5.

379. On July 24, 2002, the SEC filed a lawsuit in the United States District Court for the Southern District of New York charging Adelphia, John Rigas, Timothy Rigas, Michael Rigas, and James Rigas with violating federal securities laws. Wolf Decl. Ex. J (Press Release, SEC, Securities and Exchange Commission v. Adelphia Communications Corporation, John J. Rigas, Timothy J. Rigas, Michael J. Rigas, James P. Rigas, James R. Brown, and Michael C. Mulcahey, 02 Civ. 5776 (KW) (S.D.N.Y.) (July 24, 2002)), at 1.

380. On November 26, 2002, Judge Gerber stated at a hearing in *In re Adelphia Comm. Corp.*, No. 02-41729 (Bankr. S.D.N.Y.) (the "November 26 Bankruptcy Hearing"), "A TRO will be granted, but of less breadth than that requested and in a way that permits the Rigases to expend funds for bona fide obligations to third parties and for their living expenses and legal fees." Wolf Decl. Ex. B (Hr'g Tr. at 61, In re Adelphia Comm. Corp., No. 02-41729 (S.D.N.Y. Nov. 26, 2002)), Ex. B.

381. During a separate portion of the November 26 Bankruptcy Hearing than the portion discussed above in Paragraph 377, Judge Gerber went on to state:

> [T]his order is without prejudice to the rights of the members of the Rigas family to come back for a greater authorization, if necessary, to pay for their defense, especially their criminal defense, but also their defense of civil proceedings." Judge Gerber stated further that "[t]his order does not have the purpose and is intended not to have the effect of impairing the Rigases from defending themselves, and if it ever has that effect, notwithstanding what I just said, they can come back on three hours' notice for adjustments to eliminate that effect.

Exhibit B at 69.

382. On April 25, 2004, Adelphia and the Office of the United States Attorney for the Southern District entered into a Non-Prosecution Agreement ("NPA"), under which Adelphia agreed "to provide restitution in the amount of $715 million to ACC security-holders who were victims of fraud schemes." Pet'rs' 56.1 Ex. 74 at 3.

383. Adelphia also agreed, under the NPA:

> in connection with any matter relating to Adelphia's operations, finances and corporate governance between 1997 and Adelphia's emergence from bankruptcy, Adelphia . . . (b) shall cooperate fully with this Office, the United States Postal Inspection Service ('USPIS'), and the United States Securities and Exchange Commission ('SEC') . . . . until the later of (1) a period of two years from the date of this Agreement or (2) the date upon which all prosecutions arising out of the conduct described in the Superseding Indictment and the SEC Complaint are final."

Pet'rs' 56.1 Ex. 74 at 2.

384.   On April 28, 2005, Adelphia moved for approval of the NPA, and two other settlement agreements, in Bankruptcy Court.  Wolf Decl. Ex. I (Mot. for Order Approving the Three Related Agreements, *In Re Adelphia Commc'ns Corp, et al.*, 327 B.R. 143 (Bankr. S.D.N.Y. 2005) (No-41729)), at 2.

Dated: New York, New York

       June 22, 2018

                         GREGORY S. BERMAN
                         Acting United States Attorney

By:      /s/ Brian R. Blais
                         Brian Blais
                         Damian Williams
                         Kyle A.Wirshba
                         Daniel H. Wolf
                         Assistant United States Attorneys