# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | : | |
| JOHN J. RIGAS and TIMOTHY J. RIGAS, | : | |
| | : | |
| *Petitioners*, | : | 11-CV-6964 (KMW) |
| | : | 02-CR-1236 (KMW) |
| v. | : | |
| | : | Oral Argument Requested |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| *Respondent*. | : | |
| | : | |

## PETITIONERS' REPLY IN SUPPORT OF THEIR MOTION
## FOR JUDGMENT ON THE INTERFERENCE CLAIMS

LAWRENCE C. MARSHALL, ESQ.
ADMITTED *PRO HAC VICE*
STANFORD LAW SCHOOL
559 NATHAN ABBOTT WAY
STANFORD, CALIFORNIA 94305
(650) 723-7572
lmarshall@law.stanford.edu

STEVEN F. MOLO
MOLOLAMKEN LLP
430 PARK AVENUE
NEW YORK, NEW YORK 10022
(212) 607-8160
smolo@mololamken.com

MEGAN CUNNIFF CHURCH
JORDAN RICE
ADMITTED *PRO HAC VICE*
MOLOLAMKEN LLP
300 NORTH LASALLE STREET
CHICAGO, ILLINOIS 60654
(312) 450-6700
mchurch@mololamken.com
jrice@mololamken.com

*Attorneys for Petitioners*
*John J. Rigas and Timothy J. Rigas*

Page

INTRODUCTION ...................................................................................................1

I.    The Government Caused Adelphia to Cut Off Legal-Fee Advancement ...........................4

      A.    The Government Misconstrues the Evidence Proving It Caused Adelphia to
            Withdraw Fee Advancement.................................................................6

            1.    The May 23, 2002 Agreement Between Adelphia and the Rigases
                  Included Fee Advancement.................................................6

            2.    The Government's Interference Caused Adelphia to Withdraw Fee
                  Advancement ...............................................................7

            3.    The June 1, 2002 Decision to Cut Off Advancement to Comply with the
                  Government's Wishes Was Pretextual.......................................12

      B.    The Government's Interference with the Rigases' Access to Funds for Their
            Defense Entitles Them to Relief ..........................................................14

II.   The Denial of the Defense's Access to Witnesses and Evidence Violated the
      Rigases' Fifth Amendment Rights to Due Process............................................15

      A.    The Rigases Have Met the Operative Standard: There Is No Need for a Separate
            Discussion of Bad Faith .................................................................15

      B.    The Rigases Have Demonstrated Causation and State Action .............................17

      C.    There Was a Lack of Fundamental Fairness...........................................23

      D.    The Missing Evidence Was Material...................................................25

III.  The Court May Consider the Rigases' Evidence ............................................27

CONCLUSION...................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adickes v. S.H. Kress & Co.*,
398 U.S. 144 (1970)........................................................................................18

*Arizona v. Youngblood*,
488 U.S. 51 (1988)..........................................................................................17

*Bradley v. United States*,
No. 13-CR-20622, 2017 WL 8810744 (E.D. Mich. Sept. 25, 2017).......................29

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*,
531 U.S. 288 (2001)........................................................................................18

*Buie v. Sullivan*,
923 F.2d 10 (2d Cir. 1990)................................................................................17

*Ciambriello v. Cty. of Nassau*,
292 F.3d 307 (2d Cir. 2002)..............................................................................18

*Davila v. United States*,
No. 07-CV-1320 (JBW), 2008 WL 906691 (E.D.N.Y. Mar. 31, 2008)...................29

*Dye v. Kopiec*,
No. 16 Civ. 2952 (LGS), 2016 WL 7351810 (S.D.N.Y. Dec. 16, 2016)..................7

*Horvath v. Westport Library Ass'n*,
362 F.3d 147 (2d Cir. 2004)..............................................................................18

*In re Adelphia Commc'ns Corp.*,
323 B.R. 345 (Bankr. S.D.N.Y. 2005).............................................................5, 6

*In re Adelphia Commc'ns Corp.*,
No. 04 Civ. 2817(GEL), 2004 WL 2186582 (S.D.N.Y. Sept. 27, 2004)..................5

*Jamison v. Senkowski*,
No. 99 CIV 9424 NRB, 2001 WL 246397 (S.D.N.Y. Mar. 13, 2001)....................28

*Loliscio v. Goord*,
263 F.3d 178 (2d Cir. 2001)..............................................................................28

*Lopez v. Miller*,
915 F. Supp. 2d 373 (E.D.N.Y. 2013).................................................................29

*Norton v. Sam's Club*,
    145 F.3d 114 (2d Cir. 1998)...........................................................................5

*Simon v. City of New York*,
    No. 14-CV-8391 (JMF), 2017 WL 57860 (S.D.N.Y. Jan. 5, 2017) .........................................5

*United States v. Bin Laden*,
    116 F. Supp. 2d 489 (S.D.N.Y. 2000).....................................................................24

*United States v. Botti*,
    711 F.3d 299 (2d Cir. 2013)...........................................................................5

*United States v. Chase*,
    No. 2:04-CR-135, 2005 WL 3263910 (D. Vt. Nov. 30, 2005)..............................................24

*United States v. Desena*,
    287 F.3d 170 (2d Cir. 2002)...........................................................................17

*United States v. Gonzalez-Lopez*,
    548 U.S. 140 (2006)....................................................................................5

*United States v. Ixta-Salazar*,
    No. 8:08CR326, 2011 WL 5005991 (D. Neb. Oct. 20, 2011) ..............................................29

*United States v. Linder*,
    No. 12 CR 22, 2013 WL 812382 (N.D. Ill. Mar. 5, 2013) ...........................................23, 24

*United States v. McIntire*,
    No. 3:08-CR-038, 2010 WL 374177 (S.D. Ohio Jan. 29, 2010) ..........................................29

*United States v. Pinto*,
    850 F.2d 927 (2d Cir. 1988)...........................................................................17

*United States v. Rigas*,
    490 F.3d 208 (2d Cir. 2007)...........................................................................26

*United States v. Santos*,
    541 F.3d 63 (2d Cir. 2008).............................................................................2

*United States v. Stein*,
    495 F. Supp. 2d 390 (S.D.N.Y. 2007)...................................................................8

*United States v. Stein*,
    541 F.3d 130 (2d Cir. 2008)...........................................................................5

*United States v. Williams*
    205 F.3d 23 (2d Cir. 2000)....................................................................16, 17, 20

*Widmar v. Sun Chem. Corp.*,
  772 F.3d 457 (7th Cir. 2014) ......................................................7

*Yaron v. United States*,
  586 F. App'x. 819 (2d Cir. 2014) ...............................................17

**Constitutional Provisions, Statutes, and Rules**

U.S. Const. amend. V..................................................................15, 24

U.S. Const. amend. VI .......................................................... *passim*

28 U.S.C. §2255 .................................................................. *passim*

Fed. R. Evid. 807 .......................................................................7

Fed. R. Evid. 1101 ....................................................................28

R. 7, 28 U.S.C. foll. §2255...........................................22, 28, 29

Individual Practice, Judge Wood, 2.G ........................................28

**Other Authorities**

1 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence*
  §102.06...............................................................................29

1-19 Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice and
  Procedure* §19.5 (7th ed. 2016) ..............................................29

1-21 Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice and
  Procedure* §21.2 (7th ed. 2016) ..............................................29

## INTRODUCTION

To read the government's filing one would assume that, with no evidence whatsoever, we are throwing around wild accusations about the government's interactions with Adelphia leading up to the Rigases' trial. According to the government, we cannot rebut AUSA Clark's representation to the Bankruptcy Court that the government had no control over Adelphia: "It's a corporation. It can do what it wants. We don't have any power over them." Gov't Opp., R. 200, at 16 (quoting Gov't 56.1, Ex. C at 22-23); *see also id.* at 48. In our Opening Memorandum, we characterized this claim as "laughable," and we stand by that description. The facts here— including contemporaneous documents created by neutral parties or adversaries of the Rigases— show an extent of governmental control of Adelphia's actions that is unparalleled in any case we have found. That control resulted in denial of fee advancement and denial of access to key witnesses, violating the Rigases' constitutional rights.

In essence, the government disputes whether its role in directing Adelphia's actions in certain areas proves that the government was involved in the particular issues here—denial of fee advancement and limits on access to witnesses. This argument fails in three fundamental ways.

First, it sidesteps direct evidence of the government causing Adelphia to deny fee advancement and limit access to witnesses. Much of our evidence comes from contemporaneous documents created by the government, Adelphia, or Adelphia's counsel. These documents are reliable, probative, and by far the best available evidence of what took place more than fourteen years ago.

Second, the government's argument ignores the ways in which courts regularly rely upon inferences to prove factual propositions. Things would be easier, of course, were a single witness from the government or Adelphia willing to stand up and testify to every element of the Rigases'

claims. But the law demands no such evidence. Rather, even when the burden of proof is beyond-a-reasonable-doubt—which is higher than the preponderance-of-the-evidence standard here—facts can always (with the exception of treason) be established through reasonable inferences from circumstantial evidence. *See generally United States v. Santos*, 541 F.3d 63, 70 (2d Cir. 2008) (a verdict may be based "entirely on circumstantial evidence" and may be "inferred from the evidence" (quoting *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995), and *United States v. Ceballos*, 340 F.3d 115, 129 (2d Cir. 2003))).

Third, the government's approach of looking at each interaction between the government and Adelphia as an isolated act ignores the dictates of the state-action doctrine. That doctrine provides that when a governmental entity and private entity are so entwined as to qualify as engaged in joint action, the acts of the private entity qualify as state action regardless of whether the governmental entity specifically directed or ratified any particular act.

The evidence in this case—whether considered direct or circumstantial—establishes conclusively that, far from the arm's length and passive role the government describes, the government was intensely involved in directing Adelphia's conduct across a wide array of topics. Some highlights of the government's active and directive role include:

- The government insisted that Adelphia oust the Rigases (Pet'rs' Opening Mem., R. 192, at 13, 29);

- The government refused to permit Adelphia to provide its chosen severance package to the Rigases—unless the Rigases chose to cooperate with the government (*Id.* at 14);

- The government indicated it was "appalled" at the later severance package (which included fee advancement) (*Id.* at 15);

- The government expressed its "pleasure" once Adelphia changed its position regarding fee advancement (*Id.* at 16-17);

- The government co-opted outside counsel for Adelphia's Special Committee (*Id.* at 18);

- The government denied Adelphia the ability to review the results of the Special Committee's investigation (R. 193 at ¶ 126);

- The government forbade Adelphia from speaking with members of its own accounting department (R. 192 at 18);

- The government solicited Adelphia's input on the criminal complaint against the Rigases (*Id.* at 28);

- The government required that Adelphia place certain employees on administrative leave (as opposed to firing them), worked closely with Adelphia in drafting the terms of the administrative leave agreements, and insisted that the agreements "be revised" to the government's satisfaction (*Id.* at 18-21);

- The government prohibited employees on administrative leave from speaking with the Rigases by requiring that the employees' administrative leave agreements contain confidentiality clauses barring such communication (*Id.* at 19);

- The government responded to an e-mail from Adelphia asking whether certain revisions to the administrative leave agreements "do the trick," by indicating that the language was only acceptable based on the understanding that Adelphia would still not have the right to interview the employees (*Id.* at 19-20);

- The government conditioned Adelphia to share any information about the Rigases' defense tactics—causing Adelphia, for example, to send the government a letter in which the Rigases sought information from Buchanan Ingersoll (*Id.* at 21);

- The government, in preparing its criminal case against the Rigases, received massive litigation support services from Adelphia and its outside counsel (*Id.* at 22);

- The government was told by Adelphia that it was providing extraordinary assistance to the government because the government made clear that "no less is acceptable" (*Id.* at 22);

- The government requested that Adelphia continue to employ nine specified employees until further notice (*Id.* at 23);

- The government was consulted about Adelphia's plan to construct its direct examination of Board member Les Gelber in a related civil suit in ways that would avoid allowing the Rigases broad cross-examination (*Id.* at 24-25);

- The government had final approval on litigation by Adelphia against the Rigases, including efforts to prevent them from using private funds to defend themselves (*See, e.g.*, *id.* at 24-25);

- The government directed Adelphia to conduct related civil litigation against the Rigases in a way that would inhibit the Rigases' ability to depose certain pre-petition independent directors (*Id.* at 25-26);

- The government—as spelled out in the Fisher Memorandum—reviewed with Adelphia all communications with the Rigas family (*Id.* at 26);

- The government, upon learning that the Rigases were requesting to interview an Adelphia accountant named Rob Cavallari, told Adelphia that it objected to the Rigases interviewing Mr. Cavallari and indicated that it wanted a postal inspector present at interviews with other accountants (*Id.* at 26-27);

- The government conveyed to Dean Marshall, who worked in the Corporate Finance Department at Adelphia, that the government did not want him communicating with the Rigases (*Id.* at 27);

- The government—after the conclusion of the Rigases' criminal trial—threatened to indict the private Rigas Managed Entities if they continued to advance fees for the Rigases' defense (*Id.* at 30); and

- The government was informed by Adelphia about any employment status changes, such as firing of employees (*Id.* at 62).

These facts refute any suggestion that the government was—without any pressure or active involvement—simply the beneficiary of Adelphia's efforts to find favor with the government.

The government caused Adelphia to cut off fee advancement to the Rigases and substantially interfered with their access to witnesses. Implicitly acknowledging the strength of the Rigases' case, the government resorts to arguing that the Court must close its eyes to much of the evidence before it. The Court may and should consider all relevant facts and grant the Rigases' petition.

## I.     The Government Caused Adelphia to Cut Off Legal-Fee Advancement

With respect to the Rigases' fee-advancement claim, the government rests its defense entirely on the factual question of whether the government indeed interfered with Adelphia in this area. *See* R. 200 at Argument, § II. Significantly, however, the government does not dispute our arguments that (1) interference with the Rigases' access to fee advancement would, by itself,

establish a Sixth Amendment violation of the right to counsel of their choice; and (2) the Rigases were unable, in fact, to retain the counsel of their choice within the meaning of the Sixth Amendment. R. 192 at 40-43. Nor does the government dispute our arguments that (1) impairment of counsel's efficacy constitutes a Sixth Amendment violation, and (2) Adelphia's counsel was, in fact, significantly impaired in a manner that violates the Sixth Amendment. R. 192 at 43-59. The government waived its arguments on these issues due to its failure to dispute our contentions. *See, e.g.*, *Norton v. Sam's Club*, 145 F.3d 114, 117-18 (2d Cir. 1998) ("Issues not sufficiently argued in briefs are considered waived . . . ."); *Simon v. City of New York*, No. 14-CV-8391 (JMF), 2017 WL 57860, at *5 n.5 (S.D.N.Y. Jan. 5, 2017).[1] Thus, the only issue left with respect to the fee-advancement claim is whether the government is legally responsible for the withdrawal of advancement. The contemporaneous business records and the notes of neutral parties or adversaries of the Rigases prove that the government directed Adelphia's abrupt change of course in May 2002 to cut off fee advancement.

---

[1] The government notes briefly in a footnote that Judge Lynch said in 2004 that the Rigases had "the best criminal defense that money can buy." R. 200 at 39 n.13 (quoting *In re Adelphia Commc'ns Corp.*, No. 04 Civ. 2817(GEL), 2004 WL 2186582, at *13 (S.D.N.Y. Sept. 27, 2004)). This cursory argument by the government, which does not in any way consider the facts we have presented, is insufficient to avoid waiver. *See United States v. Botti*, 711 F.3d 299, 313 (2d Cir. 2013) (explaining that undeveloped arguments, particularly when they are raised in a footnote, are waived). Even putting waiver aside, the quality of defense counsel is irrelevant to a Sixth Amendment choice-of-counsel claim, which alleges a structural, *per se* constitutional violation. *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 148-52 (2006); *United States v. Stein*, 541 F.3d 130, 154-57 (2d Cir. 2008); *see generally* R. 192 at 41-43. Moreover, the evidence and Sixth Amendment issues now before the Court were not before Judge Lynch, and, reading his statement in context, he merely commented on his understanding of the bankruptcy court's intent. *See In re Adelphia*, 2004 WL 2186582, at *13. His offhand statement does nothing to counter the arguments in our Opening Memorandum that the government does not address.

The government also cites a footnote from a March 2005 bankruptcy court opinion in which the court said that the Rigases had "a full and fair opportunity . . . to defend themselves (which this Court, by its earlier ruling, effectively financed with measures to provide the Rigases with what Judge Lynch quite fairly described as 'the best criminal defense that money could buy' . . . )." *In re Adelphia Commc'ns Corp.*, 323 B.R. 345, 389 (Bankr. S.D.N.Y. 2005); *see* R. 200 at 12. Again, the Rigases' Sixth Amendment claim and the evidence now before the Court were not before the bankruptcy court. And the quality of their defense counsel is irrelevant to their Sixth Amendment claims.

**A.    The Government Misconstrues the Evidence Proving It Caused Adelphia to Withdraw Fee Advancement**

1.    *The May 23, 2002 Agreement Between Adelphia and the Rigases Included Fee Advancement*

The government contends that we lack evidence that the government caused Adelphia to renege on a pledge to advance fees in the May 23, 2002 agreement between Adelphia and the Rigases because the "May 23 Agreement had no such pledge." R. 200 at 32-33; *see also id.* at 7-8. The government is demonstrably wrong.

The May 23 Agreement is clear on its face that, in addition to indemnification, it included fee advancement—a "species of loan . . . pending later determination of [an officer or director's] right to receive and retain indemnification." *In re Adelphia Commc'ns Corp.*, 323 B.R. 345, 375 (Bankr. S.D.N.Y. 2005) (citing Delaware law). In particular, Paragraph 11 stated: "[Adelphia] will provide indemnification to family members (according to the Bylaws and Delaware law) as long as Rigas Family members undertake to repay Adelphia per the Bylaws. This undertaking will be collateralized as per paragraph 8 above." R. 194-30 at ¶ 11. Paragraph 8, in turn, said that Rigas-family stock holdings "will be pledged to secure . . . the undertaking to repay Adelphia for indemnification payments discussed in paragraph 11 below." *Id.* at ¶ 8. The references in Paragraphs 8 and 11 to the Rigases' "undertak[ing] to repay Adelphia," which would be collateralized with the Rigases' assets, can refer only to the undertaking that the Rigases were required to execute as a precondition to fee advancement under section 6.2 of Adelphia's bylaws. R. 194-29 at § 6.2.[2] If the May 23 Agreement contemplated only indemnification and not

---

[2] Section 6.2 of the bylaws provides that Adelphia *must* advance legal expenses to officers and directors if they undertake to repay the corporation "to the extent that a court of competent jurisdiction ultimately determines that such person is not entitled to indemnification" unless the Board or independent legal counsel "reasonably determines that such person deliberately breached his duty to the Corporation or its shareholders." R. 194-29 at § 6.2. Therefore, on May 23, 2002, Adelphia was obligated to advance fees.

advancement, there would have been nothing for the Rigases to undertake to repay and nothing for the collateral to secure.[3]

2. *The Government's Interference Caused Adelphia to Withdraw Fee Advancement*

In mere days, Adelphia went from touting John Rigas's and Tim Rigas's continued membership on Adelphia's Board in press releases, Pet'rs' 56.1 Statement, R. 193, ¶¶ 47-50, to entering the May 23 Agreement under which the Rigases' received advancement in exchange for substantial concessions, *id.* at ¶¶ 75-83, to summarily reneging on the agreement to advance fees, *id.* at ¶¶ 102-03. This timeline combined with the Holder Memorandum, even without more, is highly illuminating, and, indeed, the Holder Memorandum by itself was enough to cause Adelphia to withdraw fee advancement in violation of the Rigases' constitutional rights. But beyond the timeline, reliable and contemporaneous evidence also reveals that the government proactively pushed Adelphia into compliance with the Holder Memorandum.

On the evening of May 23, 2002, mere hours after the Rigases and Adelphia had executed the May 23 Agreement, the government told Adelphia that it was "appalled" at the deal with the Rigases and threatened to indict Adelphia. R. 192 at 14-15.[4] These explicit warnings from the government caused Adelphia to plan to "talk to the US Attorneys [sic] Office [and] 'Put

---

[3] Throughout its Response Memorandum and the 56.1 statement, including with respect to the issue of the importance of fee advancement to the Rigases, the government contends that the Rigases' "self-serving declarations" are not "competent evidence." *E.g.*, R. 200 at 33. A party's testimony is, of course, as admissible as any other witness's testimony. And, parties tend unsurprisingly to offer evidence that serves, rather than disserves, their case. Thus, supposedly "self-serving" declarations may certainly be considered. *See Dye v. Kopiec*, No. 16 Civ. 2952 (LGS), 2016 WL 7351810, at *3 (S.D.N.Y. Dec. 16, 2016); *see also Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 459-60 & n.1 (7th Cir. 2014).

[4] The government takes issue with the evidence showing that the government was "appalled" at the May 23 deal on hearsay grounds. R. 200 at 33. As noted below, *see infra*, § III, the Court may consider hearsay in a § 2255 proceeding. And the Court should do so especially for the highly reliable evidence at issue here—contemporaneous notes written by Board member Peter Metros on May 25, 2002. Even if the rule against hearsay applied with full force in § 2255 proceedings, Metros's notes regarding what took place at the May 23 meeting between the government and Adelphia are admissible under Federal Rule of Evidence 807, as they are reliable and constitute the best evidence of what took place on May 23.

together a story.'" R. 193 at ¶91. Over the next few days, Adelphia did precisely that—it talked to the government and then put together a story to justify its breach of the May 23 Agreement.

The government attempts to downplay the May 23 meeting, arguing that it shows "[a]t most . . . that the Government was 'appalled' at the totality of the severance package extended to Petitioners and their family." R. 200 at 33.[5] Even under the government's interpretation, there would be a Sixth Amendment violation given that (1) the May 23 Agreement included fee advancement as part of the Rigases' severance package, *see supra*, §I.A.1, and (2) the Holder Memorandum made clear that the government disfavored corporations advancing fees to targets of government investigations. The government undoubtedly believed that, upon hearing that the government was "appalled" at the Rigases' severance package and threatening indictment, Adelphia's attorneys would understand the imperative to bring the Agreement into compliance with the government's dictates described in the Holder Memorandum. *See United States v. Stein*, 495 F. Supp. 2d 390, 400 (S.D.N.Y. 2007) (quoting former Attorney General Meese that company counsel's failure to affirmatively tell the government that its guidelines for cooperation had been met "might well have constituted legal malpractice"). Indeed, Adelphia touted to the government its compliance with the Holder Memorandum "to the letter," R. 193 at ¶146, effectively admitting it denied fee advancement to appease the government. Thus, even accepting the government's interpretation of the evidence, its affirmative conduct caused Adelphia to withdraw fee advancement.

The government also suggests that when it expressed its disgust with the May 23 Agreement, it was primarily concerned with certain payments and benefits given to John Rigas

_____

[5] It is also worth noting that the government produced the Metros notes of the May 22, 2002 and June 1, 2002 meetings as part of its production of Section 3500 material prior to trial but withheld the notes from the May 23, 2002 meeting in which its prosecutorial interference was documented. *See* R. 194-42 at 5; *see also United States v. Rigas*, 4:05-cr-00402-JEJ-WIA, Dkt. 138 at 24 (M.D. Pa. Feb. 7, 2011).

as well as the Rigas family being able to designate two Board seats. R. 200 at 33-34. While the government was surely upset at any benefit received by the Rigases, the evidence shows that it was primarily concerned with fee advancement. What was the first thing Adelphia did after the May 23 meeting with the government? It cut off fee advancement. The Board did not at that time cut off payments to John Rigas. R. 193 at ¶ 108. Indeed, John Rigas received severance payments until after Adelphia filed for bankruptcy in late June 2002. *Id.* Nor did the Board at that time renege on the agreement to allow the Rigases to designate two Board seats. The *only material change* that took the government from being "appalled" to being "pleased" was the reneging on the agreement to provide fee advancement.

In addition, Fried Frank's billing records in the days following the May 23 meeting with the government further confirm that the government's statements on May 23, in conjunction with the Holder Memorandum, caused Adelphia to withdraw fee advancement.[6] The government, relying on its faulty argument that nobody considered fee advancement before May 23 (an argument refuted above, *see supra*, § I.A.1), contends that the records "likely reflect an effort to make a good-faith assessment of Petitioners' written request for fee-advancement." R. 200 at 35. The billing records indicate otherwise.

---

[6] The government repeats throughout its brief that we had four years of discovery with nothing to show. *See e.g.*, R. 200 at 36, 38, 40, 45. The government's characterizations about the fruitfulness of discovery are, of course, irrelevant to the Rigases' entitlement to relief. Putting that aside, however, we have uncovered significant additional evidence probative of the Rigases' claims, particularly once we gained access to Adelphia records in 2016, including the Fried Frank billing records. We also located a document indicating that not only did the government prevent key witnesses from talking to the Rigases, but the government also prohibited *Adelphia* and its outside counsel from speaking to them as well. R. 194-52. Additionally, another document we located made clear that Adelphia initially intended to terminate certain employees but, at the government's direction, instead placed them on administrative leave subject to broad confidentiality agreements (that prevented the employees from speaking with the Rigases) and agreements to cooperate with the government. *See* R. 192 at 18-21; R. 194-47; R. 194-60 at 2; R. 194-63 at 7-8. And, as additional examples, we discovered extensive coordination between the government and Adelphia, including with respect to the Rigases' ability to access witnesses in collateral litigation. *See, e.g.*, R. 194-56; R. 194-57; 194-59; R. 194-62; R. 194-79.

The billing records show that partners Peter Simmons and Mark Stein were working together on the issue of indemnification and advancement starting May 23, 2002. R. 194-34 (Simons 5/24/02 entry); *id.* (Stein 5/23/02 entry); *id.* (Simmons 5/31/02 entry); *see also id.* (Stein 5/24/02 entry). Associates Lisa Bebchick, Laura Sulem, and Brett Jaffe worked with them. *See, e.g.*, *id.* (Jaffe 5/30-31/02 entries); *id.* (Simmons 5/31/02 entry); *id.* (Bebchick 5/24/02 entry); *id.* (Simmons 5/25/02 entry); *id.* (Bebchick 5/25/02 entry). On May 26, 2002, Bebchick "[d]rafted talking points re: advancement." *Id.* (Bebchick 5/26/02 entry). The next day, Simmons and Stein, who were supervising Lisa Bebchick, reviewed her work, with Stein specifically "review[ing] draft talking points for USAO." *Id.* (Stein 5/27/02 entry); *see id.* (Simmons 5/27/02 entry).

Then, on May 29, 2002, Adelphia and its representatives met with the government and gave a presentation on "the agreement between the Rigas Family and the Company regarding the family resignations as Directors of the Company and as officers of the Company." R. 194-36 at 3 (June 1, 2002 Minutes); R. 194-34 (Jaffe 5/29/02 entry); R. 194-37 at 2 (explaining that Adelphia "[w]alked through the [May 23 Agreement]"). Critically, the government already knew about the May 23 Agreement and the fact that the Rigases had resigned their positions as officers and directors. Nevertheless, despite having been "appalled" at this Agreement on May 23, the government now expressed "[p]leasure at what happened and progress at company." R. 194-37 at 2; *see also* R. 194-36 at 3. The reason for this change in tune is clear: As notes of the June 1, 2002 Board meeting indicate, the government learned that "[r]eimbursement shall cease that board of directors reimbursement shall cease etc." R. 194-37 at 2. Here, "reimbursement" can mean only fee advancement. *Immediately* after the discussion of the May 29, 2002 meeting with the government, the Board cut off fee advancement. *Id.* at 2; R. 194-36 at 3. In sum, between May 29, 2002 and June 1, 2002, (1) Adelphia and its representatives met with the government

and went through the May 23 Agreement with the Rigases; (2) Adelphia told the government that fee advancement would cease; (3) the government, in stark contrast to its reaction when it first learned of the May 23 Agreement, was now "pleased"; and (4) directly after discussing the May 29 meeting, the Board withdrew fee advancement in conclusory fashion.

The government offers no theory regarding its abrupt change-of-heart concerning the May 23 Agreement, and it explains the Board's decision to cut off fees only with speculation based on a faulty premise regarding the meaning of the May 23 Agreement. Reliable, contemporaneous evidence shows, however, the government's preference for a denial of fee advancement described in the Holder Memorandum; the government's disgust with the May 23 Agreement, which included fee advancement; Adelphia attorneys working frantically on fee-advancement immediately after the May 23 meeting with the government, including an associate writing "***talking points re: advancement***" and a partner reviewing "talking points ***for USAO***"; Adelphia explaining that it would cut off fee advancement at a May 29 meeting, successfully appeasing the government; and Adelphia formally cutting off fee advancement on June 1, 2002.[7] The evidence demonstrates, well beyond a preponderance of the evidence, that the government interfered with the Rigases' access to funds for their defense in violation of the Sixth Amendment.

---

[7] The government notes that there could be different sets of talking points, suggesting that Lisa Bebchick's talking points were for some other, unknown purpose. R. 200 at 36 n.9. But even if there were multiple sets of talking points, it is clear that Simmons, Stein, Bebchick, and Jaffe were all working on the issue of fee advancement, that Bebchick's work was reviewed by the partners supervising her, that Stein reviewed talking points specifically for the government, that there is no indication in the record that Fried Frank prepared talking points for any other party (either to give directly to the government or for Adelphia to relay to the government), that there was a meeting with the government between May 23 and June 1 where the government heard again about the May 23 Agreement and Adelphia's plan to cut off advancement, that the government was no longer "appalled" at the May 23 Agreement after this meeting, and that only one change took place regarding the May 23 Agreement between May 23 and June 1. The far more likely view of the evidence is that Fried Frank, in an effort to placate the government, communicated Adelphia's newfound view regarding advancement from its "talking points."

3. *The June 1, 2002 Decision to Cut Off Advancement to Comply with the Government's Wishes Was Pretextual*

The government argues that Adelphia was permitted under the Adelphia bylaws to determine whether a director intentionally breached his duty to the corporation and offers *post hoc* rationales that allegedly could support the Board's conclusory June 1 finding. *See* R. 200 at 9-11 & n.5, 30-31. Based on this, the government contends that no constitutional violation occurred. The government's arguments fail.

The government's arguments that the Adelphia bylaws allowed the corporation to cease advancing fees after a reasonable finding of a deliberate breach of duty is of no moment, distracting from the evidence that the government caused Adelphia to make its abrupt "finding."[8] The government also argues that we do not cite examples of the government telling Adelphia to "adopt a false narrative for the purpose of denying Petitioners access to fee-advancement." R. 200 at 30. We, however, must show only that the government caused Adelphia to withdraw fee advancement. Once the government made clear at the May 23 meeting that fee advancement was unacceptable, Adelphia and its lawyers figured out how to "talk to the US Attorneys [sic] Office [and] 'Put together a story.'" R. 193 at ¶91.[9]

The government attempts to salvage the Board's conclusory finding of a deliberate breach of fiduciary duty through *post hoc* reasoning. It notes—in an understatement—that "[a]lthough not explained in detail in the minutes of the Board's June 1 meeting," certain portions of the record supposedly show that the Rigases did not sufficiently cooperate with the

---

[8] Additionally, the Board's June 1, 2002 "finding" was hardly "reasonable." Due to the complexity of the case and the enormous amounts Adelphia spent on armies of attorneys, absent external pressure from the government, it defies reason for Adelphia to take so little care in cutting off fee advancement.

[9] The government further suggests that the fact the Rigases did not pursue arbitration or other litigation to enforce their right to advancement under the May 23 Agreement somehow impacts their constitutional claims. *E.g.*, R. 200 at 10-11. This, again, is a distraction irrelevant to the Rigases' §2255 claims. In this case, the Rigases claim that the government violated their constitutional rights, not that Adelphia violated a contract, its bylaws, or Delaware law.

Special Committee's investigation.[10] R. 200 at 19 n.5. First, as explained above, it is irrelevant whether the Board *could* have independently reached a conclusion regarding breach of fiduciary duty (especially in hindsight). What matters is whether the government caused Adelphia to make its declaration. Second, the Board gave almost no detail whatsoever when it made its June 1, 2002 finding. *See* R. 194-36 at 3; R. 194-37 at 2. Third, the examples the government gives of the Rigases' supposed noncooperation are unavailing. *See* R. 200 at 10 n.5. Two of the examples do not appear to relate to the relevant time period before May 23, 2002 when the Rigases owed a fiduciary duty to the company because they still served as directors or officers. *See id.* One of the examples of noncooperation contained in the June 1 announcement merely says that the Board had to reiterate the Special Committee's request for interviews of the Rigas family, which hardly indicates an intentional breach of fiduciary duty. *Id.* And finally, when Adelphia entered the May 23 Agreement, the Board was fully aware and acknowledged that the May 24, 2002 form 8-K and its contents were unreliable because the government refused to let Adelphia interview key accounting employees. *See id.*; R. 192 at 18; R. 194-32 at 1, 6. Accordingly, the unreliable information in the May 24, 2002 8-K cannot justify Adelphia's about-face, especially given that the Board did not reference the 8-K when it cut off advancement.[11]

The government also contends that its 2004 threat to Alan Vinegrad that the government would indict the Rigas Managed Entities if they continued to indemnify and advance expenses to

---

[10] The government does not argue that the record before the Board on June 1, 2002 justified its bare conclusion that the Rigases breached their duty by participating in related-party transactions for their benefit and to the detriment of the company. R. 200 at 9-11 & n.5.

[11] The Rigases also cooperated extensively with Adelphia before the company cut off fee advancement. Tim Rigas, along with Deloitte & Touche, gave a presentation to the SEC on May 10, 2002. Marshall Decl. July 9, 2018, Ex. 1, Coulter Dep., at 397-98, 402-03. John and Tim Rigas also voluntarily left their positions as officers and directors; the Special Committee was created and had its mandate expanded while the Rigases controlled the Board, R. 194-93 at ACI 350517-18; and Covington, Fried Frank, PWC, and Boies Schiller were all hired while the Rigases controlled the Board.

the Rigases underscores a lack of an "explicit focus on fee-advancement in connection with the criminal trial." R. 200 at 39. In other words, the government is saying we may have done it later, but we didn't do it earlier. The fact that we happen to have evidence that the government was explicit in 2004, says nothing to cut against the conclusion that the government drove the fee-advancement issue in 2002. By contrast, it says worlds about the government willingness to threaten entities with indictment—in this very case—if they continued advance fees.

Finally, the government argues that Covington's letter and presentation to the government outlining its adherence to the Holder and Thompson Memoranda "reinforce[s]" that Adelphia did not cut off fee advancement at the government's behest. R. 200 at 37. This makes little sense. First, Adelphia agreed on May 23 to advance fees to the Rigases, and admitting that it cut off advancement to appease the government could have exposed Adelphia to serious litigation risks. R. 192 at 23 n.9. Second, if anything, the absence of an explicit mention of cutting off fee advancement is suspicious. If Adelphia did, as the government contends, cut off advancement without government interference, surely it would have trumpeted this fact loudly and repeatedly to the government in light of the Holder and Thompson Memoranda. Third, the government was fully aware of how it successfully pressured Adelphia to cut off advancement.[12]

**B.    The Government's Interference with the Rigases' Access to Funds for Their Defense Entitles Them to Relief**

The government does not dispute that coercing Adelphia to withdraw advancement would amount to a constitutional violation. *See supra* § I, pp. 4-5. Thus, if the Court concludes a preponderance of the evidence demonstrates that the government caused Adelphia to withdraw

---

[12] Relatedly, the government argues that before *Stein*, it "had no reason to be anything other than explicit if and when it chose to consider fee-advancement as an aspect of a corporation's cooperation." R. 200 at 39 n.12. This is incorrect. The government's conduct violated existing constitutional standards, as the district court and Second Circuit recognized in *Stein*.

fee advancement, the inquiry need go no further and the Court should grant the Rigases' § 2255 petition. *See id.*

However, as noted in the Opening Memorandum, a lack of funds severely adversely impacted the Rigases' defense. *See* R. 192 at 49-53. Moreover, additional examples cited elsewhere in the record demonstrating the adverse impact include documents showing: that the banks that approved the co-borrowing facility knew the Rigases would use it to buy Adelphia shares; that investment bankers working on prospectuses knew the Rigases were using co-borrowing to purchase shares but did not conclude this needed to be disclosed and were comfortable with the "immediately available funds" formulation; and that these investment bankers issued Fairness Opinions to Adelphia's Board with full understanding of these operative facts. *See, e.g.*, R. 21-8 at 3; R. 21-9. These documents would have shown the jury that the Rigases did not conceal their conduct and that the Board and an investment bank working for Adelphia were fully aware of the Rigases' plans for co-borrowed funds. Additionally, notes from Buchanan Ingersoll show that, contrary to the government's accusations, $50 million in payments provided by a Rigas Managed Entity to John Rigas were intended to be loans that were part of a legitimate larger estate plan created on the advice of the Rigases' counsel. R. 3-1 at 67; Marshall Decl. July 9, 2018, Ex. 2; *see* Trial Tr. at 10632, 11195-96.

## II. The Denial of the Defense's Access to Witnesses and Evidence Violated the Rigases' Fifth Amendment Rights to Due Process

The government cites the wrong legal standard and distorts the substantial evidence supporting the constitutional violation.

**A.** **The Rigases Have Met the Operative Standard: There Is No Need for a Separate Discussion of Bad Faith**

The government repeatedly calls us to task for not citing a line of cases that the government believes sets forth the standards for governmental interference with witnesses— particularly the element of bad faith. *See, e.g.*, R. 200 at 41. The government's argument is baseless. The claim that we are advancing is that the government and Adelphia took actions that led to *witnesses being instructed not to speak with the defense or being barred from doing so*. We cited seven cases in support of the proposition that the Sixth Amendment and the Due Process Clause "prohibit[] the government from directing or advising an individual to avoid interacting with the defense." R. 192 at 60. In contrast, the cases to which the government now points deal with the entirely different situation of when the government's presumptively legitimate acts have the collateral consequence of rendering a witness inaccessible.[13]

For example, in *United States v. Williams*, 205 F.3d 23 (2d Cir. 2000)—the case upon which the government primarily relies—the government had spoken with a defense witness following his testimony and discussed ways in which the witness's testimony was inconsistent with certain records. *Id.* at 27. The witness then chose to recant and the government called him as part of its rebuttal case. *Id.* The court held that a defendant's right to call witnesses must be balanced against "countervailing interests," which include "preventing perjury and investigating past criminal conduct." *Id.* Accordingly, the court explained, "a due process violation does not arise merely because the prosecutor interviews a potential defense witness in hopes of obtaining his testimony . . . or because the government warns a defense witness of the consequences of committing perjury." *Id.* Given the general legitimacy of the governmental conduct in question,

---

[13] That the government did not cite any of these cases in its original 2012 Memorandum in Opposition to § 2255 Relief (R. 16), stands as testament to the recognition that this line of cases is not relevant here.

the court held that a defendant "pressing such a claim must show bad faith on the part of the government." *Id.*[14]

Such an element is, of course, nonsensical where the government—as it did here—takes the flatly prohibited step of advising or instructing a witness to avoid the defense. That conduct is *per se* bad faith, which is precisely why the line of cases that deals with this situation does not include a separate bad-faith inquiry. There is no need for a separate discussion of bad faith given the extraordinary evidence of bad faith set forth throughout the record.

### B. The Rigases Have Demonstrated Causation and State Action

The government also challenges whether we have shown causation and state action. It reprises its argument that there is, in general, an insufficient showing of governmental involvement in Adelphia's decisions. It argues that "every other Circuit Court of Appeals to examine the issue has explicitly required some causal link between the Government's action and the alleged interference." R. 200 at 42. Up to a point, we take no issue with that proposition. Where we part ways with the government as a matter of fact is that this causal link has been satisfied. And where we part ways with the government as a matter of law is that under the state-

---

[14] This is similar, as the government notes, to the question addressed in *Arizona v. Youngblood*, 488 U.S. 51 (1988), where the Court dealt with police failure to preserve evidence that might have evidentiary significance. The Court recognized that law enforcement has a legitimate interest in disposing of evidence and not retaining and preserving "all material that might be of *conceivable* evidentiary significance in a particular prosecution." *Id.* at 58 (emphasis added). Hence, the Court held that a defendant challenging an otherwise legitimate exercise of police authority must show bad faith on the part of the police. In these settings, the "bad faith" element exists to differentiate between generally legitimate governmental acts and those that—based on motive—are unconstitutional.

The other cases the government cites similarly concern when otherwise permissible governmental conduct becomes prohibited because of bad faith. *See Yaron v. United States*, 586 F. App'x. 819 (2d Cir. 2014) (government did not act in bad faith in delaying witness's return to the United States and did not purposely mislead the defense about the witness's whereabouts); *United States v. Desena*, 287 F.3d 170, 176 (2d Cir. 2002) (no evidence that the "prosecution caused or contributed to" the absence of a local detective); *Buie v. Sullivan*, 923 F.2d 10, 11-13 (2d Cir. 1990) (although a potential defense witness was arrested during the course of the defendant's trial, the court accepted the prosecutors' representations that the arrest was made as soon as they believed there was probable cause); *United States v. Pinto*, 850 F.2d 927, 931 (2d Cir. 1988) (no showing of bad faith based on the defense allegation that the prosecution interviewed potential defense witness and "refused to assure him that [he] would not be indicted on new charges in the event that, while on the stand, [he] disclosed criminal activities not subsumed in his prior indictment and conviction").

action doctrine, the acts of Adelphia *are treated as acts of the government*. So it is of no moment whether the particular interference came about through an explicit government command or through an Adelphia decision.

The Supreme Court has held that a private actor is deemed to be a state actor "when the State provides 'significant encouragement, either overt or covert,' or when a private actor operates as a 'willful participant in joint activity with the State or its agents.'" *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982), and *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941 (1982)). When there is "pervasive entwinement" between public and private entities, *Brentwood*, 531 U.S. at 298, the acts of one are treated as the acts of the other (much like in the law of conspiracy); *see generally Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002) ("To state a claim against a private entity on a section 1983 conspiracy theory, the complaint must allege facts demonstrating that the private entity acted in concert with the state actor to commit an unconstitutional act."). Put differently, a private actor acts under color of state law when the private actor "is a willful participant in joint activity with the State or its agents." *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152 (1970) (quoting *United States v. Price,* 383 U.S. 787, 794 (1966)).

It matters not in such circumstances whether one entity specifically directed a particular activity of the other. Hence, in *Brentwood Academy*, a private entity sanctioned a school for using undue influence in recruiting students. 531 U.S. at 290-91, 293. The government was not involved in that particular decision. But because of general entwinement with the State, that decision was deemed to be state action. *See id.* at 298-302. The court made this point in *Horvath v. Westport Library Ass'n*, 362 F.3d 147, 154 (2d Cir. 2004), explaining that in *Brentwood Academy*, "the Supreme Court . . . cautioned that the concept of responsibility is not to be read

narrowly in the context of the state action inquiry. That is, the State need not have coerced or even encouraged the events at issue in the plaintiff's complaint if 'the relevant facts show pervasive entwinement to the point of largely overlapping identity' between the State and the entity that the plaintiff contends is a state actor." (quoting *Brentwood*, 531 U.S. at 303). In this case—even outside of the instances where the government caused Adelphia to take a particular action—the extraordinarily close, coordinated relationship between Adelphia and the government constituted joint action. As Adelphia's counsel acknowledged to the government, "[Adelphia], through the Special Committee, has taken as its mandate the duty to provide complete and unqualified assistance to the government in its efforts to bring charges against the [Rigases]." R. 194-28 at 11. Thus, the Rigases' constitutional rights were violated by decisions made by Adelphia every bit as much as by decisions made by the government.

The government ignores this core proposition of the state-action doctrine and demands instead specific evidence that the government was behind each instruction to each particular witness. Even if the law required that—and it does not—the government's challenges to our evidence are without substance. The fundamental error in the government's approach is its refusal to recognize that factual propositions are frequently proven through inferences from other facts.

Take, for example, the Rigases' letter requesting to review some Buchanan Ingersoll documents.[15] This letter was forwarded to the government by Adelphia's outside counsel,

---

[15] The government curiously criticizes us for speaking only in generalizations when they state that "witnesses from Buchanan Ingersoll . . . refused to speak with the defense." R. 200 at 45 (alteration in original) (quoting R. 192 at 64). In so claiming, the government apparently ignores the contents of Peter Fleming's affidavit, which is offered in support of the proposition. *See* R. 193 at ¶ 200 (citing R. 194-82, Fleming Decl., Ex. A). That affidavit describes the Fisher Memorandum and explains that "[q]uite clearly, this memorandum had a chilling effect on personnel who could potentially assist the defense. . . . Counsel's diligence is also demonstrated by letters that were sent to a large number of individuals (or, where known, their counsel) identified by the Government as witnesses in the 3500 material, including, among others, Joseph Sabol and Jason Woolcock, as well as many of the senior Deloitte

indicating that he had instructed the Buchanan Ingersoll lawyers to inform him of such requests so he could inform the AUSAs. R. 192 at 21. This episode is a strong piece of evidence showing how entwined the government and Adelphia were. But the government seeks to deflect it by grasping at straws and arguing, "There is no indication that the Government responded or even read the message." R. 200 at 46 (emphasis omitted). This is yet another example of the government seeking to negate our natural inferences by putting forth an implausible competing account—that the prosecutors never reviewed the correspondence that was forward to them by Adelphia's counsel.

Similarly, the government challenges the relevancy of our description of governmental interference with two of Adelphia's accountants—Rob Cavallari and Joseph Sabol. To take Mr. Cavallari as an example, the evidence of prosecutorial interference could not be more glaring. The Rigases wanted to interview him, and Adelphia checked with the prosecutors, who unambiguously vetoed the interview. R. 192 at 26-27. This action—which lacked any legitimate law enforcement purpose in contrast to the *Williams* line of cases, *see supra*, § II.A—violated the core prohibition on prosecutors barring defense access to witnesses. Indeed, the government does not try to defend this. Instead, it seeks to atomize each incident as if each occurred in a vacuum. That is most certainly not the case. The logic of the following proposition is unassailable: *if* we know that the government was intimately involved in a broad spectrum of Adelphia conduct vis-à-vis the Rigases; and *if* we know that the government was willing to take actions that interfered

---

personnel. In the letter, defense counsel asked for an opportunity to meet or speak telephonically with the witness at a time and in a fashion convenient for the witness. The defense received few responses to those letters, and in those few responses, the witnesses declined to be interviewed." R. 194-82, Ex. A at 7; *see also* R. 193 at ¶ 201 (citing R. 194-72, McMichael Decl., Ex. F at 116-17 ("I was shocked—it may be generational—that Buchanan Ingersoll would not speak to us, even on something as simple as Mr. Rigas's estate planning, which is relevant in the case.")).

with defense access to witnesses (as with Mr. Cavallari); *then* there is a strong inference that the government was involved in the policy cutting off the Rigases access to all Adelphia witnesses.

Turning to the various Adelphia employees who were barred from talking with the Rigases, the government confuses the state action and causation issues. We readily acknowledge that we must show that the interference was caused by a state actor—and in this case both the government and Adelphia qualify as such. But the government insists on more: that we affirmatively prove that the specific acts of interference were directly ordered by the government. Focusing on the October 14, 2002 Fisher Memorandum, the government cites this Court's earlier ruling (on procedural default) as stating that the Memorandum, standing alone, does not prove prosecutorial interference. R. 200 at 47. That is, of course, true. But the Memorandum *no longer stands alone*. It is now one part of a series of actions reflecting deep prosecutorial involvement in micromanaging Adelphia's treatment of the Rigases and witnesses. The government asks, "what record evidence have Petitioner's [sic] developed about Government involvement in the policy set out in the memo? None." *Id.* The government's answer is inexplicable—as established by the long list of evidence set forth in the Opening Memorandum and summarized in the Introduction.

Instead of confronting the force of the evidence, the government pounces on a passage from Mr. Fisher's deposition which, the government posits, establishes that the government had no involvement in the Fisher Memorandum. *See* R. 200 at 47-48. The deposition does no such thing. It has never been our theory that the government communicated directly with Mr. Fisher; it is plain that the government was dealing with and through Adelphia's outside counsel. So one would have fully expected Mr. Fisher to testify, as he did, that no one from the government directed him to send the letter. What is critical is that Mr. Fisher testified that he did not devise

the letter on his own, but it was outside counsel that asked him to send the letter out. *Id.* That is entirely consistent with what we have long maintained.

The government also ignores other evidence showing the direct role the prosecutors played in keeping certain witnesses off-limits to the Rigases. Take Dean Marshall, for example. Adelphia was prepared to fire him (along with several others). *See* R. 192 at 18-19. That, of course, would have taken him out of Adelphia's control and made him available to the defense. The government stepped in, though, and asked that Adelphia place him and the others on administrative leave, keeping him under the full control of Adelphia (and the government) in terms of being barred from speaking with the defense. See R. 192 at 19. Indeed, the very administrative leave documents, which the government reviewed and modified, contained provisions that barred these employees from speaking with Adelphia or the Rigases. *Id.*[16]

Dean Marshall is also highly significant for his testimony about the government's role in keeping him from speaking with the defense. Mr. Marshall has testified in absolute terms that he was told "the government did not want me communicating directly with anybody from the Rigas family." R. 193 at ¶ 175. The government pounces on Mr. Marshall's inability to recall whether he heard those instructions directly from the government, or whether it was his lawyer who told him about the government's directive (which, if true, the Court could consider under Rule 7 of the Rules Governing § 2255 Proceedings, *see infra*, § III). But either scenario implicates the government—for it matters not whether the government conveyed its message through Mr. Marshall's lawyer or to Mr. Marshall himself. To be sure, Mr. Marshall's uncertainty on this

---

[16] The government writes that "[a]n examination of the documents signed as part of Marshall's administrative leave reveals that they obligate Marshall to cooperate with prosecutors but do not state that may not do so with the Rigases." R. 200 at 50. The government is mistaken. The agreement—which the government indisputably reviewed and revised—provides that, unless an exception applies, Mr. Marshall was barred from sharing any information that he had "access to or acquired by virtue of or in connection with his employment." R. 194-47 at 4. This plainly barred providing any information to the Rigases. By contrast, the agreement explicitly allowed any and all information to be shared with the prosecution. R. 194-47 at 5-6.

point would cut against making a finding of governmental involvement in the interference based on his testimony alone. But, as we have demonstrated, it is anything but alone, and provides just one piece of a larger mosaic that unmistakably reveals the government's role.

## C. There Was a Lack of Fundamental Fairness

The government further argues that even if there were government-directed or government-sanctioned interference, there would still be no constitutional violation because it did not impact the fundamental fairness of the trial. R. 200 at 52-54. The government offers two reasons to support this conclusion, neither of which has merit.

First, the government argues that the trial cannot have been fundamentally unfair because the defense team received $27.8 million in Rigas Managed Entity ("RME") funds from court orders and a further $11.5 million from the Adelphia settlement. R. 200 at 53. But, the point of the defense teams getting money (and the government's figures are distorted), was to enable them to obtain evidence to fight for their clients' acquittals. No amount of money could fill the void left by preventing critical witnesses from speaking with the defense.

Second, the government argues that the defense could have called any of the witnesses to testify. R. 200 at 53. But, could the defense be expected to call witnesses at trial without knowing (through a pre-trial interview or recent witness statement) whether the witness had helpful information? And, even if the defense believed that a witness had exculpatory information, how could the defense reasonably be expected to call that witness without knowing (through a pre-trial interview or recent witness statement) that the witness would testify accordingly? In the course of dismissing an indictment based on instructions to personnel not to cooperate with the defense, the court in *United States v. Linder*, No. 12 CR 22, 2013 WL 812382 (N.D. Ill. Mar. 5, 2013), explained:

"The importance to a litigant of interviewing potential witnesses is undeniable. In particular, in criminal cases, where a defendant's very liberty is at stake, such interviews are especially crucial. Thus it is that one of the first things responsible counsel does in preparing a case is to seek to interview those witnesses involved in the litigation." *United States v. Fischel*, 686 F.2d 1082, 1092 (5th Cir. 1982). . . . "A defendant has the right to formulate his defense uninhibited by government conduct that, in effect, prevents him from interviewing witnesses who may be involved and from determining whether he will subpoena and call them in his defense." *United States v. Tsutagawa,* 500 F.2d 420, 423 (9th Cir. 1974).

*Linder*, 2013 WL 812382, at * 43.

The government cites two cases, neither of which is apposite. In *United States v. Bin Laden*, 116 F. Supp. 2d 489, 491 (S.D.N.Y. 2000), the defendant brought a pre-trial motion claiming that the government was using the power of the grand jury to dissuade some potential defense witnesses from testifying. The court rejected the claim, explaining that at that point the defense did not even know whether any witnesses would be affected by the government's conduct. "He merely states that his potential witnesses 'might very well' be induced to invoke their Fifth Amendment privilege." *Id.* at 494. And, with regard to one witness who was refusing to speak with the defense, the defendant could "only postulate that it [was] 'most likely due to fear of reprisals by the government.'" *Id.* Unsurprisingly, then, the court held that "[a]t this point, without knowing the actual impact that any Government action has had or will have on the witnesses' decisions to testify, it is impossible for the Court to evaluate whether the alleged interferences will deprive the Defendant of a fair trial." *Id.* at 494-495. Nothing in this holding or reasoning provides any support for the government's position that a defendant who has identified witnesses who actually refused to be interviewed by the defense has not shown fundamental unfairness.

The second case upon which the government relies is equally unavailing. In *United States v. Chase*, No. 2:04-CR-135, 2005 WL 3263910, at *2 (D. Vt. Nov. 30, 2005), the defendant

complained that the government engaged in a pattern of harassing expert defense witnesses through demands for expert disclosure and aggressive use of subpoenas. The court rejected the argument, explaining that although the defendant "contends that the government's actions have the potential to deter expert witnesses from testifying on his behalf, he provides no evidence that any witness has actually been dissuaded from testifying, or that he has been deprived of material and exculpatory evidence in any other way." *Id*. This is worlds away from the facts in this case regarding witnesses who were forced to refuse to cooperate with the defense.

### D.    The Missing Evidence Was Material

The government acknowledges that to show materiality, a defendant need only make "a plausible showing that the testimony of the [interfered-with] witnesses would have been . . . favorable to his defense, in ways not merely cumulative of available witnesses." R. 200 at 54 (quoting *United States v. Valenzuela-Bernal,* 458 U.S. 858, 873 (1982)). But, despite recognizing this as the standard, the government advances a series of materiality challenges that would fail even if the burden on us were far higher. In our Opening Memorandum, we discussed a few examples of material evidence that was never presented—emphasizing that this was by no means an exhaustive account. The government offers responses—in some cases one-sentence responses—to these examples which are wholly unavailing.

The government asserts, "[r]egarding Carl Rothenberger and Paula Zawadzki, their proffered testimony regarding Buchanan Ingersoll's knowledge and beliefs about the co-borrowing agreements and disclosures would not be exculpatory *on the issue of whether Adelphia's statements, as attributed to Petitioners, misled the public*." R. 200 at 55 (emphasis added). That statement is true but meaningless. As the government knows, a major theme of the Rigases' trial was that they lacked the requisite *mens rea* for a fraud conviction because they

acted in reasonable reliance on counsel.[17] The government's primary counter to this defense was its claim that the Rigases were not entitled to rely on counsel because counsel was never provided with a full understanding of the transactions, such as the co-borrowing agreements. The government's arguments in its *Brady* Memorandum attempted to drive this point home. The government posited that "significant information was withheld from Rothenberger during the time of the fraud, that he did not possess full information about the transactions that formed the heart of the Government's case, and that any advice of counsel defense proffered by the Rigases was therefore bound to fail." Gov't *Brady* Mem., R. 143, at 26; *see also id.* at 32 ("Rothenberger was not provided with the relevant facts necessary to support an advice of counsel defense; instead, such facts were concealed from him, thus vitiating any such defense."). The government's position is that the Rigases' advice-of-counsel defense stood or fell on whether Mr. Rothenberger and other Buchanan Ingersoll lawyers knew about the nature of the transactions; had Mr. Rothenberger or Ms. Zawadzki been called to the stand to establish that knowledge, the government's primary assault on the Rigases' defense would have been silenced. That is the essence of materiality.

The government's casual dismissal of the significance of Dean Marshall's testimony similarly ignores what happened at trial. To begin with, the awareness of Adelphia's Board, Deloitte, and Buchanan Ingersoll about co-borrowing and the EBITDA calculations most certainly does go to whether the Rigases were being transparent and relying on counsel, as

---

[17] The government quotes a footnote in the Second Circuit's opinion on direct review as somehow suggesting that Petitioners' *mens rea* (and its relation to advice of counsel) was not relevant to the case. The footnote says no such thing (and could say no such thing given fundamental tenets of criminal culpability). All the footnote states is the uncontroversial point that, as a matter of criminal liability, it did not matter whether the Rigases "were acting on the advice of investment advisers with only the best intentions of Adelphia in mind." *United States v. Rigas*, 490 F.3d 208, 214 n.4 (2d Cir. 2007). But that proposition—that even the best motives to advance the interests of Adelphia could not preclude criminal liability—in no way calls into question the classic right of a defendant to show that because he was following the advice of his counsel as to the legality of what occurred, he lacked intent to defraud.

opposed to surreptitiously launching some sinister scheme. Second, the government asserts that "Marshall's belief that the Rigases *could* repay their debt with Adelphia does not support the contention that the Rigases intended to do so." R. 200 at 55 (emphasis in original). What the government ignores, though, is that one way in which it sought to prove that the Rigases had no intent on repaying was by showing that they had no ability to repay. Several of the government's witnesses testified that the RMEs were insolvent and therefore could not pay their debts *See, e.g.*, Trial Tr. 1287-1301, 6571-73, 6583-86, 6640-41). Dean Marshall's testimony to the contrary would have been material to this key question.

Turning to Dan Liberatore's testimony, it would have exploded a central piece of James Brown's testimony about marketing support. Mr. Brown claimed that Adelphia began recording marketing support payments in August 2000, and only months later fraudulently tried to provide legitimacy to those entries by initiating discussions with Scientific Atlanta and Motorola. R. 192 at 73; R. 163-2 at 66-68. Mr. Liberatore knew, though, that Adelphia had actually begun talks with Scientific Atlanta during the summer of 2000. R. 192 at 73; R. 163-2 at 66-68. The government responds that Mr. Liberatore's missing testimony was not material because the defense was able to cross-examine Mr. Brown with Mr. Liberatore's 3500 materials. R. 200 at 55. But there is, of course, no way to equate asking a witness some questions on cross-examination (the questions being inadmissible as substantive evidence) with actually presenting a witness who would affirmatively testify to the matter in controversy.

## III.    The Court May Consider the Rigases' Evidence

The government has argued in its responsive Local Rule 56.1 statement—and to a lesser extent, its Response Memorandum—that the Court should disregard certain evidence on hearsay

or other evidentiary grounds. *See, e.g.*, Gov't 56.1 Statement, R. 201, at ¶¶ 1, 87-91; R. 200, at 33. The government is incorrect.

First, without disputing the factual substance of many of the material facts set forth in Petitioners' Local Rule 56.1 statement, the government has challenged the relevance and admissibility of the cited evidence with evidentiary objections and legal arguments in its responsive Rule 56.1 statement. Under this Court's Individual Practice 2.G.ii, a party's assertions in a responsive 56.1 Statement must be "factual assertion[s], not . . . legal assertion[s]." Thus, "[l]ack of relevance" and other evidentiary objections are not properly made in a responsive 56.1 statement. Individual Practice 2.G.ii. This Court's individual practices also do not contemplate a response to evidentiary objections raised within the confines of a Local Rule 56.1 response. Individual Practice 2.G.iii-iv. Nonetheless, we will provide a paragraph-by-paragraph response to the government's evidentiary objections should the Court grant leave to do so.

Second, the Court is free to consider hearsay evidence—or any relevant evidence— during a proceeding under 28 U.S.C. § 2255. Although the Federal Rules of Evidence generally apply in federal habeas proceedings, Fed. R. Evid. 1101(b); *Loliscio v. Goord*, 263 F.3d 178, 186 (2d Cir. 2001), "[a] federal statute or a rule prescribed by the Supreme Court may provide for admitting evidence independently from these rules," Fed. R. Evid. 1101(e). Rule 7 of the Rules Governing § 2255 is such a provision. Under the rule, the Court may permit the expansion of the record with additional materials relating to the habeas motion. R. 7(a), 28 U.S.C. foll. § 2255. These materials include "letters predating the filing of the motion, documents, [and] exhibits," as well as affidavits. R. 7(b), 28 U.S.C. foll. § 2255. The rule allows courts, which are far better placed to weigh otherwise inadmissible evidence than juries, to consider all relevant information to make accurate factual determinations. *See Jamison v. Senkowski*, No. 99 CIV 9424 NRB,

2001 WL 246397, at *6 (S.D.N.Y. Mar. 13, 2001) (explaining that where there is "substantial ambiguity about events that bear potential legal significance, an expansion of the record is an efficient means of assessing the merits of a petition").

Courts have interpreted Rule 7 to grant judges discretion to consider relevant hearsay materials in habeas proceedings. *See Lopez v. Miller*, 915 F. Supp. 2d 373, 423 n.33 (E.D.N.Y. 2013) (explaining that because of Rule 7[18] and the nonjury nature of habeas proceedings, courts may consider hearsay evidence); *Davila v. United States*, No. 07-CV-1320 (JBW), 2008 WL 906691, at *7 (E.D.N.Y. Mar. 31, 2008) ("Rules of evidence governing collateral attacks on convictions permit consideration of evidence that might otherwise be inadmissible.").[19] And leading commentators have similarly explained that Rule 7 permits consideration of hearsay. *See* 1-19 Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice and Procedure* § 19.5 (7th ed. 2016) (explaining that "[t]he hearsay, best evidence, . . . and other evidentiary rules are abandoned" in habeas proceedings under Rule 7); 1-21 Hertz & Liebman, *supra*, at § 21.2 ("The discretion generally afforded judges in making evidentiary rulings is widened in habeas corpus cases both by the nonjury nature of the proceeding and by Rule 7 of the Rules Governing Section 2254 Cases in the United States District Courts, which allows introduction into the record of materials that would be excludable on hearsay and other evidentiary grounds in most federal trial contexts."); *see also* 1 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence*

---

[18] *Lopez* referred to Rule 7 of the Rules Governing § 2254 proceedings, which is identical to Rule 7 of the Rules Governing § 2255 proceedings. 915 F. Supp. 2d at 423 n.33.

[19] *See also Bradley v. United States*, No. 13-CR-20622, 2017 WL 8810744, at *3 (E.D. Mich. Sept. 25, 2017) (noting that although courts generally exclude affidavits as hearsay, Rule 7 permits courts to consider such evidence in § 2255 proceedings), *report and recommendation adopted*, No. 13-CR-20622-01, 2018 WL 851281 (E.D. Mich. Feb. 14, 2018); *United States v. Ixta-Salazar*, No. 8:08CR326, 2011 WL 5005991, at *4 (D. Neb. Oct. 20, 2011) (describing Rule 7); *United States v. McIntire*, No. 3:08-CR-038, 2010 WL 374177, at *6 (S.D. Ohio Jan. 29, 2010) ("Rule 7 expressly permits the consideration of affidavits as part of the record. The Federal Rules of Evidence, which ordinarily exclude affidavits as hearsay, are inapplicable to § 2255 proceedings to the extent that the Rules adopted by the Supreme Court for the conduct of those proceedings allow affidavits to be considered.").

§ 102.06 & n.1 (noting that the justification for relaxing the rules of evidence is strong in nonjury proceedings). Accordingly, the Court is free to consider relevant materials. This is especially the case where, as here, habeas petitioners submit evidence far beyond "mere generalities," R. 200 at 49, as is the case with many of the reliable, contemporaneous documents prepared by disinterested parties (or even adversaries to the Rigases) at issue in this case. *See, e.g.*, R. 193, at ¶¶ 65, 68, 74, 89, 96, 100.[20]

## CONCLUSION

For the foregoing reasons and those in the Opening Memorandum, R. 192, the Court should grant the Rigases' requested relief respecting their interference claims.

---

[20] Among other facts to which the government argues the Court should turn a blind eye, the government contends that the context of the investigation and prosecution of the Rigases is irrelevant. R. 200 at 13 n.6. We argue simply that the political climate surrounding corporate crime in the wake of Enron and similar scandals in 2002 was an unusual factor in the prosecution of the Rigases that put pressure on the U.S. Attorney's Office to secure a conviction. This should be uncontroversial, given that it is indisputable that the White House and the highest rungs of the Department of Justice touted the Rigas case as a singular achievement.

Dated: July 9, 2018

Respectfully submitted,

*Attorneys for Petitioners*
*John J. Rigas and Timothy J. Rigas*

STEVEN F. MOLO
MOLOLAMKEN LLP
430 PARK AVENUE
NEW YORK, NEW YORK 10022
(212) 607-8160
smolo@mololamken.com

MEGAN CUNNIFF CHURCH
JORDAN RICE
ADMITTED *PRO HAC VICE*
MOLOLAMKEN LLP
300 NORTH LASALLE STREET
CHICAGO, ILLINOIS 60654
(312) 450-6700
mchurch@mololamken.com
jrice@mololamken.com

/s/ Lawrence C. Marshall
LAWRENCE C. MARSHALL
ADMITTED *PRO HAC VICE*
STANFORD LAW SCHOOL
559 NATHAN ABBOTT WAY
STANFORD, CALIFORNIA 94305
(650) 723-7572
lmarshall@law.stanford.edu

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 9th day of July, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all parties with an e-mail address of record who have appeared and consent to electronic service in this action.

Dated: July 9, 2018

/s/ Lawrence C. Marshall
LAWRENCE C. MARSHALL, ESQ.
ADMITTED *PRO HAC VICE*
STANFORD LAW SCHOOL
559 NATHAN ABBOTT WAY
STANFORD, CALIFORNIA 94305
(650) 723-7572
lmarshall@law.stanford.edu

*Attorney for Petitioners*